UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | MAGISTRATE NO. 21-MJ-195 (ZMF) |
| | : | |
| ETHAN NORDEAN, | : | |
| Also known as "Rufio Panman," | : | |
| | : | |
| Defendant. | : | |

MOTION FOR EMERGENCY STAY AND
FOR REVIEW OF RELEASE ORDER

The United States of America, by and through its attorney, the United States Attorney
for the District of Columbia, respectfully moves this Court to, first, stay Defendant's release
pending trial, and second, review the decision by the Magistrate Judge from the Western District
of Washington to deny the government's motion for pre-trial detention. In support thereof, the
government states the following:

I.      BACKGROUND

A.      Procedural Posture

On February 3, 2021, Defendant was arrested in his home state of Washington on an arrest
warrant issued from the United States District Court for the District of Columbia by Magistrate
Judge Zia M. Faruqui in connection with a Criminal Complaint charging the defendant with
Aiding and Abetting an Injury or Depredation Against Government Property, in violation of 18
U.S.C. §§ 1361 and 2; Obstructing or Impeding an Official Proceeding, in violation of 18 U.S.C.
§ 1512(c)(2);  Knowingly Entering or Remaining in any Restricted Building or Grounds Without
Lawful Authority, in violation of 18 U.S.C. §§ 1752(a)(1), (a)(2); and Violent Entry and

Disorderly Conduct on Capitol Grounds, in violation of 18 U.S.C. §§ 5104(e)(2)(D), and (e)(2)(G).

At his initial appearance in the Western District of Washington February 3, 2021, the United States made a motion to detain the defendant pursuant to 18 U.S.C. § 3142(f)(1)(A), because Defendant is charged with a crime of violence. The United States also sought detention pursuant to 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." The United States also sought detention pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A), because Defendant poses a serious risk of flight. The magistrate judge set a detention hearing for February 8, 2021.

After hearing argument at the detention hearing on February 8, 2021, the Magistrate Judge issued an order releasing the Defendant. The United States orally moved to stay Defendant's release pending its appeal, which was denied. The magistrate judge ordered that if the United States has not filed a motion to Stay and Transfer from this court by 6pm Eastern Time today, Defendant will be released on his own recognizance.

### B.    Statement of Facts

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the

exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session

of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there. Among those persons was Defendant Ethan Nordean, who utilizes the alias "Rufio Panman," who traveled from his home in the State of Washington and actively participated in the riot at the United States Capitol on January 6, 2021.

Whereas some of these rioters traveled to Washington, D.C. individually, a number of extremist and militia groups coordinated together to gather in Washington, expressing in advance their intent to interfere with the Electoral College certification. One such extremist group was the Proud Boys. Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values. The group has an initiation process for new members, which includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

Defendant, a 30-year old resident of the State of Washington, is a Proud Boys

4

member who occupies leadership positions in the Seattle Chapter—having self-identified as both the Sergeant of Arms and the President of that Chapter at various times. Defendant has been present at a number of Proud Boys protests – including, notably, in Portland, Oregon, where he was made "internet famous" for knocking out a counter-protester during a street brawl.





Beginning shortly after that brawl, Defendant's stock rose within the Proud Boys and he took on a more prominent role in nationwide Proud Boys events—including the "Million MAGA March," which occurred on November 14, 2020, in Washington, D.C., and the

"December Demonstration," which took place on December 12, 2020, in Washington, D.C.

Beginning as early as December 2020, public communications from Proud Boys organizers encouraged members of the Proud Boys to attend the January 6, 2021 demonstration in Washington, D.C. Such communications included messages sent by the self-described chairman of the Proud Boys, Enrique Tarrio. For example, on December 29, 2020, Tarrio posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows….we might dress in all BLACK for the occasion." I believe the statement about dressing in "all BLACK" is a reference to dressing like the group known as "Antifa," who the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black to demonstrations. Defendant also commented on such plans to dress in disguise in the video message that he posted online on January 4, 2021.

On January 6, 2021, Defendant and a group of people that hold themselves out as Proud Boys were depicted on the east side of the U.S. Capitol. Consistent with the directive issued by organizers of the Proud Boys, none of the men wore Proud Boys colors of black and yellow, but were instead dressed "incognito." Indeed, Defendant dressed in all black, and he wore a tactical vest. As one of the leaders of the group that day, he at times carried a bullhorn.



Defendant and other national organizers then led the group on a march along public roadways to the west side of the Capitol. As shown below, Defendant (at right below) can be seen marching with Proud Boy organizer, Joseph Biggs (at left below), at the front of a group of individuals on Constitution Avenue, Northwest, in the area around First Street, Northwest. The group was engaged in various chants and response calls, including "F*** Antifa!" and "Whose streets? Our streets!"



Shortly before 1:00 p.m., Defendant and Biggs marched the group to a position near the pedestrian entrance to the Capitol grounds on First Street. The entrance was secured by

a small number of U.S. Capitol Police, who stood behind a waist-height metal barrier.



Shortly after that above image was captured on video, two men advanced toward the waist-high metal gate. The crowd followed, and within minutes, the crowd overwhelmed the U.S. Capitol Police officers seen at the top of the steps in the image above. The crowd then advanced toward the U.S. Capitol.

After overwhelming the pedestrian gate near the Peace Monument and other entrances, the crowd advanced on the U.S. Capitol where another line of U.S Capitol Police and barricades attempted to stop the crowd from advancing to the walls of the building. Additional people continued to arrive until what I estimate to be thousands of people had gathered in front of the Capitol on its west side. Defendant was among the first to reach the police line in the west plaza of the Capitol.

 

Defendant remained at or near the front of the crowd as Capitol Police attempted to reform a police line. Shortly thereafter, Defendant had a brief exchange with Robert Gieswein,[1] who was among

the first to enter the Capitol through a window that was broken by a person that has been identified as Proud Boy Dominic Pezzola.[2]

---

[1] On January 27, 2021, a federal grand jury sitting in the District of Columbia returned an indictment charging Gieswein with violations of 18 U.S.C. §§ 1512(c)(2), 111(a)(1) and (b), 1361, 2, and 1752(a)(1). *United States v. Robert Gieswein*, 21-cr-24 (EGS).

[2] On January 29, 2021, a federal grand jury sitting in the District of Columbia returned an indictment charging Pezzola with substantive violations of 18 U.S.C. §§ 231, 1361, 1512(c)(1) and (2), and 1752, as well as conspiracy to commit violations of 18 U.S.C. § 231, for his unlawful conduct at the Capitol on January 6, 2021, including the breaking of a window with a stolen Capitol Police riot shield. *United States v. Dominic Pezzola*, 21-cr-52 (TJK).



Shortly after Defendant conferred with Gieswein and Pezzola, at approximately 2:00 p.m., rioters began forcing their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. Gieswein, Pezzola, and others made their way to an exterior window which they broke using a riot shield and entered the Capitol building.



*__Defendant Enters the Capitol__*

Rather than enter with Gieswein and Pezzola, Defendant was among those who entered the Capitol building after rioters forced entry and pushed past Capitol Police officers. Photographs and video also show that Defendant was near the front of the crowd of rioters, who collectively approached, stood off against, and vastly outnumbered Capitol Police.

 

 



### *Subsequent Investigation of Defendant's Role*

Defendant was quickly identified as a participant in the riot, due to his prominent position amongst the Proud Boys and the number of images of his likeness published on the Internet. In investigating Defendant's involvement on January 6, 2021, it quickly became apparent that he planned to participate in advance. Defendant was an active poster on the social media site "Parler," where he identified himself as "Rufio Panman" and utilized the username "@REBELRUFIO".

Defendant's Parler posts prior to January 6, 2021, indicate that he and other Proud Boys members were planning in advance to organize a group that would attempt to use force and violence to prevent the certification of the Electoral Vote by Congress. For example, on

or about, December 27, 2020, NORDEAN posted the following message on his Parler page: "Anyone looking to help us with safety/protective gear, or communications equipment it would be much appreciated, things have gotten more dangerous for us this past year, anything helps." The post then linked to a fundraising site called "Protective gear and communications by Rufio Panman."

On or about, January 4, 2021, Defendant posted a video which he captioned "Let them remember the day they decided to make war with us." Screenshots taken from the video show NORDEAN and other Proud Boys dressed in tactical gear along with the phrase "Back the YELLOW," which is a phrase commonly used to show support for the Proud Boys.



Also on or about, January 4, 2020, Defendant shared a post by a fellow Proud Boy leader, Individual A.  Individual A posted a picture on Parler of himself and Defendant at a protest with the caption "And fight we will."



Also, on or about, January 4, 2021, Defendant posted a link that allowed users to access an episode of Defendant's video podcast, "Rebel Talk with Rufio," where Defendant interviewed Individual A about their participation in a rally in Washington, D.C., during which Individual A was stabbed, as well as other Proud Boys related matters. During that video, which is approximately 63 minutes long, the following statements were made:

a.   Defendant stated "People don't understand the price that comes with being a Patriot these days." Individual A agreed, stating "This stuff is real. We are in a war."

b.   Defendant stated that, as President of his local Proud Boys chapter and has been telling his "guys" that they need to "make [themselves] an enemy of this corrupt system." Defendant further stated "The police are starting to become a problem."

c.   Defendant lamented what he perceived "blatant, rampant voter fraud" in the Presidential election." Defendant further stated that the perpetrators of voter fraud expected to be able to get away with it, because "they're relying on complacency. I

think they're relying on the Facebook posts, and that's all we're going to do."

    d.   Defendant stated that he and the other Proud Boys were not going to be complacent.  Rather, they were going to "bring back that original spirit of 1776 of what really established the character of what America is.  And it's not complacency, it's not low standards. It's 'this is how it's going to be, and I don't give a god damn.'"

    e.   Defendant stated that voter fraud in the Presidential election had killed democracy and added, ominously "Democracy is dead? Well, then no peace for you. No democracy, no peace."

    f.   Individual A then stated, "We're coming back. We're coming to D.C. and were going to take this country back. Your gifts, and your thoughts, and your financial contributions will not go for nothing."

On or about, January 5, 2021, the day before the riots, Defendant posted the following statement: "It is apparent now more than ever, that if you are a patriot, you will be targeted and they will come after you, funny thing is that they don't realize is, is we are coming for them."

Defendant continued to post along these lines after participating in the Capitol riot. On January 8, 2021, Defendant posted a picture of himself that was taken on January 6, 2021, with the caption "Violent extremist," apparently making light of the public condemnation that he and the Proud Boys were receiving.



On January 8, 2021, Defendant posted a photo on Parler, captioned "if you feel bad for the police, you are part of the problem. . ." apparently making light of the United States Capitol Police officer who was killed during the riot and the dozens of other officers who were injured by rioters because those officers used pepper spray in an attempt to contain the rioters.



### *Search of Defendant's Residence*

On February 3, 2020, federal law enforcement officers executed a search warrant at Defendant's home. Among the items recovered from the search were:

1.     Proof of Defendant's travel to Washington, D.C., during the time period of the Capitol Riot.

2.     Defendant's laptop computer and cellular telephone.

3.     Clothing and other items bearing Proud Boys' logos and insignia.

4.     Clothing matching the photographs above taken on January 6, 2021.

5.     Ledgers, notebooks, and other records related to Proud Boys operations.

6.     Digital camera with stored photographs.

7.     Go Pro digital video camera with stored videos.

8.     Radio system matching those seen in photographs taken on January 6, 2021, that was used by Proud Boys leaders to communicate with one another.

9.     Valid, unsigned U.S. Passport, issued to another individual with a comparative likeness to Defendant. The passport was recovered from a bedside table along with a legitimate passport issued to Defendant's wife.



**C.      Order for Release**

After an initial appearance and hearing in the Western District of Washington on February 8, 2021, the presiding magistrate judge issued an Order of Release for Defendant with certain conditions. On that same day, the United States orally sought a stay of the Order pending this Motion for Review. The magistrate judge granted that request and delayed Defendant's release until February 8, 2021.

**III.     <u>ARGUMENT</u>**

**A.  This Court Has the Authority to Stay and Review the Release Order**

Title 18, U.S.C. § 3145(a) states:

**(a) Review of a release order –** If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release
> . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed:  whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader

construction than merely danger of harm involving violence. . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[3]

### B. The Bail Reform Act Factors All Weigh in Favor of Detention

The United States seeks detention on a number of bases. First, the United States seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(A), because Defendant is charged with a crime of violence. Felony destruction of government property is a crime of violence.  For purposes of the bail statute, as relevant to these offenses, a crime of violence is defined as "an offense that has an element of the use, attempted use, or threatened use of physical force against the person or property of another," if that crime is punishable by ten years or more in prison.  *See* 18 U.S.C. § 3142(f)(1)(A) & 16. Destruction of Property, in violation of 18 U.S.C. § 1361 meets those requirements. It is punishable by ten years if the property damage was greater than $1,000, and its elements include the use of physical force against the property of another.  *See United States v.*

---

[3] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

*Khatallah*, 316 F. Supp. 2d 207, 213 (D.D.C. 2018) (Cooper, J.) (holding that destruction of government property under a substantially similar statute, 18 U.S.C. § 1363, satisfies the elements clause to be a crime of violence). Defendant is properly charged with that offense, as noted above, because the Proud Boys' actions on January 6, 2021, appeared to have been coordinated and Defendant spoke directly with Gieswein shortly before Pezzola and Gieswein entered the Capitol Building through the exterior window broken by Pezzola.

The United States is also seeking detention pursuant to 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." That rebuttable presumption applies to Defendant because 18 U.S.C. § 1361 is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), and carries a maximum sentence of ten years in prison. The Complaint and Statement of Facts establishes the probable cause to believe that Defendant committed this offense.

Once a rebuttable presumption is created, it imposes a burden of production on the defendant to offer contrary credible evidence. See United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985). However, "[t]he presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to the factors listed in § 3142(g)." United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008), (quoting United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986)); see also United States v. Ali, 793 F. Supp.2d 386, 387-88 (D.D.C. 2011); United States v. Bess, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether

conditions of release can be fashioned or whether the defendant must be detained pretrial.").

The United States also seeks detention pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A), because Defendant poses a serious risk of flight. Consequently, the government requests review of the magistrate judge's decision to release the defendant and seeks a further stay of the order from this Court.

As the Court is aware, there are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. Each of these factors weighs in favor of pretrial detention in this case.

**A.     The Nature and Circumstances of the Offenses Weigh in Favor of Detention**

The nature and circumstances of the charged offenses weigh heavily in favor of detention. Defendant, a member of a right-wing militia, knowingly and willfully participated in a riot was designed to prevent the United States Congress from certifying the results of the 2020 Presidential election. Not only did Defendant participate in the riot, his public statements indicate that he was part of the group that helped plan how the Proud Boys would act during the riot. This was evidenced on the ground, when Defendant spoke with Gieswein shortly before Pezzola and Gieswein entered the Capitol Building through the exterior window broken by Pezzola.  The group of which Nordean was a part clearly intended to make entry into the Capitol Building, and this was accomplished through the breaking of the window and other violent means used to effectuate entry.

Words alone may never communicate the true nature of the crimes that were carried out on January 6. It is an event that cannot be measured in the number dead, injured, or wounded, but

rather in the destabilizing effect that it has had on this country. This destabilizing effect is precisely what Defendant envisioned when he helped plan, helped lead, and participated in the Proud Boys' participation in the riot at the Capitol building.

**B.**     **The Weight of the Evidence Weighs in Favor of Detention**

The weight of the evidence against Defendant weighs strongly in favor of detention. Dozens of videos and photographs exist to prove Defendant's participation in the Capitol riot on January 6, 2021. The items seized from Defendant's home on February 3, 2021, confirm Defendant's identity in those photographs.

**C.**     **The Defendant's History and Characteristics Weigh in Favor of Detention**

As noted above, Defendant has, since at least 2018, been an active participant and leader in the Proud Boys. Defendant relished in the internet fame he earned when knocking out the counter-protester in Portland, Oregon, and used that fame to leverage an interview on Alex Jones' television show "InfoWars," where Defendant actively recruited new members to join Proud Boys and participate in future acts of violence. This interview was later posted on YouTube where it could continue to be viewed and utilized to recruit new members.



### D.   The Danger to the Community Created by Defendant's Release Weighs in Favor of Detention

#### i.   *Defendant Poses a Substantial Risk of Danger to the Community*

Defendant poses a substantial risk of danger to the community if he is released. Defendant believes that he and his fellow Proud Boys are "Patriots," who are going to "bring back that original spirit of 1776 of what really established the character of what America is. And it's not complacency, it's not low standards. It's 'this is how it's going to be, and I don't give a god damn.'" By his own admission, Defendant participated in the Capitol riot because he does not accept the result of the Presidential election, and has declared "No democracy, no peace." Defendant stated, both before and after the riot, that the police—and those that support them—are part of the problem.

There is no reason to believe that Defendant, or any of his Proud Boy associates, are any more interested in "complacency," or any less interested in fomenting rebellion than they were on January 5. If nothing else, the events of January 6, 2021, have exposed the size and determination of extremist groups in the United States, and their willingness to place themselves and others in danger to further their political ideology. Releasing Defendant to rejoin their fold and plan their next attack poses a potentially catastrophic risk of danger to the community.

#### ii.   *Defendant Poses a Serious Risk of Flight*

Defendant also poses a serious risk of flight. The United States is aware of social media statements by Defendant indicating a desire to move and "start a new life." These statements, coupled with Defendant's possession of a valid, U.S. Passport issued to someone else whose likeness resembles Defendant's, poses serious concerns about Defendant's intentions had he not been arrested on February 3. Were Defendant to obtain his release and acquire another such passport, it would be exceedingly difficult to catch him and ensure his presence for trial.

## <u>CONCLUSION</u>

This Court has the authority to stay the Magistrate Judge from the District of New Jersey's Order to release Defendant pending trial in this case. Moreover, this Court has the authority to overrule that decision and order that Defendant be detained and transferred to the District of Columbia pending trial. This case warrants such an exercise of the Court's authority. This case involves a presumption of detention, and all four of the Bail Reform Act factors weigh heavily in favor of detention in this case.  There is no condition, or combination of conditions, that will ensure the safety of the community if Defendant is released.

Respectfully submitted,
MICHAEL R. SHERWIN
Acting United States Attorney
New York Bar No. 4444188


By:       */s/  James B. Nelson*
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov