**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-175 |
|  | ) |
| ETHAN NORDEAN, | ) **District Judge Timothy J. Kelly** |
|  | ) |
| Defendant. | ) |
|  | ) |

**DEFENDANT NORDEAN'S OPPOSITION TO THE GOVERNMENT'S MOTION TO REVOKE PRETRIAL RELEASE**

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
Suite 4R
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

## <u>TABLE OF CONTENTS</u>

I.      FACTUAL AND PROCEDURAL BACKGROUND…………..……………..…………2

     A.      The government's first attempt to detain Nordean………………………………..2

     B.      The government's second attempt to detain Nordean based on inaccurate
             claims about "encrypted" communications and a "fake passport"…....………....5

            1.      The government makes inaccurate claims about Nordean's use of
                    "encrypted" communications on January 6……..………………..………5

            2.      The government makes inaccurate claims about a "fake passport" ……....7

            3.      The Chief Judge finds the § 1361 charge "weak" and releases Nordean...9

     C.      Nordean has fully complied with the conditions of his release for nearly
             a month, according to his senior probation officer………………………....11

     D.      The government's superseding indictment and third attempt to detain
             Nordean…………….…..………………………………………….………....12

II.     ARGUMENT……………………………………..…………………..…...……18

     A.      The law of the case doctrine bars, or at least seriously cautions against, the
             government's motion.……..…………….…………………….…....……19

     B.      The government's detention argument fails on the merits for a third time..……19

     C.      Even if § 3142(e)(3)(C) were satisfied, Nordean's full compliance with
             his strict conditions of release would plainly rebut the presumption.…….....…21

     D.      The government fails to articulate why there is "no condition" that will
             assure Nordean's appearance. ………………………………………....…21

     E.      The § 3142(g) factors are the same as they were when the government
             unsuccessfully sought Nordean's detention on two previous occasions..…....…24

     F.      The high incidence of Covid-19 in prisons and jails is another reason
             not to reverse the considered judgment of two federal judges……..………....25

CONCLUSION……………………………………………………….………....…………26

Defendant Ethan Nordean, through his counsel, files this opposition to the Government's Motion to Revoke Pretrial Release.  ECF No. 30.

The government's motion represents its third attempt to detain Nordean pretrial.  Its first attempt was rejected by the Chief Magistrate Judge of the Western District of Washington.  Its second was denied by Chief Judge Beryl A. Howell of this district.  And, in a statement attached to this opposition, a senior probation officer of the Court represents that Nordean has fully complied with the strict and special conditions of his release—which include home detention and GPS location monitoring—for nearly a month.

The government's motion is vexatious litigation.  Although this third move to detain Nordean purports to be prompted by vague text messages newly added to its superseding indictment in support of a conspiracy charge, the government still bases its detention argument on the first charge it filed against Nordean—depredation of federal property, 18 U.S.C. § 1361. Chief Judge Howell rejected the very same argument the government now makes for a third time.  Because the government neither pleaded nor proffered any evidence showing Nordean depredated federal property on January 6, or aided and abetted depredation, the Chief Judge made a factual finding that the government's felony charge was "weak at best."

The Chief Judge's decision was also driven by the government making a series of grave factual claims about Nordean's activities on January 6, only to then quickly withdraw them after the defendant presented evidence showing their falsity.  Similarly, the Chief Judge was concerned by the government's inaccurate representations that Nordean kept a "fake passport," a claim understandably absent from this, its latest effort to detain a presumptively innocent party.

The government now offers the same argument—against the law of the case—with even less evidence than it pleaded previously.  The Court will notice that the 18-page superseding

1

indictment does not contain a single factual allegation pleading whether or how Nordean depredated federal property—the sole putative statutory basis for the government's motion.  (He did not depredate property.)  Rather, at every reference to damaged property the superseding indictment is forced to caveat, in the passive voice, that damage to windows and doors "was done," often by "others in the crowd."

So, the government has made no showing that Nordean warrants detention under 18 U.S.C. § 3142(e)(3)(C), much less that release orders by two federal judges, which are the law of the case, must be disturbed.  But even if the government had made a showing to satisfy § 3142(e)(3)(C), the rebuttable presumption of detention is plainly rebutted by the very fact that Nordean has flawlessly complied with his conditions of release to date, belying the government's claim of risk to the community, which is based upon no proffered evidence.  Nor does the government offer any argument as to why there are "no conditions" to assure Nordean's appearance.

The government's motion to overturn the settled decision of two federal judges, based upon the same set of dispositive facts, and to detain Nordean, during a prison pandemic, for months as he awaits trial in the midst of unprecedented docket congestion, is frivolous.  It should be denied.

I.      **Factual and Procedural Background**

        A.      **The government's first attempt to detain Nordean**

        On February 3, Nordean was arrested in his home state of Washington on a criminal complaint charging him with one or two felonies (aiding and abetting property depredation[1] and

---

[1] The property depredation offense is a felony only if the "damage" exceeds $1,000.  18 U.S.C. § 1361.   The complaint did not plead whether that threshold amount was breached by Nordean.

obstruction of justice) and two misdemeanors (trespass and uttering abusive language near the Capitol) in connection with the events at the Capitol Building on January 6.  That morning, his wife was awoken by flash-bangs thrown into Nordean's home by a large SWAT team.  They pointed assault rifles at her.  Handcuffed, she was detained for approximately five hours and questioned without being Mirandized.  Nordean, 30, has no criminal history.  Though he was not home when the search commenced, he returned to surrender himself to the agents.

The criminal complaint upon which he was arrested alleged that, on January 6, 2021, a large crowd gathered near the pedestrian entrance to the Capitol grounds on First Street, secured by police standing behind a waist-height metal barrier.  Compl., p. 7.  "[T]wo men advanced toward [the] metal gate. The crowd followed, and within minutes, the crowd overwhelmed the U.S. Capitol Police officers [there.]" *Id.*

Nordean "was not one of the two men who initially advanced toward officers, but was present in the crowd[.]" Compl., p. 7.  The complaint alleged that thousands of people then gathered in front of the Capitol on its west side.  "Among the first to reach the police line in the west plaza of the Capitol was [Nordean.]" *Id.*, p. 8.  Nordean "then appeared to engage in a brief exchange with . . . Robert Gieswein. . ." *Id.*  In turn, Gieswein "was among the first to enter the Capitol through a window that was broken. . ." *Id.*  But it is not Gieswein, the man with whom Nordean "appeared to engage in a brief exchange," who was alleged to have broken the window. That was accomplished by another individual named Dominic Pezzola.[2] Compl., p. 8.  In a footnote, the complaint added that it,

> Does not herein assert or intend to otherwise suggest that NORDEAN was present in the immediate vicinity when the [window-breaking] took place.

---

[2] The government's motion represents as fact that Pezzola was "a Proud Boys member." Gov't Mot., p. 6.  It cites no evidence supporting that contention.  That claim is not accurate.

Compl., p. 9 n. 3.

Besides the broken window, the complaint did not cite any specific federal property damage attributable to Nordean.  That was the factual basis for the complaint's charge that Nordean aided and abetted the depredation of property, pursuant to 18 U.S.C. § 1361.  The complaint did not plead whether the damage to the window exceeded $1,000, which is necessary to make the offense a felony "for which a maximum term of imprisonment of 10 years or more is prescribed," 18 U.S.C. § 3142(e)(3)(C), a statutory requirement for pretrial detention under § 3142(e)(3)(C).

The government moved the U.S. District Court for the Western District of Washington for Nordean's pretrial detention.  *U.S. v. Ethan Nordean*, 21-mj-67, ECF No. 7 (W.D. Wash., Feb. 5, 2021).  Its argument for detention was that because § 1361 is "an offense listed in section 2332b(g)(5)(B) of title 18," 18 U.S.C. § 3142(e)(3)(C), there was a rebuttable presumption of pretrial detention under Section 3142(e)(3)(C).  *Nordean*, 21-mj-67, ECF No. 7, p. 15.  That is the same argument the government now makes for the third time in the pending detention motion.  Gov't Mot., p. 3.  Chief Magistrate Judge Brian A. Tsuchida rejected the government's argument.  *Nordean*, 21-mj-67, ECF No. 9.[3]

---

[3] Pursuant to the Due Process Protection Act, the court also ordered the government to produce materials under *Brady v. Maryland*, 373 U.S. 83 (1963) in a timely manner.  *Nordean*, 21-mj-67, ECF No. 10.  The order stated that "The failure to do so in a timely manner may result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, or any other remedy that is just under the circumstances." *Id.*

As shown *infra*, the government possessed *Brady* material at this time and did not produce it to the defense so that it could be used in a timely manner.

The government then moved this Court for an emergency stay of the Chief Magistrate Judge's order. *Nordean*, 21-mj-67, ECF No. 13. Chief Judge Howell entered a stay and ordered Nordean transferred to this district. *Id.*

However, Nordean was not transferred. He remained incarcerated in Seattle, Washington for 30 days, in a facility with a Covid-19 outbreak among detainees. During that period of time, no indictment was returned with charges against Nordean and no probable cause hearing was held pursuant to Federal Rule of Criminal Procedure 5.1. This meant that Nordean's release from custody was statutorily required. 18 U.S.C. § 3060(d). The improper detention was not harmless because the complaint upon which he was arrested did not plead probable cause of a depredation offense pursuant to § 1361. As shown below, the Chief Judge would later find that the evidence adduced to prove the § 1361 offense was "weak at best."

**B.      The government's second attempt to detain Nordean based on inaccurate claims about "encrypted" communications and a "fake passport"**

On February 23, Nordean moved to lift the stay on Chief Magistrate Judge Tsuchida's release order. ECF No. 13. In response, the government again predicated its detention argument on its depredation of property charge pursuant to § 1361, which the government said satisfied the rebuttable presumption of detention under § 3142(e)(3)(C). ECF No. 17, pp. 2-3.

> 1.      *The government makes demonstrably inaccurate claims about Nordean's use of "encrypted" communications on January 6*

In addition to its § 3142(e)(3)(C) argument, the government made the following factual claim to Chief Judge Howell in seeking to detain Nordean pretrial:

> Defendant—dressed all in black, wearing a tactical vest—*led the Proud Boys through the use of encrypted communications* and military-style equipment, and *he led them with the specific plans to: split up into groups, attempt to break into the Capitol building from as many different points as possible*, and prevent the Joint Session of Congress from Certifying the Electoral College results.

5

ECF No. 17, pp. 10-11 (emphasis added).

This factual claim was shown to be false.  Nordean advised Chief Howell that he could not have "led the Proud Boys through the use of encrypted communications" on January 6 because, among other reasons, his mobile phone was without power throughout the events of the day.  ECF No. 19, p. 9.  Although the government was at the time in possession of Nordean's phone, at no point did it disclose to the defense that exculpatory evidence existed showing that Nordean did not use "encrypted communications" on January 6.  Questioned by the Court on this point, the government acknowledged it possessed evidence showing Nordean's phone was without power during the relevant events on January 6.  3/3/21 Hr'g Trans., p. 38.  This evidence was not produced to the defense, contrary to the Due Process Protection Act order entered in his case on February 8.  *Nordean*, 21-mj-67, ECF No. 10.

The government separately contended that Nordean used a Baofeng radio—seized from his home on February 3—to lead a group of people into the Capitol on January 6.  ECF No. 17, p. 15.  However, Nordean then supplied the Court with an Amazon receipt showing that he did not receive the ham radio until January 7.  ECF No. 19, p.11.

The government countered by representing that "The Baofeng radio that defendant purchased on Amazon is not the Baofeng radio seized by law enforcement." ECF No. 21, p. 2.  It reasoned that the radio depicted in the Amazon screenshot filed by Nordean "has a short antenna and a battery that is the same size as the radio unit itself. By contrast, the Baofeng radio seized from Defendant's residence has a larger antenna and a larger battery, as well as a second, longer blade-style antenna." ECF No. 21, p. 2.  This was also false.  Nordean supplied the Court with another Amazon receipt showing that, although he ordered the items online as a package, Nordean received the "larger antenna" and "larger battery," identified during the government's

search of Nordean's home, before the radio itself, which, again, was received on January 7. There was only one Baofeng radio.  ECF No. 22, p. 2.

When the Court asked about these factual reversals, the government advised the Court to disregard its grave claim that Nordean himself used "encrypted communications" on January 6 to lead an invasion of the Capitol Building.  3/3/21 Hr'g Trans., pp. 38-39.

> 2.     *The government makes demonstrably inaccurate claims about a "fake passport"*

As a separate basis for detention, the government claimed that Nordean possessed a "fake passport" and thus posed a risk of flight.  It made this representation in two courts—in the Western District of Washington, *Nordean*, 21-mj-67, ECF No. 7, p. 19, and in this Court before the Chief Judge.  ECF No. 17, p. 21.  The claim was demonstrably false; the evidence used by the government was misleading.  All references to this claim are omitted in the government's third detention motion.

To the Chief Judge, the government represented that "law enforcement agents discovered a valid U.S. Passport issued to someone else who looks like the defendant." ECF No. 17, p. 21. That was not the case.  Here is an image of the man in the passport next to an image of the defendant, respectively.  These images were omitted from the government's brief:

 

The government also represented to the Court that "law enforcement found the passport on a clothes dresser on Defendant's side of the bed in the master bedroom, along with a passport issued to Defendant's wife." ECF No. 17, p. 21.  That was not the case.  As Mrs. Nordean explained in a sworn declaration submitted to the Court, the passport belonged to a man with whom she once had a relationship, some of whose personal effects, including this passport, were still in her possession after the relationship ended.  ECF No. 20.

The sworn declaration also stated that, contrary to the government's representations to two courts, law enforcement did not find "the passport on a clothes dresser on Defendant's side of the bed." Instead, they found it inside Mrs. Nordean's jewelry box.  ECF No. 20.  It further stated that Mrs. Nordean had never seen Ethan Nordean open or otherwise use the jewelry box and that Mr. Nordean had never discussed using the passport with Mrs. Nordean.  *Id.*

Late in the evening the day before Nordean's detention hearing held by the Chief Judge, the government responded by filing an image it said was taken during the search of the Nordean home.  The image depicted two passports lying on top of a dresser.  The government represented that counsel for the government "spoke again with the searching agents and confirmed that the passports were found on the dresser and not in a jewelry box.  The location of the passports is shown in FBI photographs which were taken by agents in accordance with FBI protocol." ECF No. 21, p. 2.

That representation was not accurate and the image submitted by the government was misleading.  Below is the image as it was filed by the government, with a green circle added by the defendant.  The red circle was in the government's original exhibit, encircling the passports.

8



ECF No. 22, p. 4.

Within the green circle is Mrs. Nodean's jewelry box.  The Court can see that the top of the box is propped open.  Nordean submitted an image of the jewelry box taken before the government's raid of the Nordean home on February 3.  ECF No. 22, p. 5.  It showed the top of the box in the closed position, which is how Mrs. Nordean keeps her jewelry box.  Mrs. Nordean was awoken by the agents' flash-bangs at approximately 6:10 a.m.  The government's exhibit showed the image of the passports was taken at 6:51 a.m.  ECF No. 21, Exh. 4.  The first thing Mrs. Nordean did upon hearing the flash-bangs and seeing agents pointing assault rifles at her was not to walk over to the jewelry box, open it, and place the passport of her ex-boyfriend on the dresser.  That does not make sense.  In addition, Nordean was not at home the night before, or the morning of, the search, as the government knew when it made its inaccurate fake passport representations.  ECF No. 22, p. 5.

3.  *The Chief Judge finds the § 1361 charge "weak" and releases Nordean*

In a March 3 hearing, the Chief Judge addressed the § 1361 charge against Nordean that he aided and abetted the depredation of federal property on January 6.  The Court and government had the following colloquy:

THE COURT: Well is it - - is it the Government's theory that under aiding and abetting liability that this defendant is responsible for all the damage done at the Capitol or just the damage done by Proud Boys members, or what?

MR. McCULLOUGH: Your Honor –

THE COURT: He personally didn't – you don't have evidence that he personally engaged in any property damage.

MR. McCULLOUGH: That is correct, Your Honor.  The Government – the Government is – for purposes of this hearing, the Government is asserting that Ethan Nordean is responsible for the property damage that was caused by those men who he led to the 1st Street gate and onto the Capitol grounds on January 6th.  This was an intended act in Ethan Nordean's statements in advance of the January 6th activities.  Ethan Nordean was clear that people thought – that people may have thought that this was simply going to be individuals making Facebook posts; but, no, we are going to bring back the spirit of 1776.  Your Honor, that is not simply a – kind of an affection for three-cornered hats and salt water taffy. . .

3/3/21 Hr'g Trans., pp. 42:13-43:9.

Turning to the pretrial detention factors under 18 U.S.C. § 3142(g), and in particular the

weight of the evidence on the § 1361 charge, the Court entered the following factual finding into

the record of this case:

THE COURT: What the Government said in its original papers is that he directed the Proud Boys with specific plans, telling them to split up into groups and to attempt to break into the Capitol building; that's a far cry from what I heard at the hearing today.  And the Government has backtracked on saying that they actually did see – directly told them to split into different groups and had this kind of strategic plan.

In addition, what I've heard at the hearing today is that the defendant, with this group, positioned himself at one of the entrances – pedestrian entrances to the Capitol and, you know, strutted right in front of the police barriers.  That's also a far cry from threatening or assaulting the police officers who were barricading the entrance to the Capitol.

He then – what I've heard at the hearing today is that the defendant's followers and other people in the crowd – not necessarily even Proud Boys – broke through the barriers, breached the police line and got into the Capitol, and the defendant went along with this mob.

**There is no allegation that the defendant caused injury to any person or that he even personally caused damage to any particular property. . . He was a leader of a march down to the Capitol.  Once they got there it's not clear what leadership role this defendant took at all to the people inside the Capitol or – even the evidence about the defendant directing people to break windows to get into the Capitol is weak, to say the least. . .**

[T]he weight of the evidence against the defendant for aiding and abetting the injury and depredation of Government property, under 18 U.S.C. section 1361, in an amount exceeding

10

$1,000 when he personally didn't do anything – and **there is no evidence of *specific directions* by this defendant to tell his fellow Proud Boys carve some vulgar thing on a door or to – any other specific information about him giving those kinds of *precise orders*** is not as strong and overwhelming to say that the weight of the evidence favors pretrial detention . . .

3/3/21 Hr'g Trans., pp. 79-80 (emboldening and italics added).

The Court then ordered Nordean released on an appearance bond with strict conditions, including home confinement and GPS location monitoring.  ECF No. 23.

> **C.    Nordean has fully complied with the conditions of his release for nearly a month, according to his senior probation officer**

Nordean was released from detention on March 3.  Since that time he has been supervised by Benjamin Beetham, a senior U.S. Probation Officer for the Western District of Washington. Statement of Benjamin Beetham, dated Mar. 20, 2021, attached as Exh. 1.

Probation Officer Beetham makes the following representation to the Court: "Since [the date of his arrest], I have been assigned his pretrial supervision on a courtesy basis for the District of Columbia.  Since March 3, 2021, Mr. Nordean has complied with all conditions of release." Exh. 1.

Beyond the standard conditions, Nordean's strict conditions, set by the Chief Judge, include:

- Travel restricted to the Western District of Washington;

- Not possessing a firearm;

- Home detention for everything except employment, education, religious services, medical visits, or court appearances; and

- GPS location monitoring, for which Nordean must pay all or part of the cost of the program.

ECF No. 23.

**D.      The government's superseding indictment and third attempt to detain Nordean**

The government's instant motion to revoke the Chief Judge's release order says that, following the return of a superseding indictment against Nordean on March 19, "new evidence highlights the grave danger that the Defendant poses to others and the community." Gov't Mot., p. 1.

The government then cites a bullet list of messages exchanged by Nordean and others on January 5.  Gov't Mot., pp. 1-2.  The messages appear to show that Nordean and others had a "plan" to meet in Washington, D.C. on January 6.  It is not clear from the government's brief what aspect of these exchanges is supposed to support reversing the release orders of two federal judges, or how they show a danger to the community, which in any case is not a sufficient basis for Bail Reform Act pretrial detention.

The government adds, "After the initial breach [of barricades], Defendant personally engaged in the destruction of government property by shaking and then knocking down a metal barrier on the Capitol grounds." Gov't Mot., p. 2.  That representation is not consistent with the allegations in the superseding indictment.  In pertinent part, the indictment alleges:

> While standing next to one another, NORDEAN and BIGGS shook a metal barricade, with Capitol police on the other side of the barricade, until NORDEAN and BIGGS and others in the crowd were able to knock it down.  The crowd, including NORDEAN, BIGGS, REHL, and DONOHOE, advanced past the trampled barricade.

First Superseding Indictment, ¶ 58.

Contrary to the government's representation, the indictment does not allege "destruction of government property by shaking and then knocking down a metal barrier on the Capitol grounds." Gov't Mot., p. 2.  It does not allege who among the "others in the crowd" knocked the barricade down.  It does not allege that "damage" to the barrier, if any, "exceeds the sum of

$1,000." 18 U.S.C. § 1361.  That is the amount required if the offense is to constitute a felony "for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(e)(3)(C), a requirement of pretrial detention under that section.

The government later represents that "photos and videos clearly show a series of intentional actions made without hesitation or regret – including video footage of Defendant personally dismantling a metal barrier that separated the crowd from Capitol Police officers and the Capitol itself." Gov't Mot., p. 5.  The government embeds two images into its brief to support that contention.  *Id.*  The Court will notice that neither image depicts the defendant dismantling a metal barrier.  It will also notice neither image depicts a dismantled metal barrier.  *Id.* [4]

The superseding indictment brings two charges which are not in Nordean's first indictment.[5]  The first is a conspiracy charge.  First Superseding Indictment, ¶¶ 25-68.  Because the overt acts in furtherance of the conspiracy begin on November 5, 2020, *id.*, ¶ 31, the government is alleging that the conspiratorial agreement was reached no later than two days following the 2020 presidential election.  *See*, *e.g.*, *Fiswick v. United States*, 329 U.S. 211, 216 (1946) (an overt act is that which is in furtherance of the preexisting criminal agreement and is necessary to complete the offense).  The Supreme Court has held that "to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975) (citing *Ingram v. United States*, 360 U.S. 672, 678 (1959)).

---

[4] The Court will also notice that while the superseding indictment references one "metal barricade" that was "shaken," the government's motion alternates at random between a "dismantled" "metal barrier" and "metal barriers," plural.  *Compare* Gov't Br., p. 5 *with* p. 6.

[5] The government relies solely on the § 1361 offense charged in the first indictment for its detention argument under the Bail Reform Act, Gov't Mot., p. 3, but Nordean addresses the government's new charges here for the sake of completeness.

The superseding indictment identifies two objects of the conspiracy that it alleges constitute violations of federal statutes.   First Superseding Indictment, ¶ 27.  The first is a violation of 18 U.S.C. § 1512(c)(2), by virtue of an alleged attempt to "stop, delay, or hinder Congress's certification of the Electoral College vote." *Id.*  The second is a violation of 18 U.S.C. § 231(a)(3), by virtue of an alleged plan "to obstruct and interfere with law enforcement officers engaged in their official duties to protect the Capitol and its occupants from those who had unlawfully advanced onto Capitol grounds." *Id.*

In turn, Section 1512(c) states:

> Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

And Section 231(a)(3) states:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—
>
> Shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3).

"Civil disorder" in § 231(a)(3) is defined as follows:

> The term "civil disorder" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

14

18 U.S.C. § 232(1).

To establish a § 231(a)(3) offense, the government must allege and prove that a defendant knew of the scene of the "civil disorder" in which he allegedly obstructed, impeded, or interfered with a law enforcement officer.  *See*, *e.g.*, *United States v. Dodge*, 538 F.2d 770, 788 (8th Cir. 1976).  It must allege "violent physical acts" against law enforcement.  *United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971); *United States v. Jaramillo*, 380 F. Supp. 1375, 1376 (D. Neb. 1974) (Section 231(a)(3) offense requires interference "in a violent manner").

Taken together, then, the superseding indictment alleges that, beginning two days after the presidential election held on November 3, 2020, the four defendants in this case possessed a knowledge far beyond that of the rest of society, including the world's premier domestic intelligence agency.  Two days after the election, the government alleges these defendants knew the following, as of November 5, 2020:

- There would be a rally at the Capitol on January 6 of the following year;

- They knew they would attend the rally;

- They knew large numbers of protestors would assemble in Washington, D.C., on the date of the ceremonial counting of the Electoral College vote;

- They knew that these protestors would contend that the Electoral College vote could somehow be altered by the Vice President;

- Yet, they also knew that, although these protestors would pressure the Vice President to alter the vote, he would not do so, relying on the legal advice given to him by future lawyers and in closely argued future opinion pieces;

- They knew that, as a result of the Vice President's future refusal to alter the vote, these protestors, many of whom were unknown to them, would then walk from the rally to the Capitol in what appeared to be spontaneous madness of crowds, but was in fact foreseen by the defendants two days after the election;

- They knew that the Capitol Building would remain curiously unprotected during the Electoral College vote count in Congress;

- They knew the protestors would jump over barricades and begin a physical contest with law enforcement, triggering a "civil disorder," 18 U.S.C. § 232(1); and

- They knew they would obstruct law enforcement during that disorder.

That is the government's criminal conspiracy theory of Nordean's 18 U.S.C. § 371 violation. The manner and means of the conspiracy includes such activities as obtaining "protective gear," raising funds for travel and the "protective gear," not wearing "Proud Boys colors," traveling to Washington D.C., and using the Telegram chat app to communicate.[6]  First Superseding Indictment, ¶ 28. The indictment omits that all of those lawful activities were engaged in by members of Nordean's group long before January 6, and in connection with other events having nothing to do with the January 6 incident. Public reports showing Nordean and his group engaging in all the listed "manner and means" of the "conspiracy" but in connection with events that transpired without any unlawful incident are widely available and known to the government. Just a few examples are cited in Nordean's brief at docket number 19, page 10. As the government knows, the group to which Nordean belongs publicly stated on many occasions long predating January 6 that it obtained "protective gear" to protect members, some of whom had been stabbed at a political event in 2020. *Id.*

As the Court will notice, none of the Telegram chats cited by the government satisfies the Chief Judge's observation that the government has not alleged "specific directions" or "precise

---

[6] The government states that the Telegram chats were "encrypted," which is supposed to show that the conversations were conspiracy-oriented. This too is an inaccurate representation. Unlike with other popular messaging apps, Telegram's chats are not end-to-end encrypted by default. They are only encrypted under the "secret chats" feature. That feature is only available for one-to-one communications, not group chats. See PSA: Telegram Chats Aren't End-to-End Encrypted by Default, How-To Geek, Jan. 25, 2021, available at: https://bit.ly/3cULLYF. The government's own brief says the defendants' messages were in group chats and were therefore not end-to-end encrypted. Gov't Mot., pp. 1-2. So, "encryption" is not a "manner and means of conspiracy." First Superseding Indictment, ¶ 28(f),(g).

orders" to commit a federal offense.  3/3/21 Hr'g Trans., pp. 79-80.  Rather, the indictment appears to rest on an inferential post hoc ergo propter hoc argument: because a large group of protestors jumped barricades and entered the Capitol on January 6, the defendants' pre-January 6 chats about a "plan" to visit D.C. must have been a plan to jump barricades, struggle with law enforcement, and enter the Capitol.[7]

Conspiracy charge aside, the superseding indictment charges Nordean with three substantive felonies, all of them alternatively pleaded as attempt crimes and as aiding and abetting crimes: a violation of 18 U.S.C. § 1512(c), First Superseding Indictment, ¶ 69; a violation of obstructing law enforcement during a civil disorder, 18 U.S.C. § 231(a)(3), *id.*, ¶ 71; and depredation of federal property, 18 U.S.C. § 1361, *id.*, ¶ 73.

**§ 1361 offense**: Nordean showed above that the superseding indictment does not allege any facts showing what he allegedly destroyed, how he did it, or whether the damage exceeded $1,000, which is the predicate for a felony offense.

**§ 1512(c)(2) offense**:  The government has not pleaded a crime.  As a previous U.S. attorney general himself observed, the "question here is whether the phrase—'or corruptly otherwise obstructs'—in clause (c)(2) is divorced from the litany of specific prohibitions in §

---

[7] Such logic would be reasonable in the context of a set-piece criminal act solely committed by the co-conspirators, such as bank robbery or a drug transaction.  If the co-conspirators are found selling drugs on Day 2, their chats on Day 1 about a "plan" can be inferred to concern the transaction.  However, this logic does not hold in the context of a large-scale protest or riot involving hundreds of actors other than the co-conspirators. If a "plan" to come to D.C. on January 6 constitutes a conspiracy to commit all the alleged criminal acts of a motley mob, then it is not clear why this conspiracy does not have over 300 co-conspirators, for every defendant in the Capitol cases. Similar questions led Judge Mehta to release a defendant charged with conspiring with "Oath Keepers" to commit crimes on January 6.  Judge orders pretrial release of key Oath Keeper charged in Capitol attack, Politico, Mar. 12, 2021, available at: https://politi.co/392ydcw.

1512, and is thus a free-standing, all-encompassing prohibition reaching *any* act that influences a proceeding, or whether the clause's prohibition against 'otherwise' obstructing is somehow tied to, and limited by, the character of all the other forms of obstruction listed in the statute." Mem. of William P. Barr, dated June 8, 2018, p. 4, available at: https://bit.ly/30LdPIw (emphasis original). Citing § 1512(c)(2)'s legislative history origins in the Sarbanes-Oxley Act, which "was expressly designed to clarify and close loopholes in the existing criminal laws related to the destruction or fabrication of evidence and the preservation of financial and audit records," the former attorney general of the Department of Justice found it was "clear that use of the word 'otherwise' in the residual clause expressly links the clause to the forms of obstruction specifically defined elsewhere in the provision," Barr Mem., p. 4—i.e., "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." § 1512(c)(1). Defying that textual limitation, the superseding indictment has charged Nordean with violating § 1512(c) by virtue of inserting his presence into the Capitol Building during a joint session of Congress to count the Electoral College votes from the 2020 presidential election. However, it is Section 1505 of title 18 that criminalizes obstruction of proceedings in Congress "by threats or force." 18 U.S.C. § 1505. The government did not charge that here because that section only covers "inquir[ies] or investigation[s] . . being had by either House," § 1505, and the ceremonial counting of Electoral College votes was neither, according to the indictment itself. First Superseding Indictment, ¶¶ 3,4 (electors and congressmen "formalize" the result, not hear evidence about voter fraud).[8]

---

[8] The government's § 1512 theory also conflicts with this Circuit's rule that the obstruction-of-justice adverb "corruptly" is transitive, e.g., "A corrupts B, i.e., A causes B to act corruptly," not

**§ 231(a)(3) offense**.  The only fact alleged in the superseding indictment that appears to address whether Nordean obstructed, or attempted to obstruct, or aided and abetted an obstruction of law enforcement during a civil disorder is the allegation that he "shook a metal barricade, with Capitol police on the other side of the barricade, until NORDEAN and BIGGS and others in the crowd were able to knock it down." First Superseding Indictment, ¶ 58.  It is hard to assess this claim, as the images cited by the government as its evidence do not show Nordean shaking or damaging a barricade.  Gov't Mot., p. 5.  The superseding indictment does not allege any "violent physical acts" against law enforcement on the part of Nordean. *Mechanic*, 454 F.2d at 852.  Many protestors at the Capitol on January 6 touched barricades, though not all of them are charged, much less charged with a felony § 231(a)(3) offense and conspiracy to commit the same.  Of course, most of those charged with touching or attempting to touch a barricade are not held for months in pretrial detention.  *See, e.g.*, *U.S. v. Mostofsky*, 21-cr-138, ECF No. 5 (D.D.C. 2021) (Capitol defendant charged with § 231(a)(3) offense for touching barricade released on standard conditions).

## II.     Argument

### A.     The law of the case doctrine bars, or at least seriously cautions against, the government's motion

The law of the case doctrine "provides that a court involved in later stages of a lawsuit should not decide questions that already were decided by that court . . .in earlier stages of the litigation." *Dist. Council 20 v. District of Columbia*, 150 F. Supp. 2d 136, 142 (D.D.C. 2001) (citing *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997)).  Reversal of the court's earlier

---

intransitive, e.g., A unilaterally influenced an official proceeding with "evil purposes." *See United States v. Poindexter*, 951 F.2d 369, 379 (D.C. Cir. 1991).

settled decision is only "appropriate where there are 'unusual' circumstances, 'extraordinary' circumstances, 'exceptional' circumstances, to prevent a 'grave injustice.'" *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 258, 262 (D.D.C. 2002) (internal citation omitted).

The government quotes the Chief Judge as saying the judge assigned to this case "may want to take another look at this if the Government persists in seeking pretrial detention here . . ." 3/3/21 Hr'g, p. 83.  That, however, does not mean it is appropriate for the government to take the exact same argument, and the exact same evidence, to a third federal judge and attempt to unwind two prior settled orders.  To the contrary, it is vexatious litigation practice and not what the Chief Judge meant.

That is what the government is attempting.  Its motion to revoke the Chief Judge's release order is explicit that it is relying on the § 1361 depredation of property offense to satisfy its pretrial detention argument under the rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(C) and an argument under § 3142(f)(1)(A) that a § 1361 offense is a "crime of violence." Gov't Mot., p. 3.  But the § 1361 offense is not new to the superseding indictment, the putative basis for the government to come back to the Court a third time.  Both Chief Magistrate Judge Tsuchida and Chief Judge Howell considered the same § 1361 offense and released Nordean, first on standard conditions and then on strict conditions.  Those settled decisions by two federal judges in the same case should be honored, as the government has offered no "extraordinary circumstances" or "grave injustice" that results from a presumptively innocent person waiting for his trial in home confinement with GPS monitoring during a prison pandemic. *Pogue*, 238 F. Supp. 2d at 262.

**B.    The government's detention argument fails on the merits for a third time**

Even if the Court does not find that the decisions of two federal judges are the law of the case, the only § 1361 allegation that can conceivably be said to be an addition to the allegations reviewed by both prior judges is the claim that Nordean "shook" a barricade, which was later knocked down by a crowd.  Gov't Mot., p. 2.

However, the superseding indictment does not even allege the barricade was damaged, much less that it was damaged in an amount exceeding $1,000, which would make it a felony offense punishable by more than one year in prison.   First Superseding Indictment, ¶ 58. Without that allegation, the government cannot satisfy the requirement in § 3142(e)(3)(C) that the offense is one "for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(e)(3)(C).  The superseding indictment plainly does not satisfy that condition of § 3142(e)(3)(C).  Accordingly, the Court should not reverse the decisions of two federal judges on account of a rebuttable presumption of detention whose statutory terms are not satisfied.[9]

**C.    Even if § 3142(e)(3)(C) were satisfied, Nordean's full compliance with his strict conditions of release would plainly rebut the presumption**

Even if the government had made a showing that § 3142(e)(3)(C) is satisfied despite not alleging any destruction of property attributable to Nordean, much less damage exceeding

---

[9] The government conclusorily states that, in the alternative to § 3142(e)(3)(C), the § 1361 offense constitutes a "crime of violence" under 18 U.S.C. § 3142(f)(1)(A) and it is permissible to detain Nordean pretrial on that basis.  Gov't Mot., p. 3.  However, that subsection also requires an offense "for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(f)(1)(A).  Because the superseding indictment does not allege destruction of property attributable to Nordean in an amount exceeding $1,000, the government has not satisfied § 3142(f)(1)(A) and has offered no basis for detention under the Bail Reform Act. Absent such a basis, it is a Fifth Amendment due process violation to detain the accused pretrial. *United States v. Salerno*, 481 U.S. 739, 747 (1987).

$1,000, the defendant's burden of producing evidence to rebut a presumption of pretrial

detention is minimal.  The defendant merely must offer "*some credible evidence* contrary to the

statutory presumption." *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018) (emphasis

added).  As many courts in this Circuit and elsewhere have repeatedly observed, the defendant's

burden is "not heavy." *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016); *United

States v. Stricklin*, 932 F.2d 1353, 1354-55 (10th Cir. 1991) ("the defendant's burden of

production [under § 3142(e)(3)(C)] is not heavy . . .").

Here, the government has not satisfied the requirements of § 3142(e)(3)(C).  But even if

it had, the following factors constitute a great deal more than "some credible evidence" that there

are *some* conditions of confinement to assure his appearance:

- That two federal judges have already determined there are conditions to assure
  Nordean's appearance;

- That a senior probation officer has represented to the Court that Nordean has fully
  complied with his conditions of release for nearly a month;

- That the conditions of his confinement are special and strict, including home
  confinement and GPS location monitoring; and

- That a sworn declaration has been filed by the individual residing with Nordean
  (his spouse) pledging herself as a third-party custodian to guarantee his
  appearance in this Court.

The government cites no case, and there is none, where a court has reversed the release

orders of two federal judges in the face of the rebutting evidence Nordean has put forward.

**D.    The government fails to articulate in what sense there is no condition that
will assure Nordean's appearance**

Assuming arguendo that § 3142(e)(3)(C) is satisfied, although the defendant has a light

*burden to produce* "some credible evidence" rebutting a presumption of detention, the *burden of

persuasion* still lies with the government.  *Taylor*, 289 F. Supp. 3d at 63.

22

Here, the government does not articulate, anywhere, why there is *no condition* or *combination of conditions* to assure Nordean's appearance.  How, exactly, would GPS monitoring and home confinement not assure his appearance in this Court? The government simply fails to make an argument.  Nor did it make any such argument in its detention motion before the Chief Judge, despite Nordean pointing out the failure.  ECF No. 17.  Accordingly, the issue is forfeited.  *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) (party's failure to respond to a conspicuous, nonfrivolous argument in opponent's brief ordinarily constitutes an argument forfeiture); *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (same).

In explaining why it claims Nordean is a "danger to the community"—which is not the same as an argument as to why there is no condition of release that will assure his appearance— the government states that "Allowing Defendant to stay on pretrial release, even in home confinement, would leave a man who has the wherewithal to help plan and lead a large group of men in a violent attack to take similar actions in the future in furtherance of his goals." Gov't Mot., p. 8.  But the government does not specify what "wherewithal" it is referring to.  The government has seized Nordean's phone and other devices.  He has a court-appointed lawyer because he does not have significant wherewithal.  Nor does the government contend Nordean does have a "plan" to conduct another "violent attack."  He does not, and the government cites no evidence of it, in any case.  And the superseding indictment does not plead evidence indicating Nordean, who has no criminal history, planned a violent attack or anything else except showing up to Washington, D.C. on January 6.  The government's "danger to the community" argument is based on no proffered evidence of future risk whatsoever.

**E.**     **The § 3142 (g) factors are the same as they were when the government unsuccessfully sought Nordean's detention on two previous occasions**

**Nature and circumstances of the offense and the weight of the evidence.**  As shown above, the superseding indictment does not properly plead a felony depredation offense under § 1361 or a felony offense under § 1512(c)(2).  The conspiracy charge is predicated on a claim of foreknowledge on the part of the co-defendants that stretches credulity.  The civil disorder charge, according to the government's detention motion, appears to be based on photographs that do not actually depict the defendant interfering with law enforcement.  This is quite similar to the government's initial claim that Nordean used "encrypted communications" on January 6 only to withdraw the claim after defendant produced rebutting evidence.

These are not allegations and proffered facts sufficient to overcome two settled release determinations by two separate federal judges, when the defendant is fully complying with his release conditions.

**Nordean's history and characteristics**.  As two federal judges have previously found, Nordean's history and characteristics do not support pretrial detention.  He has no criminal history whatsoever.  And he has deep and longstanding ties to his community in Seattle, Washington.  He went through Navy SEAL training because he is patriotic and loves his country.

**Risk of danger to the community**.  The government's argument that Nordean is a danger to the community is that he belongs to a certain political group of "Patriots" that wants to "bring back that original spirit of 1776 of what really established the character of what America is." Gov't Mot., p. 7.  The contention that a presumptively innocent person may be detained for months pretrial because he belongs to a political group is flatly unconstitutional.  *See*, *e.g.*, *United States v. Lemon*, 723 F.2d 922, 938 n. 47 (D.C. Cir. 1983) (holding that courts of appeals

have seriously restricted the use of a defendant's protected speech, association and assembly rights in determining whether to grant or deny bail).

    **F.**    **The high incidence of Covid-19 in prisons and jails is another reason not to reverse the considered judgment of two federal judges**

        Beyond the law of the case doctrine, the government's failure to satisfy the Bail Reform Act, and its inability to explain why there are no conditions of release that would assure Nordean's appearance despite the fact that such conditions are currently succeeding, it would be additionally inappropriate to reverse two federal judges' release decisions in the midst of a pandemic that is affecting prisons and jails more severely than the general population.

        As the Court knows, over the last 12 months thousands of prisoners have been released from incarceration due to the prison pandemic.  Some of the crimes the released prisoners were convicted of include leading a notorious mafia family, armed bank robbery, importing over 50 kilograms of cocaine, and sexual offenses.  *See*, *e.g.*, *United States v. Asaro*, 220 U.S. Dist. LEXIS 68044 (E.D.N.Y. Apr. 17, 2020); *United States v. Mclean*, No. 19-cr-380 (D.D.C. Mar. 28, 2020); *United States v. Curtis*, No. 1:03-cr-533, Dkt. No. 238 (D.D.C. Apr. 22, 2020).   If these convicted individuals are released, it is not clear why the Court should revoke the decisions of two federal judges and detain for months of pretrial confinement a presumptively innocent person during the pandemic.

        Given the congestion of the Court's trial calendar due to the government's decision to charge and prosecute hundreds of cases at the same time and due to the pandemic, there is a serious likelihood that pretrial detention could last for up to a year or more.  If Nordean is not guilty of a felony offense, that would imply that he would serve more time in pretrial confinement than the statutory maximum sentence on the misdemeanor offenses with which he is charged.  This Court has already held in the Capitol cases that that is insupportable under the

Bail Reform Act during the pandemic. *United States v. Griffin*, 21-cr-92, ECF No. 12 (D.D.C. 2021) (Howell, C.J.).

## **CONCLUSION**

For all of the foregoing reasons, Nordean respectfully submits that it would be in error to revoke the release orders of two federal judges.

Dated: March 21, 2021                   Respectfully submitted.

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869

## **Certificate of Service**

I hereby certify that on the 21st day of March, 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

Jim Nelson
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530
(202) 252-7846

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith

26

David B. Smith, D.C. Bar No. 403068
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com
*Appointed by the Court*