# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  21-mj-47** |
| **v.** | : | |
| | : | |
| | : | |
| **DOMINIC PEZZOLA,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

### Introduction

The United States of America, by and through the U.S. Attorney for the District of Columbia, submits this memorandum in support of the defendant's pretrial detention.  As explained below, and as the government will demonstrate at any hearing on this matter, Dominic Pezzola poses a serious danger to the community and a serious risk of flight.  The defendant's actions in breaking the window to the U.S. Capitol, allowing the first group of rioters to stream through, cannot be overstated.  The defendant's actions show planning, determination, and coordination.  His stated desire to commit further acts of violence, combined with his access to weapons- and bomb-making manuals, is extremely concerning.  Moreover, although the defendant turned himself in on the arrest warrant, he did so only after going on the run, changing his appearance, and apparently turning off his cell phone.  He offered to turn himself only after the FBI started knocking on his family members' doors in the Rochester, New York area to inquire about his whereabouts.

The defendant currently stands charged with violations of 18 U.S.C. §§ 1361, 1512(c)(2), and 1752(a), stemming from his role in the violent events that took place at the U.S. Capitol on January 6, 2021.  Pezzola used a U.S. Capitol Police shield—ironically intended to help the police defend the Capitol from intrusions—to break the window to the Capitol that allowed the other protesters to stream through.  Once inside, he was involved with a group of people who chased a police officer up the stairs near the entrance to the Senate chamber, and he smoked a cigar while bragging on video about how he knew they could "take this mother\*\*\*er over" if they just tried hard enough.

After the incident at the Capitol, the defendant returned to the Rochester, New York area, where his phone stayed on for a couple more days, before he apparently turned off his cellular telephone.  The defendant was not in the Rochester area when, on January 14, the FBI began knocking on his family members' and neighbors' doors to inquire about his whereabouts.

Pezzola poses a both serious danger to the community and a serious risk of flight.  In sum, the Court should grant the government's motion to detain him pending trial.

### <u>Principles Governing Requests for Detention</u>

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure community safety or the defendant's appearance at trial and pre-trial proceedings:  the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).

At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015). A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *Smith*, 79 F.3d at 1209. When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

## **Factual Proffer of the Evidence Supporting the Charges**[1]

At around 1:00 p.m. EST, on January 6, 2021, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past U.S. Capitol Police ("USCP") and supporting law enforcement officers there to protect the U.S. Capitol. The image below depicts a large crowd that was gathered near the northwest pedestrian entrance to the Capitol grounds on First Street. The entrance was secured by a small number of USCP officers, who stood behind a waist-height metal barrier.

---

[1]     In addition to the information laid out below, the government incorporates by reference the affidavit in support of a criminal complaint in this case, ECF No. 1, and proffers the facts contained therein to the Court.



Shortly thereafter, two individuals began walking defiantly toward the waist-high metal gate, which was being guarded by only a handful of USCP officers:



The crowd followed, and within minutes, the crowd overwhelmed the USCP officers seen at the top of the steps in the image above.

After overwhelming USCP officers at the pedestrian gate, the crowd advanced on the U.S. Capitol where another line of USCP officers and barricades attempted to stop the crowd from advancing to the walls of the building and the west-facing plaza. Among those leading the walk to the barricades near the building (and the west plaza of the Capitol) was Pezzola, shown circled below and depicted having with a salt-and-pepper beard and wearing sunglasses. Upon arriving at the next barrier, one of the individuals

walking with Pezzola dragged a segment of the fence away, shown circled below and depicted wearing a flag bandana, which left USCP officers temporarily without barrier.





     The next police line, which Pezzola was one of the first to reach, was overwhelmed by the crowd, which then advanced to the front of the U.S. Capitol. Additional people continued to arrive until what the FBI estimates to be thousands of people had gathered in front of the Capitol on its west side. Pezzola was one of the thousands of people in this crowd, and he wound up near the front of the group, near a line of USCP officers, some of whom were in riot gear. The top photo below is a zoomed-out photo showing the

crowd gathered in the plaza, and the bottom is a cropped version of the same photograph, showing the defendant.





Pezzola is not depicted as possessing any sort of riot shield in the photographs above. Shortly after this photograph was taken, members of the crowd began scuffling with police. Based on video it appears that this scuffle began shortly after one of the members of the crowd—not Pezzola—was struck and injured by a projectile possibly fired by police. Pezzola can be seen on

the video gesturing towards USCP officers before joining the back end of the scuffle and reaching his hand in, towards what appears to be a riot shield. In portions of this video, Pezzola has pulled a neck gaiter up over his face. Two screenshots from this video are below, occurring within seconds of each other. Pezzola is circled.





After the camera pans to the left and right a little, Pezzola seems to emerge with a riot shield in his possession:



Shortly thereafter, Pezzola can be seen walking away from the fray, as it is still going on. Although it is unclear from the video whether Pezzola possesses a shield as he walks away, later photographs clearly show him in possession of a riot shield. The top photo below is a screenshot about a minute later in the same video, and the bottom is a cropped version of a still photograph taken minutes after that. Pezzola had lowered his neck gaiter by the time of the below images.





Shortly thereafter, at approximately 1:48 p.m., according to a video posted originally to the social media site Parler, and later to the open Internet by *Pro Publica*,[2] a group of individuals overran a group of USCP officers on stairs that go from the plaza where Pezzola had taken the shield to the Capitol balcony area one level up.  An individual who appears to match Pezzola in all material respects—only the back of this individual's head is visible in the video—carries a riot shield up the stairs soon after the Capitol Police are overrun.  A screenshot of the person carrying the shield, who resembles Pezzola, is below:



---

2    Parler was taken offline in the aftermath of the January 6 riots.  According to its website, *Pro Publica* combed through archives of public Parler videos, and it posted over 500 videos of the events of January 6, 2021.  The entire catalogue of videos posted *Pro Publica* is available here: https://projects.propublica.org/parler-capitol-videos/.

Within the next 20-30 minutes, the defendant was at one of the entrances to the west side of the Capitol, with that same shield, using it to break the window, allowing himself and multiple other rioters to be among the first—if not the first—to enter the interior of the Capitol building on January 6.[3]  Screen shots from a video of Pezzola using the shield to break the window are below. Soon thereafter, a number of people—including Pezzola—are seen on video entering the Capitol through the open window.



A photographer also captured Pezzola's destruction of the Capitol window from another angle, and the USCP logo on the shield is clearly visible, as is the earpiece Pezzola was wearing:

---

[3]      Pezzola was not the only person trying to break windows and forcibly enter the Capitol at that time, but he appears, based on video reviewed by undersigned counsel, to be the first person at this particular entrance to successfully breach a window or door well enough to allow entry.



One of the Parler videos posted to the *Pro Publica* website follows a number of rioters who entered the Capitol through a door near the window broken by Pezzola. Pezzola can be seen on this video, apparently recording video of himself in the Capitol and yelling excitedly. A screenshot, taken from 00:19 of that video, is below. The defendant appears to still be holding the USCP riot shield. As Exhibit 3 shows, Pezzola was part of a group that turned to the right and eventually confronted USCP Officer Eugene Goodman, demanding to know "where they meeting at, where they counting the votes?" It is unclear from the video which member of the mob shouted that question at Officer Goodman.[4]

---

[4] The rioters' encounter with Officer Goodman was widely publicized after it video of it from a different angle surfaced, in part because the mob was at that point very close to the Senate chamber, which had not yet been evacuated. Officer Goodman's actions in redirecting this group of rioters, which included Pezzola, may well have kept the rioters out of the Senate chamber. *See, e.g.*, https://www.washingtonpost.com/local/public-safety/goodman-capitol-police-video/2021/01/13/08ab3eb6-546b-11eb-a931-5b162d0d033d_story.html (last visited January 25, 2021).



In a separate video posted to social media, Pezzola appears to be smoking a cigar and taking a video of himself with his phone in "Selfie" mode. A screen shot from that video is below. In it, Pezzola can be heard saying words to the effect of, "Victory smoke in the Capitol, boys. This is f***ing awesome. I knew we could take this motherf***er over [if we] just tried hard enough."



The FBI also spoke to a witness, referred to as W-1 in the affidavit in support of a criminal complaint. W-1 stated that the defendant, whom W-1 knows as "Spaz," was one of a group of individuals who W-1 stated that other members of the group talked about things they had done during the day, and they said that anyone they got their hands on they would have killed, including Nancy Pelosi. W-1 further stated that members of this group, which included "Spaz," said that they would have killed [Vice President] Mike Pence if given the chance. According to W-1, the group said it would be returning on the "20th," which in context likely referred to the Presidential Inauguration, which took place on January 20, 2021. At the time of the interview with W-1, the inauguration had not yet occurred. W-1 stated that the group said that they planned to kill every

single "m-fer" they can.[5]  W-1 stated the men said they all had firearms or access to firearms.

The government sought and obtained a search warrant for a cell-site-location information related to a phone number which, according to information provided by a cell phone provider, was registered to Pezzola.  The location information provided by the cell phone provider is consistent with Pezzola traveling from the Rochester, New York area to the Washington, D.C. area on January 5, and returning to Rochester on January 7.  The data also show that, despite consistent activity on Pezzola's phone for the months leading up to the riot at the Capitol, the phone stopped being used on or about January 9, 2021.  That lack of use continued through the defendant's surrender in Rochester, New York on January 15, 2021.  Moreover, the defendant's offer to turn himself in to law enforcement did not come until the FBI began knocking on doors in the Rochester, New York area, seeking to speak to family members.  By the time the defendant surrendered, he had shaved his beard.  A copy of the defendant's photograph from the time of his arrest is below:

---

[5]      In a later interview, W-1 stated that the group had no definitive date for a return to Washington, D.C, but W-1 re-iterated that the others agreed there would be guns and that they would be back soon and they would bring guns.



The FBI also executed a search warrant at the defendant's residence at the time of his arrest. Agents recovered, from a room that appeared to be used exclusively by the defendant, a thumb drive that contained hundreds of .pdf files. While some of those files are related to seemingly innocuous topics, a significant number of those .pdfs provide detailed instructions for making homemade firearms, poisons, and/or explosives. A sample of titles includes, but is not limited to: (1) multiple serials of a series entitled "Advanced Improvised Explosives," those serials including "Explosive Dusts" and "Incendiaries;" (2) "The Box Tube MAC-11," with subtitle, "The Ultimate DIY Machine Pistol;" (3) "Ragnar's Big Book of Homemade Weapons;" and (4) "The Advanced Anarchist's Arsenal: Recipes for Improvised Incendiaries and Explosives." All of the above examples contain detailed instructions for how to make the subject matter reflected in their titles, and they are but four of hundreds of similarly titled .pdf files on the recovered thumb drive.

16

## No Condition or Combination of Conditions Will Reasonably Assure Community Safety or the Defendant's Appearance in Court

**1. Nature and Circumstances of the Offenses Charged**

The circumstances of the offenses charged in this case overwhelmingly support detention. The seriousness of the offenses with which the defendant is charged cannot be overstated. The defendant is currently charged by complaint with one crime of violence—breaking the window of the Capitol with the shield—and the evidence as laid out above would establish probable cause to believe that he committed another crime of violence a short time earlier, robbery of U.S. government property, in violation of 18 U.S.C. § 2112.

    a.   Defendant Committed Two Crimes of Violence.

Felony destruction of government property is a crime of violence. For purposes of the bail statute, as relevant to these offenses, a crime of violence is defined as "an offense that has an element of the use, attempted use, or threatened use of physical force against the person or property of another," if that crime is punishable by ten years or more in prison. *See* 18 U.S.C. § 3142(f)(1)(A) & 16. Section 1361 of Title 18 of the U.S. Code meets those requirements. It is punishable by ten years if the property damage was greater than $1,000, and its elements include the use of physical force against the property of another. *See United States v. Khatallah*, 316 F. Supp. 2d 207, 213 (D.D.C. 2018) (Cooper, J.) (holding that destruction of government property under a substantially similar statute, 18 U.S.C. § 1363, satisfies a substantially similar elements-clause statute to qualify as a crime of violence).

The evidence as laid out above would also establish that the defendant violated 18 U.S.C. § 2112, robbery of U.S. Government property, and § 111, assault on a federal officer, among other things. The government acknowledges that the defendant is not charged with these offenses at the time this memorandum is submitted. The government nonetheless submits that it is relevant to the

17

Court's analysis as to the seriousness of the defendant's conduct and his danger to the community. Violations of § 2112 are punishable by up to 20 years in prison, and they also meet the elements test. *See United States v. Alomante-Nunez*, 963 F.3d 58, 67 (1st Cir. 2020), citing *Stokeling v. United States* 139 S.Ct. 544 (2019) (holding that common-law robbery meets the elements test of a different, but substantially similar statute, to qualify as a crime of violence). *But see United States v. Bell*, 158 F. Supp. 3d 906, 919 (N.D. Cal. 2016) (holding that § 2112 does not meet the elements test, although that opinion was issued prior to the Supreme Court's decision in *Stokeling*). Violations of § 111 under these facts are punishable by up to eight years in prison.

### b. The Charges and Defendant's Actions Are Serious.

The charges in the criminal complaint are properly characterized as serious due to the possible statutory penalties; the coordinated and determined nature of the defendant's conduct; and the defendant's violent actions throughout January 6. He was one of the first people to lead the charge from the public area outside the Capitol grounds to the exterior of the building, where he was one of on the front lines of a multitude of people who ultimately overwhelmed USCP's defenses. After the barricades blocking access from the plaza were breached, Pezzola was among the first of thousands to flood the west plaza, and he initially positioned himself near the front line of police in riot gear. When those police had to engage in active riot control measures, Pezzola ripped away an officer's riot shield. Only after he had the shield in hand did Pezzola retreat to the back portion of the crowd.

In a matter of minutes, Pezzola was again part of a first line of people who tried to outflank police by going up stairs from the plaza to the next level above it, which included the window he ultimately broke with the shield. At the entrance to the Capitol itself, Pezzola was not just on the

front lines, but *first* to breach a window so successfully that he and other rioters could enter the Capitol through it.

He later smoked what he called a "victory cigar" inside the Capitol, noting for the camera that he "knew we could take this motherfucker over [if we] just tried hard enough." Pezzola's statement to the camera underscores the government's contention that the evidence establishes both that Pezzola invested a significant personal effort to take over the Capitol and that he did so in coordination with others.

The possible maximum terms of imprisonment that the defendant faces upon conviction provide an incentive to flee. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). The defendant faces ten years of imprisonment on the charge of a violation of 18 U.S.C. § 1361; twenty years for a violation of 18 U.S.C. § 1512(c)(2), and one year for a violation of 18 U.S.C. § 1752(a). Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes "a substantial incentive to flee the United States." *See Hong Vo*, 978 F. Supp. 2d at 43 (finding detention appropriate for defendant facing stiff penalties for bribery and visa fraud). Simply put, Pezzola has no incentive to appear before this Court and submit to the jurisdiction of the United States.

**2. The Weight of Evidence Against the Defendant**

Courts also consider the weight of the evidence in assessing the risk of light. 18 U.S.C. § 3142(g)(2). The weight of the evidence against the defendant is substantial. The defendant's face is clearly visible in numerous videos, which include acts of violence against both law enforcement officers in the line of duty and U.S. Capitol property. Per the information in the affidavit in support of a complaint, he was identified by, among others, W-2, who has known him for over five years.

### 3. The History and Characteristics of the Defendant

The defendant's history and characteristics likewise support pretrial detention. The defendant has no criminal convictions of which the government is aware, and he ultimately turned himself in to law enforcement. However, his flight and change of appearance before turning himself in should weigh heavily against the fact that he did so belatedly in the Court's analysis of his risk of flight. The defendant moreover did not offer to turn himself in until the FBI began making contact with his family.

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

The defendant's conduct on January 6 demonstrates his dangerousness, and the government will not rehash it here after laying it out above. We do note, however, that according to W-1, the defendant was among a group of people who said that they would be coming back to Washington, D.C., and that they would kill every "m-fer" that they could. He has shown a willingness to attempt to "go off the grid," as evidenced by his decision to stop using his cellular phone, and to attempt to change his appearance to avoid detection. He had access, at the time of his arrest, to a significant number of instructions on how to build homemade guns and homemade explosives, available on a thumb drive. He showed perseverance, determination, and coordination in being at the front lines every step along the way before breaking into the Capitol. Given the combination of the defendant's actions on that day, his professed intentions to commit additional violence, and his access to the means to carry out that violence in a largely undetectable way, there are simply no conditions nor combinations of conditions of release that can assure the safety of the community if the defendant is released.

**Conclusion**

Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by a clear and convincing evidence that the defendant is a danger to the community and by preponderance of the evidence that he is a flight risk.  For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

MICHAEL R. SHWERIN
ACTING UNITED STATES ATTORNEY
N.Y. Bar No. 4444188

By:  __/s/ *Erik M. Kenerson*_ _____
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar Number 82960
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov