**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175 |
| | ) |
| ETHAN NORDEAN, et al., | ) **Judge Timothy J. Kelly** |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S RESPONSE TO THE GOVERNMENT'S "NOTICE OF CORRESPONDENCE TO DEFENDANTS IN ADVANCE OF SEPTEMBER 21, 2021 HEARING ON MOTIONS TO DISMISS"—AND NORDEAN'S NOTICE OF INFORMATION RELEVANT TO BAIL PROCEEDINGS**

On September 21, the Court is hearing argument on Defendants' Motion to Dismiss the First Superseding Indictment (FSI). Minutes before the close of business on Friday, September 17, the government delivered a letter to Defendants' counsel and, at the same time, filed it on the docket. ECF No. 171-1. The stated purpose of the correspondence and accompanying court filing was to

> [N]otif[y] defendants that the government reserves the right to allege in any subsequent superseding indictment that the jurisdictional bases for alleged violations based on 18 U.S.C. § 231(a)(3) include not only the "federally protected function" provision of the statute, but also the "commerce" provision. . . The government is providing this information to the parties . . .to ensure the government's position on this issue is clear and so that the parties may address the issue as necessary at the upcoming hearing. . .

ECF No. 171-1, p. 2.

This letter filing is inappropriate for several reasons. First, as the government knows, the September 21 hearing does not concern potential future pleadings in this case but a motion to dismiss the FSI, the current charging instrument. As its letter acknowledges, the government's current Section 231(a)(3) charges rely on the "federally protected function" "jurisdictional"

element alone, not that section's commerce element.  And the government's briefing explicitly

disclaims reliance on Section 231(a)(3)'s commerce prong.  ECF No. 171-1, p. 2.  Therefore, the

government is wrong to suggest that its civil disorder charges may survive the pending motion to

dismiss on the basis of a new interstate commerce argument.

Second, even if the government's interstate commerce defense were meritorious (it is

not), parties may not inject new legal arguments into briefing after the motion cycle has closed

and, here, two business days before oral argument.  *See*, *e.g.*, *McBride v. Merrill Dow & Pharm.*,

800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time

[after briefing has closed] . . . is not only unfair. . ., but also entails the risk of an improvident or

ill-advised opinion on the legal issues tendered."); *Conservation Force v. Salazar*, 916 F. Supp.

2d 15, 22 (D.D.C. 2013) (party forfeits argument made for the first time after the close of

briefing); *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n. 5 (D.D.C.

2008) (declining to consider new argument made after the close of briefing particularly

appropriate where the new argument is inconsistent with the party's earlier one).

Third, the government's eleventh-hour injection of new arguments underscores the

deficiency of its civil disorder charges.  Its letter claims that the government still stands by the

FSI's allegation that the January 6 "civil disorder" adversely affected a properly identified

"federally protected function," i.e., a "function, operation or action carried out . . . by [a]

*department, agency or instrumentality of the United States*. . ." 18 U.S.C. § 232(3) (emphasis

added).  In listing the possible "federally protected functions" so allegedly affected, the

government did not include the joint session of Congress on January 6.  Gov't Sur-Reply, ECF

No. 130, pp. 14-15.  That is because, for purposes of Title 18, congressional entities are not

executive departments or agencies.[1]  Yet one may readily infer from the DOJ's own webpage for January 6 cases that, for every Section 231(a)(3) indictment, the government's boilerplate allegation to the grand jury was that the joint session was the fact that allegedly satisfied the "federally protected function" element.  For it appears on that site that virtually every criminal complaint charging a § 231(a)(3) offense alleges as much.  *See U.S. v. Howard Adams,* 21-mj-291, ECF No. 1-1, p. 16 (D.D.C. 2021) (joint session of Congress is the "federally protected function") *through U.S. v. Philip Young*, 21-mj-547, ECF No. 1, p. 5 (D.D.C. 2021) (same).[2] The government has itself correctly conceded in the January 6 cases that congressional entities are not executive "departments" or "agencies" "of the United States." *See*, *e.g.*, *United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 (D.D.C. 2021) ("Congress is not a federal agency and department, and the certification of the Electoral Collect vote is not an 'inquiry or investigation.'").

Fourth, the government understands that it does not need to "reserve the right" to allege matters in a future indictment, the stated purpose of its letter filing.  So, it may believe there is some other advantage to be gained by signaling to the Court that the government will simply supersede with a new indictment should its "federally protection function" argument be correctly rejected.  The government's confidence that the Court will appreciate such an appearance presumes more than it should.

---

[1] *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (after Supreme Court's decision in *Hubbard*, "an entity within the Legislative Branch cannot be a 'department' within the meaning of § 1001 and 18 U.S.C. § 6," nor is Congress an "agency" under § 6); *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995) (reversing convictions under § 1001 for false statements to Congress, as *Hubbard* "narrowed the reach of ["department" and "agency"] *to matters within the executive branch*") (emphasis added).

[2] DOJ, Capitol Breach Cases, available at: https://www.justice.gov/usao-dc/capitol-breach-cases (listing every § 231(a)(3) case).

\*

In the bail hearing on September 13, counsel to Defendant Biggs alerted the Court to information concerning the government's attempts to transfer Defendant Rehl to the D.C. jail. Specifically, Biggs' counsel advised that the government's attorneys may have threatened to transfer Rehl to D.C. from a Philadelphia jail if he did not agree to cooperate with the government against the other Defendants.  Counsel have subsequently gathered additional information about this episode.  It significantly bears on Nordean's and Biggs' pending bail motions in several respects.  These matters should be investigated by the Court, as it appears that the government's constitutional violations here are not limited to the improper withholding of exculpatory material beyond the point at which Defendants may make timely use of it.  Counsel are working on obtaining sworn declarations for the Court but advise it here about what they have learned in the meantime.

On August 13, Defendant Rehl mailed a letter to the Court.  Exh. 1.  He was writing from his cell in FDC Philadelphia.  Rehl formally requested that he be allowed to terminate his then-counsel, "effective immediately, due to ineffective counsel." Among other reasons given, Rehl noted that his counsel was taking actions on his behalf without his knowledge and ignoring virtually all requests to discuss the case.  "In five months, I have met with [counsel] once in the middle of May for approximately 30 minutes," Rehl wrote.  Exh. 1.  As this letter was never filed on the docket, it is not clear when the government became aware of it.  However, as inmate non-legal mail is reviewed, particularly in a case such as this, there is a presumption that the government gained knowledge of the letter at some point.

Sometime after he mailed that message to the Court, Rehl was removed from his cell by federal agents, likely U.S. Marshals.  Rehl did not know where he was being taken.   The agents

told him he was headed to a court appearance.  That was not true.  Rehl was then moved through

an underground tunnel to what appeared to be the Philadelphia federal courthouse.  He was then

steered not to a courtroom but to an office.  There he was greeted by assistant U.S. Attorney

Luke Jones.  Rehl apparently waited with the government's prosecutor, without counsel present,

for approximately an hour and a half.  At that point, an individual who works in the office of

Rehl's former counsel appeared.  Rehl had never retained this person to be his counsel and knew

her only as an assistant to his former lawyer.[3]  At that point, AUSA Jones began to converse with

Rehl about this case.  It is our understanding that Rehl's retained counsel was not then present.

Neither was an FBI agent, according to those in the room.

 Among other matters, AUSA Jones apparently told Rehl that if he did not cooperate with

the government, he would likely be transferred from FDC Philadelphia to the D.C. jail, where he

would not be able to see his wife and child, at least until after his "conviction."[4] It is our

understanding that when Rehl said there was nothing to cooperate about, AUSA Jones responded

that, in that case, Rehl could "wear a wire" when talking to others.  Rehl's then-counsel arrived

much later—approximately three hours behind schedule.  At that point the lawyers agreed to

continue the meeting to the following day.

---

[3] In any case, in retained counsel matters the Sixth Amendment right to counsel is specific to the defendant's counsel of choice, not satisfied by any member of the bar with a juris doctor degree. At the time of the government's meeting with Rehl, this rule was clearly established.  *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) (Scalia, J.) (structural error to deprive defendant of retained counsel of choice, as "the right to select counsel of one's choice . . . has never been derived from the Sixth Amendment's purpose of ensuring a fair trial [but] has been regarded as the root meaning of the constitutional guarantee").

[4] This meeting cannot be deemed a "reverse proffer" because: (1) it was not held with Rehl's knowledge and informed consent; (2) his retained counsel was not present; (3) the government apparently attempted to elicit statements from Rehl; and (4) apparently no FBI agent was present.

So unusual were these proceedings that the Marshals who transported Rehl back to the jail expressed their concern to him about his apparent total lack of legal representation.  "Did you know that interview was going to happen? Did your lawyer set that up for you?" When jail staff returned to Rehl's cell the next day, he refused to meet with AUSA Jones again.

If this information is accurate—and counsel to Nordean and Biggs contend it is on information and belief—it is highly relevant to their pending bail motions.  First, the government has represented to the Court that the decision to transfer inmates to the D.C. jail lies within the sole discretion of the U.S. Marshals Service, not the U.S. Attorney's Office.  Yet the government appears to be using its discretion to transfer defendants to the D.C. jail as a means of coercing them into cooperating with the government, not protecting public safety.[5]

Second, if it is true that the government proposed that Rehl wear a wire to record conversations with the other Defendants, that would mean the government has a purpose for detaining Nordean and Biggs that is not related to public safety, namely, the ability to record their statements in jail using a co-Defendant.  That is not only inconsistent with the detention rationale offered by the government in Court and supported by the Bail Reform Act.  If true, the government was attempting to use Rehl to elicit recorded statements from already-arraigned Defendants in the absence of their counsel, contrary to Sixth Amendment law clearly established at the time of the government's meeting with Rehl.  *Massiah v. United States*, 377 U.S. 201 (1964) (Sixth Amendment violation when government uses co-defendant to record conversation

---

[5] On September 13, the government suggested to the Court that "rallies" like the one held in D.C. on September 18 in support of detained January 6 defendants show the danger to public safety posed by Defendants.  As the Court now knows, that "rally" saw far greater numbers of press corps and law enforcement officers, uniformed and plainclothes, than "protesters." To secure bail, Defendants may struggle to prove politics is over but they can now point to evidence suggesting that rioting at the Capitol is, at least among those closely interested in cases involving these defendants.

6

with already-arraigned defendant in the absence of his counsel); *see also Montejo v. Louisiana*, 566 U.S. 778 (2009) (not overruling *Massiah*).

Dated: September 19, 2021                    Respectfully submitted,

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

## Certificate of Service

I hereby certify that on the 19th day of September, 2021, I filed the foregoing notice with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

Jim Nelson
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530
(202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, D.C. Bar No. 403068
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com