## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| | ) |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S NOTICE OF NEW AUTHORITY IN *U.S. v. SANDLIN*, 21-CR-88-DLF AND *U.S. v. REFFITT*, 21-CR-32-DLF**

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

## <u>TABLE OF CONTENTS</u>

The Court's Decision in *Sandlin* ........................................................................... 1

    A.    "Official proceeding" ..................................................................... 1

    B.    "Section 1512(c)(2) is not limited to acts affecting evidence"............... 5

    C.    The *Sandlin* Court's analysis of vagueness doctrine, the rule of lenity
          and the novel construction principle ........................................................ 13

    D.    "Corruptly" .............................................................................................. 17

Defendant Nordean, through his counsel, notifies the Court that a judge in this district has denied a January 6 defendant's motion to dismiss a charge under 18 U.S.C. § 1512(c)(2), *U.S. v. Ronald Sandlin*, 21-cr-88-DLF, ECF No. 63 (D.D.C. 2021), while at the same time deferring consideration of another under the vagueness doctrine. *U.S. v. Guy Reffitt*, 21-cr-32-DLF, Minute Order 12/11/21 (D.D.C. 2021). Nordean will explain why following these decisions would lead the Court into error. He will also show that, either way, the decisions do not apply here on their own terms.

### A.      Official proceeding

In *Sandlin*, the Court began by acknowledging that the term "proceeding" in § 1512(c)(2)'s "official proceeding" should not be construed in the lay sense but "understood narrowly, in a 'legal' sense." Mem. Op., p. 6. For this distinction the Court relied on *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). *Id.* However, after determining that *Ermoian* correctly rejected the lay meaning, the *Sandlin* Court did not then identify the legal-sense definition ultimately settled on by the court of appeals. That definition was: "'the business done in courts.'" 752 F.3d at 1170 (quoting Black's Law Dictionary 1241 (8th ed. 2004)). The *Sandlin* Court did not note that the court of appeals went on to elaborate that "the use of the preposition 'before'"—as, for example, in the phrase "a proceeding before the Congress," § 1515(a)(1)(B)—"suggests an appearance in front of [an] agency *sitting as a tribunal*." *Id.* at 1171 (emphasis added). In *Ermoian*, an FBI investigation did not "occur 'before a Federal Government Agency'" because it was not "like a hearing or trial . . ." *Id.* The *Sandlin* Court omitted that the court of appeals held that § 1512's terms, including "attendance," "testimony," "production," and "summon," "strongly impl[y] that some formal hearing *before a tribunal* is contemplated." *Id.* (emphasis added).

1

Instead, the *Sandlin* Court determined that a legal-sense definition of "proceeding" might be satisfied by "formality" per se, which need not entail adjudication or even investigation itself. Mem. Op., p. 6. Here, however, the Court will notice several things.

First, the *Sandlin* Court cites no authority for the proposition that a legal-sense "proceeding" may occur absent adjudicative procedures or any investigation. In over a century of obstruction of justice jurisprudence, there is none.

Second, the *Sandlin* Court omitted from its analysis this Circuit's binding decision in *U.S. v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994). There, the D.C. Circuit identified two qualities that turn an investigation into a Chapter 73 "proceeding": "adjudicative power or . . . the power to enhance the[] investigation[] through the issuance of subpoenas or warrants." *Id.* at 1127. Notice that three of the attributes defining a Chapter 73 "proceeding" in *Kelley*, binding on this Court, are absent from the January 6 joint session of Congress: (i) no investigation; (ii) no adjudicative power;[1] and (iii) no power to issue subpoenas or warrants. Notice, too, that the *Sandlin* Court omits that the government stipulated in *Kelley* that "proceedings" under § 1505 (entailing congressional investigations and inquiries) are "parallel" to those in § 1512.[2]

Third, the Court will notice how the *Sandlin* Court arrived at its unique holding that "official proceeding" is satisfied by "some formal[ity]. . ." Mem. Op. p. 6 (citing *United States v.*

---

[1] By not addressing adjudicative power under *Kelley*, the *Sandlin* Court thus avoided whether the "formal" (not to say "adjudicative") procedures under the Electoral Count Act of 1887 permit Congress to adjudicate the outcome of a non-deadlocked presidential election contrary to the Constitution's Elector Clause and the Twelfth Amendment, and whether the ECA was nonbinding on Congress (whose actions on January 6 were therefore not intrinsically adjudicative) as a piece of unconstitutional legislative entrenchment. *U.S. v. Winstar Corp.*, 518 U.S. 839, 872 (1996).

[2] The appellate lawyer who personally stipulated the §§ 1505-1512 "parallel" was Merrick Garland.

2

*Ramos*, 537 F.3d 439 (5th Cir. 2008)).  It quotes *Ramos*: "That [a] proceeding occurs 'before' an agency implies 'some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency.'" *Id.* (quoting *Ramos*, 537 F.3d at 462-63).  This Court will recall that in one of the many supplements the government has submitted in this case it quoted *Ramos*'s "some formal convocation" formula— and omitted the connected phrase "in which parties are directed to appear." The *Sandlin* Court did include the latter phrase.  But the inclusion defeats the Court's formality per se definition: "parties" are by definition those opposed in an adjudicatory proceeding to which they "are directed to appear." 537 F.3d at 462-63.  Notice, too, that *Ramos*, like *Kelley*, presumes the Chapter 73 "proceeding" will involve an investigation.  All of the relevant case law does.

Fourth, although the *Sandlin* Court concludes that an "official proceeding" must at least "be akin to a formal *hearing*," it does not define "hearing." Mem. Op., p. 7 (emphasis added). However, courts define "hearing" as "'a proceeding of relative formality . . . generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and parties proceeded against have the right to be heard . . .'" *U.S. ex rel. Health Choice All.*, *LLC v. Eli Lilly & Co.*, 4 F.4th 255, 264 (5th Cir. 2021) (quoting *Hearing*, Black's Law Dictionary (5th ed. 1979)).  The Court's description of the ECA's electoral certificate-counting procedures does not entail "issues of fact or law" to be decided, "in which witnesses are heard and parties proceeded against have the right to be heard." Mem. Op., p. 7.  Put another way, the adjudicative problem cannot be "solved" by sweeping it under a rug called "hearing," even if one places the adjective "formal" before it.  Perhaps understanding this, the Court hedges the word "hearing" with qualifiers like "trappings of" and "akin to" and "analogous." Mem. Op., pp. 7-8.  But there is no such crime as "obstruction of the 'trappings' of justice" or "obstructing something 'akin to' a

3

justice-like analogy." Until January 6, federal laws had not been construed to criminalize on the plane of simile and metaphor.

Fifth, the *Sandlin* Court found that "a related provision in the same chapter of Title 18 makes clear that congressional proceedings under § 1512(c) need not be 'court-like.'" Mem. Op., p. 8. Specifically, the Court noted that under § 1503 it is unlawful to corruptly obstruct "the due administration of justice." To avoid redundancy with "official proceeding" in § 1512(c), the Court declined to "read an 'administration of justice' requirement into 'official proceeding'" and so "official proceeding" must be broader. *Id.* Here, the Court incorrectly assumed that the "due administration of justice" term reaches all adjudicatory proceedings and proceedings involving investigations. It does not. Every circuit that has defined the "due administration of justice" has held that its meaning is coterminous with judicial proceedings.[3] But a proceeding may be adjudicative or at least involve an investigation even if it is not judicial: for example, the Iran-Contra proceedings in Congress. Thus, the "due administration of justice" phrase in § 1503 is not a basis for defining "official proceedings" short of adjudicatory procedures or investigations.

Finally, the *Sandlin* Court did not address a determinative canon of statutory construction. Courts "assume Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). A party must clearly overcome that assumption to establish that Congress intended a change to the meaning given legal terms by

---

[3] *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

4

related statutes and their judicial gloss.  *Hubbard v. United States*, 514 U.S. 695, 700 (1995).

"When Congress uses the language of one statute in another statute it usually intends both

statutes to have the same meaning."  *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1249 (D.C.

Cir. 2004).  And when interpreting statutes, the "assumption is that Congress knows the law – by

which the Supreme Court means judicial decisions."  *Id.*  Put another way, when it comes to

interpreting statutory terms, "meaning is use"; statutory meaning is not a just-this-once definition

arrived at ex post ("some formal[ity]. . ." Mem. Op. p. 6).

How has the term "proceeding" been *used* in the context of Chapter 73? In a century or

more of obstruction of justice jurisprudence predating the passage of the Sarbanes-Oxley Act of

2002, the obstruction of justice term "proceeding" had never been construed to encompass any

"formal" meeting of people lacking adjudicative power or an investigation.  To the contrary, the

D.C. Circuit had held at least twice before SOX's passage that those qualities are required of a

Chapter 73 "proceeding." *Kelley*, 36 F.3d at 1127; *United States v. Poindexter*, 951 F.2d 369,

380-82 (D.C. Cir. 1991).  Thus, because there is no evidence of a contrary understanding of

"proceeding" prior to § 1512(c)(2)'s codification, the *Sandlin* Court should have "assumed" that

Congress did not intend a sub silentio amendment to the historical sense of that term as used in

the statute.  *Avocados Plus Inc.*, 370 F.3d at 1249.  When novel, just-so constructions are placed

on criminal statutes after the fact—and in noticeable ways—it may create an incorrect

impression in the public's mind of outcome-oriented decision making.

**B.**     **"Section 1512(c)(2) is not limited to acts affecting evidence"**

The *Sandlin* Court allowed that the subsections of § 1512 "surrounding" subsection (c)(2)

"focus on documentary, tangible, and testimonial evidence." Mem. Op. p. 10.  However, the

Court determined that subsection (c)(2), uniquely, "is not limited to acts affecting evidence." *Id.*

The Court did not identify any other subsection in § 1512—titled, "Tampering with a witness, victim or informant"[4]—that is similarly unbound by any relationship to evidence in a proceeding.  But the actus reus verbs in (c)(2)—"obstruct," "influence," and "impede"—are "expansive and seemingly encompass all sorts of actions that affect or interfere with official proceedings, including . . . halting the occurrence of the proceeding altogether." Mem. Op. p. 9.

The Court acknowledged that it must consider "the broader context of the statute as a whole." Mem. Op., p. 10.  It began with subsection (c)(1).  The Court allowed that (c)(1) is indeed "limited to acts affecting evidence," namely, altering, destroying or concealing documents and other objects "with the intent to impair the object's integrity or availability for use in an official proceeding." *Id.*  It also acknowledged that "Subsections (c)(1) and (c)(2) are linked by the word 'otherwise,'" resulting in "interplay between" the subsections.  *Id.*

However, one page after concluding that (c)(1) and (c)(2) are "linked," the Court determined they are, simultaneously, "plainly separate and independent." Mem. Op. p. 11.  The Court did not explain how things can be linked and separate at the same time.[5]  But it did find that (c)(2) was "independent" from (c)(1) because it is "set off by both a semicolon and a line break." *Id.*  Yet the judicial purpose of interpreting statutory text is to understand its meaning, as distinguished from its visual appearance as such.  And the Court did not explain how a semicolon and line break somehow altered the meaning of (c)(2)'s "otherwise" phrase which, as the Court correctly noted, "links" it to the meaning of (c)(1).  As Nordean has previously

---

[4] The *Sandlin* Court prefers the pre-codification title of the "relevant section in [the SOX legislation]. . ." Mem. Op., p. 13.

[5] This would appear to constitute a kind of textual analog to the physics concept of quantum entanglement, where particles, though "independent" still affect one another through "interplay" at a distance.

6

explained, the question of meaning involves grammar, not page format.  Subsection (c)(2) is a

clause dependent on (c)(1) for its meaning because the predicate "or otherwise obstructs,

influences, or impedes any official proceeding, or attempts to. . . ." is not a complete sentence.

That distinguishes the relationship between (c)(1) and (c)(2) from the relationship between the

two statutory sections in the case relied on by the *Sandlin* Court, *Overdevest Nurseries*, *L.P. v.*

*Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021).  For convenience, Nordean reproduces here the two

sections that the *Sandlin* Court compares to (c)(1) and (c)(2) of § 1512:

> To participate in the H-2A program, an employer must first certify to the Secretary of
> Labor that:
>
> > A.  there are not sufficient workers who are able, willing, and qualified, and who
> > will be available at the time and place needed, to perform the labor or services
> > involved in the petition, and
> >
> > B.  the employment of the alien in such labor or services will not adversely affect
> > the wages and working conditions of workers in the United States similarly
> > employed.

*Overdevest Nurseries*, *L.P.*, 2 F.4th at 983 (quoting 8 U.S.C. § 1188(a)(1)(A)-(B)).

As the Court will see, each of the provisions in the case relied on by the *Sandlin* Court is

a complete sentence, unlike subsections (c)(1) and (c)(2) of § 1512.  Thus, they are

grammatically independent in a way that (c)(1) and (c)(2) are not.  The same grammatical point

distinguishes Justice Scalia's finding in *United States v. Aguilar*, on which the *Sandlin* Court

relies, that the *ejusdem generis* canon did not apply to § 1503's "omnibus clause."  515 U.S. at

615-16 (finding that the omnibus clause is "independent" of the rest of § 1503 in a grammatical

sense: it stands alone as a complete sentence).

Contrary to the *Sandlin* Court's understanding, line breaks and semicolons do not

necessarily alter the meaning of the clauses that follow in a sentence.  One simple example

would seem to suffice:

The reticent volcano keeps
His never slumbering plan;
Confided are his projects pink
To no precarious man.

In the sentence above, the line break between "The reticent volcano keeps/His never slumbering plan" does not indicate that the second line's meaning is "independent" of the first line's.  To the contrary, the phrase containing the pronoun "his" cannot be understood without reference to its antecedent in the first line.  Similarly, the same pronoun following the semicolon cannot be understood without reference to the first line.  Just so with (c)(2)'s "; or otherwise obstructs . . ." We are concerned with meaning, not the surface of the page.

The *Sandlin* Court's mistake in paradoxically finding (c)(2) "linked" to, but "independent" of, (c)(1) led it to erroneously distinguish *Begay v. United States*, 553 U.S. 137 (2008).  Mem. Op., pp. 10-11.  As in *Begay*, the "otherwise" clause in (c)(2) following (c)(1)'s "alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding. . ." must only cover "similar" crimes.  574 U.S. at 142.  If (c)(2) reaches acts as unrelated to object evidence destruction as appearing in Congress without permission, it covers activities such as trespass or harassment.  Those crimes are no more "similar" to the document destruction in (c)(1) than the DUI offense was to violent crime in *Begay*.  The way in which the *Sandlin* Court distinguished *Begay* was to incorrectly find (c)(2) "independent of" (but "linked to") (c)(1).  Mem. Op. pp. 10-11.

The *Sandlin* Court's treatment of *Yates v. United States*, 574 U.S. 528 (2015) contained similar errors concerning application of the *noscitur a sociis* canon (a word is known by the company it keeps) and the avoidance of surplusage.  Consider *noscitur a sociis* first.  The *Sandlin* Court found that *Yates* "was troubled by the fact that some of the provision's verbs—like

'falsifies' and 'makes a false entry in'—would not make sense as applied to fish." Mem. Op., p. 13.  But, the Court added, that "is not a problem [in connection with January 6 and § 1512(c)(2)], where obstructing, influencing, or impeding an official proceeding naturally come in numerous forms, including both evidence impairment and the halting of the proceeding altogether." *Id.*

*Yates*'s reasoning under *noscitur a sociis* was more holistic than the isolated point cited by the *Sandlin* Court.  *Yates* found that "tangible object" in § 1519 was "in the company of" terms relating to "record[s] [or] document[s.]" 574 U.S. at 544.  "Tangible object," therefore, was "appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects . . . used to record or preserve information." *Id.*  The Court was also "[m]indful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups." *Id.* at 532.  Reading "tangible object" to cover objects like a fish that did not record or preserve information would "cut § 1519 loose from its financial-fraud mooring." *Id.*  It is not enough, the Court held, to simply contend that § 1519 "extends beyond the principal evil motivating its passage" and that the statute is a "general ban on the spoliation of evidence" going by dictionary definitions of "tangible" and "object" in isolation.  *Id.* at 536.[6]

The government's argument that § 1512(c)(2) is the only provision in the statute that criminalizes acts unrelated to evidence integrity and availability is significantly more offensive to *noscitur a sociis* than the government's interpretation in *Yates*.  As the *Sandlin* Court itself allowed, the subsections of § 1512 "surrounding" subsection (c)(2) "focus on documentary, tangible, and testimonial evidence." Mem. Op. p. 10.  Just as in *Yates*, those § 1512 provisions all concern "information" destined for a proceeding.  Allowing (c)(2) to cover acts having no

---

[6] The *Sandlin* Court's holding directly conflicts with this part of *Yates*: "Statutes often reach beyond the principal evil that animated them." Mem. Op. p. 17.

relationship to information in a proceeding would, like applying "tangible object" to a fish, "cut § [1512(c)(2)] loose from its financial-fraud mooring" and from the rest of the statutory scheme. *Yates*, 574 U.S. at 532. The government's error in *Yates* is in the same nature as its error here: it applies an obstruction of justice concept in the wrong category (trespass is not obstruction of justice; it is trespass).

The *Sandlin* Court's surplusage analysis was mistaken. Mem. Op., p. 14. The Court determined that the government's construction of (c)(2)—criminalizing any act that obstructs/influences an official proceeding—"does not entirely subsume numerous provisions within the chapter." *Id.* That is incorrect. The government's interpretation plainly swallows the rest of § 1512 as well as §§ 1503 and 1505.

The *Sandlin* Court determined that "§ 1512(a)(1)(C), (a)(2)(C), (b)(3), and (d)(2)–(4) proscribe conduct unrelated to an 'official proceeding'" and thus that surplusage is avoided. Mem. Op., p. 14. Notice, first, that the Court implicitly acknowledged that the government's construction of (c)(2) render useless §§ 1512(a)(1)(A), 1512(a)(1)(B), 1512(a)(2)(A), and 1512(a)(2)(B). But the Court is incorrect that the sub-sub-sections it emphasizes are "unrelated to an 'official proceeding'" and thus that the government's interpretation of (c)(2) does not render them superfluous. When a person kills (§ 1512(a)(1)(C)), or uses physical force (§ 1512(a)(2)(C)) on, or threatens (§ 1512(b)(3)) someone to "prevent [their] communication . . .to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense. . .," this is not unconnected to an official proceeding. For "an official proceeding need not be pending or about to be instituted at the time of the offense." § 1512(f)(1). The nexus element merely requires that obstruction of a specifically contemplated official proceeding, even if not then instituted, be the intended

outcome of the obstructive act. Therefore, if a defendant assaults a person to prevent their communication to law enforcement of the time and location of a particular drug transaction, the nexus requirement to a specific but not-yet-instituted official proceeding may be satisfied. Thus, the government's interpretation of (c)(2) has not avoided surplusage in §§ 1512(a)(1)(C), 1512(a)(2)(C), and 1512(b)(3).

The Court's surplusage mistake extends to § (d)(2)–(4). Harassment designed to prevent a person from reporting to law enforcement or a judge ((d)(2)), from arresting a person "in connection with a federal offense" ((d)(3)), or from "causing a criminal prosecution . . . to be sought or instituted" ((d)(4)) is very much conduct related to an official proceeding, because, again: official proceedings "need not be pending or about to be instituted at the time of the offense," § 1512(f)(1), and all of those actus reus contemplate official proceedings.

The Court says the government's construction of (c)(2) creates no surplusage of §§ 1503 and 1505 because those latter statutes "prohibit obstructive acts related to the 'due administration of justice' and congressional inquiries or investigations, respectively, which may have no relation to an official proceeding." Mem. Op. p. 14. Not so. As explained above, every circuit that has defined the "due administration of justice" has held that its meaning is coterminous with judicial proceedings. Judicial proceedings are also "official proceedings." § 1515(a)(1)(A). As for congressional inquiries or investigations, if, as the *Sandlin* Court believes, an "official proceeding" is merely any formal proceeding, congressional inquiries or investigations would qualify by definition.

The *Sandlin* Court cites the counter-canon that, sometimes, forbidden surplusage is merely tolerable "overlap." Mem. Op. p. 14. But while the Court cites a dissenting rather than a controlling opinion in support, it omits that in the past six years the Supreme Court has rejected

the "mere overlap" counter-canon in the context of "catchall" provisions in obstruction

statutes—precisely the scenario here.  *Marinello v. United States*, 138 S. Ct. 1101, 1107-08

(2018); *Yates*, 574 U.S. at 544.

"More important" than the "mere overlap" counter-canon, added the *Sandlin* Court, was

hypocrisy.  Defendants' construction of subsection (c)(2) "would limit its scope to acts affecting

evidence, [and thus] would also[7] overlap with the rest of § 1512."  Mem. Op., p. 14. Aha, holds

the Court, "committing an act that affects evidence in a proceeding fully encompasses 'alter[ing],

destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object' for its use in a

proceeding," too.  Here the Court conflates the defendants' argument against the government's

overbroad construction (it even reaches conduct unrelated to evidence) with the defendants'

positive construction of (c)(2).

Defendants do not argue that (c)(2) covers "any act concerning the impairment or

availability of evidence." Instead, they contend that (c)(2) criminalizes "obstruct[ing],

influenc[ing], or imped[ing] any official proceeding" by "impair[ing] [evidence's] integrity or

availability for use in an official proceeding" *in a manner other than* "detroy[ing], mutilate[ing],

or conceal[ing] a record, document or other object. . ." § 1512(c)(1).  Examples would include

interfering with non-object evidence, such as occurs in all the § 1512(c)(2) cases on which the

*Sandlin* Court relies.  Mem. Op., pp. 15-16.

Finally, the *Sandlin* Court cites to a case which "affirmed a § 1512(c)(2) conviction

where the defendant's obstructive conduct did not relate to evidence." Mem. Op., p.  6 (citing

*United States v. Reich*, 479 F.3d 179 (2d Cir. 2007)).  The Court's reliance on *Reich* is

---

[7] Notice the "also." The *Sandlin* Court impliedly admits that the government's interpretation of §
1512(c)(2) engulfs "the rest of § 1512."

misplaced.  For one thing, the obstructive conduct did "relate to evidence." The defendant faxed a fake court order to his litigation opponent in a civil case—to prevent the court from considering a motion for summary judgment.  479 F.3d at 182.  By definition, motions for summary judgment involve a review of evidence.  Fed. R. Civ. P. 56(a).  Second, the defendant did not even argue that, and the court of appeals did not consider whether, § 1512(c)(2) only covers acts related to evidence impairment or availability.  *Id.*

### C.     The *Sandlin* Court's analysis of vagueness doctrine, the rule of lenity and the novel construction principle

The Court determined that, although no court before January 6 had applied a Chapter 73 statute outside the context of adjudicatory proceedings and investigations, and although no court had applied § 1512(c)(2) to acts unrelated to evidence, the vagueness doctrine and the rule of lenity did not prevent the Court from placing those new constructions on the statute and applying them to conduct that occurred before the interpretations had been decided.  Mem. Op., p. 17.  Its analysis of those doctrines was misguided.

The Court reasoned that § 1512(c)(2)'s "verbs plainly cover obstructive acts aimed at official proceedings." Mem. Op., p. 17.  However, the question was not whether the verbs cover obstructive acts generally but obstructive acts unrelated to evidence impairment or availability— like every other part of § 1512.  Because no court had ever held so, it is hard to see how a reasonably intelligent person would have notice that (c)(2) "plainly cover[s]," for example, appearing in Congress without permission.  Moreover, the Court did not address how or why a reasonably intelligent person would be on notice that a Chapter 73 obstruction statute would be applied to a "proceeding" not involving an investigation, evidence, or adjudication.  Indeed, over a century of obstruction of justice jurisprudence would put such a person on notice that the joint

session of Congress on January 6 was not a Chapter 73 "proceeding" because it did not involve an investigation, evidence, or adjudication.

The Court adds, "there is little question that violent assaults on law enforcement officers of the nature charged here constitute obstructive acts. The defendants were on notice of the illegality of their alleged conduct." Mem. Op. p. 17. If the (frivolous) issue were whether defendants were on notice of assault charges, the *Sandlin* Court would be quite right. However, the question instead is whether they were on notice of a different crime, obstruction of justice under § 1512(c)(2). "Violent assaults," while plainly deplorable, do not have some intrinsic connection to the meaning of "proceeding" or whether all of § 1512's sections concern evidence impairment or availability. The *Sandlin* Court was addressing a straw man.

The *Sandlin* Court briefly addressed the arbitrariness component of vagueness doctrine as follows. "'Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.'" Mem. Op. p. 17 (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016)).

That analysis of the significant evidence of arbitrariness inherent in the government's use of § 1512 in the January 6 cases is unfortunately abbreviated. It is also mistaken. Over 100 times the government has entered into Class B misdemeanor plea agreements with defendants whose conduct is identical to that of defendants charged under § 1512 who are facing up to 20 years in prison. The government has ventured no explanation whatsoever to distinguish why a person falls into the misdemeanor category versus the serious felony one. No fair and impartial court system can respond to this enormous problem with drastic consequences for people's lives by citing one highly generalized statement about judicial review. Fortunately, vagueness

14

doctrine does indeed address the situation where a vague interpretation of a criminal statute enables arbitrary and discriminatory enforcement.

As Justice Gorsuch recently explained, vagueness doctrine, which is rooted in the due process clause of the Fifth Amendment, is applied specifically to prevent "the exercise of arbitrary power." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring). For vague laws "leav[e] people in the dark about what the law demands and allow[] prosecutors and courts to make it up." *Id.* Indeed, that is occurring in these very cases.

The *Fokker Servs. B.V.* decision, relied on by the *Sandlin* Court, does not hold otherwise. That case did not concern vagueness doctrine. The government and defendant entered into a deferred prosecution agreement and filed a motion to toll the Speedy Trial Act to make it work. 818 F.3d at 737. The district court denied the motion on the ground that it was unhappy with deferred prosecution and would hold out on the Speedy Trial Act until it got the charges it wanted. *Id.* The D.C. Circuit reversed, holding that courts do not have the power to hold a Speedy Trial Act motion hostage on such grounds. *Id.* This uncontroversial and quite easy decision has nothing to say about the scope of vagueness doctrine.

Here, by contrast, the point is not that the Court should direct the government which charges to file. The perspective, rather, is that of a reasonably intelligent defendant. If the government is charging hundreds of people with a Class B misdemeanor for the same conduct that randomly results in a felony charge punishable by 20 years of prison time, the issue is whether the crimes are sufficiently demarcated to put a defendant on notice of his dramatically increased criminal liability. In these cases, the government has provided no notice, much less fair notice, of when or why a defendant moves from a Title 40 offense to a § 1512 charge. This is a gross absence of "standards to govern the actions of police officers, prosecutors, juries and

15

judges," *Dimaya*, 138 S. Ct. at 1212, which cannot be effectively resolved by citations to generalized principles outside the relevant constitutional doctrine.

Finally, the *Sandlin* Court addressed the rule of lenity in two sentences.  Mem. Op., p. 18. Although no court before *Sandlin* had applied § 1512(c)(2) to proceedings not involving adjudication or investigations and to acts unrelated to evidence, and although multiple courts in the district have acknowledged that the issues are challenging and difficult, the *Sandlin* Court found no "grievous ambiguity." *Id.* (citing *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).  This was in error.  In the first place, in the *Yates* decision the Court applied an "any doubt" standard of ambiguity, not the "grievous ambiguity" standard.  574 U.S. at 548 ("[I]f our recourse to traditional tools of statutory construction *leaves any doubt* about the meaning of 'tangible object,' . . . we would invoke the rule [of lenity].") (emphasis added).  *Yates* postdates *Barber*. *See also Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) ("[C]ontrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime.") (cleaned up).  Here, as explained, courts have already expressed "doubt" about the government's novel construction of § 1512(c)(2).  In any case, even if the "grievous" ambiguity standard were correct, it would have to apply here.  If the rule of lenity does not apply to multiple novel and strained interpretations piled on top of each other that leave lawyers and courts in the dark after hundreds of pages of briefing, lenity would never apply.  In addition, although the *Sandlin* Court cites to *United States v. Lanier*, 520 U.S. 259 (1997), it did not address that decision's novel construction principle. Even if the government's interpretations of § 1512(c)(2) were somehow unambiguously correct and not void-for-vagueness, they still concededly lack any supporting precedent.  It is a violation

of the due process clause to apply them retroactively to conduct that occurred before any court had adopted those understandings of the statute. *Lanier*, 520 U.S. at 266 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964)).

### D.      Corruptly

The Court began its analysis of § 1512(c)(2)'s term "corruptly" by treating the defendants' arguments as though they were a facial challenge to that term. Mem. Op., pp. 18-19. They are not. They argue that (1) as a matter of statutory construction, "corruptly" does not mean "wrongfully, immorally or in a depraved manner" and (2) the government's definition of the term applied in the January 6 cases is unconstitutionally vague.

When the Court turned to an as-applied challenge, it erred. As in the government's analysis, the confusion arises from declining to address or acknowledge the distinction between different types of proceedings, i.e., the context in which an operative term is used. The Court allowed that in *Poindexter*, the D.C. Circuit found that equating "corruptly" with moral purpose definitions like "wrongfully" would be unconstitutionally vague and therefore held that "corruptly" must be interpreted transitively to require proof that a defendant influenced another person to violate their legal duty and thereby obstruct a congressional proceeding. Mem. Op., p. 20 (citing *Poindexter*, 951 F.2d at 379). But the Court then found that "Courts have since cabined *Poindexter*'s holding to its facts and have not read it as a broad indictment of the use of the word 'corruptly' in the various obstruction-of-justice statutes." Mem. Op., p. 20. What the *Sandlin* Court failed to acknowledge or notice is that all of the post-*Poindexter* decisions it cites for that proposition occurred in the irrelevant context of judicial proceedings, not congressional ones. *Id.* (citing cases). (Irrelevant because the Court was simultaneously assuming that investigations and evidence are not required for a Chapter 73 "proceeding").

The next steps in the *Sandlin* Court's analysis are difficult to assess. The Court cited to virtually the same dictionary definitions of "corrupt" on which the *Poindexter* court relied. Mem. Op. p. 21. Like *Poindexter*, the *Sandlin* Court noted the distinction between transitive and intransitive meanings. *Id.* The Court then went on to hold that "the plain meaning of 'corruptly' encompasses both corrupt (improper) *means* and corrupt (morally debased) *purposes*." *Id.* (emphasis original). Citing decisions from the judicial proceedings context, it "agree[d] that § 1512(c)'s proscription of knowing conduct undertaken with the specific intent to obstruct, impede or influence the proceeding provides a clear standard to which the defendant can conform his behavior." *Id.* at 23. However, not only is a corruptly-is-merely-the-intent-to-obstruct standard plainly foreclosed by *Poindexter*, it is rejected by Judge Silberman's concurrence in *U.S. v. North*, on which the *Sandlin* Court itself relies. 910 F.2d 843, 940-41 (D.C. Cir. 1990) (an intent-to-obstruct definition "reads the word 'corruptly' out of the statute").

To make matters more confusing, the *Sandlin* Court then appeared to hold that "defining 'corruptly' to involve 'wrongfulness' presents a closer question because it may be subject to the same infirmities that *Poindexter* found in the words 'immoral' and 'improper.'" Mem. Op., p. 21. The Court appeared to resolve this problem by narrowing "wrongful" to "independently criminal conduct." *Id.* at 24. The sole authority it cited for such a definition was a nonbinding concurrence in *North*. *Id.* But in applying this standard to the facts at issue, the Court appeared to indicate that "independently criminal conduct" may practically mean "very severe independently criminal conduct." For the Court found that "forcibly breach[ing] the Capitol Building, assasult[ing] Capitol police officers, and encourage[ing] others to steal laptops and paperwork from the Senate Chamber" are acts that "fall on the *obviously* unlawful side of the line." Mem. Op., p. 24 (emphasis added).

The *Sandlin* Court's definition of "corruptly" is neither consistent with D.C. Circuit precedent nor workable in practice. "Corruptly" cannot mean "independently criminal conduct" for various reasons. In the first place, it is rejected by *Poindexter*, a point the Court did not address. Poindexter's false statements to Congress predicated charges under both § 1001 and § 1505. 951 F.2d at 371. The D.C. Circuit reversed his § 1505 conviction on the ground that the government had not proven the "corruptly" element. It rejected Poindexter's challenge to his § 1001 conviction. *Id*. at 387. If a defendant's intent to obstruct a proceeding "while" committing an "independent violation of the law" were a proper definition of "corruptly," Poindexter's § 1505 conviction would not have been vacated.

Practically, the *Sandlin* Court's definition does not resolve the vagueness identified by the Court itself. If obstructing/influencing Congress is "corruptly" done whenever the defendant at the same time commits "independent criminal conduct" there remains the problem of an incomprehensible boundary between Class B misdemeanor and felony conduct. The government contends that every single protester who entered the Capitol on January 6 ipso facto committed a crime: entering a "restricted area," Title 40 "parading," or both. Yet in hundreds of cases, the government and the courts have classified that conduct as a misdemeanor even when it involved "influencing" or "obstructing" or "impeding" Congress. The problem is not merely *a sentencing issue*; it is incomprehensible vagueness at the boundary between petty and gravely serious crimes.

To its credit, the Court appeared sensitive to this extremely serious concern of notice and fairness. After deciding *Sandlin* the Court entered an order in the *Reffitt* case holding that the vagueness doctrine may prohibit a § 1512(c)(2) charge as applied in that case. 21-cr-32-DLF, Minute Order 12/11/21. The Court therefore appeared to be defining "independent criminal

conduct" to mean, perhaps, "violent independent criminal conduct" or "felonious independent criminal conduct." While that distinction may matter in fairness terms, it does not appear to have anything to do with the meaning of the term "corruptly."

All these quandaries are avoided simply and without creating unnecessary distortions in the law.  When a defendant assaults law enforcement—he has committed the offense of assault of law enforcement.  18 U.S.C. § 111.  When a defendant steals property from the Capitol—he has committed the offense of theft of government property.  18 U.S.C. § 641.  When a defendant destroys something at the Capitol—he has committed a separate offense still.  18 U.S.C. § 1361. All of the vagueness and confusion enters the analysis because the government insists on creating a novel offense that parasitically sits on top of these traditional crimes.  The effect is to punish no unique category of conduct and at the cost of distortion of legal concepts and criminal statutes.

The *Sandlin* Court did not address the distinction between how "corruptly" is interpreted in judicial proceedings versus congressional ones.  Nordean's supplemental brief shows that, outside the context of judicial proceedings, "corruptly" must be understood to require proof that the defendant obtained an unlawful advantage for himself or an associate and that he influenced another to violate their legal duty and thereby obstruct the proceeding.  ECF No. 226.  Because those facts are not alleged in the indictment, the § 1512(c)(2) charges should be dismissed.

Dated: December 12, 2021                    Respectfully submitted,


                                            */s/ David B. Smith*
                                            David B. Smith (D.C. Bar No. 403068)
                                            108 N. Alfred St.
                                            Alexandria, VA 22314
                                            Phone:(703)548-8911
                                            Fax:(703)548-8935
                                            dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

## Certificate of Service

I hereby certify that on the 12th day of December, 2021, I filed the foregoing filing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

Jim Nelson
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530
(202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Ethan Nordean*