**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
|  | ) |
|  | ) |
| ETHAN NORDEAN, et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**DEFENDANT NORDEAN'S MOTION FOR DISCOVERY AND FOR AN
EVIDENTIARY HEARING IN SUPPORT OF HIS CLAIM OF SELECTIVE
ENFORCEMENT AND PROSECUTION**

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

## <u>TABLE OF CONTENTS</u>

Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

     A.     Hundreds to thousands of protesters similarly situated to Nordean but
          not similarly investigated or charged ......................................................... 2

     B.     Government statements of discriminatory intent ........................................ 6

Argument ................................................................................................................ 12

     I.     Standard for obtaining discovery on claims of selective enforcement
          and selective prosecution ......................................................................... 12

     II.    Nordean has easily satisfied the lower standard for discovery on his
          selective enforcement claim ..................................................................... 14

     III.   Nordean has satisfied the standard for discovery on his selective
          prosecution claim ..................................................................................... 17

Conclusion .............................................................................................................. 20

**Introduction**

In hundreds of January 6 cases, the government has declined to charge protesters who concertedly entered the Capitol Building with conspiracy to obstruct an official proceeding.  In hundreds of others, the government has likewise declined to charge protesters who concertedly protested outside and inside the building with conspiracy to commit a civil disorder offense.  Here, however, it has investigated and charged Nordean for conspiring to violate those felony statutes for conduct materially indistinguishable from that of the uncharged.

The Justice Department has announced that the January 6 investigation is one of the largest in its long history.  For that reason, it features likely the largest pattern in that history of selective enforcement and prosecution.  The equal protection component of the Fifth Amendment bars prosecution motivated by the defendant's exercise of a constitutional right, such as freedom of association, assembly and to petition the government.  To obtain discovery further demonstrating such an illicit charging decision, Nordean must merely offer some evidence that similarly situated defendants could have been charged as he has been but were not, and that the discrepancy is at least in part due to his exercise of a constitutional right.  His burden is lower for a claim of selective enforcement.

In the mine-run case, selective prosecution is challenging to establish.  Here, to state the standard is to show it has been satisfied.[1]  The government's misdemeanor plea agreements with protesters identify in granular detail over 100 defendants similarly situated to Nordean who were

---

[1] Only two selective prosecution discovery motions have been resolved in the January 6 cases.  Because both turned on comparisons with the Portland courthouse riots, the decisions shed no light on selective enforcement and prosecution within the January 6 investigation itself.  *U.S. v. Judd*, 21-cr-40-TNM, ECF No. 203 (D.D.C. 2021); *U.S. v. Miller*, 21-cr-119-CJN, ECF No. 67 (D.D.C. 2021).  Neither decision addresses the selective enforcement doctrine.

not investigated or charged as he has been.  In fact, the agreements reveal defendants whose conduct inside the Capitol involved more serious wrongdoing than is alleged in this case.

The January 6 prosecutions are unprecedented in many ways.  But in at least one sense they are disturbingly retrograde.  As in the 1950s and other politically perfervid eras, prosecutors make no secret of why protesters like Nordean have been charged with novel felony conspiracies unlike others who are similarly situated.  The government targets the political beliefs and perceived ideologies of political and cultural groups.  We know this because the acting U.S. Attorney responsible for Nordean's charges announced that illicit enforcement motivation to a national audience.  We know it thanks to publicly available charging statistics.

The Court is duty-bound to dismiss criminal charges motivated on those bases.  Nordean can plainly make the minimal showing that discovery is warranted in connection with his selective enforcement and prosecution claims.  The Court should therefore direct the government to produce relevant documents and hold an evidentiary hearing in which officials overseeing this prosecution may corroborate or refute that they selectively prosecute Nordean.

**Background**

A.    **Hundreds to thousands of protesters similarly situated to Nordean but not similarly investigated or charged**

The government estimates that at least 2,000 protesters were present at the Capitol on January 6 in an area regarded by the government as "restricted" under 18 U.S.C. § 1752.  FY 2022 President's Budget Request, Federal Bureau of Investigation, Section 5-5, available at: https://www.justice.gov/jmd/page/file/1399271/download.  Of those, over 700 have been federally charged, as of December 15.  Zoe Tillman, BuzzFeed News (@ZoeTillman), Twitter (Dec. 15, 2021), available at: https://twitter.com/ZoeTillman/status/1471182272862826504.

Of the over 700 charged protesters, the government had entered into plea agreements with slightly over 100 by October 14.  ECF No. 207-1.  Approximately 90% of those agreements involved defendants who pled guilty to a misdemeanor offense and not to any felony offense.[2] And among the misdemeanants, all but approximately 10 had been charged only with misdemeanor offenses, i.e., the government had not agreed to voluntarily dismiss felony charges as part of a plea bargain.  ECF No. 207-1.

The criminal conduct of this large cohort of January 6 misdemeanants can be accurately measured against Nordean's alleged conduct because the convicted defendants stipulated to their conduct in sworn statements of the offense attached to their plea agreements.  ECF No. 207.

The misdemeanants' stipulated conduct shows them to be similarly situated to Nordean along a number of objective charging criteria, ostensibly used by the government itself:

- Nearly all the misdemeanants entered the Capitol building, as did Nordean;

- All the misdemeanants entered the area regarded as "restricted" under § 1752 by the government, inside and outside the Capitol building, as Nordean allegedly did;

- With respect to all or nearly all the misdemeanants, the government possessed sufficient evidence indicating that the defendant's purpose in entering the Capitol was in protest of the 2020 presidential election and Congress's certification of the Electoral College outcome, as the government alleges with respect to Nordean;

- The statement-of-the-offense evidence cited in support of the misdemeanor offenses is also sufficient evidence of offenses under § 1512(c)(2) and § 231(a)(3), according to the government.

---

[2] The misdemeanor offenses were (1) parading, demonstrating or picketing in the Capitol Building, 40 U.S.C. § 5104(e)(2)(G); (2) disorderly conduct in the Capitol Building, § 5104(e)(2)(D); and/or (3) entering a restricted area without lawful authorization. 18 U.S.C. § 1752(a).  ECF No. 207-1.

ECF No. 207-1.

To gauge how similarly situated the January 6 misdemeanants are to Nordean, it is necessary to understand the elements of their misdemeanor offenses and their overlap with the elements of the felonies with which Nordean is charged, as (mis)understood by the government.

The most common misdemeanor offense among the government's January 6 charges is parading, demonstrating or picketing within the Capitol Building.  40 U.S.C. § 5104(e)(2)(G); ECF No. 207-1.   The intransitive verb "demonstrate" refers to when people "march or gather somewhere to show their opposition to something or their support for something." *Demonstrate*, Collins English Dictionary, available at: https://www.collinsdictionary.com/us/dictionary/english/demonstrate.  To avoid overbreadth, this Court has held that criminal "demonstration" must "inevitably intrude upon the senses of those persons in the immediate area." *Kroll v. United States Capitol Police*, 590 F. Supp. 1282, 1291 (D.D.C. 1983) *rev'd on other grounds*, 847 F.2d 899 (D.C. Cir. 1988).  Thus, insofar as they are constitutionally sound, the government's Title 40 convictions necessarily rest on evidence that the protesters "marched" or "gathered" in the Capitol to "show their opposition to" certification of the 2020 presidential election and in a manner that "inevitably intruded upon the senses of . . . persons in the immediate area," i.e., legislators, Secret Service protectees and law enforcement officers protecting them.  *Kroll*, 590 F. Supp. at 1291.

The government's construction of a felony offense under § 1512(c)(2) in the January 6 cases necessarily overlaps with a § 5104(e)(2)(G) misdemeanor offense.  According to the government, a defendant violates § 1512(c)(2) when through any act he obstructs, impedes or influences Congress, corruptly.  To "influence" is to "affect or alter by indirect or tangible means." *Influence*, Merriam-Webster Dictionary, available at: https://www.merriam-

webster.com/dictionary/influence.  Therefore, according to the government, the over 100

misdemeanants whom it did not charge under § 1512(c)(2) are nevertheless guilty of that felony

offense if they "inevitably intruded upon the senses of" legislators and law enforcement, *Kroll*,

590 F. Supp. at 1291, thereby necessarily "affect[ing] or alter[ing]" them and their proceedings

"by indirect or tangible means"—corruptly.[3]  Because the government defines "corruptly" to

mean "by independent criminal means," and because it alleges that every protester who entered

the Capitol building committed, at least, a violation of § 1752, it acknowledges that every

misdemeanant is also guilty under § 1512(c)(2), though uncharged.  ECF No. 207-1.

Such considerations led the Chief Judge to question whether there is any conceptual or

factual difference between the Title 40 misdemeanants and protesters charged under §

1512(c)(2).  See Marcy Wheeler, Emptywheel, (@Emptywheel), Twitter (Aug. 9, 2021),

https://twitter.com/emptywheel/status/1424732173068914694 (reporting Chief Judge's remarks

during Title 40 plea colloquy in *United States v. Wes Lee Croy*, 21-cr-162 (D.D.C. 2021)).

Examined at a granular level, the government's misdemeanor plea agreements do not just

show over 100 protesters similarly situated to, but not charged like, Nordean.  They reveal

dozens of protesters whose conduct was more criminally serious than that alleged in this case.

Here, the government alleges that Nordean entered the Capitol, walked through the Rotunda, and

then exited.  It does not allege that he destroyed or stole anything inside.  It does not allege that

he penetrated into sensitive areas of the building or threatened law enforcement or legislators.

---

[3] To its credit, the Court took pains to address this issue, albeit through the lens of vagueness
doctrine, in *U.S. v. Montgomery*, 21-cr-47-RDM, ECF No. 87, pp. 48-49 (D.D.C. 2021).
However, the Court's analysis was incomplete and therefore erroneous, for it proceeded as
though the only actus reus in § 1512(c)(2) was to "obstruct," omitting from its analysis
criminally "influencing" and "impeding" a proceeding.  *Id.*  When one includes those actus rei, it
is plain there is complete conceptual overlap between the government's construction of §
1512(c)(2) and a § 5104(e)(2)(G) offense.

By contrast, the government's misdemeanor plea agreements with over 100 defendants include the following stipulated conduct:

Derek Jancart brought a gas mask and two-way radios to D.C. on January 6.  He penetrated the Capitol Building to the Speaker's conference room.  He likely destroyed evidence by deleting videos and message threads from his phone.  He posted on Facebook that he "stormed the Capitol," explaining that the protesters "wanted to let the politicians know we can get this far any time we want." ECF No. 207-1.

Leonard Ridge entered the Capitol after texting, "I think we are going to try to block the session of Congress." He later texted that he had stormed the Capitol and that "we" had broken down the doors to the offices of Senator Mitch McConnell and Speaker Nancy Pelosi.  ECF No. 207-1.

Several defendants entered the Capitol and smoked and used controlled substances inside, including in senators' offices.  ECF No. 207-1.  Simple possession of marijuana is a federal offense.  21 U.S.C. § 844.

Frank Scavo recorded himself on video inside the Capitol saying, "Stormed the f**king Capitol" and "We f**king took it back" and "Treason." Misdemeanants penetrated all the way to senators' offices and the Speaker's conference rooms.  Misdemeanants stole objects from the Capitol.  One misdemeanant recorded herself inside the Capitol saying, "We were looking for Nancy to shoot her in the frickin' brain, but we didn't find her." ECF No. 207-1.  Dozens of additional examples have been provided to the Court.  *Id.*

**B.**     **Government statements of discriminatory intent**

In March, the then-U.S. Attorney who presided over the January 6 probe conducted a nationally televised interview about the investigation.  *Inside the prosecution of the Capitol*

*rioters*, CBS News, Mar. 22, 2021, available at: https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/.  His uncommonly candid remarks are significant in the selective prosecution context in a number of respects.[4]  They were made after the operative indictment was filed in this case.  ECF No. 26.

First, the former acting U.S. Attorney stated he was still employed by the Department of Justice when he sat down for the interview and that he had possessed decision-making powers over the January 6 investigation.  *Id.*[5]

Second, the former acting U.S. Attorney then described how his office's charging decisions were made.  He began by saying his office divided the protesters into roughly two camps.  In the first were "the internet stars," which included "the 'zip-tie guy,' the 'rebel flag guy,' the 'Camp Auschwitz guy." *Inside the prosecution of the Capitol rioters*, CBS News, Mar. 22, 2021, available at: https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/.  These were charged with felonies, and not merely misdemeanors, on the charging criterion that they "were thumbing their noses at the public. . ." *Id.*

Also in the first camp were the "members of far-right militias." *Id.*  However, although this cohort was charged in a manner different from other protesters, the former U.S. Attorney

---

[4] For purposes of this motion, Nordean does not draw the Court's attention to the acting U.S. Attorney's interview on account of its impropriety.  Far more significant than the prosecutor's indisputably unwise decision to appear on television is the forthcoming content of his remarks.  Nordean proposes that it was the unscripted nature of these remarks more than the violation of Department policy they embodied which prompted DOJ to investigate his TV interview.

[5] Whether the former U.S. Attorney received "approval" from the Department is immaterial in this motion.  The government has never indicated that the prosecutor's televised remarks were not truthful.  As shown *infra*, if they are truthful they satisfy the discriminatory intent standard.

allowed that that was not necessarily because they were more criminally culpable than other

protesters.  The interview contained the following exchange:

> Scott Pelley: Was there a premeditated plan [by the "far-right militias"] to breach the Capitol?

> Michael Sherwin: That's what we're trying to determine right now.  We've charged multiple conspiracy cases. . .

Accordingly, the former U.S. Attorney acknowledged that the conspiracy charges in this

case and others were not based on a prior determination that Nordean and others had a

"premeditated plan to breach the Capitol."[6] That question was still being "determine[d]." The

chief prosecutor then explained why the charges had nevertheless been filed prematurely:

> Michael Sherwin: After the 6th, we had an inauguration on the 20th.  So, I wanted to ensure, and our office wanted to ensure, that there was shock and awe that we could charge as many people as possible before the 20th.  And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, "If we go there, we're gonna get charged."

Finally, the former U.S. Attorney described the second camp of protesters.  These were

"the great majority of the people" who were "protesters" and not "rioters." *Id.*  He explained

when a person crossed from this second camp to the first camp of "internet stars" and "far-right

militias": "You cross the line when you cross a police line aggressively.  You throw something at

a cop.  You hit a cop.  You go into a restricted area, knowing you're not supposed to be there."

*Id.*

---

[6] As Nordean explained a month after January 6, if the government does not possess evidence of a plan among the defendants to enter the Capitol but merely to nonviolently protest outside it, it does not have a conspiracy case, only constitutional assembly protected under this Circuit's longstanding precedent.  *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) ("[T]he East Front sidewalk [of the Capitol] is a public forum.").  As the government now realizes after a year of investigation, it does not possess such evidence. Rather than concede the reality, the government will allow its mistake to go unacknowledged at the cost of the defendants' and their families' lives.

Additional evidence corroborates that the Department of Justice began with the legal conclusion that conspiracy and serious felony charges would be filed against a predetermined set of protesters for reasons unrelated to the sufficiency of the evidence.  Before his appearance on national television in March, the former acting U.S. Attorney held a press conference on January 12.  *Acting U.S. Attorney Michael Sherwin provides update on criminal charges related to events at the Capitol on January 6*, DOJ Office of Public Affairs, Jan. 12, 2021, available at: https://www.justice.gov/opa/video/acting-us-attorney-michael-sherwin-district-columbia-and-fbi-washington-field-office-adic.  The former acting U.S. Attorney's remarks were made only six days after the events of January 6.  On January 12, the chief prosecutor announced that, on the previous day, his office had organized a "strike force of very senior national security prosecutors" to manage charging decisions in connection with the Capitol cases.  At this point, a few days after the event, the government had not conducted an arrest or search of any defendant in this case.  ECF No. 1.  Nevertheless, before evidence had been collected the former U.S. Attorney announced the "only marching order" he gave to the charging strike force: "Build seditious and conspiracy charges . . ." *Acting U.S. Attorney Michael Sherwin provides update on criminal charges related to events at the Capitol on January 6*, DOJ Office of Public Affairs, Jan. 12, 2021.

Moving to this particular case, that Nordean has been charged, and held in pretrial confinement, at least in part because he is a member of the Proud Boys, a political organization in disfavor with the government, is demonstrated in several ways.  First, as shown above, the government's novel construction of § 1512(c)(2) implies that hundreds of Title 40 misdemeanants are guilty of, but not charged under, that statute.  Criminal conspiracy is simply an agreement to commit a federal offense followed by a conspirator's act to effect the

9

conspiracy's illegal object.  18 U.S.C. § 371.  Therefore, dozens if not hundreds of the January 6 misdemeanants necessarily "conspired" to commit their crimes (according to the government) as they traveled in groups to the district, traversed the "restricted area" on the Capitol grounds in groups, entered the building together, and milled around inside in units.  ECF No. 207-1.  Yet the misdemeanants are not charged with conspiracy.  As the voluble former acting U.S. Attorney explained on television, the charge of conspiracy has been reserved for members of "far-right militias."  *Inside the prosecution of the Capitol rioters*, CBS News, Mar. 22, 2021, available at: https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/.

Second, the government has consistently cited Nordean's membership in and affiliation with the Proud Boys organization, and perceived corresponding political beliefs, as a basis for his charges and for detaining him pretrial, in contrast with other protesters who, unlike Nordean, committed acts of violence on January 6 but who are not members of disfavored political organizations.  A representative sample includes the following:

- Nordean's criminal complaint "alleges" Proud Boys political events prior to January 6.  That this "evidence" is alleged for its political rather than criminal nature is shown by the fact that no criminal activities are alleged to have occurred at these events.  ECF No. 6-1, p. 3;

- The Superseding Indictment "alleges" that the Proud Boys are self-described "Western Chauvinists" who "routinely attend [noncriminal, political] rallies, protests and other events. . ." ECF No. 26, p. 1;

- The criminal conspiracy is defined not by reference to a specific set of individuals but extends to a political organization itself, "The Proud Boys." ECF No. 26, p. 2.  That the

charge draws no distinction between the conspiracy and the political group is shown by the government's claim that it has properly charged a criminal agreement to destroy property between Nordean and non-defendant Dominic Pezzola solely by virtue of the allegation that Pezzola is "a Proud Boys member." ECF No. 26, p. 13; ECF No. 93, p. 5;

- The Superseding Indictment alleges that fundraising to enable the "communications" and "travel expenses" of a political organization itself, the Proud Boys, is an "overt act" of "conspiracy." ECF No. 26, p. 9;

- Nordean should be incarcerated, the government contends, because he "believes that he and his fellow Proud Boys are 'Patriots' who are going to 'bring back that original spirit of 1776 of what really established the character of what America is. And it's not complacency, it's not low standards.  It's, this is how it's going to be and I don't give a damn.'" ECF No. 30, p. 7;

- Nordean should be detained, the government argues, because "there is no reason to believe that [he], or any of his Proud Boys associates, are any more interested in 'complacency,' or any less interested in fomenting rebellion, than they were on January 5." *U.S. v. Nordean*, 21-mj-67, ECF No. 4 (W.D. Wash. 2021);

- Nordean should be incarcerated because "he is a recognized leader of the Proud Boys." ECF No. 45, p. 7;

The Court itself appears to believe that the government's enforcement motivation is at least in part rooted in Nordean's political beliefs and group affiliation.  For its stated basis for detaining the defendant pretrial is that "Even if the election has passed, all of politics has not," Hr'g Trans., 4/19/21, p. 55, and that Nordean could attend political rallies in the future. *Id.*

**Argument**

**I.      Standard for obtaining discovery on claims of selective enforcement and prosecution**

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment.  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).  While a prosecutor has "broad discretion to enforce the Nation's criminal laws," the decision to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal citation omitted).  Such "arbitrary classifications" include "a suspect's exercise of constitutional rights through participation in political activity." *United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997); *United States v. Cyprian*, 23 F.3d 1189, 1195 n. 10 (3d Cir. 1994) *cert denied*, 513 U.S. 879 (1994) (same); *United States v. Berrios*, 510 F.2d 1207, 1211 (2d Cir. 1974) (same).

To prevail on the claim, the defendant must demonstrate that the "federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465.  As to discriminatory effect, the defendant must show that "similarly situated defendants . . .could have been prosecuted but were not." *Id.* at 469.  As for improper prosecutorial motive, the defendant must demonstrate that the government chose to prosecute "at least in part because of, not merely in spite of," his protected characteristic.  *Wayte v. United States*, 470 U.S. 598, 610 (1985).  Discriminatory intent can be shown "by either direct or circumstantial evidence." *United States v. Miller*, 21-cr-119-CJN, ECF No. 67, p. 4 (D.D.C. 2021).  Dismissal of the selectively prosecuted charge is the appropriate remedy.  *In re Aiken County*, 725 F.3d 255, 264 n. 7 (D.C. Cir. 2013).

Producing evidence of these elements often requires discovery.  *Miller*, 21-cr-119-CJN, ECF No. 67, p. 1.  "If discovery is ordered, the government must assemble from its own files documents which might corroborate or refute the defendant's claim." *Armstrong*, 517 U.S. at 648.  To obtain such discovery, the defendant must identify "some evidence tending to show the existence of" the discriminatory effect and improper prosecutorial motive.  *Id.*; *Miller*, 21-cr-119-CJN, ECF No. 67, p. 2.

A selective enforcement claim is different in key respects from selective prosecution.  Just as the prosecutor may not constitutionally charge a defendant based on arbitrary classifications, so law enforcement agents may not constitutionally base target selection or prosecution referrals on such classifications.  *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (en banc) (Easterbrook, J.).  Unlike prosecutors, however,

> agents . . .are not protected by a powerful privilege or covered by a presumption of constitutional behavior.  Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.  They may also have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. . . . In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI . . . engaged in [arbitrary classifications] when selecting targets . . .or when deciding which suspects to refer for prosecution.

793 F.3d at 721.

 Accordingly, at least three federal circuits have recognized that selective enforcement claims are open to discovery on a lesser showing than the one under *Armstrong*.  *Davis*, 793 F.3d at 721; *United States v. Sellers*, 906 F.3d 848, 850-51 (9th Cir. 2018); *United States v. Washington*, 869 F.3d 192, 219 (3d Cir. 2017).  One district court has described the lower standard as merely requiring the defendant to show that his protected characteristic "has been singled out [for enforcement targeting] to a statistically significant extent in comparison with

other [potential defendants.]" *United States v. Lopez*, 415 F. Supp. 3d 422, 427 (S.D.N.Y. 2019) (Rakoff, J.).

## II.    Nordean has easily satisfied the lower standard for discovery on a selective enforcement claim

As shown above, selective enforcement claims are open to discovery on a showing considerably more relaxed than that set forth in *Armstrong*. *Davis*, 793 F.3d at 721; *Sellers*, 906 F.3d at 850-51; *Washington*, 869 F.3d at 219; *Lopez*, 415 F. Supp. 3d at 427. But even if the *Armstrong* standard were to apply to law enforcement agents and not just to prosecutors, Nordean has satisfied it.

FBI agents filed a criminal complaint against and sought a warrant for the arrest of Nordean on the basis of the same felony charges he faces today. ECF No. 6. As shown above, over 100 protesters—and likely hundreds more—engaged in the same conduct as, or more severe conduct than, Nordean is alleged to have undertaken on January 6. None was the subject of a criminal complaint and investigation pursuant § 1512(c)(2) and § 231(a)(3). Thus, there are plainly "similarly situated defendants . . .[who] could have been [investigated and criminally referred under § 1512(c)(2) and § 231(a)(3)] but were not." *Armstrong*, 517 U.S. at 469.

As for targeting and prosecution referral on the basis of arbitrary classifications, it is lying on the face of the criminal complaint. "[I]t is axiomatic that the first amendment guarantees freedom of association with religious and political organizations, however unpopular. Thus, the government cannot [target] an individual for mere membership in a religious or political organization that embraces both illegal and legal aims . . ." *United States v. Lemon*, 723 F.2d 922, 940 (D.C. Cir. 1983); *see also NAACP v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963) (holding that the First Amendment protects the right of an individual to advocate through an association). As Justice Harlan described the right of association:

14

Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. . . . It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause . . . . which embraces freedom of speech. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 499, 460-61 (1958).

As indicated above, agents' criminal complaint "alleges" Proud Boys political events prior to January 6 attended by Nordean.  That this "evidence" is alleged for its political rather than criminal nature is shown by the fact that no criminal activities are alleged to have occurred at these events.  ECF No. 6-1, p. 3.  By contrast, the criminal complaints filed against the over 100 misdemeanants referenced above do not "allege" their political affiliations, group association, and political events attended.  ECF No. 207-1.

Agents' targeting of Nordean on the basis of his political associations and beliefs can also be seen on the face of their search warrant applications.  A constitutional warrant may issue only for: (1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained.  Fed. R. Crim. P. 41(c).  To take just one example, among other "things to be seized" from Nordean's home, agents targeted all "Records and information that constitute evidence of NORDEAN's affiliation with the Proud Boys, including clothing with Proud Boys emblems, insignia, or other identifying characteristics."  Nordean Warrant Application, 2/2/2021, Attachment B, p. 4.  By definition, then, agents targeted as "evidence of a crime" any indication of Nordean's membership in a political organization.

A simple numerical comparison shows that Nordean "has been singled out [for enforcement targeting] to a statistically significant extent in comparison with other [potential defendants.]" *Lopez*, 415 F. Supp. 3d at 427.  As explained above, the concerted conduct of over 100 January 6 misdemeanants—likely well over—could have been investigated and referred for prosecution (according to the government) as a conspiracy to obstruct, impede or influence an official proceeding under § 1512(c)(2) and/or to commit a civil disorder offense under § 231(a)(3) but was not.  ECF No. 207-1.  By contrast, every time, or virtually every time, agents have investigated and referred for prosecution on an obstruction/civil disorder conspiracy related to January 6, it has been against a defendant who allegedly associates or affiliates with a political or cultural organization and in connection with his or her association or affiliation: the Proud Boys[7]; the Oath Keepers[8]; and the Three Percenters.[9]

Thus, out of over 700 charged protesters who could have been investigated and referred for prosecution for such conspiracies, approximately 37 have been actually so investigated—all of them in connection with their association with or membership in a political or cultural organization.  In other words, the charging statistics nakedly reveal that it is not exclusively (or even mainly) Nordean's conduct from which his conspiracy charges derive, but his association with the Proud Boys, a political organization.

---

[7] *U.S. v. Nordean*, *et al*., 21-cr-175 (D.D.C. 2021) (Four defendants); *U.S. v. Pezzola*, *et al*., 21-cr-52 (D.D.C. 2021) (Two defendants); *U.S. v. Kuehne*, *et al*., 21-cr-160 (D.D.C. 2021) (Six defendants).

[8] *U.S. v. Caldwell*, *et al.*, 21-cr-28 (D.D.C. 2021) (Nineteen defendants).

[9] *U.S. v. Hostetter*, 21-cr-392 (D.D.C. 2021) (Six defendants).

That easily satisfies the applicable selective enforcement discovery standard. *Lopez*, 415 F. Supp. 3d at 427; *Davis*, 793 F.3d at 721; *Sellers*, 906 F.3d at 850-51; *Washington*, 869 F.3d at 219.

## III.   Nordean has satisfied the standard for discovery on his selective prosecution claim

As explained above, Nordean's burden to obtain discovery is to identify "some evidence tending to show the existence of" the discriminatory effect of and improper prosecutorial motive behind the charges he faces. *Armstrong*, 517 U.S. at 469.  Thanks to the former acting U.S. Attorney's decision to announce his office's discriminatory charging logic publicly, Nordean has cleared even the *Armstrong* standard.

Nordean has already shown above the existence of over 100 "similarly situated" January 6 protesters who could have been charged with conspiracies to obstruct an official proceeding or commit a civil disorder offense but were not.  Thus, he has satisfied the "discriminatory effect" burden to obtain discovery.  *Armstrong*, 517 U.S. at 469.  It is critical to appreciate that this consideration distinguishes Nordean's request from the selective prosecution discovery motions rejected in *U.S. v. Judd*, 21-cr-40-TNM, ECF No. 203 (D.D.C. 2021) and *U.S. v. Miller*, 21-cr-119-CJN, ECF No. 67 (D.D.C. 2021).  In both of those cases, the Court rejected the motions on the ground that Portland riot defendants were not "similarly situated" to January 6 defendants for reasons having to do with generalized distinctions between the overarching fact patterns in Portland and the District of Columbia (e.g., the Portland courthouse was attacked at night when no one was present, unlike the Capitol).

As for improper prosecutorial motive, Nordean has offered both direct and circumstantial evidence.  *Miller*, 21-cr-119-CJN, ECF No. 67, p. 4.  The former acting U.S. Attorney explicitly announced in an interview that his office had filed conspiracy charges against Nordean and

17

others before determining whether the defendant had a "premeditated plan to breach the Capitol." *Supra* at 8.  Before evidence had been collected from the defendants here, the former acting U.S. Attorney had publicly stated that his "only marching order" to prosecutors was to "build conspiracy charges . . ." which have only been filed against defendants like Nordean on account of their group associations, as charging statistics demonstrate.  *Id.*

As to his office's motivation for bringing conspiracy charges before evidence had been reviewed, the former acting U.S. Attorney stated that it was "to ensure that there was shock and awe, that we could charge as many people as possible before the" presidential inauguration.  *Id.*

The chief prosecutor added that charges were brought to make Nordean and others "afraid to come back to D.C." *Id.*

Whether or not one agrees with the former acting U.S. Attorney's candid sentiments as a personal matter, it is indisputable that they do not constitute constitutionally defensible grounds for a charging decision.  The former U.S. Attorney likened his office's charging decisions against citizens of his own country to a military tactic involving the flamboyant display of force to overwhelm enemy combatants in war.  The Attorney General and United States Attorneys enjoy discretion "to enforce the Nation's criminal laws," *Armstrong*, 517 U.S. at 469—not to frighten citizens from petitioning their government in the nation's capital and otherwise exercising their constitutional rights.  Nordean and other Americans have a constitutional right to travel to D.C., to assemble there, and to petition their government.  *Lederman*, 291 F.3d at 44.

On their own, the former acting U.S. Attorney's remarks amount to "some evidence tending to show the existence of" an improper prosecutorial motive "at least in part" explaining the decision to charge Nordean with a conspiracy, *Wayte*, 470 U.S. at 610, sufficient to warrant discovery.  But Nordean has shown much more than that.  As explained above, the January 6

18

charging statistics demonstrate that it is not exclusively, or even mainly, Nordean's conduct from which his conspiracy charges derive, but his association with the Proud Boys, a political organization. *Supra* at 16. And the government has consistently argued that Nordean should be detained on account of the fact that he belongs to the Proud Boys organization and that "politics is not over." *Id.* That circumstantial evidence of the government's decision to selective charge Nordean corroborates what the former acting U.S. Attorney announced in clear-cut language. *Miller*, 21-cr-119-CJN, ECF No. 67, p. 4 (D.D.C. 2021).

**Conclusion**

For the foregoing reasons, the Court should direct the government to provide documents sufficient to show how charging decisions were made with respect to Nordean, demonstrating why the government decided to charge him differently from similarly situated January 6 protesters. The Court should also hold an evidentiary hearing in which the officials overseeing this prosecution may corroborate or refute that Nordean has been subject to selective enforcement and prosecution.

Dated: December 29, 2021                Respectfully submitted.


                                        */s/ David B. Smith*
                                        David B. Smith (D.C. Bar No. 403068)
                                        108 N. Alfred St.
                                        Alexandria, VA 22314
                                        Phone:(703)548-8911
                                        Fax:(703)548-8935
                                        dbs@davidbsmithpllc.com

                                        Nicholas D. Smith (D.C. Bar No. 1029802)
                                        7 East 20th Street
                                        New York, NY 10003
                                        Phone: (917) 722-1096
                                        nds@davidbsmithpllc.com

                                        *Attorneys for Ethan Nordean*

## **Certificate of Service**

I hereby certify that on the third day of December 29, 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

>   Jim Nelson
>   Assistant United States Attorney
>   555 4th Street, N.W., Room 4408
>   Washington, D.C. 20530
>   (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

>   /s/ David B. Smith
>   David B. Smith, VA Bar No. 25930
>   David B. Smith, PLLC
>   108 North Alfred Street, 1st FL
>   Alexandria, Virginia 22314
>   (703) 548-8911 / Fax (703) 548-8935
>   dbs@davidbsmithpllc.com
>
>   *Attorneys for Ethan Nordean*

20