UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-CR-175-1 (TJK) |
| : | |
| ETHAN NORDEAN, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT NORDEAN'S
MOTION FOR DISCOVERY AND HEARING ON CLAIM OF
SELECTIVE ENFORCEMENT AND PROSECUTION**

The United States respectfully opposes defendant Ethan Nordean's motion requesting discovery on a claim of selective enforcement and prosecution. ECF 267. Nordean has failed to meet the rigorous standard for overcoming the presumption of regularity that attaches to Executive Branch prosecutorial decisions. To obtain discovery, he must make a colorable showing that he was singled out for prosecution among others "similarly situated," and that his prosecution was based on an "arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 465-67 (1996). He has done neither. Insofar as he presses a related claim of "selective enforcement," his claim is likewise meritless.

## BACKGROUND

*Allegations Against Ethan Nordean*

Nordean and his co-defendants, Joseph Biggs, Zachary Rehl, and Charles Donohoe, are charged by indictment in connection with the events of January 6, 2021, at the U.S. Capitol. Each defendant is charged with one count of conspiracy (18 U.S.C. § 371); one count of obstruction of an official proceeding (and aiding and abetting the same) (18 U.S.C. §§ 1512(c)(2), 2); one count of obstruction of law enforcement during a civil disorder (and aiding and abetting the same) (18 U.S.C. §§ 231(a)(3), 2); one count of destruction of government property (and aiding and abetting

the same), in an amount in excess of $1,000 (18 U.S.C. §§ 1361, 2); one count of entering and remaining in a restricting building or grounds (18 U.S.C. § 1752(a)(1)); and one count of disorderly conduct in a restricted building or ground (18 U.S.C. § 1751(a)(2)). ECF No. 26 (Superseding Indictment).

The factual allegations underlying these charges are presented in the indictment, subsequent filings by the government, and rulings by the Court. *See, e.g.*, ECF 30 (Gov. Mot. to Revoke Nordean's Pretrial Release); ECF 71 (Oral Ruling on Pretrial Detention of Nordean); ECF 106 (Gov. Opp. to Nordean Mot. to Dismiss); ECF 107 (D.C. Circuit Affirmance of Pretrial Detention); ECF 263 (Mem. Op. Denying Nordean Mot. to Dismiss).

In summary, the allegations against Nordean are that he and his three co-defendants were leaders and planners among a large group of individuals who participated in the riot at the U.S. Capitol. ECF 263 at 2. The defendants, each of whom resided in different parts of the country, were affiliated with one another primarily (if not exclusively) through their membership in the Proud Boys, an organization in which they held leadership positions. ECF 26 at ¶¶ 5-10. Leading up to January 6, the defendants communicated with each other, and with dozens of other members of the Proud Boys organization, regarding the upcoming events in Washington, D.C., using Telegram message groups created by and for members of the Proud Boys. *Id.* at ¶¶ 39-50. Those included small groups just for leaders, of which Nordean was one, and larger groups for members who travelled to Washington, D.C. *Id.* The indictment contains additional allegations regarding Nordean's and his co-conspirators' conduct in advance of January 6, 2021, including public and private statements reflecting their state of mind and their planning for that date, fundraising for "[p]rotective gear and communications" (initiated by Nordean), and the use of radio equipment to communicate on the ground on that date. *E.g.*, *id.* at ¶¶ 28-48.

Nordean's statements leading up to and on January 6, 2021, some of which appear in the indictment, evince his state of mind and motivations with respect to the events in Washington, D.C., and are relevant to the charges against him. For example, as alleged in the indictment, on November 27, 2020, Nordean posted on social media:

> We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished. We will grow like the flame that fuels us and spread like love that guides us. We are unstoppable, unrelenting and now . . . unforgiving. Good luck to all you traitors of this country we so deeply love . . . you're going to need it.

ECF 26 ¶ at 34. Following the events of January 6, 2021, Nordean posted a message on social media that included a picture of a Capitol Police Officer administering pepper spray on that date, with a caption that read, in part, ". . . if you feel bad for the police, you are part of the problem. They care more about federal property (our property) than protecting and serving the people. BACK THE BLACK AND YELLOW' [a reference to the Proud Boys]." *Id.* at ¶ 24.

Additional allegations reflect Nordean's particular significance and leadership role. For example, on the evening of January 5, 2021, among the messages sent to Proud Boys members through Telegram was the following direction: "Rufio [Nordean] is in charge, cops are the primary threat, don't get caught by them or BLM, don't get drunk until off the street." ECF 26 at ¶ 47. On the morning of January 6, 2021, a large group of Proud Boys members gathered at the Washington Monument, as planned in advance, with Nordean visibly directing the group. *Id.* at ¶ 51. As co-defendant Donohoe communicated on his way to the Monument earlier in the morning, "I have the keys until Rufio [Nordean] and Zach [Rehl] show up," indicating deference to Nordean and his co-defendant Rehl. *Id.* at ¶ 50.

Nordean and his co-defendants led the large group of individuals from the Washington

Monument to the east side of the U.S. Capitol that morning, with Nordean and Biggs carrying and using a bullhorn to direct the group as they marched, chanting, through the streets. Nordean and other leaders later brought the large group to the First Street pedestrian entrance to the Capitol grounds, which was secured by a small number of Capitol Police, who were standing behind waist height metal barriers. ECF 26 at ¶ 53-54. Shortly after 12:53 p.m., Nordean, his co-defendants, and others charged toward the Capitol by crossing over the barriers that had been violently disassembled and trampled by members of the crowd moments before the defendants advanced. *Id.* at ¶ 55. As these events unfolded, messages were immediately posted to the Telegram message groups used by Nordean, his co-defendants, and other Proud Boys members, that people were "storming" the Capitol. *Id.* at ¶ 56.

Upon entering Capitol grounds, Nordean and his co-defendants advanced toward the west plaza of the Capitol where additional metal barricades and law enforcement were deployed to protect the building and its occupants from the advancing crowd. *Id.* at ¶ 57. While standing next to one another, Nordean and Biggs shook a metal barricade until they and others in the crowd were able to knock it down. *Id.* at ¶ 58. The crowd, including Nordean, his co-defendants, and many of the large group they had led that day, advanced past the trampled barrier. *Id.* Arriving at the west plaza, Nordean paced at the edge of the line of law enforcement while the group that he had led to the First Street gate spread out in the west plaza of the Capitol. *Id.* at ¶¶ 59-60. Around 2:00 p.m., Donohoe assisted the crowd's effort to advance up a flight of stairs toward the Capitol. *Id.* at ¶ 61. The crowd overwhelmed law enforcement and advanced toward the building. *Id.*

At 2:13 p.m., Proud Boys member and co-conspirator, Dominic Pezzola, used a riot shield to break a window that allowed rioters to enter the building and force open an adjacent door from the inside. *Id.* at ¶ 62. Nordean, his co-defendants Biggs and Rehl, and many of the men they led

that day, entered the U.S. Capitol. Many of those men have also been charged—with felonies and misdemeanors—based on their conduct.

In the course of these events, as alleged in the indictment, approximately 81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted. ECF 26 at ¶ 23. The Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue from pepper spray, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order. *Id.* Additionally, many media members were assaulted and had cameras and other news-gathering equipment destroyed. *Id.*

*Investigation and Prosecutions Relating to Events at the U.S. Capitol on January 6, 2021*

According to a Justice Department report issued on the anniversary of the January 6 attack on the U.S. Capitol, "the investigation and prosecution of those responsible for the attack continues to move forward at an unprecedented speed and scale." *See* "One Year Since the Jan. 6 Attack on the Capitol," available at https://www.justice.gov/usao-dc/one-year-jan-6-attack-capitol. The report provides data, based on a snapshot of the investigation as of December 30, 2021, including the following:

- More than 725 defendants have been arrested.

- More than 225 defendants have been charged with assaulting, resisting, or impeding officers or employees (a felony).

- At least 275 defendants have been charged with corruptly obstructing, influencing, or impeding an official proceeding, or attempting to do so (a felony).

- Approximately 640 defendants have been charged with entering or remaining in a restricted federal building or grounds (a misdemeanor).

- Approximately 40 defendants have been charged with conspiracy (a

> felony), either: (a) conspiracy to obstruct a congressional proceeding, (b) conspiracy to obstruct law enforcement during a civil disorder, (c) conspiracy to injure an officer, or (d) some combination of the three.
>
> - Approximately 145 have pleaded guilty to misdemeanors; twenty have pleaded guilty to felonies.
>
> - Approximately 70 federal defendants have been sentenced.

*Id.*

## RELEVANT LEGAL AUTHORITY

As the Supreme Court has explained, a "presumption of regularity" supports the Executive Branch's prosecutorial decisions, and, "in the absence of clear evidence to the contrary, courts presume that" Executive Branch officials "have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id.* at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). The presumption "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Id.*

To overcome that presumption, a defendant must present "clear evidence" that a decision to prosecute was "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* "The claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" (quoting *Wayte*, 470 U.S. at 608)).

The standard for obtaining discovery on a selective prosecution claim is "correspondingly rigorous," as such discovery "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy." *Armstrong*, 517 U.S. at 468; *see also United States v. Bass*, 536 U.S. 862, 864 (2002) (per curiam) (summarily reversing unfounded selective-prosecution discovery order which itself "threaten[ed] the performance of a core executive constitutional function") (internal quotation marks and citation omitted). Under that standard, the defendant must put forward "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468 (citation omitted).

Accordingly, a defendant is not entitled to discovery on a claim of selective prosecution absent a "colorable showing" that (1) the defendant was "singled out for prosecution from among others similarly situated" and (2) "the prosecution is improperly motivated, *i.e.*, based on an arbitrary classification." *United States v. Blackley*, 986 F. Supp. 616, 617-18 (D.D.C. 1997). "The District of Columbia Circuit requires that this colorable showing be made with respect to both prongs of the test." *Id.* (citing *Attorney General of the United States v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C. Cir. 1982)); *accord Bass*, 536 U.S. at 863 ("[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent.").

As Nordean's motion indicates (at 13), the D.C. Circuit has not addressed whether a "selective enforcement" claim—the same as a selective prosecution claim but aimed at law enforcement instead of prosecutors—permits discovery on a lesser showing than is required in *Armstrong*. Three circuits have done so, but only in the particular context of "reverse sting operations" not applicable here. *See United States v. Sellers*, 906 F.3d 848, 850-51 (9th Cir. 2018); *United States v. Washington*, 869 F.3d 192, 219 (3d Cir. 2017); *United States v. Davis*, 793 F.3d

7

712, 720 (7th Cir. 2015) (*en banc*). Others have applied the same requirements as *Armstrong*. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264-65 (10th Cir. 2006).

## ARGUMENT

### I. Defendant Nordean Has Not Made the Requisite Showing that He Was Singled Out from Others Similarly Situated.

A person is "similarly situated" for purposes of a selective prosecution claim "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)). Or, as the Eleventh Circuit has concluded, a person is "similarly situated" for selective prosecution purposes if he "engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

Seeking discovery as to both a selective enforcement and selective prosecution claim, Nordean (at 2-3) compares himself to more than 100 defendants who have pleaded guilty to misdemeanor offenses in connection with the events of January 6. He argues that he is "similarly situated" to those defendants but has nonetheless been charged with more serious crimes, focusing on obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and to a lesser extent, conspiracy, in violation of 18 U.S.C. § 371. Nordean claims he is similarly situated to the misdemeanants, because: (1) they went into the U.S. Capitol; (2) they entered restricted grounds; (3) there is evidence that their "purpose in entering the Capitol was in protest of the 2020 election

8

and the certification of Electoral College outcome"; and (4) there is "sufficient evidence of offenses under §§ 1512(c)(2) and 231(a)(3)," committed by the misdemeanants.[1]

Even assuming these assertions were all true, Nordean ignores the obvious distinctions between himself and the misdemeanants—in particular, the significant leadership role he played leading up to and on January 6, 2021, as described above. As a leader of a large group of individuals who participated in the riot, Nordean stands apart not only from the misdemeanants with whom he seeks to equate himself, but from nearly all of the individuals who participated in the riot—even those who personally committed more serious acts of violence.

In any event, Nordean's claim also fails because it based on at least one faulty premise: that there is no distinction between a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any of the Capitol Buildings) and a violation of 18 U.S.C. § 1512(c)(2). Nordean argues (at 5-7) that, insofar as the misdemeanants are guilty of 40 U.S.C. § 5104(e)(2)(G), they must also be guilty of 18 U.S.C. § 1512(c)(2), and the government has therefore treated Nordean differently by charging him with the felony instead of just the misdemeanor. It suffices to say that the only decision referenced by Nordean on this question is the recent opinion by Judge Moss, who reached the opposite conclusion. *See U.S. v. Montgomery*, No. 21-CR-46 RDM, 2021 WL 6134591, (D.D.C. Dec. 28, 2021).

But even accepting Nordean's faulty legal premise, he cannot show that he was "singled out" and charged with felony obstruction based on an "arbitrary classification," given that more than 200 defendants—many of whom are not affiliated with the Proud Boys or any other particular group—have been charged with the same offense. That so many other January 6 defendants face

---

[1] Although Nordean refers to 18 U.S.C. § 231(a)(3) in his motion, he does not appear to present any argument in connection with that charge.

the same felony charges directly undermines Nordean's proffered inference of discrimination. As to the cited subset of 100 misdemeanor dispositions, "[t]hat the government … offered others (but not all) favorable plea deals[] does not without more show the federal government is pursuing its claims against [Nordean] and others like him because of a difference in politics." *United States v. Miller*, 21-cr-119-CJN, ECF No. 67 (D.D.C. 2021) at 4. Rather than an indication of improper selective prosecution, these statistics would appear to reflect an effort by the government to apply the law—including felony and misdemeanor offenses—to the facts of each case. The law presumes that is as much, and Nordean has failed to rebut that presumption. *Armstrong*, 17 U.S. at 468.

As to the conspiracy charge, Nordean makes no showing that the misdemeanants are comparable to him and his alleged co-conspirators, even putting aside Nordean and his co-conspirators' conduct and communications *prior* to January 6, 2021. "[C]onspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas v. United States*, 522 U.S. 52, 65 (1997); *see also United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003) ("criminal combinations are dangerous") (citation omitted). This explains why the government charged Nordean and his co-defendants (among other January 6 defendants) with conspiracy: because their conduct was concerted, it was more dangerous, and it presents a "distinguishable legitimate prosecutorial factor[] that might justify making different prosecutorial decisions" in his case. *Branch Ministries*, 211 F.3d at 145 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997).

## II. Defendant Nordean Has Not Made the Requisite Showing that Law Enforcement's Investigation or his Prosecution is Improperly Motivated.

With respect to the second prong under *Armstrong*, Nordean has similarly failed to present any evidence that "the prosecution is improperly motivated." Nordean suggests (at 4) that he was

charged as he was because "[t]he government targets the political beliefs and perceived ideologies of political cultural groups." Nordean never explains his own "beliefs or perceived ideologies" or how they differ from the comparator group. Elsewhere, however, he argues (at 11-12), that he was charged "at least in part because he is a member of the Proud Boys, a political organization in disfavor with the government." In support of this claim, Nordean points to comments by the former Acting U.S. Attorney and to references in the government's filings to the Proud Boys. This argument also fails.

Contrary to Nordean's claim, the government's references to his membership in the Proud Boys in the indictment and elsewhere do not reflect an improper motive. Nordean and his co-defendants, as well as a large number of other Proud Boys members they led on January 6, 2021, have been investigated and prosecuted based on their conduct. Their pre-existing association with each other, of course, is relevant to understanding the nature of their communications, their coordinated actions, and their motivations in committing the alleged offenses as part of a group. As the evidence reveals, those facts are inextricably intertwined with their affiliation with the Proud Boys, and that affiliation is therefore relevant when examining the facts of the case.

The "familiar concepts of the law of conspiracy and complicity" make Nordean's "associational relationships" fair game in this proceeding. *Scales v. United States*, 367 U.S. 203, 225 (1961). His efforts to "actively and knowingly work[] in the ranks of that organization, intending to contribute to the success of [the January 6] activities," are plainly relevant to the elements of the charged offenses. *Id.* at 227. Despite what Nordean suggests (at 13), the prosecution is not about "political beliefs and group affiliation," and he has not been singled out among January 6 defendants based on his beliefs or affiliation. Moreover, there is nothing improper in seeking evidence of that affiliation insofar as it is relevant to the charged offenses.

Although Nordean takes issue with comments made by the former Acting U.S. Attorney, those comments likewise do not reflect an improper motive leading to the selective prosecution of Nordean. Nordean points to comments (at 10) indicating the government's interest moving quickly in the wake of January 6 to deter would-be rioters from committing similar offenses, particularly in light of the upcoming inauguration, and to dedicate staff to investigate possible conspiracy cases. This is precisely the type of decision-making and prioritization that falls squarely within the province of the Executive Branch, and these comments do not advance Nordean's claim of selective prosecution. *See Armstrong*, 517 U.S. at 464 ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

Nonetheless, Nordean contends (at 10) that conspiracy charges were only brought against him and others based on their membership in particular groups, like the Proud Boys or Oathkeepers. As noted above, simply because defendants are members of a particular group does not mean that their prosecution for conduct relating to January 6 is based on that membership—to the contrary, the primary commonality among members of the Proud Boys or other organizations charged in connection with January 6 is not their membership in a group but, rather, the fact that they all committed similar crimes. As to whether and how certain individuals have been charged with conspiracy, it is not surprising that individuals with prior affiliations with other rioters would be charged with conspiracy in cases where the evidence supports that charge, and where the charge is consistent with the government's enforcement priorities. *Armstrong*, 517 U.S. at 464. That the government may have prioritized conspiracy investigations and focused on groups of individuals

12

who may have worked in concert reflects an entirely permissible consideration given the particular danger presented by conspiratorial conduct and the need to focus prosecutorial resources. *See Price v. U.S. Dep't of Justice*, 865 F.3d 676, 681 (D.C. Cir. 2017) (observing that a prosecutor may legitimately consider "concerns such as … allocation of criminal justice resources") (brackets and citation omitted).

Lastly, Nordean has failed to articulate a selective-enforcement claim under any circuit's case law. Nordean's motion references only criminal complaints and plea bargains. These points address solely "how the United States Attorney has exercised prosecutorial discretion" and, accordingly, the traditional *Armstrong* standard. *Davis*, 793 F.3d at 720. Nordean presents no facts or statistics regarding the FBI's investigation of January 6, much less evidence that the agency has either pursued or declined to investigate any suspect based on an impermissible consideration. Indeed, the sheer number of arrests to date (725) shows the FBI's effort to pursue everyone involved in the U.S. Capitol breach.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        DC Bar No. 481052

By:    */s/ Luke M. Jones*
        LUKE M. JONES, VA Bar No. 75053
        ERIK M. KENERSON, OH Bar No. 82960
        JASON B.A. MCCULLOUGH
        D.C. Bar No. 998006; NY Bar No. 4544953
        Assistant United States Attorneys
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-7066
        Luke.Jones@usdoj.gov