UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| ETHAN NORDEAN, et al., | ) |
| Defendants. | ) |

**DEFENDANT NORDEAN'S REPLY IN RESPONSE TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION FOR DISCOVERY AND FOR AN EVIDENTIARY HEARING IN SUPPORT OF HIS CLAIM OF SELECTIVE ENFORCEMENT AND PROSECUTION**

Defendant Nordean moved the Court to order discovery on claims of selective enforcement and prosecution on the basis of his showing that (i) no material differences in fact or law exist between the criminal conduct of hundreds of January 6 misdemeanants and the alleged conduct of Nordean, who is charged with conspiracy; and (ii) the government's out-of-court statements and charging statistics reveal that the charging discrepancy is accounted for, at least in part, by Nordean's association with a political organization. ECF No. 267. If those points are accurate, equal protection principles require dismissal of his conspiracy charge.

The government's response assumes the Court will not take this constitutional issue seriously. ECF No. 279. It engages with the substance of Nordean's argument in five pages. *Id.*, pp. 8-12. The brevity reflects its avoidance of the relevant issues, not economy of argument.

Of the over 700 defendants arrested in connection with the events of January 6, only 40 have been charged with criminal conspiracy. ECF No. 279, p. 5. The government does not contest that all of them allegedly belong to one of three political or cultural groups. For even the

1

most casual observer of the January 6 investigation understands that members of the Proud Boys, Oath Keepers, and Three Percenters have been charged differently precisely because they belong to those political and cultural groups, not despite the exercise of their associational right to do so.

The government's attempts at denying statistical reality—that over 100 January 6 misdemeanants are "similarly situated" to Nordean but for protected group membership—are nonsensical. ECF No. 279, pp. 9-10. "[O]bvious distinctions" exist between Nordean and the misdemeanants whom the government never accused of criminal conspiracy, the government argues. *Id.*, p. 9. Perhaps assuming that its response will not be carefully considered, the government then names only one such "distinction." "As a leader of a large group of individuals who participated in the riot, Nordean stands apart. . .from the misdemeanants." *Id.*

The government misunderstands selective prosecution. The equal protection component of the Fifth Amendment forbids prosecution on a charge brought "at least in part" because of a protected characteristic, not just exclusively because of one. *Wayte v. United States*, 470 U.S. 598, 610 (1985). Incanting the word "leadership" with respect to Nordean does not supply a non-selective charging criterion accounting for why every January 6 defendant charged with criminal conspiracy belongs to a political/cultural group and is charged in connection with group membership, whereas none of the over 660 remaining defendants faces a similar charge, even when he or she acted concertedly on January 6. The government does not allege a "significant leadership role" for all, or even most of, the 40 defendants charged with conspiracy in connection with their group membership. Thus, "leadership" does not neutralize Nordean's statistical showing that protected group membership "at least in part" accounts for the decision to charge him and others with criminal conspiracy.

To show how naked the selective prosecution is here, one typical example drawn from the misdemeanant pool suffices. Well in advance of January 6, Derek Jancart and Erik Rau planned to travel to this district to attend the "Stop the Steal" rally. *U.S. v. Jancart*, 21-cr-148, ECF No. 25, p. 3. They planned for "possible violence." *Id.* Jancart brought a gas mask and two-way radios; Rau carried a medical kit and Kevlar-lined gloves. Before the event, Jancart posted to Facebook, "Anyone know the laws on pickaxes in D.C.?" under a photo of the named tool. *Id.* After attending the rally, Jancart and Rau returned to their hotel room. They then received an alert that the "Capitol had been breached." *Jancart*, 21-cr-148, ECF No. 25, p. 4. It was only at this point that they agreed to return to the Capitol. Thus, Jancart and Rau specifically agreed to join not just protest, but criminal activity, according to the government. *Id.* At the Capitol, as Rau filmed rioters breaking through the police line he could be heard on video saying, "We made it up to the Capitol . . . . We have the police surrounded!" A few minutes after Dominic Pezzola smashed a Capitol window, Jancart and Rau were among the first to enter the building through an adjacent door. *Id.*, p. 5. Rau then entered a conference room of the House Speaker. Jancart posted on social media that he "stormed the Capitol" and had "wanted to let the politicians know we can ger this far any time we want. . ." *Id.*, p. 9.

Though there is no material factual or legal distinction between Jancart and Rau's stipulated offense facts and Nordean's alleged conduct, the misdemeanants were not charged with criminal conspiracy. They are not alone. Many of the over 100 misdemeanants engaged in concerted conduct and "planning" similar to Jancart and Rau's, both before January 6 and on that day. ECF No. 207-1 (Bauer and Hemenway; Cudd and Rosa; Sweet and Fitchett; Markovsky and Nelson; Spencer and Raphael; Wrangler and Harrison; Perretta and Vulkich; Parks and Schwemmer; Pert and Winn). As with hundreds or thousands of protesters, the misdemeanants

engaged in "planning" to attend the former president's rally, walked from the rally to the Capitol, and ultimately entered the building. Or, as the Court itself accurately put it,

> I think there were probably a lot of people showing up that day with a lot of . . . different plans.

Hr'g Trans., 4/6/21, p. 23:1-10.

Except that none of the misdemeanants is charged with criminal conspiracy. That is because none allegedly belongs to a political group it is politically fashionable to condemn.

Nordean showed that there is no legal distinction between a misdemeanor parading-in-the-Capitol offense under 40 U.S.C. § 5104(e)(2)(G) and a felony offense under 18 U.S.C. § 1512(c)(2), as interpreted by the government in the January 6 cases alone. ECF No. 267, pp. 4-5. The government could have used its response to demonstrate some conceptual distinction between the offenses. That the government did not do so, and cannot, tells the Court something it may find disturbing—that Nordean has been held for nine months on a crime legally indistinguishable from a misdemeanor whose average sentence has been probation. *See* BuzzFeed News, Jan. 6 Sentencing Statistics, https://www.buzzfeednews.com/article/zoetillman/capitol-riot-judges-accountability-trump-insurrection.[1]

Finally, the government argues that, even assuming Nordean is correct about the lack of any legal distinction between a Class B misdemeanor and the government's novel obstruction theory, "more than 200 defendants—many of whom are not affiliated with the Proud Boys or any

---

[1] The government adds that it "suffices to say" a "recent opinion by Judge Moss" shows some shaft of daylight between the parading offense and the government's novel obstruction theory. ECF No. 279, p. 9 (citing *U.S. v. Montgomery*, 21-cr-46, ECF No. 87 (D.D.C. Dec. 28, 2021)). As the government knows, that is not so. While the *Montgomery* Court addressed the issue, it purported to resolve the question in the government's favor by noticeably omitting from its analysis half of § 1512(c)(2)'s actus rei. ECF No. 267, p. 5 n. 3.

4

other particular group—have been charged" under § 1512(c)(2). ECF No. 279, p. 9. The Court may ignore that straw man argument. Nordean argues that he is selectively charged with criminal conspiracy. And, as the government tacitly concedes, only 40 protesters, all alleged members of political groups, have been charged with that offense in the January 6 investigation.

      As to the improper motivation element of selective prosecution, the government provides no cogent response. ECF No. 279, pp. 10-12. The former acting U.S. Attorney responsible for Nordean's indictment announced on national television that the government decided to bring a conspiracy charge against him and other members of political organizations before determining whether they had had a "premeditated plan to breach the Capitol." ECF No. 267, p. 10. The same official likewise announced, again on national television, that his "only order" to prosecutors was to bring conspiracy charges—an order he made before the government had collected any evidence in this case. *Id.*, p. 9. The chief prosecutor added that such charging decisions were motivated by a desire to create "shock and awe" from "charg[ing] as many people as possible before" the presidential inauguration, which would make people "afraid to come back to D.C." *Id.*, p. 8.

      Denying none of those facts, the government responds, "This is precisely the type of decision-making and prioritization that falls squarely within the province of the Executive Branch." ECF No. 279, p. 12. That is mistaken. The government's internal guidelines direct that that a prosecutor must not "commence or recommend federal prosecution" unless he believes that "the admissible evidence will probably be sufficient to obtain and sustain conviction." Justice Manual, § 9-27.220 ("Grounds for Commencing or Declining Prosecution"). The former acting U.S. Attorney's remarks indicating that prosecutors were "ordered" to bring conspiracy charges before a review of admissible evidence and before determining whether Nordean and

5

others had a "premeditated plan to breach the Capitol" plainly show the existence of "grounds for commencing prosecution" impermissible under the Department's own guidelines.

The former acting U.S. Attorney himself indicated that members of "far-right militias" had been charged as they were on account of their group affiliation. ECF No. 267, p. 9. And the government fails to recognize that the charging statistics themselves—showing that every January 6 defendant charged with criminal conspiracy is so charged in connection with their membership in a political group—are circumstantial evidence of a charging decision motivated by the exercise of a constitutionally protected right. *United States v. Lopez*, 415 F. Supp. 3d 422, 427 (S.D.N.Y. 2019); *United States v. Miller*, 21-cr-119-CJN, ECF No. 67, p. 4 (D.D.C. 2021) (discriminatory intent can be shown "by either direct or circumstantial evidence").

Of course, the fact that the government has charged members of political groups alone with criminal conspiracy belies its claim that Nordean's "pre-existing association" with the Proud Boys is repeatedly cited in this case merely to "understand[] the nature of [his] communications, [] coordinated actions, and [] motivations in committing the alleged offenses as part of a group." ECF No. 279, p. 11. If protected associational rights were merely incidental to, and not at least partly determinative of, the government's decision whether to charge criminal conspiracy, basic statistical inference and common sense dictate that the government would have brought conspiracy charges against January 6 defendants who are not members of a small set of political groups but who did act concertedly in committing crimes. Such statistical inferences easily satisfy Nordean's burden of showing "some evidence tending to show the existence of" an improper charging motive in order to obtain discovery into the matter. *Lopez*, 415 F. Supp. 3d at 427.

Finally, the government misunderstands the law framing selective enforcement doctrine. ECF No. 279, pp. 7, 13. Nordean's motion showed that his burden is even lower in obtaining discovery in support of his claim of selective enforcement. ECF No. 267, p. 13. The government responds that the doctrine applies only in "reverse sting" cases. ECF No. 279, p. 7. Not so. While that fact pattern occasioned further development of selective enforcement law, the rationale supporting a burden for discovery lower than that set forth in *United States v. Armstrong*, 517 U.S. 456 (1996) does not turn on anything unique to reverse sting operations. Rather, as Judge Easterbrook has explained, the courts must be more amendable to selective enforcement claims because unlike prosecutors, law enforcement agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (en banc).

The government adds that "Nordean's motion references only criminal complaints and plea bargains" and argues that those documents cannot show selective enforcement. ECF No. 279, p. 13. Factually and legally, the government is mistaken. First, Nordean's criminal complaint and accompanying affidavit were sworn to and filed with the Court by a Special Agent. ECF No. 6. Thus, the decision to investigate Nordean for criminal conspiracy was not "solely" a matter of "how the United States Attorney has exercised prosecutorial discretion." ECF No. 279, p. 13. Second, Nordean's motion did not "reference only criminal complaints and plea bargains" but also search warrant applications created by law enforcement. ECF No. 267, p. 17. Specifically, Nordean showed that an application to search his home contended that "Records and information that constitute evidence of NORDEAN's affiliation with the Proud Boys" constituted evidence of a crime under Federal Rule of Criminal Procedure 41. *Id.*, p. 15.

7

That demonstrates that Nordean's affiliation with a political organization constituted an improper basis for investigating him for the charged crimes.

For the foregoing reasons, the Court should direct the government to provide documents sufficient to show how charging decisions were made with respect to Nordean, demonstrating why the government decided to charge him in a manner different from the way in which similarly situated January 6 protesters were charged.

Dated: January 18, 2022                    Respectfully submitted,

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 722-1096
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

## Certificate of Service

I hereby certify that on the third day of January 18, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

>Jim Nelson
>Assistant United States Attorney
>555 4th Street, N.W., Room 4408
>Washington, D.C. 20530
>(202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Ethan Nordean*