**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-CR-175-1 (TJK)** |
| | : | |
| **ETHAN NORDEAN,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT NORDEAN'S**
**MOTION FOR AN ORDER DIRECTING THE GOVERNMENT**
**TO IDENTIFY _BRADY_ MATERIAL PRODUCED IN DISCOVERY**

The United States respectfully submits this opposition to defendant Ethan Nordean's Motion for an Order Directing the Government to Identify _Brady_ Material Produced in Discovery. ECF 365. For the reasons set forth below, Nordean's motion should be denied.

**FACTS**

**A. Background.**

Nordean and three co-defendants, Joseph Biggs, Zachary Rehl, and Charles Donohoe, were first charged by indictment in this case on March 10, 2021, in connection with the events of January 6, 2021, at the Capitol. ECF 26. On March 7, 2022, a grand jury returned a second superseding indictment charging the four defendants, as well as Enrique Tarrio, who was not previously charged, and Dominic Pezzola, who was previously charged in a related case. ECF 305.

The current indictment charges all six defendants with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; obstruction of law enforcement during civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2; destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361, 2; and assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1). The indictment also

charges defendant Pezzola with robbery of personal property of the United States, in violation of 18 U.S.C. § 2112.  Defendant Donohoe has pleaded guilty and is detained pending sentencing.  All other defendants are detained pending trial.

**B.  The government's discovery efforts to date.**

Consistent with the unprecedented scope of the investigation into the events of January 6, the government has undertaken extraordinary efforts to identify relevant evidence and produce it to the defendants in organized and accessible formats.  These efforts have previously been described in the government's motion to vacate the May 2022 trial date, ECF 314 at 5-7, in its reply brief in support of that motion, ECF 327 at 8-11, and its opposition to defendant Rehl's recent discovery motion, ECF 353 at 2-4.  The government has also kept the Court apprised of its ongoing discovery productions by filing periodic notices of discovery correspondence specific to this case, *see* ECF 119, 168, 180, 216, 348, as well as updates on the status of the global discovery effort being made in all cases brought by the U.S. Attorney's Office arising out of the events of January 6, 2021 (the "Capitol Siege").  *See* ECF 120, 168, 214, 218, 290.

From the outset, the government has made frequent productions of "case-specific" discovery, meaning productions of materials the government has identified as relevant to the defendants charged in instant case.  Such materials include information from Federal Bureau of Investigation ("FBI") and U.S. Capitol Police case files for these defendants and grand jury subpoena returns.  Each production of case-specific discovery has been accompanied by a transmittal letter describing the contents of the production and, in some cases, providing context expected to be helpful to defense counsel.  *See, e.g.*, ECF 119-17 (memorializing production of videos and directing counsel to a corresponding "document contain[ing] an FBI analysis of Ethan

Nordean's movements inside the U.S. Capitol as reflected in the surveillance videos").[1]

The government has also made multiple productions of "cross discovery," that is, materials associated with other individuals charged in separate cases or otherwise investigated in connection with the defendants' activities on January 6, which may be relevant to the defendants charged here. *See* ECF 327 at 9-10 (Government's Reply in Support of Motion to Vacate Trial Date, describing cross discovery).   For example, the government has prioritized cross discovery of charged defendants such as Paul Rae (21-cr-378 (TJK)) and Gilbert Fonticoba (21-cr-638 (TJK)), who both entered the building with Defendant Biggs, and Isaiah Giddings, Brian Healion, and Freedom Vy (21-mj-689) (RMM)), who were depicted with Defendant Rehl outside and inside the Capitol building. These productions of cross discovery essentially replicate the production of case-specific discovery that has been made in the cases of those separately-charged defendants. The government has clearly identified those materials as it has produced them, as reflected in discovery correspondence filed with the Court.  *See, e.g.*, ECF 348-2; ECF 348-7.   Like the case-specific discovery productions, the cross discovery productions have been accompanied by transmittal letters describing their contents.

---

[1]    To assist case teams, including this one, in the identification and production of videos relevant to individual defendants on an on-going basis, the government has instituted a protocol pursuant to which facial-recognition technology is used to search a video library which the FBI is continuously populating for every defendant's face at regular intervals.  *See* ECF 290 at 18 (government's Memorandum Regarding Status of Discovery as of February 9, 2022).   When an apparent match is discovered, the respective case agent is notified to add the material to the defendant's FBI case file, from which it will ultimately be produced in case-specific discovery. Currently, materials in the video library include U.S. Capitol Police surveillance footage, body-worn camera footage from multiple law enforcement agencies, footage from the Senate and House Recording studios, over 237,000 digital media tips, videos scraped from Parler (after the FBI's review of thousands of videos from a two-week period encompassing January 6, 2021), and the results from searches of over 600 digital devices and Stored Communication Act ("SCA") accounts. While reliable, facial-recognition technology is an imperfect science. When issues are identified, the FBI works to improve its protocol.

Most broadly, the government, through the Capitol Siege Section Discovery Unit ("CSSDU"), continues to produce "global discovery" consisting of materials collected across all January 6 investigations and prosecutions. Access to such global discovery allows the defense to locate information it may view as material or exculpatory *in addition to* the information already identified through case-specific and cross discovery, as described above.[2]

Given the volume of information being made available via global discovery, described below, the CSSDU has taken enormous measures to make the information accessible and searchable by defense teams. Over 24,000 files consisting of U.S. Capitol Police and U.S. Secret Service surveillance footage and body-worn camera footage from five law enforcement agencies have been made available to the defense via a government-funded "evidence.com" video repository. To assist the defense in identifying relevant materials within the footage, the CSSDU has provided cover letters describing the materials in the video repository, and detailed searchable indexes of the files provided. Further, the CSSDU has provided the defense multiple tools for navigating the data, many of which comprise substantial government work product. These include plottable GPS information for MPD radios, a spreadsheet and zone maps (initially created by over sixty individuals as an investigative tool to assist prosecutors) that can be used to locate additional body-worn camera footage, maps showing the location of U.S. Capitol Police surveillance cameras in and near the Capitol, and a timeline of events drafted by the U.S. Capitol Police. *See* ECF 290 at 3-4 (government's Memorandum Regarding Status of Discovery as of February 9, 2022).

---

[2] The data that has been and continues to be made accessible via global discovery far exceeds the information to which any defendant is entitled under Federal Rule of Criminal Procedure 16, the Jencks act, or our *Brady* obligations. The government is making such vast quantities of data available due to the unique circumstances of the government's investigation into the Capitol Siege, in which hundreds of similar were committed in the same place at the same time.

All other data being produced in global discovery is being made available to the defense via a government-funded "Relativity" database.[3]  As of May 31, 2022, the items produced to the defense Relativity database include search results from over 375 digital devices and SCA accounts, over 185 recordings of subject interviews, and over 65,000 additional documents of varying nature (e.g., audio, video, PDFs).  By way of example, these ~65,000 documents include (i) reports and exhibits pertaining to allegations of misconduct by officers on January 6, 2021, regardless of whether the allegations were sustained, (ii) over 1,000 records pertaining to FBI interviews of hundreds of law enforcement officers, (iii) documents the government will use to prove the interstate commerce element of charged offenses, and (iv) documents the government will use to prove the whereabouts of Vice President Pence on January 6, 2021, as relevant to the charged offenses. As with case specific and cross-discovery, the CSSDU's Relativity productions have all been accompanied by cover letters describing the materials being provided and searchable indexes of the files provided.  *See* ECF 120, 168, 214, 218, 290.

The government intends to produce all currently identified case-specific and cross

---

[3]     Relativity is a cloud-based eDiscovery platform that offers functionalities including document organization, review, production, and analytics within a single environment, and it is an industry leader in eDiscovery hosting platforms. The defense Relativity database is fully searchable using keywords and Boolean operators, and CSSDU has collaborated extensively with the Federal Public Defender for the District of Columbia ("FPD") and the Defender Services National Litigation Support Team ("NLST") to ensure the defense Relativity database is populated with fields that legal defense teams will find useful in conducting searches for relevant evidence. Among the tools the defense may leverage when conducting searches within the Relativity database is the ability to conduct "fuzzy" searches for near-matches, which can be used to capture misspellings (for example, a fuzzy search for "Nordean" would return results containing the term "Nordeen").  Further, items in Relativity can be sorted and filtered according to various criteria, and they can be "tagged" by users for ease of later reference.  High-quality audio files in Relativity can also be machine-transcribed for additional searchability.  Using tools such as those described above, defense counsel can conduct a targeted review of the global discovery materials for documents that may be relevant to their respective clients.

discovery generated to date by this Court's June 17, 2022 discovery deadline.  Global discovery productions are expected to continue as complex materials continue to be processed, and as the broader investigation continues and new materials are ingested.  Accordingly, even after the discovery deadline has passed, the government will continue its efforts to monitor the materials being collected by the FBI and by the CSSDU for information that is relevant to the defendants in this case, and to alert the defendants to the existence and location of any such materials.

## ARGUMENT

Nordean's motion requests that the Court "direct the government to identify *Brady* material in the voluminous discovery that has been and will be produced before trial."  ECF 365 at 1.  Nordean's request far surpasses the government's obligations under applicable case law and the Local Criminal Rules, is inconsistent with the Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases developed by the Department of Justice and Administrative Office of the U.S. Courts Joint Electronic Technology Working Group, and is unreasonable in light of the extraordinary efforts the government has already undertaken to identify material information to the defense.  It should be denied.

### A. Under settled law, neither *Brady* nor any other authority requires the order Nordean seeks.

*Brady v. Maryland* requires the government to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment."  373 U.S. 83, 87 (1963).  In the District of Columbia, Local Criminal Rule 5.1 imposes additional requirements for the timing and format of such disclosures.  Here, the government has complied, and will continue to comply, with these authorities.

Nordean asks for something more: an order requiring the government to specify, for all materials it has produced or will later produce, whether each item could serve a purpose favorable

to the defense.  This request goes far beyond what the law requires.  Every Court of Appeals that has considered the issue has reached the same conclusion: the government meets its *Brady* obligations when it discloses the favorable material, and it has no additional duty to specifically identify each piece of *Brady* material as such.  *See*, *e.g.*, *United States v. Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (explaining that government generally has no "duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) (explaining that government has no duty to "ferret out any potentially defense-favorable information from materials" it has disclosed); *United States v. Yi*, 791 F. App'x 437, 438 (4th Cir. 2020) (rejecting defendant's argument "that fulfillment of the Government's obligation under *Brady* requires it to identify exculpatory material"); *United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) (finding no duty to identify *Brady* material "where the government provided the defense with an electronic and searchable database of records"); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) (stating a "general rule" that "the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"); *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (explaining that "the government is not obliged to sift fastidiously through millions of pages (whether paper or electronic)" to "direct a defendant to exculpatory evidence"); *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (ruling that *habeas* petitioner "points to no authority requiring the prosecution to single out a particular [exculpatory] segment of a videotape, and we decline to impose one"); *United States v. Jordan,* 316 F.3d 1215, 1253-54 (11th Cir. 2003) (concluding that defendant's requests, including demand that the government "identify all of the *Brady* and *Giglio* material in its possession," "went far beyond" what the law requires).  In short, the "Government is not required, in other words, to facilitate the compilation of exculpatory material that, with some

7

industry, defense counsel could marshal on their own." *United States v. Runyan,* 290 F.3d 223, 246 (5th Cir. 2002) (citing *United States v. Shoher*, 555 F. Supp. 346, 352 (S.D.N.Y. 1983)).

As a limited exception to this rule, courts have observed that the government may not *intentionally* bury *Brady* materials within voluminous discovery in a bad-faith effort to prevent their discovery. *See Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) (finding no *Brady* violation in open-file discovery "absent some showing that the government acted in bad faith or used the file to obscure exculpatory material"); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) (finding no *Brady* violation in voluminous discovery absent bad faith such as "proof that the government larded its production with entirely irrelevant documents"). Nordean does not, and cannot, allege any such underhanded tactics here.

### B. The cases relied upon by Nordean are without precedential value and are in any event distinguishable.

Nordean cites two D.C. District Court cases, and two unreported cases from other district courts, in support of his request for an elevated disclosure requirement.[4] These cases are outliers whose persuasive force is far outweighed by the contrary authorities cited above, and which are in any event distinguishable from the facts here.

In *United States v. Hsia*, the defendant raised multiple complaints arising from the government's failure to identify relevant materials from among 600,000 paper documents. 24 F. Supp. 2d 14 (D.D.C. 1998). Based on defense counsel's representation that she had "received literally no *Brady* material from the government" and that "it is virtually impossible that there

---

[4]    Nordean also cites *United States v. Bortnovsky*, altering a quotation from that case to add the word "[*Brady*]." *See* ECF 365 at 1 (citing 820 F.2d 572, 575 (2d Cir. 1987)). However, *Brady* disclosures were not at issue in *Bortnovsky*; the case instead involved a failure by the government to provide adequate pre-trial specificity about *inculpatory* facts.

would be no *Brady* material" given the nature of the case, the court found reason for "skepticism" about the government's adherence to its disclosure responsibilities.  *Id.* at 29.  The court therefore explained that "[t]he government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack,"[5] and ordered that "[t]o the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material to [the defendant]."  *Id.* at 29-30.

In *United States v. Saffarinia*, the court ordered the government to identify any known *Brady* material within its prior productions because the production involved over a million records, and when counsel requested a more detailed index of the materials, the government provided "nine separate [E]xcel workbooks" containing "324 columns of data and 1,247,039 rows."  424 F. Supp. 3d 46, 83-84 (D.D.C. 2020).  Defense counsel was working "*pro bono* with time constraints and limited financial resources."  *Id.*  The court also noted that the government "had the luxury of reviewing [the] material on a rolling basis over the course of its three-year investigation."  *Id.* at 88. Against this background, the court ordered the government to "specifically identify any known *Brady* material contained in its previously-disclosed production of approximately 3.5 million pages of documents."  *Id.* at 91.  Notably, the court carefully confined its holding to the very specific facts involved, acknowledging that "persuasive authority has articulated a 'general rule' that 'the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence.'"  *Id.* at 84 n.15, quoting *Skilling*, 554 F.3d at 576.

Even if *Hsia* and *Saffarinia* were correct on their own terms, they do not provide a reason

---

[5]     Although the court described this as a "basic proposition of *Brady* jurisprudence," 24 F. Supp. 2d at 29, it cited no authority in support.

to impose the same extraordinary burden on the government in this case, which is distinguishable in numerous respects.

First, the government here is already making extensive, good-faith efforts to assist defense counsel in identifying relevant information, including producing case-specific and cross discovery accompanied by cover letters and searchable indices that have well equipped defense counsel to focus their review on the materials most relevant to their clients.  An illustrative example is the government's recent production of a hard drive containing case-specific and cross discovery. Although the drive contained a large volume of data, the majority of the data were not "documents" requiring page-by-page review but rather audio and video recordings whose contents were clearly labeled.  The drive was accompanied by a detailed index specifying (1) the defendant or other individual to whom each item related; (2) the FBI's internal description for each item; and (3) an additional description provided by the prosecutors for added clarity.  In light of these facts, it is misleading to suggest that "375,000 hours" would be required to conduct a meaningful review of 1 terabyte of the government's discovery production.  ECF 365 at 3.  Equipped with the index, defense counsel can readily prioritize between the more important materials (such as video footage of the defendant in the Capitol) and the less important (such as the recorded interview of a witness whom defense counsel has already reviewed a written memorandum of the same interview). Similarly, the government's global discovery productions have all been accompanied by cover letters and searchable indexes describing materials being provided.  Further, the platforms being used to provide global discovery have equipped the defense with the same search functionality and analytical tools accessible by prosecutors.

Second, this is not a case, like *Hsia*, where the government has provided "literally no *Brady* material" to the defense.  To the contrary, the government has prioritized the production and

identification of materials that may contain information viewed by the defense as exculpatory.  By way of illustration, in global discovery, the government has produced and clearly identified reports and exhibits pertaining to allegations of misconduct by officers on January 6, 2021, regardless of whether the allegations were sustained.  In case-specific discovery, the government produced a 160-page grand jury transcript summarizing the key evidence in this case and highlighting various pieces of evidence arguably favorable to the defense.   And, as the Court is aware, the government also made a prior disclosure of materials that were arguably material to the preparation of the defense that resulted in a sealed motion that was recently resolved.   As these disclosures demonstrate, the government has no intention of "burying" *Brady* material for the purpose of concealing it from the defense.

Third, although Nordean is correct that he has a "small defense team," he is wrong to claim he lacks "access to resources."  ECF 365 at 2.  Nordean does in fact enjoy access to resources commensurate with the demands of this case, including access to government-funded Relativity and evidence.com databases supported by FPD, NLST, and a vendor.  Training and technical support on these platforms are available to defense counsel.[6]

Fourth, because of the unique nature of global discovery in this case, the prosecution team is in a different position than was the government in *Hsia* and *Saffarinia*.  The materials in global discovery were not obtained by, and largely have not been reviewed by, the specific attorneys and case agents assigned to Nordean's case.  To be sure, the government is diligently working to ensure that any relevant materials from the global discovery are identified and highlighted for the

---

[6]       The defendant in *Saffarinia* similarly had access to a Relativity database; however, the production logs in that case were described as "skeletal" and unhelpful, which is not the case here.  424 F. Supp. 3d at 83.

defendants to whom they pertain, as described above and in prior filings.  But beyond those efforts, it would be unrealistic to impute to the prosecution team a degree of familiarity with the global discovery materials that might justify an order like the ones in *Hsia* and *Saffarinia*.  *Cf. Saffarinia*, 424 F. Supp. 3d at 88 (reasoning that government "had the luxury of reviewing [the voluminous discovery] material on a rolling basis over the course of its three-year investigation").

The instant situation, where the amount of electronic information involved is beyond the reach of any human's manual or linear review, is addressed by the Recommendations for ESI Discovery Production in Federal Criminal Cases, and it is expressly contemplated therein that that parties will be required to rely on technology to conduct discovery review, as the government have made possible here.  *See* Department of Justice and Administrative Office of the U.S. Courts Joint Electronic Technology Working Group (JETWG) Criminal E-Discovery, A Pocket Guide for Judges, Appendix B ESI Protocol, Section 1 (Purpose), Subsection (b)( "[T]he volume of ESI in many cases may make it impossible for counsel to personally review every potentially discoverable item, and, as a consequence, the parties increasingly will employ software tools for discovery review, so ESI discovery should be done in a manner to facilitate electronic search, retrieval, sorting, and management of discovery information.").[7]

For all the above reasons, this Court should follow the mainstream rule that identification of *Brady* material is not required, rather than adopt the anomalous position taken by cases like

---

[7]       *See* Criminal E-Discovery: A Pocket Guide for Judges, *available at* http://fln.fd.org/_files/training/2017/09/Pocket_Guide_for_Judges.pdf.  The *Pocket Guide* serves as a supplement to the federal judiciary's bench book.  The JETWG was created to address best practices for the efficient and cost-effective management of post-indictment electronically stored information ("ESI") discovery between the government and defendants charged in federal criminal cases.

*Hsia* and *Saffarinia*.[8]

### C. Nordean's requested order would impose practical difficulties and invite excessive litigation.

In addition to being unsupported by rule or precedent, Nordean's requested order would create unworkable practical difficulties — both for the government seeking to comply, and for this Court in adjudicating the disputes bound to ensue.

Compliance might be reasonably achievable for evidence that is exculpatory on its face. For example, the indictment alleges that co-defendant Pezzola robbed a police officer of his or her riot shield. ECF 305 at 20, 30. If the government were to discover video showing that Pezzola actually obtained the shield by finding it unattended on the ground, that evidence would clearly qualify as *Brady*.[9] The central questions in this case, however, do not involve the defendants' physical conduct but rather their intent, as well as the existence and nature of the agreement among

---

[8]     The other cases cited by Nordean do nothing to shake this conclusion. Unlike in *United States v. Blankenship*, the government's production here cannot be described as "overbroad" or "unorganized." No. 5:14-CR-00244, 2015 WL 3687864, at *3 (S.D.W. Va. June 12, 2015). And unlike in *United States v. Salyer*, this case does not involve two "storage containers" full of paper documents but *does* involve "multiple defendants [with] overlapping discovery needs," allowing for specialized assistance already being provided by the defense vendor, FPD, and NLST. No. CR. S-10-0061 LKK, 2010 WL 3036444, at *3 (E.D. Cal. Aug. 2, 2010).

Moreover, many district courts across the country have reached opposite conclusions from the cases on which Nordean relies. *See, e.g., United States v. Gross*, 424 F. Supp. 3d 800, 803 (C.D. Cal. 2019); *United States v. Ellis*, No. 2:19-cr-693-BRM-1, 2020 WL 3962288 (D.N.J. 2020); *United States v. Parks*, No. 18-CR-0251-CVE, 2019 WL 4979838 (N.D. Okla. 2019); *United States v. Indivior, Inc.*, No. 1:19CR00016, 2019 WL 7116364 (W.D. Va. 2019); *United States v. Weaver*, 992 F. Supp. 2d 152, 156 (E.D.N.Y. 2014); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 457 (S.D.N.Y. 2011); *United States v. Ohle*, No. S3 08 CR 1109 (JSR), 2011 U.S. Dist. LEXIS 12581, at *11 (S.D.N.Y. 2011); *United States v. Alvarado*, 01 Cr. 156 (RPP), 2001 U.S. Dist. LEXIS 21100, at *13-14 (S.D.N.Y. 2001).

[9]     To be clear, the government would inform defense counsel of any discovery of this kind regardless of whether it was under express order of the Court to do so.

them.  On these issues, *Brady* is more difficult to define, and is subject to differing interpretations.

Even seemingly simple line drawing becomes difficult in practice.  For example, Rule 5.1 rightly includes impeachment information as an example of *Brady*, which of course includes inconsistent statements.  In a case like this one, where many witnesses were interviewed over more than a year of investigation, there are likely to be minor inconsistencies on occasion.  Should the government identify every single witness with a minor inconsistency, even if that inconsistency does not seem to make a difference in a likely defense?  A skilled defense attorney can almost always find a way to cross-examine a witness who has related the same subject matter on multiple occasions.  Does that mean that the government should flag all witness statements where the government can imagine a potential line of cross-examination?  And if it does do that, does it open itself up to accusations of trying to "bury" the defense?  Similarly, much evidence can be both inculpatory and exculpatory at the same time — for instance, in cases with co-conspirators, any evidence casting blame on a joint offender can be useful for both the government (in proving the offense) and the defense (in shifting blame).  And this is all setting aside the enormous practical line-drawing difficulties that come with defining what constitutes "material" exculpatory evidence *ex ante* — and therefore should be specifically "identified" — particularly where the defense and the government (and the Court) may have sharply different views of the significance of different pieces of evidence.

Given the difficulty of drawing clear lines, an order requiring the government to identify everything that could qualify as *Brady* would present the government with a Hobson's choice.  If the government takes too broad an approach, the identification of *Brady* becomes meaningless and the government is easily accused of trying to avoid the requirement, or of giving the defense red herrings.  If the government takes too narrow an approach and misses something the defense may

care about, or views particular evidence in a different light than the defense, or simply does not foresee a potential defense, it risks being accused of failing to comply with the Court's order.  In the hands of reasonably skilled defense counsel, any such list could easily be used to argue it contains "too much" or "too little," depending *ex post* on what theories the defense pursued or abandoned at trial.

Moreover, the potential *Brady* analysis would constantly be shifting: what may seem material before trial began would likely shift after an opening statement by the defense or after a witness testified.  To comply with the new rule, the government would have to constantly re-evaluate the evidence and re-categorize evidence as potential *Brady* or risk being accused of neglecting its obligations — all while simultaneously trying to prosecute the case.  As one district court has observed:

> Placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once.  Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client.  This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located.

*United States v. Ohle*, No. S3 08 CR 1109, 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011), *aff'd*, 441 F. App'x 798, 804 (2d Cir. 2011) (affirming "district court's thoughtful and meticulous opinion" below).

Moreover, regardless of the government's approach, this new requirement would invite endless litigation.  As another court analyzing this issue has stated:

> To order the Government to go beyond simply producing *Brady* material and order it to identify or label *already produced* material as covered by *Brady*—and by omission, identify non-*Brady* material—only invites future disputes as to whether the Government did an adequate job of identifying such material or characterized the material consistent with the Defendants' view of it.

*United States v. Meek,* No. 1:19-cr-00378-JMS-MJD, 2021 U.S. Dist. LEXIS 52121, at \*18-19 (S.D. Ind. 2021) (emphasis in original).

  In sum, Nordean is asking for an extraordinary requirement that would give rise to extraordinary complications in this already-complex case.  The Court should decline his request.

# CONCLUSION

For the foregoing reasons, Nordean's motion should be denied.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:      */s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov


*/s/ Jason B.A. McCullough*
JASON B.A. MCCULLOUGH
    D.C. Bar No. 998006; NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
    On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530