```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA           CR Nos. 1:21-cr-00175-TJK-1
                                           1:21-cr-00175-TJK-2
        v.                                 1:21-cr-00175-TJK-3
                                           1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                            1:21-cr-00175-TJK-6
2-JOSEPH RANDALL BIGGS
3-ZACHARY REHL                     Washington, D.C.
5-ENRIQUE TARRIO                   Monday, May 2, 2022
6-DOMINIC PEZZOLA,                 3:00 p.m.
                    Defendants.
- - - - - - - - - - - - - - - - x
```

_____

                TRANSCRIPT OF DISCOVERY CONFERENCE
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE

_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:   Luke M. Jones, Esq.
                         Erik M. Kenerson, Esq.
                         Jason B.A. McCullough, Esq.
                         Emily Miller, Esq.
                         U.S. ATTORNEY'S OFFICE
                         555 4th Street, NW
                         Washington, DC 20530
                         (202) 252-7233

For the Defendants:      Nicholas D. Smith, Esq.
                         DAVID B. SMITH, PLLC
                         7 East 20th Street
                         Suite 4r
                         New York, NY 10003
                         (917) 902-3869

                         John D. Hull, IV, Esq.
                         HULL MCGUIRE PC
                         1420 N Street, NW
                         Washington, DC 20005
                         (202) 429-6520

                         Carmen D. Hernandez, Esq.
                         7166 Mink Hollow Road
                         Highland, MD 20777
                         (240) 472-3391

APPEARANCES VIA VIDEOCONFERENCE CONTINUED:

For the Defendants:      Nayib Hassan, Esq.
                         LAW OFFICES OF NAYIB HASSAN, P.A.
                         6175 NW 153 Street
                         Suite 209
                         Miami Lakes, FL 33014
                         (305) 403-7323

                         Sabino Jauregui, Esq.
                         JAUREGUI LAW, P.A.
                         1014 West 49 Street
                         Hialeah, FL 33012
                         (305) 822-2901

                         Steven A. Metcalf, II, Esq.
                         METCALF & METCALF, P.C.
                         99 Park Avenue
                         6th Floor
                         New York, NY 10016
                         (646) 253-0514

Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1

**P R O C E E D I N G S**

2        THE DEPUTY CLERK:  We are on the record in

3 Criminal Matter 21-175, United States of America v.

4 Defendant 1, Ethan Nordean; Defendant 2, Joseph Biggs;

5 Defendant 3, Zachary Rehl; Defendant 5, Enrique Tarrio; and

6 Defendant 6, Dominic Pezzola.

7        Present for the Government are Jason McCullough,

8 Luke Jones, Erik Kenerson, and Emily Miller; present from

9 the U.S. Marshals Service are Derek Haywood, Charles

10 Miracle, and Lamont Ruffin; present for Defendant 1 is

11 Nicholas Smith; present for Defendant 2 is John Hull;

12 present for Defendant 3 is Carmen Hernandez; present for

13 Defendant 5 are Nayib Hassan and Sabino Jauregui; present

14 for Defendant 6 is Steven Metcalf.  Also present are

15 Defendant 1, Mr. Nordean; Defendant 2, Mr. Biggs; Defendant

16 5, Mr. Tarrio; Defendant 6, Mr. Pezzola.  The appearance for

17 Defendant 3, Mr. Rehl, has been waived.

18        THE COURT:  All right.  Well, good afternoon,

19 everyone.

20        And for counsel that were before me recently

21 arguing a motion under seal, I wanted you all to know I'll

22 have a decision for that on -- for you on paper either today

23 or tomorrow.  So just so you all know, that's on its way.

24        I did think that -- I know -- first of all, let me

25 say, I appreciate the efforts, I guess, on the Government's

1    side to get Ms. Miller here, representatives from the

2    Marshals Service here, and for everyone to carve out time

3    for this, because I did think it would -- it hopefully could

4    cut through some of the clutter and make sure that we're all

5    on the same page if we could all spend, you know, an hour or

6    so together today and make sure that each defendant -- that

7    the Government can tell me, given where each defendant is

8    being housed, what resources are available to them to --

9    number one, to be able to have access to their counsel; and,

10   number two, to have access to discovery, including

11   electronically -- electronic discovery; and for me to make

12   sure that these defendants are being properly prioritized

13   because of the nature of -- number one, because we have a

14   trial date approaching; and, number two, because the case

15   against them is a conspiracy case in which I think it's

16   reasonable to expect that there's a broader range of

17   discovery that could potentially be at issue.

18          So that's what I thought -- I thought it would

19   make sense to do today.  I know there are -- we may not get,

20   then, to -- Ms. Hernandez, I know you have a -- kind of,

21   a -- another discovery issue you had to raise with me.  You

22   said you might file a motion, kind of, a -- for lack of a

23   better way to put it, a concern that the -- a needle was

24   being buried in the haystack, I think, is probably a way to

25   put it.  And so, maybe, today, given that we do have the

1    marshals here; we do have the -- kind of, the discovery
2    folks here, maybe, we'll get to that today; maybe, we won't.
3    I will address it soon if we don't.  But I wanted to at
4    least, while we had the collective knowledge and the
5    collective group here today, just have the Government go
6    through for me, you know, again, where each defendant in
7    this case -- and the other thing that's been confusing, we
8    have defense counsel spread out all over the country.  For a
9    while, we had defendants being held in different places and
10   we still don't have every defendant here being held in or
11   around the D.C. area, but I wanted to at least give the
12   opportunity to go through each defendant, where they're
13   being held, what their -- what the Government believes their
14   -- the avenues they have to both access counsel and then to
15   access discovery, including electronic discovery, and then
16   to have each defense counsel be able to respond and indicate
17   whether they've been having any problems, whether that's
18   consistent with their understanding to, kind of, break
19   through, again, what I think sometimes are either -- what
20   can be misunderstandings about the nature of how we're going
21   to make sure these defendants have access to their lawyers
22   and access to the discovery.
23            So whoever from -- I guess, let me start off with
24   the Government and whoever wants to address it.  Can someone
25   from the Government, then, tick through, again, the question

```
 1    of -- those questions with regard to each defendant here and

 2    then I'll, you know -- once we have a chance to hear that,

 3    I'll hear from each of counsel for the defendants to make

 4    sure that nothing has -- there -- the wires aren't being

 5    crossed or that the system is functioning at least as it's

 6    supposed to be intended to.

 7              MS. MILLER:  Thank you, Your Honor.  Emily Miller

 8    for the United States.

 9              I'm the -- just for the record, I'm the chief of

10    the Discovery Unit for the Capitol Siege Section.  I was

11    informed about your inquiries about a week or so ago.  And

12    so I started actually coordinating with the marshals as well

13    as with -- directly with various institutions trying to find

14    out both their video visitation, in-person visitation, and

15    e-discovery policies.  So all I can do is my very best to

16    report on my findings based on those conversations.  But,

17    sort of, preliminary to any particular institution or

18    defendant, I do want to say there is one program that we

19    have available at the D.C. Jail at C- -- it's at CTF --

20    actually, it's anywhere in the D.C. Jail, but to my

21    knowledge, all the January 6th people are at CTF -- that

22    allows inmates to review videos that are in Evidence.com on

23    tablets.  So they can go -- they can log into a large

24    repository of 9 terabytes of video, over 24,000 files, and

25    they can review those as they wish on their tablets.
```

 1            I just wanted to say that it's my understanding

 2     that none of these defendants are at CTF.  And so none of

 3     them will have access to that.  And I wanted to make clearer

 4     that that program is very much a unicorn.  So we're not

 5     going to be able to replicate it in any other institution.

 6     It came together as the lucky fruition of a whole bunch of

 7     coincidences, including that they already had tablets at

 8     D.C. Jail; that inmates are allowed Internet access; that a

 9     private vendor who issues the tablets was willing to let us

10     backdoor our program into it; that Evidence.com that runs

11     the program was willing to work with that vendor; and so

12     it's just not going to be something that we can make happen

13     anywhere else.  In fact, based on my discussions with these

14     other institutions, I don't think any of them would allow

15     their inmates to even have Internet access in any event.

16     So --

17            THE COURT:  But there's --

18            MS. MILLER:  -- I just wanted to make sure that

19     that was clear.  So what we're really talking about here is

20     either case-specific discovery or discovery that is in

21     Relativity.

22            THE COURT:  Ms. Miller, let me just -- before you

23     go on, is there any reason why, if a -- if any of these

24     defendants wanted to be moved to D.C. Jail for the purpose

25     of being able to take part in what you just described -- I

1     know that's -- we've got the marshals here and they'll --

2     I'll have them chime in, too -- but do you know of any

3     reason why they couldn't?  Again, it may be that, you know

4     -- I don't -- there's not a one-size-fits-all, but it may be

5     that a defendant feels -- and their lawyer feels that

6     participating in that -- in Evidence.com or acquiring a

7     tablet and being able to review that kind of evidence is

8     important to their defense.  Is there any reason why they

9     can't request to be moved there and participate in it?

10              MS. MILLER:  So I think that that question is best

11    addressed to the marshals.  My understanding of the response

12    I would expect them to echo is that in view of the issues

13    that are ongoing with the jail, they're not moving inmates

14    there right now.  I know from my own discussions with the

15    jail that when inmates come, they have to go through an

16    intake procedure, and during the intake procedure, they are

17    housed at CDF, not at CTF, and I -- it's my understanding

18    that as long as that's the case, given the current

19    circumstances and given that there's no promise until people

20    are evaluated during that intake process of where they might

21    end up, that the marshals and the jail -- the marshals are

22    not going to bring inmates to the jail at this time, but I

23    really should let them speak for themselves.  I may have --

24    for all I know, I'm fudging the nuances of how they would

25    say it.  So --

1           THE COURT:  All right.  You know, whoever -- and

2     thank you, again, everyone from Deputy Ruffin on down who

3     are present from the Marshals Service.

4           I guess it may well be -- I don't want to

5     pre-judge it -- it may well be that what these defendants

6     can get at the facilities where they are is sufficient for

7     them, but it does seem, again, a little difficult to -- I

8     mean, I understand you are all -- you are managing a bunch

9     of different priorities, and so I understand that, but these

10    are defendants, again, A, with a trial date; B -- and with a

11    case -- in a case for which, I would say, you know -- a case

12    in which they're charged with conspiracy.  And so I, you

13    know -- unlike a lot of other cases, for example, that I

14    think that have gone to trial which we -- do not have

15    conspiracy charges at issue; they're relative- -- they're --

16    they, in some ways, are much more straightforward in terms

17    of the evidence and then -- and the potential defenses,

18    these are defendants for whom I would think the Government

19    writ large should be bending over backwards to make sure

20    they have all the access to -- access to all the evidence

21    they need -- or should be doing that for every defendant,

22    but there may be a wider scope of potential evidence at

23    issue in this case.  So -- and, you know, it seems a little

24    strange that we'd have this great program that I know,

25    Ms. Miller, you've -- the Government, I'm sure, moved heaven

1    and earth to get up and running and then not have these

2    defendants be able to have access to it.  It seems like a

3    mismatch in terms of the resources that we have and the

4    folks who do need it.

5         But let me have somebody from the marshals

6    indicate whether -- what -- at least right now, what -- if

7    -- again, if one of these defendants raised their hand and

8    said, Look, I, you know -- I think I'm going to be able to

9    defend myself best by able to -- by being able to

10   participate in the program at the D.C. Jail, why they

11   wouldn't be able to be -- or whether you all would typically

12   move them there.

13        DEPUTY RUFFIN:  Good afternoon, Judge Kelly.  This

14   is Lamont Ruffin.  I'm the Acting U.S. Marshal for the

15   District of Columbia.  I can answer some of that question, I

16   think.

17        We don't -- I mean, I'm -- I don't want to sound

18   cavalier, but we just don't typically allow defendants to

19   choose where they -- where they're housed, but then the

20   other part of it is it goes into the security aspect and

21   security classification at the jail.  We can move defendants

22   to the jail -- and I'm just saying hypothetically -- we can

23   move defendants to the jail, but then the jail has to

24   classify them to be housed at CTF where they would get

25   greater benefit of this, and there have been certain

1    situations where the jail has refused to classify someone to

2    even be a part -- or be classified over to CTF, and then it

3    becomes a balancing game that the Marshals Service should

4    not be getting involved in when it -- regarding discovery

5    when we're talking -- as it plays into our housing decisions

6    because it goes into separation issues, and behind the

7    scenes -- and I can't speak for the jail 100 percent, but I

8    can say I've been a part of some of those high-level

9    discussions in regards to the condition of confinement

10   issues that we have reported out last year.  The jail is

11   getting overwhelmed with a lot of the discovery issues.

12   They're not saying it to you all, but they're certainly

13   saying it to me; that they're not being compensated for the

14   things that they are being asked to do which does fall under

15   the Marshals Service's responsibility and some of the things

16   that we're being asked to, you know -- or being presented to

17   us -- providing extra guard services, providing -- to

18   monitor, you know, laptops being broken or laptops being

19   misappropriated -- are now falling into per diem requests,

20   and then on the -- and then there's -- another aspect that

21   we also have to look at is what demand, once Superior Court

22   -- what demand Superior Court plays into this when they

23   start -- when their defendants start asking, because I know

24   PDS has been pressuring, you know, D.C. Jail to also provide

25   the same access level to their defendants in their cases as

1     well as District Court.

2              So that's some of the issue from my 1,000-foot

3     view, so to speak, you know?  It, you know -- we -- when we

4     make these housing decisions, we try to make the decisions

5     based on who can provide the best services as far as, like,

6     medical, transport to and from the courthouse, but discovery

7     just doesn't play into that and that, you know -- and

8     then -- so we have to start looking at nationally how that

9     would impact us.  I know we're talking about this particular

10    case, but then we also have implications whereas other jails

11    may -- if we -- for instance, if we start sending defendants

12    back, there may be some limitations where those jails just

13    don't allow it if we have other resources -- don't allow

14    laptops, don't allow Internet use -- and it's just a lot for

15    these jails to manage that we're asking these jails to do

16    for us.

17             THE COURT:  Well, I certainly appreciate, I guess,

18    first, that prisoners -- those awaiting trial don't get to

19    choose where they're housed, generally speaking.  That --

20    and I also understand your point about, look, there's always

21    going to be screening processes and other determinations

22    that the jail's going to have to be able to make independent

23    of, maybe, any other consideration to make sure that the

24    housing is appropriate, but I do think it is -- well, I

25    don't want to get ahead of myself and we're going to --

 1    we'll see what these defendants have access to, but it

 2    really does seem -- for the Government to have gone through

 3    such -- the trouble to put together this ability of

 4    defendants to be able to -- and this is really -- it sounds

 5    like this system is going to be available even after -- for

 6    non-January 6th defendants in the future.  Ms. Miller's,

 7    kind of, looking -- maybe, that's not true.  I don't know

 8    whether that's true or not.  It's available to them now, in

 9    any event, and to be able to have it up and running and not

10    ultimately something that can be leveraged for a case like

11    this strikes me as just incredible.

12              In any event --

13              MS. MILLER:  Can I just --

14              THE COURT:  So Ms. Miller, why don't you tell me

15    what your research has led you to know about each of these

16    defendants, where they are and what the capabilities are.

17              MS. MILLER:  I will.  But I would like to just

18    clarify a couple of the things that Marshal Ruffin just

19    mentioned just to explain my understanding.

20              There's two different programs at the D.C. Jail.

21    One is a laptop program.  It's run -- and it existed before

22    there was ever a riot.  They have doubled the resources for

23    that program, even quadrupled them since its inception.

24    There's over 20 computers.  Any inmate can sign up for a

25    laptop.  It's Superior Court, District Court, any inmate.

1    When their discovery arrives is when they're supposed to go

2    on the laptop waitlist.  I'm not saying there haven't been

3    difficulties with it.  There have been, you know?  Just like

4    everywhere else, the jail's been through a pandemic; the

5    jail's been through workers who have had COVID; the jail's

6    been -- they grew a program organically that they didn't

7    necessarily have the resources to support and they've run

8    into issues with that, but they're trying very hard.  So

9    that's the laptop program, and that's not connected to the

10   Internet.  That's discovery that gets provided by a USB or

11   something like that or a CD.  And then separately, there's

12   the Evidence.com program.  That utilizes educational tablets

13   that are available to, I think, around 90 percent of the

14   inmates at the jail.  We've only utilized the program for

15   purposes of this case at this point.  I mean, it's really a

16   pilot program.  To the Court's inquiry about whether that

17   program will later be expanded, sure, that would be a

18   wonderful way to make use of this resource, but right now,

19   we're still just trying to work through this issue just for

20   these defendants, and so that's something that we're

21   thinking about for down the line.

22           I do just want to reiterate one other point before

23   I go through what at least I learned about each of these

24   institutions which is just to say it is true that the

25   Government invested a lot of time and energy and effort into

1    these kinds of novel solutions, and I appreciate the Court's

2    recognition of that, but in no way is it a concession that

3    it's something that these defendants are entitled to as a

4    matter of law.  And so while we'd all perhaps like it and

5    find it ideal to maximize our use of this resource, I just

6    want to make it abundantly clear that it's -- in this case,

7    where all these defendants are represented by counsel and

8    that same discovery's been made available to their

9    attorneys, which it has, we do believe that the discovery

10   obligation has been met.  But that being said, Your Honor,

11   I'm happy to address the five institutions that I called,

12   emailed, and I could -- I'm just going to go in order of a

13   list that I made.

14            It's my understanding that Mr. Tarrio's at

15   Rappahannock.  So if I have that right, I'll go there first.

16   According to my research for Rappahannock, with respect to

17   e-discovery, each housing unit has a computer that's in a

18   classroom and inmates can use it privately during their

19   scheduled -- pre-scheduled law library time to review

20   e-discovery.  The facility will accept any storage devices

21   that are approved by the U.S. Marshals Service.  Inmates

22   have to submit a request form each week to get access to the

23   law library.  They have represented to us that if Mr. Tarrio

24   needs extra time or would like to go on a consistent basis,

25   then Sergeant Foster [ph], who was the -- our contact there,

1    can speak with his case manager and make arrangements to get

2    him as much time as possible but noted that security

3    situations can prevent access to the law library on certain

4    days.  I asked about video visitation and there was none.  I

5    asked about in-person visitation and whether it was limited

6    to attorneys.  I was told it is not.  Any member of the

7    legal defense team can visit, and they are permitted to

8    bring in digital devices to share discovery with the client.

9          So that is what I learned about Rappahannock.  And

10   I understand the Court wants to go one defendant at a time.

11   So I'll stop now.

12         THE COURT:  All right.  I know Mr. Tarrio, for

13   example, is -- obviously, his case is relatively new and he

14   also arrived at that facility relatively recently.

15         Mr. Hassan, is there any -- have, you know -- have

16   you experienced any difficulties?  I mean, I -- and I know,

17   also, you're not -- you're out of Miami at this point and

18   it's still -- and also, I think the Government will be

19   responding to your motion for bond.  I think it's due --

20   their response is due today.  So obviously, this is all, you

21   know, pending the resolution of that motion once the

22   Government responds.  But is there anything you want to,

23   Mr. Hassan, put on the record or alert me to about any

24   difficulties you've had?  But, again, it may be that you're

25   -- this is such a -- you're -- the case is so new that you

1    haven't really crossed this bridge yet.

2         MR. HASSAN:  Judge, so my -- our client's been

3    there for approximately, I want to say, 17 days or a little

4    bit more than that, Judge.  And, quite frankly, we had

5    discussed with Mr. Kenerson as well as Mr. McCullough and

6    Mr. Jones regarding a potential relocation of Mr. Tarrio

7    down to South Florida, and those communications were very

8    extensive.  They requested necessity and communication or

9    the availability to communicate with counsel and their team,

10   Judge.  I expressed the possibility of that -- of him being

11   relocated back to FDC Miami which was pretty much our

12   intention from the very beginning; that he be held in FDC

13   and that we waive his presence for potentially all hearings

14   except for, of course, the trial at some point in time, and

15   those emails were sent out.  I don't know if Agent Ruffin

16   got that information or who, in fact, received that

17   information over there at the Marshals Service.  I can

18   inform the Court that FCI Mi- -- FDC Miami, the federal

19   detention center in South Florida, allows us access

20   throughout the whole period -- the whole day, Judge.  We can

21   have somebody there -- from our defense team there reviewing

22   the discovery one on one with Mr. Tarrio.

23         In regards to any communication device that we can

24   send to Mr. -- with -- to Mr. Tarrio for him to review

25   discovery, we haven't crossed that bridge yet because,

 1    unfortunately, we don't know where he's going to be held.

 2              THE COURT:  Yeah.

 3              MR. HASSAN:  So I mean, I don't want to send him

 4    discovery and then he's going to get relocated back to South

 5    Florida because all those difficulties that we're having and

 6    based upon -- I don't know if it's wishful thinking or

 7    whatever it may be, but due to the conversation that I've

 8    had with both Mr. Kenerson, Mr. Jones, and Mr. McCullough,

 9    we're expecting him to be re- -- potentially be relocated

10    back to FDC Miami.  So I don't know if that's something that

11    the Marshals Service can speak of as to right now and clear

12    up that issue of whether that will happen, but that was our

13    anticipation, our hopes, that he be relocated down to South

14    Florida.

15              THE COURT:  All right.  So it may be that you're

16    -- I mean, I'll turn to the Government in one second about

17    that request, but it sounds like we can, maybe, put your

18    client's issues aside in the sense that he may not be at

19    Rappahannock if you have your way and, in any event, I still

20    have to address your motion for bond.  So there's that

21    uncertainty, as well.

22              MR. HASSAN:  (Indicating.)

23              THE COURT:  Yeah, Mr. Hassan.  Yes, I see your --

24              MR. HASSAN:  Judge, if I may, the -- and I just

25    want to clear up something.  At FDC Miami, there's four

1    rooms with computers that have access at all times.  So any

2    of those four rooms, we can be inside the room.  We can have

3    a representative from our office -- a paralegal or a

4    representative in the room reviewing discovery from the

5    moment that they open up at 8:00 o'clock in the morning

6    through 7:00 o'clock p.m., reviewing the discovery hands-on

7    with the defendant.  So that's not available at other

8    facilities, but that is available at FDC Miami, and that's

9    what our hopes were.  That's why we made the request going

10   back to March 22nd when was the first email that I sent

11   Mr. Kenerson when we first learned that he had been

12   relocated from Miami to Tallahassee, Judge.

13          THE COURT:  Okay.  Mr. Kenerson, do you want to

14   just -- I mean, I, you know -- is this the Government --

15   something the Government is still considering sponsoring?

16   For lack of a better, I guess, way to put it.

17          MR. JONES:  Good afternoon, Your Honor.  Luke

18   Jones.

19          THE COURT:  Oh.

20          MR. JONES:  So the transfer is something that we,

21   on the prosecution team, support, obviously, recognizing the

22   U.S. Marshals Service primary responsibility and authority

23   here.

24          THE COURT:  All right.  And so were -- was the

25   Government -- let me put it this way.  What was the vehicle

```
 1   by -- was the Government going to move to transfer

 2   Mr. Tarrio?

 3          MR. JONES:  We've asked -- we've put in a request

 4   to the U.S. Marshals Service to transfer him.  We -- that's

 5   ultimately up to the U.S. Marshals.  We have not -- I don't

 6   anticipate we'd be filing a motion with the Court, but we're

 7   not at that point yet in any event.

 8          THE COURT:  All right.  It sounds like, in any

 9   event, it's something that as soon as -- the Government's

10   going to respond to the motion for bond and we'll -- and

11   I'll address it as soon as I -- and I'll address that and

12   then we'll be in a position to talk about whether the

13   Marshals Service want to transfer him to Miami.

14          MR. HASSAN:  (Indicating.)

15          THE COURT:  Yes, Mr. Hassan?  I see your hand

16   raised.

17          MR. HASSAN:  Judge --

18          THE COURT:  Yeah.

19          MR. HASSAN:  -- I had a conversation with -- I

20   don't -- I can't find the email right now, but, in fact -- I

21   don't -- I believe it was Mr. McCullough or Mr. Kenerson --

22   in which I suggested that I'll be filing a motion with the

23   Court requesting his transfer, and it was with -- and their

24   statement was to me that it was in the -- within the

25   prerogative of the Marshals Service --
```

 1           THE COURT:  Right.

 2           MR. HASSAN:  -- as far as relocation.  So they had

 3    to object to it because it was something the marshals had to

 4    speak on.  We have a representative from the marshals

 5    office.  I would ask the Court to inquire from the Marshals

 6    Service whether they're going to be inclined to relocate

 7    Mr. Tarrio back to South Florida, notwithstanding what the

 8    Government's ruling is going to -- what the Court's ruling

 9    is going to be on our motion.

10           THE COURT:  Right.  Well, okay.  Does the -- do

11    the -- before we move on to the next defendant, does -- do

12    the marshals want to address what your view is right now on

13    that point.

14           DEPUTY RUFFIN:  Judge Kelly, the -- so I think I

15    represented to -- before that this defendant -- or these

16    defendants were committed here by a judge in South Florida.

17    And so that's why the marshals in South Florida moved him on

18    the commitment order or transfer or warrant of removal out

19    of that District.  They had an obligation to move him.  I

20    cannot move him back unless our court issues an order for us

21    to move him back, but I say that -- I mean, we're going to

22    execute any order of the Court.  It's just we have to

23    communicate with our partners in the Southern District of

24    Miami because they're now going to have to take the

25    operational responsibility of this defendant, not this

1    District, and that would be, you know -- that would be a

2    little bit confusing because that's not something that we

3    normally do, but I understand this is different times and

4    calls for different measures.  I'd -- I will also say that

5    based on some of the conversations that I've had with other

6    judges in this court and our Chief Judge, is that it was our

7    understanding the Marshals Service is to move -- the

8    defendants that are charged in this District should be

9    housed under the authority of this District.

10                   THE COURT:  All right.

11                   DEPUTY RUFFIN:  So that -- I'll just leave it at

12   that and, you know, we can act accordingly.

13                   THE COURT:  All right.  I don't want to burn more

14   time on that question at the moment just because it's not a

15   -- it's not directly a discovery issue and it's something we

16   can -- I can -- we can work on with Mr. Hassan and the

17   Government and your office without having every other

18   defendant present, but at least -- I understand the

19   situation now in terms of Mr. Tarrio and his detention.

20                   Ms. Miller, why don't you go on to the next

21   defendant and the status of their facility.

22                   MS. MILLER:  The next facility I was going to

23   address was Alexandria detention facility which is where

24   Mr. Biggs is housed.  I do see that Mr. Hull's had his hand

25   up for quite some time.  I --

```
 1                    THE COURT:  Oh, I'm sorry.  Mr. Hull, I don't --
 2        we have a lot of squares here on the --
 3                    MR. HULL:  I don't need to speak --
 4                    THE COURT:  There you are.  I see you.
 5                    MR. HULL:  I don't need to speak right now.  I
 6        just wanted to make sure that people saw my hand was up.  I
 7        was, frankly, very disappointed in what I've heard so far
 8        with respect to all the defendants, but especially
 9        Mr. Biggs, my client.  This is, you know -- the response so
10        far has been disappointing, tone deaf, arrogant, and replete
11        with broken promises, and I'm just starting off.  So I would
12        like to speak when she's finished, but I --
13                    THE COURT:  All right.  Mr. Biggs [sic], she --
14                    MR. HULL:  -- (inaudible) -- what's happening
15        here.
16                    THE COURT:  She hasn't even addressed where your
17        client is located.  So I think you have to at least let her
18        make those representations.
19                    MR. HULL:  Well, I think she did, but you asked me
20        to speak, and I'm giving you that for starters.
21                    THE COURT:  All right.  She hasn't --
22                    MS. HERNANDEZ:  I like that trilogy, though, Your
23        Honor: disappointing, tone deaf, and replete with broken
24        promises.
25                    THE COURT:  Well, you know, you can save it for
```

 1    your next closing, Ms. Hernandez.

 2            All right.  Ms. Miller, go ahead.

 3            MS. MILLER:  Thank you, Your Honor.

 4            Based on what I was able to find out about

 5    Alexandria detention facility, with respect to e-discovery,

 6    upon receipt of a Court order, and once the device is

 7    approved by the U.S. Marshals Service, they will permit an

 8    attorney to supply a laptop that meets the strict security

 9    protocols of their IT personnel which, essentially, I take

10    to mean all firewalls are up or it's otherwise cut off from

11    the Internet.

12            The inmates are not allowed to use the computers

13    in their cells.  They have to use them in the law library.

14    The library visits are one hour max, and only one inmate can

15    be in the library at a time.  So -- because of COVID

16    protocols.  So daily access is not guaranteed.  I asked

17    about computers that were in the law library already, and

18    they indicated they do not have disc access or USB port

19    access.  So they are not an additional resource.

20            With respect to visitation --

21            And I'm going to just comment, I believe Deputy

22    Haywood's here and he's on some of these with me.

23            So if I'm getting any of this wrong, please feel

24    free to correct me, Deputy Haywood.

25            But for visitation, for in-person, attorneys can

1    bring in digital devices to share discovery with a client.

2    I think I sent out a follow-up email asking about

3    non-attorney members of the legal defense team and hours of

4    in-person visitation, but I haven't heard back yet.

5         With respect to video visitation, video visitation

6    is available over Webex Mondays to Fridays from 8:00 a.m. to

7    4:00 p.m.  I asked if document sharing was enabled on their

8    Webex platform and they said yes, which would give a

9    significant opportunity to share audio and video files.

10   Standard slots are one hour.  Up to two hours may be

11   reserved.  There's no cap on the number of video visits per

12   week.  And they gave me phone numbers and emails for two

13   people who can be contacted to establish video visitation.

14        THE COURT:  All right.  Mr. Hull, that actually --

15   I mean, that actually is a fairly -- it sounds like

16   in Alexandria, at least on paper, is a fairly robust set of

17   ways for you to interact with Mr. Biggs and provide him with

18   discovery, but you'll tell me why that hasn't been working,

19   I guess.

20        MR. HULL:  Well, it hasn't been working so far,

21   Your Honor.  First of all, this is the first I've heard of

22   the video being available, and I was --

23        THE COURT:  Well, that's exactly why I wanted to

24   have this --

25        MR. HULL:  Very -- no, they -- let's -- everybody

1    on this phone call except for the newcomers to it -- or this
2    conference understands how much discovery there is, and
3    especially with respect to the five defendants that are
4    still in this case.  No one, I think it's fair to say, has
5    more discovery to review.  For someone to come in and
6    suggest that Joe Biggs can be looking at stuff on video and,
7    (inaudible) -- certain times of the week and for me even --
8    I've been -- I visited him -- he's only been there two
9    months -- four times in jail, one non-contact visit; two --
10   three contact visits, and in the room I visited him in,
11   there are lots of desktops, IBM computers.  I've been told
12   by the head of the jail there that there is no such program
13   for laptops.  There can't be.  They don't have the -- they'd
14   like to have it, and they don't have the capability to do it
15   yet.  I offered to buy him one -- buy Mr. -- and this would
16   be great and my firm would -- a laptop or tablet, and he
17   actually made it very clear that I couldn't do that unless
18   he spoke with other people, and then he spoke with Deputy
19   Haywood, who I found very helpful.  Deputy Haywood actually
20   had done homework; knew what was going on; didn't come in
21   and say, you know, We put you where you needed to be.  He
22   understood some of the challenges of discovery here.
23          And I think everyone needs to understand or
24   remember if they're new to this conversation that we've been
25   at this for 15 months.  Fifteen months of trying to figure

```
 1    out how Joe Biggs -- who's a bright guy, a well-read guy, a
 2    well-educated guy who understands the themes and understands
 3    the -- we talk every day on the phone, but he still hasn't
 4    seen any of the videos except for one-and-a-half Block
 5    tapes -- Eddie Block tapes.  He needs -- and I think we've
 6    been through this before -- for us to do this the right way,
 7    I would show him all of the discovery -- that's videos plus
 8    documents and other things -- and then I would, you know --
 9    he would edit for me.  I -- as it turns out, there is no way
10    in the world I can give him any decent Fifth Amendment,
11    Sixth Amendment -- and Sixth Amendment preparation.  It
12    can't happen.  However, we want to go to trial.  We want him
13    out of there.  We believe that the detention of Mr. Biggs is
14    illegal.  It's probably inadvertently illegal, unwittingly
15    illegal on behalf of His Honor, but everybody in this room
16    knows that these guys didn't commit a conspiracy, didn't do
17    a plan --
18              THE COURT:  All right.
19              MR. HULL:  -- (inaudible) -- Proud Boys do;
20    however --
21              THE COURT:  Mr. Hull, I want to --
22              MR. HULL:  Okay.  Let me say one more thing.  One
23    more --
24              THE COURT:  Okay.
25              MR. HULL:  -- (inaudible) -- and I will be quiet.
```

1    I -- if we can get a tablet to him, that's great.  I'm out

2    of town right now.  I'll bring one to him when I do my fifth

3    visit with him.  I would be more than happy to do that, but

4    we have a lot to go over, and so far, even with personal

5    visits -- I mean, this notion that I go in and I -- I go in

6    and show him discovery and that's enough time before --

7             THE COURT:  Mm-hmm.

8             MR. HULL:  -- (inaudible) -- is, like, a different

9    universe.  What are you thinking?  What homework --

10            THE COURT:  Mr. --

11            MR. HULL:  -- (inaudible) -- in this case, folks?

12   So if I can get a tablet for him -- which is different than

13   what Shelbert Williams had been telling me over at the

14   jail -- that would be great.

15            But I would also mention one other thing.  The

16   D.C. -- the Alexandria Detention Center -- where we did not

17   expect Joe to end up; expected him to end up at the D.C.

18   Jail -- is highly functional, has really good people, and

19   I'm sure that they -- with all the resources that have been

20   thrown at keeping these guys in jail, I'm sure that they

21   could come up with a program just for Joe Biggs; however,

22   just a week ago, I was told by a couple of different people

23   -- and I think, to a certain extent, Deputy Haywood and,

24   certainly, Shelbert Williams -- that this was not possible,

25   it's not what we do, and won't be available until the fall.

1      So I'm hearing some good things, but even with all those

2      good things, I can't do this the right way.

3                   DEFENDANT BIGGS:  (Indicating.)

4                   MR. HULL:  Now, I see Mr. Biggs has his hands

5      up -- hand up.

6                   Joe, I would suggest that you not speak.

7                   THE COURT:  Yeah.  Mr. Biggs, I'm going to ask you

8      to go through your attorney.

9                   And, Mr. Hull, so the takeaway is -- and, again,

10     I'm trying to be focused on solutions here, and I think --

11     much of your comments, Mr. Hull, has been focused on

12     solutions.  I think your -- the question you posed to

13     Ms. Miller about the tablet, I think she would --

14                  Ms. Miller, that -- the tablet is not available in

15     -- outside of the D.C. Jail; is that correct?

16                  MS. MILLER:  That's correct.

17                  THE COURT:  All right.

18                  MS. MILLER:  What I was saying is according to

19     Chief Deputy Shelbert Williams -- it's true.  They do not

20     have any e-discovery program there.  I agree with Mr. Hull

21     about that.  What he said was in situations where a court

22     orders it, they will permit the defense attorney to supply a

23     laptop that meets the strict security protocols of the jail

24     which I can assure the Court will include disabling any

25     Internet access.

```
 1              THE COURT:  So Mr. Hull, I'll order it.  I mean,
 2    I -- if you work with the Government to craft an order that
 3    I can order -- that I can use to get your client that
 4    laptop, I will order it.
 5              MR. HULL:  That's a deal.  Done.  I'll do it.
 6              THE COURT:  All right.  So I mean --
 7              MR. HULL:  This is the first time I've heard that
 8    this is --
 9              THE COURT:  Well --
10              MR. HULL:  -- (inaudible.)  Tablet --
11              THE COURT:  Well, the --
12              MR. HULL:  -- laptop, we don't care.
13              THE COURT:  Fair enough.  And this is exactly why
14    I'd hoped -- that why I think getting -- even though it's, I
15    understand, a great imposition on everyone's time here,
16    where there would be value to what we're doing.
17              So Ms. Miller, if you'll work with Mr. Hull about
18    the -- what the -- what that facility requires me to order,
19    I will enter the order allowing the laptop -- allowing
20    Mr. Hull to provide the laptop to Mr. Biggs and we'll be off
21    and running.
22              MR. HULL:  Well, let's do it right here.  Tell me
23    what kind of laptop it is and I'll --
24              THE COURT:  I -- Mr. Hull, I don't want to --
25    because we have three more defendants to go through, I think
```

```
 1        I've -- I think we've set, hopefully, you two on a course
 2        where you can follow up offline and get it to me.  As soon
 3        as you get it to me, I'll sign it.  Okay?
 4                  MR. HULL:  I'm sure we'll get it done.  And I
 5        appreciate you having this earlier rather than later.  I
 6        assumed we would be doing this on the 19th.  So that's --
 7                  THE COURT:  Well --
 8                  MR. HULL:  -- appreciated and I --
 9                  THE COURT:  No, I --
10                  MR. HULL:  -- I appreciate Deputy Haywood.  He's
11        been great.
12                  THE COURT:  Great.
13                  Ms. Miller, next facility.
14                  MS. MILLER:  The next facility I'm going to
15        address is Lewisburg which is where, as I understand it,
16        Mr. Pezzola is housed.
17                  And per emails between a supervisory attorney at
18        BOP and our office and that have been previously shared with
19        the Federal Public Defender and, I believe, the judges as
20        well, there is an entire e-discovery program there.  The
21        marshals helped coordinate that before moving a significant
22        number of inmates out of D.C. Jail to Lewisburg.  And in
23        short summary, attorneys can send e-discovery by what they
24        call special mail -- which is, like, legal mail -- after
25        they submit a request form.  So first, you have to get the
```

1    request form to do this program approved; then they'll let

2    you send e-discovery by special mail.  e-discovery may only

3    be sent on CD or DVD, but hard drives can be authorized.

4    The way they have it set up is the AUSA has to coordinate

5    with the legal department.  So essentially, we would have to

6    work with the defense counsel and Lewisburg to get something

7    larger to the facility.  Inmates can review their electronic

8    discovery on a computer in their housing unit.  In addition,

9    inmates with sensitive cases or those desiring additional

10   privacy have the opportunity to request the use of a secure

11   discovery computer through housing unit staff and all

12   e-discovery is retained by the inmate.

13          With respect to visitation, video visits can be

14   scheduled Monday to Thursday from 8:00 a.m. to 4:00 p.m. and

15   Fridays from 8:00 a.m. to 3:00 p.m.  Video teleconference

16   visits cannot be scheduled less than 48 hours in advance.

17   So you have to schedule them at least 48 hours in advance.

18   Standard visits last an hour, but additional time may be

19   requested.  With the -- with this platform, it's Webex also,

20   but they do not enable document sharing.

21          And then in-person visits occur daily from 8:00

22   a.m. to 4:00 p.m.  Any visits occurring after 4:00 p.m.

23   require advance notice.  Non-attorneys can meet with the

24   inmates as long as the non-attorneys complete the NCIC

25   background form and the attorney signs an agreement

1    attesting to the fact that that person works for them and

2    that the attorney's responsible for them.  The facility will

3    provide laptops for e-discovery review.  Personal laptops

4    and cell phones are not permitted.

5              THE COURT:  All right.  I have not heard any

6    complaints about Lewisburg specifically, although I -- so

7    let me just turn to you, Mr. Metcalf.  Have you been

8    satisfied with the ability to access your client and share

9    discovery?

10             MR. METCALF:  No, Your Honor.  Now, I have been --

11   I'll make this very quick and I'll branch off a couple of

12   things that Attorney Hull did -- or mentioned.  I have no

13   problem with my video visits.  I've been able to get my

14   video visits with Mr. Pezzola.  They've been accommodating,

15   so on and so forth.  I've had numerous video visits with him

16   where he's sitting in the room that he is today.  What I do

17   have an issue with is this special mail/legal mail that I'm

18   first hearing about after numerous calls and attempts to go

19   through the jail.  So I have -- Judge -- Your Honor, more

20   than 15 months, I've been going at this on more than just --

21   defendants other than Mr. Pezzola.  I've got three hard

22   drives in limbo that I have no idea where they are that have

23   literally cost me thousands of dollars in legal staff to put

24   together and I can't tell you how many hours I actually put

25   together that I have absolutely no clue where they are.  So

1     with that being said, I've had a hard drive for Mr. Pezzola

2     for months now.  I don't want to send it to Lewisburg

3     because I don't want to lose it yet again.

4            Now, the other hard drives I've lost have not been

5     for Mr. Pezzola specifically, but I don't want to just throw

6     this out there and it ultimately go nowhere.  It's amazing

7     to me that this is the first time I'm hearing that hard

8     drives can be authorized.  I was literally told fill out the

9     requested form and it has to be done on CD and/or DVD.  So

10    I've tried to convert this ridiculous amount of material to

11    a CD and/or DVD unsuccessfully.  I've actually even spoken

12    to the AUSA about this, and I believe if he knew that my

13    hard drive could easily be sent to Lewisburg, he would have

14    informed me of that, because I told him about that specific

15    issue.  So I've spent a decent amount of time trying to

16    access this information and this is actually the first time

17    I'm hearing about it.

18            THE COURT:  Well, I'm surprised.  I know I've

19    heard of different -- let me put it this way.  Some of the

20    other problems we've discussed have surfaced in various

21    motions, but I haven't -- I don't ever recall you raising

22    this with me that you've had this problem at least to date.

23            MR. METCALF:  Well, Your Honor, if you'll recall,

24    I did raise, prior to being superseded -- this indictment

25    for Mr. Pezzola -- to have his own tablet.  That's always

1   been my position; that he should have his own tablet with

2   everything ultimately cut off so I could actually go through

3   this one by one with him and he could offer me valuable

4   information.  So I have raised that to you with Your Honor

5   before we were superseded.  Since such time, I haven't been

6   able to re-raise that issue for various different issues of

7   my own, not to mention me catching up with regards to

8   everything that's been going on since my accident with my

9   own deadlines with regards to being superseded from this

10  case.  So I have had intentions on asking for a tablet --

11              THE COURT:  All right.

12              MR. METCALF:  -- for Mr. Pezzola to be accessible

13  to him.

14              THE COURT:  All right.  Ms. Hernandez, I just see

15  your hand raised.  So I don't --

16              MS. HERNANDEZ:  I can add some information.  I

17  have a defendant at Lewisburg.

18              THE COURT:  All right.

19              MS. HERNANDEZ:  The case is with the Narcotics and

20  Dangerous Drugs Section, DOJ, and the only way to get a hard

21  drive to Lewisburg is for the prosecutor to send the hard

22  drive.  It has -- we can't -- they will not accept it from

23  defense counsel.  The prosecutor has to contact the BOP

24  attorney and they will accept it, one; second -- the second

25  problem is that DOJ tends to encrypt everything.  So the

1    first hard drive that arrived at Lewisburg was not

2    accessible by BOP or anybody else.  So DOJ had to reformat

3    another hard drive and send it, but other than --

4          But I will tell you, Mr. Metcalf, that if a

5    prosecutor gets involved, it gets done, and that's -- that

6    was my experience in another case.  I mention NDDS for

7    Mr. Miracle's sake.

8          THE COURT:  All right.

9          MR. METCALF:  I appreciate that, Ms. Hernandez.

10          THE COURT:  So Mr. Jones, let me -- Mr. Jones or

11    Mr. Miller -- or Ms. Miller, it sounds like getting you all

12    involved and making sure that the discovery Mr. Metcalf

13    wants to get to Mr. Pezzola, that there's a way for you all

14    to be involved to make sure that happens so Mr. Metcalf

15    would, then, be able to schedule calls or be able to

16    communicate with him about it but he would have it.  Will

17    you all do that forthwith, please.

18          MS. MILLER:  Yes, Your Honor.  We will do that.  I

19    just -- I do want to point out that what I was reading from

20    was a form that was shared early on not only with our office

21    but also with FPD, and including the part about if people

22    want to use hard drives, it needs to be coordinated through

23    the prosecutor.  I just want to strongly encourage all the

24    counsel on this call, we do have -- you do have a liaison

25    for discovery in FPD who is coordinating discovery on behalf

1   of all of these cases, and reaching out to Shelli Peterson

2   is an excellent place to start if you're having discovery

3   issues.  That way, you don't need to share necessarily your

4   direct issues with the Government which keeps us from

5   interfering in your Sixth Amendment rights and your

6   attorney-client privilege and, you know, we can work through

7   Shelli or -- to try and help resolve your issues.  But in

8   any event, I'm happy to pass along the Lewisburg procedures

9   if that would be helpful to the trial team to go ahead and

10  pass on to Mr. Metcalf and Mr. Tankleff.

11          THE COURT:  All right.  Thank you, Ms. Miller.

12  Next facility.

13          MS. MILLER:  The next facility is Philadelphia FDC

14  which is not in our U.S. Marshal District but is where, as I

15  understand it, Mr. Rehl is held.  I had a couple of emails

16  with Alicia Gallagher [ph], an attorney at that facility.

17  With respect to e-discovery, what she explained is that

18  there is one discovery computer on each housing unit and it

19  is housed in a private or separate room in the unit.

20  There's also a discovery room that has one to two

21  computers -- she says one to two because they may have to

22  pull one to replace one that's broken on another unit -- and

23  inmates can request to go to that discovery room, also, if

24  there's issues with their unit -- housing unit's computer.

25  If they do request to go to the discovery room, then the

1    request must be made to the unit manager and the inmate will

2    be brought in on his scheduled day.  CDs and external hard

3    drives are permitted.  They can be sent through legal mail

4    or can be sent directly to the legal department for

5    processing.  Computers are first come, first serve.  There's

6    no waitlist.  And there's no limit on the duration of time

7    an inmate can use a computer.  They can be used on an

8    as-needed basis.  With --

9              THE COURT:  Ms. --

10             MS. MILLER:  Oh, I'm sorry.

11             THE COURT:  Go ahead.  Go ahead, Ms. Miller.

12   Sorry.

13             MS. MILLER:  With respect to visitation, there is

14   video visitation.  It's private legal video visitation via

15   Webex.  She did not believe -- but was not 100 percent

16   certain -- that document sharing was enabled.  The video

17   visitation is available Monday through Friday from 7:00 a.m.

18   to 3:45 p.m.  Attorneys sign up by emailing legal services

19   at least 24 hours in advance.  The visits generally default

20   to one hour, but if the attorney asks for additional time

21   and there is space, it will be granted.  There is no cap on

22   the number of video visits per week.  Inmates are not

23   permitted to bring electronic discovery to the visitation

24   room, and there is no equipment in that room to review

25   electronic materials.  The inmate can bring a reasonable

1   amount of paperwork with him or her.  Paperwork must be sent

2   via mail.  Video visitation is not available for inmates who

3   are housed in the special housing unit or who are on

4   quarantine or isolation status.  Those requests are referred

5   to the unit team for a legal call, or if it's the special

6   housing unit, a non-contact in-person visit may occur.

7            For in-person visits, attorneys can bring laptop

8   computers to view e-discovery with their clients after

9   signing an agreement with the facility.  Additionally, there

10  is a computer in one of their attorney rooms that can be

11  used to review discovery.  Laptops cannot be used to access

12  the Internet, and tablets, iPads, thumb drives, and cell

13  phones are banned.  Legal visiting hours are Monday through

14  Friday from 6:15 a.m. until 8:00 p.m., and weekends and

15  holidays are 7:15 a.m. to 2:00 p.m.  The laptop privilege is

16  not available for non-attorney legal video -- visitors,

17  excuse me, but if there is a need for a non-attorney legal

18  visitor to bring in electronic materials, the attorney can

19  make a request that includes the name of the visitor, the

20  materials needed, and the reason, and then it would need to

21  be approved by the warden.  Typically, this is for use in

22  psychological examinations, but she did not, in her email,

23  indicate that that would be the only acceptable reason.

24            THE COURT:  Ms. Hernandez, I know your client is

25  -- was being kept in the -- his -- the facility where he is

 1     now because, all in all, it seemed to be -- it was

 2     preferable for you -- or you thought it was the best place

 3     rather than bring him here.  What's the status of your

 4     ability to see him?  Has it worked as Ms. Miller laid out?

 5             MS. HERNANDEZ:  It has worked.  I have not used

 6     the video visitation, although I will start using it.  I

 7     would prefer for him to stay there, particularly given all

 8     the discussions of the problems with bringing people to D.C.

 9     and you can't control where they are or where they're not.

10     BOP facilities are 100 times better than D.C. Jail.  As

11     helpful as -- I will give kudos to the Department of

12     Corrections in D.C. in their attempts to assist with video

13     -- with electronic review of discovery, but I'd like to know

14     from the marshals whether their letters from last November

15     and December about the disgusting situation at the D.C. Jail

16     have been corrected --

17             THE COURT:  Well, Ms. Hernandez, I'd rather keep

18     the focus on these defendants and your client --

19             MS. HERNANDEZ:  Okay.

20             THE COURT:  -- if you --

21             MS. HERNANDEZ:  Well --

22             THE COURT:  -- must know.

23             MS. HERNANDEZ:  But I mean, to the extent that --

24     if the Court -- what I'm hearing from Deputy Ruffin is that

25     if you were to bring him to D.C., there's no guarantee where

1    he would be housed and he might end up at D.C. Jail.

2              THE COURT:  Right.  I'm not -- and, Ms. Hernandez,

3    I'm not trying to raise that specter.  I'm just -- I guess

4    I'm just -- my point is things are functioning reasonably

5    well at the moment from your perspective; correct?

6              MS. HERNANDEZ:  They're functioning reasonably

7    well.  It's still, Your Honor -- it is -- the amount of

8    discovery -- according to the Government's -- according to

9    Ms. Miller's discovery report, ECF 290 back in February, the

10   evidence on Evidence.- -- the number of videos on

11   Evidence.com would take 102 days to view, and that was back

12   in February.  I don't know of additional material.  So being

13   at the jail with all the limitations that there are at any

14   facility -- at every facility --

15             THE COURT:  Right.

16             MS. HERNANDEZ:  -- is not optimum.  The Court

17   knows what our arguments have been about that.  I won't

18   rehash them now.

19             THE COURT:  I appreciate it.  I'm -- I mean, I'm

20   just trying to, you know -- I appreciate it.

21             MS. HERNANDEZ:  But, Your Honor, it's just -- it's

22   not a good situation.  It's not a good situation for any

23   defendant, and I second Mr. Hull's statement that my client

24   is a 37-year-old man --

25             THE COURT:  All right.  Ms. Hernandez, please --

```
 1              MS. HERNANDEZ:  -- with no prior violence.

 2              THE COURT:  I'm not -- I --

 3              MS. HERNANDEZ:  He doesn't need to be in jail.

 4              THE COURT:  We've had the arguments along those

 5      lines and I'm -- I've got -- especially given that I have --

 6      we have so many people here, I'm --

 7              MS. HERNANDEZ:  I understand.

 8              THE COURT:  -- trying to focus on the

 9      practicalities of any problems people are having with

10      accessing their client with discovery, and --

11              MS. HERNANDEZ:  Well --

12              THE COURT:  -- I appreciate --

13              MS. HERNANDEZ:  -- the practicalities -- I

14      understand, Your Honor.  I understand you don't want to hear

15      our banging the -- our shoes on the desks, but we're all in

16      the same shoe.  I don't -- in the same shoes.  I don't think

17      any of us believe that what we're -- even the best efforts

18      of the Government are sufficient in these cases.

19              THE COURT:  All right.  I --

20              MS. HERNANDEZ:  And hopefully, the Court will --

21      maybe, if it addresses the -- my motion on the case in

22      chief, discovery and that type of thing, that might help

23      alleviate some of the problems.

24              THE COURT:  Correct.  Correct.  You have -- the

25      motion you have not filed yet; correct?
```

1          MS. HERNANDEZ:  No, no, I did file one motion for

2     the case in chief.  I haven't filed the --

3          THE COURT:  Okay.

4          MS. HERNANDEZ:  -- (inaudible) -- motion.  I did

5     file one motion.

6          THE COURT:  Okay.

7          MS. HERNANDEZ:  But all things being equal, my

8     client has a child who will be one year old --

9          THE COURT:  Ms. Hernandez, I --

10         MS. HERNANDEZ:  No, what I'm saying is in

11     Philadelphia, physically better facilities --

12         THE COURT:  Okay.

13         MS. HERNANDEZ:  -- and at least close to home.  He

14     can visit -- family can visit.  So under the circumstances,

15     please, do not move him to D.C. at this point.

16         THE COURT:  All right.  Understand.  Understand.

17         Ms. Miller, last facility.

18         MS. MILLER:  As I understand it, Ethan Nordean is

19     being held at Northern Neck Regional Jail, and based on

20     communications that myself and the marshals have had with

21     Captain Eleazar Luna, with respect to e-discovery, attorneys

22     can provide digital discovery on a CD or USB via legal mail,

23     and once the digital discovery arrives, the jail will

24     provide the inmate a computer to review the discovery.  So

25     that sounds very similar to the D.C. Jail laptop program.

1          With respect to visitation, all visits, whether

2     in-person or video, must be scheduled at least 24 hours in

3     advance.  For in-person, members of the legal defense team

4     -- so attorneys and non-attorneys -- may use computers

5     supplied by the jail or their own devices to review

6     e-discovery with clients.  To use their own devices, they

7     have to submit a form in advance and get approval.  And to

8     use non-attorney or staff, the attorney of record has to

9     submit verification ahead of the visit.  For video visits,

10    it just says very limited video visits are available and

11    they have to be scheduled in advance, but the platform --

12    which I believe is Zoom -- has sharing capability.

13          THE COURT:  All right.  Mr. Smith, have you tried

14    the digital discovery computer option that Ms. Miller laid

15    out there?

16          MR. SMITH:  Thank you, Judge.

17          We'd like to say we agree with the Court's

18    sentiments about the importance of access to discovery and

19    counsel.  The facilities, we concur completely with all of

20    the statements the Court made in that respect in the

21    beginning of the hearing.

22          As far as attorney access is concerned, the Court

23    might recall that one of the reasons Mr. Nordean was

24    transferred to -- from the West Coast where he was

25    originally incarcerated with -- near his family was so that

1    he would have better access to counsel.  He's now in

2    Northern Neck Regional Jail which is about a four- to

3    five-hour round trip from the District in which the case is

4    held which is not exactly convenient for counsel.  It would

5    be more convenient if Mr. Nordean were held in the District

6    where, I think, the Court directly ordered the marshals to

7    transfer Mr. Nordean to.  That didn't happen.  We have

8    attempted to find out when Mr. Nordean will be transferred

9    on to the D.C. Jail and CTF, but we have been without luck.

10   We haven't got any more information for the Court about that

11   than Ms. Miller has.

12          When it comes to e-discovery, Your Honor, the

13   problems here are really layered.  So what we've been doing

14   today is Ms. Miller has been explaining her phone calls with

15   a representative at a jail, explained what, in theory, the

16   process is for reviewing electronic discovery, but, you

17   know, understanding that the Court can't physically go to

18   the jail itself and inspect conditions, what is on paper is

19   different than what happens in reality in these jails, and

20   what happens in reality is that there are constant lockdowns

21   related to COVID-19 and other issues so that it --

22   theoretically, it would be possible for an inmate to review

23   electronic discovery occasionally, maybe, once or twice a

24   week like Ms. Miller is referring to, but in reality, there

25   are all kinds of hiccups and problems that prevent that from

1    happening.

2              Now, there's a second problem, Judge, that I --

3    and Ms. Hernandez has, kind of, touched on a few of these

4    points, but there's a second problem.  Defense counsel here

5    are, kind of, mediating between the Government's production

6    of discovery and the defendants' review of it.  So what the

7    Government will do is it will put thousands of video files

8    and documents on these two discovery websites, the

9    e-discovery platform and the Relativity platform, but then

10   the -- getting access to it, logging into it, and using

11   those platforms themselves is incredibly time consuming.  So

12   there's a step involved here that the Government is not

13   really explaining.  The defense counsel has to first go on

14   to these sites, fish all of the discovery off of them, and

15   then put them on devices to, then, send them to the

16   defendants, but there is such a vast amount of discovery, as

17   Ms. Hernandez has explained, that this process, if we were

18   doing this continuously, would leave the lawyer -- the

19   defense counsel as nothing but middlemen between the

20   Government's discovery production and producing that

21   evidence to the defense.  There are thousands of videos that

22   could be relevant to this -- to the defense.  So the way

23   that the defendants would efficiently review evidence is

24   with access to Relativity themselves.

25             Now, Ms. Miller points out that some of them --

 1    the CTF inmates might have a more direct connection to

 2    Relativity and e-discovery.  That would be incredibly

 3    useful, Your Honor.  So if we could have Mr. Nordean

 4    transferred in time to review evidence for trial, we would

 5    avail ourselves of that opportunity, but right now, we don't

 6    have that.  The Relativity platform itself is very difficult

 7    for defense counsel to use.  Just logging in can take

 8    multiple apps, codes that are created every time defense

 9    counsel wants to log in.  It can take -- according to, you

10    know -- there was an assistant Federal Public Defender who

11    was representing Mr. Donohoe.  It -- he said it took him 10

12    minutes to download one PDF from the Relativity platform,

13    and that's accurate, Your Honor.  It's extremely difficult

14    to navigate this site.  I've never -- in civil discovery,

15    working cases with large amounts of discovery, I've never

16    encountered a discovery platform that's so cumbersome, Your

17    Honor, and that's in cases where the parties are very

18    well-heeled.  They can finance huge, seamless discovery

19    platforms.  I've never seen something like this, Judge,

20    that's so difficult.  And I'm not suggesting the Government

21    is doing this on purpose.  I don't think the Government's

22    doing it on purpose.  I think that there's so much work

23    going on that this platform has just not been created in the

24    best possible manner because of everything else going --

25    there's a million files to put out.

1            And so, Judge, that's the situation with

2    e-discovery right now.  I'm aware that we can submit thumb

3    drives to the Northern Neck Regional Jail facility, but

4    thumb drives are not sufficient to manage all of the

5    discovery the Government is referring to.  It would take a

6    very large hard drive, in which case, it would probably take

7    the Government to submit that hard drive to Mr. Nordean for

8    his review or, Your Honor, I could just take 32-gig flash

9    drives and take three weeks putting all of the discovery on

10   a -- 20 different flash drives.  The situation is extremely

11   difficult.  And so, you know --

12           THE COURT:  All right.  Ms. Miller, do you know

13   whether -- when -- the kind of system you described earlier,

14   would they allow -- I mean, do you know whether they would

15   allow a -- Mr. Smith to simply put all the discovery on a

16   computer and, kind of, like what -- the situation, maybe,

17   that will develop with Mr. Biggs, that they could actually

18   just -- that the defense attorney could provide a computer

19   that would have all the discovery on it?

20           MS. MILLER:  So I think the answer is manyfold to

21   the question, although it sounds simple in its asking, and

22   so forgive me if I'm not immediately direct.  Do I think

23   that that's possible?  I do think it's possible.  I think

24   for any number of reasons, it's not necessarily a very good

25   idea, and I don't know that it would work with respect to

1  highly-sensitive materials.  There would have to be an

2  agreement that the defendant was allowed to have access to

3  those without his attorney being present which I don't think

4  we would agree to.

5        THE COURT:  So Ms. Miller -- all right.  You're

6  the one who's been in deep on this for months.  So what do

7  you think the best answer is, then, to the kinds of issues

8  that Mr. Smith is raising?

9        MS. MILLER:  So Mr. Smith raised these issues with

10  the Government last week, and I actually began exploring

11  them right away.  I began immediately following up with FPD,

12  with our database vendor, and with our own AUSAs, and I just

13  don't believe that his characterization of the status of the

14  database and the issues is exactly accurate based on the

15  research that I did.

16        So for example, when I spoke to FPD, I learned

17  that while it can be a cumbersome process to log in and be

18  annoying, Deloitte is available to assist anyone, but in

19  general, FPD recognizes that the login issues are intended

20  to protect the security of the database.  And just to be

21  clear, Your Honor, we procured this vendor and this database

22  pursuant to the Government's MEGA 5 contract that allows us

23  to engage in these kinds of large contracting ventures, and

24  there are security protocols in place under that contract

25  that include that the discovery environment be FedRAMPed

1    which is, obviously, intended to protect the security of the

2    information.  The Court can imagine how interested any

3    number of hackers, for example, might be in finding their

4    way into this database.  And so yes, there's two-factor

5    login and it is slower with tokens than it is with PIV

6    cards, but I took a survey of attorneys for the Government

7    who also have to log in with tokens instead of PIV cards,

8    because not everyone who is working on our cases has them,

9    and every one of them said that, while initially they had

10   some difficulty, they worked through it with Deloitte and it

11   works fine now.

12        So then I spoke to Deloitte.  And to be clear, we

13   have two different teams.  There's the Government's Deloitte

14   team and then there's FPD's Deloitte team.  And for reasons,

15   obviously, of, you know, avoiding conflict, we don't deal

16   directly with their team and they don't deal directly with

17   our team except along very well-articulated lines of

18   communication that are written down.  And so I asked our

19   Deloitte team to reach out to their Deloitte team and see if

20   they could find anything out about these complaints and

21   whether they are, you know, manyfold and what the FPD's

22   vendor was doing about it, and the exact reply I received,

23   Your Honor, was as follows.

24        They're called "Plum."  Don't ask, but they named

25   all the databases after different stone fruits.  I can't

1    explain that exactly, but the defense database is Plum and

2    the defense vendor team is Plum.

3           Plum is currently supporting over 200 defense

4    counsel.  Plum reached out to three defense counsel who had

5    complained about various speed and login issues.  One of

6    them is Nick Smith.  Two of the three defense counsel issues

7    were corrected on a phone call with Plum support.  The one

8    person remaining --

9           THE COURT:  All right.  Ms. Miller, I have to

10   interrupt you just for one moment.  Ms. Harris informs me

11   that we are going to lose -- Mr. Nordean needs to log off

12   because -- or else he -- he'll miss his dinner, essentially,

13   because the time that we had reserved was only from 3:00 to

14   4:00 for him.

15          So Mr. Nordean, if you need to log off for that

16   purpose -- I assume -- we're -- honestly, we're, sort of,

17   wrapping up this hearing.

18          And, Mr. Smith, I believe you had said you would

19   waive his presence to the extent he couldn't be here.

20          But, Mr. Nordean, I'm informed you should log off

21   just so you don't miss your dinner.

22          MR. SMITH:  No objection to the dinner, Your

23   Honor.

24          THE COURT:  All right.  Very well.

25          So Mr. Nordean, you're excused whenever you need

1    to log off.

2                Ms. Miller, you can continue.

3                MS. MILLER:  The one person remaining, Nick Smith,

4    will not make himself available for the support calls with

5    Plum.  So they've been unable to make progress to assist him

6    with the issues he raised.  Outside those three defense

7    counsel, various minor Relativity issues have been raised

8    with Plum, but all issues, to Deloitte's knowledge, have

9    been resolved.

10               So with all due respect, Your Honor, sometimes

11   it's easier for defense counsel to come to court with a

12   problem.

13               THE COURT:  Well, fair enough.  Here's what I'm --

14               MR. SMITH:  Wait.  Wait, Judge.  Judge --

15               THE COURT:  No.  Mr. Smith, I'll let you have a

16   rejoinder, but I'm not going to -- I'm not -- go ahead,

17   Mr. Smith.

18               MR. SMITH:  Okay.

19               So I'd like to note that Ms. Miller didn't reach

20   out to the defense at any point in this case to inquire

21   whether our objections are accurate.  What she did was -- to

22   tee up an issue -- a gotcha issue in court was she reached

23   out to some representatives from Deloitte and created a

24   representation that's false, Your Honor.  So there are no

25   communications with me and Deloitte where Deloitte indicated

 1      that it would like to help resolve issues but I have not

 2      made myself available.  And, in fact, because Ms. Miller

 3      made that representation, after the hearing today, we will

 4      submit all of our emails with Deloitte to show the Court

 5      that that is not the case --

 6                THE COURT:  Mr. Smith --

 7                MR. NICHOLAS SMITH:  -- (inaudible) --

 8                THE COURT:  Mr. Smith, that's not necessary.

 9                MR. SMITH:  Well, there's --

10                THE COURT:  And --

11                MR. NICHOLAS SMITH:  There's one more point that's

12      significant here, Your Honor.  So the -- Ms. Miller is

13      making the representation that the federal defenders

14      generally have no problem logging into the defense side of

15      Deloitte.  So we will be making a submission to the Court

16      with emails from the federal defender representing

17      Mr. Donohoe who said that this Deloitte system is basically

18      unmanageable and that it takes 20 minutes, 10 minutes to

19      download a single PDF document from the site.  I think it's

20      significant that this is a lawyer who's representing the

21      Government's cooperating witness.  So if this is an issue

22      that Ms. Miller is raising factually, I think we --

23                THE COURT:  Mr. --

24                MR. NICHOLAS SMITH:  -- need to respond to that.

25                THE COURT:  Mr. Smith, if you want to do that,

1    that's your business.  I'm -- for the moment, I'm much more

2    focused on making sure that people talk to each other so

3    that we can try to resolve -- so that we can try to work

4    towards solutions rather than point fingers at each other.

5    And I say that -- I'm not -- Mr. Smith, I'm not -- I say

6    that to Ms. Miller; I say that to you.  So I'm not -- you

7    all can file whatever you'd like to file, but here's what

8    I'm going to ask the parties to do.  We've come up with, I

9    think, a series of things from --

10              And, Mr. Hull, I see your hand.  I'll get to you

11   in one second.

12              We've come up with a series of things regarding --

13              Mr. Tarrio's, maybe, a separate case and I'm going

14   to be -- Mr. Hassan, again, when the Government responds to

15   your motion, we'll have a hearing and that will be part of

16   that promptly.

17              But as to the others -- as to Mr. Pezzola,

18   definitely Mr. Biggs, and Mr. Nordean, it seems to me there

19   are -- well, at least as to those two, there are clear

20   things that the parties can do to, kind of, push the -- to

21   push the ball forward and to make e-discovery more available

22   to the defendant.

23              And, as I said, Mr. Hull, if you'll work with the

24   Government, I'll -- and propose an order to me that will

25   satisfy that -- your -- the facility to get him that laptop,

```
 1    I will sign that order.

 2             MR. HULL:  Absolutely.

 3             THE COURT:  And, Mr. Metcalf, if you'll work with

 4    Ms. Miller to make sure that you -- and, helpfully, the

 5    information that Ms. Hernandez referenced -- we'll make sure

 6    your client's able to get the electronic discovery.

 7             And then with regard to Mr. Nordean, my -- look,

 8    my suggestion is rather than spending your time filing

 9    dueling pieces of evidence on the status of that -- of the

10    -- of that tool, that you do your best to connect,

11    Mr. Smith, with those folks from Deloitte to try to

12    alleviate -- to try to see if you can work through the

13    problem, and if you can't, you know, we're going to be back

14    here shortly and we'll see where things stand.

15             MR. HULL:  (Indicating.)

16             THE COURT:  Mr. Hull, yes?

17             MR. HULL:  Solitary confinement.  Joe Biggs is

18    still in solitary confinement and I think, to a certain

19    extent, it's fair to say that what brought us here today in

20    part at least was this notice I filed just before our last

21    status on the 21st which was Document 345, and on -- and it

22    says -- it's -- it makes me even more brief -- Updated Biggs

23    Jail Conditions Status Report:  Unexpected Solitary

24    Confinement and Trial Prep Issues.  We spoke 10 days ago a

25    little bit about how -- if, in fact, there was a -- an
```

1    ability to get Mr. Biggs that tablet at some point or a

2    laptop; that there might be -- although not sure I think

3    it's an issue anymore after hearing what I've heard today --

4    there might be an issue of Mr. Biggs using that in the

5    general population; however, the expectation was and the

6    promise was that Mr. Biggs, who has no criminal record, who

7    had three months' home detention that was served admirably

8    and 11 months with no incidents in Seminole Jail -- why is

9    he still in solitary?  I mean, he's been a good sport about

10   it, but, you know -- he reads and he's cleaned up his cell.

11   But at least for the period of time during which Ms. Miller

12   and I negotiate something on -- come up with something on a

13   computer, can he be put into general population?

14             THE COURT:  So Mr. Hull, that is, obviously --

15   that is the core of the kind of thing that I have no control

16   over, as you know.  The --

17             Deputy Ruffin, do you know whether --

18             I mean, and, again, because of the nature of the

19   facility, I don't even know if the marshals can make a

20   representation --

21             MR. HULL:  I'd like to hear from Deputy Haywood,

22   because I think he --

23             THE COURT:  Okay.

24             MR. HULL:  -- (inaudible) -- a week ago that this

25   might have been a mistake.

1              THE COURT:  Okay.

2              (Brief pause.)

3              Deputy Haywood, can you respond to that.

4              (Brief pause.)

5              DEPUTY HAYWOOD:  Yes, Judge.  In regards -- can

6      you repeat the inmate's name?

7              THE COURT:  Sure.  It's Mr. Biggs.  Mr. Biggs, and

8      his lawyer has expressed -- I guess concern probably doesn't

9      really capture it -- but the point is that he is -- that

10     Mr. Biggs is in some sort of solitary confinement and he's

11     wondering why he is.

12             DEPUTY HAYWOOD:  So yes, I did follow up with the

13     facility chief, Shelbert Williams, and I did send an email

14     to the -- Mr. Hull.  And in reference to Mr. Biggs, the --

15     once he -- the defendant was cleared of confinement for

16     COVID purposes, they have a process in place where all

17     defendants, they're putting in, sort of, an admin seg. hold

18     and all defendants' cases are reviewed by classification,

19     mental health, medical, security.  They have, like, a --

20     they do, like, a triage and they look at every individual;

21     every defendant's case; and they discuss, Okay.

22     What housing can he go to?  Does he have any separatees?  Is

23     he high-profile?  Meaning, he might be in the news,

24     etcetera, etcetera.  So at -- as of last week, this was the

25     status.  And I did give this information to the attorney.

```
 1    As of last week, this was the status.  So I can follow up
 2    with Mr. -- with Chief Williams to see if they came up with
 3    a disposition for Biggs's case.  And Chief Williams did say,
 4    with the amount of -- you know, offline -- with the amount
 5    of J-6th defendants, they're looking at -- some might stay
 6    in classification or in admin hold longer because -- just to
 7    review their case and make sure they do their due diligence
 8    in trying to place them appropriately -- in appropriate
 9    housing.
10              THE COURT:  All right.
11              MR. HULL:  And I --
12              THE COURT:  Look --
13              MR. HULL:  And I appreciate the comments, Your
14    Honor, but -- and I understand the process there, but I've
15    been told since the very beginning that the ADC has a very
16    different process.  They have administrative lockdown by
17    default for a month, and then they come out of it, and
18    there's no review process that I knew of until he sent me
19    that email.  We've got -- he's been there seven or eight
20    weeks.  He had --
21              THE COURT:  No --
22              MR. HULL:  -- two weeks of quarantine credited
23    toward it, and he's even had guards say it was a mistake
24    he's in there.  Why's he still there?
25              THE COURT:  Right.  So Deputy Haywood, I'll follow
```

```
 1    up with you offline about this.  It seems to me -- I mean,
 2    in the sense that I -- well, do you know why it's taking so
 3    long?  It seems to me that's -- for COVID purposes -- I
 4    mean, your representation is that there's this process they
 5    have to go through.  It's taking an awful long time for
 6    somebody who, number one, needs to be -- needs to have
 7    access to his lawyer; needs to have -- I mean, I know he
 8    does have that -- but needs to have access to evidence and
 9    is not any -- at least to my mind, any obvious, you know,
10    candidate for need of extra -- for need of solitary.  Again,
11    this is the --
12              MS. MILLER:  (Indicating.)
13              THE COURT:  Oh, I see.
14              DEPUTY RUFFIN:  Your Honor --
15              THE COURT:  Ms. --
16              DEPUTY RUFFIN:  Your Honor, this is Lamont --
17              THE COURT:  Yes?
18              DEPUTY RUFFIN:  This is Lamont Ruffin.  I'll -- I
19    just want to get everybody on the defense side
20    understanding.  Deputy Haywood is a supervisor that works
21    for me.  So --
22              THE COURT:  Right.
23              DEPUTY RUFFIN:  -- I will contact Superintendent
24    Ted Hull --
25              THE COURT:  Okay.
```

1          DEPUTY RUFFIN:  -- of Northern Neck and I will get

2     the Court a response --

3          THE COURT:  Okay.

4          DEPUTY RUFFIN:  -- to the assertion that he's in

5     solitary confinement.

6          THE COURT:  Okay.  You know, again, this is --

7     again, as you all know, exactly how the Bureau of Prisons

8     classifies and houses folks is exactly the kind of thing

9     that you -- your expertise is -- it's exactly the kind of

10    thing that I don't really have the expertise and the

11    authority to micromanage and I appreciate that, but I do

12    think Mr. Hull is fairly -- it is fair for Mr. Hull to want

13    to know what in the world is taking so long, and I think

14    probably you agree, Deputy Ruffin.

15         MR. HULL:  Thank you, Your Honor.

16         DEPUTY RUFFIN:  I do.

17         THE COURT:  All right.

18         MS. MILLER:  Your Honor, could I just interject

19    that it's actually -- for Mr. Biggs, that's Alexandria

20    detention facility, not Northern Neck.  I just --

21         THE COURT:  Oh.  Did I say Northern Neck?  Okay.

22    Or someone did.

23         MS. MILLER:  Someone did.

24         THE COURT:  Okay.

25         MR. HULL:  We know where he is.

1          THE COURT:  They know where he is.

2          DEPUTY RUFFIN:  Okay.  Well, for clarification, I

3     have lunch with -- a lunch meeting scheduled with the

4     sheriff, Sean Casey, with ADC.  I will call him today and

5     get a -- or get a response from the sheriff.

6          THE COURT:  All right.  I appreciate your

7     follow-up on that, Deputy Ruffin, and I appreciate you being

8     here today.

9          DEPUTY HAYWOOD:  Hey, Judge, I'm back on.  I was

10    disconnected.

11         THE COURT:  Oh, thank you, Deputy Haywood.  Deputy

12    Ruffin stepped in and I think we have a plan for follow-up.

13    Thank you.

14         And thank you, Ms. Miller, for pointing out -- I

15    guess, figuring out electronically how to tell everyone that

16    Deputy Haywood had dropped off.

17         All right.  I've excluded time already in the case

18    through our next control status date.  We're going to be

19    back, at a minimum, then, and for some folks who have

20    different other things I'm going to resolve -- particularly

21    Mr. Hassan -- I'll see you, I'm sure, before then, but we've

22    made some -- I think, some progress here in terms of trying

23    to push things in a positive direction to get, you know --

24    nothing's perfect, but to get as much attorney access and as

25    much access to electronic evidence for these defendants.  So

```
 1    I'll, at a minimum, when --

 2            Ms. Miller, can you be available when we come back

 3    for our next control status date in this case?  Which is on

 4    the 19th at 2:00 o'clock.

 5            (Brief pause.)

 6            You're muted, Ms. Miller, unfortunately.  That's

 7    all right.

 8            (Brief pause.)

 9            You're still muted.

10            MS. MILLER:  There we go.

11            (Laughter.)

12            Sorry.  On May 19 at 2:00 o'clock, I am hoping I

13    will be on a beach.  So that will make it more difficult,

14    but --

15            MS. HERNANDEZ:  Too bad.  Too bad for you.

16            THE COURT:  All right.  Well, what I'll ask you to

17    do, Ms. Miller, is to follow, then, some of the -- to follow

18    some of the -- particularly as to Mr. Biggs, Mr. Pezzola,

19    and Mr. Nordean, to follow up on the things we've talked

20    about here and at least have Mr. Jones and Mr. McCullough

21    and the folks who are handling this case up to date where

22    things stand on the 19th and we'll see what progress we've

23    made between now and then.

24            MS. MILLER:  Yes, we will.

25            DEPUTY RUFFIN:  Your Honor, this is Lamont again
```

1    with the marshals.  Is --

2              THE COURT:  Yep.

3              DEPUTY RUFFIN:  I know we had mentioned about

4    issuing an order on the -- to the jails.  If it's possible,

5    could the Marshals Service review that before it's actually

6    issued?  The order --

7              THE COURT:  Sure.  I don't --

8              DEPUTY RUFFIN:  -- any order.

9              THE COURT:  I don't think I've indicated that.  I

10   mean, we're going to have to make a -- once -- well, so with

11   regard to Defendant Tarrio, he's got a motion the

12   Government's going to be responding to.  I believe they have

13   to respond today.  And then if he's detained, where his --

14   where he's housed will become a, sort of, live issue.  Maybe

15   that's the -- is that the --

16             DEPUTY RUFFIN:  Yeah, that --

17             THE COURT:  -- order -- (inaudible.)

18             DEPUTY RUFFIN:  -- and the -- I think -- correct,

19   and -- that and the laptop to the -- I think, the --

20   ordering one of our contract facilities to provide a laptop.

21   I understand the -- a facility supervisor may have said it,

22   but for continuity purposes, I -- we need to --

23             THE COURT:  Sure.

24             DEPUTY RUFFIN:  -- at least get their general

25   counsel as well as --

```
 1              THE COURT:  Yep.
 2              DEPUTY RUFFIN:  -- their executive to weigh in to
 3     it, my counterpart with the jail.
 4              THE COURT:  No problem.  I mean, that's something
 5     that, you know -- Ms. Miller laid out that it was something
 6     that their regulations provided for, and I don't see why we
 7     wouldn't make sure that there's nothing that's going to be a
 8     problem.  Frankly, again, we want this to be effective.  We
 9     want the -- we want to reduce the barriers, and I think
10     having you all take a quick look at it makes perfect sense.
11              MS. MILLER:  I believe that it was only Alexandria
12     detention facility that we even talked about issuing an
13     order to and you asked me to look into -- or you asked us,
14     actually, to discuss what would need to go into that order
15     and propose one to you, Your Honor.
16              THE COURT:  Right.
17              MS. MILLER:  I've already emailed Chief Deputy
18     Shelbert Williams while we were on this hearing, but I think
19     that's a wonderful idea that Marshal Ruffin just had.  If he
20     could please follow up with the general counsel's office and
21     we'll find something they've used in the past, and also,
22     find out what the security requirements are for the computer
23     so that it's clear.  And, obviously, I have also followed up
24     to ask, if he is in solitary confinement, if that's going to
25     interfere with the ability to utilize this program, and that
```

1    would be something also that hopefully Marshal Ruffin could

2    follow up on.

3              THE COURT:  All right.  Very well.  Thank you,

4    Ms. Miller.

5              We've made some progress today.  We're going to do

6    our best to continue to make progress.  We'll see everyone,

7    then, on the 19th or sooner.  Until then, the parties are

8    dismissed.

9              MR. HASSAN:  Thank you, Judge.

10             MS. MILLER:  Thank you.

11             MR. HASSAN:  Have a good day.

12             MR. HULL:  Thank you, Your Honor.

13             (Proceedings concluded at 4:36 p.m.)

14             *  *  *  *  *  *  *  *  *  *  *

15             **CERTIFICATE OF OFFICIAL COURT REPORTER**

16        **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

17   **certify that the above and foregoing constitutes a true and**

18   **accurate transcript of my stenographic notes and is a full,**

19   **true and complete transcript of the proceedings to the best**

20   **of my ability, dated this 15th day of June 2022.**

21        **Please note:  This hearing occurred during the COVID-19**

22   **pandemic and is, therefore, subject to the technological**

23   **limitations of court reporting remotely.**

24                            **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                             **Official Court Reporter**
25                           **United States Courthouse**
                             **Room 6722**

**333 Constitution Avenue, NW**
**Washington, DC 20001**