**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| | ) |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S MOTION TO DISMISS COUNTS ONE, TWO, THREE, FOUR, FIVE, SEVEN, EIGHT AND NINE OF THE THIRD SUPERSEDING INDICTMENT AND, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS**

**Table of Contents**

Introduction .................................................................................................... 1

The Third Superseding Indictment .................................................................. 2

Argument ........................................................................................................ 4

    I.      Standard for a Rule 12(b) motion to dismiss an indictment ................ 4

    II.     Count One, the seditious conspiracy charge, must be dismissed ......... 5

          A.     The TSI fails to state a seditious conspiracy offense ............. 5

              1.     Seditious conspiracy's history ................................ 5

              2.     Section 2384 criminalizes conspiracies to prevent the execution of federal law as such, not efforts to prevent the perceived misapplication of such laws ..................... 8

              3.     The TSI fails to allege the U.S. officers who "executed" federal law allegedly targeted by, and whose "authority" was "oppose[d]" by, the alleged conspiracy; Congress does not "execute" federal law ...................................... 14

                    (a)    A § 2384 charge must identify the persons authorized to "execute" federal law who are targeted by the conspiracy .......................... 15

                    (b)    Congress does not "execute" federal law ......... 21

          B.     Section 2384's fourth conspiracy crime contemplates the use of force against persons, not property, and the TSI alleges insufficient facts showing Nordean's agreement to use such force ............. 26

    III.    Count Four, the § 372 offense, must be dismissed ......................... 29

          A.     Members of Congress and the U.S. Capitol Police are not "officers of the United States" ................................. 29

               1.     Members of Congress are not "officers of the United States" ................................................ 30

               2.     U.S. Capitol Police are not "officers of the United States ..... 35

B.      Even if members of Congress and the U.S. Capitol Police were "officers of the United States," Count Four does not plead a § 372 offense with sufficient specificity ...................... 36

IV.     Counts Seven, Eight, and Nine, offenses under §§ 1361 and 111(a)(1), must be dismissed ................................................................................................ 37

V.      If the Court does not dismiss Counts One, Two, Three, Four, Five, Seven, Eight and Nine, Nordean moves in the alternative for a bill of particulars .... 37

Conclusion .................................................................................................................. 38

**Introduction**

In February 2021, the government charged that Ethan Nordean aided and abetted the destruction of a Capitol window on January 6 as follows: he whispered unknown words into the ear of a third party who in turn later communicated something to another man who, at some point thereafter, broke the window.  ECF No. 6.  One month after the events of January 6, the Chief Judge found that legal theory "weak to say the least."  Accordingly, in March 2021, the government dropped the window-breaking theory, charging Nordean and other defendants with conspiring to obstruct an official proceeding.  ECF No. 26.  It represented that this novel charge was based on new evidence in the form of Nordean's Telegram communications (though it had previously described those to the Chief Judge). Yet the Court, and now a second judge, did not find these chats particularly probative.  It observed:

> [L]ook, I also understand the argument that, Judge, look at the context and, from what happened, you can infer that this was a plan to do violence. Okay. Maybe that gets you somewhere, but I think there were probably a lot of people showing up that day with a lot of . . . different plans. Some went one way; some went the other way. In terms of connecting the planning to violence . . . these messages . . . don't move the needle that much.

Hr'g Trans., 4/6/21, p. 23:1-10.

Over a year then passed.  On June 6, 2022, the government charged Nordean with seditious conspiracy, as well as conspiracy to prevent U.S. officers from discharging their duties and assault.  Third Superseding Indictment (TSI), ¶¶ 25, 113, 121.  The seditious conspiracy charge rests on virtually the same "manner and means" and Telegram messages as the obstruction conspiracy charge filed over a year before that point.  *Compare* TSI, ¶ 28 *with* ECF No. 26, ¶ 28.  Three days after the government alleged a seditious conspiracy here, the House Select Committee to Investigate the January 6th Attack held a preplanned televised hearing on the subject of the Proud Boys' "seditious conspiracy."  Parts of the TSI were read verbatim to a

1

primetime national TV audience, presented as evidence.  The TSI also charges Nordean with aiding and abetting the destruction of a Capitol window, the "weak" claim it had previously dropped.  Its new felony assault charge goes like this: Defendant Donohoe, now a government cooperator, threw a water bottle at law enforcement.  The TSI does not indicate how Nordean aided the felonious misuse of Perrier.

The TSI's allegations do not come close to satisfying the elements of these criminal offenses and basic pleading rules.  The government mangles the rarely used seditious conspiracy statute, conflating efforts to prevent the execution of a federal law in all its applications (seditious conspiracy) with efforts to thwart its perceived misapplication given a particular set of facts, which efforts presuppose the law's validity; fails to allege any conspiracy to use force; ignores that its § 372 conspiracy charge is foreclosed by Supreme Court precedent; resurrects a property destruction claim the Court already deemed deficient; and neglects to allege any facts showing how Nordean is responsible for assault.  The reductio ad absurdum has finally been plumbed: political protest in the Capitol Building is now a crime akin to treason.  Even where the fact pattern is indistinguishable from a Class B parading misdemeanor.  Counts One, Two, Three, Four, Five, Seven, Eight and Nine should be dismissed.

**The Third Superseding Indictment**

Nordean assumes the Court's familiarity with the previously filed First and Second Superseding Indictments.  ECF Nos. 26, 305.  For the Court's convenience he attaches a red line comparison between the TSI and the Second Superseding Indictment, compiled by the government and produced to the defense.  Exh. 1.

The new Count One charges a seditious conspiracy under 18 U.S.C. § 2384.  Exh. 1, p. 9. In the red line, the Court will notice that, although the offenses feature different elements, the

2

government has simply relabeled as a "seditious conspiracy" allegations previously filed in support of a conspiracy to obstruct an official proceeding under §§ 1512(c)(2) and (k).  *Id.* Virtually all of the factual allegations remain the same following the statute substitution.  *Id.*, pp. 9-25.

Count Four newly charges, under 18 U.S.C. § 372,  that Nordean and the other defendants conspired to prevent "by force, intimidation and threat, any person, that is, Members of the United States Congress and law enforcement officers, from discharging any duties of any office, trust, and place of confidence under the United States, and to induce by force, intimidation, and threat, any officer of the United States, that is, Members of the United States Congress and law enforcement officers, to leave the place where their duties as officers were required to be performed." Exh. 1, p. 2.

Count Seven charges, under 18 U.S.C. § 1361, that Nordean aided and abetted the destruction of a Capitol window, a charge alleged in the first indictment, subsequently dropped, and now filed again.  Exh. 1, p. 31.  The TSI does not allege how Nordean aided and abetted the property destruction.  Count Eight charges, under 18 U.S.C. § 111(a), that a defendant "thr[ew] a water bottle at law enforcement," thereby committing felony assault and that Nordean aided and abetted that offense.  Exh. 1, p. 32.  The TSI does not allege who threw the water bottle or how Nordean aided and abetted the offense.

Count Nine charges, also under § 111(a), that a defendant assaulted an officer of the United States.  Exh. 1, p. 33.  The TSI does not allege how Nordean aided and abetted the offense.[1]

---

[1] Counts Two (conspiracy to obstruction an official proceeding, § 1512(k)), Three (obstruction of an official proceeding, § 1512(c)(2)), Five (civil disorder, § 231(a)(3)), and Six (property destruction of black metal fence, § 1361), carry over from previous indictments.

**Argument**

**I.     Standard for a Rule 12(b) motion to dismiss an indictment**

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1).  This rule performs three constitutionally required functions: (1) fulfilling the Sixth Amendment right to be informed of the nature and cause of the accusation; (2) preventing a person from being subject to double jeopardy, as required by the Fifth Amendment; and (3) protecting against prosecution for crimes based on evidence not presented to the grand jury, as required by the Fifth Amendment.  *See*, *e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

Rule 12 provides that a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).  "An indictment must contain the essential facts constituting the charged offense." *United States v. Miller*, 21-cr-119-CJN, ECF No. 86 (D.D.C. 2021), p. 4.  That has been the case since the nineteenth century, *Cochran v. United States*, 157 U.S. 286, 290 (1895), and still is today.  *United States v. Hillie*, 227 F. Supp. 3d 57, 71-72 (D.D.C. 2017) (Jackson, K.B., J.).  Particularly "'where the definition of an offen[s]e . . . includes generic terms, it is not sufficient that the indictment shall charge the offen[s]e in the same generic terms as in the definition; but it must state the species[]—it must descend to particulars.'" *Id.* (quoting *United States v. Thomas*, 444 F.2d 919, 921 (D.C. Cir. 1971)).  While in "some circumstances [] merely echoing the words of a statute and adding the time and location of the alleged offense may be enough," "when a statute is so broad and general that its terms,

without more, fail to inform a reasonable person of the essential conduct at issue, merely echoing

that language is *not* enough." *Miller*, p. 7 (emphasis original).

Similarly, "courts have long held that, while a valid indictment can be clarified through a

bill of particulars, an invalid indictment cannot be saved by one." *Hillie*, 227 F. Supp. 3d at 81;

*Untied States v. Conlon*, 628 F.2d, 150, 155 (D.C. Cir. 1980) (same).

## II.    Count One, the seditious conspiracy charge, must be dismissed

### A.    The TSI fails to state a seditious conspiracy offense

#### 1.    Seditious conspiracy's history

The modern contours of the Anglophone crime of treason were largely settled by the

reign of Edward III in fourteenth century England.  Catherine M. Tarrant, *To "insure domestic

Tranquility": Congress and the Law of Seditious Conspiracy*, *1859-1861*, 15 AM. J. LEGAL

HIST. 107, 109 (1971).  The framers modeled the Constitution's Treason Clause on an

Edwardian statute.  *Id*.  Both provide that treason consists "only" in levying war against the state,

or in adhering to its enemies, giving them aid and comfort.  U.S. Const. Art. III, § 3, cl. 1.  The

impetus for limiting treason to "only" those activities, and for doing it in the nation's basic law,

was that medieval English courts had created constructive definitions of treason "to eliminate

political enemies of the king." 15 AM. J. LEGAL HIST. at 109.  The pre-Edwardian danger

> lay in the fact that the nature and extent of the legal crime of treason was indeterminate,
> or was left to arbitrary determination.  The power to *define* treason, to declare from time
> to time who should be deemed in law to be traitors, was in its nature an *arbitrary* power.

*Id.* (quoting William Whiting).

Unlike treason law, laws of the related crime of seditious conspiracy, both at common

law and in statutes, "were virtually undeveloped" before the U.S. Civil War. 15 AM. J. LEGAL

HIST. at 107.  Prior to the war, the only instance when seditious conspiracy was a U.S. crime

against the national government was the 1798 Sedition Law which expired in 1801.  *Id.* at 111.

Besides codifying the British common law crime of seditious libel, the Sedition Law

criminalized conspiring to oppose the laws of the United States, to prevent an officer of the

United States from performing his duty, or to "counsel, advise or attempt to procure any

insurrection, riot, unlawful assembly or combination. . . ." 1 Stat. 596.  The law was ignored and

is largely regarded by legal scholars today as unconstitutional.  15 AM. J. LEGAL HIST. at 111-

12; *New York Times v. Sullivan*, 376 U.S. 254, 296 (1964) (the Sedition Act "came to an

ignominious end and by common consent has generally been treated as having been a wholly

unjustifiable and much to be regretted violation of the First Amendment").

The modern seditious conspiracy statute, now codified at § 2384, was originally enacted

by the 37th Congress in the Act of July 31, 1861.  12 Stat. 284.  The language of § 2384

perfectly reproduces the seditious conspiracy crime created in the July 31 Act.  Thus, the

historical and factual background to the Act carries great interpretive import.  The proximate

background: the Battle of Fort Sumter had just concluded.  15 AM. J. LEGAL HIST. at 118.

Sumter was seditious conspiracy *avant la lettre.*  Having seceded from the Union, South

Carolina seized federal forts.  Sumter, a strategic fortification in Charleston harbor, remained

outside its grasp.  Lincoln cabled Governor Pickens, advising that Washington would resupply

Sumter with a Navy convoy.  These vessels and their officers were "execut[ing] . . . law[s] of the

United States." § 2384.  Pickens and his government then hatched a plan with PGT Beauregard,

a former U.S. Army officer and superintendent of the U.S. Military Academy.  They would

"prevent, hinder, or delay the execution of" Lincoln's resupply effort.  *Id.*  They would "seize"

Sumter, "property of the United States[,] contrary to the authority thereof." § 2384.  They would

do all this through the use of "force." *Id.*  Here is what "force" meant in 1861: Beauregard turned

over 40 big guns in the harbor on Sumter, then occupied by his former West Point instructor and a handful of hapless troops.  Beauregard's men then rained hundreds of shells on their heads. Shelby Foote, *Fort Sumter to Perryville*, 45-49 (Vintage 1986).

The treason crime had posed practical obstacles to the Union due to the Treason Clause. The two-witness requirement stood in the way of large-scale roundups of rebels in wartime. Moreover, the punishment for treason was death.  "[B]y making the [hanging] crime national, [that would] prevent it from being punishable."[2]   15 AM. J. LEGAL HIST. at 118.  So the 37th Congress created a Not-Treason crime which happened to incorporate the common law elements of treason.  *Id.* at 118-20.  A Senate Judiciary Committee report, issued by the Democratic minority, noted that the new seditious conspiracy law likely violated the Treason Clause by disposing of its limited treason definition and two-witness requirement.  *Id.*  "Seditious conspiracy" was merely treason by another name, they concluded.  In any case, the crime of seditious conspiracy was a tool unneeded by the national government.  Lincoln had suspended the writ of habeas corpus.  "[E]ven after Congress had enacted criminal statutes to cover [military] detentions, the Administration preferred simply to detain the individuals with or without indictments as the situation required because the courts were slow, often closed."  *Id.* at 122.  Thus, there were no seditious conspiracy convictions during the war period.  *Id.*

In the 160 years from the crime's inception, it appears that no American citizen has been convicted of seditious conspiracy.  Not during the nation's Red Scares; not domestic saboteurs in the world wars; not 1960s and 1970s-era counterculture protesters who, among other shocking

---

[2] Although it is puerile to compare an armed rebellion by half the country backed by State military force with unarmed trespass inside the Capitol Building, similar considerations likely occurred to the government here in charging certain protesters under § 2384 and not the treason statute which still authorizes the penalty of death.  § 2381.

things, marched in a crowd of 50,000 on the Pentagon, sparking a confrontation with paratroopers. An Egyptian national, Sheik Omar Abdel-Rahman, the "blind sheikh," was convicted of seditious conspiracy for his role in the 1993 World Trade Center bombing. *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999). Even there, however, the government charged that Rahman had violated § 2384 by running afoul of its relatively straightforward "levying war" clause. *Id.* at 112. The sheikh *declared* he waged war on the U.S. It appears that no defendant has ever been convicted of the clause employed by the government here, criminalizing conspiring to use "force to prevent, hinder, or delay the execution of any law of the United States." § 2384.

In apparently every other reported seditious conspiracy case, the government has failed to secure convictions. *Baldwin v. Franks*, 120 U.S. 678 (1887); *Anderson v. United States*, 273 F. 20 (8th Cir. 1921); *Haywood v. United States*, 268 F. 795 (7th Cir. 1920); *United States v. Stone*, 2012 U.S. Dist. LEXIS 41434 (E.D. Mich. Mar. 27, 2012).

**2.      Section 2384 criminalizes conspiracies to prevent the execution of federal law as such, not agreements to prevent the perceived misapplication of such laws which presuppose the laws' validity**

Section 2384 provides,

If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to [1] overthrow, put down, or to destroy by force the Government of the United States, or to [2] levy war against them, or to [3] *oppose by force the authority thereof*, or [4] *by force to prevent, hinder, or delay the execution of any law of the United States*, or [5] by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

§ 2384 (emphasis and numbering added).

The TSI alleges that Nordean and the other defendants planned to delay or prevent Congress's count of electoral votes on January 6 because they believed that the declared winner

of the 2020 presidential election "stole th[e] election" from their preferred candidate.  TSI, ¶¶ 13, 14.  Thus, charges the TSI, the defendants conspired to prevent, hinder, or delay the execution of the Twelfth Amendment and the Electoral Count Act (ECA), which are "law[s] of the United States." *Id.* ¶ 27.  For the same reasons, it charges that the defendants "oppose[d]" the "authority" of the government.  *Id.*  The government's theory is inconsistent with § 2384's plain meaning, interpretive canons, statutory history, and relevant case law.

In determining the meaning of a statutory provision, courts must "give effect to every clause and word of th[e] statute." *Begay v. United States*, 553 U.S. 137, 143 (2008).  Under the *ejusdem generis* canon, "where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015). Under the related *noscitur a sociis* canon, statutory words are "known by the company [they] keep[]." *Id.* at 543.

As indicated above, Section 2384 features five distinct seditious conspiracy crimes.  The first two involve conspiracies whose aim is to end the existence of the national government or to wage war against it, which is tantamount to the same prohibited outcome.  They entail specific conspiratorial objects: overthrowing, destroying, and waging war against the government.  The fourth conspiracy, however, is couched in more abstract terms: "by force. . . prevent[ing], hinder[ing], or delay[ing] the execution of any law of the United States." § 2384.  The fourth conspiracy offense is more general than the first two as its terms encompass the more specific preceding crimes while the inverse is not true: one cannot "overthrow" the government by force without "hinder[ing], or delay[ing] the execution of any" of its laws by force, but one can do the

latter without "overthrowing" the government.  The same is true of the third conspiracy crime, also phrased in general terms: forcibly "oppos[ing]" the government's "authority."

It is not hard to see that the government's construction of § 2384's third and fourth conspiracy crimes distorts their plain meaning in the context of the statute.  In the government's interpretation, every plan to forcibly interfere with a federal law's execution is seditious conspiracy.  Yet all such plans also violate at least a dozen more mundane federal criminal statutes whose offenses fall quite short of sedition, including at least eight provisions in Section 1512.  *E.g.*, 18 U.S.C. §§ 1512(a)(1)(A), (a)(1)(B), (a)(1)(C), (a)(2)(A), (a)(2)(B)(i), (a)(2)(B)(ii), (a)(2)(B)(iii), (a)(2)(B)(iv), (a)(2)(C), (b)(1), (b)(2)(A), (b)(2)(B), (b)(2)(C), (b)(2)(D), (b)(3). That is even more true of the third conspiracy crime's prohibition on forcibly opposing the government's "authority" in any respect.  Thus, in the government's interpretation, the general words in the third and fourth conspiracy crimes are *not* "construed to embrace only objects similar in nature to [the] objects enumerated" in the first two conspiracy crimes.  *Yates*, 574 U.S. at 545.  For in its reading, whereas the first two specific conspiracy crimes concern the extinction of the federal government, the government's third and fourth conspiracy crimes cover every sort of obstruction of justice involving force.  They cover the petty drug dealer who assaults a witness to prevent his court testimony in a case involving a gram of marijuana.  Of course, pairing that crime with the South's armed rebellion against the Union is inconsistent with what you might call the canon against bathos.

The government's interpretive mistake lies in confusing (a) attempts to prevent the execution of a federal law in order to avoid its application to a particular set of facts, on the one hand, and (b) attempts to prevent the law's execution in all cases, on the other hand. The former case is merely a species of obstruction of justice.  The drug dealer assaulted the witness so as to

prevent his testimony in a particular case—not to prevent the execution of the controlled substance laws writ large.

One example demonstrates the point.  Suppose Congress enacted a law that created a nationwide right to abortion through the ninth month of pregnancy.  A group of armed vigilantes announces their aim is to forcibly stymie the law wherever and whenever it is applied—because the law itself must be rejected.  That is a conspiracy to prevent the execution of a federal law. But suppose instead an aggrieved husband conspires with his friend to assault the doctor sought out by his wife for an abortion under the new law.  The husband says, "Look here, I have no quarrel with the new law but I'll be damned if *my* child is aborted." His plan to threaten the doctor may be a federal crime, but it is not seditious conspiracy.  His intent is not to prevent the law, as such, from being executed.  The vigilantes' intent challenges the authority of the United States per se; the husband's challenges a law's application to a particular case without denying its general validity.

The case law on § 2384's third and fourth conspiracy crimes is inconsistent with the government's interpretation.  In *Anderson*, members of the Industrial Workers of the World (IWW) were charged with seditious conspiracy for organizing its workers across the country to everywhere prevent and hinder the execution of wartime mobilization and labor laws because, as socialists, they denied that the "exploiters of the workers" and "bourgeois parasites," i.e., the federal government, had any legitimacy to enact such laws, at least in connection with a war hurting the fledgling soviet state in Russia.  273 F. at 24.  Likewise in *Haywood*, the IWW defendants were charged with seditious conspiracy for planning to prevent the execution of wartime mobilization laws which the defendants believed the federal government had no authority to enact, being controlled by the "ruling, capitalistic classes." *Haywood*, 268 F. at 799.

Here, the TSI's seditious conspiracy charge makes this simple conceptual mistake.  It alleges that Nordean and the other defendants conspired to prevent Congress from certifying the election for the current president rather than the former one.  TSI, ¶¶ 13 ("'No Trump, No peace'"), 14 ("'It's time for fucking War if they steal this shit,' referring to the Presidential election.").  It thus alleges that Nordean and the defendants conspired to prevent the Twelfth Amendment and ECA from being applied in a manner they apparently sincerely believed to be mistaken (as the election was "stolen").  *Id.*  But it alleges no intent to prevent the execution of the Twelfth Amendment and ECA as such.  To the contrary, the protesters' apparent anger with the former vice president for certifying the election shows exactly the opposite: they believed it was the vice president who failed to properly apply the Twelfth Amendment and ECA.  By contrast, the IWW defendants in *Anderson* and *Haywood* did not intend to thwart wartime mobilization laws in a specific, timebound context because they were supposedly being *misapplied*.  The IWW denied that the federal law *was* law and intended to prevent its overall execution.

To the extent a seditious conspiracy charge is appropriate in the electoral vote counting context, it would allege that the defendants conspired to prevent execution of the Twelfth Amendment and ECA per se, because (for example), according to the hypothetical defendants, "through a long train of abuses and usurpations, Congress has forfeited its legitimacy, the laws of presidential election are void, and sovereignty has returned to the people" or again, "the Constitution and ECA bestow no legal authority on the Congress to certify a presidential election, the legislature being a mere kennel for the Running Dogs of Capitalism." That concept is not what the government alleges here.

The government's construction of the third and fourth conspiracy crimes fails to "give effect" to § 2384's first two conspiracy crimes because the third and fourth crimes would subsume the first two and dramatically expand the offense to reach relatively petty crimes.  If Congress "meant the [third and fourth conspiracy crimes] to be all-encompassing, it is hard to see why it would have needed to include" the first two conspiracy crimes.  *Begay*, 553 U.S. at 143.  When the third and fourth general conspiracy crimes are appropriately construed in light of the initial and more specific seditious conspiracy crimes in the list, they cover "crimes that are roughly similar, in kind as well as in degree of risk posed. . ." *Id.* Thus, they criminalize conspiracies to prevent the execution of federal laws as such—a crime "roughly similar" to an attempt to "overthrow" the government—not agreements to prevent their "misapplication" or their application to specific facts and not others, which would collapse any distinction between sedition law and obstruction of justice.  Treason and sedition are crimes that contest the legitimacy of the state.  When one challenges the *application* of the state's laws, the state's legitimacy is presupposed.  But when one claims that the law is not a law, the state itself is called into question, as it is when the government is "overthrown."

Even if the government's reading were "plausible," the rule of lenity would counsel against it here.  Federal courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute." *United States v. Aguilar*, 515 U.S. 593, 600 (1995).  The Supreme Court has urged this restraint "both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Id.*  Under the closely related rule of lenity, "if [the court's] recourse to traditional tools of statutory construction leaves *any doubt* about the meaning of [a statutory term]," the court should "invoke the rule that

ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 548-49 (emphasis added) (citation and internal quotation marks omitted). By rendering the initial and more serious seditious conspiracy crimes in the statute superfluous, defying the canons of *ejusdem generis* and *noscitur a sociis*, and collapsing the sedition crime into a mine-run obstruction-of-justice offense, the government's novel construction at the very least "leaves doubt" about its propriety.

Even if the government's interpretation were not "ambiguous," *ex post facto* principles embodied in the Due Process Clause bar courts from retroactively applying novel judicial constructions "to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)). Every judicial decision that has construed § 2384's third and fourth conspiracy crimes has involved the charge that the defendant conspired to prevent the execution of a federal law as such; none has involved the allegation that the defendant committed seditious conspiracy by challenging a law's application to a specific set of facts. Accordingly, due process forbids the retroactive application of that novel construction to acts undertaken before any court accepted the interpretation.

> **3.      The TSI fails to allege the U.S. officers who "executed" federal law allegedly targeted by, and whose "authority" was "oppose[d]" by, the alleged conspiracy; Congress does not "execute" federal law; the *Rhodes* decision's contrary interpretation of § 2384 creates unconstitutional vagueness**

Even if § 2384 criminalized agreements to forcibly prevent the perceived misapplication of a federal law recognized as valid by the conspirators, the TSI would fail to state an offense because, in two different ways, it fails to allege that Nordean and the other defendants conspired to prevent the "execution" of federal law and to "oppose" the government's "authority." First,

laws are not self-executing; government officials must execute them.  Identically, one can "oppose by force" the government's "authority" only through its officials.  The TSI fails to allege that Nordean and others conspired to prevent any officials from executing federal law and whose "authority" they "oppose[d] by force."  Second, even if the TSI is creatively construed to allege that the charged conspiracy aimed to prevent members of Congress and the President of the Senate from "executing" federal law, the seditious conspiracy charge would fail to state an offense.  Congress does not execute laws; the President does.  U.S. Const. art. II, § 3 (granting authority to the President to "take care that the laws be faithfully executed").

<b>(a)    A  § 2384 charge must identify the persons authorized to "execute" federal law who are targeted by the conspiracy</b>

Section 2384's actus rei—"prevent, hinder, or delay" and "oppose"—are transitive verbs. That means they require direct objects.  Those objects are the "execution" of any federal law and the "authority" of the government.  § 2384.  "Execution" and "authority," however, are abstract nouns.  Criminal statutes sometimes pair transitive actus rei with abstract direct objects.  *E.g.*, § 1503 ("Whoever . . . corruptly or by threats or force . . .influences, obstructs, or impedes . . . the due administration of justice [shall be punished].").  Like § 2384's "execution of any law of the United States" and "authority [of the government]," Section 1503's "due administration of justice" is an abstract function.  But it is axiomatic that justice is "administered" only through officials of the court and of the government.  That is why, for example, in a § 1503 case involving obstruction of a grand jury proceeding, the government must prove not merely that the defendant undertook "*any* act, done with the intent to 'obstruct the due administration of justice,'" *Aguilar*, 515 U.S. at 602 (emphasis original), but undertook some act with an intentional nexus to "an arm of the grand jury," i.e., specifically those people "administering justice" in the grand jury.  *Aguilar*, 515 U.S. at 600.  This nexus requirement is dictated by the

Court's "restraint in assessing the reach of a federal criminal statute. . . out of a concern that a fair warning should be given to the world in language that the common world will understand. . ." *Id.* (internal quotation marks omitted).

Just as the government failed to allege and prove in *Aguilar* an intended nexus between the defendant's acts and specific individuals who were an "arm of the grand jury," i.e., those "administering justice," here the TSI fails to allege any intended nexus between the charged conspiracy to prevent the "execution of any law of the United States" and those officials "executing" the federal laws identified by the government, i.e., the Twelfth Amendment and ECA.  It fails to allege any intended nexus between the conspiracy to "oppose" the government's "authority" and those officials exercising that authority.

Interpreting § 2384 in connection with a January 6 case, the Court in *United States v. Rhodes*, 2022 U.S. Dist. LEXIS 114264 (D.D.C. June 28, 2022) held that the government need only allege and prove a conspiracy "directed against the government of the United States *as a whole*" to establish a seditious conspiracy.  *Id.* at *12 (emphasis added).  The Court reasoned as follows.  The crimes now codified in §§ 2384 and 372 were once combined in Section 2 of Enforcement Act of 1871, also known as the Ku Klux Klan Act.  *Id.* at *9 (citing Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13 (codified at 70 Rev. Stat. § 5336 (1878))).  Section 372 provides,

> If two or more persons in any State, Territory, Possession, or District conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined under this title or imprisoned not more than six years, or both.

§ 372.

When Congress enacted the Criminal Code of 1909, it split the crime now codified in § 2384 from the crime now codified in § 372.  The seditious conspiracy provision was then codified in Chapter One, Section 6 (titled "Offenses Against the Existence of the Government"), § 6, 35 Stat. at 1089, and the crime now codified at § 372 was then codified in Chapter Three, Section 21 (titled "Offenses Against the Elective Franchise and Civil Rights of Citizens").  *Id.* at 1088.

To the *Rhodes* court, this history showed, first, that when Congress enacted the Ku Klux Klan Act in 1871, it purposefully distinguished between crimes against the United States (e.g., current § 2384's prohibition on conspiracies to overthrow the "Government of the United States") and crimes against a federal official (e.g., current § 372's prohibition on conspiring "to prevent by force, intimidation, or threat any person from accepting or holding any office, trust or place of confidence under the United States. . .").  *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *15-16.  Second, "if there were any doubt left," the Criminal Code of 1909 "resolved it" by separating the crimes now codified at §§ 2384 and 372 and placing them "under different chapter hearings."  *Id.* at *16.  The title of a statute and the heading of a section are persuasive interpretive tools, held *Rhodes*.  *Id.*

*Rhodes*' reasoning is flawed, contradictory, and inconsistent with the Court's opinion denying an earlier motion to dismiss in the same case.  First, it cannot be logically inferred from § 372's references to "individual federal officials" that Congress did not intend any intentional nexus between a § 2384 conspiracy and officials necessarily responsible for "execut[ing] . . . any law of the United States." Or, at least, that is what the judge determined in an earlier opinion in the same case.  Subsection (d) of § 1512 proscribes "harass[ing] another person and thereby

hinder[ing], delay[ing], prevent[ing], or dissuad[ing] any person from. . . attending . . . an official proceeding." The crime in subsection (c)(2) of that statute, by contrast, does not reference a connection to any individual "person" involved in an "official proceeding," proscribing instead obstruction of the proceeding itself.  Thus, applying the judge's rule from *Rhodes*, one would reason that Congress "understood how to distinguish crimes against [the proceeding itself] from those against. . . . individual [people involved in that proceeding.]" *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *15-16.  Yet when the same judge interpreted § 1512 in his earlier opinion, he applied precisely the opposite rule.  *United States v. Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *60 (D.D.C. Dec. 20, 2021).  There, he held that despite § 1512's demonstration that Congress "understood how to distinguish crimes against [the proceeding itself] from those against. . . . individual [people involved in that proceeding]," Congress intended § 1512(c)(2) to also reach harassment of individual people involved in the official proceeding, for "overlap is not uncommon in criminal statutes." *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *61.  In other words, if § 1512(d)'s references to individual persons involved in official proceedings did not inform the reach of § 1512(c)(2) in *Caldwell*, § 372's references to "individual federal officials" should not inform the reach of § 2384 here.  Similarly, the *Aguilar* nexus rule cited above applied to § 1505's omnibus clause prohibiting obstruction of the "due administration of justice" even though the same statute shows Congress "understood how to distinguish crimes against [the proceeding itself] from those against. . . . individual [people involved in that proceeding]," *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *15-16, such as "juror[s] . . . or officer[s] who may serve at [the] proceeding. . ." § 1505.

Second, *Rhodes* found it significant that, after the Criminal Code of 1909 separated the crimes now codified at §§ 2384 and 372, each offense received a unique chapter heading.  The

seditious conspiracy crime's chapter heading was "Offenses Against the Existence of the Government." That was "telling." *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *16.  Only, when presented with the title of § 1512 earlier in the case—"Tampering with a witness, victim, or an informant"—the same judge concluded that it did *not* inform the question whether § 1512(c)(2) reached acts having no relationship to any sort of evidence.  Held the judge: "The title of a statute and the heading of a section . . . [are] not meant to take the place of the detailed provisions of the text." *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *19 (internal quotation marks and citation omitted).  Indeed.

Finally, *Rhodes* deemed the original propinquity of the crimes now codified at §§ 2384 and 372 in the Ku Klux Klan act as evidence supporting the government's interpretation. *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *15 (reasoning that the "prevention of duties" clauses "immediately follow" the seditions conspiracy clauses).  Yet it subsequently found that the crimes' later separation into different statutes *also* supported the government's interpretation.  *Id.* at 16.  At work appears to be not so much an interpretive principle as heads the government wins, tails the January 6 defendant loses.

As the *Rhodes* court essentially conceded, its holding that a § 2384 conspiracy need only be "directed against the government of the United States as a whole" is inconsistent with the decisions of the 7th and 8th Circuits in *Haywood* and *Anderson*.  Both of those cases "contain language" inconsistent with the district court's opinion.  *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *19.  *Anderson* held that a seditious conspiracy count must "charge that the purpose of the conspiracy was the exertion of force *against those charged with the duty of executing the laws of the United States.*" 273 F. at 26 (emphasis added).  *Haywood* held that that crime's "prima facie meaning condemns force only when a conspiracy exists to use it *against some person who has*

19

*authority to execute and who is immediately engaged in executing a law of the United States.*"
268 F. at 800 (emphasis added).  *Rhodes* acknowledged that these cases "emphasize that the
seditious conspiracy must be directed at government officials or employees, as opposed to
nongovernment actors." 2022 U.S. Dist. LEXIS 114264, at *20.  The Court did not explain why
it then declined to apply that rule to the case before it.

Moreover, the holding from *Rhodes* is inconsistent with § 2384's "force" requirement.
The "government of the United States as a whole," *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at
*112, is an abstraction.  So is the "authority" of the government.  The "government as a whole"
does not "execute" laws.  Its constituent officials do.  The "authority" of the government is
expressed through its officials.  By the same token, a defendant's acts cannot be directed "at" the
government "as a whole" or its "authority." Section 2384 proscribes conspiracies to prevent,
hinder or delay the execution of federal law, and to oppose the government's authority, "*by
force*." *Rhodes*' holding makes nonsense of the force requirement.  While force can be directed
"against some person who has authority to execute and who is immediately engaged in executing
a law of the United States," *Haywood*, 268 F. at 800, such as Lincoln's Navy convoy to resupply
Sumter, it cannot be targeted at the government "as a whole" or "authority." *Rhodes*' holding to
the contrary is a category mistake: the use of force occurs in the world of physical reality while
the "government as a whole" and "authority" are verbal abstractions.  It therefore creates
unconstitutional vagueness: what constitutes using "force" to prevent "the government as a
whole" from executing federal law? What constitutes opposing "authority" itself by force?[3] Even

---

[3] Category mistakes: a visitor to Georgetown University views Healy Hall, the law school
building, and the library.  Stopping, he asks, "But where is the University?" His mistake is that
the buildings and library belong to the category of "physical infrastructure." "University"
belongs to the non-physical category of "institution." Just so with using "force" against the
"government as a whole" and "authority."

if the government's interpretation were somehow plausible, the Court should apply the canon of constitutional avoidance and adopt the holdings of *Anderson* and *Haywood*, "on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Suarez Martinez*, 543 U.S. 371, 382 (2005).

In sum, the plain meaning of § 2384 is, and the case law interpreting it has held, that the government must prove the seditious conspiracy was directed "against some person who has authority to execute and who is immediately engaged in executing a law of the United States" or some person who may be "oppose[d] by force" and who is exercising the government's "authority." *Haywood*, 268 F. at 800. Because Count One does not so allege, it must be dismissed.

**(b)      Congress does not "execute" federal law**

Assuming the Court agrees that § 2384 requires a nexus between the seditious conspiracy and persons executing federal law, it should not creatively construe the TSI to allege that the charged conspiracy aimed to prevent members of Congress and the President of the Senate from "executing" federal law. Even if that were alleged, Count One would fail to state an offense.

The interpretive question here is whether § 2384's reference to the "execution" of federal law should be construed in a manner consistent with elementary constitutional law. The *Rhodes* court held that 'the term 'execution' as used in § 2384 does *not* import the meaning of that term as it is used in Article II, Section 3 [i.e., the Take Care Clause]" since "the Supreme Court has not reflexively imported constitutional meanings into federal statutes." *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *24. Thus, the *Rhodes* court turned to an 1860 dictionary definition of "execution," which meant "'[t]he completion of an act or proceeding, by which it is rendered operative or effectual; a following out or carrying into effect.'" *Id.* at *21

(quoting  1 ALEXANDER M. BURRILL, A LAW DICTIONARY AND GLOSSARY 584 (2d ed. 1860)).

Applying that meaning, the court determined that members of Congress "carry[] into effect" the

Twelfth Amendment and ECA.  *Id.* at *22-23.  This interpretive method is flawed for a number

of reasons.

First, the issue is not a semantic matter of whether "the term 'execution' as used in §

2384 . . . import[s] the meaning of that term as it is used in Article II, Section 3." *Rhodes*, 2022

U.S. Dist. LEXIS 114264, at *24.  Indeed, the dictionary definition of "execution" used by the

court is consistent with the meaning of the same term in the Take Care Clause.  The court's error

lay in the apparent premise that because a dictionary definition did not reference the

constitutional principle that, in our system of government, the legislature does not execute laws,

the court was not bound to recognize that law.  But the source of constitutional law is not

lexicologists at Webster's; it is Supreme Court precedent.

 "The structure of the Constitution does not permit Congress to execute laws." *Bowsher v.*

*Synar*, 478 U.S. 714, 726 (1986).  Rather, it "sought to divide the delegated powers of the new

Federal Government into three defined categories, Legislative, Executive and Judicial." *INS v.*

*Chadha*, 462 U.S. 919, 951 (1983). The declared purpose of separating and dividing the powers

of government was to "[diffuse] power the better to secure liberty." *Youngstown Sheet & Tube*

*Co*. v. *Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  Justice Jackson quoted the

warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that "'there can be

no liberty where the legislative and executive powers are united in the same person, or body of

magistrates'. . . ." *Id.* (quoting The Federalist No. 47, p. 325 (J. Cooke ed. 1961).

"Even a cursory examination of the Constitution" reveals that the framers "provided a

vigorous Legislative Branch and a separate and wholly independent Executive Branch . . ."

*Bowsher*, 478 at 722.  Nor does the Constitution even "contemplate an active role for Congress in the *supervision* of officers charged with the execution of the laws it enacts." *Id.* (emphasis added).

Next, the *Rhodes* court points to a menu of actions that a joint session of Congress takes pursuant to the ECA.  *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *22-24.  The ECA states that the President of the Senate shall open certificates of the electoral votes; that members may object to the certificates following detailed protocols; that the Houses may separate during these objections; and that the President of the Senate may cut off debate.  *Id.*  What are members of Congress doing here, the *Rhodes* court reasons, if they are not "executing" the "law" of the ECA?  *Id.*

Contra *Rhodes*, it is precisely those features of the ECA which appear to "bind" Congress's internal proceedings that result in it being regarded not as a "law" that is legislatively "executed" but a precatory House rule in statutory form under the canon of constitutional avoidance.  *E.g.*, Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1793 (2002).  Among other problems with regarding the ECA as a "law," the constitutional anti-binding principle prevents one Congress from entrenching in unamendable law the rules of proceedings for future Congresses.  *Id.* at 1779.  So does Article I, Section 5, Clause 2 of the Constitution, by providing that "[e]ach House may determine the Rules of its Proceedings." *Id.*  Laws passed by Congress govern society as a whole; its House rules govern its internal proceedings.  In most cases, "law" is a general order, backed by threats, that is issued by a body of persons who generally command obeyance from those who believe the threats are likely to be implemented in the event of disobedience.  HLA Hart, *The Concept of Law* 25 (Oxford 1961).  As a matter of practical reality, the ECA does not command the electoral vote

counting rules of all Congresses by "law" because nothing legal stands in the way of a simple

majority voting to disregard it.  Akhil Reed Amar, *Presidents, Vice Presidents, and Death:*

*Closing the Constitution's Succession Gap*, 48 Ark. L. Rev. 215, 227 (1995) ("Spoilsports might

argue that, strictly speaking, any [electoral count] legislation passed today could not conclusively

bind a future result-oriented Congress. . .And worrywarts might fret over whether [electoral

count] legislation should be enacted as a law rather than a joint or concurrent resolution . . . [But]

the [the ECA] . . . serves as *a precommitment and focal point*.") (emphasis added); 80 N.C. L.

Rev. at 1783 (Amar's "statement leaves little doubt that the [ECA, if deemed a "law,"] is

formally unconstitutional").[4]

  Even if, notwithstanding the separation of powers, members of Congress can be said to

"execute" the Twelfth Amendment, that would not support the seditious conspiracy charge.  That

amendment does not provide that electoral certificates must be counted on January 6 or on any

other specific day.  U.S. Const. amend. XII.  It does not provide a specific place where the

certificates must be counted.  It merely provides in relevant part that the certificates must be

transmitted to the "seat of the government of the United States," and, separately, that the

---

[4] In referring to the President of the Senate, *Rhodes* repeatedly uses the title of a different office: Vice President. *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *21-27.  The office of Vice President belongs to the Executive branch.  *Rhodes* may therefore have reasoned that because the individual who held the office of President of the Senate on January 6 also held the office of Vice President, the Twelfth Amendment and ECA were being "executed" by the Executive branch.  If so, the court was mistaken.  Although the same individual holds both offices, the Constitution and ECA are quite clear that the President of the Senate is not fulfilling an executive function.  U.S. Const. amend XII; 3 U.S.C. § 15.  It is easy to see why.  As on January 6, the Vice President is often on the very ballot at issue.  If the individual who is Vice President follows the duties and loyalties of that office rather than the impartial ones of President of the Senate, it would put a conflict of interest at the heart of the constitutional order.  That is one reason why the suggestion that the Vice President can make unilateral electoral vote counting decisions is erroneous, though Vice President Thomas Jefferson appears to have done just that in the presidential election of 1800—effectively crowning himself president. 80 N.C. L. Rev. at 1656 n. 3.

President of the Senate shall, "in the presence of the Senate and House of Representatives," "open all the certificates and the votes shall then be counted." *Id.*  The TSI does not allege that Nordean and the other defendants conspired such that the certificates would not be counted "in the presence of the Senate and House of Representatives." Nor does it allege that the defendants conspired to prevent the votes from ever being counted or from being counted in time for the presidential transition.  To the contrary, if the conspiratorial object was "'No Trump, No peace,'" TSI, ¶ 13, the defendants positively contemplated that certificates would have to be counted.

Lastly comes the pragmatic argument.  If Congress does not "execute" federal law during a joint session to count electoral votes, then a mob could delay vote certification and yet not be guilty of sedition specifically.  What is disruption of the "peaceful transfer of power" if not sedition? This line of reasoning merely draws attention to the gulf separating promiscuously used phrases like "peaceful transfer of power" and "insurrection" from the factual reality of what these unarmed defendants are accused of doing.

Had the defendants truly conspired, or attempted, to forcibly prevent the "execution" of federal laws, they would have intended to use force against those actually charged with executing them: the full array of Executive power running from the FBI ultimately to the strongest military in world history.  Nothing less than defeating those instruments of hard power would constitute "destroy[ing] by force the Government of the United States" or "overthrowing" it.  § 2384.  Of course, these defendants are not accused of attempting suicide; unlike the seditious conspirators of the Civil War, they were backed not by the military force of an entire State but by a "water bottle." TSI, ¶ 122.  In such circumstances, there is nothing paradoxical about members of a foolish and criminal mob not being deemed "seditious conspirators,"

cheapening the significance of an offense meant for the kind of potent traitor who directs armed forces capable of challenging government power at his former military colleagues.

**B.      Section 2384's fourth conspiracy crime contemplates the use of force against persons, not property, and the TSI alleges insufficient facts showing Nordean's agreement to use such force**

Recall the five § 2384 conspiracy crimes:

If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to [1] overthrow, put down, or to destroy by force the Government of the United States, or to [2] levy war against them, or to [3] oppose by force the authority thereof, or [4] by force to prevent, hinder, or delay the execution of any law of the United States, or [5] by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

§ 2384 (numbering added).

Except for the second crime, all of § 2384's offenses expressly require that the defendant conspire to commit the prohibited conduct "by force." The second conspiracy crime, "levy[ing] war against" the government, implies the necessary use of force. Furthermore, taking the statute as a whole, it is plain that "by force" § 2384 means the use of force against persons, not merely property. One cannot "overthrow, put down, or destroy" the "Government of the United States" merely by using force against property and not persons. In the political and governmental sense, to "overthrow" is to "defeat or remove *someone* from power, using force." *Overthrow*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/overthrow (emphasis added). "Authority," as used in "the authority [of the Government of the United States]," § 2384, is "[t]he official right or permission to act, esp. to act legally on another's behalf . . . ." *Authority*. Black's Law Dictionary (10th ed. 2014). Those "official rights" are possessed and exercised by people. The position of those in federal governmental power—and their "authority"—does not rest on the existence of physical objects subject to destruction; it is

26

embodied in their persons by virtue of intangible processes in the Constitution.  If a comet hits the courthouse, the judge may still exercise his authority, assuming he was not in the building.  If a comet hits the judge, he no longer possesses that authority because he cannot exercise the functions of his office.

The fourth conspiracy crime therefore requires the government to prove a conspiracy to use force against "some person who has authority to execute and who is immediately engaged in executing a law of the United States." *Haywood*, 268 F. at 800.  But even if that crime's force element is satisfied by uses of force against property, it is clear that such property is limited to the means by which the federal law is "execut[ed.]"

Again, the fourth conspiracy crime criminalizes agreements "by force to prevent, hinder, or delay the execution of any law of the United States." The "by force" phrase can be read in two ways. Broadly, it could be read to mean that any conspiracy to prevent, hinder or delay a law's execution is criminalized so long as it contemplates force in any respect.  Much more naturally, it is construed to mean that the execution of federal law would be prevented, hindered or delayed due to the use of force, i.e., the force is intended to impair the media through which the law must be executed, either the persons executing it or some necessary physical objects, if any.  Plainly, the first reading would create absurdity and overbreadth.

Suppose two protesters with megaphones are demonstrating against an ethanol subsidy bill that Congress is on the verge of passing.  They are standing close enough to the Capitol Building to be heard inside but are not in a restricted area.  Their intent is to delay or hinder Congress from passing the bill through their protest.  In a dramatic gesture planned beforehand, one protester points at the Capitol and, lifting up his leg, slams it down on a can of ethanol he brought for that purpose, crushing it, saying, "Thus do I crush the despotism of Congress's evil

corn laws." While the destruction of the can could be said to constitute the "use of force," the execution of the new ethanol law does not depend on whether the can is crushed or not, nor did members of Congress even see the can crushed. The broader reading of § 2384 would criminalize protected speech, as there would be no "sufficiently important governmental interest" to outweigh such speech acts in the absence of any causal connection to the law's execution. *E.g.*, *Texas v. Johnson*, 491 U.S. 397, 407 (1989) (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

Historical examples show that this hypothetical is hardly fanciful.  Parliament enacted the Tea Act of 1773 to raise revenue from the colonies and shore up the British East India Company. As everyone knows, a group of protesters raided India Company ships in Boston Harbor and dumped nearly a million pounds of tea in the water.  The government in this case might charge that as a seditious conspiracy to prevent the execution of the Tea Act, "by force" as property was destroyed.  In fact, after investigating the matter British authorities concluded that the property destruction did not amount to treason, the antecedent to seditious conspiracy.  Bernard Donoughue, *British Politics and the American Revolution: The Path to War*, *1773-75*, 56-63 (Macmillan 1964).  After all, most of the colonies had begrudgingly complied with the Tea Act which could remain in force notwithstanding Boston's Sons of Liberty.

Here, the TSI does not allege any fact showing Nordean's agreement to use force against persons or property on which "execution" of the Twelfth Amendment and ECA depends.  The closest it comes to such a fact is the (false) allegation that "Nordean and Biggs, together with other members of the crowd, tore down a black metal fence that separated the crowd from law

enforcement."[5] Even if that fact were true, the posture of the small metal fence in question has

no, or insufficient, bearing on Congress's ability to "execut[e]" federal laws to constitute

seditious conspiracy, particularly in light of the statute's more specific government-ending

crimes.  Protesters entered the Capitol from virtually every entrance to the building and indeed

through an open corridor immediately adjacent to the fence.  ECF No. 197.  Because the use of

force is a "generic term" in this context, it is not sufficient for the indictment to "charge the

offense in the same generic terms" and it "must descend to particulars." *Hillie*, 227 F. Supp. 3d

at 71-72.  Thus, Count One must be dismissed.

## III.   Count Four, the § 372 offense, must be dismissed

### A.   Members of Congress, U.S. Capitol Police officers, and MPD officers are not "officers of the United States"

In relevant part, § 372 criminalizes conspiring to (1) "prevent, by force, intimidation, or

threat, any person from . . . discharging any duties [of any office, trust or place of confidence

under the United States]" or to (2) "induce [by force, intimidation, or threat] any officer of the

United States to leave the place, where his duties as an officer are required to be performed. . ."

Count Four charges that Nordean and the other defendants conspired to commit both offenses

against "Members of Congress and law enforcement officers." The only "law enforcement

officers" referenced in the TSI are Capitol Police officers.  TSI, ¶¶ 28, 72, 75, 86, 92, 93, 126.

Count Four must be dismissed because Members of Congress and U.S. Capitol police

officers are not "officers of the United States" and do not hold an "office, trust or place of

confidence under the United States" under Supreme Court precedent.

---

[5] The government and Court are in possession of evidence showing that a man standing behind
Nordean pulled the fence into him.  Nordean did not tear it down.  ECF No. 197, p. 2.

### 1.    Members of Congress are not "officers of the United States"

As discussed *supra*, the *Rhodes* court held that the "historical roots" and "reasons for [the] passage" of § 372 were critical to its interpretation.  *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *46.  Specifically, the crime now codified at § 372 was placed in the Ku Klux Klan Act.  *Id.*, at *9, 46.  Congress passed that Act,  *Rhodes* held, "'to enforce the provisions of the Fourteenth Amendment of the Constitution of the United States.'" *Id.* at *9 (quoting Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13).  When *Rhodes* then proceeded to conclude that members of Congress are "officers of the United States," *Id.* at *43, it was therefore what was omitted from its opinion that signaled an error.  *Rhodes* omitted that the Fourteenth Amendment itself—which § 372 was designed "to enforce," according to *Rhodes*—plainly shows that members of Congress are not "officers of the United States."

> Section 3 of the Fourteenth Amendment provides as follows:
>
> No person shall be **[a]** *a Senator or Representative in Congress*, or elector of President and Vice President, *or* **[b]** hold any *office, civil or military, under the United States*, or under any state, who, having previously taken an oath, **[a]** *as a member of Congress*, *or* **[b]** *as an officer of the United States*, or **[a]** as a *member* of any state *legislature*, *or* **[b]** as an *executive* or judicial *officer* of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const., amend XIV, § 3 (lettering and italics added).

Notice several things here.  First, the 14th Amendment clearly distinguishes between members of Congress, on the one hand, and (a) "any office, civil or military, under the United States" and (b) "officer[s] of the United States," on the other hand.  It does so multiple times, underlining the hardness of the distinction.

Second and more broadly, the Fourteenth Amendment uses the title "member" for officials of a legislature ("member of Congress," "member of any state legislature") and the title "officer" for executive or judicial officials  ("executive or judicial officer of any state").

Third, the Fourteenth Amendment indicates that the term "office under the United States" refers to an executive office not merely by distinguishing the term from "a Senator or Representative in Congress," but also by defining the two types of "office under the United States": "civil or military." Civil and military offices are executive offices, not congressional ones.

In interpreting Acts of Congress designed to enforce the Fourteenth Amendment, the Court must necessarily take cognizance of the terms of that amendment.  *E.g.*, *D.C. v. Carter*, 409 U.S. 418, 423 (1973).  Simply seizing on any dictionary definition of "officer," *e.g.*, *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *42-43, is not proper analysis because the terms of acts designed to enforce the 14th Amendment's provisions have to correspond with the meaning of those provisions as understood by the amendment's drafters.  *Carter*, 409 U.S. at 424-26; *Monroe v. Pape*, 365 U.S. 167, 204-05 (1961) (holding that party is correct to interpret the meaning of § 1983's phrases in light of the terms of the Fourteenth Amendment).  In *Carter*, for example, the Court considered § 1983's prohibition of certain conspiracies by persons of any "State *or Territory*." 409 U.S. at 418 (emphasis added).  Like § 372, Section 1983 was designed to enforce the Fourteenth Amendment, whose relevant provision states, "nor shall any *state* deprive any person of life, liberty, or property, without due process of law . . ." U.S. Const. amend. XIV, § 1 (emphasis added).  The Court held that since U.S. territories are not "'States' within the meaning of the Fourteenth Amendment," the term "State" in § 1983 likewise could not encompass territories.  *Carter*, 409 U.S. at 425 n. 11 (emphasis added) (observing that §

1983's extension to "Territor[ies]" must rest on some source of constitutional authority other

than the Fourteenth Amendment).  Discerning the meaning of an act designed to enforce the

Fourteenth Amendment does not require reliance on the proxy of "the ordinary meaning of []

terms found in Reconstruction-Era law dictionaries," *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at

*43, when the meaning specifically intended by the amendment's framers is found on the face of

the constitutional provision.

Like § 372, the statute now codified at 42 U.S.C. § 1985(1) was enacted as part of the Ku

Klux Klan Act.  *Kush v. Rutledge*, 460 U.S. 719, 724 (1983).  Virtually replicating § 372,

Section 1985 (1) provides,

> If two or more persons in any State or Territory conspire to prevent, by force,
> intimidation, or threat, any person from accepting or holding any *office, trust, or place of
> confidence under the United States*, or from discharging any duties thereof; or to induce
> by like means any *officer of the United States* to leave any State, district, or place, where
> his duties as an officer are required to be performed, or to injure him in his person or
> property on account of his lawful discharge of the duties of his office, or while engaged
> in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder,
> or impede him in the discharge of his official duties [the party so injured may have an
> action for recovery of damages]

§ 1985(1) (emphasis added).

In *Rutledge*, the Supreme Court held that all of these phrases— "office, trust, or place of

confidence under the United States" and "officer of the United States"—refer to "federal

officers." *Rutledge*, 40 U.S. at 724.  Thus, if a plaintiff brings a § 1985(1) action and is not a

federal officer, his claim is dismissed. *Id.*

But what about *Rutledge*'s phrase "federal officers," can the government's § 372 charge

wriggle through that hole?  No, "all persons who can be said to hold an office under the

government about to be established under the Constitution were intended to be included within

one or the other of [the] modes of appointment" in Article II, Section 2, Clause 2 of the

Case 1:21-cr-00175-TJK   Document 434   Filed 08/19/22   Page 36 of 43

Constitution, i.e., the Appointments Clause.  *United States v. Germaine*, 99 U.S. 508, 509

(1878).  The Appointments Clause provides that the President "shall . . . nominate [] and . . .

shall appoint . . . all . . . officers of the United States. . ." U.S. Const. art. II,  § 2, cl. 2.  That is

why, on several occasions and in multiple contexts, the Supreme Court has held and strongly

implied that "officers of the United States" and "offices" of, or under, the United States are

appointments made pursuant to the Appointments Clause, i.e., Executive officers and offices, not

members of Congress.  *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("Unless a person in

the service of the Government . . . holds his place by virtue of [the Appointments Clause], he is

not, strictly speaking, an officer of the United States."); *United States v. Smith*, 124 U.S. 525,

531-32 (1888) ("A person in the service of the government who does not derive his position from

[the Appointments Clause] is not an officer of the United States in the sense of the

Constitution."); *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868) ("[A]n office is a

public station, or employment, conferred by the appointment of government.").

Members of Congress are not "officers" under the Appointments Clause.  As the

Supreme Court recently put it, "The people do not vote for the 'Officers of the United States.'

U.S. CONST. ART. II, § 2, cl. 2." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*., 561

U.S. 477, 498 (2010) (quoting The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)).

Indeed, the Constitution explicitly forbids members of Congress from "holding any Office under

the United States" during their term in office.  U.S. Const. art. I, § 6, cl. 2; *Bowsher*, 478 U.S. at

722. ("[N]o person who is an officer of the United States may serve as a Member of the

Congress.").

As for § 372's phrase "trust[s], or place[s] of confidence under the United States" specifically, it is not just the Fourteenth Amendment that underpins *Rutledge*'s holding that these positions also refer to federal officers, not members of Congress. Article II, Section 1 provides,

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but **[a]** *no Senator or Representative*, <u>*or*</u> **[b]** *Person holding an Office of Trust* or Profit *under the United States*, shall be appointed an Elector.

U.S. Const. art. II, § 1, cl. 2 (lettering and italics added).

Just like "officers of the United States" and "offices under the United States," the phrase "office of trust"—distinguished in Article II, Section 1, Clause 2 from "Senator[s] or "Representative[s]"—refers to "appoint[ments] by the President of the United States. . ." *In re Corliss*, 11 R.I. 638, 640 (1876) (holding that a Commissioner of the United States Centennial Commission cannot serve as an elector because he "holds an office of trust under the United States" as an Executive officer).

Setting the Constitution and Supreme Court precedent aside, the *Rhodes* court turns to legislative history and even Department of Justice memoranda to conclude that members of Congress are "officers of the United States"—notwithstanding that members are constitutionally barred from those offices (U.S. Const. art. I, § 6, cl. 2). *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at \*46-47.  But in "statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364, 204 L. Ed. 2d 742, 750-751 (2019).  "Where [] that examination yields a clear answer, judges must stop." *Id.* (citing *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)).  Even when

courts "sometimes consult legislative history" they "will never allow it to be used to muddy the meaning of clear statutory language." *Id.* (internal quotation marks omitted).

Because members of Congress do not fall under any of the offices listed in § 372, Count Four must be dismissed to the extent it relies on that theory.

### 2.    U.S. Capitol Police are not "officers of the United States"

As shown *supra*, "officers of the United States" and those who hold an "office, trust, or place of confidence under the United States" are Executive officers subject to the Appointments Clause.  U.S. Capitol Police (USCP) are not Executive officers and are therefore not the subjects of § 372's protection.

The USCP are not Executive branch officers subject to the Appointments Clause.  5 U.S.C. § 101 (listing Executive departments). The USCP were established by Congress; its Chief is "appointed by the Capitol Police Board," not the President, and serves at the Board's pleasure. 2 U.S.C. § 1901.  The Board has no federal officers on it.  It consists of "the Sergeant at Arms of the House of Representatives, the Sergeant at Arms and Doorkeeper of the Senate, the Chief of the Capitol Police, and the Architect of the Capitol." 2 U.S.C. § 1901a.  Title 2 provides that "Executive departments and agencies may assist the United States Capitol Police in the performance of its duties. . ." 2 U.S.C. § 1970.  Thus, the USCP are not a part of any Executive department or agency.

Indeed, when litigants sue the USCP under statutes that create duties among Executive branch agencies, the USCP successfully move to dismiss those claims on the ground that as "an entity of Congress" the obligations of federal officers do not run to it. *Flippin v. United States*, 2019 U.S. Dist. LEXIS 222860, at *3 (D.D.C. Dec. 31, 2019).

Because USCP are not "included within one or the other of [the] modes of appointment" in the Appointments Clause, Count Four must be dismissed to the extent it relies on an alleged conspiracy directed at the USCP.  *Germaine*, 99 U.S. at 509.[6]

**B.      Even if members of Congress and U.S. Capitol Police officers were "officers of the United States" Count Four does not plead a § 372 offense with sufficient specificity**

The TSI alleges no facts showing in what sense, or how, Nordean agreed to use "force, intimidation and threat" to "prevent" members of Congress and USCP officers "from "discharging [their] duties" and to "induce" them to "leave the place where their duties . . . are required to be performed."  It alleges instead that Nordean shook a fence and entered the Capitol Building.  TSI, ¶¶ 81, 98.

That does not specify: (1) what the "force, intimidation and threat" consisted of; (2) how members of Congress and USCP officers were prevented from discharging their duties based on Nordean entering the building and allegedly shaking the fence; (3) How Nordean "induced" members of Congress and USCP officers to leave the place where their duties were required to be performed.  As previously indicated, members of Congress are not "required" to perform the electoral vote count on January 6 and are not required to do so in the Capitol Building.  U.S. Const. amend. XII.

Because § 372's provisions are "generic terms" in this context, it is not sufficient for the indictment to "charge the offense in the same generic terms" and it "must descend to particulars." *Hillie*, 227 F. Supp. 3d at 71-72.  Thus, Count Four must be dismissed.

---

[6] The TSI does not reference officers of the Metropolitan Police Department.  Even if it did, MPD officers are not "officers of the United States" and do not hold an "office, trust, or place of confidence under the United States." *Beard v. Dep't of Justice*, 917 F. Supp. 61, 61 (D.D.C. 1996) (holding that MPD is "not a federal agency" and that is also Congress's position).

**IV.    Counts 7, 8 and 9, offenses under §§ 1361 and 111(a)(1), must be dismissed**

Count 7 charges Nordean with destruction of a Capitol window under § 1361.  TSI ¶ 119.

Count 8 charges him with assaulting, resisting, opposing, impeding, intimidating and interfering

with a law enforcement officer "by throwing a water bottle at law enforcement" under §

111(a)(1).  *Id.* ¶ 122.  Count 9 charges Nordean under the same statute in connection with

Defendant Pezzola's taking of a law enforcement officer's riot shield.  *Id.* ¶¶ 86, 124.

The government does not possess probable cause to advance these charges.  Their filing

is an abuse of process.  Because the TSI specifically alleges that other defendants broke the

Capitol window, threw the water bottle and took the riot shield, the government necessarily relies

on an aiding and abetting theory to charge Nordean.  A person is responsible for aiding and

abetting a federal crime "if (and only if) he (1) takes an affirmative act in furtherance of that

offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*,

572 U.S. 65, 71 (2014).  "An intent to advance some different or lesser offense is not . . .

sufficient: Instead, the intent must go to the specific and entire crime charged." *Id.* at 76.  The

TSI does not allege any facts in support of these elements as applied to Counts 7, 8 and 9.

Because they fail to "descend to particulars," *Hillie*, 227 F. Supp. 3d at 71-72, those Counts must

be dismissed with respect to Nordean.[7]

**V.    If the Court does not dismiss Counts One, Two, Three, Four, Five, Seven, Eight,
and Nine, Nordean moves in the alternative for a bill of particulars**

---

[7] Nordean moves to dismiss Counts Two (conspiracy to obstruction an official proceeding, §
1512(k)), Three (obstruction of an official proceeding, § 1512(c)(2)) and Five (civil disorder, §
231(a)(3)) for reasons he previously put forward in a prior motion to dismiss and related briefing.
ECF No. 94.  He does this to preserve the arguments in the record with respect to the TSI.  He also
moves to dismiss the TSI because his Sixth Amendment right to a speedy trial has been violated
and incorporates his previously filed arguments to that effect.  *E.g.*, ECF Nos. 331, 343.

The court may direct the government to file a bill of particulars.  Fed. R. Crim. P. 7(f). "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Concord Mgmt. & Consulting LLC*, 385 F. Supp. 3d 69, 73 (D.D.C. 2019) (internal quotation marks omitted).  The defendant may move for a bill of particulars before or within 14 days after arraignment or at any time with Court permission.  Fed. R. Crim. P. 7(f).

A bill of particulars is appropriate for identifying the specific acts a defendant allegedly took to commit the offense, where the indictment fails to allege them or does so vaguely.  *United States v. Ramirez*, 54 F Supp. 2d 25, 90 (D.D.C. 1999) (government required to provide particulars as to all overt acts in which any defendant participated so that each defendant may understand the government's view of his alleged role in the conspiracy); *United States v. Bazezew*, 783 F. Supp. 2d 160, 168 (D.D.C. 2011) (government ordered to identify specific overt acts of defendants); *United States v. Brown*, 2007 U.S. Dist. LEXIS 49169, *45 (D.D.C. July 9, 2007) (ordering government to identify in bill of particulars "specific alleged actions and specifically worded false statements on which the government shall rely in proving its case"); *United States v. Siddiqi*, 2007 U.S. Dist. LEXIS 15410, *8 (S.D.N.Y. Feb. 21, 2007) (bill of particulars must specify the dates and amounts of bribes defendant allegedly paid); *United States v. Palfrey*, 499 F. Supp. 2d 34, 51-52 (D.D.C. 2007) (requiring government to identify proceeds allegedly used in support of criminal enterprise so defendant does not "waste precious pre-trial preparation guessing what data . . . will be relevant to [the] defense").

Here, if the Court does not grant Nordean's motion to dismiss, it should require the government to specify the following allegations in a bill of particulars:

- facts showing Nordean's agreement to use force against persons or property in order to prevent the execution of the Twelfth Amendment and ECA;

- facts showing the "force, intimidation and threat" Nordean agreed to use in connection with Count Four;

- facts showing how Nordean agreed to prevent members of Congress and USCP officers from discharging their duties in connection with Count Four;

- facts showing how Nordean agreed to "induce" members of Congress and USCP officers to leave the place where their duties were required to be performed in connection with Count Four;

- facts showing how Nordean aided and abetted the destruction of a Capitol window in connection with Count 7;

- facts showing how Nordean aided and abetted the throwing of a water bottle at law enforcement in connection with Count 8;

- facts showing how Nordean aided and abetted Defendant Pezzola's robbery of a law enforcement officer in connection with Count 9.

**Conclusion**

For all the foregoing reasons, Nordean respectfully requests that the Court dismiss Counts One, Two, Three, Four, Five, Seven, Eight and Nine of the TSI.  In the alternative, he requests that the Court require the government to file a bill of particulars.

Dated: August 18, 2022                     Respectfully submitted.

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway

Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

## Certificate of Service

I hereby certify that on the 18th day of August, 2022, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

Jim Nelson
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530
(202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com