**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| | ) |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S REPLY IN RESPONSE TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO DISMISS COUNTS ONE, TWO, THREE, FOUR, FIVE, SEVEN, EIGHT AND NINE OF THE THIRD SUPERSEDING INDICTMENT AND, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS**

# **Table of Contents**

Introduction ......................................................................................................... 1

The government's factual assertions ............................................................... 3

Argument ............................................................................................................ 7

    I.      Count One, the seditious conspiracy charge, must be dismissed ............... 7

        A.      The TSI fails to state a seditious conspiracy offense ............... 7

                1.      Section 2384 criminalizes conspiracies to prevent the execution of federal law generally, not efforts to prevent application of the law in a particular instance ............... 7

                2.      The TSI fails to allege the U.S. officers who "executed" federal law allegedly targeted by, and whose "authority" was "oppose[d]" by, the alleged conspiracy; Congress does not "execute" federal law ............... 15

                      (a)    A § 2384 charge must identify the persons authorized to "execute" federal law who are targeted by the conspiracy ............... 15

                      (b)    Congress does not "execute" federal law ............... 17

        B.      Section 2384's fourth conspiracy crime contemplates the use of force against persons, not property, and the TSI alleges insufficient facts showing Nordean's agreement to use such force ............... 22

    II.     Count Four, the § 372 offense, must be dismissed ............... 23

        A.      Members of Congress and the U.S. Capitol Police are not "officers of the United States" ............... 23

        B.      Even if members of Congress and the U.S. Capitol Police were "officers of the United States," Count Four does not plead a § 372 offense with sufficient specificity ............... 24

    III.    Counts Seven, Eight, and Nine, offenses under §§ 1361 and 111(a)(1), must be dismissed ............... 24

Conclusion ......................................................................................................... 24

**Introduction**

Lord George Gordon was a rabble-rousing politician.  He appealed to his Protestant base with slashing attacks on Parliament's extension of rights to Britain's disfavored Catholic minority.  In 1780, Gordon called on his supporters to gather in St George's Fields, a short walk from the Houses of Parliament, for a speech advocating the repeal of a Catholic emancipation law.  At least 60,000 of the aggrieved descended on London.  Gordon whipped up the crowd, thundering that the legislature would refuse their petition.  Incensed, the mob marched on Parliament and attacked MPs.  Several days passed before the riot was quelled.  Gordon was indicted for high treason.

Lord Mansfield presided over the trial in the Court of King's Bench.  Some thought the distinguished jurist would have done well by recusing himself.  Rioters had stormed his personal office.  In any case, the legal question facing Mansfield was this: if levying war against the Crown-in-Parliament constitutes treason, can a forcible attempt to prevent the execution of a law constitute levying war? Gordon's celebrated defense counsel, Thomas Erskine, argued in the negative.  Such a rule would amount to constructive treason of the kind barred under the treason statute of Edward III.  Mansfield disagreed.  However, in his instruction to the jury, the judge was precise in what was meant by a forcible attempt to prevent the execution of a law: to "force[] [the government] to make, or to repeal, by an armed multitude, any law; from that moment there is an end of all legislative authority."  *Rex v. Gordon* [1781], 21 St. Tr. 485, 604.  Gordon was acquitted of high treason, to the delight of the American colonies then battling Britain.

The distinction from Gordon's case between conspiracies to forcibly prevent the execution of a law generally (constructive levying war) and in a particular instance (a mere riot) was adopted by federal courts in the early republic.  The question arose after the Whiskey

Rebellion and Fries's Rebellion.  Both involved mob protest against tax laws.  Citing Lord Hale and Gordon's case, courts presiding over resulting treason trials held that a conspiracy to forcibly prevent the execution of law in a particular instance was not constructive levying war, but that such an agreement to oppose the law generally was.  The reasoning of these cases was adopted by the Supreme Court in *Ex parte Bollman*, 4 Cranch 75 (U.S. 1807), where Justice Marshall found that Aaron Burr's conspiracy to carve an empire in the United States did not amount to treason.  Later, courts adopted this distinction in the context of the seditious conspiracy statute, as the government's cases show.  *Bryant v. United States*, 257 F. 378, 387 (5th Cir. 1919).  Here, the government's seditious conspiracy charge is limited to "execution" of "law" on a "particular instance"—January 6.  The government's lawyers thus ask the Court to create a treason crime even more constructive than Mansfield's, an offense so loathsome to the framers it occasioned the Constitution's lone reference to substantive criminal law.

Other parts of the Constitution must also walk the plank.  Separation of powers goes overboard for January 6 too.  The government finds itself arguing that Congress intended the phrase "execution of any law of the United States" to refer to legislative activity.  But if the Electoral Count Act is a law that binds members of Congress—and not a House rule—those legislators following its commands are *complying* with law, not "executing" it in the sense meant by § 2384, as the ECA's positive and negative legal duties would be placed on Congress. (Unlike with Gordon's offense against the Crown-in-Parliament, the executive and legislative functions here are not merged, though the government is often confused on that point, referring to something it calls "government as a whole").  The government would have the Court hold that the man who refrains from robbing banks is "executing" federal laws prohibiting that conduct.  A reformed Willie Sutton is actually a federal officer, the DOJ argues.  In fact, that man "complies"

2

with those laws; if he does not, the FBI and DOJ "execute" them in the only relevant sense of that word, the legal one.  That is why those offices belong to the Executive Branch.

Similarly meritless are the government's arguments in support of its § 372 charge, alleging Nordean's conspiracy to interfere with "officers of the United States."  The Constitution explicitly bars members of Congress from holding "any office under the United States." U.S. Const. Art. I, § 6.  Though the government itself contends that § 372 was designed to enforce the Fourteenth Amendment, that amendment distinguishes between officers of the United States and members of Congress, repeatedly.  U.S. Const. Art. XIV, § 3.  The government pretends these constitutional provisions do not exist.  That is because it has no credible response to them.  As to Counts Seven, Eight and Nine, alleging property destruction and assault, the government's position is that the indictment need not plead any facts predicating Nordean's legal responsibility.  Such an absence of fact was why Lord George Gordon was acquitted.  Nordean's motion should be granted.

**The government's factual assertions**

Because its seditious conspiracy charge requires proof that Nordean and the other defendants conspired to use force, the government points to allegations in the Third Superseding Indictment (TSI) where the defendants are said to have "express[ed] support for violence if then-President Donald Trump did not remain in power." Gov't Opp., p. 2.  The Court will notice several things here.

First, the pre-January 6 comments do not express support for violence.  To the contrary, what is most striking about the government's use of these statements is how banal and ordinary they are in the current political context.  Tarrio allegedly commented, "If Biden steals this election, [the Proud Boys] will be political prisoners.  We won't go quietly . . . I promise." Gov't

Opp., p. 2.  A vow not to "go quietly" is not only not an expression of support for violence; it is

an utterly commonplace misquotation of Dylan Thomas's *Do not go gentle into that good night*.

When the poet urged, Old age should burn and rave at close of day / Rage, rage against the dying

of the light, one assumes he was not plotting geriatric seditious conspiracy.

      The next comment cited by the government is even more peculiarly used.  Nordean is

said to have stated,

> The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will
> not be extinguished.  We will grow like the flame that fuels us and spread like love that
> guides us.  We are unstoppable, unrelenting and now . . . unforgiving.  Good luck to all
> you traitors of this country we so deeply love . . . you're going to need it.

Gov't Opp., p. 2.

      The first thing to notice is that while Nordean may be justly convicted of hammy mixed

metaphors ("the flame that fuels us"), he does not express support for violence in this passage.

Perhaps more to the point, consider how twisted the government's use of the 1776 comment is.

Nordean says he "deeply love[s]" his country.  Schoolchildren are taught to celebrate the

country's founding.  Proud citizens are civic-minded ones.  You don't overthrow something you

love.  The government has it exactly backwards.  This comment does not support a seditious

conspiracy charge, it detracts from one.

      Even comments that contain references to violence are plainly performative or ironic in

tone.   Rehl is said to have stated, "Hopefully the firing squads are for the traitors that are trying

to steal the election from the American people." Gov't Opp., p. 3.  Oh, hopefully.  Rehl appears

to have been alluding to an earlier quip that firing squads would be directed at supporters of the

former president.  Of course, Rehl did not expect to see firing squads, a nineteenth century relic,

in Washington, D.C.  In any case, firing squads were organized by the government, not private

parties.

4

Second, the government is required to establish not some abstract support for violence but a conspiracy to actually use force on January 6. Nothing about the "structure" of the ludicrously named Ministry of Self-Defense (MOSD) encrypted chat group implies an agreement to use force. Gov't Opp., pp. 3-5. A "top-down structure" does not connote a seditious conspiracy. If it does, all the Fortune 500 companies should immediately retain counsel with seditious conspiracy expertise. The government similarly alleges that Tarrio received a document entitled "1776 Returns" that "set forth a plan to occupy a few 'crucial buildings' in Washington, D.C." *Id.*, p. 4. This document's service to the government is not entirely dissimilar from the service once performed for Tsarist governments by *The Protocols of the Elders of Zion.* The government does not allege that Tarrio discussed this material with any other defendant or that it was the basis for the arch plot pursued on January 6. To the contrary, the government positively concedes to the defense that it has no evidence showing those things. In the event, these defendants did not occupy the "crucial buildings" from the 1776 Returns canard.

Similarly odd is the government's use of a comment from an unnamed "participant" in a "MOSD Leaders chat" on January 3. Gov't Opp., p. 4. The "main operating theater," the participant said, should be "out in front of the Capitol building." *Id.* But thousands of protesters demonstrated "in front of the Capitol building" and have not been charged with any crime, let alone seditious conspiracy. After all, the Capitol grounds are a public forum. But, adds the government, when Rehl stated that the Capitol was a "good start," Tarrio responded, "you want to storm the Capitol." *Id.* Once again, the government reads the "evidence" backwards. If the defendants had a plan to "storm the Capitol" it would make no sense for Tarrio to speculatively interject that Rehl specifically had a desire to do that.

The same is true of the "MOSD Leaders chats" from the night of January 5.  Gov't Opp., p. 4.  The government says it sees significance in the chat that "Rufio is in charge, cops are the primary threat, don't get caught by them or [Black Lives Matter], don't get drunk until off the street." *Id.*  But if the group had a plan to "induce" by "force, intimidation, or threat" police officers "to leave the place where [their] duties . . . [were] required to be performed," § 372, this participant's comment is orthogonal to, not consistent with, such a plan.  Advising the group to avoid the police—"don't get caught by them"— and to get drunk (indoors please) does not advance a plan to confront officers to induce them to leave their "places."  A concern with getting "caught" inebriated on the street does not indicate an interfering purpose but rather the purpose of avoiding jail for drunkenness, which is also at cross-purposes with a § 372 conspiracy, or any other conspiracy.

The government's description of the first breach on January 6 of the barricades near the Peace Monument is misleading.  Gov't Opp., p. 5.  The government omits that virtually every video clip depicting this episode shows that the defendants in this case were not responsible for the initial breach.  They are nowhere to be seen among the vanguard protesters who pulled down the first barriers and pushed past law enforcement officers.  The government likewise contends that Nordean later "participated in tearing down a black metal fence."  The Court is in possession of evidence showing that a man behind Nordean violently pulled the fence back into Nordean's body.  ECF No. 197, p. 2.

The government points to defendant Pezzola's smashing of a Capitol window with a police shield.  Gov't Opp., p. 6.  It omits that the TSI alleges no facts showing an agreement between Nordean and Pezzola to destroy any property—or to do anything else.  It cannot allege those facts: Nordean has not had a single conversation with Pezzola in his life.

**Argument**

**I.      Count One, the seditious conspiracy charge, must be dismissed**

      **A.      The TSI fails to state a seditious conspiracy offense**

            **1.      Section 2384 criminalizes conspiracies to prevent the execution of federal law as such, not agreements to prevent application of the law in a particular instance**

The government takes one page to respond to Nordean's argument that § 2384 proscribes conspiracies to forcibly prevent the execution of a federal law generally, not efforts to prevent execution of such a law in a particular instance.  Gov't Opp., pp. 14-15.  That is misguided.  Nordean's position has been the law in the treason and seditious conspiracy context for hundreds of years.

As Justice Marshall showed in *Ex parte Bollman*, the crime of agreeing to forcibly "'resist or oppose the execution of any statute of the United States by force'" was at common law a conspiracy to commit treason.  8 U.S. 75, 128, 4 Cranch 75 (U.S. 1807) (quoting *Case of Fries*, 9 F. Cas. 826 (Cir. Ct. Penn. 1799)).  That is because preventing the execution of any statute of the United States by force was identified at common law as a constructive form of the crime of "levying war" against the United States.  *Id.*  As the Treason Clause of the Constitution requires proof of an overt act, U.S. Const. Article III, § 3, cl. 1, a conspiracy to prevent the execution of federal law (and thus constructively to levy war) is not treason "'unless combined with an attempt to carry such combination or conspiracy into execution.'"  *Id.*  Thus, Aaron Burr's plot to create an empire in the United States did not constitute treason, as no persons had been assembled for that purpose.  *Id.*

Common law had long recognized certain forcible efforts to oppose "the execution of law" as a constructive form of "levying war" against the government.  As Justice Marshall

observed in 1807, "levying war" is a "technical term." *Ex parte Bollman*, 8 U.S. at 471.  As indicated *supra*, Lord Mansfield instructed the jury in Gordon's case that "if persons do assemble themselves and act with force in opposition to some law which they think inconvenient, and hope thereby to get it repealed, this is levying war. . ." *Rex v. Gordon* [1781], 21 St. Tr. 485, 604.  In defining that "technical term," Justice Marshall quoted Judge Iredell instructing a grand jury in 1799: "[I]f in the case of the insurgents who may come under your consideration, the intention was to prevent by force of arms the execution of any act of the congress of the United States altogether, any forcible opposition calculated to carry that intention into effect, was a levying of war against the United States. . ." *Ex parte Bollman*, 8 U.S. at 480. The Justice also quoted Judge Chase in the second *Case of Fries*: "The courts are of opinion, that if a body of people conspire and mediate an insurrection to resist or oppose the execution of a statute of the United States by force . . .[and] proceed to carry such intention into execution by force, [] they are guilty of . . . levy[ing] war. . ." *Id.* at 128; *see also United States v. Hoxie*, 26 F. Cas. 397 (1808) (same); *United States v. Mitchell*, Cas. No. 15,788 (1795) (same); *United States v. Vigol*, 2 U.S. 346 (Cir. Ct. Penn. Apr. 1, 1795) (same).

Courts in the period immediately preceding and following enactment of the seditious conspiracy law in the Act of July 31, 1861 continued to equate efforts to forcibly prevent the "execution of federal law" with constructive "levying war" against the United States.  *United States v. Greathouse*, 4 Sawy. 457, 2 Abb. U.S. 364 (Cir. Ct. N.D. Cal. 1863); *Charge to the Grand Jury-Treason*, 30 F. Cas. 1036 (Cir. Ct. Ohio Southern Oct. 1, 1861); *Charge to Grand Jury-Treason*, 30 F. Cas. 1039, 1 Sprague 602 (Cir. Ct. Mass. Mar. 1, 1861); *United States v. Hanway*, Cas. No. 15,299 (1851).  As one of those courts explained, the seditious conspiracy law of the Act of 1861 created the crime of "treasonable conspiracy" without the treason crime's

overt act requirement.  *Charge to the Grand Jury-Treason*, 30 F. Cas. at 1037.  The court

continued that the Act of 1861:

> declared [it] to be a crime to conspire "by force to prevent, hinder, or delay the execution
> of any law of the United States." For many years a [treason] law has been in force,
> affixing punishment to any forcible opposition to the execution of an act of congress, but
> a mere conspiracy for that purpose was not criminal until the passage of the act of last
> July. There can be but little doubt, that if the provisions referred to had been earlier in
> force, it would have subjected to deserved punishment some individuals who were parties
> to unlawful conspiracies, but who directly avoided by active participation in executing
> their purposes, and who were not therefore within the reach of the law.

*Id.*

As a Civil War-era legal scholar has observed, while § 2384's prohibition on conspiring

to take the property of the United States "contrary to the authority thereof" would not constitute

treason if pursued, its crime of forcibly preventing the execution of the law of the United States

would do so under a common law constructive concept.  Catherine M. Tarrant, *To "insure*

*domestic Tranquility": Congress and the Law of Seditious Conspiracy*, *1859-1861*, 15 Am. J.

Legal Hist. 107, 111, 121 (1971) (Before the Act of 1861, "the courts had defined levying war

but had specified that such offenses as resistance to a law . . . was levying war. . .").

Critically, the offense of conspiring to forcibly prevent the execution of law has always

conformed to Nordean's interpretation of § 2384's crime of conspiring to prevent the execution

of federal law.  That is, such a crime occurs when the defendant has conspired to forcibly prevent

the execution of a law generally, not merely in a specific instance.  Again, in Gordon's case Lord

Mansfield held that the crime is to "force[] [the government] to make, or to repeal, by an armed

multitude, any law; from that moment there is an end of all legislative authority." *Gordon*, 21 St.

Tr. at 604.  Gordon's alleged aim was to prevent a Catholic emancipation law from being applied

generally.  Similarly, in the Whiskey Rebellion and Fries's Rebellion cases, the federal courts

adopted the distinction between conspiracies to prevent execution of a federal law generally

(constructive levying war) and forcible efforts to prevent the law's application in a specific

instance (a mere riot).  In the Fries's cases, for example, the court held:

> if, in the case of the insurgents who may come under your consideration, the intention
> was to prevent by force of arms the execution of any act of the congress of the United
> States *altogether* (as for instance the land tax act, the object of their opposition), any
> forcible opposition calculated to carry that intention into effect, was a levying of war
> against the United States, and of course an act of treason. . .

> But if the intention was merely to *defeat its operation in a particular instance*, or through
> the agency of a particular officer, from some private or personal motive, though a higher
> offence may have been committed, it did not amount to the crime of treason.

*Case of Fries*, 9 F. Cas. at 840 (emphasis added).

In both rebellions, rioters were found guilty of conspiracy to commit constructive levying

of war precisely because their efforts were directed at preventing the execution of federal tax

laws *generally*, not merely in a particular instance (*i.e.*, resisting payment in a specific tax year).

*United States v. Vigol*, 2 U.S. 346, 347 (Cir. Ct. Penn. 1795); *United States v. Mitchell*, 2 U.S.

348 (Cir. Ct. Penn. 1795); *Case of Fries*, 9 F. Cas. 826.[1]

The same distinction was adopted in *Hoxie*.  The Embargo Law prohibited exportations

from the United States.  The defendants conspired to take a raft of timber down Lake Champlain

toward Canada, in violation of the law.  They shot soldiers along the way who attempted to stop

the raft.  The defendants were charged with conspiring to prevent the execution of federal law,

*i.e.*, constructive levying war.  Justice Livingston instructed the jury as follows, regarding the

"boundary between treason and some other offenses, which partake . . . of an opposition to

government":

> everyone will at once perceive a very wide separation, between [1] regular and numerous
> assemblages of men, scattered over a large portion of country, under known officers, and

---

[1] Vigol and Mitchell were pardoned by President Washington.  Fries was pardoned by President
Adams, who disagreed with the court's adoption of a constructive definition of levying war.  Ron
Chernow, *Alexander Hamilton* 578 (Penguin 2004).

in every respect armed and marshalled in military and hostile array, for the avowed purpose, not only of disturbing and arresting the course of public law, in a whole district, by forcibly compelling the officers of government to resign, but by intimidation and violence, of coercing its repeal, and [2] a sudden, transient, weak, unmilitary, and unsystematized resistance, and then in a solitary instance, and for the single object of personal emolument. . . *These cases cannot be considered as parallel, without destroying, at once, every distinction between trespasses, riots, and treasons.*

*Hoxie*, 26 F. Cas. 397 (emphasis added and numbers).

Thus, the Justice instructed the jury,

[I]f you believe [that the defendant] was hired by the owner of this raft for the purpose of evading the embargo laws, *only in this instance*, and for his own private emolument, although it may have been part of the plan to use violence, and force were actually employed against the collector or his agents to accomplish this object, but that this formed no link in a conspiracy to resist or impede the operation of these laws within the district *generally* as far as their means enabled them . . . then the [defendant] is not guilty of [constructive levying war].

*Id.* (emphasis added); *see also Charge to Grand Jury-Fugitive Slave Law*, 30 F. Cas. 1015 (D. Mass. 1851) (adopting general/specific instance distinction); *Charge to Grand Jury-Treason*, 30 Fed. Cas. 1046 (Cir. Ct. Rhode Island) (Story, J.) (same).  As one scholar summarized the rule from these cases, "a sudden outbreak against the enforcement of an Act of Congress in a particular instance, not followed by continued opposition to the law, is not levying war."  Hayes McKinney, *Treason under the Constitution of the United States*, 3 Va. L. Rev. 801, 816 (1918).

Besides Gordon's case, early-republic courts considering the matter of constructive levying of war turned to Lord Hale's *The History of the Pleas of the Crown*.  In Burr's case, for example, the Virginia circuit court cited Lord Hale as follows: "'[I]t is not every unlawful or riotous assembly of many persons to do an unlawful act, though de facto they commit the act they intend, that makes a levying of war; *for then every riot would be treason*. . .'" *United States v. Burr*, 25 F. Cas. 55, 163 (Cir. Ct. Va. 1807) (quoting 1 Hale P.C., p. 149) (emphasis added); *see also* Carlton F. W. Lawson, *On Treason: A Citizen's Guide to the Law* 50 (HarperCollins

2020) ("[F]orcible resistance to a particular tax collector would not be treason i*f, say, the resistors simply believed the collector had been improperly appointed to the job*, but an insurrection to suppress *all* tax collection would be.") (emphasis added).

Courts continued to apply this distinction in the period preceding and following the enactment of the seditious conspiracy law in the Act of 1861. Consider the court's instruction in 1861 to the grand jury in *Charge to Grand Jury-Treason*. There, the district court instructed that an indictment could be returned on the preventing-execution-of-law crime only in these conditions:

> If the object be to prevent by force the execution of any public law of the United States, *generally and in all cases*, that is a treasonable purpose, *for it is entirely to overthrow the government as to one of its laws*. And if there be such an assemblage as I have already described, for the purpose of carrying such an intention into effect by force, it will constitute levying war.
>
> *But the sudden outbreak of a mob, or the assembling of men in order, by force, to defeat the execution of the law, in a particular instance, and then to disperse, without the intention to continue together, or to re-assemble for the purpose of defeating the law generally, in all cases, is not levying war.*

30 F. Cas. 1039, 1 Sprague 602 (emphasis added).

The Court will notice that this jury instruction closely follows the general/specific instance distinction in the *Case of Fries*, *Vigol*, *Mitchell*, *Hoxie* and Gordon's case. Likewise, in *Hanway*, the court held in 1851 that the preventing-execution-of-federal-law crime is committed when the conspiracy's object is to "*nullify* some law of the United States, and *totally hinder its execution, or compel its repeal*." *Hanway*, 26 F. Cas. 105, 128 (emphasis added). Based on these storied precedents, the government's cases themselves apply this distinction to the seditious conspiracy statute. *Bryant v. United States*, 257 F. 378, 387 (5th Cir. 1919). In *Bryant*, the Fifth Circuit considered the defendant's argument that a seditious conspiracy to prevent the execution of federal law must have for its object preventing "the general enforcement of a law," as opposed

12

to preventing a law's execution in a particular instance. *Id.* at 385. The court of appeals agreed. *Id.* at 387 (citing *Ex parte Bollman*, 4 Cranch 75, 127; *Burr*, 25 Fed. Cas. 162). Held the court, "the resistance or the conspiracy to resist the enforcement of the law must be general, *and not limited to a particular instance . . .*" *Id* (emphasis added). The court determined that the government had met its burden by adducing evidence that the defendants' "secret organization" did conspire to prevent federal conscription laws *generally. Id.* That is true of the convicted defendants in every seditious conspiracy case cited by the government.[2] *Bryant* was correct to construe § 2384 consistent with the common law meaning of "execution of the laws of the United States," as "[i]t is a settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *Sekhar v. United States*, 133 S.Ct. 2720, 2724 (2013) (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999)).

Set against this legal landscape, it is clear that Count One does not allege a conspiracy to forcibly prevent the execution of federal law. Unlike in Gordon's case, the Whiskey and Fries's Rebellion cases, Civil War precedents, and its own seditious conspiracy cases, the government is not alleging that the object of Nordean's "conspiracy" was to prevent application of the Twelfth Amendment and ECA *generally*—in all presidential elections, say. Unlike in all those cases, the government does not allege that Nordean had any quarrel with the Twelfth Amendment and ECA in the way that Gordon's rioters opposed the Catholic emancipation law or the Pennsylvania

---

[2] *Reeder v. United States*, 262 F. 36, 38-39 (8th Cir. 1919) (defendants conspired to prevent execution of selective service law among all citizens and military service members); *Orear v. United States*, 261 F. 257, 258 (5th Cir. 1919) (same); *Wells v. United States*, 257 F. 605, 612 (9th Cir. 1919) (defendants conspired to generally prevent the execution of Congress's joint resolution declaring war against Germany); *Isenhouer v. United States*, 256 F. 842 (8th Cir. 1919) (conspiracy directed at "destroy[ing] the established order of society by force of arms").

mobs opposed the tax laws as such.  Indeed, quite absurdly, the government does not even allege

Nordean's *knowledge* of the arcane laws he allegedly conspired to forcibly "prevent."  Rather, its

charge, at best, is the quintessential example of alleging "the sudden outbreak of a mob, or the

assembling of men in order, by force, to defeat the execution of the law, *in a particular instance,

and then to disperse. . .*" *Charge to Grand Jury-Treason*, 30 F. Cas. 1039, 1 Sprague 602

(emphasis added).  Yet even there Count One falls short.  If the defendants have no knowledge

of the "law" they conspire against, it is not the *law* they protest against but the political actions of

individual legislators.

The government offers one response to this dispositive flaw.  It argues that the canons of

*ejusdem generis* and *noscitur a sociis* do not apply to § 2384's preventing-the-execution-of-

federal-law and opposing-government-authority crimes, as they are not "of the same category" as

the levying war crimes preceding them in the statute.  Gov't Opp., p. 14.  In light of the history

cited above, the government's contention is demonstrably wrong.  The "opposing authority" and

"execution of any law of the United States" phrases were borrowed from eighteenth and

nineteenth century federal cases identifying the common law crime of constructive levying war.

*Ex parte Bollman*, 8 U.S. at 480; *Charge to Grand Jury-Treason*, 30 F. Cas. 1039, 1 Sprague

602; *Charge to the Grand Jury-Treason*, 30 F. Cas. at 1037; *Case of Fries*, 9 F. Cas. 826; *Vigol*,

2 U.S. 346, 347; *Mitchell*, 2 U.S. 348.  And, again, the government itself relies on authorities that

correctly incorporate that common law understanding into § 2384's identical language.  *Bryant*,

257 F. at 387; *Sekhar*, 133 S.Ct. at 2724.[3]

---

[3] That § 2384's language should be construed in light of the common law crime of constructive
levying war does not imply that the Treason Clause would permit a constructive treason charge,
a question which *Ex parte Bollman* did not address.

14

The government strains to deny what is obvious, that it tries to transform a crime courts have for hundreds of years deemed constructive levying war into basic obstruction of justice. Gov't Opp., p. 15.  As Nordean argued in his motion, if the crime of conspiring to forcibly prevent the execution of federal law reached attempts to prevent the law's application in a particular instance, seditious conspiracy would be nothing more than conspiracy to commit at least 15 of the crimes in 18 U.S.C. § 1512, the assault crime in § 111(a), and the civil disorder offense in § 231(a)(3), among many other offenses.  The government responds that these offenses do not involve "some positive assertion of authority by the government," as in a § 2384 offense.  Gov't Opp., p. 15.  That is wrong.  All of them involve an assertion of government authority, in the abstract sense of "government as a whole" used by the government itself here. The government "assertion of authority" in the § 1512 crimes is the mandatory "official proceeding." The "assertion of authority" in §§ 111(a) and 231(a)(3) are law enforcement officers executing their duties under law.[4]  The government does not contend that it charges a conspiracy to prevent the execution of a law "altogether." *Ex parte Bollman*, 8 U.S. at 480. Accordingly, Count One must be dismissed.

2.     **The TSI fails to allege the U.S. officers who "executed" federal law allegedly targeted by, and whose "authority" was "oppose[d]" by, the alleged conspiracy; Congress does not "execute" federal law.**

(a)    **A  § 2384 charge must identify the persons authorized to "execute" federal law who are targeted by the conspiracy**

---

[4] Ultimately, the government falls back on a by-now familiar argument that "overlap is not uncommon in criminal statutes." Gov't Opp., p. 15.  This crutch grows increasingly ludicrous as the government supplements vague Non-Crime A and vague Non-Crime B with vague Non-Crime C—all covering the same conduct for which hundreds of protesters have been convicted of a Class B parading misdemeanor.

The government contends that when it charges a conspiracy to forcibly prevent the execution of the laws of the United States, it need not allege that the conspiracy was directed at any specific thing, person or entity in physical reality; it need only allege that the defendant conspired against "government as a whole," a verbal abstraction. Its defense of this position is nearly impenetrable. Gov't Opp., pp. 16-17. The government argues that unlike §§ 111(a) and 231(a)(3), which involve interference with law enforcement officers, "Section 2384 encompasses attacks on the authority of the government *qua* government." Gov't Opp., p. 17. Yet it is not clear what "government *qua* government" means insofar as the phrase purports to identify something other than things, persons, and entities in physical reality, as it must. A concept cannot be "attacked" in a nonmetaphorical sense. Nor does requiring the government to allege things, persons, or entities somehow collapse the distinction between crimes against specific federal officers and seditious conspiracy. A group of seditious conspirators might well agree to prevent the execution of federal law by, say, targeting a federal agency itself or material that is necessary to the law's execution, such as the factories in the seditious conspiracy cases against the Industrial Workers of the World. That would not be the same crime as "target[ing] certain officers" under § 372 but it might constitute a § 2384 offense, provided other elements of that crime are satisfied. *Id.*[5]

---

[5] The government states that "contrary to [Nordean's] contention," a conspiracy to "blow up a federal courthouse" would constitute a § 2384 violation. Gov't Opp., p. 17. No less than with the statutes it interprets, the government grossly mischaracterizes Nordean's argument. If a group of conspirators agreed to forcibly prevent DOJ's execution of Criminal Law A *generally* by targeting a federal courthouse, that would constitute a § 2384 offense. That would be analogous to Fries's conspiracy to prevent the execution of a tax law *generally* by attacking a tax agent's residence. *Case of Fries*, 9 F. Cas. 826. But the only reason the issue may be intelligibly considered in the first place is the government has identified in its hypothetical some thing, person or entity targeted by the conspiracy—*DOJ's* execution of Criminal Law A.

Contrary to the government's suggestion, *Baldwin v. Franks*, 120 U.S. 678 (1887) offers no support for an argument that it need not prove any connection between the charged conspiracy and a thing, person or entity.  *Baldwin* stated that a seditious conspiracy's force must be directed against "the government as a government" in order to distinguish that crime from uses of force against private citizens.  120 U.S. at 693.  The Court was not addressing the separate question whether force can be directed at the "government as a whole" and yet somehow not at any of its constituent possessions or officials—whatever that may mean. *Baldwin* aside, two courts of appeals have explicitly held that the government must allege and prove a conspiracy directed at those persons or entities executing federal law.  *Anderson v. United States*, 273 F. 20, 26 (8th Cir. 1921) (a seditious conspiracy count must "charge that the purpose of the conspiracy was the exertion of force against those charged with the duty of executing the laws of the United States"); *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) ( § 2384's "prima facie meaning condemns force only when a conspiracy exists to use it against some person who has authority to execute and who is immediately engaged in executing a law of the United States").  Much like the court in *United States v. Rhodes*, 2022 U.S. Dist. LEXIS 114264, at \*19 (D.D.C. June 28, 2022), the government does not explain why the Court should not follow *Anderson* and *Haywood*.  There is no principled reason.  As Nordean argued in his motion, tying the § 2384 conspiracy to a thing, person or entity involved in executing federal law is required under the nexus rule of *United States v. Aguilar*, 515 U.S. 593 (1995).  Absent such a link, the allegation that a defendant conspired to use force against "government as a whole" would be unconstitutionally vague.  *Id.*  The government nowhere contests that point and the argument is forfeited.  *E.g.*, *W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 Fed. Appx. 214, 226-27 (4th Cir. 2019).

**(b)      Congress does not "execute" federal law**

Even more mistaken is the government's argument that on January 6 Congress was "executing" federal law.  Gov't Opp., pp. 18-24.  It resists Nordean's point that the ECA is a House rule in statutory form, claiming instead that its provisions legally bind members of Congress during the electoral vote count.  As the *Rhodes* court put it, the ECA "*commands* that the Joint Session 'not be dissolved until the count of the electoral votes shall be completed and result declared,'" 2022 U.S. Dist. LEXIS 114264, at *23 (quoting 3 U.S.C. § 16), and "*mandate[s]*" that Congress perform other intricate procedures detailed in that law.  *Id.*(emphasis added).

Yet if the ECA is a law that places positive and negative duties on Congress, a person using ordinary language does not say of a given legislator who follows the statute's requirements that he *executes* them.  One says that he *complies* with or *obeys* those legal requirements.  For the reason the ECA is described as a law and not a House rule in the first place is that it purportedly legally binds members of Congress to do and refrain from doing certain substantive acts which are the policy prescriptions of the law.  "To act according to an order, set of rules, or request" is to "*comply*" with them.  *Comply*, Cambridge Online Dictionary, available at: https://dictionary.cambridge.org/us/dictionary/english/comply.  "Compliance" is "[t]he state of being in conformity with some command, demand, requirement, etc." *Compliance*, Black's Law Dictionary (11th ed. 2014).  The Court will notice that although every conventional definition of "comply" will include a reference to acting according to an order, a law or a rule, most of the definitions of the transitive verb "execute" cited by the government take for direct objects not orders, laws or rules but instead "plans," "designs," "tasks," "performances," or "achievements."

Gov't Opp., p. 18 (Webster's definitions of "execute"). Yet it is "*law*" that the relevant clause of § 2384 takes for its direct object.

This obvious perspectival distinction has nothing to do with the relevant terms' "meaning in the mid-nineteenth century" versus their meaning today. Gov't Opp., p. 18. In the eighteenth century Madison could have been writing for the twenty-first when he wrote, "Had the States *complied* punctually with the articles of Confederation, or could their *compliance* have been *enforced* by as peaceable means as may be used with success towards single persons. . ." *The Federalist No. 45* (James Madison) (emphasis added). Likewise Hamilton could also write of the entities required to follow the Articles of Confederation, "It is not probable, considering the genius of this country, that the *complying* States would often be inclined to support the authority of the Union by engaging in a war against the non-*complying* States." *The Federalist No. 16* (Alexander Hamilton) (emphasis added). Hamilton similarly could write, "There was a time when we were told that breaches, by the States, of the regulations of the federal authority were not to be expected; that a sense of common interest would preside over the conduct of the respective members, and would beget a full *compliance* with all the constitutional requisitions of the Union." *The Federalist No. 15* (Alexander Hamilton) (emphasis added). Nowhere do the framers use the word "execute" to refer to a person's or entity's act of following laws enacted by the legislature. Nor does the Constitution. Instead, when it uses the term "execute" it refers to the President's role of "tak[ing] Care that the Laws be faithfully executed. . ." U.S. Const. Art. II, § 3. There, "execution" refers to the process of ensuring that laws are enforced—not the act of adhering to the substantive duties imposed by Congress's laws.

By framing the issue as whether § 2384 "*incorporates* those separation-of-powers principles," the government assumes what it tries to prove. Gov't Opp., p. 20. The relevant

interpretive question is whether the ordinary tools of statutory construction would give an impartial interpreter considering the statutory phrase "execution of the laws of the United States" any reason to infer that Congress intended to include *legislative* activity within the scope of § 2384.  The government provides no textual basis whatsoever for drawing that nonstandard inference.  It does not provide a single example of a "mid-nineteenth century" speaker referring to a legislator "executing" laws, whereas empirical examples of speakers referring to legislators (and all other persons) "complying" with substantive rules or commands are legion—in all times.  In fact, the government does not provide an empirical example from *any* period, nor does it cite a single case in which a court has referred to Congress "executing" law.[6]

The government says that *Nordean* "provides no basis in the statute's text, structure, or history to support" the "assumption" the "execution of the laws of the United States" refers to the Executive Branch's execution of the laws.  Gov't Opp., p. 21.  As it knows, that is painfully ridiculous.  The Court must presume the Congress which enacted § 2384 was familiar with—not invincibly ignorant of—the Constitution's use of the term "execute," familiar with the Executive Branch of the United States, familiar with the separation of powers, and familiar with the ordinary usage of the words "comply" and "obey" when referring to the discharge of substantive duties imposed by law, in the sense meant by the framers—and all people speaking ordinary language.  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1249 (D.C. Cir. 2004).

---

[6] The government suggests that *United States v. Lebron*, 222 F.2d 531 (2d Cir. 1955) is a case where a court determined that Congress "executed" law, as § 2384 was "used to prosecute Puerto Rican nationalists for a shooting that took place at the U.S. Capitol in 1954." Gov't Opp., p. 22.  A glance shows the government significantly overstates the case.  The charged conspiracy encompassed multiple plans to kill Execute Branch officials including the President, commonwealth governor, and military forces.  222 F.2d at 533.  Thus, the Second Circuit did not hold, and did not need to hold, that Congress "executes" law under § 2384.

The government's reading forces it into bizarre positions.  Nordean, it says,

> insists that only executive officials can execute the laws, but the Executive Branch obviously could not supplant the House of Representatives in implementing the Twelfth Amendment and the Electoral Count Act.  As a result, Nordean's argument reduces to the implausible assertion that the relevant provisions of the Twelfth Amendment and the Electoral Count Act are not "executed" at all.

Gov't Opp., p. 21.

Notice the pile of question begging.  The Executive Branch need not "supplant" the House of Representatives in "implementing" the Twelfth Amendment and the Electoral Count Act because those laws place positive and negative duties on Congress—not the Executive Branch.  The hypothesized conflict between the Executive Branch and Congress only appears when an interpreter is forced to use the transitive verb "execute" with the direct object "law," rather than the verbs "obey" or "comply." But whether that is standard usage in the context where the law at issue places substantive duties on the sentence subject is the question the interpreter is attempting to answer.  Where Congress "complies" with those laws, no "implausible" scenario emerges.  Consider the implications of the government's proposed new understanding of the term "execute," which would describe a person's adherence to an act of Congress.  Title 18 places a legal duty on citizens not to rob banks.  Thus, according to the government, when a man adheres to that duty, he "executes" federal law.  After all, says the government, the man "quite literally. . . carr[ies] out the law." Gov't Opp., p. 19.  Absurdly, the government asks the Court to *assume* that Congress intended this meaning when it interprets § 2384.

Implicitly conceding that the question whether Congress "executes" laws is decided by constitutional precedent, not Webster's lexicologists, the government notes that separation-of-powers principles "allow—indeed, mandate—a 'partial admixture' of legislative, executive, and

judicial powers for certain '*special purposes* . . .'" Gov't Opp., p. 20 (quoting *The Federalist No. 66* (Alexander Hamilton)) (emphasis added).  As the question then becomes whether the electoral vote count is one of those "*special purposes*," the government represents that Federalist Number 66 conveniently specifies "the administration of the presidential election" among those purposes.  *Id.*, p. 21.  That is false.  Hamilton did not identify presidential elections as an executive-legislative amalgam.  *The Federalist No. 66* (Alexander Hamilton).  That would make little sense.  Unlike Congress, elected Executive Branch officials have a naked conflict of interest in participating in the presidential electoral vote count every time the President is on the ballot.

. The government started with a conclusion—that seditious conspiracy is the charge it wanted to bring in this case—and only then attempted to square it with the language of § 2384.  That it does not work is all too clear.

**B.     Section 2384's fourth conspiracy crime contemplates the use of force against persons, not property, and the TSI alleges insufficient facts showing Nordean's agreement to use such force**

Nordean's motion argued that a conspiratorial agreement forcibly to oppose government "authority" or to prevent the "execution" of federal law must contemplate using force against persons embodying the "authority" or executing the law.  Even if § 2384 reaches conspiracies to use force against property, Nordean argued, the execution of the law must depend on that property.  Mot., pp. 26-29.  The government does not substantively respond to these arguments and the issue is therefore forfeited.  *W. Va. Coal Workers' Pneumoconiosis Fund*, 781 Fed. Appx. at 226-27.[7]  The TSI does not allege a single fact showing Nordean's agreement to use

---

[7] The government says it proves that the preventing-execution-of-law crime reaches conspiracies to destroy property with an example of a bombed courthouse.  Gov't Opp., p. 25 n. 8.  It does not.  For the object of its hypothetical conspiracy is to "prevent judges," i.e., persons, from fulfilling their duties.  *Id.*, p. 17. It says that a conspiracy to destroy "servers housing legislative materials" would constitute a preventing-execution-of-law crime.  *Id.*  Not so.  When lawmakers

force against law enforcement officers or member of Congress. While it falsely alleges that Nordean tore down a metal fence, the government offers no argument that execution of the Twelfth Amendment and ECA were causally related to the fence. Thus, the TSI does not charge Count One with sufficient specificity. *United States v. Hillie*, 227 F. Supp. 3d 57, 71-72 (D.D.C. 2017) (Jackson, K.B., J.).

## II.    Count Four, the § 372 offense, must be dismissed

### A.    Members of Congress, U.S. Capitol Police officers, and MPD officers are not "officers of the United States"

The Court will notice that although the government asserts § 372 was enacted as part of the Enforcement Act of 1871 to enforce the Fourteenth Amendment, Gov't Opp., p. 32, it is curiously silent about quite a significant fact: that the amendment itself repeatedly and unequivocally distinguishes between members of Congress, on the one hand, and officers of the United States and holders of offices under the United States, on the other hand. U.S. Const., amend XIV, § 3. And the Court will flip in vain through the government's brief for a response to this particular constitutional provision:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time; and *no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.*

U.S. Const. Art. I, § 6, cl. 2 (emphasis added).

The Court will notice the government has no response to *Kush v. Rutledge*, 460 U.S. 719, 724 (1983), where the Supreme Court expressly rejected the government's interpretation, holding that the persons who hold any "office, trust, or place of confidence under the United

---

"enact[] certain laws," *id.*, they do not "execute" them. That's why the government uses the word "enact."

States" or who are "officer[s] of the United States," are "*federal officers*."  It will notice that before January 6, no court had ever countenanced a lawsuit under 42 U.S.C. § 1985(1)—the civil claim for victims of a § 372 offense—by any party other than an Executive Branch official.  It will notice all of the government's § 372 cases concern Executive Branch officials.  Gov't Opp., p. 33.  Like the government, the decision in *Rhodes* passes over reality in silence.  2022 U.S. Dist. LEXIS 114264, at *46.  Once again, the interpretive issue is not whether the Court should "import constitutional meanings into federal statutes" (*id.* at *8, *14-15), whatever that may mean, nor whether the text's plain meaning "strain[s] [the] credulity" of a judge's policy notions. *Thompson v. Trump*, 2022 U.S. Dist. LEXIS 30049, at *82 (D.D.C. Feb. 18, 2022).  The question is why, if Congress intended § 372 "to enforce the provisions of the Fourteenth Amendment," *Rhodes*, 2022 U.S. Dist. LEXIS 114264, at *9, a court impartially interpreting that statute's terms would not only not find them informed by the Fourteenth Amendment's identical terms *but neglect even to acknowledge the Constitution's text. Cf. D.C. v. Carter*, 409 U.S. 418, 423 (1973) (correct to interpret § 1983's terms in light of related terms of the Fourteenth Amendment); *Monroe v. Pape*, 365 U.S. 167, 204-05 (1961) (same); *Miles*, 498 U.S. at 32; *Avocados Plus Inc.*, 370 F.3d at 1249.  The question is how a member of Congress can both hold an "office . . . under the United States," § 372, and be *constitutionally barred from holding the very same office*.  U.S. Const. Art. I, § 6, cl. 2.  The Court should not accept the government's invitation to openly defy the statute's plain meaning, and constitutional law, in service of a desired outcome.[8]

> **B.      Even if members of Congress and U.S. Capitol Police officers were "officers of the United States" Count Four does not plead a § 372 offense with sufficient specificity**

---

[8] Apart from its erroneous and unconstitutional contention that members of Congress are "officers of the United States," the government presents no unique argument in support of its claim that U.S. Capitol Police officers satisfy that definition.  Gov't Opp., p. 37.  Nor could it, as the government concedes that entity belongs to the legislative branch.  *Id.*

Count Four alleges no facts showing in what sense, or how, Nordean agreed to "prevent, by force, intimidation, or threat" members of Congress and U.S. Capitol Police officers from "discharging" their duties or agreed to "induce" the same persons to "leave the place" where their duties were "required to be performed."  § 372.  The government says Count Four "incorporates" the "factual recitation in Count One." Gov't Opp., p. 38 n. 11 (citing TSI ¶¶ 29-108).  But none of those paragraphs contains even one factual allegation showing Nordean's agreement to prevent members of Congress and Capitol police from discharging their duties or to induct them to leave the places where their duties were "required to be performed," by force or otherwise.  The allegations that Nordean entered the Capitol Building and shook a fence do not satisfy those elements.  *Hillie*, 227 F. Supp. 3d at 71-72.

### III.    Counts 7, 8 and 9, offenses under §§ 1361 and 111(a)(1), must be dismissed

The government claims it can charge a person with assault and destruction of property in federal court, allege no factual support, and justify it with a citation to *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946).  Gov't Opp., p. 38.  That is not the law.  Fed. R. Crim. P. 7(c)(1) "[T]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . .").  The TSI alleges no facts showing a criminal agreement between Nordean and the individuals who broke a Capitol window (Pezzola) and who allegedly assaulted an officer by throwing a water bottle (Donohoe).  It alleges no facts showing Nordean aided and abetted those crimes by taking an affirmative act in furtherance of that specific offense with the intent of facilitating the offense's commission. *Rosemond v. United States*, 572 U.S. 65, 71 (2014).  Accordingly, Counts Seven, Eight and Nine must be dismissed. *Hillie*, 227 F. Supp. 3d at 71-72.

Dated: September 12, 2022                                     Respectfully submitted.

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

## Certificate of Service

I hereby certify that on the 12th day of September, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

        Jim Nelson
        Assistant United States Attorney
        555 4th Street, N.W., Room 4408
        Washington, D.C. 20530
        (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

        /s/ David B. Smith
        David B. Smith, VA Bar No. 25930
        David B. Smith, PLLC
        108 North Alfred Street, 1st FL
        Alexandria, Virginia 22314
        (703) 548-8911 / Fax (703) 548-8935
        dbs@davidbsmithpllc.com