**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT STATEMENTS AND NORDEAN'S MOTION TO DIRECT THE GOVERNMENT TO IDENTIFY CO-CONSPIRATOR STATEMENTS IT INTENDS TO MOVE INTO EVIDENCE**

Defendant Nordean, through his counsel, files this opposition to the government's Motion *in Limine* to Admit Statements.  ECF No. 475.  The motion has two parts.  First, it identifies categories of out-of-court statements by the Defendants and others that the government intends to move into evidence at trial.  Second, the government argues that these unidentified statements may be admitted against non-declarant Defendants not only through the co-conspirator statement rule but also through hearsay exceptions or by characterizing the statements as non-hearsay for other reasons.  But the government has not satisfied the co-conspirator statement rule and its premise that other hearsay rules permit the statements to be admitted against non-declarants is erroneous.

The Court should hew to the "better practice" of holding a pretrial hearing to determine whether, and to what extent, the government has satisfied the co-conspirator statement rule here. *United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980).  But, at the least, the Court should direct the government to identify the co-conspirator statements it intends to move into

1

evidence at trial before determining that a pretrial hearing is not necessary.  *United States v. Bazezew*, 783 F. Supp. 2d 160, 166 (D.D.C. 2011).  Nordean moves the Court accordingly.

**The government's description of the conspiracy and proposed co-conspirator statements**

Since this is a conspiracy case, the government's motion concerning the admission at trial of out-of-court statements is one of the most significant motions it will file in this matter, if not the most significant.  Co-conspirator statements lie at the heart of any conspiracy case.  If defendants have conspired to commit a charged offense, their agreement will almost certainly be found in their own conversations with one another; common sense says it could not be otherwise. One can reasonably expect therefore that in seeking to move into evidence out-of-court statements under the co-conspirator statement rule, the government would present the Court with the strongest factual case for a conspiracy.

That is what makes the government's background section so striking.  Trial is less than two months away.  The government summarizes its strongest proof of Defendants' conspiracy to enter the Capitol and to commit crimes therein—as opposed to a noncriminal plan to protest outside the building—over the course of four and a half pages.  Gov't Mot., pp. 3-7.  Here is the evidence of the seditious conspiracy plan:

- Defendants' general "fury against traitors," *Id.*, p. 3;

- generalized "rage against law enforcement officers," *id.*;

- desire to "get radical and get some real men," *id.*, p. 4;

- plans to travel to D.C. on January 6 (where tens of thousands gathered to attend a political rally), to wear "tactical" gear (as the Defendants had done on numerous prior occasions) and to follow an "ironclad chain of command," *id.*;

- while certain Defendants urged others to act like "gentlemen," that was a mere "fig leaf,"

2

*id.*, p. 5;

- when non-defendants discussed "storming" state capitals, is "drew [no] rebuke from the MOSD Leaders," *id.*;

- one Telegram user urged others to follow the "*same plan*" (the government nowhere cites evidence showing that this "plan" is not merely marching towards the Capitol to protest outside it), *id.* (emphasis original);

- on the day of January 6, Nordean "proclaimed that 'real men are here' who 'represent the spirit of 1776,'" *id.*, p. 6;

- people marching with the Defendants shouted mean things like "fucking scum," *id.*;

- near the Capitol, Defendant Biggs "proclaimed" his erection, *id.*, p. 6;

- "co-conspirators" who were "not physically present" sent "words of encouragement like 'push inside!'" on Telegram, *id.*, p. 7;

- After January 6, Defendants expressed pride in what happened, *id.*, 7.

Notice some important facets of this summary of the government's conspiracy case:

*The government cites no communications discussing a plan to enter the Capitol Building*

First, during nearly two years of investigation the government has scraped the devices—mobile phones, communication apps, computers—of every Defendant and a dozen other Proud Boys defendants. It has reviewed hundreds or thousands of pages of their communications and certainly thousands of their messages between one another. Yet the government not only fails to cite a single communication from a Defendant discussing a plan to enter the Capitol Building and to commit crimes therein; it fails to cite such a communication from any person whatsoever.

To be fair, that cannot be considered surprising. Nor was it surprising when the government's case, as it stood nearly two years ago, lacked such evidence. Such an allegation

3

assumes knowledge on the part of the Defendants that was beyond the ken of the highest reaches

of the federal government: knowledge that the Capitol would not be adequately policed and

guarded during the joint session.  It is worth emphasizing: the government's conspiracy claim

implies—ludicrously—that the Proud Boys had deeper insight into what Capitol security would

look like on January 6 than Congress, the FBI, and other agencies tasked with enforcing security.

Only, the government does not point to any communications showing that the Defendants

possessed such secret knowledge that protesters would push at an open door on January 6.

*All the conspiracy allegations can be found replicated in any other January 6 prosecution*

The second point will leap off the page to any regular observer of January 6 prosecutions.

Virtually every allegation adduced in the government's summary of its conspiracy case can be

found in any other January 6 prosecution, from a Class B misdemeanor case to any one of its

hundreds of obstruction-of-justice cases.  Thousands of protesters, grandmothers included, were

"motivated by [a] refusal to accept the results of the 2020 Presidential Election." Gov't Mot., p.

3.  Hundreds of defendants, many of them misdemeanants, used violent-sounding language—

before, during and after January 6, even when they did not engage in or plan violence.  ECF No.

207-1 (highlighting misdemeanants who threatened to harm the Speaker of the House).

Hundreds called members of Congress "traitors," proclaimed they "stormed the Capitol,"

celebrated the event as 1776 redux, said disparaging things about police officers, reacted to the

shameful event with pride or glee.  *Id.*  Indeed, unlike the Defendants here, many defendant-

protesters did all those things even as they came to the Capitol armed with weapons or wielded

those weapons on the scene.

On close inspection, it is apparent that even the government's "planning" and "tactical

gear" claims do nothing to distinguish this case from hundreds of others which, judging from the

4

government's indictments, do not entail criminal conspiracies, much less seditious conspiracy.

Take the "planning" allegation. The Court's first impression of the Telegram conspiracy

evidence here is brutally honest about what is going on in this case:

> [L]ook, I also understand the argument that, Judge, look at the context and, from what happened, you can infer that this was a plan to do violence. Okay. Maybe that gets you somewhere, but I think there were probably a lot of people showing up that day with a lot of . . . different plans. Some went one way; some went the other way. In terms of connecting the planning to violence . . . these messages . . . don't move the needle that much.

Hr'g Trans., 4/6/21, p. 23:1-10.

The flaw in the government's case, identified by the Court 18 months ago, is no less

glaring today. If the Defendants' "plan" was to march to and protest outside the Capitol, the

government has not only not proven any kind of criminal conspiracy; it has alleged a plan to

engage in activities protected under the First Amendment. That is true even if the Defendants'

later conduct in real time, such as entering the Capitol Building without permission, was not so

protected.

As the Court observed, the problem with the government's "conspiracy" evidence is that

it is not *more* consistent with an agreement to enter the Capitol and commit crimes therein than

with an agreement to attend the former president's rally and/or to march to the Capitol and

protest outside it. In the end, the government's conspiracy case rests not on any direct evidence

but this inferential argument: because the Defendants did enter the Capitol on January 6, all their

prior references to "plans," all their preparations for a trip to D.C., and all their political

commentary must have reflected an agreement to enter the Capitol and commit crimes there—

and beyond a reasonable doubt no less. This, however, is only the *post hoc ergo propter hoc*

fallacy. And it is not hard to see that the argument proves far too much. If the fact that a

defendant entered the Capitol Building on January 6 retrospectively establishes that all his prior

plans with others to attend the rally, to "Stop the Steal," and to protest at the Capitol amounted to conspiracy, thousands of co-conspirators are missing from this case.  But mobs have never been conspiracies at law, even if the government could theoretically trace the historical communications of every member of a mob and label as "conspiracy" all their comments referring to a future event which would only later transform into a mob; they are mobs.  They are not just different words; they are different concepts.

As to "tactical gear," "communications equipment," and "chain of command," it is no less true today than it was nearly two years ago that the Proud Boys Defendants regularly used such equipment and adhered to "chains of command" at numerous rallies and events before January 6.  *E.g.*, *Portland rally: Proud Boys vow to march each month after biggest protest of Trump era*, The Guardian, Aug. 19, 2019, available at: https://www.theguardian.com/us-news/2019/aug/17/portland-oregon-far-right-rally-proud-boys-antifa (displaying group wearing "tactical gear"); *Pro-gun caravan hits Richmond streets without incident; extremist groups protest peacefully*, Wash. Post, Jan. 18, available at: https://www.washingtonpost.com/local/virginia-politics/virginia-gun-rally/2021/01/18/115f1f38-5771-11eb-a931-5b162d0d033d_story.html (displaying Proud Boys members wearing "tactical gear" at peaceful rally in 2021); *At tense Virginia rally, gun rights activists vow their fight is just getting started*, NBC News, Jan. 20, 2020, available at: https://www.nbcnews.com/news/us-news/tense-virginia-rally-gun-rights-supporters-chant-we-will-not-n1118811 (same regarding a 2020 rally); *Far-right extremist Proud Boys outnumbered by counter-protesters at Washington, D.C. Rally*, USA Today, July 6, 2019, available at: https://www.usatoday.com/story/news/nation/2019/07/06/white-nationalist-linked-proud-boys-outnumbered-counter-protesters/1661585001/ (same regarding a 2019 rally in D.C.).  If the

Defendants did not engage in "conspiracies" at these events—and the government does not contend they did—it cannot follow from the existence of "tactical gear" and "chain of command" on January 6 that a criminal conspiracy was involved.

*The government itself cannot decide when the "plan" was hatched—or what it was*

The third point to notice about the government's summary of its conspiracy claim is how the alleged "conspiratorial agreement" itself is a constantly moving target.  On the one hand, the government suggests that the three charged conspiracies were agreed upon well in advance of January 6.  It cites the Defendants' pre-January 6 plans to use "tactical and communications gear," their recruitment of "real men," and alleged anger towards the police as evidence of conspiratorial agreements that predate the group's trip to D.C.  Gov't Mot., pp. 3-5.  Yet, several pages later, the government contends that, as of January 3, the group's "plan" consisted of this: "[T]he main operating theater should be *out in front of* the House of Representatives—should be *out in front of* the Capitol building." *Id.*, p. 16 (quoting "Person 3") (emphasis added).[1]  But notice that, three days before January 6, Person 3 was opining as to where the operating theater "*should*" be.  Had the "conspiracy" to enter the Capitol and commit crimes there been formed prior to January 3, it would be nonsensical for Person 3—whom the government calls a "MOSD Leader"—to claim the group "should" be out in front of the Capitol.

Notice what the government alleges next: in response to Person 3's suggestion, "Tarrio immediately *made the leap* from 'out in front of the House of Representatives' to 'storm[ing] the Capitol.'" Gov't Mot., p. 16 (emphasis added).  If Tarrio "made the leap" to "storming the

---

[1] As discussed, the government does not prove a criminal conspiracy, of any kind, by establishing a plan to protest outside the Capitol Building, a public forum.  *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) (three-judge panel) *sum. aff'd,* 409 U.S. 972 (1972); *Lederman v. United States*, 291 F.3d 36, 39 (D.C. Cir. 2002) (East Front steps of Capitol a public forum).

Capitol" that concept was, by definition, not the "plan" before the "leap" on January 3.  Notice, too, that even Tarrio did not suggest the "plan" going forward would be to storm the Capitol but that he was speculating as to what *Person 3* "want[ed.]" *Id.*  Of course, that is not the same thing as an agreement.

The government's conspiracy theory grows more chronologically confused from there. The government quotes Nordean telling MOSD members, on January 4, "As far as what we do tomorrow, *that's what we're trying to figure out*. . ." Gov't Mot., p. 16 (emphasis added). Contrary to the government's strangely blinkered suggestion, this statement does not establish a preplanned conspiracy but the very opposite.  And according to the government itself, as late as January 5, "MOSD leadership" itself did not know "*whether a 'plan' was in place.*" Gov't Mot., p. 17 (emphasis added).  Yet if they were unsure of the "plan" on January 5, how could a fact-finder determine, under any standard of proof, that all the Defendants' actions preceding that date—such as bringing "tactical and communications" gear to D.C. and a "chain of command"—are evidence of "the plan"? It cannot.

**Argument**

**I.      Standards for admission into evidence of out-of-court statements**

Hearsay is not admissible evidence unless otherwise provided in a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court.  Fed. R. Evid. 802. Hearsay is an out-of-court statement offered by a party to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).

An out-of-court statement is "not hearsay" if "offered against an opposing party and:

(A) was made by the party in an individual or representative capacity;

(B) is one the party manifested that it adopted or believed to be true;

(C) was made by a person whom the party authorized to make a statement on the subject;

(D) was made by the party's agent or employee on a matter within the scope of that

relationship and while it existed; or

(E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).

With respect to the co-conspirator statement provision, the out-of-court statement "must

be considered but does not by itself establish . . . the existence of the conspiracy or participation

in it . . ." Fed. R. Evid. 801(d)(2).  The government carries the burden of proving by a

preponderance of the evidence (1) the existence of the charged conspiracy; (2) that the Defendant

and declarant were members of that conspiracy; (3) the out-of-court statement at issue was made

by a co-conspirator declarant during the course of the conspiracy; and (4) the statement was

made "in furtherance" of the conspiracy.  *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir.

2006).  "The principal question in the 'in furtherance' issue is whether the statement promoted,

or was intended to promote, the goals of the conspiracy." *United States v. Beech-Nut Nutrition

Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989).  Statements that "cannot conceivably be interpreted

to advance the accomplishment of conspiracy objectives, cannot reasonably be interpreted to

further that conspiracy." *Id.*   And "[i]it does not follow that solely because a statement is made

during the course of a conspiracy that statement was also in furtherance of that conspiracy." *Id.*

Where a court admits out-of-court statements against a non-declarant codefendant that do not

satisfy the co-conspirator statement rule, it is grounds for a mistrial.  *Jackson*, 627 F.2d at 1218.

Where a particular out-of-court statement does not satisfy the co-conspirator statement

provision in a joint trial, "[i]t is well established that a codefendant's out-of-court statement is

admissible against that codefendant as a 'party admission' . . . But that same statement is

inadmissible hearsay and raises Confrontation Clause concerns with respect to another defendant being prosecuted in a joint trial." *United States v. Cruz-Diaz*, 550 F.3d 168, 178-79 (1st Cir. 2008).  In that situation the "trial judge may attempt to avoid any hearsay or Confrontation Clause problems by instructing the jury not to consider the statements against any defendant other than the codefendant-declarant." *Id. See also Richardson v. Marsh*, 481 U.S. 200, 206, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) (same).

With respect to co-conspirator statement admissibility procedure in the D.C. Circuit, the "preferred practice is for the trial court to make these determinations before the hearsay evidence is admitted." *United States v. Slade*, 627 F.2d 293, 307, 200 U.S. App. D.C. 240 (D.C. Cir. 1980).  As the court of appeals put it in another case, "[T]he better practice is for the court to determine before the hearsay evidence is admitted that the evidence independent of the hearsay testimony proves the existence of the conspiracy sufficiently to justify admission of the hearsay declarations." *Jackson*, 627 F.2d at 1218; *see also United States v. Wilkins*, 538 F. Supp. 3d 49, 63 (D.D.C. 2021) (such "pre-trial ruling[s], if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations" prior to trial).

## II.     The government has not satisfied the co-conspirator statement rule with respect to Nordean

The government's motion *in limine* states that it will seek to introduce at trial some unknown number of out-of-court statements against every Defendant under the co-conspirator statement rule.  Gov't Mot., pp. 9-19.  Although the government neither identifies most of those statements nor explains to which of the three charged conspiracies each will apply, it is clear the government has not met the requirements of the rule for a number of reasons.  As inadmissible hearsay, these statements must be excluded from trial.

**A.      A pretrial hearing is necessary; at the least, the government should identify the co-conspirator statements so the Court can intelligently consider whether to hold a hearing or order the government to make a *Santiago* proffer**

Although "the better practice" is for the Court to determine before trial whether out-of-court statements satisfy the co-conspirator statement rule, *Jackson*, 627 F.2d at 1218, the government asserts that the Court should wait until the close of its case before making a determination as to whether the government has "connected up" the out-of-court statements it uses with independent proof of a conspiracy.  Gov't Mot., p. 11.  The government's inconsistent and weak description of its conspiracy case powerfully argues otherwise.

The government's proffer in support of the existence of "a conspiracy" is one paragraph long.  Gov't Mot., pp. 12-13.  As discussed above, its description of the conspiracy is riddled with inconsistencies, chronological flaws, and dubious assumptions.  *Supra* 2-8.  Perhaps most important, even if after the conclusion of the government's case the Court were to determine that the government has "connected up" *some* sort of conspiracy by a preponderance of the evidence, it is highly likely that such a conspiracy's inception would postdate many if not most of the proposed "co-conspirator statements" the government intends to introduce.

For example, as shown above, the government itself quotes Nordean admitting to MOSD members as late as January 4 that,  "As far as what we do tomorrow, *that's what we're trying to figure out*. . ." Gov't Mot., p. 16 (emphasis added).  And according to the government itself, as late as January 5, "MOSD leadership" itself did not know "*whether a 'plan' was in place." Id.*, p. 17 (emphasis added).  Should the Court defer a determination as to whether the government has established a conspiracy until the conclusion of its case and allow the government to introduce hundreds of "co-conspirator statements" made prior to January 5, the entire four-to-six-week trial will have been a waste: a mistrial will be required.  *Jackson*, 627 F.2d at 1218.

Reflecting on precisely these considerations, this Court has "direct[ed] the government promptly to produce to the Court and to the defendants all such co-conspirator statements that it intends to use as evidence at trial." *Bazezew*, 783 F. Supp. 2d at 166.  Such identification enables the Court "to determine whether it is necessary or appropriate" to conduct a pretrial hearing to decide whether co-conspirator statements are admissible at trial.  *Id.*  Thus, the government's identification of the statements at issue enables the Court to comply with Federal Rule of Evidence 801(d)(2)(E).  *Id.*  Even if the Court does not schedule a pretrial hearing on the matter, it can "employ [another] recognized pretrial procedure" to decide the admissibility issue, namely the "*Santiago* proffer," whereby "the government is required to file a written proffer setting forth its basis for the admissibility of any co-conspirator statements that the government intends to introduce at trial." *Id.* n. 8 (citing *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992); *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)).  The Seventh Circuit has described this procedure as "an efficient method of making the preliminary [Rule] 801(d)(2)(E) determination." *Rodriguez*, 975 F.2d at 406.

Here, the Court should hold a pretrial hearing given the aforementioned flaws in the government's conspiracy case.  As indicated above, the Court identified these flaws on the record.  Hr'g Trans., 4/6/21, p. 23:1-10 ("In terms of connecting the planning to violence . . . these [Telegram] messages . . . don't move the needle that much.").  But if the Court does not schedule a pretrial hearing now, ordering the government to identify the co-conspirator statements it intends to move into evidence would plainly assist the Court in making a proper determination in light of the risks of a mistrial.  For one thing, seeing the statements collectively

would allow the Court to determine what share of them precede January 5, when "MOSD leadership" itself did not know "whether a 'plan' was in place," according to the government. Gov't Mot., p. 17.  If more than half the government's case consists of co-conspirator statements made before January 5—on which date the MOSD leadership itself did not have "plan"—the likelihood of a mistrial increases dramatically.

Another critically important reason to direct the government to identify the co-conspirator statements pretrial is the fact that the government has charged three distinct conspiracies in this case, under §§§ 2384, 1512(k) and 372.  The government seems to suggest that the meaning of "the conspiracy" in Fed. R. Evid. 801(d)(2)(E) can be abstracted from the elements of each conspiracy count as they differ from charge to charge, such that for each putative co-conspirator statement the Court must only find by a preponderance of the evidence that some generalized conspiracy existed and that the statement was made by a co-conspirator declarant during and in furtherance of that abstract conspiracy.  Gov't Mot., p. 12.  But that is erroneous.  Multiple conspiracy counts that are charged under distinct criminal statutes, even where they rest on the same criminal agreement, are legally distinct conspiracies—not a single conspiracy to violate different criminal statutes—so long as they satisfy the *Blockburger* Double Jeopardy test.  *Albernaz v. United States*, 450 U.S. 333, 338-339 (1981); *American Tobacco Co*. v. *United States*, 328 U.S. 781, 788 (1946).

Accordingly, for each co-conspirator statement it intends to introduce, the government is required to prove by a preponderance the existence of each of the three charged conspiracies and that the out-of-court statement was made during and intended to further *that specific* conspiracy. *E.g.*, *United States v. Best*, 2022 U.S. Dist. LEXIS 158847, *43 (D. Conn. Sept. 2, 2022) ("To the extent that the Government offers co-conspirator statements that it claims are related to

furthering both conspiracies, such statements are only admissible for both conspiracies if the Government can clearly show that the statements meet the elements of 801(d)(2)(E) for both conspiracies.").

This requirement greatly magnifies the risks of proceeding to trial without requiring the government to identify its co-conspirator statements beforehand.  If after the conclusion of the government's case the Court determines either that the government has not established one of the three charged conspiracies by a preponderance or that a given number of co-conspirator statements introduced at trial were not made in furtherance of *each* conspiracy, a mistrial finding will be required.  *Jackson*, 627 F.2d at 1218.

In its motion, the government contends that "binding Circuit precedent holds that the government need not specify every co-conspirator statement it intends to offer at trial."  Gov't Mot., p. 12 (citing *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988)).  A glance at *Tarantino* reveals that the government has misread that case.  There, the defendant contended that Rule 16 and the Jencks Act required the government to produce in discovery his co-conspirator's statements.  *Tarantino*, 846 F.3d at 1418.  His argument was that because such statements could be admitted against him under the co-conspirator statement rule, they were effectively "his statements" and Rule 16 requires the government to produce in discovery the defendant's own statements.  *Id.*  But in *Tarantino* the co-conspirator at issue did not even testify.  And the court held that Rule 16's reference to a defendant's statements did not contemplate a co-conspirator's statements.  *Id.*  That holding has nothing to do with the issue here.  This Court in *Bazezew* properly directed the government to identify the co-conspirator statements it intended to introduce at trial not because of Rule 16 and the Jencks Act but so the

Court could properly and efficiently apply Federal Rule of Evidence 801(d)(2)(E). *Bazezew*, 783 F. Supp. 2d at 166. That is why *Bazezew*, a published decision, postdates *Tarantino*.

All of these reasons show why the Court should follow "the better practice" of holding a pretrial hearing on co-conspirator statement admissibility, *Jackson*, 627 F.2d at 1218, or should at least direct the government to identify the co-conspirator statements it intends to introduce so the Court can make an informed determination as to whether a hearing is warranted. *Bazezew*, 783 F. Supp. 2d at 166. When the cost of error on the admissibility issue is mistrial, this small pretrial precaution easily satisfies a cost-benefit analysis.

**B.     The government has not satisfied its burden of proving the existence of three conspiracies or that Nordean was a member of them**

In light of all the flaws in the government's conspiracy case highlighted above, the government's motion to admit out-of-court statements certainly cannot be granted before trial. It has given the Court no factual basis to do so, much less a preponderance of the evidence, and has not even identified the statements it asks the Court to preemptively admit.

On the other hand, however, the Court would not be without grounds if it now precludes the government from introducing the co-conspirator statements. Nordean moves for that relief. The government itself says its conspiracy case is fairly "summarized" in its motion *in limine*. Gov't Mot., p. 13. If so, Nordean has shown that the government has not established any criminal conspiracy by a preponderance of the evidence, much less the specific elements of each of the three charged conspiracies. *Supra* 2-8. In addition, even if the Court concludes that it is premature to find that the government cannot prove the conspiracies by a preponderance, it would be appropriate to preclude the government from introducing its co-conspirator statements against Nordean. The government does not cite a single piece of independent evidence demonstrating Nordean's intent to join an agreement to violate the elements of §§§ 2384,

1512(k) and 372, so it would necessarily not "connect up" such evidence at trial.  Gov't Mot., pp. 3-7.

### C.     The government's sample of co-conspirator statements underlines the risk of waiting until the conclusion of the government's case to rule on admissibility

The government provides a few examples of co-conspirator statements it intends to introduce.  Gov't Mot., pp. 15-19.  These underscore the risk of a mistrial should the Court defer ruling on admissibility until the end of the government's case.

The government's first two sample out-of-court statements concern Tarrio's vague statements about MOSD "top down structure" and Person 3's vague statement about an undefined "plan." Gov't Mot., p. 15.  Both statements were made in December 2020.  As they predate the aforementioned Defendant statements from January 4 and 5 that imply no preexisting conspiracy, it would be error to admit these December statements without first holding a pretrial hearing to assess the government's evidence as to how these chronological inconsistencies are supposedly reconciled.

The government's next two sample statements are Person 3's aforementioned one made on January 3 about the "main operating theater" outside the Capitol Building and Nordean's January 4 statement that, "As far as what we do tomorrow, that's what we're trying to figure out." Gov't Mot., p. 16.  Again, both statements precede Defendant statements on January 5 indicating that "MOSD leadership" did not know "whether a 'plan' was in place and how Tarrio might be connected." *Id.*, p. 17.  Similarly, then, it would be error to admit these January 3 and 4 statements without first holding a pretrial hearing to assess the government's evidence as to how these chronological inconsistencies are supposedly reconciled.

Finally, the government even contends that it will attempt to introduce out-of-court statements by nondefendants who are merely "followers" of the Defendants.  Gov't Mot., p. 18.

It does not explain who these individuals are, in what sense they "participated in the defendants' efforts to achieve their criminal objective," or what it means by "join[ing] forces with the Proud Boys. . ." *Id.*  Having utterly failed to demonstrate a conspiracy involving the Defendants themselves, the government pushes the Court to bend the co-conspirator statement rule to the point where it may introduce the out-of-court statements of random protesters it does not identify, no doubt picked for their prejudicial impact on the jury.  It cites no precedent in support of such a decision.  There is none.

### III.  The government's motion to admit unidentified out-of-court statements under alternative non-hearsay principles should be denied

In the next portion of the government's motion, it says, "Many of the statements that the government will seek to admit will serve to demonstrate the intent, motive, or state of mind of the declarant." Gov't Mot., p. 19.  Such statements, it says, are not offered for the truth of the matter asserted, and therefore [are] non-hearsay . . ." *Id.*, p. 20.  The first problem with what follows is that the government's descriptions of the statements at issue are so vague as to defy fulsome analysis in this pretrial motion stage and in connection with a motion *in limine*.

The government says the Court should preemptively admit into evidence all the Defendants' "questions and commands." Gov't Mot., p. 20.  But it does not show the relevant statements.  *Id.*  It cites a case holding that questions and commands "generally are not intended as assertions, and therefore cannot constitute hearsay." *Id.* (quoting *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006)).  However, the issue is that the defense and Court cannot simply presume that the undisclosed statements the government has in mind *are* merely "questions and

commands" and not assertions.  Accordingly, this portion of the government's motion must be denied.[2]

Next, the Court cannot preemptively admit as a category all out-of-court statements concerning "Defendants' motive to reverse the election." Gov't Mot., p. 21.  First, although the government initially describes all intent, motive and state-of-mind out-of-court statements as "non-hearsay," Gov't Mot., p. 20, it concedes such statements *are* hearsay several pages later, in a section concerning "*hearsay* exceptions." *Id.*, p. 31 (emphasis added).[3]  Second, as Nordean explained in his motion *in limine* to exclude certain government exhibit categories, "motive" is simply a fig leaf covering the government's attempt to inflame the jury's partisan prejudice with the Defendants' political commentary.  ECF No. 489, pp. 19-20.  By definition every single January 6 protester who has been charged was motivated by what they perceived to be a "stolen" presidential election.  If there is an investigation where the matter of motive carries almost no probative value whatsoever, it is this one.  Given that the government's "motive" evidence would be at best cumulative and fail Rule 403 balancing, the Court cannot grant a motion *in limine* sweepingly admitting every out-of-court statement the government labels "motive" evidence.  In addition, because the government does not disclose the out-of-court statements it seeks to introduce as "motive" evidence, the parties cannot properly litigate a motion *in limine* on the issue.

---

[2] Insofar as the government fills out its reply brief with the out-of-court statements themselves, the Court may not consider arguments first raised in a reply brief. *United States v. Hunter*, 786 F.3d 1006, 1012 (D.C. Cir. 2015).  If the Court considers such arguments, Nordean reserves the right to file a supplemental motion *in limine*.

[3] Nordean shows below why the government's intent, motive and state-of-mind out-of-court statements do not satisfy the hearsay exception.

Moreover, with respect to every out-of-court statement by a declarant other than Nordean, the government's motive, intent and state-of-mind arguments must be rejected with respect to admission of the statements against Nordean because he was not the declarant. *E.g.*, *United States v. Accime*, 278 Fed. App'x 897, 900 (11th Cir. May 16, 2008) (out-of-court statements did not reflect the defendant's state of mind, and were thus inadmissible, because the defendant "was not the declarant"). Even where courts admit such statements against a non-declarant, they do so "only when there is independent evidence which connects the declarant's statement with the non-declarant's activities." *United States v. Cain*, 671 F.3d 271, 300 (2d Cir. 2012) (internal quotation marks omitted) (citing *United States v. Delvecchio*, 816 F.2d 859, 863 (2d Cir. 1987)). The government does not identify any independent evidence connecting the declarant-Defendants' pre-January 6 statements to Nordean's activities. Gov't Mot., pp. 20-25.[4] Thus, even if the Court admits such motive, intent and state-of-mind statements as "non-hearsay" against other declarant-Defendants, they may not be admitted against Nordean and a limiting instruction must be given. *Cruz-Diaz*, 550 F.3d at 178-79.

In the next out-of-court statement category the government attempts to change the terms of the debate without the Court noticing. Gov't Mot., p. 22. The government had previously argued that out-of-court statements are not offered for the truth of the matter asserted, and are therefore non-hearsay, when they show the defendant's "intent, motive, or state of mind." *Id.*, p. 20. But the government's third category of out-of-court statements attempts to show that the Defendants "regularly advocated the use of violence . . ." *Id.*, p. 22. Yet these are not statements going to the Defendants' intent to commit the charged crimes but instead evidence that aims to "prove a person's character in order to show that on a particular occasion the person acted in

---

[4] The government may not raise new arguments in its reply brief. *Hunter*, 786 F.3d at 1012.

accordance with the character." Fed. R. Evid. 404(b)(1).  Such evidence may not be admitted. *Id.*

The government cites two examples of Nordean's "regular advoca[cy] [of] the use of violence." Gov't Mot., pp. 22-23.  The government does not provide any context for either alleged out-of-court statement.  Neither appears to concern January 6.  In one apparent out-of-court statement, Nordean states, "So, when police officers or government officials are breaking the law, what are we supposed to do people? Discourse? What are we supposed to—debate? No, you have to use force." *Id.*, p. 23.  In this statement it is not even clear Nordean is referring to, much less advocating, the *illegal* use of force.  He could have been referring to self-defense against the unlawful use of force.  It is impossible to know from the government's contextless quotation.  In any case, Nordean does not state a forward-looking intent to use force in these comments and the statements are thus inadmissible on the government's own terms.

Similarly, out-of-court statements embodying general "hostility toward police" satisfy no hearsay exception.  The government offers no evidence whatsoever that general hostility towards police "motivated" the Defendants' travel to D.C.  To the contrary, the government's own evidence amply demonstrates that the Defendants—like virtual every January 6 protester—were motivated to rally in D.C. because of the perceived "stolen" presidential election.  In any case, the government does not provide more than two examples of this statement category so the Court does not have enough information to make an all-or-nothing admission determination. Even if the Court were inclined to accept the government's "motive" justification in the abstract, it would still need to perform Rule 403 balancing on each statement to decide whether the probative value—minimal at best—would be substantially outweighed by the risk of unfair prejudice, jury confusion and cumulativeness.  In addition, even if the Court admits such police-

hostility statements against other declarant-Defendants, they may not be admitted against Nordean where he is not the declarant, and certainly not unless the government identifies independent evidence connecting the declarant-Defendants' pre-January 6 statements to Nordean's activities. *Delvecchio*, 816 F.2d at 863.

Equally flawed is the government's argument to admit out-of-court statements against Nordean concerning "consciousness of guilt." Gov't Mot., p. 24. The government's own unpublished case demonstrates that. *Id.* (citing *United States v. Ogedengbe*, 188 F. App'x 572, 574 (9th Cir. 2006)). The premise of this section of the government's brief is that even if these out-of-court statements do not satisfy the co-conspirator statement rule, they are admissible against Nordean as alternative types of non-hearsay. *Ogedengbe* belies that argument. There, the Ninth Circuit held that out-of-court statements from the co-defendant and wife of the defendant were nonhearsay statements since they showed her consciousness of guilt. But the defendant also argued that even if the statements were admissible against the co-defendant wife, they should not have been admitted against him and a limiting instruction should have been given to the jury. 188 F. App'x at 574. The only reason the court of appeals rejected this argument was that the wife's statements were admissible against the defendant under the co-conspirator statement rule. *Id.* Thus, if the government has not established that each of its "consciousness of guilt" out-of-court statements was also made during the course of and in furtherance of each charged conspiracy, they are not admissible against non-declarant Nordean and a limiting instruction must be given.

Changing tack, the government attempts to seek admission of apparently dozens of highly prejudicial out-of-court statements not because the Defendants were the declarants but despite the fact that they were not declarants. Gov't Mot., pp. 25-28. These out-of-court

statements should be introduced, the government says, to show the "effect on the listener." *Id.*, p.

25.  Again, absent the out-of-court statements at issue, the Court cannot determine whether to

admit the statements because, by definition, it would not know who the "listener" is and what the

purported "effect" was.  For that reason alone the motion must be denied.

But there are several more flaws in the government's argument.  The government cites a

bulleted list of Telegram messages by "recruited MOSD members." Gov't Mot., p. 26.  Yet it

makes no effort whatsoever to show that Nordean *was* a "listener." As the government's own

cases show, "effect on the listener" statements are admitted when there is no factual dispute as to

whether the party at issue was a listener.  *E.g.*, *United States v. Thompson*, 279 F.3d 1043, 1047

(D.C. Cir. 2002); *United States v. Baird*, 29 F.3d 647, 653 (D.C. Cir. 1994).  The Court cannot

simply presume that Nordean "listened" to the Telegram chats simply because his number

belonged to a chat thread.  The threads at issue involved dozens and dozens of users.  As the

government's own examples demonstrate, Nordean was almost certainly the most sparing

commenter in the threads.  Gov't Mot., p. 26.  In fact, on January 6 itself, Nordean did not

comment at all—his phone was without power during the entire event.  Thus, the statements

cannot be admitted against Nordean.

Moreover, out-of-court statements may be admitted on this non-hearsay basis to show the

*effect* on a listener.  *Thompson*, 279 F.3d at 1047.  But not only do the sample statements offered

by the government fail to explain what the purported effect on Nordean specifically was, they

often are used for reasons unrelated to any "effect" on a defendant-listener.  Take the Telegram

message from "President Leo Smith" that he is "ready to log into minecraft." The government

explains that the Court must read "minecraft" as thieves' cant meaning "ready to commit crimes

and violence." Gov't Mot., p. 26.  But even if the Court follows this factually unestablished

semantic assumption, the statement is not being used to show an "effect" on someone.  It is an attempt to transfer an anonymous user's alleged intent to one of the Defendants who did not express or endorse that intent.  The same is true of an anonymous user's comment directed at "guys who can't go [to D.C.], are you thinking about maybe just going and rallying at your state capitol? Represent, country-wide, storm everyone's capitols, do that in fifty states, they just can't avoid it." *Id.*  The government appears to claim that the "effect" on the "listeners" was that "none of the defendants . . . admonished [the commenter] that the proposal was inconsistent with self-defense." *Id.*  Yet, obviously, the government does not describe an "effect" here but the purported absence of any effect.  Absence of evidence is not evidence of absence.

Finally, all-or-nothing treatment of these effect-on the-listener statements would be inappropriate because even if the Court were to find that Nordean was somehow a "listener" despite no evidence of that allegation and that he was "affected," whatever minimal probative value they held would be substantially outweighed by the risk of unfair prejudice, jury confusion and cumulativeness.  Take the government's intent to introduce these out-of-court statements:

- On January 3, a "member" commented, "Gonna be war soon . . . ."

- Another "member" responded, "Yes sir time to stack those bodies in front of Capitol Hill";

- A "MOSD member" asked, "So are the normies and 'other' attendees going to push thru police lines and storm the capitol buildings?"

Gov't Mot., p. 27.[5]

---

[5] The Court will notice that all of the out-of-court statements were made by anonymous users whom the government does not identify.  In light of other filings in this case, sealed and unsealed, the Court should be exquisitely wary of taking these statements at face value, as the government proposes.

Counterfactually, even if the government had shown that Nordean listened to these statements and was affected, they risk unfairly prejudicing him by improperly transferring the perceived intent of nonparties to Nordean without any evidence that he adopted or endorsed that intent. If such out-of-court statements are admitted against other Defendants but not Nordean, a limiting instruction must be given.

## IV. The government's motion to admit unidentified out-of-court statements under hearsay exceptions should be denied

The government argues that even if the out-of-court statements it intends to introduce are not covered by the co-conspirator statement rule or alternative non-hearsay principles, they are admissible under hearsay exceptions. Gov't Mot., pp. 28-34. That is not the case with respect to Nordean.

At the outset, as with the non-hearsay principle arguments it makes, the government appears to assume that if a proposed out-of-court statement satisfies a hearsay exception with respect to one Defendant, that statement may be admitted against all the Defendants. Gov't Mot., pp. 28-34. Absent application of the co-conspirator statement rule, however, that is erroneous. Even where a declarant-codefendant's out-of-court statement is admissible against the declarant, it is not ipso facto admissible against a non-declarant defendant and a limiting instruction must be given. *Bruton v. United States*, 391 U.S. 123, 20 L.Ed. 2d 476, 88 S. Ct. 1620 (1968); *Accime*, 278 Fed. App'x at 900.[6] Thus, to the extent the Court agrees with the

---

[6] To be clear, Nordean does not cite *Bruton* for its holding on the Confrontation Clause. Nordean understands that some number of the government's intended out-of-court statements are not testimonial and to that extent *Bruton* does not apply. But *Bruton*'s holding that, as a matter of general hearsay principles, a declarant-codefendant's out-of-court statements are not admissible against the non-declarant defendant applies here. *Bruton*, 391 U.S. at 128 n. 3 (even though declarant-codefendant's out-of-court statement was admissible against that codefendant, Court "emphasize[d] that the hearsay statement inculpating [nondeclarant defendant] was clearly inadmissible against him under traditional rules of evidence").

24

government that some hearsay exception applies to a certain category of out-of-court statements, those statements may not be admitted against Nordean unless he was the declarant.

The government cites four hearsay exceptions by which it intends to introduce out-of-court statements: present sense impressions (Fed. R. Evid. 803(1)), excited utterances (Fed. R. Evid. 803(2)), then-existing mental states (Fed. R. Evid. 803(3)), and statements against interest (Fed. R. Evid. 804(b)(3)).  Gov't Mot., pp. 28-34.  At the outset, notice that the government has described motive, intent and state-of-mind out-of-court statements as *both* (1) non-hearsay and (2) hearsay but with an exception.  *Compare id.*, p. 20 *with* p. 31.  Because the government was right the second time, all its previous "non-hearsay" arguments on those state-of-mind subjects should be disregarded.

As to the sample out-of-court statements that are said to be admissible under these exceptions, not one was made by Nordean.  Gov't Mot., pp. 28-34.  Thus, none is admissible against him.  Because the government has not identified all the out-of-court statements it intends to introduce, the Court cannot properly determine whether they satisfy the listed hearsay exceptions.  Ruling on a motion *in limine* in that circumstance would constitute an advisory opinion.  The government's motion *in limine* must therefore be denied.

**Conclusion**

For the foregoing reasons, the Court should hold a pretrial hearing to determine whether to admit out-of-court statements under the co-conspirator statement rule.  At the least, the Court should direct the government to identify its proposed out-of-court statements in order to intelligently assess the government's motion *in limine*.

Dated: October 19, 2022                    Respectfully submitted,


                                           */s/ David B. Smith*

David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

**<u>Certificate of Service</u>**

I hereby certify that on the 19th day of October, 2022, I filed the foregoing filing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

>
> Connor Mulroe
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

>
> /s/ David B. Smith
> David B. Smith, VA Bar No. 25930
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com