UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT NORDEAN'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS FIRST OMNIBUS MOTION *IN LIMINE* TO EXCLUDE PROPOSED GOVERNMENT EXHIBITS**

The government's opposition to Nordean's Omnibus Motion *in Limine* confirms what impartial observers of this case already understand: the government has no evidence of a conspiracy among the defendants to commit crimes inside or outside the Capitol Building on January 6. Responsibility for mob action is diffuse. Yet an event like January 6 understandably arouses the public's desire for retribution against specific individuals. So the government found a scapegoat in these defendants, charged them with a conspiracy, and went about finding the evidence. Rather than acknowledge an unpopular truth, the government will brazen it out at trial by putting on a case against the Proud Boys group itself, by presenting evidence of unrelated political rallies and events, by showing the D.C. jury text messages with racist and sexist epithets, by showcasing the defendants' right-wing political views. To be sure, the government does not come right out and say it is putting on a political trial. Dressing up its strategy in rule-like language is the homage the government pays to the Federal Rules of Evidence. No impartial observer is deceived—even those who despise these defendants. If the government presents that case, it may secure a conviction but not without cost. Even those who have no sympathy for the

1

defendants and cheer on their destruction would lose some faith in the rule of law.

**Argument**

I.  **The Proud Boys group evidence is inadmissible under Rules 401, 403, 404, and the First Amendment; it is not "gang affiliation" evidence**

The government says it must be allowed to show the jury hundreds of pieces of Proud Boys paraphernalia and must be permitted to "introduce evidence regarding the structure and organization of the Proud Boys" (ECF No. 489-2) because that proposed evidence "provide[s] critical context for the size, scale, manner, and means of the conspiracy." Gov't Opp., p. 7. Consider all the ways in which that claim is transparently pretextual.

This case involves five defendants. A small number of others have pled guilty to the conspiracy charged in this case, albeit somehow without actually stipulating that their actions satisfied the co-conspirator standard of knowingly joining a criminal agreement with the intent to further its goals. *E.g.*, Plea Agreement of Charles Donohoe, ECF No. 335.[1] It is true that all these defendants are apparent members of the Proud Boys group. Yet general information about the "organization of the Proud Boys" plainly does not go to the "size, scale" of the charged conspiracy. For the government has shown the Court no evidence that all Proud Boys members present in D.C. on January 6—much less all Proud Boys members—knowingly joined the conspiracy charged in this case and with the intent to further its unlawful goals. To the contrary,

---

[1] The plea agreements are artfully worded such that a defendant will plead guilty to "believ[ing]" that other defendants' "actions were intended to stop the certification of the Electoral College vote." Statement of the Offense for Charles Donohoe, ECF No. 336, p. 9. Or the defendant will plead guilty that he personally "understood" that other defendants "were searching for an opportunity to storm the Capitol." *Id.*, p. 8. That does not satisfy the conspiracy standard because one individual's personal understanding or belief does not create an agreement, even a tacit one. A store sells widgets for $100. Seeing brisk sales in the store and customers putting fifty-dollar bills into their pockets, Mr. Brown develops the belief that widgets must be selling for $50. He approaches a salesperson who refuses to sell at that price. Mr. Brown does not have an agreement at $50—his unilateral "belief" or "understanding" notwithstanding.

the government has often argued that certain Proud Boys members present in D.C. on January 6 are not relevant witnesses in this case simply because they belonged to one Telegram chat group used by the Proud Boys and not a different chat window used by the group. Thus, nothing about membership in the Proud Boys group per se sheds light on the "size, scale" of the conspiracy charged here, according to the government's own arguments.

Identically, nothing about Proud Boys membership per se informs the "manner and means" of the conspiracy charged here. The examples given by the government show the argument is not serious. The "Ministry of Self-Defense (MOSD)" Telegram chat group "was central to the operation of the conspiracy," the government notes. Gov't Opp., p. 7. Of course, that is an argument for the introduction of MOSD chats—not an argument for introducing hundreds of pieces of Proud Boys merchandise and general evidence about "the structure and organization of the Proud Boys, including the different 'degree' rankings a member of the Proud Boys can attain, how they can attain those ranks, and how those rankings impact power dynamics between Proud Boys members." ECF No. 489-2. That the "manner and means" of the Proud Boys' conspiracy bears an uncanny resemblance to the actions of hundreds or thousands of other January 6 defendants who are not Proud Boys members also suggests that those "means" do not reveal something intrinsic to Proud Boys affiliation.

The government says that "Nordean, addressing the crowd, made exhortations like 'back the yellow.'" Gov't Opp., p. 8. On the strength of that one comment, it continues, the Court should allow the government to frame its entire case against the Proud Boys organization. That is another non sequitur.

Boldly, the government claims that general Proud Boys groups evidence is not even subject to analysis under Rule 404(b). Gov't Opp., p. 8. That is so, it says, because "the

3

defendants' membership in the Proud Boys is non-propensity evidence of the conspiracies charged." *Id.* That is strange. For one thing, the government itself listed evidence concerning "the structure and organization of the Proud Boys" in its Rule 404(b) notice letter. ECF No. 489-2 (Government: "We write pursuant to Fed. R. Evid. 404(b) to provide notice of *uncharged crimes, wrongs or acts. . .*" and listing "*evidence regarding the structure and organization of the Proud Boys*") (emphasis added).

For another thing, right after declaring that general Proud Boys group evidence is not propensity evidence, the government says it will try to show the jury the "defendants' attendance and leadership at past [Proud Boys] rallies"—i.e., uncharged crimes, wrongs or acts. Gov't Opp., pp. 9-10. Here too, the government itself already called this material Rule 404(b) evidence. ECF No. 489-2.

The government does not cite any permissible purpose under Rule 404(b) for the use of these uncharged crimes, wrongs or acts. Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). The defendants, the government says, "had either been present at or discussed prior rallies where the Proud Boys used violent force in pursuit of an objective." Gov't Opp., p. 9. The Court will notice that the allegation, even if true (it is not), does not satisfy any Rule 404(b)(2) permissible purpose and the government does not even cite one. Evidence that the defendants allegedly used force or planned to on prior occasions would, of course, be used "to show that on a particular occasion the person acted in accordance with [that] character" attribute. Fed. R. Evid. 404(b)(1). That is not permitted. *Id.* And the fact that a defendant merely "discussed prior rallies" has no relevance whatsoever.

4

The sole example given by the government is quintessential prohibited character evidence. It is also misleading. Gov't Opp., pp. 9-10. Tarrio and others are shown discussing the December 12, 2020 rally in D.C. *Id.* The first comments in the conversation concern (1) the "disposition towards the police" among the parties and (2) Antifa. One party says, "We could have run them the fuck over in DC and they wouldn't have been able to do shit." Tarrio responds, "I had a plan for it. . . . But someone talked me out of it." *Id.* The government characterizes this as "ruminating over having abstained from using force against the police in Washington, D.C., in December 2020." *Id.* Notice several things here. First, it is not even clear Tarrio's "plan" to "run them the fuck over" was in reference to the police and not Antifa, whose members were referenced immediately before Tarrio's comment. Second, the government simply assumes without evidence that it can extrapolate from one unidentified person's comment about "our disposition towards the police" to some principal characteristic of the Proud Boys group generally. Third, even if Tarrio had a plan to "run over the police" in December 2020 that is not "directly probative of whether there was an agreement to use force on January 6." Gov't Opp., p. 10. The rally in December 2020 had nothing to do with Congress's certification of electoral votes, nor did December confrontations between Antifa members and the Proud Boys. In short, the government expects the Court to accept its conclusions without any reasoned argument.

The government next contends that "precisely because affiliation evidence is so relevant in conspiracy cases [] federal circuits are nearly uniform in allowing the government wide latitude to present it." Gov't Opp., p. 10. The government then cites three cases concerning "gang affiliation." *Id.* (citing *United States v. Castillo-Aguirre*, 983 F.3d 927, 936 (7th Cir.

5

2020); *United States v. Shelledy*, 961 F.3d 1014, 1020-21 (8th Cir. 2020); *United States v. Ford*, 761 F.3d 641, 649 (6th Cir. 2014)). Notice several things here.

First, "gang affiliation" cases do not avail the government. Gangs are persons "acting together" for a purpose that is "usually criminal." *Lanzetta v. New Jersey*, 306 U.S. 451, 456 (1939) (quoting Webster's New International Dictionary (2d ed. 1934)). Hence, the government's cases mostly concern associational groups whose *sole purpose* was to commit crime; that accounts for why a defendant's affiliation with such a criminal group may constitute evidence of a criminal conspiracy. *Castillo-Aguirre*, 983 F.3d at 936 (Sinaloa Cartel); *Ford*, 761 F.3d at 649 (Vice Lords narcotics gang). By contrast, here the indictment itself concedes that the sole and indeed main purpose of the Proud Boys group is not criminal but cultural or social. Third Superseding Indictment, ECF No. 380, p. 3 ("The Proud Boys describes itself as a 'pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists.'"). Unlike in the gang cases it cites, the government has made no factual showing that the Proud Boys' sole or main purpose is criminal; it merely cites a handful of rallies where violence occurred. Even if the violence there was committed by members of the group, that does not mean that nonviolent attendance at such a rally, or membership in such a group, loses its First Amendment protection. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982). Thus, the government's Proud Boys evidence is not "gang affiliation evidence" in the first place.

Second, the government has not cited a single case where a defendant's affiliation with *a political organization* that pursues at least some noncriminal aims has been deemed proper "affiliation evidence" in a conspiracy case. It fights shy of old Communist Party criminal cases even though it is essentially adopting their logic—as they are all bad law now or are too

embarrassing to rely on.  *E.g.*, *United States v. Scales*, 367 U.S. 203 (1961) (final Communist Party member convicted under Smith Act for "affiliating" with that political party).

If the government's general Proud Boys evidence is admitted, any resulting convictions would be reversed as surely as they were in the cases Nordean has cited.  *United States v. Street*, 548 F.3d 618, 633 (8th Cir. 2008) ("We conclude that . . . . testimony about outlaw motorcycle gangs and El Forasteros was excessive, unduly prejudicial, and in great part completely irrelevant to the charged offenses."); *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991) (reversible error to admit Hells Angels affiliation evidence in conspiracy trial).[2]

Equally unavailing are the government's First Amendment arguments.  It fails to persuasively distinguish *Dawson v. Delaware*, 503 U.S. 159 (1992) and *United States v. Lemon*, 723 F.2d 922 (D.C. Cir. 1983), where the courts concluded that defendants' right to freedom of association was violated by the introduction into evidence of their membership in the Aryan Brotherhood and Black Hebrews.  Gov't Opp., pp. 11-12.  The government argues that because neither case involved a conspiracy charge specifically, both are inapposite.  But neither decision turned on the type of criminal charge at issue.  Just as it was constitutional error in *Dawson* to admit evidence of the defendant's "abstract beliefs," so would it be constitutional error to admit evidence of Proud Boys' "beliefs" insofar as they are incorporated into the government's evidence.  As Nordean showed above, a key distinction between the government's "gang affiliation" cases, on the one hand, and *Dawson*, *Lemon*, and this one, on the other hand, is that

---

[2] If the admission of guilt-by-association evidence would help the government with a jury but would likely lead to reversal of any convictions, one might reasonably ask why the government would seek to introduce it.  The answer at least partly involves an agency problem: the incentive of trial lawyers is to win the trial at all costs, not ensure that resulting convictions are sustained on appeal.  That sets up a conflict of interest between the trial lawyer and the Department of Justice's overall interests in the case.

7

the sole or main purpose of the Proud Boys group is not to commit crimes. Although comparisons with the Aryan Brotherhood and Black Hebrews are invidious, those groups, like the Proud Boys, revolve around political purposes, if often abhorrent ones.

The government also misunderstands the *Lemon* standard. To present affiliation evidence and also avoid violating the defendant's right to freedom of association, the D.C. Circuit held, the government must offer "sufficient reliable evidence of the defendant's connection to illegal activity within the [organization]." *Lemon*, 723 F.2d at 941. The government claims it satisfies this standard because "the indictment alleges the fact that Nordean was involved in a conspiracy within the Proud Boys up to and on January 6." Gov't Opp., p. 12. That conflates direct evidence of the charged crime with the kind of affiliation evidence the government seeks to introduce. *Lemon* means that the government must prove the defendant's connection to illegal activity *in the affiliation evidence*. *Lemon*, 723 F.2d at 941. General evidence about the Proud Boys' "structure," practices and beliefs does not involve Nordean engaging in illegal activity. Accordingly, the introduction of such affiliation evidence would violate Nordean's First Amendment right.

Lastly, the government has filed one paragraph of argument on Rule 403 balancing. Gov't Opp., p. 13. Its apparent belief that "gang affiliation" evidence presents no serious risk of unfair prejudice is belied by the very decisions it cites. *E.g.*, *United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009) (there is "substantial risk of unfair prejudice attached to gang affiliation evidence. . . "); *United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004) (gang affiliation evidence "generally arouse[s] negative connotations and often invoke[s] images of criminal activity and deviant behavior . . . [g]uilt by association is a genuine concern whenever gang evidence is admitted."); *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997)

("[W]hen introduced by the government against a criminal defendant, [gang affiliation evidence] can taint a defendant in the eyes of the jury . . . For this reason, in our review we examine the care and thoroughness with which a district judge considered the admission or exclusion of gang-involvement evidence."); *United States v. Butler*, 71 F.3d 243, 251 (7th Cir. 1995) (holding that the court demands careful consideration by district judges in determining admissibility of gang evidence).

Should the Court somehow conclude that the general Proud Boys group evidence is (1) not Rule 404(b) material, (2) relevant to some issue in this case, (3) not inconsistent with Nordean's right to freedom of association, and (4) "gang affiliation" evidence even though the purpose of the Proud Boys group is cultural/political not criminal, it is indisputably the case that whatever meager probative value is left after that scrutiny is grossly outweighed by the enormous unfair prejudice entailed. The Court has already observed that the government's opposition to the defendants' Motion to Change Venue is not a "slam dunk" precisely because it credits the point that the Proud Boys group has been uniquely vilified in the press and public opinion after January 6. While it may not grant that motion, it certainly should not take positive steps to exacerbate the conceded prejudice by admitting general Proud Boys group evidence on a legal theory—"gang affiliation"—that has no application here.

II.     **The government's proposed evidence concerning December 12 rally, Black Lives Matter, and the Oregon Capitol is inadmissible; the arguments offered in support are cynical and frivolous**

As if the government's Proud Boys group evidence were not discrediting enough, it also proposes showing the D.C. jury evidence of Defendant Tarrio's "destruction of a 'Black Lives Matter' banner" during a December 12, 2020 rally in D.C., a banner owned by the Asbury United Methodist Church, a historic African-American church in the district. The government

also proposes showing the jury evidence relating to "the unlawful breach of the Oregon State Capitol" in December 2020 by nondefendants. This cynical effort to tar the defendants with the jury on issues unrelated to the trial must be rejected to preserve the integrity of the case. The arguments offered by the government do not withstand minimal scrutiny. Nordean will address them briefly.

**December 12 rally**. The government offers no argument that the purpose of the Proud Boys rally on December 12, 2020 in D.C. had any conceptual connection to Congress's electoral vote count and/or the former president's rally on January 6. Gov't Opp., p. 14. Instead, it says that the December 12 "episode led directly to the creation of MOSD, and it is undeniable evidence of the intent of those who joined MOSD." *Id.* But the MOSD Telegram chat group is merely a means of communication, of course. It does not logically follow from the fact that defendants joined a chat group after Event A, which was also a chat group used to communicate for Event B, that the defendants' purposes and intents behind their involvement in Event A and Event B were the same. The medium is not the message. Insofar as the MOSD can be deemed to have some corporeal existence outside the digital universe, the reasons for it coming into existence have no causal connection to the 2020 presidential election and no evidence adduced by the government shows otherwise.

The government adds that the December 12 rally left the Proud Boys angry with the police for not "adequately investigat[ing]" the stabbing of a Proud Boys member. This "shaped Nordean's attitude toward police as he prepared to return to Washington, D.C. on January 6." Gov't Opp., p. 15. This gobbledygook does not establish the relevance of the December 12 rally, much less a probative value that would not be substantially outweighed by the manifest prejudice of injecting unrelated, highly politically charged episodes into the case. The government cites no

evidence showing that Nordean was motivated to come to D.C. on January 6 on account of the "shape" of his "attitude toward police." Rather, all the evidence shows that, like thousands of other protesters, Nordean came to D.C. that day because he sincerely believed that the 2020 presidential election was "stolen." The Court will notice that the Nordean quotations cited by the government do not concern January 6 and involve vague, banal commentary (e.g., "Back the yellow, gentlemen!"). Gov't Opp., p. 15.

The Court will also notice that the government frequently implies that Nordean engaged in, or planned, violence on December 12. Gov't Opp., p. 15 ("Nordean's prior experience of violence cannot alone prove that he was part of a violent conspiracy on January 6. . . ."). That is quite misleading. The government cites no evidence that Nordean planned or engaged in violence that day. As it knows, there is none. Allowing the government to display at trial graphic scenes of street violence involving other people from a prior episode having no conceptual relationship with the 2020 presidential election would be unforced reversible error.

**Black Lives Matter**. The government's attempt to inflame the jury with Tarrio's burning of a Black Lives Matter banner on December 12 is perhaps even more frivolous, if that is possible. It would like to inform the jury that, after burning the property of a historic black church, Tarrio posted a message on Parler that he was "not ashamed" and "proud." Gov't Opp., p. 16. That is relevant to this case, the government pretends to believe, as Tarrio's social media post "sent the message to [the other defendants] that the unlawful use of force was not only tolerated, but encouraged"—though without actually using any of those words or ideas. *Id.* That is to say, the government appears to argue that Tarrio's 2020 social media post about burning a sign sent a kind of Bat-Signal that triggered the 2021 conspiracy to interfere with the peaceful transfer of presidential power, or something. The government adds that if the jury is not

11

informed about the burning of a Black Lives Matter banner, it would fail to understand an enumerated list of quotations—which themselves do not appear to have any relevance to the case. Gov't Opp., pp. 16-17. This prior act "evidence" does not satisfy any proper purpose under Rule 404(b). Fed. R. Evid. 404(b)(2). It does not meet the test of relevance. Even if it somehow did for Defendant Tarrio, it would not for Defendant Nordean. And even if it somehow met the test of relevance for Nordean, it would patently fail Rule 403 balancing given the egregious unfair prejudice to him, as someone who was not involved in the inflammatory banner burning.

**Oregon Capitol**. As previously indicated, the government lacks evidence of any plan among the defendants to breach the Capitol on January 6. It will attempt to make up for that hole in its case by showing that nondefendants reacted gleefully when other nondefendants breached the Oregon State Capitol in December 2020. Gov't Opp., p. 17. The government has offered no proof that Nordean saw any of the nondefendants' communications. Nor has it shown that Nordean was even aware of the Oregon incident, much less that it was a model for his "planning." This evidence risks seriously misleading the jury: implying that Nordean planned to pull an Oregon State Capitol on January 6 without predicating proof that he was even aware of it. It should be excluded under Rules 404, 401, and 403.

**III.    Telegram chats and text messages predating the charged conspiracy and/or involving derogatory epithets and controversial political views should be excluded under Rules 401 and 403**

The government claims that its exhibit list production sufficiently identified the exact Telegram chats and text messages it intends to introduce at trial. Gov't Opp., p. 18. That is not accurate. In multiple places, the government has simply dumped on the defense dozens of pages of chats and texts. It has not identified which of the chats or texts it intends to use and the

12

defense's email to the government asking for clarification has gone unanswered. Nordean reserves the right to challenge any and all such Telegram chats and texts at trial, as the government has not fully complied with the Court's order to identify each specific exhibit.

The government claims that "*[a]ny* attempt excise the profanity from [defendants'] statements would require mass redactions . . . and in many cases render their statements practically unintelligible." Gov't Opp., p. 20 (emphasis added). That is a disturbing position for the government to take. And the one example cited by the government in support of its position shows how empty it is. It represents, "The government can do little about the fact that the screen name assigned to Charles Donohoe in [a] message string was 'Cracker Ni\*\*er Fa\*\*ot.'" *Id.* But that is precisely the sort of highly inflammatory and irrelevant information that the government can and must do something about: it must redact all such racist, sexist, and homophobic remarks, particularly where they do not contain substantive content, such as a screen name. *United States v. Hale-Cusanelli*, 21-cr-37-TNM (D.D.C. 2021), 5/6/2022 Hr'g Tr. at 14-15. The government provides no explanation as to why such redaction is technically infeasible. It is now on notice, *over a month before trial*, that if the government attempts to display such unredacted content to the jury, the defense will move for a mistrial—immediately—and will do so *every time the government displays such racist, sexist or homophobic content*. It is simply absurd for the government to suggest that it cannot present its case without showing defendants or others in the Telegram chats using words like "N\*\*\*\*\*" or making anti-Semitic remarks. It has shown the Court no "key messages" involving such slurs, though to be fair there are no key messages as the defendants had no concrete plans to speak of, as the government knows.

The government suggests that all Telegram chats and texts concerning Nordean's and the other defendants' controversial political views are relevant as they reveal their "motive" for

13

protesting on January 6 and "context about [defendants'] intentions." Gov't Opp., p. 23. But it offers no response to Nordean's argument that "motive" is not close to being a probative issue in January 6 prosecutions. By definition, such defendants were motivated to protest in D.C. in light of the 2020 presidential election. It is disingenuous in the extreme to claim that the government's purpose in showing a jury hundreds of statements of controversial political commentary by the defendants—e.g., calling Democrats "libtards"—is to establish their "motive" for being in D.C. that day. Insofar as such motive statements hold any probative value at all they are substantially outweighed by the egregious risk of unfair prejudice among a jury pool where the defendants' viewpoints are loathed.

IV. **Nordean's Parler posts, Rumble interviews, and 1776 Returns document should be excluded under Rules 401 and 403**

Similarly, "motive" is not the magic word that allows the government to show the jury dozens of social media posts and interviews concerning inflammatory and often irrelevant political commentary. Gov't Opp., pp. 22-27. And the "1776 Returns" document is a highly misleading canard.

"The nature and strength of the defendants' conviction that they needed to stop Biden from becoming President is a central question to be resolved," the government says. Gov't Opp., p. 22. By framing the trial issue as going to (a) the "nature" and the "strength" of the defendants' opposition to President Biden and/or the Democratic Party, as opposed to (b) whether and to what extent the defendants opposed Congress's certification of the president's election victory, the government attempts to open the door to virtually any defendant statement that concerns politics. But the issue in this case is whether the defendants intended to obstruct Congress's certification of the election and with force. That issue does not call for a complete accounting at trial of all policy quarrels the defendants have with the president or a political

party. If Parler or "Rebel Talk with Rufio" statements show that Nordean believed the 2020 election was "stolen," the government would have a marginal argument as to motive. But as Nordean's motion showed, the government is cynically attempting to show the jury the defendant's thoughts on every controversial political subject ranging from Covid-19 vaccination to "communist dorks," to paying taxes. ECF No. 489, pp. 17-19. The enormous unfair prejudice resulting from these statements is not somehow outweighed by muttering something vague about the defendants' "convictions about President Biden."

It is stipulated that the 2020 presidential election motivated Nordean's decision to travel to D.C. on January 6. That issue having been stipulated, the government's "motive" evidence is simply irrelevant or inadmissible under Rules 403 and 404.

As for the "1776 Returns" document, the government does not dispute that Nordean had no knowledge of its existence. The government does not even appear to dispute that Tarrio received the document via email but did not open the attachment. Gov't Opp., p. 27. It suggests that Tarrio must have reviewed the document because he alluded to the storming of the Winter Palace "shortly after the riot" and that event was also referenced in 1776 Returns. That is absurd. Like the Gunpowder Plot, the storming of the Winter Palace in Petrograd in 1917 is a historical reference point that occurred to many people after the events of January 6. All involved large numbers of protesters running into buildings housing the seat of government. That this historical event also occurred to Tarrio is unexceptional. In any case, since the government has laid no foundation for the document's use against Nordean, it must be excluded under Rules 401 and 403, as the false implication that he based some sort of plan on the document is unfairly prejudicial and of no probative value.

15

**V.      Protester videos not depicting the defendants; edited open-source January 6 videos; miscellaneous videos filmed by Nordean; and government-created video montages depicting edited, general January 6 footage are inadmissible under Rules 401 and 403**

The government concedes that it intends to display January 6 videos to the jury that do not capture the defendants, on the ground that they show (1) the willingness of "the men the defendants marched to the Capitol to engage in violence that day"; (2) the results of their actions; and/or (3) that a civil disorder occurred on January 6, 2021. Gov't Opp., pp. 28-30. It contends that it can introduce generic January 6 video montages capturing crimes committed by nondefendants and that any prejudice would be cured by a limiting instruction. And it claims it may show the jury videos of an intoxicated Nordean because he says the phrase "storm the Capitol" in one of them. None of these arguments has merit.

Nordean has already explained why there is no theory of admissible evidence that allows the government to show the jury evidence of nondefendant crimes by attaching the label "co-conspirator" or "tool" to those individuals and without establishing the elements of a legal conspiracy as to each nondefendant. ECF No. 505, pp. 1-4. Thus, to the extent the government's video exhibits do not depict the defendants' actions on January 6 but those of nondefendants whose participation in the conspiracy charged here has not been established by a preponderance of the evidence, they should be excluded under Rules 401 and 403. The suggestion that the government needs to show videos of nondefendants in order to present a case that a civil disorder occurred on January 6 is false. Presumably, it can make the case for the existence of a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual" with video exhibits depicting the defendants. 18 U.S.C. § 232(1).

16

As for the government's generic U.S. Capitol Police footage montage, featuring scenes of violence by nondefendants, notice that the government does not provide any argument as to relevance or Rule 403 balancing apart from the point that it must prove a "civil disorder" on one count. Gov't Opp., p. 31. As Nordean as already explained, the government does not need the Capitol montage to present a civil disorder case. Any minimal probative value is obviously substantially outweighed by the risk of unfair prejudice and jury confusion stemming from showing the jury countless scenes of violence in which the defendants did not participate.

The government's attempt to humiliate Nordean by showing the jury videos of him intoxicated is low. Gov't Opp., pp. 32-33. The fact that Nordean says, "I was part of fucking storming the Capitol" and "1776 bitch!" in the videos is not even probative. It is undisputed that Nordean entered the Capitol Building on January 6. The government says the videos show that Nordean was "proud of what he had accomplished on January 6." *Id.*, p. 33. As the government knows, that is at best a sentencing fact, not one somehow retrospectively proving intent. In any case, whatever minimal probative value is in the videos, it is patently substantially outweighed by the unfair prejudice.

**Conclusion**

For all the foregoing reasons, the above-mentioned categories of evidence should be excluded from trial.

Dated: November 4, 2022                    Respectfully submitted,

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

>Nicholas D. Smith (D.C. Bar No. 1029802)
>1123 Broadway, Suite 909
>New York, NY 10010
>Phone: (917) 902-3869
>nds@davidbsmithpllc.com

>*Attorneys for Ethan Nordean*

## Certificate of Service

I hereby certify that on the 4th day of November, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

>Connor Mulroe
>Assistant United States Attorney
>555 4th Street, N.W., Room 4408
>Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

>/s/ David B. Smith
>David B. Smith, VA Bar No. 25930
>David B. Smith, PLLC
>108 North Alfred Street, 1st FL
>Alexandria, Virginia 22314
>(703) 548-8911 / Fax (703) 548-8935
>dbs@davidbsmithpllc.com