UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

ETHAN NORDEAN et al.,

      *Defendants*.

Criminal Action No. 21-175 (TJK)

**MEMORANDUM OPINION AND ORDER**

Defendant Enrique Tarrio, joined by his four codefendants, moves to transfer venue, arguing that jurors in the District of Columbia are so prejudiced against him that he cannot receive a fair and impartial trial in this jurisdiction. For the following reasons, the Court will deny the motion without prejudice to renewal after voir dire. In so doing, the Court joins every other court in the District of Columbia that has considered a motion to transfer venue in a criminal case arising out of January 6, 2021.

**I.    Background**

The Court assumes familiarity with this case, as reflected in several of its opinions. Defendants, purported leaders of the Proud Boys, are alleged—among other things—to have engaged in a seditious conspiracy under 18 U.S.C. § 2384 and to have conspired to obstruct Congress's certification of the Electoral College vote on January 6, 2021. *See* ECF No. 380. Tarrio and his four codefendants move to transfer venue. *See* ECF No. 349.[1] For support,

---

[1] Each of Tarrio's codefendants joined his motion. *See* Minute Orders of June 10, 2022 (granting ECF Nos. 384 and 386 as to Defendants Zachary Rehl and Joseph Biggs); October 4, 2022 (granting ECF No. 471 as to Defendant Ethan Nordean); and October 31, 2022 (granting ECF No. 508 as to Defendant Dominic Pezzola). Tarrio asks the Court to transfer the case to the Southern

Defendants point to a "community attitude survey" that defense counsel in other January 6th cases commissioned from In Lux Research, as well as other polling. *See* ECF No. 351-1 at 1.[2] According to the In Lux Research study, "the DC Community's attitude is unique among" other jurisdictions and "decidedly negative toward Defendants." *Id.* at 2. Defendants have also supplemented the motion with new information about publicity surrounding the Third Superseding Indictment, the televised hearings conducted by the House Select Committee to Investigate the January 6th Attack on the United States Capitol, and updated polling from In Lux Research. *See* ECF Nos. 384, 406, 477. The new In Lux Research poll—which surveyed different jurisdictions than the first—produced similar results. *See generally* ECF Nos. 351-1, 477-1.

Defendants emphasize that, in both polls, 91 percent of District respondents "who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case." ECF Nos. 477-1 at 12; 351-1 at 2; *see also* ECF No. 477 at 1 (emphasizing this statistic). This evidence, they argue, proves that the District of Columbia jury pool is so shot through with prejudice against them that even the voir dire process cannot ensure a fair and impartial jury.

## II.    Legal Standard

The Sixth Amendment's guarantee that criminal defendants have the right to be tried by an impartial jury of their peers is a cornerstone of our judicial system. *See* U.S. Const. amend. VI. Generally, this right works in tandem with the amendment's venue provision, which "safeguard[s] against the unfairness and hardship involved when an accused is prosecuted in a remote place."

---

District of Florida, where he resides. His codefendants do not request transfer to any other jurisdiction.

[2] *See* ECF Nos. 351-2, 389-1.

*United States v. Cores*, 356 U.S. 405, 407 (1958); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a . . . trial . . . [in] the State and district wherein the crime shall have been committed."). But in rare cases, where "extraordinary local prejudice will prevent a fair trial," the Constitution requires courts to transfer a case to another venue. *See Skilling v. United States*, 561 U.S. 358, 378 (2010). The Federal Rules of Criminal Procedure also reflect this standard, requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that a defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

"[I]ntense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). Jurors must be "impartial" and "indifferent," but they "need not be ignorant." *United States v. Haldeman*, 559 F.2d 31, 60 (D.C. Cir. 1976) (en banc) (cleaned up). So even where a jury pool has been exposed to pretrial publicity related to a case, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is not disqualifying. *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Rather, "[i]t is sufficient if the juror[s] can lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." *Id.*

Courts have recognized two types of prejudice that support transferring venue: actual and presumed. Defendants may show the former "only by reference to the voir dire." *Haldeman*, 559 F.2d at 60. But as to the latter, in "extreme circumstances," "prejudice to the defendant's rights may be presumed" before voir dire. *Id.* (cleaned up).

When assessing transfer requests for presumed prejudice, courts in this district have looked to the Supreme Court's multifactored analysis in *Skilling*. *See, e.g.*, *United States v. Rhodes*, 22-cr-15 (APM), 2022 WL 2315554, at *21–22 (D.D.C. June 28, 2022). There, the Supreme Court

3

affirmed the district court's refusal to transfer a former Enron executive's prosecution away from Houston, Texas, agreeing "that no presumption [of prejudice] arose." *Skilling*, 561 U.S. at 385. In reaching this conclusion, the Court considered: (1) the "size and characteristics of the community"; (2) the fact that media stories, though unkind to the defendant, "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; (3) that "the decibel level of media attention [had] diminished somewhat" before trial; and (4) that the jury had acquitted the defendant of some counts, which cuts against the "supposition of juror bias." *Id.* at 382–83. These factors, though not exhaustive, offer a starting place for an analysis of a motion to transfer venue.

### III.   Analysis

Defendants argue that this is the rare case in which the Court should presume the jury pool is ineluctably prejudiced against them, before it even tries to select a fair and impartial jury. They contend the *Skilling* factors favor transfer, pointing to, among other things, (1) the District of Columbia's heavily Democratic partisan tilt; (2) publicity surrounding the Proud Boys and the return of the Third Superseding Indictment in June 2022; (3) the House Select Committee's televised hearings; and (4) Defendants' own private polling. As explained below, the Court disagrees that it may presume prejudice at this stage, even if Defendants' motion underscores the need for a thorough voir dire. The Court is satisfied that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *Haldeman*, 559 F.2d at 63.

\*   \*   \*

The Court begins with the *Skilling* factors. First, neither the District of Columbia's size nor characteristics support a presumption of prejudice. True, the jury pool of less than 500,000 here is much smaller than the 4.5 million in *Skilling*. *See* ECF No. 349 at 7; *Skilling*, 561 U.S. at

382. But as Judge Mehta noted when he rejected the same argument in *Rhodes*, "the District's population is greater in size than those few cases in which the [Supreme] Court has found that transfer to a different jurisdiction was constitutionally required." 2022 WL 2315554, at *21; *see also, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963) (transfer out of parish of 150,000 residents); *Irvin*, 366 U.S. at 719 (transfer out of county with 30,000 residents). Moreover, in *Mu'Min v. Virginia*, the Court cited the county's population of 182,537 as a reason *not* to presume juror prejudice. *See* 500 U.S. 415, 429 (1991). In light of this precedent, nothing about the District of Columbia's size gets Defendants very far.

As for the District's characteristics, Defendants make the point that it has "the least diverse political population in the country," emphasizing that the Democratic candidate has won more than 90 percent of the vote in the last two presidential elections. ECF No. 349 at 7. True enough. But the D.C. Circuit rejected a substantially similar point in *Haldeman*, when the defendants—who were former Nixon administration officials—moved to change venue before voir dire. The district court denied the motion, and the Circuit affirmed. Responding to the dissent's point that 81.8 percent and 78.1 percent of the District's votes went to President Nixon's Democratic opponents in the 1968 and 1972 elections (respectively), the Circuit rejected the "intimation that a community's voting patterns are at all pertinent to venue"—even in that case, which had strong political overtones. *Haldeman*, 559 F.2d at 64 n.43; *see id.* at 160 (MacKinnon, J., concurring in part and dissenting in part).

Defendants also insist—and argue as part of the first *Skilling* factor—that localized negative publicity "has programmed the potential D.C. jury pool to believe that an attack was committed by white supremacists intent on insurrection and their violent fanatical actions caused a curfew, a lockdown to be placed, and a military occupation and hold for their protection over a

period of months." ECF No. 349 at 8.  This is, at best, hyperbole.  Defendants do not point to any exclusively local reporting that might have had unique "programming" effects on the District's jury pool.  Defendants come closer to hitting the mark by pointing out that some District of Columbia residents may have felt the effects of January 6th's events in ways that render them unable to sit as fair and impartial jurors.  But Defendants' own data shows that less than 40 percent of the District's survey respondents felt "personally affected" by January 6th's events.  *See* ECF No. 477-1 at 6.  And this is an issue the Court can—and will—discuss with prospective jurors through individual voir dire.

Similarly, the Court is unconvinced that any "ongoing vitriolic feud" between the Proud Boys and the District of Columbia supports transfer at this stage in the proceedings.  *See* ECF No. 389 at 4.  Defendants discuss "clashe[s]" between Proud Boys and Antifa in the District of Columbia in November and December 2020; the D.C. Attorney General's January 6th-related lawsuit against the Proud Boys and the Oath Keepers; and Tarrio's prosecution for burning a "Black Lives Matter" banner belonging to a church here.  *See* ECF No. 389 at 4–5.  But they offer no basis on which this Court can conclude these events—two of which have nothing to do with January 6th—or any related publicity have incurably prejudiced the District of Columbia's jury pool against Defendants.  For example, although Defendants characterize the lawsuit as "much-publicized," they cite only a single article discussing it.  *Id.* at 5.  To the extent any potential juror might be improperly influenced by that lawsuit's existence, the Court is satisfied voir dire will reveal as much.

Turning to the second *Skilling* factor, the nature and extent of pretrial publicity also do not support transferring this case before voir dire.  No doubt, Defendants have been the subject of more particularized and extensive media coverage than most January 6th defendants, in part

6

because of the House Select Committee's hearings this summer. And that, to some extent, sets this case apart from other January 6th cases. *See, e.g.*, *United States v. Nassif*, 21-cr-421 (JDB), 2022 WL 4130841, at *10 (D.D.C. Sept. 12, 2022) (analyzing *Skilling*'s second factor and noting that the defendant "ha[d] not presented any evidence regarding media focused on himself").

Still, the brighter spotlight on Defendants does not support transfer, mainly because the pretrial publicity here is national in scope, available to anyone across the country with access to a television or the internet. *See* ECF No. 384 at 1–3 (listing national news reports from, among others, Bloomberg News, The New York Times, the Washington Post, and AP News). For that reason, "a change of venue would [be] of only doubtful value." *Haldeman*, 559 F.2d at 64 n.43; *see also United States v. Bochene*, 579 F. Supp. 3d 177, 182 (D.D.C. 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (cleaned up)). Indeed, looking again to Defendants' own survey evidence, District of Columbia respondents report being exposed to January 6th-related media at rates substantially equal to those of respondents from the Southern District of Florida, the Middle District of Pennsylvania, and the Eastern District of Virginia. *See* ECF No. 477-1 at 6.[3] Thus, the pretrial

---

[3] The Court also notes that the publicity here is not like that in *Rideau*, the only case in which the Supreme Court presumed juror prejudice. There, the pretrial publicity consisted of a "dramatically staged admission of guilt," which was "likely imprinted indelibly in the mind of anyone who watched it." *Skilling*, 561 U.S. at 382–83 (distinguishing *Rideau*, 373 U.S. 723). Even accounting for the House Select Committee's hearings and its mention of some Defendants by name, *Rideau*'s facts still "bear little resemblance" to those here. *See United States v. Brock*, 21-cr-140 (JDB), 2022 WL 3910549, at *6 (D.D.C. Aug. 31, 2022); *see also Skilling*, 561 U.S. at 382 ("[A]lthough news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.").

publicity Defendants discuss provides little reason for the Court to presume prejudice and transfer the case elsewhere.

On *Skilling*'s third factor, the trial will begin far enough removed from both January 6, 2021, and later spikes in pretrial publicity to mitigate risks of overriding prejudice. In *Skilling*, "over four years elapsed between Enron's bankruptcy and Skilling's trial." 561 U.S. at 383. And "[a]lthough reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* So too here. By the time Defendants' trial begins next month, nearly two years will have passed since January 6, 2021. Although press coverage of the day's events and its fallout continues, "the decibel level of media attention" has at least "diminished somewhat." *See id*. And again, the media coverage's national reach weakens the rationale for transfer in the first place.

Moreover, this Court has, to some degree, already addressed Defendants' concerns about the trial's proximity to the House Select Committee's hearings, which discussed the Proud Boys' activities on and before January 6th and highlighted some Defendants by name. At the request of Defendants Biggs and Pezzola, the Court continued the trial from August until December, noting that "[t]he proposed new trial date [of December 12, 2022], nearly all parties agree, would avoid the effect of [hearing-related] prejudicial publicity as best as possible." ECF No. 419 at 4–5.[4] To

---

[4] *See also* ECF No. 403 at 2 ("Biggs seeks to start trial after the midterms are over and some 'dust has settled' with respect to public opinion."); ECF No. 409 at 2 (Nordean "agree[ing] that a trial delay until after the conclusion of the select committee's public hearings would help ameliorate if not eliminate the unfair prejudice created by the committee and DOJ's coordinated publicity efforts"); ECF No. 417 at 3 (Rehl consenting to the continuance motion because the "only just and proper thing to do" was to "take as much time as necessary to assure that the unfair publicity has dissipated"); *but see* ECF No. 416 at 1 (Tarrio opposing continuance because he "believes that an impartial jury will never be achieved in Washington D.C. whether the trial is in August, December, or next year").

be sure, the House Select Committee reconvened for another hearing in October 2022, in which it discussed tips that law enforcement received about the Proud Boys before January 6th.[5] But Defendants cite no evidence on which the Court could find this hearing generated an "onslaught of negative and prejudicial media attention"—not to mention one that uniquely impacted the District of Columbia jury pool. ECF No. 484 at 1. Moreover, the headlines from that day focused on the House Select Committee's vote to subpoena former President Trump—not the Proud Boys.[6] In short, after evaluating *Skilling*'s third factor, the Court is satisfied that the proximity between the trial date and both January 6th and the news cycles most saturated with publicity about Defendants does not weigh in favor of transfer.[7]

\*   \*   \*

As noted above, Defendants also offer detailed survey data, which they say show that the District of Columbia jury pool is unavoidably prejudiced against them. But whether the Court considers that data under the *Skilling* factors or alongside them, it is not persuaded that these

---

[5] *See* Barbara Sprunt, *The Jan. 6 Committee has voted to subpoena Trump. Here's what else happened*, NPR (Oct. 13, 2022), https://www.npr.org/2022/10/13/1125333531/jan-6-hearing-recap-takeaways-trump-subpoena.

[6] *See, e.g.*, Sprunt, *supra* note 7; Kyle Cheney & Nicholas Wu, *Jan. 6 committee to subpoena Trump*, Politico (Oct. 13, 2022), https://www.politico.com/news/2022/10/13/jan-6-committee-trump-threat-00061454; Luke Broadwater & Alan Feuer, *Jan. 6 Panel Votes to Subpoena Trump as It Wraps Up Its Case*, N.Y. Times (Oct. 13, 2022), https://www.nytimes.com/2022/10/13/us/politics/jan-6-hearing-trump-subpoena.html.

[7] The parties agree that because the Court is considering this motion pretrial rather than after the jury's verdict, the fourth factor "does not directly apply." *See* ECF No. 376 at 13; ECF No. 349 at 7 n.7.

surveys show it should presume prejudice before voir dire.[8]  For good reason, courts here and around the country have long favored voir dire over pretrial polling to evaluate juror prejudice.

For example, in *Haldeman*, the D.C. Circuit found the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel."  559 F.2d at 64 n.43.  Strikingly, it so held even though the poll at issue found that 93 percent of the District of Columbia's population was aware of the defendants' charges and 61 percent believed they were guilty.  *See id.* at 144 (MacKinnon, J., concurring in part and dissenting in part).  Other circuits have similarly elevated the voir dire process over pretrial polling.  *See In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (The Supreme Court's "admonition" that a trial judge can best assess a juror's impartiality "undercuts [the] argument that poll percentages . . . decide the question of a presumption of prejudice" (citing *Patton v. Yount*, 467 U.S. 1025, 1039 (1984))); *United States v. Rodriguez*, 581 F.3d 775, 786 (8th Cir. 2009) (citing *Haldeman* and other cases to hold the district court was "not require[d] . . . to consider public opinion polls when ruling on change-of-venue motions").

The parties spill much ink over the surveys' precise findings and the quality of their methodology.  *See* ECF No. 376 at 18–26; ECF No. 389 at 10–13.[9]  The Court has reviewed the

---

[8] For example, the surveys largely aim to characterize the District of Columbia jury pool, which falls under the first *Skilling* factor.  *See Rhodes*, 2022 WL 2315554, at *21 (considering the first In Lux Research poll data under the first *Skilling* factor).  But some of their findings relate to the other factors, too, such as the nature and extent of pretrial publicity.

[9] In Tarrio's reply, he also included a survey commissioned by the Eastern District of Virginia's Federal Public Defender for use in another January 6th case.  *See* ECF No. 389-1.  He represents that its "results and conclusions parallel Zogby's survey," which he included with an earlier filing.  ECF No. 389 at 6; *see also* ECF No. 351-2.  The Court agrees, so this study does not move the needle any more than the other two.

polling data carefully, but the upshot is this: these polls are hardly a substitute for the voir dire process in determining whether a fair and impartial jury for this case can be selected from the District of Columbia's almost half a million potential jurors.

For example, even assuming the Court accepts these studies' conclusion that 91 percent of the District of Columbia jury pool has made "at least one prejudicial prejudgment on issues related to the case," it still does not follow that transfer is warranted. *See* ECF No. 477-1 at 3 (second In Lux Research poll); *see also* ECF No. 351-2 at 3 (Zogby study). To start, that conclusion would still leave thousands of potential jurors with no prejudicial prejudgments at all. But more importantly, it says nothing about whether prospective jurors could set aside their opinions and render judgment only on the evidence and the law as they are instructed.[10] To reiterate, the Supreme Court has said that the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is not disqualifying. *See Irvin*, 366 U.S. at 723. Rather, "[i]t is sufficient if the juror[s] can lay aside [their] impression or opinion and render a verdict based on the evidence presented in court."[11] *Id.*

Finally, the experience of courts in this jurisdiction with January 6th trials, including this Court's own, bears out the general effectiveness of voir dire. For example, after Judge Mehta first denied the defendants' motion to change venue in *Rhodes* (which relied in part on the first In Lux Research poll), he required the jury panel to complete a questionnaire before voir dire. In response,

---

[10] The most recent In Lux Research poll itself found that "63% of respondents from the DC Community claim they can be fair and impartial jurors for defendants charged with crimes related to" the events of January 6, 2021. *See* ECF No. 477-1 at 5. The Zogby poll does not appear to have attempted such a measurement. *See generally* ECF No. 351-2.

[11] Defendants also raise concerns about whether potential jurors will be willing or able to admit to their personal biases. *See* ECF No. 349 at 16; ECF No. 389 at 3. This concern underscores the need for a thorough and searching voir dire, but it is not unique to the jury pool in the District of Columbia.

only 24 percent of potential jurors reported hearing anything about the Oath Keepers that would affect their ability to be impartial. *See* ECF No. 502 at 4. Similarly, only 30 percent reported holding strong feelings about the events of January 6th that would impact their impartiality. *See id*; *see also* ECF No. 502-1 at 7 ("[T]he actual numbers as they are reflected in the juror questionnaire [do not] bear out the statements that are made in the [defendants'] motion suggesting that large percentages of people have pre-judgment bias, both in the District of Columbia and in this particular jury pool."). Judge Mehta was then able to pick a jury in only three days. *See United States v. Rhodes*, 22-cr-15 (APM), Minute Entry (D.D.C. Sept. 29, 2022); *cf. Murphy v. Florida*, 421 U.S. 794, 802–03 (1975) ("The length to which the trial court must go to select jurors who appear to be impartial is [a] factor relevant in evaluating those jurors' assurances of impartiality.").[12]

Does any of this guarantee that the Court will be able to empanel a fair and impartial jury for this case in the District of Columbia? No. But it provides good reason to believe it can. And in any event, Defendants may renew their motion to transfer if voir dire raises concerns about the jury pool's impartiality. *See Rhodes*, 2022 WL 2315554, at *23 ("Defendants remain free to renew their motion to transfer during or following the voir dire process."). For now, and for all the

---

[12] As in *Rhodes*, this Court will employ a pre-voir dire jury questionnaire. *See* ECF No. 426 at 3 ¶ 7(b); Minute Order of November 1, 2022.

reasons the Court has discussed, it will deny Defendants' motion to transfer the case.[13] And in so ruling, it joins every other court in this jurisdiction.[14]

### IV. Conclusion and Order

For all these reasons, it is hereby **ORDERED** that Defendants' Motion to Transfer Venue, ECF No. 349, is **DENIED WITHOUT PREJUDICE.**

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: November 8, 2022

---

[13] Tarrio also argues that the Court should transfer the case to the Southern District of Florida "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b); *see* ECF No. 349 at 22–23. He cites no reason why the Southern District of Florida is more convenient for trial other than the "presumptive cost" to him. *See id.* at 23. The Court finds that any convenience for Tarrio alone is outweighed by the inconvenience to the other parties and the many witnesses in this case. And his argument in favor of transfer "in the interest of justice" merely incorporates his argument under Rule 21(a). For the reasons discussed throughout, the Court rejects that argument and declines to transfer this case under Rule 21(b).

[14] *See, e.g.*, *United States v. Ballenger*, 21-cr-719 (JEB), 2022 WL 16533872, at *5 (D.D.C. Oct. 28, 2022); *United States v. Eicher*, 22-cr-38 (CKK), 2022 WL 11737926, at *4 (D.D.C. Oct. 20, 2022); *Nassif*, 2022 WL 4130841, at *10; *Brock*, 2022 WL 3910549, at *5; *United States v. Garcia*, 21-cr-129 (ABJ), 2022 WL 2904352, at *10 (D.D.C. July 22, 2022); *Rhodes*, 2022 WL 2315554, at *23; *Bochene*, 579 F. Supp. 3d at 182.