**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,        )  Criminal Action
                                 )  No. 1:21-cr-00175-TJK
                  Plaintiff,     )
                                 )
vs.                              )  **Pretrial Conference**
                                 )  **\*\*\*\*\* PARTIALLY SEALED \*\*\*\*\***
                                 )
Ethan Nordean, et al.,           )  **Washington, D.C.**
                                 )  **November 18, 2022**
                  Defendants.    )  Time:  9:30 a.m.
_____

Transcript of **Pretrial Conference**
Held Before
**The Honorable Timothy J. Kelly
United States District Judge**


A P P E A R A N C E S

For the Government:        **Jason B.A. McCullough
                           Erik M. Kenerson
                           Conor Mulroe**
                           UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                           601 D Street, Northwest
                           Washington, D.C.

                           **Nadia Moore**
                           UNITED STATES ATTORNEY'S OFFICE
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

For the Defendant (1) Ethan Nordean:
                           **Nicholas D. Smith**
                           DAVID B. SMITH, PLLC
                           7 East 20th Street
                           New York, New York 10003

For the Defendant (2) Joseph R. Biggs:
                           **John D. Hull, IV**
                           HULL MCGUIRE PC
                           1420 N Street, Northwest
                           Washington, D.C. 20005
(continued on next page)

```
1                    A P P E A R A N C E S, continued

2        For the Defendant (2) Joseph R. Biggs:
                                    Norman A. Pattis
3                                   PATTIS & SMITH, LLC
                                    383 Orange Street, 1st Floor
4                                   New Haven, Connecticut 06511

5        For the Defendant (3) Zachary Rehl:
                                    Carmen D. Hernandez
6                                   7166 Mink Hollow Road
                                    Highland, Maryland 20777
7
         For the Defendant (5) Enrique Tarrio:
8                                   Nayib Hassan
                                    LAW OFFICES OF NAYIB HASSAN, P.A.
9                                   6175 NW 153 Street, Suite 209
                                    Miami Lakes, Florida 33014
10
         For the Defendant (6) Dominic J. Pezzola:
11                                  Steven A. Metcalf, II
                                    METCALF & METCALF, P.C.
12                                  99 Park Avenue, 6th Floor
                                    New York, New York 10016
13
         For the Press Coalition:
14                                  Maxwell S. Mishkin
                                    BALLARD SPAHR LLP
15                                  1909 K Street, Northwest, 12th Floor
                                    Washington, D.C. 20006
16       _____

17       Stenographic Official Court Reporter:
                                    Nancy J. Meyer
18                                  Registered Diplomate Reporter
                                    Certified Realtime Reporter
19                                  333 Constitution Avenue, Northwest
                                    Washington, D.C. 20001
20                                  202-354-3118

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           THE COURTROOM DEPUTY:  Your Honor, we're on the

3    record in Criminal Matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs;

5    Defendant 3, Zachary Rehl; Defendant 5, Enrique Tarrio; and

6    Defendant 6, Dominic Pezzola.

7           Present for the government are Jason McCullough,

8    Erik Kenerson, Conor Mulroe, and Nadia Moore.

9           Present for Defendant 1 is Nicholas Smith.  Present for

10   Defendant 2 are John Hull and Norman Pattis.  Present for

11   Defendant 3 is Carmen Hernandez.  Present for Defendant 5 is

12   Nayib Hassan.  Present for Defendant 6 is Steven Metcalf.

13          Also present is Defendant 1, Mr. Nordean; Defendant 2,

14   Mr. Biggs; Defendant 3, Mr. Rehl; Defendant 6, Mr. Pezzola; and

15   appearing by video is Defendant 5, Mr. Tarrio.

16          THE COURT:  All right.  Good morning, everyone.

17          Let me set out what I think is a reasonable way forward

18   here in terms of what we can accomplish today and see if

19   anyone -- see if -- what the parties think of this.

20          First, I have a couple of housekeeping matters I thought

21   we would discuss.  So let me just roll through them really

22   quickly.  The first is -- we talked about it the other day.  I

23   mentioned the idea of not sitting the week between Christmas

24   and New Year's, which would be the 27th through the 30th.  If

25   we did that, we would probably reclaim the 23rd, which I had

1    sort of reserved as a little bit of a break before Christmas,

2    but do the parties want to be heard on that?  Let me put it

3    this way:  Does any party object to us moving to that schedule?

4         All right.  Seeing no objection, that's what we will do

5    to try to preserve more of our jury pool.  We'll reclaim the

6    23rd, which -- where we thought we would not sit, and then we

7    will -- and then we will not sit on the 27th to the 30th.  Now,

8    we may -- you know, as we get closer to that time, we may all

9    find that it would be advantageous on one of those days to have

10   a procedure -- have a proceeding by video that we might --

11   we'll talk about it as we get closer to then.

12        I understand people won't be in the jurisdiction.  Many

13   of you won't be, and certainly we can accommodate that, but I'd

14   leave open the possibility that we might want to -- there might

15   be some legal issues we can knock out at -- on one of those

16   days, if the parties agree to it.

17        Mr. Pattis?

18        MR. PATTIS:  Would you reconsider for the 23rd, for

19   those of us who travel from some distance?  I mean, if not, I

20   understand that this is certainly a windfall.  I didn't

21   expect -- the 23rd is a difficult date, given the plans we

22   previously made, and I can adjust, but if you reconsider, I

23   promise to behave during trial.

24        THE COURT:  Let's leave open the possibility, maybe,

25   of in the morning and breaking -- breaking at lunch.

```
 1              MR. PATTIS:  Thanks, Judge.

 2              THE COURT:  All right.

 3              MS. HERNANDEZ:  Your Honor, I think probably the --

 4    I'm local, and I'm not traveling out of -- family is coming in,

 5    but ordinarily -- that's the Friday before the Christmas

 6    holidays.

 7              THE COURT:  I understand.  So I think -- what I would

 8    do is let's leave open -- I'll say right now, it will be a half

 9    day.  Whether that will be matters before the jury or matters

10    for us to discuss, we can -- we can talk about what makes sense

11    as it gets closer, but it will be a half day.

12              All right.  So that's number one.

13              Number two, the other thing that I noticed -- again,

14    we're going to talk about the questionnaire in a moment.  The

15    other thing I noticed in putting together that questionnaire,

16    there is that one question where we lay out, well, here's who

17    is going to be masked and here's who won't be.  My thought --

18    and it sort of actually dovetails with the matter we just

19    discussed; that is, the break.

20              I had -- as you-all saw from the draft questionnaire we

21    provided, I had thought we would proceed as we are today, as

22    far as the lawyers go, that is.  No masks -- or at least

23    optional.  Obviously, masks optional.  The jurors might --

24    because we are forcing them to be here and because they are

25    sitting in -- they'll be sitting in such proximity -- would be
```

1    to have them -- what I typically do -- actually, just to ask --

2    just to put this on the record for you-all -- is ask them to

3    fill out on a slip of paper whether they're vaccinate- -- once

4    we select them -- I'm talking about the actual jury, whether

5    they're vaccinated.  And if so, are they comfortable sitting

6    with their fellow jurors with no -- with no mask on.

7         If all the jurors -- and anonymously they'll write down

8    yes or no, yes or no.  I get 14 slips back.  If I get yeses

9    from everybody, I say, okay, at least when you're -- at least

10   when you're deliberating back there and on breaks, if you want

11   to take them off, you're all in agreement, you're comfortable

12   with that, fine.  If not, one person says no, you keep them on.

13        The issue is because this will be, you know, more than a

14   week or two worth of trial, number one; and, two, because we

15   are going to have this break where a lot of folks will travel,

16   see family, whether I should require counsel -- when not

17   questioning a witness -- to wear a mask on the theory that it

18   will lessen the likelihood if someone happens to get sick that

19   it won't get everyone sick and the whole trial won't be

20   derailed.

21        So I don't know whether folks feel strongly about that

22   one way or the other, but I thought I would take your

23   temperature about whether if I impose that rule -- that is, for

24   counsel anyway.  If -- if the defendants want -- it seems to me

25   if the defendants want to remain unmasked when the jury is

1     here, I think that's probably their prerogative.  But what is

2     counsel's view whether I should sort of mandate everyone wear a

3     mask prophylactically just to make sure that, you know, again,

4     if somebody gets sick, we don't take out half of -- half of the

5     lawyers here.  Anyone want to be heard on that?

6              MR. PATTIS:  Yes.  I oppose masks, Judge.  I mean,

7     especially in a case where the government may make masks an

8     issue as part of their evidence.  But the view is if one of the

9     lawyers fall ill, we're going to have to stop the trial in any

10    case, and I don't particularly care to sit here six or seven

11    weeks --

12             THE COURT:  I don't know -- did you say if one lawyer

13    fell ill, we'll have to stop the case?

14             MR. PATTIS:  Well, I mean, if one of Mr. Biggs'

15    lawyers falls ill, he may make a claim that he has under

16    *United States v. Gonzalez-Lopez* the right to counsel of choice,

17    and because of an illness, the tri- -- you know, yada, yada,

18    yada.  You can imagine the argument.  And the Court may

19    conclude that he -- that the trial should go forward with one

20    and that will be an issue.  But I have a strong objection to

21    wearing a mask for six or seven weeks.

22             THE COURT:  You're arguing that he has the right -- I

23    mean, isn't -- isn't the import of your argument that I should

24    actually impose the -- I mean, if it's going to be a problem

25    for the trial, isn't that a stronger argument for me to impose

```
 1    the mask requirement?

 2              MR. PATTIS:  It's not at all obvious to me that the

 3    Court has inherent supervisory power over public health of

 4    trial participants, and, you know, I don't mean to be difficult

 5    about it, but I have no interest in masking up for that length

 6    of time.

 7              THE COURT:  All right.  I will weigh that.

 8          Anyone else want to be heard on this point, for or

 9    against?

10              MS. HERNANDEZ:  I personally prefer no masks.  I just

11    sat through a five-week trial.  It's a pain in the neck.  In

12    that case, Judge Boasberg's ruling was whoever -- if your

13    witness was on the stand, either you were cross-examining or

14    direct, you didn't have to wear a mask at all during, even

15    though you weren't at that moment asking the questions.

16              THE COURT:  Right.  You want to be able to just stand

17    up and object and all the rest.  Right.

18              MS. HERNANDEZ:  And all the rest -- I found it

19    cumber- -- it's -- it's not comfortable.

20              THE COURT:  Right.

21              MS. HERNANDEZ:  But -- so personally prefer -- I

22    understand depends -- in that case, in particular -- and that

23    was a month -- two months ago -- the judge gave the jurors the

24    option.  He said if it was unanimous, they wouldn't have to.

25              THE COURT:  Right.
```

1          MS. HERNANDEZ:  And in that case, they voted to wear

2     masks.

3          THE COURT:  Yeah.  I have never had -- in the three

4     or four times I've done it since the pandemic, I've come close

5     to unanimity, but most of the time at least one person --

6          (Indiscernible simultaneous cross-talk.)

7          MS. HERNANDEZ:  So I guess if the jury wants masks,

8     then it's difficult for the -- counsel to walk around without

9     masks.  But if you're asking for my preference, I prefer not to

10     wear a mask.

11          THE COURT:  All right.

12          MR. HASSAN:  Judge, just real quick.  Different

13     jurisdiction.  Southern District of Florida doesn't require a

14     mask whatsoever.  It's completely optional.  So I just ask that

15     the Court make it optional, Judge, for all parties.

16          THE COURT:  It's definitely my preference to make it

17     optional, as you see here today and as you saw yesterday.  I,

18     in general, agree with that approach.  I think the only

19     question is whether -- when we're talking about a six-week

20     trial, whether some additional precaution is necessary to make

21     sure the trial proceeds expeditiously.  You can understand

22     that, but I hear your point.

23          MR. HASSAN:  Judge, wearing a mask with a beard is a

24     little too much.

25          THE COURT:  I got it.  I got it.

```
 1              MR. HULL:  Dan Hull -- excuse me.  Dan Hull.

 2         Your Honor, I prefer no masks as well.  That said -- and

 3    you may be thinking about this -- or going to bring it up

 4    later.  What -- there was a discussion in the pretrial for

 5    Oath Keepers about what happens if one of counsel gets COVID or

 6    something like that and, you know, some of us don't get -- get

 7    it at all.  It seems like -- and some of us do.  What's -- is

 8    there a protocol for that when it happens?

 9              THE COURT:  I don't think there's a protocol.  In

10    that case, I believe they worked -- they may have lost a day or

11    two, but then they kind of worked around it and figured out how

12    to restructure -- I don't know whether that was the

13    government's case or the defense case at that point.  I think

14    it was the government's case.  And they may have restructured

15    the witnesses.  And -- and counsel worked around it in terms of

16    who was going to be -- who was handling the witness in terms of

17    cross and -- so they lost a few days, but that's, I think --

18    that was the --

19              MR. HULL:  It was one of the defendants, not counsel.

20    Was it --

21              THE COURT:  It was actually a defendant, as I recall.

22    All I know is through media reports.  I believe a defendant

23    came down with it.

24              MR. HULL:  I'm raising it.  I thought you would

25    probably mention it.
```

1          THE COURT:  There's no protocol, I don't believe.

2     We'll work around -- whoever the party is, if it happens, we'll

3     figure out how to work around it.

4          MR. HULL:  Thanks, Your Honor.

5          THE COURT:  All right.

6          MR. MCCULLOUGH:  You know, for government,

7     Your Honor -- Jason McCullough for the United States.

8          Your Honor is weighing all the considerations, and we

9     also have an interest, just like the defendants, in just making

10    sure that we get through the trial.  We're happy to take

11    Your Honor's guidance on this.

12         THE COURT:  All right.  I'll just -- I'll take that

13    as it is.

14         All right.  So with those housekeeping matters out of

15    the way, here is how I thought we would proceed.  I want to

16    talk about the questionnaire because that's something we

17    definitely have to finalize; then move to the government's

18    motion *in limine*, which I think -- I presume we're going to

19    spend the bulk of the time on.  I'll hear from the parties on

20    that.

21         Mr. Pezzola, I said I -- I'm -- I think -- Mr. Metcalf,

22    because he wasn't here the other day, I said I would hear

23    argument on his sort of supplement to the motion to dismiss.

24    So I will hear that.

25         Then my thought is -- frankly, the only other thing

1    would be to hear from Mr. Rehl on his motion to sever, and I'm

2    happy -- again, it's a Friday, and I know I'm trying to be

3    respectful of everyone's time.  Then I'm happy to release

4    everyone else and just have Ms. Hernandez here and talk about

5    the motion to sever.

6        I think on some of the other more ordinar- -- but if

7    folks want to stay for that, that's fine with me.

8        We do have -- you know, ordinarily, in a pretrial

9    conference, I'd talk about things like the jury instructions,

10   but seems we're -- you know, for a couple of reasons, I think

11   putting that discussion off probably makes sense, not the least

12   of which I owe you a ruling in the motion to dismiss.

13       Number two, I know in the Oath Keepers trial, I think

14   either yesterday or today, they're instructing the jury there.

15   So we may all benefit from looking to see what those

16   instructions were.  I mean, obviously, that's going to be -- I

17   know the -- what those instructions are will be hotly

18   contested.  We'll have plenty of time to contest it in the

19   future.

20       That's my thought, but what -- I'll hear from anyone if

21   they want to add to that agenda.

22        MS. HERNANDEZ:  Your Honor, just a housekeeping

23   matter.  This is about housing for the trial.

24       Mr. Rehl and Mr. Nordean are at Northern Neck.  I am

25   told that they were awakened at 2:00 in the morning in order to

1    get here in time, and then the other day when they were both

2    here the whole day, they didn't get back until 9:00 p.m.

3    That's an impossible schedule.

4              THE COURT:  All right.  I'll renew -- I'll renew my

5    discussions with the marshals.

6              Anything from any- -- anyone else want to put anything

7    else on our agenda here today?

8              All right.  Hearing no one.

9              Is there -- you-all got a copy of the questionnaire.

10   Does anyone want to be heard on any aspect of the

11   questionnaire?  Before we talk about the substance of it, let

12   me just say, this is my understanding of, roughly, how they

13   proceeded using this style questionnaire in the Oath Keepers

14   case anyway.

15             We will administer it -- as I mentioned to you-all, we

16   have the jurors -- the pool coming in on the 5th.  We will

17   administer it to the panel.  We will turn around and get the

18   completed questionnaires to counsel, I anticipate, that same

19   day.  And I anticipate then having a session with counsel -- I

20   don't see any reason we can't do it by video -- let's say, the

21   morning of the 7th.

22             And the idea would be if all parties agree -- or if any

23   party wants to make the argument that we should excuse a juror

24   from coming in completely, we could talk about who -- who

25   amongst the pool falls into that category, whether because they

1    say I can't make it because of hardship, because of -- or some

2    other reason they wouldn't be a qualified juror.  If we all

3    agree, then I can get that information to the jury office and

4    they can tell that potential juror you don't even need to show

5    up on the 12th.  So it will be -- or maybe, actually, what

6    would happen is the person would come and serve on a different

7    jury.

8            So that's -- that is how I see the process working, and

9    then, obviously, when we show up for *voir dire*, you'll have

10   them and you'll have all that information as a jumping-off

11   point for individual *voir dire*.

12           So on the substance of the questionnaire, I will -- I'll

13   hear whoever would like to be heard.

14           MR. HASSAN:  Judge, Nayib Hassan on behalf of

15   Mr. Tarrio, Judge.

16           Judge, many of the questions that we drafted in regards

17   to the jury questionnaire that were proposed by the defense,

18   many of those questions were open-ended questions.  And I see

19   the Court basically curtailed some of those questions and made

20   them very narrowly scoped in regards to yes-or-no questions.

21           The reasons that we asked for very broad answers on

22   certain questions, it gives a broad perspective.  It gives us a

23   better light as far as what these individuals -- like, let's

24   say, for instance -- and if I look at the Court's

25   questionnaire, Question 24, where you talk about organizational

1    affiliations and activities, and -- then it only talks about

2    five years' attended rallies, but doesn't follow up with what

3    rallies or what those were.  Doesn't give us an insight as far

4    as whatever may be.  And it's our perspective that the more

5    information, the better.  That -- that basically gives all the

6    parties the best opportunity to know the jurors as much as

7    possible.

8            And you go on and you go forth, Judge.  I mean, if we

9    continue on -- when we talk about firearms -- and I know that

10   question is going to come up regarding our motion *in limine*,

11   regarding Black Lives Matter --

12           THE COURT:  Right.  Obviously, this is all contingent

13   on those questions about --

14           (Indiscernible simultaneous cross-talk.)

15           MR. HASSAN:  Correct, Judge.  And if I see the

16   Court's questionnaire, those -- those questions are more

17   elicited on the back end of the questionnaire.  Like, let's say

18   Question 53, Question 54, and it's simply like -- it simply

19   provides for a yes-or-no answer.  The reason for being more

20   elaborative as far as that information, it gives us more

21   insight as far as what the -- what the potential jurors will be

22   thinking as far as what their insight is, as far as what

23   their -- their thoughts are.

24           I mean, that's what basically jury duty -- jury

25   selection is all about, finding out who is in -- who is

1    actually sitting on the jury.

2            THE COURT:  Sure.

3            MR. HASSAN:  If we simply go on a yes-or-no

4    questionnaire -- Judge, when we're creating this, we had --

5    first, we pulled up the questionnaire that was used in the

6    Oath Keepers case, of course.  Then we had other drafts that

7    were created, but also we pulled drafts from other cases that

8    had very complex issues.  For instance, the *Tsarnaev case* in

9    Boston, Judge.  And if we pull out that questionnaire itself,

10   there's no yes-or-no questions.  It was literally more a

11   narrative -- that provided a narrative.  The basis and the

12   reasons for that were it gave more insight as far as what the

13   jurors were thinking.

14        I think it will place all the parties in a better

15   position, including the Court, to know exactly what the jurors

16   are thinking, especially in light of some of the questions.

17   That's why we provided for open-ended questions, and that's why

18   we would object as far as not providing those open-ended

19   questions on the jury questionnaire.

20        When it comes down to it -- I mean, when we go yes-or-no

21   questions, we expect jurors to do the correct thing.  We expect

22   jurors to look at the questions and answer questions

23   adequately.  But let's be honest.  You're talking about a

24   hundred or so questions.  There comes a time period that some

25   jurors may just want to go no, no, no, no, no, and then we're

1    not going to get a correct insight.

2           So by breaking up the mindset and making these

3    open-ended questions at a certain phase of the case -- let's

4    say firearms, for instance, let's say Black Lives Matter, let's

5    say rallies, let's say different things that -- for the defense

6    we're really concerned about.  It opens up and creates -- makes

7    them think a little bit more before they move on to the next

8    question.  So that's why we're asking for the breakdown a

9    little bit and allow the jurors to answer questions, not only

10   in a yes-or-no answer, but go on and pretty much list.

11          Look, if they attended a rally, we don't know what rally

12   they attended.  It could fall for the defendant; it could fall

13   for the government.  And the fact that they attended a rally

14   may not impact one way or another whether they can be fair and

15   impartial for the trial.

16               THE COURT:  So --

17               MR. HASSAN:  It gives better insight, Judge.

18               THE COURT:  Right.  Look, and I'm trying to balance.

19   I appreciate that even apart from the issue of prejudice, it

20   is -- both sides want as much information as possible.  I've

21   been in your shoes.  You want -- you want all the information

22   you can have of these people because you want -- you want to

23   use it to your client's advantage.  There's nothing wrong with

24   that, obviously, but --

25               So I'll take what you're saying under advisement about

1    the open-ended questions.  I think I have to balance getting

2    them through -- getting them -- giving them -- you know,

3    letting them -- making it easy for them to fill out and getting

4    it quickly back to you all.  And -- and the other thing I'll

5    say is -- but I'm going to think about what you said, but I'll

6    just say this:  For example, on the questions about, let's say,

7    we do have -- they are close ended, but if you look at 49 and

8    50; right?  Have you seen -- "Have you read, seen, or heard

9    anything about the 'Proud Boys'?"  Yes/no.  Someone checks yes.

10        I'm going to follow up with them; right?  I mean, it's

11    not -- that's -- that's not the end of the story; right?  And

12    even if they check -- in the next one, anything that would

13    affect your ability -- even if they checked that no, it strikes

14    me -- we're going to ask the question, well, what have you

15    heard.  And if we're all looking at the person and we think,

16    well, okay, you know, they -- they may -- well, if there's some

17    reason to think that we need to probe further, I can do that.

18        So I -- just because these are close-ended questions

19    doesn't mean that in the individual *voir dire* part of our

20    procedure I won't be pushing further and asking open-ended

21    questions.

22        MR. HASSAN:  And I appreciate that, Judge.  One

23    concern that I do have, Judge, is that the Court raised, as far

24    as making it easy for -- making it easy for the jurors to get

25    through the questionnaire.  For many of these defendants,

1   including my client, Judge, this may be the biggest trial of

2   their life, Judge.  So the fact the Court is trying to make it

3   easy for the jurors shouldn't really play a part as far as --

4   as far as this, Judge.  I think -- I think we do need to break

5   it down a little bit, and that's why the open-ended questions

6   play a part in that because it causes them to think a little

7   bit.

8           Let's say you do answer no.  They're just going through

9   the questions.  You're going through a long list of a line of

10  questions here, and you've already -- you just covered the

11  knowledge as far as the prosecutors on this case, the knowledge

12  of the attorneys, the knowledge of the defendants.  So you're

13  working your way through this questionnaire, and pretty much

14  you're like, okay, no, no, no, no.  I mean, how do we phase it

15  in at that point in time?

16          So that's why a cause in the breakdown of

17  communication -- as far as a yes-or-no questionnaire works, and

18  that's why in cases like the *Tsarnaev* case, as well as the

19  Oklahoma City bombing case, those cases had breakdowns.  They

20  had breakdowns.  Not only did they -- some of them had a

21  yes-or-no questionnaire, but they had more of a narrative to

22  give a better insight as far as the parties, as far as who the

23  jury is.

24          This -- this can cut both ways.  This can cut towards

25  the government; it can cut towards the defense.  Because

1    they're answering yes, yes, yes, yes, yes, then we're going to

2    be sitting here all day asking every single juror certain

3    questions.  By breaking it down, you're causing them to think a

4    little bit, Judge.

5         THE COURT:  All right.

6         MR. HASSAN:  And that's our position.

7         THE COURT:  All right.  All right.  I'll think about

8    that.  I'll think about that, and I'll -- before we finalize

9    it, we'll get it to all of you just so you have it, but I'll

10   think about the point you're making.

11        MR. HASSAN:  Judge, as far as certain questions that

12   were made during the Court's proposed questionnaire, I imagine

13   those have an impact regarding how the Court will rule on the

14   motion to -- a motion *in limine*.

15        THE COURT:  No.  They don't suggest the -- no.  I put

16   them in just assuming for the moment, I guess, that all that

17   evidence will be in.  I did this before I even heard argument

18   yesterday.  So it doesn't suggest a ruling at all on those

19   questions.

20        MR. HASSAN:  So as far as --

21        THE COURT:  Obviously, I would not include those

22   questions that have to do with that type of evidence if I was

23   going to rule it out.

24        MR. HASSAN:  Do we -- as far as when the -- when the

25   Court does rule in regards to the motion *in limine*, will we

1    then have an opportunity to revise the jury questionnaire at

2    that point in time and present it to the Court, or will the

3    Court just simply remove the questions that were in the jury

4    questionnaire and go from there?

5             THE COURT:  So we're going to be -- I think

6    inevitably, one way or the other, I'm going to have to get

7    back -- we're going to have to -- and it may just be the

8    lawyers -- is -- we'll be scheduling something in the next few

9    weeks where I can give you more guidance on the outcome of

10   these motions.

11        My thought is there's only a few questionnaire --

12   questions that have to do with this sort of -- these issues

13   that might -- that I could exclude.  So I think we'll be in

14   contact, whether it's online or in person, and you'll have a

15   ruling from me on that -- those contours; but either way,

16   before the 5th, what I will -- what we will do is email you the

17   final version of this so you can see.  But I think it's just a

18   question of -- what is it? -- maybe two or three or four

19   questions that either -- that this might hinge on, and,

20   obviously, if I rule that evidence out, we would pull those

21   questions out.

22             MR. HASSAN:  And will the Court give an opportunity

23   again to counsel to -- and I'm simply asking for

24   clarification -- at a later time, Judge, because some of those

25   questions, directly, are some of the open-ended questions

1    that -- that the defense asked for; maybe the firearms -- the

2    firearm question regarding the magazines that were taken from

3    Mr. Tarrio, or Black Lives Matter issues.

4            THE COURT:  Why don't we do this:  I'll hear you

5    again -- on it again.  I'm going to have to rule more

6    definitively as much as I can on some of these motions before

7    trial and -- before the 5th.  So at that point, I'll hear you

8    on how they affect the questionnaire.

9            MR. HASSAN:  Thank you, Judge.

10           THE COURT:  Okay.  Does the government want to be --

11   oh, Ms. Hernandez.

12           MS. HERNANDEZ:  So, Your Honor, in support of

13   Mr. Nayib's argument, as the Court knows, we filed motions for

14   change of venue at which the Court has, I think, denied without

15   prejudice.

16           THE COURT:  Uh-huh.

17           MS. HERNANDEZ:  But, you know, the change of venue

18   issue is really a jury -- a fair jury issue.  So to the extent

19   that we can -- the more information we can get, the more -- the

20   more that issue gets resolved, I think.  And I -- and that --

21   on that score, I would point to the Court that, I guess, the

22   most recent -- I know there have been cases in this district,

23   including the Oath Keepers case.  And I think two things are

24   the result of that, is -- as more of those cases get tried,

25   the -- the news reports about the events of January 6th or

1     about those trials also gets out in the community.  So that

2     adds another level of potential prejudice -- or potential undue

3     prejudice, as the Court pointed out yesterday.

4            And, particularly, I think --

5            THE COURT:  This would be -- because it's publicity,

6     this is all undue.  There's -- there's nothing -- there's no

7     proffer of prejudice in terms of this.

8            MS. HERNANDEZ:  Right.  And I think the Oath Keepers

9     case is a big deal because that is a seditious conspiracy case,

10    and we're the second seditious conspiracy case.  So I think we

11    have to really be wary of that -- or aware of that.  So the

12    more information we can get, the better, and I think we get

13    more information with open-ended questions.

14           And along -- along with that issue, the Supreme Court

15    this term -- this past term, you know, decided the *Tsarnaev*

16    case, which is the case that arose out of the Boston marathon

17    bombing, and the jury -- you know, the First Circuit had

18    reversed, I believe, on jury selection issues, and I think the

19    Supreme Court upheld the -- or affirmed the convictions, in

20    part, because the jury selection process in that case, as I

21    recall, had taken, like, three weeks, and it was a very

22    extensive inquiry of the jurors.

23           So that combination of factors, again, I would -- I

24    think from the defense's point of view, that's why we want the

25    open-ended questions.  If you're not going to give us the

1    open-ended questions, we'll take the change of venue motion.

2             THE COURT:  No.  I understand.  No.  I'm going to

3    think about the point you made, and maybe -- there may be some

4    places where the open-ended questions are appropriate.  So

5    I'll -- it's a fair -- it's a fair point.

6             MS. HERNANDEZ:  And I think Mr. -- I think this has

7    already been made, but if the point wasn't made, I do think

8    some of these issues may be sensitive to jurors.  So it's -- it

9    can mask -- by being able to say yes or no, you can mask your

10   true feelings.  Whereas, if you have to put down a few words in

11   an open-ended, we might get a more honest -- so that's another

12   reason.

13            THE COURT:  And I realize this is -- you know,

14   obviously, by virtue of us doing a questionnaire, this is an

15   unusual case.  Of course, when we do general *voir dire* in the

16   general case, it's -- it's a yes-or-no question to start too,

17   and then from there, you can -- you delve in -- more in a yes

18   or no.  Oh, if yes, then let's talk about -- or no or

19   whatever the -- if you have something to say, okay, now let's

20   talk about what that thing is that you want to bring to our

21   attention.

22            So in some ways it's not any different than the -- I

23   mean, I get your point, but the open/closed issue is not any

24   different from the normal process that, you know, again, we

25   have to -- I will have to push forward past whatever they say.

1 And that's why I think it's important -- I mean, you could

2 imagine a world in which there's only a question, have you

3 seen -- just to take the Proud Boys example.  Have you read,

4 seen, or heard anything about the Proud Boys that would affect

5 your ability to be a fair and impartial juror?  No.  Well,

6 then, okay, that's just sort of beginning at the --

7   MS. HERNANDEZ:  Where have you been the last

8 two years then?

9   THE COURT:  Well, I mean, you know, they -- that

10 could mean a lot of different things, but we do have a separate

11 question for anything about them at all.

12   If somebody checks yes, which I assume many -- some -- I

13 think a surprising number of jurors on some of those questions

14 will say no, and they really won't know, but -- you know,

15 anything about Antifa, but anybody who checks yes, like --

16 okay.  Well, what did you learn, and what is -- blah, blah,

17 blah, blah.  So -- but I take your point.  I'm going to think

18 about the point you're making.

19   MS. HERNANDEZ:  So the other thing is -- or two

20 points, I think.  You know, part of the benefit of -- or part

21 of the reasoning for a jury questionnaire is the time-saving

22 that it will generate because we'll -- and I've been in one

23 case where we did a questionnaire, a drug case a long time ago

24 in front of Judge Leon, and it was -- it was hugely time-saving

25 in terms of the jury.  I mean, it took -- it took time from the

1    defense counsel and the Court because you come in and you get

2    to review the things.  But by the time we got to the jury, we

3    had a much better -- fewer questions, which I think is more

4    time-consuming in terms of having jurors here and having that

5    give and take.

6              THE COURT:  But you made that point originally, and I

7    think it's the right one, but I don't know how that cuts in

8    terms of the open-ended questions, though, Ms. Hernandez, only

9    because I'm going to ask that question regard- -- right?  Like,

10   if somebody checks yes, I know something about a topic,

11   regardless of whether there's then an open-ended question,

12   well, what do you know, and they write down whatever they write

13   down, I'm going to be asking that follow-up question regardless

14   of what they write down; right?  Like -- we have to.

15         So that's why I'm not sure how much of a time-saver it

16   really is, because I'm going to -- again, if somebody checks,

17   yeah, I know something about the Proud Boys, even if they

18   checked the other box, I mean, we're going to have to find out

19   what that is.

20         So I don't know, but I hear you.

21             MS. HERNANDEZ:  So the note I was given is to remind

22   me and you and the Court that this is not a normal case.

23             THE COURT:  It's not.  By definition, we're -- we

24   have a questionnaire, and that -- that's not -- I understand.

25   I'm only pointing out conceptually that starting with open --

1    starting with mostly close-ended questions, it is common in

2    terms of the starting point, but it's only the starting point,

3    but -- it's only the starting point.  But, in any event, I hear

4    your argument.

5              MS. HERNANDEZ:  Thank you, Your Honor.

6              THE COURT:  I don't think Ms. Hernandez is done,

7    Mr. Hull.

8              MR. HULL:  That's probably true.

9              THE COURT:  All right.  But she is.

10             MS. HERNANDEZ:  Thank you, Your Honor.

11             THE COURT:  All right.  Mr. Hull, if you'd -- please.

12             MR. HULL:  Your Honor, we spent a lot of time on

13   the -- on the questionnaire in view of the fact that this is a

14   different community, and we're trying to make that point in the

15   motion for change of venue, and the law is what it is on that,

16   and it's tough.  So I think we all thought this has to be

17   particularly, you know, well done, understandable -- I mean,

18   something that the jurors could read through and not be -- not

19   have to say later on the stand that, you know, I -- oh, I

20   didn't understand the question or -- and that happened in a few

21   of the colloquies I saw in two of the jury trials involving

22   January 6th.

23        There's -- and thank you for putting this together, but

24   there were three in particular that I thought might get, like,

25   quicker to what kind of people live in the district, who they

1    are.  And I think one -- one of those was -- I had about -- a

2    number of mine did not end up on this list, but there were

3    three in particular.

4          One is where do you get your -- instead of where do you

5    get your news, listing some sources of news.  And I didn't

6    pick -- there was *New York Times*, *Washington Post*, NPR, you

7    know, establishment, nonestablishment, a potpourri, so they

8    could say, oh, yeah, I do listen to that.  Even Sedition

9    Hunters, which I learned about during this trial, I would want

10   to know if they read it and why and, you know, certain kinds of

11   publications.

12         The second group of questions that I had were -- one

13   involved what do you think about men's groups or fraternities,

14   and I thought that -- since the -- a lot of the gestalt that

15   sort of surrounds the Proud Boys is about it being all male,

16   it's kind of a cultural issue.  I'd like to note, you know, the

17   people on the jury thought about that.

18         Also, where does -- the third category is where do you

19   get your information about -- I noticed this from watching some

20   of the *voir dire*s.  Where do you get your information about

21   what happened that day:  workplace, family, friends?  Your one

22   question touched on that, but I'd like to see something that

23   gets, you know, to the -- whatever animal that lives here in

24   the District, how did you get it?  How did you learn about it?

25   Who did you talk to about it?

```
1           THE COURT:  I do -- that question we might have moved

2      to -- I might have moved, but there is a question about

3      discussion with family members, friends, and co-workers.

4           MR. HULL:  Which number is that?

5           THE COURT:  It's 44.  It may be that one was moved.

6           MR. HULL:  You did.  There was one that you'll

7      probably find on the -- the draft that was submitted, joint

8      draft.  It's a little bit more detailed, but I think, mainly,

9      what I'd like to see is -- you know, list some news sources,

10     ask about men's groups, and ask about, you know, exactly where

11     did you get this information, because they seem to get from

12     family, neighbors, a bar, whatever, and that -- and that makes

13     some sense.

14          I also agree with the firearms points that Mr. Tarrio's

15     counsel is trying to make, and --

16          See if there's anything else.  I thought this was a good

17     list, but I don't think we can, like, spend too much time

18     making this just right and, also, so they're not tired of it,

19     so they can go through it, realize it's -- you know, I just

20     can't imagine -- say it again -- that the questionnaire would

21     be more important than in this case.

22          Thanks.

23          THE COURT:  All right.  Any other defendant before I

24     hear from the government on this point?

25          Okay.  Mr. McCullough.
```

1          MR. MCCULLOUGH:   Thank you, Your Honor.

2          I'll be brief.  I -- the government's interest here is

3    in making sure that we tease out all areas of inquiry with the

4    jurors.  We have designed a jury questionnaire that kind of

5    targets and pinpoints those areas.  It's nearly 80 questions.

6    I think that we've identified the right questions.

7          And the -- and the idea here that, you know, we just

8    want to identify those areas for further inquiry with the

9    juror, that inquiry, that colloquy is going to be best served

10   in person.  The kind of cold record based on what somebody

11   might write, whether it's five words or a hundred words in

12   response to a question, we're going to have a much better sense

13   by just knowing to target in on those areas based on their --

14   their answers to those questions yes/no.

15         I think that that -- that's the -- the government's view

16   here is that having that person in front of us rather than kind

17   of asking them to write a narrative quickly in -- in a cold

18   room somewhere -- this is designed to be the first step in the

19   process.  I think we will then all have an opportunity to

20   participate in that second step, which is a very important one,

21   and I think the one that we should be spending a lot of time

22   on, when the jury -- when the jurors are here in front of us

23   and we can really dig in on any answers to questions.

24         I think that's -- I think that's what this is designed

25   to do.  There's no kind of empirical data that defense is

1    pointing to that asking someone to write a narrative question

2    forces them to think more about one issue or another.  It's --

3    we trust them to answer these questions faithfully and

4    accurately.  We're going to have to trust them once they get in

5    the box to follow your instructions.  This is a directive from

6    the Court to answer these questions fairly and accurately.

7         I think that that's kind of what we are -- what we are

8    seeking to do here, and I think this is the right approach.

9    And I think, you know, in terms of -- you know, these issues as

10   to news sources or where information is gathered or inquiries

11   about firearms, there are questions on this questionnaire that

12   get to those points.  If there are areas for follow-up, no

13   doubt Your Honor will follow up, defense counsel will follow up

14   at the appropriate time when we actually have the jury in front

15   of us.

16        And so I think that, kind of, this, as a first step of a

17   multistep and time-intensive process, is the right way to

18   proceed.

19             THE COURT:  All right.  I'll also just note for the

20   parties, Question 47, was one that there was no -- it's -- can

21   you set -- I added it after, sort of, the questions about

22   exposures to news reports about January 6th.  It didn't appear

23   to me that there was an analogous question on either what the

24   parties proposed or, frankly, on the Oath Keepers

25   questionnaire.

1     But it struck me -- I mean, it's a slightly separate

2   question than 48, which is, "Do you have any strong opinions

3   about" what you've -- you know, what -- about what happened on

4   January 6th.  But, again, can you -- it seems to me another

5   closely related, but not exactly the same question, is, look,

6   you may have seen or heard things about it, maybe you have

7   opinions about it; maybe you don't.  But the point is, you have

8   to decide this case based on the evidence in this courtroom and

9   the law, and that's it, and not about anything you saw or heard

10   on the news, if you did.  So I just want to point that out.

11   That was one that I added that was not in the parties'

12   proposal.

13     All right.

14        MR. MCCULLOUGH:  Yes, Your Honor.  And one other

15   thing that my colleague reminds me of -- Ms. Moore, thank

16   you -- on Question 72, this is just the -- the list of charges

17   in this case.  The one item that is not in that list, which the

18   parties failed to include, is robbery of government property.

19        THE COURT:  Right.

20        MR. MCCULLOUGH:  And the -- and the government

21   apologizes for that oversight.

22        THE COURT:  All right.  Okay.

23        MR. HASSAN:  Judge, real quick on the Court's

24   response on the question on 47.  If the Court looks at the

25   proposed by -- by both parties, Question 57 and the

1    follow-up a. question, which is on page 14 and 15 of those

2    proposed by the -- joint proposed jury questionnaire, it

3    provides for an open-ended question regarding the January 6th

4    committee, and if they want --

5              THE COURT:  Right.  I include that the committee --

6    there's a question about the committee, too, in this proposal.

7    I think it's -- it's not open-ended, but it's -- the same point

8    is, have you seen anything about it?  If you have, again, we'll

9    jump off from there.

10         But my point on 47 was, it's not about the committee.

11   It's about January 6th as a whole.  Whether we're talking about

12   the committee, whether you're talking about what you saw that

13   day, you saw video.  You saw someone talking about it.

14   Whatever.  You're going to have to take all of that -- again,

15   regardless of -- you have strong views that you're going to

16   have to set aside too, but you're going to set aside what you

17   have seen regardless of your strong opinions or not and judge

18   this case based only on the evidence.

19         So that's --

20              MR. HASSAN:  No.  And I get it, Judge.

21              THE COURT:  Right.

22              MR. HASSAN:  I just -- there's certain reasons as far

23   as why we placed the open-ended questions where we did, and

24   that's specifically one of the concerns that we had regarding

25   the January 6th Select Committee.

1        We've been going at this for a long period of time;

2   right?  So back in August, the reason for a continuation of the

3   case was the possibility of the notes being released by the

4   January 6th Select Committee, and we don't know when those

5   notes -- if they will.

6        THE COURT:  I'm going to -- I take your point of the

7   open-ended questions.

8        MR. HASSAN:  Thank you, Judge.

9        THE COURT:  I'm going to -- I'm going to consider it.

10       MR. HASSAN:  Thank you, Judge.

11       THE COURT:  Okay.

12       MR. HULL:  Your Honor, very quickly.  One more thing

13  about the questionnaire that I have forgotten, and I've asked

14  other people about this and their thoughts.  Attachment A --

15  Attachment A has -- is pretty critical in this case because you

16  have -- I guess there were people who -- the jurors could have

17  heard about in the news, like Ryan Samsel, Ray Epps, that kind

18  of thing -- some of these kind of lore and legend, if you will,

19  of January 6th.

20       When does -- how does this get populated, Attachment A?

21  The question is "The following people" -- or the sentence is --

22  "may either be witnesses in this case or individuals who may be

23  discussed during the trial.  Please review the list and

24  identify any names that you recognize."  That's, in this case,

25  a fairly critical part of this.

1            THE COURT:  The parties are going to have to provide

2     that to me.

3            MR. HULL:  What's the deadline for that at this

4     point?

5            THE COURT:  Well, you-all have a witness deadline

6     now.  The government already had a witness deadline.  So

7     witnesses are -- the witness deadlines are coming and will be

8     there before we get to December 5th.

9            MR. HULL:  November 28th, in other words, that would

10    be --

11           THE COURT:  November 28th is when -- I think that's

12    right, but I think separately -- and it's a good point.

13    Obviously, the parties are going to have to provide me with --

14    this isn't just witnesses, as you point out.  It's individuals

15    who may be discussed.

16       So let me think about -- I'll probably -- what I'll do

17    is just get a date -- again, sometime between now and

18    December 5th -- I will need the parties to provide me with

19    people they think -- again, witnesses or people who could be

20    discussed.

21           MR. HULL:  And what I'm getting at here is that this

22    is likely, unfortunately, to be a long list.

23           THE COURT:  It may be.  I -- again, the kind of

24    person -- well, we'll --

25           MR. HULL:  And we want to focus the jurors' attention

1   on this -- you know, at the very end they have the list of

2   people they, for the most part, haven't heard of, but a few may

3   have, and that could be disturbing, you know, down the line.

4        So thank you.  I just wanted to mention that.

5        THE COURT:  Very well.  Why don't I just -- I'll go

6   ahead and say to have the parties provide me that -- the names

7   they would like on Attachment A by December 1, which is just

8   the Thursday before when the -- when we'll be -- when I'll be

9   administering that.

10       Okay.  All right.  So let's turn to the government's

11  motion -- actually, you know, in order to get it out of the

12  way, I'm happy to just hear argument from Mr. Pezzola and get

13  this out of the way, which is a little bit out of the -- out of

14  order.  But, again, Mr. Metcalf -- I believe he wasn't able to

15  be present during some of those arguments, and so he wanted to

16  follow up and reserve time to make this argument.

17       So why don't we check this box.  And, Mr. Metcalf, I'll

18  hear you on your -- I guess it's really a supplement, but it's

19  sort of an individualized, in a way, motion regarding your

20  client.

21        MR. METCALF:  That's fine.  Thank you, Your Honor.

22       I'll be quick on this one because it's kind of simple

23  and straight to the point.

24       The third superseding indictment charges on -- in

25  Count 10 charges Mr. Pezzola with robbery by force, violence,

1    and intimidation.  Mr. Pezzola is alleged to have taken or

2    attempted to take from the persons in the presence of a

3    Capitol Police officer personal property belonging to the

4    United States; that is, a riot shield.  So the issue here

5    becomes whether or not Count 10 is facially sufficient and or

6    fails to state a cause of action.

7         Faced with very scant authority and extremely limited

8    body of case law, I've had to look to *Stokeling v.*

9    *United States*.  It's a Supreme Court case from 2019.  This was

10   not cited in my motion.  So I want to mention that to

11   Your Honor based on the conversations that were -- that

12   happened yesterday.

13              THE COURT:  Can you give me the cite.

14              MR. METCALF:  139 Supreme Court.  So S. Ct. 544, and

15   it's a Supreme Court case from 2019.

16              THE COURT:  Okay.

17              MR. METCALF:  That case breaks down the analysis of

18   the ACCA's interpretation, which is the Armed Career Criminal

19   Act, of defining robbery and, ultimately, how cases have

20   analyzed force, intimidation, and violence.  They're not

21   interchangeable.  Any one is sufficient enough to sustain the

22   burden here.

23         Now, that -- I mention that case in particular because

24   the Supreme Court does a great job going through various

25   different interpretations, going through all the different

1    circuits, showing various different types of examples as to

2    what's sufficient facially.

3           And in doing so, the *Stokeling* court highlighting the

4    common law principles of robbery and how they apply today, how

5    they apply to 2112, and explained how the unlawful taking, if

6    not substantiated facially with force, intimidation, or

7    violence is merely a larceny.

8           THE COURT:  Right.  But isn't -- let me just cut to

9    the chase here.  Isn't all of this just a question of whether

10   the evidence is sufficient?  Isn't this an argument you can

11   make to the jury and say they haven't proved it?  I mean, I

12   don't see how the argument you're making -- and, obviously, I

13   didn't have that case to be able to look at it.  So I don't --

14   I can't speak to that.  But the argument you were making in

15   your motion struck me as just a question of -- a question of

16   whether the evidence will be sufficient to sustain a conviction

17   under that charge -- under that count, and that's a question

18   we'll -- that the jury will have to decide.

19          MR. METCALF:  Well, before we get to that point, I

20   would ask Your Honor to consider facially, as a matter of law,

21   whether or not it's sufficient in the indictment.  So let's

22   take a look at the indictment.

23          THE COURT:  Okay.

24          MR. METCALF:  The indictment has Count 10.  I already

25   read that language.  What else in the indictment actually

1 supports this issue?  Paragraph 86.  Paragraph 86 states,

2 "PEZZOLA moved toward the front of the police line and ripped

3 away a Capitol Police officer's riot shield . . ."  Now, the

4 second part of this sentence is what is important and what I

5 want to address to Your Honor.  ". . . while the officer was

6 physically engaging with individuals who had gathered

7 unlawfully into the west plaza of the Capitol."

8    The next and only other paragraph that substantiates

9 these charges is two paragraphs down, in paragraph --

10    THE COURT:  But they don't have to have --

11 Mr. Metcalf, they don't have any paragraph

12 substantiating the -- if they just had an indictment that had

13 no factual -- no facts in it at -- well, very -- if they just

14 used the language of the statute, isn't that sufficient?

15    MR. METCALF:  I submit to Your Honor, no, it's not

16 sufficient.  It doesn't put us on notice.  Rule 7, what's --

17 the Constitutional protection clause, we need to be put on

18 notice to be able to establish a defense.

19    So, essentially, what the *Stokeling* case is saying --

20 and, yes, I get Your Honor's point.  Obviously, I'm going to

21 argue this at trial.  Obviously, if Your Honor doesn't agree

22 with this motion, then, yes, that's -- I'm going to move to

23 dismiss at the end of the government's case.  I'm going to move

24 during closing, the whole nine.  But for right now, facially,

25 looking at this indictment -- and if you look at the *Stokeling*

1    case, if you look at *United States v. Bell* -- another case I

2    didn't cite to -- 158 F. Supp. 3d 906.  It's a 2016 case.  I

3    forget -- I don't have the circuit in front of me, but that

4    breaks down 2112 as well.

5         And the main point of these two cases and why I'm

6    referencing this is because in defining force or violence --

7    because the two definitionally overlap in almost every sense of

8    the word.  In order to have force, you have to have violence.

9    In order to have violence, the definition is you use force.

10   But in order to define those -- and if they're sufficient in an

11   indictment -- there has to be a showing that one's resistance

12   was overcome, and that's the purpose of what I'm trying to

13   explain and navigate to Your Honor today.

14        Overcoming one's resistance is not showing.  So to

15   answer Your Honor's question, if they just cite the statute,

16   no, that is not enough.  That is insufficient as a matter of

17   law to allow us to prepare a defense and ultimately determine

18   whether or not this -- the victims allegedly -- what -- their

19   resistance was overcome as a matter of law, and that's not

20   shown anywhere in this indictment at all.

21        So if you look at the other paragraphs that substantiate

22   the actual statutory language and the language specifically in

23   Count 10 and you go back to paragraph 86 and that second part

24   of the sentence, ". . . while the officer was physically

25   engaging with individuals who had gathered unlawfully . . ."

1   that implies, number one, no intimidation.  It also implies

2   that this officer's -- he did not resist, and there's no

3   showing of that, but facially --

4          THE COURT:  But what I just -- can't get around is

5   they don't have to show that.  They don't have to -- that

6   language that an officer -- I'd be very surprised if there's a

7   case out there, of the cases you cite, that -- that there have

8   to be facts in an indictment that show that the person

9   resisted.  But I'll --

10          MR. METCALF:  So, for example, if you go through

11   *Stokeling*, if you go through a couple other cases, they talk

12   about pocket picking.  So when someone's -- someone's wallet

13   gets taken out of their pocket, do they know at the time?  Did

14   they resist at the time?

15          THE COURT:  Sure.

16          MR. METCALF:  That becomes relevant with regards

17   to --

18          THE COURT:  It's relevant in whether the government

19   proves its case.  It's not relevant about -- these cases are

20   not motions to dismiss indictments, I'm presuming.  And it's

21   not relevant as to the question of whether the indictment is --

22   is sufficient, I don't think.  Again, when I say -- when I say,

23   you know, all they use is the statutory language, obviously, to

24   your point, you do need to know the date it happened.  You

25   need -- I mean, there's not -- you can't just cite the statute

1    in an indictment and that's that.

2         But in terms of the things you're delving into and

3    suggesting that an indictment has to show, I just don't think

4    there's any case law that's out there that says that, but I'll

5    read the cases you cite, and I'll see if I agree with you.

6         MR. METCALF:  I ask Your Honor also consider now

7    there is no -- I do not have any specific case law on this

8    point, and the government does point that out, but in order to

9    be able to defend -- in order to be able to overcome Rule 7,

10   the officer's name should also be listed in there to be able to

11   put us on notice.  That's the point of Rule 7 and the

12   constitutional requirements of it.

13        In order to be able to prepare a defense, in order to be

14   able to question certain witnesses -- I don't know which

15   officer that we're talking about -- if I wanted to subpoena

16   that officer, if they're not on the government's witness list.

17   So that's --

18        THE COURT:  You don't have that in discovery?  You

19   don't have any way of telling that in discovery?

20        MR. METCALF:  I do not know this officer's name.

21   Now, if I've overlooked that, then shame on me.  But I do not

22   have this officer's name, and in the government's opposition,

23   they basically say -- we said that it was an officer, and it

24   was property from the United States.

25        THE COURT:  Okay.

1          MR. METCALF:  So I ask Your Honor to consider that as

2     well.

3          THE COURT:  All right.

4          MR. METCALF:  All right.  Thank you, Your Honor.

5          THE COURT:  All right.  Very well.

6      I'll hear from the government.

7          MR. KENERSON:  Thank you, Your Honor.

8      Erik Kenerson on behalf of the United States.  The

9     government will be brief as well.

10      I think the Court hit the nail on the head.

11     Mr. Metcalf's arguments seem to be of two types, neither of

12     which are a motion to dismiss.  One is either a Rule 29 motion,

13     which is not ripe, of course, to the close of the government's

14     case, and the other is for a bill of particulars.

15      Just to direct the Court to a couple of cites in our

16     filing, *United States v. Williamson*, 903 F.3d 124 at 130,

17     (D.C. Circuit 2018).  An indictment parroting the language of

18     the federal criminal statute is often sufficient, and that

19     cites the Supreme Court case.  It's in the brief, but the --

20     the -- as the Court noted, the language in the indictment here

21     does, in fact, list -- hits the statutory language.  It says

22     that it happened in the District of Columbia for the reasons

23     we've stated.  It's not required to go into either the name of

24     the victim or anything else along those lines.

25      Just one note on kind of discovery provided to date.

 1    The defendant has -- and has as of November 11th in pretty

 2    final form -- the videos the government's going to use, the

 3    photos the government's going to use.  All of that evidence has

 4    been provided to defendants.  We've litigated the issue of

 5    Mr. Pezzola's robbery, specifically, in two detention hearings

 6    before this Court, one of which was with his current counsel.

 7        So -- and I'm happy to talk to him -- I don't think that

 8    now on the record is the proper time to do it.  But I'm happy

 9    to talk to Mr. Metcalf about anything he may be missing in

10    terms of the identity of the officer, but it's not a

11    requirement for pleading.

12        THE COURT:  All right.  Very well.  I'll take this

13    under advisement.

14        All right.  So now we move to the -- the main event here

15    today, the government's omnibus motion *in limine*.  Why don't I

16    proceed the way I did yesterday and give the parties some of my

17    preliminary thoughts on this.

18        I think -- it seems to me -- I mean, some of what I'm

19    going to hear from the parties today, I think, is closely

20    related to some of the arguments you were making to me

21    yesterday.  And some of it, frankly, I think -- netting out the

22    briefing at the end of the day, I think the parties -- a lot of

23    it, the parties either came, I think -- arrived at the same

24    place or it turned out the -- some of the parts of the

25    government's motion, the defendants aren't -- either aren't

1    opposing, or at the end of the day, the parties sort of arrived

2    at a place where I think they're mostly in agreement.  So let

3    me just walk through some of those areas.

4         The first area is the issue of the relevance of conduct

5    by co-conspirators, but I think this is more appropriately --

6    or the focus of the motion is these folks that the government

7    is calling tools of the conspiracy.  Look, I'm going to hear

8    from you-all on this.  I think this is -- it feels -- my gut is

9    the -- that the government is on firmer ground here than on the

10   issues about statements, which I think is -- is more

11   complicated, frankly.

12        But if these are folks -- if these -- if this is

13   effectively what the government is arguing was the result of

14   the conspiracy, it seems to me that just factual evidence of,

15   again, what they're alleging is -- was caused by the

16   conspiracy, that strikes me as relevant and admissible.  But,

17   again, I want to hear from you, and it may be a question of

18   being able to make that linkage that the defendants focus on.

19        Then the government goes into sort of a long part about

20   the authenticity of certain media.  Look, we are certainly

21   going to be arguing, as we did yesterday, about what video is

22   relevant and admissible.  I hope -- I hope and pray we are not

23   here discussing authenticity, and I don't think the defendants

24   have filed anything opposing the government's sort of theories

25   of authenticity.  The last thing we need to be doing is chewing

1     up time on that.

2          Third is the issue of sort of the statutes and records

3     and the congressional -- and the Congressional Record.  My

4     impression is that this type of evidence has been admitted in

5     every -- this doesn't make it right, of course, but my

6     impression is that this type of evidence has been admitted in

7     every single January 6th case in this jurisdiction.  Again, I

8     could be wrong, but my inclination is that the government has

9     the better view on that -- on that -- with regard to that

10    evidence.

11         Then we get to the sort of Secret Service issues.  And

12    on this one, I do think it felt like the parties were sort of

13    past -- talking past each other, and I think they arrived in

14    the -- sort of the same place; that both sides were sort of

15    trying to leverage -- I guess it was Judge McFadden's ruling in

16    another case that struck me as drawing exactly the right line,

17    and the line that both parties -- I think sort of

18    ultimately -- sort of arrived at by the end of the briefing.

19    Maybe I'm wrong, but that's what it seemed like to me.

20         Let's see.  The issue about cross of the CHS; again, the

21    government's motion was to preclude cross-examination of one,

22    but since then, I don't believe -- I don't believe -- let's put

23    it this way:  I don't think we're at a part where I need to

24    address that because I don't have before me any -- the

25    government, I don't believe, has any intention of calling a CHS

1     at this point.  So I don't think I need to address that motion

2     today.  Certainly, I think it's premature.

3            Let's see.  The out-of-court statements issue -- the

4     out-of-court statements -- or the self-serving -- the next

5     category was sort of out-of-court statements or self-serving

6     hearsay.  Look, I think the parties ended up in a

7     back-and-forth about the rule of completeness.  I think at one

8     point the government said, well, the rule of completeness can't

9     be used to circumvent the rule on excluding self-serving

10    hearsay.

11           I think -- you know, again, I think this is one where if

12    there is a rule of completeness issue, you know, I can't rule

13    on this in the abstract, but I would just say, the parties --

14    to the extent we're talking about statements on a back -- when

15    we're talking about a back-and-forth in a chat or emails or the

16    rest, look, you-all can tee it up for me as it comes.  But

17    if -- if -- the rule of completeness, I think, can trump the

18    sort of general hearsay rule if it needs to come in because the

19    government has sort of -- is going to be putting in evidence

20    that this is naturally part of.

21           So that doesn't extend -- to the extent the government's

22    arguing, well, that doesn't mean the entirety of -- you know,

23    of every single statement in the chat comes in; oh, yes, I

24    agree with that.  But on the other hand, the defense does seem

25    to have a point that if there are legitimate rule of

1   completeness issues there, that's something that the defense

2   can employ to get certain things into evidence in the right

3   circumstance.

4        Last, there's a whole bunch of things on improper

5   argument.  I think for -- as I understand it, the government

6   laid out a bunch of things that they thought were -- you know,

7   should be out of bounds, and I don't believe -- for a number of

8   these categories, I don't see the defendants contesting the

9   motion as far as charging and selective prosecution goes, as

10  far as entrapment or a public authority defense goes, as far as

11  the different things the government walked through that they

12  categorized as nullification.  So it seems to me, you know,

13  unless I hear differently, those things are -- there's -- the

14  defense has no intention of going down those roads.

15       There's one part of this that's under seal that we can

16  take up under seal.  The part that's not under seal, then, is

17  kind of the First Amendment issue.  And, you know, to me, I

18  think, again, this felt like a place where maybe the parties

19  don't disagree as much as they -- I thought they would in the

20  beginning.  If -- clearly, the defendants can't, it seems to

21  me, argue that conduct like trespassing or other acts that they

22  took are protected by the First Amendment because, as a matter

23  of law, certain of those things are not.

24       On the other hand, if the -- I'd be interested in what

25  the government's view of this is, because it seems to me what

1    the defendants are going -- are -- want to preserve is their

2    right to say to the jury, argue to the jury, well, ladies and

3    gentlemen, if all you find is that -- if all you conclude is

4    that our clients -- the only conspiracy you find is that they

5    were conspiring to get together and lawfully protest on the

6    right side of the police barriers, then you should -- then that

7    is protected by the First Amendment.  You should -- you should

8    acquit them.

9         I mean, I think they're entitled to say that, at least

10   that's my -- that's my knee-jerk impression.  I don't -- I'd be

11   interested to hear if the government disagrees with that.

12   Again, obviously, I think both parties sort of acknowledged

13   that there isn't, for example, a First Amendment defense to

14   running up into the Capitol past all the -- past all the

15   barriers, and I don't think the defendants are purporting to

16   offer that as a defense to that conduct.

17        But those are some initial thoughts, and I'll hear --

18   it's the government's motion.  So I will hear from you-all.  We

19   can leave -- if there is this one issue that we have to do

20   under seal, we can -- we can leave that and do it at the end.

21             MR. MULROE:  Good morning, Your Honor.  Conor Mulroe

22   for the United States.

23             THE COURT:  Good morning.

24             MR. MULROE:  I'm going to start for the government by

25   addressing the tools aspect of the government's motion as the

1    Court described it, and I think that Your Honor is exactly

2    right; that this is very much bound up with some of the issues

3    that were discussed yesterday, especially the statements by

4    persons other than the defendants.  These issues kind of inform

5    each other; so I think that's important to view them together.

6    So some of that might resurface, to some extent, in the

7    argument this morning.

8            We also, as we move forward, would propose to show some

9    of the proposed trial exhibits if the Court is open to that.  I

10   think it's difficult to talk about these things in the

11   abstract.  So rather than trying to summarize or paraphrase

12   them, we'd like to just put them up on the screen.

13           THE COURT:  Is there any objection to this?  I

14   mean --

15           MS. HERNANDEZ:  I missed that.

16           THE COURT:  The government would like to show me

17   certain trial exhibits to get a sense of what they -- what

18   they -- of this tools of the conspiracy argument.

19           MS. HERNANDEZ:  Your Honor, I don't know how many

20   exhibits.  Perhaps we could take a break and the government

21   could let us know which exhibits they're talking about.  I

22   don't know --

23           THE COURT:  I mean, we're not -- this isn't --

24   there's no jury here that we need to -- if -- that we need to

25   make sure it doesn't see these exhibits.

1          MS. HERNANDEZ:  I just -- how many exhibits?  Which

2     ones are we talking about?

3          THE COURT:  But you-all should have them so you can

4     respond to the argument, let's put it this way.  But --

5          MS. HERNANDEZ:  What exhibits is he talking about?

6          MR. HASSAN:  Judge, my concern -- Nayib Hassan on

7     behalf of Enrique Tarrio, Judge.

8           My concern as far as showing exhibits at this point in

9     time --

10          THE COURT REPORTER:  Can you come to the microphone.

11          MR. HASSAN:  Our concern, Judge -- and this is

12     regarding Mr. Tarrio -- is that the government is trying --

13     using this opportunity in order to show more of their case and

14     their presentation for media purposes.

15          THE COURT:  For media purposes, there's, like --

16     there's --

17          MR. HASSAN:  Whatever it may be, Judge, but --

18          THE COURT:  Look, these proceedings are not under

19     seal with regard to the potential evidence that's going to come

20     into the case.  They're not releasing these.  These exhibits at

21     this point are simply for me to be able to rule on evidence.

22     They're not under seal.  I don't know any other way -- I've

23     never heard of a trial in which the -- the government isn't

24     able to say here's the exhibit, Judge; can we admit it or not.

25     So I don't know of any way we can go forward.

1           MR. HASSAN:  Judge, I just don't know if these are

2     exhibits that the government has highlighted as being highly

3     sensitive to the defense, and at this time, they're using this

4     opportunity to highlight it to whoever it may be.

5           So, Judge, with all due respect, at least I would ask

6     for an opportunity to review the exhibits in anticipation just

7     to know exactly what we're looking at, Judge.

8           THE COURT:  All right.  Are they highly sensitive

9     exhibits, Mr. Mulroe?  I mean, I wouldn't think you would be

10    using those --

11          MR. MULROE:  No, Your Honor; not in the government's

12    view.  Just to be clear, these are Telegram messages and Parler

13    posts.  So if I don't show them, I'm just going to read them

14    into the record.  I think it's just easier for everyone if

15    we're able to put them on the screen.  They're the same

16    messages that we've been quoting in the briefing.  I just don't

17    see what possible prejudice there is to showing the Court what

18    we're talking about.

19          THE COURT:  No, this is -- they're in the briefing,

20    and the briefing is in the public record right now.  So,

21    Mr. Mulroe, you can -- actually, here's what we'll do, just

22    because I think probably we need a break for the court reporter

23    anyway -- and I can see her nodding and telling me yes.

24          So just not because we won't be considering it in open

25    court, but because I do think it's -- you know, it may be just

1      good for the defense to be able to see what you're going to

2      refer to, we'll just take our ten-minute break and come back in

3      ten minutes.

4                    (Recess taken.)

5                    THE COURTROOM DEPUTY:  Your Honor, we're back on the

6      record in Criminal Matter 21-175, United States of America v.

7      Ethan Nordean, et al.

8                    THE COURT:  All right.  Mr. Mulroe, you may proceed.

9                    MR. MULROE:  Thank you, Your Honor.

10           So turning to this issue of the tools that we've teed

11     up, I think a keynote of this argument and a keynote of the

12     case as a whole is this notion of what the defendants called

13     real men.  These real men were central to the case.  You know,

14     the Oath Keepers had their rifles.  The Proud Boys had their

15     real men.

16           And there's a striking symmetry in the evidence that

17     relatively early in the conspiracy, right after the rally on

18     January 6th is announced and right before the formation of

19     MOSD, Defendant Biggs tells Defendant Tarrio:  Let's get

20     radical and get real men.  And then they form and recruit and

21     organize that group.

22           And then later on, near the climax of the conspiracy on

23     January 6th, as the marching group is walking past the Capitol,

24     Defendant Nordean makes an announcement to his followers

25     through a bullhorn.  He says:  Real men are here, and these

1    real men represent the spirit of 1776 and are going to remind

2    those who have forgotten what the constitutional oath of office

3    means.

4         And so among the fundamental questions for the jury in

5    this case are what was the purpose of assembling this group of

6    what they called real men and bringing them to the Capitol that

7    day, and why did those real men do what they did when they got

8    there?

9         And so our position is that whether you look at these

10   people as co-conspirators or you -- whether you look at them as

11   tools, through either lens, the case is about the concerted

12   efforts of a group of people, this group that the defendants

13   called real men.  And our position is that they weaponized

14   these people.  They weaponized their followers critically

15   through a process that occurred over time.  It's not the case

16   that they just woke up one day and decided we're going to form

17   this group and carried an objective.  This is the type of

18   conspiracy that does not begin from a cold start.  It's

19   something that progresses over a period of weeks or months.

20        And so that's part of the government's theory of the

21   case.  We expect the evidence is going to show that in the

22   lead-up to January 6th, there was this growing current among

23   Proud Boys.

24             THE REPORTER:  I'm sorry.  This is?

25             MR. MULROE:  A growing current among the Proud Boys

1    that held that it was appropriate and necessary to use force

2    and violence in pursuit of their objectives.

3           So that is part and parcel with the formation of the

4    conspiracy.  And the Court has seen that in some of the

5    statements of offense, some of the co-conspirators who have

6    pled guilty already, cooperators.  So, for example, in the

7    Donohoe statement of offense at paragraph 6, he admitted that

8    "As a member of the Proud Boys since 2018 and an attendee of

9    prior national rallies attended by the Proud Boys, Donohoe knew

10   and understood that some members of the Proud Boys - known

11   internally as the 'rally' boys - would resort to unlawful

12   conduct to achieve an objective."

13          And, likewise, the Bertino statement of offense at

14   paragraph 6 repeated largely the same language, but then

15   explained further at paragraph 9 that this trend of aggressive

16   violence, that trend accelerated after the December 12th rally

17   and the trend included a willingness on the part of members --

18   who he specifically included these defendants' names, a

19   willingness to use violence affirmatively rather than only in a

20   defensive posture.

21          So this increasing willingness, Your Honor, is part of

22   what formed the conspiracy.  And that's part of the

23   government's theory of the case.  And so it does go back before

24   December 19th, even before this rally is announced.

25          We're going to show in the days immediately following

1    the election, they initially -- you know, weren't quite there

2    yet.  They had a hope that other means might be successful in

3    stopping the transfer of power.  So, for example, they hoped

4    the legal challenges would be successful, but as time

5    progressed, they realized that wasn't going to happen, and they

6    were going to have to take matters into their own hands and do

7    it their way through the use of force and violence.

8           So I want to show an exhibit that illustrates that.

9    This is going to be an exchange from a Telegram group that's

10   called Skull and Bones.  Skull and Bones was the Telegram group

11   that existed for discussion among the elders of the Proud Boys.

12   The elders being kind of the top-ranking, very small select

13   group of senior leaders.  These elders, we mentioned them

14   yesterday.  They're the same small group who voted at Tarrio's

15   request to approve the formation of MOSD.

16          These elders are the ones that Tarrio sent the message

17   Whispers 1776 when he was advocating for the creation of this

18   special chapter.  And the elders in the Skull and Bones group

19   are the same group that Tarrio, after the riot, told them:

20   Make no mistake, we did this.

21          So, Mr. McCullough, if we could have Exhibit 500,

22   slide -- or page 34.

23                THE COURT:  Can I just ask one thing.  Your motion, I

24   thought, was principally about conduct, and I know what you're

25   saying is -- your -- I mean, we talked about the issue of

1    statements, the various theories of admissibility, but isn't

2    this motion more about conduct?  And -- and I took it as an

3    attempt to establish the relevance of -- well, just reading

4    the -- you know, conduct by co-conspirators and tools.  So I

5    took it as an effort for the government to try to get me to

6    rule in videos by folks who would fall into these categories

7    that day rather than statements.

8              MR. MULROE:  Yes, Your Honor.  So that is the subject

9    of the motion.  I don't mean to retread ground we've gone over,

10   but I think it's important.  Because as the Court mentioned at

11   the beginning, the fundamental question for the conduct is

12   whether the government can make a linkage between the conduct

13   of these people and the actions of the defendants.  So the

14   statements are really -- bear directly on that.  We would

15   submit are really inextricable from it.

16             THE COURT:  Okay.

17             MS. HERNANDEZ:  Your Honor, I'm sorry.  Could we get

18   the government to identify who the elders are.  I've seen a lot

19   of stuff on the internet who the elders are.  I just wondered

20   if they have a particular --

21             THE COURT:  I'm not going to interrupt his argument

22   to have this happen.  If you want to discuss it with them

23   afterwards, I encourage you to do so.

24             MS. HERNANDEZ:  Thank you.

25             MR. MULROE:  So if we could scroll down on this

1     exhibit to see the 2:15:29 message and the ones that follow.

2     So here, discussing the election, one of the elders, Nick Ochs,

3     says, "The odds are with us because of the Supreme Court boys.

4     I'm pro violence but don't blow your load too soon."  And then

5     he says, "Not to be an anti-murder buzzkill but I really think

6     this ISNT fucked.  Once it is, let's go wild."

7           So the point, Your Honor, is that this desire and

8     advocacy of violence is mobilizing as early as early November,

9     directly following the election, and the escalation progresses.

10          And to just raise another point from yesterday, the

11    December 12th rally was a critical step in that progression.  I

12    want to just clarify a couple points about that.  The Court

13    yesterday raised the question of whether the December 12th

14    rally was actually related to the election, whether we have

15    evidence of that.  I would say, first, that the indictment

16    directly alleges that it was.  That's at page 5, paragraph 15

17    of the third superseding election [sic], and there will be

18    ample evidence at trial.  I'll just put a couple of them up.

19          So Exhibit 603, Slide 18, Mr. McCullough.

20          THE COURT:  And what I'd ask the government to do is

21    provide to me any exhibit you're referencing here so that I can

22    look at it afterwards.

23          MR. MULROE:  Certainly, Your Honor.

24          So here we have a public Parler post from Defendant

25    Biggs on the 20th, posting a flyer, essentially, March for

1   Trump, Washington, D.C., December 12th, proudboysusa.com.  And

2   he says, "Call to action.  Get your fucking ass there on the

3   12th."

4        Similarly, Defendant Rehl made posts at Parler 602.37.

5   This is on December 11th, and he says, ". . . Democrats are

6   joining the defendants, almost the whole country is picking

7   sides in this case . . ."

8        "See you all this weekend."  This weekend, referring to

9   the 12th.

10       And then the very next post, No. 38, reposting a --

11  looks like a tweet -- I'm sorry.  Is this thirty -- 38?  So,

12  again, in the day before the rally, posting this post from the

13  President in reference to the coming events, and he does a

14  hashtag on the bottom, #millionmagamarch, which was the name of

15  that event.

16       Finally, 603.6 [sic] is a post by Pezzola.  So the green

17  text indicates that he's replying to something that someone

18  else has posted, but another Parler user posts, "MARCH FOR

19  TRUMP SATURDAY DECEMBER 12TH 12 PM AT FREEDOM PLAZA

20  #marchfortrump #proudboys."  And Pezzola says, "I'll be

21  there!!!" So this clearly was election related, Your Honor.

22       And another point that I want to clarify and emphasize

23  is that, you know, in terms of the 404(b) analysis of the

24  December 12th event, December 12th is part of the offense

25  charged.  So it's alleged specifically in the indictment, in

1    the background section at paragraphs 15 and 16.  And I would

2    note also that in alleging the conspiracy offenses, the

3    indictment alleges that the time frame of the conspiracy began

4    in and around December of 2020.

5            MR. NICHOLAS SMITH:  Your Honor, this -- this whole

6    line of argument is inappropriate because, as Your Honor knows,

7    we were arguing this issue yesterday; whether there was any

8    connection -- what the 404(b) arguments were for the

9    December 12th.  We're proceeding this was the subject of a

10   motion that was litigated yesterday, and what the government

11   has just done is it's tried to bring in more support for its

12   argument but without giving any notice to the defense.

13           THE COURT:  Mr. Smith, I'm going to allow the

14   government.  It's closely linked to the conduct, and I'm

15   going -- I'm going to hear the argument, but you may respond to

16   it however you would like.

17           MR. NICHOLAS SMITH:  So, Your Honor, what I would

18   just like to put into the record is that the defense has had no

19   opportunity to address -- so there's new evidence that's coming

20   into the record that was a part of -- of a 6-terabyte

21   production that we have had about ten minutes to look at,

22   Your Honor.  The problem is that even though the government

23   showed us these texts before the hearing, they -- they failed

24   to represent to us that they would be trying to reopen argument

25   on an issue that was argued yesterday.  So we're basically

1     caught flatfooted.

2               THE COURT:  I don't --

3               MR. NICHOLAS SMITH:  Your Honor, we would probably

4     need 30 minutes.

5               THE COURT:  The texts are not catching you flatfooted

6     because the texts -- he could be -- the facts are not critical

7     to what you've just objected to.  You're objecting to making a

8     certain legal argument, and you're going to have time to -- to

9     address them.  So you may be seated.  Your objection is noted.

10              You may continue.

11              MR. MULROE:  And just for the record, from the

12    government's standpoint, Your Honor, the events of

13    December 12th are going to show and explain and provide context

14    for the actions of the tools.  That's why this is related.

15              So, again, this -- this event is in the indictment, and

16    it's in the indictment for a reason, because it is part and

17    parcel of the charged conspiracy.  So the Donohoe and the

18    Bertino pleas, their statements of offense both reflect that.

19    They reflect that the events of December 12th shaped their

20    understanding of the agreement that they were part of, and the

21    same is true for these defendants.

22              And I'd note, Your Honor, that it's not just the

23    government saying that, and it's not just Donohoe and Bertino

24    saying that, but it's also the contemporaneous communications

25    among the defendants and their co-conspirators and among the

1    people who would become the tools of this conspiracy.

2         And so there's a video that has been discussed a lot in

3    the hearings on this case, and that's this sort of briefing, a

4    briefing of all the new MOSD recruits, the new members on

5    December 30th.  A transcript of that video has been filed at

6    ECF 440, Attachment 1.  And at multiple points in this briefing

7    of the membership, the leaders explain that the purpose of this

8    new chapter is to make rallies more successful at achieving

9    their objective by avoiding what they called the

10   disorganization of December 12th in D.C.

11        So the jury just can't understand that without knowing

12   what December 12th was about.  That -- December 12th means

13   something to the leaders who refer to it.  December 12th meant

14   something to their followers who were there listening to this

15   briefing.  Apart from the briefing, the communications among

16   the defendant leaders in the lead-up to the 6th show that for

17   them, the events of December 12th were a major factor that

18   guided their recruitment in advance of the 6th.  It guided

19   their preparations in advance of the 6th, and it guided their

20   expectations in advance of the 6th.

21        And I'll show just one exhibit illustrating one of those

22   points, starting with 501.23.

23        MS. HERNANDEZ:  I'm sorry, Your Honor.  May I be

24   heard for a moment?

25        It's sort of what Mr. Smith said, but I've reviewed the

1   motion that I thought we were arguing.  There's no reference to

2   these text messages.  There's no reference to December 12th.

3   I'm not sure where we are.  I mean, there's these categories

4   that the Court was going to consider, and I think that's why

5   we're being taken aback.  We -- we weren't prepared for this.

6           I understand that the Court wants to hear argument, and

7   maybe we'll have to come back on another day.  We're just a

8   little puzzled as to what we're arguing today.  That's -- and

9   it may be the Court knows or maybe the government could

10  identify where in their motion this is coming from.

11          THE COURT:  Okay.  As I -- well, what I'm -- the

12  first category of things the government has laid out here in

13  the motion today is about conduct of the tools of the

14  conspiracy.

15          MS. HERNANDEZ:  But there's nothing in these pages --

16  nothing -- that talks about -- and I think the Court had the

17  same question.

18          THE COURT:  Right.  It's clearly related to the

19  statements.  So -- to the issue of the statements we talked

20  about yesterday.

21          MS. HERNANDEZ:  There's nothing -- I just want to say

22  to the Court --

23          THE COURT:  Right.

24          MS. HERNANDEZ:  -- ECF 494, the section on tools

25  starts at 3 and goes through 7.  There isn't even a reference

1    to December 12th or to any of these things.  So we're just

2    really at a loss.

3              THE COURT:  Fair enough.  You'll -- don't worry.  I

4    have not deprived any party in this case --

5              MS. HERNANDEZ:  I agree.  I agree.  I'm not --

6              THE COURT:  -- of opportunities to respond to the

7    other side, and in the spirit of trying to get the right

8    answer, I'm going to just let the government make its point and

9    move on, but I have never precluded -- as you know --

10             MS. HERNANDEZ:  I agree.

11             THE COURT:  -- I have never precluded any party from

12   coming back and providing me additional argument or evidence or

13   whatever they would like, because to me, the ultimate point of

14   the proceeding is for me to get the right answer.  So --

15             MS. HERNANDEZ:  And I don't mean -- and I agree with

16   the Court wholeheartedly, but the Court has been willing to

17   listen to our arguments, however, whenever they're made.  We're

18   just trying to -- really, we're trying to follow where this is

19   coming from, and I can't find it.

20             THE COURT:  All right.

21             MS. HERNANDEZ:  I know Mr. Smith is even more into

22   the details than I am.

23             THE COURT:  All right.  So I just ask Mr. Mulroe to

24   just, you know, as much as you can, wrap up on this sort of

25   ancillary point, related point, and get to the conduct issue.

1          MR. MULROE:  Yes, Your Honor.  I -- I'm just not sure

2     it's ancillary, because the message we're seeing here is them

3     talking about which tools they are going to bring into the

4     conspiracy.

5          THE COURT:  Sure.  But the motion is most -- is about

6     conduct, not about statements, and I take your point that part

7     of the issue is linking up the conduct to the conspiracy,

8     but -- and -- but I just -- I don't think -- I get the point

9     you're trying to make here.

10          MR. MULROE:  Okay.  At the Court's request, of

11     course, we'll submit these exhibits --

12          THE COURT:  Yes.

13          MR. MULROE:  -- for the record, subsequent to the

14     hearing.  So I'll summarize now.  In 501.23, they're discussing

15     who to recruit based on those people's performance in D.C.  You

16     know, the context here is they require that Proud Boys be at a

17     certain level of membership, a certain degree before they can

18     be part of MOSD.  But members of the leadership say, well, I've

19     got these guys who did really good in D.C. on the 12th, and so

20     we think they should be able to come in, even if not second

21     degree.

22          We don't have to walk through them all, but 501.25,

23     which we will submit, discusses their need for armor based on

24     what happened in D.C. on the 12th, and so the jury is going to

25     need to understand that.  Exhibit 501.49, is their expectations

1     for the 6th.  They make reference to the fact that they could

2     have run "them the fuck over," referring to the police in D.C.

3     on the 12th.  And there's discussion about how they expect that

4     there's some likelihood of that happening on the 6th.

5          And then I just do want to show one to show it's not

6     only the leadership members, but 603.12 [sic], is a post by

7     Pezzola on Parler replying to a message or a post from another

8     user saying that Antifa and the other agitators are cowards,

9     sometimes chasing them.  They kept running behind the cops.

10    Pezzola replies to that saying, "R u the brother [who] I met

11    [at] the hotel after I got maced by the punk ass 5-0."

12         So for these followers, for these tools, the 12th is

13    forefront in their minds.  It's an integral part of the offense

14    charged.  It's part of an unbroken chain of events, and so it's

15    something that's very significant for the Court to keep in its

16    mind as it considers the admissibility of these tools' conduct.

17         So turning to the tools, Your Honor, I think that in

18    every instance -- or in almost every instance, we would argue,

19    first, that these people are co-conspirators.  We think that

20    the evidence supports that, and so for that reason, I think it

21    would be uncontroversial that their conduct and their

22    intentions and their statements are all relevant and admissible

23    on that basis.

24         The tools theory is an alternate basis of relevance that

25    says even if the Court were to find that these people were

1     completely ignorant as to the ultimate aims of the conspiracy,

2     they're still part of the offense because the defendants

3     intentionally weaponized them in order to carry out the

4     offense.  And this -- this concept, I think, is not a novel

5     one.  We raised an example in the papers of mules who might

6     transport drugs or money kind of unwittingly.

7           THE COURT:  I understand this.  I think to me, this

8     theory makes sense to me.  I don't have to find that they're

9     co-conspirators.  At least -- again, putting aside statements,

10    which are -- I think fall in a different category, but it seems

11    to me if -- if you have -- if the theory -- and there's

12    predicate evidence supporting the notion that part of the

13    conspiracy was weaponizing a group of people and then the group

14    of people go do something -- again, I understand your theory,

15    and I think it makes sense.

16          Again, statements -- at least I'm talking about on

17    January 6th, which I think is what you're talking about.  The

18    conduct on January 6th, at a minimum.

19          MR. MULROE:  Yes.  Understood, Your Honor.

20          THE COURT:  I know you want all of it in, I get that.

21    At a minimum, the point of what happened -- of the conduct on

22    January 6th, I understand that argument.

23          MR. MULROE:  Yes, Your Honor.  And so I -- again, I

24    don't want to retry to take it back to the statements, but I

25    think it's -- it's extremely important that the only way the

1     government can demonstrate this theory and show the jury that

2     these people were the tools, they were weapons, they were not

3     just a group of people who the defendants assembled to

4     peacefully protest is by showing some of the -- I'll say

5     they're nonhearsay statements of these people.  So they're

6     going to be statements that are not offered for the truth of

7     any matter asserted, but I think it's significant that -- I'll

8     just lay it out.

9          They create this --

10         THE COURT:  They link together.  I'm not -- I'm not

11    arguing with you.  I -- I do think, again -- the other issue is

12    this -- well, I don't want to get into -- none of this has

13    anything really to do with -- I don't think -- with part of

14    what -- the argument yesterday about 404(b) and intent and

15    whether you could use the 12th for -- whether you could use

16    evidence that these -- not these defendants, but any of these

17    folks -- any Proud Boys were the aggressors in terms of

18    violence on that day.  To me, that is a -- I'm not -- that's a

19    separate issue through 404(b).  That's a separate issue than

20    what you're arguing.  It's just a separate issue than the -- of

21    your argument today.

22         MR. MULROE:  Yes, Your Honor.

23         THE COURT:  I'm saying they're not linked.  I could

24    easily agree with everything you're saying today.  I don't

25    think that has anything to do with the question of whether you

1    can show on a 404(b) theory, the aggression -- the -- sort of

2    the idea that the Proud Boys were the aggressors that day.  I

3    just think that's a separate thing I'm going to mull, but it

4    doesn't really affect, I don't think, your -- what -- the basis

5    for what you're arguing admissibility -- is admissible today.

6            MR. MULROE:  That's fair, Your Honor.  We're just

7    contemplating a scenario where one of the tools shows up and is

8    wearing a helmet and carrying a baseball bat and bear spray,

9    and there's an argument that they --

10           THE COURT:  On what day?

11           MR. MULROE:  On the 6th.

12           THE COURT:  Okay.

13           MR. MULROE:  And there's an argument that they

14   outfitted themselves that way, in part, because of what

15   happened on the 12th.  So whether they were ambushed on the

16   12th or something else is hugely significant for the jury to

17   understand.

18           THE COURT:  So I would have thought that that's going

19   to come in through the defen- -- you know, as a potential

20   explanation for why they were taking the precautions they were,

21   but -- anyway, but I see your point.

22           MR. MULROE:  So, Your Honor, I think that -- there's

23   no need for us to belabor kind of the basic theory of the

24   relevance of misconduct.

25           THE COURT:  I understand your theory.

1           MR. MULROE:  So I think -- I think I would leave it

2      there on the tools.

3           In terms of some of the other parts of the government's

4      motion *in limine*, it sounded like, actually, there's not much

5      of substance to cover on many of them.  So the authenticity of

6      these videos, we agree, I think, from the government's

7      perspective, it's not controversial.  There's no serious

8      dispute that these are authentic.

9           I'd note we have requested stipulations as to the

10     authenticity of certain items and haven't received any

11     agreement on those.  So just to be clear, when Mr. Smith

12     yesterday was saying we stipulate this or we stipulate that,

13     they haven't entered any stipulations as of this time.

14           THE COURT:  All right.  As far as -- you know, as far

15     as authenticity goes, again, I'm going to implore the parties

16     to try to reach agreement on authenticity.  We can't have -- we

17     can't be talking about authenticity.  I understand -- you'll

18     have all your relevance arguments available to you.  I'm not --

19     just because something is authentic doesn't mean it's relevant,

20     doesn't mean it's admissible.  So on authenticity, you know --

21     I'm not going to go so far as, say, the argument is waived

22     because you didn't put it in your opposition.  But I do think

23     it behooves the parties to -- you know, to reach an agreement

24     on authenticity.

25           MR. MULROE:  And, Your Honor, if we could just ask

1     for a little bit of clarity kind of on the scope of the Court's

2     comment.  So there's -- for one thing, there's videos that

3     depict the events of January 6th, and we submit those are

4     clearly authentic.  Another category of admissibility

5     determinations is when we've got extractions from a particular

6     cell phone and we say that this is from the phone of Person X,

7     if they were to really challenge us on that, I think we would

8     probably have to put up a series of multiple agents to show the

9     seizure of that phone, the extraction of that phone, and so

10    forth.

11         From our perspective, that is equally uncontroversial

12    and something that's not worth the jury's time.

13         THE COURT:  It shouldn't be.  And if we're here

14    talking about authenticity of any of those types of materials,

15    the jury is going to, you know, want to shoot us all.  So,

16    please, I implore the parties, authenticity should not hold up

17    our trial.

18         You're not -- you're not -- you know, you're not waiving

19    your right to argue it shouldn't come in, it's not relevant.

20    It's -- it doesn't satisfy 403 and all the rest.  Is there any

21    reason why -- well, I'll -- I'm going to hear from them on this

22    in a moment, but authenticity, really, is something, hopefully,

23    the parties can agree on.

24         MR. MULROE:  Just taking you through a few of the

25    others, Your Honor, the Secret Service cross-examination, I

1    think that the parties have landed in the same place on that,

2    which was the government's opening position on the question.

3    So we don't think there's any dispute remaining on that.

4         The CHS issue, we agree that this is one that will be

5    fact specific, if any CHS were to testify for the defense, and

6    so there's no need, from our perspective, to argue that now.

7         Similarly, the Rule 106, rule of completeness, is a

8    fact-dependent one.  So that can be addressed if and when these

9    issues arise at trial.

10        THE COURT:  Sure.  But I -- again, on that, let me

11   just pause.  I thought there was language in the government's

12   brief about, well, you know, the -- you know, the defense

13   can't -- the usual rule that self-serving here -- the

14   defendants' own hearsay statement doesn't come into evidence, I

15   think there was something to the effect of, well, that's -- you

16   know, that's -- the government -- or the defense can't use the

17   rule of completeness as a way to get those in, but I think

18   that's wrong.  I think they can.  Now, if you choose to put in

19   the other statements -- so, again, like authenticity -- maybe

20   not like authenticity, which really -- we shouldn't be arguing

21   about at all.

22        On this score, I'm just going to say, you know, we can

23   be sitting here doing it night after night at trial when -- and

24   I'll keep everyone here as late as we have to to get through

25   the next witness to make sure that whatever is coming in is

1    properly -- the rule of completeness is properly complied with.

2    But I encourage the parties to work together to figure out,

3    okay -- if there is -- if the parties can agree, great.  If

4    they can't agree, a procedure for me to rule on rule of

5    completeness.  It doesn't -- we cannot have -- anyway, I just

6    wanted to make the point that conceptually, just because

7    something is that kind of hearsay, I don't believe, means it

8    wouldn't be subject to the rule of completeness.

9            MR. MULROE:  Loud and clear, Your Honor.  Our point

10   is only that there are limits to that principle.

11           THE COURT:  Sure.  Of course.

12           MR. MULROE:  So circumvent was maybe an inartful

13   word, but the point is that the rule of completeness cannot be

14   used as a pretext to completely abolish the rule against

15   hearsay.

16           THE COURT:  Right.  And, again, it doesn't mean the

17   entire chat from days on end comes in.  I agree with you on

18   that.

19           MR. MULROE:  Your Honor, with those out of the way, I

20   would turn it over to Mr. Kenerson to address a few of the

21   First Amendment points.

22           THE COURT:  Okay.

23           MR. MULROE:  Thank you, Judge.

24           MR. KENERSON:  Thank you, Your Honor.  And I'll be

25   brief on this score.

1          I just want to start with the question the Court raised

2     for the government this morning.  Our position is that if

3     that's all we prove -- in other words, an agreement to protest

4     outside the restricted perimeter -- and I think that might be a

5     distinction --

6          THE COURT:  Right.

7          MR. KENERSON:  -- from Mr. Smith, is that -- but that

8     the instructions kind of -- that the Court will give them on

9     the elements of the offense, will instruct them to acquit.

10         So I'm not sure that a First Amendment-specific

11    instruction is required.  And so -- so one thing is, I agree, I

12    think, with the Court's major principle that if that's all the

13    government proves, it is First Amendment protected.

14         THE COURT:  Right.

15         MR. KENERSON:  I'm not sure that an instruction is

16    required, and I think in some ways it can be confusing.

17         THE COURT:  Well, I'm not necessarily suggesting an

18    instruction.  All I'm -- I think the -- or the motion *in limine*

19    was about argument, I believe.  And, again, I'm -- what I'm

20    positing is if the defense wants to argue -- right? -- the

21    government hasn't proven anything other than an agreement to

22    protest lawfully outside the -- you know, in the -- in an

23    appropriate area, you're going to contest that and say, no, no,

24    we've proven something else, We've proven much more than that.

25         But it seems to me fair game for them to argue if,

1        ladies and gentlemen, they haven't proven on an agreement,

2        anyway; right?  They haven't proven anything more than the --

3        an agreement to go lawfully protest.  And, if so, at least

4        on -- I mean, you know, we'll have to -- at least on -- as to a

5        conspiracy, that can't be the basis for you, you know, finding

6        them guilty because that is a lawful -- that is lawful.

7              I don't think -- you know, we could, I guess, quibble --

8        I don't know whether it's putting aside the issue of an

9        instruction.  If they wanted to argue that or ask questions

10       that suggest that, it seems to me that's fair game.

11             MR. KENERSON:  That is lawful, sure.  I think where

12       the government's concern comes in -- and this is, I guess,

13       where it gets to the interplay between what arguments and

14       instructions would be is that if the defense is going to be

15       permitted to say -- argue that what they did was

16       First Amendment protected, if there's not an instruction that

17       kind of accurately captures what that is, then the jury is

18       going to wonder.  So I think that -- the way the Court termed

19       it right there, that they would argue that what they did was

20       lawful, if that's the case.  I don't think the government has

21       any issue with that, and I think that's what the instructions,

22       even without a First Amendment instruction, would say.

23             I think that the -- the potential issue that comes in

24       and where it gets tricky is if they start to say that was their

25       First Amendment right and that that leaves the -- that leaves

1   open a lot of questions in the jury's mind to just kind of rush

2   in and talk about that in opening -- or in closing or in

3   opening, frankly, without kind of defining what that means for

4   the jury.

5           THE COURT:  Okay.  I don't -- I don't know -- it's

6   tricky because you could -- I think it's also tricky because

7   you-all could say, well, they -- yeah, you know, there could

8   have been an agreement to do A and B, a lawful and unlawful

9   thing, I suppose.  So I don't know.  It -- whether you say --

10  is it really that much more to say all they did was agree to

11  lawfully protest and that's protected by the First Amendment, I

12  think we all agree, probably, on sort of what the law is in

13  this --

14      It struck me from the briefing, I think we all kind of

15  agree on the basic concepts here.  It's a question of what

16  rules they would be -- on how it can be argued, and then

17  putting aside -- right? -- instructions, as in all areas are

18  tricky.

19          MR. KENERSON:  Right.  And I think that's -- I think

20  the Court is right on that.  In my -- I guess the only point

21  that I'm trying to raise in response is that what is -- is

22  lawfully permitted to be argued is kind of informed by what the

23  instructions are, if that makes any sense.

24          THE COURT:  Sure.  But, again, you're not disputing

25  that it's lawful for them to be there, be in a lawful place,

 1   not -- not in a restricted area, and to protest to their

 2   heart's content.

 3              MR. KENERSON:  Yes, I agree with nonviolent protest

 4   outside the restricted perimeter.  Agreed.

 5         The one thing I do want to raise -- and I'd be

 6   interested in what Mr. Smith has to say when he comes up.  I

 7   actually read his papers as not making that distinction.  I

 8   read his papers as an "inside the Capitol/outside the Capitol"

 9   distinction without any kind of respect for the restricted

10   perimeter.

11              THE COURT:  Right.

12              MR. KENERSON:  And the government does not think that

13   that is accurate.  But to the extent that we talk about outside

14   the restricted perimeter, we agree with the Court on that

15   point.

16              THE COURT:  All right.

17         So I guess the last thing, just -- is if we do get to

18   the point where the Court's considering a First Amendment

19   instruction, I think we would want a large amount of say -- of

20   course, with the defense as well -- in crafting that because I

21   think that does have to get carefully worded.  That's the only

22   other point we have on that.

23              THE COURT:  I don't know that an instruction -- I

24   don't know.  I hadn't thought about this in terms of an

25   instruction.  I had just thought of it in terms of what was --

1       again, I think -- I think it was teed up in terms of sort of

2       argument.

3               MR. KENERSON:  Yes, it was teed up in terms of

4       argument.

5               THE COURT:  All right.  Very well.  Look, like all

6       instructions here, you're all going to have a lot of say.

7               MR. KENERSON:  Right.  And I guess we -- part of the

8       government's motion *in limine* as well dealt with, I think,

9       issues that we touched on yesterday that Ms. Hernandez has --

10      has been briefing and talking about at various points about

11      *Wisconsin v. Mitchell.*

12              THE COURT:  Yes.

13              MR. KENERSON:  And those kinds of cases -- I don't

14      think we need to go into those today; but, I mean, that is also

15      part of why the government is concerned about where

16      First Amendment-type argument may go.  Because while the issue

17      about whether they were lawfully protesting outside the

18      restricted grounds -- and the government's view is different

19      than the First Amendment question, than what -- what

20      evidentiary use the jury may put to the government's evidence.

21      So I just want to note that that is separate, and I think

22      those -- that the Court should be separate in how it allows

23      argument on those two issues.

24              THE COURT:  Agree.  It's a separate issue what --

25      what -- as you say, what use the jury may -- how the jury may

```
 1    use statements, which is what, kind of, we talked about

 2    yesterday.

 3              MR. KENERSON:  Right.

 4              THE COURT:  Okay.

 5              MR. KENERSON:  Thank you, Your Honor.

 6              THE COURT:  All right.  Very well.

 7         Do you want to hear -- just to close this out, there

 8    is -- there is a part of the government's motion that talks

 9    about an under-seal matter.  Do you-all want to address that

10    orally?

11              MR. MCCULLOUGH:  We do, Your Honor.  I think, just

12    from a practicality standpoint, we may want to limit the issue

13    here, and then we'll return to that, if that makes sense.

14              THE COURT:  Fine.  Fair enough.

15         Please, Mr. Smith.

16              MR. NICHOLAS SMITH:  Good afternoon -- or morning,

17    Judge.

18         I'd like to start with the First Amendment point because

19    we were just touching on that, sort of close the loop on this.

20         We think the judges -- we think the Court is absolutely

21    correct that the defense has to be able to argue that if there

22    was -- if the jury believes the evidence shows an agreement

23    to --

24              THE COURT:  Only an agreement; right?  That's the

25    tricky part.
```

1          MR. NICHOLAS SMITH:  Well, at the first -- yeah, an

2     agreement to protest in -- in an area where protest is lawful

3     without the use of force, without the use of violence, or

4     destruction of property.  We -- we have to be able to make

5     that -- that argument, and -- and I think one subtlety here

6     Mr. Kenerson was talking about, well, if that's true, if the

7     defense really just wants to argue their behavior is lawful,

8     what is the difference between --

9          THE COURT:  At least some of the behavior; right?

10    That's the tricky part because there's other --

11         MR. NICHOLAS SMITH:  Exactly.

12         THE COURT:  Depending on the defendant, there's

13    different other behaviors that you can't argue that kind of

14    defense for; so it's stricken.

15         MR. NICHOLAS SMITH:  So we -- we agree with the Court

16    completely on that point.  So -- and, in particular, on the

17    obstruction of justice issue where the *actus reus* is not

18    exactly defined, it's any act that obstructs, interferes, or

19    influences corruptly the proceeding.  The government can argue

20    and may attempt to argue that, actually, the actions of moving

21    in assemblages outside the building constituted the *actus reus*,

22    and also from the perspective of the conspiracy to commit that

23    offense.

24         If -- if they're arguing, well, at the very least, the

25    plan was to move in assemblages outside of the building and

1    thereby obstruct the proceeding, then you have a situation

2    where it's not sufficient for the defense to be able to say

3    this is not merely an obstruction offense, because, actually,

4    if they're moving in assemblages and that's their -- if they're

5    moving in assemblages and protesting and the intent is to

6    protest, then you have this situation where the government is

7    arguing that the same intent is an intent to obstruct, even

8    though the defense argument is that's an intent to protest.

9         And you have this First Amendment overlay that says

10   protesting in -- protesting in a public forum is protected

11   if -- to the extent it doesn't involve an intent to involve --

12   use force, destroy property, et cetera.  So -- so there really

13   is a need for the First Amendment defense here that's not --

14   that doesn't --

15        THE COURT:  Let me see if I can sum up what you're

16   saying.

17        You want to be able to argue that if -- again, I think

18   it's tricky because the government might -- a juror might

19   conclude the government proved A and B, an intent to do one

20   thing and then an intent to do another thing.  So it's

21   almost -- so it -- and just because they find an innocent or a

22   noncriminal -- an intent to do something noncriminal doesn't

23   mean the government can't also prove an intent to do something

24   criminal.

25        So it gets tricky.  But I think what you are saying is

1    it doesn't necessarily -- you think there's a First Amendment

2    defense, at least to -- let's say to obstruct -- to obstruction

3    if someone's intent -- just imagine a hypothetical defendant

4    who's intent was to go past the outside barriers and so to be

5    in a restricted area, but not inside the building.  I think

6    this was what you're arguing, but you tell me if I'm wrong.

7         So you're past the perimeter and so you -- you know,

8    it's not a defense to those kind of trespass offenses where

9    you've gone past the -- where the police have cordoned things

10   off but you're outside the building and you're protesting, and

11   that doesn't necessarily -- you don't think the jury could

12   conclude if a juror found only that intent, that -- could not

13   convict on obstruction?

14        MR. NICHOLAS SMITH:  No, Judge.  In fact, we think to

15   the contrary.  If the jury -- the First Amendment instruction

16   could say if the intent was -- if the plan -- if the agreement

17   was to plan to --

18        THE COURT:  If the only agreement.

19        MR. NICHOLAS SMITH:  If the -- well, no.  This

20   argument is cutting in the government's favor.  If the plan was

21   to enter -- enter an area that was restricted, then we agree

22   that's not protected by the First Amendment.  I know

23   Ms. Hernandez will make a separate argument.  There's a time,

24   place, and manner kind of argument you can make with respect to

25   the restricted area, but I'm arguing something before you reach

1    that point.

2                    THE COURT:  Right.  Okay.

3                    MR. NICHOLAS SMITH:  Which is that, you know, we

4    would concede for the sake of this argument that if the plan

5    was to enter an area that -- to knowingly enter an area that

6    they're not authorized, that is not under 1752.  That, separate

7    from any other argument, is not a first -- is an agreement

8    that's protected by the First Amendment.

9          But let's say -- as the Court knows, a lot of these

10   messages it's seen about planning -- what the government is

11   calling planning -- are not very specific at all.  So if

12   there's a generalized -- even if you call it an agreement, a

13   general agreement to come and protest somewhere around the

14   Capitol, that --

15                   THE COURT:  But not cross a line.

16                   MR. NICHOLAS SMITH:  Yes.  But it's not about

17   crossing a line.  It's something that's more general than that;

18   it's a plan to go to D.C. and protest, even if it's near the

19   Capitol, but without specifying whether it's a restricted area.

20   Okay?

21                   THE COURT:  Right.

22                   MR. NICHOLAS SMITH:  So in that case, we have to be

23   able to argue that if that is the plan -- if the jury believes

24   the government hasn't proven beyond a reasonable doubt --

25                   THE COURT:  Any other plan.

1          MR. NICHOLAS SMITH:  -- any other plan --

2          THE COURT:  Right.

3          MR. NICHOLAS SMITH:  -- then that's protected, and

4    the case law is *Jeanette Rankin Brigade*.

5          THE COURT:  Again, how you get there is maybe

6    complicated in terms of what an instruction would look like,

7    but that just strikes me as ripe, I think.

8          MR. NICHOLAS SMITH:  And we submit an instruction

9    that says -- I think it says almost exactly that.  But there's

10   one more nuance, which Mr. Kenerson brought up, which is the

11   distinction between inside and outside the building as opposed

12   to lawful area.

13         THE COURT:  Yes.  Yes.

14         MR. NICHOLAS SMITH:  And our argument why it can't

15   just be lawful area is it is binding D.C. Circuit precedent

16   that the Capitol Grounds are a public forum, and it's also

17   binding precedent that the simple -- the per se act of moving

18   in assemblages within a public forum cannot -- cannot

19   constitute an offense per se.

20         If it's -- if it's assembling and parading per se,

21   the D.C. -- the Supreme Court summarily affirmed *Jeanette*

22   *Rankin Brigade*, which held -- which struck down the parading

23   offense on the Capitol Grounds.  And the three-judge panel said

24   if there's something more -- if the offense is something more

25   than merely parading, then we don't find, at least in this

1     case, a facial invalidity on any Title 40 offense.

2          They said -- the Court said if there was something like

3     disorderly conduct on the grounds or -- I think they mention

4     destruction of property.  There was -- the Court said we don't

5     find any First Amendment issue there.  But they say the mere

6     act of parading and assembly --

7          THE COURT:  So you're only talking about the parading

8     count for this argument?

9          MR. NICHOLAS SMITH:  No, no.  Because let's say --

10    again, we go back to the conspiracy.

11         THE COURT:  Yeah.

12         MR. NICHOLAS SMITH:  So if the jury -- if the

13    government does not prove beyond a reasonable doubt that the

14    conspiracy contemplated more than parading in a public forum,

15    that -- then that's -- that is -- the jury is unable to find

16    guilt because that --

17         THE COURT:  On any of the charged -- well, putting

18    aside --

19         (Indiscernible simultaneous cross-talk.)

20         MR. NICHOLAS SMITH:  -- because we're just talking

21    about planning.

22         THE COURT:  Right.

23         MR. NICHOLAS SMITH:  Because at this point, we're

24    just -- I think it's much more relevant for the conspiracy.

25         THE COURT:  All right.  So I guess, you know, I'm

1    going to let the -- you know, I'll hear from -- it's the

2    government's motion.  I'm going to hear what they say in

3    response.

4         I think on this one, it seems like the parties should

5    talk about -- and I'll think about -- whether there really is

6    anything for me to decide until we get to, like, closings,

7    closings and instructions.  I'm not sure.  I don't know how it

8    would really impact the receipt of evidence by the jury.  It's

9    possible it could affect how you open, I suppose.  It might.

10   But how you open, you're going to be -- I don't know.

11        So just think about what I really need to decide and by

12   when.  Because I think it's -- this isn't really about

13   evidence.  It's just about what you can argue and what the

14   instruction will be.  And I don't think we're that -- it may be

15   that the last nuance you've introduced here is one that the

16   government can't quite buy into and so you wouldn't be in

17   complete agreement, but I think there are -- it seems to me,

18   there's a lot of area of agreement.

19             MR. NICHOLAS SMITH:  And the other question -- and I

20   know the Court's done with this issue, but one relevant

21   question, I think, is, well, if it's so uncontroversial that an

22   agreement merely to parade on the -- in a public forum or a

23   lawful grounds, if that's uncontroversial, why is the

24   government fighting that?

25             THE COURT:  Well, because it's tricky; right?  I

1    mean, it is tricky that -- first of all, the only part of it;

2    right?  That -- that it could be confusing.  The jury has to

3    know, what if there was an agreement to do A and B.  If there's

4    an agreement to do A and B and -- or they find that, then just

5    because there was an agreement to do lawful things doesn't mean

6    they acquit on the criminal things.  I think we all agree on

7    that.  It could be confusing.

8          So, anyway, I think that's probably one reason why

9    they're -- you know, why they've sort of said, look, this is --

10   this is a tricky issue.

11         MR. NICHOLAS SMITH:  So, Judge, on the tools point,

12   the Court mentioned that it found this theory of relevance

13   meritorious.

14         THE COURT:  I just thought on -- at least, again,

15   just -- and I'm not -- I'm not saying anything one way or the

16   other about the statements.  My only point is, as it was

17   presented here -- right? -- the theory that -- their theory is

18   that the -- and even putting aside whether -- exactly what

19   evidence would come in leading up to the 6th, the point is --

20   their theory is, well, this was a conspiracy to weaponize a

21   group of people.  And I don't see why the result -- it's sort

22   of the downstream effect of a conspiracy just in human form.

23   That's the argument.

24         MR. NICHOLAS SMITH:  So I think -- I want to see if

25   I'm framing this issue right.  The tools' actions are relevant

1    in this case if the defendants are responsible for those

2    actions; is that -- I think -- I think it's fair to say that

3    their -- the actions of some people were characterizing it as

4    tools are not relevant if the defendants are not somehow

5    responsible for those actions; is that --

6              THE COURT:  They went out of their way to say, no,

7    no, no, we're not trying to hold them responsible, which is, I

8    guess, why you're bringing this up, I think.

9              MR. NICHOLAS SMITH:  Well, let me clarify.  I don't

10   mean responsible in the sense of, like, a vicarious liability

11   responsible, but I mean that they're -- when we say that the

12   tools' actions are relevant because --

13             THE COURT:  There's a causal relationship.

14             MR. NICHOLAS SMITH:  -- there's a causal

15   relationship, and the suggestion is that they're relevant

16   because these defendants are -- are responsible --

17             THE COURT:  Yeah, in that sense.

18             MR. NICHOLAS SMITH:  -- in relevance.  Okay.

19             THE COURT:  I believe that's the argument; correct.

20             MR. NICHOLAS SMITH:  So -- so I guess the defense

21   point is there's already a set of rules for determining when

22   people are responsible for other -- others' actions.  So

23   there's theories of liability here.  One is *Pinkerton*.

24             THE COURT:  Right.

25             MR. NICHOLAS SMITH:  And that means that the tools --

1    the tools concept adds no value to the co-conspirator concept

2    because we -- in order to find someone responsible for

3    another's actions, you have to find them co-conspirators and

4    that the -- the other -- the collateral action was within the

5    scope of the conspiracy and reasonably foreseeable to the

6    defendant.

7            THE COURT:  Right.  But they're not seeking that.

8            MR. NICHOLAS SMITH:  But then if we're saying this

9    isn't about responsibility, then what is relevance?

10           THE COURT:  It's a causal relationship.

11           MR. NICHOLAS SMITH:  But -- so -- so -- but so you're

12   saying the defendants are responsible -- we're showing this to

13   the jury.  Why are we showing these other people's actions who

14   are not in this case to the jury?

15           THE COURT:  Because purportedly -- again, this is the

16   theory -- right? -- is because purportedly it was caused by the

17   conspiracy that your clients allegedly were part of.

18           MR. NICHOLAS SMITH:  And that is evidence of what

19   charged offense in this case?  I don't --

20           THE COURT:  So if there's a conspiracy to do a

21   particular act or to reach a particular goal and -- take people

22   out of it; right?  It's -- and there was some matter or means

23   of reaching that goal and that happened to be by manipulating a

24   person or manipulating -- whatever it might be, some sort of

25   downstream effect, you don't think that would be admissible as

 1  evidence that the conspiracy existed?

 2          MR. NICHOLAS SMITH:  I think there's a reason they've

 3  cited no case law for the tools concept --

 4          THE COURT:  I -- I --

 5          (Indiscernible simultaneous cross-talk.)

 6          MR. NICHOLAS SMITH:  -- and I think it's because what

 7  they're trying to do is they're trying to get a *Pinkerton*-type

 8  of theory in front of a jury but without having to show any of

 9  the normal elements of -- of theories of liabilities.  So you

10  have aiding and abetting.  You have solicitation.  So

11  solicitation would -- the tool concept kind of sounds like

12  solicitation.

13          THE COURT:  I agree with you.  Mr. Smith, let me just

14  say, I'm going to -- in all ways, I'm going to scrutinize the

15  tool concept very closely for the reasons you've laid out.  It

16  is unusual.  That doesn't mean in some particular sense it's

17  wrong, but I hear what you're saying.  I don't -- and I

18  understand your argument about *Pinkerton*.

19          MR. NICHOLAS SMITH:  So, Judge, I think Mr. Mulroe

20  went back to the December 12th arguments from yesterday.  And,

21  you know, we just want to reiterate the point really quickly

22  that we haven't had an opportunity to look at and examine the

23  context of the messages that I think Mr. Mulroe suggested made

24  a link between December 12th and -- and January 6th.

25          I think the government was trying to make the argument

1      there that there might be some proper Rule 404(b)(2) purpose.

2      I know the Court was saying, well, this isn't really the same

3      issue, but that's -- I think what the government was doing is

4      cleaning up the argument it was making yesterday and offering

5      some more support for -- for that.  So we would just like to

6      respond to that; that yesterday the issue was whether --

7      something about the defendants' actions on December 12th showed

8      an intent that bears on the charges on --

9              THE COURT:  Mr. Smith, I don't want to interrupt, but

10     if you would rather put something in writing and submit it to

11     me on Monday, I'm happy to receive it, in the interest of time,

12     and because of the point you raised earlier.

13             MR. NICHOLAS SMITH:  Yep.

14             THE COURT:  Is that a yes?

15             MR. NICHOLAS SMITH:  Yes, Your Honor, we will submit

16     something.

17             THE COURT:  All right.

18             MR. NICHOLAS SMITH:  We will submit something.

19         So, Judge, on the Secret Service issue, I want to make

20     sure I have this correctly.  Mr. Mulroe, I think, said that the

21     parties no longer have any disagreement on this issue.  But

22     I -- I'd just like to clarify, for the record, so we don't have

23     to do it again, that the government is not objecting to

24     cross-examination on the issue of whether a section 1752 area

25     existed on January 6th, and that relates to communications that

1        the Secret Service had with the Capitol.

2                THE COURT:  If they do object, they will tell me when

3        I hear from them after you.

4                MR. NICHOLAS SMITH:  Okay.  Judge, on the cross of

5        CHS's issue, the Court mentioned that since this is only --

6        since the government's motion only concerns cross and not

7        direct, it can deal with this issue later, but I just want to

8        point out for the record that the government's motion actually

9        covered the defense use -- the defense potential use of these

10       witnesses in its public motion.  So I think we'll need to --

11               THE COURT:  If we -- look, if we get to that place,

12       we get to that place.  I hear what you're saying.

13               MR. NICHOLAS SMITH:  So the Court would like to hear

14       argument at a different time?

15               THE COURT:  If we -- if that becomes relevant, yes.

16               MR. NICHOLAS SMITH:  Okay.  Judge, on the rule of

17       completeness point, I think the government stipulated that

18       there would be some circumstances where if one part of it -- if

19       Mr. A's text message is shown saying something, not X, and then

20       Mr. A sends a later text message suggesting X, you know, the

21       rule of completeness would, in that circumstance, potentially

22       allow the introduction of the text, the second one.

23               We'd only like to point out that the Rule 106 actually

24       says, quote, any other writing or record, end quote, can be

25       used to complete the declarant's statement.  So this -- this

1    rule is not limited on its face to just text messages that are

2    on the same page as -- as the earlier out-of-court statement.

3         THE COURT:  Sure.  But, of course, logically, what

4    would be relevant, for example, would be temporal connection,

5    but, you know -- or something like that.

6         MR. NICHOLAS SMITH:  So we think that one other

7    possibility would be -- in addition to temporal connection

8    would be subject matter.  So, for example, if a declarant

9    says -- just hypothetically.  I'm not saying this is quoting

10   the government's evidence.  But, you know, we need to wear --

11   we need to have tactical gear on January 6th.  And then let's

12   say a couple of days later the same declarant clarifies in

13   another message, the reason I said we need tactical gear is

14   because we want to protect ourselves from Antifa.  So there the

15   same declarant is basically showing that the use of only the

16   first message would be highly misleading.

17        THE COURT:  I think -- look, this is highly

18   contextualized.  You know, the way you phrased it was the

19   reason I said that, which -- you know, the reason I said that

20   two days ago was X.  So --

21        MR. NICHOLAS SMITH:  But in that stylized example, I

22   think the Court would agree that if there were clarity like

23   that, then it would be misleading to show.

24        THE COURT:  I would say -- it's a stronger case than

25   otherwise, but I hear what you're saying conceptually.

1              MR. NICHOLAS SMITH:  So, Judge, on the -- I just want

2      to take one step back about the mules point.  The government

3      compared tools to mules where -- you know, of course, like if

4      there's a drug conspiracy case, the actions of the mules are

5      relevant in the case, but I think, Judge, if we look at those

6      cases, that's about -- that, again, goes to aiding and abetting

7      conspiracy or solicitation.

8              THE COURT:  Well, no, no.  Again, I think -- the way

9      I'm seeing it right now -- and you -- you're talking about

10     theories of liability, and they're talking about whether

11     evidence is relevant.  And those are two different things;

12     right?  Again, regardless of how or whether you would -- you

13     could find a mule criminally liable for the conduct -- again,

14     if you were trying the person who was using the mule, that

15     person's -- the fact of the mule -- the fact of whatever the

16     mule did would come in as evidence; right?

17          I think that's the difference between what they're

18     arguing and what you're responding to the argument with, which

19     I don't blame you for doing, because I think it's your

20     strongest play, but I do think it's a little bit apples and

21     oranges.  But you tell me why I'm wrong.

22             MR. NICHOLAS SMITH:  Well, Judge, I just think --

23     maybe it's just me.  I'm struggling to understand the idea of

24     relevance separate from responsibility.  So I -- like if --

25             THE COURT:  The mule is a perfect example.

1          MR. NICHOLAS SMITH:  If there's a mob of people and

2     you're trying to argue that, you know, Mr. A is responsible

3     for, you know, B through -- Mr. B through Z, you -- in order to

4     show relevance, a predicate is that there is some

5     responsibility on Mr. A's part.  I don't understand the idea

6     of -- of relevance if there isn't -- or some legal theory of

7     responsibility.

8          THE COURT:  What about an unwitting mule?  Somebody

9     who -- the government puts -- or of the -- you know, the person

10    puts a -- some drugs in someone's luggage who they're going

11    from Country A to Country B.  Person doesn't know anything

12    about it and wouldn't necessarily be liable if they didn't --

13    criminally liable if they didn't know that, but they're

14    prosecuting the person who put the drugs in the person's bag

15    knowing that Person B was going to be traveling across the

16    border.

17         MR. NICHOLAS SMITH:  Well, then in that case it would

18    be the actions -- and I take that point.  But it would be the

19    actions of the mule that are noncriminal that would be

20    relevant.  Here what the government is trying to show --

21         THE COURT:  Right.

22         MR. NICHOLAS SMITH:  -- is that criminal acts by

23    other actors, which involve their own *mens rea*, are now

24    relevant in a conspiracy even without having to show

25    co-conspirator liability.  So I think --

1          THE COURT:  Look, for a variety of reasons, this is a

2     strange fact pattern.

3          MR. NICHOLAS SMITH:  Well, Judge, let me -- one last

4     point -- and it just occurred to me right now -- is that this

5     would create a huge loophole in conspiracy law if the Court

6     were to uphold this.  So, for example, in any kind of narcotics

7     conspiracy --

8          THE COURT:  Right.

9          MR. NICHOLAS SMITH:  -- the government could try to

10     show that drug dealing, you know, by people who the government

11     couldn't prove all the elements of co-conspirator liability or

12     *Pinkerton*, but it just characterizes the actions of these

13     people as tools and, therefore, relevant to show the jury.  So

14     we're bringing in ten extra kilos by people who the government

15     can't prove, you know, *Pinkerton* or co-conspirator liability

16     with.  But we just characterize them as tools because, we say,

17     well, you know, the conspiracy contemplated lots of drug sales.

18     And so, you know, they were tools, and we can't show --

19          THE COURT:  But if they could connect the defendant

20     to all of that, why wouldn't they be able to do that?  Again,

21     they're not trying to hold -- in your scenario, they're not

22     trying to hold those people liable through that proceeding.

23     So, again --

24          MR. NICHOLAS SMITH:  What's the relevance if the

25     defendants are not liable for their actions?

1          THE COURT:  All right.

2          MR. NICHOLAS SMITH:  I guess -- I'm struggling to

3     understand how -- maybe the government can explain it.  But,

4     Judge, I think when you show a jury a bunch of criminal acts by

5     people who are not defendants and they're not connected up with

6     the conspiracy, I guess what is that suggesting to the jury?  I

7     think it's sort of suggesting that they're -- I think at least

8     we would need some kind of instruction telling the jury if this

9     evidence came in, you are not -- you are not being shown this

10    evidence to find that the defendants are criminally responsible

11    for those actions.

12         THE COURT:  I'm open -- look, you know, off the top

13    of my head, assuming it came in -- and the defendants wanted

14    that kind of instruction -- I think the government, based on

15    their submission, wouldn't oppose it, so -- anyway, but it's a

16    fair point.

17         MR. NICHOLAS SMITH:  Okay.  Thank you, Judge.

18         THE COURT:  All right.  Any -- oh, Ms. Hernandez.

19         MS. HERNANDEZ:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MS. HERNANDEZ:  So can I start with the mules?

22         THE COURT:  Sure.

23         MS. HERNANDEZ:  So there's two types of mules;

24    correct?  I mean, as the Court pointed out.  There's one mule,

25    obviously.  They don't just show up.  They get hired.  You

1   transport.  I pay you.  That's the mule -- that's a standard

2   case.

3               THE COURT:  Ms. Hernandez, let me just press pause

4   for a moment and just talk about scheduling for one moment.

5               So here's what I'd like to do is -- just so everyone

6   knows -- finish up this argument, let the government respond

7   to what the defense says, go to lunch, and hopefully do that

8   and the brief under-seal part of this motion.  Go to lunch at

9   1 o'clock; release everyone except for you, Ms. Hernandez, and

10  your client; and argue your motion to sever after lunch.

11              Is there any objection to that -- to proceeding that

12  way?

13              MS. HERNANDEZ:  No.  That's fine.  That's fine.

14              THE COURT:  I don't know if any other defendants

15  wanted to be heard on that, but I do want to try to --

16  especially for folks who may need to catch transportation, let

17  them leave at lunchtime and just have you come back and argue

18  your severance motion.

19              MS. HERNANDEZ:  That's fine.  Two things, however.  I

20  didn't understand the Court.  Does the Court want to handle

21  the -- the sealed matter now?  Is that what you're

22  suggesting --

23              THE COURT:  No, no, no, I'm not suggesting that.

24              MS. HERNANDEZ:  -- which is fine, because maybe it

25  could be done -- maybe it could be done in 20 minutes or

1      30 minutes, if that's fine.  I'm happy to wait.

2                THE COURT:  Your argument is going to take a while?

3                MS. HERNANDEZ:  No.  I'll try to be brief, but I'm

4      just -- I just thought what you were suggesting is since there

5      are people waiting on the CHS matter, that maybe you wanted to

6      take that up first, which is fine with me, if that's -- I'm

7      obviously here all day, I guess, so it's up to you.

8                THE COURT:  No, no.  Let's just finish -- finish this

9      up.

10               MS. HERNANDEZ:  Okay.  The other thing is the motion

11     to sever, there may be CHS references.

12               THE COURT:  Okay.  Well, we can, again, talk about

13     that after lunch.

14               MS. HERNANDEZ:  Given the most recent developments.

15               THE COURT:  Okay.

16               MS. HERNANDEZ:  So I was talking about the mules

17     issue.  So there's two types of mules -- and the Court is -- I

18     try -- I tried to try once -- one case with this innocent -- I

19     forget what the term is -- innocent -- innocent mule, what the

20     Court said.  You know, a guy -- and there are some cases -- a

21     guy who, as a normal course of his life, travels across the

22     border, for example, in Texas, has -- has a pass to enter the

23     border without getting inspected and blah, blah, blah.  A drug

24     dealer knows about it, sticks drugs in his trunk without his

25     knowledge, and -- and then --

1          THE COURT:  Yes, that was the example I used.  I

2     understand it.

3          MS. HERNANDEZ:  Okay.  So that's one type of mule.

4     But that's -- that's a very rare case, and there's certain

5     standards that must be met before you can even make that

6     argument, and I'm happy to bring that -- I tried one case a few

7     years ago.  Unsuccessfully, I might add.  But I was -- but the

8     standard mule, it's not -- I mean, it's not some tools.  The

9     standard mule case, it's not that there's some tool on the

10    corner that you -- no, they get hired, they get -- please

11    transport this, we'll pay you X amount of money, and you do it.

12         So if we're talking about this rare mule, innocent mule

13    case, that's a different thing, and I'm happy to -- I would

14    like to submit something to the Court on that, because there is

15    a -- a narrow body of case -- case law on that because it's not

16    a very common occurrence.

17         THE COURT:  All right.

18         MS. HERNANDEZ:  So I'd like to submit something to

19    the Court on that.

20         THE COURT:  I'll receive it on Monday then.

21         MS. HERNANDEZ:  Okay.  Yes, sir.

22         The First Amendment issue, Your Honor, the government

23    seeks to preclude a First Amendment defense altogether in

24    their -- in their motion.  I mean, they -- they -- they do

25    three parts to it.  One is they claim that *Brandenburg* is not

1    applicable for whatever reason.

2          Two, that introduction of defendant's statements does

3    not violate the First Amendment, and I disagree with that

4    wholeheartedly.  And I mentioned that in the *Rahman* case, Judge

5    Mukasey actually addressed that.

6          And then the third aspect of it is the defendant should

7    be precluded from raising a First Amendment defense to the

8    jury, and the government's argument is, essentially, we prove

9    the case; therefore, you can't --

10          THE COURT:  No.

11          MS. HERNANDEZ:  -- you can't raise a First Amendment

12    argument, and that's -- the point is -- our belief is they

13    won't be able to prove their case because of the

14    First Amendment.

15          THE COURT:  I don't think this is an area, perhaps,

16    unlike the statements, Ms. Hernandez, where I really do believe

17    the parties are sort of closer than you think.  I don't think

18    they're saying -- I think we're in agreement about what --

19    again, put the statements issue aside for the moment.  We --

20    you-all do disagree about that.

21          But the question is how to -- how to police the fact

22    that -- I don't think the government would disagree that if all

23    that they prove is an agreement to protest in a lawful place,

24    that -- that's -- the jury should acquit because that's

25    protected by the First Amendment.

1      So I just think this is -- like I said to Mr. Smith, I

2  think it's an area -- whether it's making sure arguments are

3  properly bounded or -- and then an instruction issue, I feel

4  like you-all can get a lot of the way there, but I know what

5  you're saying.  The way the motion leads --

6           MS. HERNANDEZ:  I don't believe --

7           (Indiscernible simultaneous cross-talk.)

8           THE REPORTER:  Hold on.  Hold on.

9           MS. HERNANDEZ:  I'm sorry.

10          THE COURT:  No, I'm sorry too.

11          MS. HERNANDEZ:  No.  Go ahead.

12          THE COURT:  Go ahead, Ms. Hernandez.

13          MS. HERNANDEZ:  I don't believe that's what the

14  government is arguing.  And even -- even the issue of what

15  is -- what were restricted areas or not implicates the

16  First Amendment because there is D.C. Circuit -- and other

17  circuit case law -- that says where you've got a public

18  forum -- First Amendment public forum, the extent of

19  restriction that you can impose implicates First Amendment

20  interests, so.

21      And there's a case, for example, where during one of the

22  campaigns, I believe -- during the 2016 campaign, the Trump

23  campaign -- or one of the campaigns tried to -- tried to

24  limit -- maybe it was whoever was in office at the time --

25  tried to limit the closeness of protesters to the location

1    where the person was speaking.  And the court said that's too

2    far from the speaker.  The First Amendment protest protections

3    come into play, and so the fact that you restricted space for a

4    mile is unconstitutional.

5            THE COURT:  Right.  But no Court has said that here.

6            MS. HERNANDEZ:  Well, there's only one case -- I

7    mean, they cite Judge Cooper's opinion, I believe, in

8    *Robertson*.  And I read *Robertson*.  There's no facts in there

9    that are similar to this case in the sense that -- there are

10   no -- there's very few facts.  So I'm not sure what the judge

11   was -- but, literally, the entirety of Judge Cooper's statement

12   is a conclusionary statement the First Amendment doesn't apply.

13           THE COURT:  All right.  But, I guess, Ms. Hernandez,

14   what -- it seems to me, it behooves you to tell me what you

15   want to argue and why you think the government is not letting

16   you do that.

17           MS. HERNANDEZ:  Well, they're seeking to prevent me

18   from arguing it.

19           THE COURT:  What exactly?

20           MS. HERNANDEZ:  Well, they're saying the defendants

21   should be -- at page 26 and 27 and -- page 26 and 27, top of

22   28, defendants should be precluded from raising a

23   First Amendment defense to the jury.  They --

24           THE COURT:  Look, I think you're reading the defense

25   issue, and maybe I'm trying to harmonize the briefing too much.

1    I think what the government -- and, again, maybe this will help

2    put a point on where the parties differ.

3         What the government, I think, is saying by saying you

4    can't use a First Amendment defense is that -- in their view,

5    you -- if they prove the elements of one of the charges -- of

6    one or more of the charged offenses, that the First Amendment

7    does not -- is not -- is not a defense to that charge.

8         MS. HERNANDEZ:  That's a completely circular

9    argument --

10        THE COURT:  Well --

11        MS. HERNANDEZ:  -- if they prove it, but the

12   First Amendment is implicated in the proof -- that's a decision

13   for the jury.

14        THE COURT:  No, no, no.  I don't think that's --

15        MS. HERNANDEZ:  Well, at the bottom --

16        THE COURT:  -- entirely correct.

17        MS. HERNANDEZ:  The last paragraph of 27, they seek

18   to preclude even cross-examination.  So it's not after proof.

19   They're seeking -- accordingly, any line of cross-examination

20   or argument that the defendants may wish to make regarding the

21   First Amendment is irrelevant.

22        THE COURT:  Well, look, tell me -- no one is

23   saying -- tell me what you want to argue and why do you think

24   what they're -- what they're -- what they've filed here

25   precludes you from arguing it.

1          MS. HERNANDEZ:  What they're -- we should be able to

2     establish that the Capitol Grounds are First Amendment -- a

3     public forum.

4          THE COURT:  Past -- past the cordoned-off area?

5          MS. HERNANDEZ:  The Court has -- the -- there are --

6     there are reversals of convictions for somebody who was handing

7     out pamphlets on the steps of the Capitol, which were

8     restricted, and the -- and the D.C. Circuit reversed the

9     conviction because that area is First Amendment protected.  And

10    the Court said -- distinguished the grounds, including the

11    steps, from committee rooms and other -- you know, and inside

12    the Capitol.

13         THE COURT:  Sure.  But there was no --

14         MS. HERNANDEZ:  It was the violation of a statute.

15         THE COURT:  Right.  But there was no other intent

16    that was part of the charges.

17         MS. HERNANDEZ:  That's why I'm saying, that's

18    circular.  That's the allegation.  They -- the -- the

19    allegations that there was an intent, but that's a proof issue.

20    The jur- -- it's up to the jury to decide whether the

21    government proved that intent.  It's not a given.  That's why

22    I'm saying it's a circular argument.

23         They're saying you can't present a First Amendment

24    argument because the charges involve a different intent, but

25    that's their allegation in the indictment.  It is up to the

1   jury to find whether, in fact, there was an agreement, as they

2   claimed there was, to violate the seditious conspiracy statute

3   or whatever.  All of that -- in fact, as -- as -- well, as the

4   CHS -- as -- stuff that I can't talk about, there are -- there

5   are -- there are statements -- there are allegations -- there

6   are statements that, in fact, there was no agreement to -- to

7   attack the Capitol or to any of that.

8           THE COURT:  Right.  That's separate.  That's not a

9   First Amendment defense.  That's a -- the government didn't

10  prove the charged conspiracy, that's -- you can always argue

11  that.

12          I guess what I'm trying to get at is how do you think

13  the First Amendment operates to somehow negate -- in other

14  words, if the government proves all elements of conspiracy to

15  obstruct, what work is the First Amendment doing?

16          MS. HERNANDEZ:  The --

17          THE COURT:  So it's doing none in that case.

18          MS. HERNANDEZ:  The point is the government -- if the

19  government proves -- but in getting to how the government

20  proves or what proof is presented to the jury, the

21  First Amendment activities, that is -- the government is saying

22  you can use --

23          THE COURT:  This is another flavor of your statements

24  argument then.

25          MS. HERNANDEZ:  You can argue.  So --

1          THE COURT:  This is -- it's sort of your statements

2     argument.

3          MS. HERNANDEZ:  Well, it is because the government is

4     using statements, and the case -- the government is using

5     statements which may or may not be protected by the

6     First Amendment.  That's the most I'll concede on that issue.

7     They may or may not be protected by the First Amendment --

8          THE COURT:  Okay.

9          MS. HERNANDEZ:  -- depending on a lot of things.  But

10     they don't want me to -- they do not -- they want to preclude

11     any argument that a statement made in November is a statement

12     of polit- -- protected by the First Amendment versus a

13     statement of intent, but that is for the jury.

14          THE COURT:  Okay.  You have already -- this is -- I

15     don't know that that's correct.  I understand your argument,

16     and I understand you're arguing about the statements.  I'm

17     going to be looking at that.  You argued that to me yesterday,

18     and I understand the government to be arguing you shouldn't be

19     able to make that argument regarding that statement.  I mean,

20     I'm not sure that is a jury question.  I see you've laid it

21     out.  I'll work through it, but --

22          MS. HERNANDEZ:  Let me say this:  I think -- it could

23     be or it may be a preliminary question of law for the Court,

24     but I do -- at least *Rahman* sets it up as a jury question.

25          THE COURT:  All right.  Well, I -- I haven't had --

1          MS. HERNANDEZ:  And, in fact, you know, Judge Mukasey

2     says there's three types of statements.  One you cannot use for

3     any purpose if you -- and the way he puts it is if you believe

4     it's a statement of opinion, you can use it to convict or for

5     any purpose.  And the point is that that has -- the only way we

6     get to that point where the jury gets to decide is if we can

7     introduce evidence, if we can cross-examine, if we can -- and,

8     you know, this isn't far-fetched.  There are, for example,

9     Capitol Police documents -- and even the Capitol Police

10    documents and other documents -- which refer to what was

11    happening that day as First Amendment-protected activities;

12    right?

13          THE COURT:  Yes.

14          MS. HERNANDEZ:  So that's the type of --

15          THE COURT:  I think that's about as relevant as -- I

16    mean, yes, I understand that.

17          MS. HERNANDEZ:  So that's --

18          THE COURT:  I understand that's the way the

19    Capitol Police speak of those types of activities.  That's --

20    their training tells them to refer to them --

21          (Indiscernible simultaneous cross-talk.)

22          MS. HERNANDEZ:  Correct.

23          THE COURT REPORTER:  You're both speaking at the same

24    time.

25          MS. HERNANDEZ:  Right.  Those -- those -- and the --

1    I'm sorry.  We're having a conversation.  Unfortunately, we are

2    in court and I should -- and in fact -- and I know this is --

3    maybe I should quit at this point, but -- and this is also

4    related to some of the other arguments that the government

5    makes.

6            When -- when Judge Kavanaugh was being nominated, there

7    were demonstrations.  There were demonstrations led by the --

8            THE COURT:  This is not --

9            MS. HERNANDEZ:  No, it is, Your Honor -- let me

10   explain why.  I'm not making a selective prosecution argument;

11   that's not the argument I'm making.

12           But -- but there were demonstrations by leaders -- led

13   by leaders of the Women's March and the American Civil

14   Liberties Union, and their purpose was to interrupt the

15   proceedings, and they publicly said that their purpose was to

16   persuade the senators not to confirm.  And everyone -- I'm not

17   making a selective prosecution argument.

18           THE COURT:  I understand.

19           MS. HERNANDEZ:  I'm just saying everyone -- everyone

20   perceived that activity as First Amendment-protected --

21   protected activity and, therefore -- and, therefore,

22   those 200-and-something people -- and the ACLU said we will pay

23   for your bail, which means they believed in advance that they

24   were going to be breaking rules or laws.  And those people were

25   fined.

1          I'm not making -- I'm not making a selective prosecution

2     argument, but I'm making an argument that my client, I would

3     say -- I should be able to establish that his agreement and his

4     conduct -- and, again, this goes along with the *Munchel* theory

5     of rhetorical bravado.  His conduct is more akin to that

6     activity, which we all understand to be First Amendment

7     protected, than it is to the government's view of how to

8     interpret the statements.

9          And I believe that's a jury issue.  The jury has to be

10    able to say, okay, this is what he said, this is what he did.

11    Did -- is -- is that combination of whatever the government can

12    prove through -- and I can undo through cross-examination or

13    evidence -- is that combination of talk and -- and conduct

14    meet -- prove what the government claims, you know, a seditious

15    conspiracy, or does it prove a First Amendment-protected

16    activity.

17          THE COURT:  But my point is on this -- putting aside

18    the question of what they can use particular pieces of evidence

19    for-- right? -- you have an argument.  We talked about it

20    yesterday.  I'm going look to the cases, look at Mukasey.

21          MS. HERNANDEZ:  Okay.

22          THE COURT:  It doesn't get you anything extra.  In

23    other words, if putting that issue aside, either the government

24    proves the charges or they do not; right?  Either they -- wait.

25    Either they have sufficient evidence and they prove them or

1     they don't, and the fact that -- the fact that lawful activity

2     is protected -- that lawful protest in a lawful place is

3     protected by the First Amendment doesn't -- they're not seeking

4     to criminalize that.

5                MS. HERNANDEZ:  No, but --

6                THE COURT:  Other than you've got this --

7                MS. HERNANDEZ:  You cannot disassociate -- I have to

8     be able -- you cannot dis- -- for example, let's say my client

9     is testifying.  I'm not -- but let's say my client is

10    testifying.  And -- and he says, yes, I wrote that.  In

11    November, I did write that the people were stealing the

12    election.  He should -- he has to be able to say I thought I

13    was making a political statement.  I thought I -- this is

14    America.  We get to -- we get to speak our mind about

15    political -- that's the --

16               THE COURT:  Ms. Hernandez, if someone says on day

17    one, I really hate the President, I'm going to shoot the

18    President, and then a week later someone shoots the President

19    and they're trying to figure out who shot the President --

20    okay? -- is that statement evidence of a crime?

21               MS. HERNANDEZ:  The person who said he should be

22    shot?

23               THE COURT:  Yes.  The person who says, I'm -- I

24    really hate the President.  I hate his policies or her

25    policies.  I think I'm going to shoot -- I'm going to shoot the

1     President.  And then a week later, the President is shot, and

2     it's a whodunit.  Who did it?  Can they -- can the government

3     use that statement as evidence that that person was the shooter

4     or no?  Or because it's political speech, can they not?

5               MS. HERNANDEZ:  Well, that that person -- the person

6     who shot him is not the person who made the statement.

7               THE COURT:  Yes, it is in this case.

8               MS. HERNANDEZ:  I thought you said -- yeah, but my

9     client never shot the President.

10              THE COURT:  That's for you to --

11              MS. HERNANDEZ:  That's exactly my point.  No, I'm

12    not --

13              THE COURT:  To be clear -- I regret using that

14    example because I'm not suggesting anybody in this courtroom

15    shot the President or, frankly, shot anybody; that's not the

16    point.  But I'm trying to illustrate my thought about -- and

17    I'm going to read all -- and you're back to this issue of what

18    I can use -- what the jury -- wait.  How the government can use

19    a statement.

20              MS. HERNANDEZ:  There is a --

21              THE COURT:  I'm going to look at that.

22              MS. HERNANDEZ:  There is, in fact, a case that came

23    out of this district, which is U.S. v. Watt [sic], I believe,

24    that went to the Supreme Court, and somebody did make a threat

25    on the President.  He didn't shoot him, but the government

1    charged him.  And the Supreme Court said no, First Amendment

2    protected.

3            THE COURT:  Well, that -- no, no, no.  See, this

4    is --

5            MS. HERNANDEZ:  But this is --

6            THE COURT REPORTER:  Hold on.  Wait.

7            THE COURT:  Ms. Hernandez, let me finish, please.

8            MS. HERNANDEZ:  Yes, sir.

9            THE COURT:  Here's what I'm going to do.  I'm going

10   to put my hand up like this.  I'm not trying to be rude.

11           MS. HERNANDEZ:  Sorry.

12           THE COURT:  But what I'm trying to do is get a word

13   in edgewise and not drive the court reporter mad because we're

14   talking over each other.  I'm not trying to -- this isn't -- I

15   don't mean to be disrespectful.

16        All right.

17           MS. HERNANDEZ:  Nor do I.

18           THE COURT:  I understand.

19        In those cases, threats cases, the whole point is

20   they're criminalizing the threat.  The speech is criminalized

21   or not.  And there are a lot of cases that say, hey,

22   criminalizing a threat, that is a tricky thing.  I get that.  I

23   get that.  That's -- but -- but here in this case -- right? --

24   what is not being -- no one is seeking to -- they, maybe, use

25   speech as evidence of a separate crime, but the speech is not

1      the crime.  That is a different situation.

2              MS. HERNANDEZ:  The government does not want

3      cross-examination.  So let's put this example:  Bertino takes

4      the stand.  He's a cooperating defendant.  The government has

5      shown us multiple statements that he made at some different

6      times, and he says, as he says in his -- in his -- in his plea

7      agreement, I intended or I understood or whatever.  I get to

8      cross-examine him about other statements he made in the -- in

9      the MOSD meeting where he said the exact opposite of what the

10     government claims he said -- the exact opposite of the intent

11     that he now says he had.  But in the MOSD, he was very clear

12     that our intent was to prevent a December 12th from happening

13     again.  The government doesn't want me to cross-examine on

14     first --

15             THE COURT:  No, they're not.  I guarantee you they

16     are -- and I can see from their nodding they're not, and

17     there's no way on God's good green earth they would try to do

18     that.

19             MS. HERNANDEZ:  Accordingly -- quote, accordingly,

20     any line of cross-examination or argument that the defendant

21     may wish to make regarding the First Amendment is irrelevant

22     under Rule 401.  My argument is my client -- my client --

23             THE COURT:  Ms. Hernandez, the point you were just

24     making -- you were just talking about cross-examining someone

25     on a hypothetical prior inconsistent statement; that has

1     nothing to do with the First Amendment.

2          MS. HERNANDEZ:  Well, it is, because what he was -- I

3     guarantee you, I can get from him that what he was expressing

4     in November or early December was what he believed to be

5     First Amendment-protected statements.  I should be able to tell

6     the jury, my client is charged with seditious conspiracy,

7     obstruction, this and that.  My client made a bunch of

8     statements.  They were all protected by the First Amendment,

9     and it's up to you -- and the -- the evidence will show that

10    that is all he was there for.  He was there for a peaceful

11    protest.  He was there -- that's --

12         I have to be able to make that argument, and the

13    First Amendment cases say that it's -- that the Court has --

14    the Court and the jury have to be very careful when you're

15    considering -- even in *Haupt*, which the government cited to the

16    Court yesterday, Supreme Court case, where they used statements

17    to convict of treason.  The court in that case -- the

18    Supreme Court in that case says we have to be very careful

19    whether the statements that were used were -- it was a German

20    national who was living in the United States as a resident, who

21    was charged with treason in connection with activities in

22    favor -- and the Supreme Court in that case said we have to be

23    very careful when we consider these statements to determine

24    whether they are statements of -- that support the intent to

25    commit treason or whether they're statements of a political

1    nature.

2          So I -- I will -- I will take the Court's word that I

3    will not be precluded from -- from presenting a -- a defense

4    that my client's conduct on that day and the -- my client's

5    intent on that day -- on that day -- was to -- he came to

6    Washington for a political activity.

7          THE COURT:  Ms. Hernandez, to be clear, I don't think

8    the government is seeking to preclude you from making the

9    argument you just made.  I understand your argument on the -- I

10   understand your argument.  I'm going to read the cases you've

11   cited, but I do not think the First Amendment operates the way

12   you think it operates in this area.

13         MS. HERNANDEZ:  I'll -- obviously, the Court will

14   make its ruling.  I'm reading the words of the government.  I

15   think the Court --

16         THE COURT:  No.  I agree with you.  It's written in a

17   broader way, but -- but I don't think it's -- we'll hear --

18   let's give them the opportunity to respond.

19         MS. HERNANDEZ:  You want me to say -- to accept the

20   government's view, we're from the government and we're here to

21   help?

22         THE COURT:  No, I'm not.  Not in this case.  Look, by

23   that, I just mean not here to help you and your client --

24         MS. HERNANDEZ:  Thank you.

25         THE COURT:  -- not casting any aspersions on the

1    prosecutors in this case.

2         All right.  Let me --

3         MR. PATTIS:  On the question of tools, I'd like

4    permission to submit two or three pages on Monday, and just to

5    alert the government to what the claim will be, unlike an

6    inanimate object, which is a gun, there's a question of agency

7    with respect to a person.  And to simply say they've been

8    weaponized without expert opinion about something like a

9    Stockholm syndrome or what permitted the defendants' words to

10   highjack their agency is crossing so many bridges.  I'd like an

11   opportunity to submit a brief -- supplemental brief on that for

12   Monday.

13        THE COURT:  Yes.

14        MR. PATTIS:  Thank you.

15        THE COURT:  A few pages, absolutely.

16        MR. PATTIS:  Thank you.

17        THE COURT:  All right.  Why don't I hear -- why don't

18   we close out the government's rebuttal on all issues except the

19   issue that is under seal, if any.

20        MR. MULROE:  Thank you, Your Honor.

21        I think the only one we would just briefly address is

22   the tools issue.  And it sounds like the Court kind of follows

23   what we're doing there.  So I don't want to talk Your Honor out

24   of it.

25        But on the question of the analogy, I mean, there was

1   discussion of the mules, and it's an analogy.  It's not a

2   perfect match to these facts.  But I think the only difference

3   there is that in the classic mule case, the person is generally

4   completely unwitting to sort of the unlawful nature of what

5   they're -- they're being caused to do.

6          And I think this -- this is just a little bit different.

7   I think maybe a closer analysis here -- closer analogy, you

8   could think of a gang leader who's got subordinates and those

9   people are willing to follow him and use violence and they

10  don't particularly care what the purpose of it is.  So they go

11  and beat somebody up, and for all they know, it could be part

12  of an extortion.  It could be part of a witness tampering.  It

13  could be just revenge.  They're not privy to and part of the

14  ultimate objective, and, frankly, they don't care.

15         I think in some way that's a good match for --

16             THE COURT:  Ordinarily, those people, though, would

17  be charged as co-conspirators; right?

18             MR. MULROE:  Depending on the case that's charged.

19             THE COURT:  Sure.

20             MR. MULROE:  And so if it were a witness-tampering

21  case and these people just went and beat the guy up and they

22  didn't have any knowledge that this person was a prospective

23  witness, I don't think they would be charged, and I don't think

24  they could be charged.  And so this really is directly

25  responsive to some of Mr. Smith's kind of overarching

1    arguments, which we think are wrong; but his arguments that in

2    order to be a co-conspirator of these defendants, somebody

3    would need to share in every one of the charged unlawful

4    objectives that the indictment lays out.  Now, we think that's

5    wrong.

6         But part of what the tools theory does is says, even if

7    these people were just signed up to commit violence without

8    knowing why or against whom it would be directed, that's still

9    relevant.  That's still a central part of the case.

10        And so there was, you know, a remark yesterday that the

11   Proud Boys at least were, at large, not a gang, but I think

12   what these facts show, respectfully, is very gang-like conduct.

13   The MOSD members were brought into this for a specific reason,

14   and it will be clear through, in part, the statements of those

15   people that they understood that their role was to follow

16   orders and to, in their words, kick the fuck ass when it's time

17   to kick the fuck ass.

18        So just sort of as a practical matter -- but we're not

19   arguing as a technical matter.  As a practical matter, I think

20   the tools are part of a conspiracy with the defendants.  Maybe

21   that's a conspiracy just to commit assault even if they're not

22   part of the charged conspiracy in a way that would, you know,

23   cause us to argue for relevant conduct or *Pinkerton* or things

24   like that.

25        So that was just the one point I wanted to give the

1     Court to think about it, but we'd leave it there otherwise.

2                    THE COURT:  All right.  Very well.

3              Let's -- and I know --

4                    MR. MULROE:  I'm sorry.  There was maybe something on

5       the First Amendment.

6                    THE COURT:  I'm sorry.  Go ahead.

7                    MR. KENERSON:  Thank you, Your Honor.  Erik Kenerson

8       again for the United States.

9              Just to respond to Mr. Smith -- and I suppose the

10      portion of Ms. Hernandez that went into the issue of the

11      Capitol Grounds and *Jeanette Rankin Brigade* and *Lederman* or

12      *Lederman* -- I'm not sure how it's pronounced -- case, that was

13      a leafletting case that Ms. Hernandez referenced.  I don't --

14      we haven't had much argument, and I think the papers lay it out

15      relatively well.

16             But the *Jeanette Rankin Brigade* and *Lederman*, I don't

17      think, are on point on these facts.  Because *Jeanette Rankin*

18      *Brigade* dealt with a statute that was going to prohibit all

19      parading, assembling, et cetera, moving in assemblages on

20      Capitol Grounds.  That's what was struck down.  Same thing with

21      the leafletting regulation that was at issue in *Lederman*.  That

22      was certain portions of the Capitol Grounds.  That was not

23      allowed at any time.

24             What we have on January 6th is that for a temporary

25      period of time, the entire grounds were restricted.  So it was

1    illegal for anyone to be on those grounds, and there is a

2    number of cases from a number of circuits upholding those types

3    of restrictions on a temporary basis.  We cited them in ECF 522

4    at page 13.  I won't go over them again here.

5           But I heard both Mr. Smith and Ms. Hernandez say that

6    they want to, essentially, be able to argue that if their

7    clients were only planning to move in assemblages on

8    Capitol Grounds even within the restricted area on January 6th,

9    that that is First Amendment-protected activity.  And I do not

10   think that is at all supported by -- supported by the case law

11   here.  I think that that actually -- to the point of the Court

12   trying to get to where there's disagreement between the

13   parties, there very much is on that point.

14          THE COURT:  I agree with you on that point.

15          MR. KENERSON:  Just the other thing I wanted to ask

16   too, as well, is I know Ms. Hernandez brought up the issue of

17   the -- it being a jury issue as to whether certain statements

18   were First Amendment protected or not.  We disagree with that.

19   I understand she brought a case cite to the Court's attention

20   yesterday.  To the extent the Court is considering giving such

21   an instruction, we would just be requesting a chance to brief

22   it as well.

23          THE COURT:  Sure.  Absolutely.  We'll be talking

24   about the instructions.

25          MR. KENERSON:  Thank you.

1          THE COURT:  All right.  So I also note, I -- do we

2     have an attorney in the gallery who would like to address me?

3          All right.  If you'll just come up and identify

4     yourself.

5          Thank you for waiting all this time.

6          MR. MISHKIN:  Of course.

7          Good afternoon, Your Honor.  Max Mishkin on behalf of

8     the Press Coalition.

9          I understood from being in the gallery that there --

10     Your Honor is anticipating sealing a portion of today's

11     hearing.  I guess I'm here because this will be, as I

12     understand it, the third sealing of the courtroom this week.  I

13     don't believe any members of the press are here at the moment,

14     but at least in one -- one or both of the prior hearings,

15     members of the press were expelled from the courtroom.

16          You know, my -- my search of the docket didn't turn up a

17     sealing order or a notice that the hearing would be closed or

18     an opportunity to object.  And so I'm sort of here, sort of

19     here -- I was here in the off-chance there might be another

20     closure today so that I could sort of object for the record

21     formally and make sure that, you know, to the extent that you

22     wanted to hear argument on our papers, which -- which we filed

23     a few days ago, I could offer that as well.

24          THE COURT:  With regard to the motion, I'm going to

25     give -- and it was addressed, I believe, on Monday -- or

1    whatever day it was, when I closed it, I'm going to let any

2    party have an opportunity to respond under the rules, and then

3    I will rule on it.

4        With regard to today's sealing, it is a matter that the

5    parties at this point have agreed should remain under seal.  I

6    happen to know, unlike in every -- unlike in every case, in

7    this particular instance, I happen to know the issue.  Again,

8    it's one the parties -- that is under seal at the moment, and

9    so I am going to close the court briefly because this is a

10   matter that's under seal at the moment.

11       Your objection is noted.  And, obviously, you can, if

12   you would like, file a motion or amend your prior motion to

13   include receiving a transcript of what we talked about, and

14   I'll consider that motion.  But in the first instance, I know

15   the matter at issue, and I'm going to close -- seal the

16   courtroom for discussion of this one small matter only.

17       MR. MISHKIN:  Sure.  I appreciate Your Honor's time

18   on this.  And I guess I would just -- turning from today to

19   sort of forward looking as we are approaching trial, if there

20   are likely to be continued portions of pretrial proceedings or

21   even trial proceedings that might happen in a closed courtroom,

22   you know, the more advance notice the press can have, you know,

23   to send me or one of my colleagues down here to argue it, we

24   would certainly appreciate that.

25       And it's -- you know, our position would be that, you

1    know, advance notice is, to the extent possible, required

2    under, you know, *Globe Newspapers*.

3            THE COURT:  All right.  Very well.  I think today --

4    well, fair enough.  A lot of times, as you can appreciate, we

5    don't know what's going to come up.  So fair enough.  But I'll

6    consider this in a more fulsome way afterward, and, you know,

7    if you want to -- as I said, if you want to amend your motion

8    to include today, I'll certainly -- I'll take it up.

9            MR. MISHKIN:  Thank you very much, Your Honor.

10           THE COURT:  All right.  Very well.

11           MR. NICHOLAS SMITH:  Judge, just one housekeeping

12   point, not argument.

13           So in the course of Ms. Hernandez's argument on the

14   First Amendment, it became clear that there's slightly

15   different arguments that are being made by Defendant Rehl and

16   Defendant Nordean on the First Amendment.  And it happened that

17   Your Honor was asking some questions of Ms. Hernandez that

18   relate more to the argument Nordean is making than the

19   statements, First Amendment piece.  So I'd just like to --

20   Nordean would like the opportunity to file something very short

21   clarifying what the difference is between these two types of

22   arguments, if that's --

23           THE COURT:  On Monday.

24           MR. NICHOLAS SMITH:  Okay.  Thank you, Judge.

25           THE COURT:  Thank you.

1          All right.  So let's -- the matter the parties have

2     briefed under seal will close -- so it's 1 o'clock.  Let me ask

3     this:  It's a pretty, I think, straightforward issue.  Can

4     either side imagine needing more than five or ten minutes to --

5     to argue this?

6          Okay.

7               MS. HERNANDEZ:  Which -- the severance issue?

8               THE COURT:  No, no.  The matter that the parties have

9     briefed under seal in connection with the motions that are in

10    play right now.

11         So what I'd then like to do is just seal the courtroom,

12    hear this argument, and then go ahead and release everyone but

13    Ms. Hernandez and her client and to talk about the severance

14    motion.

15              MR. METCALF:  Your Honor, I have a scheduled

16    appointment with a doctor at 1 o'clock because I thought that

17    we were going to be breaking.  Can I step outside real quick to

18    be able to call my office and have someone try to arrange that

19    for me right now?

20              THE COURT:  Yes.  Yes, you may.

21              MR. METCALF:  Thank you, Your Honor.

22              THE COURT:  All right.  So if you will seal the

23    courtroom, Ms. Harris.

24                       ***** **SEALED** *****

25    ████████████████████████████████████████████████





















```
15              (Proceedings held in open court.)

16              THE COURT:  We are out from under seal.

17         Let me release everyone who would like to be released,

18    other than the government.  But all other defendants and their

19    counsels, other than Mr. Rehl, who wants to argue his motion

20    for severance, you may remain, if you would like, but, also,

21    you are free to go.

22         We'll come back in an hour, at 2:15, and I'll hear

23    Mr. Rehl on the motion to sever.

24         Mr. Hull.

25              MR. HULL:  Your Honor, may I raise two quick issues
```

1    before we break for lunch.  And these are loose ends, is the

2    way, I think, a lot of people think of them.  The first is the

3    House transcripts, which we've had emails about and

4    discussions.  There's quite a few of them, and my -- my

5    impression from emails in talking with Mr. McCullough is that

6    it's the same regime.  You have not had any kind of, you know,

7    information about any of those being released or --

8         THE COURT:  All right.

9         MR. HULL:  -- in the possession of any of them.  And

10   I was wondering if that's true -- and I think it probably is --

11   is there a way for us to access at least the transcript of --

12   for Bertino and possibly for Tarrio?

13        THE COURT:  All right.  Again, the government, I

14   think, will say they don't control or have access to it, but

15   I'll ask them to address that.

16        Anything else?

17        MR. HULL:  And is it possible to -- and I should know

18   the answer to this, but is it possible to subpoena just those

19   two from the House clerk?

20        THE COURT:  Well, that's, again, something for the

21   parties to chat about, not at the moment.

22        MR. HULL:  Thank you.

23        One other thing, I take it there's no Oren Segal that

24   will be testifying here?  No -- we talked about that a little

25   bit this morning.

1           THE COURT:  There's no --

2           MR. HULL:  He was identified as a -- either case in

3     chief or rebuttal expert on extremism, and I don't -- normally

4     we would have addressed that today.

5           THE COURT:  Right.  So let me -- I'll go into that.

6     Let me address that real quickly.

7           So there are two motions that became moot; right?  They

8     are ECF No. 46, the marital communications motion, and

9     Nordean's motion to exclude this expert testimony, which is

10    490.  I will say right now, I will deny them both as moot

11    because the government has said they are not seeking to

12    introduce any of that evidence.

13          Mr. McCullough, do you want to address this issue of the

14    transcripts very briefly?

15          MR. MCCULLOUGH:  Yes, Your Honor.

16          Your Honor has ordered the government to advise the

17    Court and the parties within 24 hours of its access to the

18    transcripts.  The government is aware of that order, is

19    complying with that order.  That's where we are.

20          With respect to any efforts to kind of subpoena the

21    transcripts, in any case, setting aside, you know, co-equal

22    branches of government and the like, you know, kind of the

23    process of kind of asking for ones and twos of transcripts here

24    does not make a lot of sense, so.

25          THE COURT:  All right.  Very well.  We'll be back

1    at -- then in one hour, and I'll hear from Mr. Tarrio.

2    Mr. Tarrio is waiving his hands.  I just happened to catch him.

3          Yes, sir.

4          DEFENDANT TARRIO:  Can you guys hear me?

5          THE COURT:  We can hear you.

6          DEFENDANT TARRIO:  Am I -- okay.  Am I coming back,

7    or do I stay here?

8          THE COURT:  You do not need to come back, unless --

9    there's no reason --

10          MR. HASSAN:  No, Judge.

11          THE COURT:  All right.  Yes, you're done.  You're

12    released.  You're dismissed, Mr. Tarrio.

13          DEFENDANT TARRIO:  Thank you.

14          THE COURT:  All right.  Very well.  See everyone at

15    2:15.

16          (Recess taken.)

17          THE COURTROOM DEPUTY:  Your Honor, we're back on the

18    record in Criminal Matter 21-175, United States of America v.

19    Ethan Nordean, et al.

20          THE COURT:  All right.  Ms. Hernandez, you tell me

21    how much of your argument here -- you mentioned there might be

22    some under-seal things you want to mention.  If -- if that's

23    really kind of a -- we can -- we can wait to go under seal to

24    do that, if you would like, or I'll hear it separately in open

25    court, as much as you can make your motion in open court.

1    Obviously, your motion was filed -- I think the basis for your

2    motion was nothing sealed.  So I'd like to do as much of it in

3    open court as we can.

4            MS. HERNANDEZ:  Yes.  I'm just going to answer the

5    judge's question for a minute.

6            Yes, for the most part, it will be open court.  I mean,

7    I just think some of the recent materials that we received that

8    are under seal support the argument, so -- just slight

9    references I can make.  I don't --

10           THE COURT:  Okay.

11           MS. HERNANDEZ:  We don't even have anybody in the

12   courtroom.

13           THE COURT:  You can just make your point.  I mean,

14   it's not a lot of material, so.

15           MS. HERNANDEZ:  I think Mr. Smith wants to --

16           MR. NICHOLAS SMITH:  Judge, just on scheduling, I

17   learned that there's an oral argument scheduled in the Court of

18   Appeals on December 12th at 9:30 a.m.  So what struck me and my

19   co-counsel immediately about that was that in other circuits,

20   we were accustomed to receiving a notice form that asked the

21   parties to provide any conflicts, if there were any.

22           And I think what the D.C. Circuit does instead -- I

23   found a local rule that says, basically, the circuit court will

24   just go ahead and schedule when it does, and then the local

25   rule says that the trial court has to defer when trial counsel

1    is in both the court -- this only applies to one circuit, this

2    one.  So I've checked in with the government and the defense,

3    and they both are fine with beginning in the afternoon on

4    December 12th, if that's --

5             THE COURT:  If -- well, let's put it this way:  We'll

6    have a little bit of time.  I'm going to confirm the law is as

7    you suggest.

8             MR. NICHOLAS SMITH:  Judge, it's Local Rule 57.5(a).

9             THE COURT:  I will do so, but assuming you are

10   correct, we will begin in the afternoon.

11            MR. NICHOLAS SMITH:  Okay.  Thank you, Judge.

12   Thanks.

13            THE COURT:  Ms. Hernandez.

14            MS. HERNANDEZ:  Good afternoon, Your Honor.

15            THE COURT:  And before you begin, let me also just

16   put on the record, I know our court reporter has a -- has to

17   leave us in one hour.  So I don't think we'll be butting up

18   against that, but I just wanted to put that on the record.

19            MS. HERNANDEZ:  No, I don't expect -- I'll try to be

20   brief.

21        So I filed a motion to sever defendants and counts.

22   With respect to defendants, so -- as the Court knows, my

23   argument is that Mr. Rehl stands apart from the other

24   defendants.  He's not -- so the indictment alleges a particular

25   conspiracy that supposedly Mr. Biggs tells Mr. Donohoe on the

1    evening of the 5th:  We have a plan.  I spoke -- I'm with

2    Nordean.  I spoke to Tarrio.  And the only information about

3    the plan that's sent out is meet at the Capitol -- at the

4    Washington Monument at 10:00 a.m.

5         In fact, the Bertino and Donohoe pleas both relate,

6    essentially, that -- that there was a plan, but we were -- we

7    weren't given the specifics.  However, we surmised, blah, blah,

8    blah, that the plan was whatever.

9         THE COURT:  Although the indictment alleges that the

10   conspiracy -- conspiracies began much earlier.

11        MS. HERNANDEZ:  Sometime in December.

12        THE COURT:  Right.

13        MS. HERNANDEZ:  No question.  But the -- the

14   indictment at the same time explicitly states that on the 5th,

15   there's this text messaging about the plan.  That's the first

16   time that the reference to a particular plan is alleged.

17   Obviously, the conspiracy alleges an agreement -- a conspiracy

18   to violate, which began in December, but at the same time, the

19   conspiracy alleges this particular event on the 5th, which is

20   supposedly we have a plan.  So my argument -- so that's the

21   background.

22        Number one, I -- I think that the -- my theory of

23   defense, in part -- and I -- why not.  We're close enough to

24   trial, and I've been pretty clear.  The theory of defense is

25   that Mr. Rehl did not enter any plan to attack the Capitol, to

1    interfere with the Electoral College count, to invade the

2    Capitol or storm the Capitol or whatever, however you want to

3    describe it.  And that -- the only plan -- and, again, this in

4    the text messaging, after that text message -- or Telegram

5    message from Mr. Biggs where he says:  We have a plan, meet at

6    the Capitol -- meet at the Washington Monument; Mr. Rehl says:

7    Well, the plan still is to break off into groups of ten.  We

8    can do that at the Washington Monument.  So, again, there's a

9    revelation from his point of view that the plan had nothing to

10   do with attacking the Capitol.

11          And, of course, we have allegations, which I think so

12   far are undisputed, that Mr. Pezzola stole a shield and broke a

13   window and had some sort of scuffle with law enforcement; and

14   that Mr. Donohoe threw two water bottles at the -- at two

15   officers.

16          And I have argued -- and I think the recent materials

17   that we received support my argument.  I've argued, one,

18   that -- and Mr. -- that that violence was unrelated to any

19   plan, it's inconsistent with the discussions in the --

20   inconsistent with the discussions in the MOSD meetings.  And

21   part of my theory of defense is that those acts of violence, of

22   destruction of property should probably be prosecuted, but that

23   my client was there to protest and to engage in First Amendment

24   activities, and he did.  That's a separate conspiracy, which he

25   didn't have.

1          I think that's an inconsistent -- and -- and so I would

2     be pointing the finger at Pezzola, yes.  He broke a window.  He

3     stole property.  He destroyed property.  He scuffled with

4     police.  That's not me.  That's not part of the conspiracy, and

5     I think that's a fairly inconsistent conspiracy.  And I would

6     submit to the Court that on that basis alone I should be

7     severed from Mr. Pezzola.

8          In addition, Your Honor, I think, as I've argued, that

9     what the government has alleged, really, is multiple

10    conspiracies.  They've alleged this -- the 1776 Returns to

11    conspiracy, which involved allegedly some plan to occupy the

12    government -- the Capitol Grounds.  And, again, that particular

13    statement, that that was the intent to occupy the

14    Capitol Grounds, is supported by some of the statements made

15    that were recently disclosed to us.  One or more of the

16    persons -- at least one of the persons who was interviewed --

17    who -- whose materials we received states exactly that.

18              THE COURT:  I understand.

19              MS. HERNANDEZ:  Those persons also state -- some

20    or -- more than state that the -- that there was no plan to

21    attack the Capitol; that the plan was to avoid confrontation

22    with the police; that acts of violence were spontaneous and not

23    part of any agreement.  Each -- one or more of these people

24    that were -- whose -- whose information we recently received

25    have said that at different times during interviews.

1          So what I would submit to the Court -- and the motion to

2     sever goes hand in hand, to some extent, to the motion to

3     dismiss based on multiple conspiracies that I have filed.  That

4     what the government has is multiple conspiracies.  At best, you

5     know, one could be the plan that Biggs, Nordean, and Tarrio had

6     as of January 5th in the evening; one that may have involved

7     Donohoe and -- and, apparently, Bertino and -- and Pezzola to

8     become violent and attack the Capitol.  One that involved just

9     to move along with groups of people; to avoid contact, which is

10    what my client does.

11         He ends up with the Philadelphia folks and also with

12    Mr. Finley, who is the president from -- I believe it's the

13    West Virginia chapter.  They enter the Capitol.  Per the

14    allegations in the indictment, they -- the statement is that

15    they entered the Capitol.  There's no allegation in the

16    indictment that they forced their way -- forcibly entered or

17    forced their way.  And, in fact, they only enter the Capitol at

18    2:53, long after Pezzola breaks the window.  And there is

19    audiotape of someone saying, the -- we had this discussion

20    before -- the Vice President has left the building.  Whether

21    that's accurate or not, you can hear people believing that.

22    And someone in that little group saying, I wonder what -- let's

23    go inside and -- sort of curiosities.  Let's go inside and see

24    what happened.  It's not let's go inside and stop the

25    certification.

1        So -- and it's clear that the government intends to

2   introduce all sorts of statements by a number of people, and

3   one of the grounds for severance is that this -- this

4   difference in the quantity and quality of the evidence.  And I

5   would submit to the Court that with respect to Mr. Rehl,

6   there's very little evidence of any intent to commit any of

7   these offenses that the government alleges or -- that the

8   indictment alleges.

9        And -- and, again, I mean, I believe on the 4th he makes

10   some comment about the Capitol Grounds in response to someone

11   saying, we should -- we should -- the theater should be in

12   front of the Capitol and there -- and that person who says that

13   says something about there should be speeches and that type of

14   thing.  And Mr. Rehl mirrors that or -- or sort of says, yeah,

15   it's -- is Tarrio going to give a speech that day, or where's

16   Tarrio going to give a speech.

17        So I think it would be very prejudicial to Mr. Rehl to

18   have to stand trial with these other people who have made --

19   or, you know, Donohoe and all these people who apparently the

20   government will seek to introduce testimony from Mr. Tarrio --

21   or -- not testimony, but statements from Mr. Tarrio and others.

22        So for those reasons, the multiple conspiracies -- it

23   will be the inconsistent defenses, the undue prejudice from

24   introducing all these statements, which the government will

25   seek to bring in against everyone on theories of -- on theories

1    that are novel, to say the least.  They're not co-conspirator

2    statements.

3             THE COURT:  Not all the theories, but some of them

4    are.

5             MS. HERNANDEZ:  I think there's very little case law

6    that supports the argument that nonco-conspirator statements

7    come in against -- like excited utterance that is not a

8    co-conspirator statement comes in against the other defendants.

9             THE COURT:  Actually, I'm -- I think that -- well,

10   I -- I'm poking around at this, and I do think that is the law.

11   I do think that is the law, like it or not, that non- -- to the

12   extent that any statement is admissible against a defendant for

13   a non- -- for a nonhearsay -- or I shouldn't --

14            MS. HERNANDEZ:  A nonco-conspirator.

15            THE COURT:  On a nonco-conspirator basis.  Let's just

16   say excited utterance.  I think that is right that comes in

17   against all of them, and I actually think that might be the

18   case regardless of whether it's a conspiracy or not, but,

19   anyway, we're off the track.

20            MS. HERNANDEZ:  Well, I mean, I think there's case

21   law in this circuit that says you don't look at those -- first

22   of all, you don't look at those statements until you've

23   determined that there is a conspiracy, and you cannot really

24   use those statements to make a finding of a conspiracy.  So you

25   only attribute those statements by others, even co-conspirator

1    statements, to the defendant after you found the existence of a

2    conspiracy.

3         In any event -- and then I think the government now have

4    another theory, which I believe is at variance with what is

5    charged; this notion that the conspiracy was really about the

6    tools.  And it took me a while to -- I felt like -- took me a

7    while to figure out whether the tools were useful idiots or

8    items you purchase at Home Depot.  And I gather that the

9    government's theory is tools being -- well, I think the -- they

10   suggested they were like mules.  That -- I don't think that's

11   the allegations in the indictment.  It may be a variance, which

12   may call for another motion.  Anyway, I -- I'm submitting to

13   the Court that our defense will be -- will be --

14        THE COURT:  You've given me all, I think, the reasons

15   you want to articulate, Ms. Hernandez.

16        MS. HERNANDEZ:  Right.

17        THE COURT:  So let me just pose this question back to

18   you.  How would you say -- I guess multiple conspiracy issues

19   aside, how is this different from any -- I mean, so in any

20   conspiracy case -- right? -- there are often situations where

21   at the end of the day, if there happens to be a conviction, the

22   parties show up for sentencing and the government and the

23   defense argue, Person A was much more culpable, Person B was

24   much less culpable.  You know, they're really -- you know, how

25   is this different from that kind of relatively -- maybe you're

1    -- that situation is relatively common.

2                MS. HERNANDEZ:  Right.

3                THE COURT:  And, I guess, how would you say this is

4    different?  Is it something different in kind, or is it simply

5    a difference in magnitude?

6                MS. HERNANDEZ:  I think both.

7                THE COURT:  Okay.  Well, that's always the best

8    answer when a judge poses a question like that, I suppose.

9                MS. HERNANDEZ:  Both, Your Honor.

10               THE COURT:  So why don't you describe to me at this

11   point --

12               MS. HERNANDEZ:  Well, I think in a magnitude, as I've

13   suggested -- I mean, Mr. Rehl does not come in until 2:53,

14   which is long -- you know, the window is broken at 2:13 by

15   Mr. Pezzola.  At 2:14 Mr. Biggs is alleged to have entered the

16   Capitol, Mr. -- oh, and Mr. Rehl stops hanging out with these

17   gentlemen sometime -- I don't know -- around -- sometime after

18   1:00 p.m.

19        And, in fact, you know, the government has a number of

20   videos or -- which they allege where Mr. Biggs and Nordean were

21   present and they videotaped some statements or whatever.

22   Mr. Rehl is not seen with them.  He -- he's -- when he enters

23   the Capitol, he no longer -- he doesn't meet up with them.

24   He's with the group from Philadelphia, the people he traveled

25   to D.C. with, and none of whom have been charged with any

1    felonies at all in connection with that date, including

2    Mr. Finley, who traveled by himself, but was with Mr. Rehl most

3    of the day.

4         So I think it's -- it's a -- it's sort of magnitude,

5    along the lines that -- the Supreme Court case in *Kotteakos*

6    lays out.  And I -- I can see that it's -- it's judgment for

7    the Court to make.  You know, does -- you know, *Kotteakos* is

8    here at the top of the -- of whatever -- the pyramid, and then

9    all the other cases that the Court describes.  And I think it

10   is a judgment call.

11        But I do think that in the nature of this particular

12   case, on every -- the government alleges -- and I'm not

13   saying -- the government alleges, for example, that Biggs and

14   Nordean knock over the bicycle rack.  Mr. Rehl does not.  The

15   government alleges that Pezzola breaks a window -- you know,

16   steals this shield, breaks a window.

17        And as the Court may recall, there is a conversation

18   that's captured on video by someone -- maybe on one of the

19   phones -- where Mr. Rehl expresses surprise at what happened --

20             THE COURT:  Yes.

21             MS. HERNANDEZ:  -- doesn't -- he doesn't know that

22   Pezzola -- he doesn't know that it was a Proud Boy who broke

23   the window.  Donohoe tells him a Proud Boy.  I know the

24   government in their response included a photograph of a -- one

25   of the marches in Washington --

1          THE COURT:  Oh, yeah.

2          MS. HERNANDEZ:  -- where Pezzola -- but there is no

3    other evidence of any contact between the two of them.

4          And I know the government has alleged that Pezzola is in

5    some of the chats, but there's no -- there's no evidence that I

6    have seen of any communications back and forth.  So there's no

7    evidence where Pezzola says something and Mr. Rehl responds.

8          And that picture that the government has produced,

9    there -- Mr. Tarrio is in the middle, and they're not looking

10   at each other.  They're not talking to each other.  And -- and

11   I think the evidence would show that they had not met.  I think

12   the evidence would show that -- or will show that Mr. Pezzola

13   became a Proud Boy, I think, in November or December.  He was

14   brought into the organization by Mr. Bertino.  And so -- so

15   there really is no contact, other than that photograph that I'm

16   aware of.

17         So, again -- and I do think that -- and then I also

18   argued that the counts should be severed because of the -- that

19   they really don't belong together.  They're different in kind.

20         And, of course, you know, all the -- the destruction of

21   property count, the civil disorder count, all of those are on

22   some theory of aiding and abetting, *Pinkerton*, or some other

23   theory of liability, because Mr. Rehl does not commit any of

24   those acts.  Mr. Rehl does not destroy any property.  Mr. Rehl

25   did not engage in civil disorder, and those counts are not

1    charged as -- as conspiracies.

2          And under the *Rosemond* Supreme Court case of some -- not

3    too long ago, I would submit that he should not -- there's no

4    evidence that Mr. Rehl -- notwithstanding the government's

5    arguments to the contrary, there's no evidence that Mr. Rehl

6    signed on to any violence on that day.

7          And, in fact, I know the government has this theory of

8    what was going on with the MOSD, but, as the Court may recall,

9    the explicit -- the express reason for creating the MOSD is to

10   avoid the chaos of what happened on December 12th.  I mean,

11   they do talk a lot about December 12th, about the stabbing.

12   But there's all this conversation about we have to take control

13   of the situation.  We can't -- we have to make sure it doesn't

14   happen again.

15         The government picks out other -- other -- I guess

16   their -- their -- the way they spin that information is

17   different from what I think is explicit in the statements made.

18   As I said, I mean, it's explicit at the beginning and

19   throughout.  It's three reasons.  One, we want this hierarchy

20   so that we can control.  We only want to limit the number of

21   people -- not so we can create chaos, but we can control and we

22   don't have crazy people doing crazy stuff, and we want to make

23   sure that -- to avoid violence.  I mean, they continuously talk

24   about that.

25         Anyway, I don't want to belabor the point.  As I say,

1    I -- I agree that it's a judgment call.  I do think that in the

2    end, this notion -- I think in the end what you're going to

3    have is multiple conspiracies, and I think I -- and/or a

4    variance from -- I mean, this notion of the conspiracy was to

5    rile the tools or whatever it is to -- not just rile, to --

6    what they've been saying today and yesterday, I guess, was that

7    that was the conspiracy.

8              THE COURT:  All right.  Let me hear from them.

9              MR. MULROE:  Your Honor, you have heard from the

10   parties a lot over the past couple days so I don't want to

11   spend too much time.  We rely largely on the papers.  I think

12   we laid out the law of joinder and severance and rebutted any

13   possible basis for severance that Defendant Rehl could argue.

14        I just want to punctuate, kind of, a couple points,

15   especially those that sort of have new light on them after the

16   past couple days.  Fundamentally, I think what Ms. Hernandez

17   was up here arguing were all factual questions that are going

18   to be exactly what the jury needs to decide.  Was he a member

19   of the conspiracy?  Was he part of an agreement that led to

20   these things?  Was it one conspiracy or multiple conspiracies?

21   So none of those are a basis to sever the case.

22        The case properly alleges a conspiracy, and he's in each

23   of those conspiracy counts.  They are based on conduct that he

24   did, in almost every instance, along with the other defendants.

25   They're part of the same chat groups.  They were present on the

1   12th together.  They were present on the 6th together.  He

2   marched at the front of that marching column with the other

3   leaders, Nordean and Biggs, when they brought the crowd to the

4   Capitol.  So to say that we're not going to be able to prove

5   those things is something that she can argue, just not here and

6   not now.

7        It is illuminating, I think, some of the arguments she

8   makes to the extent they reveal sort of what the issues that

9   the defense is going to tee up in trial.  Ms. Hernandez says

10  that the charged conspiracy, she claims, is inconsistent with

11  the discussions that are taking place in the MOSD chat groups.

12  So that -- I mean, that goes directly to our point about we've

13  got to see the messages.  The jury needs to be able to see what

14  these discussions are to see what it was that these people were

15  contemplating.  So we -- I mean, again, we're certainly not

16  going to retread all that, but I think it illuminates it.

17        The issue the Court identified about relative

18  culpability, that is an issue in almost any case that involves

19  multiple defendants.  So she can argue that at sentencing, but

20  that's not a reason for severance.  And we cited in the brief,

21  ECF 513 at, I think, 8 -- I'm sorry -- 4, a number of cases

22  where the disparity sort of in the gravity of the charged

23  conduct was very, very different, more of a disparity than we

24  see here.  Severance was, nonetheless, denied.

25        Similarly, the antagonistic defense theory that she's

1      raised now, I don't think that's unique to the case.  For one

2      thing, the case law is that antagonistic defenses are not

3      per se a reason to sever the case.  They can contribute to

4      severance under some circumstances, but I don't think what

5      she's described is the defendant's pointing fingers at one

6      point.  What she's describing is her saying, what this other

7      guy was worse and, basically, conceding that the government --

8                THE COURT:  And I had nothing to do with that.

9                MR. MULROE:  And I had nothing to do with that.

10               THE COURT:  I mean, the argument.

11               MR. MULROE:  Right.

12           I think, if anything, though, it would be an argument

13     for Pezzola to try to get out of this case because it's not

14     going to involve the other defendants, you know, conceding what

15     he did.  But I don't see how that's an argument for Rehl to be

16     severed from the case.

17           Part of the basis for severance is the notion that

18     evidence is going to come into a joint trial that would not be

19     admissible in a trial of Rehl by himself and that he would be

20     unfairly prejudiced by that.  So, again, this dovetails with

21     all the arguments from the past couple days about who these

22     things are admissible against.

23           I think the Court is right that when something comes in

24     under a hearsay exception or if it's nonhearsay, I just haven't

25     seen any authority anywhere that says that that should be

1    limited to any particular person.  I think if it were only

2    admissible -- so take an excited utterance.  If an excited

3    utterance were only admissible against the declarant, then the

4    excited utterance exception would be completely swallowed by

5    the party opponent rule.  The party opponent rule always allows

6    the declarant's statements to come in, whatever they are.  And

7    so the whole purpose of these other hearsay exceptions or

8    nonhearsay bases is to bring it in against other people other

9    than the person saying the statement.

10          So whether or not he is tried with his co-defendants,

11   those things are coming in against him.  That's something that

12   we've argued in other filings in this case.  So with respect to

13   statements being admissible against all the members of the

14   conspiracy, that is at ECF 512 at 16 through 19.  We would

15   direct the Court there.

16          And the admissibility of, kind of, nonstatement conduct

17   by one member of the conspiracy against others, this was raised

18   kind of specifically with respect to the 1776 Returns document,

19   and we explained why that is admissible against all the

20   co-conspirators at ECF 515, pages 26 through 27.  So assuming

21   we're right about those, which we think we are, his trial with

22   respect to that evidence would look exactly the same whether he

23   was by himself or tried jointly with his co-defendants.  And so

24   that's no reason to sever it.

25          I think those are all the points I wanted to hit.  I'm

1    happy to answer any questions Your Honor might have.

2              THE COURT:  Nope.  I don't have any questions.

3              MR. MULROE:  Thank you.

4              MS. HERNANDEZ:  Number one, the statements the

5    government is seeking to introduce are not MOSD, the statements

6    we've been arguing over, and I don't think it's -- I understand

7    they want to take a third bite at the apple.  So I'll respond.

8              But those statements are -- what I -- what I mentioned

9    is the MOSD, and what they've been trying to bring in are these

10   statements on Parler and other places that predate the

11   conspiracy and -- and are not MOSD statements.  In fact, you

12   know, they want to bring in -- one of the things they mentioned

13   was Mr. Pezzola's Parler posts from November.  And there's no

14   evidence that Mr. -- Mr. Rehl was anywhere near that Parler

15   post.

16             And with respect to whether there's any case law about

17   whether these statements that are not co-conspirator statements

18   come in or don't come in, I will cite the Court to *Bruton*, the

19   Supreme Court case, which I think -- even though *Bruton* allows

20   with a limiting instruction, what -- what I think the biggest

21   problem in this case --

22             THE COURT:  *Bruton* is when --

23             MS. HERNANDEZ:  And it's not a confrontation clause

24   issue.  It's just -- I don't -- I think *Bruton* is pretty clear

25   that it does not come in against all the other defendants.

1            THE COURT:  Okay.

2            MR. NICHOLAS SMITH:  With a limiting instruction.

3            MS. HERNANDEZ:  With -- right.

4            THE COURT:  Well, look --

5            MS. HERNANDEZ:  And I think the problem in this

6     case --

7            THE COURT:  Hold on.  Hold on.  It doesn't make any

8     sense to say it doesn't come in against all the other

9     defendants without a limiting instruction.

10           MS. HERNANDEZ:  Correct.

11           THE COURT:  Either it -- if it comes in against

12    everyone, then you don't need a limiting instruction.

13           MS. HERNANDEZ:  Right.

14           THE COURT:  If it only comes in against one, then you

15    do need a limiting instruction.

16           MS. HERNANDEZ:  Well, and *Bruton*, I think, is pretty

17    clear that you do need a limiting instruction, which would

18    indicate that it doesn't come in against everyone.  In fact,

19    *Bruton* would say it doesn't come in against everyone.  And I

20    think the problem in this case, although -- there -- there are

21    cases where you get some *Bruton* statements.  The bulk of these

22    statements --

23           THE COURT:  Yes.

24           MS. HERNANDEZ:  -- are not going to be co-conspirator

25    statements, and they're going to require -- you do not need a

1    *Bruton* instruction in a co-conspirator statement.

2                THE COURT:  But we don't --

3                MS. HERNANDEZ:  So you're going to be giving a *Bruton*

4    instruction after every text message.

5                THE COURT:  No, because --

6                MS. HERNANDEZ:  We would be requesting one.

7                THE COURT:  No one has -- certainly you didn't tee

8    this up in your motion.  But *Bruton* is a situation where one

9    defendant specifically points the finger or names -- right? --

10   another.

11               MS. HERNANDEZ:  We went -- we did this or we --

12   right.

13               THE COURT:  Right.  Or just you did.  Or just the

14   other defendant.  You know, you did this; right?

15               MS. HERNANDEZ:  Well, I think it also -- Zac and I

16   went -- went and robbed the bank.

17               THE COURT:  Fine.  Fine.

18               MS. HERNANDEZ:  And it comes in against the declarant

19   but not against -- I mean, *Bruton* would say --

20               THE COURT:  Right.

21               MS. HERNANDEZ:  -- either it doesn't come in at all

22   or you have to give the limiting instruction.

23               THE COURT:  Because *Bruton* is construing the party

24   opponent; right?  You're -- because if it's coming in simply as

25   a party opponent statement, it can only be against the maker of

1    the statement, which is not the case in this situation where

2    you're talking about, for example, an excited utterance.

3                MS. HERNANDEZ:  Well, I would say that the reason

4    it's -- because it's an exception to the hearsay rule.  In

5    other words, it's an admission by the party -- the admission by

6    the party opponent is the exception to the hearsay rule; that's

7    why it's coming in.  But I would submit --

8                THE COURT:  Only against -- only against the party.

9                MS. HERNANDEZ:  Right.  But I would submit to the

10   Court that that same limiting theory or principle would apply

11   to the other.  Because if it's an excited utterance, it's my

12   excited utterance.  It's -- it's not his excited utterance.

13               THE COURT:  But as Mr. Mulroe, I think, rightly

14   pointed out -- that it makes no sense -- then the excited

15   utterance -- the excited utterance exception would be

16   completely swallowed --

17               MS. HERNANDEZ:  By the admission.

18               THE COURT:  -- by the other one; right?  So we all

19   know that; right?  Excited utterances or dying declar- -- I

20   mean, thinking about -- right? -- like someone who's dying who

21   fingers this is the person who shot me.  It doesn't -- it's not

22   only -- it's not limited to the person making -- it's not --

23   right? -- offered against the person who's dying, so.

24               MS. HERNANDEZ:  But, I mean, some of the theories,

25   Your Honor, Your Honor even asked -- like, some of the theories

1    is the effect on the listener, and Your Honor said:  Who is the

2    listener?

3         THE COURT:  Well, look.  We're getting far afield.

4    These are interesting and difficult issues that I'll sort

5    through, but I don't -- tell me how they relate to your

6    severance motion.

7         MS. HERNANDEZ:  Anyway, I do think that what you're

8    going to have in this case is a request for a limiting

9    instruction after every -- every -- other statement that the

10   government will seek to introduce.

11        And -- and the other thing about the MOSD and what the

12   government now wants to make it -- make it into is that the

13   theory -- the MOSD and the theory alleged in the indictment is

14   the MOSD created a hierarchical group with a troika at the top

15   who directs what -- you know, who's calling the shots.  And

16   nowhere in the indictment is there an allegation and nowhere in

17   the discovery is there an allegation of what that troika

18   decided other than we have a plan, call you in the morning --

19   or -- we have a plan, see you in the morning.  That was it.

20        And, again, I always point this out because I -- in many

21   ways this case is a unicorn -- or the government is trying to

22   fit a round peg into a square peg or whatever that saying is.

23   I have never -- I don't think -- before this case -- or before

24   these cases -- seen a situation where a co-conspirator pleads

25   guilty without an admission I entered the conspiracy on -- you

1    know, like this notion that there was a plan but I don't know

2    what it was.  I've never seen that.

3                 THE COURT:  Your severance motion.

4                 MS. HERNANDEZ:  I've never seen that.

5                 THE COURT:  Your severance motion.

6                 MS. HERNANDEZ:  My severance motion is that this is a

7    bizarre case and you're going to be -- we're going to be asking

8    for -- and the -- there's -- Mr. Rehl stands apart.  He didn't

9    enter with the others.

10                THE COURT:  There we go.  We're to your severance

11   motion.

12                MS. HERNANDEZ:  He didn't enter with the others.  He

13   didn't forcibly enter.  He didn't destroy any property.  He

14   wasn't even aware that a Proud Boy did this.  He's not at the

15   troika.  So that would differentiate him from some -- I mean --

16                THE COURT:  Right.  I'll look at the cases you cite.

17        All right.  I'll do my best to get back to you-all to

18   give you more guidance as soon as I can.

19        Thank you all for your time and attention.

20        Mr. Smith, you look like you want to say something.

21        MR. NICHOLAS SMITH:  Yeah.  Judge, it relates to

22   Ms. Hernandez's motion, which is if the Court doesn't sever

23   Defendant Rehl and -- on scheduling on the 12th, if the Court

24   is not inclined to -- to start in the afternoon, Ms. Hernandez

25   has offered to temporarily represent Mr. Nordean for three

1    hours.  We don't think there's any conflict there for just

2    purposes of the *voir dire.*

3           MS. HERNANDEZ:  And just to be clear, I'll do it even

4    if you sever me.

5           MR. NICHOLAS SMITH:  The reason I'm telling the Court

6    this is because we're giving contest if the Court is inclined

7    to go ahead with the morning.

8           THE COURT:  All right.  I mean, I told you already

9    that I -- assuming the rule is what you say -- and I don't

10   doubt that -- that I would do it in the afternoon.  So I'm

11   going to accommodate you on that.

12          MR. NICHOLAS SMITH:  Thank you, Judge.

13          THE COURT:  All right.  Very well.  Everyone have a

14   good weekend.

15        The parties are dismissed.

16           (Proceedings were concluded at 3:04 p.m.)

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4      Certified Realtime Reporter, do hereby certify that the above

5      and foregoing constitutes a true and accurate transcript of my

6      stenograph notes and is a full, true, and complete transcript

7      of the proceedings to the best of my ability.

8

9                       Dated this 21st day of November, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25