**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 1:21-cr-175 (TJK)** |
| **v.** | : | |
| | : | |
| **ETHAN NORDEAN,** | : | |
| **JOSEPH R. BIGGS,** | : | |
| **ZACHARY REHL,** | : | |
| **ENRIQUE TARRIO, and** | : | |
| **DOMINIC PEZZOLA,** | : | |
| **Defendants.** | : | |

**GOVERNMENT'S MOTION FOR ADMISSION OF COCONSPIRATOR
STATEMENTS AS TO ALL DEFENDANTS, AND IN OPPOSITION TO
DEFENDANT REHL'S MOTION TO STRIKE SUCH STATEMENTS**

By motion dated April 9, 2023, defendant Zachary Rehl moved this Court to strike the
Parler, Telegram and other messages that were conditionally admitted by the Court as statements
in furtherance of the conspiracy because, Rehl alleges, "the necessary factual predicates for their
admissibility have not been met." ECF 745 at 1, citing Fed. R. Evid. 104(b).[1]  Rehl argues that
government has failed to introduce "substantial independent evidence" of a conspiracy, but his
arguments are based solely on the testimony of Jeremy Bertino and Matthew Greene, neither of
whom testified that they had entered into a conspiracy specifically with defendant Rehl (ECF 745
at 4), but both of whom entered pleas of guilty to conspiracy charges and testified that they acted
in furtherance of that conspiracy on January 6.

---

[1]     The government understands and construes defendant Rehl's motion to be limited to
challenging only those exhibits that were admitted *solely* as coconspirator statements under Fed.
R. Evid. 801(d)(2)(E).  The government does not understand the Court's rulings admitting Parler
and Telegram messages pursuant to non-hearsay theories, or under other rules of evidence such as
Fed. R. Evid. 801(d)(1)(A) or 803(3), to have been provisional.

As discussed further below, the Court has provisionally admitted a limited number of statements pursuant to Federal Rules of Evidence 801(d)(2)(E) as statements in furtherance of a conspiracy.  The statements admitted by the Court under this theory were made in the MOSD Leadership or Membership Telegram chat groups by the charged defendants, witnesses who had admitted their role in the conspiracy, and an uncharged coconspirator, Aaron Wolkind.  As set forth below, the government submits that the evidence admitted at trial has established by at least a preponderance of the evidence that a conspiracy existed; that these defendants were members of the conspiracy; and that the statements the Court has provisionally admitted were made in furtherance of the conspiracy. The government further submits that the evidence at trial has demonstrated to a preponderance standard that the conspiracy began with the creation of the MOSD on December 19-20, 2020,[2] and asks this Court to find under FRE 104(b) that the necessary factual predicates for the admission of these statements have been met.

A. **Procedural Background**

The Court has received hundreds of pages of briefing and presided over multiple hours of argument concerning the admissibility of statements in this case.  The government filed its first *motion in limine* for the admission of statements on October 7, 2022.  ECF 475.  In that motion, the government noted that it expected the statements admitted during the government's case-in-chief would be "admissible under multiple, non-exclusive theories, including that the statements

---

[2]     The government submits that the conspiracy charged in this case began as early as December 19, 2020, and continued through and including January 6, 2021.  Specifically, the government contends that statements by Enrique Tarrio and Joseph Biggs beginning December 19, 2020; statements by Ethan Nordean, Zachary Rehl, Charles Donohoe, John Stewart, and Aaron Wolkind, beginning December 20, 2020; statements by Jeremy Bertino, beginning December 23, 2020; and statements by Dominic Pezzola, beginning January 2, 2021; are admissible as coconspirator statements in furtherance of the conspiracy, pursuant to FRE 801(d)(2)(E).

are (1) not hearsay because they are statements by a party opponent (including co-conspirator statements), Fed. R. Evid. 801(d)(2)); (2) not hearsay because they are either not assertions or not offered for the truth of the matter asserted or both, Fed R. Evid. 801(c)(2); (3) exceptions to the rule against hearsay because they are present sense impressions, excited utterances, or statements of the declarant's then existing state of mind (such as motive, intent, or plan), Fed. R. Evid. 803, or statements against interest, Fed. R. Evid. 804(b)(3)."  ECF 475 at 1.

The government also set forth the standard for the admissibility of co-conspirator statements.  Federal Rule of Evidence 801 holds that any statement "offered against an opposing party" is "not hearsay." Fed. R. Evid. 801(d)(2). That definitional exclusion applies not only to statements "made by the party" himself, *id.* (d)(2)(A), but also includes statements "made by the party's coconspirator during and in furtherance of the conspiracy," *id.* (d)(2)(E). Three requirements apply for the admission of co-conspirator statement: (1) a conspiracy existed; (2) the declarant and the defendant against whom the statement is offered were members of the conspiracy; and (3) the statements were made in furtherance of the conspiracy. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987); *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988). Each of these elements need only be proven by a preponderance of the evidence, *see United States v. Brockenborrugh,* 575 F.3d 726, 735 (D.C. Cir. 2009), and can be shown by evidence that is not itself admissible, *see* Fed. R. Evid. 104(a); *United States v. Khatallah*, 278 F. Supp. 3d 1, 4-5 (D.D.C. 2017) (citing *Bourjaily,* 483 U.S. at 176). The determination must, however, be based at least partially on some "independent evidence of the conspiracy," that is, on evidence other than the statements whose admissibility is in question. *See*, *United States v. Gewin,* 471 F.3d 197, 201 (D.C. Cir. 2006) (citation and internal quotation marks omitted). The required independent evidence may take many forms, including "contemporaneous acts suggestive of the

charged conspiracy and/or corroborative of the contents of the purported co-conspirator statements." *United States v. Gatling*, 96 F.3d 1511, 1520-21 (D.C. Cir. 1996)).

On December 14, 2022, after receiving fulsome briefing (ECF Nos. 499 (Nordean), 501 (Tarrio), 503 (Rehl), 512 (Gov. Reply)), and hearing oral argument, the Court issued a comprehensive oral ruling on the admissibility of statements. *See* 12/14/2022 Tr. at 6-11. In that ruling, the Court set forth the standard for the admission of co-conspirator statements, relying on *United States v. Gewin*, and declined to hold a pretrial hearing, concluding that it was not practical to "issue a broad ruling on the admissibility of co-conspirator statements before the close of the Government's case in chief." *Id.* at 7-8. The Court provisionally admitted the statements made by defendants and any witness who had admitted to being part of the conspiracy, so long as the statements were made, of course, during and in furtherance of the conspiracy. *Id.* at 8-9. The Court declined to provisionally admit statements made by other "followers and members" of the Ministry of Self Defense, finding that "while the Government need not prove that every co-conspirator, 'agreed on the details of their criminal scheme,' they still have to prove that an agreement to violate the law existed. *Id.* at 10 (citing *United States v. Gaviria*, 116 F.3d 1498, 1515, (D.C. Cir. 1997)). For MOSD members and followers, the Court required the government to proffer an additional factual basis for the admission of these statements. *Id.*

### B. Factual Background

The government introduced approximately 130 Parler messages through the testimony of FBI Special Agent Kathryn Camiliere, who testified over three trial days between January 30 and February 1, 2023. In advance of SA Camiliere's testimony, the government identified for defense the specific Parler exhibits it intended to introduce. Defendants objected to the admission of many of these exhibits. On Wednesday, January 18, the Court heard argument on the admissibility of

the Parler messages, noting that it was "fair to say that . . . a lot of my pretrial rulings cover a fair amount of it, but there are other things that . . . push the boundaries of relevance and then push the boundaries of 403 balancing in ways that I really am going to have to decide whether something comes in even apart from the broad outlines I've sketched in the pretrial rulings."  1/18/2023 Tr. at 4008-09.  The Court then proceeded during the day on January 18, and at several other moments during breaks in trial, to hear argument from each party on the admissibility of the Parler messages. On January 23, 2023, the Court issued preliminary rulings admitting certain exhibits and excluding others.  *See* 1/23/2023 Tr. at 5240-45.  Thereafter, on the morning of January 30, the Court issued a comprehensive ruling admitting many of the Parler messages the government sought to introduce as evidence of the defendants' state of mind and to show their intent, and excluding certain messages on 403 grounds.  *See* 1/30/2023 Tr. at 6051-65.

With respect to defendant Rehl, who has moved to strike the Parler messages admitted against him, the Court specifically found "Rehl's statements in these posts -- which generally express his views of the election and promote the Proud Boys -- are plainly relevant to show his intent and motive related to the charged conspiracies, his intent for the conspiracies' aims; that is, an intent to oppose the election results and at least potentially to use force." *Id.* at 6062.  The Court does not appear to have admitted any Parler message solely or even in part on the basis that it was statement in furtherance of the conspiracy (*see, e.g.* 1/23/2023 Tr. at 5242, clarifying that a handwritten message by defendant Pezzola being admitted as a statement of a party opponent, not a statement in furtherance of the conspiracy).

The government introduced approximately 270 Telegram messages, the majority of which were admitted through the testimony of FBI Special Agent Peter Dubrowski, who testified over seven trial days, between February 8 and February 21, 2023.  Other Telegram messages were

admitted through the testimony of Jeremy Bertino, who testified over five trial days between February 21 and February 28, 2023.  Additional messages were admitted through the testimony of Special Agent Nicole Miller, who testified over five trial days between March 7 and March 15, 2023.   And the remaining approximately 100 messages were admitted through the testimony of Special Agent Dubrowski who also testified on March 16, 2023.

In advance of the admission of these messages, the government filed a written pleading setting forth the overlapping, non-exclusive bases for admissibility of these Telegram messages. ECF 646, filed January 28, 2023.  The government also provided, by email dated February 1, 2023, the Court and counsel a chart setting forth the overlapping, non-exclusive bases of admissibility for each Telegram message.  Several defendants submitted written objections to the government's admissibility chart by email on February 5, 2023.

After hearing argument from the parties, primarily through not exclusively on Monday February 6, 2023, the Court issued a preliminary ruling admitting a substantial number of Telegram messages, but also excluding certain messages.  *See* 2/7/2023 Tr. at 7730-35.  The Court then issued a comprehensive oral ruling on February 10, 2023. *See, generally,* 2/10/2023 Tr. at 8578-8620).  The Court admitted a significant number of Telegram messages, finding that the messages were not admitted for their truth, but were instead relevant to the defendants' and their co-conspirators' state of mind or intent, including as circumstantial evidence of their motive and intent to form the charged conspiracy.  *See, e.g.,* 2/10/2023 Tr. at 8580, 8592. Other Telegram messages were admitted as statements of plans or intent under FRE 803(3).  *Id.* at 8593, 8595, 8596, 8604.  Other statements were admitted as non-hearsay because they were commands, *id.* at 8598, or to show their effect on the listener, *id.* at 8580, 8595.  And certain Telegram messages were admitted as statements of a party opponent under FRE 801(d)(2)(A).  *Id.* at 8600, 8609.

The Court also admitted a limited number of Telegram messages as statements made in furtherance of the conspiracy, pursuant to FRE 801(d)(2)(E).  The Court first ruled that Aaron Wolkind was a co-conspirator for purposes of the Rules of Evidence, because Wolkind was one of the few members of the MOSD leaders chat with defendants Tarrio, Nordean, Biggs, Rehl, and witnesses Jeremy Bertino, Jonathan Stewart, and Charles Donohoe, and because Wolkind helped organize members for January 6th, circulated orders to MOSD members both on the 6th and beforehand.  *Id.* at 8582-83.  The Court also concluded that certain statements made by the defendants and their coconspirators to MOSD members qualified as statements in furtherance of the conspiracy.  *Id.* at 8590 (citing *United States v. Tarantino*, 846 F. 2d 1384, 1412 (D.C. Cir. 1988) for the proposition that if a statement can be reasonably be interpreted as encouraging a co-conspirator or another person to advance the conspiracy, or as enhancing a co-conspirator or another -- or other person's usefulness to the conspiracy, then the statement is in furtherance of the conspiracy and may be admitted).

Within this framework, the Court identified and presumptively admitted a limited number of Telegram messages as co-conspirator statements:

| **Government Exhibit** | **Statement** | **Transcript Page** |
|---|---|---|
| 500-69 | Tarrio's pitch of MOSD | 8590 |
| 501-2, 501-25, 526-2 | MOSD coordination messages | 8603 |
| 501-13, 501-7 | MOSD coordination/contact info | 8603-04 |
| 501-15 | Recommending MOSD members | 8604 |
| 543-1 | Rehl discussing MOSD leadership | 8606 |
| 503-3 | MOSD Main chat | 8606-07 |
| 501-39 | Tarrio's preview of his arrest | 8607 |
| 501-50 | MOSD leader messages from 1/1 | 8608 |
| 505-18 | Tarrio's "heavy restrictions" msg. | 8610 |
| 505-6 | Stewart's comment re playing games | 8612-13 |
| 510-19 | Bertino's "hope they use them" | 8613-14 |
| 509-5 | Wolkind's "black bloc tactics" | 8614-15 |
| 507-16 | Co-conspirator encouragement | 8617 |

As the above chart makes clear, the Court provisionally admitted a limited number of Telegram messages, all of which were posted in the MOSD Leadership or Membership group chats, as being made in furtherance of the conspiracy where those statements were made by (1) a defendant; (2) a cooperating witness who had entered a plea of guilty to the conspiracy; or (3) Aaron Wolkind, because of his role in the MOSD leaders planning chats.

## C. Argument

The evidence at trial has demonstrated (1) a conspiracy existed; (2) the declarant and the defendant against whom the statement is offered were members of the conspiracy; and (3) the statements were made in furtherance of the conspiracy. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987). The government further submits that the evidence at trial has demonstrated that the conspiracy began around the time of the creation of the MOSD on December 19, 2020, and asks this Court to find under FRE 104(b) that the necessary factual predicates for the admission of these statements have been met.

The evidence adduced at trial has shown that these defendants and their coconspirators were motivated by a shared refusal to accept the results of the 2020 Presidential Election. In the weeks following that election, the defendants – in their roles as leaders and members of the Proud Boys – publicly and privately expressed their rejection of the results and their beliefs about the necessary response. The response they advocated was not peaceful demonstration or legal challenge; it was "force," "violence," "war," and, in Rehl's words, "firing squads . . . for the traitors that are trying to steal the election from the American people." 1/30/2023 Tr. at 6303-04; Government Exhibits 600-51, 600-24, 601-10, 603-4, 603-35, 602-27, 23.

Meanwhile, alongside their expressions of fury against the "traitors" who would effectuate the peaceful transfer of power, the defendants and other Proud Boys nurtured rage against the law

enforcement officers who maintained public safety in the streets. Although the Proud Boys had historically held themselves out as allied with the police, that began to change in December of 2020 as a result of two perceived offenses by the D.C. Metropolitan Police Department: first, its failure to bring charges against a person who stabbed Proud Boy Jeremy Bertino during a spree of Proud Boys violence at a rally on December 12, *see, e.g.* 2/21/2023 Tr. at 9995-97 and second, the charging (and later arrest) of Tarrio for destruction of property after he publicly admitted to burning a banner stolen from a church, *see, e.g. id.* at 10080 *et seq*.

The defendants harnessed these twin currents of Proud Boys anger into a plot to violently disrupt the transfer of power. The agreement at the heart of that conspiracy was reached no later than December 19, 2020, when Tarrio and Biggs discussed the need to radicalize: "[W]e recruit losers who wanna drink. Let's get radical and get some real men." 2/9/2023 Tr. at 8188.  A day later, Tarrio created the Ministry of Self Defense [MOSD], the structure by which the MOSD Leaders would mobilize their "real men," explaining to Biggs that "This is the thing. The new thing." *Id.* at 8201-02; Government Exs. 525-5, 518-1, 501-1.

In the encrypted chat group Tarrio created, the MOSD Leaders – including Tarrio, Biggs, Nordean, Rehl, Donohoe, Stewart, Bertino, and Wolkind – discussed travel plans for January 6, use of tactical and communications gear, and the importance of an ironclad chain of command. *See* Government Exs. 501-2, 501-25, 526-2.  They also submitted nominations for which "real men" should be brought into the group as their foot soldiers. *See* Government Ex. 501-15. As the leaders' discussions illustrate, MOSD members were chosen for two crucial traits: the discipline to follow orders from leadership and the penchant to employ street violence against the Proud Boys' perceived adversaries.  *See, e.g.,* Government Exs. 503, *et seq*., and 507, *et seq*. These were

the men Tarrio, Nordean, Biggs, and Rehl wanted at their backs as they marched to the Capitol on January 6.

The selected recruits began assembling roughly one week later, on December 27, in a new encrypted chat group. Tarrio immediately posted a message laying out ground rules, including that "Screenshots or the sharing of information outside of this chat is an instant disavowal out of the chapter. NO EXCEPTIONS. What is said here will stay." 2/9/2023 Tr. at 8236-37.  Tarrio also told members not to "use threats of violence in this chat" and to behave like "gentlemen." *Id.* However, the discussion among members showed that they immediately recognized the latter instruction – as well as the "Self Defense" portion of the group's name – to be a fig leaf. The group quickly began trading videos of Proud Boys assaulting people, discussing optimal tactics for "seek-and-destroy missions," (Government Exs. 503-6, 503-10) and encouraging one another to "storm" state capitols if they could not be present for the main event in D.C. Government Ex. 503-13. None of this discussion drew rebuke from the MOSD Leaders who created and monitored the various discussion groups; instead, it showed that they had selected exactly the right men for the job.

As January 6 drew closer, MOSD Leaders continued to stoke rage about the election and against police, and they continued to mobilize their MOSD subordinates. Defendants did not share with lower ranked members a detailed battle plan. They did not need to: What mattered was that MOSD members would follow orders, whether or not they understood or were privy to the overarching strategy. As Stewart advised during a video briefing by leadership on December 30: "Turn your brains off a little bit on trying to figure out what the big picture is, and follow the ten guys that you're with. You're going to have a leader of those ten guys…. [Directions] could come from any single person that you see on your screen right now…Yes, you might be getting told things from different people, but it's all information from the same plan. Biggs is not going to tell

you something different than I'm gonna tell you. Enrique [Tarrio] is not going to tell you something different than Zach [Rehl] is going to tell you. It's all one operational plan, so don't get hung up on the delivery. The information is all the same."  Government Ex. 613E, 613H.

The night before the attack, leaders circulated a directive to "meet at the Washington Monument at 10am tomorrow morning!," where "Details will be laid out at the pre meeting!" Government Ex. 509-24, 510-26. Rather than disseminate the details ahead of time, Biggs provided assurance that he and Nordean were together in person, that they have "a plan," and that the plan had been discussed with Tarrio. Government Ex. 509-23. Meanwhile, the MOSD members continued violent rhetoric in the days before the attack – such as "time to stack those bodies in front of Capitol Hill" – provided reciprocal assurance to leadership that they had chosen the right men for the job. Government Ex. 507-10, 507-11, 507-12.

On the morning of January 6, numerous MOSD members and other rank-and-file Proud Boys gathered at the Washington Monument as directed. *See* Government Ex. 1000.  There on the national mall, the MOSD Leaders' statements took on even greater intensity. With the Proud Boys mustered into a pack for marching, Nordean and Biggs took turns with a megaphone, using Tarrio's recent arrest as a flashpoint, and urging their listeners to align with them, and against law enforcement ("back the yellow").  *Id.*  Nordean proclaimed that "real men are here" who "represent the spirit of 1776" and who planned to "remind those who have forgotten" what the constitutional oath of office means. *Id.* As the Proud Boys group marched past police officers donning riot gear, there were shouts of "treason" and "fucking scum," showing that the leaders' speeches had reached a receptive audience.  *Id.*

Once the siege of the Capitol began, the physical conduct of the defendants and their followers demonstrates the fulfillment of their conspiratorial intent. Throughout the attack,

microphones captured numerous statements by the MOSD Leaders and their co-conspirators exclaiming with glee about their actions, such as Biggs proclaiming that "I have such a boner right now," and Pezzola boasting that he was enjoying a "victory smoke in the Capitol." Government Ex. 403-G. They also included exhortations to the crowd. As the rioters began to overwhelm a line of officers on the Pennsylvania Avenue NW walkway, Rehl shouted "Fuck them! Storm the Capitol!" Government Ex. 1001. The Telegram chats also continued to be active during the attack, with co-conspirators who were not physically present sending words of encouragement like "Push inside!" and words of approval like "Abahahhaha op success."  Government Exs. 509-32, 509-34, 533-1.

After the rioters had been cleared from the Capitol, MOSD Leaders and their co-conspirators celebrated their success. That night, Tarrio asserted to the Proud Boys "Elders" who had approved his formation of the MOSD, "Make no mistake. We did this." Government Ex. 500-84.  Similarly, Bertino told Tarrio "You know we made this happen," and "I'm so proud of my country today," to which Tarrio replied, "I know." *Id.* And the next day, Rehl similarly told an MOSD chat group that he was "proud as fuck what we accomplished." Government Ex. 510-52.

## D.    Conclusion

The evidence adduced at trial more than satisfies the preponderance standard necessary to demonstrate that a conspiracy existed; that these defendants were members of the conspiracy; and that the limited number of Telegram statements the Court has provisionally admitted were made in furtherance of the conspiracy. The government further submits that the evidence at trial has demonstrated that the conspiracy began with the creation of the MOSD on December 19, 2020,

and asks this Court to find under FRE 104(b) that the necessary factual predicates for the admission

of these statements have been met. by a preponderance of the evidence that a conspiracy existed.

> Respectfully Submitted,
> MATTHEW M. GRAVES
> United States Attorney
> D.C. Bar No. 481052
>
> By:     */s/ Jocelyn Ballantine*
> JOCELYN BALLANTINE, CA Bar No, 208267
> Chief, Complex Conspiracy Unit
> Capitol Siege Section
>
> */s/ Conor Mulroe*
> CONOR MULROE, NY Bar No. 5289640
> Trial Attorney
> U.S. Department of Justice, Criminal Division
> 1301 New York Ave. NW, Suite 700
> Washington, D.C. 20530
> (202) 330-1788
> Conor.Mulroe@usdoj.gov
>
> */s/ Jason B.A. McCullough*
> JASON B.A. MCCULLOUGH
>     NY Bar No. 4544953
> ERIK M. KENERSON, OH Bar No. 82960
> NADIA E. MOORE, NY Bar No. 4826566
>     On Detail to the District of Columbia
> Assistant United States Attorneys
> 601 D Street NW
> Washington, D.C. 20530