UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ETHAN NORDEAN et al.,<br><br>*Defendants*. | Criminal Action No. 21-175 (TJK) |

## **MEMORANDUM**

Over the course of this four-month-long trial, the Court issued a multitude of evidentiary rulings. The Court detailed the bases for its rulings on the record to the extent practicable given the need to respect the jury's time and to move the proceedings along. Given these considerations, on one occasion relating to so-called "tools" evidence, the Court said that it would detail its reasoning on the record at a later time. *See* Trial Tr. 12148. So it will do so now. The Court also takes the opportunity to clarify the Rule 403 balancing it conducted on evidence about Proud Boys rallies in the District of Columbia that occurred after the 2020 presidential election, objections to which the Court resolved piecemeal as disputes arose before and during trial.

\*   \*   \*

One of the highly contested issues in this trial has been the admissibility of statements and conduct by so-called "tools" of the charged conspiracies. As the Court explained in a lengthy oral ruling on about 200 exhibits pulled from the defendants' various Telegram chat groups, *see* Trial Tr. 8578–8619, the "tools" evidence fell into two subcategories. In one subcategory, the government sought to admit statements by "Proud Boys whom the defendants and their co-conspirators hand-selected to join the [Ministry of Self-Defense]," the special chapter Defendant

Enrique Tarrio created to be led by himself and codefendants Ethan Nordean, Joseph Biggs, and Zachary Rehl, along with several uncharged coconspirators. Trial Tr. 8586. In a second subcategory, the government sought to admit video and other evidence depicting the conduct of "people whom the defendants . . . or their coconspirators marched toward the Capitol on January 6th and to whom they had some alleged nexus or relationship in the . . . physical effort" to overtake the barriers and police and enter the Capitol. Trial Tr. 8585–86.

The Court addressed the first subcategory at length in its ruling on the Telegram-related evidence. Now—as it said it would—the Court further details its rulings as to the second subcategory. *See* Trial Tr. 12148.

Before trial, upon the defendants' objections to relevance and under Rule 403, the Court set the following parameters on evidence of tools' conduct on January 6:

> For the conduct along these lines to be relevant, it has to bear some connection to the defendants. So for example, conduct by those in the MOSD leadership or MOSD membership or Boots on the Ground Telegram chat groups, all of which the Government says were, sort of, intrinsic to the conspiracy, would be relevant. Actions by those who the defendants themselves led to the Capitol and then actions by those who, . . . at the same time . . . and adjacent to the defendants both followed them to the Capitol and then stormed the Capitol with them, again, I think, are relevant. A rational juror could find that conduct like that is some evidence of how these defendants carried out the alleged objective of the charged conspiracies.
>
> But on the other hand, mere evidence that people . . . unaffiliated with the Proud Boys or perhaps even some Proud Boys who didn't . . . march with these defendants . . . committed violent acts without any nexus to the defendants' planning groups or their conduct that day does push the bounds of relevance and carries a real risk of unfair prejudice.

ECF No. 594 at 33–34.

At the pretrial conference, the Court also noted it might ultimately require the government to provide a more specific proffer about the nature of the evidence and its connection to the defendants. And it ordered just that. Indeed, on March 6, 2023, rather than sit for trial, the Court

2

held a day-long motions hearing at which the government proffered the evidence and its connection to the defendants in response to the defendants' ongoing relevance and Rule 403 objections. *See* Hr'g Tr. Mar. 6, 2023.

The government proffered video evidence depicting conduct by twenty-two individuals who, to varying degrees, interacted with the defendants during their march to the Capitol and during the breach of the building. They included: William Pepe; Christopher Worrell; Barry Ramey; Daniel Lyons Scott; Trevor McDonald; Marc Bru; Gilbert Fonticoba; Ronald Loehrke and James Haffner; Nicholas Ochs; Gabriel Garcia; Paul Rae; Barton Shively; a group that included A.J. Fischer, Dion Rajewski, Zach Johnson, Brian Boele, and James Brett; and another group that included Arthur Jackman, Nate and Kevin Tuck, and Eddie George. After considering the government's extensive proffer and the parties' arguments, the Court excluded evidence depicting Shively and Ramey. Additionally, as to evidence depicting A.J. Fischer's group, the Court allowed the government to highlight Fischer's and Johnson's conduct, but not that of Rajewski, Boele, and Brett. Over defendants' objections, it also allowed evidence related to the other fifteen individuals. *See* Trial Tr. 12148–50.

In the Court's view, for the evidence it admitted, the government proffered a sufficient nexus between those individuals' actions on January 6 and the defendants to permit an inference that their conduct was relevant evidence of the charged conspiracies. Specifically, as to most of these individuals, the government proffered one or more of the following: they (1) were part of the defendants' marching group from the Washington Monument to the Capitol; (2) interacted with the defendants at the Capitol in a way that suggested coordination or a shared goal; or (3) were members of relevant Proud Boys chat groups, including the MOSD and the Boots on Ground group. *See generally* Hr'g Tr. Mar. 6, 2023.

The evidence connecting Loehrke and Haffner to the defendants was different, but still rendered their conduct relevant for the same reasons. There was some dispute over when, if ever, Loehrke became a member of the Proud Boys. *See* Hr'g Tr. Mar. 6, 2023 at 60. But he was part of the defendants' marching group, and he knew Nordean before January 6. In a text exchange between Loehrke and Nordean on December 29, 2020, Nordean told Loehrke that he wanted "[Loehrke] with [him] pretty much the whole time" on January 6, emphasizing that Loehrke would be "on the front line with [him]." Gov't Ex. 550-3. Loehrke responds, "Sounds good, man." *Id.* Beyond Loehrke's participation in the marching group, these messages bolstered the nexus between him and Nordean.

As for Haffner, the government proffered evidence that he marched with the defendants and otherwise accompanied Loehrke for most of the day on January 6. There was no evidence that Haffner was a Proud Boy. Even so, in the same text exchange between Loehrke and Nordean, Loehrke told Nordean he "ha[d] 3 guys" travelling with him to D.C., calling them "[b]ad mother fuckers" and "[r]econ guys that aren't [Proud Boys] but are with [them]." Gov't Ex. 550-3. Nordean responded, "Ok. We aren't wearing colors anyway. If they roll with me they will be good." *Id.* Thus, the record supported a strong inference that Haffner was one of these individuals, again establishing a relevant nexus between Haffner and Nordean.

The government's evidence of these individuals' conduct was relevant to proving the existence of the charged conspiracies. As the Court has noted throughout this case, sometimes the best evidence of a conspiracy is the concerted action that in fact results from one. *See, e.g.*, ECF No. 594 at 33; ECF No. 147 at 52. And a reasonable juror might infer concerted action from evidence that individuals who participated in the defendants' chat groups or were led by them to the Capitol were ultimately on the front lines at several critical breaches of the Capitol. Thus, a

4

reasonable juror could rely on this evidence to find that it is more likely the charged conspiracies existed.

The evidence also satisfied Rule 403's balancing test. That is, the risk that this evidence might confuse the jury or otherwise unfairly prejudice the defendants did not substantially outweigh its high probative value, as explained above. The government painstakingly mapped out each defendant's location throughout the march toward the Capitol and the subsequent riot. And the conduct of these individuals was captured on video. So the relative risk that the jurors would confuse a purported tool's conduct for a defendant's was low. And because each individual bore some nexus to at least one of the defendants' own conduct that day, inferences the jury might draw from this evidence—even considering some of the violence it depicted—were not, in the Court's view, *unfairly* prejudicial.

At the same time, the Court excluded evidence related to Shively, Ramey, Rajewski, Boele, and Brett on Rule 403 grounds. Considering the government's proffer and the whole record, these individuals lacked a sufficiently close nexus to the defendants or their conduct on January 6 to evidence a conspiracy, and in any event any marginal relevance would be substantially outweighed by the risk of unfair prejudice. For example, Shively was not a Proud Boy and did not participate in any of the relevant chat groups. Although he joined the marching group at some point, the government lacked evidence showing he had been with the group when it first convened at the Washington Monument. Hr'g Tr. Mar. 6, 2023 at 51–52. Meanwhile, the evidence the government sought to admit was particularly violent, involving assaults on officers. *See id.* So the Court excluded this evidence. The same is true of Ramey, for whom the government offered no evidence of Proud Boys membership and who may have only joined the marching group well after it began. Put another way, the government offered little more than his "sheer proximity" to

the defendants. *See* Hr'g Tr. Mar. 6, 2023 at 55. And while Fischer and Johnson were in relevant Telegram chat groups and interacted with the defendants at various points on January 6, the rest of their group—Rajewski, Boele, and Brett—did not. *See generally* Hr'g Tr. Mar. 6, 2023 at 109–21.

\*   \*   \*

The Court also takes this opportunity to clarify its rulings relating to another category of evidence: the defendants' and other Proud Boys' participation in or reactions to the so-called "Million MAGA marches" in November and December 2020 in Washington, D.C. *See* Trial Tr. 2812. On both occasions, former President Trump had "called people [to Washington, D.C.] to support the fight against what was purported to be the stolen election." Trial Tr. 2815. At both events, violence erupted between Proud Boys and others who they believed were Antifa. Although only Tarrio and Pezzola (who was not yet a member of the Proud Boys) participated in the November rally, *see* Trial Tr. 2813, the other defendants praised the Proud Boys' conduct in Telegram messages and social media posts. *See, e.g.*, Gov't Exhs. 601-3; 602-12; 603-13. And all five defendants attended the December 2020 rally, where violence again broke out, culminating in the stabbings of coconspirator Jeremy Bertino and three other Proud Boys. Additionally, at the December 2020 rally, Tarrio stole and set fire to a Black Lives Matter banner from a historically black church, which led to his arrest on January 4. Defendants objected to evidence about these rallies at various points both before and during trial on character, relevance, and Rule 403 grounds.

This evidence manifested at trial in various ways—the direct testimony of Nicholas Quested, Matthew Greene, and Jeremy Bertino; in the defendants' Parler posts; and throughout various Proud Boys Telegram chat groups. During Bertino's testimony, at least counsel for

Nordean noted a standing objection to such evidence—particularly about the December 2020 rally—under Rule 403.  Trial Tr. 9967.

When defendants objected to discrete issues related to the November or December 2020 rallies on Rule 404(b) grounds, the Court detailed its rulings on the record, admitting some evidence and excluding some.  *See, e.g.*, ECF No. 594 at 51; Trial Tr. 2944–45, 6056–58.  In addition, the Court policed the boundaries of unfair prejudice under Rule 403 as the evidence about these prior rallies took shape at trial.   Several times, the Court excluded evidence related to the November and December 2020 rallies where the risk of unfair prejudice substantially outweighed the probative value the Court recognized for this category of evidence.  *See, e.g.*, ECF No. 594 at 54 (excluding under Rule 403 that the banner Tarrio destroyed at the December 2020 rally was a Black Lives Matter flag); *id.* at 52 (limiting evidence of specific acts of violence unconnected to the defendants at the December 2020 rally); Trial. Tr. 4419 (same); Trial Tr. 19282 (enforcing the same during the cross of Pezzola); Trial Tr. 6063–64 (excluding exhibit from Rehl's Parler account related to November 2020 rally).

To the extent the record is not already clear, unlike the occasions it *excluded* this type of prior-rally evidence, when the Court *admitted* it, it found that the evidence had probative value that was not substantially outweighed by a danger of unfair prejudice.  For example, as the Court reiterated throughout the pretrial proceedings and trial, evidence about these events was probative because it showed the "defendants' relationships of trust with each other, their motivation and intent in forming the MOSD chapter at the center of [the] charges, and defendants' and other [Proud Boys] members' increasing hostility toward law enforcement." ECF No. 594 at 51.  And evidence showing the defendants "promot[ing]" violent acts from these rallies was "fair-game evidence of [defendants'] intent, and specifically what [they] saw as the appropriate response to a

7

perceived threat . . . at a rally focused on the election." Trial Tr. 6063.  As the record also reflects, this probative value was buttressed by these rallies' closeness in time to the formation of the alleged conspiracy and to January 6, 2021.  *See, e.g.*, ECF No. 594 at 50–52; Trial Tr. 2943.

To the extent that there was any marginal risk that the jury might treat defendants' presence at a rally that turned violent as improper character evidence—or draw any other unfair inference—that risk did not substantially outweigh the probative value of the evidence.  This was all the more so because defendants argued that the violence that happened at the December 2020 rally—particularly Bertino's stabbing—and the related need to defend themselves against Antifa was the very reason the MOSD was formed in the first place.  *See, e.g.*, Trial Tr. 3324–35 (Nordean's opening statement).

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 4, 2023