IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 21-cr-175-TJK |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendant. | ) |

**ETHAN NORDEAN'S RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

Nordean, by counsel, submits this brief response to certain points in the government's sentencing memorandum and supplement. ECF 855; ECF 855-2.

**I.   The government's factual claims about Nordean and the riot**

In its 80-page memorandum and 15-page supplement, the government does not clearly assert one factual claim that might warrant sentencing Nordean differently from other January 6 protesters: that Nordean and the other defendants were the proximate cause of the initial breach at the West Front of the Capitol on January 6.

Five months of trial showed that such a causal claim would have no factual support. Virtually every witness for the defense and for the government testified that the initial breach was spontaneous, not planned. Many contemporaneous videos depicting the scene showed that Nordean stood hundreds of feet away from the first police line near the Peace Circle when protesters began pulling down barricades and streaming up to the Capitol Building. Witnesses testified, and video clips showed, that at the precise moment of the first breach Nordean held his hand aloft to signal that his group should halt. The government does not cite one example of a

1

protester taking some action that day because he thought that was what Nordean wanted him to do. These awkward facts do not sit well with the government's catastrophizing rhetoric.

Without support for the key factual distinction, the government falls back on abstraction, emotional rhetoric, and subjectivity. It says the defendants "viewed themselves as revolutionaries. . ." ECF 855, p. 6. Nordean invoked 1776. *Id.* He and the others "embraced their role in bringing about a 'revolution.'" *Id.*, p. 7. The defendants "unleashed a force on the Capitol. . .," in a general manner of speaking. *Id.*

Notice the equivocal scare quotes the government hangs around words like "revolution." They are there because the government must acknowledge its awareness that, as an objective matter, it is unserious to frame the event in which the defendants participated as a revolution. One does not topple any government, much less that of the United States, by walking in and out of a building without arms. Still, Nordean agrees with the government that his group's rhetorical choices do shed light on the objective circumstances of the event, but what he sees there does not live up to the government's billing.

1848 was another unusual political year. Among other events, thousands of protesters stormed the legislature of the Second Republic in Paris. It seems the fiercely anti-monarchy demonstrators aimed to reverse the outcome of recent democratic elections to the chamber. Strangely attired, they chanted political slogans which were self-consciously adopted from the revolutionaries of 1789. At the time, contemporary opinion struggled to properly categorize the event: was it a demonstration, a riot, a rebellion, or a coup d'etat? In any case, the conventional view was that it said something ominous about the fate of French democracy.[1]

---

[1] Christopher Clark, *Revolutionary Spring: Europe Aflame and the Fight for a New World, 1848-1849* (Crown 2023).



Victor Adam, *Annales de la Republique Française: 1848 Paris*

With the passage of time, however, the consensus view of the event evolved into something nearly the opposite of the grave contemporary one. One close observer picked up on the stark contrast between the protesters' glorified revolutionary rhetoric and the anticlimax of the event itself—an immediate return to the status quo after cleaning out the unwashed protesters and their trash. He wondered what "made it possible for a grotesque mediocrity to play a hero's part" for this rabble, whose interests he did not have at heart.[2] The explanation lay partly in the fact that, notwithstanding the protesters' 1789 Returns rhetoric, the event was not a "revolution" and it was not a "coup." It was political history repeating itself, but as absurd theater. He found that it was not political magic words or ideas that threaten insurrection. It is the preponderance of material forces, whether armed or economic. The rest is historical farce, he thought.

Observers occupying the other end of the political spectrum concurred in that analysis.

---

[2] Karl Marx, *The Eighteenth Brumaire of Louis Bonaparte* (Marx 1869), preface, available at: https://www.marxists.org/archive/marx/works/download/pdf/18th-Brumaire.pdf.

One of them, a legislator, was sitting in the chamber when protesters stormed the building. What occurred that day was not a "revolution," he reflected; it was carnival of the absurd.[3]

## II. The government's arguments under Note 4 of §3A1.4 are waived and, in any case, meritless

The government asks the Court to apply an upward departure under Note 4 of U.S.S.G. §3A1.4 to all Nordean's convictions, even those not listed as federal crimes of terrorism in 18 U.S.C. § 2332b(g)(5). ECF 855, pp. 53-57. That must be rejected for several reasons.

First, the argument is waived. The government and the defendant are given a specific timeframe and procedure within which they must object to a PSR. If they fail to properly utilize that procedure, they forfeit their objections; if they positively disclaim an objection, it is waived. Fed. R. Crim. P. 32(f)(1) (requiring parties to object, in writing, to a PSR within fourteen days after receiving it); *see*, *e.g.*, *United States v. Zubia-Torres,* 550 F.3d 1202, 1208 (10th Cir. 2008) (waiver where a party fails to properly object to PSR). Here, the PSR did not apply §3A1.4 to any of Nordean's convictions. In response, the government explicitly stated that it declined to seek application of Section 3A1.4 as to any Count beyond Count Six. ECF 844, p. 1 n. 1 ("Because the defendants were all convicted of an offense specifically enumerated as a federal crime of terrorism, *i.e.*, Count Six, the government does not seek the application of Section 3A1.4 to Counts One-Four" [sic].). Accordingly, the government's note 4 argument is waived.

Second, the argument that §3A1.4 may be applied to crimes that are not listed in § 2332b(g)(5) fails on the merits. Application Note 4 is policy commentary that expands §3A1.4 and is therefore not entrusted to the Sentencing Commission acting unilaterally via application notes. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019); *Stinson v. United States*, 508 U.S. 36 (1993).

---

[3] Alexis de Tocqueville, *Recollections: The French Revolution of 1848 and Its Aftermath* (UVA Press 2016).

The Supreme Court has held that commentary "that interprets or explains a Guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that Guideline." *Stinson*, 508 U.S. at 38. And, under a doctrine known as *Auer* deference, courts should defer to an agency's (the Commission's) reasonable reading (here, the commentary) of an ambiguous regulation (the Guidelines). *Kisor*, 139 S. Ct. at 2408. However, the Supreme Court recently made clear that "a court should not afford *Auer* deference unless the regulation is *genuinely* ambiguous." *Id.* at 2415. (emphasis added).

After *Kisor*, the Third Circuit sitting *en banc* opined, "[i]f the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer. The judge's lodestar must remain the law's text, not what the [Sentencing] Commission says about that text." *United States v. Nasir*, 17 F.4th 459, 472 (3rd Cir. 2021) (concurrence). Post-*Kisor*, other courts have also acknowledged they are troubled by "[t]he commissions prior attempts to use its interpretive authority to improperly change the scope of a Guideline provision." *United States v. Kirilyuk*, 29 F.4th 1128, 1136–37 (9th Cir. 2022) (cleaned up). The Third Circuit recently applied its rationale in *Nasir* to its holding in *United States v. Banks*, 55 F. 4th 246, 528 (3rd 2022). There, in the fraud guideline, the Third Circuit invalidated Note 3(A)'s definition of "loss" as "the greater of actual loss or intended loss" finding that because the commentary's "intended loss" alternative expanded the definition of loss, it deserves no weight. *Id.*

The same analysis holds true here as application note 4 expands the Guidelines. The language of the § 3A1.4 text says a 12-level enhancement applies if the defendant's offense "involved, or was intended to promote, a federal crime of terrorism"—defined as an offense that *both* (1) satisfies § 2332b(g)(5)(A)'s motivational element, *and* (2) is a violation of a statute

5

enumerated in § 2332b(g)(5)(B). §3A1.4 n. 1. The plain meaning of the word "and" in § 2332b(g)(5) is conjunctive. *See United States v. Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020) ("Both parts of § 2332b(g)(5) must be satisfied for the enhancement to apply."). But application note 4 reads this conjunctive definition out of the guideline, rendering it disjunctive instead. Where a guideline requires the government to satisfy two criteria, an application note necessarily conflicts with the guideline if it permits the government to enhance a sentence based on satisfying only one of those criteria. *See United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018) (explaining commentary is "inconsistent with the Guidelines when following the commentary would violate the dictates of the relevant Guidelines").

Although there appears to be a circuit split on whether both parts of § 2332b(g)(5) must be satisfied for the enhancement to apply, it appears that the D.C. Circuit, in dicta, recognizes that they do. In *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012), the court acknowledged, "[t]he definition of 'federal crime of terrorism' contains its own intent element, with an additional requirement only that the offense of conviction appear on the statutory list." *Id.* (emphasis added); *accord United States v. Abu Khatallah,* 314 F.Supp. 179, 197 n.19 (D.C.C. 2018) ("The offense must also be enumerated in the statute defining a federal crime of terrorism; damaging federal property and providing material support to terrorists are on the list. 18 U.S.C. § 2332b(g)(5)(B)(i).").

The text of § 3A1.4 is not at all ambiguous as to whether the government must prove both, or only one, of the elements in § 2332b(g)(5)'s "federal crime of terrorism" definition. The guideline is clear that to qualify as a "federal crime of terrorism," an offense must satisfy *two* criteria: the motivational element and the enumerated-statutes element, and it appears that the D.C. Circuit is inclined to recognize this conjunctive requirement. This text provides no license

6

to apply § 3A1.4 where a defendant's offense involved or was intended to promote a crime that *either* (1) satisfies the motivational element *or* (2) is a violation of an enumerated statute.

Moreover, application note 4 conflicts with the legislation directing promulgation of §3A1.4. The two statutes from which § 3A1.4 and the term "Federal crime of terrorism" are derived are the Violent Crime Control and Law Enforcement Act of 1994 (Violent Crime Control Act), Pub. L. 103-322, Title XII, § 120004 and Sections 703 and 730 of the Antiterrrorism and Effective Death Penalty Act of 1996, (AEDPA), Pub. L. 104-132, 110 Stat. 1214.  The final form of what was enacted into law as the AEDPA is in Senate Bill 735 which was amended in the House of Representatives as S. 735 Effective Death Penalty and Public Safety Act of 1996 (Engrossed House Amendment).  The Conference Report on S. 735, 142 Cong. Rec. H. 3305-01, stated as to Section 730,

> Directions to Sentencing Commission:
>
> Section 730-Senate recedes to House amendment sections 206 and 207. This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to apply only to federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism. **This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element** to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

(Emphasis added).

Section 730 reads:

> The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism **only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code**.

7

(Emphasis added).

This statutory language and history also lead to the conclusion that a conviction of one of the enumerated offenses listed in § 2332b(g)(5) is a condition for applying §3A1.4. Congress elected not to include § 1512(c)(2), § 1512(k) and § 2384 in the list of federal crimes of terrorism. The Court should honor that legislative judgment. Apart from the Oath Keepers matter, no court in the country has applied §3A1.4 to those unlisted offenses.

### III. The government's grouping analysis is incorrect

The government contends that Count Six (damage to the black fence) should be grouped with Counts One, Two and Three. ECF 855, p. 67. It offers two arguments. Both fail.

"All counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. §3D1.2.

First, the government argues that Counts One-Three satisfy U.S.S.G. §3D1.2(b) because they involve the "same victim" and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. The same victim is "Congress or the government itself." ECF 855, p. 67. The government adds that Count Six also involves the same victim—"Congress or the government itself"—and groups with Counts One-Three. *Id.* That argument fails. In this district, "government itself" is not a grouping "victim." *United States v. Safavian*, 461 F. Supp. 2d 76, 84 (D.D.C. 2006) (rejecting defendant's argument that multiple convictions entailing crimes on government would group with single victim being "society in general or the United States government in general"). In *Safavian*, distinct offices within the same branch of government were held to be separate victims. *Id.* Here, as the government itself points out, the office uniquely victimized by damage to the black fence was "the Architect of the Capitol." ECF 855, p. 67. The Architect has no role in counting electoral

8

votes or protecting members of Congress. Accordingly, Count Six does not group with Counts One-Three under U.S.S.G. §3D1.2(b).

Second, citing §3D1.2(c), the government argues that Count Six groups with Counts One-Three because it "emobod[ies] conduct that is treated as a specific offense characteristic in Counts One, Two, and Three (*i.e.*, §2J1.2(b)(1)(B) ('threatening to cause physical injury to a person . . . in order to obstruct the administration of justice.'))." ECF 855, pp. 67-68. That argument fails too. Section 3D1.2(c) provides that Count X groups with Count Y "When [Count X] embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, *the guideline applicable to* [Count Y]." §3D1.2(c) (emphasis added).

But the government's grouping analysis does not conclude that "the guideline applicable to" Counts One-Three is §2J1.2. Instead, the government concludes that the offense level for all counts is set, under §3D1.3(a), by the guideline at §2B1.1, as enhanced by §3A1.4. ECF 855-2, p. 2. Another way of putting the problem is that, at the §3D1.2 stage, the government characterizes Count Six as a lesser "component" or "specific offense characteristic" crime of Counts One-Three to merge them. But it then turns this on its head by characterizing Count Six as the "most serious of the counts" in the next stage. §3D1.3(a). That is not how §3D1.2(c) works.

The fact that Count Six does not group with Counts One-Three underscores the impropriety of shoehorning the Count One offense charging § 2384 into the analysis of whether §3A1.4 should be applied to Count Six. As explained, the government makes no §3A1.4 argument specific to the facts underlying Count Six's property damage; it simply points to the seditious conspiracy conviction in Count One. But under the grouping rules, Count One is not even considered a crime "involving substantially the same harm" as Count Six. U.S.S.G.

§3D1.2. Thus, distinctly grouped Count One cannot control whether §3A1.4 applies to Count Six.[4]

### IV.  The government's upward departure arguments are meritless

The government argues for upward departures under Sections 5K2.7 and 5K2.0(a)(3). ECF 855, pp. 70-71.  Neither applies.

The government's first argument is bold.  The relevant section provides,

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected.  **Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference.**

§5K2.7 (emboldening added).

Nordean has shown that applying the obstruction guideline at §2J1.2 to the government's novel § 1512(c) charge is already bordering on frivolous.  It requires the Court to hold that Congress "administers justice," a conclusion that children are urged to resist in civics class.  If the Court holds for the government on that point, the obstruction guidelines will well and truly "reflect the appropriate punishment for such interference"—and then some. §5K2.7.  But having done so, doubling down on such an interpretation by going well beyond §2J1.2's enhancements would not be appropriate.  The government argues that "the circumstances are unusual" so the departure is warranted.  But the justification it gives—the proceeding at issue is "integral to our democracy"—is true in every § 1512(c) case.  And yet no January 6 court has applied §5K2.7 in

---

[4] The same analysis is true of Counts Four and Five which involve individual victims, not "Congress or the government itself."

10

such a case. The ubiquity of that charge makes the circumstances not "unusual" but quite common: over 300 defendants have been charged with the offense.

The next departure provision cited by the government provides,

> A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

§5K2.0(a)(3).

At the outset, Nordean notes that because the government asks the Court to upwardly depart here from 108-135 months' incarceration calculated by the PSR (absent the terrorism enhancement) to the 324-405 months it calculates, the clear and convincing evidence standard would apply. *United States v. Long*, 328 F.3d 655, 671 (D.C. Cir. 2003) (citing *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990)).

The government cites one case in support of its argument that the Court should upwardly depart as though the terrorism enhancement applies even when it does not. ECF 855, p. 71 (citing *United States v. Tankersley*, 537 F.3d 1100, 1116 (9th Cir. 2008)). The government misunderstands *Tankersley*. There, the court of appeals affirmed the district court's decision not to apply §3A1.4 and to upwardly vary as though it did. *Tankersley*, 537 F.3d at 1116. But that was because the conduct at issue was "terroristic" in nature but directed at private parties, not the government. *Id.* at 1114. Thus, contrary to the defendant's argument, there *were* "aggravating circumstances that were not adequately taken into consideration by the Sentencing Commission . . ." *Id.* Here, by contrast, there is no argument that the Guidelines do not take into account efforts that intimidate or frighten participants in an official proceeding. That is the government's precise argument for applying the specific offense characteristic enhancements in §2J1.2. ECF

11

855, pp. 29-35.  The government does not explain how those enhancements do not account for the harm it identifies.  Thus, §5K2.0(a)(3) does not apply on its own terms.

Dated: August 21, 2023                    Respectfully submitted,

/s/ David B. Smith
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com


*Attorneys for Ethan Nordean*

### Certificate of Service

I hereby certify that on the 21th day of August, 2023, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

12