```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                           1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL                    Washington, D.C.
5-ENRIQUE TARRIO                  Monday, February 6, 2023
6-DOMINIC J. PEZZOLA,             11:00 a.m.
                   Defendants.
- - - - - - - - - - - - - - - - x
```
_____

```
              TRANSCRIPT OF JURY TRIAL - DAY 26
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
```
_____

APPEARANCES:

```
For the United States:  Jason B.A. McCullough, Esq.
                        Erik M. Kenerson, Esq.
                        Conor Mulroe, Esq.
                        Nadia Moore, Esq.
                        U.S. ATTORNEY'S OFFICE
                        555 4th Street, NW
                        Washington, DC 20530
                        (202) 252-7233


For the Defendants:     Nicholas D. Smith, Esq.
                        DAVID B. SMITH, PLLC
                        7 East 20th Street
                        Suite 4r
                        New York, NY 10003
                        (917) 902-3869


                        John D. Hull, IV, Esq.
                        HULL MCGUIRE PC
                        1420 N Street, NW
                        Washington, DC 20005
                        (202) 429-6520


                        Norman A. Pattis, Esq.
                        PATTIS & SMITH, LLC
                        383 Orange Street
                        1st Floor
                        New Haven, CT 06511
                        (203) 393-3017
```

APPEARANCES CONTINUED:

For the Defendants:        Carmen D. Hernandez, Esq.
                           7166 Mink Hollow Road
                           Highland, MD 20777
                           (240) 472-3391

                           Nayib Hassan, Esq.
                           LAW OFFICES OF NAYIB HASSAN, P.A.
                           6175 NW 153 Street
                           Suite 209
                           Miami Lakes, FL 33014
                           (305) 403-7323

                           Sabino Jauregui, Esq.
                           JAUREGUI LAW, P.A.
                           1014 West 49 Street
                           Hialeah, FL 33012
                           (305) 822-2901

                           Steven A. Metcalf, II, Esq.
                           Roger Roots, Esq.
                           METCALF & METCALF, P.C.
                           99 Park Avenue
                           6th Floor
                           New York, NY 10016
                           (646) 253-0514

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1    **P R O C E E D I N G S**

2    THE DEPUTY CLERK:  This is Criminal Matter 21-175,

3    United States of America v. Defendant 1, Ethan Nordean;

4    Defendant 2, Joseph R. Biggs; Defendant 3, Zachary Rehl;

5    Defendant 5, Enrique Tarrio; and Defendant 6, Dominic J.

6    Pezzola.

7    Present for the Government are Jason McCullough,

8    Erik Kenerson, Conor Mulroe, and Nadia Moore; present for

9    Defendant 1 is Nicholas Smith; present for Defendant 2 is

10    Norman Pattis; present for Defendant 3 is Carmen Hernandez;

11    present for Defendant 5 are Nayib Hassan and Sabino

12    Jauregui; present for Defendant 6 are Steven Metcalf and

13    Roger Roots.  Also present are Defendant 1, Mr. Nordean;

14    Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl; Defendant 5,

15    Mr. Tarrio.  Defendant 6, Mr. Pezzola, is not present.

16    THE COURT:  All right.  Good morning to everyone.

17    First of all, let me -- Mr. Roots, I saw your

18    email of yesterday.  Do we all agree that we can proceed

19    here today without Mr. Pezzola, who I understand is feeling

20    ill in some way?  Obviously, we're only here to address

21    legal matters today, and we don't have the jury with us, and

22    if, you know -- it -- this is a hearing that is, sort of, a

23    continuation of, in some ways, a pretrial motion in limine

24    that we certainly, I think, under the rules, could have had

25    without one of the defendants present.  But let me just

1    first hear from -- if any party thinks, for whatever reason,

2    we could not go forward with argument today based on

3    Mr. Pezzola's absence.

4              MR. ROOTS:  (Indicating.)

5              THE COURT:  Mr. Roots?

6              MR. ROOTS:  Yeah.  Mr. Pezzola -- I did talk to

7    him on the telephone.  He was feeling under the weather.

8    Also, lots of -- he had to handle some business and some

9    other -- some phone calls and that kind of thing.  So he is

10   waiving his personal appearance today in court.

11             THE COURT:  All right.  Well, I appreciate that,

12   but, obviously, if this were, by rule, a proceeding that he

13   could not waive his appearance for, then we could not

14   proceed.  I don't think that's the case, but let me just

15   hear from -- if the Government disagrees.

16             MR. MULROE:  No, Your Honor.  We see no reason

17   that we can't go forward without him.

18             THE COURT:  All right.  Very well.  So we will do

19   so.

20             Let me -- before we -- yes, Mr. Pattis.

21             MR. PATTIS:  Mr. Hull is running late, Judge, and

22   I've spoken with Mr. Biggs.  We're prepared to go forward

23   with but one counsel.

24             THE COURT:  All right.  Very well.  Thank you for

25   that.

1          I -- before we get to the posts, and how I think

2     it makes sense for us to go forward with them, I wanted to

3     just make sure I understood.  There are some Parler evidence

4     interspersed here.  I think all of that Parler evidence is

5     already either -- well, I think all of that Parler evidence

6     is in evidence already, but let me just ask the Government

7     if that's correct.

8          MR. MULROE:  I think that's correct, Your Honor.

9     There are a limited number of Parler posts that we would

10    show during Agent Dubrowski's testimony just to make

11    connections between some of the Telegram messages, but I --

12    let me amend that.  There is one additional Parler post, I

13    think, that we would seek to admit.  All the others, I

14    think, have already been admitted into evidence.

15         THE COURT:  Okay.  And which is the Parler post,

16    just so we can keep track of it, that you -- because you --

17    I don't think you included -- let me put it this way.

18    You -- I think you included the Parler posts in what you

19    presented in your motion in terms of what was attached to

20    the motion, or at least as it was laid out for me, but I

21    don't think they were included in your chart.  So just so

22    we're all keeping track of this, can you identify the

23    exhibit number or the -- however you would like, just so we

24    know what is the new Parler posts that's out there?

25         MR. MULROE:  Yes, Your Honor.  The new one is

```
 1    Exhibit-603-66.  That's at Page 49 of the combined PDF.  And
 2    I think we do have that on the chart.
 3               THE COURT:  Oh, okay.  Okay.
 4               MR. MULROE:  We're offering it for the mental
 5    state of the declarant defendant and a statement of a party
 6    opponent.
 7               THE COURT:  Okay.  So it's -- okay.  Understood.
 8    It's No. 49 on the chart.
 9               MS. HERNANDEZ:  I'm sorry.  603 what?
10               THE COURT:  It's No. 49 on the Government's chart,
11    Exhibit-603-66.
12               MS. HERNANDEZ:  Thank you, Your Honor.
13               THE COURT:  All right.  So with that aside, let
14    me -- here is how I think it makes sense to go forward.
15               First of all, thank you to all of the parties who
16    did, sort of, go through and make individualized objections
17    here.  I think we did narrow things down significantly, and
18    I just want to -- I want to impart -- just, sort of, put the
19    state of play on the record here, at least as I see it, and
20    let you all tell me --
21               Ms. Hernandez, I just need everyone's attention.
22    Thank you.
23               And I'm going to go through the -- where I
24    think -- first, the, sort of, categories of -- categories
25    that, I think, by virtue of the parties' objections and my
```

1      review of those objections, where, sort of, things stand,

2      and then -- and then go through, sort of -- kind of give you

3      all a chance to be heard as you see fit on each category.

4              The first category, I think, is things for

5      which -- items for which there is no objection by any party.

6      And, again, I thank you all for grinding through this, and I

7      think that eliminates a chunk of the exhibits.  So I'm going

8      to just read the numbers from the Government's -- again, the

9      chart the Government presented here and that you all, kind

10     of, based many of your objections off of.  And I'm just

11     going to read the list of exhibits that I believe there is

12     no objection to, or really -- again, I'm not going to read

13     the exhibit number, but the -- I guess, the Government calls

14     it the PDF page that links to the exhibit number.

15             If you all just take note of this list and, at the

16     end, I'd just like to say, okay, these -- there's no

17     objection to, we don't have to spend any time addressing,

18     and then we'll, kind of, go on to what I see are other

19     categories.  So here's what I see the list of things we have

20     no objection to.

21             MR. SMITH:  Could Your Honor read it a little bit

22     slowly just so we could --

23             THE COURT:  I will.

24             MR. SMITH:  Thank you, Your Honor.

25             THE COURT:  I will.

```
1              48, 54, 57 through 58, 60, 65, 67 through 70, 72
2    through 74, 76 through 82, 84, 94 and 95, 100, 102, 103,
3    105, 107 through 110, 121 through 123, 128 through 134, 136,
4    137, 139 through 141, 146, 149, 151, 155 through 161, 164,
5    166 through 168, and 171 through 90 -- through 191.  171
6    through 191.
7              Does that all appear to reflect the parties'
8    understandings?
9              MR. SMITH:  Your Honor, on No. 1- -- Page 179 in
10   the Dubrowski PDF, we would ask that the Government redact
11   the N-word.
12             THE COURT:  Fair enough.  We've got to -- I should
13   have -- that's -- fair enough.  I -- actually, one of my
14   categories was your -- Mr. Smith, your, sort of, objections
15   along those lines.  So maybe, that's one that also fell into
16   there.
17             So with that caveat that 179, part of it is still
18   subject to that request, anything else any party wants to
19   raise?
20             MR. PATTIS:  Judge, Pattis on behalf of Biggs.
21             Before we proceed to argument, may we have just a
22   few moments with our clients?  I was presented with a long
23   recitation of reasons to object from Mr. Biggs that I'd like
24   to discuss with him before we proceed for just a couple of
25   minutes, because there are things that are -- can
```

 1    appropriately be brought out on cross-examination that don't

 2    rise to the level of an objection, and I'd like just a

 3    moment if I may have that.

 4         THE COURT:  Why don't I do this.  I mean, this may

 5    help you, what I'm about to do, in your conversations with

 6    Mr. Biggs, if you think that's -- that would be helpful.

 7    I'm just going to read off -- so the -- that's the first

 8    large category of things for which there is no objection.

 9    I'm just going to read what I -- as I see things standing

10    on -- with regard to the other, kind of, categories or, I

11    guess, at least as I'd put them.  One category is an -- is a

12    set of things that I would like to hear more from the

13    Government about that I have questions about their

14    admissibility.  It's a modest set.

15         Then there's a set of exhibits, I think, that are

16    all fairly characterized as relating to, to some degree, the

17    tools theory that we can talk about, again, as a, you

18    know -- you all can bring up the specifics of any one of

19    these, but we can all talk about them together.  And then

20    there's a few on the -- the -- Mr. Nordean had made some

21    objections on profanity.  And then there's a large --

22    another large swath that, I think -- I've seen what the

23    parties have indicated there are objections to.  I think my

24    inclination is to overrule those objections.  I'm certainly

25    going to hear you on any particular one you want to be heard

```
1    on, but as -- in my mind, they are in a category that
2    they're -- either I found the objection weak or the
3    objection was only for one defendant and it was really
4    about, Well, we don't think it's attributable to my client.
5    So maybe, there's a limiting instruction that you all are
6    going to work on.  But I see them as, at least at this
7    point, likely things that would be admitted.
8              So I guess, Mr. Pattis, my point is if I
9    categorize the rest of the evidence, you may find that it --
10   depending on what category is it falls in, that may -- you
11   may have your -- your discussion with Mr. Biggs might be
12   slightly different.  Is that fair?
13             MR. PATTIS:  Yes, it is, Your Honor.
14             THE COURT:  Okay.  So let me -- Ms. Hernandez, do
15   you want to be heard?
16             MS. HERNANDEZ:  Yes, Your Honor.  I mean, I
17   don't -- it's hard to tell what the Court just said, which
18   we had no objections to.  In fact, I object to almost
19   everything because of the problems with Telegram and the way
20   they're being presented.  But it's not clear to me, from the
21   list the Court gave, which ones we're talking about.  I'd
22   have to go back and look at each one of them.  But the
23   problem with all these -- and I made, sort of, a generalized
24   objection to the entirety of the exhibit because I believe
25   it -- it takes a series of messages and lumps them together
```

1    in one page whether they, in fact, are responsive to each

2    other or not.  So you know, it will take a series of text

3    messages -- we don't know whether anybody read them or

4    didn't read them, whether they were -- whether the

5    statements are responsive.  It includes a lot of people who

6    are not tools and all of that stuff.  So -- but I can't

7    tell, just from the list the Court read --

8              THE COURT:  Well, I mean, again, the -- what I had

9    asked the parties to do was use the Government's chart and

10   lay out specific objections to these -- to these documents,

11   and many, many of the defendants did that.  So I don't know

12   what you want me to say, but, like, I don't have any

13   specific objection from any party for all those ones that I

14   read.

15             Now, I should, I guess, put on the record, as I --

16   as we discussed on -- whenever it was -- Thursday, this

17   doesn't include -- I mean, you all have further objections

18   that are preserved by virtue of your motions in limine.

19   It -- I had asked the parties to incorporate my prior

20   rulings into, kind of, where you are here.  So if you all --

21   if you have made a motion in limine directed at a document

22   that I already ruled against you on, that objection is,

23   obviously, preserved.  I wasn't asking you to renew those

24   same objections.  But the point is in light of the motion --

25   the -- my rulings on the motions in limine, what objections

1    remained.  So I don't know what to tell you.  I don't have

2    any specific objection to any of those that I read and I --

3    the whole point of today was to narrow the focus.

4         MS. HERNANDEZ:  So at Page 1 and 2 of the filing

5    that I filed, I objected to the fact that the exhibits -- I

6    don't have my glasses -- that it fails the basic test for

7    the admission of demonstrative evidence, they're not a fair

8    and accurate depiction or representation of what they

9    purportedly depict.  I didn't state that 189 times, but it's

10   a broad-based objection, and I have a basis for making that

11   objection.  The expert itself -- herself talks about the

12   problems with the data extraction from Telegram which

13   misreads the dates and times and that type of thing.  So I

14   made -- I understood that I was making an objection to the

15   entirety of the Telegram chat.  I don't know -- as I said,

16   I'd have to go back and look at which the Court deems to

17   have not been objected to.  Many of them include a series of

18   out-of-court statements by people who are not tools, as I

19   understood the Court's definition -- as I understood the

20   tools definition, who are not -- that are not co-conspirator

21   statements, that are -- I don't know what -- that -- they

22   don't come in as effect on the listener exception, as I

23   understand that.  And I cited evidence, which is a case,

24   interestingly enough, written by then Judge -- Circuit Judge

25   Garland in which he explains the problems with these hearsay

 1    exceptions, and particularly what he explains is that once

 2    you -- once -- these hearsay exceptions need limiting

 3    instructions, and it becomes a real problem in closing

 4    argument when the Government uses statements that were

 5    introduced not for the truth of the matter asserted.  So

 6    it's a huge thing.  So I believed that I was objecting to

 7    everything.

 8            THE COURT:  But you didn't -- I hear what you're

 9    saying.  But, again, my direction to all the parties was to

10    make particularized objections.  Now, if you have -- so I

11    don't know what to say.  I can't rule on just a generalized

12    sense that many of these things have the statements you're

13    talking about.  I read -- I went through and I ground

14    through all of them and, in many cases, it's not -- it's a

15    question of, for example, for these, if -- let's just take

16    an easy example.  If one of your clients is objecting -- is

17    responding to someone else -- right? -- then that -- there's

18    no way to understand intelligibly -- let's just say it came

19    in as a party opponent admission.  You need the context to

20    hear what the person was responding to; right?

21            MS. HERNANDEZ:  Well, the point is you cannot

22    tell, because these exhibits -- and the special agent states

23    it.  These exhibits don't -- on Telegram and on the phones

24    which the Government has in its possession and using the

25    Oxygen reader which the Government did not use for our

1    clients -- and I'm getting this information from the

2    agent's -- from the expert agent's emails to the

3    Government -- these do not show if there's a response to the

4    particular -- they just string along a bunch of statements.

5    You cannot tell from this whether that -- the statements are

6    in response to the earlier statement.  You would if they

7    brought in the phones and did it or if they had used the

8    phones and then showed -- because the phones -- Telegram

9    itself shows whether you are responding to a particular --

10   so I don't understand that this --

11           THE COURT:  If you have an obj- -- Ms. Hernandez,

12   you can also tell from context even if something isn't --

13   even if, electronically, there's no way to denote it's

14   specifically in response to another comment, it also may be

15   that a comment follows a prior comment in a way that it's

16   obvious that it's a response to it.  So again, I -- look --

17           MS. HERNANDEZ:  Again, I'm sorry, Your Honor.

18   So that's not accurate in many instances.  So if somebody --

19   my client will say LOL.  What is he LOL'ing?

20           THE COURT:  Right.

21           MS. HERNANDEZ:  The --

22           THE COURT:  So it's your job -- Ms. Hernandez,

23   it's your job, then, to find an example of that and say,

24   Judge, I object on that basis.  So it's not -- that's why

25   we're here.  So what I'm going to do is -- I'm not going to

1    waste everyone else's time who has gone through and not

2    objected to those things.  We're probably going to be

3    continuing this on the other side of lunch, and if you want

4    to be heard on any of these documents for which no other

5    defendant has an objection, I will hear you at that time,

6    but I'm not going to burn through the time of everyone else

7    here who has been through them and has not lodged an

8    objection because it -- to have you, sort of, just open it

9    up for the first time and thumb through and try to pick out

10   a document to make an objection to.

11              MS. HERNANDEZ:  Again, I did go through them, Your

12   Honor.

13              THE COURT:  Okay.

14              MS. HERNANDEZ:  I even spoke to the Government

15   about how, you know -- are you able to -- can you tell me

16   whether there was a response?  Can you tell me whether

17   there's -- it shows -- and they said, No, we cannot;

18   Cellebrite doesn't give us that information.  So I did look

19   through them, spent a lot of time.  It's, kind of, a -- the

20   way it was produced is, kind of, crazy because even though

21   there's -- it refers to page number, it wasn't -- the

22   numbers -- the documents weren't paginated, so you have to

23   hit and miss.  I did look through them, and I'm telling --

24   and I thought that my objection -- I'm sorry if I wasn't

25   clear in my objection.  I was making objection to the

1    entire -- the entirety of the exhibit because of the

2    problems that I see, this selecting out text messages.  In

3    other words, we're not getting every text message from -- on

4    any page.  We're not getting every text message or -- I call

5    them text messages.  They're Telegram messages.  We're not

6    getting every message.  We're just getting the ones they

7    selected.  So you cannot tell -- if my client says LOL, has

8    he read all of those?  Which message is he laughing to?  And

9    so the whole thing is not a proper demonstrative exhibit.  I

10    understood -- I'm sorry if I mis- -- if the Court -- if I

11    wasn't clear enough and I'm sorry -- I thought I was -- when

12    you object to the entire thing, I think that it comprehends

13    [sic] the individual ones, but I'm sorry if I -- I'll take a

14    look at what the Court listed and I'll bring examples to the

15    Court's attention.

16              THE COURT:  Okay.  I mean, I'm open to the concept

17    that you are saying, that there's missing context and you

18    can't tell whether A is responding to B.  I'm open to that

19    as an objection.  I just can't rule in a vacuum.  That's why

20    I asked the parties to let me know which ones.  Obviously, I

21    don't think the objection you're talking about applies to

22    every single document.  So I'd ask you to take a look.  I

23    mean, for example, many of them don't even have to do with

24    your client, and the other defendants have not objected.

25    So --

1          MS. HERNANDEZ:  In fact, you know, in -- the

2     Government expert, Ms. Cain, in an email that she sent to

3     the Government -- to some of the -- to Mr. Hanak, who's the

4     case agent, says, The issue is that Cellebrite simply cannot

5     handle Telegram the way that some of our other tools can.

6     It's the very worst, actually.  And she says, I notice that

7     the file was about 50 gig- -- the Telegram data is in

8     Oxygen.  And that's another program, and they didn't do an

9     Oxygen analys- -- Oxygen is similar to Cellebrite, and

10    they -- I know that they did Oxygen -- they -- that's --

11    Oxygen for one of the phones and they did -- not any of the

12    defendants.  They did Oxygen in the Oath Keepers case.

13          So here's another one.  They -- the "create date"

14    you're seeing in Cellebrite is a file system timestamp that

15    may or may not have any correlation whatsoever to when the

16    actual message containing the video was sent.

17          These are emails that Ms. Cain sent to, you

18    know -- to the -- to the Government.  There -- there's no

19    way to tell if this document was opened within the Telegram

20    application on the phone.  There would be a read receipt

21    appearing as a checkmark on the sender's device, indicating

22    that the recipient's device saw the message, but it does not

23    indicate if the attachment was actually opened.

24          So there is a perceived -- so she -- she's

25    pointing out all the problems.  His device had extensive

1    group threads which are not parsed correctly, nor

2    coherently, in Cellebrite.  I don't have any other cases on

3    your list, but I can pretty much say with certainty that

4    they will be missing or have wonky Telegram data, as well,

5    if you relied solely on Cellebrite to parse it.

6           These are text messages from February 9th, 2022,

7    and from April 2022 authored by Special Agent Cain, who is

8    going to be brought in -- so the whole thing says that the

9    Cellebrite analysis is wonky and will not -- are not parsed

10   correctly, nor coherently.  Cellebrite simply cannot handle

11   Telegram the way some of our other tools can.  It's the very

12   worst, actually.

13          So I am objecting to the whole thing.

14          THE COURT:  Okay.  Why don't I just quickly have

15   the Government respond to at least these overarching -- I

16   mean, I think some of the things -- the -- let me put it

17   this way.  Some of your objections strike me as data that --

18   well, let me just have the Government respond, at least to

19   start.

20          MR. MULROE:  Your Honor, Conor Mulroe for the

21   United States.

22          Just to put our position on the record, the agent

23   who sponsors these exhibits is going to testify that these

24   exhibits are fair and accurate reproductions of the contents

25   of the extractions of these phones and these chats that he

1    reviewed.  Our position is that Cellebrite is an industry

2    standard application that's a perfectly valid way of

3    extracting these phones.  And so there's no basis, along the

4    lines of what Ms. Hernandez is suggesting, to exclude these

5    exhibits.  And from what I understand, she's seeking to

6    exclude wholesale the entire library of Telegram exhibits

7    that make up part of the heart of this case and that were

8    produced to her in November and that we're just hearing

9    about now at this stage in the proceeding at trial.  So we

10   think that she is wrong on the merits, but in terms of

11   today, Your Honor, I think that the Court is right that this

12   is just not what we're here to do this morning.  We would

13   ask that we get to the particularized objections that some

14   of these defendants did file, that we hash those out.  And

15   if Ms. Hernandez needs to be heard more on this or needs to

16   file something supplemental, there will be time for that

17   later, but I think everything that she's been describing

18   this morning we would concede is perfectly legitimate

19   grounds for cross-examination of Examiner Cain or of any

20   other appropriate witness, but it's just not an argument for

21   excluding these exhibits and it's not the purpose of today's

22   proceeding.

23              THE COURT:  All right.

24              MS. HERNANDEZ:  Again, Your Honor, I think I -- I

25   think Special Agent Cain's statements contradict what the

1    Government just said.  Cellebrite is not the industry

2    standard for downloading Telegram.  It is the industry

3    standard for downloading phones.  And Oxygen -- she's -- I

4    get the name Oxygen from her emails.  This isn't something

5    that I knew.  And I went online and found Oxygen and they

6    talk about Telegram and how to download it.  And it's her

7    statements that are saying, These are the flaws with the --

8    and I will submit to the Court the series of emails that she

9    sent.  And you should know that we're also having some

10   dispute over the notice that the Government has provided for

11   Agent Cain because Rule 16 was amended December 1st to

12   require additional information, and we're going back and

13   forth --

14             THE COURT:  All right.

15             MS. HERNANDEZ:  The Government has not provided

16   the additional information with respect to Special Agent

17   Cain which may have resolved some of these issues --

18             THE COURT:  All right.

19             MS. HERNANDEZ:  -- but --

20             THE COURT:  All right.  So here's -- again, I

21   think, here's what we're going to do.  Again, I think I'm --

22   I'm preparing to get you all a ruling on this tomorrow.  As

23   I said, I think we're clearing away a lot of the brush, I

24   think, here today.  I've asked the Government to have a

25   witness that they can call tomorrow that doesn't have

 1    anything -- that is a non-Telegram witness so we can resolve

 2    that -- I mean, so we can fill the time that way.  And,

 3    Ms. Hernandez, I'll, you know -- again, I think it sounds to

 4    me, if the proffer of testimony to lay the foundation for

 5    the admission of these exhibits is proper, that some of the

 6    other things you've raised about "out of context" and all

 7    the rest could go to their -- a particular, you know -- if

 8    there -- if -- that -- the context is misleading or it would

 9    mislead the jury, I'm -- I'll hear you on a

10    document-by-document basis, but -- and if you're right and

11    they can't lay the foundation to admit the documents, well,

12    that's -- that's another issue.  But I think our time today

13    is best spent going through the particulars of each -- of

14    each proposed exhibit so we can get that process -- get

15    through that process.

16            So I've laid out -- again, I -- circling back to

17    Mr. Pattis's statement, if it would give the parties and

18    those parties that need to consult with a client a little --

19    if it would help speed our proceedings, what I'm going to do

20    is I laid out the ones for which I don't believe, other than

21    Ms. Hernandez's, sort of, overarching foundational

22    objection, there are any objections.

23            Let me just give you what I consider the other

24    categories here and what they fall -- what documents fall

25    into them, and I think that can guide our discussion going

1    forward.  It may -- and it may help the defendants figure

2    out where they want to make their stands and where they

3    don't.

4            I have -- so I have the following documents or

5    exhibits, kind of, all under the tools discussion.  They

6    are -- and, again, I'll hear both sides on this.  This is

7    going to be the heart of what we discuss today, I'm sure.

8    63, 86 --

9            MR. SMITH:  Your Honor, these are Dubrowski PDF

10   page numbers?

11           THE COURT:  They are the PDF -- I don't know who

12   Dubrowski is, but these are the PDF -- this is going from

13   the Government's chart that was circulated.  Correct.

14           MR. SMITH:  And it's the PDF page number in the

15   chart?

16           THE COURT:  Correct.

17           MR. SMITH:  Thank you, Your Honor.

18           THE COURT:  Yes.

19           MR. SMITH:  So 63, and then the next one was --

20           THE COURT:  63, 86 through 93, 152 and 153, 165,

21   169 and 170, and 194, 195, and 196.  Those are the ones I

22   see as implicating the tools that we can discuss all

23   together.

24           The set of documents that -- the set of proposed

25   exhibits that I would say I have questions about and I'm,

1    sort of -- I'm going to be looking to the Government to get

2    information and to explain to me their basis for admitting,

3    other than the tools, okay, are the following:  12, 16, 21

4    and 22, 24, 32 and 33 and 34 -- sorry, 32, 33, and 34, 41

5    and 42, 53, 75, and 98.  That's, kind of -- I'll be looking

6    to have the Government explain their theory of admissibility

7    for those documents.

8              And then the final -- I'm, sort of -- I'm putting

9    aside, again, Mr. Nordean -- Mr. Smith, the profanity

10    objections which, I know, you also have, and then I'm just

11    going to read a long list.  It's not quite as long as the

12    "no objection," but this is the list that I see as, as far

13    as I'm concerned, admissible in one way or another.  Again,

14    some of them would have only had a very -- maybe, only one

15    defendant objected to it.  I think the objection feels like

16    an "overrule" to me, and it may be that, in some cases, a

17    defendant objected solely for the purpose of pointing out,

18    Well, I don't have anything to do with this; I think a

19    limiting instruction is appropriate.  Sort of, hard to tell.

20    But this is that list of ones that, again, I think if a

21    defendant has -- feels very strongly about one of these,

22    I'll want to hear from you.  They are 1 through 11, 13

23    through 15, 17 through 20, 23, 25 through 30, 35, 43 through

24    46, 49 through 52, 55, 59, 61, 64, 66, 71, 83, 85, 97, 99,

25    101, 104, 106, 111 through 116, 124 through 127, 135, 138,

1    142 through 145, 147 and 148, 150, 154, 162 through 163, 192

2    through 193, and 197 and 198.  Again, those are the ones

3    that I'm, at this point, likely to admit over objection.

4         So my thought is if -- Mr. Pattis, to your point,

5    and to give the parties a -- just sense -- a chance to

6    absorb that, why don't we -- why don't I just step down and

7    just take a 10-minute recess for you to -- all to look at

8    that, decide, kind of, how you want to proceed.  I -- what I

9    would propose doing is hearing first about the ones I've

10   laid out in terms of tools, because I think that's the most,

11   in some ways, creative or contentious, sort of, theory; hear

12   from the Government on the tools; then hear, also -- and the

13   defense, obviously -- hear on the smaller set that I want to

14   hear from the Government on in terms of, sort of, what I'm

15   looking for [sic] them for argument and a basis for starting

16   with the category that begins with No. 12; again, hear from

17   the defense; maybe, at that point, we take a break for

18   lunch; and we come back and there's this, kind of, larger

19   group that I've looked through and think I'm leaning "admit"

20   on, but I'll hear from the defense on any aspect of those

21   they think is appropriate.

22        So let's just take 10 minutes to allow you to do

23   that.  I'll come -- I'll be back on the bench in 10.

24        THE DEPUTY CLERK:  All rise.  This Honorable Court

25   stands in recess for 10 minutes.

1           (Brief recess taken.)

2           THE DEPUTY CLERK:  We're back on the record in

3    criminal matter 21-175, United States of America v. Ethan

4    Nordean, et al.

5           THE COURT:  All right.  So Mr. Mulroe, why don't I

6    first hear you on the tools -- on the documents that I

7    identified as, sort of, tools theory-related exhibits, and

8    then I'll hear from -- yes, Mr. Pattis?

9           MR. PATTIS:  Judge, I compared the list, and I

10   don't know that -- I don't have, according to the chart the

11   Government provided us, the following items listed as

12   offered on a tool foundation:  63, 152, 153, 169, and 170.

13   And in addition, there's an additional tool foundation noted

14   at 197.  So I only say that because, if we're going to

15   discuss the tool foundation, I wasn't sure that we had the

16   right universe of exhibits.

17           THE COURT:  I don't know what you mean by you

18   don't have them.

19           MR. PATTIS:  I have a chart.  I don't recall the

20   day I was given it.  It has in one column PDF page and then

21   it begins with 1 and proceeds, with few omissions, to 198.

22   The Court, I think, at the break, said that it was going to

23   consider as a class those items relating to tools and gave

24   us a series of PDF numbers.  One is 63.  However, the third

25   column -- substantive column down refers to mental state of

1    tools, and I don't see a checkmark in 63 in that column.  I

2    see three other foundations, but I don't see a tool

3    checkmark.  I don't know if I'm working off the wrong chart.

4            THE COURT:  I see what you're saying.  Now, look,

5    the part -- let me say this.  That's my -- the categories

6    that I just gave are based on my review of the document.

7            MR. PATTIS:  Okay.  Got it.

8            THE COURT:  So it may be that the Government tells

9    me, Oh, no, no, no, Judge, that's not our theory, or

10   whatever, but that's what that reflects.

11           All right.  Mr. Mulroe -- and you can let us know

12   if -- kind of, along the lines of what Mr. Pattis was

13   saying, if there's additional exhibits you think implicate

14   the tools theory, let me know.  I mean, I think there were

15   some that, on first glance, you might -- I might have

16   thought they did, but then, when I looked at them, they

17   contain, for example, a statement of one of the defendants

18   in a way that I thought it actually wasn't tools.  But

19   anyway, let me hear from you.

20           MR. MULROE:  Yes, Your Honor.  I'll go through the

21   page numbers that you've identified and then, if we need to

22   go and mop up any at the end, I can only keep so many

23   numbers in my head at one time.

24           But to start with Page 63 of the PDF which is

25   Government Exhibit-537-23, this is a message from Telegram

1    user Aaron of the Bloody East, and we noted, I think, in the

2    email by which we transmitted the chart that we expect to

3    show that this individual actually is a co-conspirator, not

4    a tool.  So I don't think we checked the tools column for

5    this one.  This user, Aaron of the Bloody East, is a

6    gentleman named Aaron Wilkins.  He was part of the

7    leadership structure of the Ministry of Self-Defense.  He

8    was one of the regional commanders, so not the top-tier

9    leadership, but, kind of, a mid-tier leadership, and part of

10   the small leadership chat group that is marked as

11   Government's Exhibit-501 and some others.  So he's one of

12   the organizers of the Ministry of Self-Defense.  He's very

13   active in the leadership chats.  He's active on the video

14   briefing that they hold to instruct the members who have

15   been recruited.  He says things along the lines of, There's

16   always going to be an objective.  And then on the day of the

17   6th itself, he sends a number of messages that are

18   encouraging and directing, telling members to push inside,

19   throw rotten eggs at people, basically, get into the Capitol

20   Building.  And then he himself actually is not present in

21   Washington, D.C., because he had to work, but he jumps in

22   the car and tries to get there as quickly as he can to join

23   in the attack on the Capitol.

24           So based on all that, we would submit that he's a

25   co-conspirator, and if the Court were willing to

1    provisionally make that finding, then we believe that this

2    would be admissible under the mental state of a

3    co-conspirator basis.  So again, like almost all the other

4    exhibits we're proffering here, this is a non-hearsay

5    statement.  We're not offering this to prove that our

6    country is, in fact, run by traitors.  Rather, this shows

7    what this alleged co-conspirator believed and the types of

8    views that he expressed.  And we think it's significant that

9    he was chosen to be one of the leaders of the Ministry of

10   Self-Defense, having expressed views like the one that's

11   captured in this exhibit.  We think that's relevant to the

12   jury because it shows them the type of Proud Boys who were

13   brought in and selected for these leadership positions.  You

14   know, they were not the drinking club, peaceful, social club

15   type of Proud Boys.  They were the ones who wanted to get

16   out there and do politics and do so in an aggressive and

17   violence-oriented way.

18            THE COURT:  Is -- have you just proffered to me,

19   then, all the facts from which you -- you request that I

20   make a preliminary finding that he's a co-conspirator?

21            MR. MULROE:  I would say that that was a summary

22   of the facts, Your Honor.  I think we -- if the Court

23   wishes, we could go through the exhibits themselves and do

24   an item by item of all of his various statements that we

25   think show his involvement in the conspiracy, but those

```
 1    are -- I guess I would call them the greatest hits.

 2            THE COURT:  I mean, I -- well, when you say all

 3    the exhibits, you mean the exhibits that I already have

 4    before me here?  Or no -- other exhibits?

 5            MR. MULROE:  The ones you have, plus some others.

 6    So I meant to flag this at the outset, Your Honor.  Agent

 7    Dubrowski, who's the special agent who's going to be

 8    introducing the Telegram exhibits, is the witness that we

 9    would intend to recall subsequently in the trial.  The set

10    of exhibits that we've supplied here making up the first

11    part of Agent Dubrowski's testimony go right up until,

12    basically, midnight, the morning of January 6th.  So this is

13    the entire lead-up.

14            THE COURT:  Right.

15            MR. MULROE:  And then we would intend to recall

16    Agent Dubrowski subsequently in the trial to introduce more

17    Telegram messages and accompanying exhibits throughout the

18    day of January 6th and in the days and weeks that follow.

19    So we're bifurcating his testimony.  And, certainly, some of

20    the evidence in support of this person's involvement in the

21    conspiracy can be found in this set, but once you get to the

22    day of, which is, you know, some of the very powerful

23    evidence of direction and desire to participate, that would

24    be in the next set.  I can show them here, if that would be

25    helpful, but --
```

1          THE COURT:  Well, I do think -- let's put it this

2     way.  Anyone who you want me to conclude, at least

3     provisionally, is a co-conspirator, it seems to me that's a

4     leap -- I mean, that -- I would ask you to just submit

5     all -- everything you want me to consider on that basis.  I

6     have -- obviously, I can look and see the evidence you have

7     here before me now.  If there's additional evidence, you

8     know, submit it to me this evening so I have a chance to

9     consider it.  I -- because I do think that's, you know --

10    that's a -- that's a leap that I need to see all the

11    evidence the Government wants to put forward in that regard.

12         All right.  So you -- this is one where you would

13    argue it's not really -- it's a co-conspirator issue as

14    opposed to a tool issue?

15         MR. MULROE:  I think we probably wouldn't call him

16    a tool.  I think that's right.

17         THE COURT:  Right.  Okay.  Okay.

18         MR. MULROE:  So Your Honor, the next one is a set

19    that, at least in our view, go together.

20         THE COURT:  Right.

21         MR. MULROE:  And that's 86 through 93.  So these

22    are all statements from subordinate members of the Ministry

23    of Self-Defense.  And these are statements that were made as

24    part of the ongoing discussion in the chat very shortly

25    after the group's formation.  Now, I think -- again, I would

1    emphasize that these are non-hearsay.  So none of these are

2    being offered for the truth of any statement that's

3    asserted.  I think in most cases, there isn't even something

4    that's being asserted.

5            THE COURT:  What -- can you just give me the --

6    I'm having trouble in my binder linking up the number in the

7    PDF to the binder of things that I have.  What is the date

8    of the exhibit -- of, let's say, 80-, you know -- 86?

9            MR. MULROE:  So 86 is Exhibit-503-5, and that's on

10   December 27th --

11           THE COURT:  All right.

12           MR. MULROE:  -- which is 8:23 p.m.  And I'll note

13   these don't go strictly chronologically.

14           THE COURT:  I know, I know, but they --

15           MR. MULROE:  So I can give you the exhibit number

16   in each case.

17           THE COURT:  Okay.  I'm there.  I'm with you.

18   Yeah, I had set these off.  All right.  Go ahead.

19           MR. MULROE:  All right.  So Your Honor, given that

20   these are non-hearsay, I think some of the defendants have

21   raised the idea of adopted admissions, which would be under

22   Rule 801(d)(2)(B).  I think that's not quite what we're

23   doing here.  We're not suggesting that the defendants have

24   affirmatively adopted these statements.  Rather, we're

25   submitting these statements because they show the members'

1  belief that the purposes of the Ministry of Self-Defense

2  included committing unlawful, aggressive violence.  And then

3  the leaders' failure to rebuke those members who have

4  expressed that sentiment, we would submit that failure to

5  rebuke them can reasonably be taken as tacit approval.  So

6  we understand that that argument depends on a certain

7  factual predicate, and Your Honor identified the type of

8  facts that you would need to see as part of the

9  December 14th oral ruling, transcript Page 26.  It was

10  things like the size of the chat, the number of people in it

11  and how frequently the leaders -- defendants and their

12  admitted co-conspirators responded to things in the chat,

13  which we take as, basically, trying to get a sense of how

14  engaged were the leaders actually in this discussion.  Was

15  it just, kind of, transpiring without their notice or were

16  they actually monitoring and responding and engaging with

17  it?

18          I think now that Your Honor has the exhibits in

19  front of you, we're prepared to lay that foundation.  And so

20  we laid a bit of that out in the filing, but I would

21  emphasize --

22          MS. HERNANDEZ:  I'm sorry, Your Honor.  What is

23  the non-hearsay basis?  I missed that.  I just -- I'm trying

24  to follow along.

25          THE COURT:  Mr. Mulroe, do you want to just

1    quickly summarize -- it's for the members' -- the state of

2    mind of the members of the MOSD and the purported failure of

3    the defendants in this case, or at least some of the

4    defendants, as leaders, to rebuke what was being said.  And

5    the state of mind being that they were prepared to commit

6    violence and crimes on behalf of the goals of the MOSD and

7    that the leaders' failure to rebuke them was somehow tacit

8    approval of that.

9         MS. HERNANDEZ:  So does that mean the Government

10   considers --

11        THE COURT:  Ms. Hernandez, I'll hear from the

12   defense.  Let --

13        MS. HERNANDEZ:  No, I'm trying to --

14        THE COURT:  No, and I'm trying to run the

15   courtroom.

16        Mr. Mulroe?

17        MR. MULROE:  Your Honor, I think you summed it up

18   well.  And so we would point to the following facts which, I

19   think, are evident in the exhibits as the basis for this

20   theory.

21        So the Ministry of Self-Defense was a relatively

22   small, highly selective group made up of hand-picked members

23   who were specifically invited by the defendants and their

24   co-conspirators based on important attributes like how they

25   would, quote, fit in with the group, how much they could be

1    trusted, and their perceived ability to follow orders.

2    These members were selected based on those criteria, and

3    then they were told repeatedly that they needed to stay on

4    topic in this chat; that the group has a mission; and if you

5    want to talk about something else, go take that elsewhere,

6    because the purpose of this group is to focus on the

7    mission.  Now, the leaders enforced that directive on

8    multiple occasions, as we laid out in our filing.

9    Exhibit-501-41 shows an instance where members of the group

10   were talking about whether women should be allowed to join,

11   and they're told, Stay on topic.  And the leaders complain

12   about that in their separate group.  They say, Hey, even in

13   this super-secret chat, we still can't get the guys to knock

14   it off about letting women in.  That's one example.

15            Another is at Exhibits-505-20 and 21 where a

16   member called Ash Barcosiba [ph] expresses some concern

17   about, when they go there on the 6th and they're not in

18   colors, there might be Proud Boys from, kind of,

19   Nazi-leaning factions that make them look bad and they can't

20   defend themselves and disavow these guys.  And the leaders

21   respond emphatically to shut that down.  Johnny Blackbeard,

22   the Telegram handle, is co-conspirator John Stewart.  He

23   says -- I'm paraphrasing -- but, Take that somewhere else.

24   This group has a mission.  You can either get with it or

25   not, but don't bring that in here.  Then Tarrio chimes in.

1    He says, Focus.  And then another co-conspirator, Noble

2    Beard, Jeremy Bertino, puts it a little more diplomatically,

3    but he says, you know, That's fine if you think that; I

4    agree with you; but that's not what we're talking about

5    here.  We have a mission.

6            There's a video -- so it's not one of the Telegram

7    chats, but it's part of the video briefing.  We've got it

8    clipped at Exhibit-613L.  This is Enrique Tarrio addressing

9    the membership during the big meeting that they held to lay

10   out all the rules and procedures.  And he says the same

11   thing:  This chat is not a place for banter.  If you want to

12   go off topic, you know, you're going to be warned and then

13   you're going to be removed.

14           So this is repeated reminders to these members

15   that they need to stay on topic and things that don't have

16   anything to do with the purposes of the group, take those

17   somewhere else.

18           We think that we've made a showing, Your Honor,

19   that the leaders were, in fact, regularly participating in

20   these discussions.  They were engaged in the conversation to

21   an extent where, if members were going off topic, the

22   leaders were in a position to see that.  And some of that

23   is -- I guess the quantitative analysis that we laid out in

24   our filing.  So these were not gigantic social media groups.

25   These were relatively small chat groups where it was small

1    enough that, you know, you could keep up with the

2    discussion.  And, as we laid out in the numbers, the

3    percentages of messages sent to the chat showed that these

4    leaders collectively were actually more active than you

5    might expect based on the numbers.  They were more active

6    than the average member based on the frequency and the

7    number of messages that they sent.

8            And, of course, sometimes they do respond directly

9    to things.  So we gave one example in the filing where a

10   member posts a voice message about how it's great to be

11   organized and you can organize in large groups and small

12   groups.  And he says something we think is significant in

13   terms of self-defense versus aggression.  He says that,

14   Small groups will be really beneficial when we want to do

15   seek-and-destroy-type rallies like we did in D.C.  And

16   that's a message that Zachary Rehl responds directly to.  He

17   says, Yeah, we're going to be a lot more organized.  That's

18   part of the purpose of this group.

19           I'm paraphrasing.  But all that, Your Honor, we

20   think, supports the inference that these leaders were

21   engaged in the discussion.  The level of engagement is going

22   to allow this jury to conclude that when somebody says

23   something in the chat, at least one of the leaders would be

24   in a position to see it; probably most of them, perhaps all

25   of them would be in a position to see that and would be in a

1    position to admonish the member if that statement was

2    inconsistent with what the leadership believed to be the

3    purposes of the group.  And --

4            THE COURT:  Go ahead.

5            MR. MULROE:  And so, therefore, when you have

6    members making statements like the ones in these exhibits

7    about how it would be great to sneak up on Antifa and break

8    their legs; when they talk about how much bail money they're

9    going to need; when they post a music video that says that

10   protest time means punch them in the face, and none of these

11   leaders chimes in to say, Hey, that's not what we're about

12   here, guys -- we think that that reasonably supports an

13   inference, for the jury and for the other members of the

14   group, that this was tacit approval by the leadership.  That

15   is the expression of a shared understanding, that even

16   though the name of this group is Ministry of Self-Defense,

17   everyone in the group knew what it was really about.

18           And the last thing I want to mention here, Your

19   Honor, is that that much is plain, I think, just on the

20   evidence on its face.  But it becomes even more important

21   for us to make that showing, even more central to the case

22   based on how some of the defendants have opened.  I'll just

23   quote from two of the openings.  Mr. Rehl's opening, counsel

24   said, Tarrio decided he was going to create the Ministry of

25   Self-Defense.  Now, maybe, it's tongue-in-cheek.  Maybe it's

1    pomposity or something else.  Whatever.  Mr. Tarrio said, We

2    need a top-down hierarchy.  We cannot have this chaos every

3    night when we have rallies.  We don't want any violence.  So

4    the Ministry of Self-Defense, they had a plan.  Let's bring

5    in some hand-picked recruits, people that we know aren't

6    wild, crazy, drunken morons.  So if their position is that

7    the purpose of this group was to bring in people who were

8    not wild, crazy, drunken morons, we should be able to show

9    who the people in this group are.  The opening by

10    Mr. Tarrio, counsel said, The Government has twisted and

11    perverted what that whole chapter and chat was for.  The

12    purpose of that chat was actually for the safety of the

13    Proud Boys.  It wasn't to find real men to do violence.

14    That wasn't the purpose of the chat.  The point of that was

15    to try to eliminate these confrontations that they had with

16    Antifa in the past.

17         So those are the claims the defendants have made.

18    And we think we're entitled to show what actually happened

19    in this chat, because up until the morning of January 6th,

20    the Ministry of Self-Defense, as an entity, only existed in

21    these chats, you know?  You can't go watch their meetings.

22    We have the video one we'll show, as well.  But it was

23    largely a digital, virtual existence.  And so to the extent

24    that there is a reality to this organizational structure,

25    it's found in the discussions.

```
 1            THE COURT:  Just one -- a couple of conceptual
 2   responses.  I did rule prior, as you note in your
 3   submission, that the -- at least the state of mind of
 4   someone who you all characterized as a tool who marched with
 5   the defendants that day, you know, crossed the barriers that
 6   day, and all the rest, was relevant.  That was someone whose
 7   conduct was closely rooted to the defendants' behavior on
 8   January 6th and, obviously, given -- and much -- and very
 9   closely rooted to whatever you want to -- however you want
10   to describe the conspiracy, very closely rooted to how that
11   conspiracy played out.  The question of -- I suppose your --
12   just the way you put your filing together, you think that,
13   you know, the Ministry of Self-Defense -- I understand your
14   theory -- it's still a -- someone who participated in that
15   chat as a tool, you all would say it's still not closely
16   rooted enough and close -- not -- let me put it this way.
17   Without this theory of tacit acceptance, it's not closely
18   enough rooted to the defendants themselves and their conduct
19   for it to come in simply because it was something a
20   purported tool said back in December?  In other words, does
21   that state of mind of a tool, without more, get you these
22   things admitted without the tacit approval theory or do you
23   think -- is your argument that that probably stretches
24   relevance too far?
25            MR. MULROE:  I think, Your Honor, that that
```

1    actually would be a separate and additional basis on which

2    to find the relevance of these things, and it's a little bit

3    different from the instance where this came up earlier with

4    Mr. Fonticoba, who had just come back from the Capitol,

5    effectively, because this is on the other side of that key

6    event, the attack on the Capitol.  It's, you know,

7    several -- maybe a week or two before.  But I think that the

8    same reasoning applies, and here's why.  At the time that

9    these discussions were taking place, January 6th had not yet

10   happened, but the Ministry of Self-Defense, its very purpose

11   was to bring together the prospective tools that would be

12   brought to bear on the Capitol on January 6th.  And so

13   there's a lot of discussion about how January 6th is going

14   to be the first time they're going to be able to deploy this

15   thing.  And the whole tools theory, really, you know, finds

16   substance in the messages where they make clear to the guys

17   that, You might not know what the goal is, you might not

18   know the whole plan, but your job is to turn off your brains

19   and follow.  And so I should be clear that some of the

20   participants in these chats do not end up going to

21   Washington, D.C. on January 6th.  Some of them do.  But I

22   think our position would be whether or not they end up

23   making the trip, they were, at the time the discussions were

24   taking place, viewed by the leadership as prospective tools.

25              THE COURT:  Okay.  And you're not going to -- and

1    you're not prepared to say, This, you know -- Exhibit-123,

2    that person ended up showing up at the Capitol; Exhibit-345,

3    that person did not, or anything along those lines?

4              MR. MULROE:  Some of them, we know for certain,

5    Your Honor.  So Gabriel PB, who appears in, I think, some of

6    the later exhibits -- I could get the numbers --

7              THE COURT:  But --

8              MR. MULROE:  -- so 505-18, 507-10, and 507-11 --

9              MR. SMITH:  Could you use the PDF page number from

10   the Dubrowski PDF?  Because I think the judge is using those

11   numbers.

12             MR. MULROE:  I could give the PDF page or the

13   exhibit number or both, Your Honor.

14             THE COURT:  The PDF page would be helpful for

15   purposes of today.

16             MR. MULROE:  So PDF Page 138, messages from

17   Gabriel PB, PDF Page 194, 195.  That is Gabriel Garcia who

18   is himself charged, and he was part of the storming of the

19   Capitol.

20             Another Telegram user, E-Jeezy [ph].  He's also on

21   Page 195.  That is Eddie George, another individual who's

22   charged.

23             There are several others who were also members of

24   the Boots on Ground Telegram group which, by design, was for

25   guys who were only -- the ones who were going to be there.

1    And so we think that, certainly, that compels an inference

2    that they were there, and that would include J-Bone and

3    Juggernaut, and El Chapo and the Vividic [ph].

4            THE COURT:  All right.

5            MR. MULROE:  So, you know, I think there are

6    others that, based on the chats, we could say with

7    confidence that they were not there.  President Leo

8    Kuznetsov [ph], I think, would be one of those, and some

9    others.  But I think that, you know, looking at it

10   prospectively, when the group is being formed, when the

11   tools are being selected, and, so to speak, trained and

12   instructed, I think we wouldn't view it as being dispositive

13   or even all that important whether or not they ended up

14   making the trip or not because what matters at this point is

15   they're marshaling their men for the mission.

16           THE COURT:  The other thing I just wanted to

17   mention, before I hear from the defendants on this set, is

18   there are a couple -- or, I guess, there are a few more sets

19   of tools you are going to want to run through.  But, you

20   know, there are a few like 5- -- to stay with our -- 90 --

21   PDF 90, I don't think -- that one -- because of the presence

22   of Mr. Rehl responding to that one, I'm not sure that,

23   really, that admission of that one really depends on a tools

24   theory.  That's why I didn't include it in my list, just

25   because you have Mr. -- you have someone, sort of, laying

1    out the need to get better organized and all that, and then

2    you have, pretty quickly, Mr. Rehl responding here, talking

3    about organizing things and, you know, that would be

4    announced soon and whatnot.  So in my view, that one -- I

5    mean, Mr. Rehl may have arguments that -- for why it

6    shouldn't come in, but I don't know that its admission

7    depends on a tools theory.  Is that fair?

8         MR. MULROE:  I think that's probably right.  I

9    think that one would survive, even if you were to reject all

10    of our arguments on the others.  I do think that that one is

11    worth considering along with the others just because of the

12    fact that Rehl chimes in here helps buttress the inference

13    that the leaders were actually paying attention to these

14    things and --

15         THE COURT:  Right.  Okay.  Fair.  Fair.

16         MR. MULROE:  And, Your Honor, I'm sorry.  I didn't

17    go number by number.  So I don't know if there are

18    particular page numbers that you identified that you might

19    still have questions about.  I think the reasoning, kind of,

20    applies to all the --

21         THE COURT:  No -- yeah, I think that's fair.  And

22    I think you had laid out -- that was a set of them that

23    began at a certain point and ended at, like, 93?  Or no --

24    did you talk about a broader list?  Or were you talking

25    about all the rest of them?

1          MR. MULROE:  So yes, I was, kind of, specifically

2     addressing 86 through 93 which is --

3          THE COURT:  Right.

4          MR. MULROE:  -- early in the formation of the

5     Ministry of Self-Defense.  152 and 153, I think, all the

6     same reasoning would apply.  These are just closer in time

7     to January 6th.  So these are on January 3rd.  And here,

8     again, we do have Zachary Rehl chiming in.  So those are the

9     -- those are like the previous one Your Honor identified.

10         MS. HERNANDEZ:  I'm sorry.  Which number was that?

11         MR. MULROE:  Those are 152 and 153.

12         THE COURT:  Mm-hmm.

13         MR. MULROE:  165 is a MOSD group again,

14    January 4th, although this one, I would note, is one of the

15    members asking a question:  Noble Beard, is Biggs or you

16    going to give us at any point tonight what our task is or if

17    it's aborted and we are just going back -- or are we just

18    going as patriots, no covert PB shit?

19         THE COURT:  Yeah.

20         MR. MULROE:  In the next exhibit --

21         THE COURT:  Can I just -- on that one, I do think,

22    to the extent both of your theories here are, sort of, "not

23    for the truth of the matter asserted" theories, that one

24    stuck out to me as you really want -- I mean, it seems to me

25    what the Government's trying to do is suggest that there was

1    "covert PB shit."  And so I think that one might not come in

2    under any of your theories because it's a -- it's -- you

3    want it for the truth of the matter; isn't that fair?

4              MR. MULROE:  I think that we are --

5              THE COURT:  I mean, it's a question, but it's,

6    sort of, an implied statement that there is such a thing as

7    "covert PB shit."

8              MR. MULROE:  I think what's most relevant about

9    this exhibit, Your Honor, is that it's a question that, on

10   the next page, 166, Ethan Nordean answers.

11             THE COURT:  Let me just -- this is one where,

12   again, I'm, sort of -- I should have cross-referenced the --

13   what date are we on?

14             MR. MULROE:  January 4th.  And so the question is

15   at Exhibit No. 510-8.  And the answer is 510-9.

16             THE COURT:  Well, I have read them all.  Why don't

17   you just go ahead and -- as I recall, the issue there might

18   have been that -- isn't it a pretty far -- this is, sort of,

19   like, what, I think -- the issue that Ms. Hernandez had

20   raised.  I mean, it's a little bit of a stretch in terms of

21   time, isn't it?  I don't have it in front of me.

22             MR. MULROE:  I think it's about dinner.

23             THE COURT:  That's my memory.

24             MR. MULROE:  I think it's 70 minutes in between,

25   but the message from Nordean is -- does appear from

1    context to be directly responsive to the question.

2            On the point about the "covert PB shit," I think

3    that, you know, perhaps that is an assertion that's embedded

4    in the question.  I don't know that that's all that

5    important from the Government's perspective, because it's

6    very clear from all the other messages that they were told,

7    Don't go in colors, which we take to be the covert -- I

8    think what's significant here is that this indicates that

9    the rank-and-file membership was actively looking to the

10   leadership for direction as the 6th grew closer and closer.

11   And just for context, this was when Enrique Tarrio's arrest

12   had thrown the plan into some uncertainty for some of the

13   members.  And so the fact that this member is looking for

14   direction from the senior leaders, waiting for orders,

15   adhering to that expectation that they turn off their brains

16   and follow is relevant and then becomes all the more

17   relevant when Nordean does, in fact, give them a directive

18   that, We're planning ahead as if the rally is continuing.

19            THE COURT:  I guess my point is you only -- you

20   probably get 95 percent of that just from the Nordean

21   exhibit.  I -- yes, it doesn't show them looking to them,

22   but you'll have -- you have a lot of exhibits making clear

23   that, at least from the leadership's perspective, they were

24   to obey leadership, and you have him giving that

25   instruction, but I take your point.  I take your point.

```
1              All right.  How about 1- -- and then as -- 169 and
2     70.  Maybe there's nothing original to be said about these
3     two, but those are the next two I have on my list at least
4     that turn on the tools theory.  Again, that's -- well, to
5     be -- 509-5 and 510 --
6              MR. MULROE:  Right.  So 169 is Aaron of the Bloody
7     East again, and I -- we will submit --
8              THE COURT:  Okay.
9              MR. MULROE:  -- some additional exhibits to
10    substantiate his status as a co-conspirator.  I would note
11    that this is a different context to the discussion.  This is
12    in the MOSD leaders group.  So you can see from the plus-six
13    bubble at the top, this is a much smaller chat where the
14    leaders were in direct contact with one another.  And so for
15    Aaron of the Bloody East, as one of the regional commanders,
16    to be reacting to Tarrio's arrest in this way by saying
17    "F these pigs; time to use black bloc tactics," we think, is
18    relevant to the state of mind of the leaders, including
19    Aaron, and not so much under a tools theory.
20             THE COURT:  Okay.  And then the next, really, I
21    had -- the next three I had were 195 through 196 at the very
22    end which also felt like they turned on a tools theory.  To
23    be clear, I guess, 507-10, 11, and 22.
24             MR. MULROE:  Right.  So pages 194, 5, and 6 --
25             THE COURT:  Yes.
```

1           MR. MULROE:  -- of the PDF.  I think these go with

2      the earlier set; that these are expressions of desire for

3      violence, more acute in a way, because it's so much closer

4      to the date of the 6th.  And those are by Gabriel PB who, as

5      I said, is Gabriel Garcia, who actually did take place and

6      storm the Capitol.  The next exhibit, 195, is Garcia, again,

7      and Eddie George.  And then 196 -- I actually think that

8      we've decided not to use 196, but that would be further

9      tools evidence, albeit from somebody who was not present at

10     the Capitol.

11           THE COURT:  Okay.  So you're withdrawing --

12           MR. MULROE:  We'll withdraw 196 --

13           THE COURT:  196.

14           MR. MULROE:  -- which is Exhibit-510-22.

15           THE COURT:  All right.  Anything more on, sort of,

16     tools or exhibits that you think implicate the tools theory

17     before I let the defendants have at it here?

18           MR. MULROE:  Court's indulgence just one moment?

19           THE COURT:  Sure.

20           MR. MULROE:  Just one last point, Your Honor, in

21     terms of the tools actions on the ground.  Mr. McCullough

22     has reminded me that Eddie George, E-Jeezy [ph] in the

23     chats, followed directly behind Defendant Biggs in his

24     second entry into the Capitol from the east side.  So that

25     is an especially proximate relationship between the

1    defendant's conduct and this tool in particular.

2            THE COURT:  Okay.  All right.  Let me -- and let's

3    just do it this way.  It's worked so well on cross.  Let me

4    just hear from the defendants in the order -- the usual

5    order in the indictment.  So we'll start with Mr. Nordean.

6            MR. SMITH:  Thank you, Judge.

7            So on the tools category that Mr. Mulroe just went

8    through, we have legal and factual objections, and we think,

9    maybe, best way to illustrate them is to focus on one or two

10   examples and extrapolate from there.  So where we would ask

11   the Court to focus first is PDF Page 194 which is Government

12   Exhibit-507-10.  And so legally -- while Your Honor is

13   flipping to that page -- there's no precedent for the manner

14   in which the Government is attempting to use non-defendant

15   out-of-court statements.  And then, factually, our argument

16   would be that even if the Court were to accept some of these

17   theories, they wouldn't apply on their own terms to Nordean

18   for a couple of reasons.

19           So let's -- starting with PDF Page 194, you can

20   see at the bottom of the page, Your Honor, a statement from

21   an individual named Gabriel PB that says, Yes, sir; time to

22   stack those bodies in front of Capitol Hill.

23           So the first argument you heard from Mr. Mulroe is

24   that these statements are not used to prove their truth.

25   They're not being introduced for their truth.

```
1                   THE COURT:  Under no theory --
2                   MR. SMITH:  Under any of their theories.
3                   THE COURT:  There is no theory in which any of
4        these --
5                   MR. SMITH:  Yes.
6                   THE COURT:  -- tools statements come in for their
7        truth.
8                   MR. SMITH:  And so, Your Honor, if Your Honor
9        looks -- I think Your Honor kind of touched on this subject
10       yourself, but if we look at the statement: Yes, sir; time to
11       stack those bodies in front of Capitol Hill, this is not
12       being used for a non-truth purpose.  This is being used to
13       show that a plan that the Government is attempting to show
14       existed involved stacking bodies in front of Capitol Hill.
15       Now, the way that Mr. Mulroe described it is this is the
16       mental state of a tool.  I don't believe that Mr. Mulroe
17       said that Gabriel PB was a co-conspirator.  This is the
18       mental state of a tool.  There is no hearsay exception for
19       the mental state of a tool.
20                  THE COURT:  Well, let's just -- let me pause you
21       on that, though.
22                  MR. SMITH:  Yeah.
23                  THE COURT:  Right.  There's -- but there is a
24       hearsay exception for something that's not -- I mean, the
25       point, I think, is this.  This is the theory; right?
```

1    There's no hearsay exception for that.  Right.  But there is

2    a hearsay exception for things that are not introduced for

3    the truth of the matter asserted.  And then the question is,

4    okay -- so that's one barrier.

5                MR. SMITH:  And --

6                THE COURT:  And the second barrier is relevance.

7    So --

8                MR. SMITH:  So --

9                THE COURT:  Right?  I mean, you've already said

10   you think, No, this really is for the truth, and -- okay.

11   And if it's -- I mean, that's one question.  And then the

12   second question is, is it relevant?

13               MR. SMITH:  So Your Honor, the statement "sir,

14   it's time to stack bodies in front of Capitol Hill," we

15   would argue, is not a mental state.  I don't understand what

16   the argument would be for saying that's a mental state.

17   That's a statement.  That's a statement -- that's a

18   statement involving what this purported plan the Government

19   is attempting to show is.  That's not a mental state.  A

20   mental state is, I'm angry.  I'm upset.  I'm --

21               THE COURT:  No, no, no, no --

22               MR. SMITH:  -- is a mood.

23               THE COURT:  Hold on.  Hold on.  Hold on.  Those

24   are direct statements of mental state.  There are --

25   routinely evidence is admitted that inferentially shows a

 1    state of -- a relevant intent, a relevant motive, you

 2    know -- all those kinds of things.  So I think, you know,

 3    you're cabining that pretty -- pretty narrowly.

 4            MR. SMITH:  So Your Honor, if -- that is correct.

 5    If there were statements saying, I can't believe that a -- I

 6    can't believe that you didn't bring the mail in today,

 7    exclamation point.  The state of mind is -- the statement is

 8    not being used to show where mail was moved or not; it's

 9    being used to show the state of mind of the declarant, which

10    is anger or surprise or shock.  But there is some argument

11    as to why the state of mind of a person is relevant for the

12    case.

13            Here, what you have is the Government simply, sort

14    of, using the phrase "state of mind," which is a category of

15    evidence, but not tying that factually to some argument as

16    to relevance.

17            THE COURT:  But --

18            MR. SMITH:  So we have --

19            THE COURT:  Let me just -- in theory, if there

20    were -- put aside -- I mean, we have, you know, party

21    opponents.  So this doesn't really -- but if the night

22    before a crime, there's a statement that -- of someone who

23    says, I really want to commit that crime tomorrow --

24    right? -- that's -- putting aside party, you know -- the

25    other ways in which it might come in, that would come in,

1    right, as a statement of relevant intent?

2            MR. SMITH:  So state -- I understand state of

3    intent to be somewhat different than a state of mind, but I

4    didn't hear Mr. Mulroe suggesting that this is admissible

5    because it shows an intent to stack bodies in front of

6    Capitol Hill.  And I think we didn't hear that from the

7    Government because there is no plausible argument that this

8    individual wanted to stack bodies in front of Capitol Hill.

9    So it wouldn't be a statement of intent, Your Honor, because

10   no one is suggesting Gabriel wants to kill people and stack

11   them.  So then the question becomes, well, what exactly is

12   the state of mind that they're suggesting here?  And it's

13   not being described, Your Honor, a relevant state of mind.

14   And I think that's because, Your Honor, this is not being

15   used to show what -- that Mr. Gabriel [sic] was angry or

16   upset our surprised.  It's being used to suggest there is a

17   plan that is embodied in this statement which is being --

18   which is offering it for its truth.  And to me, Your Honor,

19   the way that this is shown is -- here's the acid test for

20   it:  Would you want to cross-examine the declarant about

21   what he's saying?  If there's no real reason to

22   cross-examine the declarant, then it's not real -- probably

23   hearsay, but if there's some reason -- if there's something

24   you'd want to ask them about to drill down into whether --

25   what this is meant by the statement, that is hearsay.

1          So we don't have an opportunity to put Gabriel PB

2     on the stand and say, Was -- did you discuss stacking bodies

3     in front of Capitol Hill with somebody?  Where is this

4     coming from?  Or are you just making this as a joke, Your

5     Honor?  Is this a -- and if we can't do that, that is --

6     that's the test for hearsay, Your Honor.

7          So the mental state of a co-conspirator, there is

8     no such exception.  The mental state is not being described.

9     And then, further, Your Honor, it's being used to impute

10    this mental state to the defendants.  If it's not being used

11    that way, then what is the relevance, Your Honor?

12          THE COURT:  Well, let me just -- why wouldn't it

13    be -- so I just wanted to pull this up, because you used the

14    word "plan."  Why wouldn't it come -- again, put aside, for

15    the moment, relevance, an important thing, but -- right?

16    Rule 803 allows the admission of a declarant's then-existing

17    state of mind, such as motive, intent, or plan or emotional,

18    sensory, or physical condition, da-da-da-da-da-da-da-da.  So

19    again, now -- then we're talking about relevance, right?

20          MR. SMITH:  Then we're talking about relevance,

21    Your Honor.  And the relevance issue is if there's no

22    evidence -- if there's no foundation laid that Gabriel PB

23    was discussing anything with the defendants, there is no

24    argument as to plan or intent that's relevant.  If we just

25    have a -- let's say you were to take a random person from

1    the crowd --

2            THE COURT:  I mean -- okay.  But in this -- fair.

3    But that's not -- I mean, the Government's theory is that

4    these people were all rounded up in a very specific -- and

5    this particular chat is a big one.  I get it.  So I think,

6    you know -- but their theory -- and, again, as they've

7    pointed out, the defense -- a number of defendants have,

8    sort of, opened on, Oh, no, no, no, no, that's not what this

9    was all about.  Okay.  Fine.  But their theory is, No, no,

10   no, these folks were all collected to be part of this very

11   specific, sort of, new chapter that was going to carry out

12   the conspiracy.  So --

13           MR. SMITH:  So Your Honor -- so one problem there

14   is they haven't shown, Your Honor, any evidence of that fact

15   and, in fact, the Government has been told by its

16   witnesses -- many times, we've put this -- this point in

17   arguments for the Court -- that there's no factual

18   foundation for that, and it's quite twisted because these

19   witnesses have told the Government, That wasn't the reason.

20   There are countless, you know, videos among the defendants

21   saying, This is self-defense.  We're trying to avoid a

22   scenario where individuals use violence.

23           So for the Government to be using the MOSD as a,

24   kind of, bootstrap to get this in and say, This is what the

25   purpose of MOSD is, when its own evidence is to the contrary

1    is not -- the foundation is not there, Judge.

2           And then, Judge, probably the most important point

3    from Mr. Nordean's perspective is the Government concedes in

4    its briefing that Nordean has never posted to this chat

5    group.  Never, Your Honor.  So to use this statement that

6    someone is making without any -- against -- admitted against

7    Mr. Nordean without any evidence that Mr. Nordean was

8    communicating with this person at all is extremely confusing

9    and unfair.  It's unfair because to -- it's as though you're

10   taking someone from the crowd that Mr. Nordean has never met

11   and saying this is indicative of Mr. Nordean's thinking

12   somehow.  Their -- sort of, thread here that's connecting

13   them is to say MOSD and Mr. Nordean was a part of MOSD, but

14   he wasn't communicating in this channel.  There's no

15   evidence he knows this.

16          And, Your Honor, there's one more key point.

17   Mr. -- you asked Mr. Mulroe about Gabriel PB, and he said

18   that Gabriel PB was part of storming the Capitol.  What

19   Mr. Mulroe did not say is that Gabriel PB was not marching

20   with this group.  He entered the building far later than

21   this group of defendants.  So I think that the test that

22   Your Honor was using for some of these tools is, were these

23   people marching with the defendants?  This person was not

24   marching with the defendants.  And then, on top of that, you

25   have no evidence that Mr. Nordean was looking at these chats

1    at all, much less endorsing them.

2         THE COURT:  That -- and I take -- let me put it

3    this way.  The last point you're making is more a question

4    of -- let me put it this way.  It at least raises the issue

5    of a limiting instruction; right?  I mean, I -- your point

6    is, Judge, you shouldn't buy this theory at all.  This is

7    garbage.  But if you buy it as to some other defendant, as

8    to my defendant -- as to my client, well, he wasn't posting,

9    so there should be some sort of limiting instruction

10    regarding my client.  Is that fair?

11         MR. SMITH:  Yes, that is fair, Your Honor, because

12    it's one thing to say, We can show the defendant looked at

13    this statement and failed to rebuke.  Setting aside the

14    argument about failing to rebuke.  It's -- the defendant

15    looked at it.  He failed to rebuke.  When the entire chat

16    window has no evidence that the defendant looked at any of

17    the statements, because they didn't comment, that would be,

18    kind of, two levels of unprecedented argument from the

19    Court.  First, you know -- from the Government.  First,

20    we're creating this new imputation theory; and, second,

21    we're applying it when we can't -- there's no indicia that

22    the defendant looked at it.

23         THE COURT:  Okay.  That's fair.

24         MR. SMITH:  And so for Mr. Nordean, that's true

25    for three categories of these chats.  You know, we noted in

1    our response to the Court in an email that, you know, the

2    MOSD main chat, the MOSD ops chat, and the MOSD super group

3    chat, in none of them can the Government show that

4    Mr. Nordean was looking at messages because he didn't post

5    them.  He didn't respond -- didn't send a message.

6            So -- but, Judge, there's another argument with

7    the "stacking the bodies in front of Capitol Hill."  Even if

8    the Court were to grant that this is, sort of, state of mind

9    evidence and relevant, the 403 issues here are enormous.

10   The suggestion here is that this -- the jury confusion here

11   is that the Government is, sort of, suggesting that the plan

12   the defendants had involved stacking bodies in front of

13   Capitol Hill.  But there's no evidence of that, Your Honor.

14   So they're just trying to sugg- -- insin- -- the insinuation

15   to the jury is that's what -- there was a plan to kill

16   members of Congress.  There's no evidence of that.

17           And then the second one, 195, Your Honor, there's

18   a message that says -- from some person we haven't heard

19   about -- some poster says, Let the bodies hit the ground.

20   That's the last message.  It says, Let the bodies hit the

21   floor.  Let the bodies hit the floor.  From someone named

22   Deplorable 51.  We don't know who Deplorable 51 is.  We

23   don't have his given name.  Again, this is a chat window

24   where Mr. Nordean has never commented.  Then there -- right

25   above that, Your Honor, there's a message from Brother

1    Hunter Jake Phillips --

2            THE COURT:  I read it.

3            MR. SMITH:  -- which refers to storming the

4    Capitol.  We don't know who that person is.  Nordean hasn't

5    seen the message.  There's no proof that he saw the message.

6    He didn't respond to it.  So Judge, the risk here is on a

7    very, kind of, vague theory, just state of mind, we're

8    admitting all of these statements that appear to be being

9    used to show that this was a part of the plan, their truth,

10   and it's inflammatory and it suggests physical violence, and

11   the defendants haven't seen them.

12           So Judge, the problem with 86, if you look at PDF

13   Page 86, Mr. Mulroe said this isn't being used for its

14   truth.  It's a statement from Leo Kuznetsov [ph].  It says,

15   I'm ready to log into Minecraft.  So Mr. Mulroe didn't

16   describe what Minecraft is, but what the Government is

17   trying to suggest here is that this is an indication that

18   the MOSD members were planning to commit crimes, because it

19   says -- the Government is arguing that that's -- "Minecraft"

20   is thieves' cant for "I'm going to commit a crime."

21           THE COURT:  Yes.

22           MR. SMITH:  So that is the truth, Your Honor.  So

23   when they're saying this isn't being used for its truth,

24   they're admitting a statement saying, I'm ready to log into

25   Minecraft.  That means, I'm going to commit a crime.  That

1    is the truth.  That is not a non-truth purpose.  Then the

2    second problem here is this is Ministry of Self-Defense

3    main.  Mr. Nordean hasn't sent any messages in that chat.

4             THE COURT:  Isn't -- just to back up on that one

5    point, again, isn't 803(3) -- in other words, so why

6    wouldn't -- again, this is really -- it's -- this is a

7    person saying -- let's just, like -- even take what you're

8    saying as correct.  It's a person saying, I'm ready to go

9    commit a crime.

10            MR. SMITH:  Mm-hmm.

11            THE COURT:  Right?  Why -- again, now, this does

12   not address your relevance, which is a real point, and I'm

13   not, you know -- but why wouldn't it be admissible, again,

14   just from a hearsay perspective under 803(3)?

15            MR. SMITH:  Your Honor, I guess I don't draw this

16   hard line between relevance and 803(3).  Normally, 803(3)

17   statements are admitted when it's a defendant or a

18   co-conspirator.  I've never heard of a scenario where

19   someone who's not associated with the case, some random

20   person, their statement of intent is relevant.  So I guess

21   it's the same question.

22            THE COURT:  I take your point.

23            MR. SMITH:  It's --

24            THE COURT:  I take your point.  It devolves into

25   the same question.

```
 1              MR. SMITH:  And then -- so the other problems
 2     here, Your Honor, are vagueness.  Does Mr. Nordean know
 3     "Minecraft" means he's going to commit crimes?  What crime
 4     is he referring to?  I'm just generally going to commit
 5     crimes?  That's prejudicial and confusing.  And the fact
 6     that Mr. Nordean hasn't seen it.  So it's not relevant.  We
 7     don't know who Leo Kuznetsov [ph] is.  We haven't heard that
 8     from the Government.  We don't know if he was at the
 9     Capitol.  He could be a chat -- Judge --
10              THE COURT:  No, they said he wasn't.
11              MR. SMITH:  He wasn't at the Capitol?  Okay.
12     But -- so, Your Honor, you know -- Your Honor's familiar
13     with the concept of chat bots; right?  There are these
14     things that can talk, you know, in chat groups without being
15     even human beings.  We don't even know -- we just have this
16     random Telegram handle with an inflammatory statement and
17     we're prepared to show the jury it and use it against
18     defendants in a criminal case?  That is so far-fetched.
19     That's almost, like, science fiction.  This person --
20              THE COURT:  All right.  I get your argument.  I
21     get --
22              MR. SMITH:  So -- and there's a few of them.  I
23     mean, if Your Honor goes to the next page, that's 503-19,
24     Page 87, we have George Googanata [ph].  Again, we don't
25     know who that person is, what they are.  He's talking
```

```
 1   about --
 2               THE COURT:  I got it.  I see the -- I --
 3               MR. SMITH:  -- committing crimes.  Yeah.
 4               THE COURT:  I understand.  Bail money.  It's the
 5   same argument.
 6               MR. SMITH:  General vagueness problem, Your Honor.
 7               THE COURT:  I understand.
 8               MR. SMITH:  And so, you know, we agree that 194
 9   through -- 194 and 195 are the most -- are the most
10   problematic statements in this whole group.
11               THE COURT:  Oh, you -- okay.
12               MR. SMITH:  Because -- 194 and 195, because they
13   refer to killing members of Congress indirectly, stacking
14   members -- stacking bodies in front of Capitol Hill and
15   watching bodies fall.  Those are -- don't satisfy any rule,
16   relevance, 403, no evidence that the defendants saw them or
17   adopted them.
18               Just one more, briefly, Your Honor, on the
19   argument that by not objecting -- rebuking a declarant, you
20   accept their statements.  There's no precedent for that.
21   And I think the -- the reason might be that it's not common
22   sense.  There's -- when you're in a chat group with 70
23   people, like some of these MOSD groups are, and someone says
24   something outrageous, there's so many legitimate reasons why
25   you would not rebuke them for saying something.  One is
```

```
 1        clogging up this whole -- assuming you can see the statement
 2        yourself, but you don't want to clog up the thread with
 3        unnecessary back-and-forth.  You don't want to start a war
 4        that occupies all the space in the chat group.  You find it
 5        so -- you might find the comment so stupid, you don't even
 6        think it's worthy of response --
 7                 THE COURT:  Right.
 8                 MR. SMITH:  -- or so outrageous.  And --
 9                 THE COURT:  I hear what you are saying.  And in a
10        vacuum -- your argument is stronger in a vacuum than it
11        is -- at least with some of the facts the Government has --
12        at least with some of the other -- not just representations,
13        but other evidence that's in here, which is that these
14        people were specifically selected and instructed; right?  I
15        mean, that's their argument --
16                 MR. SMITH:  So --
17                 THE COURT:  -- is that it wouldn't work in just --
18        I think you're right in general, but when you've got a group
19        of people being selected and instructed, No, no, no, you
20        have to stay on topic and, if you're not on topic, you're
21        going to be rebuked, right -- I mean, that is important to
22        their argument.
23                 MR. SMITH:  So Your Honor, on that point -- thank
24        you for raising that.  You'll notice that when the
25        Government describes that argument, it's very neutral about
```

1    what they should stay on topic about.  It says there is a

2    system in place to keep them in line, but it doesn't

3    describe what that system -- what the positive goals are of

4    that system.  And the reason they're being so neutral in

5    that way is because all -- their own evidence shows that

6    they were instructed to keep in -- to comply with law and

7    avoid fighting.  That's -- there was a -- Your Honor, it's

8    in the Government's evidence that there was a form that

9    people had to fill out to --

10           THE COURT:  I know that.  I saw --

11           MR. SMITH:  And it says, Stay in line in this

12   sense.  Not in a neutral sense, whatever we say.  It's in

13   this sense.  Don't violate the law and don't start fights,

14   Your Honor.

15           THE COURT:  But there's some evidence, though,

16   that it was also about stay on topic about January 6th.

17   Again, whatever -- I don't mean to suggest that it was stay

18   on topic to commit crimes --

19           MR. SMITH:  Correct.

20           THE COURT:  -- but it was stay on topic -- at

21   least it was stay on topic about January 6th.

22           MR. SMITH:  But, Your Honor, so that neutral

23   explanation, stay on topic about January 6th, does not mean

24   that the leaders are endorsing crime-committing which is --

25   that's the missing element there.  They're saying these guys

1    were ordered to stay on topic.  Okay.  The next question is,

2    stay on topic about what?  The -- no one -- there were no

3    leaders who ordered people in these chat groups to stay on

4    topic about committing crimes.  The -- nowhere.  So to go

5    from that vague basis --

6             THE COURT:  But -- hold on.  Hold on.  Hold on.

7    Even under your theory, right, that -- let's say -- whatever

8    you want to say the topic was, your argument is that

9    committing crimes was not part of the topic; correct?

10             MR. SMITH:  So when --

11             THE COURT:  If they're -- whatever the topic was,

12    if they're talking about committing crimes, that would seem

13    to be off topic; fair?

14             MR. SMITH:  So Your Honor, every -- I guess the

15    point here is that every time -- there are some

16    admonishments that the Government is not pointing to to stay

17    on topic, one or two, often not even involving these

18    defendants.  You have hundreds and hundreds and hundreds of

19    messages.  So to say, Here are a couple of admonishments to

20    stay on topic; therefore, every time someone talks about

21    crimes, it's being admitted, this is just not -- it's not

22    consistent with common sense.  It's not consistent with how

23    these men are operating generally.  There are some kinds

24    of -- there are stupid statements that the leaders don't

25    like even after admonishing them to stop, but they don't

1    make -- they don't say "stop" every time to every single

2    person because -- just think about this here.  If Your

3    Honor's in a conversation with friends and someone says

4    something stupid, do you, you know -- you might not like it,

5    but do you feel compelled to admonish someone every time

6    you -- they say something you don't like?  It's just not --

7    the -- Your Honor, we're just submitting that there's a

8    reason there is no Rule of Evidence or case law on this

9    point, because it's not consistent with human nature.  We --

10              THE COURT:  All right.

11              MR. SMITH:  -- in any kind of social organization.

12              THE COURT:  All right.

13              MR. SMITH:  We don't go around like hall monitors

14   in conversations with our friends rebuking them every time

15   they do or don't say something.  This is a social

16   organization.

17              THE COURT:  I understand your argument.

18              If I don't let you all get lunch, you won't be

19   able to get it at the cafeteria.  So Mr. Pattis, I'm going

20   to hear from you when we return, but I don't see any way in

21   which I cannot -- we cannot break to let you all eat lunch.

22   All right?  So we'll see you back here at 2:00 o'clock to

23   continue.

24              THE DEPUTY CLERK:  All rise.  This Honorable Court

25   stands in recess.

1          (Luncheon recess taken at 12:59 p.m.)

2          THE DEPUTY CLERK:  We are back on the record in

3    Criminal Matter 21-175, United States of America v. Ethan

4    Nordean, et al.

5          THE COURT:  All right.  I had quite a -- we had

6    quite a good and spirited exchange on the tools with counsel

7    for Mr. Nordean.  So I'd ask -- I'm going to hear from each

8    of you on this, but try not to, if you would, sort of,

9    re-plow the same ground, only because I want to get to your

10   individual other objections and all the rest.

11         Yes, Mr. Smith?

12         MR. SMITH:  I just -- Your Honor, if I may, I just

13   wanted to make a five-second remark that ties out -- sort of

14   closes the loop on one thing Your Honor and I were

15   discussing before the break, if I may, and I promise it

16   will -- can be done in under a minute.

17         THE COURT:  All right.

18         MR. SMITH:  So the premise of the Government's

19   tools argument is that -- is the leadership's direction to

20   stay on topic within the chats.  We would just note that

21   that's a content-neutral guideline, if it's a guideline at

22   all, to discuss the D.C. trip only.  That's not a direction

23   to speak one way or the other such as "we need to commit

24   acts of violence."  So therefore, a failure to rebuke an

25   outrageous comment is not evidence of the purported "stay on

1    topic" policy and action because it's content-neutral.

2            The second point, Your Honor, is you might draw an

3    analogy between what the Government is trying to do with

4    these comments and the business records hearsay exception.

5    A record -- a business record can be admitted in certain

6    circumstances as a reflection of the -- of company policy

7    when it meets certain guidelines.  You might liken what the

8    Government is trying to argue to a policy -- a Proud Boys

9    policy, so to speak, but if we were to follow those rules,

10   the Government wouldn't have satisfied the business records

11   hearsay for multiple reasons, and primarily that's because

12   regularity is not shown.  Your Honor, one of the

13   requirements of a business record is that the record was

14   made as a regular practice of that activity.  So the regular

15   practice here would be rebukes from the leadership

16   indicating that you should stay on topic, but instead of

17   showing regularity, the Government has, kind of, just

18   pointed to one or two remarks from random people.

19           And then, Your Honor, the final point is that

20   multiple witnesses have testified at trial that the Proud

21   Boys build-up to January 6th was disorganized, which would

22   run contrary to the regularly conducted activities of a

23   business organization.

24           And so those are the only two points we wanted to

25   make.  Thank you, Your Honor.

 1              THE COURT:  All right.  Mr. Pattis?

 2              MR. PATTIS:  I will be brief and draft largely off

 3    of Mr. Smith's argument and say only this, Judge, that while

 4    I understand that a conspiracy can be proven

 5    circumstantially, and I've heard the standard charge on it

 6    any number of times, the links in the chain have to bear

 7    some weight, and I would ask the Court to pay particular

 8    attention to the 403 analysis as it evaluates the tools

 9    theory.  I thought Mr. Smith's point on the acid test after

10    cross-examination, the ability to recontextualize a remark,

11    was particularly telling.

12              On the law of the case to date, what we have is,

13    perhaps on the testimony of one witness, an implicit

14    conspiracy that was now given tacit approval of to

15    prospective tools.  At one point, we're piling inference

16    upon inference in such a way that it doesn't really resemble

17    a chain; it resembles a feather flying in the wind.  And

18    while that may be a tempting standard to say "doesn't that

19    really go to its weight," there is always a danger,

20    especially in this case, given the venue arguments that we

21    made, that a jury predisposed to dislike a particular

22    defendant is going to reach to draw inferences that are

23    impermissible as a matter of law.

24              So we believe that a 403 analysis is the place

25    that the Court should begin with the tools theory, if the

1    Court is inclined to think the tools theory has any validity

2    whatsoever.  We don't think that it does for reasons that

3    we've previously argued.

4         Beyond that, I would be merely repeating what

5    Mr. Smith said.  I simply wanted the Court to take note of

6    the fact that this is a thin conspiracy.  We expect the

7    Government's argument in the end to be something like this:

8    The Proud Boys were upset with the general election.  The

9    Proud Boys had used violence as a, you know -- as a means to

10   accomplish their ends in the past.  And they came to

11   Washington with perhaps a secret plan in the mind of one or

12   two people.  That plan was frustrated on the night of

13   January 4th when Tarrio was arrested; and the tools, you

14   know, that were directed to go to the Washington Monument

15   that morning for purposes unknown, as they marched up

16   Pennsylvania Avenue, they still didn't know the purpose.

17   The purpose was launched on them or was told to them at the

18   Peace Circle and, from there, this secret conspiracy that no

19   one knew about and for which there is no evidence came to

20   fruition.  And because conspiracy, much like intent, can be

21   formed in an instant, you should draw from the consequences

22   of the behavior the conclusion that it was planned.

23        I think that's the best the Government can argue

24   in this case.  And the danger of criminalizing otherwise

25   lawful conduct in terms of speech, assembly, petition for

1    redress of grievances is overwhelming.  You know, I don't

2    have to remind the Court of the great efforts that were

3    undertaken in 1971 as regards the May Day arrests in the

4    protests over the Vietnam War to tell you that there -- this

5    case is right on the cusp of criminalizing dissent because

6    of abhorrent behavior.  And, you know, we -- the conspiracy

7    net is too easy to cast.  We think that a 403 analysis is

8    required, and I'd ask you to begin your analysis there.  And

9    I realize that reverses the normal order.  You usually do,

10   you know, materiality, relevance, what's the theory, and

11   then conduct that analysis.

12                THE COURT:  Thank you, Mr. Pattis.

13                Ms. Hernandez?

14                MS. HERNANDEZ:  Your Honor, I'd like to go up to

15   the bench just to show the Court one document and then I'd

16   come back and sit and make the argument.

17                THE COURT:  All right.  Very well.

18                (Brief pause.)

19                MS. HERNANDEZ:  So thank you, Your Honor.

20                I would make this Mr. Rehl Exhibit-1.

21                THE DEPUTY CLERK:  I'm sorry?

22                MS. HERNANDEZ:  I would make this Mr. Rehl motions

23   Exhibit-1.  I don't know if -- again, how do I turn this

24   up -- off here.

25                THE DEPUTY CLERK:  It's --

```
 1                    MS. HERNANDEZ:  Can you see?

 2                    THE COURT:  Yes.

 3                    MS. HERNANDEZ:  So forget the handwriting on the

 4       side.  What I want to show the Court is this is my

 5       understanding of a screenshot of a messaging -- messages

 6       on -- obviously, one page of messages from Telegram.  And on

 7       this one, for example, it's --

 8                    THE COURT:  Ms. Hernandez, is this on the tools

 9       theory?

10                    MS. HERNANDEZ:  No, this is on my theory that

11       these exhibits must be -- that the entirety of the exhibits

12       is a problem.

13                    THE COURT:  All right.  Why don't -- can we -- I

14       mean, look --

15                    MS. HERNANDEZ:  It's going to just show you --

16                    THE COURT:  But, see, I -- here's the thing.  I'm

17       setting an order in which I would like to hear argument and

18       evidence on the issues as I've laid them out.  So if you

19       have something to say on the tools theory, I'm happy to hear

20       you.  If not, we're going to move on.

21                    MS. HERNANDEZ:  I thought the Court said you

22       didn't want to hear tools theory because Mr. Smith had --

23                    THE COURT:  No, no.  I said I would hope that each

24       counsel would try not to simply restate the part -- the

25       points that Mr. Smith made, and made well.  Mr. Pattis
```

```
 1    managed to do that and put a different spin on it and link

 2    up some other considerations.  So right now, we're focused

 3    on the tools and we're going to have time before we -- if we

 4    all follow the rules, hopefully, by the end of the day, I'll

 5    be able to hear you on this objection that you want to make.

 6              MS. HERNANDEZ:  Okay.  Sorry.  I misunderstood,

 7    because I thought earlier in the day you had told me after

 8    lunch, I could make this argument.  I'll wait until later --

 9    until later in the day or another day.

10              THE COURT:  No, I hope it will be today.  Very

11    much so.

12              MS. HERNANDEZ:  I just want -- I mean, I -- let me

13    just say this.  I think it would be -- just as background,

14    all -- I just want to show, like, a couple things, just so

15    the Court understands what the Telegram thing looks like,

16    because I'm not familiar with it myself.

17              THE COURT:  All right.  I'll hear you when we move

18    off of the -- at the appropriate time.

19              MS. HERNANDEZ:  Okay.  I'll go back to my desk,

20    then.

21              THE COURT:  All right.  Very well.

22              Do you have anything to add on tools?

23              MS. HERNANDEZ:  Yes.

24              THE COURT:  All right.

25              (Brief pause.)
```

1          MS. HERNANDEZ:  I'll start out by professing that

2     I don't understand -- I have never understood the tools

3     theory, and I barely understand the Government's arguments

4     on the admissibility of these exhibits.  So I hope I

5     don't -- I'm trying my best to address the Government's

6     arguments, and that's why I was asking Mr. Mulroe earlier

7     what exactly he had said.

8          My understanding of the tools theory, as the

9     Government had advanced it and as the Government upheld --

10    as the Court upheld it, was this notion -- and I think the

11    Court, again, said it today -- was this notion of people in

12    D.C. on January 6th marching along, entering the Capitol,

13    taking -- doing things on that day who were somehow

14    influenced by the defendants.  The bulk -- a number, if not

15    the bulk, of the exhibits that are coming in under the tools

16    theory are people who were not here who I don't believe are

17    co-conspirators in any way, shape, or form.  And so you're

18    having -- and let me say one other thing about the concept

19    that the Government is arguing that the defendants' failure

20    to -- so -- shut down these arguments -- these violent

21    arguments made by people is evidence of something.  You

22    will, at some point, I believe, see the video from the

23    December 30th Ministry of Self-Defense Zoom hearing, and

24    what you will see in that video is that there is a core

25    group of people on screen discussing things and then, on the

1    side, you see people commenting.  Obviously, all the people

2    in the Zoom hearing were somehow invited or got entry into

3    this meeting, but what you will see is all these comments on

4    the side being ignored not because there's an assent to it

5    but because they're just not talking about it.  So I think

6    that, kind of, points out one of the problems with the

7    Government's theory that somehow the failure to slap down

8    these inflammatory comments by individuals means something

9    that is relevant to this case, and I don't think that that's

10   what the evidence will show.

11         And I think no matter what theory of

12   admissibility, you know -- "not for the truth of the matter

13   asserted" theory comes in, it still has to be relevant

14   somehow.  And I think the -- and the Evans -- so that's one

15   point, is that it's very clear from that MOSD -- from that

16   Ministry of Self-Defense hearing that there's a lot of

17   commentary going on; that it's being ignored, and that

18   the -- if the -- and I think the Government, in the

19   indictment, makes the Ministry of Self-Defense, sort of, the

20   thrust of the conspiracy, and if you see that and it -- as

21   you -- and that -- and I think the Court acknowledged that

22   you're familiar with the fact that in order to be an actual

23   member of the Ministry of Self-Defense who came to D.C. to

24   do something, they had to complete a form and that there

25   were people who were separating out into groups.  For

1    example, my client, the people he came with all signed this

2    form, and none of the people he came with committed any acts

3    of violence.  So to introduce all this extraneous material

4    as somehow evidence that because he didn't shut down or slap

5    down or tell somebody, you know, That's not what we're

6    about, specifically in response to a message, I think, is

7    contrary to the evidence as it will ultimately come in and

8    completely inflammatory for the reasons that have been

9    argued.

10            And there is no -- there's no evidence necessarily

11   that Mr. Rehl -- for that theory to work, you would have to

12   show that Mr. Rehl read the comment possibly and it -- and

13   either by ignoring, was some, sort of, evidence of assent,

14   and I don't think the Government can show that, and this

15   goes back to my argument that the way these exhibits have

16   been constructed, it implies something that is not factual.

17   I will concede to the Court that there's some strings that

18   appear that one can infer the responses to each other, and

19   that usually -- more likely than not, that happens when

20   the -- when the conversations are between the -- these

21   defendants, you know, you can see that they're answering

22   each other.  I'll concede that there are some that are

23   fairly clear -- or appear -- I mean, I don't think we can be

24   certain of it, but I'm willing to concede that some of

25   them -- there's an inference to be drawn from some of them

1    that there seems to be a directly -- but these others --

2    these other people that we've never heard of in connection

3    with this case, the multitude of people, I don't think -- I

4    think that's a false inference to draw.  I think that's an

5    illogical inference to draw, one, that my client saw it --

6    that by failing to address it, it shows something else; it

7    shows some assent to whatever happened that day.  So that is

8    a big problem in these cases.

9            And with the tools theory -- and I will cite

10   the -- I cited the Evans case -- which, as it happens, was

11   written by then Circuit Judge Garland -- which really lays

12   out the problem with admitting these out-of-court statements

13   not for the truth of the matter asserted, because if you --

14   if these statements, like the statements of "we're going to

15   lay bodies at the Capitol" -- if you take the fact -- the

16   facts alleged in there, if you take the truth of that fact

17   out of there, what exactly is that statement relevant to?

18   If you take the truth of the statement, what exactly is that

19   relevant to?  And the problem, as the Evans court -- as

20   Judge Garland laid out in that Evans case, is when the

21   Government starts to do its closing argument, the Court is

22   going to be required to tell the jury and prevent the

23   Government from making arguments based on the truth of the

24   matter asserted in text messages -- or in messages that were

25   introduced not for the truth of the matter asserted.  And

1    with the hundreds -- I don't know how many messages we're

2    dealing with here.  Two hun- -- five hundred?  A thousand

3    messages?  That -- I don't think the Court will be able -- I

4    don't think the jury will be able to follow that instruction

5    when you introduce that many statements not for the truth of

6    the matter asserted when they're folded into the whole

7    theory of the Government's case.  The whole theory of the

8    Government's case is this -- that they were -- that they

9    really came to D.C. for violence when there are explicit

10    statements that they did not, and then you've got these "not

11    for the truth of the matter asserted" comments that are --

12    that the Government's going to try to weave into its

13    argument.  It creates -- as the Evans court held, it creates

14    serious evidentiary problems.

15            There's the problem -- and I don't know if this is

16    a tools -- I -- it -- there's a whole -- the 500 series

17    messages are from the Skull and Bones, I think, chat which

18    is the elders group.  My client's not a member of that

19    group.  So to infer anything from that group, it can -- that

20    group included a number of these defendants, but not all,

21    and a number of other people who, to my knowledge, have not

22    been charged and were not in D.C. at all.  So that's, sort

23    of, an independent group.  How those messages come in and

24    how they are -- come in against my client, I don't know.  I

25    don't know the Government's theory.  And I do think before

1   any of these messages come in, the Court is going to have

2   to -- the parties are going to have to get together and the

3   Court's going to ultimately decide what limiting instruction

4   you're going to give --

5           THE COURT:  Right.

6           MS. HERNANDEZ:  -- particularly with the multitude

7   of different theories of admissibility.

8           THE COURT:  That's true regardless of -- if I

9   rejected the tools theory 100 percent, that would still be

10  true.

11          MS. HERNANDEZ:  Well, I just think there's

12  multiple theories, you know?  They're introducing some for

13  state of mind, some for this, some for the other.  So I

14  think the --

15          THE COURT:  I agree.  That's what I just said.

16          MS. HERNANDEZ:  The limiting instruction's going

17  to be different, I thought.

18          THE COURT:  Well, it would have to encompass the

19  tools theory, if I accept that, but whether I accept that or

20  not, it is going to be -- there is going to have to be a

21  limiting instruction at some point that will account for the

22  different ways the jury can use these different statements.

23  That's correct.

24          MS. HERNANDEZ:  Okay.  So let me address some

25  specific -- I believe these are statements that the Court

```
 1    indicated you would be introducing as tools.

 2                   (Brief pause.)

 3                   So 507-12, I believe the Court said something

 4    about introducing that as a tools --

 5                   THE COURT:  I don't know what --

 6                   MS. HERNANDEZ:  I'm sorry.

 7                   THE COURT:  -- PDF number that is.

 8                   MS. HERNANDEZ:  Yeah.

 9                   MR. MULROE:  152.

10                   THE COURT:  Yes.  Very well.  That is one of the

11    ones we discussed.  Correct.

12                   MS. HERNANDEZ:  Okay.  So I -- and I don't know

13    whether I'm folding the tools argument into some other

14    argument, but there is no -- I don't see a logical sequence

15    to that -- to Mr. Rehl's statement there to what is said

16    earlier, or what somebody else responds at 2:49:54.  And I

17    don't even know who BNM [ph] is.  And this is -- and, again,

18    I -- our position is we need the original chats, which the

19    Government has access to on the phones, in order to be able

20    to address these issues.

21                   THE COURT:  This is one where the only tools

22    theory, it seems to me, is the last line of the document.

23    The other two -- well, one would be admissible, you know,

24    subject to relevance, of course, but it's a statement of

25    your client there responding to the prior --
```

```
 1                    MS. HERNANDEZ:  Well --

 2                    THE COURT:  Maybe, it is; maybe, it isn't.  I

 3      agree with you, it's a little unclear to me, too.

 4                    MS. HERNANDEZ:  Well, that's the problem.

 5                    THE COURT:  Okay.  Well, again, that's not -- the

 6      tools theory has to do with the line after your client's

 7      statement, it -- it seems to me.

 8                    MS. HERNANDEZ:  Well, does KBS-Man 2 -- which, I

 9      think, the Court just mentioned, maybe, my client was

10      responding to -- is that guy a tool or is that something

11      other than a tool?

12                    THE COURT:  It wouldn't matter, right, because

13      your client is -- assuming your client is responding,

14      it's -- that would be for the -- for the effect on your

15      client who's responding to that statement.  So that has

16      nothing to do with the tools theory.  If there's a statement

17      out there that your client is responding to, then the other

18      statement would be admissible, again, just to put your

19      client's statement in context.

20                    MS. HERNANDEZ:  Again, I -- the -- again, that's

21      the hearsay problem, and that -- so if it comes in for that

22      reason, it doesn't come in for the truth of the matter

23      asserted, and the --

24                    THE COURT:  Correct.

25                    MS. HERNANDEZ:  And if you take the truth of the
```

1    matter asserted away from there, it's irrelevant.

2              THE COURT:  No.  No, it's not.  It's -- I just

3    explained.  It's relevant because your client is responding

4    to it.

5              MS. HERNANDEZ:  So as I understand from Evans --

6    from the Evans decision, the Government cannot argue to the

7    jury, That statement is a response to the facts alleged in

8    the earlier one, because then they would be relying on the

9    truth of the matter asserted in that statement.  So the

10   classic truth of the -- rely -- the classic effect on the

11   listener is the police officer who testifies, I went and

12   knocked on the door at 512 Main Street.  And, Officer, why

13   did you go and knock on the door at 512 Main Street?

14   Because the lady down the street told me that she'd heard a

15   noise.  The Government cannot, in closing, say, The fact

16   that the lady heard a noise is evidence in this case.

17             THE COURT:  Right.

18             MS. HERNANDEZ:  It's not.

19             THE COURT:  Respectfully, Ms. Hernandez, this

20   doesn't have anything to do with the tools theory, number

21   one.  Number two, it's not analogous to the situation you

22   just laid out because we're not talking about a criminal

23   investigator and the reasons why the criminal investigator

24   took a particular step and, sort of, shoehorning evidence in

25   that way.  We're talking about just a statement that --

```
 1    again, here, I think, it is not as clear in other situations

 2    that your client was responding to the person, but in any

 3    event, it's just -- it's a -- it would come in, at a

 4    minimum, as a statement of a party opponent.  And the other

 5    statement, if your client, again, is responding to it, comes

 6    in just to put your client's statement in context.  I agree

 7    with you that the Government would not be able to argue the

 8    truth of the matter asserted in the other person's statement

 9    to which your client is responding.

10            MS. HERNANDEZ:  Okay.  So let's assume that that's

11    an admission of a party opponent:  It seems they are saying

12    Biden beat him, and fuck him if he wants to run in 2024,

13    too.  I believe that the "fuck him if he wants to" would

14    refer to Trump, not Biden.

15            THE COURT:  I'm sorry?

16            MS. HERNANDEZ:  I may be wrong.  I don't know what

17    that means.  But if it is, what's the relevance of that

18    statement --

19            THE COURT:  No --

20            MS. HERNANDEZ:  -- to anything?

21            THE COURT:  -- I agree with you as to that

22    statement.  That would have to depend on a tools-related

23    statement to come in --

24            MS. HERNANDEZ:  Anyway --

25            THE COURT:  -- a tools theory.
```

1          MS. HERNANDEZ:  Even an admission of a party

2     opponent has to be relevant in some way, and this is one of

3     the ones the Court -- this is one of the exhibits that the

4     Court identified as a tools theory.  I don't know how the

5     tools theory plays in here, unless we know for a fact that

6     that's a response; and, two, I don't even know how the

7     statement itself is admissible -- is relevant.  So

8     therefore, it wouldn't even be admissible.

9          The next page, 507-13, I believe, is the -- is

10    also -- is Page 153 which the Court also identified as a

11    tools theory.  Again, my client makes a statement at 2:50-57

12    [sic].  That would be an admission of a party opponent, but

13    I don't know how that is relevant to anything.  I don't know

14    who he's talking about.

15         THE COURT:  Well, again, I think the idea is that

16    your client is responding to the prior statement on the

17    prior page which just happened -- was literally one minute

18    beforehand.  And, again, I think the statement of -- so the

19    last statement -- so -- would depend on a tools theory of

20    admission, I think.

21         MS. HERNANDEZ:  So first of all, as the Court has

22    just articulated, there's a lot of assumptions here.  And

23    second of all, let's assume that it is a reference to the

24    earlier statement which I -- again, I don't think -- that's

25    the problem with the way this is -- these things are

1    constructed.  We don't know that.  We don't know if there's

2    17 messages in between.  We don't know if he's responding to

3    something earlier.  But the bottom line is, let's assume all

4    those are met.  How is "these scumbags are arrogant"

5    relevant to the Government's -- to the charges in this case

6    that my client used force to attack the Capitol or corruptly

7    interfered with the running of the Congress?  I don't know

8    other than -- I mean, a lot -- I don't know how all these

9    are relevant other than to show people making -- saying

10   things on a Telegram chat.  I don't -- I mean, has -- does

11   the Court believe that "these scumbags are arrogant" is

12   somehow relevant to the charges in this case?

13           THE COURT:  I understand your argument on

14   relevance.

15           MS. HERNANDEZ:  Okay.  So the Court also

16   identified Page 165, 510-8.  "Those three people" are -- I

17   don't know who "those people" are or how that comes in.

18           So the next is Page 169, which is 509-5.

19           THE COURT:  Well, the Government has already

20   indicated, this, they're not relying on tools.  They

21   believe -- they've proffered to me that they believe this

22   person is a co-conspirator.

23           MS. HERNANDEZ:  And, again, this is, I believe, as

24   the Government described it, a reference to January 4th as

25   the date that Mr. Tarrio was arrested.  So this standalone

 1    statement by an alleged conspirator, which is not responded

 2    to by my client or, apparently, from what I can tell, of the

 3    Government's -- rest of the text messages by anyone else,

 4    that standalone message, the state of mind of an absent

 5    co-conspirator, minimally relevant, I would argue to the

 6    Court, and inflammatory.

 7                THE COURT:  All right.  Any --

 8                MS. HERNANDEZ:  And I'm not sure -- does the

 9    Court -- is the Court saying that a state of mind statement

10    does come in for the truth of the matter asserted?

11                THE COURT:  No.

12                MS. HERNANDEZ:  So again, if it doesn't come in

13    for --

14                THE COURT:  But a co-conspirator statement does.

15                MS. HERNANDEZ:  But this is -- this statement goes

16    to the state of mind of the co-conspirator, I thought, and

17    if it does, we -- he's not telling -- he's not -- for it to

18    be a co-conspirator statement, it has to be during the

19    course of the conspiracy and in furtherance of the

20    conspiracy.  That -- in the case law, that usually means

21    that the person is making the statement to others in the

22    conspiracy for a purpose -- in furtherance of -- okay.

23    Let's go rob the bank or we need to buy the -- we need to

24    buy the -- we need to find the getaway car, or something in

25    furtherance of carrying out the conspiracy.

1                  THE COURT:  We need to take on the police, for

2       example.

3                  MS. HERNANDEZ:  Exactly.  I don't think -- this is

4       just a statement of a hothead saying whatever.  I don't --

5       he -- if he's not telling -- if there's no response and if

6       there's no give and take, I don't know that that fits the --

7       or I would argue to the Court that doesn't fit the

8       definition of "in furtherance of a conspiracy."

9                  So the next one is Page 170, and that's a -- and

10      that's 510-6.

11                 THE COURT:  Yeah.  Again, I think this is a tools

12      theory one for the last statement on the page.

13                 MS. HERNANDEZ:  And so the tool here is -- so I --

14      if I understand the Court, so that means that the statement

15      "either way, everyone should be pissed off and ready to

16      fight" -- that's a statement made by a tool that somehow is

17      being introduced for what purpose?  I don't understand --

18                 THE COURT:  Ms. Hernandez, I don't want to -- I

19      mean, the Government has laid out its theory.  This isn't,

20      like, a mystery.  I -- you're acting like it's a mystery.

21                 MS. HERNANDEZ:  I'm being very --

22                 THE COURT:  Okay.

23                 MS. HERNANDEZ:  -- candid with the Court.  I

24      don't --

25                 THE COURT:  Well --

1          MS. HERNANDEZ:  -- understand how this

2     statement --

3          THE COURT:  Then you can't make an argument

4     against it.  If you don't understand it, then you can't

5     argue against it.

6          MS. HERNANDEZ:  Well, this is a person who's not

7     present, I believe, on January 6th.  This is a person that

8     the Government is not claiming my client responded to.

9          THE COURT:  The tools theory has nothing to do

10    with either -- well, it does have to do, in -- at least in

11    part, in theory, with whether people were there that day,

12    but correct.  Correct.

13          MS. HERNANDEZ:  So if it -- he's not there and

14    he's making a statement, it's -- it -- if I understand, this

15    statement -- the tools theory, I thought, was what the --

16    what my client said that affected a tool.  This is, sort of,

17    the converse of that.  The Government is trying to shoehorn

18    this statement by a tool into somehow being relevant to my

19    client, and I -- again, I don't understand what theory of

20    admissibility or how it's relevant that someone says, Either

21    way, everyone should be pissed off and ready to fight.  It

22    has that "ready to fight" theme, but this is a tool.  This

23    is someone who wasn't there who the Government is not

24    identifying as a co-conspirator.  So it's an out-of-court

25    statement not that affected the tool but -- I don't know how

 1    it comes in, Your Honor.

 2            THE COURT:  Okay.

 3            MS. HERNANDEZ:  I would say that's irrelevant.  I

 4    don't see how that somehow says anything about my client's

 5    state of mind.

 6            THE COURT:  All right.  Anything else about the

 7    tools theory?

 8            MS. HERNANDEZ:  Well, there's -- I just want to go

 9    through them.  507-10 which is Page 194 --

10            THE COURT:  Ms. Hernandez, I'm not inviting

11    everyone to go -- if you have a specific objection teed up

12    for me, but this isn't an opportunity -- I mean, you need to

13    have done your homework.

14            MS. HERNANDEZ:  I did, Your Honor.

15            THE COURT:  I can't have every -- I can't sit here

16    and have you page through each document to say something

17    that you're not prepared to say already coming in here to

18    court.

19            MS. HERNANDEZ:  Well, I am.  I said to the Court

20    in my objections that the Government's theory now

21    encompasses people not there on January 6th.  I thought that

22    the Court had limited the -- or not just the Court, but I

23    thought that was the Government's argument to the Court.

24    The tools are people who were affected or influenced by the

25    defendants on January -- in their conduct on January 6th.

 1    All of these that go beyond that, I objected to.  I thought

 2    the Court wanted us to identify the one -- so I objected to

 3    all of those.  So if the Court wants me to just -- I'll send

 4    you a list of the ones I think that fall within that.  I

 5    just don't see -- I think the Government has -- the

 6    Government continues to broaden.  We started out in the

 7    pretrial motions a conspiracy starting December 19th.  It

 8    was broadened to what happened on December 12th because that

 9    somehow turned the defendants against the police.  At trial,

10    we've now gone into November stuff because that was a fight

11    with Antifa.  Now, the exhibits go into September because

12    that's when they're watching the debate.  And, again, this

13    tools theory, I thought, was narrowed to what our clients

14    did or said to influence others on January 6th.  Their tools

15    theory now -- and I'll -- and the ones that the Court has

16    identified -- the Court -- the ones that the Court

17    identified as tools do not fit that model.  That's what I'm

18    telling the Court.

19              THE COURT:  All right.  Very --

20              MS. HERNANDEZ:  And to the extent they don't -- to

21    the extent it's not something that my client -- to the

22    extent it -- the tools don't involve someone -- my objection

23    is to the extent that the tools do not involve someone who

24    was in D.C. on January 6th and did something as a result of

25    something that my client or the other defendants did, then I

1    object to all of those.  Those are not tools, as the Court

2    had defined them, as -- and as I understood the Court to

3    have defined them.  So if we're now going beyond that, I

4    don't know how they come in.

5             THE COURT:  All right.

6             MS. HERNANDEZ:  And I just -- if the Court will

7    just give me one moment, I'll just see if there's anything

8    else on that point.

9             (Brief pause.)

10            I think I covered the others that the Court had

11   identified as tools.

12            And along with this tools argument, Your Honor, I

13   think part of the problem with these exhibits is that they

14   jump back and forth on -- among the dates, you know, like,

15   so my understanding is the list the Government gave us is

16   the way they intend to introduce these exhibits at -- in

17   trial.  That's why they jump back and forth.  But all that

18   does is make it even more confusing, because we're going

19   from date to different date, from --

20            THE COURT:  I --

21            MS. HERNANDEZ:  -- certain conversations to other

22   conversations, and I think that just makes it even more

23   prejudicial.

24            THE COURT:  All right.  Very well.

25            Counsel for Mr. Tarrio?

```
 1              MR. JAUREGUI:  Thank you, Judge.
 2              I'm not going to rehash what everybody else said,
 3    Judge.
 4              THE COURT:  Thank you.
 5              MR. JAUREGUI:  I'm going to be brief.
 6              I think Your Honor should take a very strict
 7    gatekeeper function type with these exhibits.  I think you
 8    should be suspicious of them.  They actually worry me a lot.
 9    And I'd like to address something the Government said.  And
10    their argument is that, you know, basically, these tools or
11    these other people make these statements -- these outrageous
12    statements and then my client, Mr. Tarrio, doesn't rebuke
13    it.  And it goes a little bit into what Ms. Hernandez said
14    earlier about the authentication.  The reason it's so
15    important is the Government's not going to be able to prove
16    whether my client actually read these outrageous statements.
17    Cellebrite doesn't allow that.  It doesn't allow a host of
18    things.  It doesn't allow a review of swipe replies, polls,
19    forwards, pools [sic], edit history -- edit history is
20    where, basically, somebody makes a statement; then they go
21    back in time and they edit the statement.  The
22    administration logs are there.  The times are off.  You can
23    actually get added into chats where you don't participate,
24    and that's very important.  Okay?
25              So Your Honor should be very suspicious of these.
```

```
 1    It worries me.  An example would be Twitter, for example.  I

 2    follow a lot of people on Twitter.  I follow some of the --

 3    Mr. Parloff that's here every day -- was here a little while

 4    ago -- I follow him.  And I'm following him.  He makes some

 5    kind of outrageous statement.  I don't rebuke it.  I don't

 6    say anything.  So am I, all of a sudden, adopting that

 7    statement?  Did I fail to rebuke it?

 8              THE COURT:  Well, I'm going to just jump in with a

 9    quick rebuke, because I know I rebuked Mr. Roots earlier for

10    referring to the gallery.  So I'm going to, again --

11              MR. JAUREGUI:  Oh, my apologies.

12              THE COURT:  -- have you only address -- a small

13    rebuke -- but have only -- but please only address me or --

14    well, me.

15              MR. JAUREGUI:  Of course, Judge.  I just meant,

16    you know, media in the gallery.

17              So if I don't rebuke him, Judge, am I adopting

18    what he's writing on Twitter?  It's a very simple argument.

19    And what the Government, in essence, is saying is, I know

20    that Mr. Tarrio said on his Telegram chats, No violence; no

21    drinking; we're going to be organized so that the stabbing

22    that happened in December doesn't happen again.  The

23    Government's saying ignore all those literal statements from

24    my client on Telegram.  They're saying, Yes, there's an

25    application that everybody on the MOSD application has to
```

1    fill out.  In that application it says, No violence;

2    self-defense only; no alcohol or drugs; fit in or eff off.

3    They're saying, No, Judge, ignore that application, as well.

4    Then they're saying, You know that video on December 30th

5    where they have a briefing where they say specifically,

6    expressly, what MOSD is for?  Ignore that video, as well.

7    Only we, the Government, know exactly what they were

8    planning, and it was secret and covert and it was to attack

9    the Capitol on January 6th.  They have no evidence of that,

10   of course, but we know that's what the truth is.

11          So I -- Judge, I think you really strictly have to

12   do that gatekeeper function because all these exhibits are

13   very prejudicial.  They're horrible.  The jury's going to

14   see them.  They're going to be enraged, they're going to be

15   confused, and they're going to use all these exhibits

16   against our clients when it really had nothing to do with

17   January 6th.  These tools did not march with them on

18   January 6th.  They took no part of it.  Some of the worst

19   statements from this President Leo Kuzinski [sic] and these

20   other guys, they weren't even there.  I think one of them's

21   in London.  So they're not co-conspirators, they're not

22   tools, and it's completely unduly prejudicial.  So --

23          And for example -- an example -- PDF Page 88, the

24   bail money one, they're talking about bail money for

25   fighting Antifa; has nothing to do about storming the

1    Capitol.  Nothing.  89, which is a series of videos where

2    somebody's attacking poor Pikachu -- they go up and punch

3    him -- has nothing do with January 6th.  They're just trying

4    to make our guys be guilty by association, trying to make

5    them be as violent as possible.  If they were violent before

6    and they attacked Pikachu, then they must have been violent

7    in their plan for the Capitol, but there's no real evidence

8    of that.

9            Thank you, Your Honor.

10            THE COURT:  All right.  Thank you.

11            Mr. Pezzola?

12            MR. METCALF:  Good afternoon, Your Honor.

13            This is sometimes the best part about going last,

14    and the worst part.  So I'm going to just cut right to the

15    chase.  First off, with regards to the tools theory, I

16    believe here -- I just want to focus on PDFs 86 through 93

17    and just mention, yet again, that on the date those chats

18    are being referenced, it's December 29th of 2020.

19    Mr. Pezzola -- December, excuse me.  December -- just let me

20    double-check this date, because I'm being told I got the

21    date wrong.  December 27th.  Mr. Pezzola was not a member of

22    that chat at that time.  He became a member later on.  But

23    at the time that those particular posts were made, he was

24    not.  And, at some point, Your Honor, the 403 has to come

25    down to something.  It has to mean something.  It has to

1    ultimately get looked at in a light where Mr. Pezzola was

2    not a part of this chat group.  And the prejudicial effect

3    on him is going to start to accumulate, if it hasn't

4    already.  And the jurors are going to be read so many

5    different limiting instructions and be instructed on your --

6    by Your Honor in so many different ways that they are either

7    just not going to care or they cannot conceptualize all

8    these different instructions.  So I'd ask Your Honor to take

9    that into consideration when considering PDFs 86 to 93 with

10   regards to the tool theory.

11           Thank you.

12           THE COURT:  All right.  Thank you.

13           Does the Government want to briefly respond to any

14   of that before I try to move to the next category and then

15   open it up to the other exhibits that defendants want to be

16   heard on?

17           MR. MULROE:  Your Honor, just very briefly.  I

18   think the Court grasps the arguments from both sides.  So I

19   don't want to belabor anything.  I just -- to briefly

20   respond to Mr. Smith, he said that the "stay on topic" rule,

21   I think, he said was content-neutral, and that's, kind of,

22   our point; that you just tell the group, Stay on topic.  The

23   jury can infer what that topic is by seeing what the members

24   talk about.  So it's important to see what conversations are

25   tolerated in the chats for them to be able to figure out

1    what the topic of the chat is.  It's not, Be non-violent.

2    It's not, Follow the law.  It's, Get ready to use force

3    aggressively in a targeted manner on which we direct you.

4    We, the leaders.

5            He mentioned the business records analogy.  I

6    don't think that we're relying on anything remotely

7    analogous to business records.  So that's all I have to say

8    on that.

9            Ms. Hernandez referenced the MOSD video meeting

10   and how there was a, sort of, running stream of comments on

11   the side of the screen.  I just would emphasize that that's

12   a different forum than these largely text-based Telegram

13   chats that we're dealing with here.  So I think we would

14   disagree that it can be analogized in that way and that, you

15   know, the frequency of the comments and the pace at which

16   they come is -- it's just not comparable if you look at one

17   forum versus the other.

18           I do want to respond to the Evans case that

19   Ms. Hernandez cited here in court today and in her papers.

20   Evans involved testimony that -- I mean, it was a drug case

21   and law enforcement agents were told, This guy is selling

22   drugs, in effect.  So that was a statement that has a truth

23   value, and it's a truth value that goes to the ultimate

24   issue of the case.  And so the Court of Appeals there was

25   rightly skeptical of the Government's arguments that, Well,

1    there might be other non-hearsay purposes of this.

2    Ultimately, it was harmless error.  But Evans is just not

3    anything like what we're dealing with here.  And I think

4    that that -- you can make that point pretty apparent if you

5    look at a lot of these exhibits and just try to determine,

6    what would we be offering as the truth if we were offering

7    this for the truth of what's asserted?  I mean, Page 152 of

8    the PDF, Exhibit-507-12, where KBS-Man 2 said, The effing

9    Internet exposed all these effing douchebags and they just

10   keep going.  You're going to make the whole country stand up

11   and do bad things to bad people.  I think it's just

12   incoherent to suggest that a jury would think that that's

13   being offered for the truth of the fact that the Internet

14   exposed all these D-bags.  And so it's just -- it's not a

15   scenario like Evans.  When we say "context," I think Your

16   Honor understands what we're saying; that it's what the

17   defendants are responding directly to.  It's not a tip to

18   law enforcement the way it was in Evans.

19            Finally, Mr. Jauregui made an analogy to Twitter.

20   These chats clearly are not Twitter posts.  I mean, this is

21   a limited group discussion.  And he pointed out that there

22   were certain official rules that Mr. Tarrio put in place for

23   the chat.  He's saying that what we're asking Your Honor to

24   do is ignore those rules.  That's not the case at all.

25   We're asking Your Honor to allow the jury to see the context

```
 1    that helps them understand what those rules really were.
 2    And our position is that those rules were a cover, they were
 3    a fig leaf, and they were understood as such by these
 4    members who were chosen for loyalty, because if these
 5    members who were chosen and hand-picked for loyalty thought
 6    that this really was not about violence; that this really
 7    was about following the laws, they would not be saying the
 8    things that they said in these chats.  So it's not about
 9    ignoring the rules; it's about understanding them for what
10    they're worth which, our position, is not very much.
11              THE COURT:  All right.  I have now a series of
12    very targeted -- I mean, I'll hear from the defendants on
13    this, but these are a series of, maybe, about 10 or so that
14    I want to hear from the Government about discrete, sort
15    of -- their theories of admissibility.  If any defendant
16    wants to be heard in response, I will hear you before we get
17    to a more open-ended on all the other things that I'm, kind
18    of, leaning -- I mean, I -- the other way on, if you will.
19              So 12, if the Government can flip to 12, I --
20    maybe, this is a tools thing.  Maybe I -- maybe, this is
21    another tools-based argument.  I just didn't understand --
22    yeah, as I said, maybe, this is tools.  I didn't understand
23    the theory of admissibility for 514 -- it's Exhibit-514-11.
24    It's No. 12 on the PDF.
25              MR. MULROE:  Your Honor, we're offering 514-11, or
```

1    PDF Page 12, as part of a series of exhibits making up a

2    continuing conversation.  And so that would be Page 12 and

3    then Page 13 and 14.  And so I -- recognizing that these

4    span a period of a couple of days, I think the testimony

5    from the agent, we would proffer, will be that there were

6    topics of discussion in these chats that were, kind of,

7    ongoing that would continue sometimes over extended periods

8    of time.  And so the topic in question here is, what is the

9    appropriate response of the Proud Boys to what they perceive

10   to be a stolen election?  And so I'd note that we're in the

11   official presidents chat --

12             THE COURT:  Right.

13             MR. MULROE:  -- here.  So --

14             THE COURT:  So it's not --

15             MR. MULROE:  -- all these people are --

16             THE COURT:  So it's not tools.

17             MR. MULROE:  It's not tools.

18             THE COURT:  Right.

19             MR. MULROE:  It's not tools.

20             THE COURT:  I take that back.

21             MR. MULROE:  But each of these members of this

22   chat is a Proud Boys president, so in a position of

23   seniority within the organization.  And these people are

24   saying that they are being baited to fight.  If they don't

25   fight, they are -- excuse my language -- pussies.  Joe Biden

1    is leaving us no chance [sic].  And then in the next

2    exhibit, 514-12, one of the co-conspirators and one of the

3    defendants chime in about what they, at that time, said was

4    the right response which was what appears to be traditional,

5    kind of, legitimate advocacy:  Go to the -- call your

6    legislature, go to the polling places, go to the election

7    offices, not in colors.

8              THE COURT:  All right.

9              MR. MULROE:  And so --

10              THE COURT:  I mean, I am pretty skeptical of

11    the -- the second page, you've got the defendants -- you've

12    got co-conspirators and a defendant responding.  Okay.  The

13    first page, it's not a tools theory because it's a much more

14    open-ended and less focused chat.  I mean, I'm pretty

15    skep- -- and, you know -- and we're talking about these

16    conversations being -- look, a chat group is a roiling

17    conversation that happens over time.  But -- or it can be.

18    But I think the first page, my gut is it's too disconnected

19    from the rest of this and not connected to the statement of

20    any co-conspirator or defendant in the case.  So my, you

21    know -- my instinct is that I think that's too -- I don't

22    see a basis for 12.

23              MR. MULROE:  Certainly, Your Honor.  Just to put

24    one additional theory on the table, because it's going to, I

25    think, bleed into some of the next ones in the list, I

1    recognize up front that this is a little farther from the

2    heartland of what Your Honor has blessed pretrial.  But this

3    case and this conspiracy took place bound up with an

4    organizational structure, that structure being the Proud

5    Boys.  And so we think that there is relevance to the jury

6    of understanding the dynamics that were in play within the

7    broader Proud Boys organization, even among people who did

8    not end up being part of the conspiracy.  And in particular,

9    we would identify this dynamic of something that, I think,

10   has come up already in the trial and that we expect is going

11   to come up some more as we continue, the notion of the party

12   boys versus the rally boys.  So we've often heard the Proud

13   Boys referred to as just a drinking club, a social

14   organization.  And I think that, for a lot of the members,

15   that was true.  But you had this divide between the party

16   boys, who looked at it as a club to drink and make jokes and

17   have fun, and then the rally boys, who were more political

18   and more violent oriented.

19          And so I think it's clear from the messages,

20   including the exhibits that we've got in this set, that what

21   the Ministry of Self-Defense was doing, by Enrique Tarrio's

22   design, was mobilizing and, in his words, harnessing those

23   rally boys in a more targeted and structured and a more

24   chain-of-command-oriented way.  So we think that for the

25   jury to be able to understand the forces within the

 1    organization that he was drawing upon when he did that, it's

 2    necessary for them to see some of the context, including, to

 3    some degree here in these exhibits, these presidents of the

 4    group who were eager to commit violence in response to the

 5    election.

 6            THE COURT:  Well --

 7            MR. MULROE:  But as we continue, I'd want that

 8    theme to be one that Your Honor keeps in mind even if it's

 9    not going to get this one in.

10            THE COURT:  Look, in theory, I hear what you are

11    saying and if you want to have, you know, one of your

12    cooperators testify to that kind of thing, you know, fair

13    enough.  But I think this is just -- you still need a theory

14    of admissibility other than context.  And so my inclination

15    is that 12 probably does not meet the -- is inadmissible.

16            Tell me about 16, which was the next one where I

17    was not clear what the Government's theory really is.

18            MR. MULROE:  So 16, we are now in the Skull and

19    Bones chat which is the elders.  It's a small group of

20    senior Proud Boys leaders.  And Enrique Tarrio is a member

21    of the chat, but formally he's above them in the structure.

22    As the chairman, he is senior to the elders.  And so this is

23    not quite the same dynamic of the Ministry of Self-Defense,

24    but there's still, sort of, a hierarchy in place here where

25    I expect the agent will testify that the elders want

1    Tarrio's input on things and defer to him in some ways.

2         So against that background, here, we have a

3    discussion among this small select group of Proud Boys

4    elders about, in effect, how things -- how bad things really

5    were with the election and whether things were yet at the

6    point where violence would be necessary or if there was

7    still an avenue for non-violent legal challenges that might

8    keep Trump in office.

9         Nick Ochs now, we mentioned in our filing, we

10   would submit, is a co-conspirator.  I think we mentioned a

11   few of the facts supporting that conclusion in the filing.

12   He was charged and pled guilty to 1512(c)(2).  So he pled

13   guilty to a substantive offense that is the object of one of

14   the charged conspiracies here in this case.  He did not

15   plead to a conspiracy offense, but we think the facts show

16   that he did commit that offense in coordination with others,

17   including in coordination with some of the defendants in

18   this case.  There is a Telegram exhibit that's a little

19   later in the set where Ochs asked, Who else is going to

20   D.C., among the elders.  Tarrio says he's going.  And then

21   another guy says, I'm not going to go.  And Tarrio says, Oh,

22   you're going to make us go into battle alone?  I'm

23   paraphrasing.  So that indicates some pre-event planning to

24   go together and the fact that they had battle in mind.

25         Then on January 6th itself, Mr. Ochs links up with

1    Defendant Nordean -- among these defendants, Nordean in the

2    Rotunda.  They take a celebratory selfie together, and

3    that's going to come into evidence.  And then afterward,

4    Ochs is one of the earliest ones to be arrested.  And

5    there's messages in the Telegram chat of how that causes

6    them concern and they're trying to get legal help for him

7    and things like that.  So he's a senior Proud Boy who was

8    not in the marching group with them but who did confer with

9    Tarrio ahead of time, met with Nordean on the day itself,

10   celebrated together, and --

11            THE COURT:  All right.  So this -- the

12   admissibility here turns on whether I accept Ochs as a

13   co-conspirator; is that fair?

14            MR. MULROE:  I think that would certainly get us

15   there.  I would also add that Tarrio does respond to this

16   discussion, not necessarily in a way that affirmatively

17   adopts all the prior comments, but I think that his

18   participation in this brief exchange makes the exchange

19   relevant to the extent that these are things he was, kind

20   of, aware of and part of conversations regarding.

21            THE COURT:  All right.  I'm -- I'll look at the

22   issue of Ochs being a co-conspirator.  I'm, sort of -- I

23   think, short of that, it strikes me -- there's, you know,

24   statements in here about how it's war and all the rest.  You

25   don't have Mr. Tarrio responding to those or adopting those

1    or anything like that.  So I mean, I'll look at the issue of

2    Ochs and whether he's a co-conspirator.  I think, short of

3    that, it's a -- that one, you have an uphill climb on.

4             MR. JAUREGUI:  Judge, if I may briefly --

5             THE COURT:  No --

6             MR. JAUREGUI:  -- on this -- no?  Okay.

7             THE COURT:  Well -- I mean, all right.  Do we want

8    to do -- I mean, is it -- do you think it's more efficient

9    for me to hear you all if --

10             MR. JAUREGUI:  No, Judge.  No.

11             THE COURT:  -- you have a particular -- no, I

12    mean, I want to --

13             MR. JAUREGUI:  I just wanted to correct one

14    factual issue.  My client is not above the elders.  The

15    elders are the ultimate authority.  My guy is the ceremonial

16    spokesperson for the -- he actually has to go before the

17    elders and ask for permission for things.  I just want to --

18    I want Your Honor to understand that.

19             THE COURT:  All right.

20             MR. JAUREGUI:  Thank you.

21             THE COURT:  Very well.

22             21 and 22 were the next two I had that I wanted

23    some more from the Government on.  They are --

24             MR. MULROE:  514-18 and 19.

25             THE COURT:  514-18 and 19.  Correct.  Again, it's,

```
1    you know -- I guess this is still a similar, kind of, thing
2    where it's a series on a particular day or at least -- yeah,
3    18 and 19 are no -- I mean, 18 and 19 are no -- are -- I
4    mean, this is the -- it's not a tool.  There's no defendant
5    involved.  How do 18 -- well, 514-18 and 514-19 -- which,
6    again, to be clear, are 21 and 22 -- what's the theory of
7    admissibility there?
8              MR. MULROE:  Your Honor, I think these would rest
9    probably entirely on the organizational dynamics theory I
10   mentioned a minute ago.  So if that's a nonstarter, then
11   these are probably out.  But I do want to just emphasize
12   with these how the celebration of Proud Boys' use of force
13   at the November rally was something that deeply informed the
14   formation of the conspiracy, and it's something that we saw
15   echoed in the Parler posts that Agent Camiliere sponsored
16   over the course of last week, this idea that, hey, the Proud
17   Boys went to D.C. and, you know, they would argue, in
18   self-defense; we would argue not.  They used a lot of force
19   against their adversaries, and then they boasted and bragged
20   and celebrated it afterward.
21              THE COURT:  Right.
22              MR. MULROE:  So --
23              THE COURT:  These defendants.
24              MR. MULROE:  Correct.
25              THE COURT:  All right.
```

```
 1              MR. MULROE:  And, Your Honor, so these defendants

 2     did, but these defendants were not the only ones.  And the

 3     fact that this organization they were part of, the

 4     organization that would go on to become the pool from which

 5     they drew members of the charged conspiracy, I think it's

 6     relevant that that celebratory reaction was shared more

 7     widely than just these defendants, and was shared among the

 8     other Proud Boys leaders, not just random members of the

 9     rank and file, but the presidents who were in this

10     presidents chat.

11              THE COURT:  But doesn't this -- again, taking it

12     back from a general discussion of context, doesn't this

13     really turn on -- even though you're not saying the tools

14     theory here, doesn't it require me, effectively, to, kind

15     of, buy at least the concept of, you know, not -- I don't

16     know -- that it's somehow an adoption by the defendants

17     or -- no, you would just say -- since you said

18     organizational dynamics, and as I recall, my ruling on that

19     was that, you know, you could -- you had room to describe

20     the hierarchy within the organization, all like that.  It --

21     this was at least allegedly a crime that was occurred -- was

22     committed within an infrastructure that existed, in trying

23     to explain the case to the jury without -- a little bit

24     about the infrastructure that existed seems to me to be,

25     kind of, difficult.
```

1          I -- this is more than, sort of, organizational

2     dynamics.  It's, sort of, organizational attitude.  And,

3     look, again, to the extent you have a witness who's going to

4     come on and say, Look, I -- this is -- as you already did

5     with Mr., you know -- Mr. Greene, Well, you know, here's how

6     I interpreted the kinds of messages I received and blah,

7     blah, blah, blah, blah, blah.  Okay.  But these are just,

8     like -- and this is not that.  These are just freestanding

9     things that you want to get in to show an organizational

10    culture; is that fair?

11         MR. MULROE:  I think that's probably fair, Your

12    Honor.  So if you're --

13         THE COURT:  I mean, I'm skeptical.  I'll just say

14    I'm skeptical.  Let me put it that way.

15         MR. MULROE:  Understood.

16         THE COURT:  All right.  24 is the next one I have

17    here which is -- which make, you're going to say -- let's

18    see -- 540 --

19         MR. MULROE:  514-20?

20         THE COURT:  514-20.  Correct.  And the only thing

21    about this -- I mean, obviously, you've got a lot of --

22    you've got co-conspirators and -- and you've got Mr. Tarrio

23    here.  And so I think, one way or the other, most of this

24    comes in.  I guess my question is the latter two entries on

25    514-20.  Those also seem to be, sort of, untethered, unless,

```
 1        I guess, you're going to tell me that it links up with the

 2        next document in a way that you think shows the context for

 3        Mr. Biggs responding to it.

 4                MR. MULROE:  Well, the next document that includes

 5        messages from Biggs is a separate chat string.

 6                THE COURT:  Oh, okay.  So I take it back.  You're

 7        right.

 8                MR. MULROE:  So we won't rest on that, but I do

 9        just want to see one thing.

10                THE COURT:  Okay.

11                MR. MULROE:  With the Court's indulgence.

12                THE COURT:  Yeah.  My skepticism of this document

13        is mostly about the last two lines which don't appear --

14        just -- I don't know what the basis to get those in would

15        be.  Unless organizational -- you're -- the same, kind of,

16        organizational dynamics argument.

17                MR. JAUREGUI:  And just to be clear, July, there

18        are messages missing from the timeline from here, just so

19        you know.

20                THE COURT:  It -- you mean between the two

21        documents?

22                MR. JAUREGUI:  No, in this specific document,

23        there are messages missing in the timeline that the

24        Government did not include.  That's why Your Honor should

25        be, again, suspicious of these exhibits, because these are
```

1      replies.  For example, my client's reply, Call me in 10, has

2      nothing to do with anything that came before it.

3              THE COURT:  And you have the -- and you're going

4      to put on those things and explain that context?

5              MR. JAUREGUI:  Correct, but, again, it's

6      unnecessarily confusing for the jury.

7              MR. MULROE:  Your Honor, I want to note this for

8      the Court as well as counsel.  In constructing these

9      exhibits, our approach has been to not omit any interior

10     messages.  So clearly, there's messages that come before it

11     starts and there are messages that come after it ends, but

12     we -- we haven't excised any messages from the middle, at

13     least we haven't intended to or we don't believe that we

14     have.  So this goes for any purported omissions or any

15     purported timestamp errors.  We are certainly all ears if

16     counsel thinks there's any errors in the construction of

17     these exhibits.  But sitting here, to my knowledge, this is

18     a complete string at least from the first one to the last

19     one.

20             THE COURT:  Okay.

21             MR. MULROE:  Now -- with that said --

22             MS. HERNANDEZ:  Your Honor, with respect to this

23     item, this is not a co-conspirator statement item because

24     it's in November.  And it's true the Government can prove

25     organizational structure, but Evans says clearly that can't

1    be done through hearsay.  So I -- it's not -- it's not

2    during the conspiracy.  So --

3              THE COURT:  Right.  So I am just asking, what is

4    the theory on the last two statements that are reflected

5    here?

6              MR. MULROE:  I think the last two statements are

7    just the conclusion of this exchange.  The reason I asked

8    for the Court's indulgence was to see if there were any

9    further messages after that that we could have put in to

10   address the Court's concern, but if -- certainly, we could

11   take those out, if necessary --

12             THE COURT:  Okay.

13             MR. MULROE:  -- if you found that those didn't

14   satisfy any basis of relevance.

15             THE COURT:  All right.  Very well.

16             Next ones.  32, 33, 34 which are 549, 551, 546-1.

17   These -- oh, okay.  So I mean, these all go together, and

18   they are all this issue of the defendants discussing how --

19   well, at least, I guess, one defendant -- well, a couple of

20   defendants and others discussing whether -- what happened

21   to, I think, the individual who might have stabbed

22   Mr. Bertino; is that accurate?

23             MR. MULROE:  Yes, Your Honor.

24             THE COURT:  All right.  So I don't know the

25   reality here, but it just struck me that there's a -- there

1    may be a very good chance, at the minimum, of these having

2    to be out under 403 if they are going to mislead the jury

3    into thinking something happened that did not happen.

4            MR. MULROE:  Yes.  We certainly don't wish to lead

5    the jury to believe that the person who did the stabbing was

6    actually killed.  We know that not to be the case.  We, I

7    think, would be happy to make that very clear to the jury,

8    whether by stipulation, or we have a video that we could

9    show that shows him, kind of, walking away very much alive

10   from the incident.  So I think that steps could be taken to

11   minimize or eliminate any possibility of jury confusion on

12   that point --

13           THE COURT:  Well --

14           MR. MULROE:  -- the fact that they didn't kill

15   him.

16           THE COURT:  What is the -- what do you -- what is

17   the point of these exhibits, then?

18           MR. MULROE:  I think the point of these exhibits

19   is to show that these specific defendants responded to this

20   episode of violence, this use of force, in a way that I

21   perhaps wouldn't characterize as enthusiastically or

22   celebratory but coldly and unapologetically and very matter

23   of fact that "that's what we did."  The fundamental question

24   for the jury is going to be whether this group of men had an

25   agreement to use force on January 6th.  So this description

1    of a use of force by members of their group that, in their

2    view, was justified gives the jury important insight into

3    their intentions, their attitudes, and their state of mind

4    with respect to the use of force.

5         THE COURT:  Well, I -- so what -- I'm not sure

6    what you think -- what could preserve the -- or what you

7    think could be done to get across the point you want to get

8    across but not address or -- but -- that would lessen the

9    403 potential problem.  But I -- and I'm going to -- I'll

10   hear from the defendants on these, of course, as I will all

11   of these once we're going through.  I'm, you know -- my

12   inclination -- and I hear you on the fact that -- look, the

13   Government needs to prove an intent to use force and

14   violence, and that's -- and so evidence that gets you along

15   that -- gets you there is fair game.  But I do think the

16   risk of confusion for these three and unfair prejudice is

17   pretty high.  Do you want to just respond to that?  And I'll

18   just say I'm skeptical for that reason.

19        MR. MULROE:  Yes.  Yes, Your Honor.  So candidly,

20   that issue is not one that we spotted ahead of time.  So I'm

21   speaking, kind of, extemporaneously here.  But I just would

22   throw out one possibility; that if we were to keep these

23   exhibits and that portion of the exhibits, when we reached

24   the point in the testimony where we are showing these

25   chats -- as I said, we do have the videos of this

1    incident -- and this agent, you know -- the scope of his

2    testimony is going to be fairly tightly constrained to these

3    chats with a few of the Parler posts being shown as well for

4    additional context, but we could very well show those videos

5    with the agent to make very clear that this person was not

6    killed and, you know, to show the exhibit and I could ask on

7    direct, Now, Agent, are you aware of whether anyone was

8    actually killed in this episode?  And show the videos.  One

9    of them's already in evidence.  It was admitted during Kate

10   Camiliere's testimony because it corresponded with one of

11   Biggs's Parler posts, and then Your Honor may recall, on

12   redirect, we were going to offer a second video.  The

13   defendants objected that it was outside the scope of Agent

14   Camiliere's testimony, and that objection was sustained, but

15   we do have that video and we have one additional video that

16   shows the stabber, as I said, walking away, banged up but,

17   you know, walking on his own two feet.

18              THE COURT:  Okay.

19              MR. MULROE:  And we could discuss that with the

20   defendants, too, if they --

21              THE COURT:  Okay.  I --

22              MR. MULROE:  -- want to confer about --

23              THE COURT:  You know, I'll just say, I'm skeptical

24   on the 403 point on these three, again, just in terms of

25   confusing and misleading the jury.

```
 1                    Let's see.  40- --
 2               MR. MULROE:  Your Honor --
 3               THE COURT:  Yes?
 4               MR. MULROE:  -- so I just -- apologies --
 5               THE COURT:  Yep.
 6               MR. MULROE:  -- for interrupting.  Before --
 7               THE COURT:  No --
 8               MR. MULROE:  -- we move away from those, Page 33
 9     which is 500-51 --
10               THE COURT:  I'm there.
11               MR. MULROE:  -- that does not relate to the
12     stabbing.  This is a separate incident of violence caught on
13     video.  And this is Angel Valentine in the Skull and Bones
14     chat.  So one of the elders.  He's reposting a video that
15     was posted to Twitter and he says, This doesn't look good.
16     He's expressing concern about, effectively, bad publicity
17     for the Proud Boys based on videos that are circulating of
18     the violence from November.  So that's --
19               THE COURT:  All right.
20               MR. MULROE:  That's one that we would --
21               THE COURT:  Separate.
22               MR. MULROE:  -- offer --
23               THE COURT:  Okay.
24               MR. MULROE:  -- on a separate theory.  This goes
25     to the organizational --
```

1          THE COURT:  Okay.

2          MR. MULROE:  -- dynamics point.  This is a little

3   bit different, I think, and a little bit more relevant than

4   the others because, as we laid out in the papers, Enrique

5   Tarrio, when he created the Ministry of Self-Defense, put it

6   to a vote of the elders, and he explained the purpose and he

7   sought approval by a majority of the elders to have his

8   chapter officially sanctioned.  Angel Valentine, who, here,

9   is expressing concern about the violence in November, is one

10  of the few elders -- the minority -- who voted against the

11  Ministry of Self-Defense.  So we think that there's an

12  inference the jury can make there that the one who's worried

13  about the violence is the one who votes against this new

14  chapter.

15          THE COURT:  Do you plan on calling the person as a

16  witness?

17          MR. MULROE:  We do not --

18          THE COURT:  All right.

19          MR. MULROE:  -- but it's apparent in the chats.

20          THE COURT:  All right.  So it's a group dynamics

21  basis as well and not -- thank you, though, for clarifying.

22  It's not the same -- they're really not three in a row on

23  the same topic.

24          MR. MULROE:  Correct.

25          THE COURT:  It's the two, and the one on the

 1   separate -- okay.

 2              MS. HERNANDEZ:  My client is not at all in that

 3   chat, the elders chat.  My client does not participate --

 4              THE COURT:  All right.

 5              MS. HERNANDEZ:  -- is not a member of the

 6   elders --

 7              THE COURT:  Ms. Hernandez, you're going to get an

 8   opportunity to say whatever you'd like about each of these,

 9   along with all the other defendants.

10              All right.  41 and 42, I think you're going to

11   tell me organizational dynamics again, but I will hear from

12   you on that question.  It's 514-28 and 514-29.

13              MR. MULROE:  Your Honor, that is the theory and,

14   as we get further along in the sequence, these come closer

15   and closer to the heart of the case.  So this is still

16   organizational dynamics, but this is tied very directly to

17   the animating purposes of the Ministry of Self-Defense.

18   Chris Cannon, in the presidents chat, saying that -- about

19   the December rally, We had a small army out there last night

20   and --

21              THE COURT:  No, I've read it and I --

22              MR. MULROE:  Okay.

23              THE COURT:  -- get it.  I've read it and I get it,

24   but it's not like -- and I get what's coming through here,

25   but, again, I don't -- I mean, I think that we don't -- it's

 1    not to put another statement -- I mean, let me put it this

 2    way.  I don't think it's a "putting a statement that is

 3    clearly admissible in context" piece or theory.  It's just,

 4    We think this is important organizational context for the

 5    jury to hear.  But I think, you know, you still need a --

 6    you -- I still think you need a valid, sort of, theory of

 7    admissibility and, you know, I just don't know if the

 8    organizational dynamics basis is something I can bless under

 9    the Rules of Evidence.  You're going to have -- I mean,

10    again, you're theoretically going to have cooperators who

11    can talk essentially about this and presumably, what I know

12    of your case, you will.  I don't know.  Any -- want to be

13    heard any more --

14            MR. MULROE:  No, no --

15            THE COURT:  -- on that?

16            MR. MULROE:  -- fair enough.  Absolutely.  I see

17    where the Court is leaning on this.  I think I -- I think

18    just to put it, maybe, a little bit more clearly, it's -- I

19    think there's an inferential step that I haven't spelled out

20    yet; that these messages are indicative of broader currents

21    in the organization.  Those would be known to Enrique Tarrio

22    and the other leaders who formed the Ministry of

23    Self-Defense, and those are the types of currents that they

24    exploited in the creation of this new chapter, but I do

25    understand that that's --

1          THE COURT:  Yeah, I --

2          MR. MULROE:  -- not one that was squarely raised

3     or blessed so far in the case.

4          THE COURT:  Yeah, and I think, again, when we're

5     talking about a large -- I, you know -- we -- I think it

6     is -- without anything showing he's responding directly to

7     it or specifically read it or things like that, it gets -- I

8     think the relevance -- not that these -- let's put it this

9     way.  Not that these -- this -- facts coming out of a

10    witness's mouth aren't relevant, but showing this particular

11    thing -- I get why you want it to tell a story.  I just

12    don't know if we have a valid evidentiary basis for it.  So

13    that's 41 and 42.

14          53 was the next one.  And 53, which is 500-8, I

15    think it was the same -- I think my question on this one,

16    again, I think, only extends to the last three boxes in the

17    exhibit -- the last three statements which, again, I think

18    the things that go on beforehand, it seems to me pretty -- I

19    mean, I guess I understand how the -- they put Defendant

20    Tarrio's statement in context.  He's, sort of, responding to

21    them and what -- they're commenting on something Mr. Biggs

22    said.  I get that.  I think it just seems like the last

23    three boxes -- again, maybe, it's an organizational dynamics

24    theory, same thing, but we don't have a similar thing in

25    terms of showing an effect on Mr. Tarrio such that he's

1    responding; is that fair?

2              MR. MULROE:  Yes, Your Honor.  I think this

3    exhibit does what we need it to without those three final

4    messages.  So we would be perfectly fine excising those.

5              THE COURT:  Okay.  75.  I assume the relevance of

6    this -- I just want to hear -- and this is each of them

7    presumably suggesting people to be added to the MOSD.

8              MR. MULROE:  Correct.

9              THE COURT:  Okay.  So I -- that strikes me as

10   relevant, but I'll hear from the defendants.  I figured that

11   was it, but I wanted to just make sure.

12             And then the only other one I had identified,

13   again, was 98, which, I guess, part of my question was the

14   last statement here, is that an admitted co-conspirator

15   of -- 503-3?

16             MR. MULROE:  The last message is -- from Noble

17   Beard the Immortal?

18             THE COURT:  Yes.

19             MR. MULROE:  Yes, Your Honor.  That's Jeremy

20   Bertino.

21             THE COURT:  Okay.  That's what I thought, but I

22   wasn't 100 percent sure of that.  And so, you know, it's --

23   this is interesting, actually.  And so I did want to ask you

24   about this.  What is the Government's theory of

25   admissibility on this one?  Because, again -- and this goes,

 1    again, to what some folks have raised.  I'm trying to

 2    keep -- you all should be scoring at home, again, about what

 3    is going to come in for the truth and what isn't, because

 4    there is going to be -- have to be a limiting instruction at

 5    some point.  It just struck me this one, you know, for --

 6    what's the Government's -- it -- I assume you actually want

 7    this for the truth.  I mean, he's saying, Hey, this is how

 8    this chapter is run.  So how does this come in?

 9              MR. MULROE:  Your Honor, I think that -- well, let

10    me give the easy answer first, that this would be a

11    co-conspirator statement made in furtherance of the

12    conspiracy, would be one basis of admission.

13              THE COURT:  Okay.

14              MR. MULROE:  Beyond that --

15              THE COURT:  But you didn't -- I don't think -- did

16    you check that in your box?

17              MR. MULROE:  I may have failed to check the box,

18    but we would proffer it now.

19              THE COURT:  I'm not -- yeah, I'm not saying you

20    can't.  I'm just saying, was that intentional or was that

21    just an oversight, do you think?  And is that really -- is

22    that what you're going to -- is that your primary argument

23    to me for its admissibility?

24              MR. MULROE:  Well, I think that's a simple

25    argument for its admissibility.  And so it was an oversight

1    if we failed to check that box.  But I do think that the

2    question of whether this is being offered for the truth or

3    not is an interesting one and, maybe, one that tees up, sort

4    of, metaphysical questions.  So what's being stated here is

5    a -- effectively, a rule of the organization.  It's one of

6    the principles of the Ministry of Self-Defense that you fit

7    in or eff off, and Bertino is explaining what that means.

8                    THE COURT:  Yeah.

9                    MR. MULROE:  And so I guess the way I would see

10   this is that the rules of this organization exist only

11   inasmuch as the leaders say them to the members.  So by

12   Bertino telling them, Here's what this means; here's what

13   you're expected to do, you know, it -- in a way, that's

14   pointing to a truth, but in another way, that is just

15   creating the truth.  It's like a directive or a command, you

16   know?  It only is so because the leaders say it is so.

17           So I think that this is not, strictly speaking,

18   offered for the truth in the traditional hearsay sense in

19   the sense that there is some separate objective reality that

20   it's describing.  It's more along the lines of a command

21   or I think it's akin to what's sometimes called a verbal act

22   which I understand in this Circuit, that's, kind of,

23   narrowly limited to things that give rise to legal duties or

24   obligations or rights, but basically, he's saying, Here's

25   the rule of a group.  And so by instructing the members what

1    the rule is, he's conveying to them a duty that, within the

2    confines of this MOSD structure, they're expected to follow.

3            THE COURT:  I guess I don't disagree with anything

4    you just said.  I just -- that strikes me as wanting it in

5    for the truth of the matter asserted.  So I, you know -- I

6    mean, the truth is, here is -- and the truth is, sort of,

7    like, here is the meaning of this rule; right?  I mean,

8    that's what he's saying.  This -- he says, Basically, it

9    means anyone attending the rally who doesn't agree with how

10   the chapter decides it will be run, they can fuck off and

11   not come.  And I guess -- I don't know.  It -- I mean,

12   that's -- I mean, the last part of it does seem, kind of,

13   more like a command or instruction, but the first part of it

14   is something slightly different.

15           All right.  I mean, but you are going to argue to

16   me -- if I -- let me put it this way.  If I do believe that

17   it -- really, that the -- the issue here is that it should

18   come in -- that, really, what -- you want it for the truth,

19   you would argue to me as a backup that it's a co-conspirator

20   statement?

21           MR. MULROE:  Yes.

22           THE COURT:  All right.  Those -- so that's this

23   category.  Have we -- have you -- Mr. Mulroe, before I turn

24   to the defendants to let them loose on it, you've heard

25   I'm -- these are things that I'm skeptical of.  So use your

 1     time wisely, defendants, because I want to hear from you on

 2     the things that I'm -- I'm less skeptical of the

 3     Government's ability to get in.

 4            Mr. Mulroe, any -- do you want to fill any gaps or

 5     is -- anything further before I turn to the defendants?

 6            MR. MULROE:  No, I don't think there are any gaps.

 7     I don't want to dwell on the last point, but I do think

 8     that -- if I could just, maybe, rephrase it a little bit,

 9     this really is, in our view, more of a directive or an

10     admonition, and it's just -- so the leaders of the group say

11     to the members, fit in or eff off.  And, apparently, there's

12     some ambiguity.  So to say, What I'm telling you is, if you

13     don't agree with it, you can eff off and not come, is really

14     just a continuation of the instruction or the directive or

15     the admonition.  It's not an assertion of some other thing

16     that can be objectively verified or disproven.  So that's

17     why we don't view it as being an ordinary hearsay statement.

18            THE COURT:  Okay.  Yeah.  I mean, it's a -- a lot

19     of these things are, kind of, tricky and on the edges.

20     So -- fair enough.  I'll think about what you're saying.  I

21     mean, I'll think about what you're saying.

22            Defendants?

23            MR. SMITH:  Thank you, Your Honor.  So we'll tick

24     through these quickly.

25            On No. 12, the civil war one, we think the Court's

```
 1    absolutely right.  This is a pre-election statement from a

 2    tool about civil war.  It seemed that the Government's main

 3    argument is --

 4              THE COURT:  No, not a tool.  Not a tool.  It's the

 5    presidents chat.

 6              MR. SMITH:  Oh, so -- but Chris -- I was referring

 7    to Chris Cannon, Your Honor, and someone called Patriot

 8    Bourbon Fish --

 9              THE COURT:  But even him, I don't think -- they

10    are not relying on a tools theory here.

11              MR. SMITH:  So -- nor are they establishing that

12    they're co-conspirators, Your Honor.

13              THE COURT:  Correct.

14              MR. SMITH:  So if they're not co-conspirators and

15    they're not tools --

16              THE COURT:  They're --

17              MR. SMITH:  If you're lower than a tool --

18              THE COURT:  They're organizational dynamics.

19              MR. SMITH:  Okay.  Then I -- we would say that's

20    even more attenuated, I think, for the reasons the Court

21    indicated.

22              THE COURT:  All right.

23              MR. SMITH:  The main argument the Government made

24    here is that it's a part of a continuing conversation with

25    13, but Your Honor will see that 13 is --
```

1           THE COURT:  Hold on.  Mr. Smith, just for the poor
2   court reporter, I know you want to go fast.  I --
3           MR. SMITH:  I apologize.
4           THE COURT:  I'm for that --
5           MR. SMITH:  Yeah.
6           THE COURT:  -- but I'm also for preserving our
7   court reporter's fingers and hands.
8           MR. SMITH:  Apologies, Tim.
9           So the Government's main argument here was that
10  the November 4th exhibit, which is 514-11, does not stand on
11  its own relevance-wise so much as it relates to a continuing
12  conversation with 514-12.  The Court will see that 514-12 is
13  48 hours after 514-11 and that the individuals in the chat
14  in 514-12 do not make any reference to anything said in
15  514-11.  So it seems to be that this conversation is only
16  continuing in the sense that they're in the same chat
17  window, and if that's the argument, then that's an
18  admissibility argument for everything wholesale, then.
19          THE COURT:  All right.
20          MR. SMITH:  So --
21          THE COURT:  I understand your argument.
22          MR. SMITH:  Yeah.  So on -- oh, there's also --
23  well, now, I'll jump to No. 16 in the PDF.  That is 500-35.
24  So the Court indicated here that this -- the admissibility
25  of this statement would turn on whether Nick Ochs is a

1    co-conspirator.  We would just note that this is dated

2    November 7th, Your Honor.  So this would be long before any

3    conspiracy even began.  So we would argue that it doesn't

4    make sense to categorize this as co-conspirator or not

5    because we haven't even started a conspiracy here.  So if

6    Mr. Ochs is a conspirator later, he's not one here.  So that

7    wouldn't be a basis for admitting his statements under some

8    co-conspirator conception.

9          Judge, the second point is if Your Honor looks at

10    the 2:15 chat from Nick Ochs, you have a filthy sexual

11    allusion there as well which is a 403 issue and we would

12    submit that's part of the reason for why we're looking at

13    this.  It's prejudicial.

14          Then one of the other -- the Government's other

15    arguments was that Mr. Nordean took a photograph with Ochs

16    months later.  So we don't think the fact that the defendant

17    can be seen in the photograph with Ochs months after someone

18    sends a message, that that means Nordean is responsible for

19    it or adopting it.  That can't be a theory of relevance.

20    So -- and we also don't have any evidence that Mr. Nordean

21    adopted or saw this statement.  "Civil war" is inflammatory.

22    It's a 403 issue.

23          So Your Honor, on 21 and 22 -- again, Your Honor,

24    this is a November 15th statement from Chris Cannon.  Again,

25    we have this filthy sexual statement here.  It happens --

 1    this is -- maybe, it's a coincidence that a lot of these are
 2    popping up in the exhibits, but it's certainly a theme here.
 3    The -- it's a pre-conspiracy statement.  This is -- I guess
 4    this individual is not a tool or a co-conspirator.  He says
 5    "stomped Antifa" in this which is inflammatory and off
 6    topic.  I think, Judge, generally, we're objecting to the
 7    Government's organizational dynamics arguments because we
 8    think they're pretty vague and unfocused and inflammatory.
 9    So that's 21, 22.
10            THE COURT:  And then the -- for 21, 22, I guess,
11    the -- you're really focused on 22.
12            MR. SMITH:  Well, Your Honor, in 21, we have this
13    gross sexual thing I was referencing which is just not
14    appropriate.
15            THE COURT:  Hold on.  Maybe --
16            MR. SMITH:  That's 514-18.
17            THE COURT:  Okay.  I've -- I have --
18            MR. SMITH:  It's in the middle of the --
19            THE COURT:  Yeah, I understand.  My tabbing system
20    was off.
21            MR. SMITH:  And then Your Honor's correct.  In 22,
22    it's stomped -- one of the people who was neither a tool nor
23    a co-conspirator says, We stomped Antifa in D.C. last night.
24    And I think Your Honor heard Mr. Mulroe talk about, kind of,
25    an attitude towards violence that is, maybe, where the

1    relevance lies in the organizational dynamics, and we --

2    again, we would stress that that is pure character evidence

3    of -- an attitude towards violence is, maybe, like, a

4    textbook definition of propensity evidence.  So we would

5    object on character evidence grounds in addition to hearsay

6    and relevance and 403.

7             On the -- on No. 32, Your Honor, this is a very

8    important one.  It's 500-49.  We think --

9             THE COURT:  I'm there.

10            MR. SMITH:  -- the Court is exactly right about

11   this.  Since the statement Nordean makes there is not true,

12   it's particularly a risk for jury confusion and unfair

13   prejudice.  The Court said -- the Government said that, We

14   know the person who stabbed Bertino wasn't killed.  Well, if

15   that's the case, I, you know -- we're struggling to

16   understand the relevance.  I think Mr. Mulroe said the -- it

17   shows these defendants reacted to the use of force coldly.

18   But that -- again, and Mr. Mulroe referenced attitudes

19   towards force.  That is classic propensity --

20            THE COURT:  I don't think it -- to be fair, as my

21   rulings have suggested, I think -- let me put it this way.

22   I think statements of state of mind or intent to use

23   violence in connection with election-related events after

24   the election is not character evidence and it's fair -- it's

25   fair.  It's fairly admitted as evidence of intent.  Now,

```
1    this is -- I mean, I do think this presents a 403 issue that
2    none of those other things present and, I think, untethered
3    from specific defendants and while we're talking about
4    organizational dynamics, that's also a different thing.  But
5    anyway, continue.
6                 MR. SMITH:  Thank you, Judge.  So we agree that it
7    can be resolved on 403 uniquely alone.  It's uniquely
8    prejudicial.
9                 The last point we'd make about intent, though, is
10   we would say the Government has to say something more than
11   it shows an intent to use force.  It would have to be an
12   intent tied to the specific charged crime.  So when we're in
13   a zone where, chronologically, we're before the conspiracy
14   started, we can't say that any intent to commit the charged
15   crime has formulated, by definition, if there hasn't been
16   any plan to go to D.C. at all.  So we, you know -- this is
17   before Donald Trump told his followers to be wild and be in
18   D.C.  So it --
19                THE COURT:  I think that might slice the bologna
20   too thin --
21                MR. SMITH:  Well --
22                THE COURT:  -- but okay.  I understand your
23   argument.  I --
24                MR. SMITH:  But we agree with the Court that this
25   particular comment stands on its own in terms of 403
```

 1    prejudice, and we'd -- happy to stick to that.

 2              So let's see here.  41 -- yeah.  So Judge --

 3              THE COURT:  Organizational dynamics, you've --

 4              MR. SMITH:  Organizational dynamics.

 5              THE COURT:  -- already objected.

 6              MR. SMITH:  Yeah.  We agree with the Court that

 7    that doesn't get the Government there and -- under the

 8    rules.

 9              Mr. Mulroe indicated that these messages are

10    indicative of broader currents and that the leaders

11    exploited those currents, but what we haven't heard from the

12    Government are specifics.  Where are the messages showing

13    leaders exploiting currents?  Whatever that means.  It's --

14    you can't just say that.  You have to show something to the

15    Court.  And I think there's a tendency sometimes on the

16    Government to, kind of, take a statement or take an idea and

17    then, kind of, run with it for a bit and say things like,

18    Well, they -- the leaders exploited currents, but there

19    don't -- there isn't actually any evidence showing those

20    things specifically, or we haven't seen them.  So we think a

21    level of detail is missing here the Government should be

22    showing.  We need a proffer.

23              And that's all, Your Honor.  Thank you.

24              THE COURT:  All right.

25              MR. PATTIS:  Briefly, Judge, on behalf of

1    Mr. Biggs, as to the 32, 34 series, I seem to recall that in

2    the arguments during jury selection and the motions in

3    limine, a lot of the material as to the Proud Boys and the

4    interaction with Antifa was proffered as a means of showing

5    their changed attitude toward the police, and that this was

6    going to shed some light on their activities on January 6th.

7    It's now been transformed into a celebration of violence.

8    And, you know, whatever else these exhibits show, they show

9    a candor about the use of violence in self-defense.  And I'm

10    not sure they should be reflecting violence or disavowal of

11    it.  If they genuinely believe that they struck and injured

12    a person in defense of themselves or others, they're within

13    their rights to say, This person had it coming, and do it

14    again, you'll get likewise.  That's not a celebration.

15    That's a statement of fact, and it's a statement that

16    they're well within their rights to make.

17          The difference between self defense and

18    insurrection is profound.  They both are within the class of

19    violent acts.  But to leverage self-defense and statements

20    about it into a support for an insurrection theory on

21    the 6th -- and that is the primary element, the use of force

22    against the government -- transforms evidence that was

23    offered for one purpose into propensity evidence.  And so

24    I'd ask you to consider not admitting it on those grounds --

25          THE COURT:  Well, I want to just say one thing.

1    The -- I admitted the -- Mr. Tarrio's crime on -- in

2    December and Mr. Bertino's stabbing for the reasons that I

3    articulated.  I don't think -- but I think -- I -- and I've

4    always -- part of my pretrial rulings was also to the extent

5    the defendants -- there's evidence that they, in connection

6    with the election, in connection with political rallies and,

7    again, after the election -- to the extent that the

8    Government needs to prove an intent to commit violence, I've

9    always said that some of those things were going to be --

10   some statements or evidence would be admissible along those

11   lines within those parameters, and I've admitted it from

12   their own statements to certain things they retweeted on

13   Parler and all the rest.  So I don't think some of this

14   evidence is of any different character than I already

15   admitted.  Now, this particular series is different because

16   it -- I think there's a whole 403 thing we've been talking

17   about, and evidence about organizational culture and what

18   other people were doing is also different.  And so -- I

19   mean, those are lines clearly that I, you know -- I've

20   drawn.  But I don't think that there's a hard line -- I

21   don't think this has been the bait-and-switch that you have

22   thought, Mr. Pattis, in terms of how some of this came in

23   and now it's for some other reason.

24           MR. PATTIS:  "Bait-and-switch" is --

25           THE COURT:  Yeah.  I mean --

```
 1              MR. PATTIS:  -- stronger --

 2              THE COURT:  -- maybe, that's too strong.

 3              MR. PATTIS:  -- than I want to put it.  I mean,

 4    it -- advantageous exploitation of the boundaries, I might

 5    call it that.  And I hear what the Court is saying and, as

 6    any number of counsel have said in this case, the

 7    transcripts will control, but I recall some lengthy debate

 8    about Antifa and Proud Boys, especially during jury

 9    selection, and suggestions that it was coming in for a

10    limited purpose.  And I remind the Court of its reservations

11    in -- about the "culture of violence" testimony.  This

12    begins to look precisely like that.  And that was raised sua

13    sponte in response to how the parties treated a certain

14    witness when doors were opened on cross-examination.

15              THE COURT:  Correct.

16              MR. PATTIS:  Backtracking, Judge, I have only

17    three points to make.  The second, as to the 12 through 14

18    and 16 exhibits, you know, on 403, I think any mention of

19    civil war in this context is inherently prejudicial.  The

20    country was, in the wake of that election, and remains,

21    deeply divided, and to suggest that -- a person looking out

22    their window wondering whether, Will I be able to live

23    peacefully under one oath and one flag into the future,

24    would be paying attention as opposed to being engaged in

25    sending -- in, sort of -- in any sort of inculpatory speech.
```

 1          The organizational dynamics point, Judge, you

 2     know, the law of the case has emerged in an odd way.  We

 3     have said on several occasions that we had reservations

 4     about the use of fact witnesses to give opinions about the

 5     states of minds of others.  And it's troubling enough when

 6     they do that about other individuals, but when they do it

 7     about other groups, it becomes downright prejudicial and it

 8     seems to become guilt by association.  In my view, the

 9     organizational dynamics evidence is precisely that.  We're

10     going to attribute to loosely affiliated individuals -- or

11     even if you want to call them closely affiliated in the MOSD

12     context -- we're going to assume states of mind -- we're

13     going to attribute states of mind to them based on isolated

14     incidences, and I just don't think that there is an

15     organizational dynamics exception to the hearsay rule.

16          Finally, with respect to 503-3, one of my favorite

17     metaphors from this case has been slicing the bologna too

18     thin.  I think Mr. Mulroe might agree that he was using an

19     X-ray to slice the bologna with respect to this when he

20     concedes that his argument may be, kind of, metaphysical.  I

21     just think this is traditional hearsay.  It's not a verbal

22     act.  It imposes no legal obligation.  It's an expression of

23     a desire by an unnamed third party and, therefore, fits

24     squarely within the hearsay rules and should be prohibited.

25          THE COURT:  Which exhibit --

```
1              MR. PATTIS:  That's 503-3, and that's --

2              THE COURT:  Oh.  503-3?

3              MR. PATTIS:  Yes.

4              THE COURT:  Okay.

5              MR. PATTIS:  503-3.  Yes, sir.

6              THE COURT:  All right.

7              MR. PATTIS:  And those are Mr. Biggs's remarks,

8     sir.

9              THE COURT:  Tim, you okay?

10             THE COURT REPORTER:  (Indicates affirmatively.)

11             THE COURT:  All right.  Any other defendant want

12    to be heard on these before we turn to the, sort of -- the

13    flip side?

14             MR. METCALF:  Your Honor, I'd like to be heard.

15             MS. HERNANDEZ:  (Indicating.)

16             MR. METCALF:  Do you want to be heard?

17             MS. HERNANDEZ:  Yes.

18             THE COURT:  All right.  Please.

19             MS. HERNANDEZ:  All the 500 exhibits -- that's the

20    elders group -- my client is not present.  He's not part of

21    the elders group.  He doesn't participate in any of them.

22    So I object to any of it --

23             THE COURT:  I'm sorry.  Ms. Hernandez, again, we

24    just -- I just went through a series of exhibits that I

25    asked the Government about.  I need you to follow along with
```

1    us here.  And those are the exhibits that I'm asking for any

2    argument on before we open the floor to the list of exhibits

3    that I, sort of, indicated I'm inclined to admit but wanted

4    to hear any objections from the defendants.

5           MS. HERNANDEZ:  So the Nick Ochs -- I'm sorry.

6    The --

7           THE COURT:  No. 16.

8           MS. HERNANDEZ:  No. 16, that is -- my client is

9    not part of the Skull and Bones elders group, so I object to

10   any of it.  That was a November 7th text, or message, which

11   means it's not a co-conspirator statement.  I echo the fact

12   that there is no such thing as an organizational structure

13   exception to the hearsay rules.  They're free if they can

14   show relevance to put on competent evidence of the

15   organizational structure.  As the Court already indicated,

16   they're going to have co-conspirators cooperators who are

17   going to be testifying.  They can bring it in that way.

18   There's no exception to the hearsay rules for

19   organizational -- and, as we have been told multiple times,

20   the Proud Boys are not on trial.  Individuals are on trial.

21   So the relevance of the organizational structure of the

22   Proud Boys qua Proud Boys is questionable.

23           With respect to -- well, pages 21, 22, 514-18,

24   514-19, that's all about organizational dynamics.  Again,

25   yes, if they can make it -- if they can show that it's

1    relevant, it can come in possibly, but not through hearsay

2    statements.

3              Same goes, I believe, for Page 41 and 42 which,

4    again, I think the primary explanation was organizational

5    dynamics.

6              And I just want to, for the record, once again,

7    state, the violence that occurred in the evenings during

8    fights with Antifa or BLM were not part of the day

9    demonstrations.  The demonstrations about the election were

10   during the day.  What happened in the evenings was something

11   different from that.  What happened in the evenings was the

12   supposedly contentious relationship between the Proud Boys

13   and Antifa and their view that Antifa was beating up, you

14   know, mothers, children, whatever.  So I object to the --

15   I -- for the record, to the extent that the Court is finding

16   that somehow violence in the after demonstrations, in the

17   evenings, against Antifa is somehow related to the

18   election -- obviously, the Court can make that finding, but

19   I just want the record to be clear that those events in the

20   evenings were not the demonstrations that took place during

21   the day.

22             Also, it's already been said, but that's classic

23   propensity evidence.  The charge here is force against the

24   United States of America, not force against another entity

25   or person.  I've already -- I made this objection in another

1          context.  There's a Supreme Court case on the seditious

2          conspiracy involving an attack on Chinese laborers, and the

3          Supreme Court reversed the conviction because the seditious

4          conspiracy offense does not encompass violence against

5          individuals.  It only encompasses violence against the

6          government.

7                   The Court looked at Page 98, 503-3.  And the

8          Government explained that this was the, you know -- I

9          believe it's Bertino explaining the -- the basic rule of the

10         Ministry of Self-Defense, but the whole -- that's the last

11         statement, or the last two statements.  The -- there were

12         seven or eight other messages before that that are

13         irrelevant to -- if the -- if what the Government wants to

14         introduce is Bertino's -- again, I don't believe

15         organizational structure comes in through hearsay, but if

16         the Government wants to introduce that particular statement,

17         it doesn't need the seven or eight previous messages on that

18         page -- on Page 98, 503-3.

19                  I'm not sure what 501-15 at Page 75 -- it -- what

20         its relevance is.  I guess these are different people

21         identifying the persons they want to bring into the Ministry

22         of Self-Defense.

23                  THE COURT:  Correct.  That's what I asked the

24         Government and they corroborated that.  So --

25                  MS. HERNANDEZ:  Right.  But unless these

 1    individuals that were brought in have any relevance to --

 2    like, are these people supposedly -- did they do something

 3    on January 6th that is relevant to the trial or is it

 4    just -- I don't understand why we need all these -- I don't

 5    understand why it's relevant, unless, you know -- if they

 6    can say that AM Crusader [ph] did X, Y, and Z on

 7    January 6th, then I can see why that would be relevant.

 8    Other than that, I'm not sure what it gains us.  That the --

 9    Mr. Pattis already made the argument.  The statement --

10              THE COURT:  If he already made the argument, you

11    don't need to, Ms. --

12              MS. HERNANDEZ:  Your Honor, my --

13              THE COURT:  I mean, I --

14              MS. HERNANDEZ:  I understand, but the Government

15    makes their arguments over and over and over and again, and

16    you don't stop them.  In fact, you ask them, do you have

17    anything else to say?  I -- I understand the Court doesn't

18    like me to make arguments, but I have to make them.

19              THE COURT:  All right.  Very well.  I just --

20    again, if it -- let me put it this way.  If the precise same

21    argument has been made, all you have to do is say, I adopt

22    Mr. Pattis's comments along those particular lines.

23              MS. HERNANDEZ:  546-1, which is the one about --

24    which the Court indicated you have a lot of problems with,

25    the one about the supposedly stabbing -- that somebody got

1   murdered or killed -- that is not about violence.  That's

2   about self-defense.  It's -- if it's not true, why would you

3   introduce something that's not true and then introduce

4   videos to show that it wasn't true?  That just doesn't make

5   any sense at all in terms of relevance.  And the 403 issue

6   is enormous.  And, again, that's an event that happened

7   before the conspiracy.  So the relevancy is minimal.  The

8   prejudice is huge.  It's not even accurate.  It's not about

9   violence.  It's about self-defense.  And you -- I mean, this

10  was -- four people were stabbed -- four Proud Boys were

11  stabbed.  I think Bertino was the one who was very seriously

12  injured, but at least one of them was, from everybody's

13  description -- could have been -- could have died.  So that

14  whole -- that just -- I don't understand what that -- I

15  don't understand the relevance -- minimal relevancy and

16  huge -- I mean, undue prejudice.

17          MR. JAUREGUI:  Jauregui for Tarrio, Judge.

18          We just adopt all prior arguments.

19          MR. METCALF:  Steven Metcalf on behalf of Dom

20  Pezzola.

21          With regards to Slide 16, I just want Your Honor

22  to focus, also -- this is November 7th, 2020.  I don't even

23  believe Mr. Pezzola's application to the Proud Boys was

24  submitted yet.  And he was never on the Skull and Bones

25  chats.  Again, 403, at some point, has to mean something for

1    particular individual defendants in this case.

2         I guess moving down to 21 and 22, same scenario.

3    Mr. Pezzola was never part of the official presidents chat.

4         Going to 32 -- or 31 to 30- -- well, 32 to 34, I

5    noted that Your Honor -- or -- agreed with the confusion and

6    the unfair prejudice could be substantial with regards to

7    these slides.  And I just also want to add, same thing as

8    before, which is Mr. Pezzola was never part of any -- of

9    these chats, Skull and Bones, the official presidents chat.

10         And Slide 53, I believe, has to do with Skull and

11    Bones as well and is dated on 9/29 of 2020.  I know that

12    we've raised some of these issues with other slides and

13    prior slides, but September 29th, 2020, Mr. Pezzola has no

14    application out to the Proud Boys, has no communication with

15    these guys.  This far -- this is -- intent or anything

16    having to do with relevancy to Mr. Pezzola is far removed

17    with regards to Skull and Bones or any chats that date back

18    that far, especially with regards to any alleged conspiracy

19    that could have been formed at that time.

20         And we adopt the rest of co-counsel's arguments,

21    as well.  Thank you.

22         THE COURT:  All right.  Very well.

23         We will take -- now, we need to take a quick break

24    for the court reporter.  So we'll take that quick break and

25    come back on that other group that I had indicated I was

1    sympathetic to the Government and not sympathetic to the

2    defendants' arguments, but want to hear from anything the

3    defendants want to highlight in that regard.

4            The other thing I wanted to mention that, I think,

5    jumped out at me, as I saw some of these things, if I'm

6    putting on the table things that I could see I'd be a little

7    skeptical of, you know, I -- as -- Mr. Mulroe, you said that

8    the -- I, you know -- I -- the Government's direct of the

9    Parler agent, if we -- put it that way, the agent through

10   whom you introduced the Parler posts, you know, was fairly

11   limited -- or fairly tethered to just the content of the

12   posts.  There was cross-examination that opened things wide

13   up in other ways, but okay.  I do think that -- I saw, you

14   know, one of the things -- and circling back to one case

15   Ms. Hernandez had brought to my attention at some point, I

16   do think -- for example, there's this issue of Minecraft and

17   what that means.  I mean, I -- one -- the case that -- as I

18   recall, the case that Ms. -- we don't have to decide this

19   today, but I'll just say, I think the case that

20   Ms. Hernandez had brought to my attention -- it's escaping

21   me now -- in terms of summary, you know -- a witness

22   offering summary testimony, I don't think that's what Agent

23   Camiliere offered at all.  But to the extent that -- as I

24   recall, what that case -- I think it was that case -- did

25   say was that, you know, to the extent that an agent on

1    direct testifies that, Oh, I know something means something

2    in an email, in a text, whatever, because I read all the

3    other texts and -- as a part of my investigation, that's the

4    kind of summary testimony that, I think, the Court of

5    Appeals does not -- frowns upon.  So you know, I'm sure,

6    again, the Government may well have witnesses that can say,

7    This is a term we used.  This is why we used it.  I do think

8    that's an area where an objection would likely be

9    well-founded.  We can talk about it as we go forward, but I

10   just wanted to put that on the record, that that -- again, I

11   thought the agent in that case for the Parler posts did not

12   cross over, I don't think, in any -- into, sort of,

13   interpreting what someone meant by something in a similar

14   way, but I wanted to put that on the record.

15            All right.  We'll take 10 minutes for the court

16   reporter and be back.

17            THE DEPUTY CLERK:  All rise.  This Honorable Court

18   stands in recess for 10 minutes.

19            (Brief recess taken.)

20            THE DEPUTY CLERK:  We're back on the record in

21   Criminal Matter 21-175, United States of America v. Ethan

22   Nordean, et al.

23            You all missed the "please be seated"?

24            (Laughter.)

25            THE COURT:  All right.  Let me turn to the

 1    defendants, starting with Mr. Nordean, and as to that

 2    broader category of documents, exhibits, let me hear any

 3    particular objections you'd like to highlight, sir.

 4              MR. SMITH:  Thank you, Judge.

 5              So we're at 1 -- PDF page 197, which is Government

 6    Exhibit-507-16.  PDF Page 197.

 7              THE COURT:  Mm-hmm.  And the exhibit number,

 8    again?

 9              MR. SMITH:  507-16.

10              THE COURT:  Yep.  I'm there.

11              MR. SMITH:  So Judge, you'll see that this is a

12    January 4th snapshot in the Ministry of Self-Defense main,

13    and there's a chat at 3:23 p.m. from Brother Hunter Jake

14    Phillips [ph] that says, What would they do if one million

15    patriots stormed and took the Capitol building?  Shoot into

16    the crowd?  I think not.  So we think that the admission of

17    this particular statement against Mr. Nordean would be a 403

18    problem because Mr. Nordean has never communicated in the

19    Ministry of Self-Defense main chat and, therefore, there's

20    no evidence that he saw or adopted that statement.  It's --

21    the risk of confusion is enormous and it's unfair prejudice

22    because there's no evidence Nordean agreed with the concept

23    that patriots were -- would potentially storm the Capitol

24    and take the Capitol building.  I'm not -- this goes to one

25    of the points Ms. Hernandez was making, but I'm not clear

1    what the relevance of that message is, if not to show the

2    truth of that statement, or the suggestion that the --

3    that's some insight into the -- what the plan was.

4            THE COURT:  Well, let me just start with your

5    first point, which is just -- so the -- your argument, at

6    least in the first instance, is simply that even if this

7    were admissible along some line that doesn't directly touch

8    on your client, because it's -- you just think it -- I mean,

9    is your first argument, Mr. Smith, an argument really for a

10   limiting instruction, or no?

11           MR. SMITH:  It's an argument that -- well, if the

12   limiting instructions indicated that this statement is not

13   being admitted against Defendant Nordean, yes, that would be

14   the limiting instruction we're asking for, not to admit the

15   statement against Defendant Nordean, because he didn't see

16   it; there's no evidence he saw the statement.

17           THE COURT:  Right.  But --

18           MR. SMITH:  So --

19           THE COURT:  -- he doesn't -- I mean, depending

20   upon -- let me put it this way.  Any theory of admissibility

21   for the statement doesn't turn on that.  Does it?

22           MR. SMITH:  So Your Honor, if -- I don't

23   understand the Government to be arguing that they're saying

24   this is a co-conspirator statement.  They're not -- we don't

25   even know who Brother Hunter Jake Phillips is.

```
 1                THE COURT:  Right.  But --
 2                MR. SMITH:  So if it's not admitted under the
 3      co-conspirator exception, what is the hearsay exception or
 4      non-hearsay argument that would allow that statement to be
 5      admitted against an individual who never saw it?
 6                THE COURT:  Right.  But I mean, again, I think the
 7      point there is that you have a co-conspirator responding to
 8      the statement in a variety of ways.  So I could see various
 9      theories of admissibility for those other statements, but
10      the point is he's responding to the statement from Brother
11      Hunter Jake Phillips.
12                MR. SMITH:  So when -- is Your Honor referring to
13      Johnny Blackbeard?
14                THE COURT:  Yes.
15                MR. SMITH:  So when Johnny Blackbeard is saying,
16      No surprise there, we would say it -- that's not a
17      co-conspirator statement because it doesn't further
18      anything.  He's just making an observation, No surprise
19      there.  It's not even clear what he's talking about.  Then
20      the next statement he makes is, He is a piece of shit
21      communist.  Who is "he"?  I guess he is -- the POS communist
22      is Pat Toomey, who's referenced in the first chat there.
23      And then Blackbeard's next comment -- he seems to be --
24      Blackbeard is referring to the Toomey comment, which is the
25      first chat in the window.  So then you have, sitting right
```

1    in the middle of that conversation, a statement about

2    patriots storming the Capitol.  Blackbeard isn't even

3    referring to that.

4              THE COURT:  Well, he is in the last one.

5              MR. SMITH:  That would do nothing because they can

6    do nothing?  That would do nothing --

7              THE COURT:  They.

8              MR. SMITH:  Oh.  They would do nothing because

9    they can do nothing.

10             So he could still be referring to Toomey, but I

11   don't understand how that's furthering the conspiracy if

12   he's talking to people who are not co-conspirators.

13             THE COURT:  Well --

14             MR. SMITH:  So if he's -- you hear no argument

15   from the Government that KBS-Man 2 and Brother Hunter Jake

16   Phillips are co-conspirators.  So you have one person who is

17   allegedly a co-conspirator speaking to people who are not

18   co-conspirators.  How does that further the conspiracy?

19             THE COURT:  Well, I will -- I'll ask them of their

20   theory, but I hear what you are saying.

21             MR. SMITH:  So -- and if it doesn't, Your Honor,

22   then you just have this statement sitting out there

23   referring to people taking -- I hate -- I don't want to

24   impute ulterior motives to the Government, but it seems a

25   little bit coincidental that you have, sitting right in the

1    middle of this conversation about Toomey between two

2    non-co-conspirators and a co-conspirator -- it seems a

3    little coincidental that there's a reference to storming and

4    taking the Capitol Building in there.

5            THE COURT:  Oh, I think they'd be fine -- I don't

6    think they're offering it for the Toomey statement.  So I

7    don't -- I mean, I -- I think they want the response to the

8    storming of the Capitol.

9            MR. SMITH:  Okay.  Your Honor, so we would say

10   it's not furthering the conspiracy because Mr. Blackbeard is

11   not talking to anyone in the conspiracy.

12           THE COURT:  Okay.

13           MR. SMITH:  So it would be the same as if he's

14   saying that to his dog, you know, what -- how does that

15   further the conspiracy?

16           Then on -- the next one is 154.  That's Government

17   Exhibit-510-19.

18           THE COURT:  I'm sorry.  Somebody's talking over

19   there.  I just -- somebody at the defense table is talking

20   loudly enough that I can hear them.

21           All right.  So go ahead.  Very well.

22           MR. SMITH:  This -- one of the non-tools and

23   non-co-conspirators, Pedro Q-tip Homelander [ph], says, A

24   lot of Trump supporters will be armed this weekend.  And

25   Noble Beard, the Immortal, says, Good, I hope they use them.

1    And then Leo Kuznetsov says, Me fucking, too.

2            Again, you have two non-co-conspirators, or

3    non-tools, to this person, Noble Beard.  How is that

4    furthering -- that doesn't further the conspiracy.

5            THE COURT:  Yeah.

6            MR. SMITH:  Good, I hope they use them.

7            Also, an indication of hope -- an expression -- an

8    expression of hope is not in furtherance of anything either.

9    It's just --

10           THE COURT:  Hold on one second.  This one -- hold

11   on one second.  So --

12           (Brief pause.)

13           And --

14           MR. SMITH:  And we would argue that the risk of

15   jury confusion and prejudice here is enormous because this

16   goes to arming, you know -- referring to the potential use

17   of force.

18           THE COURT:  Yeah.  I mean, this one -- actually,

19   it's funny.  It should have been on the -- in a way, the

20   tools -- or, maybe -- I'm not sure whether it was or was

21   not.  I mean, the last -- as I see it, that last statement

22   just from -- the Government, when it's your turn to respond,

23   it seems to me the last statement is at least a tools --

24   that does depend on the tools theory one way or the other.

25           MR. SMITH:  And, Your Honor, Pedro -- the same

1    principle would apply to the first statement.  Pedro Q-tip

2    Homelander is not a co-conspirator.

3            THE COURT:  No, but not if, again, you've got a

4    co-conspirator responding to that statement.

5            MR. SMITH:  Yes, Your Honor, but it still has to

6    be in furtherance of the conspiracy.  So if we stipulate

7    that the first and the third speaker -- declarants are not

8    co-conspirators, how -- the question is, how does a

9    co-conspirator statement to someone who is not a

10   co-conspirator further the conspiracy?

11           THE COURT:  Well -- yeah.  I mean, I guess the

12   question is whether it's a co-conspirator statement or

13   offered for the mental state of the co-conspirator.

14           MR. SMITH:  The -- so, I think, then, we would get

15   back to the problem of imputing mental states.

16           THE COURT:  Well --

17           MR. SMITH:  Because --

18           THE COURT:  Well, okay.  I -- it's --

19           MR. SMITH:  And here -- and on that issue, Your

20   Honor, again, we would point out this is a Ministry of

21   Self-Defense main chat.  Again, no evidence that Mr. Nordean

22   ever sent a message in this chat group.  So we would be

23   doing this imputing co-conspirator mental statement thing in

24   a chat group where Mr. Nordean has given no proof of

25   communicating.

```
 1                THE COURT:  Well, again, that could be a -- okay.
 2     Fair enough.  I'll -- the Government -- the Government will
 3     have its opportunity to argue its -- which theory of
 4     admissibility it's really relying on, but I understand your
 5     argument.
 6                MR. SMITH:  And so just to be clear, that was a --
 7     that's a 403 argument.
 8                Then the next one is PDF page 150.  The Government
 9     exhibit number is 505-6.
10                THE COURT:  Which -- Mr. Smith, just so I am
11     keeping track, you're working, I think, backwards.  What was
12     the first PDF number you started with?
13                MR. SMITH:  I started with PDF No. 197 and then I
14     went to PDF No. 154.
15                THE COURT:  I'm with you.
16                MR. SMITH:  And now I'm on PDF 150, which is
17     Government Exhibit-505-6.
18                THE COURT:  Mm-hmm.
19                MR. SMITH:  So on this one, there's a couple of
20     issues here.  There's another Minecraft reference.
21                THE COURT:  Well -- okay.
22                MR. SMITH:  And this -- which is, you know, an
23     implication of potential crimes but without -- but vague,
24     without describing what they are or the basis for believing
25     that the group is referring to Minecraft, meaning crimes on
```

1    January 6th.

2            Then, Your Honor, this is a Ministry of

3    Self-Defense op chat window.  Again, no proof, according to

4    the Government itself, that Mr. Nordean ever sent a message

5    in this chat group.  There's some references to gays, Your

6    Honor, which we think, as a running theme here -- we think

7    it's very easy to redact simple statements like that, the

8    N-word, fags, faggots, those things, those -- that don't add

9    any content to the messages.

10           The next one is PDF Page 142.  This is Government

11   Exhibit-538-18.  This is a statement -- a chat between just

12   two people, Defendant Tarrio and someone -- and Mama Fay

13   [ph], where Tarrio refers to the Winter Palace.  This is

14   a -- we understand this is a defendant -- this is a party

15   admission for Defendant Tarrio, but we would ask for

16   limiting instructions in every case where Nordean doesn't

17   have any access to the communication.

18           THE COURT:  I mean, look, you -- we're going to --

19   there's going to be, clearly, an instruction, whether you

20   want to call it -- part of it a limiting instruction or part

21   of a just -- yeah, a limiting instruction about how the jury

22   is to make sense of these various statements.  So you know,

23   it's stipulated that you're going to have -- we're going to

24   have to work that out.

25           MR. SMITH:  Well, one simple way to make a

1    limiting instruction, I think, just while we're on this

2    subject would be to say, The Government has stipulated that

3    the defendant -- in this particular chat group, the

4    Government has stipulated the defendant did not send any

5    messages; therefore, you should not consider this -- these

6    statements against the defendant -- I mean, unless it's a

7    co-conspirator statement or --

8                THE COURT:  Yeah, it gets a little tricky, as I --

9    we have talked about before, about what can still be, for

10   example, considered as evidence against -- of the

11   conspiracy.  So in a theoretical sense, it could be

12   considered against your client in a very roundabout way.  So

13   I'm -- I think I've laid out before where I think the lines

14   are on that, but, you know, again, you all are going to have

15   to -- we're going to have to work on what the -- what it

16   says.

17               MR. SMITH:  So the next one, Your Honor, is PDF

18   page 138, which is Government Exhibit-505-18.  And this is

19   an exhibit that appears to run contrary to the Government's

20   concept of adoption of a statement through failure to rebuke

21   the declarant.  You have an individual -- a tool here,

22   Gabriel PB, who says, I'm taking a knife.  And I think he --

23   someone says in response to him, Yo, not that it matters,

24   but you do know D.C. knife rules?  And you have Tarrio --

25   Defendant Tarrio appearing to say here, Negative.  Heavy

1  restriction.

2       So this is, like, the kind of rebuke that the

3  Government appears to be referring to, and yet the

4  Government is still trying to show that, I'm taking a knife,

5  even though he was rebuked.  So this would seem to be the

6  case where this is not a proper tools, you know, imputed

7  state of mind statement with Gabriel PB saying, I'm taking a

8  knife, because he was rebuked.

9       THE COURT:  Well, I think, you know, again, I'll

10  let the Government -- this is one -- 505 -- we didn't talk

11  about this -- give me one second here.  Well, yeah, this --

12  again, I think, could have been fairly brought up under

13  tools in the sense that I think that the -- we can argue

14  about whether, you know -- again, the -- there's a --

15  whether there's relevance for the statements from Mr. Tarrio

16  and Mr. Biggs, but it seems to me it's the -- it's the last

17  statement on the page that the Government is -- the --

18  that -- part of what they want here, and that, it does seem

19  to me, turns, you know -- I don't give a fuck about the

20  rules anymore -- and that's -- that is one that, you know, I

21  think, turns on the tools theory.

22       MR. SMITH:  Well, I guess, then, the Government's

23  principle would be, if you fail to rebuke someone twice in a

24  row, you adopt their statement, because you have Tarrio

25  rebuking him once.  Then he comes -- Gabriel is persistent.

1    And he says, No, no, no, I'm going to do this.

2         So now, the Government would be saying, Well,

3    Tarrio has adopted the knife statement by failure to rebuke

4    twice.  How many times --

5         THE COURT:  I think you're mixing and matching --

6    I mean, look, they can argue for its admissibility based on

7    something else, and you -- that doesn't mean you can't use

8    it to undermine their other theory about why the -- some --

9    another exhibit is admissible.  So I'll -- I'll hear them,

10   but I -- as far as -- it seems to me that at least the

11   statements by Mr. Tarrio and Mr. Biggs, again, subject to

12   relevance, can come in as, you know -- whether -- as --

13   whether they're co-conspirator statements or party opponents

14   and -- statements of a party opponent, but the -- it's the

15   last statement that, I think, turns on tools.  And if the

16   tools theory works, it comes in; if not, it really does not.

17        MR. SMITH:  Okay.  Your Honor, the next one is PDF

18   Page 124, and the Government exhibit number is 507-7.  And

19   this one is significant, Your Honor, because it says -- the

20   Government's using this chat to show that individuals

21   knew -- in the Ministry of Self-Defense main chat knew that

22   Dominic Pezzola would be coming on January 6th because it

23   says, Welcome, Spaz.

24        THE COURT:  But why can't they just be using it to

25   show that fact, period?

1          MR. SMITH:  Because -- so Your Honor, it wouldn't

2     be able to -- the Government wouldn't be able to use it to

3     show Mr. Nordean's knowledge because Mr. -- again, there's

4     no proof that this chat, Ministry of Self-Defense main,

5     involved -- had Mr. Nordean's eyes laid on it at any point

6     because he never communicated in that chat group.

7          THE COURT:  Sure.

8          MR. SMITH:  So the limiting instruction would be,

9     if this is used to show that the defendants had knowledge

10    that Mr. Pezzola would be there, it cannot be used in that

11    way against Mr. Nordean.

12         THE COURT:  But why can't it just be used to show

13    that he joined the chat?

14         MR. SMITH:  That he -- well --

15         THE COURT:  Mr. Pezzola is now part of the chat.

16         MR. SMITH:  Correct, Your Honor, but if -- to the

17    extent the Government is using it to show that the

18    defendants knew that Mr. Pezzola would be there on

19    January 6th, then that can't be done against Mr. Nordean

20    without some proof that Mr. Nordean was ever using this chat

21    group.

22         THE COURT:  Okay.  But, again, this just strikes

23    me as a -- it's clearly admissible to show, right,

24    Mr. Pezzola joined the chat, then.

25         MR. SMITH:  Yes.

1          THE COURT:  Now, if you want a limiting

2     instruction -- again, we can talk about the limiting

3     instruction.  I'm not -- but that fact, it --

4          MR. SMITH:  We --

5          THE COURT:  -- would be admissible for that

6     purpose; right?

7          MR. SMITH:  So Judge, we're only talking about the

8     limiting instruction point that Your Honor just alluded to.

9     We're saying that -- the -- to the extent the Government

10    argues that they knew Pezzola would -- they knew Pezzola,

11    who was engaged in the -- had the wooden shield and all that

12    other kind of evidence -- they knew Pezzola would be coming

13    on January 6th, that argument cannot be made against

14    Mr. Nordean using this chat absent proof that Mr. Nordean

15    ever interacted with this chat group, ever, and there isn't

16    any proof.  So we would ask for a limiting instruction on

17    that issue to the extent the Government is making that

18    argument --

19          THE COURT:  All right.

20          MR. SMITH:  -- with this -- and then, Judge, on

21    PDF Page 114 through 116, there are some chats between

22    Tarrio and Pezzola about bringing the wood shield down.

23          THE COURT:  Yeah.

24          MR. SMITH:  These -- I've got to -- we do not

25    understand the relevance of this testimony about the wooden

1    shield coming down to D.C. and, in fact, we think it's a 403

2    issue because it's confusing the jury.  There are so many --

3    there's other testimony about the shield Dominic Pezzola

4    took on January 6th and it -- the Government seems to be

5    making some sort of insinuation that that was planned and

6    that this is evidence of that because he had a wood

7    shield --

8              THE COURT:  No --

9              MR. SMITH:  -- or some -- I'm not -- well, we

10   don't really know what the relevance of the wood shield

11   testimony is, but it's confusing, Your Honor, and this whole

12   line of evidence about that is a 403 issue.  Also, we would

13   ask for a limiting instruction here because Mr. Nordean

14   didn't see these -- there's no evidence he saw these

15   communications --

16             THE COURT:  All right.

17             MR. SMITH:  -- about the wood shield.

18             THE COURT:  What are the numbers of those --

19             MR. SMITH:  That's 114 through 116.

20             THE COURT:  Okay.

21             MR. SMITH:  Your Honor, on No. 14 -- that's 5 --

22   that's Government Exhibit-514-16 -- Tarrio says, If Biden

23   wins, we're going full fash [ph] -- full fascist.  That's

24   November 6th.  So we understand that's a party admission,

25   but that's -- this is a serious 403 issue and a spillover

```
 1    problem.  So even if, you know, Mr. Tarrio intends to go

 2    full fash [ph], that's not necessarily -- we don't

 3    understand how that's proof of the charges in this case.

 4    It's just some nasty comment.

 5               THE COURT:  Well --

 6               MR. SMITH:  And so --

 7               THE COURT:  Well, I mean, I -- you should make

 8    that argument.  But, again, I think the question is -- on

 9    this one, something like that -- again, what number are we

10    talking about here?

11               MR. SMITH:  That's PDF Page 14 --

12               THE COURT:  14.

13               MR. SMITH:  -- and it's Government Exhibit-514-16.

14               THE COURT:  Yeah.  I mean, look, I think --

15               MR. SMITH:  I also think it's facetious, but --

16               THE COURT:  Well, I mean, I -- look, I think

17    that's one where, again, you're going to have to -- we can

18    talk about how to limit it, but I think it's coming into

19    evidence, as you suggest, one way or the other.

20               MR. SMITH:  Well, we -- so just --

21               THE COURT:  I mean --

22               MR. SMITH:  We stipulate it's a party admission,

23    but we didn't suggest that under 403, it should be -- yeah.

24               THE COURT:  Fair point.  Fair point.  I'll say it

25    from my perspective.  It's coming in.
```

```
1              MR. SMITH:  Okay.

2              THE COURT:  And -- let me put it that way.  And we

3    can talk about what -- how you want to --

4              MR. SMITH:  Okay.

5              THE COURT:  -- if a limiting instruction is

6    appropriate.

7              MR. SMITH:  Okay, then.  Your Honor, No. 20 -- PDF

8    Page 20 -- that's Government Exhibit-530-3 -- Bertino says

9    that, On -- this is, you know, November 9th, 2020.  He says,

10   On Saturday, we're going to have a chance to get on -- get

11   us on video smashing people.  That's just -- this just

12   appears to be straight -- that's, again, character, you

13   know -- propensity to commit violence.  He doesn't even

14   say -- he doesn't say, Smashing people in connection with

15   the presidential election.  I'm sure, on Saturday, things

16   are going to get crazy, so we'll have a chance to get on

17   video us smashing people.  We would argue that's excludable

18   under 403.

19             On Government -- PDF Page 25 -- that's Government

20   Exhibit-521-1 -- Tarrio and Biggs are talking

21   on November 16th, and Biggs says, I've got thousands of

22   rounds and guns.  That's -- we would -- again, a party

23   admission, but -- I don't understand the relevance, but it's

24   certainly a 403 issue.  It's just a random reference to guns

25   and shooting and war.
```

1          THE COURT:  And it's -- again, I -- look, post --

2    particularly post-election expressions of how -- if the

3    election -- I mean, this doesn't say it specifically, but --

4    I mean, I think, post-election statements like this, you

5    know, I have admitted before, and I think they are

6    admissible, generally speaking.

7          MR. SMITH:  Okay.  And I think the last one here,

8    Your Honor, is 29 which is in a -- this is Government

9    Exhibit-548-8.  It's in a chat group called East Coast Rally

10   Command.  And there's a person -- a tool, or someone who's

11   lesser than a tool, called El Jefe [ph], and he says, I've

12   got a guy trying to find every single bit of wiggle room

13   when it comes to weaponry.  Someone -- Captain Trump says,

14   There's -- there was a whole thing with guns in

15   Idaho/Montana.  This is just -- this appears to be a, kind

16   of, free-floating, vague --

17         THE COURT:  Yeah.

18         MR. SMITH:  -- conversation about guns in Montana.

19   I mean, even if this is after the election, it doesn't

20   appear to be direct- -- referencing a -- the attendance at

21   any rally -- a political rally --

22         THE COURT:  Well --

23         MR. SMITH:  -- unlike the last -- the last one was

24   referring to a November rally.  This is just talking about

25   guns.

1            THE COURT:  Well, yeah.  It's got a co-conspirator

2     explaining that, at least in his view, We don't need

3     weapons.  And, you know, part of your case has been to say,

4     How crazy would it be to try to overtake and oppose the

5     government by force without weapons?  And here, I have a

6     co-conspirator saying, We don't really need weapons.

7            MR. SMITH:  We're -- and so if -- Your Honor, if

8     this were in the context of a rally, particularly

9     January 6th, I take that point, but here, it just seems to

10    be a conversation, like, We don't need weapons generally,

11    you know?  We don't have any context here, certainly,

12    suggesting this is about weapons and a particular rally,

13    much less January 6th.  We just don't need weapons.

14            THE COURT:  Well, it's a few days before the

15    December rally; right?

16            MR. SMITH:  But it -- that doesn't -- so Your

17    Honor, we don't see any -- again, like Ms. Hernandez said, a

18    part of the problem with these conversations is they're

19    decontextualized.  They're -- sometimes it's not clear what

20    people are referring to and you just see three or four

21    chats, but to me, just based on this -- these couple of

22    chats, it's not clear they're talking about, We don't

23    need weapons at a particular rally.  It's just, We don't

24    need them.  And then you have Captain Trump talking about

25    guns in Idaho and Montana.  What is that?  That doesn't

1    appear to be a reference to a rally.

2           THE COURT:  Yeah.  I mean, that particular thing,

3    I don't know what that means.  We'll -- but okay.

4           MR. SMITH:  So we would argue that it's confusing

5    and unfairly prejudicial to have conversations about guns

6    that aren't connected to any particular event.

7           And then, Your Honor, the last point is we've

8    highlighted in that spreadsheet we emailed to the Court

9    every use of the N-word in these messages; references to,

10   you know, fags and stuff like that, and we, you know -- part

11   of the -- we know the Court ruled earlier on a pretrial

12   motion that it wouldn't require the Government to redact it,

13   but it's a little bit different when we can, sort of,

14   surgically point to every single reference and just ask --

15   this is about -- I guess it's, like, 10 to 12 cases.

16          THE COURT:  7, 46, 53, 59, 98, 101, 104, 106, 145,

17   179.  Those are, I think, the ones you've pointed that out

18   in, and I will look at them.

19          MR. SMITH:  And, Your Honor, if the Government

20   were to come back and say, Well, those were -- the

21   pejorative words add substance to the conversation, that

22   would be one thing, but if they're just saying, Well, it's

23   sitting there, and so what are we going to do it about it --

24          THE COURT:  Well --

25          MR. SMITH:  -- in that case, then it should be

1      redacted.

2                    THE COURT:  Okay.

3                    MR. SMITH:  Thank you, Your Honor.

4                    THE COURT:  Fair enough.

5            Mr. Pattis?

6            MR. PATTIS:  Several for Biggs, Judge.

7            As to 71, which is 501-25 --

8            (Brief pause.)

9            Let me know when you're there.

10           (Brief pause.)

11                   THE COURT:  Yes, I'm there.

12                   MR. PATTIS:  Reference toward the bottom to K-zoo

13     which I presume to be Kalamazoo.  It's hard to know how to

14     strike that, given the context, since it talks about the use

15     of a helmet-like device which may correspond to the shell

16     that was introduced through one of the search agents.  But

17     referring to a prior incident would suggest a propensity

18     problem, if there's a way to avoid that.  And I presume that

19     means Kalamazoo.  I spoke to Attorney Mulroe about that.

20     I'm not sure if he has any further light to shed, but that's

21     how I took it.

22                   THE COURT:  Yeah.

23                   MR. PATTIS:  Second issue, Judge, and I believe

24     this may be moot.  You may recall we had a little row long

25     ago about manual copies of the exhibit.  I was provided with

1    manual copies.  I'm working off of a 106 which is 501-39.  I

2    believe reference to the Black fellows [sic] banner has been

3    removed, but I just wanted to confirm that.  You'll note

4    that -- it's about 70 percent of the way down in the body of

5    the text.

6               THE COURT:  Which -- what is the --

7               MR. PATTIS:  It's 106 and it's 501-39.

8               THE COURT:  Yeah, I'm looking -- I -- what I'm

9    looking at appears to have removed all of that completely.

10              MR. PATTIS:  Okay.  So then that's moot.

11              I join Mr. Smith's arguments as to 197, 154, and

12   20.  These are PDF numbers.  197 is 501-6, 154 is 510-19,

13   and 20 is 530-3.  I didn't note several of those, but I

14   think his arguments persuade me.  I missed those.  And I

15   offer the following comments for the Court to consider.

16   With respect, for example, to 154 or -- I believe it's 154.

17   Give me one second, please, sir.  There are multiple

18   foundations suggested for some of these exhibits, but,

19   really, if the Court were to consider the foundations as

20   offered, they're not applicable at all.

21              So consider 197, the mental state of a defendant

22   or co-conspirator.  That presumably means the state of mind

23   of a person who -- in order for that person to have a state

24   of mind as to an observation, they have to have seen it,

25   hence the nexus requirement.  When you offer the act of a

1    co-conspirator, all co-conspirators are chargeable with that
2    overt act, but there's no case law that says "my guilty mind
3    is attributable to my co-defendant's guilty mind."  The
4    offense is joining together in a conspiracy.  The offense is
5    proven by such evidence that shows there was an agreement
6    and then the overt act requirement.  As I've listened to
7    arguments in the course of the last couple days, the
8    Government seems to be collapsing or transforming the state
9    of mind of a defendant into an overt act, and it's just not
10   the law.
11            With respect to the mental state of tools, same
12   analysis.  The mental state of a tool reflects their
13   impressions.  It doesn't reflect their conduct.  And it's
14   fine to have violent and vituperative thoughts in this
15   country.  That's protected speech.  What you can't do is act
16   on them.  So a mental state, standing alone, is probative of
17   nothing and is highly prejudicial.
18            THE COURT:  Mr. Pattis, can I just pause you there
19   for a moment.
20            MR. PATTIS:  Yes.
21            THE COURT:  Put aside the tools piece which is,
22   you know, a little more unusual, but as far as a
23   co-conspirator goes, I -- is it really that exotic a theory
24   to say the mental state of a co-conspirator shouldn't come
25   in?

1              MR. PATTIS:  Well, I think it -- in some cases,

2    perhaps not.  If we're going to rob a bank and I'm at the

3    handgun store saying, Boy, I could use this to take out six

4    people, that may or may not be indicative of an intent to

5    use a weapon in furtherance of a conspiracy.  If it's

6    post-November 6th and I'm watching the returns and I'm

7    saying, This means war, that, you know -- that might be

8    covered by the curative -- or the limiting instruction we

9    gave after the agent, but I don't think it's obvious that

10   speech in every instance or a mental state reaching months

11   before the act, especially on the evidence in this case --

12   and, again, I, you know -- Judge, I made -- I haven't heard

13   the Government's full case, and I'm imagining what it can be

14   from what I've read, but I think -- I'll repeat what I said

15   earlier today.  The Government is not going to produce

16   evidence that there was a months-long conspiracy to storm

17   the Capitol on January 6th.  They're going to come up with

18   some sort of ad hoc theory manufactured in an instant at the

19   last possible minute, and then they're going to try to read

20   back dispositions and speech from months later to show a

21   disposition to commit the crime and, you know, we think

22   that's improper.

23              Impact on the listener, I think that's one of

24   the -- no, okay.  But even when -- with respect to those

25   where impact on the listener has been offered, there still

```
 1    has -- there's a nexus requirement in that case, and so many
 2    of these exhibits seem to be free-floating that somebody
 3    says something and, independent of any evidence that the
 4    listener actually heard it, there's no nexus.  And absent
 5    that nexus, it's simply a speech act floating in space
 6    untethered in time to the person who's -- who it presumably
 7    has impact- --
 8              THE COURT:  But isn't that limited to the tools
 9    theory?  In other words, I think all the other instances
10    here where -- other than the tools theory, there are plenty
11    of times when you have -- where something would come in
12    because, let's just say, one of the defendants responded to
13    it.  I'm not talking about -- that's not -- that statement
14    isn't floating in space.
15              MR. PATTIS:  No, that's a different -- and that's
16    a --
17              THE COURT:  Okay.
18              MR. PATTIS:  -- different hypothetical.  I --
19              THE COURT:  Okay.
20              MR. PATTIS:  -- agree.
21              THE COURT:  Okay.  I --
22              MR. PATTIS:  And I would concede that.
23              THE COURT:  Okay.
24              MR. PATTIS:  But I think that for the others -- I
25    mean, you know, what -- you have a danger of transforming
```

```
1    the propensity bar into something far more.  I think under

2    404(b), it's knowledge, intent, plan, preparation,

3    opportunity, motive, identity, absence of mistake, and then

4    the case law recognizes signature crimes and a couple other

5    things, and these are all vehicles to get at the person's

6    action at the time, because what has to be proven for a

7    crime isn't just a guilty mind but guilty actions.

8              THE COURT:  Yes.

9              MR. PATTIS:  And I think the danger in the -- in

10   so many of the Government's theories, as presented here, is

11   they're simply showing guilty minds and they're doing so in

12   an area that is entitled to great constitutional deference;

13   that is, speech, even violent speech, that is not an

14   imminent threat to do harm.

15             So we've argued this point before.  I'm repeating

16   myself.  So those are all I have to contribute to this

17   discussion, sir.

18             THE COURT:  All right.  Thank you.

19             MS. HERNANDEZ:  Your Honor, I think this is a

20   moment where I can show the Court what we're talking about

21   with these Telegram chats.  And so I'll mark this as Rehl

22   Exhibit-1 for this motions hearing.  So in -- if we were to

23   have the phones in front of us, for this -- and I'm sorry

24   for all this writing.  Just ignore it.  This person,

25   Hulkamaniac [ph], you can tell who he's responding to by
```

1    this line here, 95 percenter.  So the text messages -- or

2    the messages actually can identify whether they're

3    responding to the original one or some other -- some other

4    message in a list.  And that's what we want.

5            And my understanding is that Cellebrite does

6    not -- is not able to capture that when they download it.

7    The only way to -- the reason this is -- we have this, I

8    believe, is someone had a screenshot of a Telegram chat.

9    But the -- so my understanding is the Government has the

10   phones in their possession.  They've seized all our phones.

11   We don't have them.  But if those phones get fired up, we

12   could identify particularly the ones we're objecting to, or

13   the ones we're saying, That's not our client, or our client

14   is responding to something else.  So at a minimum -- and

15   particularly as -- I read those email messages from Special

16   Agent Cain who is the, quote-unquote, expert who's going to

17   be testifying on Telegram --

18            THE COURT:  Just to be clear, he's an expert?

19            MS. HERNANDEZ:  I mean she.

20            THE COURT:  She is an expert witness?

21            MS. HERNANDEZ:  Not the -- the agent who's going

22   to introduce these is not an expert witness --

23            THE COURT:  Okay.  Because you --

24            MS. HERNANDEZ:  -- but there is an expert witness

25   on Telegram.

1          THE COURT:  That the Government is going to put

2    on?

3          MS. HERNANDEZ:  Special Agent Cain --

4          THE COURT:  All right.

5          MS. HERNANDEZ:  -- is an expert witness that the

6    Government is going to put on about Telegram.  And she's the

7    one who I read those text messages from earlier today where

8    she was saying, Cellurite [sic] is not good.  We can't -- we

9    miss this; we lose that.  It -- the information is flawed,

10   that -- those kind of things.

11         So I -- so one request we have -- and I -- the

12   Government is going to say we've had these exhibits, but we

13   didn't know exactly how they were going to use it or how

14   they were going to introduce or all of this.  Anyway, if we

15   have our phones -- if the Government brings in the phones or

16   makes them accessible to an expert -- I guess we'd have to

17   go out and get an expert, or even just -- I don't think you

18   need an expert to look at the phone.  You just need -- I

19   mean, an investigator or a paralegal -- one of our

20   investigators or one of our paralegals could go into the

21   phone and identify -- presumably could identify a finite

22   number of messages, because we have the Government messages

23   that they want to introduce.  So it would just be a matter

24   of identifying those that we think are not -- don't flow

25   from one -- is not a response to something else or that type

1    of thing.  So that's just -- I just want to -- just so the

2    Court understands.

3              And I'm not an expert on Telegram.  I just know

4    this is one of the options, I believe -- I mean, I'm told

5    that you can swipe, and that means something, and you can --

6    there's different things you can do in a message that would

7    allow someone to say, This is what it means or this is not

8    what it means, or you're answering that to -- this message

9    or the other.  And, maybe, somebody else that has more

10   knowledge of Telegram -- I understand at least some of the

11   defense counsel may have downloaded Telegram and is using

12   it, so I hope that they can -- they will not be charged as

13   co-conspirators, because now we have one -- one defense

14   lawyer who reads 48 Laws of Power and uses Telegram.  He's

15   becoming -- he may need an attorney before this is all over.

16   That's just what I wanted to show the Court.

17             THE COURT:  All right.

18             MS. HERNANDEZ:  But I have more.  And I can go

19   back to my desk.  I just wanted to show the Court this.

20             THE COURT:  All right.  Very well.  Thank you.

21             MS. HERNANDEZ:  So just general problems, Your

22   Honor, also.  We have Rule 106 issues in this -- with

23   respect to the Telegram.  I'm not sure --

24             THE COURT:  Oh.  Well, provide me the -- I mean,

25   it sounds like -- are there --

1          MS. HERNANDEZ:  No -- when I say issues, we

2     have -- we -- it's not that we're at loggerheads.  We're not

3     there yet.  It's just that, with the Parler, the way the

4     Parler posts were presented by the Government, it was easier

5     to add Rule 106 items because there's, maybe, one or two

6     items per page.  The way these are set up -- we don't need

7     the Court to interfere at this moment.  I'm just letting the

8     Court know that there are a lot of Rule 106.  I mean, the

9     whole Ministry of Self-Defense, of course, the defense has

10     contrary sections that we want to introduce that we believe

11     state something different from what the Government is going

12     to introduce.  So I am just letting the Court know about

13     that.

14          There are -- with respect to Mr. Rehl, there are

15     several chat groups which the Government admits he was not

16     involved with.  And so I would move to exclude them all --

17     to -- to exclude them generally and, if you're not going to

18     exclude them, then --

19          THE COURT:  Well, Ms. Hernandez, why would I

20     exclude -- just because your client wasn't part of a

21     particular chat, that fact, and only that fact, might mean a

22     limiting -- might mean a limiting instruction is

23     appropriate.  Why would it be a basis for me to exclude

24     something?

25          MS. HERNANDEZ:  Well, there are -- with respect to

1    some of these, you have double problems.  So one, my client

2    is not a member, but also it may be a September post, which

3    predates the conspiracy, and which is minimally relevant.

4    There are multiple layers on it.  I'm just saying -- I'm

5    just letting the Court know that I need a minimum of a

6    limiting instruction for the Skull and Bones, the Ministry

7    of Self-Defense vetting, the elders chat, the East Coast

8    prospect, the OG Pickle Back Crew [ph], the Space Force, and

9    the WB Stream [ph].  So to the extent that those come --

10   that those have either limited relevancy or predate the

11   conspiracy or whatever -- and I don't know if the Court has

12   a chart on those, but I can -- the prefix for those exhibits

13   is -- Skull and Bones is prefix 500.  MOSD vetting is the

14   prefix 502.  The elders chat is the 508 exhibits.  The East

15   Coast prospect is the 513 exhibits.  The OG Pickle Back Crew

16   is the 515 exhibits.  Space Force is the 517 exhibits.  And

17   WB Stream is the 535 exhibits.

18           I've -- I concur with Mr. Nordean's request that

19   the Court ask the Government to redact statements that -- or

20   that include some crude language that is not -- that has no

21   material relevance to the case, be it, you know, gay or the

22   N-word or other similar things.

23           We object to Government Exhibit-90 and 91.  That's

24   the page numbers?  That's the PDF page numbers.  In one of

25   them there's a reference to breaking legs; in the other one,

 1    another reference to Minecraft, which is a computer game of

 2    some kind.

 3            With respect to individual -- so page 88, which is

 4    503-6 -- I don't know if the Court has it in front of you.

 5            THE COURT:  I will in a moment.

 6            MR. SMITH:  Mr. Nordean adopts Ms. Hernandez's

 7    objection to 90 and 91.

 8            THE COURT:  All right.  I have 503-6.  Yes.

 9            MS. HERNANDEZ:  Okay.  So the first statement

10    there -- first of all, I don't think any of this is relevant

11    to anything, but more specifically, the first statement is,

12    I prefer Dr Pepper.  Then there's two statements.  And then

13    my client says, That's only good with whiskey in it.  It is

14    our contention that my client's response, That's only good

15    with whiskey in it, is a reference to, I prefer Dr Pepper;

16    that is, drinking Dr Pepper with whiskey in it because

17    that's what he drinks.

18            In between those two, the 9:26 -- 9:26 p.m. entry,

19    which is the third one on that page, that is, I believe, a

20    version of the exhibit that the Court excluded, a version of

21    the video that the Court excluded on 403 grounds.  It's a

22    short version.  But there's no indication that my client --

23    when my client says, That's only good with whiskey in it,

24    he's not talking about that item above it.

25            And other than that, that particular -- that

 1    President Leo Kuznetsov, whatever his name is, he wasn't in

 2    D.C. on January 6th, so his putting that there is of no

 3    consequence.  So I would ask that this whole page be

 4    excluded as not relevant.

 5            You already discussed Page 29 which is 548-8.

 6    There was a whole thing with guns in Idaho/Montana, though.

 7    That's a -- that predates the conspiracy, December 10th,

 8    2020.  It doesn't really give us any context as to what the

 9    whole thing with guns in Idaho was.  So again, that's unduly

10    prejudicial and minimally relevant.

11            There's a number of other messages which --

12    they're not -- they're -- I don't think they're -- there's a

13    lot of messages that I don't believe are relevant to

14    anything.  For example, 501 -- I don't have the page number

15    for that.  There's a lot of messages where it just seems

16    idle talk, or talk about things that -- Page 74, which is

17    501-7, and they're talking about bringing 10 people from

18    each chapter.  Feel free to hit up Lehigh [ph].  I guess if

19    the Government wants to introduce that as background

20    information about -- this notion that people were -- people

21    in the MOSD were supposed to be bringing in their 10, I

22    don't have any objection to it.  I'm just saying that I

23    believe a lot of it is not relevant.

24            Page 73, 501-13 --

25            MR. MULROE:  Your Honor, I don't mean to

1     interrupt.  These are exhibits that the Court has identified

2     as being ones that no defendant has objected to.  I'm

3     just -- I'm not sure it's a good use of our time to be going

4     through ones that are not contested.

5          MS. HERNANDEZ:  Well, again, I thought I had

6     objected to all the exhibits for the -- because of the

7     problems that I believe -- the sequencing and the way the

8     Government has linked together these exhibits which may or

9     may not respond to anything.

10          THE COURT:  Ms. Hernandez, I'll take your overall

11     point about the -- the context and the -- your objection to

12     Parler that you laid out for me here.  But I mean, I don't

13     want this to be just flipping through exhibits that you

14     haven't proffered a specific objection to before today.  I'm

15     going to take the overarching point you made -- I'm going to

16     consider that.  I'm going to hear the Government, and then

17     I'm going to consider that.  But if you did not take the

18     time to lodge specific objections, I really don't think it's

19     respectful to me or to the other counsel here to just, sort

20     of, start flipping through things that, again, no

21     objection -- specific objection was -- was raised.

22          MS. HERNANDEZ:  As I say -- I mean, I thought I

23     made objections -- general objections on not just the makeup

24     but the fact that the tools definition had been expanded to

25     a point where the Court, you know -- that -- the hearsay

1    exceptions on effect on the -- I guess I didn't pick out the

2    particular -- I mean, the whole thing, to me, was so flawed

3    that I didn't think I needed to, but -- and I adopted

4    Mr. Smith and the other person -- people's objections.

5            Page 106, I believe that Mr. Smith already

6    objected to that.  That's one that has a -- the N-word in

7    it.

8            THE COURT:  Yes.

9            MS. HERNANDEZ:  I think some of them we've already

10    discussed earlier in other objections, so I won't belabor

11    the point.  The -- as I -- where I started with the chats --

12    the -- that -- where my client is not a participant, I

13    think, unless the Government can propound a theory of

14    admissibility that covers not just the people in that, you

15    know -- that's not limited to those people -- a lot of those

16    chats relate to September, which predate the conspiracy.

17    The whole thing should stay out.

18            And that's all I'll say for now, Your Honor.

19    Thank you.

20            THE COURT:  All right.  Counsel for Mr. Tarrio?

21            MR. JAUREGUI:  Thank you, Judge.  Jauregui for

22    Tarrio.

23            Judge, on -- the ones that I have, I'm more

24    interested in limiting instructions.  I just wanted to draw

25    your attention to it.  All the chats on the Boots on the

1    Ground group, this is a chat where my client was not a part

2    of the chat.  He was invited at some point.  There's going

3    to be some contention as to whether or not he was even

4    actually in that chat.  So I think that -- I'd like to

5    respectfully request a limiting instruction as to anything

6    about Boots on the Ground and my client.  The same thing

7    goes for the New MOSD chat.  Also going to be contention

8    about whether or not he was actually in that chat.  He was

9    actually kicked off from that chat.  In FO-923 [sic], he was

10   kicked out -- booted from the chat at 9:18, and then about a

11   minute and 30 seconds later, he gets reinvited again.

12   Again, it's more of a limiting instruction-type of thing,

13   depending on how the testimony goes with Agent Cain.

14        The other exhibits, Judge -- Page 142, it's

15   Exhibit 138-18 -- 538-18 -- and these seem to be text

16   messages between Tarrio and a lady friend where she's

17   basically talking about her kid and there's a video of her

18   kid dancing and he seems to be responding.  I would argue

19   that, Your Honor, this is completely irrelevant.  She's not

20   a co-conspirator, not a tool.

21        The same thing goes for 534-1.  That's a different

22   lady friend where he also sends a message --

23        THE COURT:  What number -- what PDF number is that

24   one?

25        MR. JAUREGUI:  Oh, the PDF.  It's -- let me look,

1    Judge.  My apologies.

2                MR. MULROE:  139.

3                MR. JAUREGUI:  139.

4                THE COURT:  Okay.

5                MR. JAUREGUI:  That is another lady friend, Judge,

6    again, not a co-conspirator, not a tool.  I don't think it's

7    relevant at all.

8                The next one I have is Exhibit-114 -- I'm sorry,

9    514-47.  And on that, it's just one word that bothers me,

10   Judge.  And I'm looking for the PDF number.

11               MR. MULROE:  Page 134.

12               MR. JAUREGUI:  Thank you, Government.

13               And, Judge, in that one, if Your Honor has it

14   there in front of you --

15               THE COURT:  Yes.

16               MR. JAUREGUI:  -- you know, he -- my client writes

17   about him doing his Goebbels thing.

18               THE COURT:  His what?

19               MR. JAUREGUI:  Goebbels.  He was the -- I guess,

20   the master of propaganda during the Third Reich.

21               THE COURT:  Oh, yes.

22               MR. JAUREGUI:  And I find that concerning.  It's,

23   you know -- it's going to be very unfairly prejudicial, you

24   know, if anybody in the jury knows what that is.  I think if

25   we just take that -- take the name off, that would be

 1    extremely helpful.

 2         And I, you know -- I adopt all prior arguments

 3    made by other counsel, you know?  Any references to gays,

 4    trannies, fags, the N-word I don't think really add

 5    anything to the case and I think they should be removed.

 6         Thank you, Your Honor.

 7         THE COURT:  All right.  Thank you.

 8         MR. METCALF:  Your Honor, with regards to

 9    Mr. Pezzola, we join the applications made on ECF 25, 138,

10    142, 150, 154, 197, and also, share the same concerns as

11    Tarrio's attorneys with regards to limiting instructions,

12    specifically with -- pertaining to the chats that

13    Mr. Pezzola was either not on or was asked to join much

14    later on.  There was two chats that Mr. Pezzola was on where

15    others, or another individual, added him in there, from my

16    belief.  So I ask Your Honor to consider that, the time

17    frame specifically when he was on.  And there are posts that

18    are going to be admitted in here from these chats at a

19    specific time frame when he was not in that chat yet.  So

20    I'd ask Your Honor to consider that with regards to the

21    Skull and Bones, elders chat, the Boots on the Ground chat,

22    the official presidents chat, and even in the MOSD chats,

23    because -- even in the December 2020 messages, he was not a

24    part of that group at that -- at such time.  So I ask Your

25    Honor to consider that, as well.

1           Thank you.

2           THE COURT:  All right.

3           MR. SMITH:  Judge, there's one last knit on PDF

4   Page 9.  This is a -- this is an October 2020 chat.

5   Mr. Tarrio -- Mr. Nordean makes a reference to fash [ph],

6   but unlike the Tarrio reference to fash [ph] on PDF Page 9,

7   this is pre- -- this is a month before the election.  And if

8   Your Honor looks on that same chat window just a couple of

9   rows down, Mr. Nordean makes a statement about the left

10  destroying our culture and our children.  This is a

11  pre-election comment.  It's 403, excludable; it's probably

12  not even relevant; and it's inflammatory.  So we would move

13  to exclude those two chats, the 3:37:49 p.m. Panman chat and

14  the 3:33:56 Panman chat that uses the word "fash" [ph].

15  That's Government Exhibit-500-15 dated October 4th, 2020.

16          Thank you, Your Honor.

17          THE COURT:  Yeah, it's --

18          MS. HERNANDEZ:  Your Honor, may I just -- I'm not

19  sure I made myself clear.  If we have access -- if the

20  defense or my client has access to his phone, we can

21  identify whether some of these text messages -- or messages

22  that we are objecting to -- whether he was replying to that

23  or not.  I don't think that's a huge demand.  That is, we

24  just want a phone that has information that may be

25  exculpatory or that we believe actually, in some instance,

1    is exculpatory.

2              THE COURT:  So --

3              MS. HERNANDEZ:  That's all we want, access to it.

4              THE COURT:  -- when I talked to Mr. Tarrio's

5    lawyers about this, they said they're prepared to argue

6    things are out of context, here's this, here's that.  Why

7    aren't you similarly positioned?

8              MS. HERNANDEZ:  Because -- for example, on that

9    one, I -- we could do that, but we've had this argument on

10   other issues.  It is true that cross-examination could

11   perhaps solve some problems, but we shouldn't have to mete

12   evidence that may not be relevant to begin with, and we're

13   not asking to move heaven and earth, you know?  This isn't

14   some sealed matter.  This is my client's phones.  The

15   Government chose to present its evidence in this fashion.  I

16   guarantee you that if they -- there was some -- because they

17   do.  From time to time, if they're -- you can see in the

18   emails among the agents, when they're looking to confirm

19   some information, you can see the agents talking to

20   themselves and saying, Well, go check the phone and see what

21   the phone says.  So we're not asking for, you know,

22   something -- we're not asking for something extraordinary.

23   We're asking for access to his phone.  And there are some --

24   there's some -- obviously, we could -- as to every single

25   message, Well, you don't know whether he was responding to

1    this or that or the other thing, that gets, kind of, old

2    after a while when, in fact, there are some that are -- as I

3    said earlier, there are some that clearly are contextual,

4    and most of them involve the defendants talking to each --

5    but some of them are rather prejudicial and the Government's

6    going to try to rely on them, and if there's some easy way

7    to dispel the Government's theory or the Government's basis

8    for introducing it, I don't think the Government has a right

9    to withhold from Mr. Rehl his own phone --

10           THE COURT:  Right.

11           MS. HERNANDEZ:  -- under these circumstances.

12           THE COURT:  To be clear, what I was saying about

13    counsel for Mr. Tarrio was they said they had -- my point

14    wasn't that you should rely on cross-examination.  My point

15    was that they seem to have -- if there was a situation where

16    they felt that the messages were -- or the -- the messages

17    were out of context, that they would -- they had the

18    messages that would provide the context.  So --

19           MS. HERNANDEZ:  I believe --

20           THE COURT:  -- I guess that's my -- my question to

21    you is, why aren't you similarly situated?

22           MS. HERNANDEZ:  I believe they're in a different

23    situation because Mr. Tarrio was out of jail for a much

24    longer time, so he had access to his phone.  I mean, I don't

25    know -- you can ask him, but I think Mr. Tarrio doesn't get

1    charged until a year later, I don't believe.  So he had

2    access to a phone for a much longer period of time and,

3    therefore, had access to the information on his phone.  My

4    client gets arrested in March.  The phone gets seized then.

5    He has had no access to it for two years.  So he never had

6    the opportunity to, sort of, go back and look over it as --

7    I mean, they can explain why they have access to it.  I

8    don't have that access.

9            THE COURT:  And you're saying the Government has

10    not produced to you all the text messages -- regardless of

11    the ones they want to introduce, that you haven't been

12    provided all the text messages?

13            MS. HERNANDEZ:  They don't provide the information

14    that I showed you where the phone would -- the app on -- the

15    Telegram app on the phone would show --

16            THE COURT:  Okay.

17            MS. HERNANDEZ:  -- who was, you know -- what the

18    response was -- whether a particular message was a response

19    to one person or a response to something else.  That's what

20    I'm saying.

21            THE COURT:  Okay.  Understood.

22            MS. HERNANDEZ:  And I think they can explain to

23    you why they have not --

24            THE COURT:  Well, they -- it really doesn't -- I

25    mean, I -- let me hear from the Government at least first on

```
 1            this point.
 2                      So a lot to respond to, but let me have you tick
 3            through.
 4                      MR. MULROE:  A lot to respond to, Your Honor.  I
 5            would like to at least hit what we see as the larger points
 6            there.  I don't know about hitting every single exhibit.  I
 7            think some of them --
 8                      THE COURT:  Okay.
 9                      MR. MULROE:  -- Your Honor -- unless you have
10            questions about, in which case, I'm happy to respond.
11                      Before getting into their objections, there are
12            just two things I want to front about our intended course
13            for the rest of the week.  One of them, Your Honor, is
14            tomorrow, we plan to call a Capitol Police witness first,
15            and then we expect our second witness of the day would be
16            Examiner Kate Cain from the FBI, who is the expert witness
17            on Telegram.  And so she will testify to how Telegram
18            operates and certain characteristics of the platform and how
19            things are extracted and subjects of that nature.
20                      So we don't believe that Your Honor's rulings on
21            all these exhibits need to be done, because she's not going
22            to be the one actually sponsoring these particular chunks,
23            as we call them.  But she's going to talk about Telegram
24            generally.
25                      THE COURT:  Okay.
```

1          MR. MULROE:  The second issue to front is, as Your

2    Honor will recall, we submitted a sealed filing on a sealed

3    topic relating to, sort of, the bounds of cross-examination

4    related to a certain subject matter.  We think any

5    cross-examination of that type would likely be outside the

6    scope of Examiner Cain's testimony.  We think some of it may

7    arguably be within the scope of Agent Dubrowski's testimony,

8    the one who will be offering these Telegram exhibits.  And

9    so it's very likely that issue will ripen by the time Agent

10   Dubrowski hits the stand.

11          So I know it's late in the day now.  I don't know

12   if Your Honor is inclined to take that up, but we do think

13   it's something that should probably be addressed --

14          THE COURT:  Well it's just a question of --

15          MR. MULROE:  -- sooner rather than later.

16          THE COURT:  It's just a question of -- right.  I'm

17   not going to take it up now, given it's not going to

18   ripen -- you'll have at least two witnesses in between.  So

19   I'm not going to take it up now, but I hear what you're

20   saying.  It will -- by the time you put on Agent Dubrowski,

21   that -- I mean, it's, sort of, ripening with each witness.

22   Let's put it that way.  I mean, but it's -- I see your

23   point, that it's more of an issue with Agent Dubrowski.  So

24   fair enough.

25          MR. MULROE:  And, Your Honor, much like we

1    requested in connection with Agent Kate Camiliere's

2    testimony, we just want to ensure that if the issue of

3    permissible cross is not resolved until, kind of, the

4    morning of his testimony, that we just have the limited

5    blessing of the Court to contact him mid testimony to

6    explain, sort of, how that issue came out.

7            THE COURT:  I mean -- all right.  I mean, I would

8    just say, for Dubrowski, you're telling me you're not

9    intending to open the door to it.  You just think that it's

10   more a possible -- or -- I mean, I -- tell me why you think

11   that it's possible -- it's -- I think what you said,

12   Mr. Mulroe -- I'm not trying to put words in your mouth --

13   it's fairer game with that witness than others.

14           MR. MCCULLOUGH:  May we go to the phone briefly?

15           THE COURT:  Well, let's save this to the end.  I

16   want to -- let's try to get through what we're trying to get

17   through here today.

18           MR. MULROE:  So Your Honor, picking up some of the

19   objections that we heard from the defense to this last batch

20   of Telegram exhibits, I want to start with the request for

21   redactions of the offensive language that runs throughout

22   these conversations.  So on this point, I'd just -- I want

23   to note that Mr. Nordean's brief during the motions in

24   limine on this stage -- on this issue was filed

25   October 14th.  It was a well-written brief that squarely

1     teed up the issue of this offensive language and requested

2     that the Court order us to redact it.  We spent time

3     drafting a response to that.  All of the parties spent time

4     arguing about it during the November hearing on the motions

5     in limine.  And then Your Honor issued a ruling at which you

6     denied the request.  That was at Page 61 to 62 of the oral

7     ruling in December.  You said, As to the derogatory remarks,

8     I'm not going to require the Government to redact everything

9     that might be offensive or allude to drug and alcohol use.

10    Simply put, the jury has a right to hear the way these

11    defendants speak, and the evidence the Government chooses to

12    present -- and it went on a bit from there.

13          So we think that ruling should control, Your

14    Honor.  I think that this trial is not moving as quickly as

15    any of us would like, and candidly, I think part of that is

16    because the defendants are seeking to relitigate a lot of

17    issues that Your Honor has ruled upon.  So we don't think

18    anything has changed since you issued that order in

19    December.  And so we think that you should deny the request

20    that they have brought again for us to clean up this

21    language.  And, you know, Mr. Smith said, It's not a

22    coincidence that this offensive language tends to recur.

23    Well, no, that's not a coincidence, but it's not because we

24    selected it.  It's because that's the way these defendants

25    spoke to one another.

1          Moving to some of the particulars.  So the first
2   couple of exhibits that Mr. Smith identified, there was this
3   issue of statements by conspirators, and he said that our
4   argument was faulty on these because these statements were
5   not in furtherance of the conspiracy.  I want to respond to
6   that in two ways.  First is just to take that argument on
7   its own terms.  And I think that the Court can readily find
8   that these statements were, in fact, made in furtherance of
9   the conspiracy.  As authority on that issue, we would direct
10  the Court to United States v. Tarantino.  I know that's one
11  that we cited in our original statements motion.  It's
12  846 F.2d 1384 at pincite 1411 to 1412, D.C. Circuit 1988.
13  But as Tarantino makes clear, it's a pretty broad standard
14  for something to be made in furtherance of a conspiracy.  It
15  does not have to be made to a co-conspirator.  It can be
16  made to anyone.  It's any statement that reasonably can be
17  interpreted as encouraging a co-conspirator or other person
18  to advance the conspiracy or as enhancing a co-conspirator
19  or other person's usefulness to the conspiracy.  That's
20  Tarantino at 1412.  So I -- that's interesting there that --
21  this "other person" notion that Tarantino contemplates, I
22  think, sounds a lot like some of the tools arguments that
23  we've been making.  I'd suggest that that's really not so
24  novel after all.
25          But moving to the exhibits, at 197, Brother Hunter

1    Jake Phillips [ph] asks, What would they do if one million

2    patriots stormed and took the Capitol building?  Shoot into

3    the crowd?  I think not.

4              Johnny Blackbeard, who is a co-conspirator, said,

5    They would do nothing because they can do nothing.

6              And, of course, on January 6th, that is just what

7    happens.  Four of these defendants and a great number of

8    their followers and a great number of other people did storm

9    and take the Capitol, and the police were not able to stop

10   them and did not shoot them.  So Johnny Blackbeard saying

11   that the police would do nothing because they can do nothing

12   strikes me as pretty clear encouragement of anyone

13   listening, all the members of this group, to do the action

14   that had been discussed.  So we do think that's a statement

15   in furtherance of the conspiracy.

16             But that's actually not the first or only basis

17   that we're relying on for that statement.  And I think --

18   with respect to Mr. Smith, I think he's missing a pretty

19   important theory of admissibility, and that is the first

20   column of our chart which we abbreviated Mental State of the

21   Defendant or the Co-Conspirator.  And so this, again, is one

22   that was litigated at length in the motions in limine phase

23   and one that Your Honor found in our favor.  I'll direct the

24   Court and parties to Page 12 of Your Honor's oral ruling.

25   And that goes on for a number of pages, but as you explained

1    there, these are things that are offered not for the truth

2    of the matter asserted but to illustrate circumstantially a

3    relevant mind state of a relevant person and those relevant

4    persons, you explained there, could be the defendants

5    themselves or it could be people who have admitted to being

6    part of this conspiracy.

7         In terms, then, of how that statement can be used,

8    there's a lot of talk about limiting instructions.  We,

9    again, think that this is something that has already been

10   resolved.  If it's not going for the truth of the matter, if

11   it's just going to circumstantially show the state of mind

12   of a co-conspirator, Your Honor explained at the bottom of

13   Page 14 -- starting there, of the oral ruling, you said, I

14   don't understand the Government to be arguing anything more

15   than they're admissible to show the declarant's state of

16   mind.  But if the jury credits the declarant's state of mind

17   suggested by the evidence, there is no reason the jury can't

18   use that more broadly as evidence of the existence of the

19   conspiracy.

20        So the fact that an admitted co-conspirator is

21   endorsing and celebrating the idea of a whole bunch of

22   people storming the Capitol building is very powerful

23   evidence of a very relevant and significant state of mind

24   and intention and hope on the basis of that person.  And

25   that's something that the jury should be able to consider

1    when it decides what this conspiracy as a whole meant.  It's

2    not something that's narrowly cabined to, you know,

3    something that you have to put out of your mind when you're

4    deciding the guilt of Ethan Nordean or Enrique Tarrio or

5    anyone else.

6            So that all goes to Exhibit-197, and, I think, the

7    same goes for the exhibit on Page 154.  This is, again, an

8    admitted co-conspirator, Noble Beard, the Immortal,

9    responding to Pedro Q-tip, who said, A lot of Trump

10   supporters will be armed this weekend.  Noble Beard, Jeremy

11   Bertino, the co-conspirator, says, Good.  I hope they use

12   them.

13           That is, again, encouraging the use of force,

14   signifying that the leaders of the Ministry of Self-Defense

15   approve of and hope for the use of force.  And so that is a

16   statement that is in furtherance of the conspiracy.  I think

17   Your Honor is correct that the bottom statement on that page

18   from President-Elect Leo Kuznetsov [ph] when he says, Me

19   effing, too, is one that would rely on the tools theory.  So

20   if Your Honor were to go against us on that, that's one that

21   we could easily remove from the exhibit without lessening

22   the import of the co-conspirator state of mind and

23   co-conspirator statement that is the second message at

24   6:40:07 p.m.

25           Page 150 includes one of the several references to

 1    Minecraft that appears throughout these exhibits.  And I
 2    appreciate Your Honor's cautionary note about how
 3    interpreting that term may bring us closer to the type of
 4    opinion evidence that that may run afoul of some of the D.C.
 5    Circuit case law.  I think what we would propose to do on
 6    Minecraft is both to have a cooperating witness,
 7    co-conspirator, explain the meaning of that term, but I
 8    think it's also something that will be within the agent's
 9    ability to explain so long as we can show the messages that
10    formed the basis of that opinion and illustrate that there
11    really was a foundation to interpret the term in that way.
12    And so we would, you know -- this would be an additional
13    exhibit that we would put together and send around and
14    proffer.  But Minecraft is a term that appears with enormous
15    frequency throughout all the chats, and I think it would be
16    readily apparent from its usage what that term means.
17              THE COURT:  As I recall, the -- so, you know,
18    we'll punt that question, obviously, to -- we'll cross that
19    bridge when we get to it.  I -- as I recall, the -- again,
20    the concern -- and I can't remember whether it was the --
21    one of the cases Ms. Hernandez raised or whether it was a
22    case I read after reading her brief -- a separate case, but
23    the concern was that, you know, again when the agent says,
24    Well, I know what that term means, the -- and the agent is
25    relying on all sorts of things, either evidence that's not

1    before the jury or other aspects -- whether it's other

2    Telegram chats or just other aspects of the investigation,

3    says, Well, that's what I think it means, and the jury

4    doesn't have those -- that other evidence before them, then

5    that's problematic.  So -- anyway, that's my understanding

6    of -- again, I apologize.  I don't recall the case, but

7    that's what we have to steer clear of, it seems to me.

8            MR. MULROE:  Mm-hmm.  And so we -- again, that is

9    not something we need to resolve right now.  But we would

10   just proffer that it is based entirely on the review of the

11   Telegram chats, and we're prepared to offer a library of

12   examples that illustrate that.

13           THE COURT:  Very well.

14           MR. MULROE:  142 was Tarrio's exchange with Mama

15   Fay [ph] about the Winter Palace.  Again, this goes back to

16   the mental state of a co-conspirator.  We don't think any

17   limiting instruction will be necessary there.

18           138, I think, we just read in a way that is

19   diametrically opposed to Mr. Smith.  So this is the one --

20   Page 13, Exhibit-505-18.  Gabriel PB, who, as we said

21   earlier, is a tool, Gabriel Garcia, says, two days before

22   January 6th -- he says, I'm taking a knife also, because

23   fuck Antifa twice.  Several minutes later, the Vividic says,

24   Yo, not that it matters, but do you knew -- but do you know

25   D.C. knife rules?  It appears to be a question.  He asks, Am

1    I good to carry my Leatherman in District of Commieville?

2            And then Tarrio's message is the next one.  I

3    don't think it can be fairly read as a rebuke.  I think he's

4    agreeing with the notion of carrying a knife.  So he's

5    responding to the question about whether -- whether knives

6    are allowed.  And Noble Lead, Enrique Tarrio, says,

7    Negative.  Heavy restrictions.  Then he goes on.  But carry

8    at a risk.  Prefer to have one than not.

9            So I think, reading that entire message, Enrique

10   Tarrio is telling the members of MOSD, You are not allowed

11   to have a knife in D.C., but you should do it anyway because

12   it's worth the risk; you'd prefer to have one than not.  And

13   that's entirely consistent with Gabriel PB's subsequent

14   message saying, I don't give an eff about the rules anymore.

15           I would proffer -- and we could easily add this

16   row to the exhibit -- but Enrique Tarrio responds again

17   after that -- it's on an unrelated topic about hotels.  But

18   I think that all is perfectly consistent and, indeed,

19   supports our theory about the leaders signaling to the

20   members what this group is really about.  And it's not about

21   following the law.  It's not about being non-violent.

22           THE COURT:  And the --

23           MR. JAUREGUI:  Judge, and if I could just complete

24   that.  On that exhibit, right after Gabriel says, I don't

25   give a fuck about the rules anymore, right after that, at

1   12:12:07, Gabriel writes, Obviously, will only be used if

2   needed.  Just so that we can complete the thought.

3           THE COURT:  Well, and let me just say, though,

4   that -- at least as this stands now, again, I think that

5   last line only comes in as a tool -- on a tools theory.  I'm

6   not -- am I right about that, Mr. Mulroe?

7           MR. MULROE:  I think, as the exhibit currently

8   stands, yes.  I think -- yes.

9           THE COURT:  All right.  And I take your point and,

10  maybe, on a 106 issue.  I understand.  I got it.

11          Continue on, Mr. Mulroe.

12          MR. MULROE:  Just skimming down my list, there

13  were more responses for limiting instructions on particular

14  exhibits.  I don't know that I need to hit each of those one

15  by one, unless Your Honor wants.

16          THE COURT:  No, I mean, look, I'm not going to

17  decide the limiting -- I -- you all have heard what I ruled

18  in the past on the -- on, I think, what the proper contours

19  of limiting instructions would be.  I'm going to rule as

20  soon as I can on this, and then you all -- we're all -- you

21  all are going to talk about what limiting instructions you

22  think are appropriate.  But you don't need to raise it with

23  me now.

24          MR. MULROE:  One I would just note, Exhibit-114 --

25  I guess it's Page 114, the exchange about Pezzola delivering

7371

1    the wooden shield.  I don't think there's any serious risk

2    that the jury is going to confuse this wooden shield for the

3    one that Pezzola stole on January 6th.  I think that they

4    will take this in the way that we're offering it, which is

5    to show the very, very high degree of loyalty and desire to

6    please leadership, that Pezzola would make this lengthy trip

7    to deliver this shield to Jeremy Bertino.  Also evidence

8    that Pezzola was known to Tarrio and Bertino.

9            THE COURT:  Right.  Just the relationship between

10   the co-conspirators vis-à-vis Mr. Pezzola.

11           MR. MULROE:  That's a better, more concise way to

12   put it.  Thank you, Your Honor.

13           Ms. Hernandez -- the issue -- the overarching

14   issue of the accuracy of the exhibits.  Your Honor, the way

15   that we have used the evidence on the Government's side, the

16   way that we have produced the evidence to the defendants

17   dating back nearly two years now and the way that we intend

18   to present the evidence at trial is in the form of data from

19   the Cellebrite extractions.  With limited exceptions for

20   particular phones, Cellebrite extractions have been the

21   standard way that we've been producing this evidence --

22   which is evidence at the very core of the case -- since the

23   very beginning, and that's how we've been litigating it

24   throughout the detention hearings, throughout the --

25           THE COURT:  I'm sorry.  I'm sorry, Mr. Mulroe.  I

1        just can't -- I can't hear you.

2                If I can have everyone keep their voice down.  I

3        know it's been a long day.

4                Continue.

5                MR. MULROE:  It's how we've litigated it through

6        the motions in limine, including the motions in limine on

7        statements.  It is the form that these exhibits have been

8        produced to the defendants going back to November when we

9        started making the exhibit productions.  And as the agent,

10       we expect, will testify, this is a reliable way of viewing

11       and considering the evidence.

12               So Ms. Hernandez, today, in court, in the middle

13       of trial, for the first time, is saying that she doesn't

14       think this is an acceptable way of viewing the evidence.

15       And, Your Honor, I just -- I think the time for that type of

16       objection has passed.  I think if she wants to cross

17       Examiner Cain or Agent Dubrowski or anyone else on the fact

18       that there may be nuances to the messages that are not

19       reflected in the exhibits, she's free to do that.  If she

20       wants to make a narrow and targeted request to see if our

21       examiner is able to provide any additional information, she

22       can do that and we will take reasonable steps to respond.

23       But to just say that this entire enormous category of

24       evidence needs to be thrown out in the middle of trial for

25       reasons that have been apparent to her for nearly two years,

1    or since she came on the case at least, you know -- I know

2    that we're not strictly arguing a waiver issue here, but I

3    think the Court needs to consider that argument in the

4    procedural context in which we find ourselves now.

5            I don't know if there's much to add on that --

6            THE COURT:  Okay.

7            MR. MULROE:  -- particular issue unless Your Honor

8    has questions.

9            THE COURT:  There's different wrinkles to this,

10   but just as far as -- let me put it this way.  Did you

11   produce all the information Cellebrite spit out to you that

12   said, "Here are all the Telegram messages on the phone"?

13           MR. MULROE:  Yes, Your Honor.

14           THE COURT:  Okay.  So if it's a question of, Well,

15   there's a text that is -- or whatever they call them -- a

16   message that should be the next one, like, Mr. Tarrio's

17   lawyer just said, Ms. Hernandez should have all of that

18   information to be able to say, Well, you've got to add this

19   message or that message?

20           MR. MULROE:  Yes.

21           THE COURT:  All right.  And it's a question of,

22   like you said -- and like she argued -- well, there's

23   nuances in terms of showing whether a particular message was

24   responding to another particular message that the way you're

25   producing these messages would not reflect that one way or

 1    the other?

 2            MR. MULROE:  Correct.

 3            THE COURT:  All right.  Okay.  All right.

 4    Anything further on responding to the defendants?

 5            MR. MULROE:  Just on the Rule 106 issue that

 6    Ms. Hernandez raised, as always, we're happy to confer.

 7    There might be additional messages that we would have no

 8    objection to putting in here.  We haven't heard anything on

 9    that front at all.  So we just don't know what they might

10    have in mind.  We did a lot of homework on our side to

11    produce all of these in advance to them.  And so we're glad

12    to engage, but we're just -- that hasn't been teed up for us

13    yet.

14            THE COURT:  Okay.  And in fairness to her, she

15    said it hadn't been teed up -- she admitted she hadn't teed

16    it up for you.

17            All right.  I think we're all messaged out,

18    Telegram messaged out.  So I want to let you go.  But before

19    I do, I think I need to hear Mr. Smith on his motion that he

20    filed yesterday with regard to the cross-examination of the

21    Agent Shae.

22            MR. SMITH:  Thank you, Your Honor.

23            THE COURT:  Agent Shae or Officer Shae?

24            MR. SMITH:  Officer Shae -- Officer Shae Cooney.

25            THE COURT:  Mr. Smith, just one second.

7375

1        MS. HERNANDEZ:  Your Honor, I'd like to respond to

2    Mr. Conor's [sic] -- I don't have to do it before

3    Mr. Smith -- Mr. Conor's statements about Cellebrite.

4        THE COURT:  No, I want to put this issue away

5    before we turn to --

6        MS. HERNANDEZ:  Okay.

7        THE COURT:  -- the other issue as the last issue

8    of our day.

9        MR. SMITH:  So thank you, Your Honor --

10       THE COURT:  No, no, I'm sorry, Mr. Smith.  I want

11   to put the Telegram issue to bed before I hear from you.

12       MS. HERNANDEZ:  So first of all, Your Honor, just

13   to be clear, the Government -- the Court has allowed the

14   Government to change their theory of prosecution several

15   times.

16       THE COURT:  No, I haven't.  But go ahead.

17       MS. HERNANDEZ:  So for the record, we started out

18   with a conspiracy that started December 19th.  It got

19   expanded to December 12th during motions hearing.  At

20   trial -- the Court's ruling on December 14th did not address

21   the November events because it found them to be outside --

22   or -- I don't know the exact language the Court used, but it

23   did not address the November because it had not been put to

24   the Court as -- by the Government -- the Government had not

25   proposed to the Court that November was relevant.  We come

1    to trial.  November became relevant.  We come to trial.

2    Well, there's a lot of exhibits and videos that have come in

3    because the Government now says November, and that had not

4    been covered by the Court.  We come to court, and now the

5    president's debate in September has become relevant and a

6    lot of evidence comes in.  So the -- so in my opinion, the

7    Court has allowed the Government to expand its theory as the

8    case progressed.

9            Two, in multiple -- on multiple occasions, the

10   Government has added exhibits -- and Mr. Smith actually

11   filed the motion and the Court ruled on it that under the

12   cases, blah, blah, blah --

13           THE COURT:  Under binding Circuit precedent.

14   Correct.

15           MS. HERNANDEZ:  -- under the case law, it was

16   admissible.  The first time that I realized Agent Cain's

17   references to the problems with using Cellebrite to download

18   Telegram was in preparation for her testimony.  Yes, we all

19   concede that there has been a mountain of evidence -- the

20   Government has referred to it in multiple pleadings as

21   unprecedented.  We have explained to the Court how difficult

22   it is to review the evidence, and it's a time-consuming --

23   and yes, there is a triage type of -- at least on my part.

24   I don't know what the other defense counsel do.  There's a

25   triage type of response to the evidence as it comes in.  We

1        look at this, we look at this, we look at this.

2              I had never, before this case, dealt with

3        Telegram.  I actually looked to hire an expert, and the

4        expert would not take CJA funds.  He wanted to be paid up

5        front, so I wasn't able to do that.

6              So it -- I'm not sitting -- I'm not doing this

7        because I'm trying to -- what's the term?  I'm not trying to

8        pull a fast one on the Government.  This is when I realized

9        these statements by the agent, which I read to the Court,

10       and which I'm happy to submit to the Court, are pretty

11       strong -- her opinion that Cellebrite is not the -- is not

12       capable of downloading -- of extracting Telegram messages.

13       There is an easy way.  It's just turning on these phones,

14       and we can do it.  Again, we're not asking the Government to

15       hire an expert.  We're not asking the Government to do

16       anything other than bring the phones to our -- even if they

17       can't bring them in for the direct, we ought to be able to

18       have them available -- under the rules, we're entitled to

19       view items seized from our clients.  And so even if they

20       can't do it, we ought to be able to access it before our

21       case is over.  That's all I'm asking for.  I'm not asking

22       for the -- if it -- in fact, if it contains exculpatory

23       information and it's in the Government's possession, they

24       have an obligation to go into those phones and find it.  So

25       I'm just telling the Court that I believe -- I'm not asking

1    to turn the world upside down.  I'm just asking for

2    something that may be exculpatory, and there are messages

3    that they're trying to introduce.  They are claiming these

4    messages are -- they're setting up a series of messages and

5    they are claiming that they're responses to the message

6    before.  And yet they cannot -- that's just an assumption

7    that the Government is making.  They ought to be required to

8    prove that up.  And if they can't prove it up, I ought to be

9    able to refute that information.  So that's -- that -- I --

10   that's a concern.

11          Second problem with Special Agent Cain.  In -- on

12   December 1st, Federal Rule of Criminal Procedure 16 was

13   amended to require more information for an expert

14   disclosure.  On December 5th, when I learned of the -- and

15   that rule change applies to all cases, those that were in

16   effect before the rule change but are still ongoing.  On

17   December 5th, when I learned of the rule change, I contacted

18   the Government and said, Can you please amend your

19   disclosure -- your expert disclosure to comply with Rule 16?

20   I got no answer from the Government until recently when they

21   said, you know, We don't think you're entitled to it because

22   there is an out -- excuse me, Nick; can you move your face

23   so I can see the judge?  Sorry.  I can stand up, but -- so

24   that -- we're still dispute -- I -- Rule 16, as currently

25   enacted, requires more disclosure than the Government has

1    produced.  And as I -- and given the problems with Telegram,

2    I would like them to comply with Rule 16.  They have known

3    at least since December that there's a rule change, and

4    possibly before then, because it's my understanding that the

5    Department of Justice has a voice at the rules-change

6    meetings.  So they probably knew it was coming.  In fact,

7    the rule change was probably changed at the request of the

8    DOJ.

9              THE COURT:  All right.  So --

10             MS. HERNANDEZ:  So that's an issue, also.

11             THE COURT:  All right.  So Ms. Hernandez, just --

12   I'm not -- just to summarize, you have issues with the

13   expert.  And so I'll take them up in due course.

14             With regard to the exhibits, the -- just so I

15   understand your objection, or your issue, you believe that

16   the Government should not be able to introduce these

17   exhibits or this information -- the Telegram chats --

18   because it's not -- it -- the way they're -- the way they

19   are using them does not allow you to definitively determine

20   whether your client has responded to a text and that's --

21   that is the objection?  In other words, it's not that you

22   don't have all the relevant Telegrams or all the rest.

23   They've produced to you, they represent, every Telegram

24   message that was on that phone.

25             MS. HERNANDEZ:  But it's not produced in the

1    manner which is usable, one; and, two -- for example, the

2    example I gave you where there was a message about

3    Dr Pepper, then there were two messages in between, and then

4    my client says --

5                THE COURT:  Right.

6                MS. HERNANDEZ:  -- with whiskey.

7                THE COURT:  But it's --

8                MS. HERNANDEZ:  So the Government is representing

9    to the Court -- and in between -- and that particular one is

10   a unique one, because, in between, there's that video --

11               THE COURT:  All right.  I just --

12               MS. HERNANDEZ:  -- which the Government has

13   already --

14               THE COURT:  Ms. Hernandez, did you hear what I

15   said?  I just summarized your point.

16               MS. HERNANDEZ:  Well, no, my point is that beyond

17   that -- it isn't that they haven't given me.  It's that the

18   exhibits they're trying to introduce are not supported by

19   the evidence, in my opinion, because that -- those two

20   exhibits in between do not respond to that.  If they want to

21   introduce that, then they have -- they should have the

22   burden of showing that, in fact, that was a response to

23   that --

24               THE COURT:  All right.

25               MS. HERNANDEZ:  -- and beyond that, I'm entitled,

1      in defense of my client, if not --

2                 THE COURT:  All right.  I understand your

3      argument, Ms. Hernandez.

4                 Mr. Smith?

5                 MR. SMITH:  Thank you, Your Honor.  It can be

6      summarized in one minute, this motion.

7                 The last Government witness was Officer Shae

8      Cooney.  She was asked on redirect whether she recalled

9      Mr. Nordean pulling down the fence in front of the west

10     front of the Capitol.

11                THE COURT:  Yes.

12                MR. SMITH:  It is true that both Mr. Nordean and

13     the Government on direct and cross asked Officer Cooney

14     about -- to look at some videos of that incident and give

15     her impression of them.  However, she wasn't asked until

16     redirect when it comes to the Government and Mr. Nordean

17     about whether she recalled that incident.  The video

18     exhibits show that she did not have a sight line on

19     Mr. Nordean when the fence came down.  We're asking -- that

20     is -- under Circuit precedent, a party has a right to

21     recross-examination where new matter is brought out on

22     redirect examination.  New matter.  Not a new subject.

23     Simply new matter.  It is new matter that was brought out on

24     redirect when she was asked whether she recalled Mr. Nordean

25     pulling down the fence.  We're only asking for about 30

1    seconds to a minute of recross-examination of the witness to

2    ask her about how she viewed -- recalled viewing Mr. Nordean

3    pulling down the fence, given that the video shows she

4    doesn't have a sight line.  That's all we're asking for,

5    Your Honor.

6            Thank you.

7            THE COURT:  Let me hear from the Government.  I

8    will say, I noticed what Mr. Smith is pointing out in real

9    time when it happened.  So what's the Government's view on

10   this?  And I know -- but on this -- on the other hand, I

11   know recross is rare.

12           MR. MULROE:  Your Honor, the testimony on direct

13   related squarely to Officer Cooney's observations of

14   Defendants Nordean and Biggs.  It also related to the

15   destruction of the fence.  And so --

16           THE COURT:  It definitely related to the

17   destruction of the fence.  It definitely related to going

18   through the videos and, you know, the way both parties have

19   been doing that.  Is it really fair to say she was asked,

20   Forget the videos; what did you observe that day?

21           MR. MULROE:  Of their personal involvement in the

22   destruction of the fence?

23           THE COURT:  Correct.

24           MR. MULROE:  I did not ask that question on

25   direct, but I asked questions that were very close to

1    that -- I'm going to walk through this step by step --

2    sufficiently close that Mr. Smith could have asked on cross,

3    Well, you didn't see him destroy the fence, did you?

4           Now, when Mr. Hull cross-examined the witness, he

5    asked that question.  He brought this up during his

6    cross-examination.  And that is where the matter was first

7    raised, on cross-examination by one of the co-defendants.

8    So our redirect merely returns to a subject that had been

9    elicited on cross.  If Mr. Smith --

10           THE COURT:  After Mr. Nordean's cross was

11    complete, to be clear.

12           MR. MULROE:  Yes.  And so -- I mean, if he had

13    asked, after Mr. Hull's cross, or even after our redirect,

14    for a brief opportunity to recross, I think we may be in a

15    slightly different place.  But the following week, to seek

16    to bring back the witness based on a video that was

17    completely available to Mr. Smith at the time and, indeed,

18    that he used at great length as a centerpiece of his own

19    cross-examination, is just him asking for another bite at

20    the apple in a way that I just don't think is justified

21    under the rules or under basic fairness.  If he wants to

22    make the point that she didn't have a sight line to the

23    fence, which I should note for the record we disagree

24    with -- and I can say more about that if the Court wishes --

25    but if he wishes to make that point, he's fully able to do

1    it through other witnesses, by cross-examination of future

2    Government witnesses, or as part of his own case in chief.

3    But if we're going to get into the practice of going home at

4    the end of the day and thinking about things that we could

5    have done better and then asking to bring back the witnesses

6    for another chance, I just -- I think that's a very

7    dangerous door to open, given the pace of the trial already.

8                    MR. SMITH:  Your Honor --

9                    MR. MULROE:  Court's indulgence just one moment?

10                   (Brief pause.)

11                   And I'm directed to a part of the transcript at

12   7102, Line 16 and 17, at the very conclusion of Mr. Smith's

13   cross-examination of the witness, appears to be getting

14   ready to ask that very question, and then struck it and

15   withdrew the question.

16                   THE COURT:  Well -- all right.  Mr. Smith, let me

17   hear from you.

18                   MR. SMITH:  Thank you, Your Honor.

19                   So Mr. Biggs's right to recross is not the issue.

20   Biggs might not have the right to recross because it was

21   raised on cross-examination.  Mr. Biggs's right is not the

22   subject that we're discussing.  It's Mr. Nordean's right.

23   And now, the fact remains that inaccurate testimony is left

24   with the jury uncorrected.

25                   Then, Your Honor -- if the subject matter of her

1    memory wasn't brought out on direct, Mr. Nordean cannot be

2    faulted for not raising it on cross; that might have been

3    outside the scope of her testimony and the Government could

4    have objected.  Your Honor, the -- Mr. Mulroe said that

5    Nordean could raise this issue through other witnesses, but

6    it's a matter of credibility of the -- Officer Cooney.  She

7    also testified that she recalled things that Mr. Nordean

8    said to her.  He was one of the only people she could recall

9    saying the word "pigs."  So credibility is an issue.

10         Mr. Mulroe said that we don't want to have to --

11   it's burdensome to drag the witness back.  Your Honor, she's

12   an officer who works in Washington, D.C. and she's the last

13   witness to testify for the Government.  This is -- the

14   difference between asking -- it was the -- Your Honor will

15   recall that when she finished her redirect testimony, it was

16   the end of the day on Thursday.  We couldn't have gotten

17   recross at that point.  We were concluding for the

18   afternoon.

19         So Your Honor, if -- the Court indicated it

20   noticed, too, that the witness might not have had a sight

21   line here.  So this is very brief recross on an important

22   issue that goes to the heart of the case, whether

23   Mr. Nordean used force on this fence.  And to allow the jury

24   to have this testimony stand uncorrected for weeks before we

25   can call back the witness would be inappropriate.

1              THE COURT:  So to be clear, I don't -- it has --

2       this has nothing to do with testimony being accurate or

3       inaccurate.  You all disagree about that.  You know, that's

4       what a trial is about; right?  It has nothing to do with

5       that.  And to be clear, what I said was only this, not that

6       I noticed she didn't have a sight line or anything like

7       that, but I do think it is -- I noticed only what the

8       parties have agreed to right here, which is she was not

9       asked on direct about her own observations.  I didn't recall

10      Mr. Biggs asking her one way or the other, after your cross

11      was done, about this issue.  But I -- she wasn't asked about

12      it on direct.  She was asked about what the video showed and

13      all the rest and -- and she wasn't asked about it.  And

14      then, on redirect, all of a sudden -- again, I guess the

15      door was opened on cross.  I did not, you know -- I -- that,

16      I don't recall, but, again, both parties seem to agree that

17      that's what happened.  I think this is going to be the rare,

18      rare instance, but I -- this is an important point for

19      Mr. Nordean and -- because of the nature of some of the

20      charges against him.

21              MR. MCCULLOUGH:  Your Honor, permission to provide

22      you with the -- it's a two-page transcript where

23      Mr. Biggs --

24              THE COURT:  But what does that -- let's assume

25      that's right.  What does that say about Mr. Nordean's right

1    to now cross on this topic that was only opened by one of

2    his -- by one of his co-defendants?  I mean, assume you're

3    right; then he just has no opportunity to do so?

4              MR. MULROE:  I think we'd be in a different place

5    if he made the request after Biggs's cross or even after --

6    but it -- Judge, the concern is that for hours to pass, and,

7    at this point, it's days later --

8              THE COURT:  Well, we haven't put on another

9    witness, I mean, for other reasons, but I -- I mean, I --

10   look, I agree with you.  If another witness was on the

11   stand, we're not talking about this.  But another witness

12   isn't on the stand.  I mean, we haven't put on another

13   witness.  So I'm going to -- look, I don't know whether

14   she's available first thing tomorrow to just get this out of

15   the way, but I'm going to allow this --

16             MR. SMITH:  Thank you, Your Honor.

17             THE COURT:  -- very limited -- very limited, very

18   limited recross of her on this one point.  Her personal

19   observations, what exactly did she see, because I do think

20   Mr. Nordean has this right to cross her on this.  And, no, I

21   wouldn't be -- and, yes, in a sense, I suppose they lucked

22   out that you all didn't have another witness to put on the

23   stand, because if you had, we wouldn't be doing this, but I

24   do think he has that right.

25             So if she can be available first thing tomorrow,

1    we can knock it out.  I don't know what her work schedule

2    is, but we can work it in at some point tomorrow if she's

3    available.  But I think, given the limited back-and-forth

4    that happened here, this is going to be the rare situation

5    when this is appropriate, but I think it's appropriate.

6              MR. SMITH:  Thank you, Your Honor.

7              THE COURT:  All right.

8              MR. MULROE:  And, Your Honor, we'll find out if

9    she's available.  I would note that we are likely to need

10   re-redirect --

11             THE COURT:  Yeah.

12             MR. MULROE:  -- after --

13             THE COURT:  Absolutely.  No, no, no, that's fair.

14   I mean, on this very, very, very narrow point, I think

15   that's right.  So if that's tomorrow, great.  We'll --

16             MS. HERNANDEZ:  I'm sorry.

17             THE COURT:  If not, we'll take her out of order.

18             MS. HERNANDEZ:  Your Honor, I'm happy to submit

19   copies of Agent Cain's emails about the problems with

20   Cellebrite, but I have an email as late as November 9th,

21   2022, where she states: I am seeing all the messages after

22   1/4/21 twice and the second one always has the X.  None of

23   these are actually deleted.  Cellebrite is processing the

24   database, WAL, inaccurately.  So these problems with the way

25   Cellebrite is processing the Telegram data inaccurately is a

1    problem that appear -- I'm not an expert on this, but

2    Special Agent Cain is writing this to multiple FBI agents --

3            THE COURT:  Let me just --

4            MS. HERNANDEZ:  -- as late as November of this

5    year -- November 9th, 2022.

6            THE COURT:  If you -- if Special Agent Cain can't

7    say that the -- what -- or I guess you're not laying the

8    foundation with these exhibits, but if they're -- if they

9    don't have a witness who can say, This is a fair and

10   accurate depiction of the Telegram information from their

11   phones, then they're going to have a problem.  Now,

12   Mr. Mulroe has said they do have a witness who says that.

13   So I don't know -- I mean, I don't know that you're -- the

14   point you're making is -- goes to the individualized

15   admissions decisions that I have to make on these

16   documents --

17           MS. HERNANDEZ:  My problem is, Your Honor, I'm not

18   an expert on Telegram.  I don't like to cross-examine

19   experts without knowing what I'm talking about.  And at this

20   point in time -- these are November 9th, 2022, exhibit- --

21   emails that an agent is sending to the case agent.  And we

22   received them in the course of the Jencks which is just a

23   month ago.  So I'm just -- again, if I blew it; if I was

24   deficient, that's on me.  I'm not -- I'm just telling the

25   Court, I'm not -- it's not that I'm holding back on the

 1     Government and I'm trying to, like -- this is just -- it's

 2     not fair to have the agent testify with these text messages

 3     with me trying to throw stuff at the wall not knowing what

 4     I'm talking about.  The Government needs to produce more

 5     information on this and what the problems are, and that's --

 6             THE COURT:  Let me just say this to the

 7     Government.  I thought we had narrowed the issue -- to this

 8     issue of responding to the, you know -- that the way the

 9     Government produced this information, you can't quite tell

10     whether -- you can't tell -- only from context can you tell

11     whether one message responded to the other.  Okay.  Put that

12     aside.  What Ms. Hernandez, I think, is saying now that

13     there's, sort of, some, sort of, broader accuracy problem

14     with the information that's reflected in the Government's

15     exhibits.  What's the response to that?

16             MR. KENERSON:  Your Honor, this is Erik Kenerson

17     for the United States.

18             I do not think that there will be -- Ms. Hernandez

19     can pursue whatever line of cross-examination she wants to

20     on the accuracy of the -- within -- obviously, within the

21     bounds of the law, on the accuracy of the -- we're not

22     conceding to all cross-examination -- with the -- as to the

23     accuracy of the underlying data that ultimately informs the

24     PDF exhibits that Special Agent Dubrowski is going to put

25     into evidence.  We expect Examiner Cain will be the

1    authenticating witness for that underlying data.  We don't

2    expect her to talk about the substance, for the most part,

3    but just to say, I've reviewed this data.  It's accurate.

4    I've compared it to the original extractions from the

5    phones.  I believe them to be accurate.  Based on my years

6    as a digital forensic examiner, I think that what was done

7    here would accurately capture what's in the phones.

8         So I think that's going to be our foundation

9    through Examiner Cain.  Now, Ms. Hernandez thinks she has

10   the ability to cross-examine her on something, and I'm sure

11   she will do so.  But I don't think it goes to whether we

12   could present the testimony tomorrow.

13        MR. JAUREGUI:  Judge, Jauregui for Tarrio.  The

14   problem is going to be is they're going to put Cain to

15   testify as the authenticating expert witness; right?  I

16   assume she's not going to go through every message -- or the

17   exhibit that they're going to introduce.  Fair; right?  And

18   then they're going to put in Dubrowski later who, when --

19   we're going to ask him, Well, Exhibit-504-22 is not

20   accurate; correct?  There's 23 messages in between this

21   message and that message.  And he's going to say, I don't

22   know, because I'm not an expert.  That's my concern.

23        THE COURT:  Well, it's not -- I don't -- it --

24   they've already indicated they haven't left out messages in

25   between.  Now, there may be messages after or before -- I

```
 1   mean --
 2              MR. JAUREGUI:  That's incorrect.
 3              THE COURT:  Okay.
 4              MR. JAUREGUI:  Just saying.
 5              THE COURT:  But, look, the question of whether
 6   there is a message, then, in between, that's -- I don't
 7   understand -- that's not an expert -- that's not a question
 8   of an expert witness.  Either there is or there is not.
 9              MR. JAUREGUI:  The problem is going to be that
10   when somebody is replying, let's say, to a swipe reply, if
11   you don't have the correct underlying data -- which
12   Cellebrite does not produce, period -- you don't know who
13   they're really responding to.
14              THE COURT:  Well, we've -- okay.  We've been
15   around and around on that point, and I think -- look, my --
16   I'll think about it, but my inclination is that's a -- truly
17   a cross question.  The question of -- and a context
18   question.  If one side wants to -- if one side want- -- if
19   the defendants want to make the point that, Oh, there is
20   information on the phone, but it -- the way this is
21   produced, we can't tell for sure whether person A is
22   responding to person B, have at it.  Or -- and, you know --
23   I mean, I don't think that goes to the basic accuracy of
24   what the Government is producing here.  It's a limitation on
25   the information, for sure.  And if somebody points me to a
```

7393

```
 1    particular exhibit and says, Judge, look, they're not
 2    responding.  This is -- A is not responding to B, no way,
 3    well, then that's a basis to exclude that exhibit if it's
 4    really in question.  But I haven't -- I mean, I've been
 5    looking at -- I've looked at the exhibits.  I don't -- in
 6    general, that is not the case.
 7                 MR. JAUREGUI:  Okay.
 8                 THE COURT:  All right.  Let's -- why don't we come
 9    in at 9:30 instead of 9:00 just to, sort of, give everyone
10    that half an hour.  But we won't have, hopefully,
11    anything -- I don't know -- look, Government, you've
12    indicated you don't need my ruling to go forward tomorrow.
13    I'll do my best to have it at some point tomorrow, or very
14    soon, but you can -- you believe you can go ahead without my
15    ruling with this one witness?
16                 MR. KENERSON:  It would be two:  The U.S. Capitol
17    Police officer and then Examiner Cain are the two that, I
18    think, we are ready to put on without a ruling.
19                 THE COURT:  Without a ruling?  Right.
20                 MR. MCCULLOUGH:  Plus Cooney, if she's available.
21                 THE COURT:  Right, plus Cooney, if she's
22    available.  And -- but you wouldn't need me for Cain, is
23    your point -- you wouldn't need the ruling for Cain.
24                 MR. KENERSON:  I don't think we would -- that's
25    certainly our position.  I don't know if the defense has a
```

1    different position, but I don't think that we would.

2              THE COURT:  Okay.

3              MR. KENERSON:  I don't know if Ms. Hernandez is

4    going to keep objecting on notice grounds, as she indicated

5    she might just now, Rule 16 notice.  I don't know if the

6    Court -- if she continues to raise that objection, if the

7    Court is going to say --

8              THE COURT:  If she raises the objection, I will

9    rule on the objection at that time.

10              We'll see everyone at 9:30 tomorrow.

11              THE DEPUTY CLERK:  All rise.  This Honorable Court

12    is adjourned.

13              (Proceedings concluded at 6:13 p.m.)

14                    * * * * * * * * * * * *

15              **CERTIFICATE OF OFFICIAL COURT REPORTER**

16    **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

17    **that the above and foregoing constitutes a true and accurate**

18    **transcript of my stenographic notes and is a full, true and**

19    **complete transcript of the proceedings to the best of my**

20    **ability, dated this 7th day of February 2023.**

21                         **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                         Official Court Reporter
22                         United States Courthouse
                         Room 6722
23                         333 Constitution Avenue, NW
                         Washington, DC 20001

24

25

7395

## /

**/s/Timothy** [1] - 7394:21

## 0

**06511** [1] - 7172:24

## 1

**1** [9] - 7174:3, 7174:9, 7174:13, 7179:9, 7183:4, 7194:22, 7196:21, 7218:1, 7317:5
**1-ETHAN** [1] - 7172:4
**1/4/21** [1] - 7388:22
**10** [10] - 7195:22, 7195:23, 7195:25, 7270:13, 7282:1, 7316:15, 7316:18, 7336:15, 7349:17, 7349:21
**10-minute** [1] - 7195:7
**100** [3] - 7179:2, 7250:9, 7292:22
**10003** [1] - 7172:18
**10016** [1] - 7173:13
**101** [2] - 7194:25, 7336:16
**1014** [1] - 7173:9
**102** [1] - 7179:2
**103** [1] - 7179:2
**104** [2] - 7194:25, 7336:16
**105** [1] - 7179:3
**106** [10] - 7194:25, 7336:16, 7338:1, 7338:7, 7345:22, 7346:5, 7346:8, 7351:5, 7370:10, 7374:5
**107** [1] - 7179:3
**10th** [1] - 7349:7
**11** [2] - 7194:22, 7218:23
**110** [1] - 7179:3
**111** [1] - 7194:25
**114** [3] - 7330:21, 7331:19, 7370:25
**116** [3] - 7194:25, 7330:21, 7331:19
**11:00** [1] - 7172:6
**12** [13] - 7194:3, 7195:16, 7270:19, 7270:24, 7271:1, 7271:2, 7272:22, 7274:15, 7296:25, 7306:17, 7336:15,

7364:24
**121** [1] - 7179:3
**123** [1] - 7179:3
**124** [2] - 7194:25, 7328:18
**127** [1] - 7194:25
**128** [1] - 7179:3
**12:12:07** [1] - 7370:1
**12:59** [1] - 7238:1
**12th** [2] - 7261:8, 7375:19
**13** [5] - 7194:22, 7271:3, 7297:25, 7368:20
**134** [2] - 7179:3, 7353:11
**135** [1] - 7194:25
**136** [1] - 7179:3
**137** [1] - 7179:4
**138** [5] - 7194:25, 7212:16, 7326:18, 7354:9, 7368:18
**138-18** [1] - 7352:15
**1384** [1] - 7363:12
**139** [3] - 7179:4, 7353:2, 7353:3
**14** [6] - 7271:3, 7306:17, 7331:21, 7332:11, 7332:12, 7365:13
**141** [1] - 7179:4
**1411** [1] - 7363:12
**1412** [2] - 7363:12, 7363:20
**142** [5] - 7195:1, 7325:10, 7352:14, 7354:10, 7368:14
**1420** [1] - 7172:20
**145** [2] - 7195:1, 7336:16
**146** [1] - 7179:4
**147** [1] - 7195:1
**148** [1] - 7195:1
**149** [1] - 7179:4
**14th** [3] - 7203:9, 7361:25, 7375:20
**15** [1] - 7194:23
**150** [5] - 7195:1, 7324:8, 7324:16, 7354:10, 7366:25
**151** [1] - 7179:4
**1512(c)(2)** [1] - 7275:12
**152** [6] - 7193:20, 7196:12, 7215:5, 7215:11, 7251:9, 7269:7
**153** [6] - 7173:5, 7193:20, 7196:12, 7215:5, 7215:11,

7255:10
**154** [9] - 7195:1, 7321:16, 7324:14, 7338:11, 7338:12, 7338:16, 7354:10, 7366:7
**155** [1] - 7179:4
**15th** [1] - 7299:24
**16** [15] - 7191:11, 7194:3, 7274:16, 7274:18, 7298:23, 7306:18, 7309:7, 7309:8, 7313:21, 7378:12, 7378:19, 7378:24, 7379:2, 7384:12, 7384:5
**161** [1] - 7179:4
**162** [1] - 7195:1
**163** [1] - 7195:1
**164** [1] - 7179:4
**165** [3] - 7193:20, 7215:13, 7256:16
**166** [2] - 7179:5, 7216:10
**168** [1] - 7179:5
**169** [5] - 7193:21, 7196:12, 7218:1, 7218:6, 7256:18
**16th** [1] - 7333:21
**17** [3] - 7194:23, 7256:2, 7384:12
**170** [3] - 7193:21, 7196:12, 7258:9
**171** [2] - 7179:5
**179** [3] - 7179:9, 7179:17, 7336:17
**18** [3] - 7278:3, 7278:5
**189** [1] - 7183:9
**19** [4] - 7277:24, 7277:25, 7278:3
**191** [2] - 7179:5, 7179:6
**192** [1] - 7195:1
**193** [1] - 7195:2
**194** [9] - 7193:21, 7212:17, 7218:24, 7220:11, 7220:19, 7233:8, 7233:9, 7233:12, 7260:9
**195** [8] - 7193:21, 7212:17, 7212:21, 7218:21, 7219:6, 7229:17, 7233:9, 7233:12
**196** [6] - 7193:21, 7218:21, 7219:7, 7219:8, 7219:12, 7219:13
**197** [10] - 7195:2, 7196:14, 7317:5,

7317:6, 7324:13, 7338:11, 7338:12, 7338:21, 7354:10, 7363:25
**1971** [1] - 7242:3
**198** [2] - 7195:2, 7196:21
**1988** [1] - 7363:12
**19th** [2] - 7261:7, 7375:18
**1:21-cr-00175-TJK-1** [1] - 7172:2
**1:21-cr-00175-TJK-2** [1] - 7172:3
**1:21-cr-00175-TJK-3** [1] - 7172:3
**1:21-cr-00175-TJK-5** [1] - 7172:4
**1:21-cr-00175-TJK-6** [1] - 7172:4
**1st** [3] - 7172:24, 7191:11, 7378:12

## 2

**2** [7] - 7174:4, 7174:9, 7174:14, 7183:4, 7252:8, 7269:8, 7320:15
**2-JOSEPH** [1] - 7172:5
**20** [5] - 7194:23, 7333:7, 7333:8, 7338:12, 7338:13
**20001** [2] - 7173:17, 7394:23
**20005** [1] - 7172:21
**202** [3] - 7172:15, 7172:21, 7173:17
**2020** [9] - 7266:18, 7313:22, 7314:11, 7314:13, 7333:9, 7349:8, 7354:23, 7355:4, 7355:15
**2022** [5] - 7189:6, 7189:7, 7388:21, 7389:5, 7389:20
**2023** [2] - 7172:6, 7394:20
**2024** [1] - 7362:14
**203** [1] - 7172:25
**20530** [1] - 7172:14
**20777** [1] - 7173:3
**209** [1] - 7173:6
**20th** [1] - 7172:17
**21** [10] - 7194:3, 7205:15, 7277:22, 7278:6, 7299:23, 7300:9, 7300:10, 7300:12, 7309:23,

7314:2
**21-175** [4] - 7174:2, 7196:3, 7238:3, 7316:21
**22** [11] - 7194:4, 7218:23, 7277:22, 7278:6, 7299:23, 7300:9, 7300:10, 7300:11, 7300:21, 7309:23, 7314:2
**23** [2] - 7194:23, 7391:20
**24** [2] - 7194:4, 7280:16
**240** [1] - 7173:3
**25** [3] - 7194:23, 7333:19, 7354:9
**252-7233** [1] - 7172:15
**253-0514** [1] - 7173:14
**26** [2] - 7172:8, 7203:9
**27th** [2] - 7202:10, 7266:21
**29** [2] - 7334:8, 7349:5
**29th** [2] - 7266:18, 7314:13
**2:00** [1] - 7237:22
**2:15** [1] - 7299:10
**2:49:54** [1] - 7251:16
**2:50-57** [1] - 7255:11

## 3

**3** [3] - 7174:4, 7174:10, 7174:14
**3-ZACHARY** [1] - 7172:5
**30** [2] - 7194:23, 7314:4, 7352:11, 7381:25
**305** [2] - 7173:7, 7173:10
**30th** [2] - 7245:23, 7265:4
**31** [1] - 7314:4
**32** [7] - 7194:4, 7283:16, 7301:7, 7304:1, 7314:4
**33** [4] - 7194:4, 7283:16, 7287:8
**33012** [1] - 7173:9
**33014** [1] - 7173:6
**333** [2] - 7173:16, 7394:23
**34** [5] - 7194:4, 7283:16, 7304:1, 7314:4
**35** [1] - 7194:23
**354-3111** [1] - 7173:17
**383** [1] - 7172:23
**393-3017** [1] - 7172:25

7396

**3:23** [1] - 7317:13
**3:33:56** [1] - 7355:14
**3:37:49** [1] - 7355:13
**3rd** [1] - 7215:7

**4**

**40** [1] - 7287:1
**403** [29] - 7229:9,
7233:16, 7240:8,
7240:24, 7242:7,
7266:24, 7284:2,
7285:9, 7286:24,
7299:11, 7299:22,
7301:6, 7302:1,
7302:7, 7302:25,
7305:16, 7306:18,
7313:5, 7313:25,
7317:17, 7324:7,
7331:1, 7331:12,
7331:25, 7332:23,
7333:18, 7333:24,
7348:21, 7355:11
**403-7323** [1] - 7173:7
**404(b** [1] - 7342:2
**41** [5] - 7194:4,
7289:10, 7291:13,
7303:2, 7310:3
**42** [4] - 7194:5,
7289:10, 7291:13,
7310:3
**429-6520** [1] - 7172:21
**43** [1] - 7194:23
**46** [2] - 7194:24,
7336:16
**472-3391** [1] - 7173:3
**48** [3] - 7179:1,
7298:13, 7345:14
**49** [5] - 7173:9,
7177:1, 7177:8,
7177:10, 7194:24
**4r** [1] - 7172:17
**4th** [8] - 7172:14,
7215:14, 7216:14,
7241:13, 7256:24,
7298:10, 7317:12,
7355:15

**5**

**5** [6] - 7174:5,
7174:11, 7174:14,
7213:20, 7218:24,
7331:21
**5-ENRIQUE** [1] -
7172:6
**50** [1] - 7188:7
**500** [3] - 7249:16,
7308:19, 7347:13
**500-35** [1] - 7298:23

**500-49** [1] - 7301:8
**500-51** [1] - 7287:9
**500-8** [1] - 7291:14
**501** [1] - 7349:14
**501-13** [1] - 7349:24
**501-15** [1] - 7311:19
**501-25** [1] - 7337:7
**501-39** [2] - 7338:1,
7338:7
**501-6** [1] - 7338:12
**501-7** [1] - 7349:17
**502** [1] - 7347:14
**503-19** [1] - 7232:23
**503-3** [7] - 7292:15,
7307:16, 7308:1,
7308:2, 7308:5,
7311:7, 7311:18
**503-6** [2] - 7348:4,
7348:8
**505** [1] - 7327:10
**505-18** [1] - 7212:8
**505-6** [1] - 7324:9
**507-10** [3] - 7212:8,
7218:23, 7260:9
**507-11** [1] - 7212:8
**507-12** [1] - 7251:3
**507-13** [1] - 7255:9
**507-16** [1] - 7317:9
**507-7** [1] - 7328:18
**508** [1] - 7347:14
**509-5** [2] - 7218:5,
7256:18
**51** [2] - 7229:22
**510** [1] - 7218:5
**510-19** [1] - 7338:12
**510-6** [1] - 7258:10
**510-8** [2] - 7216:15,
7256:16
**510-9** [1] - 7216:15
**512** [2] - 7253:12,
7253:13
**513** [1] - 7347:15
**514** [1] - 7270:23
**514-11** [4] - 7270:25,
7298:10, 7298:13,
7298:15
**514-12** [4] - 7272:2,
7298:12, 7298:14
**514-18** [5] - 7277:24,
7277:25, 7278:5,
7300:16, 7309:23
**514-19** [2] - 7278:5,
7309:24
**514-20** [3] - 7280:19,
7280:20, 7280:25
**514-28** [1] - 7289:12
**514-29** [1] - 7289:12
**514-47** [1] - 7353:9
**515** [1] - 7347:16

**517** [1] - 7347:16
**52** [1] - 7194:24
**53** [5] - 7194:5,
7291:14, 7314:10,
7336:16
**530-3** [1] - 7338:13
**534-1** [1] - 7352:21
**535** [1] - 7347:17
**538-18** [1] - 7352:15
**54** [1] - 7179:1
**540** [1] - 7280:18
**546-1** [2] - 7283:16,
7312:23
**548-8** [1] - 7349:5
**549** [1] - 7283:16
**55** [1] - 7194:24
**551** [1] - 7283:16
**555** [1] - 7172:14
**57** [1] - 7179:1
**58** [1] - 7179:1
**59** [2] - 7194:24,
7336:16
**5th** [2] - 7378:14,
7378:17

**6**

**6** [5] - 7172:6, 7174:5,
7174:12, 7174:15,
7218:24
**6-DOMINIC** [1] -
7172:6
**60** [1] - 7179:1
**603** [1] - 7177:9
**61** [2] - 7194:24,
7362:6
**6175** [1] - 7173:5
**62** [1] - 7362:6
**63** [7] - 7193:8,
7193:19, 7193:20,
7196:12, 7196:24,
7197:1, 7197:24
**64** [1] - 7194:24
**646** [1] - 7173:14
**65** [1] - 7179:1
**66** [1] - 7194:24
**67** [1] - 7179:1
**6722** [2] - 7173:16,
7394:22
**6:13** [1] - 7394:13
**6:40:07** [1] - 7366:24
**6th** [48] - 7173:13,
7198:17, 7200:12,
7200:18, 7205:17,
7209:19, 7210:8,
7211:9, 7211:12,
7211:13, 7211:21,
7215:7, 7217:10,
7219:4, 7235:16,
7235:21, 7235:23,

7239:21, 7245:12,
7259:7, 7260:21,
7260:25, 7261:14,
7261:24, 7265:9,
7265:17, 7265:18,
7266:3, 7275:25,
7284:25, 7304:6,
7304:21, 7312:3,
7312:7, 7325:1,
7328:22, 7329:19,
7330:13, 7331:4,
7331:24, 7335:9,
7335:13, 7340:6,
7340:17, 7349:2,
7364:6, 7368:22,
7371:3

**7**

**7** [2] - 7172:17,
7336:16
**70** [5] - 7179:1,
7216:24, 7218:2,
7233:22, 7338:4
**71** [2] - 7194:24,
7337:7
**7102** [1] - 7384:12
**7166** [1] - 7173:2
**72** [1] - 7179:1
**73** [1] - 7349:24
**74** [2] - 7179:2,
7349:16
**75** [3] - 7194:5,
7292:5, 7311:19
**76** [1] - 7179:2
**7th** [4] - 7299:2,
7309:10, 7313:22,
7394:20

**8**

**80** [1] - 7202:8
**801(d)(2)(B)** [1] -
7202:22
**803** [1] - 7225:16
**803(3** [3] - 7231:5,
7231:14, 7231:16
**803(3)** [1] - 7231:16
**82** [1] - 7179:2
**822-2901** [1] - 7173:10
**83** [1] - 7194:24
**84** [1] - 7179:2
**846** [1] - 7363:12
**85** [1] - 7194:24
**86** [10] - 7193:8,
7193:20, 7201:21,
7202:8, 7202:9,
7215:2, 7230:12,
7230:13, 7266:16,
7267:9

**87** [1] - 7232:24
**88** [2] - 7265:23,
7348:3
**89** [1] - 7266:1
**8:23** [1] - 7202:12

**9**

**9** [2] - 7355:4, 7355:6
**9/29** [1] - 7314:11
**90** [4] - 7179:5,
7213:20, 7213:21,
7348:7
**902-3869** [1] - 7172:18
**91** [2] - 7347:23,
7348:7
**917** [1] - 7172:18
**93** [6] - 7193:20,
7201:21, 7214:23,
7215:2, 7266:16,
7267:9
**94** [1] - 7179:2
**95** [3] - 7179:2,
7217:20, 7343:1
**97** [1] - 7194:24
**98** [5] - 7194:5,
7292:13, 7311:7,
7311:18, 7336:16
**99** [2] - 7173:12,
7194:24
**9:00** [1] - 7393:9
**9:18** [1] - 7352:10
**9:26** [2] - 7348:18
**9:30** [2] - 7393:9,
7394:10
**9th** [5] - 7189:6,
7333:9, 7388:20,
7389:5, 7389:20

**A**

**a.m** [1] - 7172:6
**Aaron** [6] - 7198:1,
7198:5, 7198:6,
7218:6, 7218:15,
7218:19
**abbreviated** [1] -
7364:20
**abhorrent** [1] - 7242:6
**ability** [6] - 7205:1,
7240:10, 7296:3,
7367:9, 7391:10,
7394:20
**able** [26] - 7186:15,
7209:8, 7211:14,
7237:19, 7244:5,
7249:3, 7249:4,
7251:19, 7254:7,
7263:15, 7267:25,
7273:25, 7306:22,

7397

7329:2, 7343:6,
7364:9, 7365:25,
7372:21, 7373:18,
7377:5, 7377:17,
7377:20, 7378:9,
7379:16, 7383:25
**aborted** [1] - 7215:17
**absence** [2] - 7175:3,
7342:3
**absent** [3] - 7257:4,
7330:14, 7341:4
**absolutely** [3] -
7290:16, 7297:1,
7388:13
**absorb** [1] - 7195:6
**accept** [5] - 7220:16,
7233:20, 7250:19,
7276:12
**acceptable** [1] -
7372:14
**acceptance** [1] -
7210:17
**access** [13] - 7251:19,
7325:17, 7355:19,
7355:20, 7356:3,
7356:23, 7357:24,
7358:2, 7358:3,
7358:5, 7358:7,
7358:8, 7377:20
**accessible** [1] -
7344:16
**accompanying** [1] -
7200:17
**accomplish** [1] -
7241:10
**according** [2] -
7196:10, 7325:3
**account** [1] - 7250:21
**accumulate** [1] -
7267:3
**accuracy** [6] -
7371:14, 7390:13,
7390:20, 7390:21,
7390:23, 7392:23
**accurate** [11] - 7183:8,
7185:18, 7189:24,
7283:22, 7313:8,
7386:2, 7389:10,
7391:3, 7391:5,
7391:20, 7394:17
**accurately** [1] -
7391:7
**acid** [2] - 7224:19,
7240:9
**acknowledged** [1] -
7246:21
**act** [9] - 7294:21,
7307:22, 7338:25,
7339:2, 7339:6,
7339:9, 7339:15,

7340:11, 7341:5
**acting** [1] - 7258:20
**action** [3] - 7239:1,
7342:6, 7364:13
**actions** [2] - 7219:21,
7342:7
**active** [4] - 7198:13,
7207:4, 7207:5
**actively** [1] - 7217:9
**activities** [2] -
7239:22, 7304:6
**activity** [1] - 7239:14
**acts** [3] - 7238:24,
7247:2, 7304:19
**actual** [2] - 7188:16,
7246:22
**acute** [1] - 7219:3
**ad** [1] - 7340:18
**add** [10] - 7244:22,
7276:15, 7314:7,
7325:8, 7336:21,
7346:5, 7354:4,
7369:15, 7373:5,
7373:18
**added** [4] - 7263:23,
7292:7, 7354:15,
7376:10
**addition** [2] - 7196:13,
7301:5
**additional** [14] -
7176:12, 7191:12,
7191:16, 7196:13,
7197:13, 7201:7,
7211:1, 7218:9,
7272:24, 7286:4,
7286:15, 7367:12,
7372:21, 7374:7
**address** [13] -
7174:20, 7231:12,
7245:5, 7248:6,
7250:24, 7251:20,
7263:9, 7264:12,
7264:13, 7283:10,
7285:8, 7375:20,
7375:23
**addressed** [1] -
7360:13
**addressing** [3] -
7178:17, 7206:8,
7215:2
**adhering** [1] - 7217:15
**adjourned** [1] -
7394:12
**administration** [1] -
7263:22
**admissibility** [23] -
7180:14, 7194:6,
7245:4, 7246:12,
7250:7, 7259:20,
7270:15, 7270:23,

7274:14, 7276:12,
7278:7, 7290:7,
7292:25, 7293:23,
7293:25, 7298:18,
7298:24, 7318:20,
7319:9, 7324:4,
7328:6, 7351:14,
7364:19
**admissible** [17] -
7194:13, 7199:2,
7224:4, 7231:13,
7251:23, 7252:18,
7255:7, 7255:8,
7290:3, 7305:10,
7318:7, 7328:9,
7329:23, 7330:5,
7334:6, 7365:15,
7376:16
**admission** [16] -
7183:7, 7184:19,
7192:5, 7213:23,
7214:6, 7225:16,
7254:11, 7255:1,
7255:12, 7255:20,
7293:12, 7317:16,
7325:15, 7331:24,
7332:22, 7333:23
**admissions** [2] -
7202:21, 7389:15
**admit** [6] - 7176:13,
7192:11, 7195:3,
7195:19, 7309:3,
7318:14
**admits** [1] - 7346:15
**admitted** [24] -
7176:14, 7181:7,
7203:12, 7210:22,
7222:25, 7227:6,
7231:17, 7236:21,
7239:5, 7286:9,
7292:14, 7301:25,
7305:1, 7305:11,
7305:15, 7318:13,
7319:2, 7319:5,
7334:5, 7354:18,
7365:5, 7365:20,
7366:8, 7374:15
**admitting** [6] - 7194:2,
7230:8, 7230:24,
7248:12, 7299:7,
7304:24
**admonish** [2] -
7208:1, 7237:5
**admonishing** [1] -
7236:25
**admonishments** [2] -
7236:16, 7236:19
**admonition** [2] -
7296:10, 7296:15
**adopt** [5] - 7312:21,

7313:18, 7314:20,
7327:24, 7354:2
**adopted** [7] - 7202:21,
7202:24, 7233:17,
7299:21, 7317:20,
7328:3, 7351:3
**adopting** [4] - 7264:6,
7264:17, 7276:25,
7299:19
**adoption** [2] -
7279:16, 7326:20
**adopts** [2] - 7276:17,
7348:6
**advance** [2] - 7363:18,
7374:11
**advanced** [1] - 7245:9
**advantageous** [1] -
7306:4
**adversaries** [1] -
7278:19
**advocacy** [1] - 7272:5
**affected** [3] - 7259:16,
7259:25, 7260:24
**affiliated** [2] -
7307:10, 7307:11
**affirmatively** [3] -
7202:24, 7276:16,
7308:10
**afoul** [1] - 7367:4
**afternoon** [2] -
7266:12, 7385:18
**agent** [24] - 7184:22,
7188:4, 7189:22,
7200:6, 7200:7,
7271:5, 7274:25,
7286:1, 7286:5,
7286:7, 7315:9,
7315:25, 7316:11,
7340:9, 7343:21,
7367:23, 7367:24,
7372:9, 7374:23,
7377:9, 7389:21,
7390:2
**Agent** [26] - 7176:10,
7189:7, 7190:25,
7191:11, 7191:16,
7200:11, 7200:16,
7278:15, 7286:13,
7315:22, 7343:16,
7344:3, 7352:13,
7360:7, 7360:9,
7360:20, 7360:23,
7361:1, 7372:17,
7374:21, 7376:16,
7378:11, 7388:19,
7389:2, 7389:6,
7390:24
**agent's** [3] - 7185:2,
7367:8
**agents** [5] - 7268:21,

7313:18, 7314:20,
7327:24, 7354:2
**adopted** [7] - 7202:21,
7337:16, 7356:18,
7356:19, 7389:2
**aggression** [1] -
7207:13
**aggressive** [2] -
7199:16, 7203:2
**aggressively** [1] -
7268:3
**ago** [4] - 7264:4,
7278:10, 7337:25,
7389:23
**agree** [16] - 7174:18,
7206:4, 7233:8,
7250:15, 7252:3,
7254:6, 7254:21,
7295:9, 7296:13,
7302:6, 7302:24,
7303:6, 7307:18,
7341:20, 7386:16,
7387:10
**agreed** [3] - 7314:5,
7317:22, 7386:8
**agreeing** [1] - 7369:4
**agreement** [2] -
7284:25, 7339:5
**ahead** [9] - 7202:18,
7208:4, 7216:17,
7217:18, 7276:9,
7285:20, 7321:21,
7375:16, 7393:14
**aided** [1] - 7173:19
**akin** [1] - 7294:21
**al** [3] - 7196:4, 7238:4,
7316:22
**albeit** [1] - 7219:9
**alcohol** [2] - 7265:2,
7362:9
**alive** [1] - 7284:9
**alleged** [5] - 7199:7,
7248:16, 7253:7,
7257:1, 7314:18
**allegedly** [2] -
7279:21, 7320:17
**allow** [11] - 7195:22,
7207:22, 7263:17,
7263:18, 7269:25,
7319:4, 7345:7,
7379:19, 7385:23,
7387:15
**allowed** [5] - 7205:10,
7369:6, 7369:10,
7375:13, 7376:7
**allows** [1] - 7225:16
**allude** [1] - 7362:9
**alluded** [1] - 7330:8
**allusion** [1] - 7299:11
**almost** [3] - 7181:18,
7199:3, 7232:19
**alone** [3] - 7275:22,
7302:7, 7339:16

7398

**AM** [1] - 7312:6
**ambiguity** [1] -
7296:12
**amend** [2] - 7176:12,
7378:18
**amended** [2] -
7191:11, 7378:13
**America** [5] - 7174:3,
7196:3, 7238:3,
7310:24, 7316:21
**AMERICA** [1] - 7172:2
**analogized** [1] -
7268:14
**analogous** [2] -
7253:21, 7268:7
**analogy** [3] - 7239:3,
7268:5, 7269:19
**analys** [1] - 7188:9
**analysis** [8] - 7189:9,
7206:23, 7240:8,
7240:24, 7242:7,
7242:8, 7242:11,
7339:12
**Angel** [2] - 7287:13,
7288:8
**anger** [1] - 7223:10
**angry** [2] - 7222:20,
7224:15
**animating** [1] -
7289:17
**announced** [1] -
7214:4
**answer** [3] - 7216:15,
7293:10, 7378:20
**answering** [2] -
7247:21, 7345:8
**answers** [1] - 7216:10
**Antifa** [13] - 7208:7,
7209:16, 7261:11,
7265:25, 7300:5,
7300:23, 7304:4,
7306:8, 7310:8,
7310:13, 7310:17,
7368:23
**anyway** [6] - 7197:19,
7254:24, 7302:5,
7344:14, 7368:5,
7369:11
**apologies** [4] -
7264:11, 7287:4,
7298:8, 7353:1
**apologize** [2] -
7298:3, 7368:6
**app** [2] - 7358:14,
7358:15
**apparent** [4] - 7269:4,
7288:19, 7367:16,
7372:25
**Appeals** [2] - 7268:24,
7316:5

**appear** [9] - 7179:7,
7216:25, 7230:8,
7247:18, 7247:23,
7281:13, 7334:20,
7336:1, 7389:1
**appearance** [2] -
7175:10, 7175:13
**APPEARANCES** [2] -
7172:10, 7173:1
**appearing** [2] -
7188:21, 7326:25
**apple** [1] - 7383:20
**applicable** [1] -
7338:20
**application** [8] -
7188:20, 7190:2,
7264:25, 7265:1,
7265:3, 7313:23,
7314:14
**applications** [1] -
7354:9
**applies** [4] - 7187:21,
7211:8, 7214:20,
7378:15
**apply** [3] - 7215:6,
7220:17, 7323:1
**applying** [1] - 7228:21
**appreciate** [2] -
7175:11, 7367:2
**approach** [1] - 7282:9
**appropriate** [11] -
7190:20, 7194:19,
7195:21, 7244:18,
7271:9, 7300:14,
7333:6, 7346:23,
7370:22, 7388:5
**appropriately** [1] -
7180:1
**approval** [6] - 7203:5,
7204:8, 7208:14,
7210:22, 7240:14,
7288:7
**approve** [1] - 7366:15
**April** [1] - 7189:7
**area** [2] - 7316:8,
7342:12
**arguably** [1] - 7360:7
**argue** [22] - 7201:13,
7222:15, 7239:8,
7241:23, 7253:6,
7254:7, 7257:5,
7258:7, 7259:5,
7278:17, 7278:18,
7295:15, 7295:19,
7299:3, 7322:14,
7324:3, 7327:13,
7328:6, 7333:17,
7336:4, 7352:18,
7356:5
**argued** [4] - 7241:3,

7247:9, 7342:15,
7373:22
**argues** [1] - 7330:10
**arguing** [6] - 7230:19,
7245:19, 7318:23,
7362:4, 7365:14,
7373:2
**argument** [75] -
7175:2, 7179:21,
7184:4, 7190:20,
7195:15, 7203:6,
7210:23, 7220:15,
7220:23, 7222:16,
7223:10, 7223:15,
7224:7, 7225:24,
7228:14, 7228:18,
7229:6, 7232:20,
7233:5, 7233:19,
7234:10, 7234:15,
7234:22, 7234:25,
7236:8, 7237:17,
7238:19, 7240:3,
7241:7, 7242:16,
7243:17, 7244:8,
7247:15, 7248:21,
7249:13, 7251:13,
7251:14, 7256:13,
7259:3, 7260:23,
7262:12, 7263:10,
7264:18, 7270:21,
7281:16, 7293:22,
7293:25, 7297:3,
7297:23, 7298:9,
7298:17, 7298:18,
7298:21, 7302:23,
7307:20, 7309:2,
7312:9, 7312:10,
7312:21, 7318:5,
7318:9, 7318:11,
7319:4, 7320:14,
7324:5, 7324:7,
7330:13, 7330:18,
7332:8, 7356:9,
7363:4, 7363:6,
7373:3, 7381:3
**arguments** [24] -
7214:5, 7214:10,
7226:17, 7240:20,
7245:3, 7245:6,
7245:20, 7245:21,
7248:23, 7267:18,
7268:25, 7299:15,
7300:7, 7304:2,
7312:15, 7312:18,
7313:18, 7314:20,
7315:2, 7338:11,
7338:14, 7339:7,
7354:2, 7363:22
**armed** [2] - 7321:24,
7366:10

**arming** [1] - 7322:16
**army** [1] - 7289:19
**arrest** [2] - 7217:11,
7218:16
**arrested** [4] - 7241:13,
7256:25, 7276:4,
7358:4
**arrests** [1] - 7242:3
**arrogant** [2] - 7256:4,
7256:11
**articulated** [2] -
7255:22, 7305:3
**Ash** [1] - 7205:16
**aside** [8] - 7177:13,
7194:9, 7223:20,
7223:24, 7225:14,
7228:13, 7339:21,
7390:12
**aspect** [1] - 7195:20
**aspects** [2] - 7368:1,
7368:2
**assembly** [1] -
7241:25
**assent** [3] - 7246:4,
7247:13, 7248:7
**asserted** [9] - 7184:5,
7202:3, 7202:4,
7215:23, 7222:3,
7246:13, 7248:13,
7248:24, 7248:25,
7249:6, 7249:11,
7252:23, 7253:1,
7253:9, 7254:8,
7257:10, 7269:7,
7295:5, 7365:2
**assertion** [2] - 7217:3,
7296:15
**associated** [1] -
7231:19
**association** [2] -
7266:4, 7307:8
**assume** [9] - 7254:10,
7255:23, 7256:3,
7292:5, 7293:6,
7307:12, 7386:24,
7387:2, 7391:16
**assuming** [2] -
7234:1, 7252:13
**assumption** [1] -
7378:6
**assumptions** [1] -
7255:22
**attached** [1] - 7176:19
**attachment** [1] -
7188:23
**attack** [5] - 7198:23,
7211:6, 7256:6,
7265:8, 7311:2
**attacked** [1] - 7266:6
**attacking** [1] - 7266:2

**attempting** [3] -
7220:14, 7221:13,
7222:19
**attendance** [1] -
7334:20
**attending** [1] - 7295:9
**attention** [8] -
7177:21, 7187:15,
7214:13, 7240:8,
7306:24, 7315:15,
7315:20, 7351:25
**attenuated** [1] -
7297:20
**attitude** [4] - 7280:2,
7300:25, 7301:3,
7304:5
**attitudes** [2] - 7285:3,
7301:18
**Attorney** [1] - 7337:19
**attorney** [1] - 7345:15
**ATTORNEY'S** [1] -
7172:13
**attorneys** [1] -
7354:11
**attributable** [2] -
7181:4, 7339:3
**attribute** [2] - 7307:10,
7307:13
**attributes** [1] -
7204:24
**authenticating** [2] -
7391:1, 7391:15
**authentication** [1] -
7263:14
**authored** [1] - 7189:7
**authority** [2] -
7277:15, 7363:9
**available** [8] -
7377:18, 7383:17,
7387:14, 7387:25,
7388:3, 7388:9,
7393:20, 7393:22
**avenue** [1] - 7275:7
**Avenue** [5] - 7173:12,
7173:16, 7241:16,
7394:23
**average** [1] - 7207:6
**avoid** [3] - 7226:21,
7235:7, 7337:18
**aware** [2] - 7276:20,
7286:7

**B**

**B.A** [1] - 7172:11
**back-and-forth** [2] -
7234:3, 7388:3
**background** [3] -
7244:13, 7275:2,
7349:19

7399

**backtracking** [1] - 7306:16

**backup** [1] - 7295:19

**backwards** [1] - 7324:11

**bad** [5] - 7205:19, 7269:11, 7275:4, 7287:16

**bags** [1] - 7269:14

**bail** [4] - 7208:8, 7233:4, 7265:24

**bait** [2] - 7305:21, 7305:24

**bait-and-switch** [2] - 7305:21, 7305:24

**baited** [1] - 7271:24

**banged** [1] - 7286:16

**bank** [2] - 7257:23, 7340:2

**banner** [1] - 7338:2

**banter** [1] - 7206:11

**bar** [1] - 7342:1

**Barcosiba** [1] - 7205:16

**barely** [1] - 7245:3

**barrier** [2] - 7222:4, 7222:6

**barriers** [1] - 7292:15

**based** [21] - 7175:2, 7178:10, 7183:10, 7197:6, 7198:24, 7204:24, 7205:2, 7207:5, 7207:6, 7208:22, 7213:6, 7248:23, 7268:12, 7270:21, 7287:17, 7307:13, 7328:6, 7335:21, 7368:10, 7383:16, 7391:5

**basic** [4] - 7183:6, 7311:9, 7383:21, 7392:23

**basis** [27] - 7183:10, 7185:24, 7190:3, 7192:10, 7194:2, 7195:15, 7199:3, 7201:5, 7203:23, 7204:19, 7211:1, 7236:5, 7272:22, 7281:14, 7283:14, 7288:21, 7290:8, 7291:12, 7293:12, 7299:7, 7324:24, 7346:23, 7357:7, 7364:16, 7365:24, 7367:10, 7393:3

**batch** [1] - 7361:19

**battle** [2] - 7275:22, 7275:24

**bear** [2] - 7211:12,

7240:6

**Beard** [7] - 7206:2, 7215:15, 7292:17, 7321:25, 7322:3, 7366:8, 7366:10

**beat** [1] - 7254:12

**beating** [1] - 7310:13

**became** [2] - 7266:22, 7376:1

**become** [3] - 7279:4, 7307:8, 7376:5

**becomes** [5] - 7184:3, 7208:20, 7217:16, 7224:11, 7307:7

**becoming** [1] - 7345:15

**bed** [1] - 7375:11

**BEFORE** [1] - 7172:9

**beforehand** [2] - 7255:18, 7291:18

**began** [2] - 7214:23, 7299:3

**begin** [3] - 7240:25, 7242:8, 7356:12

**beginning** [1] - 7371:23

**begins** [3] - 7195:16, 7196:21, 7306:12

**behalf** [4] - 7179:20, 7204:6, 7303:25, 7313:19

**behavior** [3] - 7210:7, 7241:22, 7242:6

**behind** [1] - 7219:23

**beings** [1] - 7232:15

**belabor** [2] - 7267:19, 7351:10

**belief** [2] - 7203:1, 7354:16

**bench** [2] - 7195:23, 7242:15

**beneficial** [1] - 7207:14

**Bertino** [12] - 7206:2, 7283:22, 7292:20, 7294:7, 7294:12, 7301:14, 7311:9, 7313:11, 7333:8, 7366:11, 7371:7, 7371:8

**Bertino's** [2] - 7305:2, 7311:14

**best** [7] - 7192:13, 7220:9, 7241:23, 7245:5, 7266:13, 7393:13, 7394:19

**better** [3] - 7214:1, 7371:11, 7384:5

**between** [26] - 7176:11, 7216:24,

7219:25, 7231:16, 7239:3, 7247:20, 7256:2, 7273:15, 7281:20, 7304:17, 7310:12, 7321:1, 7325:11, 7330:21, 7348:18, 7352:16, 7360:18, 7371:9, 7380:3, 7380:9, 7380:10, 7380:20, 7385:14, 7391:20, 7391:25, 7392:6

**beyond** [6] - 7241:4, 7261:1, 7262:3, 7293:14, 7380:16, 7380:25

**Biden** [4] - 7254:12, 7254:14, 7271:25, 7331:22

**bifurcating** [1] - 7200:19

**big** [3] - 7206:9, 7226:5, 7248:8

**BIGGS** [1] - 7172:5

**Biggs** [22] - 7174:4, 7174:14, 7175:22, 7179:20, 7179:23, 7180:6, 7181:11, 7215:15, 7219:23, 7281:3, 7281:5, 7291:21, 7304:1, 7327:16, 7328:11, 7333:20, 7333:21, 7337:6, 7382:14, 7384:20, 7386:10, 7386:23

**Biggs's** [5] - 7286:11, 7308:7, 7384:19, 7384:21, 7387:5

**binder** [2] - 7202:6, 7202:7

**binding** [1] - 7376:13

**bit** [15] - 7178:21, 7203:20, 7211:2, 7216:20, 7263:13, 7279:23, 7288:3, 7290:18, 7296:8, 7303:17, 7320:25, 7334:12, 7336:13, 7362:12

**bite** [1] - 7383:19

**Black** [1] - 7338:2

**black** [1] - 7218:17

**Blackbeard** [8] - 7205:21, 7319:13, 7319:15, 7319:24, 7320:2, 7321:10, 7364:4, 7364:10

**Blackbeard's** [1] - 7319:23

**blah** [9] - 7280:6, 7280:7, 7376:12

**bleed** [1] - 7272:25

**bless** [1] - 7290:8

**blessed** [2] - 7273:2, 7291:3

**blessing** [1] - 7361:5

**blew** [1] - 7389:23

**BLM** [1] - 7310:8

**bloc** [1] - 7218:17

**Bloody** [4] - 7198:1, 7198:5, 7218:6, 7218:15

**BNM** [1] - 7251:17

**boasted** [1] - 7278:19

**bodies** [15] - 7220:22, 7221:11, 7221:14, 7222:14, 7224:5, 7224:8, 7225:2, 7229:7, 7229:12, 7229:19, 7229:20, 7229:21, 7233:14, 7233:15, 7248:15

**body** [1] - 7338:4

**bologna** [1] - 7302:19, 7307:17, 7307:19

**Bone** [1] - 7213:2

**Bones** [11] - 7249:17, 7274:19, 7287:13, 7309:9, 7313:24, 7314:9, 7314:11, 7314:17, 7347:6, 7347:13, 7354:21

**booted** [1] - 7352:10

**Boots** [4] - 7212:24, 7351:25, 7352:6, 7354:21

**bootstrap** [1] - 7226:24

**bothers** [1] - 7353:9

**bots** [1] - 7232:13

**bottom** [5] - 7220:20, 7256:3, 7337:12, 7365:12, 7366:17

**bound** [1] - 7273:3

**boundaries** [1] - 7306:4

**bounds** [2] - 7360:3, 7390:21

**Bourbon** [1] - 7297:8

**box** [3] - 7293:16, 7293:17, 7294:1

**boxes** [2] - 7291:16, 7291:23

**Boy** [2] - 7276:7, 7340:3

**boys** [5] - 7273:12, 7273:16, 7273:17, 7273:23

**Boys** [27] - 7199:12,

7199:15, 7205:18, 7209:13, 7239:8, 7239:21, 7241:8, 7241:9, 7271:9, 7271:22, 7273:5, 7273:7, 7273:13, 7274:20, 7275:3, 7278:17, 7279:8, 7287:17, 7304:3, 7306:8, 7309:20, 7309:22, 7310:12, 7313:10, 7313:23, 7314:14

**Boys'** [1] - 7278:12

**bragged** [1] - 7278:19

**brains** [2] - 7211:18, 7217:15

**break** [7] - 7195:17, 7196:22, 7208:7, 7237:21, 7238:15, 7314:23, 7314:24

**breaking** [1] - 7347:25

**bridge** [1] - 7367:19

**Brief** [8] - 7196:1, 7242:18, 7244:25, 7251:2, 7262:9, 7316:19, 7322:12, 7384:10

**brief** [10] - 7240:2, 7263:5, 7276:18, 7337:8, 7337:10, 7361:23, 7361:25, 7367:22, 7383:14, 7385:21

**briefing** [4] - 7198:14, 7206:7, 7227:4, 7265:5

**briefly** [7] - 7233:18, 7267:13, 7267:17, 7267:19, 7277:4, 7303:25, 7361:14

**bring** [14] - 7180:18, 7187:14, 7205:25, 7209:4, 7209:7, 7211:11, 7223:6, 7309:17, 7311:21, 7367:3, 7377:16, 7377:17, 7383:16, 7384:5

**bringing** [3] - 7330:22, 7349:17, 7349:21

**brings** [1] - 7344:15

**broad** [2] - 7183:10, 7363:13

**broad-based** [1] - 7183:10

**broaden** [1] - 7261:6

**broadened** [1] - 7261:8

**broader** [6] - 7214:24,

7400

7273:7, 7290:20,
7303:10, 7317:2,
7390:13
**broadly** [1] - 7365:18
**Brother** [6] - 7229:25,
7317:13, 7318:25,
7319:10, 7320:15,
7363:25
**brought** [14] - 7180:1,
7185:7, 7189:8,
7199:13, 7211:12,
7312:1, 7315:15,
7315:20, 7327:12,
7362:20, 7381:21,
7381:23, 7383:5,
7385:1
**brush** [1] - 7191:23
**bubble** [1] - 7218:13
**build** [1] - 7239:21
**build-up** [1] - 7239:21
**building** [5] - 7227:20,
7317:15, 7317:24,
7364:2, 7365:22
**Building** [2] - 7198:20,
7321:4
**bulk** [2] - 7245:14,
7245:15
**bunch** [2] - 7185:4,
7365:21
**burden** [1] - 7380:22
**burdensome** [1] -
7385:11
**burn** [1] - 7186:6
**business** [8] - 7175:8,
7239:4, 7239:5,
7239:10, 7239:13,
7239:23, 7268:5,
7268:7
**buttress** [1] - 7214:12
**buy** [5] - 7228:6,
7228:7, 7257:23,
7257:24, 7279:15

**C**

**cabined** [1] - 7366:2
**cabining** [1] - 7223:3
**cafeteria** [1] - 7237:19
**Cain** [20] - 7188:2,
7188:17, 7189:7,
7190:19, 7191:11,
7191:17, 7343:16,
7344:3, 7352:13,
7359:16, 7372:17,
7378:11, 7389:2,
7389:6, 7390:25,
7391:9, 7391:14,
7393:17, 7393:22,
7393:23
**Cain's** [4] - 7190:25,

7360:6, 7376:16,
7388:19
**Camiliere** [2] -
7278:15, 7315:23
**Camiliere's** [3] -
7286:10, 7286:14,
7361:1
**candid** [1] - 7258:23
**candidly** [2] - 7285:19,
7362:15
**candor** [1] - 7304:9
**Cannon** [3] - 7289:18,
7297:7, 7299:24
**cannot** [16] - 7184:21,
7185:5, 7186:17,
7187:7, 7188:4,
7189:10, 7209:2,
7237:21, 7253:6,
7253:15, 7267:7,
7329:10, 7330:13,
7378:6, 7385:1
**capable** [1] - 7377:12
**Capitol** [43] - 7198:19,
7198:23, 7211:4,
7211:6, 7211:12,
7212:2, 7212:19,
7219:6, 7219:10,
7219:24, 7220:22,
7221:11, 7221:14,
7222:14, 7224:6,
7224:8, 7225:3,
7227:18, 7229:7,
7229:13, 7230:4,
7232:9, 7232:11,
7233:14, 7245:12,
7248:15, 7256:6,
7265:9, 7266:1,
7266:7, 7317:15,
7317:23, 7317:24,
7320:2, 7321:4,
7321:8, 7340:17,
7359:14, 7364:2,
7364:9, 7365:22,
7381:10, 7393:16
**Captain** [2] - 7334:13,
7335:24
**capture** [2] - 7343:6,
7391:7
**captured** [1] - 7199:11
**car** [2] - 7198:22,
7257:24
**care** [1] - 7267:7
**Carmen** [2] - 7173:2,
7174:10
**carry** [3] - 7226:11,
7369:1, 7369:7
**carrying** [2] - 7257:25,
7369:4
**case** [79] - 7175:14,
7183:23, 7188:4,

7188:12, 7190:7,
7202:16, 7204:3,
7208:21, 7223:12,
7231:19, 7232:18,
7237:8, 7240:12,
7240:20, 7241:24,
7242:5, 7246:9,
7248:3, 7248:10,
7248:20, 7249:7,
7249:8, 7253:16,
7256:5, 7256:12,
7257:20, 7268:18,
7268:20, 7268:24,
7269:24, 7272:20,
7273:3, 7275:14,
7275:18, 7279:23,
7284:6, 7289:15,
7290:12, 7291:3,
7301:15, 7306:6,
7307:2, 7307:17,
7311:1, 7314:1,
7315:14, 7315:17,
7315:18, 7315:19,
7315:24, 7316:11,
7325:16, 7327:6,
7332:3, 7335:3,
7336:25, 7339:2,
7340:11, 7340:13,
7341:1, 7342:4,
7347:21, 7354:5,
7359:10, 7367:5,
7367:22, 7368:6,
7371:22, 7373:1,
7376:8, 7376:15,
7377:2, 7377:21,
7384:2, 7385:22,
7389:21, 7393:6
**cases** [10] - 7184:14,
7189:2, 7194:16,
7202:3, 7248:8,
7336:15, 7340:1,
7367:21, 7376:12,
7378:15
**cast** [1] - 7242:7
**categories** [8] -
7177:24, 7178:19,
7179:14, 7180:10,
7192:24, 7197:5,
7228:25
**categorize** [2] -
7181:9, 7299:4
**category** [13] - 7178:3,
7178:4, 7180:8,
7180:11, 7181:1,
7181:10, 7195:16,
7220:7, 7223:14,
7267:14, 7295:23,
7317:2, 7372:23
**caught** [1] - 7287:12
**causes** [1] - 7276:5

**cautionary** [1] -
7367:2
**caveat** [1] - 7179:17
**CCR** [3] - 7173:15,
7394:16, 7394:21
**celebrated** [2] -
7276:10, 7278:20
**celebrating** [1] -
7365:21
**celebration** [3] -
7278:12, 7304:7,
7304:14
**celebratory** [3] -
7276:2, 7279:6,
7284:22
**Cellebrite** [22] -
7186:18, 7188:4,
7188:9, 7188:14,
7189:2, 7189:5,
7189:9, 7189:10,
7190:1, 7191:1,
7263:17, 7343:5,
7371:19, 7371:20,
7373:11, 7375:3,
7376:17, 7377:11,
7388:20, 7388:23,
7388:25, 7392:12
**Cellurite** [1] - 7344:8
**centerpiece** [1] -
7383:18
**central** [1] - 7208:21
**ceremonial** [1] -
7277:15
**certain** [12] - 7203:6,
7212:4, 7214:23,
7239:5, 7239:7,
7247:24, 7262:21,
7269:22, 7305:12,
7306:13, 7359:18,
7360:4
**certainly** [13] -
7174:24, 7180:24,
7200:19, 7213:1,
7272:23, 7276:14,
7282:15, 7283:10,
7284:4, 7300:2,
7333:24, 7335:11,
7393:25
**certainty** [1] - 7189:3
**CERTIFICATE** [1] -
7394:15
**certify** [1] - 7394:16
**chain** [3] - 7240:6,
7240:17, 7273:24
**chain-of-command-
oriented** [1] -
7273:24
**chairman** [1] -
7274:22
**challenges** [1] -

7275:7
**chance** [8] - 7178:3,
7195:5, 7201:8,
7272:1, 7284:1,
7333:10, 7333:16,
7384:6
**change** [7] - 7375:14,
7378:15, 7378:16,
7378:17, 7379:3,
7379:5, 7379:7
**changed** [3] - 7304:5,
7362:18, 7379:7
**channel** [1] - 7227:14
**chaos** [1] - 7209:2
**Chapo** [1] - 7213:3
**chapter** [2] - 7209:11,
7226:11, 7288:8,
7288:14, 7290:24,
7293:8, 7295:10,
7349:18
**character** [5] - 7301:2,
7301:5, 7301:24,
7305:14, 7333:12
**characteristics** [1] -
7359:18
**characterize** [1] -
7284:21
**characterized** [2] -
7180:16, 7210:4
**charge** [2] - 7240:5,
7310:23
**chargeable** [1] -
7339:1
**charged** [10] -
7212:18, 7212:22,
7249:22, 7275:12,
7275:14, 7279:5,
7302:12, 7302:14,
7345:12, 7358:1
**charges** [4] - 7256:5,
7256:12, 7332:3,
7386:20
**chart** [14] - 7176:21,
7177:2, 7177:8,
7177:10, 7178:9,
7182:9, 7193:13,
7193:15, 7196:10,
7196:19, 7197:3,
7198:2, 7347:12,
7364:20
**chase** [1] - 7266:15
**chat** [98] - 7183:15,
7198:10, 7201:24,
7203:10, 7203:12,
7205:4, 7205:13,
7206:11, 7206:25,
7207:3, 7207:23,
7209:11, 7209:12,
7209:14, 7209:19,
7210:15, 7218:13,

7401

7226:5, 7227:4, 7228:15, 7229:2, 7229:3, 7229:23, 7231:3, 7232:9, 7232:13, 7232:14, 7233:22, 7234:4, 7236:3, 7249:17, 7256:10, 7266:22, 7267:2, 7268:1, 7269:23, 7271:11, 7271:22, 7272:14, 7272:16, 7274:19, 7274:21, 7276:5, 7279:10, 7281:5, 7287:14, 7289:3, 7289:18, 7297:5, 7298:13, 7298:16, 7299:10, 7314:3, 7314:9, 7317:13, 7317:19, 7319:22, 7319:25, 7323:21, 7323:22, 7323:24, 7325:3, 7325:5, 7325:11, 7326:3, 7328:20, 7328:21, 7329:4, 7329:6, 7329:13, 7329:15, 7329:20, 7329:24, 7330:14, 7330:15, 7334:9, 7343:8, 7346:15, 7346:21, 7347:7, 7347:14, 7352:1, 7352:2, 7352:4, 7352:7, 7352:8, 7352:9, 7352:10, 7354:19, 7354:21, 7354:22, 7355:4, 7355:8, 7355:13, 7355:14
**chats** [41] - 7189:25, 7198:13, 7206:7, 7209:21, 7211:20, 7213:6, 7219:23, 7227:25, 7228:25, 7238:20, 7251:18, 7263:23, 7264:20, 7266:17, 7267:25, 7268:13, 7269:20, 7270:8, 7271:6, 7285:25, 7286:3, 7288:19, 7313:25, 7314:9, 7314:17, 7330:21, 7335:21, 7335:22, 7342:21, 7351:11, 7351:16, 7351:25, 7354:12, 7354:14, 7354:18, 7354:22, 7355:13, 7367:15, 7368:2, 7368:11, 7379:17
**check** [5] - 7266:20,

7293:16, 7293:17, 7294:1, 7356:20
**checked** [1] - 7198:4
**checkmark** [3] - 7188:21, 7197:1, 7197:3
**cheek** [1] - 7208:25
**chief** [1] - 7384:2
**children** [2] - 7310:14, 7355:10
**chime** [1] - 7272:3
**chimes** [3] - 7205:25, 7208:11, 7214:12
**chiming** [1] - 7215:8
**Chinese** [1] - 7311:2
**chooses** [1] - 7362:11
**chose** [1] - 7356:15
**chosen** [3] - 7199:9, 7270:4, 7270:5
**Chris** [4] - 7289:18, 7297:6, 7297:7, 7299:24
**chronologically** [2] - 7202:13, 7302:13
**chunk** [1] - 7178:7
**chunks** [1] - 7359:22
**Circle** [1] - 7241:18
**circling** [2] - 7192:16, 7315:14
**circuit** [1] - 7294:22
**Circuit** [6] - 7183:24, 7248:11, 7363:12, 7367:5, 7376:13, 7381:20
**circulated** [1] - 7193:13
**circulating** [1] - 7287:17
**circumstances** [2] - 7239:6, 7357:11
**circumstantially** [3] - 7240:5, 7365:2, 7365:11
**cite** [1] - 7248:9
**cited** [4] - 7183:23, 7248:10, 7268:19, 7363:11
**civil** [4] - 7296:25, 7297:2, 7299:21, 7306:19
**CJA** [1] - 7377:4
**claiming** [3] - 7259:8, 7378:3, 7378:5
**claims** [1] - 7209:17
**clarifying** [1] - 7288:21
**class** [2] - 7196:23, 7304:18
**classic** [4] - 7253:10, 7301:19, 7310:22

**clean** [1] - 7362:20
**clear** [33] - 7181:20, 7186:25, 7187:11, 7211:16, 7211:19, 7217:6, 7217:22, 7218:23, 7246:15, 7247:23, 7254:1, 7273:19, 7274:17, 7278:6, 7281:17, 7284:7, 7286:5, 7310:19, 7317:25, 7319:19, 7324:6, 7335:19, 7335:22, 7343:18, 7355:19, 7357:12, 7363:13, 7364:12, 7368:7, 7375:13, 7383:11, 7386:1, 7386:5
**clearing** [1] - 7191:23
**clearly** [9] - 7269:20, 7282:10, 7282:25, 7290:3, 7290:18, 7305:19, 7325:19, 7329:23, 7357:3
**CLERK** [10] - 7174:2, 7195:24, 7196:2, 7237:24, 7238:2, 7242:21, 7242:25, 7316:17, 7316:20, 7394:11
**client** [55] - 7181:4, 7185:19, 7187:7, 7187:24, 7192:18, 7228:8, 7228:10, 7247:1, 7248:5, 7249:24, 7251:25, 7252:9, 7252:13, 7252:15, 7252:17, 7253:3, 7254:2, 7254:5, 7254:9, 7255:11, 7255:16, 7256:6, 7257:2, 7259:8, 7259:16, 7259:19, 7261:21, 7261:25, 7263:12, 7263:16, 7264:24, 7277:14, 7289:2, 7289:3, 7308:20, 7309:8, 7318:8, 7326:12, 7343:13, 7346:20, 7347:1, 7348:13, 7348:22, 7348:23, 7351:12, 7352:1, 7352:6, 7353:16, 7355:20, 7358:4, 7379:20, 7380:4, 7381:1
**client's** [8] - 7249:18, 7252:6, 7252:19, 7254:6, 7260:4,

7282:1, 7348:14, 7356:14
**clients** [6] - 7179:22, 7184:16, 7185:1, 7261:13, 7265:16, 7377:19
**climb** [1] - 7277:3
**clipped** [1] - 7206:8
**clog** [1] - 7234:2
**clogging** [1] - 7234:1
**close** [3] - 7210:16, 7382:25, 7383:2
**closely** [6] - 7210:7, 7210:9, 7210:10, 7210:15, 7210:17, 7307:11
**closer** [7] - 7215:6, 7217:10, 7219:3, 7289:14, 7289:15, 7367:3
**closes** [1] - 7238:14
**closing** [3] - 7184:3, 7248:21, 7253:15
**club** [4] - 7199:14, 7273:13, 7273:16
**co** [94] - 7183:20, 7198:3, 7198:25, 7199:3, 7199:7, 7199:20, 7201:3, 7203:12, 7204:24, 7205:22, 7206:1, 7218:10, 7221:17, 7225:7, 7231:18, 7245:17, 7256:22, 7257:5, 7257:14, 7257:16, 7257:18, 7259:24, 7265:21, 7272:2, 7272:12, 7272:20, 7275:10, 7276:13, 7276:22, 7277:2, 7280:22, 7282:23, 7292:14, 7293:11, 7295:19, 7297:12, 7297:14, 7299:1, 7299:4, 7299:8, 7300:4, 7300:23, 7309:11, 7309:16, 7314:20, 7318:24, 7319:3, 7319:7, 7319:17, 7320:12, 7320:16, 7320:17, 7320:18, 7321:2, 7321:23, 7322:2, 7323:2, 7323:4, 7323:8, 7323:9, 7323:10, 7323:12, 7323:13, 7323:23, 7326:7, 7328:13, 7335:1, 7335:6,

7338:22, 7339:1, 7339:3, 7339:23, 7339:24, 7345:13, 7352:20, 7353:6, 7363:15, 7363:17, 7363:18, 7364:4, 7365:12, 7365:20, 7366:8, 7366:11, 7366:22, 7366:23, 7367:7, 7368:16, 7371:10, 7383:7, 7387:2
**Co** [1] - 7364:21
**co-conspirator** [70] - 7183:20, 7198:3, 7198:25, 7199:3, 7199:7, 7199:20, 7201:3, 7201:13, 7205:22, 7206:1, 7218:10, 7221:17, 7225:7, 7231:18, 7256:22, 7257:5, 7257:14, 7257:16, 7257:18, 7259:24, 7272:20, 7275:10, 7276:13, 7276:22, 7277:2, 7282:23, 7292:14, 7293:11, 7295:19, 7299:1, 7299:4, 7299:8, 7300:4, 7300:23, 7309:11, 7318:24, 7319:3, 7319:7, 7319:17, 7320:17, 7321:2, 7321:23, 7322:2, 7323:2, 7323:4, 7323:9, 7323:10, 7323:12, 7323:13, 7323:23, 7326:7, 7328:13, 7335:1, 7335:6, 7338:22, 7339:1, 7339:3, 7339:24, 7352:20, 7353:6, 7363:15, 7363:17, 7363:18, 7364:4, 7365:12, 7365:20, 7366:8, 7366:11, 7366:22, 7366:23, 7367:7, 7368:16
**Co-Conspirator** [1] - 7364:21
**co-conspirators** [17] - 7203:12, 7204:24, 7245:17, 7265:21, 7272:2, 7272:12, 7280:22, 7297:12, 7297:14, 7309:16, 7320:12, 7320:16, 7320:18, 7323:8, 7339:1, 7345:13, 7371:10

7402

**co-counsel's** [1] - 7314:20

**co-defendant's** [1] - 7339:3

**co-defendants** [2] - 7383:7, 7387:2

**Coast** [3] - 7334:9, 7347:7, 7347:15

**coherently** [2] - 7189:2, 7189:10

**coincidence** [3] - 7300:1, 7362:22, 7362:23

**coincidental** [2] - 7320:25, 7321:3

**coldly** [2] - 7284:22, 7301:17

**collapsing** [1] - 7339:8

**collected** [1] - 7226:10

**collectively** [1] - 7207:4

**colors** [3] - 7205:18, 7217:7, 7272:7

**COLUMBIA** [1] - 7172:1

**column** [6] - 7196:20, 7196:25, 7197:1, 7198:4, 7364:20

**combined** [1] - 7177:1

**coming** [13] - 7225:4, 7245:15, 7260:17, 7289:24, 7291:9, 7304:13, 7306:9, 7328:22, 7330:12, 7331:1, 7332:18, 7332:25, 7379:6

**Command** [1] - 7334:10

**command** [4] - 7273:24, 7294:15, 7294:20, 7295:13

**commanders** [2] - 7198:8, 7218:15

**comment** [12] - 7185:14, 7185:15, 7228:17, 7234:5, 7238:25, 7247:12, 7302:25, 7319:23, 7319:24, 7332:4, 7355:11

**commentary** [1] - 7246:17

**commented** [1] - 7229:24

**commenting** [2] - 7246:1, 7291:21

**comments** [9] - 7239:4, 7246:3,

7246:8, 7249:11, 7268:10, 7268:15, 7276:17, 7312:22, 7338:15

**Commieville** [1] - 7369:1

**commit** [16] - 7204:5, 7223:23, 7230:18, 7230:20, 7230:25, 7231:9, 7232:3, 7232:4, 7235:18, 7238:23, 7274:4, 7275:16, 7302:14, 7305:8, 7333:13, 7340:21

**committed** [2] - 7247:2, 7279:22

**committing** [6] - 7203:2, 7233:3, 7235:24, 7236:4, 7236:9, 7236:12

**common** [2] - 7233:21, 7236:22

**communicated** [2] - 7317:18, 7329:6

**communicating** [3] - 7227:8, 7227:14, 7323:25

**communication** [2] - 7314:14, 7325:17

**communications** [1] - 7331:15

**communist** [2] - 7319:21

**company** [1] - 7239:6

**comparable** [1] - 7268:16

**compared** [2] - 7196:9, 7391:4

**compelled** [1] - 7237:5

**compels** [1] - 7213:1

**competent** [1] - 7309:14

**complain** [1] - 7205:11

**complete** [6] - 7246:24, 7282:18, 7369:23, 7370:2, 7383:11, 7394:19

**completely** [5] - 7247:8, 7265:22, 7338:9, 7352:19, 7383:17

**comply** [3] - 7235:6, 7378:19, 7379:2

**comprehends** [1] - 7187:12

**computer** [2] - 7173:19, 7348:1

**computer-aided** [1] - 7173:19

**concede** [6] - 7190:18, 7247:17, 7247:22, 7247:24, 7341:22, 7376:19

**concedes** [2] - 7227:3, 7307:20

**conceding** [1] - 7390:22

**concept** [6] - 7187:16, 7232:13, 7245:18, 7279:15, 7317:22, 7326:20

**conception** [1] - 7299:8

**conceptual** [1] - 7210:1

**conceptualize** [1] - 7267:7

**concern** [10] - 7205:16, 7276:6, 7283:10, 7287:16, 7288:9, 7367:20, 7367:23, 7378:10, 7387:6, 7391:22

**concerned** [1] - 7194:13

**concerning** [1] - 7353:22

**concerns** [1] - 7354:10

**concise** [1] - 7371:11

**conclude** [2] - 7201:2, 7207:22

**concluded** [1] - 7394:13

**concluding** [1] - 7385:17

**conclusion** [4] - 7241:22, 7275:11, 7283:7, 7384:12

**concur** [1] - 7347:18

**condition** [1] - 7225:18

**conduct** [7] - 7210:7, 7210:18, 7220:1, 7241:25, 7242:11, 7260:25, 7339:13

**conducted** [1] - 7239:22

**confer** [3] - 7276:8, 7286:22, 7374:6

**confidence** [1] - 7213:7

**confines** [1] - 7295:2

**confirm** [2] - 7338:3, 7356:18

**confrontations** [1] - 7209:15

**confuse** [1] - 7371:2

**confused** [1] - 7265:15

**confusing** [8] - 7227:8, 7232:5, 7262:18, 7282:6, 7286:25, 7331:2, 7331:11, 7336:4

**confusion** [7] - 7229:10, 7284:11, 7285:16, 7301:12, 7314:5, 7317:21, 7322:15

**Congress** [3] - 7229:16, 7233:13, 7256:7

**connected** [2] - 7272:19, 7336:6

**connecting** [1] - 7227:12

**connection** [6] - 7248:2, 7301:23, 7305:5, 7305:6, 7333:14, 7361:1

**connections** [1] - 7176:11

**Conor** [3] - 7172:12, 7174:8, 7189:20

**Conor's** [2] - 7375:2, 7375:3

**consequence** [1] - 7349:3

**consequences** [1] - 7241:21

**consider** [16] - 7192:23, 7196:23, 7201:5, 7201:9, 7304:24, 7326:5, 7338:15, 7338:19, 7338:21, 7350:16, 7350:17, 7354:16, 7354:20, 7354:25, 7365:25, 7373:3

**consideration** [1] - 7267:9

**considerations** [1] - 7244:2

**considered** [2] - 7326:10, 7326:12

**considering** [3] - 7214:11, 7267:9, 7372:11

**considers** [1] - 7204:10

**consistent** [5] - 7236:22, 7237:9, 7369:13, 7369:18

**conspiracies** [1] - 7275:14

**conspiracy** [60] -

7199:25, 7200:21, 7210:10, 7210:11, 7226:12, 7240:4, 7240:14, 7241:6, 7241:18, 7241:20, 7242:6, 7246:20, 7257:19, 7257:20, 7257:22, 7257:25, 7258:8, 7261:7, 7273:3, 7273:8, 7275:15, 7278:14, 7279:5, 7283:2, 7293:12, 7299:3, 7299:5, 7300:3, 7302:13, 7311:2, 7311:4, 7313:7, 7314:18, 7320:11, 7320:18, 7321:10, 7321:11, 7321:15, 7322:4, 7323:6, 7323:10, 7326:11, 7339:4, 7340:5, 7340:16, 7347:3, 7347:11, 7349:7, 7351:16, 7363:5, 7363:9, 7363:14, 7363:18, 7363:19, 7364:15, 7365:6, 7365:19, 7366:1, 7366:16, 7375:18

**Conspirator** [1] - 7364:21

**conspirator** [72] - 7183:20, 7198:3, 7198:25, 7199:3, 7199:7, 7199:20, 7201:3, 7201:13, 7205:22, 7206:1, 7218:10, 7221:17, 7225:7, 7231:18, 7256:22, 7257:1, 7257:5, 7257:14, 7257:16, 7257:18, 7259:24, 7272:20, 7275:10, 7276:13, 7276:22, 7277:2, 7282:23, 7292:14, 7293:11, 7295:19, 7299:1, 7299:4, 7299:6, 7299:8, 7300:4, 7300:23, 7309:11, 7318:24, 7319:3, 7319:7, 7319:17, 7320:17, 7321:2, 7323:2, 7323:4, 7323:9, 7323:10, 7323:12, 7323:13, 7323:23, 7326:7, 7328:13, 7335:1, 7335:6, 7338:22, 7339:1,

7403

7339:23, 7339:24, 7352:20, 7353:6, 7363:15, 7363:17, 7363:18, 7364:4, 7365:12, 7365:20, 7366:8, 7366:11, 7366:22, 7366:23, 7367:7, 7368:16

**conspirators** [21] - 7203:12, 7204:24, 7245:17, 7265:21, 7272:2, 7272:12, 7280:22, 7297:12, 7297:14, 7309:16, 7320:12, 7320:16, 7320:18, 7321:2, 7321:23, 7322:2, 7323:8, 7339:1, 7345:13, 7363:3, 7371:10

**constitutes** [1] - 7394:17

**Constitution** [2] - 7173:16, 7394:23

**constitutional** [1] - 7342:12

**constrained** [1] - 7286:2

**constructed** [2] - 7247:16, 7256:1

**constructing** [1] - 7282:8

**construction** [1] - 7282:16

**consult** [1] - 7192:18

**consuming** [1] - 7376:22

**contact** [2] - 7218:14, 7361:5

**contacted** [1] - 7378:17

**contain** [1] - 7197:17

**containing** [1] - 7188:16

**contains** [1] - 7377:22

**contemplates** [1] - 7363:21

**content** [5] - 7238:21, 7239:1, 7267:21, 7315:11, 7325:9

**content-neutral** [3] - 7238:21, 7239:1, 7267:21

**contention** [3] - 7348:14, 7352:3, 7352:7

**contentious** [2] - 7195:11, 7310:12

**contents** [1] - 7189:24

**contested** [1] - 7350:4

**context** [35] - 7184:19, 7185:12, 7187:17, 7192:6, 7192:8, 7217:1, 7217:11, 7218:11, 7252:19, 7254:6, 7269:15, 7269:25, 7274:2, 7274:14, 7279:12, 7281:2, 7282:4, 7286:4, 7290:3, 7290:4, 7291:20, 7306:19, 7307:12, 7311:1, 7335:8, 7335:11, 7337:14, 7349:8, 7350:11, 7356:6, 7357:17, 7357:18, 7373:4, 7390:10, 7392:17

**contextual** [1] - 7357:3

**continuation** [2] - 7174:23, 7296:14

**continue** [7] - 7237:23, 7271:7, 7273:11, 7274:7, 7302:5, 7370:11, 7372:4

**CONTINUED** [1] - 7173:1

**continues** [2] - 7261:6, 7394:6

**continuing** [6] - 7186:3, 7217:18, 7271:2, 7297:24, 7298:11, 7298:16

**contours** [1] - 7370:18

**contradict** [1] - 7190:25

**contrary** [5] - 7226:25, 7239:22, 7247:7, 7326:19, 7346:10

**contribute** [1] - 7342:16

**control** [2] - 7306:7, 7362:13

**conversation** [12] - 7206:20, 7237:3, 7271:2, 7272:17, 7297:24, 7298:12, 7298:15, 7320:1, 7321:1, 7334:18, 7335:10, 7336:21

**conversations** [11] - 7180:5, 7237:14, 7247:20, 7262:21, 7262:22, 7267:24, 7272:16, 7276:20, 7335:18, 7336:5, 7361:22

**converse** [1] -

7259:17

**conveying** [1] - 7295:1

**conviction** [1] - 7311:3

**Cooney** [6] - 7374:24, 7381:8, 7381:13, 7385:6, 7393:20, 7393:21

**Cooney's** [1] - 7382:13

**cooperating** [1] - 7367:6

**cooperators** [3] - 7274:12, 7290:10, 7309:16

**coordination** [2] - 7275:16, 7275:17

**copies** [3] - 7337:25, 7338:1, 7388:19

**core** [2] - 7245:24, 7371:22

**correct** [31] - 7176:7, 7176:8, 7193:13, 7193:16, 7223:4, 7231:8, 7235:19, 7236:9, 7250:23, 7251:11, 7252:24, 7259:12, 7277:13, 7277:25, 7278:24, 7280:20, 7282:5, 7288:24, 7292:8, 7297:13, 7300:21, 7306:15, 7311:23, 7329:16, 7366:17, 7374:2, 7376:14, 7382:23, 7391:20, 7392:11

**correctly** [2] - 7189:1, 7189:10

**correlation** [1] - 7188:15

**correspond** [1] - 7337:15

**corresponded** [1] - 7286:10

**corroborated** [1] - 7311:24

**corruptly** [1] - 7256:6

**counsel** [15] - 7175:23, 7208:23, 7209:10, 7238:6, 7243:24, 7262:25, 7282:8, 7282:16, 7306:6, 7345:11, 7350:19, 7351:20, 7354:3, 7357:13, 7376:24

**counsel's** [1] - 7314:20

**countless** [1] - 7226:20

**country** [4] - 7199:6, 7269:10, 7306:20, 7339:15

**couple** [14] - 7179:24, 7210:1, 7213:18, 7220:18, 7236:19, 7244:14, 7271:4, 7283:19, 7324:19, 7335:21, 7339:7, 7342:4, 7355:8, 7363:2

**course** [13] - 7207:8, 7251:24, 7257:19, 7264:15, 7265:10, 7278:16, 7285:10, 7339:7, 7346:9, 7359:12, 7364:6, 7379:13, 7389:22

**Court** [23] - 7173:15, 7173:15, 7195:24, 7237:24, 7246:21, 7258:23, 7268:24, 7297:20, 7311:1, 7311:3, 7316:4, 7316:17, 7338:15, 7345:16, 7347:5, 7350:1, 7362:2, 7373:3, 7380:9, 7394:6, 7394:7, 7394:11, 7394:21

**COURT** [454] - 7172:1, 7174:16, 7175:5, 7175:11, 7175:18, 7175:24, 7176:15, 7177:3, 7177:7, 7177:10, 7177:13, 7178:23, 7178:25, 7179:12, 7180:4, 7181:14, 7182:8, 7184:8, 7185:11, 7185:20, 7185:22, 7186:13, 7187:16, 7189:14, 7190:23, 7191:14, 7191:18, 7191:20, 7193:11, 7193:16, 7193:18, 7193:20, 7196:5, 7196:17, 7197:4, 7197:8, 7199:18, 7200:2, 7200:14, 7201:1, 7201:17, 7201:20, 7202:5, 7202:11, 7202:14, 7202:17, 7203:25, 7204:11, 7204:14, 7208:4, 7210:1, 7211:25, 7212:7, 7212:14, 7213:4,

7213:16, 7214:15, 7214:21, 7215:3, 7215:12, 7215:19, 7215:21, 7216:5, 7216:11, 7216:16, 7216:23, 7217:19, 7218:8, 7218:20, 7218:25, 7219:11, 7219:13, 7219:15, 7219:19, 7220:2, 7221:1, 7221:3, 7221:6, 7221:20, 7221:23, 7222:6, 7222:9, 7222:21, 7222:23, 7223:17, 7223:19, 7225:12, 7226:2, 7228:2, 7228:23, 7230:2, 7230:21, 7231:4, 7231:11, 7231:22, 7231:24, 7232:10, 7232:17, 7232:20, 7233:2, 7233:4, 7233:7, 7233:11, 7234:7, 7234:9, 7234:17, 7235:10, 7235:15, 7235:20, 7236:6, 7236:11, 7237:10, 7237:12, 7237:17, 7238:5, 7238:17, 7240:1, 7242:12, 7242:17, 7243:2, 7243:8, 7243:13, 7243:16, 7243:23, 7244:10, 7244:17, 7244:21, 7244:24, 7250:5, 7250:8, 7250:15, 7250:18, 7251:5, 7251:7, 7251:10, 7251:21, 7252:2, 7252:5, 7252:12, 7252:24, 7253:2, 7253:17, 7253:19, 7254:15, 7254:19, 7254:21, 7254:25, 7255:15, 7256:13, 7256:19, 7257:7, 7257:11, 7257:14, 7258:1, 7258:11, 7258:18, 7258:22, 7258:25, 7259:3, 7259:9, 7260:2, 7260:6, 7260:10, 7260:15, 7261:19, 7262:5, 7262:20, 7262:24, 7263:4, 7264:8, 7264:12, 7266:10, 7267:12, 7270:11, 7271:12, 7271:14, 7271:16, 7271:18,

7404

7271:20, 7272:8,
7272:10, 7274:6,
7274:10, 7276:11,
7276:21, 7277:5,
7277:7, 7277:11,
7277:19, 7277:21,
7277:25, 7278:21,
7278:23, 7278:25,
7279:11, 7280:13,
7280:16, 7280:20,
7281:6, 7281:10,
7281:12, 7281:20,
7282:3, 7282:20,
7283:3, 7283:12,
7283:15, 7283:24,
7284:13, 7284:16,
7285:5, 7286:18,
7286:21, 7286:23,
7287:3, 7287:5,
7287:7, 7287:10,
7287:19, 7287:21,
7287:23, 7288:1,
7288:15, 7288:18,
7288:20, 7288:25,
7289:4, 7289:7,
7289:21, 7289:23,
7290:15, 7291:1,
7291:4, 7292:5,
7292:9, 7292:18,
7292:21, 7293:13,
7293:15, 7293:19,
7294:8, 7295:3,
7295:22, 7296:18,
7297:4, 7297:9,
7297:13, 7297:16,
7297:18, 7297:22,
7298:1, 7298:4,
7298:6, 7298:19,
7298:21, 7300:10,
7300:15, 7300:17,
7300:19, 7301:9,
7301:20, 7302:19,
7302:22, 7303:3,
7303:5, 7303:24,
7304:25, 7305:25,
7306:2, 7306:15,
7307:25, 7308:2,
7308:4, 7308:6,
7308:9, 7308:10,
7308:11, 7308:18,
7308:23, 7309:7,
7311:23, 7312:10,
7312:13, 7312:19,
7314:22, 7316:25,
7317:7, 7317:10,
7318:4, 7318:17,
7318:19, 7319:1,
7319:6, 7319:14,
7320:4, 7320:7,
7320:13, 7320:19,
7321:5, 7321:12,

7321:18, 7322:5,
7322:10, 7322:18,
7323:3, 7323:11,
7323:16, 7323:18,
7324:1, 7324:10,
7324:15, 7324:18,
7324:21, 7325:18,
7326:8, 7327:9,
7328:5, 7328:24,
7329:7, 7329:12,
7329:15, 7329:22,
7330:1, 7330:5,
7330:19, 7330:23,
7331:8, 7331:16,
7331:18, 7331:20,
7332:5, 7332:7,
7332:12, 7332:14,
7332:16, 7332:21,
7332:24, 7333:2,
7333:5, 7334:1,
7334:17, 7334:22,
7335:1, 7335:14,
7336:2, 7336:16,
7336:24, 7337:2,
7337:4, 7337:11,
7337:22, 7338:6,
7338:8, 7339:18,
7339:21, 7341:8,
7341:17, 7341:19,
7341:21, 7341:23,
7342:8, 7342:18,
7343:18, 7343:20,
7343:23, 7344:1,
7344:4, 7345:17,
7345:20, 7345:24,
7346:19, 7348:5,
7348:8, 7350:10,
7351:8, 7351:20,
7352:23, 7353:4,
7353:15, 7353:18,
7353:21, 7354:7,
7355:2, 7355:17,
7356:2, 7356:4,
7357:10, 7357:12,
7357:20, 7358:9,
7358:16, 7358:21,
7358:24, 7359:8,
7359:25, 7360:14,
7360:16, 7361:7,
7361:15, 7367:17,
7368:13, 7369:22,
7370:3, 7370:9,
7370:16, 7371:9,
7371:25, 7373:6,
7373:9, 7373:14,
7373:21, 7374:3,
7374:14, 7374:23,
7374:25, 7375:4,
7375:7, 7375:10,
7375:16, 7376:13,
7379:9, 7379:11,

7380:5, 7380:7,
7380:11, 7380:14,
7380:24, 7381:2,
7381:11, 7382:7,
7382:16, 7382:23,
7383:10, 7384:16,
7386:1, 7386:24,
7387:8, 7387:17,
7388:7, 7388:11,
7388:13, 7388:17,
7389:3, 7389:6,
7390:6, 7391:23,
7392:3, 7392:5,
7392:14, 7393:8,
7393:19, 7393:21,
7394:2, 7394:8,
7394:15

**court** [126] - 7175:10,
7181:17, 7181:21,
7182:7, 7183:16,
7183:18, 7187:10,
7187:14, 7190:11,
7191:8, 7196:22,
7198:25, 7199:22,
7220:11, 7220:15,
7220:16, 7226:17,
7228:19, 7229:1,
7229:8, 7240:7,
7240:25, 7241:1,
7241:5, 7242:2,
7242:15, 7243:4,
7243:21, 7244:15,
7245:10, 7245:11,
7247:17, 7248:12,
7248:19, 7248:21,
7249:3, 7249:13,
7250:1, 7250:25,
7251:3, 7252:9,
7255:3, 7255:4,
7255:10, 7255:21,
7256:11, 7256:15,
7257:6, 7257:9,
7258:7, 7258:14,
7259:24, 7260:18,
7260:19, 7260:22,
7260:23, 7261:2,
7261:3, 7261:15,
7261:16, 7261:18,
7262:1, 7262:2,
7262:6, 7262:10,
7267:18, 7268:19,
7282:8, 7290:17,
7298:2, 7298:7,
7298:12, 7298:24,
7301:10, 7301:13,
7302:24, 7303:6,
7303:15, 7306:5,
7306:10, 7309:15,
7310:15, 7310:18,
7311:7, 7312:17,
7312:24, 7314:24,

7316:15, 7336:8,
7336:11, 7338:19,
7342:20, 7345:2,
7345:19, 7346:7,
7346:8, 7346:12,
7347:11, 7347:19,
7348:4, 7348:20,
7348:21, 7350:25,
7361:5, 7363:7,
7363:10, 7364:24,
7372:12, 7375:13,
7375:22, 7375:24,
7375:25, 7376:4,
7376:7, 7376:11,
7376:21, 7377:9,
7377:10, 7377:25,
7383:24, 7385:19,
7389:25

**court's** [2] - 7183:19,
7250:3

**Court's** [8] - 7187:15,
7219:18, 7281:11,
7283:8, 7283:10,
7296:25, 7375:20,
7384:9

**Courthouse** [2] -
7173:16, 7394:22

**courtroom** [1] -
7204:15

**cover** [1] - 7270:2

**covered** [3] - 7262:10,
7340:8, 7376:4

**covers** [1] - 7351:14

**covert** [6] - 7215:18,
7216:1, 7216:7,
7217:2, 7217:7,
7265:8

**CR** [1] - 7172:2

**crazy** [5] - 7186:20,
7209:6, 7209:8,
7333:16, 7335:4

**create** [2] - 7188:13,
7208:24

**created** [1] - 7288:5

**creates** [2] - 7249:13

**creating** [2] - 7228:20,
7294:15

**creation** [1] - 7290:24

**creative** [1] - 7195:11

**credibility** [2] -
7385:6, 7385:9

**credits** [1] - 7365:16

**Crew** [2] - 7347:8,
7347:15

**crime** [13] - 7223:22,
7223:23, 7230:20,
7230:25, 7231:9,
7232:3, 7235:24,
7279:21, 7302:12,
7302:15, 7305:1,

7340:21, 7342:7

**crime-committing** [1]
- 7235:24

**crimes** [13] - 7204:6,
7230:18, 7232:3,
7232:5, 7233:3,
7235:18, 7236:4,
7236:9, 7236:12,
7236:21, 7324:23,
7324:25, 7342:4

**Criminal** [4] - 7174:2,
7238:3, 7316:21,
7378:12

**criminal** [4] - 7196:3,
7232:18, 7253:22,
7253:23

**criminalizing** [2] -
7241:24, 7242:5

**criteria** [1] - 7205:2

**cross** [41] - 7180:1,
7190:19, 7216:12,
7220:3, 7224:20,
7224:22, 7240:10,
7306:14, 7315:12,
7316:12, 7356:10,
7357:14, 7360:3,
7360:5, 7361:3,
7367:18, 7372:16,
7374:20, 7381:13,
7383:2, 7383:4,
7383:6, 7383:7,
7383:9, 7383:10,
7383:13, 7383:19,
7384:1, 7384:13,
7384:21, 7385:2,
7386:10, 7386:15,
7387:1, 7387:5,
7387:20, 7389:18,
7390:19, 7390:22,
7391:10, 7392:17

**cross-examination**
[18] - 7180:1,
7190:19, 7240:10,
7306:14, 7315:12,
7356:10, 7357:14,
7360:3, 7360:5,
7374:20, 7383:6,
7383:7, 7383:19,
7384:1, 7384:13,
7384:21, 7390:19,
7390:22

**cross-examine** [4] -
7224:20, 7224:22,
7389:18, 7391:10

**cross-examined** [1] -
7383:4

**cross-referenced** [1] -
7216:12

**crossed** [1] - 7210:5

**crowd** [4] - 7226:1,

7227:10, 7317:16, 7364:3
**CRR** [3] - 7173:15, 7394:16, 7394:21
**crude** [1] - 7347:20
**Crusader** [1] - 7312:6
**CT** [1] - 7172:24
**culture** [4] - 7280:10, 7305:17, 7306:11, 7355:10
**curative** [1] - 7340:8
**currents** [6] - 7290:20, 7290:23, 7303:10, 7303:11, 7303:13, 7303:18
**cusp** [1] - 7242:5
**cut** [1] - 7266:14

## D

**D-bags** [1] - 7269:14
**D.C** [23] - 7172:5, 7198:21, 7207:15, 7211:21, 7238:22, 7245:12, 7246:23, 7249:9, 7249:22, 7261:24, 7275:20, 7278:17, 7300:23, 7302:16, 7302:18, 7326:24, 7331:1, 7349:2, 7363:12, 7367:4, 7368:25, 7369:11, 7385:12
**da-da-da-da-da-da-da** [1] - 7225:18
**dancing** [1] - 7352:18
**danger** [4] - 7240:19, 7241:24, 7341:25, 7342:9
**dangerous** [1] - 7384:7
**data** [10] - 7183:12, 7188:7, 7189:4, 7189:17, 7371:18, 7388:25, 7390:23, 7391:1, 7391:3, 7392:11
**database** [1] - 7388:24
**date** [12] - 7188:13, 7202:7, 7216:13, 7219:4, 7240:12, 7256:25, 7262:19, 7266:17, 7266:20, 7266:21, 7314:17
**dated** [4] - 7299:1, 7314:11, 7355:15, 7394:20
**dates** [2] - 7183:13, 7262:14
**dating** [1] - 7371:17

**DAVID** [1] - 7172:16
**DAY** [1] - 7172:8
**days** [6] - 7200:18, 7271:4, 7335:14, 7339:7, 7368:21, 7387:7
**DC** [4] - 7172:14, 7172:21, 7173:17, 7394:23
**dealing** [3] - 7249:2, 7268:13, 7269:3
**dealt** [1] - 7377:2
**debate** [3] - 7261:12, 7306:7, 7376:5
**December** [27] - 7191:11, 7202:10, 7203:9, 7210:20, 7245:23, 7261:7, 7261:8, 7264:22, 7265:4, 7266:18, 7266:19, 7266:21, 7289:19, 7305:2, 7335:15, 7349:7, 7354:23, 7362:7, 7362:19, 7375:18, 7375:19, 7375:20, 7378:12, 7378:14, 7378:17, 7379:3
**decide** [4] - 7195:8, 7250:3, 7315:18, 7370:17
**decided** [2] - 7208:24, 7219:8
**decides** [2] - 7295:10, 7366:1
**deciding** [1] - 7366:4
**decision** [1] - 7253:6
**decisions** [1] - 7389:15
**declarant** [6] - 7177:5, 7223:9, 7224:20, 7224:22, 7233:19, 7326:21
**declarant's** [3] - 7225:16, 7365:15, 7365:16
**declarants** [1] - 7323:7
**decontextualized** [1] - 7335:19
**deems** [1] - 7183:16
**deeply** [2] - 7278:13, 7306:21
**defend** [1] - 7205:20
**defendant** [29] - 7177:5, 7181:3, 7186:5, 7194:15, 7194:17, 7194:21, 7220:14, 7228:7, 7228:8, 7228:12,

7228:14, 7228:16, 7228:22, 7231:17, 7240:22, 7270:15, 7272:12, 7272:20, 7278:4, 7283:19, 7299:16, 7308:11, 7325:14, 7326:3, 7326:4, 7326:6, 7338:21, 7339:9, 7350:2
**Defendant** [24] - 7174:3, 7174:4, 7174:5, 7174:9, 7174:10, 7174:11, 7174:12, 7174:13, 7174:14, 7174:15, 7219:23, 7276:1, 7291:19, 7318:13, 7318:15, 7325:12, 7325:15, 7326:25, 7364:21
**defendant's** [2] - 7220:1, 7339:3
**Defendants** [4] - 7172:7, 7172:16, 7173:2, 7382:14
**defendants** [84] - 7174:25, 7182:11, 7187:24, 7188:12, 7190:14, 7193:1, 7197:17, 7202:20, 7202:23, 7203:11, 7204:3, 7204:4, 7204:23, 7208:22, 7209:17, 7210:5, 7210:18, 7213:17, 7219:17, 7220:4, 7225:10, 7225:23, 7226:7, 7226:20, 7227:21, 7227:23, 7227:24, 7229:12, 7230:11, 7232:18, 7233:16, 7236:18, 7245:14, 7247:21, 7249:20, 7260:25, 7261:9, 7261:25, 7267:15, 7269:17, 7270:12, 7272:3, 7272:11, 7275:17, 7276:1, 7278:23, 7279:1, 7279:2, 7279:7, 7279:16, 7283:18, 7283:20, 7284:19, 7285:10, 7286:13, 7286:20, 7289:9, 7292:10, 7295:24, 7296:1, 7296:5, 7296:22, 7301:17, 7302:3, 7305:5, 7309:4, 7314:1, 7315:3,

7317:1, 7329:9, 7329:18, 7341:12, 7357:4, 7362:11, 7362:16, 7362:24, 7364:7, 7365:4, 7371:16, 7372:8, 7374:4, 7383:7, 7387:2, 7392:19
**defendants'** [3] - 7210:7, 7245:19, 7315:2
**defense** [24] - 7195:13, 7195:17, 7195:20, 7204:12, 7207:13, 7226:7, 7226:21, 7265:2, 7278:18, 7304:9, 7304:12, 7304:17, 7304:19, 7313:2, 7313:9, 7321:19, 7345:11, 7345:13, 7346:9, 7355:20, 7361:19, 7376:24, 7381:1, 7393:25
**Defense** [36] - 7198:7, 7198:12, 7199:10, 7201:23, 7203:1, 7204:21, 7208:16, 7208:25, 7209:4, 7209:20, 7210:13, 7211:10, 7215:5, 7231:2, 7245:23, 7246:16, 7246:19, 7246:23, 7273:21, 7274:23, 7288:5, 7288:11, 7289:17, 7290:23, 7294:6, 7311:10, 7311:22, 7317:12, 7317:19, 7323:21, 7325:3, 7328:21, 7329:4, 7346:9, 7347:7, 7366:14
**defer** [1] - 7275:1
**deference** [1] - 7342:12
**deficient** [1] - 7389:24
**defined** [2] - 7262:2, 7262:3
**definitely** [2] - 7382:16, 7382:17
**definition** [6] - 7183:19, 7183:20, 7258:8, 7301:4, 7302:15, 7350:24
**definitively** [1] - 7379:19
**degree** [3] - 7180:16, 7274:3, 7371:5
**deleted** [1] - 7388:23

**deliver** [1] - 7371:7
**delivering** [1] - 7370:25
**demand** [1] - 7355:23
**demonstrations** [4] - 7310:9, 7310:16, 7310:20
**demonstrative** [2] - 7183:7, 7187:9
**denied** [1] - 7362:6
**denote** [1] - 7185:13
**deny** [1] - 7362:19
**Department** [1] - 7379:5
**depict** [1] - 7183:9
**depiction** [2] - 7183:8, 7389:10
**Deplorable** [2] - 7229:22
**deploy** [1] - 7211:14
**DEPUTY** [10] - 7174:2, 7195:24, 7196:2, 7237:24, 7238:2, 7242:21, 7242:25, 7316:17, 7316:20, 7394:11
**derogatory** [1] - 7362:7
**describe** [4] - 7210:10, 7230:16, 7235:3, 7279:19
**described** [4] - 7221:15, 7224:13, 7225:8, 7256:24
**describes** [1] - 7234:25
**describing** [3] - 7190:17, 7294:20, 7324:24
**description** [2] - 7284:25, 7313:13
**design** [2] - 7212:24, 7273:22
**desire** [4] - 7200:23, 7219:2, 7307:23, 7371:5
**desk** [2] - 7244:19, 7345:19
**destroy** [2] - 7207:15, 7383:3
**destroying** [1] - 7355:10
**destruction** [3] - 7382:15, 7382:17, 7382:22
**detail** [1] - 7303:21
**detention** [1] - 7371:24
**determine** [2] - 7269:5, 7379:19

7406

device [4] - 7188:21, 7188:22, 7188:25, 7337:15
devolves [1] - 7231:24
diametrically [1] - 7368:19
died [1] - 7313:13
difference [2] - 7304:17, 7385:14
different [33] - 7181:12, 7211:3, 7218:11, 7224:3, 7244:1, 7250:7, 7250:17, 7250:22, 7262:19, 7267:5, 7267:6, 7267:8, 7268:12, 7288:3, 7295:14, 7302:4, 7305:14, 7305:15, 7305:18, 7310:11, 7311:20, 7336:13, 7341:15, 7341:18, 7345:6, 7346:11, 7352:21, 7357:22, 7373:9, 7383:15, 7387:4, 7394:1
difficult [2] - 7279:25, 7376:21
digital [2] - 7209:23, 7391:6
dinner [1] - 7216:22
diplomatically [1] - 7206:2
direct [16] - 7218:14, 7222:24, 7268:3, 7286:7, 7315:8, 7316:1, 7334:20, 7363:9, 7364:23, 7377:17, 7381:13, 7382:12, 7382:25, 7385:1, 7386:9, 7386:12
directed [3] - 7182:21, 7241:14, 7384:11
directing [1] - 7198:18
direction [6] - 7184:9, 7200:23, 7217:10, 7217:14, 7238:19, 7238:22
directive [5] - 7205:7, 7217:17, 7294:15, 7296:9, 7296:14
directly [9] - 7207:8, 7207:16, 7217:1, 7219:23, 7248:1, 7269:17, 7289:16, 7291:6, 7318:7
disagree [4] - 7268:14, 7295:3, 7383:23, 7386:3

disagrees [1] - 7175:15
disavow [1] - 7205:20
disavowal [1] - 7304:10
disclosure [4] - 7378:14, 7378:19, 7378:25
disconnected [1] - 7272:18
discrete [1] - 7270:14
discuss [7] - 7179:24, 7193:7, 7193:22, 7196:15, 7225:2, 7238:22, 7286:19
discussed [5] - 7182:16, 7251:11, 7349:5, 7351:10, 7364:14
discussing [6] - 7225:23, 7238:15, 7245:25, 7283:18, 7283:20, 7384:22
discussion [15] - 7181:11, 7192:25, 7193:5, 7201:24, 7203:14, 7207:2, 7207:21, 7211:13, 7218:11, 7269:21, 7271:6, 7275:3, 7276:16, 7279:12, 7342:17
discussions [4] - 7206:20, 7209:25, 7211:9, 7211:23
dislike [1] - 7240:21
disorganized [1] - 7239:21
dispel [1] - 7357:7
disposition [1] - 7340:21
dispositions [1] - 7340:20
dispositive [1] - 7213:12
disproven [1] - 7296:16
dispute [2] - 7191:10, 7378:24
dissent [1] - 7242:5
DISTRICT [3] - 7172:1, 7172:1, 7172:9
District [1] - 7369:1
divide [1] - 7273:15
divided [1] - 7306:21
document [14] - 7182:21, 7186:10, 7187:22, 7188:19, 7192:10, 7197:6, 7242:15, 7251:22,

7260:16, 7281:2, 7281:4, 7281:12, 7281:22
document-by-document [1] - 7192:10
documents [12] - 7182:10, 7186:4, 7186:22, 7192:11, 7192:24, 7193:4, 7193:24, 7194:7, 7196:6, 7281:21, 7317:2, 7389:16
dog [1] - 7321:14
DOJ [1] - 7379:8
Dom [1] - 7313:19
Dominic [3] - 7174:5, 7328:22, 7331:3
Donald [1] - 7302:17
done [9] - 7238:16, 7260:13, 7283:1, 7285:7, 7329:19, 7359:21, 7384:5, 7386:11, 7391:6
door [5] - 7253:12, 7253:13, 7361:9, 7384:7, 7386:15
doors [1] - 7306:14
double [2] - 7266:20, 7347:1
double-check [1] - 7266:20
douchebags [1] - 7269:9
down [24] - 7177:17, 7195:6, 7196:25, 7205:21, 7209:2, 7224:24, 7245:20, 7246:7, 7247:4, 7247:5, 7253:14, 7266:25, 7314:2, 7330:22, 7331:1, 7338:4, 7355:9, 7370:12, 7372:2, 7378:1, 7381:9, 7381:19, 7381:25, 7382:3
download [3] - 7191:6, 7343:6, 7376:17
downloaded [1] - 7345:11
downloading [3] - 7191:2, 7191:3, 7377:12
downright [1] - 7307:7
Dr [4] - 7348:12, 7348:15, 7348:16, 7380:3
draft [1] - 7240:2

drafting [1] - 7362:3
drag [1] - 7385:11
draw [7] - 7231:15, 7239:2, 7240:22, 7241:21, 7248:4, 7248:5, 7351:24
drawing [1] - 7274:1
drawn [2] - 7247:25, 7305:20
drew [1] - 7279:5
drill [1] - 7224:24
drink [1] - 7273:16
drinking [4] - 7199:14, 7264:21, 7273:13, 7348:16
drinks [1] - 7348:17
drug [2] - 7268:20, 7362:9
drugs [2] - 7265:2, 7268:22
drunken [2] - 7209:6, 7209:8
Dubrowski [13] - 7179:10, 7193:9, 7193:12, 7200:7, 7200:16, 7212:10, 7360:10, 7360:20, 7360:23, 7361:8, 7372:17, 7390:24, 7391:18
Dubrowski's [3] - 7176:10, 7200:11, 7360:7
due [1] - 7379:13
during [15] - 7176:10, 7206:9, 7257:18, 7283:2, 7286:9, 7304:2, 7306:8, 7310:7, 7310:10, 7310:20, 7353:20, 7361:23, 7362:4, 7375:19, 7383:5
duties [1] - 7294:23
duty [1] - 7295:1
dwell [1] - 7296:7
dynamic [2] - 7273:9, 7274:23
dynamics [22] - 7273:6, 7278:9, 7279:18, 7280:2, 7281:16, 7288:2, 7288:20, 7289:11, 7289:16, 7290:8, 7291:23, 7297:18, 7300:7, 7301:1, 7302:4, 7303:3, 7303:4, 7307:1, 7307:9, 7307:15, 7309:24, 7310:5

**E**

E-Jeezy [2] - 7212:20, 7219:22
eager [1] - 7274:4
earliest [1] - 7276:4
early [1] - 7215:4
ears [1] - 7282:15
earth [1] - 7356:13
easier [1] - 7346:4
easily [2] - 7366:21, 7369:15
East [8] - 7172:17, 7198:1, 7198:5, 7218:7, 7218:15, 7334:9, 7347:7, 7347:14
east [1] - 7219:24
easy [6] - 7184:16, 7242:7, 7293:10, 7325:7, 7357:6, 7377:13
eat [1] - 7237:21
ECF [1] - 7354:9
echo [1] - 7309:11
echoed [1] - 7278:15
Eddie [3] - 7212:21, 7219:7, 7219:22
edges [1] - 7296:19
edit [3] - 7263:19, 7263:21
eff [5] - 7265:2, 7294:7, 7296:11, 7296:13, 7369:14
effect [9] - 7183:22, 7252:14, 7253:10, 7267:2, 7268:22, 7275:4, 7291:25, 7351:1, 7378:16
effectively [4] - 7211:5, 7279:14, 7287:16, 7294:5
efficient [1] - 7277:8
effing [3] - 7269:8, 7269:9, 7366:19
efforts [1] - 7242:2
eggs [1] - 7198:19
eight [2] - 7311:12, 7311:17
either [13] - 7176:5, 7181:2, 7205:24, 7247:13, 7258:15, 7259:10, 7259:20, 7267:6, 7322:8, 7347:10, 7354:13, 7367:25, 7392:8
El [2] - 7213:3, 7334:11
elders [21] - 7249:18, 7274:19, 7274:22,

7407

7274:25, 7275:4,
7275:20, 7277:14,
7277:15, 7277:17,
7287:14, 7288:6,
7288:7, 7288:10,
7289:3, 7289:6,
7308:20, 7308:21,
7309:9, 7347:7,
7347:14, 7354:21
**Elect** [1] - 7366:18
**election** [20] - 7241:8,
7271:10, 7272:6,
7274:5, 7275:5,
7297:1, 7301:23,
7301:24, 7305:6,
7305:7, 7306:20,
7310:9, 7310:18,
7333:15, 7334:2,
7334:3, 7334:4,
7334:19, 7355:7,
7355:11
**election-related** [1] -
7301:23
**electronically** [1] -
7185:13
**element** [2] - 7235:25,
7304:21
**elicited** [1] - 7383:9
**eliminate** [2] -
7209:15, 7284:11
**eliminates** [1] -
7178:7
**elsewhere** [1] - 7205:5
**email** [7] - 7174:18,
7188:2, 7198:2,
7229:1, 7316:2,
7343:15, 7388:20
**emailed** [1] - 7336:8
**emails** [7] - 7185:2,
7188:17, 7191:4,
7191:8, 7356:18,
7388:19, 7389:21
**embedded** [1] -
7217:3
**embodied** [1] -
7224:17
**emerged** [1] - 7307:2
**emotional** [1] -
7225:17
**emphasize** [4] -
7202:1, 7203:21,
7268:11, 7278:11
**emphatically** [1] -
7205:21
**enacted** [1] - 7378:25
**encompass** [2] -
7250:18, 7311:4
**encompasses** [2] -
7260:21, 7311:5
**encouragement** [1] -

7364:12
**encouraging** [3] -
7198:18, 7363:17,
7366:13
**end** [11] - 7178:16,
7197:22, 7211:20,
7211:22, 7218:22,
7241:7, 7244:4,
7273:8, 7361:15,
7384:4, 7385:16
**ended** [5] - 7212:2,
7213:13, 7214:23,
7270:17, 7272:14
**endorsing** [3] -
7228:1, 7235:24,
7365:21
**ends** [2] - 7241:10,
7282:11
**enforced** [1] - 7205:7
**enforcement** [2] -
7268:21, 7269:18
**engage** [1] - 7374:12
**engaged** [5] -
7203:14, 7206:20,
7207:21, 7306:24,
7330:11
**engagement** [1] -
7207:21
**engaging** [1] -
7203:16
**enhancing** [1] -
7363:18
**enormous** [6] -
7229:9, 7313:6,
7317:21, 7322:15,
7367:14, 7372:23
**enraged** [1] - 7265:14
**Enrique** [11] - 7174:5,
7206:8, 7217:11,
7273:21, 7274:20,
7288:4, 7290:21,
7366:4, 7369:6,
7369:9, 7369:16
**ensure** [1] - 7361:2
**entered** [1] - 7227:20
**entering** [1] - 7245:12
**enthusiastically** [1] -
7284:21
**entire** [7] - 7187:1,
7187:12, 7190:6,
7200:13, 7228:15,
7369:9, 7372:23
**entirely** [3] - 7278:9,
7368:10, 7369:13
**entirety** [4] - 7181:24,
7183:15, 7187:1,
7243:11
**entitled** [5] - 7209:18,
7342:12, 7377:18,
7378:21, 7380:25

**entity** [2] - 7209:20,
7310:24
**entries** [1] - 7280:24
**entry** [3] - 7219:24,
7246:2, 7348:18
**episode** [2] - 7284:20,
7286:8
**Erik** [3] - 7172:12,
7174:8, 7390:16
**error** [1] - 7269:2
**errors** [2] - 7282:15,
7282:16
**escaping** [1] -
7315:20
**especially** [5] -
7219:25, 7240:20,
7306:8, 7314:18,
7340:11
**Esq** [12] - 7172:11,
7172:12, 7172:12,
7172:13, 7172:16,
7172:19, 7172:22,
7173:2, 7173:4,
7173:8, 7173:11,
7173:11
**essence** [1] - 7264:19
**essentially** [1] -
7290:11
**establishing** [1] -
7297:11
**et** [3] - 7196:4, 7238:4,
7316:22
**Ethan** [6] - 7174:3,
7196:3, 7216:10,
7238:3, 7316:21,
7366:4
**evaluates** [1] - 7240:8
**Evans** [13] - 7246:14,
7248:10, 7248:19,
7248:20, 7249:13,
7253:5, 7253:6,
7268:18, 7268:20,
7269:2, 7269:15,
7269:18, 7282:25
**evening** [1] - 7201:8
**evenings** [5] - 7310:7,
7310:10, 7310:11,
7310:17, 7310:20
**event** [5] - 7211:6,
7254:3, 7275:23,
7313:6, 7336:6
**events** [3] - 7301:23,
7310:19, 7375:21
**Evidence** [2] - 7237:8,
7290:9
**evidence** [102] -
7176:3, 7176:4,
7176:5, 7176:6,
7176:14, 7181:9,
7183:7, 7183:23,

7200:20, 7200:23,
7201:6, 7201:7,
7201:11, 7208:20,
7219:9, 7222:25,
7223:15, 7225:22,
7226:14, 7226:25,
7227:7, 7227:15,
7227:25, 7228:16,
7229:9, 7229:13,
7229:16, 7233:16,
7234:13, 7235:5,
7235:8, 7235:15,
7238:25, 7241:19,
7243:18, 7245:21,
7246:10, 7247:4,
7247:7, 7247:10,
7247:13, 7253:16,
7253:24, 7265:9,
7266:7, 7276:3,
7285:14, 7286:9,
7299:20, 7301:2,
7301:4, 7301:5,
7301:24, 7301:25,
7303:19, 7304:22,
7304:23, 7305:5,
7305:10, 7305:14,
7305:17, 7307:9,
7309:14, 7310:23,
7317:20, 7317:22,
7318:16, 7323:21,
7326:10, 7330:12,
7331:6, 7331:12,
7331:14, 7332:19,
7339:5, 7340:11,
7340:16, 7341:3,
7356:12, 7356:15,
7362:11, 7365:17,
7365:18, 7365:23,
7367:4, 7367:25,
7368:4, 7371:7,
7371:15, 7371:16,
7371:18, 7371:21,
7371:22, 7372:11,
7372:14, 7372:24,
7376:19, 7376:19,
7376:22, 7376:25,
7380:19, 7390:25
**evident** [1] - 7204:19
**evidentiary** [2] -
7249:14, 7291:12
**exact** [1] - 7375:22
**exactly** [9] - 7224:11,
7245:7, 7248:17,
7248:18, 7258:3,
7265:7, 7301:10,
7344:13, 7387:19
**examination** [21] -
7180:1, 7190:19,
7240:10, 7306:14,
7315:12, 7356:10,

7357:14, 7360:3,
7360:5, 7374:20,
7381:21, 7381:22,
7382:1, 7383:6,
7383:7, 7383:19,
7384:1, 7384:13,
7384:21, 7390:19,
7390:22
**examine** [4] - 7224:20,
7224:22, 7389:18,
7391:10
**examined** [1] - 7383:4
**Examiner** [7] -
7190:19, 7359:16,
7360:6, 7372:17,
7390:25, 7391:9,
7393:17
**examiner** [2] -
7372:21, 7391:6
**example** [22] -
7184:15, 7184:16,
7185:23, 7187:23,
7197:17, 7205:14,
7207:9, 7243:7,
7247:1, 7258:2,
7264:1, 7265:23,
7282:1, 7315:16,
7326:10, 7338:16,
7349:14, 7356:8,
7380:1, 7380:2
**examples** [3] -
7187:14, 7220:10,
7368:12
**exception** [12] -
7183:22, 7221:18,
7221:24, 7222:1,
7222:2, 7225:8,
7239:4, 7307:15,
7309:13, 7309:18,
7319:3
**exceptions** [4] -
7184:1, 7184:2,
7351:1, 7371:19
**exchange** [6] -
7238:6, 7276:18,
7283:7, 7368:14,
7370:25
**excised** [1] - 7282:12
**excising** [1] - 7292:4
**exclamation** [1] -
7223:7
**excludable** [2] -
7333:17, 7355:11
**exclude** [9] - 7190:4,
7190:6, 7346:16,
7346:17, 7346:18,
7346:20, 7346:23,
7355:13, 7393:3
**excluded** [3] -
7348:20, 7348:21,

7349:4
**excluding** [1] -
7190:21
**exculpatory** [4] -
7355:25, 7356:1,
7377:22, 7378:2
**excuse** [3] - 7266:19,
7271:25, 7378:22
**Exhibit** [2] - 7216:15,
7352:15
**exhibit** [41] - 7176:23,
7178:13, 7178:14,
7181:24, 7187:1,
7187:9, 7192:14,
7199:11, 7202:8,
7202:15, 7212:13,
7215:20, 7216:9,
7217:21, 7219:6,
7272:2, 7275:18,
7286:6, 7291:17,
7292:3, 7298:10,
7307:25, 7317:7,
7324:9, 7326:19,
7328:9, 7328:18,
7337:25, 7348:20,
7359:6, 7366:7,
7366:21, 7367:13,
7369:16, 7369:24,
7370:7, 7372:9,
7389:20, 7391:17,
7393:1, 7393:3
**Exhibit-1** [3] -
7242:20, 7242:23,
7342:22
**Exhibit-114** [2] -
7353:8, 7370:24
**Exhibit-123** [1] -
7212:1
**Exhibit-197** [1] -
7366:6
**Exhibit-345** [1] -
7212:2
**Exhibit-500-15** [1] -
7355:15
**Exhibit-501** [1] -
7198:11
**Exhibit-501-41** [1] -
7205:9
**Exhibit-503-5** [1] -
7202:9
**Exhibit-504-22** [1] -
7391:19
**Exhibit-505-18** [2] -
7326:18, 7368:20
**Exhibit-505-6** [1] -
7324:17
**Exhibit-507-10** [1] -
7220:12
**Exhibit-507-12** [1] -
7269:8

**Exhibit-507-16** [1] -
7317:6
**Exhibit-510-19** [1] -
7321:17
**Exhibit-510-22** [1] -
7219:14
**Exhibit-514-11** [1] -
7270:23
**Exhibit-514-16** [2] -
7331:22, 7332:13
**Exhibit-521-1** [1] -
7333:20
**Exhibit-530-3** [1] -
7333:8
**Exhibit-537-23** [1] -
7197:25
**Exhibit-538-18** [1] -
7325:11
**Exhibit-548-8** [1] -
7334:9
**Exhibit-603-66** [2] -
7177:1, 7177:11
**Exhibit-613L** [1] -
7206:8
**Exhibit-90** [1] -
7347:23
**exhibits** [99] - 7178:7,
7178:11, 7180:15,
7183:5, 7184:22,
7184:23, 7189:23,
7189:24, 7190:5,
7190:6, 7190:21,
7192:5, 7193:5,
7193:25, 7196:7,
7196:16, 7197:13,
7199:4, 7199:23,
7200:3, 7200:4,
7200:8, 7200:10,
7200:17, 7203:18,
7204:19, 7208:6,
7212:6, 7217:22,
7218:9, 7219:16,
7243:11, 7245:4,
7245:15, 7247:15,
7255:3, 7261:11,
7262:13, 7262:16,
7263:7, 7265:12,
7265:15, 7267:15,
7269:5, 7271:1,
7273:20, 7274:3,
7281:25, 7282:9,
7282:17, 7284:17,
7284:18, 7285:23,
7300:2, 7304:8,
7306:18, 7308:19,
7308:24, 7309:1,
7309:2, 7317:2,
7338:18, 7341:2,
7344:12, 7347:12,
7347:14, 7347:15,

7347:16, 7347:17,
7350:1, 7350:6,
7350:8, 7350:13,
7352:14, 7359:21,
7360:8, 7361:20,
7363:2, 7363:25,
7367:1, 7370:14,
7371:14, 7372:7,
7372:19, 7376:2,
7376:10, 7379:14,
7379:17, 7380:18,
7380:20, 7381:18,
7389:8, 7390:15,
7390:24, 7393:5
**Exhibits-505-20** [1] -
7205:15
**exist** [1] - 7294:10
**existed** [4] - 7209:20,
7221:14, 7279:22,
7279:24
**existence** [2] -
7209:23, 7365:18
**existing** [1] - 7225:16
**exotic** [1] - 7339:23
**expand** [1] - 7376:7
**expanded** [2] -
7350:24, 7375:19
**expect** [9] - 7198:2,
7207:5, 7241:6,
7273:10, 7274:25,
7359:15, 7372:10,
7390:25, 7391:2
**expectation** [1] -
7217:15
**expected** [2] -
7294:13, 7295:2
**expert** [26] - 7183:11,
7185:2, 7188:2,
7343:16, 7343:18,
7343:20, 7343:22,
7343:24, 7344:5,
7344:16, 7344:17,
7344:18, 7345:3,
7359:16, 7377:3,
7377:4, 7377:15,
7378:13, 7378:19,
7379:13, 7389:1,
7389:18, 7391:15,
7391:22, 7392:7,
7392:8
**experts** [1] - 7389:19
**explain** [9] - 7194:2,
7194:6, 7279:23,
7282:4, 7358:7,
7358:22, 7361:6,
7367:7, 7367:9
**explained** [7] -
7253:3, 7288:6,
7311:8, 7364:25,
7365:4, 7365:12,

7376:21
**explaining** [3] -
7294:7, 7311:9,
7335:2
**explains** [2] - 7183:25,
7184:1
**explanation** [2] -
7235:23, 7310:4
**explicit** [1] - 7249:9
**exploitation** [1] -
7306:4
**exploited** [3] -
7290:24, 7303:11,
7303:18
**exploiting** [1] -
7303:13
**exposed** [2] - 7269:9,
7269:14
**expressed** [3] -
7199:8, 7199:10,
7203:4
**expresses** [1] -
7205:16
**expressing** [1] -
7287:16, 7288:9
**expression** [4] -
7208:15, 7307:22,
7322:7, 7322:8
**expressions** [2] -
7219:2, 7334:2
**expressly** [1] - 7265:6
**extemporaneously** [1]
- 7285:21
**extended** [1] - 7271:7
**extends** [1] - 7291:16
**extensive** [1] -
7188:25
**extent** [18] - 7206:21,
7209:23, 7215:22,
7261:20, 7261:21,
7261:22, 7261:23,
7276:19, 7280:3,
7305:4, 7305:7,
7310:15, 7315:23,
7315:25, 7329:17,
7330:9, 7330:17,
7347:9
**extracted** [1] -
7359:19
**extracting** [2] -
7190:3, 7377:12
**extraction** [1] -
7183:12
**extractions** [4] -
7189:25, 7371:19,
7371:20, 7391:4
**extraneous** [1] -
7247:3
**extraordinary** [1] -
7356:22

**extrapolate** [1] -
7220:10
**extremely** [2] -
7227:8, 7354:1
**eyes** [1] - 7329:5

---

## F

**F.2d** [1] - 7363:12
**face** [3] - 7208:10,
7208:20, 7378:22
**facetious** [1] -
7332:15
**fact** [43] - 7181:18,
7182:1, 7183:5,
7188:1, 7199:6,
7206:19, 7214:12,
7217:13, 7217:17,
7226:14, 7226:15,
7232:5, 7241:6,
7246:22, 7248:15,
7248:16, 7253:15,
7255:5, 7269:13,
7275:24, 7279:3,
7284:14, 7284:23,
7285:12, 7299:16,
7304:15, 7307:4,
7309:11, 7312:16,
7328:25, 7330:3,
7331:1, 7346:21,
7350:24, 7357:2,
7363:8, 7365:20,
7372:17, 7377:22,
7379:6, 7380:22,
7384:23
**factions** [1] - 7205:19
**facts** [10] - 7199:19,
7199:22, 7203:8,
7204:18, 7234:11,
7248:16, 7253:7,
7275:11, 7275:15,
7291:9
**factual** [5] - 7203:7,
7220:8, 7226:17,
7247:16, 7277:14
**factually** [2] - 7220:15,
7223:15
**faggots** [1] - 7325:8
**fags** [3] - 7325:8,
7336:10, 7354:4
**fail** [2] - 7264:7,
7327:23
**failed** [4] - 7228:13,
7228:15, 7293:17,
7294:1
**failing** [2] - 7228:14,
7248:6
**fails** [1] - 7183:6
**failure** [9] - 7203:3,
7203:4, 7204:2,

7409

7204:7, 7238:24,
7245:19, 7246:7,
7326:20, 7328:3
**fair** [36] - 7179:12,
7179:13, 7181:12,
7183:7, 7189:24,
7214:7, 7214:15,
7214:21, 7216:3,
7226:2, 7228:10,
7228:11, 7228:23,
7236:13, 7274:12,
7276:13, 7280:10,
7280:11, 7285:15,
7290:16, 7292:1,
7296:20, 7301:20,
7301:24, 7301:25,
7324:2, 7332:24,
7337:4, 7360:24,
7382:19, 7388:13,
7389:9, 7390:2,
7391:17
**fairer** [1] - 7361:13
**fairly** [8] - 7180:16,
7247:23, 7286:2,
7301:25, 7315:10,
7315:11, 7327:12,
7369:3
**fairness** [2] - 7374:14,
7383:21
**fall** [4] - 7192:24,
7233:15, 7261:4
**falls** [1] - 7181:10
**false** [1] - 7248:4
**familiar** [3] - 7232:12,
7244:16, 7246:22
**far** [13] - 7194:12,
7210:24, 7216:18,
7227:20, 7232:18,
7291:3, 7314:15,
7314:16, 7314:18,
7328:10, 7339:22,
7342:1, 7373:10
**far-fetched** [1] -
7232:18
**fascist** [1] - 7331:23
**fash** [5] - 7331:23,
7332:2, 7355:5,
7355:6, 7355:14
**fashion** [1] - 7356:15
**fast** [2] - 7298:2,
7377:8
**faulted** [1] - 7385:2
**faulty** [1] - 7363:4
**favor** [1] - 7364:23
**favorite** [1] - 7307:16
**Fay** [2] - 7325:12,
7368:15
**FBI** [2] - 7359:16,
7389:2
**feather** [1] - 7240:17

**February** [3] - 7172:6,
7189:6, 7394:20
**Federal** [1] - 7378:12
**feet** [1] - 7286:17
**fell** [1] - 7179:15
**fellows** [1] - 7338:2
**felt** [2] - 7218:22,
7357:16
**fence** [10] - 7381:9,
7381:19, 7381:25,
7382:3, 7382:15,
7382:17, 7382:22,
7383:3, 7383:23,
7385:23
**fetched** [1] - 7232:18
**few** [10] - 7179:22,
7180:20, 7196:21,
7213:18, 7213:20,
7232:22, 7275:11,
7286:3, 7288:10,
7335:14
**fiction** [1] - 7232:19
**fig** [1] - 7270:3
**fight** [6] - 7258:16,
7259:21, 7259:22,
7261:10, 7271:24,
7271:25
**fighting** [2] - 7235:7,
7265:25
**fights** [2] - 7235:13,
7310:8
**figure** [2] - 7193:1,
7267:25
**figured** [1] - 7292:10
**file** [6] - 7188:7,
7188:14, 7190:14,
7190:16, 7217:9,
7279:9
**filed** [4] - 7183:5,
7361:24, 7374:20,
7376:11
**filing** [9] - 7183:4,
7203:20, 7205:8,
7206:24, 7207:9,
7210:12, 7275:9,
7275:11, 7360:2
**fill** [4] - 7192:2,
7259:9, 7265:1,
7296:4
**filthy** [2] - 7299:10,
7299:25
**final** [3] - 7194:8,
7239:19, 7292:3
**finally** [2] - 7269:19,
7307:16
**fine** [5] - 7206:3,
7226:9, 7292:4,
7321:5, 7339:14
**fingers** [1] - 7298:7
**finished** [1] - 7385:15

**finite** [1] - 7344:21
**fired** [1] - 7343:11
**first** [46] - 7174:17,
7175:1, 7177:15,
7177:24, 7178:4,
7180:7, 7186:9,
7195:9, 7196:6,
7197:15, 7200:10,
7211:14, 7220:11,
7220:23, 7228:19,
7255:21, 7266:15,
7272:13, 7272:18,
7282:18, 7293:10,
7295:13, 7318:5,
7318:6, 7318:9,
7319:22, 7319:25,
7323:1, 7323:7,
7324:12, 7348:9,
7348:10, 7348:11,
7358:25, 7359:14,
7363:1, 7363:6,
7364:16, 7364:19,
7372:13, 7375:12,
7376:16, 7383:6,
7387:14, 7387:25
**Fish** [1] - 7297:8
**fit** [7] - 7178:3,
7204:25, 7258:7,
7261:17, 7265:2,
7294:6, 7296:11
**fits** [2] - 7258:6,
7307:23
**five** [2] - 7238:13,
7249:2
**five-second** [1] -
7238:13
**FL** [2] - 7173:6, 7173:9
**flag** [2] - 7200:6,
7306:23
**flawed** [2] - 7344:9,
7351:2
**flaws** [1] - 7191:7
**flip** [2] - 7270:19,
7308:13
**flipping** [3] - 7220:13,
7350:13, 7350:20
**floating** [4] - 7334:16,
7341:2, 7341:5,
7341:14
**floor** [3] - 7229:21,
7309:2
**Floor** [2] - 7172:24,
7173:13
**flow** [1] - 7344:24
**flying** [1] - 7240:17
**FO-923** [1] - 7352:9
**focus** [7] - 7183:3,
7205:6, 7206:1,
7220:9, 7220:11,
7266:16, 7313:22

**focused** [3] - 7244:2,
7272:14, 7300:11
**folded** [1] - 7249:6
**folding** [1] - 7251:13
**folks** [2] - 7226:10,
7293:1
**follow** [13] - 7200:18,
7203:24, 7205:1,
7211:19, 7217:16,
7239:9, 7244:4,
7249:4, 7264:2,
7264:4, 7295:2,
7308:25
**Follow** [1] - 7268:2
**followed** [1] - 7219:23
**followers** [2] -
7302:17, 7364:8
**following** [9] - 7193:4,
7194:3, 7196:11,
7204:18, 7264:4,
7270:7, 7338:15,
7369:21, 7383:15
**follows** [1] - 7185:15
**Fonticoba** [1] - 7211:4
**FOR** [1] - 7172:1
**force** [20] - 7256:6,
7268:2, 7278:12,
7278:18, 7284:20,
7284:25, 7285:1,
7285:4, 7285:13,
7301:17, 7301:19,
7302:11, 7304:21,
7310:23, 7310:24,
7322:17, 7335:5,
7366:13, 7366:15,
7385:23
**Force** [2] - 7347:8,
7347:16
**forces** [1] - 7273:25
**foregoing** [1] -
7394:17
**forensic** [1] - 7391:6
**forget** [2] - 7243:3,
7382:20
**form** [6] - 7235:8,
7245:17, 7246:24,
7247:2, 7371:18,
7372:7
**formally** [1] - 7274:21
**formation** [3] -
7201:25, 7215:4,
7278:14
**formed** [5] - 7213:10,
7241:21, 7290:22,
7314:19, 7367:10
**formulated** [1] -
7302:15
**forth** [5] - 7191:13,
7234:3, 7262:14,
7262:17, 7388:3

**forum** [2] - 7268:12,
7268:17
**forward** [9] - 7175:2,
7175:17, 7175:22,
7176:2, 7177:14,
7193:1, 7201:11,
7316:9, 7393:12
**forwards** [1] - 7263:19
**foundation** [12] -
7192:4, 7192:11,
7196:12, 7196:13,
7196:15, 7203:19,
7225:22, 7226:18,
7227:1, 7367:11,
7389:8, 7391:8
**foundational** [1] -
7192:21
**foundations** [3] -
7197:2, 7338:18,
7338:19
**founded** [1] - 7316:9
**four** [4] - 7313:10,
7335:20, 7364:7
**frame** [2] - 7354:17,
7354:19
**free** [5] - 7309:13,
7334:16, 7341:2,
7349:18, 7372:19
**free-floating** [2] -
7334:16, 7341:2
**freestanding** [1] -
7280:8
**frequency** [3] -
7207:6, 7268:15,
7367:15
**frequently** [1] -
7203:11
**friend** [3] - 7352:16,
7352:22, 7353:5
**friends** [2] - 7237:3,
7237:14
**front** [22] - 7203:19,
7216:21, 7220:22,
7221:11, 7221:14,
7222:14, 7224:5,
7224:8, 7225:3,
7229:7, 7229:12,
7233:14, 7273:1,
7342:23, 7348:4,
7353:14, 7359:12,
7360:1, 7374:9,
7377:5, 7381:9,
7381:10
**frowns** [1] - 7316:5
**fruition** [1] - 7241:20
**frustrated** [1] -
7241:12
**fuck** [6] - 7254:12,
7254:13, 7295:10,
7327:19, 7368:23,

7369:25
**fucking** [1] - 7322:1
**full** [5] - 7331:23,
7332:2, 7340:13,
7394:18
**fully** [1] - 7383:25
**fun** [1] - 7273:17
**function** [2] - 7263:7,
7265:12
**fundamental** [1] -
7284:23
**funds** [1] - 7377:4
**funny** [1] - 7322:19
**furtherance** [13] -
7257:19, 7257:22,
7257:25, 7258:8,
7293:11, 7322:8,
7323:6, 7340:5,
7363:5, 7363:8,
7363:14, 7364:15,
7366:16
**furthering** [3] -
7320:11, 7321:10,
7322:4
**future** [2] - 7306:23,
7384:1

---

**G**

**Gabriel** [22] - 7212:5,
7212:17, 7219:4,
7219:5, 7220:21,
7221:17, 7224:10,
7224:15, 7225:1,
7225:22, 7227:17,
7227:18, 7227:19,
7326:22, 7327:7,
7327:25, 7368:20,
7368:21, 7369:13,
7369:24, 7370:1
**gains** [1] - 7312:8
**gallery** [2] - 7264:10,
7264:16
**game** [3] - 7285:15,
7348:1, 7361:13
**gaps** [2] - 7296:4,
7296:6
**garbage** [1] - 7228:7
**Garcia** [4] - 7212:17,
7219:5, 7219:6,
7368:21
**Garland** [3] - 7183:25,
7248:11, 7248:20
**gatekeeper** [2] -
7263:7, 7265:12
**gay** [1] - 7347:21
**gays** [2] - 7325:5,
7354:3
**general** [7] - 7233:6,
7234:18, 7241:8,

7279:12, 7345:21,
7350:23, 7393:6
**generalized** [2] -
7181:23, 7184:11
**generally** [7] - 7232:4,
7236:23, 7300:6,
7334:6, 7335:10,
7346:17, 7359:24
**gentleman** [1] -
7198:6
**genuinely** [1] -
7304:11
**George** [4] - 7212:21,
7219:7, 7219:22,
7232:24
**getaway** [1] - 7257:24
**gig** [1] - 7188:7
**gigantic** [1] - 7206:24
**given** [14] - 7196:20,
7202:19, 7210:8,
7229:23, 7240:14,
7240:20, 7323:24,
7337:14, 7360:17,
7379:1, 7380:17,
7382:3, 7384:7,
7388:3
**glad** [1] - 7374:11
**glance** [1] - 7197:15
**glasses** [1] - 7183:6
**goal** [1] - 7211:17
**goals** [2] - 7204:6,
7235:3
**Goebbels** [2] -
7353:17, 7353:19
**Googanata** [1] -
7232:24
**Government** [36] -
7184:25, 7197:25,
7220:11, 7220:14,
7232:8, 7236:16,
7256:19, 7297:23,
7303:21, 7317:5,
7321:16, 7324:8,
7324:17, 7325:10,
7326:18, 7331:22,
7332:13, 7333:8,
7333:19, 7334:8,
7336:19, 7344:1,
7344:6, 7344:12,
7346:4, 7346:11,
7347:23, 7355:15,
7358:9, 7365:14,
7376:10, 7377:14,
7380:12, 7390:9,
7393:11
**government** [159] -
7174:7, 7175:15,
7176:6, 7178:9,
7178:13, 7179:10,
7180:13, 7184:4,

7184:24, 7185:3,
7186:14, 7188:2,
7188:3, 7188:18,
7189:15, 7189:18,
7191:1, 7191:10,
7191:15, 7191:24,
7194:1, 7194:6,
7195:12, 7195:14,
7196:11, 7197:8,
7201:11, 7204:9,
7209:10, 7221:13,
7222:18, 7223:13,
7224:7, 7226:15,
7226:19, 7226:23,
7227:3, 7228:19,
7229:3, 7229:11,
7230:16, 7230:19,
7234:11, 7234:25,
7239:3, 7239:8,
7239:10, 7239:17,
7241:23, 7245:9,
7245:19, 7246:18,
7247:14, 7248:21,
7248:23, 7251:19,
7253:6, 7253:15,
7254:7, 7256:24,
7258:19, 7259:8,
7259:17, 7259:23,
7261:5, 7261:6,
7262:15, 7263:9,
7264:19, 7265:7,
7267:13, 7270:14,
7270:19, 7277:23,
7281:24, 7282:24,
7285:13, 7301:13,
7302:10, 7303:7,
7303:12, 7303:16,
7304:22, 7305:8,
7308:25, 7311:6,
7311:8, 7311:13,
7311:16, 7311:24,
7312:14, 7315:1,
7316:6, 7318:23,
7320:15, 7320:24,
7322:22, 7324:2,
7325:4, 7326:2,
7326:4, 7327:3,
7327:4, 7327:10,
7327:17, 7328:2,
7328:18, 7329:2,
7329:17, 7330:9,
7330:17, 7331:4,
7335:5, 7336:12,
7339:8, 7340:15,
7343:9, 7344:15,
7344:22, 7346:15,
7347:19, 7349:19,
7350:8, 7350:16,
7351:13, 7353:12,
7356:15, 7357:8,
7358:25, 7362:8,

7362:11, 7375:13,
7375:14, 7375:24,
7376:3, 7376:7,
7376:20, 7377:8,
7377:15, 7378:7,
7378:18, 7378:20,
7378:25, 7379:16,
7380:8, 7381:7,
7381:13, 7381:16,
7382:7, 7384:2,
7385:3, 7385:13,
7390:1, 7390:4,
7390:7, 7392:24
**government's** [36] -
7177:10, 7178:8,
7182:9, 7193:13,
7217:5, 7226:3,
7235:8, 7238:18,
7241:7, 7245:5,
7246:7, 7249:7,
7249:8, 7249:25,
7256:5, 7257:3,
7260:20, 7260:23,
7274:17, 7292:24,
7293:6, 7296:3,
7297:2, 7299:14,
7300:7, 7315:8,
7326:19, 7327:22,
7340:13, 7342:10,
7357:7, 7371:15,
7377:23, 7382:9,
7390:14
**Government's** [10] -
7198:11, 7215:25,
7245:3, 7249:12,
7263:15, 7264:23,
7268:25, 7298:9,
7328:20, 7357:5
**grant** [1] - 7229:8
**grasps** [1] - 7267:18
**great** [8] - 7207:10,
7208:7, 7242:2,
7342:12, 7364:7,
7364:8, 7383:18,
7388:15
**greatest** [1] - 7200:1
**Greene** [1] - 7280:5
**grew** [1] - 7217:10
**grievances** [1] -
7242:1
**grinding** [1] - 7178:6
**gross** [1] - 7300:13
**Ground** [4] - 7212:24,
7352:1, 7352:6,
7354:21
**ground** [4] - 7184:13,
7219:21, 7229:19,
7238:9
**grounds** [5] - 7190:19,
7301:5, 7304:24,

7348:21, 7394:4
**group** [66] - 7189:1,
7195:19, 7198:10,
7204:22, 7204:25,
7205:4, 7205:6,
7205:9, 7205:12,
7205:24, 7206:16,
7207:18, 7208:3,
7208:14, 7208:16,
7208:17, 7209:7,
7209:9, 7212:24,
7213:10, 7215:13,
7216:12, 7227:5,
7227:20, 7227:21,
7229:2, 7233:10,
7233:22, 7234:4,
7234:18, 7245:25,
7249:18, 7249:19,
7249:20, 7249:23,
7267:2, 7267:22,
7269:21, 7272:16,
7274:4, 7274:19,
7275:3, 7276:8,
7284:24, 7285:1,
7288:20, 7294:25,
7296:10, 7308:20,
7308:21, 7309:9,
7314:25, 7323:22,
7323:24, 7324:25,
7325:5, 7326:3,
7329:6, 7329:21,
7330:15, 7334:9,
7352:1, 7354:24,
7364:13, 7364:13, 7369:20
**group's** [1] - 7201:25
**groups** [11] - 7206:24,
7206:25, 7207:11,
7207:12, 7207:14,
7232:14, 7233:23,
7236:3, 7246:25,
7307:7, 7346:15
**guarantee** [1] -
7356:16
**guess** [37] - 7178:13,
7180:11, 7181:8,
7182:15, 7200:1,
7206:23, 7213:18,
7217:19, 7218:23,
7231:15, 7231:20,
7236:14, 7278:1,
7280:24, 7281:1,
7283:19, 7291:19,
7292:13, 7294:9,
7295:3, 7295:11,
7300:3, 7300:10,
7311:20, 7314:2,
7319:21, 7323:11,
7327:22, 7336:15,
7344:16, 7349:18,
7351:1, 7353:19,

7357:20, 7370:25,
7386:14, 7389:7
**guide** [1] - 7192:25
**guideline** [2] -
7238:21
**guidelines** [1] -
7239:7
**guilt** [2] - 7307:8,
7366:4
**guilty** [8] - 7266:4,
7275:12, 7275:13,
7339:2, 7339:3,
7342:7, 7342:11
**guns** [9] - 7333:22,
7333:24, 7334:14,
7334:18, 7334:25,
7335:25, 7336:5,
7349:6, 7349:9
**gut** [1] - 7272:18
**guy** [5] - 7252:10,
7268:21, 7275:21,
7277:15, 7334:12
**guys** [9] - 7205:13,
7205:20, 7208:12,
7211:16, 7212:25,
7235:25, 7265:20,
7266:4, 7314:15

---

### H

**half** [1] - 7393:10
**hall** [1] - 7237:13
**Hanak** [1] - 7188:3
**hand** [4] - 7204:22,
7209:5, 7270:5,
7382:10
**hand-picked** [3] -
7204:22, 7209:5,
7270:5
**handgun** [1] - 7340:3
**handle** [5] - 7175:8,
7188:5, 7189:10,
7205:22, 7232:16
**hands** [1] - 7298:7
**handwriting** [1] -
7243:3
**happy** [7] - 7243:19,
7284:7, 7303:1,
7359:10, 7374:6,
7377:10, 7388:18
**hard** [5] - 7181:17,
7194:19, 7231:16,
7305:20, 7337:13
**harm** [1] - 7342:14
**harmless** [1] - 7269:2
**harnessing** [1] -
7273:22
**hash** [1] - 7190:14
**Hassan** [2] - 7173:4,
7174:11

**HASSAN** [1] - 7173:5
**hate** [1] - 7320:23
**Haven** [1] - 7172:24
**head** [1] - 7197:23
**hear** [62] - 7175:1,
7175:15, 7180:12,
7180:25, 7184:8,
7184:20, 7186:5,
7192:9, 7193:6,
7194:22, 7195:11,
7195:12, 7195:13,
7195:14, 7195:16,
7195:20, 7196:6,
7196:8, 7197:19,
7204:11, 7213:17,
7220:4, 7224:4,
7224:6, 7234:9,
7237:20, 7238:7,
7243:17, 7243:19,
7243:22, 7244:5,
7244:17, 7270:12,
7270:14, 7270:16,
7274:10, 7277:9,
7285:10, 7285:12,
7289:11, 7290:5,
7292:6, 7292:10,
7296:1, 7306:5,
7309:4, 7315:2,
7317:2, 7320:14,
7320:20, 7321:20,
7328:9, 7350:16,
7358:25, 7360:19,
7362:10, 7372:1,
7374:19, 7375:11,
7380:14, 7382:7,
7384:17
**heard** [28] - 7178:3,
7180:25, 7181:15,
7186:4, 7190:15,
7220:23, 7229:18,
7231:18, 7232:7,
7240:5, 7248:2,
7253:14, 7253:16,
7267:16, 7270:16,
7273:12, 7290:13,
7295:24, 7300:24,
7303:11, 7308:12,
7308:14, 7308:16,
7340:12, 7341:4,
7361:19, 7370:17,
7374:8
**hearing** [8] - 7174:22,
7190:8, 7195:9,
7245:23, 7246:2,
7246:16, 7342:22,
7362:4, 7375:19
**hearings** [1] - 7371:24
**hearsay** [32] -
7183:25, 7184:2,
7199:4, 7202:1,

7202:20, 7203:23,
7221:18, 7221:24,
7222:1, 7222:2,
7224:23, 7224:25,
7225:6, 7231:14,
7239:4, 7239:11,
7252:21, 7269:1,
7283:1, 7294:18,
7296:17, 7301:5,
7307:15, 7307:21,
7307:24, 7309:13,
7309:18, 7310:1,
7311:15, 7319:3,
7319:4, 7350:25
**heart** [4] - 7190:7,
7193:7, 7289:15,
7385:22
**heartland** [1] - 7273:2
**heaven** [1] - 7356:13
**heavy** [2] - 7326:25,
7369:7
**HELD** [1] - 7172:9
**held** [2] - 7206:9,
7249:13
**helmet** [1] - 7337:15
**helmet-like** [1] -
7337:15
**help** [4] - 7180:5,
7192:19, 7193:1,
7276:6
**helpful** [4] - 7180:6,
7200:25, 7212:14,
7354:1
**helps** [2] - 7214:12,
7270:1
**hence** [1] - 7338:25
**hereby** [1] - 7394:16
**Hernandez** [39] -
7173:2, 7174:10,
7177:21, 7181:14,
7185:11, 7185:22,
7190:4, 7190:15,
7192:3, 7204:11,
7216:19, 7242:13,
7243:8, 7253:19,
7258:18, 7260:10,
7263:13, 7268:9,
7268:19, 7289:7,
7308:23, 7315:15,
7315:20, 7317:25,
7335:17, 7346:19,
7350:10, 7367:21,
7371:13, 7372:12,
7373:17, 7374:6,
7379:11, 7380:14,
7381:3, 7390:12,
7390:18, 7391:9,
7394:3
**HERNANDEZ** [120] -
7177:9, 7177:12,

7181:16, 7183:4,
7184:21, 7185:17,
7185:21, 7186:11,
7186:14, 7188:1,
7190:24, 7191:15,
7191:19, 7203:22,
7204:9, 7204:13,
7215:10, 7242:14,
7242:19, 7242:22,
7243:1, 7243:3,
7243:10, 7243:15,
7243:21, 7244:6,
7244:12, 7244:19,
7244:23, 7245:1,
7250:6, 7250:11,
7250:16, 7250:24,
7251:6, 7251:8,
7251:12, 7252:1,
7252:4, 7252:8,
7252:20, 7252:25,
7253:5, 7253:18,
7254:10, 7254:16,
7254:20, 7254:24,
7255:1, 7255:21,
7256:15, 7256:23,
7257:8, 7257:12,
7257:15, 7258:3,
7258:13, 7258:21,
7258:23, 7259:1,
7259:6, 7259:13,
7260:3, 7260:8,
7260:14, 7260:19,
7261:20, 7262:6,
7262:21, 7282:22,
7289:2, 7289:5,
7308:15, 7308:17,
7308:19, 7309:5,
7309:8, 7311:25,
7312:12, 7312:14,
7312:23, 7342:19,
7343:19, 7343:21,
7343:24, 7344:3,
7344:5, 7345:18,
7345:21, 7346:1,
7346:25, 7348:9,
7350:5, 7350:22,
7351:9, 7355:18,
7356:3, 7356:8,
7357:11, 7357:19,
7357:22, 7358:13,
7358:17, 7358:22,
7375:1, 7375:6,
7375:12, 7375:17,
7376:15, 7379:10,
7379:25, 7380:6,
7380:8, 7380:12,
7380:16, 7380:25,
7388:16, 7388:18,
7389:4, 7389:17
**Hernandez's** [2] -
7192:21, 7348:6

**herself** [1] - 7183:11
**Hialeah** [1] - 7173:9
**hierarchy** [3] - 7209:2,
7274:24, 7279:20
**high** [2] - 7285:17,
7371:5
**Highland** [1] - 7173:3
**highlight** [2] - 7315:3,
7317:3
**highlighted** [1] -
7336:8
**highly** [2] - 7204:22,
7339:17
**Hill** [10] - 7220:22,
7221:11, 7221:14,
7222:14, 7224:6,
7224:8, 7225:3,
7229:7, 7229:13,
7233:14
**himself** [2] - 7198:20,
7212:18
**hire** [2] - 7377:3,
7377:15
**history** [2] - 7263:19
**hit** [7] - 7186:23,
7229:19, 7229:20,
7229:21, 7349:18,
7359:5, 7370:14
**hits** [2] - 7200:1,
7360:10
**hitting** [1] - 7359:6
**hmm** [5] - 7215:12,
7231:10, 7317:7,
7324:18, 7368:8
**hoc** [1] - 7340:18
**hold** [11] - 7198:14,
7222:23, 7236:6,
7298:1, 7300:15,
7322:10
**holding** [1] - 7389:25
**Hollow** [1] - 7173:2
**home** [2] - 7293:2,
7384:3
**Homelander** [2] -
7321:23, 7323:2
**homework** [2] -
7260:13, 7374:10
**Honor** [209] - 7175:16,
7176:8, 7176:25,
7177:12, 7178:21,
7178:24, 7179:9,
7181:13, 7181:16,
7185:17, 7186:12,
7189:20, 7190:11,
7190:24, 7193:9,
7193:17, 7197:20,
7199:22, 7200:6,
7201:18, 7202:19,
7203:7, 7203:18,
7203:22, 7204:17,

7206:18, 7207:19, 7208:19, 7210:25, 7212:5, 7212:13, 7214:16, 7215:9, 7216:9, 7219:20, 7220:12, 7220:20, 7221:8, 7221:9, 7222:13, 7223:4, 7224:9, 7224:13, 7224:14, 7224:18, 7225:5, 7225:6, 7225:9, 7225:11, 7225:21, 7226:13, 7226:14, 7227:5, 7227:16, 7227:22, 7228:11, 7229:13, 7229:17, 7229:25, 7230:22, 7231:15, 7232:2, 7232:12, 7232:23, 7233:6, 7233:18, 7234:23, 7235:7, 7235:14, 7235:22, 7236:14, 7237:7, 7238:12, 7238:14, 7239:2, 7239:12, 7239:19, 7239:25, 7242:14, 7242:19, 7260:1, 7260:14, 7262:12, 7263:6, 7263:25, 7266:9, 7266:12, 7266:24, 7267:6, 7267:8, 7267:17, 7269:16, 7269:23, 7269:25, 7270:25, 7272:23, 7273:2, 7274:8, 7277:18, 7278:8, 7279:1, 7280:12, 7281:24, 7282:7, 7282:22, 7283:23, 7285:19, 7286:11, 7287:2, 7289:13, 7292:2, 7292:19, 7293:9, 7296:23, 7297:7, 7297:12, 7297:25, 7299:2, 7299:9, 7299:23, 7300:12, 7300:24, 7301:7, 7303:23, 7308:14, 7312:12, 7313:21, 7314:5, 7318:22, 7319:12, 7320:21, 7321:9, 7322:25, 7323:5, 7323:20, 7325:2, 7325:6, 7326:17, 7328:17, 7328:19, 7329:1, 7329:16, 7330:8, 7331:11, 7331:21, 7333:7, 7334:8,

7335:7, 7335:17, 7336:7, 7336:19, 7337:3, 7342:19, 7345:22, 7349:25, 7351:18, 7352:19, 7353:13, 7354:6, 7354:8, 7354:16, 7354:20, 7354:25, 7355:8, 7355:16, 7355:18, 7359:4, 7359:9, 7359:13, 7360:2, 7360:12, 7360:25, 7361:18, 7362:5, 7362:14, 7362:17, 7364:23, 7365:12, 7366:17, 7366:20, 7370:15, 7371:12, 7371:14, 7372:15, 7373:7, 7373:13, 7374:22, 7375:1, 7375:9, 7375:12, 7381:5, 7382:5, 7382:12, 7384:8, 7384:18, 7384:25, 7385:4, 7385:11, 7385:14, 7385:19, 7386:21, 7387:16, 7388:6, 7388:8, 7388:18, 7389:17, 7390:16
**Honor's** [6] - 7232:12, 7237:3, 7300:21, 7359:20, 7364:24, 7367:2
**Honorable** [4] - 7195:24, 7237:24, 7316:17, 7394:11
**HONORABLE** [1] - 7172:9
**hope** [11] - 7243:23, 7244:10, 7245:4, 7321:25, 7322:6, 7322:7, 7322:8, 7345:12, 7365:24, 7366:11, 7366:15
**hopefully** [2] - 7244:4, 7393:10
**horrible** [1] - 7265:13
**host** [1] - 7263:17
**hotels** [1] - 7369:17
**hothead** [1] - 7258:4
**hour** [1] - 7393:10
**hours** [2] - 7298:13, 7387:6
**huge** [4] - 7184:6, 7313:8, 7313:16, 7355:23
**Hulkamaniac** [1] - 7342:25
**Hull** [1] - 7172:19

**hull** [2] - 7175:21, 7383:4
**HULL** [1] - 7172:20
**hull's** [1] - 7383:13
**human** [2] - 7232:15, 7237:9
**hun** [1] - 7249:2
**hundred** [1] - 7249:2
**hundreds** [4] - 7236:18, 7249:1
**Hunter** [6] - 7230:1, 7317:13, 7318:25, 7319:11, 7320:15, 7363:25
**hypothetical** [1] - 7341:18

## I

**Idaho** [2] - 7335:25, 7349:9
**Idaho/Montana** [2] - 7334:15, 7349:6
**idea** [5] - 7202:21, 7255:15, 7278:16, 7303:16, 7365:21
**identified** [14] - 7196:7, 7197:21, 7203:7, 7214:18, 7215:9, 7255:4, 7255:10, 7256:16, 7261:16, 7261:17, 7262:11, 7292:12, 7350:1, 7363:2
**identify** [8] - 7176:22, 7261:2, 7273:9, 7343:2, 7343:12, 7344:21, 7355:21
**identifying** [3] - 7259:24, 7311:21, 7344:24
**identity** [1] - 7342:3
**idle** [1] - 7349:16
**ignore** [5] - 7264:23, 7265:3, 7265:6, 7269:24, 7342:24
**ignored** [2] - 7246:4, 7246:17
**ignoring** [2] - 7247:13, 7270:9
**ll** [1] - 7173:11
**ill** [1] - 7174:20
**illogical** [1] - 7248:5
**illustrate** [4] - 7220:9, 7365:2, 7367:10, 7368:12
**imagining** [1] - 7340:13
**imminent** [1] - 7342:14

**Immortal** [3] - 7292:17, 7321:25, 7366:8
**impact** [3] - 7340:23, 7340:25, 7341:7
**impart** [1] - 7177:18
**impermissible** [1] - 7240:23
**implicate** [2] - 7197:13, 7219:16
**implicating** [1] - 7193:22
**implication** [1] - 7324:23
**implicit** [1] - 7240:13
**implied** [1] - 7216:6
**implies** [1] - 7247:16
**import** [1] - 7366:22
**important** [16] - 7204:24, 7208:20, 7213:13, 7217:5, 7225:15, 7227:2, 7234:21, 7263:15, 7263:24, 7267:24, 7285:2, 7290:4, 7301:8, 7364:19, 7385:21, 7386:18
**imposes** [1] - 7307:22
**impression** [1] - 7381:15
**impressions** [1] - 7339:13
**improper** [1] - 7340:22
**imputation** [1] - 7228:20
**impute** [2] - 7225:9, 7320:24
**imputed** [1] - 7327:6
**imputing** [2] - 7323:15, 7323:23
**IN** [1] - 7172:1
**inaccurate** [2] - 7384:23, 7386:3
**inaccurately** [2] - 7388:24, 7388:25
**inadmissible** [1] - 7274:15
**inappropriate** [1] - 7385:25
**inasmuch** [1] - 7294:11
**incidences** [1] - 7307:14
**incident** [6] - 7284:10, 7286:1, 7287:12, 7337:17, 7381:14, 7381:17
**inclination** [4] - 7180:24, 7274:14, 7285:12, 7392:16

**inclined** [3] - 7241:1, 7309:3, 7360:12
**include** [6] - 7182:17, 7183:17, 7213:2, 7213:24, 7281:24, 7347:20
**included** [5] - 7176:17, 7176:18, 7176:21, 7203:2, 7249:20
**includes** [3] - 7182:5, 7281:4, 7366:25
**including** [5] - 7218:18, 7273:20, 7274:2, 7275:17, 7372:6
**incoherent** [1] - 7269:12
**inconsistent** [1] - 7208:2
**incorporate** [1] - 7182:19
**incorrect** [1] - 7392:2
**inculpatory** [1] - 7306:25
**indeed** [2] - 7369:18, 7383:17
**independent** [2] - 7249:23, 7341:3
**indicate** [1] - 7188:23
**indicated** [15] - 7180:23, 7251:1, 7256:20, 7297:21, 7298:24, 7303:9, 7309:3, 7309:15, 7312:24, 7314:25, 7318:12, 7385:19, 7391:24, 7393:12, 7394:4
**indicates** [3] - 7217:8, 7275:23, 7308:10
**indicating** [4] - 7175:4, 7188:21, 7239:16, 7308:15
**indication** [3] - 7230:17, 7322:7, 7348:22
**indicative** [4] - 7227:11, 7290:20, 7303:10, 7340:4
**indicia** [1] - 7228:21
**indictment** [2] - 7220:5, 7246:19
**indirectly** [1] - 7233:13
**individual** [13] - 7187:13, 7198:3, 7212:21, 7220:21, 7224:8, 7238:10, 7283:21, 7300:4,

7413

7314:1, 7319:5, 7326:21, 7348:3, 7354:15
**individualized** [2] - 7177:16, 7389:14
**individuals** [9] - 7226:22, 7246:8, 7298:13, 7307:6, 7307:10, 7309:20, 7311:5, 7312:1, 7328:20
**indulgence** [4] - 7219:18, 7281:11, 7283:8, 7384:9
**industry** [3] - 7190:1, 7191:1, 7191:2
**infer** [3] - 7247:18, 7249:19, 7267:23
**inference** [10] - 7207:20, 7208:13, 7213:1, 7214:12, 7240:15, 7240:16, 7247:25, 7248:4, 7248:5, 7288:12
**inferences** [1] - 7240:22
**inferential** [1] - 7290:19
**inferentially** [1] - 7222:25
**inflammatory** [9] - 7230:10, 7232:16, 7246:8, 7247:8, 7257:6, 7299:21, 7300:5, 7300:8, 7355:12
**influence** [1] - 7261:14
**influenced** [2] - 7245:14, 7260:24
**information** [24] - 7185:1, 7186:18, 7191:12, 7191:16, 7194:2, 7344:9, 7349:20, 7355:24, 7356:19, 7358:3, 7358:13, 7372:21, 7373:11, 7373:18, 7377:23, 7378:9, 7378:13, 7379:17, 7389:10, 7390:5, 7390:9, 7390:14, 7392:20, 7392:25
**informed** [1] - 7278:13
**informs** [1] - 7390:23
**infrastructure** [2] - 7279:22, 7279:24
**inherently** [1] - 7306:19
**injured** [2] - 7304:11,

7313:12
**input** [1] - 7275:1
**inside** [1] - 7198:18
**insight** [2] - 7285:2, 7318:3
**insin** [1] - 7229:14
**insinuation** [2] - 7229:14, 7331:5
**instance** [6] - 7205:9, 7211:3, 7318:6, 7340:10, 7355:25, 7386:18
**instances** [2] - 7185:18, 7341:9
**instant** [2] - 7241:21, 7340:18
**instead** [2] - 7239:16, 7393:9
**instinct** [1] - 7272:21
**instruct** [1] - 7198:14
**instructed** [5] - 7213:12, 7234:14, 7234:19, 7235:6, 7267:5
**instructing** [1] - 7294:25
**instruction** [30] - 7181:5, 7194:19, 7217:25, 7228:5, 7228:9, 7249:4, 7250:3, 7250:21, 7293:4, 7295:13, 7296:14, 7318:10, 7318:14, 7325:19, 7325:20, 7325:21, 7326:1, 7329:8, 7330:2, 7330:3, 7330:8, 7330:16, 7331:13, 7333:5, 7340:8, 7346:22, 7347:6, 7352:5, 7352:12, 7368:17
**instruction's** [1] - 7250:16
**instruction-type** [1] - 7352:12
**instructions** [11] - 7184:3, 7267:5, 7267:8, 7318:12, 7325:16, 7351:24, 7354:11, 7365:8, 7370:13, 7370:19, 7370:21
**insurrection** [2] - 7304:18, 7304:20
**intelligibly** [1] - 7184:18
**intend** [4] - 7200:9, 7200:15, 7262:16, 7371:17

**intended** [2] - 7282:13, 7359:12
**intending** [1] - 7361:9
**intends** [1] - 7332:1
**intent** [20] - 7223:1, 7224:1, 7224:3, 7224:5, 7224:9, 7225:17, 7225:24, 7231:20, 7241:20, 7285:13, 7301:22, 7301:25, 7302:9, 7302:11, 7302:12, 7302:14, 7305:8, 7314:15, 7340:4, 7342:2
**intention** [1] - 7365:24
**intentional** [1] - 7293:20
**intentions** [1] - 7285:3
**interacted** [1] - 7330:15
**interaction** [1] - 7304:4
**interested** [1] - 7351:24
**interesting** [3] - 7292:23, 7294:3, 7363:20
**interestingly** [1] - 7183:24
**interfere** [1] - 7346:7
**interfered** [1] - 7256:7
**interior** [1] - 7282:9
**Internet** [2] - 7269:9, 7269:13
**interpret** [1] - 7367:11
**interpreted** [2] - 7280:6, 7363:17
**interpreting** [2] - 7316:13, 7367:3
**interrupt** [1] - 7350:1
**interrupting** [1] - 7287:6
**interspersed** [1] - 7176:4
**introduce** [20] - 7200:16, 7247:3, 7249:5, 7262:16, 7311:14, 7311:16, 7313:3, 7343:22, 7344:14, 7344:23, 7346:10, 7346:12, 7349:19, 7358:11, 7378:3, 7379:16, 7380:18, 7380:21, 7391:17
**introduced** [7] - 7184:5, 7220:25, 7222:2, 7248:25, 7258:17, 7315:10,

7337:16
**introducing** [5] - 7200:8, 7250:12, 7251:1, 7251:4, 7357:8
**investigation** [2] - 7316:3, 7368:2
**investigator** [3] - 7253:23, 7344:19
**investigators** [1] - 7344:20
**invited** [3] - 7204:23, 7246:2, 7352:2
**inviting** [1] - 7260:10
**involve** [3] - 7261:22, 7261:23, 7357:4
**involved** [4] - 7221:14, 7229:12, 7268:20, 7278:5, 7329:5, 7346:16
**involvement** [3] - 7199:25, 7200:20, 7382:21
**involving** [3] - 7222:18, 7236:17, 7311:2
**irrelevant** [4] - 7253:1, 7260:3, 7311:13, 7352:19
**isolated** [1] - 7307:13
**issue** [55] - 7188:4, 7192:12, 7201:13, 7201:14, 7216:17, 7216:19, 7225:21, 7228:4, 7268:24, 7276:22, 7277:1, 7277:14, 7283:18, 7285:20, 7295:17, 7299:11, 7299:22, 7302:1, 7313:5, 7315:16, 7323:19, 7330:17, 7331:2, 7331:12, 7331:25, 7333:24, 7337:23, 7360:1, 7360:9, 7360:23, 7361:2, 7361:6, 7361:24, 7362:1, 7363:3, 7363:9, 7370:10, 7371:13, 7371:14, 7373:2, 7373:7, 7374:5, 7375:4, 7375:7, 7375:11, 7379:10, 7379:15, 7384:19, 7385:5, 7385:9, 7385:22, 7386:11, 7390:7, 7390:8
**issued** [2] - 7362:5, 7362:18

**issues** [11] - 7191:17, 7229:9, 7243:18, 7251:20, 7314:12, 7324:20, 7345:22, 7346:1, 7356:10, 7362:17, 7379:12
**item** [5] - 7199:24, 7282:23, 7348:24
**items** [6] - 7178:5, 7196:11, 7196:23, 7346:5, 7346:6, 7377:19
**itself** [7] - 7183:11, 7185:9, 7198:17, 7255:7, 7275:25, 7276:9, 7325:4
**IV** [1] - 7172:19

## J

**J-Bone** [1] - 7213:2
**jail** [1] - 7357:23
**Jake** [6] - 7230:1, 7317:13, 7318:25, 7319:11, 7320:15, 7364:1
**January** [47] - 7200:12, 7200:18, 7209:19, 7210:8, 7211:9, 7211:12, 7211:13, 7211:21, 7215:7, 7215:14, 7216:14, 7235:16, 7235:21, 7235:23, 7239:21, 7241:13, 7245:12, 7256:24, 7259:7, 7260:21, 7260:25, 7261:14, 7261:24, 7265:9, 7265:17, 7265:18, 7266:3, 7275:25, 7284:25, 7304:6, 7312:3, 7312:7, 7317:12, 7325:1, 7328:22, 7329:19, 7330:13, 7331:4, 7335:9, 7335:13, 7340:17, 7349:2, 7364:6, 7368:22, 7371:3
**Jason** [2] - 7172:11, 7174:7
**Jaurequi** [6] - 7173:8, 7174:12, 7269:19, 7313:17, 7351:21, 7391:13
**JAUREGUI** [28] - 7173:8, 7263:1, 7263:5, 7264:11, 7264:15, 7277:4,

7414

7277:6, 7277:10, 7277:13, 7277:20, 7281:17, 7281:22, 7282:5, 7313:17, 7351:21, 7352:25, 7353:3, 7353:5, 7353:12, 7353:16, 7353:19, 7353:22, 7369:23, 7391:13, 7392:2, 7392:4, 7392:9, 7393:7
**Jeezy** [2] - 7212:20, 7219:22
**Jefe** [1] - 7334:11
**Jencks** [1] - 7389:22
**Jeremy** [4] - 7206:2, 7292:19, 7366:10, 7371:7
**job** [3] - 7185:22, 7185:23, 7211:18
**Joe** [1] - 7271:25
**John** [2] - 7172:19, 7205:22
**Johnny** [5] - 7205:21, 7319:13, 7319:15, 7364:4, 7364:10
**join** [5] - 7198:22, 7205:10, 7338:11, 7354:9, 7354:13
**joined** [2] - 7329:13, 7329:24
**joining** [1] - 7339:4
**joke** [1] - 7225:4
**jokes** [1] - 7273:16
**Joseph** [1] - 7174:4
**Judge** [40] - 7175:21, 7183:24, 7197:9, 7220:6, 7227:1, 7227:2, 7229:6, 7230:6, 7230:12, 7232:9, 7240:3, 7248:11, 7248:20, 7263:1, 7263:3, 7264:15, 7264:17, 7265:11, 7277:10, 7300:6, 7302:6, 7303:25, 7306:16, 7307:1, 7313:17, 7317:4, 7317:11, 7330:7, 7330:20, 7337:6, 7337:23, 7340:12, 7351:21, 7352:14, 7353:1, 7353:5, 7353:10, 7353:13, 7387:6
**judge** [15] - 7179:20, 7185:24, 7196:9, 7212:10, 7228:6, 7265:3, 7277:4, 7299:9, 7303:2,

7351:23, 7355:3, 7369:23, 7378:23, 7391:13, 7393:1
**JUDGE** [1] - 7172:9
**Juggernaut** [1] - 7213:3
**July** [1] - 7281:17
**jump** [4] - 7262:14, 7262:17, 7264:8, 7298:23
**jumped** [1] - 7315:5
**jumps** [1] - 7198:21
**jurors** [1] - 7267:4
**jury** [45] - 7174:21, 7192:9, 7199:12, 7207:22, 7208:13, 7229:10, 7229:15, 7232:17, 7240:21, 7248:22, 7249:4, 7250:22, 7253:7, 7267:23, 7269:12, 7269:25, 7273:5, 7273:25, 7279:23, 7282:6, 7284:2, 7284:5, 7284:7, 7284:11, 7284:24, 7285:2, 7286:25, 7288:12, 7290:5, 7301:12, 7304:2, 7306:8, 7322:15, 7325:21, 7331:2, 7353:24, 7362:10, 7365:16, 7365:17, 7365:25, 7368:1, 7368:3, 7371:2, 7384:24, 7385:23
**JURY** [1] - 7172:8
**jury's** [1] - 7265:13
**Justice** [1] - 7379:5
**justified** [2] - 7285:2, 7383:20

## K

**K-zoo** [1] - 7337:12
**Kalamazoo** [2] - 7337:13, 7337:19
**Kate** [3] - 7286:9, 7359:16, 7361:1
**KBS** [3] - 7252:8, 7269:8, 7320:15
**KBS-Man** [3] - 7252:8, 7269:8, 7320:15
**keep** [11] - 7176:16, 7197:22, 7207:1, 7235:2, 7235:6, 7269:10, 7275:8, 7285:22, 7293:2, 7372:2, 7394:4
**Keepers** [1] - 7188:12

**keeping** [2] - 7176:22, 7324:11
**keeps** [1] - 7274:8
**KELLY** [1] - 7172:9
**KENERSON** [4] - 7390:16, 7393:16, 7393:24, 7394:3
**Kenerson** [3] - 7172:12, 7174:8, 7390:16
**key** [2] - 7211:5, 7227:16
**kicked** [2] - 7352:9, 7352:10
**kid** [2] - 7352:17, 7352:18
**kill** [3] - 7224:10, 7229:15, 7284:14
**killed** [5] - 7284:6, 7286:6, 7286:8, 7301:14, 7313:1
**killing** [1] - 7233:13
**kind** [53] - 7175:9, 7178:2, 7178:9, 7178:18, 7180:10, 7182:20, 7186:19, 7186:20, 7193:5, 7194:5, 7195:8, 7195:18, 7197:12, 7198:9, 7203:15, 7205:18, 7214:19, 7215:1, 7221:9, 7226:24, 7228:18, 7230:7, 7237:11, 7239:17, 7246:6, 7264:5, 7267:21, 7270:17, 7271:6, 7272:5, 7274:12, 7276:19, 7278:1, 7279:14, 7279:25, 7281:15, 7284:9, 7285:21, 7294:22, 7295:12, 7296:19, 7300:24, 7303:16, 7303:17, 7307:20, 7316:4, 7327:2, 7330:12, 7334:15, 7344:10, 7348:2, 7357:1, 7361:3
**kinds** [3] - 7223:2, 7236:23, 7280:6
**knife** [9] - 7326:22, 7326:24, 7327:4, 7327:8, 7328:3, 7368:22, 7368:25, 7369:4, 7369:11
**knit** [1] - 7355:3
**knives** [1] - 7369:5
**knock** [3] - 7205:13, 7253:13, 7388:1

**knocked** [1] - 7253:12
**knowing** [2] - 7389:19, 7390:3
**knowledge** [6] - 7249:21, 7282:17, 7329:3, 7329:9, 7342:2, 7345:10
**known** [3] - 7290:21, 7371:8, 7379:2
**knows** [2] - 7227:15, 7353:24
**Kuzinski** [1] - 7265:19
**Kuznetsov** [6] - 7213:8, 7230:14, 7232:7, 7322:1, 7349:1, 7366:18

## L

**laborers** [1] - 7311:2
**lady** [5] - 7253:14, 7253:16, 7352:16, 7352:22, 7353:5
**laid** [18] - 7176:20, 7192:16, 7192:20, 7195:10, 7203:20, 7205:8, 7206:23, 7207:2, 7214:22, 7225:22, 7243:18, 7248:20, 7253:22, 7258:19, 7288:4, 7326:13, 7329:5, 7350:12
**Lakes** [1] - 7173:6
**language** [7] - 7271:25, 7347:20, 7361:21, 7362:1, 7362:21, 7362:22, 7375:22
**large** [5] - 7180:8, 7180:21, 7180:22, 7207:11, 7291:5
**largely** [3] - 7209:23, 7240:2, 7268:12
**larger** [2] - 7195:18, 7359:5
**last** [43] - 7208:18, 7219:20, 7228:3, 7229:20, 7251:22, 7255:19, 7258:12, 7266:13, 7278:16, 7281:13, 7282:18, 7283:4, 7283:6, 7289:19, 7291:16, 7291:17, 7291:22, 7292:14, 7292:16, 7295:12, 7296:7, 7300:23, 7302:9, 7311:10, 7311:11, 7320:4, 7322:21,

7322:23, 7327:16, 7328:15, 7334:7, 7334:23, 7336:7, 7339:7, 7340:19, 7355:3, 7361:19, 7370:5, 7375:7, 7381:7, 7385:12
**late** [4] - 7175:21, 7360:11, 7388:20, 7389:4
**latter** [1] - 7280:24
**laughing** [1] - 7187:8
**laughter** [1] - 7316:24
**launched** [1] - 7241:17
**law** [17] - 7235:6, 7235:13, 7237:8, 7240:12, 7240:23, 7257:20, 7268:2, 7268:21, 7269:18, 7307:2, 7339:2, 7339:10, 7342:4, 7367:5, 7369:21, 7376:15, 7390:21
**LAW** [2] - 7173:5, 7173:8
**lawful** [1] - 7241:25
**laws** [1] - 7270:7
**Laws** [1] - 7345:14
**lawyer** [2] - 7345:14, 7373:17
**lawyers** [1] - 7356:5
**lay** [6] - 7182:10, 7192:4, 7192:11, 7203:19, 7206:9, 7248:15
**layers** [1] - 7347:4
**laying** [2] - 7213:25, 7389:7
**lays** [1] - 7248:11
**lead** [2] - 7200:13, 7284:4
**Lead** [1] - 7369:6
**lead-up** [1] - 7200:13
**leaders** [33] - 7199:9, 7203:11, 7203:14, 7204:4, 7205:7, 7205:11, 7205:20, 7206:19, 7206:22, 7207:4, 7207:20, 7207:23, 7208:11, 7214:13, 7217:14, 7218:12, 7218:14, 7218:18, 7235:24, 7236:3, 7236:24, 7268:4, 7274:20, 7279:8, 7290:22, 7294:11, 7294:16, 7296:10, 7303:10, 7303:13, 7303:18,

7415

7366:14, 7369:19
**leaders'** [2] - 7203:3,
7204:7
**leadership** [13] -
7198:7, 7198:9,
7198:10, 7198:13,
7199:13, 7208:2,
7208:14, 7211:24,
7217:10, 7217:24,
7239:15, 7371:6
**leadership's** [2] -
7217:23, 7238:19
**leaf** [1] - 7270:3
**leaning** [4] - 7195:19,
7205:19, 7270:18,
7290:17
**leap** [2] - 7201:4,
7201:10
**learned** [2] - 7378:14,
7378:17
**least** [37] - 7176:20,
7177:19, 7180:11,
7181:6, 7189:15,
7189:18, 7201:2,
7201:19, 7204:3,
7207:23, 7210:3,
7217:23, 7218:3,
7228:4, 7234:11,
7234:12, 7235:21,
7259:10, 7278:2,
7279:15, 7279:21,
7282:13, 7282:18,
7283:19, 7313:12,
7318:6, 7322:23,
7328:10, 7335:2,
7345:10, 7358:25,
7359:5, 7360:18,
7370:4, 7373:1,
7376:23, 7379:3
**Leatherman** [1] -
7369:1
**leaving** [1] - 7272:1
**left** [3] - 7355:9,
7384:23, 7391:24
**legal** [6] - 7174:21,
7220:8, 7275:7,
7276:6, 7294:23,
7307:22
**legally** [1] - 7220:12
**legislature** [1] -
7272:6
**legitimate** [3] -
7190:18, 7233:24,
7272:5
**legs** [2] - 7208:8,
7347:25
**Lehigh** [1] - 7349:18
**length** [2] - 7364:22,
7383:18
**lengthy** [1] - 7306:7,

7371:6
**Leo** [7] - 7213:7,
7230:14, 7232:7,
7265:19, 7322:1,
7349:1, 7366:18
**less** [4] - 7228:1,
7272:14, 7296:2,
7335:13
**lessen** [1] - 7285:8
**lessening** [1] -
7366:21
**lesser** [1] - 7334:11
**letting** [4] - 7205:14,
7346:7, 7346:12,
7347:5
**level** [3] - 7180:2,
7207:21, 7303:21
**levels** [1] - 7228:18
**leverage** [1] - 7304:19
**library** [2] - 7190:6,
7368:11
**lies** [1] - 7301:1
**light** [4] - 7182:24,
7267:1, 7304:6,
7337:20
**likely** [7] - 7181:7,
7195:3, 7247:19,
7316:8, 7360:5,
7360:9, 7388:9
**liken** [1] - 7239:7
**likewise** [1] - 7304:14
**limine** [10] - 7174:23,
7182:18, 7182:21,
7182:25, 7304:3,
7361:24, 7362:5,
7364:22, 7372:6
**limit** [1] - 7332:18
**limitation** [1] -
7392:24
**limited** [15] - 7176:9,
7260:22, 7269:21,
7294:23, 7306:10,
7315:11, 7341:8,
7347:10, 7351:15,
7361:4, 7371:19,
7387:17, 7387:18,
7388:3
**limiting** [38] - 7181:5,
7184:2, 7194:19,
7228:5, 7228:9,
7250:3, 7250:16,
7250:21, 7267:5,
7293:4, 7318:10,
7318:12, 7318:14,
7325:16, 7325:20,
7325:21, 7326:1,
7329:8, 7330:1,
7330:2, 7330:8,
7330:16, 7331:13,
7333:5, 7340:8,

7346:22, 7347:6,
7351:24, 7352:5,
7352:12, 7354:11,
7365:8, 7368:17,
7370:13, 7370:17,
7370:19, 7370:21
**line** [17] - 7231:16,
7235:2, 7235:11,
7251:22, 7252:6,
7256:3, 7305:20,
7318:7, 7331:12,
7343:1, 7370:5,
7381:18, 7382:4,
7383:22, 7385:21,
7386:6, 7390:19
**Line** [1] - 7384:12
**lines** [11] - 7179:15,
7190:4, 7197:12,
7198:15, 7212:3,
7281:13, 7294:20,
7305:11, 7305:19,
7312:22, 7326:13
**link** [1] - 7244:1
**linked** [1] - 7350:8
**linking** [1] - 7202:6
**links** [4] - 7178:14,
7240:6, 7275:25,
7281:1
**list** [19] - 7178:11,
7178:15, 7178:19,
7181:21, 7182:7,
7189:3, 7194:11,
7194:12, 7194:20,
7196:9, 7213:24,
7214:24, 7218:3,
7261:4, 7262:15,
7272:25, 7309:2,
7343:4, 7370:12
**listed** [2] - 7187:14,
7196:11
**listened** [1] - 7339:6
**listener** [5] - 7183:22,
7253:11, 7340:23,
7340:25, 7341:4
**listening** [1] - 7364:13
**literal** [1] - 7264:23
**literally** [1] - 7255:17
**litigated** [2] - 7364:22,
7372:5
**litigating** [1] - 7371:23
**live** [1] - 7306:22
**LLC** [1] - 7172:23
**lodge** [1] - 7350:18
**lodged** [1] - 7186:7
**log** [2] - 7230:15,
7230:24
**loggerheads** [1] -
7346:2
**logical** [1] - 7251:14
**logs** [1] - 7263:22

**LOL** [2] - 7185:19,
7187:7
**LOL'ing** [1] - 7185:19
**London** [1] - 7265:21
**look** [45] - 7181:22,
7183:16, 7185:16,
7186:18, 7186:23,
7187:14, 7187:22,
7195:7, 7197:4,
7201:6, 7205:19,
7221:10, 7230:12,
7243:14, 7268:16,
7269:5, 7272:16,
7274:10, 7276:21,
7277:1, 7280:3,
7280:4, 7285:12,
7287:15, 7306:12,
7325:18, 7328:6,
7332:14, 7332:16,
7334:1, 7336:18,
7344:18, 7352:25,
7358:6, 7370:16,
7377:1, 7381:14,
7387:10, 7387:13,
7392:5, 7392:15,
7393:1, 7393:11
**looked** [11] - 7195:19,
7197:16, 7228:12,
7228:15, 7228:16,
7228:22, 7267:1,
7273:16, 7311:7,
7377:3, 7393:5
**looking** [16] - 7194:1,
7194:5, 7195:15,
7213:9, 7217:9,
7217:13, 7217:21,
7227:25, 7229:4,
7299:12, 7306:21,
7338:8, 7338:9,
7353:10, 7356:18,
7393:5
**looks** [4] - 7221:9,
7244:15, 7299:9,
7355:8
**loop** [1] - 7238:14
**loose** [1] - 7295:24
**loosely** [1] - 7307:10
**lose** [1] - 7344:9
**loudly** [1] - 7321:20
**lower** [1] - 7297:17
**loyalty** [3] - 7270:4,
7270:5, 7371:5
**lucked** [1] - 7387:21
**lumps** [1] - 7181:25
**lunch** [5] - 7186:3,
7195:18, 7237:18,
7237:21, 7244:8
**Luncheon** [1] - 7238:1

**M**

**machine** [1] - 7173:18
**mail** [2] - 7223:6,
7223:8
**main** [10] - 7229:2,
7231:3, 7297:2,
7297:23, 7298:9,
7317:12, 7317:19,
7323:21, 7328:21,
7329:4
**Main** [2] - 7253:12,
7253:13
**majority** [1] - 7288:7
**makeup** [1] - 7350:23
**Mama** [2] - 7325:12,
7368:14
**Man** [3] - 7252:8,
7269:8, 7320:15
**managed** [1] - 7244:1
**manner** [3] - 7220:13,
7268:3, 7380:1
**manual** [2] - 7337:25,
7338:1
**manufactured** [1] -
7340:18
**March** [1] - 7358:4
**march** [1] - 7265:17
**marched** [2] - 7210:4,
7241:15
**marching** [5] -
7227:19, 7227:23,
7227:24, 7245:12,
7276:8
**mark** [1] - 7342:21
**marked** [1] - 7198:10
**marshaling** [1] -
7213:15
**master** [1] - 7353:20
**matching** [1] - 7328:5
**material** [5] - 7247:3,
7304:3, 7347:21
**materiality** [1] -
7242:10
**matter** [33] - 7184:5,
7196:3, 7215:23,
7216:3, 7222:3,
7240:23, 7246:11,
7246:12, 7248:13,
7248:24, 7248:25,
7249:6, 7249:11,
7252:12, 7252:22,
7253:1, 7253:9,
7254:8, 7257:10,
7284:22, 7295:5,
7344:23, 7356:14,
7360:4, 7365:2,
7365:10, 7381:21,
7381:22, 7381:23,
7383:6, 7384:25,

7416

7385:6
**Matter** [3] - 7174:2,
7238:3, 7316:21
**matters** [4] - 7174:21,
7213:14, 7326:23,
7368:24
**McCullough** [3] -
7172:11, 7174:7,
7219:21
**MCCULLOUGH** [3] -
7361:14, 7386:21,
7393:20
**MCGUIRE** [1] -
7172:20
**MD** [1] - 7173:3
**mean** [126] - 7180:4,
7181:16, 7182:8,
7182:17, 7187:16,
7187:23, 7189:16,
7192:2, 7196:17,
7197:14, 7200:2,
7200:3, 7201:4,
7204:9, 7214:5,
7215:24, 7216:5,
7216:20, 7221:24,
7222:9, 7222:11,
7223:20, 7226:2,
7226:3, 7228:5,
7232:23, 7234:15,
7234:21, 7235:17,
7235:23, 7243:14,
7244:12, 7247:23,
7256:8, 7256:10,
7258:19, 7260:12,
7266:25, 7268:20,
7269:7, 7269:20,
7270:12, 7270:18,
7272:10, 7272:14,
7277:1, 7277:7,
7277:8, 7277:12,
7278:3, 7278:4,
7280:13, 7280:21,
7281:20, 7283:17,
7289:25, 7290:1,
7290:9, 7291:19,
7293:7, 7295:6,
7295:7, 7295:11,
7295:12, 7295:15,
7296:18, 7296:21,
7302:1, 7305:19,
7305:25, 7306:3,
7312:13, 7313:9,
7313:16, 7313:25,
7315:17, 7318:8,
7318:19, 7319:6,
7321:7, 7322:18,
7322:21, 7323:11,
7325:18, 7326:6,
7328:6, 7328:7,
7332:7, 7332:14,

7332:16, 7332:21,
7334:3, 7334:4,
7334:19, 7336:2,
7341:25, 7343:19,
7344:19, 7345:4,
7345:24, 7346:8,
7346:21, 7346:22,
7349:25, 7350:12,
7350:22, 7351:2,
7357:24, 7358:7,
7358:25, 7360:21,
7360:22, 7361:7,
7361:10, 7370:16,
7383:12, 7387:2,
7387:9, 7387:12,
7388:14, 7389:13,
7392:1, 7392:23,
7393:4
**meaning** [3] - 7295:7,
7324:25, 7367:7
**means** [27] - 7208:10,
7230:25, 7232:3,
7241:9, 7246:8,
7254:17, 7257:20,
7258:14, 7294:7,
7294:12, 7295:9,
7299:18, 7303:13,
7304:4, 7309:11,
7315:17, 7316:1,
7336:3, 7337:19,
7338:22, 7340:7,
7345:5, 7345:7,
7345:8, 7367:16,
7367:24, 7368:3
**meant** [5] - 7200:6,
7224:25, 7264:15,
7316:13, 7366:1
**media** [2] - 7206:24,
7264:16
**meet** [1] - 7274:15
**meeting** [3] - 7206:9,
7246:3, 7268:9
**meetings** [2] -
7209:21, 7379:6
**meets** [1] - 7239:7
**member** [12] -
7205:16, 7207:6,
7208:1, 7217:13, 7246:23,
7249:18, 7266:21,
7266:22, 7274:20,
7289:5, 7347:2
**members** [33] -
7198:14, 7198:18,
7201:22, 7203:3,
7204:2, 7204:22,
7205:2, 7205:9,
7206:14, 7206:21,
7208:6, 7208:13,
7212:23, 7215:15,

7217:13, 7229:16,
7230:18, 7233:13,
7233:14, 7267:23,
7270:4, 7270:5,
7271:21, 7273:14,
7279:5, 7279:8,
7285:1, 7294:11,
7294:25, 7296:11,
7364:13, 7369:10,
7369:20
**members'** [2] -
7202:25, 7204:1
**membership** [2] -
7206:9, 7217:9
**memory** [2] - 7216:23,
7385:1
**men** [4] - 7209:13,
7213:15, 7236:23,
7284:24
**Mental** [1] - 7364:20
**mental** [24] - 7177:4,
7196:25, 7199:2,
7221:16, 7221:18,
7221:19, 7222:15,
7222:16, 7222:19,
7222:20, 7222:24,
7225:7, 7225:8,
7225:10, 7323:13,
7323:15, 7323:23,
7338:21, 7339:11,
7339:12, 7339:16,
7339:24, 7340:10,
7368:16
**mention** [5] - 7208:18,
7213:17, 7266:17,
7306:18, 7315:4
**mentioned** [5] -
7252:9, 7268:5,
7275:9, 7275:10,
7278:10
**merely** [2] - 7241:4,
7383:8
**merits** [1] - 7190:10
**message** [47] -
7187:3, 7187:4,
7187:6, 7187:8,
7188:16, 7188:22,
7197:25, 7207:10,
7207:16, 7216:25,
7229:5, 7229:18,
7229:20, 7229:25,
7230:5, 7247:6,
7257:4, 7292:16,
7299:18, 7309:10,
7318:1, 7323:22,
7325:4, 7343:4,
7345:6, 7345:8,
7352:22, 7356:25,
7358:18, 7366:23,
7369:2, 7369:9,

7369:14, 7373:16,
7373:19, 7373:23,
7373:24, 7378:5,
7379:24, 7380:2,
7390:11, 7391:16,
7391:21, 7392:6
**messaged** [2] -
7374:17, 7374:18
**messages** [81] -
7176:11, 7181:25,
7182:3, 7187:2,
7187:5, 7189:6,
7198:17, 7200:17,
7207:3, 7207:7,
7211:16, 7212:16,
7217:6, 7229:4,
7231:3, 7236:19,
7243:5, 7243:6,
7248:24, 7249:1,
7249:3, 7249:17,
7249:23, 7250:1,
7256:2, 7257:3,
7273:19, 7276:5,
7280:6, 7281:5,
7281:18, 7281:23,
7282:10, 7282:11,
7282:12, 7283:9,
7290:20, 7292:4,
7303:9, 7303:12,
7311:12, 7311:17,
7325:9, 7326:5,
7336:9, 7343:1,
7343:2, 7343:15,
7344:7, 7344:22,
7349:11, 7349:13,
7349:15, 7352:16,
7354:23, 7355:21,
7357:16, 7357:18,
7358:10, 7358:12,
7367:9, 7372:18,
7373:12, 7373:25,
7374:7, 7377:12,
7378:2, 7378:4,
7380:3, 7388:21,
7390:2, 7391:20,
7391:24, 7391:25
**messaging** [1] -
7243:5
**met** [3] - 7227:10,
7256:4, 7276:9
**metaphors** [1] -
7307:17
**metaphysical** [2] -
7294:4, 7307:20
**Metcalf** [3] - 7173:11,
7174:12, 7313:19
**METCALF** [7] -
7173:12, 7266:12,
7308:14, 7308:16,
7313:19, 7354:8

**mete** [1] - 7356:11
**Miami** [1] - 7173:6
**mid** [2] - 7198:9,
7361:5
**mid-tier** [1] - 7198:9
**middle** [6] - 7282:12,
7300:18, 7320:1,
7321:1, 7372:12,
7372:24
**midnight** [1] - 7200:12
**might** [32] - 7181:11,
7197:15, 7205:18,
7207:5, 7211:17,
7214:18, 7216:1,
7216:17, 7223:25,
7233:21, 7234:5,
7237:4, 7239:2,
7239:7, 7269:1,
7275:7, 7283:21,
7302:19, 7306:4,
7307:18, 7340:7,
7346:21, 7346:22,
7362:9, 7374:7,
7374:9, 7384:20,
7385:2, 7385:20,
7394:5
**MILLER** [1] - 7394:16
**Miller** [2] - 7173:15,
7394:21
**million** [2] - 7317:14,
7364:1
**mind** [43] - 7181:1,
7204:2, 7204:5,
7210:3, 7210:21,
7218:18, 7223:7,
7223:9, 7223:11,
7223:14, 7224:3,
7224:12, 7224:13,
7225:17, 7229:8,
7230:7, 7241:11,
7250:13, 7257:4,
7257:9, 7257:16,
7260:5, 7274:8,
7275:24, 7285:3,
7301:22, 7307:12,
7307:13, 7327:7,
7338:22, 7338:24,
7339:2, 7339:3,
7339:9, 7342:7,
7365:3, 7365:11,
7365:16, 7365:23,
7366:3, 7366:22,
7374:10
**minds** [2] - 7307:5,
7342:11
**Minecraft** [12] -
7230:15, 7230:16,
7230:19, 7230:25,
7232:3, 7315:16,
7324:20, 7324:25,

7417

7348:1, 7367:1, 7367:6, 7367:14

**minimal** [2] - 7313:7, 7313:15

**minimally** [3] - 7257:5, 7347:3, 7349:10

**minimize** [1] - 7284:11

**minimum** [4] - 7254:4, 7284:1, 7343:14, 7347:5

**Ministry** [36] - 7198:7, 7198:12, 7199:9, 7201:22, 7203:1, 7204:21, 7208:16, 7208:24, 7209:4, 7209:20, 7210:13, 7211:10, 7215:5, 7231:2, 7245:23, 7246:16, 7246:19, 7246:23, 7273:21, 7274:23, 7288:5, 7288:11, 7289:17, 7290:22, 7294:6, 7311:10, 7311:21, 7317:12, 7317:19, 7323:20, 7325:2, 7328:21, 7329:4, 7346:9, 7347:6, 7366:14

**Mink** [1] - 7173:2

**minority** [1] - 7288:10

**minute** [7] - 7238:16, 7255:17, 7278:10, 7340:19, 7352:11, 7381:6, 7382:1

**minutes** [7] - 7179:25, 7195:22, 7195:25, 7216:24, 7316:15, 7316:18, 7368:23

**mis** [1] - 7187:10

**mislead** [2] - 7192:9, 7284:2

**misleading** [2] - 7192:8, 7286:25

**misreads** [1] - 7183:13

**miss** [2] - 7186:23, 7344:9

**missed** [3] - 7203:23, 7316:23, 7338:14

**missing** [7] - 7187:17, 7189:4, 7235:25, 7281:18, 7281:23, 7303:21, 7364:18

**mission** [5] - 7205:4, 7205:7, 7205:24, 7206:5, 7213:15

**mistake** [1] - 7342:3

**misunderstood** [1] - 7244:6

**mixing** [1] - 7328:5

**mobilizing** [1] - 7273:22

**model** [1] - 7261:17

**modest** [1] - 7180:14

**moment** [9] - 7180:3, 7219:18, 7225:15, 7262:7, 7339:19, 7342:20, 7346:7, 7348:5, 7384:9

**moments** [1] - 7179:22

**Monday** [1] - 7172:6

**money** [4] - 7208:8, 7233:4, 7265:24

**monitoring** [1] - 7203:16

**monitors** [1] - 7237:13

**Montana** [2] - 7334:18, 7335:25

**month** [2] - 7355:7, 7389:23

**months** [5] - 7299:16, 7299:17, 7340:10, 7340:16, 7340:20

**months-long** [1] - 7340:16

**Monument** [1] - 7241:14

**mood** [1] - 7222:22

**Moore** [2] - 7172:13, 7174:8

**moot** [2] - 7337:24, 7338:10

**mop** [1] - 7197:22

**morning** [7] - 7174:16, 7190:12, 7190:18, 7200:12, 7209:19, 7241:15, 7361:4

**morons** [2] - 7209:6, 7209:8

**MOSD** [25] - 7204:2, 7204:6, 7215:13, 7218:12, 7226:23, 7226:25, 7227:13, 7229:2, 7230:18, 7233:23, 7246:15, 7264:25, 7265:6, 7268:9, 7292:7, 7295:2, 7307:11, 7347:13, 7349:21, 7352:7, 7354:22, 7369:10

**most** [10] - 7195:10, 7202:3, 7207:24, 7216:8, 7227:2, 7233:9, 7280:23, 7357:4, 7391:2

**mostly** [1] - 7281:13

**mothers** [1] - 7310:14

**motion** [10] - 7174:23, 7176:19, 7176:20, 7182:21, 7182:24, 7336:12, 7363:11, 7374:19, 7376:11, 7381:6

**motions** [12] - 7182:18, 7182:25, 7242:22, 7261:7, 7304:2, 7342:22, 7361:23, 7362:4, 7364:22, 7372:6, 7375:19

**motive** [3] - 7223:1, 7225:17, 7342:3

**motives** [1] - 7320:24

**mountain** [1] - 7376:19

**mouth** [2] - 7291:10, 7361:12

**move** [8] - 7243:20, 7244:17, 7267:14, 7287:8, 7346:16, 7355:12, 7356:13, 7378:22

**moved** [1] - 7223:8

**moving** [4] - 7314:2, 7362:14, 7363:1, 7363:25

**MR** [350] - 7175:4, 7175:6, 7175:16, 7175:21, 7176:8, 7176:25, 7177:4, 7178:21, 7178:24, 7179:9, 7179:20, 7181:13, 7189:20, 7193:9, 7193:14, 7193:17, 7193:19, 7196:9, 7196:19, 7197:7, 7197:20, 7199:21, 7200:5, 7200:15, 7201:15, 7201:18, 7201:21, 7202:9, 7202:12, 7202:15, 7202:19, 7204:17, 7208:5, 7210:25, 7212:4, 7212:8, 7212:12, 7212:16, 7213:5, 7214:8, 7214:16, 7215:1, 7215:4, 7215:11, 7215:13, 7215:20, 7216:4, 7216:8, 7216:14, 7216:22, 7216:24, 7218:6, 7218:9, 7218:24, 7219:1, 7219:12, 7219:14, 7219:18, 7219:20, 7220:6,

7221:2, 7221:5, 7221:8, 7221:22, 7222:5, 7222:8, 7222:13, 7222:22, 7223:4, 7223:18, 7224:2, 7225:20, 7226:13, 7228:11, 7228:24, 7230:3, 7230:22, 7231:10, 7231:15, 7231:23, 7232:1, 7232:11, 7232:22, 7233:3, 7233:6, 7233:12, 7234:8, 7234:16, 7234:23, 7235:11, 7235:19, 7235:22, 7236:10, 7236:14, 7237:11, 7237:13, 7238:12, 7238:18, 7240:2, 7251:9, 7263:1, 7263:5, 7264:11, 7264:15, 7266:12, 7267:17, 7270:25, 7271:13, 7271:15, 7271:17, 7271:19, 7271:21, 7272:9, 7272:23, 7274:7, 7274:18, 7276:14, 7277:4, 7277:6, 7277:10, 7277:13, 7277:20, 7277:24, 7278:8, 7278:22, 7278:24, 7279:1, 7280:11, 7280:15, 7280:19, 7281:4, 7281:8, 7281:11, 7281:17, 7281:22, 7282:5, 7282:7, 7282:21, 7283:6, 7283:13, 7283:23, 7284:4, 7284:14, 7284:18, 7285:19, 7286:19, 7286:22, 7287:2, 7287:4, 7287:6, 7287:8, 7287:11, 7287:20, 7287:22, 7287:24, 7288:2, 7288:17, 7288:19, 7288:24, 7289:13, 7289:22, 7290:14, 7290:16, 7291:2, 7292:2, 7292:8, 7292:16, 7292:19, 7293:9, 7293:14, 7293:17, 7293:24, 7294:9, 7295:21, 7296:6, 7296:23, 7297:6, 7297:11, 7297:14, 7297:17, 7297:19,

7297:23, 7298:3, 7298:5, 7298:8, 7298:20, 7298:22, 7300:12, 7300:16, 7300:18, 7300:21, 7301:10, 7302:6, 7302:21, 7302:24, 7303:4, 7303:6, 7303:25, 7305:24, 7306:1, 7306:3, 7306:16, 7308:1, 7308:3, 7308:5, 7308:7, 7308:14, 7308:16, 7313:17, 7313:19, 7317:4, 7317:9, 7317:11, 7318:11, 7318:18, 7318:22, 7319:2, 7319:12, 7319:15, 7320:5, 7320:8, 7320:14, 7320:21, 7321:9, 7321:13, 7321:22, 7322:6, 7322:14, 7322:25, 7323:5, 7323:14, 7323:17, 7323:19, 7324:6, 7324:13, 7324:16, 7324:19, 7324:22, 7325:25, 7326:17, 7327:22, 7328:17, 7329:1, 7329:8, 7329:14, 7329:16, 7329:25, 7330:4, 7330:7, 7330:20, 7330:24, 7331:9, 7331:17, 7331:19, 7331:21, 7332:6, 7332:11, 7332:13, 7332:15, 7332:20, 7332:22, 7333:1, 7333:4, 7333:7, 7334:7, 7334:18, 7334:23, 7335:7, 7335:16, 7336:4, 7336:19, 7336:25, 7337:3, 7337:6, 7337:12, 7337:23, 7338:7, 7338:10, 7339:20, 7340:1, 7341:15, 7341:18, 7341:20, 7341:22, 7341:24, 7342:9, 7348:6, 7349:25, 7351:21, 7352:25, 7353:2, 7353:3, 7353:5, 7353:11, 7353:12, 7353:16, 7353:19, 7353:22, 7354:8, 7355:3, 7359:4, 7359:9, 7360:1,

7418

7360:15, 7360:25,
7361:14, 7361:18,
7368:8, 7368:14,
7369:23, 7370:7,
7370:12, 7370:24,
7371:11, 7372:5,
7373:7, 7373:13,
7373:20, 7374:2,
7374:5, 7374:22,
7374:24, 7375:9,
7381:5, 7381:12,
7382:12, 7382:21,
7382:24, 7383:12,
7384:8, 7384:9,
7384:18, 7386:21,
7387:4, 7387:16,
7388:6, 7388:8,
7388:12, 7390:16,
7391:13, 7392:2,
7392:4, 7392:9,
7393:7, 7393:16,
7393:20, 7393:24,
7394:3

**MS** [120] - 7177:9,
7177:12, 7181:16,
7183:4, 7184:21,
7185:17, 7185:21,
7186:11, 7186:14,
7188:1, 7190:24,
7191:15, 7191:19,
7203:22, 7204:9,
7204:13, 7215:10,
7242:14, 7242:19,
7242:22, 7243:1,
7243:3, 7243:10,
7243:15, 7243:21,
7244:6, 7244:12,
7244:19, 7244:23,
7245:1, 7250:6,
7250:11, 7250:16,
7250:24, 7251:6,
7251:8, 7251:12,
7252:1, 7252:4,
7252:8, 7252:20,
7252:25, 7253:5,
7253:18, 7254:10,
7254:16, 7254:20,
7254:24, 7255:1,
7255:21, 7256:15,
7256:23, 7257:8,
7257:12, 7257:15,
7258:3, 7258:13,
7258:21, 7258:23,
7259:1, 7259:6,
7259:13, 7260:3,
7260:8, 7260:14,
7260:19, 7261:20,
7262:6, 7262:21,
7282:22, 7289:2,
7289:5, 7308:15,
7308:17, 7308:19,

7309:5, 7309:8,
7311:25, 7312:12,
7312:14, 7312:23,
7342:19, 7343:19,
7343:21, 7343:24,
7344:3, 7344:5,
7345:18, 7345:21,
7346:1, 7346:25,
7348:9, 7350:5,
7350:22, 7351:9,
7355:18, 7356:3,
7356:8, 7357:11,
7357:19, 7357:22,
7358:13, 7358:17,
7358:22, 7375:1,
7375:6, 7375:12,
7375:17, 7376:15,
7379:10, 7379:25,
7380:6, 7380:8,
7380:12, 7380:16,
7380:25, 7388:16,
7388:18, 7389:4,
7389:17

**Mulroe** [33] - 7172:12,
7174:8, 7189:20,
7196:5, 7197:11,
7203:25, 7204:16,
7220:7, 7220:23,
7221:15, 7221:16,
7224:4, 7227:17,
7227:19, 7230:13,
7230:15, 7245:6,
7295:23, 7296:4,
7300:24, 7301:16,
7301:18, 7303:9,
7307:18, 7315:7,
7337:19, 7361:12,
7370:6, 7370:11,
7371:25, 7385:4,
7385:10, 7389:12

**MULROE** [136] -
7175:16, 7176:8,
7176:25, 7177:4,
7189:20, 7197:20,
7199:21, 7200:5,
7200:15, 7201:15,
7201:18, 7201:21,
7202:9, 7202:12,
7202:15, 7202:19,
7204:17, 7208:5,
7210:25, 7212:4,
7212:8, 7212:12,
7212:16, 7213:5,
7214:8, 7214:16,
7215:1, 7215:4,
7215:11, 7215:13,
7215:20, 7216:4,
7216:8, 7216:14,
7216:22, 7216:24,
7218:6, 7218:9,
7218:24, 7219:1,

7219:12, 7219:14,
7219:18, 7219:20,
7251:9, 7267:17,
7270:25, 7271:13,
7271:15, 7271:17,
7271:19, 7271:21,
7272:9, 7272:23,
7274:7, 7274:18,
7276:14, 7277:24,
7278:8, 7278:22,
7278:24, 7279:1,
7280:11, 7280:15,
7280:19, 7281:4,
7281:8, 7281:11,
7282:7, 7282:21,
7283:6, 7283:13,
7283:23, 7284:4,
7284:14, 7284:18,
7285:19, 7286:19,
7286:22, 7287:2,
7287:4, 7287:6,
7287:8, 7287:11,
7287:20, 7287:22,
7287:24, 7288:2,
7288:17, 7288:19,
7288:24, 7289:13,
7289:22, 7290:14,
7290:16, 7291:2,
7292:2, 7292:8,
7292:16, 7292:19,
7293:9, 7293:14,
7293:17, 7293:24,
7294:9, 7295:21,
7296:6, 7349:25,
7353:2, 7353:11,
7359:4, 7359:9,
7360:1, 7360:15,
7360:25, 7361:18,
7368:8, 7368:14,
7370:7, 7370:12,
7370:24, 7371:11,
7372:5, 7373:7,
7373:13, 7373:20,
7374:2, 7374:5,
7382:12, 7382:21,
7382:24, 7383:12,
7384:9, 7387:4,
7388:8, 7388:12

**multiple** [11] - 7205:8,
7239:11, 7239:20,
7250:12, 7309:19,
7338:17, 7347:4,
7376:9, 7376:20,
7389:2

**multitude** [2] - 7248:3,
7250:6

**murdered** [1] - 7313:1

**music** [1] - 7208:9

**must** [2] - 7243:11,
7266:6

**mystery** [2] - 7258:20

# N

**N-word** [6] - 7179:11,
7325:8, 7336:9,
7347:22, 7351:6,
7354:4

**Nadia** [2] - 7172:13,
7174:8

**name** [5] - 7191:4,
7208:16, 7229:23,
7349:1, 7353:25

**named** [3] - 7198:6,
7220:21, 7229:21

**narrow** [4] - 7177:17,
7183:3, 7372:20,
7388:14

**narrowed** [2] -
7261:13, 7390:7

**narrowly** [3] - 7223:3,
7294:23, 7366:2

**nasty** [1] - 7332:4

**nature** [3] - 7237:9,
7359:19, 7386:19

**Nayib** [2] - 7173:4,
7174:11

**NAYIB** [1] - 7173:5

**Nazi** [1] - 7205:19

**Nazi-leaning** [1] -
7205:19

**nearly** [2] - 7371:17,
7372:25

**necessarily** [3] -
7247:10, 7276:16,
7332:2

**necessary** [4] -
7274:2, 7275:6,
7283:11, 7368:17

**need** [48] - 7177:21,
7184:2, 7184:19,
7192:18, 7197:21,
7201:10, 7203:8,
7206:15, 7208:9,
7209:2, 7214:1,
7238:23, 7251:18,
7257:23, 7257:24,
7258:1, 7260:12,
7274:13, 7290:5,
7290:6, 7292:3,
7303:22, 7308:25,
7311:17, 7312:4,
7312:11, 7314:23,
7335:2, 7335:6,
7335:10, 7335:13,
7335:23, 7335:24,
7344:18, 7345:15,
7346:6, 7347:5,
7359:21, 7368:9,
7370:14, 7370:22,

7374:19, 7388:9,
7393:12, 7393:22,
7393:23

**needed** [3] - 7205:3,
7351:3, 7370:2

**needs** [7] - 7190:15,
7285:13, 7305:8,
7372:24, 7373:3,
7390:4

**Negative** [1] - 7326:25

**negative** [1] - 7369:7

**net** [1] - 7242:7

**neutral** [7] - 7234:25,
7235:4, 7235:12,
7235:22, 7238:21,
7239:1, 7267:21

**never** [15] - 7227:4,
7227:5, 7227:10,
7229:24, 7231:18,
7245:2, 7248:2,
7313:24, 7314:3,
7314:8, 7317:18,
7319:5, 7329:6,
7358:5, 7377:2

**new** [11] - 7176:24,
7176:25, 7226:11,
7228:20, 7288:13,
7290:24, 7381:21,
7381:22, 7381:23

**New** [4] - 7172:18,
7172:24, 7173:13,
7352:7

**next** [34] - 7193:19,
7200:24, 7201:18,
7215:20, 7216:10,
7218:3, 7218:20,
7218:21, 7219:6,
7232:23, 7236:1,
7255:9, 7256:18,
7258:9, 7267:14,
7272:1, 7272:25,
7274:16, 7277:22,
7280:16, 7281:2,
7281:4, 7283:16,
7291:14, 7319:20,
7319:23, 7321:16,
7324:8, 7325:10,
7326:17, 7328:17,
7353:8, 7369:2,
7373:16

**nexus** [4] - 7338:25,
7341:1, 7341:4,
7341:5

**Nicholas** [2] -
7172:16, 7174:9

**Nick** [5] - 7275:9,
7298:25, 7299:10,
7309:5, 7378:22

**night** [5] - 7209:3,
7223:21, 7241:12,

7419

7289:19, 7300:23
**NJ** [3] - 7173:15,
7394:16, 7394:21
**NJ-CCR** [3] - 7173:15,
7394:16, 7394:21
**Noble** [8] - 7206:1,
7215:15, 7292:16,
7321:25, 7322:3,
7366:8, 7366:10,
7369:6
**noise** [2] - 7253:15,
7253:16
**non** [18] - 7192:1,
7199:4, 7202:1,
7202:20, 7203:23,
7220:14, 7221:12,
7231:1, 7268:1,
7269:1, 7275:7,
7319:4, 7321:2,
7321:22, 7321:23,
7322:2, 7322:3,
7369:21
**non-co-conspirators**
[3] - 7321:2, 7321:23,
7322:2
**non-defendant** [1] -
7220:14
**non-hearsay** [6] -
7199:4, 7202:1,
7202:20, 7203:23,
7269:1, 7319:4
**non-Telegram** [1] -
7192:1
**non-tools** [2] -
7321:22, 7322:3
**non-truth** [2] -
7221:12, 7231:1
**non-violent** [3] -
7268:1, 7275:7,
7369:21
**none** [6] - 7202:1,
7208:10, 7229:3,
7247:2, 7302:2,
7388:22
**nonstarter** [1] -
7278:10
**NORDEAN** [1] -
7172:4
**Nordean** [67] - 7174:3,
7174:13, 7180:20,
7194:9, 7196:4,
7216:10, 7216:25,
7217:17, 7217:20,
7220:5, 7220:17,
7227:4, 7227:7,
7227:10, 7227:13,
7227:25, 7228:24,
7229:4, 7229:24,
7230:4, 7231:3,
7232:2, 7232:6,

7238:4, 7238:7,
7276:1, 7276:9,
7299:15, 7299:18,
7299:20, 7301:11,
7316:22, 7317:1,
7317:17, 7317:18,
7317:22, 7318:13,
7318:15, 7323:21,
7323:24, 7325:4,
7325:16, 7329:11,
7329:19, 7329:20,
7330:14, 7331:13,
7348:6, 7355:5,
7355:9, 7366:4,
7381:9, 7381:12,
7381:16, 7381:19,
7381:24, 7382:2,
7382:14, 7385:1,
7385:5, 7385:7,
7385:23, 7386:19,
7387:20
**Nordean's** [9] -
7227:3, 7227:11,
7329:3, 7329:5,
7347:18, 7361:23,
7383:10, 7384:22,
7386:25
**normal** [1] - 7242:9
**normally** [1] - 7231:16
**Norman** [2] - 7172:22,
7174:10
**Nos** [1] - 7172:2
**note** [17] - 7178:15,
7202:12, 7210:2,
7215:14, 7218:10,
7238:20, 7241:5,
7271:10, 7282:7,
7299:1, 7338:3,
7338:13, 7361:23,
7367:2, 7370:24,
7383:23, 7388:9
**noted** [4] - 7196:13,
7198:1, 7228:25,
7314:5
**notes** [1] - 7394:18
**nothing** [20] - 7218:2,
7252:16, 7259:9,
7265:16, 7265:25,
7266:1, 7266:3,
7282:2, 7320:5,
7320:6, 7320:8,
7320:9, 7339:17,
7364:5, 7364:11,
7386:2, 7386:4
**notice** [6] - 7188:6,
7191:10, 7203:15,
7234:24, 7394:4,
7394:5
**noticed** [4] - 7382:8,
7385:20, 7386:6,

7386:7
**notion** [6] - 7245:10,
7245:11, 7273:11,
7349:20, 7363:21,
7369:4
**novel** [1] - 7363:24
**November** [27] -
7190:8, 7261:10,
7278:13, 7282:24,
7287:18, 7288:9,
7298:10, 7299:2,
7299:24, 7309:10,
7313:22, 7331:24,
7333:9, 7333:21,
7334:24, 7340:6,
7362:4, 7372:8,
7375:21, 7375:23,
7375:25, 7376:1,
7376:3, 7388:20,
7389:4, 7389:5,
7389:20
**nowhere** [1] - 7236:4
**nuances** [2] -
7372:18, 7373:23
**number** [39] - 7176:9,
7176:23, 7178:13,
7178:14, 7186:21,
7193:14, 7198:17,
7202:6, 7202:15,
7203:10, 7207:7,
7212:9, 7212:13,
7214:17, 7215:10,
7226:7, 7240:6,
7245:14, 7249:20,
7249:21, 7251:7,
7253:20, 7253:21,
7306:6, 7317:7,
7324:9, 7324:12,
7328:18, 7332:9,
7344:22, 7349:11,
7349:14, 7352:23,
7353:10, 7364:7,
7364:8, 7364:25
**numbers** [15] -
7178:8, 7186:22,
7193:10, 7196:24,
7197:21, 7197:23,
7207:2, 7207:5,
7212:6, 7212:11,
7214:18, 7331:18,
7338:12, 7347:24
**NW** [5] - 7172:14,
7172:20, 7173:5,
7173:16, 7394:23
**NY** [2] - 7172:18,
7173:13

---

**O**

---

**o'clock** [1] - 7237:22

**oath** [1] - 7306:23
**Oath** [1] - 7188:12
**obey** [1] - 7217:24
**obj** [1] - 7185:11
**object** [11] - 7179:23,
7181:18, 7185:24,
7187:12, 7262:1,
7275:13, 7301:5,
7308:22, 7309:9,
7310:14, 7347:23
**objected** [14] - 7183:5,
7183:17, 7186:2,
7187:24, 7194:15,
7194:17, 7261:1,
7261:2, 7286:13,
7303:5, 7350:2,
7350:6, 7351:6,
7385:4
**objecting** [8] - 7184:6,
7184:16, 7189:13,
7233:19, 7300:6,
7343:12, 7355:22,
7394:4
**objection** [46] -
7178:5, 7178:12,
7178:17, 7178:20,
7180:2, 7180:8,
7181:2, 7181:3,
7181:24, 7182:13,
7182:22, 7183:2,
7183:10, 7183:11,
7183:14, 7186:5,
7186:8, 7186:10,
7186:24, 7186:25,
7187:19, 7187:21,
7192:22, 7194:12,
7194:15, 7195:3,
7244:5, 7260:11,
7261:22, 7286:14,
7310:25, 7316:8,
7348:7, 7349:22,
7350:11, 7350:14,
7350:21, 7372:16,
7374:8, 7379:15,
7379:21, 7394:6,
7394:8, 7394:9
**objections** [30] -
7177:16, 7177:25,
7178:1, 7178:10,
7179:14, 7180:21,
7180:23, 7180:24,
7181:18, 7182:10,
7182:17, 7182:24,
7182:25, 7184:10,
7189:17, 7190:13,
7192:22, 7194:10,
7220:8, 7238:10,
7260:20, 7309:4,
7317:3, 7350:18,
7350:23, 7351:4,

7351:10, 7359:11,
7361:19
**objective** [2] -
7198:16, 7294:19
**objectively** [1] -
7296:16
**obligation** [2] -
7307:22, 7377:24
**obligations** [1] -
7294:24
**observation** [2] -
7319:18, 7338:24
**observations** [3] -
7382:13, 7386:9,
7387:19
**observe** [1] - 7382:20
**obvious** [2] - 7185:16,
7340:9
**obviously** [15] -
7174:20, 7175:12,
7182:23, 7187:20,
7195:13, 7201:6,
7210:8, 7243:6,
7246:1, 7280:21,
7310:18, 7356:24,
7367:18, 7370:1,
7390:20
**occasions** [3] -
7205:8, 7307:3,
7376:9
**occupies** [1] - 7234:4
**occurred** [2] -
7279:21, 7310:7
**Ochs** [13] - 7275:9,
7275:19, 7275:25,
7276:4, 7276:12,
7276:22, 7277:2,
7298:25, 7299:6,
7299:10, 7299:15,
7299:17, 7309:5
**October** [3] - 7355:4,
7355:15, 7361:25
**odd** [1] - 7307:2
**OF** [5] - 7172:1,
7172:2, 7172:8,
7173:5, 7394:15
**offense** [6] - 7275:13,
7275:15, 7275:16,
7311:4, 7339:4
**offensive** [4] -
7361:21, 7362:1,
7362:9, 7362:22
**offer** [5] - 7286:12,
7287:22, 7338:15,
7338:25, 7368:11
**offered** [11] - 7196:12,
7202:2, 7269:13,
7294:2, 7294:18,
7304:23, 7315:23,
7323:13, 7338:20,

7340:25, 7365:1
**offering** [10] - 7177:4, 7199:5, 7224:18, 7269:6, 7270:25, 7315:22, 7321:6, 7360:8, 7371:4
**OFFICE** [1] - 7172:13
**office** [1] - 7275:8
**officer** [4] - 7253:11, 7374:24, 7385:12, 7393:17
**Officer** [7] - 7253:12, 7374:23, 7374:24, 7381:7, 7381:13, 7382:13, 7385:6
**OFFICES** [1] - 7173:5
**offices** - 7272:7
**OFFICIAL** [1] - 7394:15
**Official** [2] - 7173:15, 7394:21
**official** [5] - 7269:22, 7271:11, 7314:3, 7314:9, 7354:22
**officially** [1] - 7288:8
**often** [2] - 7236:17, 7273:12
**OG** [2] - 7347:8, 7347:15
**old** [1] - 7357:1
**omissions** [2] - 7196:21, 7282:14
**omit** [1] - 7282:9
**once** [6] - 7184:1, 7184:2, 7200:21, 7285:11, 7310:6, 7327:25
**one** [247] - 7174:25, 7175:23, 7176:12, 7176:25, 7179:13, 7179:15, 7180:11, 7180:18, 7180:25, 7181:3, 7181:22, 7182:1, 7184:16, 7188:11, 7188:13, 7193:19, 7194:13, 7194:14, 7194:21, 7196:20, 7196:24, 7197:17, 7197:23, 7198:5, 7198:8, 7198:11, 7199:9, 7199:10, 7201:12, 7201:18, 7205:14, 7206:6, 7207:9, 7207:23, 7209:22, 7210:1, 7213:8, 7213:21, 7213:22, 7213:23, 7214:4, 7214:9, 7214:10, 7215:9, 7215:14,

7215:21, 7215:23, 7216:1, 7216:11, 7218:14, 7218:15, 7219:18, 7219:20, 7220:9, 7222:4, 7222:11, 7224:10, 7226:5, 7226:13, 7227:16, 7228:12, 7229:17, 7231:4, 7233:18, 7233:25, 7236:2, 7236:17, 7238:14, 7238:23, 7239:12, 7239:18, 7240:13, 7240:15, 7241:11, 7241:19, 7242:15, 7243:6, 7243:7, 7245:18, 7246:6, 7246:14, 7247:18, 7248:5, 7251:10, 7251:21, 7251:23, 7253:8, 7253:21, 7255:2, 7255:3, 7255:17, 7258:9, 7258:12, 7261:2, 7262:7, 7265:20, 7265:24, 7268:16, 7272:2, 7272:24, 7274:8, 7274:9, 7274:11, 7274:16, 7275:13, 7276:4, 7277:3, 7277:13, 7280:16, 7280:23, 7281:9, 7282:18, 7282:19, 7283:19, 7285:20, 7285:22, 7286:8, 7286:10, 7286:15, 7287:14, 7287:20, 7288:9, 7288:12, 7288:13, 7288:25, 7291:2, 7291:14, 7291:15, 7292:12, 7292:25, 7293:5, 7293:12, 7294:3, 7294:5, 7296:25, 7299:6, 7299:14, 7300:22, 7301:8, 7304:23, 7304:25, 7306:23, 7307:16, 7312:23, 7312:25, 7313:11, 7313:12, 7315:14, 7315:17, 7317:14, 7317:24, 7320:4, 7320:16, 7321:16, 7321:22, 7322:10, 7322:11, 7322:18, 7322:24, 7324:8, 7324:19, 7325:10, 7325:25, 7326:17, 7327:10, 7327:11, 7327:20,

7328:17, 7328:19, 7332:9, 7332:17, 7332:19, 7334:7, 7334:23, 7336:22, 7337:16, 7338:17, 7340:23, 7341:12, 7343:3, 7344:7, 7344:11, 7344:19, 7344:20, 7344:25, 7345:4, 7345:13, 7346:5, 7347:1, 7347:24, 7347:25, 7348:19, 7351:6, 7352:24, 7353:8, 7353:9, 7353:13, 7355:3, 7356:9, 7358:19, 7359:13, 7359:22, 7360:8, 7362:25, 7363:10, 7364:1, 7364:21, 7364:23, 7366:19, 7366:20, 7366:25, 7367:21, 7368:19, 7369:2, 7369:8, 7369:12, 7370:14, 7370:15, 7370:24, 7371:3, 7373:16, 7373:25, 7374:25, 7377:8, 7380:1, 7380:9, 7380:10, 7381:6, 7383:7, 7384:9, 7385:8, 7386:10, 7387:1, 7387:2, 7387:18, 7388:22, 7390:11, 7392:18, 7393:15
**ones** [30] - 7181:21, 7182:13, 7187:6, 7187:13, 7187:20, 7192:20, 7193:21, 7194:20, 7195:2, 7195:9, 7199:15, 7200:5, 7208:6, 7212:25, 7251:11, 7255:3, 7261:4, 7261:15, 7261:16, 7272:25, 7276:4, 7279:2, 7283:16, 7336:17, 7343:12, 7343:13, 7350:2, 7350:4, 7351:23, 7358:11
**ongoing** [3] - 7201:24, 7271:7, 7378:16
**online** [1] - 7191:5
**op** [1] - 7325:3
**open** [9] - 7186:8, 7187:16, 7187:18, 7267:15, 7270:17, 7272:14, 7309:2,

7361:9, 7384:7
**open-ended** [2] - 7270:17, 7272:14
**opened** [8] - 7188:19, 7188:23, 7208:22, 7226:8, 7306:14, 7315:12, 7386:15, 7387:1
**opening** [2] - 7208:23, 7209:9
**openings** [1] - 7208:23
**operates** [1] - 7359:18
**operating** [1] - 7236:23
**opinion** [5] - 7367:4, 7367:10, 7376:6, 7377:11, 7380:19
**opinions** [1] - 7307:4
**opponent** [7] - 7177:6, 7184:19, 7254:4, 7254:11, 7255:2, 7255:12, 7328:14
**opponents** [2] - 7223:21, 7328:13
**opportunity** [8] - 7225:1, 7260:12, 7289:8, 7324:3, 7342:3, 7358:6, 7383:14, 7387:3
**oppose** [1] - 7335:4
**opposed** [3] - 7201:14, 7306:24, 7368:19
**ops** [1] - 7229:2
**options** [1] - 7345:4
**oral** [4] - 7203:9, 7362:6, 7364:24, 7365:13
**Orange** [1] - 7172:23
**order** [10] - 7220:4, 7220:5, 7242:9, 7243:17, 7246:22, 7251:19, 7338:23, 7362:2, 7362:18, 7388:17
**ordered** [2] - 7236:1, 7236:3
**orders** [2] - 7205:1, 7217:14
**ordinary** [1] - 7296:17
**organization** [13] - 7237:11, 7237:16, 7239:23, 7271:23, 7273:7, 7273:14, 7274:1, 7279:3, 7279:4, 7279:20, 7290:21, 7294:5, 7294:10
**organizational** [33] -

7209:24, 7273:4, 7278:9, 7279:18, 7280:1, 7280:2, 7280:9, 7281:15, 7281:16, 7282:25, 7287:25, 7289:11, 7289:16, 7290:4, 7290:8, 7291:23, 7297:18, 7300:7, 7301:1, 7302:4, 7303:3, 7303:4, 7305:17, 7307:1, 7307:9, 7307:15, 7309:12, 7309:15, 7309:19, 7309:21, 7309:24, 7310:4, 7311:15
**organize** [1] - 7207:11
**organized** [4] - 7207:11, 7207:17, 7214:1, 7264:21
**organizers** [1] - 7198:12
**organizing** [1] - 7214:3
**oriented** [3] - 7199:17, 7273:18, 7273:24
**original** [5] - 7218:2, 7251:18, 7343:3, 7363:11, 7391:4
**otherwise** [1] - 7241:24
**ought** [4] - 7377:17, 7377:20, 7378:7, 7378:8
**ourselves** [1] - 7373:4
**out-of-court** [4] - 7183:18, 7220:15, 7248:12, 7259:24
**outrageous** [6] - 7233:24, 7234:8, 7238:25, 7263:11, 7263:16, 7264:5
**outset** [1] - 7200:6
**outside** [4] - 7286:13, 7360:5, 7375:21, 7385:3
**overall** [1] - 7350:10
**overarching** [4] - 7189:15, 7192:21, 7350:15, 7371:13
**overrule** [2] - 7180:24, 7194:16
**oversight** [2] - 7293:21, 7293:25
**overt** [3] - 7339:2, 7339:6, 7339:9
**overtake** [1] - 7335:4
**overwhelming** [1] - 7242:1

7421

**own** [12] - 7220:17, 7226:25, 7235:5, 7286:17, 7298:11, 7302:25, 7305:12, 7357:9, 7363:7, 7383:18, 7384:2, 7386:9
**Oxygen** [10] - 7184:25, 7188:8, 7188:9, 7188:10, 7188:11, 7188:12, 7191:3, 7191:4, 7191:5

## P

**P.A** [2] - 7173:5, 7173:8
**P.C** [1] - 7173:12
**p.m** [7] - 7202:12, 7238:1, 7317:13, 7348:18, 7355:13, 7366:24, 7394:13
**pace** [2] - 7268:15, 7384:7
**Page** [46] - 7177:1, 7179:9, 7183:4, 7197:24, 7203:9, 7212:16, 7212:17, 7212:21, 7220:11, 7220:19, 7230:13, 7232:24, 7255:10, 7256:16, 7256:18, 7258:9, 7260:9, 7265:23, 7269:7, 7271:1, 7271:2, 7271:3, 7287:8, 7310:3, 7311:7, 7311:18, 7311:19, 7317:6, 7325:10, 7328:18, 7330:21, 7332:11, 7333:8, 7333:19, 7349:5, 7349:16, 7349:24, 7352:14, 7355:4, 7355:6, 7362:6, 7364:24, 7365:13, 7366:7, 7368:20, 7370:25
**page** [41] - 7178:14, 7182:1, 7186:21, 7187:4, 7193:10, 7193:14, 7196:20, 7197:21, 7212:9, 7212:12, 7212:14, 7214:18, 7216:10, 7220:13, 7220:20, 7232:23, 7243:6, 7255:9, 7255:17, 7258:12, 7260:16, 7272:11, 7272:13,

7272:18, 7311:18, 7317:5, 7324:8, 7326:18, 7327:17, 7346:6, 7347:24, 7348:3, 7348:19, 7349:3, 7349:14, 7351:5, 7353:11, 7366:17, 7366:25, 7386:22
**pages** [3] - 7218:24, 7309:23, 7364:25
**paginated** [1] - 7186:22
**paid** [1] - 7377:4
**Palace** [2] - 7325:13, 7368:15
**Panman** [2] - 7355:13, 7355:14
**papers** [2] - 7268:19, 7288:4
**paralegal** [1] - 7344:19
**paralegals** [1] - 7344:20
**parameters** [1] - 7305:11
**paraphrasing** [3] - 7205:23, 7207:19, 7275:23
**Park** [1] - 7173:12
**Parler** [18] - 7176:3, 7176:4, 7176:5, 7176:9, 7176:12, 7176:15, 7176:18, 7176:24, 7278:15, 7286:3, 7286:11, 7305:13, 7315:9, 7315:10, 7316:11, 7346:3, 7346:4, 7350:12
**Parloff** [1] - 7264:3
**parse** [1] - 7189:5
**parsed** [2] - 7189:1, 7189:9
**part** [55] - 7179:17, 7190:7, 7197:5, 7198:6, 7198:9, 7200:11, 7201:24, 7203:8, 7206:7, 7207:18, 7212:18, 7226:10, 7227:13, 7227:18, 7230:9, 7236:9, 7243:24, 7259:11, 7262:13, 7265:18, 7266:13, 7266:14, 7267:2, 7271:1, 7273:8, 7276:20, 7279:3, 7292:13, 7295:12, 7295:13, 7297:24,

7299:12, 7305:4, 7308:20, 7309:9, 7310:8, 7314:3, 7314:8, 7316:3, 7325:20, 7327:18, 7329:15, 7335:3, 7335:18, 7336:10, 7346:20, 7352:1, 7354:24, 7362:15, 7365:6, 7376:23, 7384:2, 7384:11, 7391:2
**participant** [1] - 7351:12
**participants** [1] - 7211:20
**participate** [4] - 7200:23, 7263:23, 7289:3, 7308:21
**participated** [1] - 7210:14
**participating** [1] - 7206:19
**participation** [1] - 7276:18
**particular** [39] - 7180:25, 7185:4, 7185:9, 7192:7, 7214:18, 7220:1, 7226:5, 7240:7, 7240:21, 7253:24, 7266:23, 7273:8, 7277:11, 7278:2, 7291:10, 7302:25, 7305:15, 7311:16, 7312:22, 7314:1, 7317:3, 7317:17, 7326:3, 7335:12, 7335:23, 7336:2, 7336:6, 7346:21, 7348:25, 7351:2, 7358:18, 7359:22, 7370:13, 7371:20, 7373:7, 7373:23, 7373:24, 7380:9, 7393:1
**particularized** [2] - 7184:10, 7190:13
**particularly** [8] - 7184:1, 7240:11, 7250:6, 7301:12, 7334:2, 7335:8, 7343:12, 7343:15
**particulars** [2] - 7192:13, 7363:1
**parties** [16] - 7177:15, 7180:23, 7182:9, 7182:19, 7184:9, 7187:20, 7192:17, 7192:18, 7195:5,

7250:2, 7306:13, 7362:3, 7364:24, 7382:18, 7386:8, 7386:16
**parties'** [2] - 7177:25, 7179:7
**party** [22] - 7175:1, 7177:5, 7178:5, 7179:18, 7182:13, 7184:19, 7223:20, 7223:24, 7254:4, 7254:11, 7255:1, 7255:12, 7273:15, 7273:15, 7307:23, 7325:14, 7328:13, 7328:14, 7331:24, 7332:22, 7333:22, 7381:20
**pass** [1] - 7387:6
**passed** [1] - 7372:16
**past** [3] - 7209:16, 7241:10, 7370:18
**Pat** [1] - 7319:22
**Patriot** [1] - 7297:7
**patriots** [5] - 7215:18, 7317:15, 7317:23, 7320:2, 7364:2
**Pattis** [16] - 7172:22, 7174:10, 7175:20, 7179:20, 7181:8, 7195:4, 7196:8, 7197:12, 7237:19, 7240:1, 7242:12, 7243:25, 7305:22, 7312:9, 7337:5, 7339:18
**PATTIS** [30] - 7172:23, 7175:21, 7179:20, 7181:13, 7196:9, 7196:19, 7197:7, 7240:2, 7303:25, 7305:24, 7306:1, 7306:3, 7306:16, 7308:1, 7308:3, 7308:5, 7308:7, 7337:6, 7337:12, 7337:23, 7338:7, 7338:10, 7339:20, 7340:1, 7341:15, 7341:18, 7341:20, 7341:22, 7341:24, 7342:9
**Pattis's** [2] - 7192:17, 7312:22
**pause** [10] - 7221:20, 7242:18, 7244:25, 7251:2, 7262:9, 7322:12, 7337:8, 7337:10, 7339:18, 7384:10

**pay** [1] - 7240:7
**paying** [2] - 7214:13, 7306:24
**PB** [17] - 7212:5, 7212:17, 7215:18, 7216:1, 7216:7, 7217:2, 7219:4, 7220:21, 7221:17, 7225:1, 7225:22, 7227:17, 7227:18, 7227:19, 7326:22, 7327:7, 7368:20
**PB's** [1] - 7369:13
**PC** [1] - 7172:20
**PDF** [50] - 7177:1, 7178:14, 7179:10, 7193:9, 7193:11, 7193:12, 7193:14, 7196:20, 7196:24, 7197:24, 7202:7, 7212:9, 7212:10, 7212:12, 7212:14, 7212:16, 7212:17, 7213:21, 7219:1, 7220:11, 7220:19, 7230:12, 7251:7, 7265:23, 7269:8, 7270:24, 7271:1, 7298:23, 7317:5, 7317:6, 7324:8, 7324:12, 7324:13, 7324:14, 7324:16, 7325:10, 7326:17, 7328:17, 7330:21, 7332:11, 7333:7, 7333:19, 7338:12, 7347:24, 7352:23, 7352:25, 7353:10, 7355:3, 7355:6, 7390:24
**PDFs** [2] - 7266:16, 7267:9
**Peace** [1] - 7241:18
**peaceful** [1] - 7199:14
**peacefully** [1] - 7306:23
**Pedro** [4] - 7321:23, 7322:25, 7323:1, 7366:9
**pejorative** [1] - 7336:21
**Pennsylvania** [1] - 7241:16
**people** [65] - 7182:5, 7183:18, 7198:19, 7203:10, 7209:5, 7209:7, 7209:9, 7224:10, 7226:4, 7227:23, 7233:23, 7234:14, 7234:19,

7235:9, 7236:3, 7239:18, 7241:12, 7245:11, 7245:16, 7245:21, 7245:25, 7246:1, 7246:25, 7247:1, 7247:2, 7248:2, 7248:3, 7249:21, 7256:9, 7256:16, 7256:17, 7259:11, 7260:21, 7260:24, 7263:11, 7264:2, 7269:11, 7271:15, 7271:23, 7273:7, 7292:7, 7300:22, 7305:18, 7311:20, 7312:2, 7313:10, 7320:12, 7320:17, 7320:23, 7325:12, 7333:11, 7333:14, 7333:17, 7335:20, 7340:4, 7349:17, 7349:20, 7351:14, 7351:15, 7364:8, 7365:5, 7365:22, 7385:8
**people's** [1] - 7351:4
**Pepper** [4] - 7348:12, 7348:15, 7348:16, 7380:3
**per** [1] - 7346:6
**perceive** [1] - 7271:9
**perceived** [2] - 7188:24, 7205:1
**percent** [4] - 7217:20, 7250:9, 7292:22, 7338:4
**percentages** [1] - 7207:3
**percenter** [1] - 7343:1
**perfectly** [4] - 7190:2, 7190:18, 7292:4, 7369:18
**perhaps** [7] - 7207:24, 7217:3, 7240:13, 7241:11, 7284:21, 7340:2, 7356:11
**period** [4] - 7271:4, 7328:25, 7358:2, 7392:12
**periods** [1] - 7271:7
**permissible** [1] - 7361:3
**permission** [2] - 7277:17, 7386:21
**persistent** [1] - 7327:25
**person** [43] - 7184:20, 7212:2, 7212:3, 7223:11, 7225:25, 7227:8, 7227:23,

7229:18, 7230:4, 7231:7, 7231:8, 7231:20, 7232:19, 7232:25, 7237:2, 7254:2, 7256:22, 7257:21, 7259:6, 7259:7, 7284:5, 7286:5, 7288:15, 7301:14, 7304:12, 7304:13, 7306:21, 7310:25, 7320:16, 7322:3, 7334:10, 7338:23, 7341:6, 7342:24, 7351:4, 7358:19, 7363:17, 7363:21, 7365:3, 7365:24, 7392:21, 7392:22
**person's** [4] - 7200:20, 7254:8, 7342:5, 7363:19
**personal** [3] - 7175:10, 7382:21, 7387:18
**persons** [2] - 7311:21, 7365:4
**perspective** [5] - 7217:5, 7217:23, 7227:3, 7231:14, 7332:25
**persuade** [1] - 7338:14
**pertaining** [1] - 7354:12
**perverted** [1] - 7209:11
**petition** [1] - 7241:25
**Pezzola** [31] - 7174:6, 7174:15, 7174:19, 7175:6, 7266:11, 7266:19, 7266:21, 7267:1, 7313:20, 7314:3, 7314:8, 7314:13, 7314:16, 7328:22, 7329:10, 7329:15, 7329:18, 7329:24, 7330:10, 7330:12, 7330:22, 7331:3, 7354:9, 7354:13, 7354:14, 7370:25, 7371:3, 7371:6, 7371:8, 7371:10
**PEZZOLA** [1] - 7172:6
**Pezzola's** [2] - 7175:3, 7313:23
**ph** [19] - 7205:16, 7213:8, 7219:22, 7232:7, 7251:17, 7312:6, 7317:14,

7321:23, 7325:13, 7331:23, 7332:2, 7334:11, 7342:25, 7347:8, 7355:5, 7355:6, 7364:1, 7366:18, 7368:15
**ph]** [7] - 7212:20, 7213:3, 7230:14, 7232:24, 7347:9, 7349:18, 7355:14
**phase** [1] - 7364:22
**Phillips** [6] - 7230:1, 7317:14, 7318:25, 7319:11, 7320:16, 7364:1
**phone** [20] - 7175:9, 7188:20, 7344:18, 7344:21, 7355:20, 7355:24, 7356:20, 7356:21, 7356:23, 7357:9, 7357:24, 7358:2, 7358:3, 7358:4, 7358:14, 7358:15, 7361:14, 7373:12, 7379:24, 7392:20
**phones** [23] - 7184:23, 7185:7, 7185:8, 7188:11, 7189:25, 7190:3, 7191:3, 7251:19, 7342:23, 7343:10, 7343:11, 7344:15, 7356:14, 7371:20, 7377:13, 7377:16, 7377:24, 7389:11, 7391:5, 7391:7
**photograph** [2] - 7299:15, 7299:17
**phrase** [1] - 7223:14
**physical** [2] - 7225:18, 7230:10
**pick** [2] - 7186:9, 7351:1
**picked** [3] - 7204:22, 7209:5, 7270:5
**picking** [1] - 7361:18
**Pickle** [2] - 7347:8, 7347:15
**piece** [3] - 7290:3, 7319:20, 7339:21
**pigs** [2] - 7218:17, 7385:9
**Pikachu** [2] - 7266:2, 7266:6
**piling** [1] - 7240:15
**pincite** [1] - 7363:12
**pissed** [2] - 7258:15, 7259:21
**place** [12] - 7206:11,

7211:9, 7211:24, 7219:5, 7235:2, 7240:24, 7269:22, 7273:3, 7274:24, 7310:20, 7383:15, 7387:4
**places** [1] - 7272:6
**plain** [1] - 7208:19
**plan** [20] - 7209:4, 7211:18, 7217:12, 7221:13, 7222:18, 7224:17, 7225:14, 7225:17, 7225:24, 7229:11, 7229:15, 7230:9, 7241:11, 7241:12, 7266:7, 7288:15, 7302:16, 7318:3, 7342:2, 7359:14
**planned** [2] - 7241:22, 7331:5
**planning** [4] - 7217:18, 7230:18, 7265:8, 7275:23
**platform** [1] - 7359:18
**plausible** [1] - 7224:7
**play** [2] - 7177:19, 7273:6
**played** [1] - 7210:11
**plays** [1] - 7255:5
**plead** [1] - 7275:15
**pleadings** [1] - 7376:20
**pled** [2] - 7275:12
**plenty** [1] - 7341:10
**PLLC** [1] - 7172:16
**plow** [1] - 7238:9
**plus** [4] - 7200:5, 7218:12, 7393:20, 7393:21
**plus-six** [1] - 7218:12
**point** [97] - 7181:7, 7181:8, 7182:24, 7183:3, 7184:21, 7195:3, 7195:4, 7195:17, 7204:18, 7209:14, 7213:14, 7214:23, 7215:16, 7217:2, 7217:19, 7217:25, 7219:20, 7221:25, 7223:7, 7226:16, 7227:2, 7227:16, 7228:3, 7228:5, 7231:5, 7231:12, 7231:22, 7231:24, 7234:23, 7236:15, 7237:9, 7239:2, 7239:19, 7240:9, 7240:15, 7245:22, 7246:15,

7250:21, 7262:8, 7266:24, 7267:22, 7269:4, 7275:6, 7284:12, 7284:17, 7284:18, 7285:7, 7285:24, 7286:24, 7288:2, 7293:5, 7296:7, 7299:9, 7302:9, 7307:1, 7313:25, 7315:15, 7318:5, 7319:7, 7319:10, 7323:20, 7329:5, 7330:8, 7332:24, 7335:9, 7336:7, 7336:14, 7342:15, 7350:11, 7350:15, 7350:25, 7351:11, 7352:2, 7357:13, 7357:14, 7359:1, 7360:23, 7361:22, 7370:9, 7380:15, 7380:16, 7383:22, 7383:25, 7385:17, 7386:18, 7387:7, 7387:18, 7388:2, 7388:14, 7389:14, 7389:20, 7392:15, 7392:19, 7393:13, 7393:23
**pointed** [4] - 7226:7, 7239:18, 7269:21, 7336:17
**pointing** [5] - 7188:25, 7194:17, 7236:16, 7294:14, 7382:8
**points** [7] - 7239:24, 7243:25, 7246:6, 7306:17, 7317:25, 7359:5, 7392:25
**Police** [2] - 7359:14, 7393:17
**police** [6] - 7253:11, 7258:1, 7261:9, 7304:5, 7364:9, 7364:11
**policy** [4] - 7239:1, 7239:6, 7239:8, 7239:9
**political** [3] - 7273:17, 7305:6, 7334:21
**politics** [1] - 7199:16
**polling** [1] - 7272:6
**polls** [1] - 7263:18
**pomposity** [1] - 7209:1
**pool** [1] - 7279:4
**pools** [1] - 7263:19
**poor** [2] - 7266:2, 7298:1
**popping** [1] - 7300:2

7423

**portion** [1] - 7285:23
**POS** [1] - 7319:21
**position** [14] -
7189:22, 7190:1,
7206:22, 7207:24,
7207:25, 7208:1,
7209:6, 7211:22,
7251:18, 7270:2,
7270:10, 7271:22,
7393:25, 7394:1
**positioned** [1] -
7356:7
**positions** [1] -
7199:13
**positive** [1] - 7235:3
**possession** [2] -
7184:24, 7343:10,
7377:23
**possibility** [2] -
7284:11, 7285:22
**possible** [4] - 7266:5,
7340:19, 7361:10,
7361:11
**possibly** [3] - 7247:12,
7310:1, 7379:4
**post** [9] - 7176:12,
7176:15, 7208:9,
7229:4, 7334:1,
7334:2, 7334:4,
7340:6, 7347:2
**post-election** [2] -
7334:2, 7334:4
**post-November** [1] -
7340:6
**posted** [2] - 7227:4,
7287:15
**poster** [1] - 7229:19
**posting** [1] - 7228:8
**posts** [15] - 7176:1,
7176:9, 7176:18,
7176:24, 7207:10,
7266:23, 7269:20,
7278:15, 7286:3,
7286:11, 7315:10,
7315:12, 7316:11,
7346:4, 7354:17
**potential** [3] - 7285:9,
7322:16, 7324:23
**potentially** [1] -
7317:23
**Power** [1] - 7345:14
**powerful** [2] -
7200:22, 7365:22
**practice** [3] - 7239:14,
7239:15, 7384:3
**pre** [5] - 7275:23,
7297:1, 7300:3,
7355:7, 7355:11
**pre-conspiracy** [1] -
7300:3

**pre-election** [2] -
7297:1, 7355:11
**pre-event** [1] -
7275:23
**precedent** [4] -
7220:13, 7233:20,
7376:13, 7381:20
**precise** [1] - 7312:20
**precisely** [2] -
7306:12, 7307:9
**predate** [2] - 7347:10,
7351:16
**predates** [2] - 7347:3,
7349:7
**predicate** [1] - 7203:7
**predisposed** [1] -
7240:21
**prefer** [4] - 7348:12,
7348:15, 7369:8,
7369:12
**prefix** [3] - 7347:12,
7347:13, 7347:14
**prejudice** [8] -
7285:16, 7301:13,
7303:1, 7313:8,
7313:16, 7314:6,
7317:21, 7322:15
**prejudicial** [14] -
7232:5, 7262:23,
7265:13, 7265:22,
7267:2, 7299:13,
7302:8, 7306:19,
7307:7, 7336:5,
7339:17, 7349:10,
7353:23, 7357:5
**preliminary** [1] -
7199:20
**premise** [1] - 7238:18
**preparation** [2] -
7342:2, 7376:18
**prepared** [8] -
7175:22, 7203:19,
7204:5, 7212:1,
7232:17, 7260:17,
7356:5, 7368:11
**preparing** [1] -
7191:22
**presence** [1] -
7213:21
**present** [18] - 7174:7,
7174:8, 7174:9,
7174:10, 7174:11,
7174:12, 7174:13,
7174:15, 7174:25,
7198:20, 7219:9,
7259:7, 7302:2,
7308:20, 7356:15,
7362:12, 7371:18,
7391:12
**presented** [6] -

7176:19, 7178:9,
7179:22, 7181:20,
7342:10, 7346:4
**presents** [1] - 7302:1
**preserve** [1] - 7285:6
**preserved** [2] -
7182:18, 7182:23
**preserving** [1] -
7298:6
**President** [3] -
7265:19, 7349:1,
7366:18
**president** [2] - 7213:7,
7271:22
**president's** [1] -
7376:5
**President-Elect** [1] -
7366:18
**presidential** [1] -
7333:15
**presidents** [9] -
7271:11, 7274:3,
7279:9, 7279:10,
7289:18, 7297:5,
7314:3, 7314:9,
7354:22
**presumably** [5] -
7290:11, 7292:7,
7338:22, 7341:6,
7344:21
**presume** [2] -
7337:13, 7337:18
**pretrial** [5] - 7174:23,
7261:7, 7273:2,
7305:4, 7336:11
**pretty** [15] - 7189:3,
7214:2, 7216:18,
7223:3, 7269:4,
7272:10, 7272:14,
7285:17, 7291:18,
7300:8, 7363:13,
7364:12, 7364:18,
7377:10
**prevent** [1] - 7248:22
**previous** [2] - 7215:9,
7311:17
**previously** [1] -
7241:3
**primarily** [1] - 7239:11
**primary** [3] - 7293:22,
7304:21, 7310:4
**principle** [2] - 7323:1,
7327:23
**principles** [1] - 7294:6
**probative** [1] -
7339:16
**problem** [28] -
7181:23, 7184:3,
7226:13, 7230:12,
7231:2, 7233:6,

7243:12, 7248:8,
7248:12, 7248:19,
7249:15, 7252:4,
7252:21, 7255:25,
7262:13, 7285:9,
7317:18, 7323:15,
7332:1, 7335:18,
7337:18, 7378:11,
7389:1, 7389:11,
7389:17, 7390:13,
7391:14, 7392:9
**problematic** [2] -
7233:10, 7368:5
**problems** [18] -
7181:19, 7183:12,
7183:25, 7187:2,
7188:25, 7232:1,
7246:6, 7249:14,
7312:24, 7345:21,
7347:1, 7350:7,
7356:11, 7376:17,
7379:1, 7388:19,
7388:24, 7390:5
**procedural** [1] -
7373:4
**Procedure** [1] -
7378:12
**procedures** [1] -
7206:10
**proceed** [5] - 7174:18,
7175:14, 7179:21,
7179:24, 7195:8
**proceeding** [3] -
7175:12, 7190:9,
7190:22
**proceedings** [3] -
7192:19, 7394:13,
7394:19
**Proceedings** [1] -
7173:18
**proceeds** [1] -
7196:21
**process** [2] - 7192:14,
7192:15
**processing** [2] -
7388:23, 7388:25
**produce** [5] - 7340:15,
7373:11, 7374:11,
7390:4, 7392:12
**produced** [11] -
7173:19, 7186:20,
7190:8, 7358:10,
7371:16, 7372:8,
7379:1, 7379:23,
7379:25, 7390:9,
7392:21
**producing** [3] -
7371:21, 7373:25,
7392:24
**productions** [1] -

7372:9
**profanity** [2] -
7180:21, 7194:9
**professing** [1] -
7245:1
**proffer** [7] - 7192:4,
7271:5, 7293:18,
7303:22, 7367:14,
7368:10, 7369:15
**proffered** [4] -
7199:18, 7256:21,
7304:4, 7350:14
**proffering** [1] - 7199:4
**profound** [1] -
7304:18
**program** [1] - 7188:8
**progressed** [1] -
7376:8
**prohibited** [1] -
7307:24
**promise** [1] - 7238:15
**proof** [8] - 7230:5,
7323:24, 7325:3,
7329:4, 7329:20,
7330:14, 7330:16,
7332:3
**propaganda** [1] -
7353:20
**propensity** [7] -
7301:4, 7301:19,
7304:23, 7310:23,
7333:13, 7337:17,
7342:1
**proper** [4] - 7187:9,
7192:5, 7327:6,
7370:18
**propose** [2] - 7195:9,
7367:5
**proposed** [3] -
7192:14, 7193:24,
7375:25
**propound** [1] -
7351:13
**prosecution** [1] -
7375:14
**prospect** [2] - 7347:8,
7347:15
**prospective** [3] -
7211:11, 7211:24,
7240:15
**prospectively** [1] -
7213:10
**protected** [1] -
7339:15
**protest** [1] - 7208:10
**protests** [1] - 7242:4
**Proud** [29] - 7199:12,
7199:15, 7205:18,
7209:13, 7239:8,
7239:20, 7241:8,

7424

7241:9, 7271:9, 7271:22, 7273:4, 7273:7, 7273:12, 7274:20, 7275:3, 7276:7, 7278:12, 7278:16, 7279:8, 7287:17, 7304:3, 7306:8, 7309:20, 7309:22, 7310:12, 7313:10, 7313:23, 7314:14

**prove** [8] - 7199:5, 7220:24, 7263:15, 7282:24, 7285:13, 7305:8, 7378:8

**proven** [3] - 7240:4, 7339:5, 7342:6

**provide** [5] - 7345:24, 7357:18, 7358:13, 7372:21, 7386:21

**provided** [5] - 7191:10, 7191:15, 7196:11, 7337:25, 7358:12

**provisionally** [2] - 7199:1, 7201:3

**proximate** [1] - 7219:25

**publicity** [1] - 7287:16

**pull** [2] - 7225:13, 7377:8

**pulling** [3] - 7381:9, 7381:25, 7382:3

**punch** [2] - 7208:10, 7266:2

**punt** [1] - 7367:18

**pure** [1] - 7301:2

**purported** [6] - 7204:2, 7210:20, 7222:18, 7238:25, 7282:14, 7282:15

**purportedly** [1] - 7183:9

**purpose** [19] - 7190:21, 7194:17, 7205:6, 7207:18, 7209:7, 7209:12, 7209:14, 7211:10, 7221:12, 7226:25, 7231:1, 7241:16, 7241:17, 7257:22, 7258:17, 7288:6, 7304:23, 7306:10, 7330:6

**purposes** [7] - 7203:1, 7206:16, 7208:3, 7212:15, 7241:15, 7269:1, 7289:17

**pursue** [1] - 7390:19

**push** [1] - 7198:18

**pussies** [1] - 7271:25

**put** [62] - 7176:17, 7177:18, 7180:11, 7182:15, 7189:16, 7189:22, 7201:1, 7201:11, 7210:12, 7210:16, 7223:20, 7225:1, 7225:14, 7226:16, 7228:2, 7228:4, 7244:1, 7252:18, 7254:6, 7269:22, 7272:23, 7280:14, 7282:4, 7283:9, 7288:5, 7290:1, 7290:18, 7291:8, 7291:19, 7295:16, 7301:21, 7306:3, 7309:14, 7312:20, 7315:9, 7316:10, 7316:14, 7318:20, 7333:2, 7339:21, 7344:1, 7344:6, 7360:20, 7360:22, 7361:12, 7362:10, 7366:3, 7367:13, 7371:12, 7373:10, 7375:4, 7375:11, 7375:23, 7387:8, 7387:12, 7387:22, 7390:11, 7390:24, 7391:14, 7391:18, 7393:18

**puts** [1] - 7206:2

**putting** [6] - 7194:8, 7223:24, 7290:2, 7315:6, 7349:2, 7374:8

## Q

**Q-tip** [3] - 7321:23, 7323:1, 7366:9

**qua** [1] - 7309:22

**quantitative** [1] - 7206:23

**questionable** [1] - 7309:22

**questions** [7] - 7180:13, 7193:25, 7214:19, 7294:4, 7359:10, 7373:8, 7382:25

**quick** [3] - 7264:9, 7314:23, 7314:24

**quickly** [6] - 7189:14, 7198:22, 7204:1, 7214:2, 7296:24, 7362:14

**quite** [7] - 7194:11, 7202:22, 7226:18,

7238:5, 7238:6, 7274:23, 7390:9

**quote** [3] - 7204:25, 7208:23, 7343:16

**quote-unquote** [1] - 7343:16

## R

**raise** [4] - 7179:19, 7370:22, 7385:5, 7394:6

**raised** [12] - 7192:6, 7202:21, 7216:20, 7291:2, 7293:1, 7306:12, 7314:12, 7350:21, 7367:21, 7374:6, 7383:7, 7384:21

**raises** [2] - 7228:4, 7394:8

**raising** [2] - 7234:24, 7385:2

**rallies** [3] - 7207:15, 7209:3, 7305:6

**rally** [15] - 7217:18, 7273:12, 7273:17, 7273:23, 7278:13, 7289:19, 7295:9, 7334:21, 7334:24, 7335:8, 7335:12, 7335:15, 7335:23, 7336:1

**Rally** [1] - 7334:9

**random** [6] - 7225:25, 7231:19, 7232:16, 7239:18, 7279:8, 7333:24

**rank** [2] - 7217:9, 7279:9

**rank-and-file** [1] - 7217:9

**rare** [4] - 7382:11, 7386:17, 7386:18, 7388:4

**rather** [4] - 7199:6, 7202:24, 7357:5, 7360:15

**ray** [1] - 7307:19

**re** [2] - 7238:9, 7388:10

**re-plow** [1] - 7238:9

**re-redirect** [1] - 7388:10

**reach** [1] - 7240:22

**reached** [1] - 7285:23

**reaching** [1] - 7340:10

**reacted** [1] - 7301:17

**reacting** [1] - 7218:16

**reaction** [1] - 7279:6

**read** [32] - 7178:8, 7178:11, 7178:12, 7178:21, 7180:7, 7180:9, 7182:3, 7182:4, 7182:7, 7182:14, 7183:2, 7184:13, 7187:8, 7188:20, 7194:11, 7216:16, 7230:2, 7247:12, 7263:16, 7267:4, 7289:21, 7289:23, 7291:7, 7316:2, 7340:14, 7340:19, 7343:15, 7344:7, 7367:22, 7368:18, 7369:3, 7377:9

**reader** [1] - 7184:25

**readily** [2] - 7363:7, 7367:16

**reading** [2] - 7367:22, 7369:9

**reads** [1] - 7345:14

**ready** [9] - 7230:15, 7230:24, 7231:8, 7258:15, 7259:21, 7259:22, 7268:2, 7384:14, 7393:18

**real** [7] - 7184:3, 7209:13, 7224:21, 7224:22, 7231:12, 7266:7, 7382:8

**reality** [3] - 7209:24, 7283:25, 7294:19

**realize** [1] - 7242:9

**realized** [2] - 7376:16, 7377:8

**really** [50] - 7178:12, 7181:3, 7201:13, 7207:14, 7208:17, 7211:15, 7213:23, 7215:24, 7218:20, 7222:10, 7223:21, 7223:23, 7231:6, 7240:16, 7240:19, 7248:11, 7249:9, 7265:11, 7265:16, 7270:1, 7270:6, 7274:17, 7275:4, 7279:13, 7288:22, 7293:21, 7295:17, 7295:18, 7296:9, 7296:13, 7300:11, 7318:9, 7324:4, 7328:16, 7331:10, 7335:6, 7338:19, 7339:23, 7349:8, 7350:18, 7354:4, 7358:24, 7363:23, 7367:11, 7369:20,

7382:19, 7392:13, 7393:4

**reason** [16] - 7175:1, 7175:16, 7224:21, 7224:23, 7226:19, 7233:21, 7235:4, 7237:8, 7252:22, 7263:14, 7283:7, 7285:18, 7299:12, 7305:23, 7343:7, 7365:17

**reasonable** [1] - 7372:22

**reasonably** [3] - 7203:5, 7208:12, 7363:16

**reasoning** [3] - 7211:8, 7214:19, 7215:6

**reasons** [11] - 7179:23, 7220:18, 7233:24, 7239:11, 7241:2, 7247:8, 7253:23, 7297:20, 7305:2, 7372:25, 7387:9

**rebuke** [20] - 7203:3, 7203:5, 7204:4, 7204:7, 7228:13, 7228:14, 7228:15, 7233:25, 7238:24, 7263:12, 7264:5, 7264:7, 7264:9, 7264:13, 7264:17, 7326:20, 7327:2, 7327:23, 7328:3, 7369:3

**rebuked** [4] - 7234:21, 7264:9, 7327:5, 7327:8

**rebukes** [1] - 7239:15

**rebuking** [3] - 7233:19, 7237:14, 7327:25

**recalled** [5] - 7381:8, 7381:17, 7381:24, 7382:2, 7385:7

**receipt** [1] - 7188:20

**received** [2] - 7280:6, 7389:22

**recently** [1] - 7378:20

**recess** [7] - 7195:7, 7195:25, 7196:1, 7237:25, 7238:1, 7316:18, 7316:19

**recipient's** [1] - 7188:22

**recitation** [1] - 7179:23

**recognize** [1] - 7273:1

**recognizes** [1] -
7342:4
**recognizing** [1] -
7271:3
**recontextualize** [1] -
7240:10
**record** [17] - 7177:19,
7182:15, 7189:22,
7196:2, 7238:2,
7239:5, 7239:13,
7310:6, 7310:15,
7310:19, 7316:10,
7316:14, 7316:20,
7375:17, 7383:23
**recorded** [1] - 7173:18
**records** [4] - 7239:4,
7239:10, 7268:5,
7268:7
**recross** [9] - 7381:21,
7382:1, 7382:11,
7383:14, 7384:19,
7384:20, 7385:17,
7385:21, 7387:18
**recross-examination**
[2] - 7381:21, 7382:1
**recruited** [1] - 7198:15
**recruits** [1] - 7209:5
**recur** [1] - 7362:22
**redact** [6] - 7179:10,
7325:7, 7336:12,
7347:19, 7362:2,
7362:8
**redacted** [1] - 7337:1
**redactions** [1] -
7361:21
**redirect** [10] -
7286:12, 7381:8,
7381:16, 7381:22,
7381:24, 7383:8,
7383:13, 7385:15,
7386:14, 7388:10
**redress** [1] - 7242:1
**refer** [2] - 7233:13,
7254:14
**reference** [15] -
7255:23, 7256:24,
7298:14, 7321:3,
7324:20, 7333:24,
7336:1, 7336:14,
7337:12, 7338:2,
7347:25, 7348:1,
7348:15, 7355:5,
7355:6
**referenced** [5] -
7216:12, 7266:18,
7268:9, 7301:18,
7319:22
**references** [5] -
7325:5, 7336:9,
7354:3, 7366:25,

7376:17
**referencing** [2] -
7300:13, 7334:20
**referred** [2] - 7273:13,
7376:20
**referring** [14] - 7232:4,
7264:10, 7297:6,
7319:12, 7319:24,
7320:3, 7320:10,
7320:23, 7322:16,
7324:25, 7327:3,
7334:24, 7335:20,
7337:17
**refers** [4] - 7186:21,
7196:25, 7230:3,
7325:13
**reflect** [3] - 7179:7,
7339:13, 7373:25
**reflected** [3] - 7283:4,
7372:19, 7390:14
**reflecting** [1] -
7304:10
**reflection** [1] - 7239:6
**reflects** [2] - 7197:10,
7339:12
**refute** [1] - 7378:9
**regard** [5] - 7180:10,
7201:11, 7315:3,
7374:20, 7379:14
**regarding** [2] -
7228:10, 7276:20
**regardless** [2] -
7250:8, 7358:10
**regards** [10] - 7242:3,
7266:15, 7267:10,
7313:21, 7314:6,
7314:17, 7314:18,
7354:8, 7354:11,
7354:20
**regional** [2] - 7198:8,
7218:15
**regular** [2] - 7239:14
**regularity** [2] -
7239:12, 7239:17
**regularly** [2] -
7206:19, 7239:22
**rehash** [1] - 7263:2
**Rehl** [15] - 7174:4,
7174:14, 7207:16,
7213:22, 7214:2,
7214:5, 7214:12,
7215:8, 7242:20,
7242:22, 7247:11,
7247:12, 7342:21,
7346:14, 7357:9
**REHL** [1] - 7172:5
**Rehl's** [2] - 7208:23,
7251:15
**Reich** [1] - 7353:20
**reinvited** [1] - 7352:11

**reject** [1] - 7214:9
**rejected** [1] - 7250:9
**relate** [2] - 7287:11,
7351:16
**related** [9] - 7196:7,
7254:22, 7301:23,
7310:17, 7360:4,
7382:13, 7382:14,
7382:16, 7382:17
**relates** [1] - 7298:11
**relating** [3] - 7180:16,
7196:23, 7360:3
**relationship** [3] -
7219:25, 7310:12,
7371:9
**relatively** [2] -
7204:21, 7206:25
**relevance** [38] -
7210:24, 7211:2,
7222:6, 7223:16,
7225:11, 7225:15,
7225:19, 7225:20,
7225:21, 7231:12,
7231:16, 7233:16,
7242:10, 7251:24,
7254:17, 7256:14,
7273:5, 7283:14,
7291:8, 7292:5,
7298:11, 7299:19,
7301:1, 7301:6,
7301:16, 7309:14,
7309:21, 7311:20,
7312:1, 7313:5,
7313:15, 7318:1,
7327:15, 7328:12,
7330:25, 7331:10,
7333:23, 7347:21
**relevance-wise** [1] -
7298:11
**relevancy** [4] - 7313:7,
7313:15, 7314:16,
7347:10
**relevant** [56] -
7199:11, 7210:6,
7216:8, 7217:16,
7217:17, 7218:18,
7222:12, 7223:1,
7223:11, 7224:1,
7224:13, 7225:24,
7229:9, 7231:20,
7232:6, 7246:9,
7246:13, 7248:17,
7248:19, 7253:3,
7255:2, 7255:7,
7255:13, 7256:5,
7256:9, 7256:12,
7257:5, 7259:18,
7259:20, 7276:19,
7279:6, 7288:3,
7291:10, 7292:10,

7310:1, 7312:3,
7312:5, 7312:7,
7347:3, 7348:10,
7349:4, 7349:10,
7349:13, 7349:23,
7353:7, 7355:12,
7356:12, 7365:3,
7365:23, 7375:25,
7376:1, 7376:5,
7379:22
**reliable** [1] - 7372:10
**relied** [1] - 7189:5
**relitigate** [1] - 7362:16
**rely** [4] - 7253:10,
7357:6, 7357:14,
7366:19
**relying** [7] - 7253:8,
7256:20, 7268:6,
7297:10, 7324:4,
7364:17, 7367:25
**remained** [1] - 7183:1
**remains** [2] - 7306:20,
7384:23
**remark** [2] - 7238:13,
7240:10
**remarks** [3] - 7239:18,
7308:7, 7362:7
**remember** [1] -
7367:20
**remind** [2] - 7242:2,
7306:10
**reminded** [1] -
7219:22
**reminders** [1] -
7206:14
**remotely** [1] - 7268:6
**remove** [1] - 7366:21
**removed** [5] -
7206:13, 7314:16,
7338:3, 7338:9,
7354:5
**renew** [1] - 7182:23
**repeat** [1] - 7340:14
**repeated** [1] - 7206:14
**repeatedly** [1] -
7205:3
**repeating** [1] - 7241:4,
7342:15
**rephrase** [1] - 7296:8
**replies** [2] - 7263:18,
7282:1
**reply** [2] - 7282:1,
7392:10
**replying** [2] - 7355:22,
7392:10
**REPORTER** [2] -
7308:10, 7394:15
**reporter** [3] - 7298:2,
7314:24, 7316:16
**Reporter** [3] -

7173:15, 7173:15,
7394:21
**reporter's** [1] - 7298:7
**reposting** [1] -
7287:14
**represent** [1] -
7379:23
**representation** [1] -
7183:8
**representations** [1] -
7234:12
**representing** [1] -
7380:8
**reproductions** [1] -
7189:24
**request** [11] - 7179:18,
7199:19, 7344:11,
7347:18, 7352:5,
7361:20, 7362:6,
7362:19, 7372:20,
7379:7, 7387:5
**requested** [2] -
7361:1, 7362:1
**require** [5] - 7191:12,
7279:14, 7336:12,
7362:8, 7378:13
**required** [3] - 7242:8,
7248:22, 7378:7
**requirement** [3] -
7338:25, 7339:6,
7341:1
**requirements** [1] -
7239:13
**requires** [1] - 7378:25
**resemble** [1] -
7240:16
**resembles** [1] -
7240:17
**reservations** [2] -
7306:10, 7307:3
**resolve** [2] - 7192:1,
7368:9
**resolved** [4] -
7191:17, 7302:7,
7361:3, 7365:10
**respect** [14] - 7191:16,
7282:22, 7285:4,
7307:16, 7307:19,
7309:23, 7338:16,
7339:11, 7340:24,
7345:23, 7346:14,
7346:25, 7348:3,
7364:18
**respectful** [1] -
7350:19
**respectfully** [2] -
7253:19, 7352:5
**respond** [20] -
7189:15, 7189:18,
7205:21, 7207:8,

7229:5, 7230:6,
7267:13, 7267:20,
7268:18, 7276:15,
7285:17, 7322:22,
7350:9, 7359:2,
7359:4, 7359:10,
7363:5, 7372:22,
7375:1, 7380:20
**responded** [7] -
7203:12, 7257:1,
7259:8, 7284:19,
7341:12, 7379:20,
7390:11
**responding** [42] -
7184:17, 7184:20,
7185:9, 7187:18,
7203:16, 7213:22,
7214:2, 7251:25,
7252:10, 7252:13,
7252:15, 7252:17,
7253:3, 7254:2,
7254:5, 7254:9,
7255:16, 7256:2,
7269:17, 7272:12,
7276:25, 7281:3,
7291:6, 7291:20,
7292:1, 7319:7,
7319:10, 7323:4,
7342:25, 7343:3,
7343:14, 7352:18,
7356:25, 7366:9,
7369:5, 7373:24,
7374:4, 7390:8,
7392:13, 7392:22,
7393:2
**responds** [3] -
7207:16, 7251:16,
7369:16
**response** [27] -
7185:3, 7185:6,
7185:14, 7185:16,
7186:16, 7229:1,
7234:6, 7247:6,
7253:7, 7255:6,
7258:5, 7270:16,
7271:9, 7272:4,
7274:4, 7306:13,
7321:7, 7326:23,
7344:25, 7348:14,
7358:18, 7358:19,
7362:3, 7376:25,
7380:22, 7390:15
**responses** [4] -
7210:2, 7247:18,
7370:13, 7378:5
**responsible** [1] -
7299:18
**responsive** [3] -
7182:1, 7182:5,
7217:1

**rest** [15] - 7181:9,
7192:7, 7210:6,
7214:25, 7238:10,
7257:3, 7272:19,
7276:24, 7278:8,
7281:8, 7305:13,
7314:20, 7359:13,
7379:22, 7386:13
**restate** [1] - 7243:24
**restriction** [1] - 7327:1
**restrictions** [1] -
7369:7
**result** [1] - 7261:24
**return** [1] - 7237:20
**returns** [2] - 7340:6,
7383:8
**retweeted** [1] -
7305:12
**reversed** [1] - 7311:3
**reverses** [1] - 7242:9
**review** [5] - 7178:1,
7197:6, 7263:18,
7368:10, 7376:22
**reviewed** [2] - 7190:1,
7391:3
**rightly** [1] - 7268:25
**rights** [3] - 7294:24,
7304:13, 7304:16
**ripen** [2] - 7360:9,
7360:18
**ripening** [1] - 7360:21
**rise** [6] - 7180:2,
7195:24, 7237:24,
7294:23, 7316:17,
7394:11
**risk** [8] - 7230:6,
7285:16, 7301:12,
7317:21, 7322:14,
7369:8, 7369:12,
7371:1
**Road** [1] - 7173:2
**rob** [2] - 7257:23,
7340:2
**Roger** [2] - 7173:11,
7174:13
**roiling** [1] - 7272:16
**Room** [2] - 7173:16,
7394:22
**room** [2] - 7279:19,
7334:12
**rooted** [5] - 7210:7,
7210:9, 7210:10,
7210:16, 7210:18
**roots** [3] - 7174:17,
7175:5, 7264:9
**Roots** [2] - 7173:11,
7174:13
**ROOTS** [2] - 7175:4,
7175:6
**rotten** [1] - 7198:19

**Rotunda** [1] - 7276:2
**roundabout** [1] -
7326:12
**rounded** [1] - 7226:4
**rounds** [1] - 7333:22
**routinely** [1] - 7222:25
**row** [4] - 7288:22,
7327:24, 7337:24,
7369:16
**rows** [1] - 7355:9
**RPR** [3] - 7173:15,
7394:16, 7394:21
**rule** [19] - 7175:12,
7184:11, 7187:19,
7210:2, 7233:15,
7267:20, 7294:5,
7294:25, 7295:1,
7295:7, 7307:15,
7311:9, 7370:19,
7378:15, 7378:16,
7378:17, 7379:3,
7379:7, 7394:9
**Rule** [13] - 7191:11,
7202:22, 7225:16,
7237:8, 7345:22,
7346:5, 7346:8,
7374:5, 7378:12,
7378:19, 7378:24,
7379:2, 7394:5
**ruled** [5] - 7182:22,
7336:11, 7362:17,
7370:17, 7376:11
**Rules** [1] - 7290:9
**rules** [22] - 7174:24,
7206:10, 7239:9,
7244:4, 7269:22,
7269:24, 7270:1,
7270:2, 7270:9,
7294:10, 7303:8,
7307:24, 7309:13,
7309:18, 7326:24,
7327:20, 7368:25,
7369:14, 7369:25,
7377:18, 7379:5,
7383:21
**rules-change** [1] -
7379:5
**ruling** [14] - 7191:22,
7203:9, 7279:18,
7362:5, 7362:7,
7362:13, 7364:24,
7365:13, 7375:20,
7393:12, 7393:15,
7393:18, 7393:19,
7393:23
**rulings** [5] - 7182:20,
7182:25, 7301:21,
7305:4, 7359:20
**run** [10] - 7199:6,
7204:14, 7213:19,

7239:22, 7254:12,
7293:8, 7295:10,
7303:17, 7326:19,
7367:4
**running** [4] - 7175:21,
7256:7, 7268:10,
7325:6
**runs** [1] - 7361:21

**S**

**Sabino** [2] - 7173:8,
7174:11
**safety** [1] - 7209:12
**sanctioned** [1] -
7288:8
**satisfied** [1] - 7239:10
**satisfy** [2] - 7233:15,
7283:14
**Saturday** [2] -
7333:10, 7333:15
**save** [1] - 7361:15
**saw** [14] - 7174:17,
7188:22, 7230:5,
7233:16, 7235:10,
7248:5, 7278:14,
7299:21, 7315:5,
7315:13, 7317:20,
7318:16, 7319:5,
7331:14
**scenario** [4] -
7226:22, 7231:18,
7269:15, 7314:2
**schedule** [1] - 7388:1
**science** [1] - 7232:19
**scope** [5] - 7286:1,
7286:13, 7360:6,
7360:7, 7385:3
**scoring** [1] - 7293:2
**screen** [2] - 7245:25,
7268:11
**screenshot** [2] -
7243:5, 7343:8
**scumbags** [2] -
7256:4, 7256:11
**sealed** [3] - 7356:14,
7360:2
**search** [1] - 7337:16
**seated** [1] - 7316:23
**second** [24] - 7219:24,
7222:6, 7222:12,
7228:20, 7229:17,
7231:2, 7238:13,
7239:2, 7255:23,
7272:11, 7286:12,
7299:9, 7306:17,
7322:10, 7322:11,
7327:11, 7337:23,
7338:17, 7359:15,
7360:1, 7366:23,

7374:25, 7378:11,
7388:22
**seconds** [2] -
7352:11, 7382:1
**secret** [4] - 7205:13,
7241:11, 7241:18,
7265:8
**sections** [1] - 7346:10
**seditious** [2] - 7311:1,
7311:3
**see** [71] - 7175:16,
7177:19, 7178:3,
7178:18, 7178:19,
7180:9, 7181:6,
7187:2, 7193:22,
7194:12, 7197:1,
7197:2, 7197:4,
7201:6, 7201:10,
7203:8, 7206:22,
7207:24, 7207:25,
7218:12, 7220:20,
7233:2, 7234:1,
7237:20, 7237:22,
7243:1, 7243:16,
7245:22, 7245:24,
7246:1, 7246:3,
7246:20, 7247:21,
7251:14, 7260:4,
7261:5, 7262:7,
7265:14, 7267:24,
7269:25, 7272:22,
7274:2, 7280:18,
7281:9, 7283:8,
7287:1, 7290:16,
7294:9, 7297:25,
7298:12, 7303:2,
7312:7, 7315:6,
7317:11, 7318:15,
7319:8, 7322:21,
7331:14, 7335:17,
7335:20, 7356:17,
7356:19, 7356:20,
7359:5, 7360:22,
7372:20, 7378:23,
7383:3, 7387:19,
7394:10
**seeing** [3] - 7188:14,
7267:23, 7388:21
**seek** [3] - 7176:13,
7207:15, 7383:15
**seek-and-destroy-
type** [1] - 7207:15
**seeking** [2] - 7190:5,
7362:16
**seem** [10] - 7236:12,
7280:25, 7295:12,
7304:1, 7327:5,
7327:18, 7341:2,
7352:15, 7357:15,
7386:16

**seized** [3] - 7343:10, 7358:4, 7377:19
**select** [1] - 7275:3
**selected** [7] - 7187:7, 7199:13, 7205:2, 7213:11, 7234:14, 7234:19, 7362:24
**selecting** [1] - 7187:2
**selection** [2] - 7304:2, 7306:9
**selective** [1] - 7204:22
**Self** [36] - 7198:7, 7198:12, 7199:10, 7201:23, 7203:1, 7204:21, 7208:16, 7208:25, 7209:4, 7209:20, 7210:13, 7211:10, 7215:5, 7231:2, 7245:23, 7246:16, 7246:19, 7246:23, 7273:21, 7274:23, 7288:5, 7288:11, 7289:17, 7290:23, 7294:6, 7311:10, 7311:22, 7317:12, 7317:19, 7323:21, 7325:3, 7328:21, 7329:4, 7346:9, 7347:7, 7366:14
**self** [9] - 7207:13, 7226:21, 7265:2, 7278:18, 7304:9, 7304:17, 7304:19, 7313:2, 7313:9
**Self-Defense** [36] - 7198:7, 7198:12, 7199:10, 7201:23, 7203:1, 7204:21, 7208:16, 7208:25, 7209:4, 7209:20, 7210:13, 7211:10, 7215:5, 7231:2, 7245:23, 7246:16, 7246:19, 7246:23, 7273:21, 7274:23, 7288:5, 7288:11, 7289:17, 7290:23, 7294:6, 7311:10, 7311:22, 7317:19, 7323:21, 7325:3, 7328:21, 7329:4, 7346:9, 7347:7, 7366:14
**self-defense** [8] - 7207:13, 7226:21, 7265:2, 7278:18, 7304:9, 7304:19, 7313:2, 7313:9
**selfie** [1] - 7276:2

**selling** [1] - 7268:21
**send** [4] - 7229:5, 7261:3, 7326:4, 7367:13
**sender's** [1] - 7188:21
**sending** [2] - 7306:25, 7389:21
**sends** [3] - 7198:17, 7299:18, 7352:22
**senior** [4] - 7217:14, 7274:20, 7274:22, 7276:7
**seniority** [1] - 7271:23
**sense** [19] - 7176:2, 7177:14, 7184:12, 7195:5, 7203:13, 7233:22, 7235:12, 7235:13, 7236:22, 7294:18, 7294:19, 7298:16, 7299:4, 7313:5, 7325:22, 7326:11, 7327:13, 7387:21
**sensory** [1] - 7225:18
**sent** [9] - 7188:2, 7188:16, 7188:17, 7191:9, 7207:3, 7207:7, 7231:3, 7323:22, 7325:4
**sentiment** [1] - 7203:4
**separate** [9] - 7205:12, 7211:1, 7281:5, 7287:12, 7287:21, 7287:24, 7289:1, 7294:19, 7367:22
**separating** [1] - 7246:25
**September** [5] - 7261:11, 7314:13, 7347:2, 7351:16, 7376:5
**sequence** [2] - 7251:14, 7289:14
**sequencing** [1] - 7350:7
**series** [15] - 7181:25, 7182:2, 7183:17, 7191:8, 7196:24, 7249:16, 7266:1, 7270:11, 7270:13, 7271:1, 7278:2, 7304:1, 7305:15, 7308:24, 7378:4
**serious** [3] - 7249:14, 7331:25, 7371:1
**seriously** [1] - 7313:11
**set** [17] - 7180:12, 7180:14, 7180:15,

7193:24, 7195:13, 7200:9, 7200:21, 7200:24, 7201:18, 7202:18, 7213:17, 7214:22, 7219:2, 7273:20, 7275:19, 7346:6
**sets** [1] - 7213:18
**setting** [3] - 7228:13, 7243:17, 7378:4
**seven** [2] - 7311:12, 7311:17
**several** [9] - 7211:7, 7212:23, 7307:3, 7337:6, 7338:13, 7346:15, 7366:25, 7368:23, 7375:14
**sexual** [3] - 7299:10, 7299:25, 7300:13
**Shae** [6] - 7374:21, 7374:23, 7374:24, 7381:7
**shape** [1] - 7245:17
**share** [1] - 7354:10
**shared** [3] - 7208:15, 7279:6, 7279:7
**shed** [2] - 7304:6, 7337:20
**shell** [1] - 7337:15
**shield** [10] - 7330:11, 7330:22, 7331:1, 7331:3, 7331:7, 7331:10, 7331:17, 7371:1, 7371:2, 7371:7
**shit** [5] - 7215:18, 7216:1, 7216:7, 7217:2, 7319:20
**shock** [1] - 7223:10
**shoehorn** [1] - 7259:17
**shoehorning** [1] - 7253:24
**shoot** [3] - 7317:15, 7364:2, 7364:10
**shooting** [1] - 7333:25
**short** [3] - 7276:23, 7277:2, 7348:22
**shorthand** [1] - 7173:18
**shortly** [1] - 7201:24
**show** [60] - 7176:10, 7185:3, 7198:3, 7199:25, 7200:24, 7202:25, 7209:8, 7209:18, 7209:22, 7217:21, 7221:13, 7222:19, 7223:8, 7223:9, 7224:15, 7228:12, 7229:3,

7230:9, 7232:17, 7242:15, 7243:4, 7243:15, 7244:14, 7246:10, 7247:12, 7247:14, 7256:9, 7275:15, 7280:9, 7284:9, 7284:19, 7286:4, 7286:6, 7286:8, 7303:14, 7304:8, 7309:14, 7309:25, 7313:4, 7318:1, 7327:4, 7328:20, 7328:25, 7329:3, 7329:9, 7329:12, 7329:17, 7329:23, 7340:20, 7342:20, 7345:16, 7345:19, 7358:15, 7365:11, 7365:15, 7367:9, 7371:5, 7381:18
**showed** [4] - 7185:8, 7207:3, 7358:14, 7386:12
**showing** [15] - 7206:18, 7208:21, 7212:2, 7239:17, 7285:24, 7291:6, 7291:10, 7291:25, 7303:12, 7303:19, 7303:22, 7304:4, 7342:11, 7373:23, 7380:22
**shown** [4] - 7224:19, 7226:14, 7239:12, 7286:3
**shows** [17] - 7185:9, 7186:17, 7199:6, 7199:12, 7205:9, 7222:25, 7224:5, 7235:5, 7248:6, 7248:7, 7281:2, 7284:9, 7286:16, 7301:17, 7302:11, 7339:5, 7382:3
**shut** [3] - 7205:21, 7245:20, 7247:4
**sic** [9] - 7187:13, 7195:15, 7224:15, 7263:19, 7265:19, 7338:2, 7344:8, 7352:9, 7375:2
**sic]** [2] - 7255:12, 7272:1
**side** [12] - 7186:3, 7211:5, 7219:24, 7243:4, 7246:1, 7246:4, 7268:11, 7308:13, 7371:15, 7374:10, 7392:18

**sides** [2] - 7193:6, 7267:18
**sight** [5] - 7381:18, 7382:4, 7383:22, 7385:20, 7386:6
**signaling** [1] - 7369:19
**signature** [1] - 7342:4
**signed** [1] - 7247:1
**significant** [5] - 7199:8, 7207:12, 7217:8, 7328:19, 7365:23
**significantly** [1] - 7177:17
**signifying** [1] - 7366:14
**similar** [5] - 7188:9, 7278:1, 7291:24, 7316:13, 7347:22
**similarly** [2] - 7356:7, 7357:21
**simple** [4] - 7264:18, 7293:24, 7325:7, 7325:25
**simply** [11] - 7188:4, 7189:10, 7210:19, 7223:13, 7241:5, 7243:24, 7318:6, 7341:5, 7342:11, 7362:10, 7381:23
**single** [6] - 7187:22, 7237:1, 7334:12, 7336:14, 7356:24, 7359:6
**sit** [2] - 7242:16, 7260:15
**sitting** [6] - 7282:17, 7319:25, 7320:22, 7320:25, 7336:23, 7377:6
**situated** [1] - 7357:21
**situation** [4] - 7253:21, 7357:15, 7357:23, 7388:4
**situations** [1] - 7254:1
**six** [2] - 7218:12, 7340:3
**size** [1] - 7203:10
**skep** [1] - 7272:15
**skeptical** [9] - 7268:25, 7272:10, 7280:13, 7280:14, 7285:18, 7286:23, 7295:25, 7296:2, 7315:7
**skepticism** [1] - 7281:12
**skimming** [1] - 7370:12

7428

**Skull** [11] - 7249:17, 7274:18, 7287:13, 7309:9, 7313:24, 7314:9, 7314:10, 7314:17, 7347:6, 7347:13, 7354:21
**slap** [2] - 7246:7, 7247:4
**slice** [2] - 7302:19, 7307:19
**slicing** [1] - 7307:17
**Slide** [2] - 7313:21, 7314:10
**slides** [3] - 7314:7, 7314:12, 7314:13
**slightly** [3] - 7181:12, 7295:14, 7383:15
**slowly** [1] - 7178:22
**small** [9] - 7198:10, 7204:22, 7206:25, 7207:11, 7264:12, 7274:19, 7275:3, 7289:19
**Small** [1] - 7207:14
**smaller** [2] - 7195:13, 7218:13
**smashing** [2] - 7333:11, 7333:17
**Smashing** [1] - 7333:14
**Smith** [29] - 7172:16, 7174:9, 7179:14, 7194:9, 7238:11, 7241:5, 7243:22, 7243:25, 7267:20, 7298:1, 7318:9, 7324:10, 7351:4, 7351:5, 7362:21, 7363:2, 7364:18, 7368:19, 7374:9, 7374:25, 7375:3, 7375:10, 7376:10, 7381:4, 7382:8, 7383:2, 7383:9, 7383:17, 7384:16
**SMITH** [146] - 7172:16, 7172:23, 7178:21, 7178:24, 7179:9, 7193:9, 7193:14, 7193:17, 7193:19, 7212:9, 7220:6, 7221:2, 7221:5, 7221:8, 7221:22, 7222:5, 7222:8, 7222:13, 7222:22, 7223:4, 7223:18, 7224:2, 7225:20, 7226:13, 7228:11, 7228:24, 7230:3, 7230:22, 7231:10,

7231:15, 7231:23, 7232:1, 7232:11, 7232:22, 7233:3, 7233:6, 7233:8, 7233:12, 7234:8, 7234:16, 7234:23, 7235:11, 7235:19, 7235:22, 7236:10, 7236:14, 7237:11, 7237:13, 7238:12, 7238:18, 7296:23, 7297:6, 7297:11, 7297:14, 7297:17, 7297:19, 7297:23, 7298:3, 7298:5, 7298:8, 7298:20, 7298:22, 7300:12, 7300:16, 7300:18, 7300:21, 7301:10, 7302:6, 7302:21, 7302:24, 7303:4, 7303:6, 7317:4, 7317:9, 7317:11, 7318:11, 7318:18, 7318:22, 7319:2, 7319:12, 7319:15, 7320:5, 7320:8, 7320:14, 7320:21, 7321:9, 7321:13, 7321:22, 7322:6, 7322:14, 7322:25, 7323:5, 7323:14, 7323:17, 7323:19, 7324:6, 7324:13, 7324:16, 7324:19, 7324:22, 7325:25, 7326:17, 7327:22, 7328:17, 7329:1, 7329:8, 7329:14, 7329:16, 7329:25, 7330:4, 7330:7, 7330:20, 7330:24, 7331:9, 7331:17, 7331:19, 7331:21, 7332:6, 7332:11, 7332:13, 7332:15, 7332:20, 7332:22, 7333:1, 7333:4, 7333:7, 7334:7, 7334:18, 7334:23, 7335:7, 7335:16, 7336:4, 7336:19, 7336:25, 7337:3, 7348:6, 7355:3, 7374:22, 7374:24, 7375:9, 7381:5, 7381:12, 7384:8, 7384:18, 7387:16, 7388:6
**Smith's** [4] - 7240:3, 7240:9, 7338:11,

7384:12
**snapshot** [1] - 7317:12
**sneak** [1] - 7208:7
**social** [5] - 7199:14, 7206:24, 7237:11, 7237:15, 7273:13
**solely** [2] - 7189:5, 7194:17
**solve** [1] - 7356:11
**someone** [29] - 7184:17, 7210:4, 7210:6, 7210:14, 7213:25, 7223:22, 7227:6, 7227:10, 7229:21, 7231:19, 7233:23, 7236:20, 7237:3, 7237:5, 7259:20, 7259:23, 7261:22, 7261:23, 7297:7, 7299:17, 7316:13, 7323:9, 7325:12, 7326:23, 7327:23, 7334:10, 7334:13, 7343:8, 7345:7
**sometimes** [6] - 7207:8, 7266:13, 7271:7, 7294:21, 7303:15, 7335:19
**somewhat** [1] - 7224:3
**somewhere** [2] - 7205:23, 7206:17
**soon** [3] - 7214:4, 7370:20, 7393:14
**sooner** [1] - 7360:15
**sorry** [24] - 7177:9, 7185:17, 7186:24, 7187:10, 7187:11, 7187:13, 7194:4, 7203:22, 7214:16, 7215:10, 7242:21, 7244:6, 7251:6, 7254:15, 7308:23, 7309:5, 7321:18, 7342:23, 7353:8, 7371:25, 7375:10, 7378:23, 7388:16
**sort** [63] - 7174:22, 7177:16, 7177:18, 7177:24, 7178:1, 7178:2, 7179:14, 7181:23, 7186:8, 7192:21, 7194:1, 7194:8, 7194:19, 7195:11, 7195:14, 7196:7, 7213:25, 7215:22, 7216:6, 7216:12, 7216:18,

7219:15, 7223:13, 7226:8, 7226:11, 7227:12, 7228:9, 7229:8, 7229:11, 7238:8, 7238:13, 7246:19, 7247:13, 7249:22, 7253:24, 7259:16, 7268:10, 7270:14, 7274:24, 7276:22, 7280:1, 7280:2, 7280:25, 7290:6, 7291:20, 7294:3, 7295:6, 7306:25, 7308:12, 7309:3, 7316:12, 7331:5, 7336:13, 7340:18, 7350:19, 7358:6, 7360:3, 7360:21, 7361:6, 7390:13, 7393:9
**sorts** [1] - 7367:25
**sought** [1] - 7288:7
**sounds** [3] - 7192:3, 7345:25, 7363:22
**Space** [1] - 7347:8
**space** [4] - 7234:4, 7341:5, 7341:14, 7347:16
**span** [1] - 7271:4
**Spaz** [1] - 7328:23
**speaker** [1] - 7323:7
**speaking** [4] - 7285:21, 7294:17, 7320:17, 7334:6
**Special** [9] - 7189:7, 7190:25, 7191:16, 7343:15, 7344:3, 7378:11, 7389:2, 7389:6, 7390:24
**special** [2] - 7184:22, 7200:7
**specific** [15] - 7182:10, 7182:13, 7183:2, 7226:4, 7226:11, 7250:25, 7260:11, 7281:22, 7284:19, 7302:3, 7302:12, 7350:14, 7350:18, 7350:21, 7354:19
**specifically** [12] - 7185:14, 7204:23, 7215:1, 7234:14, 7247:6, 7265:5, 7291:7, 7303:20, 7334:3, 7348:11, 7354:12, 7354:17
**specifics** [2] - 7180:18, 7303:12
**speech** [8] - 7241:25,

7306:25, 7339:15, 7340:10, 7340:20, 7341:5, 7342:13
**speed** [1] - 7192:19
**spelled** [1] - 7290:19
**spend** [1] - 7178:17
**spent** [4] - 7186:19, 7192:13, 7362:2, 7362:3
**spillover** [1] - 7331:25
**spin** [1] - 7244:1
**spirited** [1] - 7238:6
**spit** [1] - 7373:11
**spoken** [1] - 7175:22
**spokesperson** [1] - 7277:16
**sponsored** [1] - 7278:15
**sponsoring** [1] - 7359:22
**sponsors** [1] - 7189:23
**sponte** [1] - 7306:13
**spotted** [1] - 7285:20
**spreadsheet** [1] - 7336:8
**squarely** [4] - 7291:2, 7307:24, 7361:25, 7382:13
**stabbed** [4] - 7283:21, 7301:14, 7313:10, 7313:11
**stabber** [1] - 7286:16
**stabbing** [5] - 7264:21, 7284:5, 7287:12, 7305:2, 7312:25
**stack** [6] - 7220:22, 7221:11, 7222:14, 7224:5, 7224:8, 7224:10
**stacking** [6] - 7221:14, 7225:2, 7229:7, 7229:12, 7233:13, 7233:14
**stage** [2] - 7190:9, 7361:24
**stand** [10] - 7178:1, 7225:2, 7269:10, 7298:10, 7360:10, 7378:23, 7385:24, 7387:11, 7387:12, 7387:23
**standalone** [2] - 7256:25, 7257:4
**standard** [7] - 7190:2, 7191:2, 7191:3, 7240:5, 7240:18, 7363:13, 7371:21
**standing** [2] - 7180:9,

7339:16
**stands** [7] - 7193:2, 7195:25, 7237:25, 7302:25, 7316:18, 7370:4, 7370:8
**start** [10] - 7189:19, 7197:24, 7220:5, 7234:3, 7235:13, 7245:1, 7267:3, 7318:4, 7350:20, 7361:20
**started** [9] - 7261:6, 7299:5, 7302:14, 7324:12, 7324:13, 7351:11, 7372:9, 7375:17, 7375:18
**starting** [5] - 7195:15, 7220:19, 7261:7, 7317:1, 7365:13
**starts** [2] - 7248:21, 7282:11
**state** [61] - 7177:5, 7177:19, 7183:9, 7196:25, 7199:2, 7204:1, 7204:5, 7210:3, 7210:21, 7218:18, 7221:16, 7221:18, 7221:19, 7222:15, 7222:16, 7222:19, 7222:20, 7222:24, 7223:1, 7223:7, 7223:9, 7223:11, 7223:14, 7224:2, 7224:3, 7224:12, 7224:13, 7225:7, 7225:8, 7225:10, 7225:17, 7229:8, 7230:7, 7250:13, 7257:4, 7257:9, 7257:16, 7260:5, 7285:3, 7301:22, 7310:7, 7323:13, 7327:7, 7338:21, 7338:22, 7338:23, 7339:8, 7339:11, 7339:12, 7339:16, 7339:24, 7340:10, 7346:11, 7365:3, 7365:11, 7365:15, 7365:16, 7365:23, 7366:22, 7368:16
**State** [1] - 7364:20
**statement** [137] - 7177:5, 7185:6, 7192:17, 7197:17, 7199:5, 7202:2, 7208:1, 7216:6, 7220:20, 7221:10, 7222:13, 7222:17,

7222:18, 7223:7, 7223:22, 7224:1, 7224:9, 7224:17, 7224:25, 7227:5, 7228:13, 7230:14, 7230:24, 7231:20, 7232:16, 7234:1, 7248:17, 7248:18, 7251:15, 7251:24, 7252:7, 7252:15, 7252:16, 7252:18, 7252:19, 7253:7, 7253:9, 7253:25, 7254:4, 7254:5, 7254:6, 7254:8, 7254:18, 7254:22, 7254:23, 7255:7, 7255:11, 7255:16, 7255:18, 7255:19, 7255:24, 7257:1, 7257:9, 7257:14, 7257:15, 7257:18, 7257:21, 7258:4, 7258:12, 7258:14, 7258:16, 7259:2, 7259:14, 7259:15, 7259:18, 7259:25, 7263:20, 7263:21, 7264:5, 7264:7, 7268:22, 7272:19, 7282:23, 7290:1, 7290:2, 7291:20, 7292:14, 7293:11, 7295:20, 7296:17, 7297:1, 7298:25, 7299:21, 7299:24, 7299:25, 7300:3, 7301:11, 7303:16, 7304:15, 7309:11, 7311:11, 7311:16, 7312:9, 7317:17, 7317:20, 7318:2, 7318:12, 7318:15, 7318:16, 7318:21, 7318:24, 7319:4, 7319:8, 7319:10, 7319:17, 7319:20, 7320:1, 7320:22, 7321:6, 7322:21, 7322:23, 7323:1, 7323:4, 7323:9, 7323:12, 7323:23, 7325:11, 7326:7, 7326:20, 7327:7, 7327:17, 7327:24, 7328:3, 7328:15, 7341:13, 7348:9, 7348:11, 7355:9, 7363:16, 7364:14, 7364:17, 7365:7, 7366:16, 7366:17,

7366:23
**statements** [67] - 7182:5, 7183:18, 7183:21, 7184:4, 7184:12, 7185:4, 7185:5, 7190:25, 7191:7, 7199:24, 7201:22, 7201:23, 7202:24, 7202:25, 7208:6, 7220:15, 7220:24, 7221:6, 7222:24, 7223:5, 7228:17, 7230:8, 7231:17, 7233:10, 7233:20, 7236:24, 7248:12, 7248:14, 7249:5, 7249:10, 7250:22, 7250:25, 7263:11, 7263:12, 7263:16, 7264:23, 7265:19, 7276:24, 7283:4, 7283:6, 7291:17, 7299:7, 7301:22, 7304:19, 7305:10, 7305:12, 7310:2, 7311:11, 7319:9, 7325:7, 7325:22, 7326:6, 7327:15, 7328:11, 7328:13, 7328:14, 7334:4, 7347:19, 7348:12, 7363:3, 7363:4, 7363:8, 7363:11, 7372:7, 7375:3, 7377:9
**STATES** [3] - 7172:1, 7172:2, 7172:9
**states** [6] - 7184:22, 7307:5, 7307:12, 7307:13, 7323:15, 7388:21
**States** [10] - 7172:11, 7174:3, 7189:21, 7196:3, 7238:3, 7310:24, 7316:21, 7363:10, 7390:17, 7394:22
**status** [1] - 7218:10
**Stay** [2] - 7235:11, 7267:22
**stay** [21] - 7205:3, 7205:11, 7206:15, 7213:20, 7234:20, 7235:1, 7235:16, 7235:17, 7235:20, 7235:21, 7235:23, 7236:1, 7236:2, 7236:3, 7236:16, 7236:20, 7238:20, 7238:25, 7239:16,

7267:20, 7351:17
**steer** [1] - 7368:7
**stenographic** [1] - 7394:18
**step** [5] - 7195:6, 7253:24, 7290:19, 7383:1
**steps** [2] - 7284:10, 7372:22
**Steven** [3] - 7173:11, 7174:12, 7313:19
**Stewart** [1] - 7205:22
**stick** [1] - 7303:1
**still** [22] - 7179:17, 7205:13, 7210:14, 7210:15, 7214:19, 7241:16, 7246:13, 7250:9, 7274:13, 7274:24, 7275:7, 7278:1, 7289:15, 7290:5, 7290:6, 7320:10, 7323:5, 7326:9, 7327:4, 7340:25, 7378:16, 7378:24
**stipulate** [2] - 7323:6, 7332:22
**stipulated** [3] - 7325:23, 7326:2, 7326:4
**stipulation** [1] - 7284:8
**stole** [1] - 7371:3
**stolen** [1] - 7271:10
**stomped** [3] - 7300:5, 7300:22, 7300:23
**stop** [4] - 7236:25, 7237:1, 7312:16, 7364:9
**store** [1] - 7340:3
**storm** [4] - 7219:6, 7317:23, 7340:16, 7364:8
**stormed** [2] - 7317:15, 7364:2
**storming** [8] - 7212:18, 7227:18, 7230:3, 7265:25, 7320:2, 7321:3, 7321:8, 7365:22
**story** [1] - 7291:11
**straight** [1] - 7333:12
**Stream** [2] - 7347:9, 7347:17
**stream** [1] - 7268:10
**Street** [8] - 7172:14, 7172:17, 7172:20, 7172:23, 7173:5, 7173:9, 7253:12, 7253:13

**street** [1] - 7253:14
**stress** [1] - 7301:2
**stretch** [1] - 7216:20
**stretches** [1] - 7210:23
**strict** [1] - 7263:6
**strictly** [4] - 7202:13, 7265:11, 7294:17, 7373:2
**strike** [2] - 7189:17, 7337:14
**strikes** [5] - 7276:23, 7292:9, 7295:4, 7329:22, 7364:12
**string** [3] - 7185:4, 7281:5, 7282:18
**strings** [1] - 7247:17
**strong** [2] - 7306:2, 7377:11
**stronger** [2] - 7234:10, 7306:1
**strongly** [1] - 7194:21
**struck** [4] - 7283:25, 7293:5, 7304:11, 7384:14
**structure** [11] - 7198:7, 7209:24, 7273:4, 7274:21, 7282:25, 7295:2, 7309:12, 7309:15, 7309:21, 7311:15
**structured** [1] - 7273:23
**struggling** [1] - 7301:15
**stuck** [1] - 7215:24
**stuff** [4] - 7182:6, 7261:10, 7336:10, 7390:3
**stupid** [3] - 7234:5, 7236:24, 7237:4
**sua** [1] - 7306:12
**subject** [10] - 7179:18, 7221:9, 7251:24, 7326:2, 7328:11, 7360:4, 7381:22, 7383:8, 7384:22, 7384:25
**subjects** [1] - 7359:19
**submission** [1] - 7210:3
**submit** [10] - 7191:8, 7198:24, 7201:4, 7201:8, 7203:4, 7218:7, 7275:10, 7299:12, 7377:10, 7388:18
**submitted** [2] - 7313:24, 7360:2
**submitting** [2] -

7202:25, 7237:7
**subordinate** [1] - 7201:22
**subsequent** [1] - 7369:13
**subsequently** [2] - 7200:9, 7200:16
**substance** [3] - 7211:16, 7336:21, 7391:2
**substantial** [1] - 7314:6
**substantiate** [1] - 7218:10
**substantive** [2] - 7196:25, 7275:13
**sudden** [2] - 7264:6, 7386:14
**sufficiently** [1] - 7383:2
**sugg** [1] - 7229:14
**suggest** [10] - 7215:25, 7224:16, 7230:17, 7235:17, 7269:12, 7306:21, 7332:19, 7332:23, 7337:17, 7363:23
**suggested** [3] - 7301:21, 7338:18, 7365:17
**suggesting** [8] - 7190:4, 7202:23, 7224:4, 7224:10, 7224:12, 7229:11, 7292:7, 7335:12
**suggestion** [2] - 7229:10, 7318:2
**suggestions** [1] - 7306:9
**suggests** [1] - 7230:10
**Suite** [2] - 7172:17, 7173:6
**summarize** [2] - 7204:1, 7379:12
**summarized** [2] - 7380:15, 7381:6
**summary** [4] - 7199:21, 7315:21, 7315:22, 7316:4
**summed** [1] - 7204:17
**super** [2] - 7205:13, 7229:2
**super-secret** [1] - 7205:13
**supplemental** [1] - 7190:16
**supplied** [1] - 7200:10
**support** [2] - 7200:20, 7304:20

**supported** [1] - 7380:18
**supporters** [2] - 7321:24, 7366:10
**supporting** [1] - 7275:11
**supports** [3] - 7207:20, 7208:12, 7369:19
**suppose** [2] - 7210:11, 7387:21
**supposed** [1] - 7349:21
**supposedly** [3] - 7310:12, 7312:2, 7312:25
**Supreme** [2] - 7311:1, 7311:3
**surgically** [1] - 7336:14
**surprise** [3] - 7223:10, 7319:16, 7319:18
**surprised** [1] - 7224:16
**survive** [1] - 7214:9
**suspicious** [3] - 7263:8, 7263:25, 7281:25
**sustained** [1] - 7286:14
**swath** [1] - 7180:22
**swipe** [3] - 7263:18, 7345:5, 7392:10
**switch** [2] - 7305:21, 7305:24
**sympathetic** [2] - 7315:1
**system** [5] - 7188:14, 7235:2, 7235:3, 7235:4, 7300:19

---

## T

**tabbing** [1] - 7300:19
**table** [3] - 7272:24, 7315:6, 7321:19
**tacit** [6] - 7203:5, 7204:7, 7208:14, 7210:17, 7210:22, 7240:14
**tactics** [1] - 7218:17
**talks** [3] - 7183:11, 7236:20, 7337:14
**Tarantino** [4] - 7363:10, 7363:13, 7363:20, 7363:21
**targeted** [4] - 7268:3, 7270:12, 7273:23, 7372:20
**TARRIO** [1] - 7172:6

**Tarrio** [51] - 7174:5, 7174:15, 7205:25, 7206:8, 7208:24, 7209:1, 7209:10, 7241:13, 7256:25, 7262:25, 7263:12, 7264:20, 7269:22, 7274:20, 7275:20, 7275:21, 7276:9, 7276:15, 7276:25, 7280:22, 7288:5, 7290:21, 7291:25, 7313:17, 7325:12, 7325:13, 7325:15, 7326:24, 7326:25, 7327:15, 7327:24, 7328:3, 7328:11, 7330:22, 7331:22, 7332:1, 7333:20, 7351:20, 7351:22, 7352:16, 7355:5, 7355:6, 7357:13, 7357:23, 7357:25, 7366:4, 7369:6, 7369:10, 7369:16, 7371:8, 7391:13
**Tarrio's** [11] - 7217:11, 7218:16, 7273:21, 7275:1, 7291:20, 7305:1, 7354:11, 7356:4, 7368:14, 7369:2, 7373:16
**task** [1] - 7215:16
**teed** [5] - 7260:11, 7362:1, 7374:12, 7374:15
**tees** [1] - 7294:3
**Telegram** [62] - 7176:11, 7181:19, 7183:12, 7183:15, 7184:23, 7185:8, 7187:5, 7188:5, 7188:7, 7188:19, 7189:4, 7189:11, 7190:6, 7191:2, 7191:6, 7192:1, 7197:25, 7200:8, 7200:17, 7205:22, 7206:6, 7212:20, 7212:24, 7232:16, 7243:6, 7244:15, 7256:10, 7264:20, 7264:24, 7268:12, 7275:18, 7276:5, 7342:21, 7343:8, 7343:17, 7343:25, 7344:6, 7345:3, 7345:10, 7345:11, 7345:14, 7345:23, 7358:15, 7359:17,

7359:23, 7360:8, 7361:20, 7368:2, 7368:11, 7373:12, 7374:18, 7375:11, 7376:18, 7377:3, 7377:12, 7379:1, 7379:17, 7379:23, 7388:25, 7389:10, 7389:18
**Telegrams** [1] - 7379:22
**telephone** [1] - 7175:7
**tempting** [1] - 7240:18
**tendency** [1] - 7303:15
**tends** [1] - 7362:22
**term** [8] - 7316:7, 7367:3, 7367:7, 7367:11, 7367:14, 7367:16, 7367:24, 7377:7
**terms** [18] - 7176:19, 7190:10, 7195:10, 7195:14, 7207:13, 7216:20, 7219:21, 7220:17, 7241:25, 7286:24, 7291:25, 7302:25, 7305:22, 7313:5, 7315:21, 7363:7, 7365:7, 7373:23
**test** [5] - 7183:6, 7224:19, 7225:6, 7227:21, 7240:9
**testified** [2] - 7239:20, 7385:7
**testifies** [2] - 7253:11, 7316:1
**testify** [8] - 7189:23, 7274:12, 7274:25, 7359:17, 7372:10, 7385:13, 7390:2, 7391:15
**testifying** [2] - 7309:17, 7343:17
**testimony** [31] - 7176:10, 7192:4, 7200:11, 7200:19, 7240:13, 7268:20, 7271:4, 7285:24, 7286:2, 7286:10, 7286:14, 7306:11, 7315:22, 7316:4, 7330:25, 7331:3, 7331:11, 7352:13, 7360:6, 7360:7, 7361:2, 7361:4, 7361:5, 7376:18, 7382:12, 7384:23, 7385:3, 7385:15,

7385:24, 7386:2, 7391:12
**tethered** [1] - 7315:11
**text** [21] - 7182:2, 7187:2, 7187:3, 7187:4, 7187:5, 7189:6, 7248:24, 7257:3, 7268:12, 7309:10, 7316:2, 7338:5, 7343:1, 7344:7, 7352:15, 7355:21, 7358:10, 7358:12, 7373:15, 7379:20, 7390:2
**text-based** [1] - 7268:12
**textbook** [1] - 7301:4
**texts** [1] - 7316:3
**THE** [465] - 7172:1, 7172:1, 7172:9, 7174:2, 7174:16, 7175:5, 7175:11, 7175:18, 7175:24, 7176:15, 7177:3, 7177:7, 7177:10, 7177:13, 7178:23, 7178:25, 7179:12, 7180:4, 7181:14, 7182:8, 7184:8, 7185:11, 7185:20, 7185:22, 7186:13, 7187:16, 7189:14, 7190:23, 7191:14, 7191:18, 7191:20, 7193:11, 7193:16, 7193:18, 7193:20, 7195:24, 7196:2, 7196:5, 7196:17, 7197:4, 7197:8, 7199:18, 7200:2, 7200:14, 7201:1, 7201:17, 7201:20, 7202:5, 7202:11, 7202:14, 7202:17, 7203:25, 7204:11, 7204:14, 7208:4, 7210:1, 7211:25, 7212:7, 7212:14, 7213:4, 7213:16, 7214:15, 7214:21, 7215:3, 7215:12, 7215:19, 7215:21, 7216:5, 7216:11, 7216:16, 7216:23, 7217:19, 7218:8, 7218:20, 7218:25, 7219:11, 7219:13, 7219:15, 7219:19, 7220:2, 7221:1, 7221:3, 7221:6,

7431

7221:20, 7221:23, 7222:6, 7222:9, 7222:21, 7222:23, 7223:17, 7223:19, 7225:12, 7226:2, 7228:2, 7228:23, 7230:2, 7230:21, 7231:4, 7231:11, 7231:22, 7231:24, 7232:10, 7232:20, 7233:2, 7233:4, 7233:7, 7233:11, 7234:7, 7234:9, 7234:17, 7235:10, 7235:15, 7235:20, 7236:6, 7236:11, 7237:10, 7237:12, 7237:17, 7237:24, 7238:2, 7238:5, 7238:17, 7240:1, 7242:12, 7242:17, 7242:21, 7242:25, 7243:2, 7243:8, 7243:13, 7243:16, 7243:23, 7244:10, 7244:17, 7244:21, 7244:24, 7250:5, 7250:8, 7250:15, 7250:18, 7251:5, 7251:7, 7251:10, 7251:21, 7252:2, 7252:5, 7252:12, 7252:24, 7253:2, 7253:17, 7253:19, 7254:15, 7254:19, 7254:21, 7254:25, 7255:15, 7256:13, 7256:19, 7257:7, 7257:11, 7257:14, 7258:1, 7258:11, 7258:18, 7258:22, 7258:25, 7259:3, 7259:9, 7260:2, 7260:6, 7260:10, 7260:15, 7261:19, 7262:5, 7262:20, 7262:24, 7263:4, 7264:8, 7264:12, 7266:10, 7267:12, 7270:11, 7271:12, 7271:14, 7271:16, 7271:18, 7271:20, 7272:8, 7272:10, 7274:6, 7274:10, 7276:11, 7276:21, 7277:5, 7277:7, 7277:11, 7277:19, 7277:21, 7277:25, 7278:21, 7278:23, 7278:25, 7279:11, 7280:13, 7280:16,

7280:20, 7281:6, 7281:10, 7281:12, 7281:20, 7282:3, 7282:20, 7283:3, 7283:12, 7283:15, 7283:24, 7284:13, 7284:16, 7285:5, 7286:18, 7286:21, 7286:23, 7287:3, 7287:5, 7287:7, 7287:10, 7287:19, 7287:21, 7287:23, 7288:1, 7288:15, 7288:18, 7288:20, 7288:25, 7289:4, 7289:7, 7289:21, 7289:23, 7290:15, 7291:1, 7291:4, 7292:5, 7292:9, 7292:18, 7292:21, 7293:13, 7293:15, 7293:19, 7294:8, 7295:3, 7295:22, 7296:18, 7297:4, 7297:9, 7297:13, 7297:16, 7297:18, 7297:22, 7298:1, 7298:4, 7298:6, 7298:19, 7298:21, 7300:10, 7300:15, 7300:17, 7300:19, 7301:9, 7301:20, 7302:19, 7302:22, 7303:3, 7303:5, 7303:24, 7304:25, 7305:25, 7306:2, 7306:15, 7307:25, 7308:2, 7308:4, 7308:6, 7308:9, 7308:10, 7308:11, 7308:18, 7308:23, 7309:7, 7311:23, 7312:10, 7312:13, 7312:19, 7314:22, 7316:17, 7316:20, 7316:25, 7317:7, 7317:10, 7318:4, 7318:17, 7318:19, 7319:1, 7319:6, 7319:14, 7320:4, 7320:7, 7320:13, 7320:19, 7321:5, 7321:12, 7321:18, 7322:5, 7322:10, 7322:18, 7323:3, 7323:11, 7323:16, 7323:18, 7324:1, 7324:10, 7324:15, 7324:18, 7324:21, 7325:18, 7326:8, 7327:9, 7328:5,

7328:24, 7329:7, 7329:12, 7329:15, 7329:22, 7330:1, 7330:5, 7330:19, 7330:23, 7331:8, 7331:16, 7331:18, 7331:20, 7332:5, 7332:7, 7332:12, 7332:14, 7332:16, 7332:21, 7332:24, 7333:2, 7333:5, 7334:1, 7334:17, 7334:22, 7335:1, 7335:14, 7336:2, 7336:16, 7336:24, 7337:2, 7337:4, 7337:11, 7337:22, 7338:6, 7338:8, 7339:18, 7339:21, 7341:8, 7341:17, 7341:19, 7341:21, 7341:23, 7342:8, 7342:18, 7343:18, 7343:20, 7343:23, 7344:1, 7344:4, 7345:17, 7345:20, 7345:24, 7346:19, 7348:5, 7348:8, 7350:10, 7351:8, 7351:20, 7352:23, 7353:4, 7353:15, 7353:18, 7353:21, 7354:7, 7355:2, 7355:17, 7356:2, 7356:4, 7357:10, 7357:12, 7357:20, 7358:9, 7358:16, 7358:21, 7358:24, 7359:8, 7359:25, 7360:14, 7360:16, 7361:7, 7361:15, 7367:17, 7368:13, 7369:22, 7370:3, 7370:9, 7370:16, 7371:9, 7371:25, 7373:6, 7373:9, 7373:14, 7373:21, 7374:3, 7374:14, 7374:23, 7374:25, 7375:4, 7375:7, 7375:10, 7375:16, 7376:13, 7379:9, 7379:11, 7380:5, 7380:7, 7380:11, 7380:14, 7380:24, 7381:2, 7381:11, 7382:7, 7382:16, 7382:23, 7383:10, 7384:16, 7386:1, 7386:24, 7387:8, 7387:17, 7388:7,

7388:11, 7388:13, 7388:17, 7389:3, 7389:6, 7390:6, 7391:23, 7392:3, 7392:5, 7392:14, 7393:8, 7393:19, 7393:21, 7394:2, 7394:8, 7394:11
**them's** [2] - 7265:20, 7286:9
**theme** [4] - 7259:22, 7274:8, 7300:2, 7325:6
**themselves** [6] - 7199:23, 7205:20, 7210:18, 7304:12, 7356:20, 7365:5
**then-existing** [1] - 7225:16
**theoretical** [1] - 7326:11
**theoretically** [1] - 7290:10
**theories** [10] - 7215:22, 7215:23, 7216:2, 7220:17, 7221:2, 7250:7, 7250:12, 7270:15, 7319:9, 7342:10
**theory** [108] - 7180:17, 7194:6, 7195:11, 7196:7, 7197:9, 7197:14, 7204:20, 7210:14, 7210:17, 7210:22, 7211:15, 7213:24, 7214:7, 7218:4, 7218:19, 7218:22, 7219:16, 7221:1, 7221:3, 7221:25, 7223:19, 7226:3, 7226:6, 7226:9, 7228:6, 7228:20, 7230:7, 7236:7, 7240:9, 7240:25, 7241:1, 7242:10, 7243:9, 7243:10, 7243:19, 7243:22, 7245:3, 7245:8, 7245:16, 7246:7, 7246:11, 7246:13, 7247:11, 7248:9, 7249:7, 7249:25, 7250:9, 7250:19, 7251:22, 7252:6, 7252:16, 7253:20, 7254:25, 7255:4, 7255:5, 7255:11, 7255:19, 7258:12, 7258:19, 7259:9, 7259:11,

7259:15, 7259:19, 7260:7, 7260:20, 7261:13, 7261:15, 7266:15, 7267:10, 7270:23, 7272:13, 7272:24, 7274:10, 7274:13, 7274:17, 7278:6, 7278:9, 7279:14, 7283:4, 7287:24, 7289:13, 7290:3, 7290:6, 7291:24, 7292:24, 7297:10, 7299:19, 7304:20, 7318:20, 7320:20, 7322:24, 7324:3, 7327:21, 7328:8, 7328:16, 7339:23, 7340:18, 7341:9, 7341:10, 7351:13, 7357:7, 7364:19, 7366:19, 7369:19, 7370:5, 7375:14, 7376:7
**theory-related** [1] - 7196:7
**therefore** [8] - 7208:5, 7236:20, 7238:24, 7255:8, 7307:23, 7317:19, 7326:5, 7358:3
**they've** [5] - 7226:6, 7256:21, 7343:10, 7379:23, 7391:24
**thieves'** [1] - 7230:20
**thin** [3] - 7241:6, 7302:20, 7307:18
**thinking** [3] - 7227:11, 7284:3, 7384:4
**thinks** [3] - 7175:1, 7282:16, 7391:9
**Third** [1] - 7353:20
**third** [4] - 7196:24, 7307:23, 7323:7, 7348:19
**thoughts** [1] - 7339:14
**thousand** [1] - 7249:2
**thousands** [1] - 7333:21
**thread** [2] - 7227:12, 7234:2
**threads** [1] - 7189:1
**threat** [1] - 7342:14
**three** [13] - 7197:2, 7218:21, 7228:25, 7256:16, 7285:16, 7286:24, 7288:22, 7291:16, 7291:17, 7291:23, 7292:3, 7306:17, 7335:20
**throughout** [6] -

7200:17, 7361:21,
7367:1, 7367:15,
7371:24
**throw** [3] - 7198:19,
7285:22, 7390:3
**thrown** [2] - 7217:12,
7372:24
**thrust** [1] - 7246:20
**thumb** [1] - 7186:9
**Thursday** [2] -
7182:16, 7385:16
**tick** [2] - 7296:23,
7359:2
**tied** [2] - 7289:16,
7302:12
**tier** [2] - 7198:8,
7198:9
**ties** [1] - 7238:13
**tightly** [1] - 7286:2
**Tim** [2] - 7298:8,
7308:9
**time-consuming** [1] -
7376:22
**timeline** [2] - 7281:18,
7281:23
**timestamp** [2] -
7188:14, 7282:15
**Timothy** [1] - 7173:15
**TIMOTHY** [2] - 7172:9,
7394:16
**tip** [4] - 7269:17,
7321:23, 7323:1,
7366:9
**today** [20] - 7174:19,
7174:21, 7175:2,
7175:10, 7183:3,
7190:11, 7191:24,
7192:12, 7193:7,
7212:15, 7223:6,
7244:10, 7245:11,
7268:19, 7315:19,
7340:15, 7344:7,
7350:14, 7361:17,
7372:12
**today's** [1] - 7190:21
**together** [14] -
7180:19, 7181:25,
7193:23, 7201:19,
7210:12, 7211:11,
7250:2, 7275:24,
7276:2, 7276:10,
7283:17, 7339:4,
7350:8, 7367:13
**tolerated** [1] - 7267:25
**tomorrow** [12] -
7191:22, 7191:25,
7223:23, 7359:14,
7387:14, 7387:25,
7388:2, 7388:15,
7391:12, 7393:12,

7393:13, 7394:10
**tongue** [1] - 7208:25
**tongue-in-cheek** [1] -
7208:25
**tonight** [1] - 7215:16
**took** [9] - 7253:24,
7265:18, 7273:3,
7299:15, 7310:20,
7317:15, 7331:4,
7337:21, 7364:2
**tool** [39] - 7196:12,
7196:13, 7196:15,
7197:2, 7198:4,
7201:14, 7201:16,
7210:4, 7210:15,
7210:20, 7210:21,
7220:1, 7221:16,
7221:18, 7221:19,
7252:10, 7252:11,
7258:13, 7258:16,
7259:16, 7259:18,
7259:22, 7259:25,
7267:10, 7278:4,
7297:2, 7297:4,
7297:17, 7300:4,
7300:22, 7326:21,
7334:10, 7334:11,
7339:12, 7352:20,
7353:6, 7368:21,
7370:5
**tools-based** [1] -
7270:21
**tools-related** [1] -
7254:22
**Toomey** [5] - 7319:22,
7319:24, 7320:10,
7321:1, 7321:6
**top** [4] - 7198:8,
7209:2, 7218:13,
7227:24
**top-down** [1] - 7209:2
**top-tier** [1] - 7198:8
**topic** [35] - 7205:4,
7205:11, 7206:12,
7206:15, 7206:21,
7234:20, 7235:1,
7235:16, 7235:18,
7235:20, 7235:21,
7235:23, 7236:1,
7236:2, 7236:4,
7236:8, 7236:9,
7236:11, 7236:13,
7236:17, 7236:20,
7238:20, 7239:1,
7239:16, 7267:20,
7267:22, 7267:23,
7268:1, 7271:8,
7288:23, 7300:6,
7360:3, 7369:17,
7387:1
**topics** [1] - 7271:6
**touch** [1] - 7318:7
**touched** [1] - 7221:9

7253:20, 7254:22,
7254:25, 7255:4,
7255:5, 7255:11,
7255:19, 7256:20,
7258:11, 7259:9,
7259:15, 7260:7,
7260:24, 7261:13,
7261:14, 7261:17,
7261:22, 7261:23,
7262:1, 7262:11,
7262:12, 7263:10,
7265:17, 7265:22,
7266:15, 7270:20,
7270:21, 7270:22,
7271:16, 7271:17,
7271:19, 7272:13,
7279:13, 7297:10,
7297:15, 7321:22,
7322:3, 7322:20,
7322:23, 7322:24,
7327:6, 7327:13,
7327:21, 7328:15,
7328:16, 7339:11,
7339:21, 7341:8,
7341:10, 7350:24,
7363:22, 7366:19,
7370:5
**tools-based** [1] -
7270:21
**tools-related** [1] -
7254:22
**Toomey** [5] - 7319:22,
7319:24, 7320:10,
7321:1, 7321:6
**top** [4] - 7198:8,
7209:2, 7218:13,
7227:24
**top-down** [1] - 7209:2
**top-tier** [1] - 7198:8
**topic** [35] - 7205:4,
7205:11, 7206:12,
7206:15, 7206:21,
7234:20, 7235:1,
7235:16, 7235:18,
7235:20, 7235:21,
7235:23, 7236:1,
7236:2, 7236:4,
7236:8, 7236:9,
7236:11, 7236:13,
7236:17, 7236:20,
7238:20, 7239:1,
7239:16, 7267:20,
7267:22, 7267:23,
7268:1, 7271:8,
7288:23, 7300:6,
7360:3, 7369:17,
7387:1
**topics** [1] - 7271:6
**touch** [1] - 7318:7
**touched** [1] - 7221:9

**toward** [2] - 7304:5,
7337:12
**towards** [3] - 7300:25,
7301:3, 7301:19
**track** [3] - 7176:16,
7176:22, 7324:11
**traditional** [3] -
7272:4, 7294:18,
7307:21
**trained** [1] - 7213:11
**traitors** [1] - 7199:6
**trannies** [1] - 7354:4
**transcript** [6] -
7173:18, 7203:9,
7384:11, 7386:22,
7394:18, 7394:19
**TRANSCRIPT** [1] -
7172:8
**transcription** [1] -
7173:19
**transcripts** [1] -
7306:7
**transformed** [1] -
7304:7
**transforming** [2] -
7339:8, 7341:25
**transforms** [1] -
7304:22
**transmitted** [1] -
7198:2
**transpiring** [1] -
7203:15
**treated** [1] - 7306:13
**triage** [2] - 7376:23,
7376:25
**TRIAL** [1] - 7172:8
**trial** [19] - 7190:9,
7200:9, 7200:16,
7239:20, 7261:9,
7262:17, 7273:10,
7309:20, 7312:3,
7362:14, 7371:18,
7372:13, 7372:24,
7375:20, 7376:1,
7384:7, 7386:4
**tricky** [2] - 7296:19,
7326:8
**tries** [1] - 7198:22
**trip** [4] - 7211:23,
7213:14, 7238:22,
7371:6
**trouble** [1] - 7202:6
**troubling** [1] - 7307:5
**true** [13] - 7228:24,
7250:8, 7250:10,
7273:15, 7282:24,
7301:11, 7313:2,
7313:3, 7313:4,
7356:10, 7381:12,
7394:17, 7394:18

**truly** [1] - 7392:16
**Trump** [7] - 7254:14,
7275:8, 7302:17,
7321:24, 7334:13,
7335:24, 7366:9
**trusted** [1] - 7205:1
**truth** [50] - 7184:5,
7202:2, 7215:23,
7216:3, 7220:24,
7220:25, 7221:7,
7221:12, 7222:3,
7222:10, 7224:18,
7230:9, 7230:14,
7230:22, 7230:23,
7231:1, 7246:12,
7248:13, 7248:16,
7248:18, 7248:23,
7248:25, 7249:5,
7249:11, 7252:22,
7252:25, 7253:9,
7253:10, 7254:8,
7257:10, 7265:10,
7268:22, 7268:23,
7269:6, 7269:7,
7269:13, 7293:3,
7293:7, 7294:2,
7294:14, 7294:15,
7294:18, 7295:5,
7295:6, 7295:18,
7318:2, 7365:1,
7365:10
**try** [11] - 7186:9,
7209:15, 7238:8,
7243:24, 7249:12,
7267:14, 7269:5,
7335:4, 7340:19,
7357:6, 7361:16
**trying** [27] - 7203:13,
7203:23, 7204:13,
7204:14, 7215:25,
7226:21, 7229:14,
7230:17, 7239:3,
7239:8, 7245:5,
7259:17, 7266:3,
7266:4, 7276:6,
7279:22, 7293:1,
7327:4, 7334:12,
7361:12, 7361:16,
7377:7, 7378:3,
7380:18, 7390:1,
7390:3
**turn** [14] - 7211:18,
7217:15, 7218:4,
7242:23, 7279:13,
7295:23, 7296:5,
7298:25, 7308:12,
7316:25, 7318:21,
7322:22, 7375:5,
7378:1
**turned** [2] - 7218:22,

7261:9
**turning** [1] - 7377:13
**turns** [4] - 7276:12, 7327:19, 7327:21, 7328:15
**twice** [4] - 7327:23, 7328:4, 7368:23, 7388:22
**twisted** [2] - 7209:10, 7226:18
**Twitter** [6] - 7264:1, 7264:2, 7264:18, 7269:19, 7269:20, 7287:15
**two** [45] - 7208:23, 7211:7, 7218:3, 7220:9, 7228:18, 7236:17, 7239:18, 7239:24, 7241:12, 7249:2, 7251:23, 7253:21, 7255:6, 7277:22, 7280:24, 7281:13, 7281:20, 7283:4, 7283:6, 7286:17, 7288:25, 7311:11, 7321:1, 7322:2, 7325:12, 7346:5, 7348:12, 7348:18, 7354:14, 7355:13, 7358:5, 7359:12, 7360:18, 7363:6, 7368:21, 7371:17, 7372:25, 7376:9, 7380:1, 7380:3, 7380:19, 7386:22, 7393:16, 7393:17
**two-page** [1] - 7386:22
**tying** [1] - 7223:15
**type** [13] - 7183:13, 7199:12, 7199:15, 7203:7, 7207:15, 7263:7, 7344:25, 7352:12, 7360:5, 7367:3, 7372:15, 7376:23, 7376:25
**types** [2] - 7199:7, 7290:23

## U

**U.S** [3] - 7172:13, 7173:16, 7393:16
**ulterior** [1] - 7320:24
**ultimate** [2] - 7268:23, 7277:15
**ultimately** [5] - 7247:7, 7250:3, 7267:1, 7269:2,

7390:23
**unapologetically** [1] - 7284:22
**uncertainty** [1] - 7217:12
**unclear** [1] - 7252:3
**uncorrected** [2] - 7384:24, 7385:24
**under** [31] - 7174:24, 7175:7, 7193:5, 7199:2, 7202:21, 7216:2, 7218:19, 7221:1, 7221:2, 7231:14, 7236:7, 7238:16, 7245:15, 7284:2, 7290:8, 7299:7, 7303:7, 7306:23, 7319:2, 7327:12, 7332:23, 7333:18, 7342:1, 7357:11, 7376:11, 7376:13, 7376:15, 7377:18, 7381:20, 7383:21
**underlying** [3] - 7390:23, 7391:1, 7392:11
**undermine** [1] - 7328:8
**understandings** [1] - 7179:8
**understood** [11] - 7176:3, 7177:7, 7183:14, 7183:19, 7187:10, 7245:2, 7262:2, 7270:3, 7280:15, 7358:21
**undertaken** [1] - 7242:3
**undue** [1] - 7313:16
**unduly** [2] - 7265:22, 7349:9
**unfair** [6] - 7227:9, 7285:16, 7301:12, 7314:6, 7317:21
**unfairly** [2] - 7336:5, 7353:23
**unfocused** [1] - 7300:8
**unique** [1] - 7380:10
**uniquely** [2] - 7302:7
**UNITED** [3] - 7172:1, 7172:2, 7172:9
**United** [10] - 7172:11, 7174:3, 7189:21, 7196:3, 7238:3, 7310:24, 7316:21, 7363:10, 7390:17, 7394:22
**universe** [1] - 7196:16

**unknown** [1] - 7241:15
**unlawful** [1] - 7203:2
**unless** [10] - 7255:5, 7280:25, 7281:15, 7311:25, 7312:5, 7326:6, 7351:13, 7359:9, 7370:15, 7373:7
**unlike** [2] - 7334:23, 7355:6
**unnamed** [1] - 7307:23
**unnecessarily** [1] - 7282:6
**unnecessary** [1] - 7234:3
**unprecedented** [2] - 7228:18, 7376:21
**unquote** [1] - 7343:16
**unrelated** [1] - 7369:17
**untethered** [1] - 7280:25, 7302:2, 7341:6
**unusual** [1] - 7339:22
**up** [67] - 7180:18, 7186:9, 7190:7, 7197:22, 7200:10, 7200:11, 7200:13, 7202:6, 7204:17, 7204:22, 7207:1, 7208:7, 7209:19, 7211:3, 7211:20, 7211:22, 7212:2, 7213:13, 7225:13, 7226:4, 7231:4, 7234:1, 7234:2, 7239:21, 7241:15, 7242:14, 7242:24, 7244:2, 7260:11, 7266:2, 7267:15, 7269:10, 7271:1, 7273:1, 7273:3, 7273:8, 7273:10, 7273:11, 7275:25, 7281:1, 7286:16, 7294:3, 7300:2, 7310:13, 7315:13, 7327:12, 7340:17, 7343:11, 7346:6, 7349:18, 7360:12, 7360:17, 7360:19, 7361:18, 7362:1, 7362:20, 7374:12, 7374:15, 7374:16, 7377:4, 7378:4, 7378:8, 7378:23, 7379:13, 7383:5
**upheld** [2] - 7245:9,

7245:10
**uphill** [1] - 7277:3
**upset** [3] - 7222:20, 7224:16, 7241:8
**upside** [1] - 7378:1
**usable** [1] - 7380:1
**usage** [1] - 7367:16
**usefulness** [1] - 7363:19
**user** [3] - 7198:1, 7198:5, 7212:20
**uses** [3] - 7184:4, 7345:14, 7355:14
**usual** [1] - 7220:4

## V

**vacuum** [3] - 7187:19, 7234:10
**vague** [5] - 7230:7, 7236:5, 7300:8, 7324:23, 7334:16
**vagueness** [2] - 7232:2, 7233:6
**Valentine** [2] - 7287:13, 7288:8
**valid** [3] - 7190:2, 7290:6, 7291:12
**validity** [1] - 7241:1
**value** [1] - 7268:23
**variety** [1] - 7319:8
**various** [3] - 7199:24, 7319:8, 7325:22
**vehicles** [1] - 7342:5
**venue** [1] - 7240:20
**verbal** [2] - 7294:21, 7307:21
**verified** [1] - 7296:16
**version** [3] - 7348:20, 7348:22
**versus** [3] - 7207:13, 7268:17, 7273:12
**vetting** [2] - 7347:7, 7347:13
**video** [26] - 7188:16, 7198:13, 7206:6, 7206:7, 7208:9, 7209:22, 7245:22, 7245:24, 7265:4, 7265:6, 7268:9, 7284:8, 7286:12, 7286:15, 7287:13, 7287:14, 7333:11, 7333:17, 7348:21, 7352:17, 7380:10, 7381:17, 7382:3, 7383:16, 7386:12
**videos** [11] - 7226:20, 7266:1, 7285:25, 7286:4, 7286:8,

7287:17, 7313:4, 7376:2, 7381:14, 7382:18, 7382:20
**Vietnam** [1] - 7242:4
**view** [11] - 7201:19, 7213:12, 7214:4, 7285:2, 7296:9, 7296:17, 7307:8, 7310:13, 7335:2, 7377:19, 7382:9
**viewed** [2] - 7211:24, 7382:2
**viewing** [3] - 7372:10, 7372:14, 7382:2
**views** [2] - 7199:8, 7199:10
**violate** [1] - 7235:13
**violence** [38] - 7199:17, 7203:2, 7204:6, 7209:3, 7209:13, 7219:3, 7226:22, 7230:10, 7238:24, 7241:9, 7247:3, 7249:9, 7264:20, 7265:1, 7270:6, 7274:4, 7275:6, 7284:20, 7285:14, 7287:12, 7287:18, 7288:9, 7288:13, 7300:25, 7301:3, 7301:23, 7304:7, 7304:9, 7304:10, 7305:8, 7306:11, 7310:7, 7310:16, 7311:4, 7311:5, 7313:1, 7313:9, 7333:13
**violence-oriented** [1] - 7199:17
**violent** [11] - 7245:20, 7266:5, 7266:6, 7268:1, 7273:18, 7275:7, 7304:19, 7339:14, 7342:13, 7369:21
**virtual** [1] - 7209:23
**virtue** [2] - 7177:25, 7182:18
**vis-à-vis** [1] - 7371:10
**vituperative** [1] - 7339:14
**Vividic** [3] - 7213:3, 7368:23
**voice** [3] - 7207:10, 7372:2, 7379:5
**vote** [1] - 7288:6
**voted** [1] - 7288:10
**votes** [1] - 7288:13

# W

**wait** [1] - 7244:8
**waiting** [1] - 7217:14
**waive** [1] - 7175:13
**waiver** [1] - 7373:2
**waiving** [1] - 7175:10
**wake** [1] - 7306:20
**WAL** [1] - 7388:24
**walk** [1] - 7383:1
**walking** [3] - 7284:9, 7286:16, 7286:17
**wall** [1] - 7390:3
**wants** [16] - 7179:18, 7201:11, 7224:10, 7254:12, 7254:13, 7261:3, 7270:16, 7311:13, 7311:16, 7349:19, 7370:15, 7372:16, 7372:20, 7383:21, 7390:19, 7392:18
**War** [1] - 7242:4
**war** [8] - 7234:3, 7276:24, 7296:25, 7297:2, 7299:21, 7306:19, 7333:25, 7340:7
**warned** [1] - 7206:12
**Washington** [10] - 7172:5, 7172:14, 7172:21, 7173:17, 7198:21, 7211:21, 7241:11, 7241:14, 7385:12, 7394:23
**waste** [1] - 7186:1
**watch** [1] - 7209:21
**watching** [3] - 7233:15, 7261:12, 7340:6
**ways** [9] - 7174:23, 7195:11, 7223:25, 7250:22, 7267:6, 7275:1, 7315:13, 7319:8, 7363:6
**WB** [2] - 7347:9, 7347:17
**weak** [1] - 7181:2
**weapon** [1] - 7340:5
**weaponry** [1] - 7334:13
**weapons** [7] - 7335:3, 7335:5, 7335:6, 7335:10, 7335:12, 7335:13, 7335:23
**weather** [1] - 7175:7
**weave** [1] - 7249:12
**week** [4] - 7211:7, 7278:16, 7359:13, 7383:15

**weekend** [2] - 7321:24, 7366:10
**weeks** [2] - 7200:18, 7385:24
**weight** [2] - 7240:7, 7240:19
**Welcome** [1] - 7328:23
**well-founded** [1] - 7316:9
**well-written** [1] - 7361:25
**west** [1] - 7381:9
**West** [1] - 7173:9
**whatnot** [1] - 7214:4
**whatsoever** [2] - 7188:15, 7241:2
**whiskey** [5] - 7348:13, 7348:15, 7348:16, 7348:23, 7380:6
**whole** [26] - 7183:3, 7187:9, 7189:8, 7189:13, 7209:11, 7211:15, 7211:18, 7233:10, 7234:1, 7249:6, 7249:7, 7249:16, 7269:10, 7305:16, 7311:10, 7313:14, 7331:11, 7334:14, 7346:9, 7349:3, 7349:6, 7349:9, 7351:2, 7351:17, 7365:21, 7366:1
**wholesale** [2] - 7190:6, 7298:18
**wide** [1] - 7315:12
**widely** [1] - 7279:7
**wiggle** [1] - 7334:12
**wild** [3] - 7209:6, 7209:8, 7302:17
**Wilkins** [1] - 7198:6
**willing** [2] - 7198:25, 7247:24
**wind** [1] - 7240:17
**window** [7] - 7228:16, 7229:23, 7298:17, 7306:22, 7319:25, 7325:3, 7355:8
**wins** [1] - 7331:23
**Winter** [2] - 7325:13, 7368:15
**wise** [1] - 7298:11
**wisely** [1] - 7296:1
**wish** [1] - 7284:4
**wishes** [3] - 7199:23, 7383:24, 7383:25
**withdraw** [1] - 7219:12
**withdrawing** [1] -

7219:11
**withdrew** [1] - 7384:15
**withhold** [1] - 7357:9
**witness** [39] - 7190:20, 7191:25, 7192:1, 7200:8, 7240:13, 7280:3, 7288:16, 7306:14, 7315:21, 7343:20, 7343:22, 7343:24, 7344:5, 7359:14, 7359:15, 7359:16, 7360:21, 7361:13, 7367:6, 7381:7, 7382:1, 7383:4, 7383:16, 7384:13, 7385:11, 7385:13, 7385:20, 7385:25, 7387:9, 7387:10, 7387:11, 7387:13, 7387:22, 7389:9, 7389:12, 7391:1, 7391:15, 7392:8, 7393:15
**witness's** [1] - 7291:10
**witnesses** [10] - 7226:16, 7226:19, 7239:20, 7307:4, 7316:6, 7360:18, 7384:1, 7384:2, 7384:5, 7385:5
**women** [2] - 7205:10, 7205:14
**wondering** [1] - 7306:22
**wonky** [2] - 7189:4, 7189:9
**wood** [4] - 7330:22, 7331:6, 7331:10, 7331:17
**wooden** [4] - 7330:11, 7330:25, 7371:1, 7371:2
**word** [10] - 7179:11, 7225:14, 7325:8, 7336:9, 7347:22, 7351:6, 7353:9, 7354:4, 7355:14, 7385:9
**words** [8] - 7187:3, 7210:20, 7231:5, 7273:22, 7336:21, 7341:9, 7361:12, 7379:21
**works** [2] - 7328:16, 7385:12
**world** [1] - 7378:1
**worried** [1] - 7288:12

**worries** [1] - 7264:1
**worry** [1] - 7263:8
**worst** [4] - 7188:6, 7189:12, 7265:18, 7266:14
**worth** [3] - 7214:11, 7270:10, 7369:12
**worthy** [1] - 7234:6
**wrinkles** [1] - 7373:9
**writes** [2] - 7353:16, 7370:1
**writing** [3] - 7264:18, 7342:24, 7389:2
**written** [3] - 7183:24, 7248:11, 7361:25

# X

**X-ray** [1] - 7307:19

# Y

**year** [2] - 7358:1, 7389:5
**years** [4] - 7358:5, 7371:17, 7372:25, 7391:5
**yesterday** [2] - 7174:18, 7374:20
**Yo** [2] - 7326:23, 7368:24
**York** [2] - 7172:18, 7173:13
**yourself** [2] - 7221:10, 7234:2

# Z

**Zachary** [3] - 7174:4, 7207:16, 7215:8
**zone** [1] - 7302:13
**zoo** [1] - 7337:12
**zoom** [2] - 7245:23, 7246:2