```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
          v.                              1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
   1-ETHAN NORDEAN                         1:21-cr-00175-TJK-6
   2-JOSEPH R. BIGGS
   3-ZACHARY REHL                  Washington, D.C.
   5-ENRIQUE TARRIO                Tuesday, August 29, 2023
   6-DOMINIC J. PEZZOLA,           9:30 a.m.
                       Defendants.
- - - - - - - - - - - - - - - - x
```

_____

                 TRANSCRIPT OF OMNIBUS HEARING
          HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:    Jason B.A. McCullough, Esq.
                          Erik M. Kenerson, Esq.
                          Conor Mulroe, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017

                          Nayib Hassan, Esq.
                          LAW OFFICES OF NAYIB HASSAN, P.A.
                          6175 NW 153 Street
                          Suite 209
                          Miami Lakes, FL 33014
                          (305) 403-7323

APPEARANCES CONTINUED:

For the Defendants:         Sabino Jauregui, Esq.
                            JAUREGUI LAW, P.A.
                            1014 West 49 Street
                            Hialeah, FL 33012
                            (305) 822-2901

                            Steven A. Metcalf, II, Esq.
                            METCALF & METCALF, P.C.
                            99 Park Avenue
                            6th Floor
                            New York, NY 10016
                            (646) 253-0514

                            Roger Roots, Esq.
                            10 Dorrance Street
                            Suite 700 #649
                            Providence, RI 02903
                            (775) 764-9347

Court Reporter:             Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
                            U.S. Courthouse, Room 6722
                            333 Constitution Avenue, NW
                            Washington, DC 20001
                            (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  This is Criminal Matter 21-175,

3    United States of America v. Defendant 1, Ethan Nordean;

4    Defendant 2, Joseph R. Biggs; Defendant 3, Zachary Rehl;

5    Defendant 5, Enrique Tarrio; and Defendant 6, Dominic J.

6    Pezzola.

7          Present for the Government are Jason McCullough,

8    Erik Kenerson, and Conor Mulroe; present for Defendant 1 is

9    Nicholas Smith; present for Defendant 2 is Norman Pattis;

10   present for Defendant 3 is also Norman Pattis; present for

11   Defendant 5 are Nayib Hassan and Sabino Jauregui; and

12   present for Defendant 6 are Steven Metcalf and Roger Roots.

13   Also present are Defendant 1, Mr. Nordean; Defendant 2,

14   Mr. Biggs; Defendant 3, Mr. Rehl; Defendant 5, Mr. Tarrio;

15   and Defendant 6, Mr. Pezzola.

16         THE COURT:  All right.  Good morning to everyone.

17   Apologies for the delay.  I understand the marshals brought

18   the defendants to the wrong courtroom which is why we were

19   briefly delayed.

20         Here is how I would like to proceed, which is a

21   little bit different than, I think, what I had relayed to

22   the parties the other day, just a little bit different.

23   We'll start with -- the Government had asked -- I think the

24   Government has some victim impact statements they want to

25   present.  We will do that.  Instead of, then, me, then --

1    me, then, proceeding to have me relay a ruling on the

2    Rule 29 and Rule 33 motions, I think I'd rather catch you

3    all when you're fresh, frankly, and I'll just hear from you

4    on the three topics that I had laid out on the guidelines

5    calculations that we're here to discuss.  The Government,

6    whichever -- whatever defendants would like to address those

7    three topics.  If a topic was not on that list, then either

8    I don't need to hear from you on it or it may be something

9    that individually pertains to one of the defendants in a

10   particular way.  I'll hear from defense counsel or the

11   Government in the individual sentencings that will be

12   happening later this week.  But at least as to those three

13   global topics, we'll go through them.  Then, in whatever --

14   in the time we have remaining, once we're through that

15   argument, while everyone is tired at that point, I'll put my

16   ruling on the record regarding the Rule 29 and Rule 33

17   motions.  So flipping the last two things, I think, is

18   better for all of you to hear from you earlier in the day

19   than later.

20          Any questions before we proceed from any counsel?

21          All right.  Hearing none, why don't we start --

22   again, I said I would put the victims at the beginning of

23   today so that they didn't have to wait around.  So

24   Mr. Mulroe, you may proceed.

25          MR. MULROE:  Thank you, Your Honor.  Conor Mulroe

1    for the United States.

2        We do have two victims who are here in person and

3    would like to give a statement to the Court.  One additional

4    victim has submitted something in writing that the

5    Government would like to just read into the record this

6    morning.  So all three were trial witnesses that I expect

7    Your Honor will remember from the trial.  We're going to

8    begin with Officer Shae Cooney.

9        THE COURT:  Officer, you may proceed.

10        OFFICER COONEY:  Good morning.  My name is Officer

11    Shae Cooney.  I've been on the department now going on six

12    years.  On January 6th, 2021, I was going into my third year

13    on the department, wasn't quite sure what to say about

14    everything that happened that day, but what I do want to say

15    is that day --

16        THE COURT:  I'm sorry.  Can I have silence from

17    everyone else on this side of the bar while the -- while

18    Officer Cooney is testifying.

19        You may proceed.

20        OFFICER COONEY:  January 6th definitely changed

21    the way I saw the department.  I took one of my fellow

22    officer's overtime that day.  I wasn't drafted to come in

23    that early, but decided I would take his overtime and get an

24    extra four hours which, for that day, would have been a

25    12-hour day, which turned into an almost 19-hour day.

1    Seeing firsthand of everything that happened when I went

2    down to the lower west terrace was something I had never

3    thought that I would ever have to do.  I knew signing up for

4    this department anything could happen, ranging from the

5    smallest incident of showing someone directions to the

6    nearest mall, the nearest Starbucks, to something that we

7    saw on January 6th.  That day was the first time I wasn't

8    sure if I was going home that night.

9              (Brief pause.)

10             Sorry.

11             (Brief pause.)

12             THE COURT:  Take your time.

13             (Brief pause.)

14             OFFICER COONEY:  Probably one of the first times

15   I've really talked about -- feeling my phone vibrate for

16   hours, knowing that my family was trying to reach me and I

17   couldn't do anything for hours was very heartbreaking.  I

18   had -- a previous relationship was on the department and he

19   was on the roof of the Capitol watching the entire time, not

20   able to do anything.  He had his job and I had mine.  And he

21   was the last person I talked to before I had to go down to

22   the lower west terrace.  And thinking the entire time I

23   really hope I get to see him at the end of this night.

24             I had to put my skills to the test that day.  I

25   never thought I'd be fighting my own fellow citizens that

1    day.  It was heartbreaking to have a group of people who, on

2    any other day, were very pro-police, pro-law enforcement,

3    pro-United States, for hours, continuously attack us and

4    beat us with thin blue line flags that I'd never thought I

5    would ever see happen, asking us to just let them in and let

6    them do what they had to do.

7            Everyone that came onto the Capitol grounds had a

8    choice that day.  They had a choice, and they decided to

9    make the wrong choice.  No matter how many times we told

10   them that they were not coming past us, that nothing that

11   they were doing that day was going to make a difference, it

12   didn't matter to them.  It didn't matter that they were --

13   that we were cops.  It didn't matter that we were fellow

14   U.S. citizens.  They wanted any way possible to get inside

15   that building.  Continuously fighting side by side with my

16   fellow officers, getting hit with flags, poles, anything you

17   could think of, on top of being sprayed with something

18   that -- as much as we've gone through training and we

19   prepare for, having it actually happen to you against your

20   fellow citizens was something that I didn't think would ever

21   happen.

22           Since that day, I haven't really talked about

23   anything that really happened.  Tried to just move on, keep

24   it in, because I have a job to do -- besides today -- kind

25   of, let a little bit of emotion come out.  I lost a friend

1    that day, someone who I had worked with for almost three

2    years.  I was standing right next to him when we started

3    fighting, and later that night he was gone.  And every day,

4    we have to be reminded that he's not here anymore because

5    the people in this courtroom decided that they weren't happy

6    with how an election went and they thought the best idea was

7    to break into the Capitol, fight police officers, and try to

8    overturn an election.  We understood people were upset and

9    angry.  We tried to talk to them as best as we could to

10   understand that -- we understand we are angry and whatnot,

11   but this is not going to fix anything.  It didn't matter how

12   much talking that we did that day.  There was too many

13   people that wanted to just keep on going and get through us

14   as much as possible.

15          It breaks my heart that we're in this position

16   today because people were unhappy, and instead of trying to

17   do the right thing and have peaceful demonstrations, talk to

18   your members of Congress, do things the right way, they

19   decided to break the law, assault officers, and cause an

20   officer to lose his life and to have other officers take

21   their lives because of things that they saw.

22          I don't know how the rest of my career will go,

23   but I really hope that nothing like this ever happens again.

24   A lot of officers are fighting every day to get through the

25   shifts, not knowing if another January 6th would happen

1    again.  Every day that we go to work, we put on a uniform

2    and do the job that we swore we would take.  That day was

3    the pinnacle of what we had to do.  We had a job to protect

4    the building and everybody inside it, and we did that.  No

5    matter what anyone says, that day, we ended up taking back

6    the Capitol and protecting every staff and member inside.

7            I appreciate you talking and -- letting me talk

8    and hearing me out.  That's all I have to say.  Thank you.

9            THE COURT:  All right.  Thank you, Officer Cooney.

10           MR. MULROE:  Your Honor, also present today is

11   Inspector Thomas Loyd from the Capitol Police.

12           INSPECTOR LOYD:  Good morning, Your Honor.

13           THE COURT:  Good morning, sir.

14           INSPECTOR LOYD:  My name is Inspector Tom Loyd

15   from the United States Capitol Police.  Thank you for the

16   opportunity to address the Court.

17           The January 6th riot started by the mob at

18   12:53 p.m. when they violently attacked my personnel at

19   Peace Circle.  During this initial breach, one of my

20   officers was knocked unconscious and several others received

21   serious injuries.  Watching this unfold from the Senate

22   majority leader's office and then from the inauguration

23   stage was horrifying.  Just a few dozen of my officers

24   fought thousands of protesters on the west front.  Despite

25   the overwhelming odds, my personnel did not quit.  After

they lost the line at Peace Circle, they established another police line at the base of the lower west terrace.  This wasn't good enough for the mob.  The mob attacked my personnel again, driving us back to the base of the inauguration stage.  I joined my personnel at the base of the stage and witnessed the most violent fighting in my 33-year career.  We were attacked with flagpoles, bear spray, hammers, and frozen water bottles, among other weapons.

The D.C. Metropolitan Police Department showed up in force within minutes on the west front, most without their protective equipment, saving the lives of my personnel.  I am forever grateful for their quick response.  After the Metropolitan Police Department took over the west front, my personnel fell back and began to focus on the interior of the Capitol building which was breached at approximately 2:10 p.m.  At 2:10 p.m., I was ordered by my chain of command to leave the west front and respond to the east front because the mob had breached that perimeter.  I never made it to the east front because the rioters breached the Capitol building at the Senate wing door.  The mob was headed to the Senate floor.  A quick-thinking officer led the mob away from the rear of the Senate lobby to a small police line at the Ohio Clock Corridor, saving several protester lives, the lives of the United States Senators,

1    and the Vice President of the United States.  Once again,

2    just a few Capitol Police officers formed a police line to

3    stop the surge of hundreds of protesters inside the Capitol

4    building.

5            From the Ohio Clock Hallway, I responded to check

6    on the status of the House of Representatives.  When I

7    arrived, it was eerily quiet because the mob was still on

8    the north side of the building.  Eventually, the mob made

9    their way to the House chamber.  Once again, myself with

10   just a handful of officers established a police line at the

11   House main door.  One of my sergeants made a valiant attempt

12   to reason with the dozens of angry protesters who, once

13   again, breached our police line.  Thankfully, the House main

14   door held despite the tremendous beating.  The strength of

15   the door saved the lives of several protesters who would

16   have been shot if the door had been breached.

17           Unfortunately, the Speaker's lobby doors were made

18   mostly of glass and were easily breached.  While I was

19   actively evacuating the members of the House of

20   Representatives out of the west side of the Speaker's lobby,

21   an attempt was made to breach the east side resulting in

22   gunfire.  Tragically, a protester lost her life during this

23   breach.  Due to the overwhelming numbers of the mob, my

24   personnel were forced to shelter in place and then evacuate

25   the United States Senate, the House of Representatives, as

1   well as the vice president.  The evacuations were completed

2   with only seconds to spare.  Because communication was cut

3   off from our command center, my personnel relied on their

4   training and successfully sheltered in place and then

5   relocated the Congress and the vice president when it was

6   clear the mob would enter the House and Senate chambers.  My

7   team completed their actions on their own.  I have never

8   been prouder.

9        Recent video has emerged that alleged my officers

10  were tour guides for the protesters in the Capitol building.

11  From 12:53 p.m. until approximately 6:00 p.m., the mob was

12  in control of the exterior of the Capitol building.  From

13  2:10 p.m. until 4:30 p.m., the mob controlled the interior

14  of the Capitol building.  When a mob controls one-third of

15  the United States Government, you will see disturbing videos

16  of police officers being at the mercy of the rioters.  The

17  mob on January 6th was one team made up of tens of thousands

18  of people.  Individual defenses fall apart because

19  defendants must assume the risks that they will be held

20  responsible for all the crime committed by an entire mob.

21  It doesn't matter what time individual defendants arrived at

22  the crime scene or individual actions.  They were one team

23  for that particular event.

24        Some defendants have stated they assisted my

25  personnel on January 6th.  This is the same tactic used by

1      domestic violence suspects when they want to control their

2      victims:  Beat a victim to the point of unconsciousness and

3      then attempt to render aid.  The rioters should have gone

4      home when it was obvious things were going off the rails.

5              The criticism of my personnel was unrelenting

6      immediately after January 6th.  It was alleged that the

7      rioters penetrated the interior of the Capitol building

8      because my personnel did not know how to lock down the

9      building properly.  These same critics were fully aware of

10     the videos showing my officers valiantly fighting protesters

11     as they broke through 200-year-old windows and 30-year-old

12     doors.

13             The most egregious criticism of my officers came

14     from a well-respected former government official just a few

15     months ago.  The former government official, whose tenure

16     came to a close in December 2022, felt the need to slander

17     my officers via the media.  He insinuated my officers would

18     have shot and killed additional January 6th protesters if a

19     majority of them were a different race.  A vile public

20     statement.  This is the same official who, on January 6th,

21     sheltered in place with his military unit just a few blocks

22     from the Capitol.  For several hours, he watched law

23     enforcement officers from as far as -- away as New Jersey

24     passing by in an effort to save us.  His unit arrived after

25     the fight was over.

1    I wanted to thank all the police chiefs who

2    immediately authorized their officers to respond to the

3    Capitol.  They lived up to the unwavering law enforcement

4    motto, "first responder."  The riot officially ended at

5    8:30 p.m. on January 6th when one of my officers collapsed

6    and died while walking back to our office.  His body

7    survived a few more hours into January 7th because his

8    fellow officers lined up to give him CPR until the

9    paramedics arrived.  A machine at the hospital kept his body

10   alive until his family could say good-bye in person.  There

11   was nothing natural about the way the officer fought or

12   died, because I witnessed both.

13         Another Capitol Police officer, as well as

14   multiple Metropolitan officers, committed suicide as a

15   result of the riot.

16         Despite the tremendous beating my personnel took

17   on January 6th, all those who could walk showed up for work

18   the next day.  Once again, I could not have been prouder.

19         I am consistently asked if I ever grow weary of

20   court prep and trials from January 6th, but my answer is no

21   because every time I participate in court prep or an actual

22   trial, I see a new video or hear a new radio run of the

23   actions of my personnel on that terrible day.  The courage

24   of my officers is beyond words.  After everything they have

25   been through, they proudly represent the legislative branch

1    of government and support the mission of the department to

2    protect the Congress.

3            Thank you, Your Honor.

4            THE COURT:  Thank you, Inspector Loyd, and thank

5    you and those who serve under you for your service on that

6    day and every day.

7            Mr. Mulroe?

8            MR. MULROE:  Your Honor, lastly, on the victims,

9    I'm sure the Court will recall the testimony of Mark Ode,

10   who was the Capitol Police officer victimized by the assault

11   and robbery committed by Defendant Pezzola.  He was not able

12   to come in person today.  He's moved on to employment with a

13   different law enforcement agency out of the area, but he

14   submitted a letter that we'd like to read into the record

15   now.

16           THE COURT:  Please.

17           MR. MULROE:  Mr. Ode's statement is as follows:

18           "Thank you, respectful jury and Your Honor for

19   giving me this opportunity to express freely on my

20   experience on January 6th.  I honorably served as a United

21   States Capitol Police officer for a period of nearly six

22   years and the event of January 6th is forever imprinted in

23   my memory.  I will always remember January 6th as the day

24   that changed my life.  I will remember stepping on the west

25   front of the Capitol steps thinking that I will [sic] likely

to never see my family again and only wishing to tell them

that I loved them just once more.  I will always remember a

heart-piercing stare of horror in the eyes of the young

female MPD officer who was brutally clutched and pushed to

the ground by violent assailants as I was trying to help

her.  I will never forget attempting to aid another officer

and being violently dragged down by my riot shield as it

ripped away from me by brutal force and simultaneously being

pinned to the ground by multiple assailants, feeling all of

their weight crushing my lungs and gasping for even the

slightest pocket of air while being strangled by the

chinstrap of my helmet.

"I will also never forget the burning sensation of

chemicals in my throat and in my eyes as I felt my life

fleeing my body and telling myself to get up while

perceiving the most vivid vision of my own funeral, nor will

I forget seeing tears on my fellow officer faces when we

first heard about the passing of our brothers Officer Brian

Sicknick and Officer Howard Liebengood or waking up in the

middle of the night with an aching shoulder injury for a

period of nearly two years while undergoing physical therapy

as a result of the injury sustained while I was yanked to

the ground by aforementioned violent rioters.

"Certain memories and experiences leave deep marks

that never fully heal and serve as a real reminder of things

1   that were and things that could have been.  These memories

2   of January 6th and many more will always be with me and with

3   all of those who responded to their oath of duty on that

4   day.

5        "For me, the January 6th events were not an

6   accident and it was not a random response of a small group

7   of angry demonstrators who simply disagreed with the

8   political climate of the period.  It was a planned and

9   organized attempt to overthrow our constitutional process by

10  individuals who determined that their opinion of the few

11  were superior to our Constitution and decided to use

12  violence and terror to impose their will.

13       "I respectfully ask this jury to consider my

14  experience and experience of others to serve a true justice

15  for all of those who held the line on January 6th and their

16  families who still continue to hold their watch and share

17  their scars.

18       "Thank you, honorable jury.

19       "Sincerely, Mark L. Ode."

20       THE COURT:  All right.

21       MR. MULROE:  Your Honor, that concludes the victim

22  statements.

23       THE COURT:  All right.  Thank you, Mr. Mulroe.

24       And to the extent any defendant wants to remark

25  upon that or comment on it, we'll do it as you're -- in your

1    individual sentencings as we proceed this week.

2         All right.  So let us proceed, then, to the three

3    issues I outlined in my order of yesterday regarding the

4    guidelines.  Again, I'm going to hear from you all,

5    obviously, regarding the entirety of the guidelines

6    calculations for your clients, the 3553(a) factors, and all

7    the rest at another time, but I thought it would make sense

8    to try to hear all of you on these common issues and common

9    issues that can, you know -- can greatly affect the

10   guideline calculation for all defendants.

11        So why don't we start with the first issue in the

12   order, the question of whether -- of the most analogous

13   guideline to the conspiracy counts on Counts 1 and 4, the,

14   sort of, non-obstruction conspiracies.  I have -- the

15   Government wants me to apply 2J1.2.  At least -- I can't

16   remember who may have joined the arguments, but at least

17   Mr. Nordean, I believe, wants 2A2.4.  I'm particularly

18   interested in, as I read some of the cases that both parties

19   cited -- it was, kind of, an interesting split -- maybe,

20   split in the Circuits a little bit on how -- just the

21   methodology that I'm supposed to employ.  It seems as

22   though -- the question is, what do I look to to see if a

23   statute is -- or a guideline is sufficiently analogous or an

24   offense is sufficiently analogous?  And then if there's more

25   than one statute -- if there's more than one guideline that

1    is sufficiently analogous, how to choose between two that is

2    the most analogous.  And there's at least some support out

3    there -- I didn't see anything in this Circuit, but there's

4    certainly some support for the notion that, at the first

5    step, I only look at the elements of the offenses and that,

6    at the second step, I look at the -- I can look at either --

7    and there's a little bit -- it sounds like a little bit of a

8    split on this, too -- I can either look at the conduct in

9    the indictment that's elicited in the -- or that's set forth

10   in the indictment or I can look to the evidence in the case,

11   what's been proven.

12            So I'd like to hear first from the Government on

13   this point, why at least as to Counts 1 and 4 -- and I

14   think, you know -- I think the Government is clearly on --

15   let's put it this way.  The authority for applying the

16   obstruction guideline for seditious conspiracy is pretty

17   strong.  It's less -- I -- there's less precedent on Count 4

18   and what to do with that one.  So let me hear from the

19   Government on, sort of, why you think it's 2J1.2 for both of

20   those and what you think I should look at and what

21   methodology I should follow to try to figure out which of

22   them is appropriate, and then I'll hear from any defendant

23   who wants to be heard on this.

24            Mr. McCullough, you drew the short straw.  At

25   least, that's what I -- that's what it looked like at

1    counsel table.

2            MR. MCCULLOUGH:  That's quite all right.  Thank

3    you, Your Honor.

4            So as to your question in terms of the Circuit

5    split and how to approach this issue, the answer is that you

6    are to look at the elements of the offense that are

7    presented as well as -- I think the appropriate thing is to

8    look at the facts as alleged in the indictment.  That is the

9    way that the -- I think, the Ninth Circuit describes that.

10   I know Your Honor clearly read the cases that, when you look

11   at the Eighth Circuit, the Third Circuit, the Tenth Circuit

12   also described, maybe, even a more reaching inquiry.  But I

13   think, here, you don't even need to get to that point.

14   This -- the indictment alleged that they --

15           THE COURT:  Well, I agree with you.  The

16   distinction between the indictment and the evidence is, kind

17   of -- I agree, for -- I don't see a distinction there.  I

18   mean, for purposes of this --

19           MR. MCCULLOUGH:  Excellent.  So Your Honor, I

20   think that, fundamentally, what you do is you look at the

21   elements of the offense.  And this -- and what these

22   defendants are accused of doing is to use force to oppose

23   the government.  That fits with the administration -- the

24   obstruction of justice here.  It is an effort to obstruct

25   the -- it is an effort to obstruct the operation of the

1        government as a government and when you --

2               THE COURT:  Well, you're talking -- okay.  As far

3        as seditious conspiracy --

4               MR. MCCULLOUGH:  As far as seditious conspiracy

5        goes.  So it is the effort to obstruct the government as a

6        government.  It addresses that issue.  When we talk about

7        the -- the approach here in terms of what the crime

8        actually -- what the statute actually criminalizes, that's

9        what it's focused on.  It's focused on the disruption to the

10       administration of justice, the obstruction of justice here.

11       And that's why 2J1.2 applies.

12              Further, when you, then, look at the specific

13       offense characteristics that are applicable in 2J1.2, you

14       will see that they identify and graft very cleanly onto what

15       is alleged here in terms of the crime of seditious

16       conspiracy and the facts in the indictment, that -- the

17       question is, there are specific offense characteristics that

18       enhance the crime if it is -- if it includes physical

19       violence or property damage, if it is planned, extensive

20       planning.  Those further tell you that it is the appropriate

21       and the sufficiently analogous guideline to apply here.

22       And, in fact, the guidelines themselves, as Your Honor

23       knows, refer to this idea that you have -- that these

24       guidelines are intended to address, kind of, a broad array

25       of conduct.  And so in 2J1.1, it describes, you know, kind

1    of, the idea that you would look across the relevant conduct

2    of the offense.  And so, Your Honor, I think it's -- in

3    terms of seditious conspiracy, I think it's a clean

4    application, certainly.

5            And just to address the defendants' points here,

6    they suggest that once you go to 2M -- the 2M treason

7    guidelines, that, you know, this, kind of, blows up the

8    entire analysis because this is not tantamount to waging

9    war.  That's just simply not the case.  As Your Honor has

10   ruled, when evaluating the seditious conspiracy statute, you

11   recognized that the statute was filling a gap between the

12   serious crime of treason and the more -- the less serious

13   misdemeanor crimes.  It was intended to, kind of, fill this

14   middle ground.  It was not intended to just be another

15   treason statute.  And so when you look at the 2M guideline

16   and it directs you to find the most analogous guideline,

17   that's the appropriate step here.

18           And I think the other thing to remember, just,

19   kind of, framing all of this out, which is where I intended

20   to start but for your question, is that it doesn't -- this

21   is not looking for a perfect match.  That's not what we're

22   after here.  We are looking for sufficiently analogous and

23   as the -- I think, as Judge Gorsuch in one of the opinions

24   described, kind of, the ballpark test, if you will, kind of,

25   you --

```
1              THE COURT:  Well, no, but the ballpark test was
2      the first step.
3              MR. MCCULLOUGH:  Correct.
4              THE COURT:  Okay.
5              MR. MCCULLOUGH:  Correct.
6              THE COURT:  In other words, is it adequately --
7      I'm going to -- I'm not going to use it --
8              MR. MCCULLOUGH:  Is it sufficiently --
9              THE COURT:  Sufficiently --
10             MR. MCCULLOUGH:  -- analogous?  That is correct.
11     And that's why you don't -- you -- my good friend's, kind
12     of, suggestion that it -- we get to 30- -- the 3553 factors,
13     that you can't find a sufficiently analogous guideline is
14     just not the case.  It's a -- you're not looking for a
15     perfect match.
16             So I -- unless you'd like to hear -- I know you
17     said that the more complicated issue may be the -- Count 4.
18             THE COURT:  Right.  Well, it's just -- it's not --
19     and there isn't as much of a body of precedent; that it
20     seems -- well, you tell me.  I don't think -- I don't recall
21     either party bringing to my attention a case in which a
22     defendant charged or convicted of seditious conspiracy in
23     which 2J1.2 wasn't applied, I think.  I could be wrong.
24             MR. MCCULLOUGH:  I --
25             THE COURT:  But certainly the overwhelming
```

1    majority of them.

2                 MR. MCCULLOUGH:  That's correct.  The first step

3    of it -- of that inquiry is always going to the 2M and then,

4    as Your Honor knows, that Mr. -- Judge Mehta applied 2J1.2

5    with respect to the Oath Keepers.

6                 THE COURT:  Right, and in many other situations.

7                 MR. MCCULLOUGH:  Correct.

8                 THE COURT:  You know, the -- Count 4, there just

9    isn't as much precedent, and to the extent there is some

10   precedent, you have that case from the Tenth Circuit.  Now,

11   it's a very -- obviously, the facts are very different.  And

12   at least what that case stands for is that there are

13   other -- that, in a given situation, as for 372 -- as for

14   Count 4, there are other guidelines that could be -- that

15   could be sufficiently analogous -- that are sufficiently

16   analogous and could be the most analogous in, maybe, a

17   different case.  I know you're going to argue to me this is

18   not that case.  Fine.  But the point is there are -- there

19   are more than one -- more than one guideline is in the

20   ballpark there.  And so I think that's -- to me, that one is

21   the one where it's a little -- it's a closer call or, maybe,

22   a closer -- it's not -- let me put it this way.  It's not

23   the -- the evidence is -- or the case law behind it is not

24   what it is for seditious conspiracy.

25                 MR. MCCULLOUGH:  Certainly, Your Honor.  And so I

1    think, again -- I mean, as Your Honor has framed it, there

2    are -- this is a situation where you may have additional

3    options, as you said.  You may have the option of 2A2.4,

4    which I know that the defendants promote as the applicable

5    guideline there.

6            The -- I think the -- again, if you look at the

7    elements of the offense, the elements of the offense are

8    actually -- reach beyond just pure, kind of, assault, and so

9    I think this is the key part here; right?  So when you look

10   at actually what is required in that statute, they have

11   conspired to prevent, by force, intimidation, or threat, any

12   person from accepting or holding any office, trust, or place

13   of confidence under the United States, or from discharging

14   their duties thereof, or to induce by like means any officer

15   of the United States to leave the place where his duties as

16   an officer are required to be performed.  That's the

17   statute.  It's not -- it -- so the statute -- the object, if

18   you will, is deeper than simply addressing the individual

19   officer, and we're talking about here law enforcement

20   officers and members of Congress.

21           THE COURT:  Right.

22           MR. MCCULLOUGH:  And so we're talking about

23   something that's larger than the individual act of an

24   individual officer.  We're talking about the ultimate

25   object, which is to get those people to leave the place

1   where their duties are to be performed.  And that's what the

2   jury -- I mean, that's what the jury is charged with and

3   that's what the jury found.  And so when we're actually

4   thinking about, well, which is more appropriate here, as

5   between 2A2.4 which looks at, okay, well, you're just

6   obstructing -- you're obstructing or assaulting an officer,

7   as opposed to something that has a larger purpose, a larger

8   meaning.  And so that's where, once you go beyond the

9   elements into the circumstances of the offense and the facts

10  of the offense, I think that's where it becomes -- this is

11  where this becomes the most analogous guideline.  And the

12  reason for that is that this is -- as Your Honor knows,

13  we've presented this to the jury as one conspiracy that

14  violated three statutes.  And the ultimate purpose here was

15  to obstruct the certification.  The purpose of threatening,

16  intimidating these officers, members of Congress, law

17  enforcement, to leave the place where their duties are to be

18  performed, the reason that that's happening is to obstruct

19  the certification, is to obstruct the official proceeding,

20  and that's consistent with the statute in the sense that

21  that -- the statute is asking, kind of, what is the ultimate

22  purpose here?  It's not criminalizing just interfering with

23  the officer; it's criminalizing that next step.

24          And so, Your Honor, that's why -- that there

25  are -- there may be -- in this case, you may have other

1    analogous guidelines from which to choose that, kind of,

2    fall into the sufficiently analogous question, which, again,

3    I think, supports, frankly, the first argument in terms of,

4    kind of, sufficiently analogous is pretty broad.  But this

5    is why the -- 2J1.2 is the most analogous guideline here.

6          So if Your Honor has any questions for me, I'm

7    happy to answer them, but I think that --

8          THE COURT:  No.  No.  On that, I hear you, and

9    those are -- I think you made the arguments I thought you

10   would make.

11         Let me hear from any defendant on this.

12         Mr. Smith, you may proceed if it's you, or anyone

13   else as well.

14         MR. SMITH:  Good morning, Judge.  Nick Smith for

15   Ethan Nordean.

16         On the one hand, this issue that the Court is

17   focusing on, rightly, is -- seems, kind of, like it's in the

18   weeds, because this determination as to which guideline

19   applies to Count 1 might not control the Court's ultimate

20   sentencing guideline range.  However, I think it also points

21   to something -- a deeper issue here that is extremely

22   important, and it's one that, like many other issues in

23   these cases, crops up again and again.  With the obstruction

24   of justice offense here, we had a lot of extensive pretrial

25   briefing on the meaning of obstruction of justice and 1512

1    and whether it applies to a proceeding that doesn't involve

2    the administration of justice.  And at that pretrial motions

3    stage when we were deciding the law, the Court held -- and

4    many judges have held in this court -- that it's precisely

5    because Congress does not administer justice that we should

6    not count -- consider the fact that Congress was not

7    reviewing evidence or making a quasi-judicial determination

8    on January 6th.

9            Then, when we get to the sentencing guidelines

10   stage, things start to look a little bit hinky.  The

11   guidelines under 2J1.2 that apply to the obstruction of

12   justice offense focus on interference with the

13   administration of justice.  We're in a difficult spot now

14   because, before trial, we had just held that Congress

15   doesn't administer justice.  When we get to the sentencing

16   stage, Congress does administer justice, some courts have

17   held.

18           We see the exact same problem with the seditious

19   conspiracy offense.  In pretrial briefing, the parties had

20   agreed on the notion that this offense in section 2384 is

21   basically a codification of a common law crime called

22   constructive treason.  Constructive treason used to exist

23   where force was used to prevent the execution of law.  And

24   that's exactly the phrase that we see in section 2384.  The

25   courts called this a, kind of, constructive waging war on

1    the United States.  A lot of colonial courts said that to

2    interfere -- to use force to interfere with the execution of

3    law is tantamount to waging war on the United States, for if

4    a single law is violated, is prevented from being enforced

5    through force, it's the same as taking down all of the

6    republic's laws.  That's what these courts found.

7          And there's some Supreme Court precedent for the

8    idea that when Congress codifies an offense from the common

9    law, the interpretation of those phrases at common law are,

10   then -- are, basically, incorporated into the statute.  So

11   the argument -- just to keep things going, the argument the

12   defendants were making pretrial is that that phrase, using

13   force to prevent the execution of law or to oppose the

14   government, should be interpreted in the context in which it

15   was used before codification of the predecessor statute to

16   section 2384.  That would mean that this offense, seditious

17   conspiracy, is committed when people agree to use force

18   that's basically tantamount to waging war on the United

19   States.  We argued that wouldn't be something like the kind

20   of, sort of, property destruction one sees at a riot or a

21   protest, but rather something that looks akin to the attack

22   on Fort Sumter which spawned this statute.

23          So Your Honor, now we're at the sentencing stage.

24   And just like with obstruction of justice, we have something

25   unusual going on.  If we look at the Government's sentencing

1    memoranda, you can see that they concede, and, in fact,

2    positively argue, that every time seditious conspiracy has

3    been sentenced, the treason guideline applies.  And the

4    treason guideline says this guideline shall apply for any

5    offense that's tantamount to waging war on the United

6    States.  Not just waging war, but tantamount.  That happens

7    to be -- line up very closely with the way that courts used

8    to treat this common law constructive treason crime.

9            Now, I'm not arguing that my client should be

10   sentenced under the treason offense.  But what I am saying

11   is there's something bad going on when we see, in the

12   Government's sentencing memoranda, that it's agreeing that

13   the offense here was not tantamount to waging war on the

14   United States.  And then the next question becomes, why?

15   Why has -- is the Government saying that this is not the

16   treason offense when, in every other application of this

17   statute in history, it has been?

18           THE COURT:  Mr. Smith, let me just cut you off

19   right there.  I really don't care, frankly, the why.  I

20   mean, I care about the legal arguments each side makes and I

21   care about getting the legal question right.  So talking

22   about why the Government takes a position, why the defense

23   takes a position, is, kind of, a waste of time.

24           MR. SMITH:  Well, so -- I take your point, Your

25   Honor.

1          THE COURT:  Because I'm, you know -- once again,

2     I'm here to resolve -- actually, today, of all days -- only

3     legal issues that pertain to the guidelines.  The guidelines

4     calculations.  So if, for one day, we could take off -- we

5     could take the day off from pointing the finger at one side

6     or the other and impugning each other's motives, that would

7     aid my job today.

8          MR. SMITH:  Thank you, Your Honor.

9          I was not impugning the Government's motives.  I'm

10     just making an argument that says this guideline, 2J1.2,

11     cannot be analogous to treason because there is a treason

12     statute.  It doesn't just apply to technical treason in

13     Section 2381.  It applies to all crimes tantamount to

14     treason.  We have an analogous guideline.  And, Your Honor,

15     if it were true -- setting aside the legal arguments about

16     the statute --

17          THE COURT:  But it -- okay.

18          MR. SMITH:  -- if it were true that seditious

19     conspiracy were analogous to obstruction of justice, then

20     we're saying something very, very broad here that --

21          THE COURT:  Well --

22          MR. SMITH:  -- says every obstruction of justice

23     offense in the new crime we've created, any attempt to

24     influence Congress corruptly --

25          THE COURT:  Mr. Smith, let me just say this.  If

1    you read all the cases that wrestle with the concept of

2    choosing, first of all, any guidelines that are sufficiently

3    analogous, and then moving to the question of which is most

4    analogous, you're going to see that -- what did now Justice

5    Gorsuch call it?  Something like the ballpark test?  So --

6    at least for the first step.  My point is it -- I understand

7    the argument you're making, but my response to you is that

8    this is all -- by the very nature of the fact that we're

9    trying to find the closest fit, and you can look at a lot of

10    different things in doing that, that it's going to be an

11    inexact science.

12            MR. SMITH:  Oh, Your Honor, I think I'm

13    understanding the point I should be making now.  I

14    apologize.  So when we're looking at -- I think everyone

15    agrees, including the Court, that we turn to -- after 2X5.1,

16    we turn to the treason guideline.  That's what the Probation

17    Office said; that's what the Government has said; and I

18    think the Court is implicitly agreeing that at the first

19    stage at least, we go to 2M1.1.

20            THE COURT:  Well, all I'm -- what I'm saying is

21    that many courts have, at the minimum, found that to be one

22    that is sufficiently analogous to consider.  So I don't

23    think -- I don't know whether you're disputing that or not,

24    but --

25            MR. SMITH:  So I'm -- what I'm just pointing to,

```
 1        Your Honor, is there's a reason we turn to 2M1.1 at the
 2        beginning; right?  If there was no argument that the treason
 3        offense -- the treason guideline was the appropriate one, we
 4        wouldn't have turned to 2M1.1 after looking at 2X5.1,
 5        because 2X5.1 says if there's no guideline for the specific
 6        statute, we turn to the most analogous one.
 7               THE COURT:  Right.
 8               MR. SMITH:  I don't know if the phrase is most
 9        analogous or to an analogous --
10               THE COURT:  Well --
11               MR. SMITH:  -- an analogous.
12               THE COURT:  -- it's used two different ways in
13        that guideline, but go ahead.
14               MR. SMITH:  So we've made a legal determination --
15        everyone, I think -- that 2M1.1 is analogous.
16               THE COURT:  Mm-hmm.
17               MR. SMITH:  And there's a reason we determined
18        that it was analogous, because this statute that's being
19        used is basically a codification of constructive treason.
20               THE COURT:  Well, but one could come to that
21        conclusion -- one could come to the conclusion that it's
22        analogous without going that far, is my point.
23               MR. SMITH:  So we've made a determination that
24        it's analogous.  And then 2M1.1 says if the crime is
25        tantamount to waging war against the United States, apply
```

1    this base offense level, 2M1.1(a).  And then it says if it's

2    not -- if it's not analogous to -- if it's not tantamount to

3    waging war against the United States, then look to the most

4    analogous guideline.  So what I'm -- the legal argument I'm

5    making is we don't reach the argument the Government is

6    trying to make here because the seditious conspiracy statute

7    is, by its nature, a crime that's supposed to be tantamount

8    to waging war on the United States.  So when I was saying --

9    when I was pointing out that the Government is making a

10   distinction between this case and every other, I guess,

11   reported case involving seditious conspiracy, that's not to

12   impugn their motives.  It's to suggest that that was their

13   guideline.  They've said it doesn't apply.  Ergo, at this

14   stage, at least we're in section 3553 range.

15           And I think the final argument here, Your Honor,

16   is that it just proves too much.  If we have courts holding

17   that seditious conspiracy is analogous to obstruction of

18   justice, you know, we don't -- that doesn't satisfy the

19   elements test, as Your Honor might have noted, but it also

20   suggests that everyone who's convicted of obstruction, at

21   least the January 6th cases, has committed a crime analogous

22   to seditious conspiracy.  That's the -- it's a two-way

23   street.  If seditious conspiracy's analogous to obstruction

24   of justice, obstruction of justice is analogous to seditious

25   conspiracy, and yet -- just the final point is the average

```
 1   sentence for the 1512(c) offense in the January 6th cases is
 2   approximately 38 months of incarceration which would not
 3   seem to be proportionate to a crime like seditious
 4   conspiracy.
 5              THE COURT:  All right.
 6              MR. SMITH:  And then, Your Honor, the final point
 7   on Section 372 is --
 8              THE COURT:  Yes.
 9              MR. SMITH:  -- that I -- it sounds like
10   Mr. McCullough was suggesting that although this -- if we
11   were to take this "conspiracy to interfere with police
12   officers" offense and break it down into its underlying
13   offense, I think there he might have suggested, "Well, it
14   might be appropriate in that case to apply 2A2.2 -- or
15   2A2.4," rather, "But because it involves conspiracy, then
16   we've got something larger here.  We have a larger purpose
17   at work."  But, Your Honor, that's not how the guidelines
18   work.  There's a guideline that says when you have a
19   conspiracy offense that does not have a specific guideline,
20   you look to the other underlying offense, and the underlying
21   offense here is interference with individual police
22   officers.  So the guidelines would seem to suggest there
23   directly -- I'd --
24              THE COURT:  How do you respond to the points
25   Mr. McCullough made that it's broader -- the statute is
```

1    broader in the sense that, number one, it seems to be -- it

2    includes members of Congress, not just merely law

3    enforcement; and, two, it seems to be getting at something

4    more than just assault by referencing the duties of the

5    person and by this concept of moving the person away from

6    the place where their duties are to be performed and, I

7    guess, number three, that -- isn't that the underlying thing

8    that was going on here that they're charged with, not really

9    assault, but trying to move them -- trying to interfere with

10   their duties which were -- which, at least as to the members

11   of Congress, were to continue the count of the electoral

12   process?

13          MR. SMITH:  I think I'm on the same page with Your

14   Honor on this issue, that it seems like this is a -- every

15   fact that Your Honor just described is -- the offense of

16   interfering with police is a 231 offense or a 111(a) offense

17   which have been sentenced under 2A2.4 if there's not

18   aggravated assault.  So I guess adding a layer of conspiracy

19   to the claim doesn't seem to change that.

20          THE COURT:  Well, but don't you agree that I have

21   to look at -- ultimately, even if I have several guidelines

22   that are sufficiently analogous to consider, that I do look

23   at at least -- whether it's -- what's charged in the

24   indictment or what was proven at trial -- for this purpose I

25   don't think it really matters, the difference between those

1    two things -- doesn't it come off more as something more

2    than just an assault?

3            MR. SMITH:  Your Honor, I think we would probably

4    say it comes off as something less because there was no, you

5    know, assault.  The jury acquitted Mr. Nordean -- either

6    acquitted or hung on every relevant, sort of, assault count.

7    So I think that would not be appropriate in light of the

8    jury's verdict.

9            THE COURT:  Okay.  Any other defendant want to be

10   heard on this slice of the guidelines question?

11           MR. ROOTS:  Yeah, very quickly, Your Honor.  This

12   is Roger Roots on behalf of Mr. Pezzola.

13           Of course, the jury acquitted Pezzola of Count 1,

14   so that does not apply to Pezzola, but I do want to discuss

15   just the issue of the proper guideline for Count 4.

16           THE COURT:  Mm-hmm.

17           MR. ROOTS:  As Your Honor mentioned, there isn't

18   much case law on this issue.  There is that case from the

19   Tenth Circuit authored by Neil Gorsuch.  And we're going to

20   argue that that -- that Gorsuch got it wrong in that case;

21   that, in fact, the appropriate guideline for Count 4 is the

22   other one that was under consideration in that case, and

23   that is 2A2.4, for several reasons.  Number one, Count 4 is

24   this statute called 18 U.S. Code Section 371.  And that is a

25   post-Civil War statute in the -- it was written by Congress

1    in the wake of the Civil War:  If two or more persons in any

2    state, territory, possession, or district conspire to

3    prevent, by force, intimidation or a threat, any person from

4    accepting or holding any office, trust, or place of

5    confidence, et cetera, you know, they shall be punished by

6    up to six years in prison, et cetera.

7         Okay.  So this statute is most analogous to the

8    idea of resisting or opposing officers.  It is not most

9    analysis -- analogous to this idea of obstructing justice.

10   This statute is a resisting officer-type statute.  It is not

11   an obstructing proceeding-type statute.  And this is very

12   important, because obstruction of justice is this concept of

13   doing something -- using violence to -- like the 1512 count,

14   for example -- disrupting the findings of a legislative

15   session or a court session, whereas clearly that is not the

16   focus of the statute, 372.  That statute is focused on

17   resisting officers on -- in the field, much as the guideline

18   range 2A2.4.

19        THE COURT:  Well, it does include members of

20   Congress, though.

21        MR. ROOTS:  It does include members of Congress,

22   but it is not -- it -- the -- I guess you could call it the

23   gist of the statute is not about the findings of a

24   proceeding.  It's more -- to me, it seems more temporal,

25   more -- the statute reads more about resisting and opposing

1    a congressman in the field.  And I would also point out just

2    the severity -- I think that's another thing that should be

3    taken into consideration by the Court, not just the

4    elements, but the -- not just the conduct, but the severity

5    that Congress enacted with Count 4, this idea of

6    18 U.S. Code 372, up to six years in prison.  Congress did

7    not indicate that this was a crime punishable by up to 20

8    years in prison, like obstruction of justice would be.  And

9    so I would just suggest that 2A2.4 is the most analogous,

10   clearly, of all the guidelines with regard to Count 4.

11          Thank you.

12          THE COURT:  Okay.  All right.  Any other defendant

13   want to be heard on that slice?

14          All right.  If not, let's move to -- so let's next

15   go to -- I think it was the -- let's see what order I put

16   these in.  Actually, it was the third issue I raised in the

17   order, the issue of aggravated assault and -- this is

18   Count 5 now -- the issue of whether to apply aggravated

19   assault.  I guess my questions -- start with the Government

20   again.  My questions to the Government are, what are the

21   limits on what -- I mean, you, kind of -- in your memo, you

22   throw out a bunch of different conduct -- I think even

23   including Donohoe's conduct -- but you throw out a bunch of

24   different possibilities for what you think I can consider as

25   meeting the standard for aggravated assault here.  I

1    think -- or really just assault, period, to start with.  How

2    can I -- I mean, I guess my question is, can I consider all

3    of those different things you lay out, number one?  Can I

4    attribute -- can I really attribute the conduct of one

5    defendant to another for purposes of this guideline?  That

6    is my question.

7              MR. MCCULLOUGH:  Thank you, Your Honor.

8              So with respect to the question as to the conduct,

9    so let's -- I want to start there, but there's more to this.

10   You can look at all of --

11             THE COURT:  Go ahead.

12             MR. MCCULLOUGH:  I just wanted to make sure.

13             THE COURT:  No, no, no, please.

14             MR. MCCULLOUGH:  You can look at all of the

15   relevant conduct.  It encompasses the defendants' acts and

16   those the defendant, you know, aided and abetted, counseled,

17   commanded, induced, procured, or willfully caused.  And so

18   the defendants --

19             THE COURT:  And jointly undertaking criminal

20   activity; that's your -- that's the Government's position.

21             MR. MCCULLOUGH:  Correct.

22             THE COURT:  Okay.

23             MR. MCCULLOUGH:  Correct.  And, Your Honor,

24   it's -- that conduct is not necessarily, kind of,

25   coterminous with the scope of the conspiracy.

```
 1              THE COURT:  Right.
 2              MR. MCCULLOUGH:  Under the guidelines, as you
 3    know, it -- the relevant conduct includes all harm that
 4    resulted.  And so you can look at a broad scope of the
 5    conduct here.  And, Your Honor, I think that they -- the
 6    defense counsel will point to the -- you know, quibble as to
 7    the assault that Pezzola carried out.
 8              THE COURT:  Yes, they do, as they should.
 9              MR. MCCULLOUGH:  As they should.  As they should.
10    But there was not an acquittal on Donohoe's assault.  And
11    the jury clearly knew how to acquit, but it did not.  And so
12    we remember that -- Your Honor, we remember that the
13    standard there is beyond a reasonable doubt.  The standard
14    here is propensity of the evidence.  And it is more than
15    satisfied.  When we look at the way that the jury convicted
16    in terms of the conspiracies here and what these defendants
17    intended to do and what they carried out doing, property
18    damage, pushing forward with a goal of obstructing the
19    certification, Count 1, that they agreed to use force to
20    stop the certification.  So Your Honor, there is not -- Your
21    Honor should not be -- kind of, in any way feel, kind of,
22    constrained by this, that because of the jury's decision
23    with respect to Pezzola's assault in which he testified as
24    to, kind of, his mental state as he did it extensively, and
25    what others who acted in furtherance of the conspiracy did.
```

```
 1     And while Mr. Rehl's assault on an officer was not charged,
 2     Your Honor can nonetheless view that and take that into
 3     account in terms of the kind of conduct that was being
 4     carried out.  So let's -- but --
 5               THE COURT:  And I can count that against all of
 6     them --
 7               MR. MCCULLOUGH:  That's correct, Your Honor.
 8               THE COURT:  -- is your position?
 9               MR. MCCULLOUGH:  Yes.  Yes, you can.  But, Your
10     Honor, to -- let's set all that to the side, because the --
11     I think there's the more, kind of, straight line answer in
12     terms of the aggravated assault guideline here in terms of
13     the 231.  So we're talking about Count 5, the 231 charge.
14     And in this case, Your Honor, the -- one of the -- one
15     element of aggravated assault is a question as to whether it
16     was done with the intent to commit another felony.  And so I
17     wanted to answer your question --
18               THE COURT:  But isn't -- aren't -- don't I need to
19     get to -- so I think I see where you are going, but I had
20     thought those two things had to act together.  In other
21     words, you do need an assault, right, in order for this to
22     kick in?  In other words, for me to -- the aggravated
23     assault guideline -- I -- a felonious assault that involved,
24     A, dangerous weapon -- we're not talking about that; B, a
25     serious bodily injury -- we're not talking about that; C,
```

1    strangling, suffocating or attempting to do that -- we're

2    not talking about that; or attempt to commit another felony.

3            The question is -- so -- but I apply that when the

4    conduct is an aggravated assault.  But -- and so I guess why

5    do you think it is, sort of, a -- I don't want to put words

6    in your mouth, but it's, sort of, an end around the question

7    we were just discussing to say, "Well, Judge, you can just

8    find -- you can conclude that they had an intent to commit

9    another felony," because there has to be an assault first

10   for it to get to aggravated assault.

11           MR. MCCULLOUGH:  Well, Your Honor, I think we are

12   talking about using the -- we are talking about the crime of

13   231, which is interfering with an officer during a civil

14   disorder.  That's what -- that's the count of conviction.

15   And so we're using the 2A2.4 guideline because it is the

16   appropriate guideline to basically apply here, but it

17   doesn't necessarily mean that you need a physical assault in

18   order to --

19           THE COURT:  Okay.  So --

20           MR. MCCULLOUGH:  It is the interference that we

21   are talking about.

22           THE COURT:  So the Government's position is

23   because anyone who was -- any defendants who were convicted

24   on Count 5, that, sort of, satisfies the assault?  And that

25   the question now becomes, is it aggravated?  And so I don't

1    even really need -- I don't need to be mucking around in

2    the -- my -- I mean, I'm just -- I'm not trying to -- but --

3              MR. MCCULLOUGH:  Not my words, Your Honor.

4              THE COURT:  No, they're not your words, but I'll

5    say them.  Your argument to me was, I didn't need to be

6    mucking around with that antecedent question I asked because

7    the count of conviction, sort of, makes it an --

8    effectively, an assault?

9              MR. MCCULLOUGH:  That is correct, Your Honor.

10   That is correct.  It is -- what they have been convicted of

11   is interfering with law enforcement during a civil disorder.

12   And that puts you into this guideline.  And the question is,

13   then, is there -- is there --

14             THE COURT:  Is it aggravated?  I mean --

15             MR. MCCULLOUGH:  Is it aggravating?  And, you

16   know, kind of, the aggravated assault, Your Honor, kind of,

17   the Black -- I mean, Black's Law Dictionary would, you know,

18   kind of, describe aggravated assault as, you know, any

19   criminal assault that's accompanied by circumstances that

20   make it more severe, such as intent to commit another crime.

21   That is, kind of -- that's the definition of aggravated

22   assault.  And so when we're talking about the way that this

23   crime was committed, it was committed in an effort to

24   further the obstruction of justice, a count on which they

25   were all convicted, Count 3.

1          THE COURT:  All right.  I understand that

2    argument.  I did not -- you know, this is why sometimes oral

3    argument is helpful.  I did not understand that argument

4    before, but I do understand your argument now.  I'm not

5    sure -- I mean, but I understand the argument.

6          MR. MCCULLOUGH:  And if -- I guess if Your Honor

7    has -- I'm happy to expand on any of the, kind of, relevant

8    conduct that Your Honor can consider, but I think, as Your

9    Honor is prepared to rule on the Rule 29, Rule 33, you've no

10   doubt, kind of, covered the landscape of facts.  But, Your

11   Honor, the -- with respect to the relevant conduct here that

12   one can consider, as I said, the assault by Zachary Rehl,

13   one can consider.  Your Honor can consider the assault by

14   Milkshake as he pushed up the concrete stairs and pushed

15   behind the -- as Mr. Biggs and his cohort followed behind,

16   and Mr. Pezzola followed behind.  And, Your Honor, you can

17   even consider -- I mean, I -- and I would submit to you that

18   you can even consider the assault by Mr. Pezzola.  Now, I,

19   100 percent, you know, appreciate that the jury did acquit

20   on that count, but that there is a delta between, you know,

21   preponderance of the evidence for purposes of the -- for

22   purposes of applying the guidelines and beyond a reasonable

23   doubt for purposes of proving a conviction.

24          THE COURT:  Let me just say -- I'm just looking

25   now at the language in Count 5, committing or attempting to

 1    commit an act to obstruct, impede, or interfere with law

 2    enforcement officers, lawful -- carrying out their official

 3    duties incident to a civil disorder.

 4            Isn't there a delta -- speaking of deltas, isn't

 5    there a delta between conduct that the jury could have found

 6    to satisfy that -- for example, the conduct of Mr. Biggs and

 7    Mr. Nordean at the fence, okay -- that conduct could satisfy

 8    that statute, but it wouldn't necessarily be an assault;

 9    isn't that fair?

10            MR. MCCULLOUGH:  I think that's -- that is an

11    accurate statement, that that -- that could have been one

12    thing that the jury was considering.  We don't have that

13    answer.  We did not have a specialized jury -- verdict form,

14    rather, on the --

15            THE COURT:  Right.  I --

16            MR. MCCULLOUGH:  So I appreciate Your Honor's

17    question.  I think I would submit to you that the jury did

18    see the full array of evidence, including assaults by

19    these -- some of these individual defendants and others that

20    were under their command as they marched to the Capitol.

21            THE COURT:  Right.  This is all to say it's my

22    decision, not the jury's, but my point is only it's not --

23    it's -- I don't think it's in -- I'm not saying you're

24    saying this, but it -- whatever the jury found -- my only

25    point is the jury need not have found an assault.  The point

1    is I -- in order for me to apply this guideline, though, I

2    have to conclude from evidence that there was an assault.

3                MR. MCCULLOUGH:  Well, I think one thing is -- and

4    Your Honor will, no doubt, kind of, take your time with

5    this -- but as -- comparing the 111 statute and the 231

6    statute, impede and interfere are in both statutes.  And so

7    I think --

8                THE COURT:  Fair.

9                MR. MCCULLOUGH:  And so in terms of it being an

10   assault, I think that, you know, even if you, kind of, take

11   a different bar and you say, well, there's no physical

12   contact, of course, we know that there can be non-physical

13   contact assaults.  And so the issue, you know, fundamentally

14   boils down to, were they engaged in this 231 activity for

15   purposes of carrying out another felony?  And that -- the

16   answer has been provided -- on that question, Your Honor,

17   that answer's been provided by the jury, that they have --

18   they were carrying this out for purposes of obstructing the

19   certification, Count 3.  So I think that that is a --

20   that's, kind of, a clean line there.  But I appreciate Your

21   Honor's questions in terms of, kind of, wading into the

22   facts.

23                THE COURT:  All right.  Any defendant want to be

24   heard on this?

25                Yes, sir, Mr. Smith.

1          MR. SMITH:  Very briefly, Judge.

2          It's a given that the Court can consider acquitted

3    conduct for purposes of applying this enhancement.  So we'll

4    just move past that.  It doesn't matter whether the jury

5    acquitted Mr. Nordean on the assault or hung.  The problem

6    here with the Government's argument is that it hasn't

7    offered facts showing by a preponderance of the evidence

8    that the aggravated assault guideline applies to Count 5.

9    The first reason is -- let's take Donohoe's assault.  We

10   didn't hear from Mr. --

11         THE COURT:  Well, let's -- can we just --

12         MR. SMITH:  Yeah.

13         THE COURT:  I -- why don't we -- will you address

14   the point Mr. McCullough made, which is to say I don't need

15   to -- let's put it this way.  The jury -- what -- the --

16   putting aside the different examples they raised, for

17   example, what about the conduct at the fence?  I know --

18   look, I know -- I have to, you know -- I know you have --

19   you dispute the conduct at the fence.  But isn't that enough

20   for me to conclude that there was at least the kind of

21   assault that -- an interference assault, if you will?

22         MR. SMITH:  Your Honor, we would say that the --

23   under the aggravated assault dead- -- guideline in 2A2.2,

24   there's a precise definition of "aggravated assault" which

25   is a felonious assault that involves a dangerous weapon or

1    the intent to cause bodily injury, serious bodily injury,

2    strangling, suffocating, or attempting to strangle or

3    suffocate, or an intent to commit another felony.  So for

4    the fence-shaking episode, we don't have a felonious

5    assault.  Mr. McCullough was referring to assault and how it

6    can be established without physical contact.  A felonious

7    assault under Section 111(a) is felonious -- is physical

8    contact or it's not a --

9              THE COURT:  Is -- say again.

10             MR. SMITH:  Is -- involves physical contact or

11    it's not a felonious assault unless you have the intent to

12    commit another felony.

13             THE COURT:  Right.

14             MR. SMITH:  So we don't have a felonious assault

15    at the fence-shaking episode.  Assault itself under the

16    generic federal definition involves an intent to cause

17    bodily harm or an intent to cause a threat that would

18    reasonably put one in apprehension of bodily harm.  I don't

19    think Mr. McCullough pointed to facts at the fence-shaking

20    episode showing an intent to cause bodily harm or the threat

21    to cause bodily harm.  So we don't have an assault there.

22    We don't have a felonious assault because we don't have

23    physical contact with a victim.  And I don't think

24    Mr. McCullough pointed to any facts showing what intent --

25    showing Mr. Nordean's intent to commit another felony at

1    that point in time.

2         On Mr. Donohoe's bottle-throwing --

3         THE COURT:  I mean, isn't that the entire -- I

4    mean, I, you know -- he would say that's the entire case.  I

5    know you don't think they made their burden, but in an

6    attempt to, you know -- in, you know -- the federal

7    obstruction statute is what he would argue just to make it

8    as clean as possible; right?  And I know -- well, you

9    have -- we've talked about the -- that statute a lot, but --

10   okay.  I mean, that would be his argument.

11        MR. SMITH:  Well, the fence-shaking episode wasn't

12   even charged as an assault.  It was not charged --

13        THE COURT:  Right.

14        MR. SMITH:  -- under 111(a).

15        THE COURT:  Correct.

16        MR. SMITH:  And the -- I think you were going

17   through this with Mr. McCullough, Your Honor, but you

18   pointed out that, you know, interference is not the same

19   thing as assault and, you know, Section 231 and 111(a) share

20   some actus reus like interfere and obstruct, but that's not

21   the definition of "aggravated assault."

22        THE COURT:  It's clearly not the definition of

23   "aggravated assault."  I understand.

24        MR. SMITH:  And so, Your Honor, I think on -- but

25   on -- I'd just like to address Mr. Donohoe's

1    bottle-throwing, because I think that's --

2            THE COURT:  Okay.

3            MR. SMITH:  -- mostly where the Government hung

4    its hat in the briefing.  Again, Your Honor, there, even if

5    we assume that's an assault, we didn't hear from Mr. Donohoe

6    at trial.  So what -- we don't have any evidence in the

7    record to show by a preponderance that Mr. Nordean was

8    engaged in joint activity with Mr. Donohoe when he threw the

9    water bottle.  So in order to make -- in order for this to

10    be relevant conduct to Mr. Nordean, there has to be some --

11    you have to satisfy the joint activity, you know -- joint

12    criminal activity definition in the guidelines, and we

13    didn't hear any facts from the Government on how -- what

14    facts show that that water bottle throwing was attributable

15    to Mr. Nordean as relevant activity.

16            Then, Your Honor, I don't think the water bottle

17    struck an officer.  So we don't have physical contact for a

18    felonious assault.

19            THE COURT:  But you agree -- if I believe the

20    evidence -- if I conclude they had intent to commit another

21    felony at that time, that doesn't matter?

22            MR. SMITH:  Well, I'm saying that the -- for it to

23    be relevant conduct to Mr. Nordean, that act still has to --

24    we have to go through the Pinkerton analysis, essentially,

25    which is how relevant conduct is defined using the Pinkerton

1    test, and we would have to see by a preponderance of the

2    evidence that Mr. Donohoe's bottle-throwing was in

3    furtherance and reasonably foreseeable to the conspiracy.

4            THE COURT:  Yes, I agree --

5            MR. SMITH:  And I'm -- the argument we're making

6    to Your Honor now is we don't have facts showing that

7    Mr. Nordean's conspiracy, as found by the Government, was

8    being furthered and was -- and was reasonably foreseeable --

9    it was reasonably foreseeable that a water -- throwing a

10   water bottle would be contemplated within the corners of the

11   conspiracy.

12           THE COURT:  All right.

13           MR. SMITH:  And although the Court can consider

14   acquitted conduct, we don't think that acquitted or hung --

15   you know, conduct for which the jury acquitted Mr. Nordean

16   or hung would be appropriate in this context.

17           So thank you, Your Honor.

18           THE COURT:  All right.  Mr. Roots --

19           Or Mr. Pattis?

20           MR. PATTIS:  Good morning, Judge.  Good to see you

21   again.

22           If -- as I look at the cases in the annotations in

23   the guidelines and try to discern the line between cases

24   finding no aggravation and cases finding aggravation, it

25   seems to me that one could argue that in this case, you

1    should not find aggravation.  And I can recite all the

2    cases, but you have the same guidelines manual I do.  But

3    referring to them anecdotally, cases finding aggravation

4    talk about using a gun to shoot.  "Defendant shot an

5    occupied vehicle; stabbed a corrections guard with a

6    syringe; knocked out a police officer; swerved a car into a

7    pursuing agent's car," these were found to have the

8    predicate assault and they were aggravated, and that -- and

9    aggravating -- and, as I understand it, an aggravating

10   factor enhances the culpability.  Cases in which no

11   aggravation was found was -- mere use of a deadly weapon

12   alone is not sufficient.

13           THE COURT:  But, Mr. Pattis, it's not a -- I --

14   look, I take your point about these analogies, but it's not

15   a -- I don't have a free-flowing, open-ended task of just

16   saying, "I think this is aggravated," or, "I think it's

17   not."  I have to apply the definition in the guidelines;

18   right?  I mean --

19           MR. PATTIS:  You do, but you still have to reach

20   the conclusion that it's, in fact, aggravating.

21           THE COURT:  Under the definition here.

22           MR. PATTIS:  Correct.

23           THE COURT:  Right.  I -- obviously.  Yeah.

24           MR. PATTIS:  And so -- and the question that you'd

25   asked the Government that I didn't hear the Government

1    respond to was the attribution problem, and I don't think

2    that you can simply say aiding and abetting and, therefore,

3    everything.  I mean, I don't see a case that says you can.

4            THE COURT:  Well, they were --

5            MR. PATTIS:  And so --

6            THE COURT:  Whether I agree or not, they responded

7    that under the guidelines, this was jointly -- that, you

8    know, I can conclude it's jointly undertaking criminal

9    activity.  Whether I do that or not, I -- but that's the

10   response to that.

11           MR. PATTIS:  And it's -- yes, you could, and

12   language is written in general terms such that any

13   particular can be crammed under a general if -- to serve a

14   purpose, but I think the purpose here is to provide some

15   uniformity in sentencing and some sense in -- that the law

16   makes sense from case to case to case.  And so to say that

17   they were there to engage in this sort of conduct and,

18   therefore, whatever -- and I think Mr. Smith's point about

19   Donahue [sic] is particularly well taken -- therefore, that

20   was reasonably foreseeable at the time and because one, you

21   know -- because they were there for a felony, everything

22   counts, I think that's just pressing too hard, and that's my

23   general response to the Government's sentencing memos in

24   general:  They're pressing too hard.  A crime was committed

25   here, and it was a crime that was deeply embarrassing

1    perhaps to the United States in the eyes of the world, but

2    it wasn't the crime of the century.

3            THE COURT:  All right.  Mr. Jauregui?

4            MR. JAUREGUI:  Good morning, Your Honor.  Sabino

5    Jauregui on behalf of Enrique Tarrio.

6            Judge, I just have just a very basic, specific --

7    fact-specific argument, and it's going to be the same one

8    I'm going to be making on the terrorism.  As Your Honor

9    knows, my client was not there on January 6th.  It was not

10   reasonably foreseeable for him to see this water being

11   thrown by Donohoe.  It was not reasonably foreseeable for

12   him to know what was going to happen with that fence.  He

13   never personally touched the fence.  So just based on the

14   specific facts, as Your Honor heard during our very lengthy

15   trial, there was no way my client could have reasonably

16   foreseen these specific actions, any assault, any

17   destruction of property.

18           Thank you, Your Honor.  As to the fence.

19           MR. ROOTS:  Thank you, Your Honor.  Roger Roots

20   for Mr. Pezzola.

21           This statute -- this is 18 U.S. Code 231 -- is a

22   very specific statute.  It's unique.  It is really a

23   riot-type statute.  And it -- I think it's obvious from the

24   reading of the statute that Congress intended it to apply to

25   a fairly low -- a low-level state of thinking, or mens rea,

1    doesn't require a whole lot.  It is designed at people who

2    engage in riots and oppose, resist officers during those

3    riots.  Now, the word "assault" I don't read as being in

4    that statute.  So I cannot imagine that they can shoehorn an

5    aggravated assault-level sentence out of that.  Now, this is

6    a statute punishable by up to five years' imprisonment.  And

7    they're trying to catapult a sentence so high from -- by

8    attaching this aggravated assault idea.  Again, this is not

9    a statute that requires a lot of -- and I would argue that

10    it's a low intent and it's -- it is -- ironically, it's a

11    specific setting-type statute.  It can only apply to civil

12    disorders, riots, civil disturbances.  So at -- the irony of

13    this particular statute, it's designed and it's almost

14    self-contained.  It does not lend itself to specific intent

15    to commit another felony.  So Congress obviously intended

16    this statute to apply to a setting where someone resists law

17    enforcement during a riot, and it can't be turned into a

18    specific intent statute with the idea that someone -- that

19    someone, then -- with the intent to commit another felony.

20    It just -- it becomes just convoluted and confusing if that

21    were the application.  This cannot be punished as aggravated

22    assault.

23            THE COURT:  Well, but there's nothing that says,

24    here's a statute; it criminalizes certain conduct.  Now we

25    have a guideline for that statute.  And the Sentencing

1    Commission says, well, if you do it with this other --
2    whether it -- with this, sort of -- in a particular way that
3    we think you should be -- we, the Sentencing Commission,
4    think the guidelines should be higher -- there's no reason
5    they can't do that; right?  I mean, obviously, they can't --
6    we -- I can never sentence anyone above the statutory
7    maximum.  But what's -- what is the reason -- I don't see
8    any reason why, in the -- conceptually, the Sentencing
9    Commission can't say, Okay.  I, you know -- persons
10   convicted of Offense A, because -- and the -- they've -- the
11   Government's met its burden as to the elements.  If there's
12   something else above and beyond that that happened, whatever
13   it might be, some aggravating factor -- I mean, that is the
14   guidelines, right, to say -- you still can't go above the
15   statutory maximum, but you -- something else happened that
16   we want to make -- we want to make clear that the guidelines
17   should be higher rather than lower, and that's all really
18   they're doing here.
19             MR. ROOTS:  Well, it's -- I think the sentencing
20   guidelines are -- obviously, it's, sort of, an umbrella that
21   the Sentencing Commission tries to place over this vast
22   array of criminal laws, and they don't always fit very well.
23   I do believe the right -- the most analogous guideline is
24   2A2.4, which is resisting law enforcement, which also is
25   probably the most analogous to, you know, 111(a) type

1    assaults.  I -- it's probably the same guideline.  But this

2    is a statute that is a riot-type statute.  It's not a --

3    imagine the idea -- just the -- just the whole idea -- the

4    concept of participating in a riot with the specific intent

5    to commit another felony, rape or, in this case, you know,

6    let's just say -- it becomes ridiculous.  In this case,

7    it's, you know, obstructing an official proceeding or

8    seditious conspiracy or something.  It becomes ridiculous

9    that you would commit a riot with the specific intent to

10   commit some other felony.  I think we all recognize that a

11   riot -- a civil disorder or civil disturbance is some kind

12   of a -- well, it's an -- it's an -- it's an episode of, you

13   know, vitriolic, perhaps, violent conduct that really

14   doesn't lend itself to specific intent to commit another

15   felony.

16          And so this can -- and I would just argue also

17   that the Government doesn't need more incentive, as they

18   already have, to create indictments with multiple counts.

19   This is a -- the Government is increasingly, over the years,

20   starting to create these indictments and knowing that if

21   they stack enough indictments, enough counts on an

22   indictment, and that, then, they can, at sentencing time, if

23   anybody gets convicted, they can argue, well, hey, this

24   aggravated idea applies because, well, there was an intent

25   to commit another felony.  What was that other felony?

1     Well, let's look.  Oh, it's one of these others that we've

2     put on the indictment.  It just incentivizes Government to

3     create more and more convoluted, multiple-count indictments,

4     and it just does not apply to Count 5.

5                  THE COURT:  All right.  Very well.

6                  Mr. Smith?

7                  MR. SMITH:  Your Honor, just one preservation

8     point.  We would object to applying the aggravated assault

9     guideline to the extent the felonious assault and the

10    Section 2A2.2 definition is felonious because the defendant

11    had the intent to commit another felony and where the

12    aggravated assault guideline applies under Definition 1,

13    subsection (d), because the defendant has the intent to

14    commit another felony.  If we have a felonious assault

15    because of the intent to commit another felony and we have

16    an aggravated assault for the exact same reason, that would

17    render subpart (d) of the definition superfluous.  So the

18    defense would argue that the intent to commit another felony

19    that's -- that would hypothetically render the 231 offense a

20    felonious assault cannot be the same as the intent to commit

21    another felony in aggravated assault subsection part (d).

22                 THE COURT:  What's -- well, at least antecedently,

23    it seems to me, Mr. McCullough, among the arguments he made,

24    I think, was that something can be felonious -- in other

25    words, they were convicted of -- right -- they were

1    convicted, you know -- if you're convicted of Count 5, that

2    doesn't -- that didn't require any particular injury or

3    anything.  Why can't -- if -- in other words, if I accept

4    the argument -- I'm not saying I do -- that a conviction

5    under Count 5 -- or evidence I find sufficient to sustain a

6    conviction under Count 5, to be technical -- if that, by

7    virtue of -- if that gets you -- gets the Government past

8    felonious assault, then it -- then your argument doesn't

9    hold up; is that right?  But you would challenge that, I

10   guess.

11          MR. MCCULLOUGH:  Yes, Your Honor.  If I'm

12   understanding Your Honor -- I mean, you're basically

13   suggesting that there's effectively double-counting; right?

14   So you're pushing -- you're --

15          THE COURT:  That's what Mr. Smith is -- or it's --

16   yes, or bootstrapping perhaps.

17          MR. MCCULLOUGH:  Bootstrapping --

18          THE COURT:  Yeah.

19          MR. MCCULLOUGH:  -- a better way to put it.  Your

20   Honor, I think it is a fair question.  I think that it is

21   nonetheless the case that the civil disorder and the crime

22   in civil disorder does constitute an interference with a law

23   enforcement officer during a civil disorder which, you know,

24   kind of, suggests the broader array of conduct that is

25   taking place, to include relevant conduct that includes the

```
1    assaults that are happening during the riot.  But I think
2    more importantly, Your Honor, the relevant conduct here for
3    these defendants -- and I just -- I want to, kind of, hit
4    this back because -- I mean, the suggestion is that we've,
5    kind of, run from relevant conduct in some way; meaning, the
6    purpose of felonious assault.  The relevant conduct here
7    includes felonious assaults.  It includes common law
8    assaults.  That -- those common law assaults include
9    Mr. Rehl's spraying of officers, Daniel Lyons Scott's
10   assault of officers as they pushed up the stairs, Dominic
11   Pezzola's assault on Officer Ode, Charles Donohoe's
12   assaulting officers with the water bottles, and those are
13   all carried out with the intent to commit another felony.
14   That is Count 3.  And so I don't want to, in any way,
15   suggest that we are, you know, kind of, not leaning fully
16   into that.
17             THE COURT:  No.
18             MR. MCCULLOUGH:  The -- I think the jury's
19   verdicts demonstrate an understanding that this was a
20   concerted effort.  The suggestion that some of these acts
21   were not foreseeable, given as -- I think -- I would just
22   point Your Honor to the path that the defendants took in the
23   course of the morning on the west plaza as they --
24             THE COURT:  You don't have to recount.
25             MR. MCCULLOUGH:  I -- and I will not, but I would
```

1    point you to the path.  And the path that they removed

2    themselves and went back forward, I think, kind of,

3    demonstrates that the assault's fully reasonably foreseeable

4    within the scope of the conspiracy and, again, pointing to

5    the jury's conclusion with respect to Count 8 which, when

6    they know how to acquit on Count 9; they did not on Count 8,

7    demonstrates that, in fact, that is well within the scope of

8    the conspiracy.

9                THE COURT:  Okay.

10               MR. MCCULLOUGH:  Thank you, Your Honor.

11               THE COURT:  We need to take a break for our court

12   reporter.  We'll come back and talk about the terrorism

13   enhancement.  Let's take a five-minute break -- 10-minute

14   break.

15               THE DEPUTY CLERK:  All rise.

16               (Brief recess taken.)

17               THE DEPUTY CLERK:  We are back on the record in

18   Criminal Matter 21-175, United States of America v. Ethan

19   Nordean, et al.

20               THE COURT:  All right.  The last topic that I

21   wanted to hear from you all on is the adjustment for crimes

22   of terrorism.  And so let me just -- I think -- I'm

23   certainly going to hear from any defendant who wants to

24   argue for any reason why I shouldn't apply it.  I think my

25   questions will -- starting with the Government, my questions

1    more -- to the Government at least -- are going to be more

2    along the lines of -- I just want to confirm you're asking

3    me to apply it to Counts 6 and 7 and you're not asking me to

4    apply it on any of the other counts, I think, and -- number

5    one, I just want to make sure that is the Government's

6    position.

7        Then there's the question of the departure.  And,

8    again, from your written submission, I wasn't sure whether

9    that was something you were asking for as a backstop in case

10   I didn't apply the -- in case I didn't apply the adjustment

11   or what, number two.

12        So those are, really, the arguments I have for the

13   Government, sort of the interplay, exactly what -- just to

14   confirm that, as far as the adjustment goes, you're only

15   requesting it for Counts 6 and 7 in the way that you lay

16   out, and I just don't have to consider whether, directly

17   through the guideline, the adjustment would apply to the

18   other offenses, and then what the relationship between that

19   request and your upward -- and your departure request is.

20   And then I'll hear from the defendants on all the reasons

21   why I -- in their view, I shouldn't apply it at all.

22        MR. MCCULLOUGH:  Thank you, Your Honor.

23        I think your understanding is correct so -- in

24   terms of the Government's position, but I'll just walk

25   through it to make sure that we're talking about the same

1      thing here.

2              The Government is asking for the application of

3      the 3A1.4 adjustment to apply to Counts 6 and 7.  So the

4      destruction of federal property.

5              THE COURT:  And only those counts.

6              MR. MCCULLOUGH:  And only those counts.  That is

7      correct.  And Your -- as Your Honor knows that those -- the

8      destruction of federal property, 1361, is one of the

9      enumerated crimes under 2332b(g)(5)(B) and we argue that it

10     meets the requisite intent under b(g)(5)(A).  You did not

11     ask to hear from us on that, and so I will not address that.

12     I will save that to the extent you'd like to hear from us

13     after or I can address it now.  It's your -- but I want to

14     focus on what you asked.  And so that's -- to address that,

15     that's the fundamental issue here.  And so it is an -- it --

16     the -- Count 6 and 7, it is an enumerated statute under

17     b(g)(5)(B); it meets the requisite intent, as we've said;

18     and we would ask for the application of that adjustment.  In

19     addition to that -- and so it's not a backstop, Your Honor.

20             In addition to that, what we do in terms of the

21     order of operations, right, is we analyze the individual

22     counts and we come up with a guideline for the individual

23     counts.  And so we would ask for the upward departure under

24     Note 4 of 3A1.4, but to be clear, the upward departure of

25     Note 4 -- not the adjustment, but the upward departure -- to

1    apply to the counts of conviction, Counts 1 through 4.  And

2    there, the guidelines --

3                 THE COURT:  Counts -- did you say Counts 1 through

4    4?

5                 MR. MCCULLOUGH:  Correct.

6                 THE COURT:  Okay.

7                 MR. MCCULLOUGH:  There, the guidelines, again, say

8    that the upward departure would be warranted when the crime

9    is calculated to influence or affect the conduct of

10   government by intimidation or coercion or to retaliate

11   against government conduct.

12                The -- Your Honor, I think, just -- to just start,

13   I mean, the crime of seditious conspiracy, I think, is

14   the -- kind of, a core one here.  It applies to the count of

15   seditious conspiracy.  The jury's findings with respect to

16   the -- Count 1 demonstrate the intent and demonstrate the

17   fact that these defendants intended to influence government,

18   coerce government into changing its posture that day with

19   respect -- and it's acting against the government as a

20   government.  That is the count of conviction with respect to

21   Count 1.

22                With respect -- and so --

23                (Brief pause.)

24                I don't know if Your Honor has other --

25                THE COURT:  Well --

```
 1                MR. MCCULLOUGH:  -- questions or --
 2                THE COURT:  So -- and it's your argument that --
 3      what is the practical effect of that on the guidelines
 4      calculation?
 5                MR. MCCULLOUGH:  So the practical effect of that
 6      on the guidelines calculation is that when you -- so for
 7      seditious conspiracy, when we calculate under 2J1.2 and we
 8      apply -- so for Count 1 -- so just, kind of, building it up,
 9      right -- so the math, if you will, you apply 2J1.2.  Start
10      with a base offense level of 14.  You add the specific
11      offense characteristics, the plus eight and plus three for
12      substantial interference as well as the physical or property
13      damage, and then plus two for the planning.
14                THE COURT:  Okay.
15                MR. MCCULLOUGH:  And then, of course, Your Honor,
16      these are specific to the defendants, but we have Chapter 3
17      role enhance- -- which I won't even get into --
18                THE COURT:  Sure.  Right.  But just --
19                MR. MCCULLOUGH:  So let's just fast-forward
20      through that.
21                THE COURT:  Right.  Just imagine I would have
22      applied that just for --
23                MR. MCCULLOUGH:  Imagine --
24                THE COURT:  -- purposes of this.
25                MR. MCCULLOUGH:  So then we get to offense level
```

1   calculations for Mr. Tarrio and Mr. Biggs of Offense

2   Level 33.  You'll get to an offense level for Mr. Rehl of

3   Offense Level 32.  And you'll get to an offense level for

4   Mr. Nordean of Offense Level 31.  Now, you -- and for

5   Mr. Pezzola, I believe it's Offense Level 30.

6       You then apply -- so the distinction between 3A1.4

7   adjustment and the Note 4 adjustment, of course, is that the

8   3A1.4 -- sorry, I think I said Note 4 adjustment.  I meant

9   Note 4 upward departure.  My apologies.  The distinction

10  between the two is that under 3A1.4, the adjustment, you --

11  it has a process by which you increase the offense level to

12  a minimum of 32 and then you also apply the criminal history

13  category of VI.  And so the calculations that we've set

14  forth in our sentencing memo refer to that calculation, and

15  that is how we get to the guidelines ranges that are set

16  forth on, effectively, Page 2 of our omnibus.

17       THE COURT:  Right.  I am looking at them right

18  now.

19       MR. MCCULLOUGH:  Okay.  Now, Your Honor can get

20  to -- as we point out in Footnote 2 in our response

21  memoranda -- and you don't have to look at it; I'll explain

22  it, but we point this out.  It's also in writing in

23  Footnote 2.  You can also take the offense level calculation

24  for, let's say, Mr. Biggs or Mr. Nordean at 31 or 33, and by

25  applying Note 4, you can increase the offense level, not --

1    holding the criminal history constant, so keep them at

2    Criminal History Category I -- but you can increase the

3    offense level such that the same range applies.  And so, for

4    instance, with respect to Mr. Biggs, I believe that's an

5    offense level increase of nine points, which puts him in

6    that same range.  And so, Your Honor --

7              THE COURT:  So it wouldn't have any -- I mean,

8    ultimately, it doesn't have any practical application other

9    than with regard to the way the individual offense

10   guidelines are calculated.

11             MR. MCCULLOUGH:  That's --

12             THE COURT:  After grouping it, it doesn't affect

13   it at all.

14             MR. MCCULLOUGH:  So --

15             THE COURT:  Well, it could, but you're not -- to

16   be clear, you're not asking me to make it matter.

17             MR. MCCULLOUGH:  That's correct, Your Honor.  I --

18   and I think that the process -- I mean, from an order of

19   operations perspective, I think the process would be that

20   you would apply -- you would apply both and then you, kind

21   of, do your grouping at the end.

22             THE COURT:  Right.

23             MR. MCCULLOUGH:  Right?  So you've got -- you,

24   kind of, hold the counts constant and then you do your

25   grouping.  And so, Your Honor, I think, as you said, you

```
1    come to the same practical destination whether you apply

2    3A1.4 adjustment to Count 6 or you apply the Note 4 upward

3    departure to Count 1.

4         THE COURT:  Well, it depends on how much I depart,

5    obviously, but yeah, right.

6         MR. MCCULLOUGH:  And that's -- and I think that is

7    our position, is that one can and one should.  It's

8    appropriate here.

9         So I don't know if Your Honor has any other

10   questions on that, or if you'd like to dive into any of the

11   specifics, but that's -- that is the Government's position

12   which, I think, you asked me to address.

13        THE COURT:  No, that's -- why don't I wait to

14   hear -- I think it may be more productive to -- as far as

15   just -- putting aside the odd math of all this and how it

16   works under the guidelines, to hear from you all after I

17   hear from the defendants on just the, kind of, core question

18   of why I should or should not apply, frankly, either one of

19   these.

20        MR. MCCULLOUGH:  Thank you, Your Honor.

21        THE COURT:  All right.  So any defendant who wants

22   to address this.  Again, I wanted to just understand what

23   the Government's request was in terms of the mechanics, but

24   I'll hear from you on why I should not apply it.

25        MR. SMITH:  Thank you, Your Honor.
```

1          So we heard two arguments from Mr. McCullough.

2    One was on the adjustment under 3A1.4 and the second was the

3    upward departure.  On the first argument, the adjustment,

4    the Government is arguing that it should apply to Count 6

5    which involved Mr. Nordean's fence destruction, according to

6    the jury.  And, there, I think, it's essential that we look

7    at the definition of federal crime of terrorism in

8    Section 2332b(g)(5).  And this is another example of a case

9    where we're looking at a partial sentence, and the question

10   is, do we interpret this sentence in isolation or do we

11   interpret it in the context of the surrounding statutory

12   scheme and setup?

13          And here, if we look at 2332b(5) [sic] in

14   isolation, it says a federal crime of terrorism is one

15   that's calculated to influence or affect the conduct of

16   government through the use of coercion or intimidation, and

17   then there's a list --

18          THE COURT:  Right.

19          MR. SMITH:  --- of federal crimes.  But before we

20   get to the list, if we were to just interpret that phrase in

21   isolation, then you're encompassing -- well, first, you're

22   encompassing half of the statute of Section 1512 which

23   involves threats to government witnesses and informants.

24   Every attempt to threaten a witness or an informant in the

25   context of an official proceeding could be considered using

1    coercion or threats to extract some conduct from the

2    government through threats or coercion.  Every single one.

3                  THE COURT:  Okay.

4                  MR. SMITH:  Every single one.  And, of course,

5    that's never how the terrorism enhancement has been applied,

6    because courts look down at the context of the statutes that

7    are being used in the context of the terrorism enhancement,

8    and what you see are threatened use of nuclear weapons,

9    biological weapons, destruction at airports, the kinds of

10    events -- spectacular events of violence that are -- that

11    mark acts of terrorism, particularly international acts of

12    terrorism.  And here, what the Government is asking the

13    Court to do is so radical.  They're taking an instance of

14    petit property destruction and they're saying that this can

15    be a federal crime of terrorism.  If that's true, then any

16    act of protest in the country, if we can fit it within the

17    corners of either relevant conduct or the federal crimes of

18    terrorism statute, becomes a crime of terrorism.  The

19    implications of the Government's argument are vast.  And

20    what it says in response to that is, "Well, January 6th was

21    a unique event in our history."  That is true.  But the way

22    in which they're defining this enhancement could apply

23    elsewhere.

24                  THE COURT:  But let me just respond to that.  Even

25    if I agreed with you about those risks, isn't that something

```
 1    that people who are concerned about it need to take up with
 2    either, A, Congress; or B, the Sentencing Commission?  In
 3    other words, I -- in this case, Congress; right?  Congress
 4    has defined -- I mean, a combination of Congress and the
 5    Sentencing Commission.  They've defined the offense this way
 6    and they've defined the enhancement this way.  And I just
 7    don't know that I have the authority to just, sort of, say,
 8    well, that's not really the spirit of any of this.  Even if
 9    I agreed with you.  Or -- let's even take it one step
10    further.  I don't think I have the authority to say, jeez,
11    in other cases, this could be abused.  Right?  So I'm just
12    not going to do it here.
13          MR. SMITH:  Well, Your Honor, even if we just look
14    at the facts here, they don't satisfy the standard for
15    Count 6 and -- so we've made an argument that the standard
16    is clear and convincing evidence.
17          THE COURT:  Right.
18          MR. SMITH:  Even if the Court doesn't find that
19    clear and convincing evidence applies, there's no way we get
20    from the fence-shaking episode -- where there really isn't
21    sufficient evidence to make out a felony -- we get from that
22    to that act was calculated to affect the conduct of
23    government through coercion or force.  Which act?  Which --
24    what conduct is Mr. Nordean said to extract from the
25    Government in that?  We've never heard that from the
```

1    Government.  What it does is it points to Count 1 and says,

2    in its nature, intrinsically, seditious conspiracy, it

3    meets -- satisfies the federal crime of terrorism

4    definition, even though it's not listed as a federal crime

5    of terrorism, but that can't be sufficient.  That's not

6    listed as a federal crime of terrorism.  Congress decided

7    not to include it.  So it can't satisfy clear and convincing

8    evidence, much less preponderance, to merely point to a

9    crime that's not listed and then bootstrap it to Count 6.

10                THE COURT:  Oh, no.

11                MR. SMITH:  There have to be some --

12                THE COURT:  I think you're --

13                MR. SMITH:  -- facts.

14                THE COURT:  I think you're -- now, you're doing

15    apples and oranges.  They don't -- they need the -- I think

16    their argument is that, "Judge, you can -- as to the

17    requisite mental state, we think -- regardless of what the

18    jury did, we think you can find" -- and I don't have the

19    language here, but you know the mental state that's

20    needed -- "we think you can find that and, just for good

21    measure, the jury did find seditious conspiracy.  So if you

22    think that count was satis- -- if you think there was

23    sufficient evidence for that count, then, jeez, of course

24    that mental state is satisfied."  And then, number two, you

25    need an enumerated offense; right?

1            MR. SMITH:  Well, I think even the Government

2      would agree that there has to be some factual nexus between

3      the count --

4            THE COURT:  Right.

5            MR. SMITH:  -- whose elements they're hanging on

6      and the count to which they're trying to apply the

7      adjustment, and that's what I'm zeroing in on here, Judge.

8      I'm saying that they still need to show the Court facts to

9      prove by a preponderance that the fence incident was

10     calculated to affect the government -- calculated to affect

11     government conduct through coercion or intimidation.

12           THE COURT:  Right.

13           MR. SMITH:  So it can't be sufficient to just

14     point to another count's elements.  There has to be a

15     factual link.

16           THE COURT:  Sure.  I get that.  But I -- I mean, I

17     just -- candidly, I don't see the -- I don't think that's a

18     tough bar for the Government, with all the evidence I heard.

19           MR. SMITH:  Well, so, Your Honor, the argument we

20     would be making is there's any number of reasons why someone

21     might pull down a fence that don't have to do with

22     extracting something from the government.

23           THE COURT:  In theory, that's correct, but that

24     wasn't this trial.

25           MR. SMITH:  Well, I -- so they haven't pointed to

1    facts at trial that show his intent at that moment was to

2    calculate -- was calculated to influence the conduct of the

3    government.

4              THE COURT:  All right.  I understand your

5    argument.

6              MR. SMITH:  So -- right.  So there's another

7    factor here, Your Honor, which is that the defendant was

8    intoxicated, was drinking at the time.  It's -- as Your

9    Honor knows, it is always a defense on specific intent

10   crimes where someone is intoxicated at the time.  So

11   particularly in the context of clear and convincing evidence

12   on the mens rea issue, we don't see how anyone could get to

13   clear and convincing evidence on the specific intent.  The

14   courts have said this is a specific intent element that must

15   be satisfied calculated to influence the conduct of

16   government.  There's no dispute -- I think even the

17   Government would acknowledge he was intoxicated at the time

18   of this incident.  There's no dispute of -- on the facts on

19   that issue at trial.

20             THE COURT:  There was no evidence -- there was

21   evidence that he had a beer can in his hand.  That's what I

22   recall.

23             MR. SMITH:  And there's evidence that it was empty

24   when it hit the ground.

25             THE COURT:  Say again.

 1            MR. SMITH:  There was evidence that it was empty

 2    when it hit the ground.

 3            THE COURT:  Okay.

 4            MR. SMITH:  So unless he was, you know, holding it

 5    for someone else, he was, you know -- so I think we do

 6    have -- there is evidence in the record he was drinking.

 7            There's also other evidence, Your Honor --

 8            THE COURT:  All right.  Mr. Smith --

 9            MR. SMITH:  -- on the march he was --

10            THE COURT:  -- what's your argument on the

11    departure?

12            MR. SMITH:  On the departure provision, Your

13    Honor, number one, the argument's waived because the --

14    Mr. McCullough seems to be making some argument about how

15    Section 3 -- the Government argues that Section 3A1.4,

16    quote, applies when it's used as an adjustment, but it's not

17    3A1.4 that is applying when it's used as a departure.  It's

18    still 3A1.4 either way.

19            THE COURT:  Okay.

20            MR. SMITH:  In the Government's response to the

21    PSR, Your Honor, they said, quote, "We are not" -- I don't

22    have the exact quote, so I won't say "quote" -- but they

23    said, "We are not asking the Court to apply 3A1.4 to any --

24    to Counts 1 through 4."  Applying it, Your Honor, means also

25    using the departure on those -- the departure under 3A1.4,

1    Note 4, to those counts.  So it's waived.  But then even if

2    Your Honor -- does Your Honor understand that argument

3    that --

4               THE COURT:  I do.  It's -- I do understand it.

5               MR. SMITH:  Well, they say, "We're not asking the

6    Court to apply it."  So --

7               THE COURT:  All right.

8               MR. SMITH:  So I'm just -- I think if the defense

9    were to say something like that, the Government might take

10   the position that, hey, the defense has waived this

11   argument.

12              THE COURT:  I would look at them funny, too,

13   but --

14              MR. SMITH:  Okay.

15              THE COURT:  -- proceed.

16              MR. SMITH:  So Your Honor, another reason it

17   doesn't apply is the Supreme Court has recently said in this

18   Kisor case -- K-I-S-O-R -- that the courts do not defer --

19   should not defer to application notes when they're

20   clearly -- when they're unambiguously inconsistent with the

21   guideline itself.  And here, there's an unambiguous

22   inconsistency.

23              The guideline in 3A1.4 says, clearly, two elements

24   have to be satisfied for a -- the adjustment to apply.  It

25   has to be a federal crime of terrorism, the offense that

1    we're considering, and that's to satisfy the federal crime

2    of terrorism statute in Section 2332b(g)(5).  So to the

3    extent Note 4 says, "Well, actually, one of those prongs is

4    not necessary; you don't need a federal crime of terrorism,"

5    that is unambiguously inconsistent with the guideline

6    itself.

7                THE COURT:  For a departure.

8                MR. SMITH:  For a departure.  I thought -- we're

9    just discussing the departure argument right now.

10               THE COURT:  Right.

11               MR. SMITH:  And our first departure argument was

12   waiver.  The Court didn't like that one.  So the second

13   argument we're making on departure -- that is, the argument

14   that 3A1.4 should apply to Counts 1 through 4 -- the

15   argument we're making there is the Court should not depart

16   on those counts under 3A1.4 because Note 4, which gets you

17   to crimes outside the federal crime of terrorism, is

18   unambiguously inconsistent with the guideline itself to the

19   extent it sheds the federal crime of terrorism --

20               THE COURT:  All right.

21               MR. SMITH:  -- requirement.  And, Your Honor, I

22   think a couple of your colleagues on the bench have actually

23   so held in some prominent January 6th cases.  I think Judge

24   Berman Jackson considered the question in a case involving

25   one of the most violent defendants in all of these cases,

1    someone who was going around -- I think the defendant's name

2    was Rodriguez, but he was basically going around punching

3    and assaulting everyone in sight for hours.  And so if there

4    was a case where Note 4 might be applied because the conduct

5    was just -- there was no federal crime of terrorism, but the

6    conduct was calculated to affect the conduct of government

7    through coercion or force, it would be this case, and the

8    judge -- I think what the judge was saying was, "Wait a

9    second.  This note is inconsistent with the guideline."

10                THE COURT:  Did she -- was this after the case

11    you're citing came down?

12                MR. SMITH:  Yes.  I think -- the Supreme Court

13    case?

14                THE COURT:  Yeah.

15                MR. SMITH:  Yeah, I think that case is from 2019.

16                THE COURT:  Okay.  And --

17                MR. SMITH:  It's cited in our papers, but -- and,

18    Your Honor, a couple of other judges -- except for Judge

19    Mehta, who, I think, might be alone on this issue -- a

20    couple of other judges have also held -- Judges McFadden and

21    Friedrich, I think, have held that, "No, we can't apply

22    Note 4 and 3A1.4 as a departure in this context."

23                THE COURT:  Can't -- if I -- you couldn't -- you

24    think they both held that you cannot -- that a court could

25    not apply both of them to different counts of conviction in

1    a particular case?

2            MR. SMITH:  I don't think they were making a

3    general statement about Note 4 so much as they were saying,

4    "Well, at least in this -- at least in the January 6th

5    context with these defendants we have in front of us, we're

6    not applying Note 4."

7            THE COURT:  Okay.  But that's not -- I mean, that

8    could be for any one of many reasons, but --

9            MR. SMITH:  Well, but, Your Honor, if we just --

10   if we're -- if we detach this adjustment or departure from

11   the list federal crimes of terrorism, what are we left --

12   we're left with a very general statement about any act that

13   influences the conduct of government through the use of

14   coercion or force and then we're in space.

15           THE COURT:  Okay.  I just --

16           MR. SMITH:  And so --

17           THE COURT:  I'm just asking you what the

18   rationale -- you're saying Judge Berman Jackson's rationale

19   was -- under the Supreme Court case you're mentioning, that

20   it was -- it's inconsistent.

21           MR. SMITH:  I think that was her logic, Judge.

22   But Judge Friedrich's logic, I know for sure -- and I'm

23   willing to quote her on this -- was that it would create --

24   to apply Note 4 in the Reffitt case in front of her --

25           THE COURT:  Right.

 1          MR. SMITH:  -- would create unwarranted sentence

 2   disparities.

 3          THE COURT:  Well --

 4          MR. SMITH:  And that's a different part of the

 5   analysis, but --

 6          THE COURT:  Obviously.

 7          MR. SMITH:  But nevertheless, her point, I think,

 8   is very well taken, which is that if we have -- if you could

 9   describe any January 6th defendant's conduct as satisfying

10   that -- the first half of the federal crime of terrorism

11   standard, then what you'd have -- you could characterize

12   misdemeanors --

13          THE COURT:  Listen --

14          MR. SMITH:  -- as --

15          THE COURT:  -- the background to all of this,

16   quite frankly, is that -- I don't disagree with what you're

17   saying, and that's -- and so, I think for good reason, the

18   Government doesn't come in and ask for this very often.  The

19   question is -- but -- anyway, yes, that's the background to

20   all of this.  What to make of that is another thing.  But I

21   agree with you that it's not -- for a variety of reasons,

22   it's -- there are certainly cases where the Government could

23   come in and ask for things that seem completely draconian.

24   I'm not sure this is that case, but I don't disagree with

25   the point you're making.

1          MR. SMITH:  And the final point, Your Honor,

2     Judge, is while the Court and the Government might be able

3     to distinguish a misdemeanor case from this case on certain

4     facts, the problem -- the heart of the problem is that the

5     standard the Court is applying leaves us without any

6     limiting principle.

7          THE COURT:  I'm not --

8          MR. SMITH:  Yeah.

9          THE COURT:  I hear you.

10         MR. SMITH:  Thank you, Judge.

11         THE COURT:  I understand the argument.

12         MR. SMITH:  Thanks.

13         THE COURT:  All right.  Any other -- arguments

14    from any other defendant on this?

15         MR. JAUREGUI:  (Indicating.)

16         THE COURT:  Your client wasn't present.

17         (Laughter.)

18         MR. JAUREGUI:  Judge, my client wasn't present.

19    He wasn't there.  And, as Your Honor knows, in previous

20    rallies, he had difficulty controlling the Proud Boys.  He

21    did not control the Proud Boys on January 6th.  He was not

22    there.  It was not reasonably foreseeable that this fence

23    was going to be touched, destroyed, or affected in any way.

24    And I think the Government, to a certain point, concedes

25    that because when they did their supplemental response to

1    the motion for the conflict between Rehl and Biggs, they

2    wrote that one of the issues would be that Mr. Pattis might

3    successfully argue that Mr. Rehl never touched the fence and

4    thus the terrorism enhancement did not apply to him.  So if

5    it's reasonably foreseeable that terrorism enhancement could

6    not apply to Mr. Rehl, then definitely it cannot apply to

7    Mr. Tarrio who wasn't even there on January 6th.

8              So -- and, as Your Honor knows, throughout all the

9    evidence throughout trial, my client, over and over again,

10   said -- over and over again, said that the Proud Boys would

11   never be the ones to cross police lines; would never be the

12   ones to engage with police.  There was not a single

13   statement during the trial where my client -- advocating

14   attacking the police or being violent towards the police or

15   anything of the sort or destroying government property in

16   any way, shape, or form.

17             So again, he wasn't there; not reasonably

18   foreseeable; that fence was not destroyed upon his command;

19   he had no knowledge of it; and that's it, Judge.

20             THE COURT:  All right.

21             MR. JAUREGUI:  Thank you.

22             THE COURT:  All right.

23             MR. METCALF:  Mr. McCullough actually said it --

24   what I intended to say, but he just said it opposite.  Just

25   because you can doesn't mean you should, and it doesn't mean

1    that you should take these facts and find the requisite

2    intent for Counts 6 and 7 to rise to this level of a

3    terrorist enhancement.  So how does the Government get

4    there?  Your Honor already discussed that.  It is, kind of,

5    through Count 1.  And it was stated that Count 1 goes to the

6    intent.  And in -- on the third page of their most recent

7    filing to all defendants' sentencing memorandum, this

8    statement is actually stated, and Your Honor, kind of, hit

9    it on the head, as well.  In addition to them showing

10   intent, oh, yeah, the jury found -- just one second; I want

11   to find the exact language.  The jury unanimously concluded

12   beyond a reasonable doubt that the defendants conspired or

13   agreed with at least one other person with the goal of

14   opposing by force the authority of the government.  Now,

15   missing in that one sentence, Your Honor, Page 3, is

16   Mr. Pezzola's name.  And that goes to the essence of what

17   I'm saying.

18           The intent component being found in the two

19   conspiracies that he was not convicted in.  Now, if you

20   utilize or just focus on that intent component and we go to

21   Note 4 of Section 3A1.4 -- I had to read this a couple of

22   times, and I believe that this upward departure provision

23   should not apply to Mr. Pezzola for a completely different

24   reason.  It's broken up into two separate parts: (A) is for

25   counts that are not enumerated; (B) is for the counts that

1    are enumerated.  So Counts 6 and 7 actually would go to

2    Subdivision (B) of this note, but instead what is being

3    referenced is the first part.  And if the first part, you

4    take that intent and you take that seditious conspiracy and

5    the two conspiracies that Mr. Pezzola was not convicted of,

6    it's our position that the first part, (A), of Note 4 should

7    not apply to Mr. Pezzola for specifically that reason, that

8    requisite intent reason, and that could be a fact-specific

9    inquiry that Your Honor knows the evidence and can go

10   through.  Mr. Pezzola walked away from the crowd for over an

11   hour.  Mr. Pezzola then ended up branching off with other

12   people from New York, not these other co-defendants.

13   Count 6 specifically does -- was not shown to have been

14   committed by Mr. Pezzola, but it would actually only rely on

15   co-conspirator liability.  And I ask Your Honor to take that

16   into consideration when taking such a -- when considering

17   such a drastic approach and what this terrorist enhancement

18   actually means.  Terrorism has a real, true meaning, and I

19   don't want to get into the spirit because Your Honor already

20   said, shouldn't we be going to Congress about that?  But the

21   spirit and essence of these crimes in no way should even

22   come close to comparing -- to being applied here.

23   Mr. Pezzola did not physically touch a fence, was

24   not actually alleged to have physically touched a fence --

25              THE COURT:  Can I just -- can I just jump in on

 1    the fence part.

 2              MR. METCALF:  Yes.

 3              THE COURT:  The Government is arguing it applies

 4    to Count 7 as well.  So --

 5              MR. METCALF:  And I'm going to get there.

 6              THE COURT:  Okay.

 7              MR. METCALF:  So Your Honor, the nature,

 8    circumstances of Count 7 -- I know I'm going to say -- or

 9    we've argued this ad nauseam -- even argued it to the

10    jury -- that should have been a misdemeanor offense.  $700.

11    So the threshold between felony and misdemeanor there is

12    $1,000.  One pane of glass was shown, and testified to, to

13    be in the $700 range.  Two puts you at $1,400.  We believe

14    that another individual, not a co-conspirator in this case,

15    was responsible for the first pane of glass and Mr. Pezzola

16    was responsible for just one.  Now, that becomes relevant

17    because to, kind of, branch off what Attorney Smith said,

18    we're talking about a misdemeanor here or our argument that

19    this should be a misdemeanor.  I'll wait for your decision

20    this afternoon or -- on the 2933, but I know Your Honor's

21    not going to agree with me, but that is our position.  This

22    is a lower-level offense when taken -- when the facts are

23    fully considered.  And whether you agree or disagree, that's

24    the kind of offense level that we're talking about here.

25              THE COURT:  Although under the -- am I right -- I

1    don't have the statute in front of me, but it actually

2    wouldn't -- I mean, you might argue it's unfair, and I might

3    agree, but it actually doesn't matter for purposes --

4    whether it's a misdemeanor or not I don't think actually

5    matters under the guideline, does it?  Well, I guess the

6    guidelines wouldn't apply to a misdemeanor.  So maybe,

7    that's right.

8         MR. METCALF:  I mean, everything's stacked.

9    Mr. Pezzola's guidelines are at a 30.  You're going to hear

10    arguments about that on Friday.  As far as that misdemeanor

11    versus a felony, I don't think it would have changed

12    anything in the calculation.  It wouldn't have changed

13    anything in the PSR.  But it does go to the nature of what

14    we're speaking about here: terrorist enhancement.  That's

15    what I'm trying to get.  The essence of that statute,

16    although written in that form, also should have meaning, and

17    it should have meaning vastly greater than the offense that

18    was committed here.

19         Mr. Pezzola took responsibility for that, as well.

20    I mean, there are so many different components that Your

21    Honor could look at as far as the facts and the evidence

22    that were presented during this trial that would allow for

23    you to say that this should not apply to this offense.  And

24    specifically Count 7 is an offense where Mr. Pezzola took

25    full responsibility for.  He said, "I was the one who did

1    this.  I understand co-conspirator liability is going to

2    apply for 6 and 7."

3            But ultimately, at the end of the day, and in

4    considering, are you going to put them at a Category VI for

5    this behavior?  That's what this comes down to.  So even if

6    the guidelines go up just a little bit, you're at a Criminal

7    History Category VI.  This is Mr. Pezzola's first arrest.

8    To make that jump is, to me -- is -- it should not even be

9    coming close to being applied here, and that's what we

10   respectfully submit, Your Honor.

11           Take a look, again, at the subsection (B) of

12   Footnote -- of Note 4 and how that specific section applies

13   to enumerated crimes, and the standard there completely

14   changes, as well.  The terrorist motive was to intimidate or

15   coerce a civilian population.  Either way you apply this

16   statute, it shouldn't apply to Mr. Pezzola.

17           THE COURT:  All right.

18           MR. METCALF:  Thank you.

19           THE COURT:  Thank you, Mr. Metcalf.

20           Let me hear -- if no other defendant -- I let the

21   Government -- I indicated I would give them the last word

22   because I thought most of the arguments, at least in the

23   first instance on this one, were going to be coming from the

24   defendants.

25           MR. MCCULLOUGH:  Thank you, Your Honor.

1          So I think just starting with, kind of, where we

2     left off, the idea that -- I think, kind of, echoed by a

3     number of the defendants that this is just, kind of, a

4     misapplication of terrorism.  It's not mass casualties and

5     the like.  Your Honor, this -- as Your Honor knows, the

6     focus of this was on obstructing the peaceful transition of

7     power in this country.  That is what was before the jury.

8     That is what they aimed at.  And that is a significant

9     crime.  And they did it -- they prepared to do it.  They

10    recruited individuals that they believed could help them do

11    it, Mr. Pezzola being one of them, virtually -- and I say

12    this intentionally -- literally the poster child for their

13    effort.  "Lords of War, #J6."  These are the men that they

14    prepared to stop the peaceful transfer of power with.  It

15    does not require mass casualties.

16         Look at what the Seventh Circuit said in

17    Christianson -- it's a case we cited in our brief, 586 F.3d

18    532 -- "the purpose of the defendant's actions was to

19    further" -- in that case, ELF, Environmental Liberation

20    Front -- "political agenda, the end to industrial society.

21    The method they chose to communicate this desire was not

22    peaceful protest with speeches, songs, and a petition

23    outside the facility but instead a violent attack against

24    the facility.  Because the defendants do not look the part

25    of our current conception of a terrorist does not separate

1    them from that company."

2        The terrorist -- the application of 3A1.- --

3    the -- 3A1.4 has been applied to individuals who have met at

4    a bar and gone to the IRS to deface the records.

5        THE COURT:  Mr. McCullough, you don't have to

6    spend any more --

7        MR. MCCULLOUGH:  Okay.

8        THE COURT:  -- on this argument.  I mean, look, I

9    have to calculate the guidelines as they are.  What, you

10   know -- but -- and I don't think it's my -- I don't think I

11   have the ability to, sort of, look at the spirit of things

12   and decide, No, the guidelines are going to be applied some

13   other way.  Of course, you know, the guidelines are

14   advisory, so, you know -- this is what you all are going to

15   be arguing to me after we calculate them.  But I do think --

16   I need to calculate them, and I -- I mean, I don't find the

17   argument that, jeez, this isn't the spirit of this

18   guideline, or even, gee, this guideline could be applied in

19   some way in some other case that's totally inappropriate --

20   that may well be, but I don't think that's the task in front

21   of me.

22       MR. MCCULLOUGH:  Fair enough, Your Honor.  And so

23   I -- if you'd like me to address the intent when they got to

24   the fence, I will.  Otherwise, I'll move on.  I think that

25   falls into the category of things that you --

```
 1            THE COURT:  Well, I'd like to hear -- I mean, this
 2    issue -- the issue that Mr. -- in particular, the issue that
 3    Mr. Smith brought up regarding the various -- actually, I
 4    assume the Government's probably more familiar with -- or as
 5    familiar with this as any defense lawyer -- is what Judge
 6    Berman Jackson -- the issue of the application of the upward
 7    departure, whether -- what rationale is different --
 8    different members of the bench in this court have given in
 9    not applying that for one reason or another and whether any
10    of them have adopted this issue of, well, this is, sort of,
11    inconsistent with -- the departure is, sort of, inconsistent
12    from the broader adjustment, and so that -- I'm not going to
13    apply it.
14            MR. MCCULLOUGH:  So Your Honor, it is my
15    understanding that with respect to -- and these are some of
16    the cases that were mentioned here -- Reffitt and --
17    Rodriguez, which was before Judge Berman Jackson; Reffitt,
18    of course, before Judge Friedrich -- my understanding is
19    that those decisions were made with respect to unwarranted
20    sentencing disparities.
21            THE COURT:  Right.
22            MR. MCCULLOUGH:  The -- I do know and -- that
23    Ms. -- sorry, that Mr. Smith pointed out this question that
24    Judge Friedrich had raised as to whether Note 4 goes beyond
25    3A1.4.  It was raised.  I -- Your Honor, I think that -- the
```

1    question there is whether the -- the -- whether the

2    guidelines -- the commentary goes beyond, kind of -- in any

3    way expands the scope or purpose of 3A1.4.  And here, the

4    application of Note 4 is -- does not go -- it does not

5    extend beyond what is promulgated in the original law, in

6    the 1996 law, that allowed -- that directed the Sentencing

7    Commission to basically institute 3A1.4 and expand it to

8    these crimes of terrorism.  It offers increases in the

9    offense level up to 12 points, which is within that

10   boundary.  And it does not request any change to the

11   criminal history category.  And as -- the Ninth Circuit had

12   looked at this in a case called Tankersley, 537 F.3d 1100 --

13   it's the Ninth Circuit, 2008 -- and determined that, looking

14   at Congress's intent in passing the -- the act that allowed

15   for this provision to be added to the Sentencing

16   Commission -- the sentencing guidelines, rather, and

17   determined that it did fit within the construct, and it was

18   in furtherance of the intent of the statute, that it would

19   be applied either to someone who was trying to institute --

20   or affect a private population or coerce government with a

21   non-enumerated statute.  And it was applied there in that

22   case -- or I should say upheld there in that case.

23            So I don't know if Your Honor had any other

24   questions there, but I think, kind of, fundamentally, the

25   Note 4 departure is -- it's, of course, discretionary, but

1    the guideline -- in terms of the -- Your Honor's ultimate

2    application there, but the Note 4 departure as set forth in

3    the commentary there is a valid -- is valid and -- guidance

4    from the commission.

5              THE COURT:  All right.

6              MR. SMITH:  Your Honor, there's --

7              THE COURT:  Yes, Mr. Smith.

8              MR. SMITH:  There's one point, I think, that

9    Mr. McCullough just raised that's worth drilling down on for

10   the Court.  I believe that in explaining why Note 4 does not

11   conflict with the language promulgated in Guidelines 3A1.4,

12   Mr. McCullough said that that's because Note 4 calls for an

13   upward departure in the offense level as though the 3A1.4

14   adjustment applies, but not the criminal history category --

15             THE COURT:  Okay.

16             MR. SMITH:  -- if I heard that correctly.  Now,

17   one of the questions the Court was asking earlier of

18   Mr. McCullough was, "Well, what's the practical difference

19   between the Court applying 3A1.4 as an adjustment to Count 6

20   and 3A1.4 as an upward departure on Counts 1 through 4?"

21   Now, if we heard Mr. McCullough correctly, there is a

22   practical difference because the Government appears to be

23   taking the position that under Note 4, the criminal history

24   category is not elevated from I to VI, unlike the

25   adjustment.  So there would be a difference in the

```
1   guidelines range if the Court were to apply --
2           THE COURT:  Sure.  I don't -- I think this is --
3   you're misunderstanding, I think, that -- what -- the point
4   was if I did apply the guideline as opposed to the
5   departure -- if I did apply the guideline, the adjustment,
6   the question of whether, then, I also applied the departure
7   would become irrelevant; that -- not either/or, but if it
8   was one versus both, that that wouldn't make a difference in
9   the guideline calculation in the way the Government's asking
10  me to do it.
11          MR. SMITH:  Correct, if it was one versus both, as
12  Your Honor just --
13          THE COURT:  Right.
14          MR. SMITH:  -- framed it, then there wouldn't be a
15  practical difference.
16          THE COURT:  Right.
17          MR. SMITH:  It would only be a difference if the
18  Court was choosing between applying 3A1.4 --
19          THE COURT:  Or the --
20          MR. SMITH:  -- as a departure generally --
21          THE COURT:  No, no, no.  Right.
22          MR. SMITH:  -- or 3A1.4, right, as an adjustment
23  to just Count 6.
24          THE COURT:  I understand.  I think we're all on
25  the same page.  Okay.
```

1          MR. SMITH:  But, Your Honor, it -- because there

2     could be factual arguments that are specific to Count 6,

3     this could become an issue later on.  So just putting that

4     out there.  So if the Court, for example -- hypothetically

5     speaking, if the Court were to say, "I'm applying 3A1.4 to

6     Count 6 as an adjustment.  I'm also applying -- but just

7     to -- the avoidance of doubt, I'm also applying 3A1.4 under

8     Note 4 as a departure on Counts 1 through 4," then suppose

9     some future court were to decide there's insufficient

10    evidence on Count 6.  Then there would be a difference.

11         THE COURT:  Sure.  No, no, obviously.

12         MR. SMITH:  So --

13         THE COURT:  Right.  Right.

14         MR. SMITH:  So just --

15         THE COURT:  Understood.  It's not -- I -- I'm

16    going to come out with what I think the right thing is.  I'm

17    not trying to hide behind the fact that it would make no

18    difference that I could just apply it.  I understand your

19    point.

20         All right.  It's 12:18.  Let's break for lunch

21    until 1:45.  1:45, we'll be back here and I'll rule on the

22    outstanding motions.

23         THE DEPUTY CLERK:  All rise.  This Honorable Court

24    stands in recess until the return of Court at 1:45.

25         (Brief recess taken.)

1          THE DEPUTY CLERK:  We're back on the record in

2     Criminal Matter 21-175, United States of America v. Ethan

3     Nordean, et al.

4          THE COURT:  All right.  So we'll turn now to my

5     oral ruling on the post-trial motions.  It is a lengthy

6     ruling, but it was a lengthy trial.

7          Before me are defendants' post-trial motions in

8     this matter.  All the defendants moved for judgment of

9     acquittal under Federal Rule of Criminal Procedure 29(a),

10    and I reserved judgment under Rule 29(b).  So following that

11    ruling, defendants Nordean, Biggs, Rehl, and Pezzola have

12    now moved for judgment of acquittal under Federal Rule of

13    Criminal Procedure (c).  Those are ECF Nos. 822, 824, and

14    825.  Defendant Tarrio moved to join Nordean's motion which,

15    I think, remains pending, so I'll just grant that right now.

16    ECF No. 823.  Biggs, Rehl, and Pezzola also moved for a new

17    trial under Rule 33.

18         To recap, the third superseding indictment charged

19    each of the five defendants here with nine counts:  Count 1,

20    seditious conspiracy, in violation of 18 United States Code

21    2384; Count 2, conspiracy to obstruct an official

22    proceeding, in violation of 18 United States Code Section

23    1512(k); Count 3, obstruction of an official proceeding, in

24    violation of 18 United States Code Section 1512(c)(2);

25    Count 4, conspiracy to use force, intimidation, or threats

1    to present -- prevent officers of the United States from

2    discharging their duties, in violation of 18 United States

3    Code Section 372; Count 5, obstruction of law enforcement

4    during a civil disorder, in violation of 18 United States

5    Code Section 231(a)(3); Counts 6 and 7, destruction of

6    United States property, in violation of 18 United States

7    Code 1361; and Counts 8 and 9, assaulting, resisting, or

8    impeding federal officers, in violation of 18 United States

9    Code Section 111(a).  The indictment further charged

10   Mr. Pezzola with Count 10, robbery of the personal property

11   of the United States, in violation of 18 United States Code

12   Section 2112.

13           The jury convicted Nordean, Biggs, Rehl, and

14   Tarrio of both seditious conspiracy and conspiracy to

15   obstruct an official proceeding.  It acquitted Mr. Pezzola

16   of Count 1 and hung on Count 2 as to him, prompting me to

17   declare a mistrial as to him on that count.  The jury

18   further convicted all five defendants on Counts 3 through 6,

19   obstructing an official proceeding, conspiring to use force

20   to present -- prevent federal officers from discharging

21   their duties; obstructing a law enforcement officer during a

22   civil disorder; and destruction of government property,

23   specifically a black fence valued above $1,000.  However, on

24   Count 7, the jury convicted only Mr. Pezzola of destroying a

25   Capitol window and hung as to the remaining defendants.  It

1    hung entirely on Count 8, the Section 111(a) charge

2    predicated on Charles Donohoe throwing a water bottle at a

3    line of police.  And it convicted only Mr. Pezzola on

4    Count 9, assaulting an officer in the course of his taking a

5    riot shield, acquitting the others.  And finally, the jury

6    convicted Mr. Pezzola of robbery on Count 10.

7         So here's how I'll plan to proceed.  Starting with

8    the Rule 29 motions, I'll discuss the relevant standard and

9    then explain why I do think the Government's evidence was

10   sufficient to sustain the jury's verdicts.  And after that,

11   I will take up and deny the defendants' motions for a new

12   trial, as well.

13        Rule -- Federal Rule of Criminal Procedure 29

14   allows a defendant to move for a judgment of acquittal on

15   any offense for which the evidence is insufficient to

16   sustain a conviction.  After a jury has rendered a verdict,

17   a defendant carries a very heavy burden to show it should be

18   set aside.  Courts, quote, "must affirm the verdict if,

19   considering the evidence in the light most favorable to the

20   Government, it determines that any rational trier of fact

21   would have reached the same verdict."  That's United

22   States v. Hale-Cusanelli, 628 F. Supp. 3d 320 at 324, a

23   D.D.C. case from 2022 quoting United States v. Wahl,

24   290 F.3d 370 at 375, a D.C. Circuit case from 2002.  Courts

25   must draw, quote, "no distinction between direct and

1    circumstantial evidence," closed quote, and give full play

2    to the right of the jury to determine credibility, weigh the

3    evidence, and draw justifiable inferences of fact.  That is

4    United States v. Williams, 836 F.3d 1 at 6, a D.C. Circuit

5    case from 2016.

6         As Rule 29 requires, I will focus on the evidence

7    as it existed at the close of the Government's case when the

8    defendants first moved for relief, but because the

9    defendants so moved again after the close of all the

10   evidence and after the verdict, I'll address the evidence in

11   their case in chief as appropriate, but considered at either

12   juncture, the motions must be denied.

13        So we'll begin with Count 1, seditious conspiracy.

14   To prove an offense under 18 United States Code Section

15   2384, as charged in this case, the Government had to prove

16   the defendants conspired to do at least one of two things:

17   one, oppose by force the authority of the United States; or,

18   by force, prevent, hinder, or delay the execution of any law

19   of the United States.  As I instructed the jury, to satisfy

20   its burden, the Government had to prove both that the

21   charged conspiracy existed and that each defendant

22   intentionally participated in the conspiracy with knowledge

23   of its unlawful goals and with the specific intent to

24   further its unlawful objectives.  So I'll begin by outlining

25   the evidence on which a rational jury could have determined

1    that a conspiracy existed to, by force, oppose the authority

2    of the United States and to prevent, hinder, or delay the

3    execution of a law.  In so doing, I'll construe all the

4    evidence, as I must, in the light most favorable to the

5    Government and afford it the benefit of all reasonable

6    inferences.  I also note now that I'm not going to say much

7    about Defendant Pezzola's conduct at this point because the

8    jury acquitted him of seditious conspiracy.  I will discuss

9    his conduct and involvement with the other defendants more

10   once I reach the third conspiracy conviction under 18 United

11   States Code Section 372.

12           To prove the existence of a conspiracy, the

13   Government had to prove that at least two people, in some

14   way or manner, explicitly or implicitly came to an

15   understanding to accomplish the charged unlawful objectives.

16   They didn't have to prove that the members of the conspiracy

17   agreed to all the details or to the specific means by which

18   they would accomplish their ends.  They only had to prove

19   that the conspirators shared an explicit or implicit mutual

20   understanding to try to achieve a common and unlawful

21   objective.

22           In broad strokes, a reasonable juror could have

23   concluded, based on the following, that the follow- -- based

24   on the following, that the following evidence comprised --

25   essentially comprised the defendants' conspiratorial

1    agreement.

2         During a debate between former President Trump and

3    then candidate Joe Biden, a moderator called upon President

4    Trump to disavow, quote, "white supremacist," closed quote,

5    organizations that supported him.  When former President

6    Trump asked who he meant, Biden chimed in, answering, the

7    Proud Boys.  In response, former President Trump said "Proud

8    Boys, stand back and stand by."

9         A rational jury could have concluded from that

10   evidence that this comment galvanized the Proud Boys

11   organization and aided their recruitment.  Indeed, several

12   of the defendants here showed great enthusiasm that former

13   President Trump had mentioned them.  At that time, Tarrio,

14   Nordean, Biggs, and Rehl were all leaders or prominent

15   members of the organization.  Tarrio, who was at that time

16   the organization's national chairman, posted on his Parler

17   account, quote, "standing by, sir."

18         Then later that year, former President Trump lost

19   several key swing states and, with them, the election.  The

20   defendants' social media commentary reflected increased

21   frustration over failed efforts to challenge the outcome in

22   the courts or otherwise.  Twice, Mr. Tarrio traveled to

23   Washington, D.C., to lead other Proud Boys at so-called Stop

24   the Steal rallies.  Nordean, Biggs, and Rehl all joined

25   Tarrio for the second rally in December.  At both events,

1    violence erupted, which these defendants then celebrated in

2    broadcasts online.  In some instances, videos of the Proud

3    Boys' use of street violence in furtherance of their

4    political goals was used a recruitment tool for the

5    organization.

6            However, at the December rally, a Proud Boys

7    member, Jeremy Bertino, was stabbed in a violent outbreak --

8    from -- by someone who the Proud Boys believed was Antifa.

9    After the rally, Tarrio said in a Telegram chat of Proud

10   Boys chapter presidents, including Nordean and Rehl, that

11   the problem at the December rally was, quote, "dudes not

12   listening to a simple chain of command," bemoaning that he

13   had posted rules that had not been followed.  That's

14   Government's Exhibits 513-34 and 513-39.

15           In the early morning of December 19th, 2020, just

16   a few weeks before January 6th, former President Trump

17   posted on Twitter, quote, "big protest in D.C. on

18   January 6th.  Be there.  Will be wild."  Exhibit-1102.  Two

19   hours later, while discussing the Proud Boys' organizational

20   reputation, Tarrio messaged Biggs that, quote, "the drinking

21   stuff helps us mask and recruit," closed quote.  Biggs

22   replied, quote, "but we recruit losers who want to drink.

23   Let's get radical and get real men."  Exhibit-525-5.  Later

24   that day, Tarrio, Nordean, and Biggs had a 15-minute video

25   chat.  And later that evening, in the early morning hours of

1    December 20th, Tarrio created an encrypted Telegram chat

2    group called the Ministry of Self-Defense, or the MOSD.

3    That's Exhibit-501-1.  The group included Tarrio, Biggs,

4    Nordean, and Rehl, as well as Charles Donohoe, Jeremy

5    Bertino, and John Stewart.

6         Based on the evidence at trial, which I'll soon

7    walk through in detail, a reasonable jury could have

8    concluded that the MOSD, created immediately after Trump's

9    call for supporters to rally in D.C. on January 6th, and

10   Tarrio and Biggs's discussion, manifested the defendants'

11   and other leaders' conspiratorial agreement and objective:

12   To recruit, organize, and, if necessary, deploy the Proud

13   Boys' so-called rally boys on January 6th to stop the

14   unlawful [sic] transition of power; that is, to weaponize

15   those members that had displayed a willingness to use

16   violence as to achieve the organization's political goals

17   instead of just drinking and socializing.

18         So the question now is what other evidence, viewed

19   in the light most favorable to the Government, supports the

20   jury's verdict that the agreement I just described actually

21   existed.  Of course, it's not possible, sitting here today,

22   to identify every single piece of evidence in the

23   Government's months-long case in chief that supports denying

24   the Rule 29 motions.  But I will discuss here some of the

25   key evidence, apart from what I just mentioned, upon which a

1    reasonable jury could have concluded that the seditious

2    conspiracy charged -- that was charged, in fact, existed.

3    I'll break that evidence down into three buckets which

4    should proceed more or less chronologically.  First, the

5    evidence that suggests the defendants and their other

6    co-conspirators, including at least Bertino and Stewart,

7    individually intended to use violent means to achieve their

8    political ends in this period after the election, including

9    to stop the transfer of presidential power.  Second, I'll

10   outline the evidence on which a jury could have concluded

11   that the defendants assembled the MOSD as a tool to

12   accomplish that shared objective.  And, third, I'll describe

13   the defendants' conduct and statements on January 6th itself

14   that support the existence of that agreement.

15          So in the Telegram chat -- in the Telegram group

16   for Proud Boys chapter presidents in which members

17   celebrated former President Trump's comment, Mr. Tarrio

18   responded, quote, "guys, stand by."  Exhibit-514-3.  About

19   an hour later, in a response to one member's question about

20   what exactly former President Trump's comment meant,

21   Stewart, a soon-to-be MOSD leader, responded, quote, "I read

22   it as stand by.  Don't engage immediately, but be ready to

23   go," closed quote.  That's 514 -- Exhibit-514-7.

24   Separately, on Parler, Biggs announced that, quote, "Trump

25   basically said, go fuck them up," closed quote, likely

1    referring to Antifa.  Exhibit-603-66.

2            Afterward, the evidence reflected that a divide

3    emerged within the Proud Boys leadership, with Tarrio and

4    Nordean seemingly on one side and at least some

5    organizational leaders on the other.  Members of the Proud

6    Boy elders chat Skull and Bones took issue with Biggs's

7    public comments after the presidential debate.  They asked

8    Tarrio, who was close with Biggs, to tell him to take his

9    posts down, disagreeing with Biggs's interpretation of what

10   former President Trump said and expressing concern that if

11   Biggs didn't, quote, "shut up," closed quote, Proud Boys

12   would get hurt.  Exhibit 500-3.  Tarrio, however, told them

13   to, quote, "let this play out," closed quote, and refused

14   to, quote, "disavow a guy that has helped the Proud Boys

15   every step of the way," closed quote.  That's Exhibit 500-5.

16           Around the same time, the elders discussed how to

17   handle messages that had been posted publicly from a Proud

18   Boys uncensored chat along with some of Biggs's posts.

19   Nordean suggested, quote, "Why don't we just fash the fuck

20   out so we don't have to worry about these problems anymore,"

21   closed quote.  He elaborated "politics ain't working for

22   nobody; optics game doesn't work," closed quote, and, quote,

23   "it's time to fuckin' rage, not pay [sic] tea time with

24   rhinos."  Exhibit 500-15.

25           Criticism of Biggs did not debate -- abate, but

1      neither did Tarrio's support.  In the official presidents

2      chat, Tarrio defended Biggs by explaining that he helped --

3      he helps Tarrio, quote, "organize," closed quote.  When

4      someone asked if it would be a big deal for Tarrio to,

5      quote, "tap the Biggs breaks," closed quote, for a while,

6      Tarrio responded that he, quote, "depended on Biggs and

7      Rufio," a nickname for Nordean, quote, "to make decisions,"

8      closed quote, at events.  That's Exhibit-514-37.

9              A reasonable jury might have taken all of this

10     as -- all of this early evidence unifying Tarrio, Biggs, and

11     Nordean, and setting them apart from the other Proud Boys

12     leadership, and suggesting an intent and motive to form the

13     MOSD.

14             Defendants' suggestions that violence could be

15     needed or would be needed to address the election results

16     continued apace.

17             Beginning with Tarrio, he posted to his Parler

18     account on November 5th that the Proud Boys would not,

19     quote, "stand by and watch" our country "America be," quote,

20     "taken over by these socialist pigs," closed quote.

21     Exhibit-600-2.  The next day, he posted that, quote, "the

22     media constantly accuses them of wanting to start a civil

23     war," warning them to, quote, "be careful what they ask for"

24     because they "don't want to start one, but they will sure as

25     fuck finish one."  Exhibit-600-5.

1    After media -- major media outlets announced that

2    Joe Biden had won the election, quote, "he remarked that the

3    Proud Boys would be rolling out because the stand-by order

4    has been rescinded."  Exhibit-600-6.  And as January 6th

5    approached, Tarrio's rhetoric continued.  On New Year's Day,

6    he posted, quote, "let's ring in this year with one word in

7    mind.  Revolt"; as well as "New Year's revolution."

8    Exhibit-600-52 and 54.

9    The morning after the election, Biggs posted a

10    video on his Parler saying there would be a, quote, "civil

11    war," closed quote, because defendants [sic] were, quote,

12    "poking the bear," closed quote, trying to steal the

13    election.  Exhibit-603-1.  He later added that the left

14    didn't, quote, "realize they were radicalizing people,"

15    closed quote, and it would be, quote, "time for fucking war

16    if they steal this shit," closed quote.  That's

17    Exhibit-603-2 and -4.  A few days later, he remarked that

18    the state of the country now is -- the state of the country

19    now is all the evidence you need to understand why we need

20    the Second Amendment.  Exhibit-603-9.

21    Rehl posted that he hoped, quote, "firing squads,"

22    closed quote, would be reserved for those who were trying,

23    to, quote, "steal the election," closed quote.

24    Exhibit-602-59.

25    At the same time, and along similar lines, the

1    defendants' statements suggesting a hostility toward and a

2    willingness to forcibly oppose law enforcement in relation

3    to the election results.  In response to a headline in

4    December suggesting that police officers in Michigan had

5    prevented GOP electors from entering the state capitol,

6    Biggs posted, quote, "we the people will treat your thin

7    blue line like we do Antifa.  We will knock you to your

8    unconstitutional asses.  Get in our way and get walked over.

9    You will become the enemy of the state.  You will be tried

10   for treason.  You will have no chance.  FAFO.  We aren't

11   here to play games.  This is war."  Exhibit-603-33.

12            Nordean made similar comments.  In mid-December

13   2020, he echoed the views of someone in the elders chat who

14   said, quote, "there wasn't much reason to ally before other

15   than punching commies, but now there's a real reason.  We

16   are months away from gulags.  It's now or never.  We fight

17   or we get locked up."  Nordean responded, "perfectly said,

18   my brother."  Exhibit-500-40.

19            Then in a podcast on December 28th, 2020, Nordean

20   remarked that, quote, "the only thing left," closed quote,

21   was to use force against the government.  He clarified that

22   he didn't want to use force against the government because,

23   quote, "the repercussions are unknown," but he would, quote,

24   "prepare an army," closed quote, to "literally replace,"

25   closed quote, the officials in charge.  Exhibit-608-C.

1    Then, again, a few days later, during another podcast with

2    Jeremy Bertino, Nordean explained that, quote, "when police

3    officers or government officials are breaking the law,"

4    quote, "you have to use force," closed quote.

5    Exhibit-609-B.  In his view, doing so was the point of,

6    quote, "the organized militia part of our Constitution,"

7    closed quote.  Again, that was Exhibit-609-B.

8            Collectively, a reasonable jury may have viewed

9    this evidence that defendants believed violence was

10   necessary to stop the presidential transition.  More

11   specifically, a jury might conclude -- a rational jury --

12   that these statements reflect their thinking also that law

13   enforcement had aligned against them and that they would

14   need to battle law enforcement to accomplish their goals.

15           The defendants' words became actions at two

16   so-called Stop the Steal rallies in D.C. on November 14th,

17   2020, and December 12th, 2020, both of which were

18   coordinated to protest the election results.

19           Of the defendants, only Tarrio and Pezzola

20   attended the November rally, although Pezzola -- and Pezzola

21   was not yet a Proud Boy.  Tarrio posted a photo of himself

22   on social media with a caption saying that, a, quote, "can

23   of whoop-ass" was on its way to D.C.  Exhibit-600-15.  And

24   violence indeed broke out the night of the rally between the

25   Proud Boys and Antifa, or at least those that they believed

1    were Antifa.

2            After the rally, the defendants celebrated what

3    had happened that day, including violent clashes, as a

4    success for the organization.  Rehl shared videos of a Proud

5    Boy smashing a woman in the head with a helmet, knocking her

6    unconscious.  He commented that the video showed the Proud

7    Boys not laying down and standing up for America.

8    Exhibit-602-9.  Rehl posted another video interlacing clips

9    of the Proud Boys' street violence in Washington, D.C. with

10   videos about the election, commenting, quote, "be careful

11   what you wish for when you ask to release the Kraken,"

12   closed quote.  Exhibit-602-12.

13           Biggs and Nordean also commented on the violence

14   at these rallies.  Biggs remarked that he had spoken with

15   Tarrio and that, quote, "the Proud Boys had one hell of a

16   day," closed quote, and, quote, "in self-defense, they

17   whipped commie ass and were victorious."  Exhibit-603-13.

18   Within minutes, Nordean also posted that the Proud Boys

19   killed it in D.C. and that, quote, "more needs to be done

20   to," quote, "come together and run these scumbags out of our

21   cities and anyone supporting them."  Exhibit-601-3.

22           Still, while the defendants publicly celebrated

23   the November rally, Biggs privately expressed to Tarrio that

24   it wasn't enough.  Two days afterward, Biggs messaged

25   Tarrio, I'm ready to war.  When Tarrio responded, we warred

1    on Saturday, Biggs responded, that's a sparring.  War hasn't

2    happened yet.  I'll let you know when a war starts.  Tarrio

3    said, quote, "I'll be at your house when it does.  I can't

4    throw a rock, but I can shoot," to which Biggs responded "I

5    got thousands of rounds and guns."  Exhibit-525-1.

6         Another rally took place on December 20th, 20- --

7    December 12th, 2020, which each of the defendants attended.

8    Transcript 4480 to 84.  Former President Trump had announced

9    the rally, and Mr. Biggs shared a flyer encouraging Proud

10   Boys to attend and answer the, quote, "call to action."

11   Exhibit-603-19.  He later posted online that he was ready to

12   rumble.  Exhibit-603-27.  On December 7th [sic], the night

13   before the rally, Tarrio gave a speech to a group of Proud

14   Boys that had traveled down for the event.  He encouraged

15   the men to resist the stolen election and announced, quote,

16   "if you want a war, well, you've got one."  That's trial

17   transcript 4487 through 88.  And on the evening of

18   December 12th, Tarrio led a march through the city, flanked

19   by Biggs, Nordean, Rehl, and Pezzola.  A group of Proud Boys

20   stole a banner, and Tarrio joined them in setting it on

21   fire.  Exhibit-273; transcript 9970.

22        Later that evening, violence broke out between

23   several Proud Boys and a pedestrian they believed to be

24   Antifa.  While the video footage at trial might admit

25   multiple interpretations, at least in one light it shows

1    multiple Proud Boys ganging up on that pedestrian.  The man

2    pulled out a knife as he attempted to escape the conflict

3    and, in his retreat, he stabbed multiple people, including

4    Bertino.  Exhibit-272, Exhibit-609-29, and transcript 9973.

5    After the stabbings, a larger group of Proud Boys, including

6    Mr. Pezzola, attacked the man until police intervened.

7    Government Exhibit-272; transcript 10076.

8         The defendants mostly celebrated December 12th's

9    events, but, as I mentioned earlier, Tarrio at least viewed

10   the disorder as a chain of command problem.  Exhibit-514-34.

11   In that way, a reasonable jury might have interpreted the

12   events of November and December 2020 as catalysts for

13   Tarrio's decision to start the MOSD.  Indeed, a reasonable

14   juror might have concluded that other Proud Boys leaders'

15   responses to the events of the 12th was the final straw

16   solidifying the divide between Tarrio and chapter presidents

17   that would rather have seen the organization take a step

18   back.

19        In a lengthy message to the presidents chat,

20   Mr. Tarrio explained, a lot of us have lost everything to

21   this.  Now we're fighting like women because we have made an

22   offensive push in some social media posts.  Do we have to

23   reassess how we do things?  Yes.  This was a learning

24   experience on how to march 1,000 guys down a street.  I

25   posted rules that, if they would have been followed, we

1    wouldn't have even been talking about it.  So excuse me if

2    I'm fighting back against retards that have no idea what

3    went on.  Not only the ones that weren't there, but the ones

4    that didn't follow the plan.  So fuck all you pieces of

5    shit.  Exhibit-514-39.

6            And as I'll discuss more later, the evidence can

7    easily be interpreted -- this evidence can easily be

8    interpreted as showing that the fallout from that event

9    continued to motivate the defendants through January 6th.

10   In particular, a rational jury might have found it marked a

11   turning point in the defendants' and their co-conspirators'

12   attitude toward the police; that it helped inspire Tarrio's

13   decision to implement a more solid command structure within

14   the MOSD; and that it otherwise reflected the defendants'

15   intent to use targeted force or street violence to advance

16   their political goals with respect to the election.

17           Before proceeding further, I just want to stop and

18   take a moment to discuss how the evidence about the

19   defendants', and the Proud Boys' in general, feud with

20   Antifa fits into the larger puzzle here.  The Government

21   offered this evidence for a variety of reasons, including as

22   circumstantial proof of the defendants' intent and motive on

23   January 6th.  But the defendants repeatedly objected that

24   evidence of violent clashes with Antifa wasn't relevant to

25   their intent to oppose the government by force.  I allowed

1    the evidence for all the reasons that are already on the

2    record, but I want to elaborate now why I think a reasonable

3    juror might have concluded that the defendants'

4    participation in and celebration of violence against Antifa

5    was some evidence of their ultimate intent to use force

6    against the Government.

7    　　　　Construed in the light most favorable to the

8    Government, the record contained ample evidence that the

9    Proud Boys' feud with Antifa and their political battles

10    against the government and law enforcement became

11    intertwined in this period after the election.  When

12    President Trump told the Proud Boys to stand back and stand

13    by on the debate stage -- that was before the election -- he

14    clarified that someone still needed to do something about

15    Antifa.  Exhibit-1101.  This comment prompted Biggs to

16    suggest that Trump had given them license to go eff them up.

17    Exhibit-603-66.

18    　　　　Matthew Greene, a Proud Boy who attended the Stop

19    the Steal rallies and was with Pezzola on January 6th,

20    testified that the Proud Boys, quote, "viewed themselves

21    almost as the foot soldiers of the right where Antifa were

22    the foot soldiers of the left."  That's the transcript at

23    5374.  Jeremy Bertino went on to testify that they perceived

24    D.C. police as protecting Antifa from the Proud Boys at the

25    December rally.  Transcript at 9966.  Some in the

1    organization began calling police officers coptifa.  For

2    example, Exhibit-507-11.  All in all, a reasonable jury

3    might have concluded that the defendants viewed their

4    conflict with Antifa as one piece of a larger political war,

5    culminating in the disputed election results.

6          So all in all, a reasonable jury might have taken

7    all that evidence -- that -- the defendants' individual

8    statements regarding the intensity of their belief that the

9    election had been stolen, their comments about an impending

10   war and being left with no choice but to resort to violence,

11   their growing disdain for law enforcement, and their

12   participation in or celebration of the Proud Boys' violence

13   against political opponents on the opposite side of that war

14   as evidence of their shared motive and intent to form the

15   charged conspiracy.

16          I'll now turn to the creation and management of

17   the MOSD, which the Government argued to the jury was the

18   manifestation of the defendants' and their co-conspirators'

19   unlawful agreement.  Put another way, a rational jury might

20   have concluded that the defendants intended for the MOSD to

21   be a vehicle by which they could carry out their unlawful

22   ends.

23          There are several pieces to the puzzle here which,

24   combined, would have permitted a rational jury to draw the

25   conclusion I just said.  First, there is some specific

1    evidence that directly informs Mr. Tarrio's intent which, as

2    the chapter's founder and leader, is particularly relevant.

3    Second, the defendants' and other MOSD leaders'

4    conversations among themselves betray a shared desire to use

5    or facilitate the use of force on January 6th.  And third,

6    conversations among the MOSD members, the defendants, and

7    other leaders recruited to the chapter which further

8    informed the chapter's true purpose or at least a purpose

9    that a rational jury could infer.

10              First, Mr. Tarrio suggested early on that if it

11   were up to him, he would coordinate an effort similar to the

12   one that ended up happening on January 6th.  In the

13   election's immediate aftermath, on November 6th, a member of

14   the official presidents chat asked "Okay, genius.  What's

15   your plan to stop this from unfolding?"  Tarrio responded,

16   quote, "not sit on Telegram.  In those swing states, get to

17   the election offices.  No colors, but bring people."

18   Exhibit-514-12.  The idea mirrors what he directed on

19   January 6th, but with a focus shifted to the Capitol.

20              Traditionally -- additionally, there's enough

21   evidence for a reasonable jury to have concluded that

22   Mr. Tarrio began the MOSD and recruited the other defendants

23   as leaders specifically to prepare for January 6th.  As I

24   mentioned earlier, in the early morning hours of

25   December 19th, Mr. -- former President Trump called his

1    supporters to be in Washington, D.C., tweeting, quote, "big

2    protest in D.C. on January 6th.  Be there.  Will be wild."

3    Exhibit-1102.

4           About two hours later, Tarrio texted Biggs that,

5    quote, "the drinking stuff," closed quote, within the Proud

6    Boys, quote, "helps mask and recruit," closed quote, but

7    noted that "some chapters don't leave their bars and homes,"

8    closed quote.  Biggs retorted that, quote, "they recruit

9    losers who want to drink," closed quote, instead -- and

10   suggested instead that they should, quote, "get radical and

11   get real men."  He said no one on their side, quote, "sees a

12   drinking club.  They see men who stand up and fight."  A few

13   hours later, he texted Tarrio again that he had purchased a

14   ticket for early January.  Exhibit-525-5.

15          Later that afternoon, Tarrio texted Biggs and

16   Nordean in a group chat asking to -- for a video call.  They

17   spoke for about 15 minutes.  A few hours after the call,

18   Biggs messaged the group, quote, "Trump's calling the troops

19   in on the 6th.  Might be a big deal."  Exhibit-518-1.  And

20   that evening, in the early morning hours of December 20th,

21   Tarrio created an encrypted chat on Telegram with Biggs,

22   Nordean, Rehl, Bertino, Stewart, and Donohoe.

23   Exhibit-501-1.  Tarrio positioned himself, Nordean, and

24   Biggs at the top of the command structure.  Rehl fell a tier

25   below them.  Exhibit-500-9.  They would later add other

1    leaders, including Aaron Wolkind, a Proud Boy who worked

2    with Rehl in the Philadelphia chapter.  Exhibit-543-1.

3    Based on this chain of events, a reasonable juror might have

4    concluded that the defendants intended to take -- to create

5    a separate chapter within the Proud Boys of real men like

6    them who were willing to stand up and fight on January 6th.

7            The way Trump pitched the new -- the way Tarrio

8    pitched the new chapter to the Proud Boys elders further

9    suggested a relative -- a revolutionary motive.  A jury

10   could have concluded that the name "Ministry of

11   Self-Defense," closed quote, was tongue in cheek.  Tarrio

12   proposed the chapter as a way, quote, "to hold unruly

13   members accountable at events" because "rally boys will

14   always be a thing.  They just need to be able to control and

15   harness themselves in large numbers," closed quote.

16   That's -- well, that's Exhibit-500-72.  He further told the

17   group that the chapter's mission statement was, quote, "to

18   standardize event organizing."  But shortly thereafter, he

19   messaged again: "whispers, 1776."  Exhibit-500-72 and 74.

20   From this, a reasonable juror might have concluded that the

21   MOSD was not solely about organizing rallies better and

22   holding rally boys accountable, but rather organizing

23   rallies and directing them as a force and a revolutionary

24   force.  Buttressing this reasonable inference are Tarrio's

25   earlier statements saying he'd be inclined to disguise his

1    true motives, once noting that he always sees -- always

2    uses, quote, "plausible deniability," closed quote, to his

3    advantage.  That's Exhibit-500-15.

4        Although I'm jumping ahead a little bit, the last

5    thing I want to discuss here is an important piece of

6    evidence that received a great deal of attention at trial,

7    the 1776 Returns document.  On December 30th, Tarrio

8    received a document from a girlfriend titled, quote, "1776

9    Returns," closed quote, that set out a plan to occupy

10   government buildings in Washington, D.C., on January 6th to

11   protest the election results.  Exhibit-528-1.  The document

12   calls for -- called for groups of people to amass outside

13   government buildings and overwhelm the defenses with a

14   sudden surge of the crowd.  Exhibit-528-1A.  The document

15   called this, quote, "storming the Winter Palace," closed

16   quote, apparently referencing the Russian Revolution.

17       The Government offered evidence that Tarrio

18   engaged with this document in some way; meaning, it may have

19   shaped his intent.  Special Agent Nicole Miller testified

20   that Tarrio's phone records revealed that he interacted with

21   the document and Googled "Winter Palace."  Transcript

22   12966-67.  Tarrio also twice invoked this relatively obscure

23   reference.  On January 3rd, a different woman remarked to

24   Tarrio in a private text thread that if her kid, quote, "is

25   anything like Tarrio, she's in so much trouble," closed

1    quote, because he'd, quote, "be like, mom, I'm going to go

2    take the Capitol," closed quote.  Tarrio responded

3    immediately, quote, "the Winter Palace," closed quote.

4    Exhibit-538-18.  Tarrio also used the term in a private

5    conversation with Bertino as the riot unfolded on

6    January 6th.  Exhibit-530-5.  Tarrio thereafter Googled "the

7    Winter Palace" and interacted with the document on his

8    phone.  From this evidence, a reasonable jury might have

9    concluded that Tarrio designed the MOSD as a revolutionary

10   force to oppose the transfer of power.

11          So now, I'll turn to evidence about how the

12   chapter unfolded and prepared for January 6th, again,

13   continuing to inform that conclusion and -- from which a

14   reasonable jury might have inferred that the group indeed

15   shared that unlawful purpose.

16          Around the time defendants formed the MOSD, they

17   also began planning their trip to D.C. for the 6th.  Certain

18   facts in evidence may have suggested to the jury that they

19   didn't see it as an ordinary rally.  For one, Tarrio

20   instructed the members of one Telegram chat group called,

21   quote, "Operation D.C. Street Sweepers," closed quote, which

22   included Nordean and Rehl, that they were not to wear Proud

23   Boys colors on January 6th.  That's Exhibit-537-19.  This

24   instruction would become a common refrain, plausibly

25   suggesting to a jury the defendants' intent to obfuscate

1    themselves and evade identification by law enforcement.

2           Biggs echoed the sentiment in another group titled

3    Space Force chat which also included Tarrio.  He told a

4    member that, quote, "so many Proud Boys wanna cry about

5    optics," closed quote, so they would be attending the

6    January 6th rally, quote, "as concerned citizens who hate

7    commies," closed quote.  When one member commented that he

8    was, quote, "confused by the thing on the 6th," wondering

9    whether former President Trump would, quote, "cross the

10   Rubicon" or whether he, quote, "just wanted a bunch of

11   people to wave flags and stomp their feet," and another

12   remarked that, quote, "maybe, shit's actually going down,"

13   closed quote, Biggs replied that he was not booking his

14   ticket as a joke.  He further noted Nordean and Tarrio would

15   also be attending.  That's Exhibit-517-1.

16          Back in the MOSD chat, the defendants and other

17   co-conspirators discussed further preparations for the 6th,

18   including purchasing tactical gear and sharing emergency

19   contact lists in case of injury.  Again, from this -- that's

20   Exhibit-501-4, 25, and 13.  From this, the jury might have

21   concluded that the defendants were preparing for violence on

22   the 6th.  The conversations among MOSD leadership further

23   supported a reasonable inference that they intended the

24   chapter to be a, sort of, tactical force on January 6th.  In

25   one message thread in the leaders chat, Donohoe mentioned

1    that they should, quote, "hear the guys out on," quote,

2    "escalation of force," closed quote, and, quote, "standard

3    operating procedures."  He further noted that he wanted to

4    discuss a, quote, "quick reaction force," closed quote.  In

5    response, Bertino, Rehl, Donohoe, and a user called Twisted

6    Zach discussed Proud Boys they saw acting violently at the

7    December 12th rally.  Exhibit-501-41.  Additionally, Biggs

8    suggested that the group should avoid posting anything

9    online until after the 6th to avoid, quote, "giving away

10   locations or their numbers," closed quote.  That is

11   Exhibit-501-12.

12           Additionally, throughout this period, the MOSD

13   leaders expressed a hostility toward police that a

14   reasonable jury might have found reflective of their shared

15   objective to unlawfully oppose the Government's authority on

16   January 6th.  Specifically, the evidence supported a

17   reasonable inference that the defendants were ready and

18   willing to use force against law enforcement officers,

19   protecting Congress's proceedings whom they viewed as

20   traitors.

21           For example, on January [sic] 30th, Tarrio

22   received a tip that he would be arrested for his actions at

23   the rally back on December 12th.  When he told the other

24   MOSD leaders, Stewart said they "could have a fucking riot,"

25   closed quote, on the 6th if the Proud Boys didn't know the

1    arrest was coming.  When Tarrio suggested that the Proud

2    Boys, quote, "wouldn't punch cops," closed quote, Stewart

3    responded, quote, "I'm not so sure.  We are on the razor's

4    edge," closed quote.  Bertino then encouraged Tarrio not to

5    make a statement the night before the arrest, but, quote,

6    "just let it happen because," quote, "maybe, it's the shot

7    heard round the world and the normies will fuck up the

8    cops."  Exhibit-501-40.

9              A conversation among the defendants and

10   cooperators [sic] on January 6th -- on January 1st marked a

11   notable shift in the group's disposition.  After discussing

12   another rally where police, in their view, sided with Antifa

13   over the Proud Boys, Wolkind posited that the group's

14   disposition -- quote, "disposition toward the police needs

15   to be reevaluated," closed quote.  Stewart remarked that,

16   quote, "if would be an escalation that we would never be

17   able to back away from," closed quote, but he was, quote,

18   "ready for it."  He also added that the Proud Boys could

19   have, quote, "ran the police the fuck over in D.C. and they

20   wouldn't have been able to do shit," closed quote,

21   presumably referring to the rally back on December 12th.

22   And at that point, Tarrio responded that he, quote, "had a

23   plan for it but someone talked him out of it," closed quote.

24   Biggs echoed that he wanted to, quote, "fuck shit up,"

25   closed quote, and was ready to, quote, "be the Zamboni and

1   roll over motherfuckers."  Bertino said "#FuckTheBlue."  And

2   Stewart agreed, resolving that, quote, "they chose their

3   fucking side, so let's get this done."  Exhibit-501-50.

4        Then on January 3rd, the group discussed logistics

5   for the 6th.  Stewart sent a voice note suggesting, quote,

6   "the main operating theater should be out in front of the

7   House of Representatives.  It should be out in front of the

8   Capitol building.  That's where the vote is taking place and

9   all the objections," closed quote.  Rehl noted that unless

10  Tarrio was planning on giving a speech elsewhere, quote,

11  "the Capitol is a good start," closed quote.

12  Exhibit-501-56.  Tarrio answered with a voice note the

13  following day, saying, quote, "I didn't hear this voice note

14  till now.  You wanna storm the Capitol," closed quote.

15  That's Exhibit-501-57.

16        Later that day, Tarrio landed in D.C. knowing he

17  would be arrested.  Just before his arrest, Tarrio spoke on

18  the phone with Biggs for two minutes.  After, he texted

19  Biggs, quote, "whatever happens, make it a spectacle,"

20  closed quote.  Biggs responded "yup."  Exhibit-519-1.

21        After police arrested Tarrio in D.C. on

22  January 4th, the other MOSD leaders tried to nuke the chats

23  he was in, including all the MOSD chats, in case the police

24  got access to his phone.  For example, Exhibit-501-62.  A

25  reasonable jury might have believed that this conduct

1  displayed a consciousness of guilt relating to the charged

2  conspiracy.

3          And one last thing I'll mention here is that a

4  reasonable jury might have credited Jerry [sic] Bertino's

5  testimony, the only MOSD leader to testify for the

6  Government.  He described at length his understanding of the

7  group's beliefs about the election, law enforcement, and the

8  need to use force.  And he expressly testified that he and

9  the defendants agreed implicitly to forcibly stop the

10 election -- the -- or execution of a law.  Transcript 10310.

11 When pushed on cross-examination, he explained that there

12 was no detailed plan in place for how to accomplish the goal

13 but that they had formed an implicit agreement to do so all

14 the same.  That's Transcript 10307-10.

15         I'll turn now to the evidence from the MOSD

16 membership chats that a reasonable jury might have believed

17 to somehow reflect the defendants' conspiratorial intent, as

18 well.  Construing the evidence in the government's favor,

19 the dynamic between MOSD leadership and membership reveals

20 that defendants' and their -- reveals the defendants' and

21 their co-conspirators' intent to deploy the MOSD membership

22 to achieve the objective of their conspiratorial agreement,

23 or at least so a rational jury could have concluded.

24 Leadership instructed members to keep everything in the

25 group private, to strictly adhere to a chain of command, to

1    stay on topic.  And to, quote, "fit in or fuck off."  See,

2    for example, Exhibit-503-1, 503-3, 613-E and 614.  As

3    Stewart put it, members were to, quote, "turn their brains

4    off and follow," closed quote.  That's Exhibit-613-E.

5        The defendants and their co-conspirators withheld

6    their objectives from the membership -- withheld their

7    objectives from the membership.  During an introductory Zoom

8    call explaining the MOSD's purpose, leadership made clear

9    that every event the group attended would have a strategic

10   objective, including January 6th.  But when the members

11   asked about the objectives for January 6th, Tarrio refused

12   to reveal it.  Exhibit-613-D and -M.

13       A jury might have inferred that the leaders'

14   undisclosed objective was part and parcel with the group's

15   general tenor.  I'm not going to go through every message,

16   obviously, in detail, but -- there are many, but suffice it

17   to say that MOSD members regularly advocated what appeared

18   to be for violence on January 6th or otherwise suggest a --

19   suggested a willingness to use force.  Notable examples

20   include one member saying he was, quote, "ready to log into

21   Minecraft," closed quote, upon entering the group, which the

22   Government offered evidence to show was a euphemism for

23   breaking the law or being violent.  Exhibit-503-5.  Another

24   member, following an introductory Zoom call, remarked that

25   he was honored to join the chapter and, quote, "wanted to

1    kick ass when it was time to kick ass."  Exhibit-503-23.

2    One discussed storming state capitols if they couldn't make

3    it to D.C.  503-13.  And just a few days before January 6th,

4    a member remarked, quote, "gonna be war soon," to which

5    another responded, "yes, sir, time to stack those bodies in

6    front of Capitol Hill," closed quote.  Exhibit-507-10.  And

7    when one member questioned, "what would" -- "what would" --

8    "do" -- "what would they do if 1 million patriots stormed

9    and took the Capitol building," Stewart responded "They

10   would do nothing because they can do nothing."

11   Exhibit-507-16.

12             A reasonable jury -- a rational jury might have

13   construed the MOSD members' repeated calls for using force

14   as reflecting the leaders' motives and intent and the

15   chapter's purpose for a few reasons.  First, the defendants

16   and other MOSD leaders had hand-selected each member of the

17   MOSD, and a reasonable juror might have inferred from all

18   the evidence that the defendants' pattern of selecting Proud

19   Boys who were interested in using force was no coincidence.

20   Indeed, as the Government noted throughout the trial, the

21   defendants never rebuked -- second, as the Government noted

22   throughout the trial, the defendants never rebuked these

23   comments.  Of course, a jury might have refused to draw any

24   inference from the defendants' silence on these remarks.

25   But construing the evidence in the Government's favor, the

1    opposite evidence -- the opposite inference is just as

2    reasonably possible.  The jury might have inferred that if

3    the MOSD was truly supposed to be defensive and did not

4    contemplate offensive force, one of the leaders would have

5    stepped in to discourage this talk.  After all, members were

6    repeatedly instructed to stay on topic, and sometimes MOSD

7    leaders did criticize members for straying into other

8    unrelated issues.  For example, Exhibit-525-7.

9            I'll now turn to how the events of January 6th

10   unfolded, focusing on the roles Nordean, Biggs, Rehl, and

11   other MOSD members played in leading the Proud Boys in a

12   march to, around, and ultimately into the Capitol.  In

13   short, as I've said before, sometimes the best evidence of a

14   conspiracy is the concerted action that, in fact, results.

15   So a reasonable jury might have interpreted the concerted

16   action I'm about to discuss -- particularly the defendants'

17   and their co-conspirators' actions in leading their

18   followers at critical breach points -- as evidence

19   supporting the existence of the conspiratorial agreement.

20           After Tarrio's arrest, Nordean and Biggs took over

21   command and assured the membership that, quote, "the rally's

22   continuing."  Exhibit-510-9.  The evening of January 5th,

23   Biggs told MOSD membership that he and Nordean had a plan,

24   which they discussed with Tarrio.  Exhibit-509-23.  In a

25   private encrypted message, Nordean instructed his men to

1    meet at the Washington Monument at 10 a.m. and that, quote,

2    "from there," closed quote, the men would be, quote,

3    "marching to the Capitol," closed quote.  That's

4    Exhibit-551.  Donohoe, Bertino, and Stewart then echoed that

5    in the MOSD member chat as well as the other chat group they

6    created to -- they echoed that in the MOSD member chat as

7    well as another chat group they created to communicate with

8    everyone present in D.C., the, quote, "Boots on the Ground,"

9    closed quote, chat group.  Exhibit-510-24 and 26, and

10   Exhibit-512-5.

11          On the morning of January 6th, Donohoe, Stewart,

12   Wolkind, and Bertino discussed their hopes for the day in

13   the MOSD leaders chat.  Wolkind wrote "I want to see

14   thousands of normies burn that city to ash today."  And,

15   quote, "the state is the enemy of the people."  Bertino

16   responded, quote, "would be epic.  We are the people,"

17   closed quote.  And Stewart added "I will settle with seeing

18   them smash some pigs to dust," noting, quote, "these

19   normie-cons have no adrenaline control."  Bertino said "fuck

20   it.  Let them loose."  And Stewart remarked that the police,

21   quote, "went too far when he [sic] arrested Tarrio as a

22   scare tactic."  Exhibit-509-26.  The defendants revealed no

23   disagreements with these sentence -- with these sentiments,

24   and Bertino further testified that his conversations -- that

25   his conversations with Proud Boys seemed desperate.

1    Transcript at 10137 to 38.

2            Later that morning, a large group of Proud Boys

3    met at the Washington Monument.  Transcript 5482.

4    Consistent with the MOSD leaders' instructions, the group

5    did not dress in Proud Boys colors, but many wore tactical

6    equipment.  Transcript at 5481 and Exhibit-1000 at -- and

7    Exhibit-1000.  Nordean and Biggs, with Rehl by their side,

8    riled the crowd before the march, particularly against the

9    police.  Nordean contrasted Tarrio's charges with law

10    enforcement's treatment of the person who had stabbed

11    Bertino and others at the December rally, saying, quote, "we

12    put our lives and safety and everything on the line and

13    these people put us in jail.  It's time to just say no,"

14    closed quote.  And adapting the pro-law enforcement tag

15    line, quote, "back the blue," closed quote, to the Proud

16    Boys' colors, he encouraged the group to, quote, "back the

17    yellow.  Back the yellow, gentlemen."  Again, that's

18    Exhibit-1000.  On his heels, Biggs announced, quote, "after

19    what they did to our boy Enrique, we're going to let D.C.

20    know we're goddamn here.  So let's go fucking kick some

21    goddamn ass," closed quote.  After a pause, he added,

22    "metaphorically speaking, but you know what I mean," closed

23    quote, at which the crowd laughs.

24            At around 10:45 a.m., Nordean, Biggs, and Rehl

25    marched the Proud Boys group, including MOSD members, down

1    the National Mall and toward the Capitol and away from

2    former President Trump's speech.  Along the way, Nordean

3    escalated his rhetoric.  As the group walked past the front

4    face of the Capitol, Nordean announced, quote, "we represent

5    the spirit of 1776," closed quote, and threatened to, quote,

6    "remind those," closed quote, who had forgotten their oaths

7    what they mean.  Again, it's Exhibit-1000.  As the group

8    marched past Capitol Police officers, members of the group

9    taunted the officers, yelling "treason" and warning "don't

10   make us go against you."

11        When the marching group reached the east side of

12   the Capitol, one man yelled out "Let's take the fucking

13   Capitol," closed quote.  The man was chastised and told not

14   to yell that.  Nordean responded into the microphone "It was

15   Milkshake, man, you know?  Idiot."  Another man said "Don't

16   yell it, do it."  But no one, including Mr. Nordean,

17   instructed otherwise.  That's Exhibit-1000.

18        Rehl, who had led the marching group alongside

19   Nordean and Biggs, also helped coordinate the group as they

20   marched toward the Capitol.  Exhibit-1000.  He also

21   communicated with MOSD leaders who were not present in D.C.

22   about the group's progress.  For example, Exhibit-509-29.

23        Shortly before noon, Nordean, Biggs, and Rehl led

24   the marching group back around the Capitol to a group of

25   food trucks.  They waited there for about 30 minutes, and

1    then Nordean organized the group to finish the march back to

2    the Capitol right before the electoral count was set to

3    begin.  Exhibit-1000 and 1001.

4            Biggs, Nordean, Rehl, and the member [sic] in the

5    marching group then played integral roles in breaching

6    police lines at the Peace Circle, the first security breach

7    of the Capitol invasion.  As they approached the sparse and

8    mostly peaceful crowd already gathered, Biggs led the

9    marching group in chants that included "Whose Capitol?  Our

10   Capitol" and "1776."  Example -- Exhibit-1001.  Within

11   minutes, the crowd grew and became more agitated, and then

12   they surged forward toward a barricade manned by five

13   officers.  Exhibit-1001.  As the crowd surged forward, and

14   construing the evidence in the Government's favor, Nordean

15   and Biggs can be seen trying to organize the men to follow

16   their lead, and just after that the men and the entire crowd

17   plowed through the barricade.  Meanwhile, Rehl moved to the

18   front of the crowd and, again, construing the evidence in

19   the Government's favor, because he vigorously disputed this

20   at trial, yelled, quote, "fuck them, storm the Capitol," as

21   he went through the barricade, as well.

22           After the first barricades fell, the defendants

23   and other Proud Boys led the way onto the Capitol grounds.

24   Rehl moved to the front of the crowd surrounded by other

25   Proud Boys.  Transcript 12318 to 19, Exhibit-44-D [sic].

1    Biggs filled -- filmed a selfie-style video as he charged up

2    the walkway, capturing Nordean celebrating with the Proud

3    Boys hand gesture and Biggs defiantly announced that they

4    had, quote, "gone through every barricade this -- thus far.

5    Fuck you."  Exhibit-404F [sic].  Nordean and Biggs moved

6    through the crowd in a stack formation -- that is, with the

7    hands -- with their hands on the shoulders of the man in

8    front of them -- with other Proud Boys to reach the very

9    front of the crowd.  Transcript 12322-23 and Exhibit-492-FX.

10          The next barrier was a waist-high black fence

11   blocking off a secured area.  Biggs beckoned Nordean.  And,

12   again, viewing the evidence in the Government's favor, the

13   two combined with others to pull the fence out of the

14   ground.  Exhibit-445-BX.  Nordean and Biggs charged forward

15   with Rehl not far behind.  Biggs waved the crowd forward.

16   Exhibit-445-BY.

17          Shortly before 1:30 p.m., as the police began to

18   regain control of the west plaza, Biggs and Nordean, along

19   with other members of the Proud Boys, regrouped on the

20   Capitol lawn.  Biggs filmed a selfie-style video with

21   Nordean and several other Proud Boys, cheering that they had

22   just, quote, "stormed the Capitol," and claiming that

23   January 6th was a day in infamy.  Exhibit-404-LL.

24          At approximately 1:30, law enforcement had

25   regained some control of the west plaza.  Recognizing as

1    much, Rehl reported in a text message to others that the

2    crowd was at a standstill.  Exhibit-547-5.  Shortly

3    thereafter, Nordean, Biggs, Donohoe, Mr. Pezzola, and

4    several other Proud Boys reunited at the base of the stairs

5    leading up to the upper west terrace.  A Proud Boy named

6    Daniel Lyons Scott, who had marched behind the defendants to

7    the Capitol, shoved two officers up the stairs, prompting

8    the crowd's final push up to the building.  See Exhibit-451X

9    and transcript 12467.  The crowd overwhelmed the officers

10    and pushed up the scaffolding.

11        In the hours that followed, Nordean, Biggs, and

12    Rehl all entered the Capitol.  Biggs, in fact, did so twice.

13    When he exited the building a second time, he filmed himself

14    and the crowd on the east side of the Capitol and remarked,

15    quote, "we've taken the Capitol," closed quote.

16    Exhibit-405-I.

17        From all this evidence, a rational jury could have

18    inferred that the defendants' coordinated actions that day

19    were the product of an agreement to use force to stop the

20    transition of power, specifically, by halting the electoral

21    count vote.  A jury might have inferred an intent to use

22    force from the simple fact that each of Nordean, Biggs, and

23    Rehl personally used force in some way and celebrated and

24    encouraged violence by others as they advanced toward the

25    Capitol.  Nordean and Biggs personally helped destroy a

1    black fence erecting a barrier between the Capitol, law

2    enforcement, and everyone else assembled there, which I'll

3    discuss more later with respect to Count C [sic].  While

4    inside the building, Rehl texted another group, quote,

5    "civil war started," closed quote.  Exhibit-547-5.  And

6    although this wasn't part of the Government's case in chief,

7    the Government ultimately introduced evidence on Rehl's

8    cross-examination that, at some point during a clash on the

9    west front, Rehl shot pepper spray or some other chemical

10   toward law enforcement.  For example, Exhibit-2008.  Or at

11   least that's what a reasonable jury could have inferred from

12   that evidence.

13          Beyond that, I'm not going to rehash all the

14   so-called tools evidence right now.  But suffice it to say,

15   I think a reasonable jury might have inferred it was no

16   coincidence that a number of the men who had been in the

17   MOSD and Boots on the Ground chat groups, or else who joined

18   up with the defendants for their march from the Washington

19   Monument, ended up playing key roles in violent clashes with

20   law enforcement in several places, including at several

21   breach points in or around the Capitol.  In addition, even

22   though the jury acquitted Mr. Pezzola of seditious

23   conspiracy and hung as to him on the 1512(k) count, the jury

24   still may have considered his conduct persuasive evidence of

25   the conspiracy as, well, what a coincidence it is that a

1    member of both the MOSD and the marching group happened to

2    play a key role, again, in several breach points, including,

3    most obviously, breaking the window into the Capitol which

4    so many rioters streamed into it.  Along the similar lines,

5    again, the jury might have inferred it was no coincidence

6    that an individual who initiated the first breach of the

7    Capitol grounds did so within three minutes of putting his

8    arm around and speaking to Mr. Biggs.  That's Transcript

9    12241 at [sic] 45 and Exhibit-1001.

10          Meanwhile, off-site, but closely monitoring the

11   day's events, the other MOSD leaders communicated publicly

12   and amongst themselves about what happened that day.  A

13   reasonable jury might have concluded from these messages

14   that the MOSD leaders had executed an agreement to stop the

15   certification and even considered it a success, at least

16   temporarily.  Several leaders, including Tarrio, directed

17   those on the ground not to back down.  Additionally, Tarrio

18   and others took credit for the day's events.

19          First, after Nordean, Biggs, Rehl, and other Proud

20   Boys pushed past the first barrier, Bertino told MOSD

21   leaders to, quote, "form a spear," closed quote; meaning, a

22   formation that would allow them to, quote, "drive their way

23   through a cloud -- a crowd," closed quote.  That's

24   Exhibit-1137; transcript at 10145.  Then in the MOSD members

25   chat, he instructed, quote, "storming the Capitol right

now," closed quote, and echoed the same in Boots on the
Ground, telling the men to, quote, "get there," closed
quote.  Those are Exhibits-510-33 and 512-8.  At trial, the
Government asked Bertino whether he was surprised to see an
MOSD leader -- specifically, Donohoe -- at the front of the
crowd as it first entered into -- as it first crossed a
restricted area.  Bertino explained that he wasn't surprised
because they, quote, "always led the way and the normies
were always behind them."  Transcript at 10144.

Then just after 1:30 and back in the MOSD leaders
chat, Stewart shared news that the Madison building on
Capitol Hill was being evacuated.  Wolkind replied, quote,
"ops success," closed quote.  509-34.  At the same time,
after the crowd advanced up the scaffolding toward the
building, Stewart instructed the MOSD leaders to, quote,
"accelerate," closed quote.  Exhibit-510-36.

Tarrio, on the other hand, watched the riot unfold
from [sic] TV from a hotel room outside the city.  He posted
several encouraging messages on his social media, including,
quote, "proud of my boys and my country," closed quote, and,
quote, "don't fucking leave," closed quote.  Exhibit-600-59.
In another post, he shared a photo of cowering lawmakers
with the caption, quote, "When the people fear the
government, there is tyranny; when the government fears the
people, there is liberty."  Exhibit-600-60 and -63.

1          Tarrio also tried to call both Nordean and Biggs

2     while they were inside the Capitol building.  Biggs returned

3     his call and the two spoke for about 42 seconds.

4     Exhibit-653-1; transcript -- trial transcript at 12646.  In

5     a private message, Bertino texted Tarrio, quote, "brother,

6     you know we made this happen," closed quote.  Tarrio

7     responded, quote, "I know," closed quote.  Then he added

8     "this is it," closed quote.  Bertino responded, quote,

9     "1776, motherfucker."  And Tarrio responded, mirroring the

10    1776 Returns document I've already discussed, quote, "the

11    Winter Palace," closed quote.  Exhibit-530-5.  Later, Tarrio

12    echoed the sentiment in the Proud Boys elders group chat,

13    saying, quote, "make no mistake, we did this," closed quote.

14    And when another elder asked, "what do we do now," Tarrio

15    replied, quote, "do it again," closed quote.  That's

16    Exhibit-500-86.  Late in the evening, Tarrio posted a video

17    of himself standing in front of the Capitol ominously with

18    the caption "Premonition."  Exhibit-600-64.

19          Finally, and very briefly, I'll discuss how the

20    defendants reacted to the events of January 6th.  For -- a

21    reasonable jury might have interpreted their conduct as both

22    revealing their intent for the day and showing consciousness

23    of guilt.  I won't walk -- but all in all, as evidence of

24    the agreement.  I won't walk through all the specific

25    messages, of course, the defendants sent, but in broad

1    strokes, they and other MOSD leaders expressed pride in what

2    had happened on January 6th while emphasizing it didn't go

3    far enough.    In an interview, Biggs called January 6th a

4    warning shot, noting that the founding fathers were, quote,

5    "considered terrorists," closed quote.    Exhibit-611-D.

6    Tarrio told the Proud Boys chapter presidents that, quote,

7    "God didn't put him at the Capitol for a reason, because

8    they would still be there," closed quote.    That's

9    Exhibit-514-59.    Rehl bemoaned the day -- that the day felt

10   like a waste because the politicians didn't, quote, "get

11   scared and realize they need to answer for this fraud,"

12   closed quote.    In his view, "everyone should have showed up

13   armed and took the country back the right way," closed

14   quote.    Exhibit-544-4.    And after former President Trump

15   gave a speech disavowing the violence, Nordean scoffed,

16   saying, quote, "no excuse for violence?    Ever?    Nah, I'm

17   good."    Exhibit-515-4.    From these statements and several

18   others, a reasonable jury might have concluded that the

19   defendants, again, did -- went to the Capitol as part of

20   their agreement and not simply reflecting a situation where

21   they got swept up in violence that was unexpected.

22           Additionally, the jury might have concluded that

23   their conduct showed consciousness of guilt, again, further

24   bolstering the idea of a conspiratorial agreement.    After

25   people began getting arrested, MOSD leaders tried to nuke

1    chat histories or remove members from groups after word got

2    out that arrests were impending.  For example,

3    Exhibits-509-41, 509-42, 532-2, and 500-107.  And although

4    this came up in the defendants' case, I'll add that when

5    Mr. Pezzola and another member of the defendants' marching

6    group, William Pepe, both got charged with conspiracy to

7    obstruct an official proceeding in late January, Tarrio

8    asked the -- the evidence showed that Tarrio asked Bertino

9    to instruct Pezzola to say he wasn't with the Proud Boys.

10   That's trial transcript 19253.

11          As I mentioned, the Government had to prove that

12   each of Tarrio, Nordean, Biggs, and Rehl participated in a

13   conspiracy with the knowledge of and the specific intent to

14   further its unlawful goals; that is, the seditious

15   conspiracy to forcibly oppose the Government's authority and

16   interfere with an execution of the law, all to stop the

17   peaceful transfer of presidential power.

18          By and large, the evidence I've already discussed

19   at length, in my view, gets the job on this element,

20   specifically, the evidence about how the MOSD came to be.

21   The MOSD was Tarrio's creation, through consultation with

22   Biggs and Nordean.  So as far as the MOSD represents the

23   conspiracy, it also represents evidence of these defendants'

24   knowledge of the conspiracy's objectives or, again, at least

25   that is what a rational jury could have found.

1              More -- furthermore, the statements I've recounted

2     at length -- specifically, those revealing the defendants'

3     beliefs that violence might be necessary to resist the

4     election results -- and their repeated references to battle

5     and civil war -- show their awareness of the agreement's

6     objectives.  Nordean's and Biggs's on-the-ground leadership,

7     directing a group of 200 or so Proud Boys to the Capitol and

8     through several breach points further confirms their intent

9     to advance that unlawful objective.

10             As for Mr. Rehl, even though Tarrio did not

11    consult him directly before creating the MOSD, he was one of

12    the first leaders added to the group and he recruited others

13    from his chapter.  He helped lead the MOSD Zoom call.  And

14    on January 6th, he led the Proud Boys group side by side

15    with Nordean and Rehl through significant periods of the

16    march and the attack on the Capitol.  And when the group

17    reached the first barrier at the Peace Circle, he yelled for

18    the group to charge forward and, again, viewed in the light

19    most favorably to the Government, to storm the Capitol.

20             So again, that's far from all the evidence on

21    which a reasonable jury might have relied on to find that

22    each of the defendants joined the conspiracy with a

23    knowledge of and intent to further its unlawful objectives.

24    But in light of the nature -- I think this is evidence on

25    which the jury could find both that the conspiracy existed

1    and that supported Tarrio's, Biggs's, Nordean's, and Rehl's

2    knowledge of its objectives.  In this case, the evidence of

3    those two things is more or less coextensive.

4            I'm going to now turn to the defendants' arguments

5    in response to all of that.  But I am going to take a brief

6    break for all of you, and particularly for the court

7    reporter.  So we'll take 10 minutes and I'll finish up when

8    we come back.

9            THE DEPUTY CLERK:  All rise.

10           (Brief recess taken.)

11           THE DEPUTY CLERK:  We're back on the record in

12   Criminal Matter 21-175, United States of America v. Ethan

13   Nordean, et al.

14           THE COURT:  All right.  I'll turn now to the

15   defendants' specific arguments --

16           MR. METCALF:  Your Honor, if I may real quick,

17   Mr. Tarrio's attorneys --

18           THE COURT:  Oh, I'm so sorry.  I did not see that.

19           MR. METCALF:  Can I go out and get them?

20           THE COURT:  Please.  You may.

21           MR. METCALF:  Thank you, Your Honor.

22           (Brief pause.)

23           THE COURT:  All right.  I'll turn now to the

24   defendants' specific arguments on this charge.  I'll start

25   with Mr. Nordean, who makes both legal and factual

1    arguments.  I won't spend too much time on the legal

2    arguments because they reiterate -- I -- issues I resolved

3    long ago and they really don't have any place in this type

4    of motion, but in any event, they reiterate issues I

5    resolved a long time ago.

6         First, he argues the Government did not present

7    sufficient evidence to prove seditious conspiracy to

8    prevent, hinder, or delay the execution of a law and

9    Congress, he says, does not execute federal law.  Of course,

10   he did raise this argument in his motion to dismiss the

11   third superseding indictment and I rejected it.  There, I

12   did explain that Congress executes the Twelfth Amendment and

13   the Electoral Count Act because, by undertaking what those

14   laws require, it carries into effect their ultimate objects:

15   the certification of the Electoral College vote and the

16   transition of executive power from one president to the

17   next.  That's ECF No. 586 at 14.  So I just incorporate that

18   analysis here and reject that argument for the same reasons

19   I already did.

20        Next, Nordean reiterates his argument at the

21   motion to dismiss stage about the proper scope of a

22   seditious conspiracy charge.  He argues, again, that the

23   Government's evidence was insufficient because, quote,

24   "longstanding precedent holds that preventing a law's

25   execution refers to efforts to stop a law in all its

1    applications and at all times, and not to challenge an -- a

2    law's application to a set of facts in a particular

3    instance."  That's ECF No. 822 at 6.  But as I held in

4    rejecting Nordean's motion to dismiss, the conspiracy for

5    which Nordean was charged -- and now convicted -- was,

6    quote, "a conspiracy to hinder" -- was, in my opinion, "a

7    conspiracy to hinder execution of the Twelfth Amendment and

8    the Electoral Count Act in all their applications and on a

9    nationwide basis."  ECF No. 586 at 8.  So again, I'll just

10   incorporate that analysis here and reject the same arguments

11   for the same reasons.

12           Next, Mr. Nordean argues that the jury lacked

13   sufficient evidence on the force element of seditious

14   conspiracy.  He first notes that the jury did not convict

15   him for Pezzola's destruction of the Capitol window in

16   Count 7 or for Donohoe's assault on an officer charged in

17   Count 8 or Pezzola's assault while stealing a riot shield

18   charged in Count 9.  And he further contends that the

19   evidence did not support his conclusion -- his conviction on

20   Count 6 for destroying the black metal fence, an issue I'll

21   discuss later.  In full, then, Nordean argues that there,

22   quote, "was no seditious use of force to which Nordean could

23   have agreed which was supported by sufficient evidence,"

24   closed quote.  ECF No. 822 at 6 and 7.

25           The problem with this argument is that seditious

1    conspiracy does not require the use of force.  It requires

2    an agreement to use force.  Nothing in the statute requires

3    the jury to predicate a seditious conspiracy conviction on a

4    particular forceful act that ultimately occurs.  So from the

5    evidence I've already outlined at length, the Government has

6    presented sufficient evidence for the jury to conclude that

7    Nordean had entered an agreement to use force on January 6th

8    to stop the transition of power.  And besides, for reasons

9    I'll discuss in a little bit, I do think there was

10   sufficient evidence that supported Nordean's conviction on

11   Count 6 that would fill the bill.

12          Moreover, even if the jury's verdicts as to

13   Nordean on Counts 7, 8, and 9 were somehow inconsistent with

14   its conviction on seditious conspiracy, it's not for me, in

15   evaluating a Rule 29 motion, to try to read a jury's mind

16   and reconcile its verdicts.  That's United States v. Dykes,

17   406 F.3d 717 at 77 -- 722, a D.C. Circuit case from 2005.

18          Last, on this offense, Mr. Nordean points out

19   that, quote, "witnesses testified and video evidence

20   demonstrated that Nordean took positive steps to prevent a

21   protester from assaulting a law enforcement officer outside

22   the Capitol," closed quote, by placing his hand on the man's

23   shoulder.  ECF No. 822 at 7.  I agree that is a reasonable

24   way to view the evidence from Mr. Nordean's -- in the light

25   most favorable to Mr. Nordean.  But as the Government

1    responds, a reasonable jury might have interpreted that

2    action multiple ways, including ones that favor the

3    Government.  For example, they could have believed Nordean

4    would have the protester channel his efforts elsewhere.  And

5    even if Nordean were holding the man back, a reasonable jury

6    could find that that somehow didn't cancel out his own

7    statements and conduct elsewhere, and, ultimately, on

8    balance, still have the evidence support the conviction.

9            Next, Mr. Tarrio joins all of Mr. Nordean's

10    arguments, but adds that he was not at the Capitol on

11    January 6th, as he has reiterated here today, and did not

12    communicate with the other defendants between his arrest on

13    January 4th until after the initial breach.  First of all,

14    on the second point, I think the record does belie that.

15    Nicholas Quested, a jury who was with -- a journalist who

16    was with Mr. Tarrio on and before January 6th, testified

17    that Tarrio contacted, or at least attempted to reach,

18    Nordean on the phone after he was released from jail on

19    the 5th.  That's transcript at 5417 through 18 and

20    transcript at 5421.  Biggs relayed to the MOSD leadership

21    that he spoke with Tarrio on the evening of the 5th and that

22    they discussed plans.  That's Exhibit-509-23.  And then

23    Tarrio regained access to his Telegram account.  Once he

24    did, he rejoined the MOSD leaders chat.  That's

25    Exhibit-509-25 and 28.

1          Additionally, Tarrio's absence from the Capitol is

2    simply neither here nor there.  The evidence I've already

3    outlined amply demonstrates how a reasonable jury could find

4    that Tarrio initiated and directed the charged conspiracies

5    right up until the time -- at least all the way through, but

6    certainly without being hindered until he was arrested.  As

7    for the substantive offenses on the ground, a reasonable

8    jury -- a rational jury readily could have convicted Tarrio

9    based on Pinkerton liability, as I instructed the jury.  So

10   his argument on this point, I don't think, gets him

11   anywhere.

12          Last, I'll address Biggs's and Rehl's arguments

13   that they presented jointly through shared counsel.  By and

14   large, their arguments on this count reiterate the First

15   Amendment argument that I've rejected more times than I can

16   recount during these proceedings.  I will say I know that it

17   is an argument that is genuinely held and made in good

18   faith.  They argue that because -- I just -- it's genuinely

19   held, it's made in good faith, but I don't think it reflects

20   the current state of the law.  They argue that because the

21   political speech leading up to the riot -- leading up to the

22   attack was neither incitement nor a true threat, that it was

23   First Amendment protected.  Of course, as I've said many

24   times, I think that's true so far as it goes.  But the

25   defendants go on to assert that, quote, "given the

1    centrality of the First Amendment and the importance of

2    political speech in the American tradition, the Government

3    was required to prove more than it did to warrant getting

4    the case to the jury.  At the very least, in a conspiracy

5    relying on First Amendment protected speech and activity to

6    prove intent, the Government should be required to rely on

7    more than protected activity as circumstantial evidence of

8    intent."  That's ECF No. 828 at 10.

9          Again, I think this is a genuinely held argument

10   made in good faith, but I don't think that standard -- that

11   argument for this increased evidentiary standard has no

12   basis in the law at the moment.  They cite no cases for this

13   proposition that the nature of the Government's evidence

14   somehow required it to do more.  And I've -- as I've

15   explained during this case many times, the Supreme Court has

16   squarely held, in Wisconsin v. Mitchell, that, quote, "the

17   First Amendment does not prohibit the evidentiary use of

18   speech to establish the elements of the crime or to prove

19   motive or intent."  That's 508 U.S. 476 at 489, a Supreme

20   Court case from 1993.  In fact, the Supreme Court drew that

21   principle from an earlier case, Haupt v. United States, 330

22   U.S. 631 at 1947 [sic].  In that case, the defendant had

23   been tried for treason and the Government offered evidence

24   of the defendant's conversations with others expressing

25   sympathy toward Germany and Adolf Hitler and hostility

1    toward the United States.  The court held that those

2    statements were, quote, "clearly admissible on the question

3    of intent and adherence to the enemy," Id. at -- that's --

4    same case at 642.

5         Now, obviously, we're not talking about Germany

6    and Hitler here.  But that's exactly how the Government used

7    the defendants' statements here.  The defendants were

8    neither charged or -- nor convicted of incitement or any

9    other offense that targets the speech itself.  Instead, the

10   defendant [sic] used the defendants' statements as evidence

11   of their motive and intent vis-à-vis January 6th and to show

12   the character of their unlawful agreement, with the

13   agreement being the offense.  That's entirely consistent

14   with Wisconsin v. Mitchell and related cases.  Not only

15   that, but at the defendants' request, I provided several

16   First Amendment-based limiting instructions, and the parties

17   thoroughly litigated a First Amendment jury instruction that

18   I gave the jury.  So defendants' additional arguments on

19   this First Amendment point simply offer me no reason to

20   upset the jury's verdict.

21        That's Count 1.  However, subsequent counts are

22   going to go much quicker.

23        I'll turn now to the obstruction counts.

24   Obstruction of an official proceeding under 18 United States

25   Code 1512(c)(2) and conspiracy to commit the same under

1   1512(k).  On Count 2, the jury convicted Mr. Tarrio,

2   Mr. Nordean, Mr. Biggs, and Mr. Rehl of conspiracy to

3   obstruct an official proceeding, but hung on that count as

4   to Mr. Pezzola.  But it convicted each defendant under

5   1512(c)(2).  I'm going to address these offenses together

6   because so many of the defendants' arguments on one apply to

7   the other.

8           As I instructed the jury, to convict the

9   defendants of conspiracy to obstruct an official proceeding,

10  they had to find that -- one, that the defendant conspired

11  or agreed with at least one other person with the goal of

12  committing the crime of constructly [sic] obstructing an

13  official proceeding; and, two, that the defendant joined or

14  entered into that agreement with an awareness of and an

15  intent to further its unlawful goal.  Then, on the

16  substantive 1512(c)(2) offense charged in Count 3, the jury

17  had to find, one, that the defendant attempted to or did

18  obstruct or impede an official proceeding; that is,

19  Congress's electoral certification proceedings; two, that

20  the defendant intended to obstruct that proceeding; three,

21  that the defendant acted knowingly, with awareness that the

22  natural and probable effect of his conduct would be to

23  obstruct or impede the official proceeding; and, four, that

24  the defendant acted corruptly.

25          Before turning to the evidence supporting these

1    offenses and the defendants' arguments about it, I'll

2    briefly address Biggs's and Rehl's suggestion that the

3    jury's verdict convicting the defendants on Counts 2 and 3

4    carries with it a very real potential for a violation of the

5    Double Jeopardy Clause.  They argue that if the agreement to

6    act occurs concurrently or at the same time as the decision

7    to act is reached, there is no principal distinction between

8    the conspiracy and the substantive charge, meaning the same

9    conduct is arguably punished twice.  ECF No. 828 at 11.

10   This is a creative argument, but one that I just don't think

11   gets them anywhere.

12           First of all, the defendants don't actually argue

13   there is a double jeopardy problem here or cite the relevant

14   standard under Blockburger v. United States.  They only ask

15   that I should consider that risk.  Second, for all the

16   reasons I outlined at the outset, a reasonable jury very

17   well might have concluded that the defendants formed their

18   unlawful agreement long before the 6th.  And, third, 1512(k)

19   and 1512(c)(2) are two different offenses.  Applying the

20   Blockburger elements test, 1512(k) requires an agreement and

21   1512(c) does not.  And 1512(c)(2) requires actual

22   obstruction or attempted obstruction which 1512(k) does not.

23   There really is simply no risk of double jeopardy -- at

24   least as that is defined in the case law -- here at all.

25           Turning to the evidence supporting the jury's

1    verdict, I'll start with the 1512(k) conspiracy.  Look, the

2    same evidence supporting the defendants' convictions for

3    seditious conspiracy supports the convictions under 1512(k)

4    as well.  A reasonable jury might have found that the same

5    evidence I just plowed through show that the defendants made

6    several -- that -- made several distinct agreements.  First,

7    to use force to oppose the Government's authority and

8    interfere with an execution of the law, but, second, here,

9    to accomplish those goals by means of corruptly obstructing

10   Congress's electoral count.  So I'll just incorporate all my

11   findings I've already discussed for the purposes of this

12   count.  However, I do want to point out a few key pieces of

13   evidence on which a reasonable jury might have relied to

14   find that the defendants and their co-conspirators intended

15   to target the certification proceedings specifically.

16        Before the 6th, the defendants showed they knew --

17   that they knew the proceeding would be taking place, and its

18   significance.  Mr. Rehl once explained on Parler that

19   January 6th would be, quote, "the day where Congress gets to

20   argue the legitimacy of the Electoral College votes," closed

21   quote.  And Biggs shared the names of congressmen whom he

22   expected to, quote, "object on January 6th," closed quote.

23   Exhibits-602-40 and 603-53.  Furthermore, as I noted before,

24   a few days before the 6th, Stewart sent a voicemail to the

25   MOSD leaders chat remarking that, quote, "the main operating

1     theater should be out in front of the Capitol building.

2     That's where the vote is taking place and all the

3     objections."  Exhibit-501-56.  Mr. Rehl and Mr. Tarrio

4     expressly acknowledged listening to this message.

5     Exhibits-501-56 and 57.  And last, a reasonable jury might

6     have inferred that the defendants had come to a mutual

7     understanding to obstruct the electoral count from their

8     physical conduct that day which was laser-focused on the

9     Capitol instead of joining thousands of other supporters of

10    former President Trump to watch his speech at the Ellipse.

11          Turning now to the substantive 1512(c) count, I'll

12    first address the convictions for defendants Nordean, Biggs,

13    and Rehl together, then discuss Mr. Tarrio and then

14    Mr. Pezzola.

15          As to Nordean, Biggs, and Rehl, the events I've --

16    the evidence I've already outlined about their conduct on

17    the 6th and leading up to it supports their convictions for

18    the substantive 1512(c)(2) count, as well.  Specifically,

19    I've discussed the substantial evidence demonstrating, at

20    least to a rational jury, the defendants' knowledge of the

21    proceeding and intent to disrupt it and their conduct --

22    that is, charging through barriers and entering the

23    Capitol -- how that contributed to the proceeding's

24    interruption.

25          Now, Biggs and Rehl contend otherwise, but they

1  don't argue anything specific about the actual evidence

2  supporting their convictions.  Instead, they mostly launch a

3  series of policy arguments that, I think, ultimately don't

4  move the needle on a Rule 29 motion.  They suggest that the

5  Government has overcharged this case by distorting

6  Section 1512(c)(2) beyond 1512(c)(1)'s focus on evidence

7  impairment crimes.  Of course, the D.C. Circuit has

8  conclusively resolved that issue in United States v. Fischer

9  where a -- well, conclusively resolved it for the moment, I

10 suppose, and in this Circuit -- where a panel majority held

11 that 1512(c)(2) was not limited to evidence impairment

12 crimes.  They suggest -- they, Mr. Biggs and Mr. Rehl,

13 suggest Fischer was wrongly decided, asserting that, quote,

14 "the use of a statute fashioned to respond to manipulation

15 of official proceedings by means of influencing the

16 integrity of the evidence in the context of the January 6th

17 riot prosecutions is the sort of improbably broad

18 interpretation of a criminal statute of which the Supreme

19 Court has disapproved," closed quote.  That's ECF No. 828 at

20 16.

21        But all of that being said, it goes without saying

22 that Fischer binds me.  In any event, their argument that

23 Fischer's holding applies only to cases involving assaults

24 is not persuasive at all.  The lead opinion in that case

25 simply noted that an assault on law enforcement officers,

1    quote, "clearly meets the test of independently unlawful

2    conduct," closed quote, to show the defendant acted

3    corruptly.  That's the Fischer case at page 340.  The

4    court's discussion of assaultive conduct had nothing to do

5    with whether 1512(c)(2) was confined to evidence impairment

6    crimes like those in (c)(1).

7           The last element the Government had to prove was

8    that the defendants acted corruptly.  This element, of

9    course, was the subject of considerable attention in this

10   case, to say the least.  And after detailed briefing and

11   much argument, I did instruct the jury that to find a

12   defendant acted corruptly, they would have to conclude that

13   he used independently awful -- unlawful means or acted with

14   an unlawful purpose or both.  I further instructed that,

15   quote, "a defendant must not -- must also act with

16   consciousness of wrongdoing," meaning "with an understanding

17   or awareness that what the person is doing is wrong."  Then,

18   after considering the parties' arguments about the D.C.

19   Circuit's recent decision in Fischer, I added for the jury

20   that acting corruptly often, quote, "involves acting with

21   the intent to secure an unlawful advantage or benefit either

22   for oneself or for another person."  That's ECF No. 767 at

23   31 through 32.

24          So construing the evidence in the Government's

25   favor, I do think that sufficient evidence supported a

1  reasonable inference that the defendants here acted
2  corruptly.  First, they used independently unlawful means to
3  obstruct the proceedings.  At minimum, these defendants'
4  convictions for destroying the black fence -- which was
5  erected to secure the building and Congress's business
6  inside it from protesters -- satisfies this element.
7  Nordean and Biggs directly participated in tearing the fence
8  down, and the jury found Rehl equally responsible as a
9  co-conspirator.  Furthermore, factoring in details from the
10  defense case, although Mr. Rehl did not face an assault
11  charge for pepper-spraying an officer during a clash on the
12  west front, a reasonable jury might have concluded that
13  doing so was an independently unlawful means of obstructing
14  the proceedings inside the building.
15          So too, a reasonable jury readily could have
16  concluded that the defendants were aware that what they were
17  doing was wrong.  The defendants positioned themselves
18  opposite law enforcement.  They shook and dismantled
19  barriers against law enforcement's commands.  They engaged
20  with officers in different ways, calling them pigs and
21  traitors.  And they maintained positions at the helm of a
22  mob they witnessed physically assaulting officers.  This is,
23  of course, viewing the evidence in the light most favorable
24  to the Government.  A reasonable jury might have concluded
25  that someone directly opposing law enforcement in the way

1    that the evidence showed would know what they are doing as

2    wrong.  And just as powerfully, their discussions about

3    deleting Telegram messages after the fact show a

4    consciousness of wrongdoing.

5           Nordean argues that the Government failed to prove

6    that he conspired to or, in fact, acted corruptly because it

7    did not prove that he intended to procure an unlawful

8    benefit that he knew to be unlawful.  And he points to Judge

9    Walker's concurrence in Fischer, which takes that view.

10   After briefing and argument, I held that Judge Fischer's

11   [sic] concurrence did not control, and I was not otherwise

12   persuaded to adopt his view.  I'll incorporate my earlier

13   analysis on that point here which is found at Pages 19171

14   through 81 of the trial transcript.  Biggs and Rehl also

15   take issue with the Fischer court's reading of the

16   "corruptly" element as a general matter, but they don't

17   argue that the jury lacked sufficient evidence to conclude

18   that they acted with the requisite intent under the

19   definition I provided.

20          But even if the Government had to prove the

21   defendants intended to procure an unlawful advantage or

22   benefit, a reasonable jury might have concluded that the

23   defendants acted with that intent.  As the lead opinion in

24   Fischer recognized, quote, "intentions of helping their

25   preferred candidate overturn the election results would

1    suffice to establish a hope or expectation of either benefit

2    to oneself or a benefit of another person."  64 F.4th at

3    340 -- Page 340 of Fischer.

4            Nordean further argues that even under the

5    1512(c)(2) definition I provided the jury, the Government's

6    evidence was insufficient.  In so doing, he disregards

7    cooperating witness testimony as incredible and suggests

8    that the Telegram messages are not probative because they

9    don't reveal an express agreement to obstruct the electoral

10   count.  I've already discussed the ways the Telegram

11   messages are probative of Mr. Nordean's intent, so I won't

12   rehash that again.  But as for the cooperators' testimony,

13   it is up to the jury to make credibility determinations.

14   Mr. Nordean may disagree, but the jury has acted within its

15   province to find their testimony credible if indeed it even

16   did.  That evidence -- but in any event, the evidence on the

17   whole here would pass muster under Rule 29 whether or not it

18   did.

19           Nordean further points out that the cooperating

20   witnesses like Bertino and Matthew Greene told the

21   Government during its investigation that the Proud Boys

22   didn't have a plan or agreement to stop the count.  That's

23   true, but that's not, at least in the case of Bertino, what

24   he told the jury.  During Nordean's own cross-examination,

25   Bertino expressly stated that he and the defendants had

1    formed such an agreement, and he was cross-examined about

2    those earlier statements to the FBI.  That's transcript at

3    10310.  It was up to the jury to decide what weight to give

4    his testimony, given those inconsistencies, but a reasonable

5    jury could credit his trial testimony and discredit his

6    earlier statements to law enforcement.  And considering

7    Matthew Greene was not in MOSD membership, a reasonable jury

8    might have concluded that his lack of awareness about a

9    broader conspiracy encompassing all of the defendants was

10   not all that probative either way.  As for there not being

11   evidence of a specific plan, as the instruction I gave the

12   jury reflects, the law is clear that a jury not find that

13   the defendants agreed on all the details of their criminal

14   scheme.

15         Last, Nordean argues that some evidence was

16   inconsistent with Nordean's participation in a 1512

17   conspiracy.  He highlights that, one, Travis Nugent, who was

18   part of the Proud Boys' marching group, heard Nordean

19   telling the group that he was hung over and he wanted to go

20   back to their Airbnb; two, that Nordean also told Nugent

21   after the Peace Circle breach that he was moving forward to

22   find his friends; three, that another defense witness,

23   Michale Graves, had arranged with Nordean to meet back at

24   their Airbnb between 3 or 4 p.m. on the 6th; four, that

25   Nordean told some in the marching group that they would

1    attend the rally at the Ellipse after walking to the

2    Capitol; and that, five, that he let himself be filmed at

3    all.

4           First, I'll notice -- I'll note that almost none

5    of this evidence informs my analysis of Nordean's first

6    Rule 29(a) motion after the close of the Government's case

7    since, obviously, it involves testimony from Mr. Nordean's

8    case in chief.  But with respect to the renewed motion at

9    the end of the trial and his Rule 29(c) motion here, a

10   reasonable jury might well have concluded that most of the

11   testimony to which Nordean points is not at all inconsistent

12   with the charged conspiracies.  Moreover, as I mentioned

13   just a moment ago, it's the jury's job to weigh the evidence

14   and, at this stage, construing it in the Government's favor,

15   as I must, the jury could have reasonably concluded that the

16   evidence of what actually occurred at the Capitol that day

17   and all the other evidence I've described outweighed some of

18   the evidence Mr. Nordean highlights here.  As for Nordean

19   allowing himself -- and, certainly, his stray comments about

20   the venturing elsewhere.

21          As for Mr. Nordean allowing her -- himself to be

22   filmed throughout the day, I'll just add that a reasonable

23   juror might have concluded that Eddie Block, a defense

24   witness who filmed the Proud Boys' march, in fact, did avoid

25   recording conversations involving planning for the day.  At

1    one point, when Mr. Block approached Mr. Nordean and others

2    speaking in a small group near the Capitol, he retreated,

3    saying, quote, "I better get out of here.  You guys are

4    talking about stuff I don't want to hear," closed quote.

5    That's Exhibit-1000.  So in all, none of Nordean's arguments

6    convinced me that the jury's verdict cannot stand.

7            As for Mr. Tarrio, the analysis is

8    straightforward.  It does not matter that he was not at the

9    Capitol that day under the law.  I instructed the jury on

10   Pinkerton liability.  Nordean, Biggs, and Rehl obviously

11   committed the substantive offense of obstructing an official

12   proceeding during and in furtherance of the conspiracy to do

13   the same.  So too, as the conspiracy's object, the offense

14   was a reasonably foreseeable consequence of Tarrio's

15   unlawful agreement with the other defendants.  So through

16   Pinkerton liability, I -- again, I think there's a basis for

17   Mr. Tarrio's conviction here, even though he was not at the

18   Capitol that day.

19           Finally, we turn to Mr. Pezzola.  To this point,

20   I've said little about Mr. Pezzola because Count 3 was the

21   first count on which the jury convicted him.  I'll note that

22   although Mr. Pezzola purports to challenge Count 3 in his

23   post-trial motion, his only argument is that he "was

24   wrongfully convicted of Count 3 because, among other

25   factors, there was not a single link to Pezzola committing

1    conspiracy with any other individual to obstruct an official

2    proceeding," closed quote.  That's ECF No. 824 at 2.  But

3    Count 3 was not a conspiracy count.  The jury did not

4    convict Mr. Pezzola on the 1512(k) count.  So his argument

5    does not make any sense.

6          Even so, just to preserve the record, I'll just

7    highlight the evidence that leaves no question in my mind

8    that the evidence supported Mr. Pezzola's conviction for

9    obstructing an official proceeding.  After robbing a Capitol

10    Police officer of his riot shield, an act we'll discuss more

11    later, at least for which there was evidence -- sufficient

12    evidence -- Pezzola was one of the first rioters to charge

13    up the scaffolding and into the building.  He then used the

14    riot shield to smash open a window near the Senate wing

15    door, which was the mob's first point of entry into the

16    building.  That's Exhibit-425.  No doubt, a jury could

17    conclude that this conduct, in fact, obstructed the

18    proceedings inside.

19          A reasonable jury could also have concluded that

20    Pezzola acted with corrupt intent.  At the top of the

21    scaffolding stairs, Pezzola yelled profanities and threats

22    at the officers holding the line, according to the evidence

23    at trial.  He said "You'd better be fucking scared.  Yeah,

24    you better be fucking scared.  We ain't fucking stopping.

25    You had better decide what side you're on, motherfuckers.

1    You think Antifa's fucking bad?  Just you wait."  That's

2    Exhibit-429-CX.

3         After the rioters overwhelmed officers at the top

4    of the stairs, Pezzola and a small group made a beeline for

5    the Senate wing door, which further respect -- reflects his

6    intent to disrupt the proceedings inside.  And finally, if

7    there was any question about his intent remaining, he

8    removed it through a selfie video he filmed and sent to

9    other Proud Boys once inside.  With a cigar in his mouth, he

10   cheered, quote, "victory smoke in the Capitol, boys.  I knew

11   we could take this motherfucker over if we just tried hard

12   enough.  Proud of your motherfucking boy."  That's

13   Exhibit-403-G.  That was enough to send Count 3 to the jury,

14   clearly.  On these facts, a jury easily could have

15   concluded -- a rational jury -- that Pezzola intentionally

16   and corruptly obstructed Congress's certification

17   proceedings.

18        With that, we'll move on to Count 4.

19        The jury convicted all the defendants for

20   conspiracy to use force, intimidation, or threats to prevent

21   officers of the United States from discharging their duties,

22   in violation of 18 United States Code 372.  As I instructed

23   them, to reach this verdict they had to find that each

24   defendant agreed with at least one other person to, by

25   force, intimidation, or threat, A, prevent a member of

1    Congress or a federal law enforcement officer from

2    discharging a duty; or, B, induce a member of Congress or

3    federal law enforcement officer to leave the place where

4    that person's duties were required to be formed [sic].  The

5    jury found that the conspiracy captured both of these goals.

6           As for defendants Tarrio, Nordean, Biggs, and

7    Rehl, all the same evidence supporting the first two

8    conspiracy convictions supports the verdict here, as well.

9    So I'll just incorporate all that evidence about their

10   intent and conduct that I've already discussed for purposes

11   of this count.  Only Nordean offers any argument on this

12   count specifically, incorporating the same arguments he made

13   at the motion-to-dismiss stage.  He, once again, argues that

14   372 does not encompass a conspiracy directed at members of

15   Congress or Capitol Police.  And I'll just incorporate my

16   earlier analysis reflecting that argument here.  That's ECF

17   No. 586 at 21 -- at 21 through 30.  He further argues that

18   the Government's evidence on this count was insufficient

19   because, at one time, evidence appeared to pick Nordean --

20   depict Nordean, again, holding someone back from attacking a

21   police officer.  But, again, as I've already explained, a

22   reasonable jury might have concluded that Nordean's hand on

23   the rioter's shoulder was not inconsistent with the charged

24   conspiracies at all or, in any event, just simply may have

25   weighed the evidence such that they felt a conviction was

1    warranted.

2         But the jury also convicted Pezzola on the

3    conspiracy count -- but the jury also convicted Pezzola on

4    this conspiracy account [sic].  Again, Mr. Pezzola does not

5    directly challenge his conviction on this count in his

6    motion, only Counts 3, 6, 7, 9, and 10.  That's ECF No. 824

7    at 1.  Even so, just to secure the record, given

8    Mr. Pezzola's oral motions during trial, let me walk through

9    some of the evidence supporting his conviction on this

10   count.

11        First, to the extent that the jury's verdict on

12   this count is inconsistent with its inability to reach a

13   verdict as to him on Count 2 or its acquittal of him on

14   Count 1, I reiterate it is -- the law is clear:  It's not my

15   job at the Rule 29 stage to try to reconcile the verdicts,

16   nor it -- is it a basis to attack the conviction on a count

17   that the evidence otherwise supports.  That's United States

18   v. Dykes, 406 F.3d 717 at 722, a D.C. Circuit case from

19   2005.

20        To that end, I do think a rational jury could have

21   concluded that even if Pezzola didn't conspire with the

22   other defendants in the leader -- in the lead-up to

23   January 6th, that he joined their unlawful agreement to

24   achieve the objectives set out in Count 4 at least closer to

25   or as of January 6th.  Jeremy Bertino added Pezzola, who had

1   only recently joined the Proud Boys, to the MOSD on

2   January 2nd.  Pezzola had just visited Bertino in North

3   Carolina and told Bertino he was among the men who attacked

4   the man who had stabbed Bertino on December 12th.  That's

5   trial transcript 10076.  And on the 6th, Pezzola joined the

6   defendants' marching group to the Capitol.  Once there, he

7   led the charge up to the Capitol alongside some of the

8   defendants and Donohoe, another MOSD leader and

9   co-conspirator.  The Government's evidence showed Pezzola

10  and Donohoe carrying the stolen riot shield across the

11  Capitol grounds.  That's Exhibit-450X and trial transcript

12  12390 through 91.  Indeed, Donohoe claimed that the riot

13  shield -- claimed the riot shield for the MOSD, posting in

14  the leaders chat, quote, "got a riot shield," closed quote.

15  That's Exhibit-509-33.  Pezzola further posed for a photo

16  with the riot shield while holding up the Proud Boys' hand

17  sign.  Exhibit-475.

18          Pezzola's comments once inside the Capitol are

19  perhaps the most revealing.  Again, as I mentioned before,

20  after leading the charge into the building, forcing members

21  of Congress to leave the place where they were performing

22  their duties, he announced his view that credit for this

23  result belonged a collective effort.  He recorded a view

24  announcing "I knew we could take the Capitol over if we

25  tried hard enough," closed quote, and added a Proud Boys

1    slogan, "proud of your mother fucking boy."  Again, that's

2    Exhibit-403G.

3         Beyond that, the evidence about Pezzola's conduct

4    at the top of the scaffolding further evidences his intent

5    to advance a 372 conspiracy specifically.  Again, he yelled

6    threats at law enforcement officers, and once the police

7    line gave way, charged headlong toward the Senate wing door.

8    From there, he immediately helped other rioters smash in the

9    window and gain entry to the building.

10        From this evidence and from Mr. Pezzola's

11   concerted actions with the defendants on the 6th, a

12   reasonable jury could have concluded that he joined this

13   unlawful agreement to, through force or intimidation, induce

14   members of Congress or law enforcement officers to leave the

15   place where they were to perform their duties and prevent

16   them from exercising those duties.

17        None of the defendants directly challenged their

18   conviction on Count 5 for obstructing officers during a

19   civil disorder, at least on paper.  And for good reason.

20   The evidence I've described to this point provides ample

21   support for that verdict as to Nordean, Biggs, Rehl, and

22   Pezzola for their direct participation on the ground on

23   January 6th and as to Tarrio under Pinkerton liability as

24   I've explained.  So I'll move on to defendants' conviction

25   on Count 6 for destroying a black metal fence, in violation

1    of 18 United States Code Section 1361.  To convict the

2    defendants on this count, the jury had to find that they

3    willfully injured, damaged, or destroyed property belonging

4    to the United States, or attempted to do so.  Furthermore,

5    the jury had to decide whether the damage exceeded $1,000 in

6    value, the dividing line between the statute's misdemeanor

7    and felony provisions.

8              As I've already explained, after moving through

9    the first barrier, the defendants moved toward -- moved

10   forward onto the grounds as Mr. Biggs recorded himself

11   announcing that they had, quote, "gone through every

12   barricade," closed quote, at this point.  Exhibit-404F

13   [sic].  The defendants and the crowd, according to the

14   evidence, approached a black metal fence separating

15   themselves from the officers protecting the Capitol,

16   including Officer Shae Cooney who testified at trial.  At

17   first, Biggs and Nordean were standing several feet apart,

18   but Biggs beckoned to -- Nordean to him.  The two of them

19   seemed to have tested the fence's strength, and then Biggs

20   pulled the mask over -- pulled a mask over his face.  That's

21   Exhibit-445-BX.  Officer Cooney testified that as the crowd

22   started pulling the fence, Nordean shouted "pigs" and

23   "traitors" at the officer.  That's transcript at 7087

24   through 88.

25             From there, the Government presented videos from

1    several angles that, construing the evidence in the light

2    most favorable to the Government, show Nordean and Biggs

3    tearing apart two adjoining sections of the fence.

4    Exhibit-445-BX, Exhibit-492-G, Exhibit-417X, and

5    Exhibit-417X [sic].  In these videos, the jury could see

6    Nordean and Biggs with their hands down -- I'm sorry, with

7    their hands on the fence where two segments joined together.

8    It would see them jostle and pull down on the fence segments

9    and see them move forward among the first group of the mob

10   to surge forward between those two segments.  And Officer

11   Cooney testified to the same, particularly Nordean's

12   conduct.  That's transcripts at 7013 and 7149.

13          Now, no doubt, dismantling the fence was a group

14   effort.  But from the video evidence and Officer Cooney's

15   testimony, the jury had more than sufficient evidence on

16   which to convict Nordean and Biggs for their direct

17   participation in the fence's destruction.  And because a

18   reasonable jury could have found that tearing down a barrier

19   between the rioters and the Capitol was reasonably

20   foreseeable and furthered the conspiracy or conspiracies for

21   which the jury convicted Tarrio, Rehl, and Pezzola, the jury

22   convicted them on Count 2 despite Rehl's argument that he

23   was no more responsible for the fence than anyone else in

24   the crowd.

25          Nordean argues that his conviction for destroying

1    the fence rests on insufficient evidence because video

2    evidence depicted him only touching the fence while others

3    pulled it down, and Officer Cooney's testimony otherwise was

4    not credible.  That's ECF No. 822 at 7.  But it's up to the

5    jury to decide credibility, and it's not for me to disturb

6    that finding here.  Similarly, Biggs argues there was no

7    evidence that he intended to destroy the fence.  But, again,

8    based on the video footage and Officer Cooney's testimony, a

9    jury had enough evidence -- a rational jury had enough

10   evidence to conclude the opposite.

11          The Government also offered enough evidence for a

12   reasonable jury to conclude that the damaged fence cost more

13   than $1,000 under 18 United States Code Section 1361's

14   felony provision.  A representative from the Architect of

15   the Capitol, Jason McIntyre, testified that the fence at

16   issue was a, quote, "temporary fence that they," quote,

17   "install in the days leading up to the presidential

18   inaugural on the west front."  That's the transcript at

19   11478.  The fence was in, quote, "like new," closed quote,

20   condition before the 6th but, quote, "completely dismantled,

21   closed quote," and a, quote, "total loss," closed quote,

22   afterward.  Transcript 11479 through 80.

23          I'm not going to walk through all the math here.

24   That's why I went to law school.  But McIntyre testified

25   that the cost to repair each panel of the fence was $585.36.

1     So the cost to replace two panels Nordean and Biggs directly

2     damaged would be $1170.72.  Additionally, I instructed the

3     jury on aiding and abetting liability.  The evidence would

4     further allow a reasonable jury to find that the defendants

5     aided and abetted the other rioters in damaging the entire

6     fence, or at least more than those -- just those two panels,

7     making them responsible for more damage.

8           Nordean further argues that he can't be liable for

9     over $1,000 in damage because, quote, "no evidence showed

10    that the fence segment connected to him was itself broken or

11    damaged as opposed to merely pulled down."  ECF No. 822 at

12    8.  But McIntyre testified that the whole fence was a total

13    loss and the jury was allowed to credit that testimony.

14          I'll briefly add very briefly that in a segment of

15    his reply brief that I struck for exceeding the local rule's

16    page limits, Pezzola included two newly-discovered photos

17    purportedly depicting the black fence standing after the

18    defendants have -- would have gone through it.  But he does

19    not explain where this photo came -- photos came from, they

20    have no timestamp, so it's not at all clear where on the

21    ground this black fence was standing.  So even if Pezzola

22    had raised this issue, these photos don't cast any doubt on

23    the jury's verdict or, as he argues, warrant a new trial.

24          The remaining counts concern only Mr. Pezzola.

25    First up is his conviction on Count 7 for destroying a

1    Capitol window in violation of 18 United States Code

2    Section 1361, causing damage over $1,000.  Pezzola does not

3    dispute that he smashed in a Capitol window with a riot

4    shield, nor could he as video footage the jury watched

5    multiple times during the trial shows him doing exactly

6    that.  For example, Exhibit-425.  Instead, he argues that he

7    is only responsible for destroying one window panel, which

8    McIntyre valued at $774, instead of both panels in the

9    shattered window.  Specifically, he argues that one panel

10   was already broken beyond repair when another rioter put a

11   two-by-four through it before Pezzola merely detached the

12   panel from its frame.  Exhibit-425, again.  He further

13   argues that the Government's valuation of the damage is,

14   closed -- is, quote, "outrageous," closed quote.  That's ECF

15   No. 84 [sic] at 3 through 4.

16            First, the jury had -- a rational jury could have

17   held Pezzola responsible for destroying both window panes.

18   Even if the other rioter's damage to one of the panes means

19   that Pezzola was not the principal offender as to that pane,

20   the evidence at least supported a finding that he aided and

21   abetted the other rioter in destroying the entire window to

22   create an opening for the -- to the Capitol.  The video

23   footage alone was enough to send that count to the jury.

24   But then, on direct examination, Pezzola testified that when

25   he saw, quote, "another kid break the window," he was "kind

1    of, like, oh, I guess this is what we're doing," closed

2    quote, supporting at least somewhat an aiding-and-abetting

3    theory of liability.  That's transcript 19075.

4            Second, the jury reasonably -- the jury, again,

5    was entitled to credit McIntyre's testimony that each window

6    cost $774 to replace.  Although Pezzola notes that he had an

7    expert -- a counter-expert prepared, I excluded that

8    expert's testimony because Mr. Pezzola's notice -- his

9    expert notice was both untimely and substantively deficient

10   under Rule 16.  So again, on Count 7, the evidence was

11   sufficient.

12           The last counts I have to address relate to

13   Mr. Pezzola's theft of Officer Ode's riot shield.  I'll

14   address these together because they arise out of the same

15   incident.

16           The jury convicted Mr. Pezzola of assaulting,

17   resisting, or impeding Officer Ode in violation of 18 United

18   States Code Section 111(a) and for robbery for taking his

19   riot shield in violation of 18 United States Code

20   Section 2112.  To convict Pezzola of the assault in Count 9,

21   the jury had to find that he intentionally and forcibly

22   assaulted, resisted, opposed, impeded, intimidated, or

23   interfered with a Capitol Police officer who was engaged in

24   the performance of his official duties and with the intent

25   to commit another felony.  I further instructed the jury

1    that another felony meant any of Counts 1 through 7 and

2    Count 10.  To convict Pezzola of robbery, the jury had to

3    find that Pezzola, by force or violence, took and carried

4    away Officer Ode's shield against his will and that Pezzola

5    intended to permanently deprive the United States of that

6    shield.  And I do think, like all the other counts,

7    sufficient evidence supported the jury's verdict on both

8    counts.

9         Beginning with the Government's evidence, video

10    and photographs plainly show Mr. Pezzola forcibly ripping

11    the riot [sic] from Officer Ode's hands.  So -- see, for

12    example, Exhibit-203, 229X, 444AX.  Officer Ode further

13    testified that a man matching Mr. Pezzola's description,

14    together with another person, forcibly took the shield from

15    him.  Trial transcript 7487 through 88 and -91.  The

16    Government also offered a video where someone in the video

17    asked Mr. Pezzola, "You stole a riot shield?"  And he

18    responded "Yeah."  Exhibit-442-A.  Then Mr. Pezzola himself

19    testified that he tried to take the shield from Officer

20    Ode's possession while it still was in his hands.  Trial

21    transcript 19375-77.

22         Although Mr. Pezzola does not offer any direct

23    argument about Count 9, he does argue that he did not use

24    force to deprive Officer Ode of the shield, a necessary

25    element for Counts 9 and 10.  Instead, he claims he simply

1    picked the shield up off the ground after another rioter

2    actually took it by force.  That's ECF No. 824 at 4.  But I

3    don't think, as I have just laid out, there is any question

4    that the evidence permitted the jury to conclude otherwise.

5        Second, Mr. Pezzola argues that he was not guilty

6    of robbery, only the lesser included charge of theft,

7    because he did not intend to permanently deprive the

8    government of the riot shield.  And to be sure, Mr. Pezzola

9    did return it to law enforcement before leaving the Capitol.

10    That's ECF No. 824 at 4.  But, again -- I know this is a

11    refrain, but it is what I have to do -- construing the

12    evidence in the light most favorable to the Government, a

13    reasonable jury could have concluded that Mr. Pezzola took

14    the shield with the intent to steal it, but then changed his

15    mind as he was leaving the Capitol.

16        First, considering only the evidence in the

17    Government's case in chief, Mr. Pezzola carried the shield

18    around for quite a while; the evidence was about 90 minutes.

19    And rather than use it as a shield, he did use it to break

20    into the Capitol building.  This is at least circumstantial

21    evidence of an intent to permanently deprive the Government

22    of this property.  Then, on the defense case, again, Pezzola

23    testified that he returned to use the shield -- he returned

24    the shield when a line of officers, quote, "reached out

25    towards," quote, him and, quote, "grabbed onto," quote, the

1    shield as he was making his way out of the building.  He

2    further called it a, quote, "last-minute decision to give it

3    back," closed quote.  That's the trial transcript 19412-13.

4    So I do think, even at the close of all the evidence, there

5    would have been sufficient evidence to support the jury's

6    verdict on this count, as well.

7         Before proceeding to the Rule -- so that is --

8    well, before proceeding to the Rule 33 motions for a new

9    trial, let me just speak very briefly about the defense case

10   in chief.  I have discussed some of the defendants' evidence

11   in addressing their arguments throughout this ruling.  But

12   because they originally moved, under Rule 29(a), both after

13   the Government's case and after the close of the evidence,

14   and because Mr. Nordean expressly invokes Rule 29(c) in his

15   motion here, I want to touch on why I still sent the case to

16   the jury after the defense case and why nothing in the

17   defense case changes my analysis or that conclusion that

18   that was appropriate.

19        In broad strokes, the defense witnesses did not do

20   that much to reflect key elements -- to refute key elements

21   of the Government's case and, at times, strengthened it.

22   For example, when Nordean and Tarrio called members of the

23   MOSD to testify that they weren't aware of a plan to storm

24   the Capitol, the Government clarified that they weren't

25   chapter leaders and, thus, in little position to know the

1     defendants' or other MOSD leaders' intent.  Additionally,

2     some of these witnesses became combative and evasive on

3     cross-examination such that it was -- that a reasonable

4     juror might have questioned their credibility.

5          A few specifics.  Defense witnesses who marched

6     with the defendants on January 6th, including Travis Nugent

7     and Eddie Block, confirmed that the group viewed Biggs and

8     Nordean as leaders.  Trial transcript 14636 through 37 and

9     14991 and 14997.  Nugent further testified that Proud Boys

10    followed Nordean because he was famous for his fighting

11    ability.  Transcript 14627 through 28.  And during what

12    happened on January 6th, Nugent asked Nordean whether they

13    were really doing this when the barricades came down and, by

14    his telling, Nordean just turned and walked toward the

15    Capitol.  Nugent testified that he simply followed a chain

16    of command -- his chain of command.  Transcript at 14643

17    through 45.  All of this supports the Government's theory

18    about how Nordean and the other defendants led the Proud

19    Boys on the 6th.

20          Additionally, several additional defense witnesses

21    offered testimony that supported the Government's theory

22    about how the defendants harnessed violence within the Proud

23    Boys, and the Government showed they supported violence on

24    the 6th.  For example, Nugent testified that, to him, rally

25    boy meant protest, which meant violence.  Transcript at

1    14559.   Jorge Mesa, who testified for Tarrio that the Proud

2    Boys' purpose in attending the January 6th rally was to

3    peacefully protest, testified that January 6th was a

4    glorious event and, quote, "the most patriotic act in this

5    country in the last hundred years."   Transcript at 15426

6    through 27.

7            Another -- and the last thing I'll note is that a

8    reasonable jury might have discredited any of Rehl's and

9    Pezzola's self-serving testimony.   Jurors might have

10   concluded their testimony was incredible for several

11   reasons, but particularly because the Government impeached

12   Rehl's direct examination testimony that he did not assault

13   anyone on the 6th with footage apparently of him

14   pepper-spraying a police officer.   And when confronted with

15   the footage, Mr. Rehl repeatedly tried to say it wasn't him

16   when a reasonable juror could easily -- readily have

17   concluded that it was, based on his distinctive clothing.

18   Transcript 18740-41 and Government's Exhibit-2008.

19           As for Pezzola, a jury might have viewed the

20   marked shift in his demeanor between direct and cross as

21   reflecting poorly on his credibility.   After expressing

22   remorse and taking responsibility for his actions on

23   January 6th on direct, he them took aim at the trial itself

24   at a later point, calling the proceedings corrupt and the

25   charges fake.   Trial transcript 19331.

1          Again, construing the evidence in the Government's

2     favor, a reasonable jury might have taken the evidence

3     presented by the defense on the whole as supporting, rather

4     than refuting, the Government's case.  But at the very

5     least, it provided no reason not to send the case to the

6     jury.

7          One last point.  I want to briefly address

8     Mr. Pezzola's reply brief, some of which I struck for

9     failure to adhere to the local rule's page limit.

10          On the merits, Mr. Pezzola's -- even putting aside

11     the page limit problems, on the merits, Mr. Pezzola's

12     arguments are largely untethered to his actual convictions.

13     He takes aim at the case as a whole instead of the evidence

14     supporting his own convictions which, notably, did not

15     include seditious conspiracy.  His arguments are

16     scattershot, conclusory, and simply fail to grapple with the

17     record in any meaningful way.  He argues that the tools

18     theory amounts to unconstitutional collectivist punishment.

19     I've already explained many, many times the basic theory of

20     relevance supporting the Government's use of non-hearsay

21     statements and conduct by certain individuals that the

22     defendants recruited to the MOSD and marched to the Capitol,

23     and I incorporate those rulings here.  The basic principles

24     of relevance supporting those rulings are not novel and do

25     not implicate constitutional concerns.

1          And last, Pezzola's accusations of Brady evidence

2     related to CHS material are simply baseless.  I addressed

3     and denied a similar motion by Pezzola during trial.  As

4     I've said, counsel for Mr. Pezzola's repeated and

5     unsubstantiated accusations of government misconduct in this

6     regard are not only meritless, but inappropriate for court

7     and, frankly, as a matter of pure professionalism.

8          So for all of these reasons, I do find that all

9     the evidence was sufficient to sustain all of the above

10    convictions, again, whether measured at the close of the

11    Government's case or at the close of all the evidence.  So

12    for all those reasons, the Rule 29 motions are denied.

13         As for Rule 33, Federal Rule of Criminal Procedure

14    33(a) states that the court "may vacate any judgment and

15    grant a new trial if the interest of justice so requires,"

16    closed quote.  Despite this broad discretion, the D.C.

17    Circuit has instructed that, quote, "granting a new trial

18    motion is warranted only in those limited circumstances

19    where a serious miscarriage of justice may have occurred,"

20    closed quote.  That's United States v. Wheeler, 753 F.3d 200

21    at 208, a D.C. Circuit case from 2014.

22         The defendants' arguments on this point -- and the

23    defendants who have moved for a new trial are defendants

24    Biggs, Rehl, and Pezzola -- they fall far short of this

25    standard.  First, Biggs and Rehl argue that the publicity

1    incident to Congress's report on the events at the Capitol

2    on January 6th and former President Trump's toxic invocation

3    of the Proud Boys and the repeated use of secret proceedings

4    during trial served as a distraction, warranting a new trial

5    even in the absence of any particular showing of prejudice.

6    ECF No. 828 at 23 through 24.  None of this shows a serious

7    miscarriage of justice.  I have to emphasize repeatedly,

8    none of it.

9            First, former President Trump mentioning the Proud

10   Boys in a debate was competent evidence in this case which

11   the Government showed impacted the defendants' -- reflected

12   the defendants' state of mind and, really more accurately,

13   their motive related to January 6th.  Second, the time I

14   took to address matters outside the jury's presence -- often

15   at the defendants' behest -- hardly shows injustice, not to

16   mention the time that the jury sat in recess often turned on

17   the defendants' own lengthy arguments that I permitted them

18   to make because I wanted to make sure they were heard.  And

19   there were certain other times that I took up matters under

20   seal to protect the integrity of the proceedings before me.

21   To risk the proceedings by failing to do so would have been

22   a miscarriage of justice, not the other way around.

23           Third, no pre or mid-trial publicity shows a

24   miscarriage of justice in this case.  As everyone in this

25   courtroom is aware, I conducted an extensive voir dire

1    lasting about two weeks.  During that process, I filtered

2    out jurors who may have been unduly impacted by what they

3    had heard or read about the Proud Boys from the January 6th

4    Committee hearings or in any other way.  Importantly, no

5    defendant identifies any juror that I qualified, let alone

6    that was seated in this trial, for whom the record at all

7    supports any inference of bias based on publicity they cite

8    or for any other reason.  Not only that.  At Mr. Biggs's

9    request, I frequently admonished the jury to avoid all press

10    coverage about the defendants, the case, or January 6th

11    generally.  And, at one point, I began giving him -- them

12    that instruction -- a reminder of that instruction every

13    night when they left the courthouse.  The defendants offer

14    absolutely no evidence whatsoever that the jury violated

15    that instruction.

16        Defendant Pezzola, on the other hand, argues he's

17    entitled to a new trial because new evidence shows that,

18    quote, "100 Antifa agitators," including someone by the name

19    of Landon Copeland, attended the January 6th rally.  But

20    this new evidence is nothing more than vague claims by a

21    single person that have apparently appeared somewhere on the

22    Internet.  Pezzola also points to other supported --

23    supposed Antifa agitators in portions of his reply brief

24    that I struck for failure to comply with the local rules.

25    I'm not going to spend a lot of time on this.  Mr. Pezzola's

1    claims about Antifa are speculative and fantastical.  And

2    even if they were true, they wouldn't have much to do with

3    this case.  Even if a group of Antifa members conspired to

4    bring about violence or committed acts of violence on

5    the 6th, that doesn't mean the evidence doesn't show that

6    the defendants in this case did the same.  So Pezzola's

7    argument on this point gets him nowhere.  And, again,

8    they're based on, as far as I can tell, again, something

9    somebody said somewhere on the Internet which is just not a

10   competent basis for Mr. Pezzola to make the argument or even

11   for me to grant him any relief.

12           That is the end of my oral ruling.  I know you're

13   all very pleased with that.  It's 4:30.  I will see some of

14   you tomorrow at 10:00, some of you tomorrow in the

15   afternoon, and others of you later in the week.  Until then,

16   the parties are dismissed.

17           THE DEPUTY CLERK:  All rise.  This Honorable Court

18   is adjourned.

19           (Proceedings concluded at 4:35 p.m.)

20                 * * * * * * * * * * * *

21           **CERTIFICATE OF OFFICIAL COURT REPORTER**

22   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

23   **that the above and foregoing constitutes a true and accurate**

24   **transcript of my stenographic notes and is a full, true and**

25   **complete transcript of the proceedings to the best of my**

1      ability, dated this 30th day of August 2023.

2                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
3                              United States Courthouse
                               Room 6722
4                              333 Constitution Avenue, NW
                               Washington, DC 20001

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## #

**#649** [1] - 2:9
**#FuckTheBlue** [1] - 124:1
**#J6** [1] - 89:13

## $

**$1,000** [6] - 86:12, 97:23, 168:5, 170:13, 171:9, 172:2
**$1,400** [1] - 86:13
**$1170.72** [1] - 171:2
**$585.36** [1] - 170:25
**$700** [2] - 86:10, 86:13
**$774** [2] - 172:8, 173:6

## /

**/s/Timothy** [1] - 184:2

## 0

**02903** [1] - 2:10
**06511** [1] - 1:21

## 1

**1** [31] - 3:3, 3:8, 3:13, 18:13, 19:13, 27:19, 37:13, 41:19, 59:12, 65:1, 65:3, 65:16, 65:21, 66:8, 69:3, 73:1, 76:24, 78:14, 84:5, 93:20, 95:8, 96:19, 97:16, 99:4, 99:13, 127:8, 149:21, 165:7, 165:14, 174:1
**1,000** [1] - 112:24
**1-ETHAN** [1] - 1:4
**10** [9] - 2:9, 97:10, 98:6, 129:1, 142:7, 148:8, 165:6, 174:2, 174:25
**10-minute** [1] - 62:13
**100** [2] - 45:19, 182:18
**10003** [1] - 1:17
**1001** [1] - 132:3
**10016** [1] - 2:7
**10076** [2] - 112:7, 166:5
**10137** [1] - 130:1
**1014** [1] - 2:3
**10144** [1] - 137:9
**10145** [1] - 136:24
**10307-10** [1] - 125:14
**10310** [2] - 125:10, 159:3

**10:00** [1] - 183:14
**10:45** [1] - 130:24
**11** [1] - 151:9
**1100** [1] - 92:12
**111** [1] - 47:5
**111(a** [6] - 36:16, 49:7, 50:19, 57:25, 98:1, 173:18
**111(a)** [2] - 50:14, 97:9
**11478** [1] - 170:19
**11479** [1] - 170:22
**12** [1] - 92:9
**12-hour** [1] - 5:25
**12241** [1] - 136:9
**12318** [1] - 132:25
**12322-23** [1] - 133:9
**12390** [1] - 166:12
**12467** [1] - 134:9
**12646** [1] - 138:4
**12966-67** [1] - 119:22
**12:18** [1] - 95:20
**12:53** [2] - 9:18, 12:11
**12th** [8] - 109:17, 111:7, 111:18, 112:15, 122:7, 122:23, 123:21, 166:4
**12th's** [1] - 112:8
**13** [1] - 121:20
**1361** [4] - 64:8, 97:7, 168:1, 172:2
**1361's** [1] - 170:13
**14** [2] - 66:10, 143:17
**14559** [1] - 178:1
**14627** [1] - 177:11
**14636** [1] - 177:8
**14643** [1] - 177:16
**14991** [1] - 177:9
**14997** [1] - 177:9
**14th** [1] - 109:16
**15** [1] - 117:17
**15-minute** [1] - 102:24
**1512** [4] - 27:25, 38:13, 70:22, 159:16
**1512(c** [3] - 35:1, 151:21, 153:11
**1512(c)(1)'s** [1] - 154:6
**1512(c)(2** [10] - 96:24, 149:25, 150:16, 151:19, 151:21, 153:18, 154:6, 154:11, 155:5, 158:5
**1512(c)(2)** [1] - 150:5
**1512(k** [8] - 96:23, 135:23, 151:18, 151:20, 151:22, 152:1, 152:3, 162:4
**1512(k)** [1] - 150:1
**153** [1] - 1:23

**15426** [1] - 178:5
**16** [2] - 154:20, 173:10
**1776** [7] - 118:19, 119:7, 119:8, 131:5, 132:10, 138:9, 138:10
**18** [21] - 37:24, 39:6, 55:21, 96:20, 96:22, 96:24, 97:2, 97:4, 97:6, 97:8, 97:11, 99:14, 100:10, 146:19, 149:24, 163:22, 168:1, 170:13, 172:1, 173:17, 173:19
**18740-41** [1] - 178:18
**19** [1] - 132:25
**19-hour** [1] - 5:25
**19075** [1] - 173:3
**19171** [1] - 157:13
**19253** [1] - 140:10
**19331** [1] - 178:25
**19375-77** [1] - 174:21
**19412-13** [1] - 176:3
**1947** [1] - 148:22
**1993** [1] - 148:20
**1996** [1] - 92:6
**19th** [2] - 102:15, 116:25
**1:21-cr-00175-TJK-1** [1] - 1:2
**1:21-cr-00175-TJK-2** [1] - 1:3
**1:21-cr-00175-TJK-3** [1] - 1:3
**1:21-cr-00175-TJK-5** [1] - 1:4
**1:21-cr-00175-TJK-6** [1] - 1:4
**1:30** [3] - 133:17, 133:24, 137:10
**1:45** [3] - 95:21, 95:24
**1st** [2] - 1:20, 123:10

## 2

**2** [13] - 3:4, 3:9, 3:13, 67:16, 67:20, 67:23, 96:21, 97:16, 150:1, 151:3, 162:2, 165:13, 169:22
**2-JOSEPH** [1] - 1:5
**20** [2] - 39:7, 111:6
**200** [2] - 141:7, 180:20
**200-year-old** [1] - 13:11
**20001** [2] - 2:13, 184:4
**2002** [1] - 98:24
**2005** [2] - 145:17, 165:19

**2008** [1] - 92:13
**2014** [1] - 180:21
**2016** [1] - 99:5
**2019** [1] - 79:15
**202** [2] - 1:14, 2:14
**2020** [7] - 102:15, 108:13, 108:19, 109:17, 111:7, 112:12
**2021** [1] - 5:12
**2022** [2] - 13:16, 98:23
**2023** [2] - 1:6, 184:1
**203** [1] - 1:21
**20530** [1] - 1:14
**208** [1] - 180:21
**209** [1] - 1:24
**20th** [4] - 1:16, 103:1, 111:6, 117:20
**21** [2] - 164:17
**21-175** [4] - 3:2, 62:18, 96:2, 142:12
**2112** [2] - 97:12, 173:20
**229X** [1] - 174:12
**231** [1] - 181:6
**231** [9] - 36:16, 42:13, 43:13, 47:5, 47:14, 50:19, 55:21, 59:19
**231(a)(3** [1] - 97:5
**2332b(5** [1] - 70:13
**2332b(g)(5)** [2] - 70:8, 78:2
**2332b(g)(5)(B** [1] - 64:9
**2381** [1] - 31:13
**2384** [5] - 28:20, 28:24, 29:16, 96:21, 99:15
**24** [1] - 181:6
**25** [1] - 121:20
**252-7233** [1] - 1:14
**253-0514** [1] - 2:7
**26** [1] - 129:9
**27** [1] - 178:6
**28** [2] - 146:25, 177:11
**28th** [1] - 108:19
**29** [13] - 1:6, 4:2, 4:16, 45:9, 98:8, 98:13, 99:6, 103:24, 145:15, 154:4, 158:17, 165:15, 180:12
**29(a** [3] - 96:9, 160:6, 176:12
**29(b)** [1] - 96:10
**29(c** [2] - 160:9, 176:14
**290** [1] - 98:24
**2933** [1] - 86:20

**2:10** [3] - 10:17, 12:13
**2A2.2** [3] - 35:14, 48:23, 59:10
**2A2.4** [10] - 18:17, 25:3, 26:5, 35:15, 36:17, 37:23, 38:18, 39:9, 43:15, 57:24
**2J1.1** [1] - 21:25
**2J1.2** [11] - 18:15, 19:19, 21:11, 21:13, 23:23, 24:4, 27:5, 28:11, 31:10, 66:7, 66:9
**2M** [4] - 22:6, 22:15, 24:3
**2M1.1** [5] - 32:19, 33:1, 33:4, 33:15, 33:24
**2M1.1(a)** [1] - 34:1
**2nd** [1] - 166:2
**2X5.1** [3] - 32:15, 33:4, 33:5

## 3

**3** [21] - 3:4, 3:10, 3:14, 44:25, 47:19, 61:14, 66:16, 76:15, 84:15, 96:23, 97:18, 150:16, 151:3, 159:24, 161:20, 161:22, 161:24, 162:3, 163:13, 165:6, 172:15
**3-ZACHARY** [1] - 1:5
**30** [5] - 23:12, 67:5, 87:9, 131:25, 164:17
**30-year-old** [1] - 13:11
**305** [2] - 1:25, 2:4
**30th** [3] - 119:7, 122:21, 184:1
**31** [3] - 67:4, 67:24, 155:23
**32** [3] - 67:3, 67:12, 155:23
**320** [1] - 98:22
**324** [1] - 98:22
**33** [8] - 4:2, 4:16, 45:9, 67:2, 67:24, 96:17, 176:8, 180:13
**33(a** [1] - 180:14
**33-year** [1] - 10:7
**330** [1] - 148:21
**33012** [1] - 2:3
**33014** [1] - 1:24
**333** [2] - 2:13, 184:4
**340** [3] - 155:3, 158:3
**354-3111** [1] - 2:14
**3553** [2] - 23:12, 34:14
**3553(a** [1] - 18:6

**37** [1] - 177:8
**370** [1] - 98:24
**371** [1] - 37:24
**372** [9] - 24:13, 35:7,
38:16, 39:6, 97:3,
100:11, 163:22,
164:14, 167:5
**375** [1] - 98:24
**38** [2] - 35:2, 130:1
**383** [1] - 1:20
**393-3017** [1] - 1:21
**3A1** [1] - 90:2
**3A1.4** [29] - 64:3,
64:24, 67:6, 67:8,
67:10, 69:2, 70:2,
76:15, 76:17, 76:18,
76:23, 76:25, 77:23,
78:14, 78:16, 79:22,
84:21, 90:3, 91:25,
92:3, 92:7, 93:11,
93:13, 93:19, 93:20,
94:18, 94:22, 95:5,
95:7
**3d** [1] - 98:22
**3rd** [2] - 119:23, 124:4

---

**4**

**4** [51] - 18:13, 19:13,
19:17, 23:17, 24:8,
24:14, 37:15, 37:21,
37:23, 39:5, 39:10,
64:24, 64:25, 65:1,
65:4, 67:7, 67:8,
67:9, 67:25, 69:2,
76:24, 77:1, 78:3,
78:14, 78:16, 79:4,
79:22, 80:3, 80:6,
80:24, 84:21, 85:6,
88:12, 91:24, 92:4,
92:25, 93:2, 93:10,
93:12, 93:20, 93:23,
95:8, 96:25, 107:17,
159:24, 163:18,
165:24, 172:15,
175:2, 175:10
**403-7323** [1] - 1:25
**406** [2] - 145:17,
165:18
**42** [1] - 138:3
**444AX** [1] - 174:12
**4480** [1] - 111:8
**4487** [1] - 111:17
**45** [2] - 136:9, 177:17
**476** [1] - 148:19
**489** [1] - 148:19
**49** [1] - 2:3
**4:30** [2] - 12:13,
183:13
**4:35** [1] - 183:19

---

**4r** [1] - 1:17
**4th** [3] - 1:13, 124:22,
146:13

---

**5**

**5** [14] - 3:5, 3:11, 3:14,
39:18, 42:13, 43:24,
45:25, 48:8, 59:4,
60:1, 60:5, 60:6,
97:3, 167:18
**5-ENRIQUE** [1] - 1:6
**500-107** [1] - 140:3
**500-15** [1] - 105:24
**500-3** [1] - 105:12
**500-5** [1] - 105:15
**503-13** [1] - 127:3
**503-3** [1] - 126:2
**508** [1] - 148:19
**509-34** [1] - 137:13
**509-42** [1] - 140:3
**512-8** [1] - 137:3
**513-34** [1] - 102:14
**513-39** [1] - 102:14
**514** [1] - 104:23
**532** [1] - 89:18
**532-2** [1] - 140:3
**537** [1] - 92:12
**5374** [1] - 114:23
**54** [1] - 107:8
**5417** [1] - 146:19
**5421** [1] - 146:20
**5481** [1] - 130:6
**5482** [1] - 130:3
**555** [1] - 1:13
**57** [1] - 153:5
**586** [4] - 89:17,
143:17, 144:9,
164:17
**5th** [4] - 106:18,
128:22, 146:19,
146:21

---

**6**

**6** [29] - 3:5, 3:12, 3:15,
63:3, 63:15, 64:3,
64:16, 69:2, 70:4,
72:15, 73:9, 84:2,
85:1, 85:13, 88:2,
93:19, 94:23, 95:2,
95:6, 95:10, 97:5,
97:18, 99:4, 144:3,
144:20, 144:24,
145:11, 165:6,
167:25
**6-DOMINIC** [1] - 1:6
**603-53** [1] - 152:23
**613-E** [1] - 126:2
**614** [1] - 126:2

---

**6175** [1] - 1:23
**628** [1] - 98:22
**63** [1] - 137:25
**631** [1] - 148:22
**64** [1] - 158:2
**642** [1] - 149:4
**646** [1] - 2:7
**6722** [2] - 2:12, 184:3
**6:00** [1] - 12:11
**6th** [105] - 2:6, 5:12,
5:20, 6:7, 8:25, 9:17,
12:17, 12:25, 13:6,
13:18, 13:20, 14:5,
14:17, 14:20, 15:20,
15:22, 15:23, 17:2,
17:5, 17:15, 28:8,
34:21, 35:1, 55:9,
71:20, 78:23, 80:4,
81:9, 82:21, 83:7,
102:16, 102:18,
103:9, 103:13,
104:13, 107:4,
113:9, 113:23,
114:19, 116:5,
116:12, 116:13,
116:19, 116:23,
117:2, 117:19,
118:6, 119:10,
120:6, 120:12,
120:17, 120:23,
121:6, 121:8,
121:17, 121:22,
121:24, 122:9,
122:16, 122:25,
123:10, 124:5,
126:10, 126:11,
126:18, 127:3,
128:9, 129:11,
133:23, 138:20,
139:2, 139:3,
141:14, 145:7,
146:11, 146:16,
149:11, 151:18,
152:16, 152:19,
152:22, 152:24,
153:17, 154:16,
159:24, 165:23,
165:25, 166:5,
167:11, 167:23,
170:20, 177:6,
177:12, 177:19,
177:24, 178:2,
178:3, 178:13,
178:23, 181:2,
181:13, 182:3,
182:10, 182:19,
183:5

---

**7**

**7** [22] - 1:16, 63:3,
63:15, 64:3, 64:16,
84:2, 85:1, 86:4,
86:8, 87:24, 88:2,
97:5, 97:24, 144:16,
144:24, 145:13,
145:23, 165:6,
170:4, 171:25,
173:10, 174:1
**700** [1] - 2:9
**7013** [1] - 169:12
**7087** [1] - 168:23
**7149** [1] - 169:12
**717** [2] - 145:17,
165:18
**722** [2] - 145:17,
165:18
**74** [1] - 118:19
**7487** [1] - 174:15
**753** [1] - 180:20
**764-9347** [1] - 2:10
**767** [1] - 155:22
**77** [1] - 145:17
**775** [1] - 2:10
**7th** [2] - 14:7, 111:12

---

**8**

**8** [8] - 62:5, 62:6, 97:7,
98:1, 144:9, 144:17,
145:13, 171:12
**80** [1] - 170:22
**81** [1] - 157:14
**822** [6] - 96:13, 144:3,
144:24, 145:23,
170:4, 171:11
**822-2901** [1] - 2:4
**823** [1] - 96:16
**824** [5] - 96:13, 162:2,
165:6, 175:2, 175:10
**825** [1] - 96:14
**828** [4] - 148:8, 151:9,
154:19, 181:6
**836** [1] - 99:4
**84** [2] - 111:8, 172:15
**88** [3] - 111:17,
168:24, 174:15
**8:30** [1] - 14:5

---

**9**

**9** [9] - 62:6, 97:7, 98:4,
144:18, 145:13,
165:6, 173:20,
174:23, 174:25
**90** [1] - 175:18
**902-3869** [1] - 1:18
**91** [2] - 166:12, 174:15

---

**917** [1] - 1:18
**99** [1] - 2:6
**9966** [1] - 114:25
**9970** [1] - 111:21
**9973** [1] - 112:4
**9:30** [1] - 1:6

---

**A**

**a.m** [3] - 1:6, 129:1,
130:24
**Aaron** [1] - 118:1
**abate** [1] - 105:25
**abetted** [3] - 40:16,
171:5, 172:21
**abetting** [3] - 54:2,
171:3, 173:2
**ability** [3] - 90:11,
177:11, 184:1
**able** [6] - 6:20, 15:11,
82:2, 118:14,
123:17, 123:20
**absence** [2] - 147:1,
181:5
**absolutely** [1] -
182:14
**abused** [1] - 72:11
**accelerate** [1] - 137:16
**accept** [1] - 60:3
**accepting** [2] - 25:12,
38:4
**access** [2] - 124:24,
146:23
**accident** [1] - 17:6
**accompanied** [1] -
44:19
**accomplish** [6] -
100:15, 100:18,
104:12, 109:14,
125:12, 152:9
**according** [3] - 70:5,
162:22, 168:13
**account** [5] - 42:3,
101:17, 106:18,
146:23, 165:4
**accountable** [2] -
118:13, 118:22
**accurate** [2] - 46:11,
183:23
**accurately** [1] -
181:12
**accusations** [2] -
180:1, 180:5
**accused** [1] - 20:22
**accuses** [1] - 106:22
**achieve** [5] - 100:20,
103:16, 104:7,
125:22, 165:24
**aching** [1] - 16:20
**acknowledge** [1] -

75:17
**acknowledged** [1] - 153:4
**acquit** [3] - 41:11, 45:19, 62:6
**acquittal** [5] - 41:10, 96:9, 96:12, 98:14, 165:13
**acquitted** [11] - 37:5, 37:6, 37:13, 48:2, 48:5, 52:14, 52:15, 97:15, 100:8, 135:22
**acquitting** [1] - 98:5
**Act** [2] - 143:13, 144:8
**act** [15] - 25:23, 42:20, 46:1, 51:23, 71:16, 72:22, 72:23, 80:12, 92:14, 145:4, 151:6, 151:7, 155:15, 162:10, 178:4
**acted** [13] - 41:25, 150:21, 150:24, 155:2, 155:8, 155:12, 155:13, 156:1, 157:6, 157:18, 157:23, 158:14, 162:20
**acting** [4] - 65:19, 122:6, 155:20
**action** [4] - 111:10, 128:14, 128:16, 146:2
**actions** [11] - 12:7, 12:22, 14:23, 55:16, 89:18, 109:15, 122:22, 128:17, 134:18, 167:11, 178:22
**actively** [1] - 11:19
**activity** [9] - 40:20, 47:14, 51:8, 51:11, 51:12, 51:15, 54:9, 148:5, 148:7
**acts** [5] - 40:15, 61:20, 71:11, 183:4
**actual** [4] - 14:21, 151:21, 154:1, 179:12
**actus** [1] - 50:20
**ad** [1] - 86:9
**adapting** [1] - 130:14
**add** [5] - 66:10, 117:25, 140:4, 160:22, 171:14
**added** [10] - 92:15, 107:13, 123:18, 129:17, 130:21, 138:7, 141:12, 155:19, 165:25, 166:25

**adding** [1] - 36:18
**addition** [4] - 64:19, 64:20, 84:9, 135:21
**additional** [5] - 5:3, 13:18, 25:2, 149:18, 177:20
**additionally** [9] - 116:20, 122:7, 122:12, 136:17, 139:22, 147:1, 171:2, 177:1, 177:20
**address** [22] - 4:6, 9:16, 21:24, 22:5, 48:13, 50:25, 64:11, 64:13, 64:14, 69:12, 69:22, 90:23, 99:10, 106:15, 147:12, 150:5, 151:2, 153:12, 173:12, 173:14, 179:7, 181:14
**addressed** [1] - 180:2
**addresses** [1] - 21:6
**addressing** [2] - 25:18, 176:11
**adds** [1] - 146:10
**adequately** [1] - 23:6
**adhere** [2] - 125:25, 179:9
**adherence** [1] - 149:3
**adjoining** [1] - 169:3
**adjourned** [1] - 183:18
**adjustment** [25] - 62:21, 63:10, 63:14, 63:17, 64:3, 64:18, 64:25, 67:7, 67:8, 67:10, 69:2, 70:2, 70:3, 74:7, 76:16, 77:24, 80:10, 91:12, 93:14, 93:19, 93:25, 94:5, 94:22, 95:6
**administer** [3] - 28:5, 28:15, 28:16
**administration** [4] - 20:23, 21:10, 28:2, 28:13
**admissible** [1] - 149:2
**admit** [1] - 111:24
**admonished** [1] - 182:9
**Adolf** [1] - 148:25
**adopt** [1] - 157:12
**adopted** [1] - 91:10
**adrenaline** [1] - 129:19
**advance** [3] - 113:15, 141:9, 167:5
**advanced** [2] - 134:24, 137:14
**advantage** [3] - 119:3,

155:21, 157:21
**advisory** [1] - 90:14
**advocated** [1] - 126:17
**advocating** [1] - 83:13
**affect** [9] - 18:9, 65:9, 68:12, 70:15, 72:22, 74:10, 79:6, 92:20
**affected** [1] - 82:23
**affirm** [1] - 98:18
**afford** [1] - 100:5
**aforementioned** [1] - 16:23
**aftermath** [1] - 116:13
**afternoon** [3] - 86:20, 117:15, 183:15
**agency** [1] - 15:13
**agenda** [1] - 89:20
**Agent** [1] - 119:19
**agent's** [1] - 53:7
**aggravated** [29] - 36:18, 39:17, 39:18, 39:25, 42:12, 42:15, 42:22, 43:4, 43:10, 43:25, 44:14, 44:16, 44:18, 44:21, 48:8, 48:23, 48:24, 50:21, 50:23, 53:8, 53:16, 56:5, 56:8, 56:21, 58:24, 59:8, 59:12, 59:16, 59:21
**aggravating** [5] - 44:15, 53:9, 53:20, 57:13
**aggravation** [5] - 52:24, 53:1, 53:3, 53:11
**agitated** [1] - 132:11
**agitators** [2] - 182:18, 182:23
**ago** [4] - 13:15, 143:3, 143:5, 160:13
**agree** [13] - 20:15, 20:17, 29:17, 36:20, 51:19, 52:4, 54:6, 74:2, 81:21, 86:21, 86:23, 87:3, 145:23
**agreed** [12] - 28:20, 41:19, 71:25, 72:9, 84:13, 100:17, 124:2, 125:9, 144:23, 150:11, 159:13, 163:24
**agreeing** [2] - 30:12, 32:18
**agreement** [27] - 101:1, 103:11, 103:20, 104:14, 115:19, 125:13, 125:22, 128:19,

134:19, 136:14, 138:24, 139:20, 139:24, 145:2, 145:7, 149:12, 149:13, 150:14, 151:5, 151:18, 151:20, 158:9, 158:22, 159:1, 161:15, 165:23, 167:13
**agreement's** [1] - 141:5
**agreements** [1] - 152:6
**agrees** [1] - 32:15
**ahead** [3] - 33:13, 40:11, 119:4
**aid** [3] - 13:3, 16:6, 31:7
**aided** [5] - 2:15, 40:16, 101:11, 171:5, 172:20
**aiding** [3] - 54:2, 171:3, 173:2
**aiding-and-abetting** [1] - 173:2
**aim** [2] - 178:23, 179:13
**aimed** [1] - 89:8
**ain't** [2] - 105:21, 162:24
**air** [1] - 16:11
**Airbnb** [2] - 159:20, 159:24
**airports** [1] - 71:9
**akin** [1] - 29:21
**al** [3] - 62:19, 96:3, 142:13
**aligned** [1] - 109:13
**alive** [1] - 14:10
**alleged** [6] - 12:9, 13:6, 20:8, 20:14, 21:15, 85:24
**allow** [3] - 87:22, 136:22, 171:4
**allowed** [4] - 92:6, 92:14, 113:25, 171:13
**allowing** [2] - 160:19, 160:21
**allows** [1] - 98:14
**ally** [1] - 108:14
**almost** [5] - 5:25, 8:1, 56:13, 114:21, 160:4
**alone** [4] - 53:12, 79:19, 172:23, 182:5
**alongside** [2] - 131:18, 166:7
**amass** [1] - 119:12
**Amendment** [11] -

107:20, 143:12, 144:7, 147:15, 147:23, 148:1, 148:5, 148:17, 149:16, 149:17, 149:19
**Amendment-based** [1] - 149:16
**AMERICA** [1] - 1:2
**America** [6] - 3:3, 62:18, 96:2, 106:19, 110:7, 142:12
**American** [1] - 148:2
**amounts** [1] - 179:18
**ample** [2] - 114:8, 167:20
**amply** [1] - 147:3
**analogies** [1] - 53:14
**analogous** [44] - 18:12, 18:23, 18:24, 19:1, 19:2, 21:21, 22:16, 22:22, 23:10, 23:13, 24:15, 24:16, 26:11, 27:1, 27:2, 27:4, 27:5, 31:11, 31:14, 31:19, 32:3, 32:4, 32:22, 33:6, 33:9, 33:11, 33:15, 33:18, 33:22, 33:24, 34:2, 34:4, 34:17, 34:21, 34:23, 34:24, 36:22, 38:7, 38:9, 39:9, 57:23, 57:25
**analysis** [11] - 22:8, 38:9, 51:24, 81:5, 143:18, 144:10, 157:13, 160:5, 161:7, 164:16, 176:17
**analyze** [1] - 64:21
**anecdotally** [1] - 53:3
**angles** [1] - 169:1
**angry** [4] - 8:9, 8:10, 11:12, 17:7
**annotations** [1] - 52:22
**announced** [8] - 104:24, 107:1, 111:8, 111:15, 130:18, 131:4, 133:3, 166:22
**announcing** [2] - 166:24, 168:11
**answer** [9] - 14:20, 20:5, 27:7, 42:11, 42:17, 46:13, 47:16, 111:10, 139:11
**answer's** [1] - 47:17
**answered** [1] - 124:12
**answering** [1] - 101:6

**antecedent** [1] - 44:6
**antecedently** [1] - 59:22
**Antifa** [19] - 102:8, 105:1, 108:7, 109:25, 110:1, 111:24, 113:20, 113:24, 114:4, 114:9, 114:15, 114:21, 114:24, 115:4, 123:12, 182:18, 182:23, 183:1, 183:3
**Antifa's** [1] - 163:1
**anyway** [1] - 81:19
**apace** [1] - 106:16
**apart** [5] - 12:18, 103:25, 106:11, 168:17, 169:3
**apologies** [2] - 3:17, 67:9
**apologize** [1] - 32:14
**APPEARANCES** [2] - 1:10, 2:1
**appeared** [3] - 126:17, 164:19, 182:21
**apples** [1] - 73:15
**applicable** [2] - 21:13, 25:4
**application** [12] - 22:4, 30:16, 56:21, 64:2, 64:18, 68:8, 77:19, 90:2, 91:6, 92:4, 93:2, 144:2
**applications** [2] - 144:1, 144:8
**applied** [13] - 23:23, 24:4, 66:22, 71:5, 79:4, 85:22, 88:9, 90:3, 90:12, 90:18, 92:19, 92:21, 94:6
**applies** [16] - 21:11, 27:19, 28:1, 30:3, 31:13, 48:8, 58:24, 59:12, 65:14, 68:3, 72:19, 76:16, 86:3, 88:12, 93:14, 154:23
**apply** [64] - 18:15, 21:21, 28:11, 30:4, 31:12, 33:25, 34:13, 35:14, 37:14, 39:18, 43:3, 43:16, 47:1, 53:17, 55:24, 56:11, 56:16, 59:4, 62:24, 63:3, 63:4, 63:10, 63:17, 63:21, 64:3, 65:1, 66:8, 66:9, 67:6, 67:12, 68:20, 69:1, 69:2, 69:18, 69:24, 70:4, 71:22,

74:6, 76:23, 77:6, 77:17, 77:24, 78:14, 79:21, 79:25, 80:24, 83:4, 83:6, 84:23, 85:7, 87:6, 87:23, 88:2, 88:15, 88:16, 91:13, 94:1, 94:4, 94:5, 95:18, 150:6
**applying** [16] - 19:15, 45:22, 48:3, 59:8, 67:25, 76:17, 76:24, 80:6, 82:5, 91:9, 93:19, 94:18, 95:5, 95:6, 95:7, 151:19
**appreciate** [4] - 9:7, 45:19, 46:16, 47:20
**apprehension** [1] - 49:18
**approach** [3] - 20:5, 21:7, 85:17
**approached** [4] - 107:5, 132:7, 161:1, 168:14
**appropriate** [14] - 19:22, 20:7, 21:20, 22:17, 26:4, 33:3, 35:14, 37:7, 37:21, 43:16, 52:16, 69:8, 99:11, 176:18
**Architect** [1] - 170:14
**area** [3] - 15:13, 133:11, 137:7
**arguably** [1] - 151:9
**argue** [22] - 24:17, 30:2, 37:20, 50:7, 52:25, 56:9, 58:16, 58:23, 59:18, 62:24, 64:9, 83:3, 87:2, 147:18, 147:20, 151:5, 151:12, 152:20, 154:1, 157:17, 174:23, 180:25
**argued** [4] - 29:19, 86:9, 115:17
**argues** [20] - 76:15, 143:6, 143:22, 144:12, 144:21, 157:5, 158:4, 159:15, 164:13, 164:17, 169:25, 170:6, 171:8, 171:23, 172:6, 172:9, 172:13, 175:5, 179:17, 182:16
**arguing** [4] - 30:9, 70:4, 86:3, 90:15
**argument** [63] - 4:15, 27:3, 29:11, 31:10,

32:7, 33:2, 34:4, 34:5, 34:15, 44:5, 45:2, 45:3, 45:4, 45:5, 48:6, 50:10, 52:5, 55:7, 60:4, 60:8, 66:2, 70:3, 71:19, 72:15, 73:16, 74:19, 75:5, 76:10, 76:14, 77:2, 77:11, 78:9, 78:11, 78:13, 78:15, 82:11, 86:18, 90:8, 90:17, 143:10, 143:18, 143:20, 144:25, 147:10, 147:15, 147:17, 148:9, 148:11, 151:10, 154:22, 155:11, 157:10, 161:23, 162:4, 164:11, 164:16, 169:22, 174:23, 183:7, 183:10
**argument's** [1] - 76:13
**arguments** [32] - 18:16, 27:9, 30:20, 31:15, 59:23, 63:12, 70:1, 82:13, 87:10, 88:22, 95:2, 142:4, 142:15, 142:24, 143:1, 143:2, 144:10, 146:10, 147:12, 147:14, 149:18, 150:6, 151:1, 154:3, 155:18, 161:5, 164:12, 176:11, 179:12, 179:15, 180:22, 181:17
**arise** [1] - 173:14
**arm** [1] - 136:8
**armed** [1] - 139:13
**army** [1] - 108:24
**arranged** [1] - 159:23
**array** [1] - 21:24, 46:18, 57:22, 60:24
**arrest** [6] - 88:7, 123:1, 123:5, 124:17, 128:20, 146:12
**arrested** [6] - 122:22, 124:17, 124:21, 129:21, 139:25, 147:6
**arrests** [1] - 140:2
**arrived** [4] - 11:7, 12:21, 13:24, 14:9
**ash** [1] - 129:14
**aside** [5] - 31:15, 48:16, 69:15, 98:18, 179:10

**ass** [5] - 109:23, 110:17, 127:1, 130:21
**assailants** [2] - 16:5, 16:9
**assault** [84] - 8:19, 15:10, 25:8, 36:4, 36:9, 36:18, 37:2, 37:5, 37:6, 39:17, 39:19, 39:25, 40:1, 41:7, 41:10, 41:23, 42:1, 42:12, 42:15, 42:21, 42:23, 43:4, 43:9, 43:10, 43:17, 43:24, 44:8, 44:16, 44:18, 44:19, 44:22, 45:12, 45:13, 45:18, 46:8, 46:25, 47:2, 47:10, 48:5, 48:8, 48:9, 48:21, 48:23, 48:24, 48:25, 49:5, 49:7, 49:11, 49:14, 49:15, 49:21, 49:22, 50:12, 50:19, 50:21, 50:23, 51:5, 51:18, 53:8, 55:16, 56:3, 56:5, 56:8, 56:22, 59:8, 59:9, 59:12, 59:14, 59:16, 59:20, 59:21, 60:8, 61:6, 61:10, 61:11, 144:16, 144:17, 154:25, 156:10, 173:20, 178:12
**assault's** [1] - 62:3
**assault-level** [1] - 56:5
**assaulted** [1] - 173:22
**assaulting** [8] - 26:6, 61:12, 79:3, 97:7, 98:4, 145:21, 156:22, 173:16
**assaultive** [1] - 155:4
**assaults** [8] - 46:18, 47:13, 58:1, 61:1, 61:7, 61:8, 154:23
**assembled** [2] - 104:11, 135:2
**assert** [1] - 147:25
**asserting** [1] - 154:13
**asses** [1] - 108:8
**assisted** [1] - 12:24
**assume** [3] - 12:19, 51:5, 91:4
**assured** [1] - 128:21
**attaching** [1] - 56:8
**attack** [6] - 7:3, 29:21, 89:23, 141:16, 147:22, 165:16
**attacked** [5] - 9:18, 10:3, 10:7, 112:6,

166:3
**attacking** [2] - 83:14, 164:20
**attempt** [8] - 11:11, 11:21, 13:3, 17:9, 31:23, 43:2, 50:6, 70:24
**attempted** [5] - 112:2, 146:17, 150:17, 151:22, 168:4
**attempting** [4] - 16:6, 43:1, 45:25, 49:2
**attend** [2] - 111:10, 160:1
**attended** [5] - 109:20, 111:7, 114:18, 126:9, 182:19
**attending** [3] - 121:5, 121:15, 178:2
**attention** [3] - 23:21, 119:6, 155:9
**attitude** [1] - 113:12
**attorney** [1] - 86:17
**ATTORNEY'S** [1] - 1:13
**attorneys** [1] - 142:17
**attributable** [1] - 51:14
**attribute** [2] - 40:4
**attribution** [1] - 54:1
**August** [2] - 1:6, 184:1
**authored** [1] - 37:19
**authority** [9] - 19:15, 72:7, 72:10, 84:14, 99:17, 100:1, 122:15, 140:15, 152:7
**authorized** [1] - 14:2
**Avenue** [3] - 2:6, 2:13, 184:4
**average** [1] - 34:25
**avoid** [4] - 122:8, 122:9, 160:24, 182:9
**avoidance** [1] - 95:7
**aware** [4] - 13:9, 156:16, 176:23, 181:25
**awareness** [5] - 141:5, 150:14, 150:21, 155:17, 159:8
**awful** [1] - 155:13

**B**

**b(g)(5)(A)** [1] - 64:10
**b(g)(5)(B** [1] - 64:17
**B.A** [1] - 1:11
**background** [2] - 81:15, 81:19
**backstop** [2] - 63:9,

64:19
**bad** [2] - 30:11, 163:1
**balance** [1] - 146:8
**ballpark** [4] - 22:24, 23:1, 24:20, 32:5
**banner** [1] - 111:20
**bar** [4] - 5:17, 47:11, 74:18, 90:4
**barricade** [5] - 132:12, 132:17, 132:21, 133:4, 168:12
**barricades** [2] - 132:22, 177:13
**barrier** [6] - 133:10, 135:1, 136:20, 141:17, 168:9, 169:18
**barriers** [2] - 153:22, 156:19
**bars** [1] - 117:7
**base** [6] - 10:2, 10:4, 10:5, 34:1, 66:10, 134:4
**based** [11] - 55:13, 100:23, 103:6, 118:3, 147:9, 149:16, 170:8, 178:17, 182:7, 183:8
**baseless** [1] - 180:2
**basic** [3] - 55:6, 179:19, 179:23
**basis** [5] - 144:9, 148:12, 161:16, 165:16, 183:10
**battle** [2] - 109:14, 141:4
**battles** [1] - 114:9
**bear** [2] - 10:7, 107:12
**beat** [2] - 7:4, 13:2
**beating** [2] - 11:14, 14:16
**became** [4] - 109:15, 114:10, 132:11, 177:2
**beckoned** [2] - 133:11, 168:18
**become** [4] - 94:7, 95:3, 108:9, 120:24
**becomes** [9] - 26:10, 26:11, 30:14, 43:25, 56:20, 58:6, 58:8, 71:18, 86:16
**beeline** [1] - 163:4
**beer** [1] - 75:21
**BEFORE** [1] - 1:9
**began** [7] - 10:15, 115:1, 116:22, 120:17, 133:17, 139:25, 182:11
**begin** [4] - 5:8, 99:13,

99:24, 132:3
**beginning** [4] - 4:22, 33:2, 106:17, 174:9
**behalf** [2] - 37:12, 55:5
**behavior** [1] - 88:5
**behest** [1] - 181:15
**behind** [8] - 24:23, 45:15, 45:16, 95:17, 133:15, 134:6, 137:9
**belie** [1] - 146:14
**belief** [1] - 115:8
**beliefs** [2] - 125:7, 141:3
**belonged** [1] - 166:23
**belonging** [1] - 168:3
**below** [1] - 117:25
**bemoaned** [1] - 139:9
**bemoaning** [1] - 102:12
**bench** [2] - 78:22, 91:8
**benefit** [6] - 100:5, 155:21, 157:8, 157:22, 158:1, 158:2
**Berman** [4] - 78:24, 80:18, 91:6, 91:17
**Bertino** [30] - 102:7, 103:5, 104:6, 109:2, 112:4, 114:23, 117:22, 120:5, 122:5, 123:4, 124:1, 129:4, 129:12, 129:15, 129:19, 129:24, 130:11, 136:20, 137:4, 137:7, 138:5, 138:8, 140:8, 158:20, 158:23, 158:25, 165:25, 166:2, 166:3, 166:4
**Bertino's** [1] - 125:4
**best** [4] - 8:6, 8:9, 128:13, 183:25
**betray** [1] - 116:4
**better** [7] - 4:18, 60:19, 118:21, 161:3, 162:23, 162:24, 162:25
**between** [31] - 19:1, 20:16, 22:11, 26:5, 34:10, 36:25, 45:20, 46:5, 52:23, 63:18, 67:6, 67:10, 74:2, 83:1, 86:11, 93:19, 94:18, 98:25, 101:2, 109:24, 111:22, 112:16, 125:19, 135:1, 146:12, 151:7, 159:24,

168:6, 169:10, 169:19, 178:20
**beyond** [14] - 14:24, 25:8, 26:8, 41:13, 45:22, 57:12, 84:12, 91:24, 92:2, 92:5, 135:13, 154:6, 167:3, 172:10
**bias** [1] - 182:7
**Biden** [3] - 101:3, 101:6, 107:2
**big** [4] - 102:17, 106:4, 117:1, 117:19
**BIGGS** [1] - 1:5
**Biggs** [104] - 3:4, 3:14, 45:15, 46:6, 67:1, 67:24, 68:4, 83:1, 96:11, 96:16, 97:13, 101:14, 101:24, 102:20, 102:21, 102:24, 103:3, 104:24, 105:8, 105:11, 105:25, 106:2, 106:5, 106:6, 106:10, 107:9, 108:6, 110:13, 110:14, 110:23, 110:24, 111:1, 111:4, 111:9, 111:19, 114:15, 117:4, 117:8, 117:15, 117:18, 117:21, 117:24, 121:2, 121:13, 122:7, 123:24, 124:18, 124:19, 124:20, 128:10, 128:20, 128:23, 130:7, 130:18, 130:24, 131:19, 131:23, 132:4, 132:8, 132:15, 133:1, 133:3, 133:5, 133:11, 133:14, 133:15, 133:18, 133:20, 134:3, 134:11, 134:12, 134:22, 134:25, 136:8, 136:19, 138:1, 138:2, 139:3, 140:12, 140:22, 146:20, 150:2, 152:21, 153:12, 153:15, 153:25, 154:12, 156:7, 157:14, 161:10, 164:6, 167:21, 168:10, 168:17, 168:18, 168:19, 169:2, 169:6,

169:16, 170:6, 171:1, 177:7, 180:24, 180:25
**Biggs's** [9] - 103:10, 105:6, 105:9, 105:18, 141:6, 142:1, 147:12, 151:2, 182:8
**bill** [1] - 145:11
**binds** [1] - 154:22
**biological** [1] - 71:9
**bit** [10] - 3:21, 3:22, 7:25, 18:20, 19:7, 28:10, 88:6, 119:4, 145:9
**Black** [1] - 44:17
**black** [9] - 97:23, 133:10, 135:1, 144:20, 156:4, 167:25, 168:14, 171:17, 171:21
**Black's** [1] - 44:17
**Block** [3] - 160:23, 161:1, 177:7
**Blockburger** [2] - 151:14, 151:20
**blocking** [1] - 133:11
**blocks** [1] - 13:21
**blows** [1] - 22:7
**blue** [3] - 7:4, 108:7, 130:15
**bodies** [1] - 127:5
**bodily** [4] - 42:25, 49:1, 49:17, 49:18, 49:20, 49:21
**body** [4] - 14:6, 14:9, 16:15, 23:19
**boils** [1] - 47:14
**bolstering** [1] - 139:24
**Bones** [1] - 105:6
**booking** [1] - 121:13
**Boots** [3] - 129:8, 135:17, 137:1
**bootstrap** [1] - 73:9
**bootstrapping** [2] - 60:16, 60:17
**bottle** [6] - 50:2, 51:1, 51:9, 51:14, 51:16, 52:2, 52:10, 98:2
**bottle-throwing** [3] - 50:2, 51:1, 52:2
**bottles** [2] - 10:8, 61:12
**boundary** [1] - 92:10
**Boy** [6] - 105:6, 109:21, 110:5, 114:18, 118:1, 134:5
**boy** [4] - 130:19, 163:12, 167:1, 177:25

**Boys** [71] - 82:20, 82:21, 83:10, 101:7, 101:8, 101:10, 101:23, 102:6, 102:8, 102:10, 104:16, 105:3, 105:11, 105:14, 105:18, 106:11, 106:18, 107:3, 109:25, 110:7, 110:15, 110:18, 111:10, 111:14, 111:19, 111:23, 112:1, 112:5, 112:14, 114:12, 114:20, 114:24, 117:6, 118:5, 118:8, 120:23, 121:4, 122:6, 122:25, 123:2, 123:13, 123:18, 127:19, 128:11, 129:25, 130:2, 130:5, 130:25, 132:23, 132:25, 133:3, 133:8, 133:19, 133:21, 134:4, 136:20, 138:12, 139:6, 140:9, 141:7, 141:14, 158:21, 163:9, 166:1, 166:25, 177:9, 177:19, 177:23, 181:3, 181:10, 182:3
**boys** [5] - 103:13, 118:13, 118:22, 137:20, 163:10
**Boys'** [12] - 102:3, 102:19, 103:13, 110:9, 113:19, 114:9, 115:12, 130:16, 159:18, 160:24, 166:16, 178:2
**Brady** [1] - 180:1
**brains** [1] - 126:3
**branch** [2] - 14:25, 86:17
**branching** [1] - 85:11
**breach** [11] - 9:19, 11:21, 11:23, 128:18, 132:6, 135:21, 136:2, 136:6, 141:8, 146:13, 159:21
**breached** [6] - 10:16, 10:19, 10:20, 11:13, 11:16, 11:18
**breaching** [1] - 132:5
**break** [11] - 8:7, 8:19,

35:12, 62:11, 62:13, 62:14, 95:20, 104:3, 142:6, 172:25, 175:19
**breaking** [3] - 109:3, 126:23, 136:3
**breaks** [2] - 8:15, 106:5
**Brian** [1] - 16:18
**Brief** [6] - 6:9, 6:11, 62:16, 95:25, 142:10, 142:22
**brief** [7] - 6:13, 65:23, 89:17, 142:5, 171:15, 179:8, 182:23
**briefing** [5] - 27:25, 28:19, 51:4, 155:10, 157:10
**briefly** [8] - 3:19, 48:1, 138:19, 151:2, 171:14, 176:9, 179:7
**bring** [2] - 116:17, 183:4
**bringing** [1] - 23:21
**broad** [9] - 21:24, 27:4, 31:20, 41:4, 100:22, 138:25, 154:17, 176:19, 180:16
**broadcasts** [1] - 102:2
**broader** [5] - 35:25, 36:1, 60:24, 91:12, 159:9
**broke** [3] - 13:11, 109:24, 111:22
**broken** [1] - 84:24, 171:10, 172:10
**brother** [2] - 108:18, 138:5
**brothers** [1] - 16:18
**brought** [2] - 3:17, 91:3
**brutal** [1] - 16:8
**brutally** [1] - 16:4
**buckets** [1] - 104:3
**building** [29] - 7:15, 9:4, 10:16, 10:21, 11:4, 11:8, 12:10, 12:12, 12:14, 13:7, 13:9, 66:8, 124:8, 127:9, 134:8, 134:13, 135:4, 137:11, 137:15, 138:2, 153:1, 156:5, 156:14, 162:13, 162:16, 166:20, 167:9, 175:20, 176:1
**buildings** [2] - 119:10, 119:13

**bunch** [3] - 39:22, 39:23, 121:10
**burden** [4] - 50:5, 57:11, 98:17, 99:20
**burn** [1] - 129:14
**burning** [1] - 16:13
**business** [1] - 156:5
**buttressing** [1] - 118:24
**bye** [1] - 14:10

**C**

**c)** [1] - 96:13
**c)(1)** [1] - 155:6
**calculate** [6] - 66:7, 75:2, 90:9, 90:15, 90:16
**calculated** [6] - 65:9, 68:10, 70:15, 72:22, 74:10, 75:2, 75:15, 79:6
**calculation** [7] - 18:10, 66:4, 66:6, 67:14, 67:23, 87:12, 94:9
**calculations** [5] - 4:5, 18:6, 31:4, 67:1, 67:13
**cancel** [1] - 146:6
**candidate** [2] - 101:3, 157:25
**candidly** [1] - 74:17
**cannot** [7] - 31:11, 56:4, 56:21, 59:20, 79:24, 83:6, 161:6
**Capitol** [98] - 6:19, 7:7, 8:7, 9:6, 9:11, 9:15, 10:16, 10:21, 11:2, 11:3, 12:10, 12:12, 12:14, 13:7, 13:22, 14:3, 14:13, 15:10, 15:21, 15:25, 46:20, 97:25, 116:19, 120:2, 124:8, 124:11, 124:14, 127:6, 127:9, 128:12, 129:3, 131:1, 131:4, 131:8, 131:12, 131:13, 131:20, 131:24, 132:2, 132:7, 132:9, 132:10, 132:20, 132:23, 133:20, 133:22, 134:7, 134:12, 134:14, 134:15, 134:25, 135:1, 135:21, 136:3, 136:7,

136:25, 137:12, 138:2, 138:17, 139:7, 139:19, 141:7, 141:16, 141:19, 144:15, 145:22, 146:10, 147:1, 153:1, 153:9, 153:23, 160:2, 160:16, 161:2, 161:9, 161:18, 162:9, 163:10, 164:15, 166:6, 166:7, 166:11, 166:18, 166:24, 168:15, 169:19, 170:15, 172:1, 172:3, 172:22, 173:23, 175:9, 175:15, 175:20, 176:24, 177:15, 179:22, 181:1
**capitol** [1] - 108:5
**capitols** [1] - 127:2
**caption** [3] - 109:22, 137:23, 138:18
**captured** [1] - 164:5
**capturing** [1] - 133:2
**car** [2] - 53:6, 53:7
**care** [3] - 30:19, 30:20, 30:21
**career** [2] - 8:22, 10:7
**careful** [2] - 106:23, 110:10
**Carolina** [1] - 166:3
**carried** [6] - 41:7, 41:17, 42:4, 61:13, 174:3, 175:17
**carries** [3] - 98:17, 143:14, 151:4
**carry** [1] - 115:21
**carrying** [4] - 46:2, 47:15, 47:18, 166:10
**case** [98] - 19:10, 22:9, 23:14, 23:21, 24:10, 24:12, 24:17, 24:18, 24:23, 26:25, 34:10, 34:11, 35:14, 37:18, 37:20, 37:22, 42:14, 50:4, 52:25, 54:3, 54:16, 58:5, 58:6, 60:21, 63:9, 63:10, 70:8, 72:3, 77:18, 78:24, 79:4, 79:7, 79:10, 79:13, 79:15, 80:1, 80:19, 80:24, 81:24, 82:3, 86:14, 89:17, 89:19, 90:19, 92:12, 92:22, 98:23, 98:24, 99:5, 99:7, 99:11, 99:15,

103:23, 121:19, 124:23, 135:6, 140:4, 142:2, 145:17, 148:4, 148:15, 148:20, 148:21, 148:22, 149:4, 151:24, 154:5, 154:24, 155:3, 155:10, 156:10, 158:23, 160:6, 160:8, 165:18, 175:17, 175:22, 176:9, 176:13, 176:15, 176:16, 176:17, 176:21, 179:4, 179:5, 179:13, 180:11, 180:21, 181:10, 181:24, 182:10, 183:3, 183:6
**cases** [20] - 18:18, 20:10, 27:23, 32:1, 34:21, 35:1, 52:22, 52:23, 52:24, 53:2, 53:3, 53:10, 72:11, 78:23, 78:25, 81:22, 91:16, 148:12, 149:14, 154:23
**cast** [1] - 171:22
**casualties** [2] - 89:4, 89:15
**catalysts** [1] - 112:12
**catapult** [1] - 56:7
**catch** [1] - 4:2
**category** [5] - 67:13, 90:25, 92:11, 93:14, 93:24
**Category** [3] - 68:2, 88:4, 88:7
**caused** [1] - 40:17
**causing** [1] - 172:2
**CCR** [3] - 2:11, 183:22, 184:2
**celebrated** [6] - 102:1, 104:17, 110:2, 110:22, 112:8, 134:23
**celebrating** [1] - 133:2
**celebration** [2] - 114:4, 115:12
**center** [1] - 12:3
**centrality** [1] - 148:1
**century** [1] - 55:2
**certain** [7] - 16:24, 56:24, 82:3, 82:24, 120:17, 179:21, 181:19
**certainly** [8] - 19:4, 22:4, 23:25, 24:25, 62:23, 81:22, 147:6,

160:19
**CERTIFICATE** [1] - 183:21
**certification** [10] - 26:15, 26:19, 41:19, 41:20, 47:19, 136:15, 143:15, 150:19, 152:15, 163:16
**certify** [1] - 183:22
**cetera** [2] - 38:5, 38:6
**chain** [7] - 10:18, 102:12, 112:10, 118:3, 125:25, 177:15, 177:16
**chairman** [1] - 101:16
**challenge** [5] - 60:9, 101:21, 144:1, 161:22, 165:5
**challenged** [1] - 167:17
**chamber** [1] - 11:9
**chambers** [1] - 12:6
**chance** [1] - 108:10
**change** [2] - 36:19, 92:10
**changed** [5] - 5:20, 15:24, 87:11, 87:12, 175:14
**changes** [2] - 88:14, 176:17
**changing** [1] - 65:18
**channel** [1] - 146:4
**chants** [1] - 132:9
**Chapter** [1] - 66:16
**chapter** [14] - 102:10, 104:16, 112:16, 116:7, 118:2, 118:5, 118:8, 118:12, 120:12, 121:24, 126:25, 139:6, 141:13, 176:25
**chapter's** [4] - 116:2, 116:8, 118:17, 127:15
**chapters** [1] - 117:7
**character** [1] - 149:12
**characteristics** [3] - 21:13, 21:17, 66:11
**characterize** [1] - 81:11
**charge** [12] - 42:13, 98:1, 108:25, 141:18, 142:24, 143:22, 151:8, 156:11, 162:12, 166:7, 166:20, 175:6
**charged** [28] - 23:22, 26:2, 36:8, 36:23, 42:1, 50:12, 96:18,

97:9, 99:15, 99:21, 100:15, 104:2, 115:15, 125:1, 133:1, 133:14, 140:6, 144:5, 144:16, 144:18, 147:4, 149:8, 150:16, 160:12, 164:23, 167:7

**charges** [2] - 130:9, 178:25

**charging** [1] - 153:22

**Charles** [3] - 61:11, 98:2, 103:4

**chastised** [1] - 131:13

**chat** [30] - 102:9, 102:25, 103:1, 104:15, 105:6, 105:18, 106:2, 108:13, 112:19, 116:14, 117:16, 117:21, 120:20, 121:3, 121:16, 121:25, 129:5, 129:6, 129:7, 129:9, 129:13, 135:17, 136:25, 137:11, 138:12, 140:1, 146:24, 152:25, 166:14

**chats** [3] - 124:22, 124:23, 125:16

**check** [1] - 11:5

**cheek** [1] - 118:11

**cheered** [1] - 163:10

**cheering** [1] - 133:21

**chemical** [1] - 135:9

**chemicals** [1] - 16:14

**chief** [6] - 99:11, 103:23, 135:6, 160:8, 175:17, 176:10

**chiefs** [1] - 14:1

**child** [1] - 89:12

**chimed** [1] - 101:6

**chinstrap** [1] - 16:12

**choice** [4] - 7:8, 7:9, 115:10

**choose** [2] - 19:1, 27:1

**choosing** [2] - 32:2, 94:18

**chose** [2] - 89:21, 124:2

**Christianson** [1] - 89:17

**chronologically** [1] - 104:4

**CHS** [1] - 180:2

**cigar** [1] - 163:9

**Circle** [5] - 9:19, 10:1, 132:6, 141:17, 159:21

**circuit** [2] - 19:3, 154:10

**Circuit** [17] - 20:4, 20:9, 20:11, 24:10, 37:19, 89:16, 92:11, 92:13, 98:24, 99:4, 145:17, 154:7, 165:18, 180:17, 180:21

**Circuit's** [1] - 155:19

**circuits** [1] - 18:20

**circumstances** [4] - 26:9, 44:19, 86:8, 180:18

**circumstantial** [4] - 99:1, 113:22, 148:7, 175:20

**cite** [3] - 148:12, 151:13, 182:7

**cited** [3] - 18:19, 79:17, 89:17

**cities** [1] - 110:21

**citing** [1] - 79:11

**citizens** [4] - 6:25, 7:14, 7:20, 121:6

**city** [3] - 111:18, 129:14, 137:18

**Civil** [2] - 37:25, 38:1

**civil** [17] - 43:13, 44:11, 46:3, 56:11, 56:12, 58:11, 60:21, 60:22, 60:23, 97:4, 97:22, 106:22, 107:10, 135:5, 141:5, 167:19

**civilian** [1] - 88:15

**claim** [1] - 36:19

**claimed** [2] - 166:12, 166:13

**claiming** [1] - 133:22

**claims** [3] - 174:25, 182:20, 183:1

**clarified** [3] - 108:21, 114:14, 176:24

**clash** [2] - 135:8, 156:11

**clashes** [3] - 110:3, 113:24, 135:19

**Clause** [1] - 151:5

**clean** [3] - 22:3, 47:20, 50:8

**cleanly** [1] - 21:14

**clear** [13] - 12:6, 57:16, 64:24, 68:16, 72:16, 72:19, 73:7, 75:11, 75:13, 126:8, 159:12, 165:14,

171:20

**clearly** [11] - 19:14, 20:10, 38:15, 39:10, 41:11, 50:22, 77:20, 77:23, 149:2, 155:1, 163:14

**CLERK** [8] - 3:2, 62:15, 62:17, 95:23, 96:1, 142:9, 142:11, 183:17

**client** [7] - 30:9, 55:9, 55:15, 82:16, 82:18, 83:9, 83:13

**clients** [1] - 18:6

**climate** [1] - 17:8

**clips** [1] - 110:8

**Clock** [2] - 10:24, 11:5

**close** [11] - 13:16, 85:22, 88:9, 99:7, 99:9, 105:8, 160:6, 176:4, 176:13, 180:10, 180:11

**closed** [112] - 99:1, 101:4, 102:21, 104:23, 104:25, 105:11, 105:13, 105:15, 105:21, 105:22, 106:3, 106:5, 106:8, 106:20, 107:11, 107:12, 107:15, 107:16, 107:22, 107:23, 108:20, 108:24, 108:25, 109:4, 109:7, 110:12, 110:16, 117:5, 117:6, 117:8, 117:9, 118:11, 118:15, 119:2, 119:9, 119:15, 119:25, 120:2, 120:3, 120:21, 121:5, 121:7, 121:13, 122:2, 122:4, 122:10, 122:25, 123:2, 123:4, 123:15, 123:17, 123:20, 123:23, 123:25, 124:9, 124:11, 124:14, 124:20, 126:4, 126:21, 127:6, 129:2, 129:3, 129:9, 129:17, 130:14, 130:15, 130:21, 130:22, 131:5, 131:6, 131:13, 134:15, 135:5, 136:21, 136:23, 137:1,

137:2, 137:13, 137:16, 137:20, 137:21, 138:6, 138:7, 138:8, 138:11, 138:13, 138:15, 139:5, 139:8, 139:12, 139:13, 144:24, 145:22, 152:20, 152:22, 154:19, 155:2, 161:4, 162:2, 166:14, 166:25, 168:12, 170:19, 170:21, 172:14, 173:1, 176:3, 180:16, 180:20

**closely** [2] - 30:7, 136:10

**closer** [3] - 24:21, 24:22, 165:24

**closest** [1] - 32:9

**clothing** [1] - 178:17

**cloud** [1] - 136:23

**club** [1] - 117:12

**clutched** [1] - 16:4

**co** [14] - 85:12, 85:15, 86:14, 88:1, 104:6, 113:11, 115:18, 121:17, 125:21, 126:5, 128:17, 152:14, 156:9, 166:9

**co-conspirator** [5] - 85:15, 86:14, 88:1, 156:9, 166:9

**co-conspirators** [4] - 104:6, 121:17, 126:5, 152:14

**co-conspirators'** [4] - 113:11, 115:18, 125:21, 128:17

**co-defendants** [1] - 85:12

**Code** [20] - 37:24, 39:6, 55:21, 96:20, 96:22, 96:24, 97:3, 97:5, 97:7, 97:9, 97:11, 99:14, 100:11, 149:25, 163:22, 168:1, 170:13, 172:1, 173:18, 173:19

**codification** [3] - 28:21, 29:15, 33:19

**codifies** [1] - 29:8

**coerce** [3] - 65:18, 88:15, 92:20

**coercion** [8] - 65:10, 70:16, 71:1, 71:2, 72:23, 74:11, 79:7, 80:14

**coextensive** [1] - 142:3

**cohort** [1] - 45:15

**coincidence** [4] - 127:19, 135:16, 135:25, 136:5

**collapsed** [1] - 14:5

**colleagues** [1] - 78:22

**collective** [1] - 166:23

**collectively** [1] - 109:8

**collectivist** [1] - 179:18

**College** [2] - 143:15, 152:20

**colonial** [1] - 29:1

**colors** [4] - 116:17, 120:23, 130:5, 130:16

**COLUMBIA** [1] - 1:1

**combative** [1] - 177:2

**combination** [1] - 72:4

**combined** [2] - 115:24, 133:13

**coming** [4] - 7:10, 88:9, 88:23, 123:1

**command** [12] - 10:18, 12:3, 46:20, 83:18, 102:12, 112:10, 113:13, 117:24, 125:25, 128:21, 177:16

**commanded** [1] - 40:17

**commands** [1] - 156:19

**comment** [5] - 17:25, 101:10, 104:17, 104:20, 114:15

**commentary** [3] - 92:2, 93:3, 101:20

**commented** [3] - 110:6, 110:13, 121:7

**commenting** [1] - 110:10

**comments** [6] - 105:7, 108:12, 115:9, 127:23, 160:19, 166:18

**commie** [1] - 110:17

**commies** [2] - 108:15, 121:7

**Commission** [8] - 57:1, 57:3, 57:9, 57:21, 72:2, 72:5, 92:7, 92:16

**commission** [1] - 93:4

**commit** [24] - 42:16, 43:2, 43:8, 44:20, 46:1, 49:3, 49:12, 49:25, 51:20, 56:15,

56:19, 58:5, 58:9,
58:10, 58:14, 58:25,
59:11, 59:14, 59:15,
59:18, 59:20, 61:13,
149:25, 173:25
**committed** [12] -
12:20, 14:14, 15:11,
29:17, 34:21, 44:23,
54:24, 85:14, 87:18,
161:11, 183:4
**Committee** [1] - 182:4
**committing** [3] -
45:25, 150:12,
161:25
**common** [10] - 18:8,
28:21, 29:8, 29:9,
30:8, 61:7, 61:8,
100:20, 120:24
**communicate** [3] -
89:21, 129:7, 146:12
**communicated** [2] -
131:21, 136:11
**communication** [1] -
12:2
**company** [1] - 90:1
**comparing** [2] - 47:5,
85:22
**competent** [2] -
181:10, 183:10
**complete** [1] - 183:25
**completed** [2] - 12:1,
12:7
**completely** [4] -
81:23, 84:23, 88:13,
170:20
**complicated** [1] -
23:17
**comply** [1] - 182:24
**component** [2] -
84:18, 84:20
**components** [1] -
87:20
**comprised** [2] -
100:24, 100:25
**computer** [1] - 2:15
**computer-aided** [1] -
2:15
**concede** [1] - 30:1
**concedes** [1] - 82:24
**concept** [4] - 32:1,
36:5, 38:12, 58:4
**conception** [1] - 89:25
**conceptually** [1] -
57:8
**concern** [2] - 105:10,
171:24
**concerned** [2] - 72:1,
121:6
**concerns** [1] - 179:25
**concerted** [4] - 61:20,

128:14, 128:15,
167:11
**conclude** [13] - 43:8,
47:2, 48:20, 51:20,
54:8, 109:11, 145:6,
155:12, 157:17,
162:17, 170:10,
170:12, 175:4
**concluded** [38] -
84:11, 100:23,
101:9, 103:8, 104:1,
104:10, 112:14,
114:3, 115:3,
115:20, 116:21,
118:4, 118:10,
118:20, 120:9,
121:21, 125:23,
136:13, 139:18,
139:22, 151:17,
156:12, 156:16,
156:24, 157:22,
159:8, 160:10,
160:15, 160:23,
162:19, 163:15,
164:22, 165:21,
167:12, 175:13,
178:10, 178:17,
183:19
**concludes** [1] - 17:21
**conclusion** [8] -
33:21, 53:20, 62:5,
115:25, 120:13,
144:19, 176:17
**conclusively** [2] -
154:8, 154:9
**conclusory** [1] -
179:16
**concrete** [1] - 45:14
**concurrence** [2] -
157:9, 157:11
**concurrently** [1] -
151:6
**condition** [1] - 170:20
**conduct** [70] - 19:8,
21:25, 22:1, 39:4,
39:22, 39:23, 40:4,
40:8, 40:15, 40:24,
41:3, 41:5, 42:3,
43:4, 45:8, 45:11,
46:5, 46:6, 46:7,
48:3, 48:17, 48:19,
51:10, 51:23, 51:25,
52:14, 52:15, 54:17,
56:24, 58:13, 60:24,
60:25, 61:2, 61:5,
61:6, 65:9, 65:11,
70:15, 71:1, 71:17,
72:22, 72:24, 74:11,
75:2, 75:15, 79:4,
79:6, 80:13, 81:9,

100:7, 100:9,
104:13, 124:25,
135:24, 138:21,
139:23, 146:7,
150:22, 151:9,
153:8, 153:16,
153:21, 155:2,
155:4, 162:17,
164:10, 167:3,
169:12, 179:21
**conducted** [1] -
181:25
**confidence** [2] -
25:13, 38:5
**confined** [1] - 155:5
**confirm** [2] - 63:2,
63:14
**confirmed** [1] - 177:7
**confirms** [1] - 141:8
**conflict** [4] - 83:1,
93:11, 112:2, 115:4
**confronted** [1] -
178:14
**confused** [1] - 121:8
**confusing** [1] - 56:20
**Congress** [34] - 8:18,
12:5, 15:2, 25:20,
26:16, 28:5, 28:6,
28:14, 28:16, 29:8,
31:24, 36:2, 36:11,
37:25, 38:20, 38:21,
39:5, 39:6, 55:24,
56:15, 72:2, 72:3,
72:4, 73:6, 85:20,
143:9, 143:12,
152:19, 164:1,
164:2, 164:15,
166:21, 167:14
**Congress's** [7] -
92:14, 122:19,
150:19, 152:10,
156:5, 163:16, 181:1
**congressman** [1] -
39:1
**congressmen** [1] -
152:21
**connected** [1] -
171:10
**Conor** [3] - 1:12, 3:8,
4:25
**cons** [1] - 129:19
**consciousness** [5] -
125:1, 138:22,
139:23, 155:16,
157:4
**consequence** [1] -
161:14
**consider** [16] - 17:13,
28:6, 32:22, 36:22,
39:24, 40:2, 45:8,

45:12, 45:13, 45:17,
45:18, 48:2, 52:13,
63:16, 151:15
**considerable** [1] -
155:9
**consideration** [3] -
37:22, 39:3, 85:16
**considered** [7] -
70:25, 78:24, 86:23,
99:11, 135:24,
136:15, 139:5
**considering** [8] -
46:12, 78:1, 85:16,
88:4, 98:19, 155:18,
159:6, 175:16
**consistent** [3] - 26:20,
130:4, 149:13
**consistently** [1] -
14:19
**conspiracies** [8] -
18:14, 41:16, 84:19,
85:5, 147:4, 160:12,
164:24, 169:20
**conspiracy** [93] -
18:13, 19:16, 21:3,
21:4, 21:16, 22:3,
22:10, 23:22, 24:24,
26:13, 28:19, 29:17,
30:2, 31:19, 34:6,
34:11, 34:17, 34:22,
34:25, 35:4, 35:11,
35:15, 35:19, 36:18,
40:25, 41:25, 52:3,
52:7, 52:11, 58:8,
62:4, 62:8, 65:13,
65:15, 66:7, 73:2,
73:21, 85:4, 96:20,
96:21, 96:25, 97:14,
99:13, 99:21, 99:22,
100:1, 100:8,
100:10, 100:12,
100:16, 104:2,
115:15, 125:2,
128:14, 135:23,
135:25, 140:6,
140:13, 140:15,
140:23, 141:22,
141:25, 143:7,
143:22, 144:4,
144:6, 144:7,
144:14, 145:1,
145:3, 145:14,
148:4, 149:25,
150:2, 150:9, 151:8,
152:1, 152:3, 159:9,
159:17, 161:12,
162:1, 162:3,
163:20, 164:5,
164:8, 164:14,
165:3, 165:4, 167:5,

169:20, 179:15
**conspiracy's** [3] -
34:23, 140:24,
161:13
**conspirator** [5] -
85:15, 86:14, 88:1,
156:9, 166:9
**conspiratorial** [6] -
100:25, 103:11,
125:17, 125:22,
128:19, 139:24
**conspirators** [5] -
100:19, 104:6,
121:17, 126:5,
152:14
**conspirators'** [4] -
113:11, 115:18,
125:21, 128:17
**conspire** [2] - 38:2,
165:21
**conspired** [6] - 25:11,
84:12, 99:16,
150:10, 157:6, 183:3
**conspiring** [1] - 97:19
**constant** [2] - 68:1,
68:24
**constantly** [1] -
106:22
**constitute** [1] - 60:22
**constitutes** [1] -
183:23
**Constitution** [4] -
2:13, 17:11, 109:6,
184:4
**constitutional** [2] -
17:9, 179:25
**constrained** [1] -
41:22
**construct** [1] - 92:17
**constructive** [5] -
28:22, 28:25, 30:8,
33:19
**constructly** [1] -
150:12
**construe** [1] - 100:3
**construed** [2] - 114:7,
127:13
**construing** [9] -
125:18, 127:25,
132:14, 132:18,
155:24, 160:14,
169:1, 175:11, 179:1
**consult** [1] - 141:11
**consultation** [1] -
140:21
**contact** [8] - 47:12,
47:13, 49:6, 49:8,
49:10, 49:23, 51:17,
121:19
**contacted** [1] - 146:17

**contained** [2] - 56:14, 114:8

**contemplate** [1] - 128:4

**contemplated** [1] - 52:10

**contend** [1] - 153:25

**contends** [1] - 144:18

**context** [10] - 29:14, 52:16, 70:11, 70:25, 71:6, 71:7, 75:11, 79:22, 80:5, 154:16

**continue** [2] - 17:16, 36:11

**CONTINUED** [1] - 2:1

**continued** [3] - 106:16, 107:5, 113:9

**continuing** [2] - 120:13, 128:22

**continuously** [2] - 7:3, 7:15

**contrasted** [1] - 130:9

**contributed** [1] - 153:23

**control** [9] - 12:12, 13:1, 27:19, 82:21, 118:14, 129:19, 133:18, 133:25, 157:11

**controlled** [1] - 12:13

**controlling** [1] - 82:20

**controls** [1] - 12:14

**conversation** [2] - 120:5, 123:9

**conversations** [7] - 116:4, 116:6, 121:22, 129:24, 129:25, 148:24, 160:25

**convict** [7] - 144:14, 150:8, 162:4, 168:1, 169:16, 173:20, 174:2

**convicted** [31] - 23:22, 34:20, 41:15, 43:23, 44:10, 44:25, 57:10, 58:23, 59:25, 60:1, 84:19, 85:5, 97:13, 97:18, 97:24, 98:3, 98:6, 144:5, 147:8, 149:8, 150:1, 150:4, 161:21, 161:24, 163:19, 165:2, 165:3, 169:21, 169:22, 173:16

**convicting** [1] - 151:3

**conviction** [25] - 43:14, 44:7, 45:23, 60:4, 60:6, 65:1, 65:20, 79:25, 98:16,

100:10, 144:19, 145:3, 145:10, 145:14, 146:8, 161:17, 162:8, 164:25, 165:5, 165:9, 165:16, 167:18, 167:24, 169:25, 171:25

**convictions** [10] - 152:2, 152:3, 153:12, 153:17, 154:2, 156:4, 164:8, 179:12, 179:14, 180:10

**convinced** [1] - 161:6

**convincing** [5] - 72:16, 72:19, 73:7, 75:11, 75:13

**convoluted** [2] - 56:20, 59:3

**Cooney** [7] - 5:8, 5:11, 5:18, 9:9, 168:16, 168:21, 169:11

**COONEY** [3] - 5:10, 5:20, 6:14

**Cooney's** [3] - 169:14, 170:3, 170:8

**cooperating** [2] - 158:7, 158:19

**cooperators** [1] - 123:10

**cooperators'** [1] - 158:12

**coordinate** [2] - 116:11, 131:19

**coordinated** [2] - 109:18, 134:18

**Copeland** [1] - 182:19

**cops** [3] - 7:13, 123:2, 123:8

**coptifa** [1] - 115:1

**core** [2] - 65:14, 69:17

**corners** [2] - 52:10, 71:17

**correct** [18] - 23:3, 23:5, 23:10, 24:2, 24:7, 40:21, 40:23, 42:7, 44:9, 44:10, 50:15, 53:22, 63:23, 64:7, 65:5, 68:17, 74:23, 94:11

**corrections** [1] - 53:5

**correctly** [2] - 93:16, 93:21

**Corridor** [1] - 10:24

**corrupt** [2] - 162:20, 178:24

**corruptly** [11] - 31:24, 150:24, 152:9, 155:3, 155:8,

155:12, 155:20, 156:2, 157:6, 157:16, 163:16

**cost** [4] - 170:12, 170:25, 171:1, 173:6

**coterminous** [1] - 40:25

**counsel** [6] - 4:10, 4:20, 20:1, 41:6, 147:13, 180:4

**counseled** [1] - 40:16

**Count** [89] - 19:17, 23:17, 24:8, 24:14, 27:19, 37:13, 37:15, 37:21, 37:23, 39:5, 39:10, 39:18, 41:19, 42:13, 43:24, 44:25, 45:25, 47:19, 48:8, 59:4, 60:1, 60:5, 60:6, 61:14, 62:5, 62:6, 64:16, 65:16, 65:21, 66:8, 69:2, 69:3, 70:4, 72:15, 73:1, 73:9, 84:5, 85:13, 86:4, 86:8, 87:24, 93:19, 94:23, 95:2, 95:6, 95:10, 96:19, 96:21, 96:23, 96:25, 97:3, 97:10, 97:16, 97:24, 98:1, 98:4, 98:6, 99:13, 135:3, 143:13, 144:8, 144:16, 144:17, 144:18, 144:20, 145:11, 149:21, 150:1, 150:16, 161:20, 161:22, 161:24, 162:3, 163:13, 163:18, 165:13, 165:14, 165:24, 167:18, 167:25, 169:22, 171:25, 173:10, 173:20, 174:2, 174:23

**count** [43] - 28:6, 36:11, 37:6, 38:13, 42:5, 43:14, 44:7, 44:24, 45:20, 59:3, 65:14, 65:20, 73:22, 73:23, 74:3, 74:6, 97:17, 132:2, 134:21, 135:23, 147:14, 150:3, 152:10, 152:12, 153:7, 153:11, 153:18, 158:10, 158:22, 161:21, 162:3, 162:4, 164:11, 164:12,

164:18, 165:3, 165:5, 165:10, 165:12, 165:16, 168:2, 172:23, 176:6

**count's** [1] - 74:14

**counter** [1] - 173:7

**counter-expert** [1] - 173:7

**counting** [1] - 60:13

**country** [8] - 71:16, 89:7, 106:19, 107:18, 137:20, 139:13, 178:5

**counts** [24] - 18:13, 54:22, 58:18, 58:21, 63:4, 64:5, 64:6, 64:22, 64:23, 65:1, 65:3, 68:24, 77:1, 78:16, 79:25, 84:25, 96:19, 149:21, 149:23, 171:24, 173:12, 174:6, 174:8

**Counts** [21] - 18:13, 19:13, 63:3, 63:15, 64:3, 65:1, 65:3, 76:24, 78:14, 84:2, 85:1, 93:20, 95:8, 97:5, 97:7, 97:18, 145:13, 151:3, 165:6, 174:1, 174:25

**couple** [4] - 78:22, 79:18, 79:20, 84:21

**courage** [1] - 14:23

**course** [19] - 37:13, 47:12, 61:23, 66:15, 67:7, 71:4, 73:23, 90:13, 91:18, 92:25, 98:4, 103:21, 127:23, 138:25, 143:9, 147:23, 154:7, 155:9, 156:23

**Court** [17] - 2:11, 2:12, 29:7, 71:13, 77:6, 77:17, 79:12, 80:19, 94:18, 95:23, 95:24, 148:15, 148:20, 154:19, 183:17, 184:2

**court** [35] - 5:3, 9:16, 14:20, 14:21, 15:9, 27:16, 28:3, 28:4, 32:15, 32:18, 38:15, 39:3, 48:2, 52:13, 62:11, 72:18, 74:8, 76:23, 78:12, 78:15, 79:24, 82:2, 82:5, 91:8, 93:10, 93:17, 93:19, 94:1, 95:4, 95:5, 95:9, 142:6, 149:1, 180:6, 180:14

**COURT** [179] - 1:1, 3:16, 5:9, 5:16, 6:12, 9:9, 9:13, 15:4, 15:16, 17:20, 17:23, 20:15, 21:2, 23:1, 23:4, 23:6, 23:9, 23:18, 23:25, 24:6, 24:8, 25:21, 27:8, 30:18, 31:1, 31:17, 31:21, 31:25, 32:20, 33:7, 33:10, 33:12, 33:16, 33:20, 35:5, 35:8, 35:24, 36:20, 37:9, 37:16, 38:19, 39:12, 40:11, 40:13, 40:19, 40:22, 41:1, 41:8, 42:5, 42:8, 42:18, 43:19, 43:22, 44:4, 44:14, 45:1, 45:24, 46:15, 46:21, 47:8, 47:23, 48:11, 48:13, 49:9, 49:13, 50:3, 50:13, 50:15, 50:22, 51:2, 51:19, 52:4, 52:12, 52:18, 53:13, 53:21, 53:23, 54:4, 54:6, 55:3, 56:23, 59:5, 59:22, 60:15, 60:18, 61:17, 61:24, 62:9, 62:11, 62:20, 64:5, 65:3, 65:6, 65:25, 66:2, 66:14, 66:18, 66:21, 66:24, 67:17, 68:7, 68:12, 68:15, 68:22, 69:4, 69:13, 69:21, 70:18, 71:3, 71:24, 72:17, 73:10, 73:12, 73:14, 74:4, 74:12, 74:16, 74:23, 75:4, 75:20, 75:25, 76:3, 76:8, 76:10, 76:19, 77:4, 77:7, 77:12, 77:15, 78:7, 78:10, 78:20, 79:10, 79:14, 79:16, 79:23, 80:7, 80:15, 80:17, 80:25, 81:3, 81:6, 81:13, 81:15, 82:7, 82:9, 82:11, 82:13, 82:16, 83:20, 83:22, 85:25, 86:3, 86:6, 86:25, 88:17, 88:19, 90:5, 90:8, 91:1, 91:21, 93:5, 93:7, 93:15, 94:2, 94:13, 94:16, 94:19, 94:21, 94:24, 95:11, 95:13, 95:15, 96:4, 142:14, 142:18, 142:20, 142:23, 183:21

**court's** [3] - 27:19, 155:4, 157:15
**courthouse** [1] - 182:13
**Courthouse** [2] - 2:12, 184:3
**courtroom** [3] - 3:18, 8:5, 181:25
**courts** [13] - 28:16, 28:25, 29:1, 29:6, 30:7, 32:21, 34:16, 71:6, 75:14, 77:18, 98:18, 98:24, 101:22
**coverage** [1] - 182:10
**covered** [1] - 45:10
**cowering** [1] - 137:22
**CPR** [1] - 14:8
**CR** [1] - 1:2
**crammed** [1] - 54:13
**create** [7] - 58:18, 58:20, 59:3, 80:23, 81:1, 118:4, 172:22
**created** [6] - 31:23, 103:1, 103:8, 117:21, 129:6, 129:7
**creating** [1] - 141:11
**creation** [2] - 115:16, 140:21
**creative** [1] - 151:10
**credibility** [5] - 99:2, 158:13, 170:5, 177:4, 178:21
**credible** [2] - 158:15, 170:4
**credit** [5] - 136:18, 159:5, 166:22, 171:13, 173:5
**credited** [1] - 125:4
**crime** [41] - 12:20, 12:22, 21:7, 21:15, 21:18, 22:12, 28:21, 30:8, 31:23, 33:24, 34:7, 34:21, 35:3, 39:7, 43:12, 44:20, 44:23, 54:24, 54:25, 55:2, 60:21, 65:8, 65:13, 70:7, 70:14, 71:15, 71:18, 73:3, 73:4, 73:6, 73:9, 77:25, 78:1, 78:4, 78:17, 78:19, 79:5, 81:10, 89:9, 148:18, 150:12
**crimes** [15] - 22:13, 31:13, 62:21, 64:9, 70:19, 71:17, 75:10, 78:17, 80:11, 85:21, 88:13, 92:8, 154:7, 154:12, 155:6
**criminal** [12] - 40:19,

44:19, 51:12, 54:8, 57:22, 67:12, 68:1, 92:11, 93:14, 93:23, 154:18, 159:13
**Criminal** [10] - 3:2, 62:18, 68:2, 88:6, 96:2, 96:9, 96:13, 98:13, 142:12, 180:13
**criminalizes** [2] - 21:8, 56:24
**criminalizing** [2] - 26:22, 26:23
**critical** [1] - 128:18
**criticism** [3] - 13:5, 13:13, 105:25
**criticize** [1] - 128:7
**critics** [1] - 13:9
**crops** [1] - 27:23
**cross** [8] - 83:11, 121:9, 125:11, 135:8, 158:24, 159:1, 177:3, 178:20
**cross-examination** [4] - 125:11, 135:8, 158:24, 177:3
**cross-examined** [1] - 159:1
**crossed** [1] - 137:6
**crowd** [22] - 85:10, 119:14, 130:8, 130:23, 132:8, 132:11, 132:13, 132:16, 132:18, 132:24, 133:6, 133:9, 133:15, 134:2, 134:9, 134:14, 136:23, 137:6, 137:14, 168:13, 168:21, 169:24
**crowd's** [1] - 134:8
**CRR** [3] - 2:11, 183:22, 184:2
**crushing** [1] - 16:10
**cry** [1] - 121:4
**CT** [1] - 1:21
**culminating** [1] - 115:5
**culpability** [1] - 53:10
**current** [2] - 89:25, 147:20
**Cusanelli** [1] - 98:22
**cut** [2] - 12:2, 30:18

# D

**d)** [1] - 59:21
**D.C** [30] - 1:5, 10:10, 98:24, 99:4, 101:23,

102:17, 103:9, 109:16, 109:23, 110:9, 110:19, 114:24, 117:1, 117:2, 119:10, 120:17, 120:21, 123:19, 124:16, 124:21, 127:3, 129:8, 130:19, 131:21, 145:17, 154:7, 155:18, 165:18, 180:16, 180:21
**D.D.C** [1] - 98:23
**damage** [9] - 21:19, 41:18, 66:13, 168:5, 171:7, 171:9, 172:2, 172:13, 172:18
**damaged** [4] - 168:3, 170:12, 171:2, 171:11
**damaging** [1] - 171:5
**dangerous** [2] - 42:24, 48:25
**Daniel** [2] - 61:9, 134:6
**dated** [1] - 184:1
**DAVID** [1] - 1:16
**day's** [2] - 136:11, 136:18
**days** [7] - 31:2, 107:17, 109:1, 110:24, 127:3, 152:24, 170:17
**DC** [3] - 1:14, 2:13, 184:4
**dead** [1] - 48:23
**deadly** [1] - 53:11
**deal** [3] - 106:4, 117:19, 119:6
**debate** [5] - 101:2, 105:7, 105:25, 114:13, 181:10
**December** [25] - 13:16, 101:25, 102:6, 102:11, 102:15, 103:1, 108:4, 108:12, 108:19, 109:17, 111:6, 111:7, 111:12, 111:18, 112:8, 112:12, 114:25, 116:25, 117:20, 119:7, 122:7, 122:23, 123:21, 130:11, 166:4
**decide** [6] - 90:12, 95:9, 159:3, 162:25, 168:5, 170:5

**decided** [7] - 5:23, 7:8, 8:5, 8:19, 17:11, 73:6, 154:13
**deciding** [1] - 28:3
**decision** [8] - 41:22, 46:22, 86:19, 112:13, 113:13, 151:6, 155:19, 176:2
**decisions** [2] - 91:19, 106:7
**declare** [1] - 97:17
**deep** [1] - 16:24
**deeper** [2] - 25:18, 27:21
**deeply** [1] - 54:25
**deface** [1] - 90:4
**Defendant** [18] - 3:3, 3:4, 3:5, 3:8, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 15:11, 96:14, 100:7
**defendant** [35] - 17:24, 19:22, 23:22, 27:11, 37:9, 39:12, 40:5, 40:16, 47:23, 53:4, 59:10, 59:13, 62:23, 69:21, 75:7, 82:14, 88:20, 98:14, 98:17, 99:21, 148:22, 149:10, 150:4, 150:10, 150:13, 150:17, 150:20, 150:21, 150:24, 155:2, 155:12, 155:15, 163:24, 182:5, 182:16
**defendant's** [4] - 79:1, 81:9, 89:18, 148:24
**defendants** [114] - 3:18, 4:6, 4:9, 12:19, 12:21, 12:24, 18:10, 20:22, 25:4, 29:12, 40:18, 41:16, 43:23, 46:19, 61:3, 61:22, 63:20, 65:17, 66:16, 69:17, 78:25, 80:5, 84:12, 85:12, 88:24, 89:3, 89:24, 96:8, 96:11, 96:19, 97:18, 97:25, 99:8, 99:9, 99:16, 100:9, 101:12, 102:1, 104:5, 104:11, 107:11, 109:9, 109:19, 110:2, 110:22, 111:7, 112:8, 113:9, 113:23, 115:3, 115:20, 116:6,

116:22, 118:4, 120:16, 121:16, 121:21, 122:17, 123:9, 125:9, 126:5, 127:15, 127:21, 127:22, 129:22, 132:22, 134:6, 135:18, 138:20, 138:25, 139:19, 141:22, 146:12, 147:25, 149:7, 150:9, 151:3, 151:12, 151:17, 152:5, 152:14, 152:16, 153:6, 153:12, 155:8, 156:1, 156:16, 156:17, 157:21, 157:23, 158:25, 159:9, 159:13, 161:15, 163:19, 164:6, 165:22, 166:8, 167:11, 167:17, 168:2, 168:9, 168:13, 171:4, 171:18, 177:6, 177:18, 177:22, 179:22, 180:23, 182:10, 182:13, 183:6
**Defendants** [3] - 1:7, 1:15, 2:2
**defendants'** [53] - 22:5, 40:15, 84:7, 96:7, 98:11, 100:25, 101:20, 103:10, 104:13, 106:14, 108:1, 109:15, 113:11, 113:14, 113:19, 113:22, 114:3, 115:7, 115:18, 116:3, 120:25, 125:17, 125:20, 127:18, 127:24, 128:16, 134:18, 140:4, 140:5, 140:23, 141:2, 142:4, 142:15, 142:24, 149:7, 149:10, 149:15, 149:18, 150:6, 151:1, 152:2, 153:20, 156:3, 166:6, 167:24, 176:10, 177:1, 180:22, 181:11, 181:12, 181:15, 181:17
**defended** [1] - 106:2
**Defense** [2] - 103:2, 118:11

**defense** [20] - 4:10, 30:22, 41:6, 59:18, 75:9, 77:8, 77:10, 91:5, 110:16, 156:10, 159:22, 160:23, 175:22, 176:9, 176:16, 176:17, 176:19, 177:5, 177:20, 179:3

**defenses** [2] - 12:18, 119:13

**defensive** [1] - 128:3

**defer** [2] - 77:18, 77:19

**defiantly** [1] - 133:3

**deficient** [1] - 173:9

**defined** [5] - 51:25, 72:4, 72:5, 72:6, 151:24

**defining** [1] - 71:22

**definitely** [2] - 5:20, 83:6

**definition** [14] - 44:21, 48:24, 49:16, 50:21, 50:22, 51:12, 53:17, 53:21, 59:10, 59:17, 70:7, 73:4, 157:19, 158:5

**Definition** [1] - 59:12

**delay** [4] - 3:17, 99:18, 100:2, 143:8

**delayed** [1] - 3:19

**deleting** [1] - 157:3

**delta** [3] - 45:20, 46:4, 46:5

**deltas** [1] - 46:4

**demeanor** [1] - 178:20

**demonstrate** [3] - 61:19, 65:16

**demonstrated** [1] - 145:20

**demonstrates** [3] - 62:3, 62:7, 147:3

**demonstrating** [1] - 153:19

**demonstrations** [1] - 8:17

**demonstrators** [1] - 17:7

**deniability** [1] - 119:2

**denied** [3] - 99:12, 180:3, 180:12

**deny** [1] - 98:11

**denying** [1] - 103:23

**depart** [2] - 69:4, 78:15

**Department** [2] - 10:10, 10:14

**department** [6] - 5:11, 5:13, 5:21, 6:4, 6:18,

15:1

**departure** [32] - 63:7, 63:19, 64:23, 64:24, 64:25, 65:8, 67:9, 69:3, 70:3, 76:11, 76:12, 76:17, 76:25, 78:7, 78:8, 78:9, 78:11, 78:13, 79:22, 80:10, 84:22, 91:7, 91:11, 92:25, 93:2, 93:13, 93:20, 94:5, 94:6, 94:20, 95:8

**depended** [1] - 106:6

**depict** [1] - 164:20

**depicted** [1] - 170:2

**depicting** [1] - 171:17

**deploy** [2] - 103:12, 125:21

**deprive** [4] - 174:5, 174:24, 175:7, 175:21

**DEPUTY** [8] - 3:2, 62:15, 62:17, 95:23, 96:1, 142:9, 142:11, 183:17

**describe** [3] - 44:18, 81:9, 104:12

**described** [7] - 20:12, 22:24, 36:15, 103:20, 125:6, 160:17, 167:20

**describes** [2] - 20:9, 21:25

**description** [1] - 174:13

**designed** [3] - 56:1, 56:13, 120:9

**desire** [2] - 89:21, 116:4

**desperate** [1] - 129:25

**despite** [5] - 9:24, 11:14, 14:16, 169:22, 180:16

**destination** [1] - 69:1

**destroy** [2] - 134:25, 170:7

**destroyed** [3] - 82:23, 83:18, 168:3

**destroying** [10] - 83:15, 97:24, 144:20, 156:4, 167:25, 169:25, 171:25, 172:7, 172:17, 172:21

**destruction** [11] - 29:20, 55:17, 64:4, 64:8, 70:5, 71:9, 71:11, 71:14, 97:5, 97:22, 144:15, 169:17

**detach** [1] - 80:10

**detached** [1] - 172:11

**detail** [2] - 103:7, 126:16

**detailed** [2] - 125:12, 155:10

**details** [3] - 100:17, 156:9, 159:13

**determination** [4] - 27:18, 28:7, 33:14, 33:23

**determinations** [1] - 158:13

**determine** [1] - 99:2

**determined** [5] - 17:10, 33:17, 92:13, 92:17, 99:25

**determines** [1] - 98:20

**Dictionary** [1] - 44:17

**died** [2] - 14:6, 14:12

**difference** [10] - 7:11, 36:25, 93:18, 93:22, 93:25, 94:8, 94:15, 94:17, 95:10, 95:18

**different** [22] - 3:21, 3:22, 13:19, 15:13, 24:11, 24:17, 32:10, 33:12, 39:22, 39:24, 40:3, 47:11, 48:16, 79:25, 81:4, 84:23, 87:20, 91:7, 91:8, 119:23, 151:19, 156:20

**difficult** [1] - 28:13

**difficulty** [1] - 82:20

**dire** [1] - 181:25

**direct** [8] - 98:25, 167:22, 169:16, 172:24, 174:22, 178:12, 178:20, 178:23

**directed** [5] - 92:6, 116:18, 136:16, 147:4, 164:14

**directing** [2] - 118:23, 141:7

**directions** [1] - 6:5

**directly** [9] - 35:23, 63:16, 116:1, 141:11, 156:7, 156:25, 165:5, 167:17, 171:1

**directs** [1] - 22:16

**disagree** [4] - 81:16, 81:24, 86:23, 158:14

**disagreed** [1] - 17:7

**disagreeing** [1] - 105:9

**disagreements** [1] - 129:23

**disapproved** [1] -

154:19

**disavow** [2] - 101:4, 105:14

**disavowing** [1] - 139:15

**discern** [1] - 52:23

**discharging** [5] - 25:13, 97:2, 97:20, 163:21, 164:2

**discourage** [1] - 128:5

**discovered** [1] - 171:16

**discredit** [1] - 159:5

**discredited** [1] - 178:8

**discretion** [1] - 180:16

**discretionary** [1] - 92:25

**discuss** [16] - 4:5, 37:14, 98:8, 100:8, 103:24, 113:6, 113:18, 119:5, 122:4, 128:16, 135:3, 138:19, 144:21, 145:9, 153:13, 162:10

**discussed** [16] - 84:4, 105:16, 121:17, 122:6, 124:4, 127:2, 128:24, 129:12, 138:10, 140:18, 146:22, 152:11, 153:19, 158:10, 164:10, 176:10

**discussing** [4] - 43:7, 78:9, 102:19, 123:11

**discussion** [2] - 103:10, 155:4

**discussions** [1] - 157:2

**disdain** [1] - 115:11

**disguise** [1] - 118:25

**dismantled** [2] - 156:18, 170:20

**dismantling** [1] - 169:13

**dismiss** [4] - 143:10, 143:21, 144:4, 164:13

**dismissed** [1] - 183:16

**disorder** [11] - 43:14, 44:11, 46:3, 58:11, 60:21, 60:22, 60:23, 97:4, 97:22, 112:10, 167:19

**disorders** [1] - 56:12

**disparities** [2] - 81:2, 91:20

**displayed** [2] - 103:15, 125:1

**disposition** [3] - 123:11, 123:14

**dispute** [4] - 48:19, 75:16, 75:18, 172:3

**disputed** [2] - 115:5, 132:19

**disputing** [1] - 32:23

**disregards** [1] - 158:6

**disrupt** [2] - 153:21, 163:6

**disrupting** [1] - 38:14

**disruption** [1] - 21:9

**distinct** [1] - 152:6

**distinction** [7] - 20:16, 20:17, 34:10, 67:6, 67:9, 98:25, 151:7

**distinctive** [1] - 178:17

**distinguish** [1] - 82:3

**distorting** [1] - 154:5

**distraction** [1] - 181:4

**DISTRICT** [3] - 1:1, 1:1, 1:9

**district** [1] - 38:2

**disturb** [1] - 170:5

**disturbance** [1] - 58:11

**disturbances** [1] - 56:12

**disturbing** [1] - 12:15

**dive** [1] - 69:10

**divide** [2] - 105:2, 112:16

**dividing** [1] - 168:6

**document** [8] - 119:7, 119:8, 119:11, 119:14, 119:18, 119:21, 120:7, 138:10

**domestic** [1] - 13:1

**Dominic** [2] - 3:5, 61:10

**Donahue** [1] - 54:19

**done** [3] - 42:16, 110:19, 124:3

**Donohoe** [15] - 51:5, 51:8, 55:11, 98:2, 103:4, 117:22, 121:25, 122:5, 129:4, 129:11, 134:3, 137:5, 166:8, 166:10, 166:12

**Donohoe's** [8] - 39:23, 41:10, 48:9, 50:2, 50:25, 52:2, 61:11, 144:16

**door** [8] - 10:21, 11:11, 11:14, 11:15, 11:16, 162:15, 163:5, 167:7

**doors** [2] - 11:17, 13:12
**Dorrance** [1] - 2:9
**Double** [1] - 151:5
**double** [3] - 60:13, 151:13, 151:23
**double-counting** [1] - 60:13
**doubt** [9] - 41:13, 45:10, 45:23, 47:4, 84:12, 95:7, 162:16, 169:13, 171:22
**down** [27] - 6:2, 6:21, 13:8, 16:7, 29:5, 35:12, 47:14, 71:6, 74:21, 79:11, 88:5, 93:9, 104:3, 105:9, 110:7, 111:14, 112:24, 121:12, 130:25, 136:17, 156:8, 169:6, 169:8, 169:18, 170:3, 171:11, 177:13
**dozen** [1] - 9:23
**dozens** [1] - 11:12
**draconian** [1] - 81:23
**drafted** [1] - 5:22
**dragged** [1] - 16:7
**drastic** [1] - 85:17
**draw** [4] - 98:25, 99:3, 115:24, 127:23
**dress** [1] - 130:5
**drew** [2] - 19:24, 148:20
**drilling** [1] - 93:9
**drink** [2] - 102:22, 117:9
**drinking** [6] - 75:8, 76:6, 102:20, 103:17, 117:5, 117:12
**drive** [1] - 136:22
**driving** [1] - 10:4
**dudes** [1] - 102:11
**due** [1] - 11:23
**during** [30] - 9:19, 11:22, 43:13, 44:11, 55:14, 56:2, 56:17, 60:23, 61:1, 83:13, 87:22, 97:4, 97:21, 101:2, 109:1, 126:7, 135:8, 147:16, 148:15, 156:11, 158:21, 158:24, 161:12, 165:8, 167:18, 172:5, 177:11, 180:3, 181:4, 182:1
**dust** [1] - 129:18
**duties** [16] - 25:14,

25:15, 26:1, 26:17, 36:4, 36:6, 36:10, 46:3, 97:2, 97:21, 163:21, 164:4, 166:22, 167:15, 167:16, 173:24
**duty** [2] - 17:3, 164:2
**Dykes** [2] - 145:16, 165:18
**dynamic** [1] - 125:19

## E

**early** [8] - 5:23, 102:15, 102:25, 106:10, 116:10, 116:24, 117:14, 117:20
**easily** [5] - 11:18, 113:7, 163:14, 178:16
**East** [1] - 1:16
**east** [5] - 10:19, 10:20, 11:21, 131:11, 134:14
**ECF** [20] - 96:13, 96:16, 143:17, 144:3, 144:9, 144:24, 145:23, 148:8, 151:9, 154:19, 155:22, 162:2, 164:16, 165:6, 170:4, 171:11, 172:14, 175:2, 175:10, 181:6
**echoed** [8] - 89:2, 108:13, 121:2, 123:24, 129:4, 129:6, 137:1, 138:12
**Eddie** [2] - 160:23, 177:7
**edge** [1] - 123:4
**eerily** [1] - 11:7
**eff** [1] - 114:16
**effect** [4] - 66:3, 66:5, 143:14, 150:22
**effectively** [3] - 44:8, 60:13, 67:16
**effort** [10] - 13:24, 20:24, 20:25, 21:5, 44:23, 61:20, 89:13, 116:11, 166:23, 169:14
**efforts** [3] - 101:21, 143:25, 146:4
**egregious** [1] - 13:13
**eight** [1] - 66:11
**Eighth** [1] - 20:11
**either** [15] - 4:7, 19:6, 19:8, 23:21, 37:5,

69:18, 71:17, 72:2, 76:18, 88:15, 92:19, 99:11, 155:21, 158:1, 159:10
**either/or** [1] - 94:7
**elaborate** [1] - 114:2
**elaborated** [1] - 105:21
**elder** [1] - 138:14
**elders** [5] - 105:6, 105:16, 108:13, 118:8, 138:12
**election** [24] - 8:6, 8:8, 101:19, 104:8, 106:15, 107:2, 107:9, 107:13, 107:23, 108:3, 109:18, 110:10, 111:15, 113:16, 114:11, 114:13, 115:5, 115:9, 116:17, 119:11, 125:7, 125:10, 141:4, 157:25
**election's** [1] - 116:13
**Electoral** [3] - 143:13, 143:15, 144:8, 152:20
**electoral** [7] - 36:11, 132:2, 134:20, 150:19, 152:10, 153:7, 158:9
**electors** [1] - 108:5
**element** [9] - 42:15, 75:14, 140:19, 144:13, 155:7, 155:8, 156:6, 157:16, 174:25
**elements** [16] - 19:5, 20:6, 20:21, 25:7, 26:9, 34:19, 39:4, 57:11, 74:5, 74:14, 77:23, 148:18, 151:20, 176:20
**elevated** [1] - 93:24
**ELF** [1] - 89:19
**elicited** [1] - 19:9
**Ellipse** [2] - 153:10, 160:1
**elsewhere** [5] - 71:23, 124:10, 146:4, 146:7, 160:20
**embarrassing** [1] - 54:25
**emerged** [2] - 12:9, 105:3
**emergency** [1] - 121:18
**emotion** [1] - 7:25
**emphasize** [1] - 181:7

**emphasizing** [1] - 139:2
**employ** [1] - 18:21
**employment** [1] - 15:12
**empty** [2] - 75:23, 76:1
**enacted** [1] - 39:5
**encompass** [1] - 164:14
**encompasses** [1] - 40:15
**encompassing** [3] - 70:21, 70:22, 159:9
**encouraged** [4] - 111:14, 123:4, 130:16, 134:24
**encouraging** [2] - 111:9, 137:19
**encrypted** [3] - 103:1, 117:21, 128:25
**end** [8] - 6:23, 43:6, 68:21, 88:3, 89:20, 160:9, 165:20, 183:12
**ended** [6] - 9:5, 14:4, 53:15, 85:11, 116:12, 135:19
**ends** [3] - 100:18, 104:8, 115:22
**enemy** [3] - 108:9, 129:15, 149:3
**enforced** [1] - 29:4
**enforcement** [37] - 7:2, 13:23, 14:3, 15:13, 25:19, 26:17, 36:3, 44:11, 46:2, 56:17, 57:24, 60:23, 97:3, 97:21, 108:2, 109:13, 109:14, 114:10, 115:11, 121:1, 122:18, 125:7, 130:14, 133:24, 135:2, 135:10, 135:20, 145:21, 154:25, 156:18, 156:25, 159:6, 164:1, 164:3, 167:6, 167:14, 175:9
**enforcement's** [2] - 130:10, 156:19
**engage** [4] - 54:17, 56:2, 83:12, 104:22
**engaged** [5] - 47:14, 51:8, 119:18, 156:19, 173:23
**enhance** [2] - 21:18, 66:17
**enhancement** [11] - 48:3, 62:13, 71:5, 71:7, 71:22, 72:6,

83:4, 83:5, 84:3, 85:17, 87:14
**enhances** [1] - 53:10
**Enrique** [3] - 3:5, 55:5, 130:19
**enter** [1] - 12:6
**entered** [4] - 134:12, 137:6, 145:7, 150:14
**entering** [3] - 108:5, 126:21, 153:22
**enthusiasm** [1] - 101:12
**entire** [6] - 6:19, 6:22, 12:20, 22:8, 50:3, 50:4, 132:16, 171:5, 172:21
**entirely** [2] - 98:1, 149:13
**entirety** [1] - 18:5
**entitled** [2] - 173:5, 182:17
**entry** [2] - 162:15, 167:9
**enumerated** [7] - 64:9, 64:16, 73:25, 84:25, 85:1, 88:13, 92:21
**Environmental** [1] - 89:19
**epic** [1] - 129:16
**episode** [6] - 49:4, 49:15, 49:20, 50:11, 58:12, 72:20
**equally** [1] - 156:8
**equipment** [2] - 10:12, 130:6
**erected** [1] - 156:5
**erecting** [1] - 135:1
**ergo** [1] - 34:13
**Erik** [2] - 1:12, 3:8
**erupted** [1] - 102:1
**escalated** [1] - 131:3
**escalation** [2] - 122:2, 123:16
**escape** [1] - 112:2
**Esq** [9] - 1:11, 1:12, 1:12, 1:15, 1:19, 1:22, 2:2, 2:5, 2:8
**essence** [3] - 84:16, 85:21, 87:15
**essential** [1] - 70:6
**essentially** [2] - 51:24, 100:25
**establish** [2] - 148:18, 158:1
**established** [3] - 10:1, 11:10, 49:6
**et** [5] - 38:5, 38:6, 62:19, 96:3, 142:13
**Ethan** [5] - 3:3, 27:15, 62:18, 96:2, 142:12

**euphemism** [1] - 126:22
**evacuate** [1] - 11:24
**evacuated** [1] - 137:12
**evacuating** [1] - 11:19
**evacuations** [1] - 12:1
**evade** [1] - 121:1
**evaluating** [2] - 22:10, 145:15
**evasive** [1] - 177:2
**evening** [7] - 102:25, 111:17, 111:22, 117:20, 128:22, 138:16, 146:21
**event** [12] - 12:23, 15:22, 71:21, 111:14, 113:8, 118:18, 126:9, 143:4, 154:22, 158:16, 164:24, 178:4
**events** [16] - 17:5, 71:10, 101:25, 106:8, 112:9, 112:12, 112:15, 118:3, 118:13, 128:9, 136:11, 136:18, 138:20, 153:15, 181:1
**eventually** [1] - 11:8
**evidence** [191] - 19:10, 20:16, 24:23, 28:7, 41:14, 45:21, 46:18, 47:2, 48:7, 51:6, 72:16, 72:19, 72:21, 73:8, 73:23, 74:18, 75:11, 75:13, 75:20, 75:21, 75:23, 76:1, 76:6, 76:7, 83:9, 85:9, 87:21, 95:10, 98:9, 98:15, 98:19, 99:1, 99:3, 99:6, 99:10, 99:25, 100:4, 100:24, 101:10, 103:6, 103:18, 103:22, 103:25, 104:3, 104:5, 104:10, 105:2, 106:10, 107:19, 109:9, 113:6, 113:7, 113:18, 113:21, 113:24, 114:1, 114:5, 114:8, 115:7, 115:14, 116:1, 116:21, 119:6, 119:17, 120:8, 120:11, 120:18, 122:16, 125:15, 125:18, 126:22,

127:18, 127:25, 128:1, 128:13, 128:18, 132:14, 132:18, 133:12, 134:17, 135:7, 135:12, 135:14, 135:24, 138:23, 140:8, 140:18, 140:20, 140:23, 141:20, 141:24, 142:2, 143:7, 143:23, 144:13, 144:19, 144:23, 145:5, 145:6, 145:10, 145:19, 145:24, 146:8, 147:2, 148:7, 148:13, 148:23, 149:10, 150:25, 151:25, 152:2, 152:5, 152:13, 153:16, 153:19, 154:1, 154:6, 154:11, 154:16, 155:5, 155:24, 155:25, 156:23, 157:1, 157:17, 158:6, 158:16, 159:11, 159:15, 160:5, 160:13, 160:16, 160:17, 160:18, 162:7, 162:8, 162:11, 162:12, 162:22, 164:7, 164:9, 164:18, 164:19, 164:25, 165:9, 165:17, 166:9, 167:3, 167:10, 167:20, 168:14, 169:1, 169:14, 169:15, 170:1, 170:2, 170:7, 170:9, 170:10, 170:11, 171:3, 171:9, 172:20, 173:10, 174:7, 174:9, 175:4, 175:12, 175:16, 175:18, 175:21, 176:4, 176:5, 176:10, 176:13, 179:1, 179:2, 179:13, 180:1, 180:9, 180:11, 181:10, 182:14, 182:17, 182:20, 183:5
**evidences** [1] - 167:4
**evidentiary** [2] - 148:11, 148:17
**exact** [4] - 28:18,

59:16, 76:22, 84:11
**exactly** [5] - 28:24, 63:13, 104:20, 149:6, 172:5
**examination** [6] - 125:11, 135:8, 158:24, 172:24, 177:3, 178:12
**examined** [1] - 159:1
**example** [19] - 38:14, 46:6, 48:17, 70:8, 95:4, 115:2, 122:21, 124:24, 126:2, 128:8, 131:22, 132:10, 135:10, 140:2, 146:3, 172:6, 174:12, 176:22, 177:24
**examples** [2] - 48:16, 126:19
**exceeded** [1] - 168:5
**exceeding** [1] - 171:15
**excellent** [1] - 20:19
**except** [1] - 79:18
**excluded** [1] - 173:7
**excuse** [2] - 113:1, 139:16
**execute** [1] - 143:9
**executed** [1] - 136:14
**executes** [1] - 143:12
**execution** [11] - 28:23, 29:2, 29:13, 99:18, 100:3, 125:10, 140:16, 143:8, 143:25, 144:7, 152:8
**executive** [1] - 143:16
**exercising** [1] - 167:16
**exhibit** [2] - 105:12, 105:24
**Exhibit** [1] - 105:15
**Exhibit-1000** [8] - 130:6, 130:7, 130:18, 131:7, 131:17, 131:20, 132:3, 161:5
**Exhibit-1001** [3] - 132:10, 132:13, 136:9
**Exhibit-1101** [1] - 114:15
**Exhibit-1102** [2] - 102:18, 117:3
**Exhibit-1137** [1] - 136:24
**Exhibit-2008** [2] - 135:10, 178:18
**Exhibit-203** [1] - 174:12

59:16, 76:22, 84:11
**Exhibit-272** [2] - 112:4, 112:7
**Exhibit-273** [1] - 111:21
**Exhibit-403-G** [1] - 163:13
**Exhibit-403G** [1] - 167:2
**exhibit-404-LL** [1] - 133:23
**Exhibit-404F** [2] - 133:5, 168:12
**exhibit-405-I** [1] - 134:16
**Exhibit-417X** [2] - 169:4, 169:5
**Exhibit-425** [3] - 162:16, 172:6, 172:12
**Exhibit-429-CX** [1] - 163:2
**Exhibit-44-D** [1] - 132:25
**Exhibit-442-A** [1] - 174:18
**exhibit-445-BX** [1] - 169:4
**Exhibit-445-BX** [2] - 133:14, 168:21
**Exhibit-445-BY** [1] - 133:16
**Exhibit-450X** [1] - 166:11
**Exhibit-451X** [1] - 134:8
**Exhibit-475** [1] - 166:17
**Exhibit-492-FX** [1] - 133:9
**Exhibit-492-G** [1] - 169:4
**Exhibit-500-15** [1] - 119:3
**exhibit-500-40** [1] - 108:18
**Exhibit-500-72** [1] - 118:16
**exhibit-500-72** [1] - 118:19
**Exhibit-500-86** [1] - 138:16
**exhibit-500-9** [1] - 117:25
**Exhibit-501-1** [2] - 103:3, 117:23
**Exhibit-501-12** [1] - 122:11
**Exhibit-501-4** [1] - 121:20
**exhibit-501-40** [1] -

123:8
**Exhibit-501-41** [1] - 122:7
**exhibit-501-50** [1] - 124:3
**exhibit-501-56** [2] - 124:12, 153:3
**Exhibit-501-57** [1] - 124:15
**Exhibit-501-62** [1] - 124:24
**Exhibit-503-1** [1] - 126:2
**exhibit-503-23** [1] - 127:1
**exhibit-503-5** [1] - 126:23
**exhibit-507-10** [1] - 127:6
**Exhibit-507-11** [1] - 115:2
**exhibit-507-16** [1] - 127:11
**Exhibit-509-23** [1] - 146:22
**exhibit-509-23** [1] - 128:24
**Exhibit-509-25** [1] - 146:25
**exhibit-509-26** [1] - 129:22
**Exhibit-509-29** [1] - 131:22
**Exhibit-509-33** [1] - 166:15
**Exhibit-510-24** [1] - 129:9
**Exhibit-510-36** [1] - 137:16
**Exhibit-510-9** [1] - 128:22
**Exhibit-512-5** [1] - 129:10
**Exhibit-514-12** [1] - 116:18
**Exhibit-514-3** [1] - 104:18
**Exhibit-514-34** [1] - 112:10
**Exhibit-514-37** [1] - 106:8
**Exhibit-514-39** [1] - 113:5
**Exhibit-514-59** [1] - 139:9
**Exhibit-514-7** [1] - 104:23
**Exhibit-515-4** [1] - 139:17
**Exhibit-517-1** [1] -

121:15
**Exhibit-518-1** [1] - 117:19
**Exhibit-519-1** [1] - 124:20
**Exhibit-525-1** [1] - 111:5
**Exhibit-525-5** [2] - 102:23, 117:14
**Exhibit-525-7** [1] - 128:8
**Exhibit-528-1** [1] - 119:11
**Exhibit-528-1A** [1] - 119:14
**exhibit-530-5** [1] - 120:6
**Exhibit-530-5** [1] - 138:11
**Exhibit-537-19** [1] - 120:23
**Exhibit-538-18** [1] - 120:4
**Exhibit-543-1** [1] - 118:2
**Exhibit-544-4** [1] - 139:14
**Exhibit-547-5** [2] - 134:2, 135:5
**Exhibit-551** [1] - 129:4
**Exhibit-600-15** [1] - 109:23
**Exhibit-600-2** [1] - 106:21
**Exhibit-600-5** [1] - 106:25
**Exhibit-600-52** [1] - 107:8
**Exhibit-600-59** [1] - 137:21
**Exhibit-600-6** [1] - 107:4
**Exhibit-600-60** [1] - 137:25
**Exhibit-600-64** [1] - 138:18
**Exhibit-601-3** [1] - 110:21
**Exhibit-602-12** [1] - 110:12
**Exhibit-602-59** [1] - 107:24
**Exhibit-602-9** [1] - 110:8
**Exhibit-603-1** [1] - 107:13
**Exhibit-603-13** [1] - 110:17
**Exhibit-603-19** [1] - 111:11

**Exhibit-603-2** [1] - 107:17
**Exhibit-603-27** [1] - 111:12
**Exhibit-603-33** [1] - 108:11
**Exhibit-603-66** [2] - 105:1, 114:17
**Exhibit-603-9** [1] - 107:20
**Exhibit-608-C** [1] - 108:25
**Exhibit-609-29** [1] - 112:4
**Exhibit-609-B** [2] - 109:5, 109:7
**Exhibit-611-D** [1] - 139:5
**Exhibit-613-D** [1] - 126:12
**Exhibit-613-E** [1] - 126:4
**Exhibit-653-1** [1] - 138:4
**Exhibits** [1] - 102:14
**exhibits-501-56** [1] - 153:5
**Exhibits-509-41** [1] - 140:3
**Exhibits-510-33** [1] - 137:3
**Exhibits-602-40** [1] - 152:23
**exist** [1] - 28:22
**existed** [6] - 99:7, 99:21, 100:1, 103:21, 104:2, 141:25
**existence** [3] - 100:12, 104:14, 128:19
**exited** [1] - 134:13
**expand** [2] - 45:7, 92:7
**expands** [1] - 92:3
**expect** [1] - 5:6
**expectation** [1] - 158:1
**expected** [1] - 152:22
**experience** [4] - 15:20, 17:14, 112:24
**experiences** [1] - 16:24
**expert** [3] - 173:7, 173:9
**expert's** [1] - 173:8
**explain** [4] - 67:21, 98:9, 143:12, 171:19
**explained** [10] - 109:2, 112:20, 125:11, 137:7, 148:15,

152:18, 164:21, 167:24, 168:8, 179:19
**explaining** [3] - 93:10, 106:2, 126:8
**explicit** [1] - 100:19
**explicitly** [1] - 100:14
**express** [2] - 15:19, 158:9
**expressed** [3] - 110:23, 122:13, 139:1
**expressing** [1] - 105:10, 148:24, 178:21
**expressly** [4] - 125:8, 153:4, 158:25, 176:14
**extend** [1] - 92:5
**extensive** [3] - 21:19, 27:24, 181:25
**extensively** [1] - 41:24
**extent** [7] - 17:24, 24:9, 59:9, 64:12, 78:3, 78:19, 165:11
**exterior** [1] - 12:12
**extra** [1] - 5:24
**extract** [2] - 71:1, 72:24
**extracting** [1] - 74:22
**extremely** [1] - 27:21
**eyes** [3] - 16:3, 16:14, 55:1

## F

**F.3d** [7] - 89:17, 92:12, 98:24, 99:4, 145:17, 165:18, 180:20
**F.4th** [1] - 158:2
**face** [3] - 131:4, 156:10, 168:20
**faces** [1] - 16:17
**facilitate** [1] - 116:5
**facility** [2] - 89:23, 89:24
**fact** [23] - 21:22, 28:6, 30:1, 32:8, 36:15, 37:21, 53:20, 55:7, 62:7, 65:17, 85:8, 95:17, 98:20, 99:3, 104:2, 128:14, 134:12, 134:22, 148:20, 157:3, 157:6, 160:24, 162:17
**fact-specific** [2] - 55:7, 85:8
**factor** [3] - 53:10, 57:13, 75:7

**factoring** [1] - 156:9
**factors** [3] - 18:6, 23:12, 161:25
**facts** [25] - 20:8, 21:16, 24:11, 26:9, 45:10, 47:22, 48:7, 49:19, 49:24, 51:13, 51:14, 52:6, 55:14, 72:14, 73:13, 74:8, 75:1, 75:18, 82:4, 84:1, 86:22, 87:21, 120:18, 144:2, 163:14
**factual** [4] - 74:2, 74:15, 95:2, 142:25
**FAFO** [1] - 108:10
**fail** [1] - 179:16
**failed** [2] - 101:21, 157:5
**failing** [1] - 181:21
**failure** [2] - 179:9, 182:24
**fair** [4] - 46:9, 47:8, 60:20, 90:22
**fairly** [1] - 55:25
**faith** [3] - 147:18, 147:19, 148:10
**fake** [1] - 178:25
**fall** [3] - 12:18, 27:2, 180:24
**fallout** [1] - 113:8
**falls** [1] - 90:25
**familiar** [2] - 91:4, 91:5
**families** [1] - 17:16
**family** [3] - 6:16, 14:10, 16:1
**famous** [1] - 177:10
**fantastical** [1] - 183:1
**far** [17] - 13:23, 21:2, 21:4, 33:22, 63:14, 69:14, 87:10, 87:21, 129:21, 133:4, 133:15, 139:3, 140:22, 141:20, 147:24, 180:24, 183:8
**fash** [1] - 105:19
**fashioned** [1] - 154:14
**fast** [1] - 66:19
**fast-forward** [1] - 66:19
**fathers** [1] - 139:4
**favor** [9] - 125:18, 127:25, 132:14, 132:19, 133:12, 146:2, 155:25, 160:14, 179:2
**favorable** [8] - 98:19, 100:4, 103:19,

114:7, 145:25, 156:23, 169:2, 175:12
**favorably** [1] - 141:19
**FBI** [1] - 159:2
**fear** [1] - 137:23
**fears** [1] - 137:24
**federal** [25] - 49:16, 50:6, 64:4, 64:8, 70:7, 70:14, 70:19, 71:15, 71:17, 73:3, 73:4, 73:6, 77:25, 78:1, 78:4, 78:17, 78:19, 79:5, 80:11, 81:10, 97:8, 97:20, 143:9, 164:1, 164:3
**Federal** [4] - 96:9, 96:12, 98:13, 180:13
**feet** [2] - 121:11, 168:17
**fell** [3] - 10:15, 117:24, 132:22
**fellow** [7] - 5:21, 6:25, 7:13, 7:16, 7:20, 14:8, 16:17
**felonious** [17] - 42:23, 48:25, 49:4, 49:6, 49:7, 49:11, 49:14, 49:22, 51:18, 59:9, 59:10, 59:14, 59:20, 59:24, 60:8, 61:6, 61:7
**felony** [29] - 42:16, 43:2, 43:9, 47:15, 49:3, 49:12, 49:25, 51:21, 54:21, 56:15, 56:19, 58:5, 58:10, 58:15, 58:25, 59:11, 59:14, 59:15, 59:18, 59:21, 61:13, 72:21, 86:11, 87:11, 168:7, 170:14, 173:25, 174:1
**felt** [4] - 13:16, 16:14, 139:9, 164:25
**female** [1] - 16:4
**fence** [49] - 46:7, 48:17, 48:19, 49:4, 49:15, 49:19, 50:11, 55:12, 55:13, 55:18, 70:5, 72:20, 74:9, 74:21, 82:22, 83:3, 83:18, 85:23, 85:24, 86:1, 90:24, 97:23, 133:10, 133:13, 135:1, 144:20, 156:4, 156:7, 167:25, 168:14, 168:22, 169:3, 169:7, 169:8,

169:13, 169:23, 170:1, 170:2, 170:7, 170:12, 170:15, 170:16, 170:19, 170:25, 171:6, 171:10, 171:12, 171:17, 171:21

**fence's** [2] - 168:19, 169:17

**fence-shaking** [5] - 49:4, 49:15, 49:19, 50:11, 72:20

**feud** [2] - 113:19, 114:9

**few** [16] - 9:23, 11:2, 13:14, 13:21, 14:7, 17:10, 102:16, 107:17, 109:1, 117:12, 117:17, 127:3, 127:15, 152:12, 152:24, 177:5

**field** [2] - 38:17, 39:1

**fight** [5] - 8:7, 13:25, 108:16, 117:12, 118:6

**fighting** [9] - 6:25, 7:15, 8:3, 8:24, 10:6, 13:10, 112:21, 113:2, 177:10

**figure** [1] - 19:21

**filing** [1] - 84:7

**fill** [2] - 22:13, 145:11

**filled** [1] - 133:1

**filling** [1] - 22:11

**filmed** [7] - 133:1, 133:20, 134:13, 160:2, 160:22, 160:24, 163:8

**filtered** [1] - 182:1

**final** [6] - 34:15, 34:25, 35:6, 82:1, 112:15, 134:8

**finally** [4] - 98:5, 138:19, 161:19, 163:6

**findings** [4] - 38:14, 38:23, 65:15, 152:11

**fine** [1] - 24:18

**finger** [1] - 31:5

**finish** [3] - 106:25, 132:1, 142:7

**fire** [1] - 111:21

**firing** [1] - 107:21

**First** [8] - 147:14, 147:23, 148:1, 148:5, 148:17, 149:16, 149:17, 149:19

**first** [61] - 6:7, 6:14,

14:4, 16:18, 18:11, 19:4, 19:12, 23:2, 24:2, 27:3, 32:2, 32:6, 32:18, 43:9, 48:9, 70:3, 70:21, 78:11, 81:10, 85:3, 85:6, 86:15, 88:7, 88:23, 99:8, 104:4, 115:25, 116:10, 127:15, 132:6, 132:22, 136:6, 136:19, 136:20, 137:6, 141:12, 141:17, 143:6, 144:14, 146:13, 151:12, 152:6, 153:12, 156:2, 160:4, 160:5, 161:21, 162:12, 162:15, 164:7, 165:11, 168:9, 168:17, 169:9, 171:25, 172:16, 175:16, 180:25, 181:9

**firsthand** [1] - 6:1

**Fischer** [9] - 154:8, 154:13, 154:22, 155:3, 155:19, 157:9, 157:15, 157:24, 158:3

**Fischer's** [2] - 154:23, 157:10

**fit** [5] - 32:9, 57:22, 71:16, 92:17, 126:1

**fits** [2] - 20:23, 113:20

**five** [6] - 56:6, 62:13, 96:19, 97:18, 132:12, 160:2

**five-minute** [1] - 62:13

**fix** [1] - 8:11

**FL** [2] - 1:24, 2:3

**flagpoles** [1] - 10:7

**flags** [3] - 7:4, 7:16, 121:11

**flanked** [1] - 111:18

**fleeing** [1] - 16:15

**flipping** [1] - 4:17

**Floor** [2] - 1:20, 2:6

**floor** [1] - 10:22

**flowing** [1] - 53:15

**flyer** [1] - 111:9

**focus** [9] - 10:15, 28:12, 38:16, 64:14, 84:20, 89:6, 99:6, 116:19, 154:6

**focused** [4] - 21:9, 38:16, 153:8

**focusing** [2] - 27:17, 128:10

**follow** [5] - 19:21, 100:23, 113:4, 126:4, 132:15

**followed** [7] - 45:15, 45:16, 102:13, 112:25, 134:11, 177:10, 177:15

**followers** [1] - 128:18

**following** [6] - 96:10, 100:23, 100:24, 124:13, 126:24

**follows** [1] - 15:17

**food** [1] - 131:25

**foot** [2] - 114:21, 114:22

**footage** [6] - 111:24, 170:8, 172:4, 172:23, 178:13, 178:15

**Footnote** [3] - 67:20, 67:23, 88:12

**FOR** [1] - 1:1

**force** [54] - 10:11, 16:8, 20:22, 25:11, 28:23, 29:2, 29:5, 29:13, 29:17, 38:3, 41:19, 72:23, 79:7, 80:14, 84:14, 96:25, 97:19, 99:17, 99:18, 100:1, 108:21, 108:22, 109:4, 113:15, 113:25, 114:5, 116:5, 118:23, 118:24, 120:10, 121:24, 122:2, 122:4, 122:18, 125:8, 126:19, 127:13, 127:19, 128:4, 134:19, 134:22, 134:23, 144:13, 144:22, 145:1, 145:2, 145:7, 152:7, 163:20, 163:25, 167:13, 174:3, 174:24, 175:2

**Force** [1] - 121:3

**forced** [1] - 11:24

**forceful** [1] - 145:4

**forcibly** [6] - 108:2, 125:9, 140:15, 173:21, 174:10, 174:14

**forcing** [1] - 166:20

**foregoing** [1] - 183:23

**foreseeable** [13] - 52:3, 52:8, 52:9, 54:20, 55:10, 55:11, 61:21, 62:3, 82:22, 83:5, 83:18, 161:14,

169:20

**foreseen** [1] - 55:16

**forever** [2] - 10:13, 15:22

**forget** [3] - 16:6, 16:13, 16:17

**forgotten** [1] - 131:6

**form** [6] - 46:13, 83:16, 87:16, 106:12, 115:14, 136:21

**formation** [2] - 133:6, 136:22

**formed** [6] - 11:2, 120:16, 125:13, 151:17, 159:1, 164:4

**former** [19] - 13:14, 13:15, 101:2, 101:5, 101:7, 101:12, 101:18, 102:16, 104:17, 104:20, 105:10, 111:8, 116:25, 121:9, 131:2, 139:14, 153:10, 181:2, 181:9

**Fort** [1] - 29:22

**forth** [4] - 19:9, 67:14, 67:16, 93:2

**forward** [2] - 41:18, 62:2, 66:19, 132:12, 132:13, 133:14, 133:15, 141:18, 159:21, 168:10, 169:9, 169:10

**fought** [2] - 9:24, 14:11

**founder** [1] - 116:2

**founding** [1] - 139:4

**four** [4] - 5:24, 150:23, 159:24, 172:11

**frame** [1] - 172:12

**framed** [2] - 25:1, 94:14

**framing** [1] - 22:19

**frankly** [6] - 4:3, 27:3, 30:19, 69:18, 81:16, 180:7

**fraud** [1] - 139:11

**free** [1] - 53:15

**free-flowing** [1] - 53:15

**freely** [1] - 15:19

**frequently** [1] - 182:9

**fresh** [1] - 4:3

**Friday** [1] - 87:10

**Friedrich** [3] - 79:21, 91:18, 91:24

**Friedrich's** [1] - 80:22

**friend** [1] - 7:25

**friend's** [1] - 23:11

**friends** [1] - 159:22

**Front** [1] - 89:20

**front** [25] - 9:24, 10:11, 10:15, 10:18, 10:19, 10:20, 15:25, 80:5, 80:24, 87:1, 90:20, 124:6, 124:7, 127:6, 131:3, 132:18, 132:24, 133:8, 133:9, 135:9, 137:5, 138:17, 153:1, 156:12, 170:18

**frozen** [1] - 10:8

**frustration** [1] - 101:21

**fuck** [11] - 104:25, 105:19, 106:25, 113:4, 123:7, 123:19, 123:24, 126:1, 129:19, 132:20, 133:5

**fuckin'** [1] - 105:23

**fucking** [11] - 107:15, 122:24, 124:3, 130:20, 131:12, 137:21, 162:23, 162:24, 163:1, 167:1

**full** [5] - 46:18, 87:25, 99:1, 144:21, 183:24

**fully** [5] - 13:9, 16:25, 61:15, 62:3, 86:23

**fundamental** [1] - 64:15

**fundamentally** [3] - 20:20, 47:13, 92:24

**funeral** [1] - 16:16

**funny** [1] - 77:12

**furtherance** [5] - 41:25, 52:3, 92:18, 102:3, 161:12

**furthered** [2] - 52:8, 169:20

**furthermore** [4] - 141:1, 152:23, 156:9, 168:4

**future** [1] - 95:9

## G

**gain** [1] - 167:9

**galvanized** [1] - 101:10

**game** [1] - 105:22

**games** [1] - 108:11

**ganging** [1] - 112:1

**gap** [1] - 22:11

**gasping** [1] - 16:10

**gathered** [1] - 132:8

**gear** [1] - 121:18

**gee** [1] - 90:18
**general** [9] - 54:12, 54:13, 54:23, 54:24, 80:3, 80:12, 113:19, 126:15, 157:16
**generally** [2] - 94:20, 182:11
**generic** [1] - 49:16
**genius** [1] - 116:14
**gentlemen** [1] - 130:17
**genuinely** [3] - 147:17, 147:18, 148:9
**Germany** [2] - 148:25, 149:5
**gesture** [1] - 133:3
**girlfriend** [1] - 119:8
**gist** [1] - 38:23
**given** [8] - 24:13, 48:2, 61:21, 91:8, 114:16, 147:25, 159:4, 165:7
**glass** [3] - 11:18, 86:12, 86:15
**global** [1] - 4:13
**glorious** [1] - 178:4
**goal** [5] - 41:18, 84:13, 125:12, 150:11, 150:15
**goals** [8] - 99:23, 102:4, 103:16, 109:14, 113:16, 140:14, 152:9, 164:5
**God** [1] - 139:7
**goddamn** [2] - 130:20, 130:21
**gonna** [1] - 127:4
**good-bye** [1] - 14:10
**Googled** [2] - 119:21, 120:6
**GOP** [1] - 108:5
**Gorsuch** [4] - 22:23, 32:5, 37:19, 37:20
**government** [113] - 3:7, 4:5, 4:11, 5:5, 13:14, 13:15, 15:1, 18:15, 19:12, 19:14, 19:19, 20:23, 21:1, 21:5, 21:6, 29:14, 30:15, 34:5, 51:3, 53:25, 62:25, 63:1, 63:13, 64:2, 65:10, 65:11, 65:17, 65:18, 65:19, 65:20, 70:4, 70:16, 70:23, 71:2, 71:12, 72:23, 72:25, 73:1, 74:1, 74:10, 74:11, 74:18, 74:22, 75:3, 75:16, 75:17, 76:15, 77:9, 79:6,

80:13, 81:18, 81:22, 82:24, 83:15, 84:3, 84:14, 92:20, 93:22, 97:22, 98:20, 99:15, 99:20, 100:5, 100:13, 103:19, 108:21, 108:22, 109:3, 112:7, 113:20, 113:25, 114:6, 114:10, 115:17, 119:10, 119:13, 119:17, 125:6, 126:22, 127:20, 127:21, 135:7, 137:4, 137:24, 140:11, 141:19, 143:6, 145:5, 145:25, 146:3, 148:2, 148:6, 148:23, 154:5, 155:7, 156:24, 157:5, 157:20, 158:21, 168:25, 169:2, 174:16, 175:8, 175:12, 175:21, 176:24, 177:23, 178:11, 180:5, 181:11
**Government** [20] - 3:23, 3:24, 12:15, 30:22, 32:17, 34:9, 39:19, 39:20, 51:13, 52:7, 58:17, 58:19, 59:2, 60:7, 82:2, 86:3, 88:21, 114:8, 149:6, 170:11
**government's** [35] - 29:25, 30:12, 40:20, 43:22, 54:23, 63:24, 69:11, 69:23, 71:19, 76:20, 91:4, 94:9, 98:9, 99:7, 103:23, 122:15, 125:18, 132:14, 140:15, 143:23, 148:13, 158:5, 160:6, 160:14, 166:9, 172:13, 174:9, 175:17, 176:21, 177:17, 177:21, 179:1, 179:4, 179:20, 180:11
**Government's** [14] - 31:9, 48:6, 57:11, 63:5, 102:14, 127:25, 132:19, 133:12, 135:6, 152:7, 155:24, 164:18, 176:13, 178:18
**grabbed** [1] - 175:25

**graft** [1] - 21:14
**grant** [3] - 96:15, 180:15, 183:11
**granting** [1] - 180:17
**grapple** [1] - 179:16
**grateful** [1] - 10:13
**Graves** [1] - 159:23
**great** [2] - 101:12, 119:6
**greater** [1] - 87:17
**greatly** [1] - 18:9
**Greene** [3] - 114:18, 158:20, 159:7
**grew** [1] - 132:11
**ground** [13] - 16:5, 16:9, 16:23, 22:14, 75:24, 76:2, 133:14, 136:17, 141:6, 147:7, 167:22, 171:21, 175:1
**Ground** [3] - 129:8, 135:17, 137:2
**grounds** [5] - 7:7, 132:23, 136:7, 166:11, 168:10
**group** [56] - 7:1, 17:6, 103:2, 103:3, 104:15, 111:13, 111:19, 112:5, 117:16, 117:18, 118:17, 120:14, 120:20, 121:2, 122:8, 124:4, 125:25, 126:9, 129:7, 129:9, 130:2, 130:4, 130:16, 130:25, 131:3, 131:7, 131:8, 131:11, 131:18, 131:19, 131:24, 132:1, 132:5, 132:9, 135:4, 136:1, 138:12, 140:6, 141:7, 141:12, 141:14, 141:16, 141:18, 159:18, 159:19, 159:25, 161:2, 163:4, 166:6, 169:9, 169:13, 177:7, 183:3
**group's** [5] - 123:11, 123:13, 125:7, 126:14, 131:22
**grouping** [3] - 68:12, 68:21, 68:25
**groups** [3] - 119:12, 135:17, 140:1
**grow** [1] - 14:19
**growing** [1] - 115:11

**guard** [1] - 53:5
**guess** [11] - 34:10, 36:7, 36:18, 38:22, 39:19, 40:2, 43:4, 45:6, 60:10, 87:5, 173:1
**guidance** [1] - 93:3
**guideline** [59] - 18:10, 18:13, 18:23, 18:25, 19:16, 21:21, 22:15, 22:16, 23:13, 24:19, 25:5, 26:11, 27:5, 27:18, 27:20, 30:3, 30:4, 31:10, 31:14, 32:16, 33:3, 33:5, 33:13, 34:4, 34:13, 35:18, 35:19, 37:15, 37:21, 38:17, 40:5, 42:12, 42:23, 43:15, 43:16, 44:12, 47:1, 48:8, 48:23, 56:25, 57:23, 58:1, 59:9, 59:12, 63:17, 64:22, 77:21, 77:23, 78:5, 78:18, 79:9, 87:5, 90:18, 93:1, 94:4, 94:5, 94:9
**guidelines** [45] - 4:4, 18:4, 18:5, 21:22, 21:24, 22:7, 24:14, 27:1, 28:9, 28:11, 31:3, 32:2, 35:17, 35:22, 36:21, 37:10, 39:10, 41:2, 45:22, 51:12, 52:23, 53:2, 53:17, 54:7, 57:4, 57:14, 57:16, 57:20, 65:2, 65:7, 66:3, 66:6, 67:15, 68:10, 69:16, 87:6, 87:9, 88:6, 90:9, 90:12, 90:13, 92:2, 92:16, 94:1
**Guidelines** [1] - 93:11
**guides** [1] - 12:10
**guilt** [3] - 125:1, 138:23, 139:23
**guilty** [1] - 175:5
**gulags** [1] - 108:16
**gun** [1] - 53:4
**gunfire** [1] - 11:22
**guns** [1] - 111:5
**guy** [1] - 105:14
**guys** [4] - 104:18, 112:24, 122:1, 161:3

**H**

**Hale** [1] - 98:22
**Hale-Cusanelli** [1] -

98:22
**half** [2] - 70:22, 81:10
**Hallway** [1] - 11:5
**halting** [1] - 134:20
**hammers** [1] - 10:8
**hand** [9] - 27:16, 75:21, 127:16, 133:3, 137:17, 145:22, 164:22, 166:16, 182:16
**hand-selected** [1] - 127:16
**handful** [1] - 11:10
**handle** [1] - 105:17
**hands** [6] - 133:7, 169:6, 169:7, 174:11, 174:20
**hanging** [1] - 74:5
**happy** [3] - 8:5, 27:7, 45:7
**hard** [4] - 54:22, 54:24, 163:11, 166:25
**hardly** [1] - 181:15
**harm** [5] - 41:3, 49:17, 49:18, 49:20, 49:21
**harness** [1] - 118:15
**harnessed** [1] - 177:22
**Hassan** [2] - 1:22, 3:11
**HASSAN** [1] - 1:23
**hat** [1] - 51:4
**hate** [1] - 121:6
**Haupt** [1] - 148:21
**Haven** [1] - 1:21
**head** [2] - 84:9, 110:5
**headed** [1] - 10:22
**headline** [1] - 108:3
**headlong** [1] - 167:7
**heal** [1] - 16:25
**hear** [33] - 4:3, 4:8, 4:10, 4:18, 14:22, 18:4, 18:8, 19:12, 19:18, 19:22, 23:16, 27:8, 27:11, 48:10, 51:5, 51:13, 53:25, 62:21, 62:23, 63:20, 64:11, 64:12, 69:14, 69:16, 69:17, 69:24, 82:9, 87:9, 88:20, 91:1, 122:1, 124:13, 161:4
**heard** [15] - 16:18, 19:23, 37:10, 39:13, 47:24, 55:14, 70:1, 72:25, 74:18, 93:16, 93:21, 123:7, 159:18, 181:18, 182:3

**HEARING** [1] - 1:8
**hearing** [2] - 4:21, 9:8
**hearings** [1] - 182:4
**hearsay** [1] - 179:20
**heart** [3] - 8:15, 16:3, 82:4
**heart-piercing** [1] - 16:3
**heartbreaking** [2] - 6:17, 7:1
**heavy** [1] - 98:17
**heels** [1] - 130:18
**held** [20] - 11:14, 12:19, 17:15, 28:3, 28:4, 28:14, 28:17, 78:23, 79:20, 79:21, 79:24, 144:3, 147:17, 147:19, 148:9, 148:16, 149:1, 154:10, 157:10, 172:17
**HELD** [1] - 1:9
**hell** [1] - 110:15
**helm** [1] - 156:21
**helmet** [2] - 16:12, 110:5
**help** [2] - 16:5, 89:10
**helped** [7] - 105:14, 106:2, 113:12, 131:19, 134:25, 141:13, 167:8
**helpful** [1] - 45:3
**helping** [1] - 157:24
**helps** [3] - 102:21, 106:3, 117:6
**hereby** [1] - 183:22
**Hialeah** [1] - 2:3
**hide** [1] - 95:17
**high** [2] - 56:7, 133:10
**higher** [2] - 57:4, 57:17
**highlight** [1] - 162:7
**highlights** [2] - 159:17, 160:18
**Hill** [2] - 127:6, 137:12
**himself** [9] - 109:21, 117:23, 134:13, 138:17, 160:2, 160:19, 160:21, 168:10, 174:18
**hinder** [5] - 99:18, 100:2, 143:8, 144:6, 144:7
**hindered** [1] - 147:6
**hinky** [1] - 28:10
**histories** [1] - 140:1
**History** [2] - 68:2, 88:7
**history** [7] - 30:17, 67:12, 68:1, 71:21, 92:11, 93:14, 93:23

**hit** [5] - 7:16, 61:3, 75:24, 76:2, 84:8
**Hitler** [2] - 148:25, 149:6
**hmm** [2] - 33:16, 37:16
**hold** [4] - 17:16, 60:9, 68:24, 118:12
**holding** [11] - 25:12, 34:16, 38:4, 68:1, 76:4, 118:22, 146:5, 154:23, 162:22, 164:20, 166:16
**holds** [1] - 143:24
**home** [2] - 6:8, 13:4
**homes** [1] - 117:7
**Honor** [127] - 4:25, 5:7, 9:10, 9:12, 15:3, 15:8, 15:18, 17:21, 20:3, 20:10, 20:19, 21:22, 22:2, 22:9, 24:4, 24:25, 25:1, 26:12, 26:24, 27:6, 29:23, 30:25, 31:8, 31:14, 32:12, 33:1, 34:15, 34:19, 35:6, 35:17, 36:14, 36:15, 37:3, 37:11, 37:17, 40:7, 40:23, 41:5, 41:12, 41:20, 41:21, 42:2, 42:7, 42:10, 42:14, 43:11, 44:3, 44:9, 44:16, 45:6, 45:8, 45:9, 45:11, 45:13, 45:16, 47:4, 47:16, 48:22, 50:17, 50:24, 51:4, 51:16, 52:6, 52:17, 55:4, 55:8, 55:14, 55:18, 55:19, 59:7, 60:11, 60:12, 60:20, 61:2, 61:22, 62:10, 63:22, 64:7, 64:19, 65:12, 65:24, 66:15, 67:19, 68:6, 68:17, 68:25, 69:9, 69:20, 69:25, 72:13, 74:19, 75:7, 75:9, 76:7, 76:13, 76:21, 76:24, 77:2, 77:16, 78:21, 79:18, 80:9, 82:1, 82:19, 83:8, 84:4, 84:8, 84:15, 85:9, 85:15, 85:19, 86:7, 87:21, 88:10, 88:25, 89:5, 90:22, 91:14, 91:25, 92:23, 93:6, 94:12, 95:1, 142:16, 142:21
**Honor's** [4] - 46:16, 47:21, 86:20, 93:1

**Honorable** [2] - 95:23, 183:17
**HONORABLE** [1] - 1:9
**honorable** [1] - 17:18
**honorably** [1] - 15:20
**honored** [1] - 126:25
**hope** [3] - 6:23, 8:23, 158:1
**hoped** [1] - 107:21
**hopes** [1] - 129:12
**horrifying** [1] - 9:23
**horror** [1] - 16:3
**hospital** [1] - 14:9
**hostility** [3] - 108:1, 122:13, 148:25
**hotel** [1] - 137:18
**hour** [2] - 85:11, 104:19
**hours** [15] - 5:24, 6:16, 6:17, 7:3, 13:22, 14:7, 79:3, 102:19, 102:25, 116:24, 117:4, 117:13, 117:17, 117:20, 134:11
**House** [5] - 11:6, 11:9, 11:19, 11:25, 124:7
**house** [4] - 11:11, 11:13, 12:6, 111:3
**Howard** [1] - 16:19
**hundred** [1] - 178:5
**hundreds** [1] - 11:3
**hung** [11] - 37:6, 48:5, 51:3, 52:14, 52:16, 97:16, 97:25, 98:1, 135:23, 150:3, 159:19
**hurt** [1] - 105:12
**hypothetically** [2] - 59:19, 95:4

**I**

**Id** [1] - 149:3
**idea** [16] - 8:6, 21:23, 22:1, 29:8, 38:8, 38:9, 39:5, 56:8, 56:18, 58:3, 58:24, 89:2, 113:2, 116:18, 139:24
**identification** [1] - 121:1
**identifies** [1] - 182:5
**identify** [2] - 21:14, 103:22
**idiot** [1] - 131:15
**II** [1] - 2:5
**imagine** [4] - 56:4, 58:3, 66:21, 66:23
**immediate** [1] -

116:13
**immediately** [6] - 13:6, 14:2, 103:8, 104:22, 120:3, 167:8
**impact** [1] - 3:24
**impacted** [2] - 181:11, 182:2
**impairment** [3] - 154:7, 154:11, 155:5
**impeached** [1] - 178:11
**impede** [4] - 46:1, 47:6, 150:18, 150:23
**impeded** [1] - 173:22
**impeding** [2] - 97:8, 173:17
**impending** [2] - 115:9, 140:2
**implement** [1] - 113:13
**implicate** [1] - 179:25
**implications** [1] - 71:19
**implicit** [2] - 100:19, 125:13
**implicitly** [3] - 32:18, 100:14, 125:9
**importance** [1] - 148:1
**important** [3] - 27:22, 38:12, 119:5
**importantly** [2] - 61:2, 182:4
**impose** [1] - 17:12
**imprinted** [1] - 15:22
**imprisonment** [1] - 56:6
**improbably** [1] - 154:17
**impugn** [1] - 34:12
**impugning** [2] - 31:6, 31:9
**IN** [1] - 1:1
**inability** [1] - 165:12
**inappropriate** [2] - 90:19, 180:6
**inaugural** [1] - 170:18
**inauguration** [2] - 9:22, 10:5
**incarceration** [1] - 35:2
**incentive** [1] - 58:17
**incentivizes** [1] - 59:2
**incident** [6] - 6:5, 46:3, 74:9, 75:18, 173:15, 181:1
**incitement** [2] - 147:22, 149:8
**inclined** [1] - 118:25
**include** [7] - 38:19, 38:21, 60:25, 61:8,

73:7, 126:20, 179:15
**included** [6] - 103:3, 120:22, 121:3, 132:9, 171:16, 175:6
**includes** [6] - 21:18, 36:2, 41:3, 60:25, 61:7
**including** [24] - 32:15, 39:23, 46:18, 102:10, 104:6, 104:8, 110:3, 112:3, 112:5, 113:21, 118:1, 121:18, 124:23, 126:10, 130:25, 131:16, 135:20, 136:2, 136:16, 137:19, 146:2, 168:16, 177:6, 182:18
**inconsistencies** [1] - 159:4
**inconsistency** [1] - 77:22
**inconsistent** [12] - 77:20, 78:5, 78:18, 79:9, 80:20, 91:11, 145:13, 159:16, 160:11, 164:23, 165:12
**incorporate** [7] - 143:17, 144:10, 152:10, 157:12, 164:9, 164:15, 179:23
**incorporated** [1] - 29:10
**incorporating** [1] - 164:12
**increase** [4] - 67:11, 67:25, 68:2, 68:5
**increased** [2] - 101:20, 148:11
**increases** [1] - 92:8
**increasingly** [1] - 58:19
**incredible** [2] - 158:7, 178:10
**indeed** [7] - 101:11, 109:24, 112:13, 120:14, 127:20, 158:15, 166:12
**independently** [4] - 155:1, 155:13, 156:2, 156:13
**indicate** [1] - 39:7
**indicated** [1] - 88:21
**indicating** [1] - 82:15
**indictment** [12] - 19:9, 19:10, 20:8, 20:14, 20:16, 21:16, 36:24,

58:22, 59:2, 96:18, 97:9, 143:11
**indictments** [4] - 58:18, 58:20, 58:21, 59:3
**individual** [17] - 4:11, 12:18, 12:21, 12:22, 18:1, 25:18, 25:23, 25:24, 35:21, 46:19, 64:21, 64:22, 68:9, 86:14, 115:7, 136:6, 162:1
**individually** [2] - 4:9, 104:7
**individuals** [4] - 17:10, 89:10, 90:3, 179:21
**induce** [3] - 25:14, 164:2, 167:13
**induced** [1] - 40:17
**industrial** [1] - 89:20
**inexact** [1] - 32:11
**infamy** [1] - 133:23
**infer** [1] - 116:9
**inference** [7] - 118:24, 121:23, 122:17, 127:24, 128:1, 156:1, 182:7
**inferences** [2] - 99:3, 100:6
**inferred** [10] - 120:14, 126:13, 127:17, 128:2, 134:18, 134:21, 135:11, 135:15, 136:5, 153:6
**influence** [6] - 31:24, 65:9, 65:17, 70:15, 75:2, 75:15
**influences** [1] - 80:13
**influencing** [1] - 154:15
**inform** [1] - 120:13
**informant** [1] - 70:24
**informants** [1] - 70:23
**informed** [1] - 116:8
**informs** [2] - 116:1, 160:5
**initial** [2] - 9:19, 146:13
**initiated** [2] - 136:6, 147:4
**injured** [1] - 168:3
**injuries** [1] - 9:21
**injury** [7] - 16:20, 16:22, 42:25, 49:1, 60:2, 121:19
**injustice** [1] - 181:15
**inquiry** [3] - 20:12, 24:3, 85:9
**inside** [12] - 7:14, 9:4,

9:6, 11:3, 135:4, 138:2, 156:6, 156:14, 162:18, 163:6, 163:9, 166:18
**insinuated** [1] - 13:17
**Inspector** [3] - 9:11, 9:14, 15:4
**INSPECTOR** [2] - 9:12, 9:14
**inspire** [1] - 113:12
**install** [1] - 170:17
**instance** [4] - 68:4, 71:13, 88:23, 144:3
**instances** [1] - 102:2
**instead** [14] - 3:25, 8:16, 85:2, 89:23, 103:17, 117:9, 117:10, 149:9, 153:9, 154:2, 172:6, 172:8, 174:25, 179:13
**institute** [2] - 92:7, 92:19
**instruct** [2] - 140:9, 155:11
**instructed** [16] - 99:19, 120:20, 125:24, 128:6, 128:25, 131:17, 136:25, 137:15, 147:9, 150:8, 155:14, 161:9, 163:22, 171:2, 173:25, 180:17
**instruction** [6] - 120:24, 149:17, 159:11, 182:12, 182:15
**instructions** [2] - 130:4, 149:16
**insufficient** [6] - 95:9, 98:15, 143:23, 158:6, 164:18, 170:1
**integral** [1] - 132:5
**integrity** [2] - 154:16, 181:20
**intend** [1] - 175:7
**intended** [19] - 21:24, 22:13, 22:14, 22:19, 41:17, 55:24, 56:15, 65:17, 83:24, 104:7, 115:20, 118:4, 121:23, 150:20, 152:14, 157:7, 157:21, 170:7, 174:5
**intensity** [1] - 115:8
**intent** [81] - 42:16, 43:8, 44:20, 49:1, 49:3, 49:11, 49:16, 49:17, 49:20, 49:24,

49:25, 51:20, 56:10, 56:14, 56:18, 56:19, 58:4, 58:9, 58:14, 58:24, 59:11, 59:13, 59:15, 59:18, 59:20, 61:13, 64:10, 64:17, 65:16, 75:1, 75:9, 75:13, 75:14, 84:2, 84:6, 84:10, 84:18, 84:20, 85:4, 85:8, 90:23, 92:14, 92:18, 99:23, 106:12, 113:15, 113:22, 113:25, 114:5, 115:14, 116:1, 119:19, 120:25, 125:17, 125:21, 127:14, 134:21, 138:22, 140:13, 141:8, 141:23, 148:6, 148:8, 148:19, 149:3, 149:11, 150:15, 153:21, 155:21, 157:18, 157:23, 158:11, 162:20, 163:6, 163:7, 164:10, 167:4, 173:24, 175:14, 175:21, 177:1
**intentionally** [4] - 89:12, 99:22, 163:15, 173:21
**intentions** [1] - 157:24
**interacted** [2] - 119:20, 120:7
**interest** [1] - 180:15
**interested** [2] - 18:18, 127:19
**interesting** [1] - 18:19
**interfere** [9] - 29:2, 35:11, 36:9, 46:1, 47:6, 50:20, 140:16, 152:8
**interfered** [1] - 173:23
**interference** [7] - 28:12, 35:21, 43:20, 48:21, 50:18, 60:22, 66:12
**interfering** [4] - 26:22, 36:16, 43:13, 44:11
**interior** [3] - 10:16, 12:13, 13:7
**interlacing** [1] - 110:8
**international** [1] - 71:11
**Internet** [2] - 182:22, 183:9
**interplay** [1] - 63:13
**interpret** [3] - 70:10,

70:11, 70:20
**interpretation** [3] - 29:9, 105:9, 154:18
**interpretations** [1] - 111:25
**interpreted** [7] - 29:14, 112:11, 113:7, 113:8, 128:15, 138:21, 146:1
**interruption** [1] - 153:24
**intertwined** [1] - 114:11
**intervened** [1] - 112:6
**interview** [1] - 139:3
**intimidate** [1] - 88:14
**intimidated** [1] - 173:22
**intimidating** [1] - 26:16
**intimidation** [9] - 25:11, 38:3, 65:10, 70:16, 74:11, 96:25, 163:20, 163:25, 167:13
**intoxicated** [3] - 75:8, 75:10, 75:17
**intrinsically** [1] - 73:2
**introduced** [1] - 135:7
**introductory** [2] - 126:7, 126:24
**invasion** [1] - 132:7
**investigation** [1] - 158:21
**invocation** [1] - 181:2
**invoked** [1] - 119:22
**invokes** [1] - 176:14
**involve** [1] - 28:1
**involved** [2] - 42:23, 70:5
**involvement** [1] - 100:9
**involves** [7] - 35:15, 48:25, 49:10, 49:16, 70:23, 155:20, 160:7
**involving** [4] - 34:11, 78:24, 154:23, 160:25
**ironically** [1] - 56:10
**irony** [1] - 56:12
**irrelevant** [1] - 94:7
**IRS** [1] - 90:4
**isolation** [3] - 70:10, 70:14, 70:21
**issue** [29] - 18:11, 20:5, 21:6, 23:17, 27:16, 27:21, 36:14, 37:15, 37:18, 39:16, 39:17, 39:18, 47:13,

64:15, 75:12, 75:19, 79:19, 91:2, 91:6, 91:10, 95:3, 105:6, 144:20, 154:8, 157:15, 170:16, 171:22
**issues** [9] - 18:3, 18:8, 18:9, 27:22, 31:3, 83:2, 128:8, 143:2, 143:4
**itself** [10] - 49:15, 56:14, 58:14, 77:21, 78:6, 78:18, 104:13, 149:9, 171:10, 178:23

**J**

**Jackson** [3] - 78:24, 91:6, 91:17
**Jackson's** [1] - 80:18
**jail** [2] - 130:13, 146:18
**January** [94] - 5:12, 5:20, 6:7, 8:25, 9:17, 12:17, 12:25, 13:6, 13:18, 13:20, 14:5, 14:7, 14:17, 14:20, 15:20, 15:22, 15:23, 17:2, 17:5, 17:15, 28:8, 34:21, 35:1, 55:9, 71:20, 78:23, 80:4, 81:9, 82:21, 83:7, 102:16, 102:18, 103:9, 103:13, 104:13, 107:4, 113:9, 113:23, 114:19, 116:5, 116:12, 116:19, 116:23, 117:2, 117:14, 118:6, 119:10, 119:23, 120:6, 120:12, 120:23, 121:6, 121:24, 122:16, 122:21, 123:10, 124:4, 124:22, 126:10, 126:11, 126:18, 127:3, 128:9, 128:22, 129:11, 133:23, 138:20, 139:2, 139:3, 140:7, 141:14, 145:7, 146:11, 146:13, 146:16, 149:11, 152:19, 152:22, 154:16, 165:23, 165:25, 166:2, 167:23, 177:6, 177:12, 178:2,

178:3, 178:23,
181:2, 181:13,
182:3, 182:10,
182:19
**Jason** [3] - 1:11, 3:7,
170:15
**Jauregui** [4] - 2:2,
3:11, 55:3, 55:5
**JAUREGUI** [5] - 2:2,
55:4, 82:15, 82:18,
83:21
**jeez** [3] - 72:10, 73:23,
90:17
**Jeopardy** [1] - 151:5
**jeopardy** [2] - 151:13,
151:23
**Jeremy** [5] - 102:7,
103:4, 109:2,
114:23, 165:25
**Jerry** [1] - 125:4
**Jersey** [1] - 13:23
**job** [8] - 6:20, 7:24,
9:2, 9:3, 31:7,
140:19, 160:13,
165:15
**Joe** [2] - 101:3, 107:2
**John** [1] - 103:5
**join** [2] - 96:14, 126:25
**joined** [12] - 10:5,
18:16, 101:24,
111:20, 135:17,
141:22, 150:13,
165:23, 166:1,
166:5, 167:12, 169:7
**joining** [1] - 153:9
**joins** [1] - 146:9
**joint** [3] - 51:8, 51:11
**jointly** [4] - 40:19,
54:7, 54:8, 147:13
**joke** [1] - 121:14
**Jorge** [1] - 178:1
**Joseph** [1] - 3:4
**jostle** [1] - 169:8
**journalist** [1] - 146:15
**JUDGE** [1] - 1:9
**judge** [5] - 55:6,
73:16, 79:8, 82:18
**Judge** [21] - 22:23,
24:4, 27:14, 43:7,
48:1, 52:20, 74:7,
78:23, 79:18, 80:18,
80:21, 80:22, 82:2,
82:10, 83:19, 91:5,
91:17, 91:18, 91:24,
157:8, 157:10
**judges** [3] - 28:4,
79:18, 79:20
**Judges** [1] - 79:20
**judgment** [5] - 96:8,
96:10, 96:12, 98:14,

180:14
**judicial** [1] - 28:7
**jump** [2] - 85:25, 88:8
**jumping** [1] - 119:4
**juncture** [1] - 99:12
**juror** [10] - 100:22,
112:14, 114:3,
118:3, 118:20,
127:17, 160:23,
177:4, 178:16, 182:5
**jurors** [2] - 178:9,
182:2
**jury** [176] - 15:18,
17:13, 17:18, 26:2,
26:3, 26:13, 37:5,
37:13, 41:11, 41:15,
45:19, 46:5, 46:12,
46:13, 46:17, 46:24,
46:25, 47:17, 48:4,
48:15, 52:15, 70:6,
73:18, 73:21, 84:10,
84:11, 86:10, 89:7,
97:13, 97:17, 97:24,
98:5, 98:16, 99:2,
99:19, 99:25, 100:8,
101:9, 103:7, 104:1,
104:10, 106:9,
109:8, 109:11,
112:11, 113:10,
115:2, 115:6,
115:17, 115:19,
115:24, 116:9,
116:21, 118:9,
120:8, 120:14,
120:18, 120:25,
121:20, 122:14,
124:25, 125:4,
125:16, 125:23,
126:13, 127:12,
127:23, 128:2,
128:15, 134:17,
134:21, 135:11,
135:15, 135:22,
135:23, 136:5,
136:13, 138:21,
139:18, 139:22,
140:25, 141:21,
141:25, 144:12,
144:14, 145:3,
145:6, 146:1, 146:5,
146:15, 147:3,
147:8, 147:9, 148:4,
149:17, 149:18,
150:1, 150:8,
150:16, 151:16,
152:4, 152:13,
153:5, 153:20,
155:11, 155:19,
156:8, 156:12,
156:15, 156:24,

157:17, 157:22,
158:5, 158:13,
158:14, 158:24,
159:3, 159:5, 159:7,
159:12, 160:10,
160:15, 161:9,
161:21, 162:3,
162:16, 162:19,
163:13, 163:14,
163:15, 163:19,
164:5, 164:22,
165:2, 165:3,
165:20, 167:12,
168:2, 168:5, 169:5,
169:15, 169:18,
169:21, 170:5,
170:9, 170:12,
171:3, 171:4,
171:13, 172:4,
172:16, 172:23,
173:4, 173:16,
173:21, 173:25,
174:2, 175:4,
175:13, 176:16,
178:8, 178:19,
179:2, 179:6,
181:16, 182:9,
182:14
**jury's** [20] - 37:8,
41:22, 46:22, 61:18,
62:5, 65:15, 98:10,
103:20, 145:12,
145:15, 149:20,
151:3, 151:25,
160:13, 161:6,
165:11, 171:23,
174:7, 176:5, 181:14
**Justice** [1] - 32:4
**justice** [27] - 17:14,
20:24, 21:10, 27:24,
27:25, 28:2, 28:5,
28:12, 28:13, 28:15,
28:16, 29:24, 31:19,
31:22, 34:18, 34:24,
38:9, 38:12, 39:8,
44:24, 180:15,
180:19, 181:7,
181:22, 181:24
**justifiable** [1] - 99:3

## K

**keep** [5] - 7:23, 8:13,
29:11, 68:1, 125:24
**Keepers** [1] - 24:5
**KELLY** [1] - 1:9
**Kenerson** [2] - 1:12,
3:8
**kept** [1] - 14:9
**key** [8] - 25:9, 101:19,

103:25, 135:19,
136:2, 152:12,
176:20
**kick** [4] - 42:22, 127:1,
130:20
**kid** [2] - 119:24,
172:25
**killed** [2] - 13:18,
110:19
**kind** [58] - 7:24, 18:19,
20:16, 21:24, 21:25,
22:7, 22:13, 22:19,
22:24, 23:11, 25:8,
26:21, 27:1, 27:4,
27:17, 28:25, 29:19,
30:23, 39:21, 40:24,
41:21, 41:24, 42:3,
42:11, 44:16, 44:18,
44:21, 45:7, 45:10,
47:4, 47:10, 47:20,
47:21, 48:20, 58:11,
60:24, 61:3, 61:5,
61:15, 62:2, 65:14,
66:8, 68:20, 68:24,
69:17, 84:4, 84:8,
86:17, 86:24, 89:1,
89:2, 89:3, 92:2,
92:24, 172:25
**kinds** [1] - 71:9
**Kisor** [1] - 77:18
**KISOR** [1] - 77:18
**knife** [1] - 112:2
**knock** [1] - 108:7
**knocked** [2] - 9:20,
53:6
**knocking** [1] - 110:5
**knowing** [4] - 6:16,
8:25, 58:20, 124:16
**knowingly** [1] -
150:21
**knowledge** [7] -
83:19, 99:22,
140:13, 140:24,
141:23, 142:2,
153:20
**knows** [10] - 21:23,
24:4, 26:12, 55:9,
64:7, 75:9, 82:19,
83:8, 85:9, 89:5
**Kraken** [1] - 110:11

## L

**lack** [1] - 159:8
**lacked** [2] - 144:12,
157:17
**laid** [2] - 4:4, 175:3
**Lakes** [1] - 1:24
**landed** [1] - 124:16
**Landon** [1] - 182:19

**landscape** [1] - 45:10
**language** [5] - 45:25,
54:12, 73:19, 84:11,
93:11
**large** [4] - 118:15,
130:2, 140:18,
147:14
**largely** [1] - 179:12
**larger** [8] - 25:23,
26:7, 35:16, 112:5,
113:20, 115:4
**laser** [1] - 153:8
**laser-focused** [1] -
153:8
**last** [17] - 4:17, 6:21,
62:20, 88:21, 119:4,
125:3, 145:18,
147:12, 153:5,
155:7, 159:15,
173:12, 176:2,
178:5, 178:7, 179:7,
180:1
**last-minute** [1] - 176:2
**lasting** [1] - 182:1
**lastly** [1] - 15:8
**late** [2] - 138:16, 140:7
**laughs** [1] - 130:23
**laughter** [1] - 82:17
**launch** [1] - 154:2
**LAW** [2] - 1:23, 2:2
**law** [73] - 7:2, 8:19,
13:22, 14:3, 15:13,
24:23, 25:19, 26:16,
28:3, 28:21, 28:23,
29:3, 29:4, 29:9,
29:13, 30:8, 36:2,
37:18, 44:11, 46:1,
54:15, 56:16, 57:24,
60:22, 61:7, 61:8,
92:5, 92:6, 97:3,
97:21, 99:18, 100:3,
108:2, 109:3,
109:12, 109:14,
114:10, 115:11,
121:1, 122:18,
125:7, 125:10,
126:23, 130:9,
130:14, 133:24,
135:1, 135:10,
135:20, 140:16,
143:8, 143:9,
143:25, 145:21,
147:20, 148:12,
151:24, 152:8,
154:25, 156:18,
156:19, 156:25,
159:6, 159:12,
161:9, 164:1, 164:3,
165:14, 167:6,
167:14, 170:24,

175:9
**Law** [1] - 44:17
**law's** [2] - 143:24, 144:2
**lawful** [1] - 46:2
**lawmakers** [1] - 137:22
**lawn** [1] - 133:20
**laws** [3] - 29:6, 57:22, 143:14
**lawyer** [1] - 91:5
**lay** [2] - 40:3, 63:15
**layer** [1] - 36:18
**laying** [1] - 110:7
**lead** [6] - 101:23, 132:16, 141:13, 154:24, 157:23, 165:22
**lead-up** [1] - 165:22
**leader** [6] - 104:21, 116:2, 125:5, 137:5, 165:22, 166:8
**leader's** [1] - 9:22
**leaders** [28] - 101:14, 105:5, 116:7, 116:23, 118:1, 121:25, 122:13, 122:24, 124:22, 127:16, 128:4, 128:7, 129:13, 131:21, 136:11, 136:14, 136:16, 136:21, 137:10, 137:15, 139:1, 139:25, 141:12, 146:24, 152:25, 166:14, 176:25, 177:8
**leaders'** [7] - 103:11, 112:14, 116:3, 126:13, 127:14, 130:4, 177:1
**leadership** [8] - 105:3, 106:12, 121:22, 125:19, 125:24, 126:8, 141:6, 146:20
**leading** [8] - 128:11, 128:17, 134:5, 147:21, 153:17, 166:20, 170:17
**leaning** [1] - 61:15
**learning** [1] - 112:23
**least** [49] - 4:12, 18:15, 18:16, 19:2, 19:13, 19:25, 24:12, 32:6, 32:19, 34:14, 34:21, 36:10, 36:23, 48:20, 59:22, 63:1, 80:4, 84:13, 88:22, 99:16, 100:13,

104:6, 105:4, 109:25, 111:25, 112:9, 116:8, 125:23, 135:11, 136:15, 140:24, 146:17, 147:5, 148:4, 150:11, 151:24, 153:20, 155:10, 158:23, 162:11, 163:24, 165:24, 167:19, 171:6, 172:20, 173:2, 175:20, 179:5
**leave** [10] - 10:18, 16:24, 25:15, 25:25, 26:17, 117:7, 137:21, 164:3, 166:21, 167:14
**leaves** [2] - 82:5, 162:7
**leaving** [2] - 175:9, 175:15
**led** [10] - 10:22, 111:18, 131:18, 131:23, 132:8, 132:23, 137:8, 141:14, 166:7, 177:18
**left** [8] - 80:11, 80:12, 89:2, 107:13, 108:20, 114:22, 115:10, 182:13
**legal** [8] - 30:20, 30:21, 31:3, 31:15, 33:14, 34:4, 142:25, 143:1
**legislative** [2] - 14:25, 38:14
**legitimacy** [1] - 152:20
**lend** [2] - 56:14, 58:14
**length** [4] - 125:6, 140:19, 141:2, 145:5
**lengthy** [5] - 55:14, 96:5, 96:6, 112:19, 181:17
**less** [7] - 19:17, 22:12, 37:4, 73:8, 104:4, 142:3
**lesser** [1] - 175:6
**letter** [1] - 15:14
**letting** [1] - 9:7
**level** [17] - 34:1, 55:25, 56:5, 66:10, 66:25, 67:2, 67:3, 67:11, 67:23, 67:25, 68:3, 68:5, 84:2, 86:22, 86:24, 92:9, 93:13
**Level** [4] - 67:2, 67:3, 67:4, 67:5
**liability** [8] - 85:15,

88:1, 147:9, 161:10, 161:16, 167:23, 171:3, 173:3
**liable** [1] - 171:8
**Liberation** [1] - 89:19
**liberty** [1] - 137:25
**license** [1] - 114:16
**Liebengood** [1] - 16:19
**life** [4] - 8:20, 11:22, 15:24, 16:14
**light** [12] - 37:7, 98:19, 100:4, 103:19, 111:25, 114:7, 141:18, 141:24, 145:24, 156:23, 169:1, 175:12
**likely** [2] - 15:25, 104:25
**limit** [2] - 179:9, 179:11
**limited** [2] - 154:11, 180:18
**limiting** [2] - 82:6, 149:16
**limits** [2] - 39:21, 171:16
**line** [20] - 7:4, 10:1, 10:2, 10:24, 11:2, 11:10, 11:13, 17:15, 30:7, 42:11, 47:20, 52:23, 98:3, 108:7, 130:12, 130:15, 162:22, 167:7, 168:6, 175:24
**lined** [1] - 14:8
**lines** [5] - 63:2, 83:11, 107:25, 132:6, 136:4
**link** [2] - 74:15, 161:25
**list** [4] - 4:7, 70:17, 70:20, 80:11
**listed** [3] - 73:4, 73:6, 73:9
**listen** [1] - 81:13
**listening** [2] - 102:12, 153:4
**lists** [1] - 121:19
**literally** [2] - 89:12, 108:24
**litigated** [1] - 149:17
**lived** [1] - 14:3
**lives** [6] - 8:21, 10:12, 10:25, 11:15, 130:12
**LLC** [1] - 1:19
**lobby** [3] - 10:23, 11:17, 11:20
**local** [3] - 171:15, 179:9, 182:24
**locations** [1] - 122:10
**lock** [1] - 13:8

**locked** [1] - 108:17
**log** [1] - 126:20
**logic** [2] - 80:21, 80:22
**logistics** [1] - 124:4
**longstanding** [1] - 143:24
**look** [44] - 18:22, 19:5, 19:6, 19:8, 19:10, 19:20, 20:6, 20:8, 20:10, 20:20, 21:12, 22:1, 22:15, 25:6, 25:9, 28:10, 29:25, 32:9, 34:3, 35:20, 36:21, 36:22, 40:10, 40:14, 41:4, 41:15, 48:18, 52:22, 53:14, 59:1, 67:21, 70:6, 70:13, 71:6, 72:13, 77:12, 87:21, 88:11, 89:16, 89:24, 90:8, 90:11, 152:1
**looked** [2] - 19:25, 92:12
**looking** [9] - 22:21, 22:22, 23:14, 32:14, 33:4, 45:24, 67:17, 70:9, 92:13
**looks** [2] - 26:5, 29:21
**loose** [1] - 129:20
**lords** [1] - 89:13
**lose** [1] - 8:20
**losers** [2] - 102:22, 117:9
**loss** [2] - 170:21, 171:13
**lost** [5] - 7:25, 10:1, 11:22, 101:18, 112:20
**loved** [1] - 16:2
**low** [3] - 55:25, 56:10
**low-level** [1] - 55:25
**lower** [5] - 6:2, 6:22, 10:2, 57:17, 86:22
**lower-level** [1] - 86:22
**Loyd** [3] - 9:11, 9:14, 15:4
**LOYD** [2] - 9:12, 9:14
**lunch** [1] - 95:20
**lungs** [1] - 16:10
**Lyons** [2] - 61:9, 134:6

---

**M**

**machine** [2] - 2:15, 14:9
**Madison** [1] - 137:11
**main** [4] - 11:11, 11:13, 124:6, 152:25
**maintained** [1] - 156:21

**major** [1] - 107:1
**majority** [4] - 9:22, 13:19, 24:1, 154:10
**Mall** [1] - 131:1
**mall** [1] - 6:6
**man** [10] - 112:1, 112:6, 131:12, 131:13, 131:15, 133:7, 146:5, 166:4, 174:13
**man's** [1] - 145:22
**management** [1] - 115:16
**manifestation** [1] - 115:18
**manifested** [1] - 103:10
**manipulation** [1] - 154:14
**manned** [1] - 132:12
**manner** [1] - 100:14
**manual** [1] - 53:2
**march** [9] - 76:9, 111:18, 112:24, 128:12, 130:8, 132:1, 135:18, 141:16, 160:24
**marched** [7] - 46:20, 130:25, 131:8, 131:20, 134:6, 177:5, 179:22
**marching** [11] - 129:3, 131:11, 131:18, 131:24, 132:5, 132:9, 136:1, 140:5, 159:18, 159:25, 166:6
**mark** [1] - 71:11
**Mark** [2] - 15:9, 17:19
**marked** [3] - 113:10, 123:10, 178:20
**marks** [1] - 16:24
**marshals** [1] - 3:17
**mask** [4] - 102:21, 117:6, 168:20
**mass** [2] - 89:4, 89:15
**match** [2] - 22:21, 23:15
**matching** [1] - 174:13
**material** [1] - 180:2
**math** [3] - 66:9, 69:15, 170:23
**Matter** [4] - 3:2, 62:18, 96:2, 142:12
**matter** [15] - 7:9, 7:12, 7:13, 8:11, 9:5, 12:21, 48:4, 51:21, 68:16, 87:3, 96:8, 157:16, 161:8, 180:7
**matters** [4] - 36:25,

87:5, 181:14, 181:19
**Matthew** [3] - 114:18, 158:20, 159:7
**maximum** [2] - 57:7, 57:15
**MCCULLOUGH** [59] - 20:2, 20:19, 21:4, 23:3, 23:5, 23:8, 23:10, 23:24, 24:2, 24:7, 24:25, 25:22, 40:7, 40:12, 40:14, 40:21, 40:23, 41:2, 41:9, 42:7, 42:9, 43:11, 43:20, 44:3, 44:9, 44:15, 45:6, 46:10, 46:16, 47:3, 47:9, 60:11, 60:17, 60:19, 61:18, 61:25, 62:10, 63:22, 64:6, 65:5, 65:7, 66:1, 66:5, 66:15, 66:19, 66:23, 66:25, 67:19, 68:11, 68:14, 68:17, 68:23, 69:6, 69:20, 88:25, 90:7, 90:22, 91:14, 91:22
**McCullough** [19] - 1:11, 3:7, 19:24, 35:10, 35:25, 48:14, 49:5, 49:19, 49:24, 50:17, 59:23, 70:1, 76:14, 83:23, 90:5, 93:9, 93:12, 93:18, 93:21
**McFadden** [1] - 79:20
**McIntyre** [4] - 170:15, 170:24, 171:12, 172:8
**McIntyre's** [1] - 173:5
**mean** [39] - 20:18, 25:1, 26:2, 29:16, 30:20, 39:21, 40:2, 43:17, 44:2, 44:14, 44:17, 45:5, 45:17, 50:3, 50:4, 50:10, 53:18, 54:3, 57:5, 57:13, 60:12, 61:4, 65:13, 68:7, 68:18, 72:4, 74:16, 80:7, 83:25, 87:2, 87:8, 87:20, 90:8, 90:16, 91:1, 130:22, 131:7, 183:5
**meaning** [10] - 26:8, 27:25, 61:5, 85:18, 87:16, 87:17, 119:18, 136:21, 151:8, 155:16
**meaningful** [1] - 179:17

**means** [11] - 25:14, 76:24, 85:18, 100:17, 104:7, 152:9, 154:15, 155:13, 156:2, 156:13, 172:18
**meant** [6] - 67:8, 101:6, 104:20, 174:1, 177:25
**meanwhile** [2] - 132:17, 136:10
**measure** [1] - 73:21
**measured** [1] - 180:10
**mechanics** [1] - 69:23
**media** [8] - 13:17, 101:20, 106:22, 107:1, 109:22, 112:22, 137:19
**meet** [2] - 129:1, 159:23
**meeting** [1] - 39:25
**meets** [4] - 64:10, 64:17, 73:3, 155:1
**Mehta** [2] - 24:4, 79:19
**member** [17] - 9:6, 102:7, 116:13, 121:4, 121:7, 126:20, 126:24, 127:4, 127:7, 127:16, 129:5, 129:6, 132:4, 136:1, 140:5, 163:25, 164:2
**member's** [1] - 104:19
**members** [34] - 8:18, 11:19, 15:20, 26:16, 36:2, 36:10, 38:19, 38:21, 91:8, 100:16, 101:15, 103:15, 104:16, 105:5, 116:6, 118:13, 120:20, 125:24, 126:3, 126:10, 126:17, 128:5, 128:7, 128:11, 130:25, 131:8, 133:19, 136:24, 140:1, 164:14, 166:20, 167:14, 176:22, 183:3
**members'** [1] - 127:13
**membership** [8] - 125:16, 125:19, 125:21, 126:6, 126:7, 128:21, 128:23, 159:7
**memo** [2] - 39:21, 67:14
**memoranda** [3] - 30:1, 30:12, 67:21
**memorandum** [1] -

84:7
**memories** [2] - 16:24, 17:1
**memory** [1] - 15:23
**memos** [1] - 54:23
**men** [13] - 89:13, 102:23, 111:15, 117:11, 117:12, 118:5, 128:25, 129:2, 132:15, 132:16, 135:16, 137:2, 166:3
**mens** [2] - 55:25, 75:12
**mental** [4] - 41:24, 73:17, 73:19, 73:24
**mention** [2] - 125:3, 181:16
**mentioned** [10] - 37:17, 91:16, 101:13, 103:25, 112:9, 116:24, 121:25, 140:11, 160:12, 166:19
**mentioning** [2] - 80:19, 181:9
**mercy** [1] - 12:16
**mere** [1] - 53:11
**merely** [4] - 36:2, 73:8, 171:11, 172:11
**meritless** [1] - 180:6
**merits** [2] - 179:10, 179:11
**Mesa** [1] - 178:1
**message** [7] - 112:19, 121:25, 126:15, 128:25, 134:1, 138:5, 153:4
**messaged** [4] - 102:20, 110:24, 117:18, 118:19
**messages** [7] - 105:17, 136:13, 137:19, 138:25, 157:3, 158:8, 158:11
**met** [3] - 57:11, 90:3, 130:3
**metal** [3] - 144:20, 167:25, 168:14
**metaphorically** [1] - 130:22
**Metcalf** [3] - 2:5, 3:12, 88:19
**METCALF** [11] - 2:5, 83:23, 86:2, 86:5, 86:7, 87:8, 88:18, 142:16, 142:19, 142:21
**method** [1] - 89:21
**methodology** [2] -

18:21, 19:21
**Metropolitan** [3] - 10:10, 10:14, 14:14
**Miami** [1] - 1:24
**Michale** [1] - 159:23
**Michigan** [1] - 108:4
**microphone** [1] - 131:14
**mid** [2] - 108:12, 181:23
**mid-December** [1] - 108:12
**mid-trial** [1] - 181:23
**middle** [2] - 16:20, 22:14
**might** [65] - 27:19, 34:19, 35:13, 35:14, 57:13, 74:21, 77:9, 79:4, 79:19, 82:2, 83:2, 87:2, 106:9, 109:11, 111:24, 112:11, 112:14, 113:10, 114:3, 115:3, 115:6, 115:19, 117:19, 118:3, 118:20, 120:8, 120:14, 121:20, 122:14, 124:25, 125:4, 125:16, 126:13, 127:12, 127:17, 127:23, 128:2, 128:15, 134:21, 135:15, 136:5, 136:13, 138:21, 139:18, 139:22, 141:3, 141:21, 146:1, 151:17, 152:4, 152:13, 153:5, 156:12, 156:24, 157:22, 159:8, 160:10, 160:23, 164:22, 177:4, 178:8, 178:9, 178:19, 179:2
**military** [1] - 13:21
**militia** [1] - 109:6
**Milkshake** [2] - 45:14, 131:15
**Miller** [3] - 2:11, 119:19, 184:2
**MILLER** [1] - 183:22
**million** [1] - 127:8
**mind** [5] - 107:7, 145:15, 162:7, 175:15, 181:12
**mine** [1] - 6:20
**Minecraft** [1] - 126:21
**minimum** [3] - 32:21, 67:12, 156:3

**Ministry** [2] - 103:2, 118:10
**minute** [2] - 62:13, 176:2
**minutes** [9] - 10:11, 110:18, 117:17, 124:18, 131:25, 132:11, 136:7, 142:7, 175:18
**mirroring** [1] - 138:9
**mirrors** [1] - 116:18
**misapplication** [1] - 89:4
**miscarriage** [4] - 180:19, 181:7, 181:22, 181:24
**misconduct** [1] - 180:5
**misdemeanor** [10] - 22:13, 82:3, 86:10, 86:11, 86:18, 86:19, 87:4, 87:6, 87:10, 168:6
**misdemeanors** [1] - 81:12
**missing** [1] - 84:15
**mission** [2] - 15:1, 118:17
**mistake** [1] - 138:13
**mistrial** [1] - 97:17
**misunderstanding** [1] - 94:3
**Mitchell** [2] - 148:16, 149:14
**mob** [17] - 9:17, 10:3, 10:19, 10:21, 10:23, 11:7, 11:8, 11:23, 12:6, 12:11, 12:13, 12:14, 12:17, 12:20, 156:22, 169:9
**mob's** [1] - 162:15
**moderator** [1] - 101:3
**mom** [1] - 120:1
**moment** [5] - 75:1, 113:18, 148:12, 154:9, 160:13
**monitoring** [1] - 136:10
**months** [4] - 13:15, 35:2, 103:23, 108:16
**months-long** [1] - 103:23
**Monument** [3] - 129:1, 130:3, 135:19
**moreover** [2] - 145:12, 160:12
**morning** [16] - 3:16, 5:6, 5:10, 9:12, 9:13, 27:14, 52:20, 55:4, 61:23, 102:15,

102:25, 107:9,
116:24, 117:20,
129:11, 130:2
**MOSD** [65] - 103:2,
103:8, 104:11,
104:21, 106:13,
112:13, 113:14,
115:17, 115:20,
116:3, 116:6,
116:22, 118:21,
120:9, 120:16,
121:16, 121:22,
122:12, 122:24,
124:22, 124:23,
125:5, 125:15,
125:19, 125:21,
126:17, 127:13,
127:16, 127:17,
128:3, 128:6,
128:11, 128:23,
129:5, 129:6,
129:13, 130:4,
130:25, 131:21,
135:17, 136:1,
136:11, 136:14,
136:20, 136:24,
137:5, 137:10,
137:15, 139:1,
139:25, 140:20,
140:21, 140:22,
141:11, 141:13,
146:20, 146:24,
152:25, 159:7,
166:1, 166:8,
166:13, 176:23,
177:1, 179:22
**MOSD's** [1] - 126:8
**most** [35] - 10:6,
10:11, 13:13, 16:16,
18:12, 19:2, 22:16,
24:16, 26:11, 27:5,
32:3, 33:6, 33:8,
34:3, 38:7, 38:8,
39:9, 57:23, 57:25,
78:25, 84:6, 88:22,
98:19, 100:4,
103:19, 114:7,
136:3, 141:19,
145:25, 156:23,
160:10, 166:19,
169:2, 175:12, 178:4
**mostly** [5] - 11:18,
51:3, 112:8, 132:8,
154:2
**mother** [1] - 167:1
**motherfucker** [2] -
138:9, 163:11
**motherfuckers** [2] -
124:1, 162:25
**motherfucking** [1] -

163:12
**motion** [17] - 83:1,
96:14, 143:4,
143:10, 143:21,
144:4, 145:15,
154:4, 160:6, 160:8,
160:9, 161:23,
164:13, 165:6,
176:15, 180:3,
180:18
**motion-to-dismiss** [1]
- 164:13
**motions** [13] - 4:2,
4:17, 28:2, 95:22,
96:5, 96:7, 98:8,
98:11, 99:12,
103:24, 165:8,
176:8, 180:12
**motivate** [1] - 113:9
**motive** [8] - 88:14,
106:12, 113:22,
115:14, 118:9,
148:19, 149:11,
181:13
**motives** [5] - 31:6,
31:9, 34:12, 119:1,
127:14
**motto** [1] - 14:4
**mouth** [2] - 43:6,
163:9
**move** [10] - 7:23, 36:9,
39:14, 48:4, 90:24,
98:14, 154:4,
163:18, 167:24,
169:9
**moved** [14] - 15:12,
96:8, 96:12, 96:14,
96:16, 99:8, 99:9,
132:17, 132:24,
133:5, 168:9,
176:12, 180:23
**moving** [4] - 32:3,
36:5, 159:21, 168:8
**MPD** [1] - 16:4
**MR** [170] - 4:25, 9:10,
15:8, 15:17, 17:21,
20:2, 20:19, 21:4,
23:3, 23:5, 23:8,
23:10, 23:24, 24:2,
24:7, 24:25, 25:22,
27:14, 30:24, 31:8,
31:18, 31:22, 32:12,
32:25, 33:8, 33:11,
33:14, 33:17, 33:23,
35:6, 35:9, 36:13,
37:3, 37:11, 37:17,
38:21, 40:7, 40:12,
40:14, 40:21, 40:23,
41:2, 41:9, 42:7,
42:9, 43:11, 43:20,

44:3, 44:9, 44:15,
45:6, 46:10, 46:16,
47:3, 47:9, 48:1,
48:12, 48:22, 49:10,
49:14, 50:11, 50:14,
50:16, 50:24, 51:3,
51:22, 52:5, 52:13,
52:20, 53:19, 53:22,
53:24, 54:5, 54:11,
55:4, 55:19, 57:19,
59:7, 60:11, 60:17,
60:19, 61:18, 61:25,
62:10, 63:22, 64:6,
65:5, 65:7, 66:1,
66:5, 66:15, 66:19,
66:23, 66:25, 67:19,
68:11, 68:14, 68:17,
68:23, 69:6, 69:20,
69:25, 70:19, 71:4,
72:13, 72:18, 73:11,
73:13, 74:1, 74:5,
74:13, 74:19, 74:25,
75:6, 75:23, 76:1,
76:4, 76:9, 76:12,
76:20, 77:5, 77:8,
77:14, 77:16, 78:8,
78:11, 78:21, 79:12,
79:15, 79:17, 80:2,
80:9, 80:16, 80:21,
81:1, 81:4, 81:7,
81:14, 82:1, 82:8,
82:10, 82:12, 82:15,
82:18, 83:21, 83:23,
86:2, 86:5, 86:7,
87:8, 88:18, 88:25,
90:7, 90:22, 91:14,
91:22, 93:6, 93:8,
93:16, 94:11, 94:14,
94:17, 94:20, 94:22,
95:1, 95:12, 95:14,
142:16, 142:19,
142:21
**mucking** [2] - 44:1,
44:6
**Mulroe** [6] - 1:12, 3:8,
4:24, 4:25, 15:7,
17:23
**MULROE** [5] - 4:25,
9:10, 15:8, 15:17,
17:21
**multiple** [9] - 14:14,
16:9, 58:18, 59:3,
111:25, 112:1,
112:3, 146:2, 172:5
**multiple-count** [1] -
59:3
**must** [9] - 12:19,
75:14, 98:18, 98:25,
99:12, 100:4,
155:15, 160:15

**muster** [1] - 158:17
**mutual** [2] - 100:19,
153:6

# N

**nah** [1] - 139:16
**name** [6] - 5:10, 9:14,
79:1, 84:16, 118:10,
182:18
**named** [1] - 134:5
**names** [1] - 152:21
**National** [1] - 131:1
**national** [1] - 101:16
**nationwide** [1] - 144:9
**natural** [2] - 14:11,
150:22
**nature** [7] - 32:8, 34:7,
73:2, 86:7, 87:13,
141:24, 148:13
**nauseam** [1] - 86:9
**Nayib** [2] - 1:22, 3:11
**NAYIB** [1] - 1:23
**near** [2] - 161:2,
162:14
**nearest** [2] - 6:6
**nearly** [2] - 15:21,
16:21
**necessarily** [3] -
40:24, 43:17, 46:8
**necessary** [5] - 78:4,
103:12, 109:10,
141:3, 174:24
**need** [25] - 4:8, 13:16,
20:13, 42:18, 42:21,
43:17, 44:1, 44:5,
46:25, 48:14, 58:17,
62:11, 72:1, 73:15,
73:25, 74:8, 78:4,
90:16, 107:19,
109:14, 118:14,
125:8, 139:11
**needed** [4] - 73:20,
106:15, 114:14
**needle** [1] - 154:4
**needs** [2] - 110:19,
123:14
**Neil** [1] - 37:19
**never** [20] - 6:2, 6:25,
7:4, 10:20, 12:7,
16:1, 16:6, 16:13,
16:25, 55:13, 57:6,
71:5, 72:25, 83:3,
83:11, 108:16,
123:16, 127:21,
127:22
**nevertheless** [1] -
81:7
**New** [7] - 1:17, 1:21,
2:7, 13:23, 85:12,

107:5, 107:7
**new** [17] - 14:22,
31:23, 96:16, 98:11,
118:7, 118:8,
170:19, 171:23,
176:8, 180:15,
180:17, 180:23,
181:4, 182:17,
182:20
**newly** [1] - 171:16
**newly-discovered** [1]
- 171:16
**news** [1] - 137:11
**next** [11] - 8:2, 14:18,
26:23, 30:14, 39:14,
106:21, 133:10,
143:17, 143:20,
144:12, 146:9
**nexus** [1] - 74:2
**Nicholas** [3] - 1:15,
3:9, 146:15
**Nick** [1] - 27:14
**nickname** [1] - 106:7
**Nicole** [1] - 119:19
**night** [8] - 6:8, 6:23,
8:3, 16:20, 109:24,
111:12, 123:5,
182:13
**nine** [2] - 68:5, 96:19
**Ninth** [3] - 20:9, 92:11,
92:13
**NJ** [3] - 2:11, 183:22,
184:2
**NJ-CCR** [3] - 2:11,
183:22, 184:2
**nobody** [1] - 105:22
**non** [4] - 18:14, 47:12,
92:21, 179:20
**non-enumerated** [1] -
92:21
**non-hearsay** [1] -
179:20
**non-obstruction** [1] -
18:14
**non-physical** [1] -
47:12
**none** [6] - 4:21, 160:4,
161:5, 167:17,
181:6, 181:8
**nonetheless** [2] -
42:2, 60:21
**noon** [1] - 131:23
**Nordean** [127] - 3:3,
3:13, 18:17, 27:15,
37:5, 46:7, 48:5,
51:7, 51:10, 51:15,
51:23, 52:15, 62:19,
67:4, 67:24, 72:24,
96:3, 96:11, 97:13,
101:14, 101:24,

102:10, 102:24, 103:4, 105:4, 105:19, 106:7, 106:11, 108:12, 108:17, 108:19, 109:2, 110:13, 110:18, 111:19, 117:16, 117:22, 117:23, 120:22, 121:14, 128:10, 128:20, 128:23, 128:25, 130:7, 130:9, 130:24, 131:2, 131:4, 131:14, 131:16, 131:19, 131:23, 132:1, 132:4, 132:14, 133:2, 133:5, 133:11, 133:14, 133:18, 133:21, 134:3, 134:11, 134:22, 134:25, 136:19, 138:1, 139:15, 140:12, 140:22, 141:15, 142:13, 142:25, 143:20, 144:5, 144:12, 144:21, 144:22, 145:7, 145:13, 145:18, 145:20, 145:25, 146:3, 146:5, 146:18, 150:2, 153:12, 153:15, 156:7, 157:5, 158:4, 158:14, 158:19, 159:15, 159:18, 159:20, 159:23, 159:25, 160:11, 160:18, 160:21, 161:1, 161:10, 164:6, 164:11, 164:19, 164:20, 167:21, 168:17, 168:18, 168:22, 169:2, 169:6, 169:16, 169:25, 171:1, 171:8, 176:14, 176:22, 177:8, 177:10, 177:12, 177:14, 177:18
**NORDEAN** [1] - 1:4
**Nordean's** [18] - 49:25, 52:7, 70:5, 96:14, 141:6, 142:1, 144:4, 145:10, 145:24, 146:9, 158:11, 158:24, 159:16, 160:5,

160:7, 161:5, 164:22, 169:11
**Norman** [3] - 1:19, 3:9, 3:10
**normie** [1] - 129:19
**normie-cons** [1] - 129:19
**normies** [3] - 123:7, 129:14, 137:8
**north** [1] - 11:8
**North** [1] - 166:2
**Nos** [2] - 1:2, 96:13
**notable** [2] - 123:11, 126:19
**notably** [1] - 179:14
**Note** [26] - 64:24, 64:25, 67:7, 67:8, 67:9, 67:25, 69:2, 77:1, 78:3, 78:16, 79:4, 79:22, 80:3, 80:6, 80:24, 84:21, 85:6, 88:12, 91:24, 92:4, 92:25, 93:2, 93:10, 93:12, 93:23, 95:8
**note** [9] - 79:9, 85:2, 100:6, 124:5, 124:12, 124:13, 160:4, 161:21, 178:7
**noted** [9] - 34:19, 117:7, 121:14, 122:3, 124:9, 127:20, 127:21, 152:23, 154:25
**notes** [4] - 77:19, 144:14, 173:6, 183:24
**nothing** [10] - 7:10, 8:23, 14:11, 56:23, 127:10, 145:2, 155:4, 176:16, 182:20
**notice** [3] - 160:4, 173:8, 173:9
**noting** [3] - 119:1, 129:18, 139:4
**notion** [2] - 19:4, 28:20
**novel** [1] - 179:24
**November** [6] - 106:18, 109:16, 109:20, 110:23, 112:12, 116:13
**nowhere** [1] - 183:7
**nuclear** [1] - 71:8
**Nugent** [7] - 159:17, 159:20, 177:6, 177:9, 177:12, 177:15, 177:24
**nuke** [2] - 124:22,

139:25
**number** [11] - 36:1, 36:7, 37:23, 40:3, 63:4, 63:11, 73:24, 74:20, 76:13, 89:3, 135:16
**numbers** [3] - 11:23, 118:15, 122:10
**NW** [4] - 1:13, 1:23, 2:13, 184:4
**NY** [2] - 1:17, 2:7

## O

**Oath** [1] - 24:5
**oath** [1] - 17:3
**oaths** [1] - 131:6
**obfuscate** [1] - 120:25
**object** [5] - 25:17, 25:25, 59:8, 152:22, 161:13
**objected** [1] - 113:23
**objections** [2] - 124:9, 153:3
**objective** [8] - 100:21, 103:11, 104:12, 122:15, 125:22, 126:10, 126:14, 141:9
**objectives** [10] - 99:24, 100:15, 126:6, 126:7, 126:11, 140:24, 141:6, 141:23, 142:2, 165:24
**objects** [1] - 143:14
**obscure** [1] - 119:22
**obstruct** [20] - 20:24, 20:25, 21:5, 26:15, 26:18, 26:19, 46:1, 50:20, 96:21, 97:15, 140:7, 150:3, 150:9, 150:18, 150:20, 150:23, 153:7, 156:3, 158:9, 162:1
**obstructed** [2] - 162:17, 163:16
**obstructing** [16] - 26:6, 38:9, 38:11, 41:18, 47:18, 58:7, 89:6, 97:19, 97:21, 150:12, 152:9, 156:13, 161:11, 162:9, 167:18
**obstruction** [24] - 18:14, 19:16, 20:24, 21:10, 27:23, 27:25, 28:11, 29:24, 31:19, 31:22, 34:17, 34:20, 34:23, 34:24, 38:12,

39:8, 44:24, 50:7, 96:23, 97:3, 149:23, 149:24, 151:22
**obvious** [2] - 13:4, 55:23
**obviously** [14] - 18:5, 24:11, 53:23, 56:15, 57:5, 57:20, 69:5, 81:6, 95:11, 126:16, 136:3, 149:5, 160:7, 161:10
**occupied** [1] - 53:5
**occupy** [1] - 119:9
**occurred** [2] - 160:16, 180:19
**occurs** [2] - 145:4, 151:6
**odd** [1] - 69:15
**odds** [1] - 9:25
**Ode** [6] - 15:9, 17:19, 61:11, 173:17, 174:12, 174:24
**Ode's** [5] - 15:17, 173:13, 174:4, 174:11, 174:20
**OF** [5] - 1:1, 1:2, 1:8, 1:23, 183:21
**off-site** [1] - 136:10
**offender** [1] - 172:19
**Offense** [5] - 57:10, 67:1, 67:3, 67:4, 67:5
**offense** [6] - 18:24, 20:6, 20:21, 21:13, 21:17, 22:2, 25:7, 26:9, 26:10, 27:24, 28:12, 28:19, 28:20, 29:8, 29:16, 30:5, 30:10, 30:13, 30:16, 31:23, 33:3, 34:1, 35:1, 35:12, 35:13, 35:19, 35:20, 35:21, 36:15, 36:16, 59:19, 66:10, 66:11, 66:25, 67:2, 67:3, 67:11, 67:23, 67:25, 68:3, 68:5, 68:9, 72:5, 73:25, 77:25, 86:10, 86:22, 86:24, 87:17, 87:23, 87:24, 92:9, 93:13, 98:15, 99:14, 145:18, 149:9, 149:13, 150:16, 161:11, 161:13
**offenses** [6] - 19:5, 63:18, 147:7, 150:5, 151:1, 151:19
**offensive** [2] - 112:22, 128:4
**offer** [3] - 149:19,

174:22, 182:13
**offered** [8] - 48:7, 113:21, 119:17, 126:22, 148:23, 170:11, 174:16, 177:21
**offers** [2] - 92:8, 164:11
**office** [4] - 9:22, 14:6, 25:12, 38:4
**OFFICE** [1] - 1:13
**Office** [1] - 32:17
**Officer** [20] - 5:8, 5:10, 5:18, 9:9, 16:18, 16:19, 61:11, 168:16, 168:21, 169:10, 169:14, 170:3, 170:8, 173:13, 173:17, 174:4, 174:11, 174:12, 174:19, 174:24
**officer** [34] - 5:9, 8:20, 10:22, 14:11, 14:13, 15:10, 15:21, 16:4, 16:6, 16:17, 25:14, 25:16, 25:19, 25:24, 26:6, 26:23, 38:10, 42:1, 43:13, 51:17, 53:6, 60:23, 97:21, 98:4, 144:16, 145:21, 156:11, 162:10, 164:1, 164:3, 164:21, 168:23, 173:23, 178:14
**OFFICER** [3] - 5:10, 5:20, 6:14
**officer's** [1] - 5:22
**officer-type** [1] - 38:10
**officers** [55] - 7:16, 8:7, 8:19, 8:20, 8:24, 9:20, 9:23, 11:2, 11:10, 12:9, 12:16, 13:10, 13:13, 13:17, 13:23, 14:2, 14:5, 14:8, 14:14, 14:24, 25:20, 26:16, 35:12, 35:22, 38:8, 38:17, 46:2, 56:2, 61:9, 61:10, 61:12, 97:1, 97:8, 97:20, 108:4, 109:3, 115:1, 122:18, 131:8, 131:9, 132:13, 134:7, 134:9, 154:25, 156:20, 156:22, 162:22, 163:3, 163:21, 167:6, 167:14,

167:18, 168:15,
175:24
**OFFICES** [1] - 1:23
**offices** [1] - 116:17
**OFFICIAL** [1] - 183:21
**official** [25] - 13:14,
13:15, 13:20, 26:19,
46:2, 58:7, 70:25,
96:21, 96:23, 97:15,
97:19, 106:1,
116:14, 140:7,
149:24, 150:3,
150:9, 150:13,
150:18, 150:23,
154:15, 161:11,
162:1, 162:9, 173:24
**Official** [2] - 2:12,
184:2
**officially** [1] - 14:4
**officials** [2] - 108:25,
109:3
**often** [4] - 81:18,
155:20, 181:14,
181:16
**Ohio** [2] - 10:24, 11:5
**ominously** [1] -
138:17
**OMNIBUS** [1] - 1:8
**omnibus** [1] - 67:16
**on-the-ground** [1] -
141:6
**once** [18] - 4:14, 11:1,
11:9, 11:12, 14:18,
16:2, 22:6, 26:8,
31:1, 100:10, 119:1,
146:23, 152:18,
163:9, 164:13,
166:6, 166:18, 167:6
**one** [117] - 4:9, 5:3,
5:21, 6:14, 9:19,
11:11, 12:14, 12:17,
12:22, 14:5, 18:25,
19:18, 22:23, 24:19,
24:20, 24:21, 26:13,
27:16, 27:22, 29:20,
31:4, 31:5, 32:21,
33:3, 33:6, 33:20,
33:21, 36:1, 37:22,
37:23, 40:3, 40:4,
42:14, 45:12, 45:13,
46:11, 47:3, 49:18,
52:25, 54:20, 55:7,
59:1, 59:7, 63:5,
64:8, 65:14, 69:7,
69:18, 70:2, 70:14,
71:2, 71:4, 72:9,
76:13, 78:3, 78:12,
78:25, 80:8, 83:2,
84:10, 84:13, 84:15,
86:12, 86:16, 87:25,

88:23, 89:11, 91:9,
93:8, 93:17, 94:8,
94:11, 99:16, 99:17,
104:19, 105:4,
106:24, 106:25,
107:6, 110:15,
111:16, 111:25,
115:4, 116:12,
117:11, 120:19,
120:20, 121:7,
121:25, 125:3,
126:20, 127:2,
127:7, 128:4,
131:12, 131:16,
141:11, 143:16,
150:6, 150:10,
150:11, 150:17,
151:10, 159:17,
161:1, 162:12,
163:24, 164:19,
172:7, 172:9,
172:18, 179:7,
182:11
**one-third** [1] - 12:14
**ones** [5] - 83:11,
83:12, 113:3, 146:2
**oneself** [2] - 155:22,
158:2
**online** [3] - 102:2,
111:11, 122:9
**open** [2] - 53:15,
162:14
**open-ended** [1] -
53:15
**opening** [1] - 172:22
**operating** [3] - 122:3,
124:6, 152:25
**operation** [1] - 20:25
**Operation** [2] - 120:21
**operations** [2] - 64:21,
68:19
**opinion** [4] - 17:10,
144:6, 154:24,
157:23
**opinions** [1] - 22:23
**opponents** [1] -
115:13
**opportunity** [2] - 9:16,
15:19
**oppose** [11] - 20:22,
29:13, 56:2, 99:17,
100:1, 108:2,
113:25, 120:10,
122:15, 140:15,
152:7
**opposed** [4] - 26:7,
94:4, 171:11, 173:22
**opposing** [4] - 38:8,
38:25, 84:14, 156:25
**opposite** [6] - 83:24,

115:13, 128:1,
156:18, 170:10
**ops** [1] - 137:13
**optics** [2] - 105:22,
121:5
**option** [1] - 25:3
**options** [1] - 25:3
**oral** [4] - 45:2, 96:5,
165:8, 183:12
**Orange** [1] - 1:20
**oranges** [1] - 73:15
**order** [12] - 18:3,
18:12, 39:15, 39:17,
42:21, 43:18, 47:1,
51:9, 64:21, 68:18,
107:3
**ordered** [1] - 10:17
**ordinary** [1] - 120:19
**organization** [6] -
101:11, 101:15,
102:5, 110:4,
112:17, 115:1
**organization's** [2] -
101:16, 103:16
**organizational** [2] -
102:19, 105:5
**organizations** [1] -
101:5
**organize** [3] - 103:12,
106:3, 132:15
**organized** [3] - 17:9,
109:6, 132:1
**organizing** [3] -
118:18, 118:21,
118:22
**original** [1] - 92:5
**originally** [1] - 176:12
**otherwise** [10] - 90:24,
101:22, 113:14,
126:18, 131:17,
153:25, 157:11,
165:17, 170:3, 175:4
**outbreak** [1] - 102:7
**outcome** [1] - 101:21
**outlets** [1] - 107:1
**outline** [1] - 104:10
**outlined** [5] - 18:3,
145:5, 147:3,
151:16, 153:16
**outlining** [1] - 99:24
**outrageous** [1] -
172:14
**outset** [1] - 151:16
**outside** [6] - 78:17,
89:23, 119:12,
137:18, 145:21,
181:14
**outstanding** [1] -
95:22
**outweighed** [1] -

160:17
**overcharged** [1] -
154:5
**overthrow** [1] - 17:9
**overtime** [2] - 5:22,
5:23
**overturn** [2] - 8:8,
157:25
**overwhelm** [1] -
119:13
**overwhelmed** [2] -
134:9, 163:3
**overwhelming** [3] -
9:25, 11:23, 23:25
**own** [7] - 6:25, 12:7,
16:16, 146:6,
158:24, 179:14,
181:17

## P

**P.A** [2] - 1:23, 2:2
**P.C** [1] - 2:5
**p.m** [11] - 9:18, 10:17,
12:11, 12:13, 14:5,
133:17, 159:24,
183:19
**Page** [3] - 67:16,
84:15, 158:3
**page** [7] - 36:13, 84:6,
94:25, 155:3,
171:16, 179:9,
179:11
**Pages** [1] - 157:13
**Palace** [5] - 119:15,
119:21, 120:3,
120:7, 138:11
**pane** [3] - 86:12,
86:15, 172:19
**panel** [5] - 154:10,
170:25, 172:7,
172:9, 172:12
**panels** [3] - 171:1,
171:6, 172:8
**panes** [2] - 172:17,
172:18
**paper** [1] - 167:19
**papers** [1] - 79:17
**paramedics** [1] - 14:9
**parcel** [1] - 126:14
**Park** [1] - 2:6
**Parler** [5] - 101:16,
104:24, 106:17,
107:10, 152:18
**part** [13] - 25:9, 59:21,
81:4, 85:3, 85:6,
86:1, 89:24, 109:6,
126:14, 135:6,
139:19, 159:18
**partial** [1] - 70:9

**participate** [1] - 14:21
**participated** [3] -
99:22, 140:12, 156:7
**participating** [1] -
58:4
**participation** [5] -
114:4, 115:12,
159:16, 167:22,
169:17
**particular** [12] - 4:10,
12:23, 54:13, 56:13,
57:2, 60:2, 80:1,
91:2, 113:10, 144:2,
145:4, 181:5
**particularly** [10] -
18:17, 54:19, 71:11,
75:11, 116:2,
128:16, 130:8,
142:6, 169:11,
178:11
**parties** [5] - 3:22,
18:18, 28:19,
149:16, 183:16
**parties'** [1] - 155:18
**parts** [1] - 84:24
**party** [1] - 23:21
**pass** [1] - 158:17
**passing** [3] - 13:24,
16:18, 92:14
**past** [6] - 7:10, 48:4,
60:7, 131:3, 131:8,
136:20
**path** [3] - 61:22, 62:1
**patriotic** [1] - 178:4
**patriots** [1] - 127:8
**pattern** [1] - 127:18
**Pattis** [6] - 1:19, 3:9,
3:10, 52:19, 53:13,
83:2
**PATTIS** [7] - 1:19,
52:20, 53:19, 53:22,
53:24, 54:5, 54:11
**pause** [6] - 6:9, 6:11,
6:13, 65:23, 130:21,
142:22
**pay** [1] - 105:23
**Peace** [5] - 9:19, 10:1,
132:6, 141:17,
159:21
**peaceful** [6] - 8:17,
89:6, 89:14, 89:22,
132:8, 140:17
**peacefully** [1] - 178:3
**pedestrian** [2] -
111:23, 112:1
**pending** [1] - 96:15
**penetrated** [1] - 13:7
**people** [24] - 7:1, 8:5,
8:8, 8:13, 8:16,
12:18, 25:25, 29:17,

56:1, 72:1, 85:12, 100:13, 107:14, 108:6, 112:3, 116:17, 119:12, 121:11, 129:15, 129:16, 130:13, 137:23, 137:25, 139:25
**Pepe** [1] - 140:6
**pepper** [3] - 135:9, 156:11, 178:14
**pepper-spraying** [2] - 156:11, 178:14
**perceived** [1] - 114:23
**perceiving** [1] - 16:16
**percent** [1] - 45:19
**perfect** [2] - 22:21, 23:15
**perfectly** [1] - 108:17
**perform** [1] - 167:15
**performance** [1] - 173:24
**performed** [4] - 25:16, 26:1, 26:18, 36:6
**performing** [1] - 166:21
**perhaps** [4] - 55:1, 58:13, 60:16, 166:19
**perimeter** [1] - 10:19
**period** [7] - 15:21, 16:21, 17:8, 40:1, 104:8, 114:11, 122:12
**periods** [1] - 141:15
**permanently** [3] - 174:5, 175:7, 175:21
**permitted** [3] - 115:24, 175:4, 181:17
**person** [17] - 5:2, 6:21, 14:10, 15:12, 25:12, 36:5, 38:3, 84:13, 130:10, 150:11, 155:17, 155:22, 158:2, 163:24, 174:14, 182:21
**person's** [1] - 164:4
**personal** [1] - 97:10
**personally** [3] - 55:13, 134:23, 134:25
**personnel** [13] - 9:18, 9:25, 10:4, 10:5, 10:13, 10:15, 11:24, 12:3, 12:25, 13:5, 13:8, 14:16, 14:23
**persons** [2] - 38:1, 57:9
**perspective** [1] - 68:19
**persuaded** [1] - 157:12

**persuasive** [2] - 135:24, 154:24
**pertain** [1] - 31:3
**pertains** [1] - 4:9
**petit** [1] - 71:14
**petition** [1] - 89:22
**Pezzola** [92] - 3:6, 3:15, 15:11, 37:12, 37:13, 37:14, 41:7, 45:16, 45:18, 55:20, 67:5, 84:23, 85:5, 85:7, 85:10, 85:11, 85:14, 85:23, 86:15, 87:19, 87:24, 88:16, 89:11, 96:11, 96:16, 97:10, 97:15, 97:24, 98:3, 98:6, 109:19, 109:20, 111:19, 112:6, 114:19, 134:3, 135:22, 140:5, 140:9, 150:4, 153:14, 161:19, 161:20, 161:22, 161:25, 162:4, 162:12, 162:20, 162:21, 163:4, 163:15, 165:2, 165:3, 165:4, 165:21, 165:25, 166:2, 166:5, 166:9, 166:15, 167:22, 169:21, 171:16, 171:21, 171:24, 172:2, 172:11, 172:17, 172:19, 172:24, 173:6, 173:16, 173:20, 174:2, 174:3, 174:4, 174:10, 174:17, 174:18, 174:22, 175:5, 175:8, 175:13, 175:17, 175:22, 178:19, 180:3, 180:24, 182:16, 182:22, 183:10
**PEZZOLA** [1] - 1:6
**Pezzola's** [24] - 41:23, 61:11, 84:16, 87:9, 88:7, 100:7, 144:15, 144:17, 162:8, 165:8, 166:18, 167:3, 167:10, 173:8, 173:13, 174:13, 178:9, 179:8, 179:10, 179:11, 180:1, 180:4, 182:25, 183:6
**Philadelphia** [1] - 118:2

**phone** [6] - 6:15, 119:20, 120:8, 124:18, 124:24, 146:18
**photo** [4] - 109:21, 137:22, 166:15, 171:19
**photographs** [1] - 174:10
**photos** [3] - 171:16, 171:19, 171:22
**phrase** [4] - 28:24, 29:12, 33:8, 70:20
**phrases** [1] - 29:9
**physical** [12] - 16:21, 21:18, 43:17, 47:11, 47:12, 49:6, 49:7, 49:10, 49:23, 51:17, 66:12, 153:8
**physically** [3] - 85:23, 85:24, 156:22
**pick** [1] - 164:19
**picked** [1] - 175:1
**piece** [3] - 103:22, 115:4, 119:5
**pieces** [3] - 113:4, 115:23, 152:12
**piercing** [1] - 16:3
**pigs** [4] - 106:20, 129:18, 156:20, 168:22
**Pinkerton** [6] - 51:24, 51:25, 147:9, 161:10, 161:16, 167:23
**pinnacle** [1] - 9:3
**pinned** [1] - 16:9
**pitched** [2] - 118:7, 118:8
**place** [20] - 11:24, 12:4, 13:21, 25:12, 25:15, 25:25, 26:17, 36:6, 38:4, 57:21, 60:25, 111:6, 124:8, 125:12, 143:3, 152:17, 153:2, 164:3, 166:21, 167:15
**places** [1] - 135:20
**placing** [1] - 145:22
**plainly** [1] - 174:10
**plan** [10] - 98:7, 113:4, 116:15, 119:9, 123:23, 125:12, 128:23, 158:22, 159:11, 176:23
**planned** [2] - 17:8, 21:19
**planning** [5] - 21:20, 66:13, 120:17,

124:10, 160:25
**plans** [1] - 146:22
**plausible** [1] - 119:2
**plausibly** [1] - 120:24
**play** [4] - 99:1, 105:13, 108:11, 136:2
**played** [2] - 128:11, 132:5
**playing** [1] - 135:19
**plaza** [3] - 61:23, 133:18, 133:25
**pleased** [1] - 183:13
**PLLC** [1] - 1:16
**plowed** [2] - 132:17, 152:5
**plus** [3] - 66:11, 66:13
**pocket** [1] - 16:11
**podcast** [2] - 108:19, 109:1
**point** [54] - 4:15, 13:2, 19:13, 20:13, 24:18, 30:24, 32:6, 32:13, 33:22, 34:25, 35:6, 39:1, 41:6, 46:22, 46:25, 48:14, 50:1, 53:14, 54:18, 59:8, 61:22, 62:1, 67:20, 67:22, 73:8, 74:14, 81:7, 81:25, 82:1, 82:24, 93:8, 94:3, 95:19, 100:7, 109:5, 113:11, 123:22, 135:8, 146:14, 147:10, 149:19, 152:12, 157:13, 161:1, 161:19, 162:15, 167:20, 168:12, 178:24, 179:7, 180:22, 182:11, 183:7
**pointed** [5] - 49:19, 49:24, 50:18, 74:25, 91:23
**pointing** [4] - 31:5, 32:25, 34:9, 62:4
**points** [15] - 22:5, 27:20, 35:24, 68:5, 73:1, 92:9, 128:18, 135:21, 136:2, 141:8, 145:18, 157:8, 158:19, 160:11, 182:22
**poking** [1] - 107:12
**poles** [1] - 7:16
**police** [37] - 7:2, 8:7, 10:2, 10:24, 11:2, 11:10, 11:13, 12:16, 14:1, 35:11, 35:21, 36:16, 53:6, 83:11, 83:12, 83:14, 98:3,

108:4, 109:2, 112:6, 113:12, 114:24, 115:1, 122:13, 123:12, 123:14, 123:19, 124:21, 124:23, 129:20, 130:9, 132:6, 133:17, 164:21, 167:6, 178:14
**Police** [12] - 9:11, 9:15, 10:10, 10:14, 11:2, 14:13, 15:10, 15:21, 131:8, 162:10, 164:15, 173:23
**policy** [1] - 154:3
**political** [11] - 17:8, 89:20, 102:4, 103:16, 104:8, 113:16, 114:9, 115:4, 115:13, 147:21, 148:2
**politicians** [1] - 139:10
**politics** [1] - 105:21
**poorly** [1] - 178:21
**population** [2] - 88:15, 92:20
**portions** [1] - 182:23
**posed** [1] - 166:15
**posited** [1] - 123:13
**position** [15] - 8:15, 30:22, 30:23, 40:20, 42:8, 43:22, 63:6, 63:24, 69:7, 69:11, 77:10, 85:6, 86:21, 93:23, 176:25
**positioned** [2] - 117:23, 156:17
**positions** [1] - 156:21
**positive** [1] - 145:20
**positively** [1] - 30:2
**possession** [2] - 38:2, 174:20
**possibilities** [1] - 39:24
**possible** [5] - 7:14, 8:14, 50:8, 103:21, 128:2
**post** [5] - 37:25, 96:5, 96:7, 137:22, 161:23
**post-Civil** [1] - 37:25
**post-trial** [3] - 96:5, 96:7, 161:23
**posted** [7] - 101:16, 102:13, 102:17, 105:17, 106:17, 106:21, 107:6, 107:9, 107:21, 108:6, 109:21,

110:8, 110:18, 111:11, 112:25, 137:18, 138:16
**poster** [1] - 89:12
**posting** [2] - 122:8, 166:13
**posts** [3] - 105:9, 105:18, 112:22
**posture** [1] - 65:18
**potential** [1] - 151:4
**power** [9] - 89:7, 89:14, 103:14, 104:9, 120:10, 134:20, 140:17, 143:16, 145:8
**powerfully** [1] - 157:2
**practical** [7] - 66:3, 66:5, 68:8, 69:1, 93:18, 93:22, 94:15
**pre** [1] - 181:23
**precedent** [6] - 19:17, 23:19, 24:9, 24:10, 29:7, 143:24
**precise** [1] - 48:24
**precisely** [1] - 28:4
**predecessor** [1] - 29:15
**predicate** [2] - 53:8, 145:3
**predicated** [1] - 98:2
**preferred** [1] - 157:25
**prejudice** [1] - 181:5
**Premonition** [1] - 138:18
**prep** [2] - 14:20, 14:21
**preparations** [1] - 121:17
**prepare** [3] - 7:19, 108:24, 116:23
**prepared** [5] - 45:9, 89:9, 89:14, 120:12, 173:7
**preparing** [1] - 121:21
**preponderance** [6] - 45:21, 48:7, 51:7, 52:1, 73:8, 74:9
**presence** [1] - 181:14
**present** [16] - 3:7, 3:8, 3:9, 3:10, 3:12, 3:13, 3:25, 9:10, 82:16, 82:18, 97:1, 97:20, 129:8, 131:21, 143:6
**presented** [7] - 20:7, 26:13, 87:22, 145:6, 147:13, 168:25, 179:3
**preservation** [1] - 59:7
**preserve** [1] - 162:6
**President** [20] - 11:1, 101:2, 101:3, 101:5,

101:7, 101:13, 101:18, 102:16, 104:17, 104:20, 105:10, 111:8, 114:12, 116:25, 121:9, 131:2, 139:14, 153:10, 181:2, 181:9
**president** [3] - 12:1, 12:5, 143:16
**presidential** [5] - 104:9, 105:7, 109:10, 140:17, 170:17
**presidents** [7] - 102:10, 104:16, 106:1, 112:16, 112:19, 116:14, 139:6
**press** [1] - 182:9
**pressing** [2] - 54:22, 54:24
**presumably** [1] - 123:21
**pretrial** [4] - 27:24, 28:2, 28:19, 29:12
**pretty** [2] - 19:16, 27:4
**prevent** [13] - 25:11, 28:23, 29:13, 38:3, 97:1, 97:20, 99:18, 100:2, 143:8, 145:20, 163:20, 163:25, 167:15
**prevented** [2] - 29:4, 108:5
**preventing** [1] - 143:24
**previous** [2] - 6:18, 82:19
**pride** [1] - 139:1
**principal** [2] - 151:7, 172:19
**principle** [2] - 82:6, 148:21
**principles** [1] - 179:23
**prison** [3] - 38:6, 39:6, 39:8
**private** [6] - 92:20, 119:24, 120:4, 125:25, 128:25, 138:5
**privately** [1] - 110:23
**pro** [4] - 7:2, 7:3, 130:14
**pro-law** [2] - 7:2, 130:14
**pro-police** [1] - 7:2
**pro-United** [1] - 7:3
**probable** [1] - 150:22
**Probation** [1] - 32:16

**probative** [3] - 158:8, 158:11, 159:10
**problem** [9] - 28:18, 48:5, 54:1, 82:4, 102:11, 112:10, 144:25, 151:13
**problems** [2] - 105:20, 179:11
**Procedure** [4] - 96:9, 96:13, 98:13, 180:13
**procedures** [1] - 122:3
**proceed** [11] - 3:20, 4:20, 4:24, 5:9, 5:19, 18:1, 18:2, 27:12, 77:15, 98:7, 104:4
**proceeding** [27] - 4:1, 26:19, 28:1, 38:11, 38:24, 58:7, 70:25, 96:22, 96:23, 97:15, 97:19, 113:17, 140:7, 149:24, 150:3, 150:9, 150:13, 150:18, 150:20, 150:23, 152:17, 153:21, 161:12, 162:2, 162:9, 176:7, 176:8
**proceeding's** [1] - 153:23
**proceeding-type** [1] - 38:11
**Proceedings** [1] - 2:15
**proceedings** [16] - 122:19, 147:16, 150:19, 152:15, 154:15, 156:3, 156:14, 162:18, 163:6, 163:17, 178:24, 181:3, 181:20, 181:21, 183:19, 183:25
**process** [6] - 17:9, 36:12, 67:11, 68:18, 68:19, 182:1
**procure** [2] - 157:7, 157:21
**procured** [1] - 40:17
**produced** [1] - 2:15
**product** [1] - 134:19
**productive** [1] - 69:14
**profanities** [1] - 162:21
**professionalism** [1] - 180:7
**progress** [1] - 131:22
**prohibit** [1] - 148:17
**prominent** [2] - 78:23, 101:14
**promote** [1] - 25:4

**prompted** [1] - 114:15
**prompting** [2] - 97:16, 134:7
**promulgated** [2] - 92:5, 93:11
**prongs** [1] - 78:3
**proof** [1] - 113:22
**propensity** [1] - 41:14
**proper** [2] - 37:15, 143:21
**properly** [1] - 13:9
**property** [14] - 21:19, 29:20, 41:17, 55:17, 64:4, 64:8, 66:12, 71:14, 83:15, 97:6, 97:10, 97:22, 168:3, 175:22
**proportionate** [1] - 35:3
**proposed** [1] - 118:12
**proposition** [1] - 148:13
**prosecutions** [1] - 154:17
**protect** [3] - 9:3, 15:2, 181:20
**protected** [3] - 147:23, 148:5, 148:7
**protecting** [4] - 9:6, 114:24, 122:19, 168:15
**protective** [1] - 10:12
**protest** [9] - 29:21, 71:16, 89:22, 102:17, 109:18, 117:2, 119:11, 177:25, 178:3
**protester** [4] - 10:25, 11:22, 145:21, 146:4
**protesters** [8] - 9:24, 11:3, 11:12, 11:15, 12:10, 13:10, 13:18, 156:6
**Proud** [89] - 82:20, 82:21, 83:10, 101:7, 101:10, 101:23, 102:2, 102:6, 102:8, 102:9, 102:19, 103:12, 104:16, 105:3, 105:5, 105:11, 105:14, 105:17, 106:11, 106:18, 107:3, 109:21, 109:25, 110:4, 110:6, 110:9, 110:15, 110:18, 111:9, 111:13, 111:19, 111:23, 112:1, 112:5, 112:14, 113:19,

114:9, 114:12, 114:18, 114:20, 114:24, 115:12, 117:5, 118:1, 118:5, 118:8, 120:22, 121:4, 122:6, 122:25, 123:1, 123:13, 123:18, 127:18, 128:11, 129:25, 130:2, 130:5, 130:15, 130:25, 132:23, 132:25, 133:2, 133:8, 133:19, 133:21, 134:4, 134:5, 136:19, 138:12, 139:6, 140:9, 141:7, 141:14, 158:21, 159:18, 160:24, 163:9, 166:1, 166:16, 166:25, 177:9, 177:18, 177:22, 178:1, 181:3, 181:9, 182:3
**proud** [3] - 137:20, 163:12, 167:1
**prouder** [2] - 12:8, 14:18
**proudly** [1] - 14:25
**prove** [17] - 74:9, 99:14, 99:15, 99:20, 100:12, 100:13, 100:16, 100:18, 140:11, 143:7, 148:3, 148:6, 148:18, 155:7, 157:5, 157:7, 157:20
**proven** [2] - 19:11, 36:24
**proves** [1] - 34:16
**provide** [1] - 54:14
**provided** [6] - 47:16, 47:17, 149:15, 157:19, 158:5, 179:5
**Providence** [1] - 2:10
**provides** [1] - 167:20
**province** [1] - 158:15
**proving** [1] - 45:23
**provision** [4] - 76:12, 84:22, 92:15, 170:14
**provisions** [1] - 168:7
**PSR** [2] - 76:21, 87:13
**public** [2] - 13:19, 105:7
**publicity** [3] - 180:25, 181:23, 182:7
**publicly** [3] - 105:17, 110:22, 136:11
**pull** [3] - 74:21,

133:13, 169:8

**pulled** [5] - 112:2, 168:20, 170:3, 171:11

**pulling** [1] - 168:22

**punch** [1] - 123:2

**punching** [2] - 79:2, 108:15

**punishable** [2] - 39:7, 56:6

**punished** [3] - 38:5, 56:21, 151:9

**punishment** [1] - 179:18

**purchased** [1] - 117:13

**purchasing** [1] - 121:18

**pure** [2] - 25:8, 180:7

**purportedly** [1] - 171:17

**purports** [1] - 161:22

**purpose** [18] - 26:7, 26:14, 26:15, 26:22, 35:16, 36:24, 54:14, 61:6, 89:18, 92:3, 116:8, 120:15, 126:8, 127:15, 155:14, 178:2

**purposes** [12] - 20:18, 40:5, 45:21, 45:22, 45:23, 47:15, 47:18, 48:3, 66:24, 87:3, 152:11, 164:10

**pursuing** [1] - 53:7

**push** [2] - 112:22, 134:8

**pushed** [7] - 16:4, 45:14, 61:10, 125:11, 134:10, 136:20

**pushing** [2] - 41:18, 60:14

**put** [19] - 4:15, 4:22, 6:24, 9:1, 19:15, 24:22, 39:15, 43:5, 48:15, 49:18, 59:2, 60:19, 88:4, 115:19, 126:3, 130:12, 130:13, 139:7, 172:10

**puts** [3] - 44:12, 68:5, 86:13

**putting** [5] - 48:16, 69:15, 95:3, 136:7, 179:10

**puzzle** [2] - 113:20, 115:23

# Q

**qualified** [1] - 182:5

**quasi** [1] - 28:7

**quasi-judicial** [1] - 28:7

**Quested** [1] - 146:15

**questioned** [2] - 127:7, 177:4

**questions** [11] - 4:20, 27:6, 39:19, 39:20, 47:21, 62:25, 66:1, 69:10, 92:24, 93:17

**quibble** [1] - 41:6

**quick** [4] - 10:13, 10:22, 122:4, 142:16

**quick-thinking** [1] - 10:22

**quicker** [1] - 149:22

**quickly** [1] - 37:11

**quiet** [1] - 11:7

**quit** [1] - 9:25

**quite** [4] - 5:13, 20:2, 81:16, 175:18

**quote** [289] - 76:16, 76:21, 76:22, 80:23, 98:18, 98:25, 99:1, 101:4, 101:17, 102:11, 102:17, 102:20, 102:21, 102:22, 104:18, 104:21, 104:23, 104:24, 104:25, 105:11, 105:13, 105:14, 105:15, 105:19, 105:21, 105:22, 106:3, 106:5, 106:6, 106:7, 106:8, 106:19, 106:20, 106:21, 106:23, 107:2, 107:6, 107:10, 107:11, 107:12, 107:14, 107:15, 107:16, 107:21, 107:22, 107:23, 108:6, 108:14, 108:20, 108:23, 108:24, 108:25, 109:2, 109:4, 109:6, 109:7, 109:22, 110:10, 110:12, 110:15, 110:16, 110:19, 110:20, 111:3, 111:10, 111:15, 114:20, 116:16, 117:1, 117:5, 117:6, 117:8, 117:9, 117:10, 117:11, 117:18,

118:11, 118:12, 118:15, 118:17, 119:2, 119:8, 119:9, 119:15, 119:16, 119:24, 120:1, 120:2, 120:3, 120:21, 121:4, 121:5, 121:6, 121:7, 121:8, 121:9, 121:10, 121:12, 121:13, 122:1, 122:2, 122:4, 122:9, 122:10, 122:25, 123:2, 123:3, 123:4, 123:5, 123:6, 123:14, 123:15, 123:16, 123:17, 123:19, 123:20, 123:22, 123:23, 123:24, 123:25, 124:2, 124:5, 124:9, 124:10, 124:11, 124:13, 124:14, 124:19, 124:20, 126:1, 126:3, 126:4, 126:20, 126:21, 126:25, 127:4, 127:6, 128:21, 129:1, 129:2, 129:3, 129:8, 129:9, 129:15, 129:16, 129:17, 129:18, 129:21, 130:11, 130:14, 130:15, 130:16, 130:18, 130:21, 130:23, 131:4, 131:5, 131:6, 131:13, 132:20, 133:4, 133:22, 134:15, 135:4, 135:5, 136:21, 136:22, 136:23, 136:25, 137:1, 137:2, 137:3, 137:8, 137:12, 137:13, 137:15, 137:16, 137:20, 137:21, 137:23, 138:5, 138:6, 138:7, 138:8, 138:10, 138:11, 138:13, 138:15, 139:4, 139:5, 139:6, 139:8, 139:10, 139:12, 139:14, 139:16, 143:23, 144:6, 144:22, 144:24, 145:19, 145:22, 147:25, 148:16, 149:2, 152:19, 152:21, 152:22, 152:25,

154:13, 154:19, 155:1, 155:2, 155:15, 155:20, 157:24, 161:3, 161:4, 162:2, 163:10, 166:14, 166:25, 168:11, 168:12, 170:16, 170:19, 170:20, 170:21, 171:9, 172:14, 172:25, 173:2, 175:24, 175:25, 176:2, 176:3, 178:4, 180:16, 180:17, 180:20, 182:18

**quoting** [1] - 98:23

# R

**race** [1] - 13:19

**radical** [3] - 71:13, 102:23, 117:10

**radicalizing** [1] - 107:14

**radio** [1] - 14:22

**rage** [1] - 105:23

**rails** [1] - 13:4

**raise** [1] - 143:10

**raised** [6] - 39:16, 48:16, 91:24, 91:25, 93:9, 171:22

**rallies** [7] - 82:20, 101:24, 109:16, 110:14, 114:19, 118:21, 118:23

**rally** [27] - 101:25, 102:6, 102:9, 102:11, 103:9, 103:13, 109:20, 109:24, 110:2, 110:23, 111:6, 111:9, 111:13, 114:25, 118:13, 118:22, 120:19, 121:6, 122:7, 122:23, 123:12, 123:21, 130:11, 160:1, 177:24, 178:2, 182:19

**rally's** [1] - 128:21

**ran** [1] - 123:19

**random** [1] - 17:6

**range** [7] - 27:20, 34:14, 38:18, 68:3, 68:6, 86:13, 94:1

**ranges** [1] - 67:15

**ranging** [1] - 6:4

**rape** [1] - 58:5

**rather** [10] - 4:2,

29:21, 35:15, 46:14, 57:17, 92:16, 112:17, 118:22, 175:19, 179:3

**rational** [18] - 98:20, 99:25, 101:9, 109:11, 113:10, 115:19, 115:24, 116:9, 125:23, 127:12, 134:17, 140:25, 147:8, 153:20, 163:15, 165:20, 170:9, 172:16

**rationale** [3] - 80:18, 91:7

**razor's** [1] - 123:3

**rea** [2] - 55:25, 75:12

**reach** [9] - 6:16, 25:8, 34:5, 53:19, 100:10, 133:8, 146:17, 163:23, 165:12

**reached** [5] - 98:21, 131:11, 141:17, 151:7, 175:24

**reaching** [1] - 20:12

**reacted** [1] - 138:20

**reaction** [1] - 122:4

**read** [10] - 5:5, 15:14, 18:18, 20:10, 32:1, 56:3, 84:21, 104:21, 145:15, 182:3

**readily** [3] - 147:8, 156:15, 178:16

**reading** [2] - 55:24, 157:15

**reads** [1] - 38:25

**ready** [7] - 104:22, 110:25, 111:11, 122:17, 123:18, 123:25, 126:20

**real** [8] - 16:25, 85:18, 102:23, 108:15, 117:11, 118:5, 142:16, 151:4

**realize** [2] - 107:14, 139:11

**really** [21] - 6:15, 6:23, 7:22, 7:23, 8:23, 30:19, 36:8, 36:25, 40:1, 40:4, 44:1, 55:22, 57:17, 58:13, 63:12, 72:8, 72:20, 143:3, 151:23, 177:13, 181:12

**rear** [1] - 10:23

**reason** [24] - 11:12, 26:12, 26:18, 33:1, 33:17, 48:9, 57:4, 57:7, 57:8, 59:16,

62:24, 77:16, 81:17, 84:24, 85:7, 85:8, 91:9, 108:14, 108:15, 139:7, 149:19, 167:19, 179:5, 182:8
**reasonable** [64] - 41:13, 45:22, 84:12, 100:5, 100:22, 103:7, 104:1, 106:9, 109:8, 112:11, 112:13, 114:2, 115:2, 115:6, 116:21, 118:3, 118:20, 118:24, 120:8, 120:14, 121:23, 122:14, 122:17, 124:25, 125:4, 125:16, 127:12, 127:17, 128:15, 135:11, 135:15, 136:13, 138:21, 139:18, 141:21, 145:23, 146:1, 146:5, 147:3, 147:7, 151:16, 152:4, 152:13, 153:5, 156:1, 156:12, 156:15, 156:24, 157:22, 159:4, 159:7, 160:10, 160:22, 162:19, 164:22, 167:12, 169:18, 170:12, 171:4, 175:13, 177:3, 178:8, 178:16, 179:2
**reasonably** [17] - 49:18, 52:3, 52:8, 52:9, 54:20, 55:10, 55:11, 55:15, 62:3, 82:22, 83:5, 83:17, 128:2, 160:15, 161:14, 169:19, 173:4
**reasons** [15] - 37:23, 63:20, 74:20, 80:8, 81:21, 113:21, 114:1, 127:15, 143:18, 144:11, 145:8, 151:16, 178:11, 180:8, 180:12
**reassess** [1] - 112:23
**rebuked** [2] - 127:21, 127:22
**recap** [1] - 96:18
**received** [4] - 9:20, 119:6, 119:8, 122:22
**recent** [3] - 12:9, 84:6,

155:19
**recently** [2] - 77:17, 166:1
**recess** [5] - 62:16, 95:24, 95:25, 142:10, 181:16
**recite** [1] - 53:1
**recognize** [1] - 58:10
**recognized** [2] - 22:11, 157:24
**recognizing** [1] - 133:25
**reconcile** [2] - 145:16, 165:15
**record** [15] - 4:16, 5:5, 15:14, 51:7, 62:17, 76:6, 96:1, 114:2, 114:8, 142:11, 146:14, 162:6, 165:7, 179:17, 182:6
**recorded** [3] - 2:15, 166:23, 168:10
**recording** [1] - 160:25
**records** [2] - 90:4, 119:20
**recount** [2] - 61:24, 147:16
**recounted** [1] - 141:1
**recruit** [5] - 102:21, 102:22, 103:12, 117:6, 117:8
**recruited** [5] - 89:10, 116:7, 116:22, 141:12, 179:22
**recruitment** [2] - 101:11, 102:4
**reevaluated** [1] - 123:15
**refer** [2] - 21:23, 67:14
**reference** [1] - 119:23
**referenced** [1] - 85:3
**references** [1] - 141:4
**referencing** [2] - 36:4, 119:16
**referring** [4] - 49:5, 53:3, 105:1, 123:21
**refers** [1] - 143:25
**Reffitt** [3] - 80:24, 91:16, 91:17
**reflect** [3] - 109:12, 125:17, 176:20
**reflected** [4] - 101:20, 105:2, 113:14, 181:11
**reflecting** [4] - 127:14, 139:20, 164:16, 178:21
**reflective** [1] - 122:14
**reflects** [3] - 147:19, 159:12, 163:5

**refrain** [2] - 120:24, 175:11
**refused** [3] - 105:13, 126:11, 127:23
**refute** [1] - 176:20
**refuting** [1] - 179:4
**regain** [1] - 133:18
**regained** [2] - 133:25, 146:23
**regard** [3] - 39:10, 68:9, 180:6
**regarding** [5] - 4:16, 18:3, 18:5, 91:3, 115:8
**regardless** [1] - 73:17
**regrouped** [1] - 133:19
**regularly** [1] - 126:17
**rehash** [2] - 135:13, 158:12
**Rehl** [60] - 3:4, 3:14, 45:12, 67:2, 83:1, 83:3, 83:6, 96:11, 96:16, 97:13, 101:14, 101:24, 102:10, 103:4, 107:21, 110:4, 110:8, 111:19, 117:22, 117:24, 118:2, 120:22, 122:5, 124:9, 128:10, 130:7, 130:24, 131:18, 131:23, 132:4, 132:17, 132:24, 133:15, 134:1, 134:12, 134:23, 135:4, 135:9, 136:19, 139:9, 140:12, 141:10, 141:15, 150:2, 152:18, 153:3, 153:13, 153:15, 153:25, 154:12, 156:8, 156:10, 157:14, 161:10, 164:7, 167:21, 169:21, 178:15, 180:24, 180:25
**REHL** [1] - 1:5
**Rehl's** [9] - 42:1, 61:9, 135:7, 142:1, 147:12, 151:2, 169:22, 178:8, 178:12
**reiterate** [4] - 143:2, 143:4, 147:14, 165:14
**reiterated** [1] - 146:11
**reiterates** [1] - 143:20

**reject** [2] - 143:18, 144:10
**rejected** [2] - 143:11, 147:15
**rejecting** [1] - 144:4
**rejoined** [1] - 146:24
**relate** [1] - 173:12
**related** [3] - 149:14, 180:2, 181:13
**relating** [1] - 125:1
**relation** [1] - 108:2
**relationship** [2] - 6:18, 63:18
**relative** [1] - 118:9
**relatively** [1] - 119:22
**relay** [1] - 4:1
**relayed** [2] - 3:21, 146:20
**release** [1] - 110:11
**released** [1] - 146:18
**relevance** [2] - 179:20, 179:24
**relevant** [20] - 22:1, 37:6, 40:15, 41:3, 45:7, 45:11, 51:10, 51:15, 51:23, 51:25, 60:25, 61:2, 61:5, 61:6, 71:17, 86:16, 98:8, 113:24, 116:2, 151:13
**relied** [3] - 12:3, 141:21, 152:13
**relief** [2] - 99:8, 183:11
**relocated** [1] - 12:5
**rely** [2] - 85:14, 148:6
**relying** [1] - 148:5
**remaining** [4] - 4:14, 97:25, 163:7, 171:24
**remains** [1] - 96:15
**remark** [1] - 17:24
**remarked** [11] - 107:2, 107:17, 108:20, 110:14, 119:23, 121:12, 123:15, 126:24, 127:4, 129:20, 134:14
**remarking** [1] - 152:25
**remarks** [1] - 127:24
**remember** [8] - 5:7, 15:23, 15:24, 16:2, 18:16, 22:18, 41:12
**remind** [1] - 131:6
**reminded** [1] - 8:4
**reminder** [2] - 16:25, 182:12
**remorse** [1] - 178:22
**remove** [1] - 140:1
**removed** [2] - 62:1, 163:8

**render** [3] - 13:3, 59:17, 59:19
**rendered** [1] - 98:16
**renewed** [1] - 160:8
**repair** [2] - 170:25, 172:10
**repeated** [4] - 127:13, 141:4, 180:4, 181:3
**repeatedly** [4] - 113:23, 128:6, 178:15, 181:7
**repercussions** [1] - 108:23
**replace** [3] - 108:24, 171:1, 173:6
**replied** [4] - 102:22, 121:13, 137:12, 138:15
**reply** [3] - 171:15, 179:8, 182:23
**report** [1] - 181:1
**reported** [2] - 34:11, 134:1
**REPORTER** [1] - 183:21
**Reporter** [3] - 2:11, 2:12, 184:2
**reporter** [2] - 62:12, 142:7
**represent** [2] - 14:25, 131:4
**representative** [1] - 170:14
**Representatives** [4] - 11:6, 11:20, 11:25, 124:7
**represents** [2] - 140:22, 140:23
**republic's** [1] - 29:6
**reputation** [1] - 102:20
**request** [5] - 63:19, 69:23, 92:10, 149:15, 182:9
**requesting** [1] - 63:15
**require** [5] - 56:1, 60:2, 89:15, 143:14, 145:1
**required** [6] - 25:10, 25:16, 148:3, 148:6, 148:14, 164:4
**requirement** [1] - 78:21
**requires** [7] - 56:9, 99:6, 145:1, 145:2, 151:20, 151:21, 180:15
**requisite** [6] - 64:10, 64:17, 73:17, 84:1, 85:8, 157:18

**rescinded** [1] - 107:4
**reserved** [2] - 96:10, 107:22
**resist** [3] - 56:2, 111:15, 141:3
**resisted** [1] - 173:22
**resisting** [7] - 38:8, 38:10, 38:17, 38:25, 57:24, 97:7, 173:17
**resists** [1] - 56:16
**resolve** [1] - 31:2
**resolved** [4] - 143:2, 143:5, 154:8, 154:9
**resolving** [1] - 124:2
**resort** [1] - 115:10
**respect** [16] - 24:5, 40:8, 41:23, 45:11, 62:5, 65:15, 65:19, 65:20, 65:22, 68:4, 91:15, 91:19, 113:16, 135:3, 160:8, 163:5
**respected** [1] - 13:14
**respectful** [1] - 15:18
**respectfully** [2] - 17:13, 88:10
**respond** [6] - 10:18, 14:2, 35:24, 54:1, 71:24, 154:14
**responded** [23] - 11:5, 17:3, 54:6, 104:18, 104:21, 106:6, 108:17, 110:25, 111:1, 111:4, 116:15, 120:2, 123:3, 123:22, 124:20, 127:5, 127:9, 129:16, 131:14, 138:7, 138:8, 138:9, 174:18
**responder** [1] - 14:4
**responds** [1] - 146:1
**response** [14] - 10:13, 17:6, 32:7, 54:10, 54:23, 67:20, 71:20, 76:20, 82:25, 101:7, 104:19, 108:3, 122:5, 142:5
**responses** [1] - 112:15
**responsibility** [3] - 87:19, 87:25, 178:22
**responsible** [8] - 12:20, 86:15, 86:16, 156:8, 169:23, 171:7, 172:7, 172:17
**rest** [2] - 8:22, 18:7
**restricted** [1] - 137:7
**rests** [1] - 170:1
**result** [3] - 14:15,

16:22, 166:23
**resulted** [1] - 41:4
**resulting** [1] - 11:21
**results** [8] - 106:15, 108:3, 109:18, 115:5, 119:11, 128:14, 141:4, 157:25
**retaliate** [1] - 65:10
**retards** [1] - 113:2
**retorted** [1] - 117:8
**retreat** [1] - 112:3
**retreated** [1] - 161:2
**return** [2] - 95:24, 175:9
**returned** [3] - 138:2, 175:23
**Returns** [3] - 119:7, 119:9, 138:10
**reunited** [1] - 134:4
**reus** [1] - 50:20
**reveal** [2] - 126:12, 158:9
**revealed** [2] - 119:20, 129:22
**revealing** [3] - 138:22, 141:2, 166:19
**reveals** [2] - 125:19, 125:20
**reviewing** [1] - 28:7
**revolt** [1] - 107:7
**Revolution** [1] - 119:16
**revolution** [1] - 107:7
**revolutionary** [3] - 118:9, 118:23, 120:9
**rhetoric** [2] - 107:5, 131:3
**rhinos** [1] - 105:24
**RI** [1] - 2:10
**ridiculous** [2] - 58:6, 58:8
**rightly** [1] - 27:17
**riled** [1] - 130:8
**ring** [1] - 107:6
**riot** [32] - 9:17, 14:4, 14:15, 16:7, 29:20, 55:23, 56:17, 58:2, 58:4, 58:9, 58:11, 61:1, 98:5, 120:5, 122:24, 137:17, 144:17, 147:21, 154:17, 162:10, 162:14, 166:10, 166:12, 166:13, 166:14, 166:16, 172:3, 173:13, 173:19, 174:11, 174:17, 175:8
**riot-type** [2] - 55:23,

58:2
**rioter** [3] - 172:10, 172:21, 175:1
**rioter's** [2] - 164:23, 172:18
**rioters** [11] - 10:20, 12:16, 13:3, 13:7, 16:23, 136:4, 162:12, 163:3, 167:8, 169:19, 171:5
**riots** [3] - 56:2, 56:3, 56:12
**ripped** [1] - 16:8
**ripping** [1] - 174:10
**rise** [5] - 62:15, 84:2, 95:23, 142:9, 183:17
**risk** [3] - 151:15, 151:23, 181:21
**risks** [2] - 12:19, 71:25
**robbery** [6] - 15:11, 97:10, 98:6, 173:18, 174:2, 175:6
**robbing** [1] - 162:9
**rock** [1] - 111:4
**Rodriguez** [2] - 79:2, 91:17
**Roger** [4] - 2:8, 3:12, 37:12, 55:19
**role** [2] - 66:17, 136:2
**roles** [3] - 128:10, 132:5, 135:19
**roll** [1] - 124:1
**rolling** [1] - 107:3
**roof** [1] - 6:19
**room** [1] - 137:18
**Room** [2] - 2:12, 184:3
**ROOTS** [5] - 37:11, 37:17, 38:21, 55:19, 57:19
**Roots** [5] - 2:8, 3:12, 37:12, 52:18, 55:19
**round** [1] - 123:7
**rounds** [1] - 111:5
**RPR** [3] - 2:11, 183:22, 184:2
**Rubicon** [1] - 121:10
**Rufio** [1] - 106:7
**Rule** [28] - 4:2, 4:16, 45:9, 96:9, 96:10, 96:12, 96:17, 98:8, 98:13, 99:6, 103:24, 145:15, 154:4, 158:17, 160:6, 160:9, 165:15, 173:10, 176:7, 176:8, 176:12, 176:14, 180:12, 180:13
**rule** [3] - 45:9, 95:21, 98:13

**rule's** [2] - 171:15, 179:9
**ruled** [1] - 22:10
**rules** [3] - 102:13, 112:25, 182:24
**ruling** [7] - 4:1, 4:16, 96:5, 96:6, 96:11, 176:11, 183:12
**rulings** [2] - 179:23, 179:24
**rumble** [1] - 111:12
**run** [3] - 14:22, 61:5, 110:20
**Russian** [1] - 119:16

**S**

**Sabino** [3] - 2:2, 3:11, 55:4
**safety** [1] - 130:12
**sat** [1] - 181:16
**satis** [1] - 73:22
**satisfied** [4] - 41:15, 73:24, 75:15, 77:24
**satisfies** [3] - 43:24, 73:3, 156:6
**satisfy** [8] - 34:18, 46:6, 46:7, 51:11, 72:14, 73:7, 78:1, 99:19
**satisfying** [1] - 81:9
**Saturday** [1] - 111:1
**save** [2] - 13:24, 64:12
**saved** [1] - 11:15
**saving** [2] - 10:12, 10:24
**saw** [5] - 5:21, 6:7, 8:21, 122:6, 172:25
**scaffolding** [5] - 134:10, 137:14, 162:13, 162:21, 167:4
**scare** [1] - 129:22
**scared** [3] - 139:11, 162:23, 162:24
**scars** [1] - 17:17
**scattershot** [1] - 179:16
**scene** [1] - 12:22
**scheme** [2] - 70:12, 159:14
**school** [1] - 170:24
**science** [1] - 32:11
**scoffed** [1] - 139:15
**scope** [6] - 40:25, 41:4, 62:4, 62:7, 92:3, 143:21
**Scott** [1] - 134:6
**Scott's** [1] - 61:9
**scumbags** [1] -

110:20
**seal** [1] - 181:20
**seated** [1] - 182:6
**Second** [1] - 107:20
**second** [16] - 19:6, 70:2, 78:12, 79:9, 84:10, 101:25, 104:9, 116:3, 127:21, 134:13, 146:14, 151:15, 152:8, 173:4, 175:5, 181:13
**seconds** [2] - 12:2, 138:3
**secret** [1] - 181:3
**Section** [27] - 31:13, 35:7, 37:24, 49:7, 50:19, 59:10, 70:8, 70:22, 76:15, 78:2, 84:21, 96:22, 96:24, 97:3, 97:5, 97:9, 97:12, 98:1, 99:14, 100:11, 154:6, 168:1, 170:13, 172:2, 173:18, 173:20
**section** [5] - 28:20, 28:24, 29:16, 34:14, 88:12
**sections** [1] - 169:3
**secure** [3] - 155:21, 156:5, 165:7
**secured** [1] - 133:11
**security** [1] - 132:6
**seditious** [42] - 19:16, 21:3, 21:4, 21:15, 22:3, 22:10, 23:22, 24:24, 28:18, 29:16, 30:2, 31:18, 34:6, 34:11, 34:17, 34:22, 34:23, 34:24, 35:3, 58:8, 65:13, 65:15, 66:7, 73:2, 73:21, 85:4, 96:20, 97:14, 99:13, 100:8, 104:1, 135:22, 140:14, 143:7, 143:22, 144:13, 144:22, 144:25, 145:3, 145:14, 152:3, 179:15
**see** [37] - 6:23, 7:5, 12:15, 14:22, 16:1, 18:22, 19:3, 20:17, 21:14, 28:18, 28:24, 30:1, 30:11, 32:4, 39:15, 42:19, 46:18, 52:1, 52:20, 54:3, 55:10, 57:7, 71:8, 74:17, 75:12,

117:12, 120:19, 126:1, 129:13, 134:8, 137:4, 142:18, 169:5, 169:8, 169:9, 174:11, 183:13
**seeing** [3] - 6:1, 16:17, 129:17
**seem** [4] - 35:3, 35:22, 36:19, 81:23
**seemingly** [1] - 105:4
**sees** [3] - 29:20, 117:11, 119:1
**segment** [2] - 171:10, 171:14
**segments** [3] - 169:7, 169:8, 169:10
**selected** [1] - 127:16
**selecting** [1] - 127:18
**Self** [2] - 103:2, 118:11
**self** [3] - 56:14, 110:16, 178:9
**self-contained** [1] - 56:14
**self-defense** [1] - 110:16
**Self-Defense** [2] - 103:2, 118:11
**self-serving** [1] - 178:9
**selfie** [3] - 133:1, 133:20, 163:8
**selfie-style** [2] - 133:1, 133:20
**Senate** [9] - 9:21, 10:21, 10:22, 10:23, 11:25, 12:6, 162:14, 163:5, 167:7
**Senators** [1] - 10:25
**send** [3] - 163:13, 172:23, 179:5
**sensation** [1] - 16:13
**sense** [6] - 18:7, 26:20, 36:1, 54:15, 54:16, 162:5
**sent** [5] - 124:5, 138:25, 152:24, 163:8, 176:15
**sentence** [9] - 35:1, 56:5, 56:7, 57:6, 70:9, 70:10, 81:1, 84:15, 129:23
**sentenced** [3] - 30:3, 30:10, 36:17
**sentencing** [14] - 27:20, 28:9, 28:15, 29:23, 29:25, 30:12, 54:15, 54:23, 57:19, 58:22, 67:14, 84:7,

91:20, 92:16
**Sentencing** [8] - 56:25, 57:3, 57:8, 57:21, 72:2, 72:5, 92:6, 92:15
**sentencings** [2] - 4:11, 18:1
**sentiment** [2] - 121:2, 138:12
**sentiments** [1] - 129:23
**separate** [3] - 84:24, 89:25, 118:5
**separately** [1] - 104:24
**separating** [1] - 168:14
**sergeants** [1] - 11:11
**series** [1] - 154:3
**serious** [7] - 9:21, 22:12, 42:25, 49:1, 180:19, 181:6
**serve** [4] - 15:5, 16:25, 17:14, 54:13
**served** [2] - 15:20, 181:4
**service** [1] - 15:5
**serving** [1] - 178:9
**session** [2] - 38:15
**set** [10] - 19:9, 42:10, 67:13, 67:15, 93:2, 98:18, 119:9, 132:2, 144:2, 165:24
**setting** [5] - 31:15, 56:11, 56:16, 56:11, 111:20
**setting-type** [1] - 56:11
**settle** [1] - 129:17
**setup** [1] - 70:12
**Seventh** [1] - 89:16
**several** [26] - 9:20, 10:24, 11:15, 13:22, 36:21, 37:23, 101:11, 101:19, 111:23, 115:23, 133:21, 134:4, 135:20, 136:2, 136:16, 137:19, 139:17, 141:8, 149:15, 152:6, 168:17, 169:1, 177:20, 178:10
**severe** [1] - 44:20
**severity** [2] - 39:2, 39:4
**Shae** [3] - 5:8, 5:11, 168:16
**shaking** [5] - 49:4, 49:15, 49:19, 50:11,

72:20
**shall** [2] - 30:4, 38:5
**shape** [1] - 83:16
**shaped** [1] - 119:19
**share** [2] - 17:16, 50:19
**shared** [12] - 100:19, 104:12, 110:4, 111:9, 115:14, 116:4, 120:15, 122:14, 137:11, 137:22, 147:13, 152:21
**sharing** [1] - 121:18
**shattered** [1] - 172:9
**sheds** [1] - 78:19
**shelter** [1] - 11:24
**sheltered** [2] - 12:4, 13:21
**shield** [27] - 16:7, 98:5, 144:17, 162:10, 162:14, 166:10, 166:13, 166:14, 166:16, 172:4, 173:13, 173:19, 174:4, 174:6, 174:14, 174:17, 174:19, 174:24, 175:1, 175:8, 175:14, 175:17, 175:19, 175:23, 175:24, 176:1
**shift** [2] - 123:11, 178:20
**shifted** [1] - 116:19
**shifts** [1] - 8:25
**shit** [4] - 107:16, 113:5, 123:20, 123:24
**shit's** [1] - 121:12
**shoehorn** [1] - 56:4
**shook** [1] - 156:18
**shoot** [2] - 53:4, 111:4
**short** [3] - 19:24, 128:13, 180:24
**shorthand** [1] - 2:15
**shortly** [4] - 118:18, 131:23, 133:17, 134:2
**shot** [6] - 11:16, 13:18, 53:4, 123:6, 135:9, 139:4
**shoulder** [3] - 16:20, 145:23, 164:23
**shoulders** [1] - 133:7
**shouted** [1] - 168:22
**shoved** [1] - 134:7
**show** [14] - 51:7, 51:14, 74:8, 75:1,

98:17, 126:22, 141:5, 149:11, 152:5, 155:2, 157:3, 169:2, 174:10, 183:5
**showed** [13] - 10:10, 14:17, 101:12, 110:6, 139:12, 139:23, 140:8, 152:16, 157:1, 166:9, 171:9, 177:23, 181:11
**showing** [11] - 6:5, 13:10, 48:7, 49:20, 49:24, 49:25, 52:6, 84:9, 113:8, 138:22, 181:5
**shown** [2] - 85:13, 86:12
**shows** [6] - 111:25, 172:5, 181:6, 181:15, 181:23, 182:17
**shut** [1] - 105:11
**sic** [19] - 15:25, 54:19, 70:13, 103:14, 105:23, 107:11, 111:12, 122:21, 123:10, 125:4, 129:21, 132:4, 136:9, 137:18, 149:10, 150:12, 157:11, 172:15, 174:11
**sic]** [8] - 132:25, 133:5, 135:3, 148:22, 164:4, 165:4, 168:13, 169:5
**Sicknick** [1] - 16:19
**side** [19] - 5:17, 7:15, 11:8, 11:20, 11:21, 30:20, 31:5, 42:10, 105:4, 115:13, 117:11, 124:3, 130:7, 131:11, 134:14, 141:14, 162:25
**sided** [1] - 123:12
**sight** [1] - 79:3
**sign** [1] - 166:17
**significance** [1] - 152:18
**significant** [2] - 89:8, 141:15
**signing** [1] - 6:3
**silence** [2] - 5:16, 127:24
**similar** [5] - 107:25, 108:12, 116:11, 136:4, 180:3
**similarly** [1] - 170:6

**simple** [2] - 102:12, 134:22
**simply** [14] - 17:7, 22:9, 25:18, 54:2, 139:20, 147:2, 149:19, 151:23, 154:25, 164:24, 174:25, 177:15, 179:16, 180:2
**simultaneously** [1] - 16:8
**sincerely** [1] - 17:19
**single** [7] - 29:4, 71:2, 71:4, 83:12, 103:22, 161:25, 182:21
**sit** [1] - 116:16
**site** [1] - 136:10
**sitting** [1] - 103:21
**situation** [3] - 24:13, 25:2, 139:20
**situations** [1] - 24:6
**six** [4] - 5:11, 15:21, 38:6, 39:6
**skills** [1] - 6:24
**Skull** [1] - 105:6
**slander** [1] - 13:16
**slice** [2] - 37:10, 39:13
**slightest** [1] - 16:11
**slogan** [1] - 167:1
**small** [4] - 10:23, 17:6, 161:2, 163:4
**smallest** [1] - 6:5
**smash** [3] - 129:18, 162:14, 167:8
**smashed** [1] - 172:3
**smashing** [1] - 110:5
**Smith** [14] - 1:15, 3:9, 27:12, 27:14, 30:18, 31:25, 47:25, 59:6, 60:15, 76:8, 86:17, 91:3, 91:23, 93:7
**SMITH** [84] - 1:16, 1:19, 27:14, 30:24, 31:8, 31:18, 31:22, 32:12, 32:25, 33:8, 33:11, 33:14, 33:17, 33:23, 35:6, 35:9, 36:13, 37:3, 48:1, 48:12, 48:22, 49:10, 49:14, 50:11, 50:14, 50:16, 50:24, 51:3, 51:22, 52:5, 52:13, 59:7, 69:25, 70:19, 71:4, 72:13, 72:18, 73:11, 73:13, 74:1, 74:5, 74:13, 74:19, 74:25, 75:6, 75:23, 76:1, 76:4, 76:9, 76:12, 76:20, 77:5, 77:8, 77:14, 77:16,

78:8, 78:11, 78:21, 79:12, 79:15, 79:17, 80:2, 80:9, 80:16, 80:21, 81:1, 81:4, 81:7, 81:14, 82:1, 82:8, 82:10, 82:12, 93:6, 93:8, 93:16, 94:11, 94:14, 94:17, 94:20, 94:22, 95:1, 95:12, 95:14
**Smith's** [1] - 54:18
**smoke** [1] - 163:10
**so-called** [4] - 101:23, 103:13, 109:16, 135:14
**social** [4] - 101:20, 109:22, 112:22, 137:19
**socialist** [1] - 106:20
**socializing** [1] - 103:17
**society** [1] - 89:20
**soldiers** [2] - 114:21, 114:22
**solely** [1] - 118:21
**solid** [1] - 113:13
**solidifying** [1] - 112:16
**someone** [19] - 6:5, 8:1, 56:16, 56:18, 56:19, 74:20, 75:10, 76:5, 79:1, 92:19, 102:8, 106:4, 108:13, 114:14, 123:23, 156:25, 164:20, 174:16, 182:18
**sometimes** [3] - 45:2, 128:6, 128:13
**somewhat** [1] - 173:2
**somewhere** [2] - 182:21, 183:9
**songs** [1] - 89:22
**soon** [3] - 103:6, 104:21, 127:4
**soon-to-be** [1] - 104:21
**sorry** [6] - 5:16, 6:10, 67:8, 91:23, 142:18, 169:6
**sort** [19] - 18:14, 19:19, 29:20, 37:6, 43:5, 43:6, 43:24, 44:7, 54:17, 57:2, 57:20, 63:13, 72:7, 83:15, 90:11, 91:10, 91:11, 121:24, 154:17
**sounds** [2] - 19:7, 35:9

**Space** [1] - 121:3
**space** [1] - 80:14
**spare** [1] - 12:2
**sparring** [1] - 111:1
**sparse** [1] - 132:7
**spawned** [1] - 29:22
**speaker's** [1] - 11:17
**Speaker's** [1] - 11:20
**speaking** [6] - 46:4, 87:14, 95:5, 130:22, 136:8, 161:2
**spear** [1] - 136:21
**Special** [1] - 119:19
**specialized** [1] - 46:13
**specific** [32] - 21:12, 21:17, 33:5, 35:19, 55:6, 55:7, 55:14, 55:16, 55:22, 56:11, 56:14, 56:18, 58:4, 58:9, 58:14, 66:10, 66:16, 75:9, 75:13, 75:14, 85:8, 88:12, 95:2, 99:23, 100:17, 115:25, 138:24, 140:13, 142:15, 142:24, 154:1, 159:11
**specifically** [16] - 85:7, 85:13, 87:24, 97:23, 109:11, 116:23, 122:16, 134:20, 137:5, 140:20, 141:2, 152:15, 153:18, 164:12, 167:5, 172:9
**specifics** [2] - 69:11, 177:5
**spectacle** [1] - 124:19
**spectacular** [1] - 71:10
**speculative** [1] - 183:1
**speech** [10] - 111:13, 124:10, 131:2, 139:15, 147:21, 148:2, 148:5, 148:18, 149:9, 153:10
**speeches** [1] - 89:22
**spend** [3] - 90:6, 143:1, 182:25
**spirit** [6] - 72:8, 85:19, 85:21, 90:11, 90:17, 131:5
**split** [4] - 18:19, 18:20, 19:8, 20:5
**spoken** [1] - 110:14
**spot** [1] - 28:13
**spray** [2] - 10:8, 135:9
**sprayed** [1] - 7:17
**spraying** [3] - 61:9,

156:11, 178:14
**squads** [1] - 107:21
**squarely** [1] - 148:16
**stabbed** [5] - 53:5, 102:7, 112:3, 130:10, 166:4
**stabbings** [1] - 112:5
**stack** [3] - 58:21, 127:5, 133:6
**stacked** [1] - 87:8
**staff** [1] - 9:6
**stage** [14] - 9:23, 10:5, 10:6, 28:3, 28:10, 28:16, 29:23, 32:19, 34:14, 114:13, 143:21, 160:14, 164:13, 165:15
**stairs** [6] - 45:14, 61:10, 134:4, 134:7, 162:21, 163:4
**stand** [11] - 101:8, 104:18, 104:22, 106:19, 107:3, 114:12, 117:12, 118:6, 161:6
**stand-by** [1] - 107:3
**standard** [14] - 39:25, 41:13, 72:14, 72:15, 81:11, 82:5, 88:13, 98:8, 122:2, 148:10, 148:11, 151:14, 180:25
**standardize** [1] - 118:18
**standing** [7] - 8:2, 101:17, 110:7, 138:17, 168:17, 171:17, 171:21
**stands** [2] - 24:12, 95:24
**standstill** [1] - 134:2
**Starbucks** [1] - 6:6
**stare** [1] - 16:3
**start** [16] - 3:23, 4:21, 18:11, 22:20, 28:10, 39:19, 40:1, 40:9, 65:12, 66:9, 106:22, 106:24, 112:13, 124:11, 142:24, 152:1
**started** [4] - 8:2, 9:17, 135:5, 168:22
**starting** [4] - 58:20, 62:25, 89:1, 98:7
**starts** [1] - 111:2
**state** [14] - 38:2, 41:24, 55:25, 73:17, 73:19, 73:24, 107:18, 108:5, 108:9, 127:2,

129:15, 147:20, 181:12
**statement** [10] - 5:3, 13:20, 15:17, 46:11, 80:3, 80:12, 83:13, 84:8, 118:17, 123:5
**statements** [16] - 3:24, 17:22, 104:13, 108:1, 109:12, 115:8, 118:25, 139:17, 141:1, 146:7, 149:2, 149:7, 149:10, 159:2, 159:6, 179:21
**states** [3] - 101:19, 116:16, 180:14
**STATES** [3] - 1:1, 1:2, 1:9
**States** [61] - 1:11, 3:3, 5:1, 7:3, 9:15, 10:25, 11:1, 11:25, 12:15, 15:21, 25:13, 25:15, 29:1, 29:3, 29:19, 30:6, 30:14, 33:25, 34:3, 34:8, 55:1, 62:18, 96:2, 96:20, 96:22, 96:24, 97:1, 97:2, 97:4, 97:6, 97:8, 97:11, 98:22, 98:23, 99:4, 99:14, 99:17, 99:19, 100:2, 100:11, 142:12, 145:16, 148:21, 149:1, 149:24, 151:14, 154:8, 163:21, 163:22, 165:17, 168:1, 168:4, 170:13, 172:1, 173:18, 173:19, 174:5, 180:20, 184:3
**status** [1] - 11:6
**statute** [63] - 18:23, 18:25, 21:8, 22:10, 22:11, 22:15, 25:10, 25:17, 26:20, 26:21, 29:10, 29:15, 29:22, 30:17, 31:12, 31:16, 33:6, 33:18, 34:6, 35:25, 37:24, 37:25, 38:7, 38:10, 38:11, 38:16, 38:23, 38:25, 46:8, 47:5, 47:6, 50:7, 50:9, 55:21, 55:22, 55:23, 55:24, 56:4, 56:6, 56:9, 56:11, 56:13, 56:16, 56:18, 56:24, 56:25, 58:2, 64:16, 70:22, 71:18, 78:2, 87:1,

87:15, 88:16, 92:18, 92:21, 145:2, 154:14, 154:18
**statute's** [1] - 168:6
**statutes** [3] - 26:14, 47:6, 71:6
**statutory** [3] - 57:6, 57:15, 70:11
**stay** [2] - 126:1, 128:6
**steal** [4] - 107:12, 107:16, 107:23, 175:14
**Steal** [3] - 101:24, 109:16, 114:19
**stealing** [1] - 144:17
**stenographic** [1] - 183:24
**step** [10] - 19:5, 19:6, 22:17, 23:2, 24:2, 26:23, 32:6, 72:9, 105:15, 112:17
**stepped** [1] - 128:5
**stepping** [1] - 15:24
**steps** [2] - 15:25, 145:20
**Steven** [2] - 2:5, 3:12
**Stewart** [18] - 103:5, 104:6, 104:21, 117:22, 122:24, 123:2, 123:15, 124:2, 124:5, 126:3, 127:9, 129:4, 129:11, 129:17, 129:20, 137:11, 137:15, 152:24
**still** [14] - 11:7, 17:16, 51:23, 53:19, 57:14, 74:8, 76:18, 110:22, 114:14, 135:24, 139:8, 146:8, 174:20, 176:15
**stole** [2] - 111:20, 174:17
**stolen** [3] - 111:15, 115:9, 166:10
**stomp** [1] - 121:11
**Stop** [3] - 101:23, 109:16, 114:18
**stop** [15] - 11:3, 41:20, 89:14, 103:13, 104:9, 109:10, 113:17, 116:15, 125:9, 134:19, 136:14, 140:16, 143:25, 145:8, 158:22
**stopping** [1] - 162:24
**storm** [4] - 124:14, 132:20, 141:19, 176:23

**stormed** [2] - 127:8, 133:22

**storming** [3] - 119:15, 127:2, 136:25

**straight** [1] - 42:11

**straightforward** [1] - 161:8

**strangle** [1] - 49:2

**strangled** [1] - 16:11

**strangling** [2] - 43:1, 49:2

**strategic** [1] - 126:9

**straw** [2] - 19:24, 112:15

**stray** [1] - 160:19

**straying** [1] - 128:7

**streamed** [1] - 136:4

**street** [5] - 34:23, 102:3, 110:9, 112:24, 113:15

**Street** [7] - 1:13, 1:16, 1:20, 1:23, 2:3, 2:9, 120:21

**strength** [2] - 11:14, 168:19

**strengthened** [1] - 176:21

**strictly** [1] - 125:25

**strokes** [3] - 100:22, 139:1, 176:19

**strong** [1] - 19:17

**struck** [4] - 51:17, 171:15, 179:8, 182:24

**structure** [2] - 113:13, 117:24

**stuff** [3] - 102:21, 117:5, 161:4

**style** [2] - 133:1, 133:20

**Subdivision** [1] - 85:2

**subject** [1] - 155:9

**submission** [1] - 63:8

**submit** [3] - 45:17, 46:17, 88:10

**submitted** [2] - 5:4, 15:14

**subpart** [1] - 59:17

**subsection** [3] - 59:13, 59:21, 88:11

**subsequent** [1] - 149:21

**substantial** [2] - 66:12, 153:19

**substantive** [6] - 147:7, 150:16, 151:8, 153:11, 153:18, 161:11

**substantively** [1] - 173:9

**success** [3] - 110:4, 136:15, 137:13

**successfully** [2] - 12:4, 83:3

**sudden** [1] - 119:14

**suffice** [3] - 126:16, 135:14, 158:1

**sufficient** [20] - 53:12, 60:5, 72:21, 73:5, 73:23, 74:13, 98:10, 143:7, 144:13, 144:23, 145:6, 145:10, 155:25, 157:17, 162:11, 169:15, 173:11, 174:7, 176:5, 180:9

**sufficiently** [15] - 18:23, 18:24, 19:1, 21:21, 22:22, 23:8, 23:9, 23:13, 24:15, 27:2, 27:4, 32:2, 32:22, 36:22

**suffocate** [1] - 49:3

**suffocating** [2] - 43:1, 49:2

**suggest** [10] - 22:6, 34:12, 35:22, 39:9, 61:15, 114:16, 126:18, 154:4, 154:12, 154:13

**suggested** [9] - 35:13, 105:19, 116:10, 117:10, 118:9, 120:18, 122:8, 123:1, 126:19

**suggesting** [7] - 35:10, 60:13, 106:12, 108:1, 108:4, 120:25, 124:5

**suggestion** [4] - 23:12, 61:4, 61:20, 151:2

**suggestions** [1] - 106:14

**suggests** [4] - 34:20, 60:24, 104:5, 158:7

**suicide** [1] - 14:14

**Suite** [3] - 1:17, 1:24, 2:9

**Sumter** [1] - 29:22

**superfluous** [1] - 59:17

**superior** [1] - 17:11

**superseding** [2] - 96:18, 143:11

**Supp** [1] - 98:22

**supplemental** [1] - 82:25

**support** [9] - 15:1, 19:2, 19:4, 104:14, 106:1, 144:19, 146:8, 167:21, 176:5

**supported** [13] - 101:5, 121:23, 122:16, 142:1, 144:23, 145:10, 155:25, 162:8, 172:20, 174:7, 177:21, 177:23, 182:22

**supporters** [3] - 103:9, 117:1, 153:9

**supporting** [13] - 110:21, 128:19, 150:25, 151:25, 152:2, 154:2, 164:7, 165:9, 173:2, 179:3, 179:14, 179:20, 179:24

**supports** [9] - 27:3, 103:19, 103:23, 152:3, 153:17, 164:8, 165:17, 177:17, 182:7

**suppose** [2] - 95:8, 154:10

**supposed** [4] - 18:21, 34:7, 128:3, 182:23

**supremacist** [1] - 101:4

**Supreme** [8] - 29:7, 77:17, 79:12, 80:19, 148:15, 148:19, 148:20, 154:18

**surge** [3] - 11:3, 119:14, 169:10

**surged** [2] - 132:12, 132:13

**surprised** [2] - 137:4, 137:7

**surrounded** [1] - 132:24

**surrounding** [1] - 70:11

**survived** [1] - 14:7

**suspects** [1] - 13:1

**sustain** [4] - 60:5, 98:10, 98:16, 180:9

**sustained** [1] - 16:22

**Sweepers** [1] - 120:21

**swept** [1] - 139:21

**swerved** [1] - 53:6

**swing** [2] - 101:19, 116:16

**swore** [1] - 9:2

**sympathy** [1] - 148:25

**syringe** [1] - 53:6

# T

**table** [1] - 20:1

**tactic** [2] - 12:25, 129:22

**tactical** [3] - 121:18, 121:24, 130:5

**tag** [1] - 130:14

**Tankersley** [1] - 92:12

**tantamount** [10] - 22:8, 29:3, 29:18, 30:5, 30:6, 30:13, 31:13, 33:25, 34:2, 34:7

**tap** [1] - 106:5

**target** [2] - 152:15

**targeted** [1] - 113:15

**targets** [1] - 149:9

**TARRIO** [1] - 1:6

**Tarrio** [105] - 3:5, 3:14, 55:5, 67:1, 83:7, 96:14, 97:14, 101:13, 101:15, 101:22, 101:25, 102:9, 102:20, 102:24, 103:1, 103:3, 103:10, 104:17, 105:3, 105:8, 105:12, 106:2, 106:3, 106:4, 106:6, 106:10, 106:17, 109:19, 109:21, 110:15, 110:23, 110:25, 111:2, 111:13, 111:18, 111:20, 112:9, 112:16, 112:20, 116:10, 116:15, 116:22, 117:4, 117:13, 117:15, 117:21, 117:23, 118:7, 118:11, 119:7, 119:17, 119:22, 119:24, 119:25, 120:2, 120:4, 120:6, 120:9, 120:19, 121:3, 121:14, 122:21, 123:1, 123:4, 123:22, 124:10, 124:12, 124:16, 124:17, 124:21, 126:11, 128:24, 129:21, 136:16, 136:17, 137:17, 138:1, 138:5, 138:6, 138:9, 138:11, 138:14, 138:16, 139:6, 140:7, 140:8,

140:12, 141:10, 146:9, 146:16, 146:17, 146:21, 146:23, 147:4, 147:8, 150:1, 153:3, 153:13, 161:7, 164:6, 167:23, 169:21, 176:22, 178:1

**Tarrio's** [15] - 106:1, 107:5, 112:13, 113:12, 116:1, 118:24, 119:20, 128:20, 130:9, 140:21, 142:1, 142:17, 147:1, 161:14, 161:17

**task** [2] - 53:15, 90:20

**taunted** [1] - 131:9

**tea** [1] - 105:23

**team** [2] - 12:7, 12:17, 12:22

**tearing** [2] - 156:7, 169:3, 169:18

**tears** [1] - 16:17

**technical** [2] - 31:12, 60:6

**Telegram** [11] - 102:9, 103:1, 104:15, 116:16, 117:21, 120:20, 146:23, 157:3, 158:8, 158:10

**temporal** [1] - 38:24

**temporarily** [1] - 136:16

**temporary** [1] - 170:16

**tenor** [1] - 126:15

**tens** [1] - 12:17

**Tenth** [3] - 20:11, 24:10, 37:19

**tenure** [1] - 13:15

**term** [1] - 120:4

**terms** [16] - 20:4, 21:7, 21:15, 22:3, 27:3, 41:16, 42:3, 42:12, 47:9, 47:21, 54:12, 63:24, 64:20, 69:23, 93:1

**terrace** [4] - 6:2, 6:22, 10:2, 134:5

**terrible** [1] - 14:23

**territory** [1] - 38:2

**terror** [1] - 17:12

**terrorism** [28] - 55:8, 62:12, 62:22, 70:7, 70:14, 71:5, 71:7, 71:11, 71:12, 71:15, 71:18, 73:3, 73:5, 73:6, 77:25, 78:2, 78:4, 78:17, 78:19,

79:5, 80:11, 81:10, 83:4, 83:5, 85:18, 89:4, 92:8
**terrorist** [6] - 84:3, 85:17, 87:14, 88:14, 89:25, 90:2
**terrorists** [1] - 139:5
**test** [8] - 6:24, 22:24, 23:1, 32:5, 34:19, 52:1, 151:20, 155:1
**tested** [1] - 168:19
**testified** [23] - 41:23, 86:12, 114:20, 119:19, 125:8, 129:24, 145:19, 146:16, 168:16, 168:21, 169:11, 170:15, 170:24, 171:12, 172:24, 174:13, 174:19, 175:23, 177:9, 177:15, 177:24, 178:1, 178:3
**testify** [3] - 114:23, 125:5, 176:23
**testifying** [1] - 5:18
**testimony** [19] - 15:9, 125:5, 158:7, 158:12, 158:15, 159:4, 159:5, 160:7, 160:11, 169:15, 170:3, 170:8, 171:13, 173:5, 173:8, 177:21, 178:9, 178:10, 178:12
**text** [2] - 119:24, 134:1
**texted** [6] - 117:4, 117:13, 117:15, 124:18, 135:4, 138:5
**thankfully** [1] - 11:13
**THE** [188] - 1:1, 1:1, 1:9, 3:2, 3:16, 5:9, 5:16, 6:12, 9:9, 9:13, 15:4, 15:16, 17:20, 17:23, 20:15, 21:2, 23:1, 23:4, 23:6, 23:9, 23:18, 23:25, 24:6, 24:8, 25:21, 27:8, 30:18, 31:1, 31:17, 31:21, 31:25, 32:20, 33:7, 33:10, 33:12, 33:16, 33:20, 35:5, 35:8, 35:24, 36:20, 37:9, 37:16, 38:19, 39:12, 40:11, 40:13, 40:19, 40:22, 41:1, 41:8, 42:5, 42:8, 42:18, 43:19, 43:22, 44:4, 44:14,

45:1, 45:24, 46:15, 46:21, 47:8, 47:23, 48:11, 48:13, 49:9, 49:13, 50:3, 50:13, 50:15, 50:22, 51:2, 51:19, 52:4, 52:12, 52:18, 53:13, 53:21, 53:23, 54:4, 54:6, 55:3, 56:23, 59:5, 59:22, 60:15, 60:18, 61:17, 61:24, 62:9, 62:11, 62:15, 62:17, 62:20, 64:5, 65:3, 65:6, 65:25, 66:2, 66:14, 66:18, 66:21, 66:24, 67:17, 68:7, 68:12, 68:15, 68:22, 69:4, 69:13, 69:21, 70:18, 71:3, 71:24, 72:17, 73:10, 73:12, 73:14, 74:4, 74:12, 74:16, 74:23, 75:4, 75:20, 75:25, 76:3, 76:8, 76:10, 76:19, 77:4, 77:7, 77:12, 77:15, 78:7, 78:10, 78:20, 79:10, 79:14, 79:16, 79:23, 80:7, 80:15, 80:17, 80:25, 81:3, 81:6, 81:13, 81:15, 82:7, 82:9, 82:11, 82:13, 82:16, 83:20, 83:22, 85:25, 86:3, 86:6, 86:25, 88:17, 88:19, 90:5, 90:8, 91:1, 91:21, 93:5, 93:7, 93:15, 94:2, 94:13, 94:16, 94:19, 94:21, 94:24, 95:11, 95:13, 95:15, 95:23, 96:1, 96:4, 142:9, 142:11, 142:14, 142:18, 142:20, 142:23, 183:17
**theater** [2] - 124:6, 153:1
**theft** [2] - 173:13, 175:6
**themselves** [9] - 21:22, 62:2, 114:20, 116:4, 118:15, 121:1, 136:12, 156:17, 168:15
**theory** [6] - 74:23, 173:3, 177:17, 177:21, 179:18, 179:19
**therapy** [1] - 16:21
**thereafter** [3] - 118:18,

120:6, 134:3
**therefore** [3] - 54:2, 54:18, 54:19
**thereof** [1] - 25:14
**they've** [4] - 34:13, 57:10, 72:5, 72:6
**thin** [2] - 7:4, 108:6
**thinking** [6] - 6:22, 10:22, 15:25, 26:4, 55:25, 109:12
**third** [11] - 5:12, 12:14, 39:16, 84:6, 96:18, 100:10, 104:12, 116:5, 143:11, 151:18, 181:23
**Third** [1] - 20:11
**Thomas** [1] - 9:11
**thoroughly** [1] - 149:17
**thousands** [5] - 9:24, 12:17, 111:5, 129:14, 153:9
**thread** [2] - 119:24, 121:25
**threat** [6] - 25:11, 38:3, 49:17, 49:20, 147:22, 163:25
**threaten** [1] - 70:24
**threatened** [2] - 71:8, 131:5
**threatening** [1] - 26:15
**threats** [7] - 70:23, 71:1, 71:2, 96:25, 162:21, 163:20, 167:6
**three** [13] - 4:4, 4:7, 4:12, 5:6, 8:1, 18:2, 26:14, 36:7, 66:11, 104:3, 136:7, 150:20, 159:22
**threshold** [1] - 86:11
**threw** [1] - 51:8
**throat** [1] - 16:14
**throughout** [7] - 83:8, 83:9, 122:12, 127:20, 127:22, 160:22, 176:11
**throw** [3] - 39:22, 39:23, 111:4
**throwing** [6] - 50:2, 51:1, 51:14, 52:2, 52:9, 98:2
**thrown** [1] - 55:11
**ticket** [2] - 117:14, 121:14
**tier** [1] - 117:24
**timestamp** [1] - 171:20
**Timothy** [1] - 2:11

**TIMOTHY** [2] - 1:9, 183:22
**tip** [1] - 122:22
**tired** [1] - 4:15
**titled** [2] - 119:8, 121:2
**today** [10] - 4:23, 7:24, 8:16, 9:10, 15:12, 31:2, 31:7, 103:21, 129:14, 146:11
**together** [7] - 42:20, 110:20, 150:5, 153:13, 169:7, 173:14, 174:14
**Tom** [1] - 9:14
**tomorrow** [2] - 183:14
**tongue** [1] - 118:11
**took** [20] - 5:21, 10:14, 14:16, 61:22, 87:19, 87:24, 105:6, 111:6, 127:9, 128:20, 136:18, 139:13, 145:20, 174:3, 174:14, 175:2, 175:13, 178:23, 181:14, 181:19
**tool** [2] - 102:4, 104:11
**tools** [2] - 135:14, 179:17
**top** [5] - 7:17, 117:24, 162:20, 163:3, 167:4
**topic** [4] - 4:7, 62:20, 126:1, 128:6
**topics** [3] - 4:4, 4:7, 4:13
**total** [2] - 170:21, 171:12
**totally** [1] - 90:19
**touch** [2] - 85:23, 176:15
**touched** [4] - 55:13, 82:23, 83:3, 85:24
**touching** [1] - 170:2
**tough** [1] - 74:18
**tour** [1] - 12:10
**toward** [15] - 108:1, 113:12, 122:13, 123:14, 131:1, 131:20, 132:12, 134:24, 135:10, 137:14, 148:25, 149:1, 167:7, 168:9, 177:14
**towards** [2] - 83:14, 175:25
**toxic** [1] - 181:2
**tradition** [1] - 148:2
**traditionally** [1] - 116:20

**tragically** [1] - 11:22
**training** [2] - 7:18, 12:4
**traitors** [3] - 122:20, 156:21, 168:23
**TRANSCRIPT** [1] - 1:8
**Transcript** [2] - 125:14, 136:8
**transcript** [43] - 2:15, 111:8, 111:17, 111:21, 112:4, 112:7, 114:22, 114:25, 119:21, 125:10, 130:1, 130:3, 130:6, 132:25, 133:9, 134:9, 136:24, 137:9, 138:4, 140:10, 146:19, 146:20, 157:14, 159:2, 166:5, 166:11, 168:23, 170:18, 170:22, 173:3, 174:15, 174:21, 176:3, 177:8, 177:11, 177:16, 177:25, 178:5, 178:18, 178:25, 183:24, 183:25
**transcription** [1] - 2:15
**transcripts** [1] - 169:12
**transfer** [4] - 89:14, 104:9, 120:10, 140:17
**transition** [6] - 89:6, 103:14, 109:10, 134:20, 143:16, 145:8
**traveled** [2] - 101:22, 111:14
**Travis** [2] - 159:17, 177:6
**treason** [21] - 22:6, 22:12, 22:15, 28:22, 30:3, 30:4, 30:8, 30:10, 30:16, 31:11, 31:12, 31:14, 32:16, 33:2, 33:3, 33:19, 108:10, 131:9, 148:23
**treat** [2] - 30:8, 108:6
**treatment** [1] - 130:10
**tremendous** [2] - 11:14, 14:16
**trial** [55] - 5:6, 5:7, 14:22, 28:14, 36:24, 51:6, 55:15, 74:24,

75:1, 75:19, 83:9, 83:13, 87:22, 96:5, 96:6, 96:7, 96:17, 98:12, 103:6, 111:16, 111:24, 119:6, 127:20, 127:22, 132:20, 137:3, 138:4, 140:10, 157:14, 159:5, 160:9, 161:23, 162:23, 165:8, 166:5, 166:11, 168:16, 171:23, 172:5, 174:15, 174:20, 176:3, 176:9, 177:8, 178:23, 178:25, 180:3, 180:15, 180:17, 180:23, 181:4, 181:23, 182:6, 182:17
**trials** [1] - 14:20
**tried** [11] - 7:23, 8:9, 108:9, 124:22, 138:1, 139:25, 148:23, 163:11, 166:25, 174:19, 178:15
**trier** [1] - 98:20
**tries** [1] - 57:21
**trip** [1] - 120:17
**troops** [1] - 117:18
**trouble** [1] - 119:25
**trucks** [1] - 131:25
**true** [14] - 17:14, 31:15, 31:18, 71:15, 71:21, 85:18, 116:8, 119:1, 147:22, 147:24, 158:23, 183:2, 183:23, 183:24
**truly** [1] - 128:3
**Trump** [18] - 101:2, 101:4, 101:6, 101:7, 101:13, 101:18, 102:16, 104:24, 105:10, 111:8, 114:12, 114:16, 116:25, 118:7, 121:9, 139:14, 153:10, 181:9
**Trump's** [6] - 103:8, 104:17, 104:20, 117:18, 131:2, 181:2
**trust** [2] - 25:12, 38:4
**try** [7] - 8:7, 18:8, 19:21, 52:23, 100:20, 145:15, 165:15
**trying** [16] - 6:16, 8:16,

16:5, 32:9, 34:6, 36:9, 44:2, 56:7, 74:6, 87:15, 92:19, 95:17, 107:12, 107:22, 132:15
**Tuesday** [1] - 1:6
**turn** [15] - 32:15, 32:16, 33:1, 33:6, 96:4, 115:16, 120:11, 125:15, 126:3, 128:9, 142:4, 142:14, 142:23, 149:23, 161:19
**turned** [5] - 5:25, 33:4, 56:17, 177:14, 181:16
**turning** [4] - 113:11, 150:25, 151:25, 153:11
**TV** [1] - 137:18
**tweeting** [1] - 117:1
**Twelfth** [2] - 143:12, 144:7
**twice** [4] - 101:22, 119:22, 134:12, 151:9
**Twisted** [1] - 122:5
**Twitter** [1] - 102:17
**two** [45] - 4:17, 5:2, 16:21, 19:1, 33:12, 34:22, 36:3, 37:1, 38:1, 42:20, 63:11, 66:13, 67:10, 70:1, 73:24, 77:23, 84:18, 84:24, 85:5, 86:13, 99:16, 100:13, 102:18, 109:15, 110:24, 117:4, 124:18, 133:13, 134:7, 138:3, 142:3, 150:13, 150:19, 151:19, 159:20, 164:7, 168:18, 169:3, 169:7, 169:10, 171:1, 171:6, 171:16, 172:11, 182:1
**two-by-four** [1] - 172:11
**two-way** [1] - 34:22
**type** [7] - 38:10, 38:11, 55:23, 56:11, 57:25, 58:2, 143:3
**tyranny** [1] - 137:24

## U

**U.S** [8] - 1:13, 2:12, 7:14, 37:24, 39:6, 55:21, 148:19,

148:22
**ultimate** [7] - 25:24, 26:14, 26:21, 27:19, 93:1, 114:5, 143:14
**ultimately** [8] - 36:21, 68:8, 88:3, 128:12, 135:7, 145:4, 146:7, 154:3
**umbrella** [1] - 57:20
**unambiguous** [1] - 77:21
**unambiguously** [3] - 77:20, 78:5, 78:18
**unanimously** [1] - 84:11
**uncensored** [1] - 105:18
**unconscious** [2] - 9:20, 110:6
**unconsciousness** [1] - 13:2
**unconstitutional** [2] - 108:8, 179:18
**under** [53] - 15:5, 25:13, 28:11, 30:10, 36:17, 37:22, 41:2, 46:20, 48:23, 49:7, 49:15, 50:14, 53:21, 54:7, 54:13, 59:12, 60:5, 60:6, 64:9, 64:10, 64:16, 64:23, 66:7, 67:10, 69:16, 70:2, 76:25, 78:16, 80:19, 86:25, 87:5, 93:23, 95:7, 96:9, 96:10, 96:12, 96:17, 99:14, 100:10, 149:24, 149:25, 150:4, 151:14, 152:3, 157:18, 158:4, 158:17, 161:9, 167:23, 170:13, 173:10, 176:12, 181:19
**undergoing** [1] - 16:21
**underlying** [4] - 35:12, 35:20, 36:7
**understood** [2] - 8:8, 95:15
**undertaking** [3] - 40:19, 54:8, 143:13
**undisclosed** [1] - 126:14
**unduly** [1] - 182:2
**unexpected** [1] - 139:21
**unfair** [1] - 87:2
**unfold** [2] - 9:21, 137:17

**unfolded** [3] - 120:5, 120:12, 128:10
**unfolding** [1] - 116:15
**unfortunately** [1] - 11:17
**unhappy** [1] - 8:16
**uniform** [1] - 9:1
**uniformity** [1] - 54:15
**unifying** [1] - 106:10
**unique** [2] - 55:22, 71:21
**unit** [2] - 13:21, 13:24
**UNITED** [3] - 1:1, 1:2, 1:9
**United** [61] - 1:11, 3:3, 5:1, 7:3, 9:15, 10:25, 11:1, 11:25, 12:15, 15:20, 25:13, 25:15, 29:1, 29:3, 29:18, 30:5, 30:14, 33:25, 34:3, 34:8, 55:1, 62:18, 96:2, 96:20, 96:22, 96:24, 97:1, 97:2, 97:4, 97:6, 97:8, 97:11, 98:21, 98:23, 99:4, 99:14, 99:17, 99:19, 100:2, 100:10, 142:12, 145:16, 148:21, 149:1, 149:24, 151:14, 154:8, 163:21, 163:22, 165:17, 168:1, 168:4, 170:13, 172:1, 173:17, 173:19, 174:5, 180:20, 184:3
**unknown** [1] - 108:23
**unlawful** [26] - 99:23, 99:24, 100:15, 100:20, 103:14, 115:19, 115:21, 120:15, 140:14, 141:9, 141:23, 149:12, 150:15, 151:18, 155:1, 155:13, 155:14, 155:21, 156:2, 156:13, 157:7, 157:8, 157:21, 161:15, 165:23, 167:13
**unlawfully** [1] - 122:15
**unless** [4] - 23:16, 49:11, 76:4, 124:9
**unlike** [1] - 93:24
**unrelated** [1] - 128:8
**unrelenting** [1] - 13:5
**unruly** [1] - 118:12

**unsubstantiated** [1] - 180:5
**untethered** [1] - 179:12
**untimely** [1] - 173:9
**unusual** [1] - 29:25
**unwarranted** [2] - 81:1, 91:19
**unwavering** [1] - 14:3
**up** [67] - 6:3, 9:5, 10:11, 12:17, 14:3, 14:8, 14:17, 16:15, 16:19, 22:7, 27:23, 30:7, 38:6, 39:6, 39:7, 45:14, 56:6, 60:9, 61:10, 64:22, 66:8, 72:1, 84:24, 85:11, 88:6, 91:3, 92:9, 98:11, 104:25, 105:11, 108:17, 110:7, 112:1, 114:16, 116:11, 116:12, 117:12, 118:6, 123:7, 123:24, 133:1, 134:5, 134:7, 134:8, 134:10, 135:18, 135:19, 137:14, 139:12, 139:21, 140:4, 142:7, 147:5, 147:21, 153:17, 158:13, 159:3, 162:13, 165:22, 166:7, 166:16, 170:4, 170:17, 171:25, 175:1, 181:19
**upheld** [1] - 92:22
**upper** [1] - 134:5
**upset** [2] - 8:8, 149:20
**upward** [12] - 63:19, 64:23, 64:24, 64:25, 65:8, 67:9, 69:2, 70:3, 84:22, 91:6, 93:13, 93:20
**user** [1] - 122:5
**uses** [1] - 119:2
**utilize** [1] - 84:20

## V

**vacate** [1] - 180:14
**vague** [1] - 182:20
**valiant** [1] - 11:11
**valiantly** [1] - 13:10
**valid** [2] - 93:3
**valuation** [1] - 172:13
**value** [1] - 168:6
**valued** [2] - 97:23, 172:8

**variety** [2] - 81:21, 113:21
**various** [1] - 91:3
**vast** [2] - 57:21, 71:19
**vastly** [1] - 87:17
**vehicle** [2] - 53:5, 115:21
**venturing** [1] - 160:20
**verdict** [19] - 37:8, 46:13, 98:16, 98:18, 98:21, 99:10, 103:20, 149:20, 151:3, 152:1, 161:6, 163:23, 164:8, 165:11, 165:13, 167:21, 171:23, 174:7, 176:6
**verdicts** [5] - 61:19, 98:10, 145:12, 145:16, 165:15
**versus** [3] - 87:11, 94:8, 94:11
**VI** [4] - 67:13, 88:4, 88:7, 93:24
**via** [1] - 13:17
**vibrate** [1] - 6:15
**vice** [2] - 12:1, 12:5
**Vice** [1] - 11:1
**victim** [5] - 3:24, 5:4, 13:2, 17:21, 49:23
**victimized** [1] - 15:10
**victims** [4] - 4:22, 5:2, 13:2, 15:8
**victorious** [1] - 110:17
**victory** [1] - 163:10
**video** [21] - 12:9, 14:22, 102:24, 107:10, 110:6, 110:8, 111:24, 117:16, 133:1, 133:20, 138:16, 145:19, 163:8, 169:14, 170:1, 170:8, 172:4, 172:22, 174:9, 174:16
**videos** [7] - 12:15, 13:10, 102:2, 110:4, 110:10, 168:25, 169:5
**view** [11] - 42:2, 63:21, 109:5, 123:12, 139:12, 140:19, 145:24, 157:9, 157:12, 166:22, 166:23
**viewed** [9] - 103:18, 109:8, 112:9, 114:20, 115:3, 122:19, 141:18,

177:7, 178:19
**viewing** [2] - 133:12, 156:23
**views** [1] - 108:13
**vigorously** [1] - 132:19
**vile** [1] - 13:19
**violated** [3] - 26:14, 29:4, 182:14
**violation** [14] - 96:20, 96:22, 96:24, 97:2, 97:4, 97:6, 97:8, 97:11, 151:4, 163:22, 167:25, 172:1, 173:17, 173:19
**violence** [31] - 13:1, 17:12, 21:19, 38:13, 71:10, 102:1, 102:3, 103:16, 106:14, 109:9, 109:24, 110:9, 110:13, 111:22, 113:15, 114:4, 115:10, 115:12, 121:21, 126:18, 134:24, 139:15, 139:16, 139:21, 141:3, 174:3, 177:22, 177:23, 177:25, 183:4
**violent** [13] - 10:6, 16:5, 16:23, 58:13, 78:25, 83:14, 89:23, 102:7, 104:7, 110:3, 113:24, 126:23, 135:19
**violently** [3] - 9:18, 16:7, 122:6
**virtually** [1] - 89:11
**virtue** [1] - 60:7
**vis-à-vis** [1] - 149:11
**vision** [1] - 16:16
**visited** [1] - 166:2
**vitriolic** [1] - 58:13
**vivid** [1] - 16:16
**voice** [3] - 124:5, 124:12, 124:13
**voicemail** [1] - 152:24
**voir** [1] - 181:25
**vote** [4] - 124:8, 134:21, 143:15, 153:2
**votes** [1] - 152:20

**W**

**wading** [1] - 47:21
**waging** [10] - 22:8, 28:25, 29:3, 29:18,

30:5, 30:6, 30:13, 33:25, 34:3, 34:8
**Wahl** [1] - 98:23
**waist** [1] - 133:10
**waist-high** [1] - 133:10
**wait** [5] - 4:23, 69:13, 79:8, 86:19, 163:1
**waited** [1] - 131:25
**waived** [3] - 76:13, 77:1, 77:10
**waiver** [1] - 78:12
**wake** [1] - 38:1
**waking** [1] - 16:19
**walk** [7] - 14:17, 63:24, 103:7, 138:23, 138:24, 165:8, 170:23
**walked** [4] - 85:10, 108:8, 131:3, 177:14
**Walker's** [1] - 157:9
**walking** [2] - 14:6, 160:1
**walkway** [1] - 133:2
**wanna** [2] - 121:4, 124:14
**wants** [6] - 17:24, 18:15, 18:17, 19:23, 62:23, 69:21
**War** [3] - 37:25, 38:1, 89:13
**war** [24] - 22:9, 28:25, 29:3, 29:18, 30:5, 30:6, 30:13, 33:25, 34:3, 34:8, 106:23, 107:11, 107:15, 108:11, 110:25, 111:1, 111:2, 111:16, 115:4, 115:10, 115:13, 127:4, 135:5, 141:5
**warning** [3] - 106:23, 131:9, 139:4
**warrant** [2] - 148:3, 171:23
**warranted** [3] - 65:8, 165:1, 180:18
**warranting** [1] - 181:4
**warred** [1] - 110:25
**Washington** [11] - 1:5, 1:14, 2:13, 101:23, 110:9, 117:1, 119:10, 129:1, 130:3, 135:18, 184:4
**waste** [2] - 30:23, 139:10
**watch** [3] - 17:16, 106:19, 153:10
**watched** [3] - 13:22, 137:17, 172:4

**watching** [2] - 6:19, 9:21
**water** [9] - 10:8, 51:9, 51:14, 51:16, 52:9, 52:10, 55:10, 61:12, 98:2
**wave** [1] - 121:11
**waved** [1] - 133:15
**ways** [4] - 33:12, 146:2, 156:20, 158:10
**weapon** [3] - 42:24, 48:25, 53:11
**weaponize** [1] - 103:14
**weapons** [3] - 10:9, 71:8, 71:9
**wear** [1] - 120:22
**weary** [1] - 14:19
**weeds** [1] - 27:18
**week** [3] - 4:12, 18:1, 183:15
**weeks** [2] - 102:16, 182:1
**weigh** [2] - 99:2, 160:13
**weighed** [2] - 164:25
**weight** [2] - 16:10, 159:3
**well-respected** [1] - 13:14
**West** [1] - 2:3
**west** [16] - 6:2, 6:22, 9:24, 10:2, 10:11, 10:14, 10:18, 11:20, 15:24, 61:23, 133:18, 133:25, 134:5, 135:9, 156:12, 170:18
**whatnot** [1] - 8:10
**whatsoever** [1] - 182:14
**wheeler** [1] - 180:20
**whereas** [1] - 38:15
**whichever** [1] - 4:6
**whipped** [1] - 110:17
**whispers** [1] - 118:19
**white** [1] - 101:4
**whole** [6] - 56:1, 58:3, 158:17, 171:12, 179:3, 179:13
**whoop** [1] - 109:23
**whoop-ass** [1] - 109:23
**wild** [2] - 102:18, 117:2
**willfully** [2] - 40:17, 168:3
**William** [1] - 140:6
**Williams** [1] - 99:4

**willing** [3] - 80:23, 118:6, 122:18
**willingness** [3] - 103:15, 108:2, 126:19
**window** [13] - 97:25, 136:3, 144:15, 162:14, 167:9, 172:1, 172:3, 172:7, 172:9, 172:17, 172:21, 172:25, 173:5
**windows** [1] - 13:11
**wing** [4] - 10:21, 162:14, 163:5, 167:7
**Winter** [5] - 119:15, 119:21, 120:3, 120:7, 138:11
**Wisconsin** [2] - 148:16, 149:14
**wish** [1] - 110:11
**wishing** [1] - 16:1
**withheld** [2] - 126:5, 126:6
**witness** [4] - 70:24, 158:7, 159:22, 160:24
**witnessed** [3] - 10:6, 14:12, 156:22
**witnesses** [8] - 5:6, 70:23, 145:19, 158:20, 176:19, 177:2, 177:5, 177:20
**Wolkind** [5] - 118:1, 123:13, 129:12, 129:13, 137:12
**woman** [2] - 110:5, 119:23
**women** [1] - 112:21
**won** [1] - 107:2
**wondering** [1] - 121:8
**word** [4] - 56:3, 88:21, 107:6, 140:1
**words** [11] - 14:24, 23:6, 42:21, 42:22, 43:5, 44:3, 44:4, 59:25, 60:3, 72:3, 109:15
**wore** [1] - 130:5
**works** [1] - 69:16
**world** [2] - 55:1, 123:7
**worry** [1] - 105:20
**worth** [1] - 93:9
**wrestle** [1] - 32:1
**writing** [2] - 5:4, 67:22
**written** [4] - 37:25, 54:12, 63:8, 87:16
**wrongdoing** [2] - 155:16, 157:4
**wrongfully** [1] -

161:24
**wrongly** [1] - 154:13
**wrote** [2] - 83:2, 129:13

## Y

**yanked** [1] - 16:22
**year** [3] - 5:12, 101:18, 107:6
**Year's** [2] - 107:5, 107:7
**years** [9] - 5:12, 8:2, 15:22, 16:21, 38:6, 39:6, 39:8, 58:19, 178:5
**years'** [1] - 56:6
**yell** [2] - 131:14, 131:16
**yelled** [5] - 131:12, 132:20, 141:17, 162:21, 167:5
**yelling** [1] - 131:9
**yellow** [2] - 130:17
**yesterday** [1] - 18:3
**York** [3] - 1:17, 2:7, 85:12
**young** [1] - 16:3
**yup** [1] - 124:20

## Z

**Zach** [1] - 122:6
**Zachary** [2] - 3:4, 45:12
**Zamboni** [1] - 123:25
**zeroing** [1] - 74:7
**zoom** [2] - 126:7, 141:13
**Zoom** [1] - 126:24